UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ROCKWELL AUTOMATION, INC.,       :
                              :
              Plaintiff,      :
      v.                    :     C.A.No.:
                              :
PARCORP S.R.L. d/b/a WI AUTOMATION,   :
                              :
             Defendant.     :

## COMPLAINT

Plaintiff Rockwell Automation, Inc. ("Rockwell"), by its attorneys and for its Complaint against Defendant Parcorp s.r.l. d/b/a WI Automation ("WI Automation"), alleges and states as follows:

## NATURE OF THE ACTION

1.    This action is based on WI Automation's misleading advertising and sale of infringing Rockwell goods.

2.    WI Automation engaged in the unlawful sale and distribution within the United States of unauthorized gray market Rockwell products, which are materially different from those sold by Rockwell and its authorized distributors in the United States ("Genuine Rockwell Products"). These unauthorized gray market products bear registered trademarks owned by Rockwell, such as Allen-Bradley®, A-B®, Rockwell Automation®, and ControlLogix® (defined *infra* as "Asserted Trademarks"), yet differ from Genuine Rockwell Products in many respects as described in this Complaint.

3.    WI Automation's offers to sell and its sales of materially different Rockwell products infringe Rockwell's Asserted Trademarks; and, as described herein, WI Automation's

violations have caused and continue to cause confusion, mistake, and/or deception to the public and constitute willful and deliberate trademark infringement.

4.      Therefore, Rockwell brings this lawsuit to remedy the substantial and irreparable harm caused by WI Automation's offers for sale, sale, and marketing of infringing gray market Rockwell products. Accordingly, Rockwell seeks injunctive relief. In addition, Rockwell is entitled to damages, attorneys' fees and costs on account of WI Automation's misconduct.

## THE PARTIES, JURISDICTION AND VENUE

5.      Plaintiff Rockwell Automation, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 1201 South Second Street, Milwaukee, Wisconsin 53204.

6.      Defendant Parcorp s.r.l. d/b/a WI Automation is a corporation organized and existing under the laws of Italy, having its principal place of business at 9 Via Madame De Stael, 80070 Bacoli (NA), Italy.

7.      This is an action arising under Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)); Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); 6 Del. C. § 2532 *et seq.;* and Delaware common law.

8.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.

9.      This Court also has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship among the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

10.      WI Automation maintains an interactive website accessible in this forum which enables residents of this forum to interact with WI Automation, facilitate business with WI

Automation, to exchange business information with WI Automation, form contracts with WI Automation, and through which WI Automation offers products, such as the unauthorized Rockwell products at issue in this action, for sale in this forum that infringe Rockwell's Asserted Trademarks.

11.     On information and belief, WI Automation, through its interactive website, has offered for sale and sold one or more of the unauthorized Rockwell Products at issue in this forum that infringes Rockwell's Asserted Trademarks.

12.     On information and belief, WI Automation does business in this forum and by its acts has caused and continues to cause Rockwell injury in this forum, including by having committed and continuing to commit acts of trademark infringement in this forum as alleged in this Complaint.

13.     WI Automation's website lists its USA address as "County Rte 561, Voorhees Township New Jersey, USA."

14.     Upon information and belief, WI Automation also conducts business at 6 Knottingham Dr., Voorhees Township, NJ 08043.

15.     This Court has personal jurisdiction over WI Automation at least because it has deliberately engaged in significant and continuous business activities within Delaware. Accordingly, WI Automation has established minimum contacts with the District of Delaware.

16.     In addition, or in the alternative, personal jurisdiction exists over WI Automation under Fed. R. Civ. P. 4(k)(2).

17.     Venue is proper in this district under 28 U.S.C. § 1391.

## THE FACTUAL STORY UNDERLYING THIS LAWSUIT

**I.      Rockwell's Operations and Reputation**

18.      Rockwell is a 100-year-old company headquartered in Milwaukee, Wisconsin. Rockwell is the world's largest company dedicated to industrial automation and information. It employs over 22,000 people worldwide, with approximately 8,500 employed in the United States, and its annual spending on research and development of new and innovative products tops $250 million annually.

19.      Rockwell's core business is built around its industrial automation products, which include the brains (programmable controllers, or "PLCs"), muscle (motors and drives) and related devices (input/output devices, safety devices) that run a variety of industrial and commercial operations ranging from assembly lines (*e.g.* automotive lines, food processing plants and pharmaceutical plants), to critical infrastructure (*e.g.* oil refineries), to automation involving safety of children (*e.g.*, amusement park rides).

20.      While Rockwell's customers and the industries they serve are diverse, they have one thing in common: breakdowns are extremely costly and can be very dangerous, requiring that Rockwell's products run at very high reliability and safety levels 24/7 year after year.

21.      Because the failure of Rockwell's products can have costly – even catastrophic – results, Rockwell does not sell to a mass consumer market. It is also not just selling "a box" or a "widget." Instead, Rockwell sells industrial control products that include a quality assurance safety net that ensures the products work safely and reliably during their lifetime.

22.      Genuine Rockwell Products are sold only by Rockwell and its Authorized Distributors ("ADs") and come with a variety of services including Rockwell's manufacturer's warranty and Rockwell's quality control assurances and safety and security notices, known as product safety advisories and product notices.  And Rockwell ensures that highly trained domain

4

experts work at each of these ADs – there are more than 1,000 such experts in North America alone. Rockwell also engages in constant worldwide monitoring through its ADs of any problems with its products that arise. Rockwell assembles this information and uses it to evaluate whether to issue software and firmware upgrades, product safety notices, and even recalls for its customers. These costly actions and investments are designed to anticipate and correct problems before they arise and cause Rockwell users harm.

23.     In fact, Rockwell spells out in its very sales contract that it sells more than simply a widget in a box:



(Highlighting added)

24.     In simple terms, Rockwell invests time, energy, and money to deliver the highest quality and reliability to its customers. And Rockwell's customers, in turn, rely on the durability and quality that is associated with the Rockwell name.

25.    As a result, the Rockwell name is more than just letters on a box. Rockwell's unique "Allen-Bradley" trademark brand has represented this high-quality assurance for more than 100 years.



26.    A Rockwell customer does not have to be completely familiar with every aspect of that safety net, but instead can reasonably rely upon the Allen-Bradley brand's acquired reputation for high quality, reliability, and support provided by this safety net.

27.    Rockwell has protected that valuable information with a series of trademarks, including numerous trademarks on the Principal Register of the United States Patent and Trademark Office ("USPTO"), all of which are valid, subsisting and incontestable pursuant to 15 U.S.C. § 1065 (all collectively, the "Asserted Trademarks").

28.    All of the efforts that Rockwell makes to provide for innovative solutions, the safety of its customers, and the reputation of its brand have not gone unnoticed: Rockwell has been named one of Ethisphere's Most Ethical Companies eight times (including for the past five consecutive years), is recognized for its "citizenship, integrity and transparency," has been named to the Dow Jones Sustainability North American Index six times, has been listed on the FTSE4 Good Index of Companies for more than a decade, and was ranked #7 on Newsweek Magazine's 2016 list of Top Green Companies in the United States.

II.    **Rockwell's Distribution Model**

29.    In order to provide the quality assurance and safety net of services, Rockwell must closely control the chain of custody and handling of its goods. Rockwell does that by selling its products in only two different ways: directly and through a network of ADs.

30.     Rockwell's practice of selling only through authorized distributors is deliberately designed to ensure that Rockwell can maintain its assurance over quality control. Rockwell also tracks point-of-sale data through its authorized distributors that allow it to understand where its products are being used and any issues that might arise.

31.     Rockwell's relationships with its authorized distributors go back decades in many cases, and the close relationships are maintained and formalized by a web of mutual obligations. Rockwell gives its distributors the right to sell Rockwell's genuine products, which bear the Asserted Trademarks, within a given territory, embeds engineers and product specialists with its distributors, offers price support, and assists them in the marketing of and support for the genuine Rockwell products they sell. Rockwell also assumes responsibility for warrantying its products sold by its authorized distributors to end users and is likewise responsible for repairs or replacements. In return, the authorized distributors agree to several obligations in the sale, shipping, handling, installation, support for, and marketing of Rockwell products.

32.     One of these obligations is that authorized distributors will sell Rockwell products only to end users or to certain value-added resellers, such as original equipment manufacturers ("OEMs") and system integrators.

33.     The bulk of legitimate end users of Rockwell products purchase these products directly from authorized Rockwell distributors for their own use. However, some end users do not buy Rockwell products directly from authorized distributors due to the complexity of their particular industrial applications. Instead, the end users buy from system integrators and OEMs who purchase Rockwell products from authorized distributors for the "value-added" purpose of assembling them into more complex industrial applications for resale to end users or installation at an end users' facilities. A simple example would be a system integrator that designs a unique

assembly line setup using Rockwell controllers, safety products, and sensory input systems and installs that setup in an end user's factory. The term "value-added" is critical: these third parties are not permitted to buy Rockwell products from an authorized distributor for mere resale on the gray market. To the contrary, they are expected and required to use the Rockwell products only for value-added purposes—such as for direct integration into larger machines.

34.     The obligation against sale to non-value-added resellers is embedded within every contract between Rockwell and its authorized distributors, and is explained in great detail in Rockwell's Unauthorized Third Party Resellers policy, which is incorporated into each authorized distributor contract as well. Likewise, the resale rights of Rockwell's Recognized System Integrators and Recognized Solution Partners is tightly circumscribed, limiting resale only as part of a solution offered to customers, and proscribing resale on a stand-alone basis.

35.     Rockwell's distribution model also allows it to price its products appropriately and competitively for different regions. For instance, Rockwell may sell its products to its distributors in Asia at a lower price than it sells products to distributors in the United States to account for regional differences in pricing and local labor. In this manner, Rockwell can still provide its high quality products and safety assurance net globally while staying cost-competitive in various regional markets.

### III.     The Asserted Trademarks

36.     Rockwell is the registered owner of the following trademarks on the Principal Register of the United States Patent and Trademark Office ("USPTO"), all of which are valid, subsisting and incontestable pursuant to 15 U.S.C. § 1065 (all collectively, "Asserted Trademarks").

| Trademark | Reg. No. | Date | Attached as |
|---|---|---|---|
| A-B (and Design) | 1172995 | 10/13/1981 | Exhibit 1 |
| A-B (and Design) | 696401 | 04/19/1960 | Exhibit 2 |
| A-B (and Design) | 693780 | 03/01/1960 | Exhibit 3 |
| ALLEN-BRADLEY | 1172994 | 10/13/1981 | Exhibit 4 |
| ALLEN-BRADLEY | 712800 | 03/21/1961 | Exhibit 5 |
| ALLEN-BRADLEY | 712836 | 03/21/1961 | Exhibit 6 |
| ROCKWELL AUTOMATION | 2510226 | 11/20/2001 | Exhibit 7 |
| ROCKWELL AUTOMATION | 2671196 | 01/07/2003 | Exhibit 8 |
| ROCKWELL AUTOMATION | 2701786 | 04/01/2003 | Exhibit 9 |
| CONTROLLOGIX | 2412742 | 12/12/2000 | Exhibit 10 |

37.     Rockwell uses the Asserted Trademarks to let end users know the marked products have been manufactured to the highest-quality standards possible and are supported with the Rockwell high-quality assurance.

38.     For example, Rockwell's unique "Allen-Bradley" trademark brand has represented this high-quality assurance for over 100 years.



39.     The "A-B" octagon mark is so engrained in the company's core that the founders of Allen Bradley, brothers Lynde and Harry Bradley, were buried in an octagon-shaped plot at Forest Home Cemetery in Milwaukee, WI. In 1964, a major addition to Rockwell's headquarters complex included the construction of what was then the world's largest four-sided clock (now the largest in the Western hemisphere) whose octagonal clock faces continue to look over downtown Milwaukee, Wisconsin.



The Allen-Bradley four-sided clock was lit for the first time before construction work was completed (left); as it stands today (right).

40.     A Rockwell customer does not have to be completely familiar with every aspect of that safety net, but instead can reasonably rely upon the Allen-Bradley® brand's acquired reputation for high quality, reliability, and support provided by this safety net.

41.     Rockwell's Asserted Trademarks are considered extremely valuable—so much so that their value is reported in Rockwell's 10K filings. In a recent annual report, Rockwell's Trademarks were valued at over $70 million, with the Allen-Bradley® / A-B® trademark alone valued at well over $40 million.

42.     In addition to registering the Asserted Trademarks, Rockwell has taken reasonable efforts to protect its brands against improper resale. As explained above, Rockwell imposes contractual obligations on its authorized distributors to avoid gray-market resales. It does so because such resale can erode Rockwell's brand for quality assurance and its safety net to maintain high reliability, 24/7, for years. Additionally, Rockwell methodically sends letters from time to time to system integrators warning them they may only use Rockwell products in value-add activities and, stating in no uncertain terms, that they may not resell Rockwell products.

43.     Given the importance of controlling the improper resale of its products, Rockwell takes reasonable steps to investigate when it learns of violations of this policy in order to protect its brand.

## IV.     The Products at Issue

44.     This action involves a large scope of products that comprise Rockwell's Allen-Bradley® industrial automation systems. Rockwell's automation systems involve a massive amount of components, ranging from programmable controllers, to human machine interfaces ("HMIs"), motors, drives, motor control systems, networking equipment, input/output modules, power supplies, signaling devices, etc. But while the products vary in kind, they all have in common the Asserted Allen-Bradley®/A-B®/Rockwell Automation® Trademarks.

45.     An exemplary configuration of a Rockwell® Allen-Bradley® industrial automation system is shown in the figure below:



46.     In this exemplary system, many of the key components of a Rockwell industrial automation system are shown, which are described in the following paragraphs.

**Control Systems and Controllers.**

47.     At the heart of many of Rockwell's control systems are programmable controllers, which serve as the "brains" of the system. Rockwell offers many lines of Allen-Bradley® programmable controllers, including its flagship ControlLogix® and CompactLogix® lines, plus MicroLogix, SoftLogix, GuardPLC, SmartGuard, Micro800 and SLC 500 to name a few. Rockwell offers control systems for nearly any size application, ranging from large, plant-wide process control down to micro or nano sized systems for individual machine or apparatus control. Many of Rockwell's larger scale control system platforms are modular, with different

functionalities being provided by individual modules which allow the customer to select each module comprising the system to meet the custom-tailored needs of the application.



*Allen-Bradley® ControlLogix® Controllers and Modules*

48.     While programmable controllers are the brains of Rockwell's control systems, the "nervous system" is provided by input and output ("I/O") components, such as the Allen-Bradley® 1715 I/O, FLEX I/O and Dynamix units in the diagram above. In larger scale control systems, discrete I/O modules connected to control modules via a common backplane in a controller chassis can provide this functionality. In smaller scale control systems, such as the MicroLogix and Micro800 platforms, I/O capabilities may be embedded within the controllers themselves.

**Visualization Hardware.**

49.     To visualize, monitor and control the operation of manufacturing and industrial processes, Rockwell offers a wide array of visualization hardware and software. A key element of Rockwell's Allen-Bradley® visualization products are HMIs. In the example above, a PanelView Plus HMI is used. Rockwell's Allen-Bradley® portfolio of HMIs provides a consistent look and feel for electronic operator interface terminals, distributed client/server HMI, and information

software. Programming tools and advanced software applications include remote access and data analysis to accelerate development and improve efficiency. Rockwell's HMI products include its rugged PanelView graphic terminals, industrial computers (e.g., Rockwell's VersaView line), other industrial monitors, as well as a full suite of visualization and operation software.

**Motors and Motor Control Systems.**

50.     An important element of many industrial and manufacturing processes is motion – whether it be the simple conveyance of products along an assembly line, exerting precise control of articulated robots, agitating chemicals in a process vessel – the list is infinite. Rockwell offers motion and motor control products to meet every need. Rockwell's Allen-Bradley® servo drives (e.g., Kinetix and Ultra 3000 lines) and the motors they power extend from compact single-axis solutions to high-performance multi-axis systems for rotational and linear motion and positioning applications. To control low and medium voltage AC and DC motors in a wide range of power ratings, Rockwell offers many different drive options, including Rockwell's Allen-Bradley® PowerFlex line of AC and DC drives. Rockwell also offers comprehensive motor control centers (e.g., Rockwell's Allen-Bradley® CENTERLINE line) for low and medium voltage applications.

**Safety Devices.**

51.     A common thread throughout all of Rockwell's product offerings is an emphasis on safety and reliability. Some applications, of course, demand additional safety features. For example, many industrial and manufacturing processes occur alongside or with the assistance of human operators. To ensure their safety, Rockwell offers a complete range of Allen-Bradley® safety solutions and products tailored to those needs. Many of Rockwell's product lines include variants of standard products that offer additional safety features. For example, Rockwell offers Allen-Bradley® drives that include a Safe Torque-Off feature that limits the torque applied by a

14

motor. Other products, such as the Allen-Bradley® CENTERLINE motor control centers offer an ArcShield option that provides electrical arc-resistance for operation in potentially hazardous environments. In addition to variants of standard products with additional safety features, Rockwell also offers safety products such as Allen-Bradley® SmartGuard controllers and GuardPLC safety control systems, as well as safety relays and switches and presence sensing devices such as light curtains, laser scanners, hand detectors, safety mats and safety edge profiles. Rockwell also offers its Allen-Bradley® Guardmaster line of connection systems that provide added reliability in tying machine safety components together.



**An Allen-Bradley® Guardshield safety light shield**

**Networking Equipment**.

52.     Rockwell's industrial networking solutions provide the essential communication capabilities that allow control system components to talk to one another within a system, allow system-to-system communication, and also allow plant and process monitoring components to tap into control systems to monitor what is going on at any given moment. Rockwell's networking solutions enable communication according to many different industrial communications protocols, including ControlNet, DeviceNet and Ethernet/IP to name a few. As with Rockwell's I/O products,

Rockwell offers modular and embedded networking capabilities for its control systems. In addition, Rockwell offers many different types of networking hardware outside of the control system envelope that establish and secure industrial communication networks. For example, Rockwell's Allen-Bradley® Stratix line of network switches, routers and security appliances provide the industrial network infrastructure essential for customers' increasingly connected enterprises.



**Allen-Bradley® Stratix 5700 network switches**

**Power Supplies**.

53.     Rockwell provides a wide variety of power supply solutions. From switched mode and industrial uninterruptible power supplies to transformers, every product is designed for reliability and dependable operation. Rockwell's Allen-Bradley® power supply range includes its on-machine power supplies (such as the ArmorPower On-Machine Power Supply line), voltage sag protectors (such as the DySC line), circuit control transformers, switched mode power supplies and uninterruptible power supplies.



**An Allen-Bradley® ArmorPower On-Machine Power Supply**

**Additional Components**.

54.     The above outline the larger components of Rockwell's automation systems. But there are many more as Rockwell offers a complete range of Allen-Bradley® control components that match the quality and reliability that Rockwell is known for, which includes push buttons, signaling devices, relays, timers, contactors, switches, sensors, wiring and cordsets to name a few.

## V.     WI Automation

55.     In contrast to Rockwell, the defendant WI Automation does not develop or make any products. Instead, WI Automation operates as a middleman. To be clear, WI Automation has ***never*** sold and has ***never*** been authorized to sell new, Genuine Rockwell Products.

56.     But that fact has not stopped WI Automation from profiteering off of Rockwell's hard-earned name. WI Automation saw an opportunity to make large profits by purchasing gray market, used, and counterfeit goods, and selling them labeled as "new" or some other deceptive and untrue label that has evolved over time but has always been designed to fool customers into believing that they were purchasing products that were from Rockwell's closely controlled chain of custody, backed by Rockwell's support and warranty, and qualified for the latest software updates and support. But that was simply not the case.

17



57.     Without authorization from Rockwell, WI Automation's website has offered for sale thousands of industrial automation controllers and other industrial automation components and parts bearing Plaintiff's Trademarks (referred to herein as "Unauthorized Rockwell Products").



58.     WI Automation has falsely advertises on its website and through other media that the Unauthorized Rockwell Products that it offered for sale and sold were "new" or "new factory sealed" or "original product" and that "[t]he warranty for new sealed products is 12 months from the delivery date" and "all products are covered by 12 months warranty" (implying coverage by the Rockwell warranty), despite knowing that the products were not new and did not come with the Rockwell warranty.   This is all entirely untrue. In reality, on information and belief, WI Automation is shipping customers used and counterfeit products and products obtained from unverified sources to fulfill orders for "new" Rockwell products. None of the products that WI Automation sold or sells to its customers were covered by Rockwell's warranty or entitled to Rockwell support.

59.     Unfortunately, to date, on information and belief WI Automation has succeeded in selling into the marketplace many of these unlawful "new" Rockwell products.

60.     On information and belief, WI Automation continues to offer for sale and sell Unauthorized Rockwell Products.

**VI.     The Unauthorized Rockwell Products.**

61.     The Unauthorized Rockwell Products sold by WI Automation are all materially different from Genuine Rockwell Products sold by Rockwell and its authorized distributors.

62.     Rockwell spent decades investing in the goodwill ascribed to its products, which are represented and embodied by the Asserted Trademarks.

63.     WI Automation is not authorized to sell Rockwell products, and has no interest in maintaining the crucial goodwill and support that the Rockwell trademarks bring—other than to freeride on the marks' value to turn a profit. Yet, WI Automation markets, advertises, and sells Unauthorized Rockwell Products to end users.

64.     While many of these products are advertised as new and/or factory sealed, there are a number of material differences between Genuine Rockwell Products sold by Rockwell and its authorized distributors and the Unauthorized Rockwell Products sold by WI Automation. Exemplary material differences are set forth below:

**Lack of a Manufacturer's Warranty.**

65.     Rockwell offers a warranty ("Rockwell Warranty") to customers who purchase Genuine Rockwell Products directly from either Rockwell or from one of Rockwell's authorized distributors. The Rockwell Warranty applies to only those specific customers. As part of a Rockwell Warranty, authorized personnel, authorized components, authorized firmware, and authorized testing and other equipment is available in servicing the Genuine Rockwell Products. Third parties such as WI Automation are unable to offer an equivalent warranty, since they lack the proprietary information and equipment that Rockwell, as the creator of these products, has access to and in fact uses to perform its warranty services.

66.     The Rockwell Warranty specifically provides that the warranty applies only to customers who purchase their product either directly from Rockwell or an authorized Rockwell distributor. Accordingly, purchasers who do not purchase products directly from Rockwell or directly from a Rockwell authorized distributor are not entitled to a Rockwell Warranty for service or repair of products.

67.     Therefore, buyers of Unauthorized Rockwell Products sold by WI Automation are not entitled to receive a Rockwell Warranty. In contrast, buyers of Genuine Rockwell Products do receive a Rockwell Warranty, as described more fully above.

68.     Consumers consider this difference between Genuine Rockwell Products and Unauthorized Rockwell Products to be important to a decision about whether to purchase the

20

products yet are unaware the Unauthorized Rockwell Products lack this important feature. This harms the consumer.

69.     This difference constitutes a material difference between Unauthorized Rockwell Products and Genuine Rockwell Products, it erodes the goodwill represented by Rockwell's Asserted Trademarks, and it renders the Unauthorized Rockwell Products infringing products under U.S. trademark laws.

**Lack of Product Recall Notices.**

70.     Customers who purchase Genuine Rockwell Products directly from Rockwell or a Rockwell authorized distributor provide contact information to Rockwell and/or its authorized distributor so that those customers can be provided with, among other things, product recall information.

71.     With respect to Genuine Rockwell Products, from time to time, Rockwell provides Recall Notices to customers in the event a given product is recalled to resolve safety or other concerns. Rockwell provides such notices via mail, electronic mail, or other means to those customers who purchased those products directly from Rockwell or one of its authorized distributors.

72.     When a customer purchases a product from an unauthorized reseller, such as WI Automation, that customer's sale and contact information is not provided to Rockwell. Therefore, purchasers of Unauthorized Rockwell Products do not receive Recall Notices from Rockwell in the manner that purchasers of Genuine Rockwell Products do.

73.     WI Automation does not provide Recall Notices via mail, electronic mail, or other means with respect to the Unauthorized Rockwell Products. In contrast, buyers of Genuine Rockwell Products do receive such notices.

74.     Consumers consider this difference between Genuine Rockwell Products and Unauthorized Rockwell Products to be important to a decision about whether to purchase the products yet are unaware the Unauthorized Rockwell Products lack this important feature. This harms the consumer.

75.     This difference constitutes a material difference between Unauthorized Rockwell Products and Genuine Rockwell Products, it erodes the goodwill represented by Rockwell's Asserted Trademarks, and it renders the Unauthorized Rockwell Products infringing products under U.S. trademark laws.

**Lack of Product Safety Notices.**

76.     Customers who purchase Genuine Rockwell Products directly from Rockwell or a Rockwell authorized distributor routinely provide contact information to Rockwell and/or its authorized distributor so that those customers can be provided with, among other things, updated product safety information.

77.     With respect to Genuine Rockwell Products, from time to time, Rockwell provides notices to customers in the event of an advisory concerning the safety or proper use of such products. Rockwell provides such product safety notices (referred to as either a "Product Notice" or "Product Safety Advisory") via mail, electronic mail, or other means to those customers who purchased those products directly from Rockwell or one of its authorized distributors. Given their importance, Rockwell's authorized distributors are contractually required to provide these notices and advisories to end users.

78.     When a customer purchases Unauthorized Rockwell Products from WI Automation, that customer's sale and contact information is not provided to Rockwell. Therefore,

purchasers of Unauthorized Rockwell Products do not receive Product Safety Advisories from Rockwell in the manner that purchasers of Genuine Rockwell Products do.

79.     WI Automation does not provide Product Safety Advisories via mail, electronic mail, or other means with respect to the Unauthorized Rockwell Products. In contrast, buyers of Genuine Rockwell Products routinely receive such notices, as described more fully above.

80.     Consumers consider this difference between Genuine Rockwell Products and Unauthorized Rockwell Products to be important to a decision about whether to purchase the products yet are unaware the Unauthorized Rockwell Products lack this important feature. This harms the consumer.

81.     This difference constitutes a material difference between Unauthorized Rockwell Products and Genuine Rockwell Products, it erodes the goodwill represented by Rockwell's Asserted Trademarks, and it renders the Unauthorized Rockwell Products infringing products under U.S. trademark laws.

**Differences in Customer Support.**

82.     As part of the bargained-for exchange for its products, Rockwell provides invaluable technical customer support in connection with the sale of Genuine Rockwell Products.

83.     WI Automation does not have access to the manufacturing notices and other proprietary technical knowledge regarding Genuine Rockwell Products that are only available to Rockwell and its ADs. Accordingly, WI Automation cannot provide the same level of customer support that Rockwell offers.

84.     Consumers consider this difference between Genuine Rockwell Products and Unauthorized Rockwell Products to be important to a decision about whether to purchase the

products yet are unaware the Unauthorized Rockwell Products lack this important feature. This harms the consumer.

85.     This difference constitutes a material difference between Unauthorized Rockwell Products and Genuine Rockwell Products, it erodes the goodwill represented by Rockwell's Asserted Trademarks, and it renders the Unauthorized Rockwell Products infringing products under U.S. trademark laws.

**Lack of Quality Control by WI Automation's Suppliers.**

86.     Quality is of critical importance to customers who purchase Rockwell products. Unscheduled down time often carries enormous costs for users of Rockwell products. One key reason that customers choose Rockwell over Rockwell's competitors is because of Rockwell's commitment to quality and reliability.

87.     To maintain the high quality of goods bearing Rockwell's Asserted Trademarks, Rockwell maintains an authorized network of distributors for the sale of Genuine Rockwell Products. These authorized distributors have been trained and authorized by Rockwell to sell Genuine Rockwell Products to end customers.

88.     Genuine Rockwell Products are sold by Rockwell itself and through its authorized distributors to ensure that Rockwell's legitimate, substantial, and non-pretextual quality control procedures are followed.

89.     Rockwell does not warrant Rockwell products sold outside its authorized distribution network, where proper handling procedures cannot be verified by Rockwell.

90.     WI Automation's unauthorized sources are largely unknown to Rockwell. As a result, Rockwell is unable to ensure that the quality of any Unauthorized Rockwell Products that

are handled, packaged, preserved, shipped, purged (or not purged), and/or stored by these unknown sources is sufficient and in accordance with Rockwell's quality control standards.

91.     Many Rockwell products include electronic equipment or other sensitive parts that are vulnerable to shock, vibration, compression, temperature, contamination, moisture, and electrostatic discharge and can be permanently damaged or weakened, sometimes without any observable way to detect such weakening (latent damage), if not handled properly.

92.     To address these concerns and to maintain the high quality of goods bearing Rockwell's Asserted Trademarks, Rockwell follows quality control procedures to control the handling, packaging, preservation, shipping, purge, and storage of Rockwell products.

93.     These procedures ensure the high quality of Rockwell products, prevent damage and deterioration of those products, and ensure the safety of the handlers and users. Rockwell regularly updates its quality control procedures and expends significant resources upholding its quality control procedures.

94.     Rockwell has policies and personnel to make sure that Rockwell products are packaged and shipped in such a way so as to ensure that Rockwell products are, and continue to be, safe and of the highest quality.

95.     Using those policies and personnel, Rockwell has substantial quality control procedures in place concerning the shipping and handling of Rockwell products.

96.     For example, Rockwell follows procedures for the use of particular moisture-controlled packaging (through use of particular barrier materials and other materials such as silica gel or activated clay type desiccants) in order to guard against corrosion of sensitive parts or components in Rockwell products.

97.     Rockwell also follows procedures concerning how multiple products are boxed and/or placed on pallets to ensure that the products will be transported safely and without damage. Rockwell also follows procedures concerning additional protective packaging used in the shipment of Rockwell products internationally.

98.     Rockwell also follows procedures for the use of particular ESD (electro-static discharge) packaging to protect Rockwell products.

99.     Rockwell also uses other quality control procedures in place to ensure that Rockwell products are, and continue to be, safe and of the highest quality. In addition, for example, Rockwell and its authorized distributors have quality control procedures in place that require that, from time-to-time, certain Rockwell products that have quality issues be removed from inventory in order to ensure that those products are not sold to customers.

100.    In addition, Rockwell uses a number of other post-manufacture quality control procedures in order to ensure that Rockwell products are, and continue to be, safe and of the highest quality. Many of these quality control procedures are described in more detail elsewhere in this Complaint, including (a) the requirement that Rockwell products be sold only directly by Rockwell or by its authorized distributors; (b) the existence of factory seals on Rockwell products which indicate if a product has been opened or otherwise tampered with; (c) Rockwell's provision of customer support to customers of Rockwell products; (d) Rockwell's sending of product safety notices directly to customers, as needed; (e) Rockwell's sending of product recall notices directly to customers, as needed; (f) Rockwell's provision of licensed software and firmware; (g) Rockwell's provision of an intellectual property indemnity to consumers; and (h) Rockwell's provision of a Rockwell Warranty to customers.

101.    If all of Rockwell's quality control procedures are not followed, the products being sold can be damaged, weakened, sold when they should not have been sold due to product safety concerns, or otherwise compromised. For example, electrostatic discharge is one of the most common hazards for electronic components and can destroy or weaken, sometimes without any observable way to detect such weakening (latent damage to), electronic components when they are not handled according to proper quality control methods.

102.    Upon information and belief, WI Automation's unauthorized sources do not always follow all of Rockwell's quality control procedures. As a result, many of the Unauthorized Rockwell Products will be of different and/or subpar quality, in comparison with Genuine Rockwell Products.

103.    Accordingly, buyers of Unauthorized Rockwell Products sold by WI Automation receive products that have been handled, packaged, preserved, shipped, purged (or not purged), and/or stored by these unauthorized sources in a manner that is different from Rockwell's quality control procedures.

104.    The sale of Unauthorized Rockwell Products that do not conform to Rockwell's quality control procedures diminishes the value of Rockwell's Asserted Trademarks.

105.    Consumers consider this difference between Genuine Rockwell Products and Unauthorized Rockwell Products important to a decision about whether to purchase the products yet are unaware the Unauthorized Rockwell Products lack this important feature. This harms the consumer.

106.    This difference constitutes a material difference between Unauthorized Rockwell Products and Genuine Rockwell Products, it erodes the goodwill represented by Rockwell's

Asserted Trademarks, and it renders the Unauthorized Rockwell Products infringing products under U.S. trademark laws.

**Lack of Quality Control by WI Automation.**

107.    On information and belief, WI Automation themselves do not always follow all of Rockwell's quality control procedures, including all of the quality control procedures outlined in more detail above and elsewhere in this Complaint.

108.    As a result, Rockwell is unable to ensure that the quality of any Unauthorized Rockwell Products that are handled, packaged, preserved, shipped, purged (or not purged), and/or stored by unauthorized resellers, such as WI Automation, is sufficient and in accordance with Rockwell's quality control standards.

109.    If all of Rockwell's quality control standards are not followed, the products being sold can be damaged, weakened, sold when they should not have been sold due to product safety concerns, or otherwise compromised.

110.    Accordingly, buyers of Unauthorized Rockwell Products, such as those sold by WI Automation, receive products that have been handled, packaged, preserved, shipped, purged (or not purged), and/or stored in a manner that is different from Rockwell's quality control procedures.

111.    As described above, Rockwell has a number of post-manufacture quality control procedures in place in order to ensure that Rockwell products are, and continue to be, safe and of the highest quality.

112.    In addition, as described above, Rockwell also has a number of quality control measures relating to the packaging and shipping of the products, as well as policies and procedures to remove products from inventory that have quality issues.

113.    Given that WI Automation does not adhere to all of these Rockwell procedures, many of the Unauthorized Rockwell Products will be of different and/or subpar quality, in comparison with Genuine Rockwell Products.

114.    Consumers consider this difference between Genuine Rockwell Products and Unauthorized Rockwell Products to be important to a decision about whether to purchase the products yet are unaware the Unauthorized Rockwell Products lack this important feature. This harms the consumer.

115.    This difference constitutes a material difference between Unauthorized Rockwell Products and Genuine Rockwell Products, it erodes the goodwill represented by Rockwell's Asserted Trademarks, and it renders the Unauthorized Rockwell Products infringing products under U.S. trademark laws.

**Hardware with Unlicensed Software/Firmware.**

116.    With respect to Genuine Rockwell Products, Rockwell provides a non-exclusive, non-transferable license specific to the buyer. The license provided to purchasers of Genuine Rockwell Products includes rights to software and firmware pre-installed on Genuine Rockwell Products as well as software and firmware downloaded from Rockwell by the end user after the purchase of Genuine Rockwell Products. For example, as discussed elsewhere in this Complaint, Rockwell's Allen-Bradley® ControlLogix® and CompactLogix® controllers require the download and installation of Rockwell's copyrighted firmware in order for those controllers to become functional and the license to that firmware is provided to only purchasers of Genuine Rockwell Products. In other words, any software and/or firmware contained on Genuine Rockwell Products, or which are downloaded from Rockwell for use on such products, is not sold to the

buyer, but is instead licensed to the buyer subject to certain restrictions. This license is personal to that buyer and is not transferable to any other person or entity in any manner.

117.    Buyers who purchase Unauthorized Rockwell Products that may contain software and/or firmware purporting to be Rockwell software and/or firmware do not receive a license from Rockwell to use any such software or firmware that may be loaded on any such products or downloaded from Rockwell.

118.    Unauthorized sellers, such as the WI Automation, do not, and cannot, provide a license to its customers for the use of any Rockwell software or firmware that may be loaded on the Unauthorized Rockwell Products or downloaded from Rockwell.

119.    Accordingly, buyers of Unauthorized Rockwell Products do not have a license to the software and/or firmware purporting to be Rockwell software and/or firmware that may be loaded on those goods or downloaded from Rockwell. In contrast, buyers of Genuine Rockwell Products do have a license to the Rockwell software and/or firmware that may be loaded on those authorized products or downloaded from Rockwell, as described more fully above.

120.    Consumers consider this difference between Genuine Rockwell Products and Unauthorized Rockwell Products to be important to a decision about whether to purchase the products yet are unaware the Unauthorized Rockwell Products lack this important feature. This harms the consumer.

121.    This difference constitutes a material difference between Unauthorized Rockwell Products and Genuine Rockwell Products, it erodes the goodwill represented by Rockwell's Asserted Trademarks, and it renders the Unauthorized Rockwell Products infringing products under U.S. trademark and copyright laws.

**Differences in Quality of Unauthorized Rockwell Products.**

122.     Unlike unauthorized resellers, Rockwell and its authorized distributors have procedures in place that require that, from time-to-time, certain Rockwell products that have quality issues be removed from inventory in order to ensure that those products are not sold to customers.

123.     Upon information and belief, WI Automation does not follow these Rockwell procedures to remove Unauthorized Rockwell Products with quality issues from WI Automation's inventory. Given that WI Automation does not adhere to these Rockwell procedures, many of the Unauthorized Rockwell Products will be of different and/or subpar quality, in comparison with Genuine Rockwell Products.

124.     Consumers have complained about the quality of Unauthorized Rockwell Products sold by unauthorized resellers. Consumers consider differences in quality between Genuine Rockwell Products and Unauthorized Rockwell Products to be important to a decision about whether to purchase the products yet are unaware the Unauthorized Rockwell Products lack this important feature. This harms the consumer.

125.     This difference constitutes a material difference between Unauthorized Rockwell Products and Genuine Rockwell Products, it erodes the goodwill represented by Rockwell's Asserted Trademarks, and it renders the Unauthorized Rockwell Products as infringing products under U.S. trademark laws.

**Other Material Differences.**

126.     Rockwell's research as to the differences between Unauthorized Rockwell Products sold by WI Automation and Genuine Rockwell Products is ongoing and limited to publicly available means. Discovery may reveal additional material differences. Any other material differences that exist between Unauthorized Rockwell Products and Genuine Rockwell Products

will also create a presumption of customer confusion, erode the goodwill represented by the Asserted Trademarks, and render the Unauthorized Rockwell Products as infringing products under U.S. trademark laws.

The provision of the Rockwell warranty, quality assurances, services, licenses and support discussed above for Rockwell's and its Authorized Distributor's customers of Genuine Rockwell Products is not discretionary; Rockwell provides these services and quality assurances to all, or at least substantially all, customers of Genuine Rockwell Products. Customers who purchase Genuine Rockwell Products from Rockwell and its Authorized Distributors are therefore assured that the Genuine Rockwell Products are predictably and consistently accompanied by the Rockwell warranty, quality assurances, services, licenses and support discussed above.

## VII.   **The Harm From WI Automation's Conduct**

127.   Rockwell's ability to provide a quality and safety network in the sale of new Rockwell Products differs dramatically from what WI Automation can provide:



128.   Unlike Rockwell, WI Automation does not have a 100-year history as a premier manufacturer in the U.S. It has no repair facility that can remanufacture Rockwell Products to

Rockwell's proprietary specifications or even properly repair them. It has no monitoring system to investigate recalls and safety notices. It often cannot verify the source of Rockwell Products it is selling as "new."

129.   How then has WI Automation sought to overcome its inability to provide these essential services? Through deceptive marketing schemes – heavily based through the internet – that seek to obscure these dramatic differences.  For instance, WI Automation has listed Rockwell products for sale on its website by unequivocally labeling them as "New Factory Sealed – Original product" and by stating "12 Months Warranty" implying that the Rockwell warranty applies when it does not.



(emphasis added). Moreover, regardless of the actual verbiage used, the WI Automation website has always created a cumulative misimpression that leaves a customer not understanding that what WI Automation is selling as "new" Rockwell product is materially altered in many respects.

130.    Therefore WI Automation's internet and other marketing of "new" Rockwell Products were leaving the misimpression that customers are buying genuine Rockwell Products with the only differentiator being a lower price.

131.    The consequences for the customer can be extremely serious because of safety and security concerns which require the Rockwell product safety net to be in place.

132.    Customer misimpressions of quality assurance in WI Automation's marketing of "new" Rockwell Products on the internet can lead consumers to expect the same quality that comes from a truly new Rockwell product purchased from an AD.

133.    WI Automation has been deliberately confusing its customers by hiding the "source" and true nature and quality of these products.

134.    WI Automation employs this sleight of hand because WI Automation cannot make new products, cannot "remanufacture" Rockwell Products to Rockwell's proprietary specifications, and does not have a sophisticated Rockwell-type distribution system to carefully monitor quality and ensure proper chain of custody.

135.    Again, the consequences of WI Automation's scheme include serious risks – customer confusion, undermining of Rockwell's distribution channels and harming its relationships with its distributors, disrupting Rockwell's delicate pricing mechanism and, most importantly, WI Automation's sales jeopardize their customers' businesses and even, potentially, their employees' lives. WI Automation deliberately leads its customers to believe that the "new" products it sells are every bit as safe and reliable as new Rockwell Products. Other WI Automation sales that Rockwell knows of have included critical safety-related products destined for pharmaceutical plants, theme park rides, and other assembly lines. Any of these parts could malfunction and cause enormous physical and economic harm to WI Automation's customers.

136.    Because WI Automation has deliberately marketed its Rockwell goods in a misleading fashion, customers would often be led to believe that <u>Rockwell's</u> manufacturing – rather than WI Automation's acquisition, storage, and shipping practices – led to the types of defects inherent in WI Automation's aged, used, surplus, damaged, and counterfeit products. This clearly jeopardized Rockwell's commercial goodwill and brand reputation.

*    *    *

137.    WI Automation is unfairly competing with Rockwell and its authorized distributors, creating a substantial likelihood of confusion and causing mistake and deception in consumers' minds, because the Unauthorized Rockwell Products, although physically similar to legitimate Rockwell products, are materially different from legitimate Rockwell products.

138.    Accordingly, as a result of WI Automation's continued sale of Unauthorized Rockwell Products, Rockwell has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and its authorized distributors, for which there is no adequate remedy at law. Moreover, this harm will have a negative effect on interstate commerce, given that Rockwell's products are sold across the United States.

139.    In addition, WI Automation's acquisition and sale of Unauthorized Rockwell Products hinders Rockwell's ability to track its products, thereby potentially endangering the public by preventing Rockwell from resolving quality problems and recalling defective products.

140.    Due to the nature and uses of the products at issue, which, as described more fully above, are used in critical infrastructure and other sensitive equipment, WI Automation's sale of Unauthorized Rockwell Products poses a serious risk to public health and safety. By causing such a likelihood of confusion, mistake, deception, and potential public health risk, WI Automation is inflicting irreparable harm to public health and welfare.

## COUNT I — TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)

141.  Rockwell hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference.

142.  As alleged more fully herein, the USPTO has granted Rockwell federal trademark registrations for the trademarks consisting of or incorporating Plaintiff's Trademarks.

143.  WI Automation's unauthorized sales and attempted sales of Unauthorized Rockwell Products containing Plaintiff's Trademarks to unsuspecting consumers is a violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

144.  WI Automation's sale and continued sale of Unauthorized Rockwell Products has created a substantial likelihood of confusion and caused mistake and deception in consumers' minds because the Unauthorized Rockwell Products, although physically similar to legitimate Rockwell products, are materially different from legitimate Rockwell products.

145.  Rockwell does not authorize, condone or otherwise allow the sale of non-conforming goods having the material differences found in the Unauthorized Rockwell Products sold by WI Automation.

146.  WI Automation's unauthorized use of Plaintiff's Trademarks constitutes use in commerce, without the consent of Rockwell, of a reproduction, counterfeit, copy, or colorable imitation of Plaintiff's Trademarks in connection with the advertisement, promotion, sale, and distribution of products and/or services. Such use is likely to cause confusion or mistake, or to deceive customers, and therefore infringes Plaintiff's Trademarks, in violation of 15 U.S.C. § 1114(1).

147.  As a result of WI Automation's continued sale of Unauthorized Rockwell Products, Rockwell has suffered and will continue to suffer irreparable harm to its goodwill and reputation with not only its customers, who confuse the Unauthorized Rockwell Products for legitimate

Rockwell products, but also with its authorized distributors, whose prices WI Automation is able to undercut by selling Unauthorized Rockwell Products.

148.    Rockwell has no adequate remedy at law for the above immediate and continuing harm. Rockwell has been, and absent injunctive relief will continue to be, irreparably harmed by WI Automation's actions.

## COUNT II — FALSE ADVERTISING (15 U.S.C. § 1125(a)(1)(B))

149.    Rockwell hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference.

150.    WI Automation's unauthorized sales and attempted sales of Unauthorized Rockwell Products as legitimate Rockwell products to unsuspecting consumers constitute false advertising, which is a violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

151.    WI Automation has made false and/or misleading statements in commercial advertising regarding the Unauthorized Rockwell Products, which are likely to cause confusion and mistake, and to misrepresent the nature and characteristics of the Unauthorized Rockwell Products and WI Automation's commercial activities, and have substantially affected interstate commerce.

152.    WI Automation's unlawful conduct has deceived, and is likely to continue to deceive, a material segment of the consumers to whom WI Automation has directed its marketing activities. WI Automation's false and/or misleading statements are material in that they are likely to influence consumers to purchase products from WI Automation and cause competitive and other commercial injuries to Rockwell.

153.    WI Automation has made, and continues to make, its false and/or misleading statements with the intent to cause confusion and mistake, and to deceive the public as to the

nature, quality, or characteristics of the Unauthorized Rockwell Products and WI Automation's commercial activities. Rockwell has been damaged as a result.

154.    Rockwell has no adequate remedy at law for the above immediate and continuing harm. Rockwell has been, and absent injunctive relief will continue to be, irreparably harmed by WI Automation's actions.

### COUNT III — FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a)(1)(A))

155.    Rockwell hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference.

156.    WI Automation's use of Plaintiff's Trademarks in the manner alleged herein constitutes a false designation of origin within the meaning of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), which is likely to cause confusion, mistake, or deception as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of WI Automation's commercial activities with respect to Plaintiff's Trademarks.

157.    The purchasing public is likely to attribute to Rockwell, WI Automation's use of Plaintiff's Trademarks as a source of origin, authorization, and/or sponsorship for the products WI Automation sells and, further, purchase products from WI Automation in the erroneous belief that WI Automation is authorized by, associated with, sponsored by, or affiliated with Rockwell, when WI Automation is not.

158.    WI Automation's actions have been conducted intentionally and willfully, with the express intent to cause confusion and mistake, to deceive and mislead the purchasing public, to trade upon the high-quality reputation of Rockwell, and to improperly appropriate to itself the valuable trademark rights of Rockwell.

159.    WI Automation's unlawful conduct has deceived, and is likely to continue to deceive, a material segment of the consumers to whom WI Automation has directed its marketing

activities. WI Automation's false and/or misleading statements are material in that they are likely to influence consumers to purchase products from WI Automation and cause competitive and other commercial injuries to Rockwell. WI Automation has made, and continues to make, false and/or misleading statements with the intent to cause confusion and mistake, and to deceive the public into believing that WI Automation is authorized by, associated with, sponsored by, or affiliated with Rockwell, when WI Automation is not. Rockwell has been damaged as a result.

160.    As a result of WI Automation's misconduct, Rockwell has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and its authorized distributors.

161.    Rockwell has no adequate remedy at law for the above immediate and continuing harm. Rockwell has been, and absent injunctive relief will continue to be, irreparably harmed by WI Automation's actions.

## COUNT IV — STATUTORY UNFAIR COMPETITION
### (6 Del. C. § 2532 *et seq.*)

162.    Rockwell hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference.

163.    WI Automation's acts set forth above constitute unlawful, unfair, or fraudulent business practices in violation of 6 Del. C. § 2532 *et seq.*

164.    By reason of WI Automation's infringing activities, WI Automation has damaged and caused irreparable harm to Rockwell and, unless restrained, will continue to damage and cause irreparable injury to Rockwell's goodwill and reputation.

165.    WI Automation's acts have injured, and will continue to injure, Rockwell by, among other things, siphoning customers, diluting Plaintiff's Asserted Trademarks, confusing customers, and injuring Rockwell's reputation.

166.    WI Automation's use of Plaintiff's Asserted Trademarks deceives customers and potential customers regarding the origin of goods and services offered by WI Automation.

167.    Rockwell has no adequate remedy at law for the above immediate and continuing harm. Rockwell has been, and absent injunctive relief will continue to be, irreparably harmed by WI Automation's actions.

168.    Pursuant to 6 Del. C. § 2532 *et seq.*, Rockwell is entitled to injunctive relief and recovery of all direct and indirect damages, trebled within the discretion of the court.

## COUNT V — COMMON LAW UNFAIR COMPETITION

169.    Rockwell hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference.

170.    In connection with the promotion, marketing, and distribution of the Unauthorized Rockwell Products, WI Automation has made certain factual misrepresentations, including, but not limited to, those statements contained herein and incorporated herein by reference.

171.    Such representations are material, as they are likely to deceive or mislead prospective customers and to encourage prospective purchasers to purchase the Unauthorized Rockwell Products instead of genuine Rockwell products.

172.    WI Automation's conduct is likely to confuse a prospective buyer or customer as to the origin, source, or sponsorship of WI Automation's products, or to cause mistake or to deceive the public into believing that WI Automation's sale of the Unauthorized Rockwell Products is authorized by Rockwell.

173.    WI Automation has promoted and deceptively marketed the Unauthorized Rockwell Products to the detriment of Rockwell, as many of Rockwell's customers and prospective customers have been and will be induced to purchase the Unauthorized Rockwell

Products instead of Rockwell products, based on WI Automation's statements and conduct described more fully herein.

174.    Rockwell's customers and prospective customers would not otherwise have purchased the Unauthorized Rockwell Products but for WI Automation's conduct and representations described more fully herein.

175.    Rockwell has a reasonable basis for believing that WI Automation's misrepresentations and conduct, described more fully herein, have caused or are likely to cause a diversion of its customers to its competitors, to decrease Rockwell's profits, and/or to cause harm to Rockwell's reputation or goodwill.

176.    WI Automation's conduct in deceptively marketing and promoting the Unauthorized Rockwell Products, and its other acts and conduct as described herein, are actionable as an unfair method of competition pursuant to the common law of Delaware, and Rockwell has been damaged as a result of WI Automation's unfair competition.

177.    Because WI Automation's acts were undertaken with the intent to harm Rockwell in disregard of its rights, Rockwell is further entitled to an award of punitive damages against WI Automation in an amount sufficient to punish it and to deter such conduct in the future.

178.    Rockwell has no adequate remedy at law for the above immediate and continuing harm. Rockwell has been, and absent injunctive relief will continue to be, irreparably harmed by WI Automation's actions.

## **COUNT VI — UNJUST ENRICHMENT**

179.    Rockwell hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference.

180.    Defendant WI Automation received an improper benefit in the form of Rockwell goods wrongfully acquired at an unreasonably low price, and profits from the improper resale of those goods.

181.    It would be inequitable to allow WI Automation to retain these goods and the profits derived from their sale due to their wrongful acquisition and improper marketing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Rockwell Automation, Inc., prays for judgment as follows:

A.    For judgment that:

    1.    WI Automation has violated Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

    2.    WI Automation has engaged in false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B);

    3.    WI Automation has engaged in false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A);

    4.    WI Automation has engaged in unfair competition in violation of 6 Del. C. § 2532 *et seq.;*

    5.    WI Automation has engaged in unfair competition in violation of the common law of the State of Delaware;

    6.    WI Automation has been unjustly enriched thereby.

B.    For a preliminary injunction and, thereafter, a permanent injunction restraining and enjoining WI Automation and all of its agents, servants, employees, successors and assigns, and all persons in active concert or participation with WI Automation (or its agents) from:

    1.    Selling, marketing, advertising, importing, or purchasing Unauthorized Rockwell Products;

    2.    Using any of Plaintiff's Trademarks and/or any other confusingly similar designation, alone or in combination with other words, phrases, symbols or designs, as trademarks, trade names, domain name components or otherwise, to market, advertise, or identify WI Automation's goods or services;

    3.    Otherwise infringing Plaintiff's Trademarks;

    4.    Representing by any means whatsoever, directly or indirectly, that any products or services offered or provided by WI Automation are offered or authorized by Rockwell, or from otherwise taking any action likely to cause confusion, mistake, or deception on the part of consumers as to the source or origin of such products or services or as to any authorization, sponsorship, approval, or affiliation relationship between WI Automation and Rockwell;

    5.    Affixing, applying, annexing, or using in connection with the manufacture, distribution, marketing, advertising, packaging, sale, and/or offering for sale or other use of any products or services, a false description or representation, including without limitation words, symbols, photographs, or product representations similar

to those used by Rockwell, tending to falsely describe or represent such products or services as being those of Rockwell;

6.  Unfairly competing with Rockwell in any manner whatsoever or otherwise injuring its business reputation in the manner complained of herein; and

7.  Engaging in assignments or transfers, formation of new entities or associations or utilization of any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in sub-paragraphs (a) through (g) above.

C.  An order, under 15 U.S.C. §§ 1116 and 1118, requiring WI Automation (including its employees and agents) to deliver to Rockwell (or allow Rockwell to pick up), or requiring to be destroyed, all Unauthorized Rockwell Products that are in WI Automation's possession, custody, or control.

D.  An order, pursuant to 15 U.S.C. § 1116, requiring WI Automation to file with this Court and serve upon Rockwell within 30 days after the entry of each of the preliminary and permanent injunctions a report, in writing and under oath, setting forth in detail the manner in which WI Automation has complied with the preceding two paragraphs of this Prayer for Relief.

E.  An order:

1.  Awarding Rockwell, under 15 U.S.C. § 1117, all profits received by WI Automation from the sales and revenues of any kind made as a result of WI Automation's sales of Unauthorized Rockwell Products, and damages, to be determined, that Rockwell has suffered as a result of WI Automation's sales and marketing of Unauthorized Rockwell Products (including, but not limited to, Rockwell's lost profits, price erosion, and damages awarded pursuant to 15 U.S.C. § 1117 and 6 Del. C. § 2532 *et seq*, trebled);

2.  Awarding Rockwell damages, attorneys' fees, and costs to the fullest extent provided for by the United States statute and the common law of Delaware, including punitive damages;

3.  Awarding Rockwell pre-judgment and post-judgment interest; and

4.  Awarding Rockwell such other and further relief as this Court deems just and equitable.

## **DEMAND FOR A JURY TRIAL**

Plaintiff Rockwell Automation, Inc., demands a trial by jury on all issues so triable.

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

OF COUNSEL:

Paul Tanck
Neal J. McLaughlin
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel: (212) 210-9400
Fax: (212) 210-9444
paul.tanck@alston.com
neal.mclaughlin@alston.com

Dated:  August 27, 2021

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (# 3630)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
Tel: (302) 472-7311
dgattuso@hegh.law

*Attorneys for Plaintiff*