# Exhibit 1



# 2022
## ANNUAL REPORT ON FORM 10-K



# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

---

# Form 10-K

**(Mark One)**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended September 30, 2022

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 1-12383

# Rockwell Automation, Inc.

*(Exact name of registrant as specified in its charter)*

| Delaware | 25-1797617 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| 1201 South Second Street Milwaukee, Wisconsin | 53204 |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code

+1 (414) 382-2000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock ($1.00 par value) | ROK | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large Accelerated Filer | ☑ | Accelerated Filer | ☐ |
|---|---|---|---|
| Non-accelerated Filer | ☐ | Smaller Reporting Company | ☐ |
| | | Emerging Growth Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☑

The aggregate market value of registrant's voting stock held by non-affiliates of registrant on March 31, 2022 was approximately $32.5 billion.

114,844,152 shares of registrant's Common Stock, par value $1 per share, were outstanding on October 31, 2022.

## DOCUMENTS INCORPORATED BY REFERENCE

Certain information contained in the Proxy Statement for the Annual Meeting of Shareowners of registrant to be held on February 7, 2023, is incorporated by reference into Part III hereof.

**TABLE OF CONTENTS**

PART I                                                                    3

ITEM 1.     BUSINESS                                                      4
ITEM 1A.    RISK FACTORS                                                  6
ITEM 1B.    UNRESOLVED STAFF COMMENTS                                    11
ITEM 2.     PROPERTIES                                                   11
ITEM 3.     LEGAL PROCEEDINGS                                            11
ITEM 4.     MINE SAFETY DISCLOSURES                                      11
ITEM 4A.    INFORMATION ABOUT OUR
            EXECUTIVE OFFICERS                                           12

PART II                                                                  13

ITEM 5.     MARKET FOR REGISTRANT'S COMMON
            EQUITY, RELATED STOCKHOLDER
            MATTERS, AND ISSUER PURCHASES
            OF EQUITY SECURITIES                                         13
ITEM 6.     RESERVED                                                     14
ITEM 7.     MANAGEMENT'S DISCUSSION AND
            ANALYSIS OF FINANCIAL CONDITION
            AND RESULTS OF OPERATIONS                                    14
ITEM 7A.    QUANTITATIVE AND QUALITATIVE
            DISCLOSURES ABOUT MARKET RISK                                33
ITEM 8.     FINANCIAL STATEMENTS AND
            SUPPLEMENTARY DATA                                           34
            CONSOLIDATED BALANCE SHEET                                   34
            CONSOLIDATED STATEMENT OF OPERATIONS                         35
            CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME               36
            CONSOLIDATED STATEMENT OF CASH FLOWS                         37
            CONSOLIDATED STATEMENT OF SHAREOWNERS' EQUITY                38
            NOTES TO CONSOLIDATED FINANCIAL STATEMENTS                   39

ITEM 9.     CHANGES IN AND DISAGREEMENTS
            WITH ACCOUNTANTS ON ACCOUNTING
            AND FINANCIAL DISCLOSURE                                     80
ITEM 9A.    CONTROLS AND PROCEDURES                                      80
ITEM 9B.    OTHER INFORMATION                                            80
ITEM 9C.    DISCLOSURE REGARDING FOREIGN
            JURISDICTIONS THAT PREVENT
            INSPECTIONS                                                  80

PART III                                                                 81

ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS,
            AND CORPORATE GOVERNANCE                                     81
ITEM 11.    EXECUTIVE COMPENSATION                                       81
ITEM 12.    SECURITY OWNERSHIP OF CERTAIN
            BENEFICIAL OWNERS AND MANAGEMENT
            AND RELATED STOCKHOLDER MATTERS                              81
ITEM 13.    CERTAIN RELATIONSHIPS AND
            RELATED TRANSACTIONS, AND
            DIRECTOR INDEPENDENCE                                        82
ITEM 14.    PRINCIPAL ACCOUNTANT FEES
            AND SERVICES                                                 82

PART IV                                                                  83

ITEM 15.    EXHIBITS AND FINANCIAL
            STATEMENT SCHEDULES                                         83
ITEM 16.    FORM 10-K SUMMARY                                           86

SIGNATURES                                                               87

# PART I

## FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains statements (including certain projections and business trends) that are "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. Words such as "believe", "estimate", "project", "plan", "expect", "anticipate", "will", "intend", and other similar expressions may identify forward-looking statements. Actual results may differ materially from those projected as a result of certain risks and uncertainties, many of which are beyond our control, including but not limited to:

- the availability and price of components and materials;
- macroeconomic factors, including inflation, global and regional business conditions (including adverse impacts in certain markets, such as Oil & Gas), commodity prices, currency exchange rates, the cyclical nature of our customers' capital spending, and sovereign debt concerns;
- the severity and duration of disruptions to our business due to pandemics (including the COVID-19 pandemic), natural disasters (including those as a result of climate change), acts of war (including the Russia and Ukraine conflict), strikes, terrorism, social unrest or other causes, including the impacts of the COVID-19 pandemic and efforts to manage it on the global economy, liquidity and financial markets, demand for our hardware and software products, solutions, and services, our supply chain, our work force, our liquidity and the value of the assets we own;
- the availability and cost of capital;
- our ability to attract, develop, and retain qualified personnel;
- the successful integration and management of strategic transactions and achievement of the expected benefits of these transactions;
- laws, regulations, and governmental policies affecting our activities in the countries where we do business, including those related to tariffs, taxation, trade controls (including sanctions placed on Russia), cybersecurity, and climate change;
- the availability, effectiveness, and security of our information technology systems;
- our ability to manage and mitigate the risk related to security vulnerabilities and breaches of our hardware and software products, solutions, and services;

- the successful development of advanced technologies and demand for and market acceptance of new and existing hardware and software products;
- our ability to manage and mitigate the risks associated with our solutions and services businesses;
- the successful execution of our cost productivity initiatives;
- competitive hardware and software products, solutions, and services, pricing pressures, and our ability to provide high quality products, solutions, and services;
- disruptions to our distribution channels or the failure of distributors to develop and maintain capabilities to sell our products;
- intellectual property infringement claims by others and the ability to protect our intellectual property;
- the uncertainty of claims by taxing authorities in the various jurisdictions where we do business;
- the uncertainties of litigation, including liabilities related to the safety and security of the hardware and software products, solutions, and services we sell;
- risks associated with our investment in common stock of PTC Inc., including the potential for volatility in our reported quarterly earnings associated with changes in the market value of such stock;
- our ability to manage costs related to employee retirement and health care benefits; and
- other risks and uncertainties, including but not limited to those detailed from time to time in our Securities and Exchange Commission (SEC) filings.

These forward-looking statements reflect our beliefs as of the date of filing this report. We undertake no obligation to update or revise any forward-looking statement, whether as a result of new information, future events, or otherwise. See Item 1A. *Risk Factors* for more information.

# ITEM 1.  BUSINESS

## GENERAL

Rockwell Automation, Inc. ("Rockwell Automation" or the "Company") is a global leader in industrial automation and digital transformation. We connect the imaginations of people with the potential of technology to expand what is humanly possible, making the world more productive and more sustainable. Our hardware and software products, solutions, and services are designed to meet our customers' needs to reduce total cost of ownership, maximize asset utilization, improve time to market, and reduce enterprise business risk. See Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations* (MD&A) for additional information on our business and long-term strategy.

The Company continues the business founded as the Allen-Bradley Company in 1903. The privately-owned Allen-Bradley Company was a leading North American manufacturer of industrial automation equipment when the former Rockwell International Corporation (RIC) purchased it in 1985.

The Company was incorporated in Delaware in connection with a tax-free reorganization completed on December 6, 1996, pursuant to which we divested our former aerospace and defense businesses (the A&D Business) to The Boeing Company (Boeing). In the reorganization, RIC contributed all of its businesses, other than the A&D Business, to the Company and distributed all capital stock of the Company to RIC's shareowners. Boeing then acquired RIC.

As used herein, the terms "we", "us", "our", "Rockwell Automation", or the "Company" include wholly-owned and controlled majority-owned subsidiaries and predecessors unless the context indicates otherwise. Information included in this Annual Report on Form 10-K refers to our continuing businesses unless otherwise indicated.

Whenever an Item of this Annual Report on Form 10-K refers to information in our Proxy Statement for our Annual Meeting of Shareowners to be held on February 7, 2023 (the Proxy Statement), or to information under specific captions in Item 7. *MD&A*, or in Item 8. *Financial Statements and Supplementary Data* (the Consolidated Financial Statements), the information is incorporated in that Item by reference. All date references to years and quarters refer to our fiscal year and quarters, unless otherwise stated.

## OPERATING SEGMENTS

Starting in fiscal 2021, we have three operating segments: Intelligent Devices, Software & Control, and Lifecycle Services. The Intelligent Devices segment includes drives, motion, safety, sensing, industrial components, and configured-to-order products. The Software & Control segment includes control and visualization software and hardware, information software, and network and security infrastructure. The Lifecycle Services segment includes consulting, professional services and solutions, connected services, and maintenance services, as well as the Sensia joint venture.

Our operating segments share common sales, supply chain, and functional support organizations and conduct business globally. Major markets served by all segments consist of discrete end markets (e.g., Automotive, Semiconductor, and Warehousing & Logistics), hybrid end markets (e.g., Food & Beverage and Life Sciences), and process end markets (e.g., Oil & Gas, Metals, and Chemicals). See Note 19 in the Consolidated Financial Statements for additional information on our operating segments.

## GEOGRAPHIC INFORMATION

We do business in more than 100 countries around the world. The largest sales outside the United States on a country of destination basis are in China, Canada, Italy, Mexico, Germany, and the United Kingdom. See Item 1A. *Risk Factors* for a discussion of risks associated with our global operations.

## COMPETITION

Our competitors range from large, diversified corporations that may also have business interests outside of industrial automation to smaller companies that offer a limited portfolio of industrial automation products, solutions, and services. Factors that influence our competitive position include the breadth of our product portfolio and scope of solutions, technology differentiation, domain expertise, installed base, distribution network, quality of hardware and software products, solutions, and services, global presence, and price. Major competitors include Siemens AG, ABB Ltd, Schneider Electric SA, Emerson Electric Co., Mitsubishi Electric Corp., Honeywell International Inc., AVEVA Group plc, Dassault Systemes, and Aspen Technology, Inc.

## DISTRIBUTION

In most countries, we sell primarily through independent distributors in conjunction with our direct sales force. Approximately 75 percent of our global sales are through independent distributors. Sales to our largest distributor in 2022, 2021, and 2020, were approximately 10 percent of our total sales.

## EMPLOYEES

See Item 7. **MD&A** for information on our employees, including information related to attracting, developing, and retaining highly qualified talent.

## RAW MATERIALS

We purchase a wide range of equipment, components, finished products, and materials used in our business. The raw materials essential to the manufacture of our products generally are available at competitive prices. We have a broad base of suppliers and subcontractors. We depend upon the ability of our suppliers and subcontractors to meet performance and quality specifications and delivery schedules. See Item 1A. **Risk Factors** for a discussion of risks associated with our reliance on third-party suppliers.

## BACKLOG

See Item 7. **MD&A** for information on our order backlog.

## ENVIRONMENTAL PROTECTION REQUIREMENTS

Information about the effect of compliance with environmental protection requirements and resolution of environmental claims is contained in Note 17 in the Consolidated Financial Statements. See Item 1A. **Risk Factors** for a discussion of risks associated with liabilities and costs related to environmental remediation.

## PATENTS, LICENSES, AND TRADEMARKS

We own or license numerous patents and patent applications related to our hardware and software products, solutions, and services. While in the aggregate our patents and licenses are important in the operation of our business, we do not believe that loss or termination of any one of them would materially affect our business or financial condition. We have received various claims of patent infringement and requests for patent indemnification. We believe that none of these claims or requests will have a material adverse effect on our financial condition. See Item 1A. **Risk Factors** for a discussion of risks associated with our intellectual property.

The Company's name and its registered trademark "Rockwell Automation®" and other trademarks such as "Allen-Bradley®", "A-B®", "PlantPAx® Process Automation System™", and "The Connected Enterprise®" are important to all of our business segments. In addition, we own other important trademarks that we use, such as "ControlLogix®" and "CompactLogix®" for our control systems, "PowerFlex®" for our AC drives, and "Rockwell Software®", "FactoryTalk®", "Plex Systems®", and "Fiix®" for our software and cloud offerings.

## SEASONALITY

Our business segments are not subject to significant seasonality. However, the calendarization of our results can vary and may be affected by the seasonal spending patterns of our customers due to their annual budgeting processes and their working schedules.

## AVAILABLE INFORMATION

We maintain a website at https://www.rockwellautomation.com. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to such reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (the Exchange Act), as well as our annual reports to shareowners and Section 16 reports on Forms 3, 4 and 5, are available free of charge on this site through the "Investors" link as soon as reasonably practicable after we file or furnish these reports with the SEC. All reports we file with the SEC are also available free of charge via EDGAR through the SEC's website at https://www.sec.gov. Our Guidelines on Corporate Governance and charters for our Board committees are also available on our website. The information contained on and linked from our website is not incorporated by reference into this Annual Report on Form 10-K.

# ITEM 1A.  RISK FACTORS

In the ordinary course of our business, we face various strategic, operating, compliance, and financial risks. These risks could have an impact on our business, financial condition, operating results, and cash flows. Our most significant risks are set forth below and elsewhere in this Annual Report on Form 10-K.

Our Enterprise Risk Management (ERM) process seeks to identify and address significant risks. Our ERM process assesses, manages, and monitors risks consistent with the integrated risk framework in the *Enterprise Risk Management - Integrated Framework (2017)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). We believe that risk-taking is an inherent aspect of the pursuit of our strategy. Our goal is to manage risks prudently rather than avoid risks. We can mitigate risks and their impact on the Company only to a limited extent.

A team of senior executives prioritizes identified risks and assigns an executive to address each major identified risk area and lead action plans to manage risks. Our Board of Directors provides oversight of the ERM process and reviews significant identified risks. The Audit Committee of the Board of Directors also reviews significant financial risk exposures and the steps management has taken to monitor and manage them. Our other Board committees also play a role in risk management, as set forth in their respective charters.

Our goal is to proactively manage risks using a structured approach in conjunction with strategic planning, with the intent to preserve and enhance shareowner value. However, the risks set forth below and elsewhere in this Annual Report on Form 10-K and other risks and uncertainties could adversely affect us and cause our results to vary materially from recent results or from our anticipated future results.

## INDUSTRY AND ECONOMIC RISKS

### *ADVERSE CHANGES IN MACROECONOMIC OR INDUSTRY CONDITIONS MAY RESULT IN DECREASES IN OUR SALES AND PROFITABILITY.*

We are subject to macroeconomic cycles and when recessions occur, we may experience reduced, canceled or delayed orders, payment delays or defaults, supply chain disruptions, or other adverse events as a result of the economic challenges faced by our customers, prospective customers, and suppliers.

Demand for our hardware and software products, solutions, and services is sensitive to changes in levels of production and the financial performance of major industries that we serve. As economic activity slows, credit markets tighten, or sovereign debt concerns arise, companies tend to reduce their levels of capital spending, which could result in decreased demand for our hardware and software products, solutions, and services.

As a global company operating in over 100 countries, we face risks related to foreign currency markets. A strengthening U.S. Dollar (USD) may adversely impact our sales and profitability related to business we do outside the U.S.

Oil & Gas is a major industry that we serve, including through our Sensia joint venture. When adverse Oil & Gas industry events arise, companies may reduce their levels of spending, which could result in decreased demand for our hardware and software products, solutions, and services. Demand for our hardware and software products, solutions, and services is sensitive to industry volatility and risks including those related to commodity prices, supply and demand dynamics, production costs, geological and political activities, and environmental regulations including those intended to reduce the impact of climate change.

Increases in energy demand and supply disruptions caused by the Russia and Ukraine conflict have resulted in significantly higher energy prices, particularly in Europe. Persistent high energy prices and the potential for further supply disruptions, including rationing, may have an adverse impact on industrial output and could reduce demand for our hardware and software products, solutions, and services in Europe.

### *WE FACE THE POTENTIAL HARMS OF NATURAL DISASTERS, INCLUDING THOSE AS A RESULT OF CLIMATE CHANGE, PANDEMICS, INCLUDING THE COVID-19 PANDEMIC, ACTS OF WAR, INCLUDING THE RUSSIA AND UKRAINE CONFLICT, TERRORISM, INTERNATIONAL CONFLICTS, OR OTHER DISRUPTIONS TO OUR OPERATIONS, THE DURATION AND SEVERITY OF WHICH ARE HIGHLY UNCERTAIN AND DIFFICULT TO PREDICT.*

Our business depends on the movement of people and goods around the world. Natural disasters (including but not limited to those as a result of climate change), pandemics (including the COVID-19 pandemic), acts or threats of war (including the Russia and Ukraine conflict) or terrorism, international conflicts, power outages, fires, explosions, equipment failures, sabotage, political instability, and the actions taken by governments could cause damage to or disrupt our business operations, our suppliers or our customers, and could create economic instability. Disruptions to our information technology (IT) infrastructure from system failures, shutdowns, power outages, telecommunication or utility failures, and other events, including disruptions at third-party IT and other service providers, could also interfere with or disrupt our operations. Although it is not possible to predict such events or their consequences, these events could decrease demand for our hardware and software products, solutions, or services, increase our costs, or make it difficult or impossible for us to deliver products, solutions, or services.

The COVID-19 pandemic continues to cause disruption to the global economy, including in all of the regions in which we, our suppliers, distributors, business partners, and customers do business and in which our workforce is located. We continue to monitor the pandemic, and while periodic local increases and decreases in COVID-19 cases are likely, generally the restrictions due to and in response to the pandemic continue to relax in most locations. However, the COVID-19 pandemic and efforts to manage it, including those by governmental authorities, have had, and could continue to have, an adverse effect on the economy and our business in many ways. This includes, but is not limited to, a continued limit on the movement of goods, services, and to some extent people, including our own workforce, resulting in worldwide disruptions in our supply chain and distribution. Adverse impacts to our customers' business operations and financial condition could lead to a decrease in their liquidity and/or spending resulting in a decrease in demand for and our customers' ability to pay for our hardware and software products, solutions, and services.

The unprecedented and continuously evolving nature of the COVID-19 pandemic make the duration and severity of its impacts difficult to predict, which could limit our ability to respond to those impacts. Additionally, the impacts described above and other impacts of the COVID-19 pandemic and responses to it could substantially increase the risk to us from the other risks described in this Item 1A. *Risk Factors.*

*VOLATILITY AND DISRUPTION OF THE CAPITAL AND CREDIT MARKETS MAY RESULT IN INCREASED COSTS TO MAINTAIN OUR CAPITAL STRUCTURE.*

Our ability to access the credit markets and the costs of borrowing are affected by the strength of our credit rating and current market conditions. If our access to credit, including the commercial paper market, is adversely affected by a change in market conditions or otherwise, our cost of borrowings may increase or our ability to fund operations may be reduced.

*OUR INDUSTRY IS HIGHLY COMPETITIVE.*

We face strong competition in all of our market segments in several significant respects. We compete based on breadth and scope of our hardware and software product portfolio and solution and service offerings, technology differentiation, the domain expertise of our employees and partners, product performance, quality of our hardware and software products, solutions, and services, knowledge of integrated systems and applications that address our customers' business challenges, pricing, delivery, and customer service. The relative importance of these factors differs across the geographic markets and product areas that we serve and across our market segments. We seek to maintain competitive pricing levels across and within geographic markets by continually developing advanced technologies for new hardware and software products and product enhancements and offering complete solutions for our customers' business problems. In addition, we continue to drive productivity to reduce our cost structure. If we fail to achieve our objectives, to keep pace with technological changes, or to provide high quality hardware and software products, solutions, and services, we may lose business or experience price erosion and correspondingly lower sales and margins. We expect the level of competition to remain high in the future, which could limit our ability to maintain or increase our market share or profitability.

## BUSINESS AND OPERATIONAL RISKS

*WE RELY ON SUPPLIERS TO PROVIDE EQUIPMENT, COMPONENTS, AND SERVICES.*

Our business requires that we buy equipment, components, and services including finished products, electronic components, and commodities. Our reliance on suppliers involves certain risks, including:

- shortages of components, commodities, or other materials, which could adversely affect our manufacturing efficiencies and ability to make timely delivery of our products, solutions, and services;

- changes in the cost of these purchases due to inflation, exchange rate fluctuations, taxes, tariffs, commodity market volatility, or other factors that affect our suppliers;

- poor quality or an insecure supply chain, which could adversely affect the reliability and reputation of our hardware and software products, solutions, and services;

- embargoes, sanctions, and other trade restrictions that may affect our ability to purchase from various suppliers; and

- intellectual property risks such as challenges to ownership of rights or alleged infringement by suppliers.

Any of these uncertainties could adversely affect our profitability and ability to compete. We also maintain several single-source supplier relationships because either alternative sources are not available or the relationship is advantageous due to performance, quality, support, delivery, capacity, or price considerations. Unavailability of, or delivery delays for, single-source components or products could adversely affect our ability to ship the related products in a timely manner. The effect of unavailability or delivery delays would be more severe if associated with our higher volume and more profitable products. Even where substitute sources of supply are available, qualifying alternative suppliers and establishing reliable supplies could cost more or result in delays and a loss of sales.

*OUR BUSINESS SUCCESS DEPENDS ON ATTRACTING, DEVELOPING, AND RETAINING HIGHLY QUALIFIED PERSONNEL.*

Our success depends on the efforts and abilities of our management team and employees. The skills, experience, and industry knowledge of our employees significantly benefit our operations and performance. The market for employees and leaders with

certain skills and experiences is very competitive, and difficulty attracting, developing, and retaining members of our management team and key employees could have a negative effect on our business, operating results, and financial condition. Maintaining a positive and inclusive culture and work environment, offering attractive compensation, benefits, and development opportunities, and effectively implementing processes and technology that enable our employees to work effectively and efficiently are important to our ability to attract and retain employees.

### WE SELL TO CUSTOMERS AROUND THE WORLD AND ARE SUBJECT TO THE RISKS OF DOING BUSINESS IN MANY COUNTRIES.

We do business in more than 100 countries around the world. In addition, our manufacturing operations, suppliers, and employees are located in many places around the world. Less than half of our total sales in 2022 were to customers outside the U.S. The future success of our business depends on growth in our sales in all global markets. Our global operations are subject to numerous financial, legal, and operating risks, such as political and economic instability; prevalence of corruption in certain countries; enforcement of contract and intellectual property rights; and compliance with existing and future laws, regulations, and policies, including those related to exports, imports, tariffs, embargoes and other trade restrictions (including sanctions placed on Russia), investments, taxation, product content and performance, employment, and repatriation of earnings. In addition, we are affected by changes in foreign currency exchange rates, inflation rates, and interest rates. The occurrence or consequences of these risks may make it more difficult to operate our business and may increase our costs, which could decrease our profitability and have an adverse effect on our financial condition.

### FAILURES OR SECURITY BREACHES OF OUR PRODUCTS, CONNECTED SERVICES, MANUFACTURING ENVIRONMENT, SUPPLY CHAIN, OR INFORMATION TECHNOLOGY SYSTEMS COULD HAVE AN ADVERSE EFFECT ON OUR BUSINESS.

We rely heavily on technology in our hardware and software products, solutions, and services for our customers' manufacturing environment, and in our enterprise infrastructure. Despite the implementation of security measures, our systems are vulnerable to unauthorized access by nation states, hackers, cyber-criminals, malicious insiders, and other actors who may engage in fraud, theft of confidential or proprietary information, or sabotage. Our systems could be compromised by malware (including ransomware), cyber attacks, and other events, ranging from widespread, non-targeted, global cyber threats to targeted advanced persistent threats. Given that our hardware and software products, solutions, and services are used in critical infrastructure, these threats could indicate increased risk for our products, services, solutions, manufacturing, and IT infrastructure. Past global cyber attacks have also been perpetuated by compromising software updates in widely-used software products, increasing the risk that vulnerabilities or malicious content could be inserted into our products. In some cases, malware attacks were spread throughout the supply chain, moving from one company to the next via authorized network connections.

Our hardware and software products, solutions, and services are used by our direct and indirect customers in applications that may be subject to information theft, tampering, sabotage, or cyber-attacks. Careless or malicious actors could cause a customer's process to be disrupted or could cause equipment to operate in an improper manner that could result in harm to people or property. While we continue to improve the security attributes of our hardware and software products, solutions, and services, we can reduce risk, not eliminate it. To a significant extent, the security of our customers' systems depends on how those systems are designed, installed, protected, configured, updated and monitored, and much of this is typically outside our control. In addition, both software and hardware supply chains introduce security vulnerabilities into many products across the industry.

Our business uses technology resources on a dispersed, global basis for a wide variety of functions including development, engineering, manufacturing, sales, accounting, and human resources. Our vendors, partners, employees, and customers have access to, and share, information across multiple locations via various digital technologies. In addition, we rely on partners and vendors, including cloud providers, for a wide range of products and outsourced activities as part of our internal IT infrastructure and our commercial offerings. Secure connectivity is important to these ongoing operations. Also, our partners and vendors frequently have access to our confidential information as well as confidential information about our customers, employees, and others. We design our security architecture to reduce the risk that a compromise of our partners' infrastructure, for example a cloud platform, could lead to a compromise of our internal systems or customer networks. In addition, our Third-Party Risk Program manages risk posed by our suppliers that have access to our confidential information, systems, or network, but this risk cannot be eliminated and vulnerabilities at third parties could result in unknown risk exposure to our business and information.

The current cyber threat environment indicates increased risk for all companies, including those in industrial automation and information. Like other global companies, we have experienced cyber threats and incidents, although none have been material or had a material adverse effect on our business or financial condition. Our information security efforts, under the leadership of our Chief Information Security Officer and Chief Product Security Officer, with the support of the entire management team, include major programs designed to address security governance and risk, product security, identification and protection of critical assets, insider risk, third-party risk, security awareness, and cyber defense operations. We believe these measures reduce, but cannot eliminate, the risk of a cybersecurity incident. Any significant security incidents could have an adverse impact on sales, harm our reputation and cause us to incur legal liability and increased costs to address such events and related security concerns.

### AN INABILITY TO RESPOND TO CHANGES IN CUSTOMER PREFERENCES COULD RESULT IN DECREASED DEMAND FOR OUR PRODUCTS.

Our success depends in part on our ability to anticipate and offer hardware and software products that appeal to the changing needs and preferences of our customers in the various markets we serve. Developing new hardware and software products requires high

levels of innovation, and the development process is often lengthy and costly. If we are not able to anticipate, identify, develop, and market products that respond to changes in customer preferences and emerging technological and broader industry trends, demand for our products could decline.

### THERE ARE INHERENT RISKS IN OUR SOLUTIONS AND SERVICES BUSINESSES.

Risks inherent in the sale of solutions and services include assuming greater responsibility for successfully delivering projects that meet a particular customer specification, including defining and controlling contract scope, efficiently executing projects, and managing the performance and quality of our subcontractors and suppliers. If we are unable to manage and mitigate these risks, we could incur cost overruns, liabilities, and other losses that would adversely affect our results of operations.

### WE RELY ON OUR DISTRIBUTION CHANNEL FOR A SUBSTANTIAL PORTION OF OUR SALES.

In North America, a large percentage of our sales are through distributors. In certain other countries, the majority of our sales are also through a limited number of distributors. We depend on the capabilities and competencies of our distributors to sell our hardware and software products, solutions, and services and deliver value to our customers. Disruptions to our existing distribution channel or the failure of distributors to maintain and develop the appropriate capabilities to sell our hardware and software products, solutions, and services could adversely affect our sales. A disruption could result from the sale of a distributor to a competitor, financial instability of a distributor, or other events.

### INTELLECTUAL PROPERTY INFRINGEMENT CLAIMS OF OTHERS AND THE INABILITY TO PROTECT OUR INTELLECTUAL PROPERTY RIGHTS COULD HARM OUR BUSINESS AND OUR CUSTOMERS.

Others may assert intellectual property infringement claims against us or our customers. We frequently provide a limited intellectual property indemnity in connection with our terms and conditions of sale to our customers and in other types of contracts with third parties. Indemnification payments and legal expenses to defend claims could be costly.

In addition, we own the rights to many patents, trademarks, brand names, and trade names that are important to our business. The inability to enforce our intellectual property rights (including as a result of counterfeit products and sales made by unauthorized resellers) may have an adverse effect on our results of operations. Expenses related to enforcing our intellectual property rights could be significant.

### INCREASING EMPLOYEE BENEFIT COSTS AND FUNDING REQUIREMENTS COULD HAVE A NEGATIVE EFFECT ON OUR OPERATING RESULTS AND FINANCIAL CONDITION.

One important aspect of attracting and retaining qualified personnel is continuing to offer competitive employee retirement and health care benefits. The expenses we record for our pension and other postretirement benefit plans depend on factors such as changes in market interest rates, the value of plan assets, mortality assumptions, and healthcare trend rates. Significant unfavorable changes in these factors would increase our expenses and funding requirements. Expenses and funding requirements related to employer-funded healthcare benefits depend on laws and regulations, which could change, as well as healthcare cost inflation. An inability to control costs and funding requirements related to employee and retiree benefits could negatively impact our operating results and financial condition.

## STRATEGIC TRANSACTIONS AND INVESTMENTS RISKS

### FAILURE TO IDENTIFY, MANAGE, COMPLETE, AND INTEGRATE STRATEGIC TRANSACTIONS MAY ADVERSELY AFFECT OUR BUSINESS OR WE MAY NOT ACHIEVE THE EXPECTED BENEFITS OF THESE TRANSACTIONS.

As part of our strategy, we pursue strategic transactions, including acquisitions, joint ventures, investments, and other business opportunities and purchases of technology from third parties. In order to be successful, we must identify attractive transaction opportunities, effectively complete the transaction, and manage post-closing matters, such as integration of the acquired business or technology (including related personnel) and cooperation with our joint venture and other strategic partners. We may not be able to identify or complete beneficial transaction opportunities given the intense competition for them. Completing these transactions requires favorable environments and we may encounter difficulties in obtaining the necessary regulatory approvals in both domestic and foreign jurisdictions. Even if we successfully identify and complete such transactions, we may not achieve the

expected benefits of such transactions and we may not be able to successfully address risks and uncertainties inherent in such transactions, including:

- difficulties in integrating the purchased or new operations, technologies, products or services, retaining customers, and achieving the expected benefits of the transaction, such as sales increases, access to technologies, cost savings, and increases in geographic or product presence, in the desired time frames;
- loss of key employees or difficulties integrating personnel;
- legal and compliance issues;
- unknown or undisclosed and unmitigated cyber risks to purchased systems, products, and services;
- difficulties implementing and maintaining consistent standards, financial systems, internal and other controls, procedures, policies, and information systems;

- difficulties maintaining relationships with our joint venture and other strategic partners (including as a result of such joint venture and other strategic partners having differing business objectives) and managing disputes with such joint venture and other strategic partners that may arise in connection with our relationships with them; and
- difficulties in yielding the desired strategic or financial benefit from venture capital investments, including as a result of being a minority investor or macroeconomic conditions.

Strategic transactions and technology investments could result in debt, dilution, liabilities, increased interest expense, restructuring charges, and impairment and amortization expenses related to goodwill and identifiable intangible assets.

### *WE OWN COMMON STOCK IN PTC INC. AND ARE EXPOSED TO THE VOLATILITY, LIQUIDITY, AND OTHER RISKS INHERENT IN HOLDING THAT STOCK.*

We own common stock of PTC Inc. (PTC), a Nasdaq-listed company. We present this investment on our Consolidated Balance Sheet at its fair value at the end of each reporting period. The fair value of our shares of PTC common stock (PTC Shares) is subject to fluctuation in the future due to the volatility of the stock market, changes in general economic conditions, and the performance of PTC. We recognize all changes in the fair value of the PTC Shares (whether realized or unrealized) as gains or losses in our Consolidated Statement of Operations. Accordingly, changes in the fair value of the PTC Shares can materially impact the earnings we report, which introduces volatility in our earnings that is not associated with the results of our business operations. In particular, significant declines in the fair value of the PTC Shares would produce significant declines in our reported earnings.

While there is an established trading market for shares of PTC common stock, there are limitations on our ability to dispose of some or all of the PTC Shares should we wish to reduce our investment. Until September 2023, we are subject to contractual restrictions on our ability to transfer the PTC Shares, subject to certain exceptions. In addition, we are subject to certain restrictions on our ability to transfer the PTC Shares under the securities laws. If we were forced to sell some or all of the PTC Shares in the market, there can be no assurance that we would be able to sell them at prices equivalent to the value of the PTC Shares that we have reported on our Consolidated Balance Sheet, and we may be forced to sell them at significantly lower prices.

Finally, our equity position in PTC is a minority position, which exposes us to further risk as we are not able to exert control over PTC.

## LEGAL, TAX, AND REGULATORY RISKS

### *NEW LEGISLATIVE AND REGULATORY ACTIONS COULD ADVERSELY AFFECT OUR BUSINESS.*

Legislative and regulatory action, including those related to corporate income taxes, the environment, materials, products, certification, and labeling, privacy, cybersecurity, or climate change, may be taken in the jurisdictions where we operate that may affect our business activities or may otherwise increase our costs to do business.

In October 2021, the Organization for Economic Cooperation and Development (OECD) and G20 Finance Ministers reached an agreement that, among other things, ensures that income earned in each jurisdiction that a multinational enterprise operates in is subject to a minimum corporate income tax rate of at least 15%. Discussions related to the formal implementation of this agreement, including within the tax law of each member jurisdiction including the United States, are ongoing. Enactment of this regulation in its current form would increase the amount of global corporate income tax paid by the Company.

We are increasingly required to comply with various environmental and other material, product, certification, and labeling laws and regulations (including the emerging European Union Eco-design for Sustainable Products Regulation). Our customers may also be required to comply with such legislative and regulatory requirements. These requirements could increase our costs and could potentially have an adverse effect on our ability to do business in certain jurisdictions. Changes in these requirements could impact demand for our hardware and software products, solutions, and services.

Compliance with privacy and cybersecurity regulations could increase our operating costs as part of our efforts to protect and safeguard our sensitive data, personal information, and IT infrastructure. Failure to maintain information privacy could result in legal liability or reputational harm.

In addition, increased public awareness and concern regarding climate change may result in more requirements or expectations that could mandate more restrictive or expansive standards, such as more prescriptive reporting of environmental, social, and governance metrics. There continues to be a lack of consistent climate change legislation and standards, which creates uncertainty. While the Company has adopted certain voluntary targets, environmental laws, regulations, or standards may be changed, accelerated, or adopted and impose significant operational restrictions and compliance requirements upon the Company, its products, or customers, which could negatively impact the Company's business, capital expenditures, results of operations, and financial condition.

### *CLAIMS FROM TAXING AUTHORITIES COULD HAVE AN ADVERSE EFFECT ON OUR INCOME TAX EXPENSE AND FINANCIAL CONDITION.*

We conduct business in many countries, which requires us to interpret and comply with the income tax laws and rulings in each of those taxing jurisdictions. Due to the ambiguity of tax laws among those jurisdictions as well as the uncertainty of how underlying facts may be construed, our estimates of income tax liabilities may differ from actual payments or assessments. We must successfully defend any claims from taxing authorities to avoid an adverse effect on our operating results and financial condition.

*POTENTIAL LIABILITIES AND COSTS FROM LITIGATION (INCLUDING ASBESTOS CLAIMS AND ENVIRONMENTAL REMEDIATION) COULD REDUCE OUR PROFITABILITY.*

Various lawsuits, claims, and proceedings have been or may be asserted against us relating to the conduct of our business or of our divested businesses, including those pertaining to the safety and security of the hardware and software products, solutions, and services we sell, employment, contract matters, and environmental remediation.

We have been named as a defendant in lawsuits alleging personal injury as a result of exposure to asbestos that was used in certain of our products many years ago. Our products may also be used in hazardous industrial activities, which could result in product liability claims. The uncertainties of litigation (including asbestos claims) and the uncertainties related to the collection of insurance proceeds make it difficult to predict the ultimate resolution of these lawsuits.

Our operations are subject to various environmental regulations concerning human health, the limitation and control of emissions and discharges into the air, ground, and water, the quality of air and bodies of water, and the handling, use, and disposal of specified substances. Our financial responsibility to clean up contaminated property or for natural resource damages may extend to previously owned or used properties, waterways and properties owned by unrelated companies or individuals, as well as properties that we currently own and use, regardless of whether the contamination is attributable to prior owners. We have been named as a potentially responsible party at cleanup sites and may be so named in the future, and the costs associated with these current and future sites may be significant.

We have, from time to time, divested certain of our businesses. In connection with these divestitures, certain lawsuits, claims, and proceedings may be instituted or asserted against us related to the period that we owned the businesses, either because we agreed to retain certain liabilities related to these periods or because such liabilities fall upon us by operation of law. In some instances, the divested business has assumed the liabilities; however, it is possible that we might be responsible for satisfying those liabilities if the divested business is unable to do so.

# ITEM 1B.  UNRESOLVED STAFF COMMENTS

None.

# ITEM 2.  PROPERTIES

Our global headquarters in Milwaukee, Wisconsin, an owned facility, includes product development, sales, marketing, manufacturing, supply chain operations, finance, and other administrative and executive office functions. Most of our other facilities are leased and shared across our three operating segments. At September 30, 2022, the Company had approximately 50 manufacturing and distribution locations worldwide, disbursed evenly across our regions.

There are no major encumbrances (other than financing arrangements, which in the aggregate are not significant) on any of our properties or equipment. Our properties and equipment are in good operating condition and are adequate for our present needs. We do not anticipate difficulty in renewing existing leases as they expire or in finding alternative facilities.

# ITEM 3.  LEGAL PROCEEDINGS

The information required by this Item 3 is contained in Note 17 in the Consolidated Financial Statements within the section entitled *Other Matters*.

# ITEM 4.  MINE SAFETY DISCLOSURES

Not applicable.

# ITEM 4A. INFORMATION ABOUT OUR EXECUTIVE OFFICERS

The name, age, office and position held with the Company, and principal occupations and employment during the past five years of each of the executive officers of the Company as of November 1, 2022 are:

| Name, Office and Position, and Principal Occupations and Employment | Age |
|---|---|
| **Blake D. Moret** | Chairman of the Board since January 1, 2018, and President and Chief Executive Officer since July 1, 2016 | 59 |
| Nicholas C. Gangestad | Senior Vice President and Chief Financial Officer since March 1, 2021; previously Senior Vice President and Chief Financial Officer, 3M Company (consumer goods, health care and worker safety) | 58 |
| Scott A. Genereux | Senior Vice President and Chief Revenue Officer since February 1, 2021; previously Executive Vice President of Worldwide Field Operations at Veritas (provider of information management services) (2017-2020), and Senior Vice President at Oracle (cloud applications and platform services) | 59 |
| Rebecca W. House | Senior Vice President, Chief People (since July 2020) and Legal Officer and Secretary since January 3, 2017 | 49 |
| Frank C. Kulaszewicz | Senior Vice President Lifecycle Services since October 1, 2020; previously Senior Vice President | 58 |
| Veena M. Lakkundi | Senior Vice President, Strategy and Corporate Development since November 1, 2021; previously Senior Vice President, Strategy & Business Development (2020-2021), Vice President and General Manager, Industrial Adhesives and Tapes Division (2019-2020), Vice President and Chief Ethics & Compliance Officer, Compliance and Business Conduct, Legal Affairs (2017-2019) at 3M Company (consumer goods, health care and worker safety) | 53 |
| John M. Miller | Vice President and Chief Intellectual Property Counsel | 55 |
| Tessa M. Myers | Senior Vice President Intelligent Devices since June 6, 2022; previously Vice President and General Manager, Production Operations Management (from April 2021-June 2022), Vice President, Product Management (from October 2020-April 2021), and Regional President, North America | 46 |
| Christopher Nardecchia | Senior Vice President and Chief Information Officer since November 1, 2017 | 60 |
| Cyril P. Perducat | Senior Vice President (since June 1, 2021) and Chief Technology Officer since July 1, 2021; previously Executive Vice President, Schneider Electric (energy and automation digital solutions) | 53 |
| Terry L. Riesterer | Vice President and Controller since November 29, 2019; previously Vice President, Corporate Financial Planning and Analysis and Corporate Development (from August 2016-November 2019) and Vice President, Global Finance Operations | 54 |
| Brian A. Shepherd | Senior Vice President Software and Control since February 1, 2021; previously President, Production Software SFx (2019-2020) and Senior Vice President, Software Solutions (2017-2019) at Hexagon Manufacturing Intelligence (metrology and manufacturing solution specialist), and Executive Vice President, PTC Inc. (digital technology) | 57 |
| Isaac R. Woods | Vice President and Treasurer since October 1, 2020; previously Director, Finance, Power Control Business (from March 2019-October 2020), Director, Capital Markets (from January 2017-March 2019), and Manager, Corporate Finance and Investor Relations | 37 |
| Francis S. Wlodarczyk | Senior Vice President since June 1, 2022; previously Senior Vice President Intelligent Devices (from October 2020-June 2022) and Senior Vice President (from July 2018-October 2020) | 57 |

There are no family relationships, as defined by applicable SEC rules, between any of the above executive officers and any other executive officer or director of the Company. No officer of the Company was selected pursuant to any arrangement or understanding between the officer and any person other than the Company. All executive officers are elected annually.

# PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES

### MARKET INFORMATION

Our common stock, $1 par value, is listed on the New York Stock Exchange and trades under the symbol "ROK". On October 31, 2022, there were 12,652 shareowners of record of our common stock.

### COMPANY PURCHASES

The table below sets forth information with respect to purchases made by or on behalf of us of shares of our common stock during the three months ended September 30, 2022:

| Period | Total Number of Shares Purchased[1] | Average Price Paid Per Share[2] | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Approx. Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs[3] |
|---|---|---|---|---|
| July 1 – 31, 2022 | 193,368 | $   208.92 | 193,368 | $   1,286,459,441 |
| August 1 – 31, 2022 | 73,880 | 249.01 | 73,880 | 1,268,062,555 |
| September 1 – 30, 2022 | 71,780 | 234.01 | 71,780 | 1,251,265,224 |
| Total | 339,028 | $   222.97 | 339,028 | |

*(1) All of the shares purchased during the quarter ended September 30, 2022, were acquired pursuant to the repurchase program described in (3) below.*

*(2) Average price paid per share includes brokerage commissions.*

*(3) On both July 24, 2019, and May 2, 2022, the Board of Directors authorized us to expend an additional $1.0 billion to repurchase shares of our common stock. Our repurchase program allows us to repurchase shares at management's discretion or at our broker's discretion pursuant to a share repurchase plan subject to price and volume parameters.*

### PERFORMANCE GRAPH

The following information is not deemed to be "soliciting material" or to be "filed" with the SEC or subject to Regulation 14A or 14C under the Exchange Act or to the liabilities of Section 18 of the Exchange Act, and will not be deemed to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent the Company specifically incorporates it by reference into such a filing.

The following line graph compares the cumulative total shareowner return on our common stock against the cumulative total return of the S&P Composite-500 Stock Index (S&P 500 Index), the S&P 500 Selected GICS groups (Capital Goods, Software & Services, and Technology Hardware & Equipment), and the S&P Electrical Components & Equipment Index for the period of five fiscal years from October 1, 2017, to September 30, 2022, assuming in each case a fixed investment of $100 at the respective closing prices on September 30, 2017, and reinvestment of all dividends.

For performance shares awarded in fiscal 2021, we changed our relative performance benchmark group from the S&P 500 Index to the S&P 500 Selected GICS groups noted above in order to include companies that are more aligned with the Company's strategic direction. Accordingly, we will begin comparing our cumulative total shareowner return to the cumulative total return of both the S&P 500 Index and the S&P 500 Selected GICS groups (weighted based on respective GICS market capitalization) in the following graph. We have included the S&P Electrical Components & Equipment Index for this fiscal year only for comparative purposes to prior fiscal year graphs.



The cumulative total returns on Rockwell Automation common stock and each index as of September 30, 2017 through 2022 plotted in the above graph are as follows:

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Rockwell Automation[1] | $ 100.00 | $ 107.27 | $ 96.48 | $ 131.85 | $ 178.54 | $ 132.89 |
| S&P 500 Index | 100.00 | 117.90 | 122.90 | 141.50 | 183.93 | 155.43 |
| S&P Selected GICS groups | 100.00 | 126.80 | 136.68 | 195.25 | 248.49 | 210.34 |
| S&P Electrical Components & Equipment | 100.00 | 115.84 | 111.96 | 130.07 | 188.42 | 149.34 |
| Cash dividends per common share | 3.04 | 3.51 | 3.88 | 4.08 | 4.28 | 4.48 |

*(1)   Includes the reinvestment of all dividends in our common stock.*

# ITEM 6.  RESERVED

Not required.

# ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

## RESULTS OF OPERATIONS

### NON-GAAP MEASURES

The following discussion includes organic sales, total segment operating earnings and margin, Adjusted Income, Adjusted EPS, Adjusted Effective Tax Rate and free cash flow, which are non-GAAP measures. See **Supplemental Sales Information** for a reconciliation of reported sales to organic sales and a discussion of why we believe this non-GAAP measure is useful to investors. See *Summary of Results of Operations* for a reconciliation of Income before income taxes to total segment operating earnings and margin and a discussion of why we believe these

non-GAAP measures are useful to investors. See *Adjusted Income, Adjusted EPS, and Adjusted Effective Tax Rate Reconciliation* for a reconciliation of Net income attributable to Rockwell Automation, diluted EPS, and effective tax rate to Adjusted Income, Adjusted EPS, and Adjusted Effective Tax Rate, respectively, and a discussion of why we believe these non-GAAP measures are useful to investors. See **Financial Condition** for a reconciliation of cash flows from operating activities to free cash flow and a discussion of why we believe this non-GAAP measure is useful to investors.

## OVERVIEW

Rockwell Automation, Inc. is a global leader in industrial automation and digital transformation. We connect the imaginations of people with the potential of technology to expand what is humanly possible, making the world more productive and more sustainable. Overall demand for our hardware and software products, solutions, and services is driven by:

- investments in manufacturing, including upgrades, modifications and expansions of existing facilities or production lines, and new facilities or production lines;

- investments in basic materials production capacity, which may be related to commodity pricing levels;

- our customers' needs for faster time to market, operational productivity, asset management and reliability, and enterprise risk management;

- our customers' needs to continuously improve quality, safety, and sustainability;

- industry factors that include our customers' new product introductions, demand for our customers' products or services, and the regulatory and competitive environments in which our customers operate;

- levels of global industrial production and capacity utilization;

- regional factors that include local political, social, regulatory, and economic circumstances; and

- the spending patterns of our customers due to their annual budgeting processes and their working schedules.

## LONG-TERM STRATEGY

Our strategy is to bring The Connected Enterprise to life by integrating control and information across the enterprise. We deliver customer outcomes by combining advanced industrial automation with the latest information technology. Our growth and performance strategy seeks to:

- achieve organic sales growth in excess of the automation market by expanding our served market and strengthening our competitive differentiation;

- grow market share of our core platforms;

- drive double digit growth in information solutions and connected services;

- drive double digit growth in annual recurring revenue (ARR);

- acquire companies that serve as catalysts to organic growth by increasing our information solutions and high-value services offerings and capabilities, expanding our global presence, or enhancing our process expertise;

- enhance our market access by building our channel capability and partner network;

- deploy human and financial resources to strengthen our technology leadership and our intellectual capital business model;

- continuously improve quality and customer experience; and

- drive annual cost productivity.

By implementing the above strategy, we seek to achieve our long-term financial goals, including above-market organic sales growth, increasing the portion of our total revenue that is recurring

in nature, EPS growth above sales growth, return on invested capital in excess of 20 percent, and free cash flow equal to about 100 percent of Adjusted Income. We expect acquisitions to add a percentage point or more per year to long-term sales growth.

Our customers face the challenge of remaining globally cost competitive and automation can help them achieve their productivity and sustainability objectives. Our value proposition is to help our customers reduce time to market, lower total cost of ownership, improve asset utilization and manage enterprise risks.

## DIFFERENTIATION THROUGH TECHNOLOGY INNOVATION AND DOMAIN EXPERTISE

Our integrated control and information architecture, with Logix at its core, is an important differentiator. We are the only automation provider that can support discrete, process, batch, safety, motion, and power control on the same hardware platform with the same software programming environment. Our integrated architecture is scalable with standard open communications protocols making it easier for customers to implement it more cost effectively. Our information software portfolio, combined with the software made available as a result of our strategic alliance with PTC, is the most comprehensive and flexible information platform in the industry. Through the combination of this technology and our domain expertise we help customers to achieve additional productivity benefits, such as reduced unplanned downtime, improved energy efficiency, higher quality, and increased throughput yield.

Intelligent motor control is one of our core competencies and an important aspect of an automation system. These hardware and software products and solutions enhance the availability, efficiency and safe operation of our customers' critical and most energy-intensive plant assets. Our intelligent motor control offering can be integrated seamlessly with the Logix architecture.

Domain expertise refers to the industry and application knowledge required to deliver solutions and services that support customers through the entire life cycle of their automation investment. The combination of industry-specific domain expertise of our people with our innovative technologies enables us to help our customers solve their manufacturing and business challenges.

## GLOBAL EXPANSION

As the manufacturing world continues to expand, we must be able to meet our customers' needs around the world. Approximately 66 percent of our employees and less than half of our total sales are outside the U.S. We continue to expand our footprint in emerging markets.

As we expand in markets with considerable growth potential and shift our global footprint, we expect to continue to broaden the portfolio of hardware and software products, solutions, and services that we provide to our customers in these regions. We have made significant investments to globalize our manufacturing, product development and customer-facing resources in order to be closer to our customers throughout the world. The emerging markets of Asia Pacific, including China and India, Latin America, Central and Eastern Europe and Africa are projected to be the fastest growing over the long term, due to higher levels of infrastructure investment and the growing middle-class

population. We believe that increased demand for consumer products in these markets will lead to manufacturing investment and provide us with additional growth opportunities in the future.

## ENHANCED MARKET ACCESS

Over the past decade, our investments in technology and globalization have enabled us to expand our addressed market to over $100 billion. Our process initiative has been the most important contributor to this expansion and remains our largest growth opportunity.

Original Equipment Manufacturers (OEMs) represent another area of addressed market expansion and an important growth opportunity. To remain competitive, OEMs need to find the optimal balance of machine cost and performance while reducing their time to market. Our scalable integrated architecture and intelligent motor control offerings, along with design productivity tools and our motion and safety products, can assist OEMs in addressing these business needs.

We have developed a powerful network of channel partners, technology partners and commercial partners that act as amplifiers to our internal capabilities and enable us to serve our customers' needs around the world.

## BROAD RANGE OF INDUSTRIES SERVED

We apply our knowledge of manufacturing applications to help customers solve their business challenges. We serve customers in a wide range of industries, which we group into three broad categories: discrete, hybrid, and process.

| Discrete | Hybrid | Process |
|---|---|---|
| Automotive | Food & Beverage | Oil & Gas |
| Semiconductor | Life Sciences | Mining |
| Warehousing & E-commerce | Household & Personal Care | Metals |
| General Industries | Tire | Chemicals |
| Printing & Publishing | Eco Industrial | Pulp & Paper |
| Marine | Water / Wastewater | Other Process |
| Glass | Waste Management | |
| Fiber & Textiles | Mass Transit | |
| Airports | Renewable Energy | |
| Aerospace | | |
| Other Discrete | | |

## OUTSOURCING AND SUSTAINABILITY TRENDS

Demand for our hardware and software products, solutions, and services across all industries benefits from the outsourcing and sustainability needs of our customers. Customers increasingly desire to outsource engineering services to achieve a more flexible cost base. Our manufacturing application knowledge enables us to serve these customers globally.

We help our customers meet their sustainability needs pertaining to energy efficiency, environmental, and safety goals. Customers across all industries are investing in more energy-efficient manufacturing processes and technologies, such as intelligent motor control, and energy-efficient solutions and services. In addition, environmental and safety objectives, including those related to combating climate change, often spur customers to invest to ensure compliance and implement sustainable business practices. As customers seek to be more sustainable, our offering of hardware and software products provide strategic opportunities to appeal to their changing needs and preferences.

## ACQUISITIONS AND INVESTMENTS

Our acquisition and investment strategy focuses on hardware and software products, solutions, and services that will be catalytic to the organic growth of our core offerings.

In March 2022, we, through our Sensia affiliate, acquired Swinton Technology, a provider of meeting supervisory systems and measurement expertise in the Oil & Gas industry.

In November 2021, we acquired AVATA, a services provider for supply chain management, enterprise resource planning, and enterprise performance management solutions.

In August 2021, we acquired Plex Systems, a cloud-native smart manufacturing platform. Plex offers a single-instance, multi-tenant Software-as-a-Service manufacturing platform, including advanced manufacturing execution systems, quality, and supply chain management capabilities.

In December 2020, we acquired Fiix Inc., a privately-held, artificial intelligence enabled computerized maintenance management system (CMMS) company based in Toronto, Ontario, Canada. Fiix's cloud-native CMMS creates workflows for the scheduling, organizing, and tracking of equipment maintenance; connects seamlessly to business systems; and drives data-driven decisions.

In October 2020, we acquired Oylo, a privately-held industrial cybersecurity services provider based in Barcelona, Spain. Oylo provides a broad range of industrial control system cybersecurity services and solutions including assessments, turnkey implementations, managed services and incident response.

In April 2020, we acquired ASEM, S.p.A., a provider of digital automation technologies based in Italy. ASEM's products will allow us to provide customers with a high degree of configurability for their industrial computing needs, allow them to achieve faster time to market, lower their cost of ownership, improve asset utilization, and better manage enterprise risk.

In April 2020, we also acquired Kalypso, LP, a privately-held U.S.-based software delivery and consulting firm specializing in the digital transformation of industrial companies with a strong client base in life sciences, consumer products and industrial high-tech.

In January 2020, we acquired Avnet Data Security, LTD, an Israel-based cybersecurity provider with over 20 years of experience. Avnet's combination of service delivery, training, research, and managed services enables us to serve more customers and accelerate our portfolio development.

In October 2019, we completed the formation of a joint venture, Sensia, a fully integrated digital oilfield automation solutions provider, with SLB. The joint venture leverages SLB's oil and gas domain knowledge and our automation and information expertise. Rockwell Automation owns 53% of Sensia and SLB owns 47% of Sensia.

In October 2019, we also acquired MESTECH Services, a global provider of Manufacturing Execution Systems / Manufacturing Operations Management, digital solutions consulting, and systems integration services. The acquisition of MESTECH expands our capabilities to profitably grow information solutions and connected services globally and accelerate our ability to help our customers execute digital transformation initiatives.

In January 2019, we acquired Emulate3D, an innovative engineering software developer whose products digitally simulate and emulate industrial automation systems. This acquisition enables our customers to virtually test machine and system designs before incurring manufacturing and automation costs and committing to a final design.

In addition, we make venture investments that enable access to complementary and leading edge technologies aligned with our strategic priorities, accelerating internal development efforts, reducing time to market, and as a hedge against disruptive technologies.

We believe these acquisitions and investments will help us expand our served market and deliver value to our customers.

## ATTRACTING, DEVELOPING, AND RETAINING HIGHLY QUALIFIED TALENT

At Rockwell Automation, we promise to expand human possibility within our company and throughout the world of industrial production, and we work to attract and develop highly engaged people who can and want to do their best work.

Our commitment to diversity, equity, and inclusion starts at the top. Our 11 board members include three female and two African American directors. In fiscal 2021, we hired our first chief diversity officer and made investments to accelerate our efforts to increase diversity, equity, and inclusion across the company.

A culture of integrity is fundamental to Rockwell's core values, including a formal ethics and compliance organization and an Ombuds office that investigates ethical and legal concerns brought forth by employees. Our code of conduct, along with our partner code of conduct and supplier code of conduct prohibits corrupt acts, bribery, and anticompetitive behavior. Employee training is used to reinforce our values companywide, with participation in trainings related to ethics, environment, health and safety, and emergency responses at or near 100%.

There are several ways in which we attract, develop, and retain highly qualified talent, including:

- we make the safety and health of our employees a top priority. We strive for zero workplace injuries and illnesses and operate in a manner that recognizes safety as fundamental to Rockwell Automation being a great place to work. In fiscal 2022, we achieved 0.38 recordable cases per 100 employees.

- we capture and act upon employee feedback through our annual employee engagement survey. It measures several engagement indicators and drivers and provides an overall employee engagement index (EEI) with external benchmark comparison. The latest survey, conducted in March 2022, showed an EEI of 76, which was equal to a global norm for this index. Our global inclusion index score was 77, two points higher than the global benchmark of 75.

- we invest in growth and development of our employees. As the pace of change increases, it is important we provide re-skilling and upskilling opportunities for our technical talent, along with soft skills and leadership development for all. We offer a portfolio of all employee, managerial, and leader training that spans on-demand, virtual, and live instructor-led formats. Our programs focus on basic as well as transformational skills. We take pride in our culture and in fiscal 2021 created an opportunity for our employees to participate in team-based culture workshops. In fiscal 2022, the majority of our employees completed one or more of our training programs representing over 500,000 learning hours.

- we offer employee assistance and work life benefits to all global employees. Our comprehensive benefits include healthcare benefits, disability and life insurance benefits, paid time off, and leave programs. Rockwell offers plans and resources to help employees meet future savings goals through defined benefit and retirement savings plans. We offer flextime, remote work, and part-time arrangements whenever business conditions permit. We believe that face to face interaction is critical for our culture, innovation, people development, and engagement, and that flexible, virtual work arrangements help employees be more productive and engaged. During fiscal 2022, we launched our Hybrid Workplace Program, which combines the values of both physical workspaces and virtual work options, both of which are important for attracting, retaining, and developing talent and facilitating innovation, engagement, and productivity.

We monitor employee retention and attrition rates by demographic factors including by gender, ethnicity, generation, years of service, career role, region, business, and function. We generally experienced higher attrition rates in fiscal 2022 as compared to fiscal 2021. We believe the increase is consistent with market trends experienced broadly across labor markets in fiscal 2022. We use attrition rate information to identify and address unfavorable trends to mitigate risk to our business. See Item 1A. *Risk Factors* for a discussion of risks relating to our inability to attract, develop, and retain highly qualified talent.

At September 30, 2022, our employees, including those employed by consolidated subsidiaries, by region were approximately:

| | |
|---|---|
| North America | 10,000 |
| Europe, Middle East and Africa | 5,500 |
| Asia Pacific | 6,000 |
| Latin America | 4,500 |
| Total employees | 26,000 |

Our employees had the following global gender demographics based on voluntary disclosure:

| | September 30, 2022 | |
|---|---|---|
| | Women | Men |
| All employees | 32% | 68% |
| Individual Contributors | 33% | 67% |
| People Managers | 26% | 74% |
| Technical Talent | 17% | 83% |
| Manufacturing Associates | 48% | 52% |

Our U.S. employees had the following race and ethnicity demographics based on voluntary disclosure:

| | September 30, 2022 | | | | | |
|---|---|---|---|---|---|---|
| | Black / African American | Asian | Hispanic / Latinx | White | Multiracial, Native American and Pacific Islander | Undisclosed |
| All U.S. Employees | 7% | 9% | 5% | 73% | 2% | 4% |
| Individual Contributors | 7% | 10% | 5% | 72% | 2% | 4% |
| People Managers | 6% | 7% | 5% | 78% | 1% | 3% |
| Technical Talent | 6% | 12% | 6% | 72% | 2% | 2% |
| Manufacturing Associates | 14% | 13% | 3% | 54% | 2% | 14% |

## CONTINUOUS IMPROVEMENT

Productivity and continuous improvement are important components of our culture. We have programs in place that drive ongoing process improvement, functional streamlining, material cost savings, and manufacturing productivity. These are intended to improve profitability that can be used to fund investments in growth and to offset inflation. Our ongoing productivity initiatives target both cost reduction and improved asset utilization. Charges for workforce reductions and facility rationalization may be required in order to effectively execute our productivity programs.

## U.S. ECONOMIC TRENDS

In 2022, sales in the U.S. accounted for over half of our total sales. The various indicators we use to gauge the direction and momentum of our served U.S. markets include:

- the Industrial Production (IP) Index, published by the Federal Reserve, which measures the real output of manufacturing, mining, and electric and gas utilities. The IP Index is expressed as a percentage of real output in a base year, currently 2017. Historically, there has been a meaningful correlation between the changes in the IP Index and the level of automation investment made by our U.S. customers in their manufacturing base.

- the Manufacturing Purchasing Managers' Index (PMI), published by the Institute for Supply Management (ISM), which indicates the current and near-term state of manufacturing activity in the U.S. According to the ISM, a PMI measure above 50 indicates that the U.S. manufacturing economy is generally expanding while a measure below 50 indicates that it is generally contracting.

The table below depicts the trends in these indicators from fiscal 2020 to 2022. These figures are as of November 8, 2022, and are subject to revision by the issuing organizations. The IP

index rose 0.5, a slower rate of acceleration, in the fourth quarter of fiscal 2022 versus the third quarter of fiscal 2022. The U.S. manufacturing sector continued to expand in the fourth quarter with PMI remaining above 50, however, this is the lowest rate since the pandemic recovery began, reflecting an easing of demand.

| | IP Index | PMI |
|---|---|---|
| **Fiscal 2022 quarter ended:** | | |
| September 2022 | 102.4 | 50.9 |
| June 2022 | 101.9 | 53.0 |
| March 2022 | 101.1 | 57.1 |
| December 2021 | 100.1 | 58.8 |
| **Fiscal 2021 quarter ended:** | | |
| September 2021 | 98.8 | 60.5 |
| June 2021 | 97.9 | 60.9 |
| March 2021 | 96.7 | 63.7 |
| December 2020 | 96.1 | 60.5 |
| **Fiscal 2020 quarter ended:** | | |
| September 2020 | 94.1 | 55.7 |
| June 2020 | 84.6 | 52.2 |
| March 2020 | 97.5 | 49.7 |
| December 2019 | 101.7 | 47.8 |

During 2022, inflation in the U.S. has had an impact on our input costs and pricing. The Producer Price Index (PPI), published by the Bureau of Labor Statistics, measures the average change over time in the selling prices received by domestic producers for their output. PPI for September 30, 2022, June 30, 2022, March 31, 2022, and December 31, 2021, increased 8.5 percent, 11.3 percent, 11.7 percent, and 10.0 percent, respectively, compared to September 30, 2021, June 30, 2021, March 31, 2021, and December 31, 2020. These figures are as of November 8, 2022, and are subject to revision by the issuing organization.

## NON-U.S. ECONOMIC TRENDS

In 2022, sales to customers outside the U.S. accounted for less than half of our total sales. These customers include both indigenous companies and multinational companies with a global presence. In addition to the global factors previously mentioned in the *Overview* section, international demand, particularly in emerging markets, has historically been driven by the strength of the industrial economy in each region, investments in infrastructure, and expanding consumer markets. We use changes in key countries' gross domestic product (GDP), IP, and PMI as indicators of the growth opportunities in each region where we do business. Industrial output outside the U.S. was mixed in the fourth quarter of fiscal 2022.

Global GDP forecasts are mixed, with Europe, Middle East, and Africa and Latin America projected to see slowing growth from 2022 to 2023 and Asia projected to see flat to slightly higher growth. Supply chain disruptions, labor shortages, and global inflation are expected to remain persistent in 2023, along with elevated geopolitical instability.

## SUPPLY CHAIN

We have a global supply chain, including a network of suppliers and manufacturing and distribution facilities. The supply chain is stressed by increased demand, along with pandemic-related and other global events that have put additional pressures on manufacturing output and freight lanes. This has resulted in and could continue to result in:

- disruptions in our supply chain;
- difficulty in procuring or inability to procure components and materials necessary for our hardware and software products, solutions, and services;
- increased costs for commodities, components, and freight services; and
- delays in delivering, or an inability to deliver, our hardware and software products, solutions, and services.

Our total order backlog consists of (in millions):

| | September 30, | | | |
|---|---|---|---|---|
| | | 2022 | | 2021 |
| Intelligent Devices | $ | 2,086.1 | $ | 1,052.8 |
| Software & Control | | 1,456.8 | | 618.2 |
| Lifecycle Services | | 1,654.1 | | 1,239.5 |
| Total Company | $ | 5,197.0 | $ | 2,910.5 |

See Note 2 in the Consolidated Financial Statements for additional information on the nature of our products and services and revenue recognition.

We are closely managing our end-to-end supply chain, from sourcing to production to customer delivery, with a particular focus on all critical and at-risk suppliers and supplier locations globally. We have made large-scale investments to increase capacity across our network in support of our orders growth. Additional actions we are taking include:

- extending order visibility to our supply base to ensure we are appropriately planning for extended component lead times;
- securing longer-term supply agreements with critical partners;
- re-engineering of existing products to increase component supply resiliency;
- capacity investments, including redundant manufacturing lines and additional electronic assembly equipment; and
- qualification of additional suppliers to diversify our supplier base.

We believe these and other actions we are taking will over time normalize our product lead times and reduce our backlog.

## COVID-19 PANDEMIC

We continue to monitor the impacts of the COVID-19 pandemic on all aspects of our business and geographies. Uncertainty on the duration and severity of those impacts remains due to the evolving nature of the pandemic, government responses to it, and regulations across the geographies in which our business operates. We are continuously responding to the changing conditions created by the pandemic and evolving regulations and remain focused on our priorities including employee health and safety, our customer needs, and protecting critical investments to drive long-term differentiation.

## OUTLOOK

The table below provides guidance for sales growth and earnings per share for fiscal 2023 as of November 8, 2022. Our guidance reflects record backlog and assumes continued supply chain stabilization.

| Sales Growth Guidance | | EPS Guidance | |
|---|---|---|---|
| Reported sales growth | 7.5% - 11.5% | Diluted EPS | $9.54 - $10.34 |
| Organic sales growth[1] | 9.0% - 13.0% | Adjusted EPS[1] | $10.20 - $11.00 |
| Inorganic sales growth | ~ 1.0% | | |
| Currency translation | ~ (2.5)% | | |

(1)   *Organic sales growth and Adjusted EPS are non-GAAP measures. See* **Supplemental Sales Information** *and* **Adjusted Income, Adjusted EPS, and Adjusted Effective Tax Rate Reconciliation** *for more information on these non-GAAP measures.*
Note: Guidance includes estimated impact of CUBIC acquisition in fiscal year 2023.

PART II
ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

## SUMMARY OF RESULTS OF OPERATIONS

The following table reflects our sales and operating results (in millions, except per share amounts and percentages):

| | | Year Ended September 30, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2020 |
| Sales | | | | | | |
| Intelligent Devices (a) | $ | 3,544.6 | $ | 3,311.9 | $ | 2,956.0 |
| Software & Control (b) | | 2,312.9 | | 1,947.0 | | 1,681.3 |
| Lifecycle Services (c) | | 1,902.9 | | 1,738.5 | | 1,692.5 |
| Total sales (d) | $ | 7,760.4 | $ | 6,997.4 | $ | 6,329.8 |
| Segment operating earnings[1] | | | | | | |
| Intelligent Devices (e) | $ | 717.6 | $ | 702.1 | $ | 587.8 |
| Software & Control (f) | | 666.7 | | 531.0 | | 473.8 |
| Lifecycle Services (g) | | 158.3 | | 158.2 | | 196.3 |
| Total segment operating earnings[2] (h) | | 1,542.6 | | 1,391.3 | | 1,257.9 |
| Purchase accounting depreciation and amortization | | (103.9) | | (55.1) | | (41.4) |
| Corporate and other | | (104.7) | | (120.6) | | (98.9) |
| Non-operating pension and postretirement benefit cost | | (4.7) | | (63.8) | | (37.4) |
| Change in fair value of investments | | (136.9) | | 397.4 | | 153.9 |
| Legal settlement | | — | | 70.0 | | — |
| Interest expense, net | | (118.8) | | (93.0) | | (98.0) |
| Income before income taxes (i) | | 1,073.6 | | 1,526.2 | | 1,136.1 |
| Income tax provision | | (154.5) | | (181.9) | | (112.9) |
| Net income | | 919.1 | | 1,344.3 | | 1,023.2 |
| Net loss attributable to noncontrolling interests | | (13.1) | | (13.8) | | (0.2) |
| NET INCOME ATTRIBUTABLE TO ROCKWELL AUTOMATION | $ | 932.2 | $ | 1,358.1 | $ | 1,023.4 |
| DILUTED EPS | $ | 7.97 | $ | 11.58 | $ | 8.77 |
| ADJUSTED EPS[3] | $ | 9.49 | $ | 9.43 | $ | 7.87 |
| DILUTED WEIGHTED AVERAGE OUTSTANDING SHARES | | 116.7 | | 117.1 | | 116.6 |
| Pre-tax margin (i/d) | | 13.8% | | 21.8% | | 17.9% |
| Intelligent Devices segment operating margin (e/a) | | 20.2% | | 21.2% | | 19.9% |
| Software & Control segment operating margin (f/b) | | 28.8% | | 27.3% | | 28.2% |
| Lifecycle Services segment operating margin (g/c) | | 8.3% | | 9.1% | | 11.6% |
| Total segment operating margin[2] (h/d) | | 19.9% | | 19.9% | | 19.9% |

(1)  *See Note 19 in the Consolidated Financial Statements for the definition of segment operating earnings.*

(2)  *Total segment operating earnings and total segment operating margin are non-GAAP financial measures. We exclude purchase accounting depreciation and amortization, corporate and other, non-operating pension and postretirement benefit cost, change in fair value of investments, the $70 million legal settlement in fiscal 2021, interest expense, net, and income tax provision because we do not consider these items to be directly related to the operating performance of our segments. We believe total segment operating earnings and total segment operating margin are useful to investors as measures of operating performance. We use these measures to monitor and evaluate the profitability of our operating segments. Our measures of total segment operating earnings and total segment operating margin may be different from measures used by other companies.*

(3)  *Adjusted EPS is a non-GAAP earnings measure. See **Adjusted Income, Adjusted EPS, and Adjusted Effective Tax Rate Reconciliation** for more information on this non-GAAP measure.*

## 2022 COMPARED TO 2021

### SALES

Sales in fiscal 2022 increased 10.9 percent compared to 2021. Organic sales increased 11.3 percent. Currency translation decreased sales by 2.7 percentage points. Acquisitions increased sales by 2.3 percentage points. Organic annual recurring revenue at September 30, 2022, grew approximately 14 percent compared to September 30, 2021. See *Organic Annual Recurring Revenue* for information on this measure. Pricing increased sales in our Intelligent Devices and Software & Control operating segments by approximately 3.3 percentage points.

The table below presents our sales for the year ended September 30, 2022, attributed to the geographic regions based upon country of destination, and the percentage change from the same period in 2021 (in millions, except percentages). The results by region, segment, and industry were primarily driven by component availability rather than the underlying demand.

| | | Year Ended September 30, 2022 | Change vs. Year Ended September 30, 2021 | Change in Organic Sales[1] vs. Year Ended September 30, 2021 |
|---|---|---|---|---|
| North America | $ | 4,722.0 | 14.3% | 10.7% |
| Europe, Middle East and Africa | | 1,437.6 | 2.3% | 11.8% |
| Asia Pacific | | 1,088.0 | 7.5% | 10.8% |
| Latin America | | 512.8 | 14.8% | 15.8% |
| TOTAL COMPANY SALES | $ | 7,760.4 | 10.9% | 11.3% |

(1)  *Organic sales and organic sales growth exclude the effect of acquisitions, changes in currency exchange rates, and divestitures. See **Supplemental Sales Information** for information on these non-GAAP measures.*

### CORPORATE AND OTHER

Corporate and other expenses were $104.7 million in fiscal 2022 compared to $120.6 million in fiscal 2021. The prior year includes deal costs associated with the acquisition of Plex Systems.

### INCOME BEFORE INCOME TAXES

Income before income taxes decreased to $1,073.6 million in 2022 from $1,526.2 million in 2021, primarily due to fair-value adjustments recognized in connection with our investment in PTC (the "PTC adjustments") and a $70 million pre-tax favorable legal settlement in the first quarter of fiscal 2021, partially offset by higher operating earnings. Total segment operating earnings increased to $1,542.6 million from $1,391.3 million in 2021, primarily due to higher sales, including price increases, and lower incentive compensation, partially offset by higher input costs and higher investment spend.

### INCOME TAXES

The effective tax rate in 2022 was 14.4 percent compared to 11.9 percent in 2021. The Adjusted Effective Tax Rate in 2022 was 16.0 percent compared to 11.6 percent in 2021. The increases in the effective tax rate and the Adjusted Effective Tax Rate were primarily due to higher discrete benefits in the prior year.

See Note 16 in the Consolidated Financial Statements for a complete reconciliation of the United States statutory tax rate to the effective tax rate and more information on tax events in 2022 and 2021 affecting each year's respective tax rates.

### DILUTED EPS AND ADJUSTED EPS

Fiscal 2022 Net income attributable to Rockwell Automation was $932.2 million or $7.97 per share, compared to $1,358.1 million or $11.58 per share in fiscal 2021. The decreases in Net income attributable to Rockwell Automation and diluted EPS were primarily due to the PTC adjustments and a $70 million pre-tax favorable legal settlement in the first quarter of fiscal 2021, partially offset by higher operating earnings. Adjusted EPS was $9.49 in fiscal 2022, up 0.6 percent compared to $9.43 in fiscal 2021, primarily due to higher sales, including price increases, and lower incentive compensation, partially offset by higher input costs, higher investment spend, higher tax rate, and the prior year favorable legal settlement.

## INTELLIGENT DEVICES

### SALES

Intelligent Devices sales increased 7.0 percent in 2022 compared to 2021. Organic sales increased 9.7 percent. The effects of currency translation decreased sales by 2.7 percentage points. All regions experienced sales increases.

### SEGMENT OPERATING MARGIN

Intelligent Devices segment operating earnings increased 2.2 percent year over year. Segment operating margin decreased to 20.2 percent in 2022 from 21.2 percent in 2021, primarily driven by higher sales, including pricing increases, and lower incentive compensation.

PART II
ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

## SOFTWARE & CONTROL

### SALES

Software & Control sales increased 18.8 percent in 2022 compared to 2021. Organic sales increased 13.8 percent. The effects of currency translation decreased sales by 2.7 percentage points and acquisitions increased sales by 7.7 percentage points. All regions experienced reported and organic sales increases, except for EMEA where organic sales increased but unfavorable currency translation reduced reported sales.

### SEGMENT OPERATING MARGIN

Software & Control segment operating earnings increased 25.6 percent year over year. Segment operating margin increased to 28.8 percent in 2022 from 27.3 percent in 2021, primarily due to higher sales, including pricing increases, and lower incentive compensation, partially offset by higher input costs, higher investment spend, and the impact of acquisitions.

## LIFECYCLE SERVICES

### SALES

Lifecycle Services sales increased 9.5 percent in 2022 compared to 2021. Organic sales increased 11.4 percent. The effects of currency translation decreased sales by 2.5 percentage points and acquisitions increased sales by 0.6 percentage points. All regions experienced sales increases.

### SEGMENT OPERATING MARGIN

Lifecycle Services segment operating earnings increased 0.1 percent year over year. Segment operating margin decreased to 8.3 percent in 2022 from 9.1 percent in 2021, driven by supply chain constraints and higher investment spend, partially offset by higher sales and lower incentive compensation.

## 2021 COMPARED TO 2020

### SALES

Sales in fiscal 2021 increased 10.5 percent compared to 2020. Organic sales increased 6.7 percent of which pricing increased sales by approximately 1 percent. Currency translation increased sales by 2.3 percentage points. Acquisitions increased sales by 1.5 percentage points. Organic annual recurring revenue (ARR) at September 30, 2021 grew approximately 18 percent compared to September 30, 2020. See *Organic Annual Recurring Revenue* for information on this measure.

The table below presents our sales for the year ended September 30, 2021, attributed to the geographic regions based upon country of destination, and the percentage change from the same period a year ago (in millions, except percentages):

| | | Year Ended September 30, 2021 | Change vs. Year Ended September 30, 2020 | Change in Organic Sales[1] vs. Year Ended September 30, 2020 |
|---|---|---|---|---|
| North America | $ | 4,132.8 | 9.9% | 8.0% |
| Europe, Middle East and Africa | | 1,405.7 | 12.5% | 2.8% |
| Asia Pacific | | 1,012.2 | 16.5% | 10.3% |
| Latin America | | 446.7 | (1.1)% | (0.1)% |
| TOTAL COMPANY SALES | $ | 6,997.4 | 10.5% | 6.7% |

(1)   Organic sales and organic sales growth exclude the effect of acquisitions, changes in currency exchange rates, and divestitures. See *Supplemental Sales Information* for information on these non-GAAP measures.

- Reported and organic sales in North America increased in discrete and hybrid industries, partially offset by weakness in process industries, particularly Oil & Gas.
- EMEA reported and organic sales increased primarily due to strength in Food & Beverage and Tire. Reported sales also increased due to currency translation and sales from acquisitions.
- Asia Pacific reported and organic sales increased year over year, primarily due to strength in Semiconductor, Life Sciences, and Tire. Reported sales also increased due to favorable currency translation.
- Reported and organic sales in Latin America decreased year over year, primarily due to weakness in Mining and Oil & Gas, partially offset by growth in Food & Beverage.

## CORPORATE AND OTHER

Corporate and other expenses were $120.6 million in fiscal 2021 compared to $98.9 million in fiscal 2020. The increase was primarily driven by deal costs associated with the acquisition of Plex Systems.

## INCOME BEFORE INCOME TAXES

Income before income taxes increased 34 percent from $1,136.1 million in 2020 to $1,526.2 million in 2021, primarily due to the PTC adjustments recognized in 2021 and 2020, higher operating earnings, and a $70 million pre-tax favorable legal settlement in the first quarter of fiscal 2021. Total segment operating earnings increased 11 percent year over year from $1,257.9 million in 2020 to $1,391.3 million in 2021, primarily due to higher sales, partially offset by the reinstatement of incentive compensation and the reversal of temporary pay actions taken in fiscal 2020.

## INCOME TAXES

The effective tax rate in 2021 was 11.9 percent compared to 9.9 percent in 2020. The increase in the effective tax rate was primarily due to the effect of tax benefits recognized upon the formation of the Sensia joint venture in fiscal 2020 and other discrete items. The Adjusted Effective Tax Rate in 2021 was 11.6 percent compared to 12.4 percent in 2020. The decrease in the Adjusted Effective Tax Rate was primarily due to higher discrete benefits in the current year.

See Note 16 in the Consolidated Financial Statements for a complete reconciliation of the United States statutory tax rate to the effective tax rate and more information on tax events in 2021 and 2020 affecting each year's respective tax rates.

## DILUTED EPS AND ADJUSTED EPS

Fiscal 2021 Net income attributable to Rockwell Automation was $1,358.1 million or $11.58 per share, compared to $1,023.4 million or $8.77 per share in fiscal 2020. The increase in Net income attributable to Rockwell Automation and diluted EPS were primarily due to higher sales and the PTC adjustments, partially offset by the reinstatement of incentive compensation and the reversal of temporary pay actions taken in fiscal 2020. Fiscal 2021 Adjusted EPS was $9.43, up 19.8% percent compared to $7.87 in fiscal 2020, primarily due to higher sales, partially offset by the reinstatement of incentive compensation and the reversal of temporary pay actions taken in fiscal 2020.

## OPERATING SEGMENTS

The following is a discussion of our results by operating segment. See Note 19 in the Consolidated Financial Statements for additional information on each segment and our definition of segment operating earnings.

## INTELLIGENT DEVICES

### SALES

Intelligent Devices sales increased 12.0 percent in 2021 compared to 2020. Organic sales increased 9.7 percent and the effect of currency translation increased sales by 2.3 percentage points. All regions experienced sales increases.

### SEGMENT OPERATING MARGIN

Intelligent Devices segment operating earnings increased 19.4 percent. Operating margin was 21.2% percent in 2021 compared to 19.9% percent in 2020, primarily due to higher sales, partially offset by the reinstatement of incentive compensation.

## SOFTWARE & CONTROL

### SALES

Software & Control sales increased 15.8 percent in 2021 compared to 2020. Organic sales increased 10.0 percent, the effect of currency translation increased sales by 2.5 percentage points, and acquisitions increased sales by 3.3 percentage points. All regions experienced sales increases.

### SEGMENT OPERATING MARGIN

Software & Control segment operating earnings increased 12.1 percent year over year. Segment operating margin was 27.3 percent in 2021 compared to 28.2 percent a year ago, primarily due to higher planned investment spend and the reinstatement of incentive compensation, partially offset by higher sales.

## LIFECYCLE SERVICES

### SALES

Lifecycle Services sales increased 2.7 percent in 2021 compared to 2020. Organic sales decreased 1.8 percent. The effects of currency translation increased sales by 2.2 percentage points, and acquisitions increased sales by 2.3 percentage points. Reported sales increased in EMEA and Asia Pacific, were flat in North America, and decreased in Latin America. Organic sales decreased in all regions except Asia Pacific.

### SEGMENT OPERATING MARGIN

Lifecycle Services segment operating earnings decreased 19.4 percent year over year. Segment operating margin was 9.1 percent in 2021 compared to 11.6 percent a year ago, primarily due to the reinstatement of incentive compensation.

## SUPPLEMENTAL SEGMENT INFORMATION

Purchase accounting depreciation and amortization and non-operating pension and postretirement benefit (credit) cost are not allocated to our operating segments because these costs are excluded from our measurement of each segment's operating performance for internal purposes. If we were to allocate these costs, we would attribute them to each of our segments as follows (in millions):

| | Year Ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2020 |
| Purchase accounting depreciation and amortization | | | | | | |
| Intelligent Devices | $ | 2.5 | $ | 2.7 | $ | 2.9 |
| Software & Control | | 69.0 | | 19.2 | | 6.7 |
| Lifecycle Services | | 31.4 | | 32.1 | | 30.8 |
| Non-operating pension and postretirement benefit (credit) cost | | | | | | |
| Intelligent Devices | $ | (3.5) | $ | 14.1 | $ | 7.4 |
| Software & Control | | (3.5) | | 14.1 | | 7.4 |
| Lifecycle Services | | (4.8) | | 18.8 | | 9.9 |

## ADJUSTED INCOME, ADJUSTED EPS, AND ADJUSTED EFFECTIVE TAX RATE RECONCILIATION

Adjusted Income, Adjusted EPS, and Adjusted Effective Tax Rate are non-GAAP earnings measures that exclude non-operating pension and postretirement benefit cost, purchase accounting depreciation and amortization attributable to Rockwell Automation, change in fair value of investments, and Net loss attributable to noncontrolling interests, including their respective tax effects. Non-operating pension and postretirement benefit cost is defined as all components of our net periodic pension and postretirement benefit cost except for service cost. See Note 14 in the Consolidated Financial Statements for more information on our net periodic pension and postretirement benefit cost.

We believe that Adjusted Income, Adjusted EPS, and Adjusted Effective Tax Rate provide useful information to our investors about our operating performance and allow management and investors to compare our operating performance period over period. Adjusted EPS is also used as a financial measure of performance for our annual incentive compensation. Our measures of Adjusted Income, Adjusted EPS, and Adjusted Effective Tax Rate may be different from measures used by other companies. These non-GAAP measures should not be considered a substitute for Net income attributable to Rockwell Automation, diluted EPS, and effective tax rate.

The following are reconciliations of Net income attributable to Rockwell Automation, diluted EPS, and effective tax rate to Adjusted Income, Adjusted EPS, and Adjusted Effective Tax Rate, respectively (in millions, except per share amounts and percentages):

| | | Year Ended September 30, | | | | |
|---|---|---|---|---|---|---|
| | | **2022** | | **2021** | | **2020** |
| Net income attributable to Rockwell Automation | $ | 932.2 | $ | 1,358.1 | $ | 1,023.4 |
| Non-operating pension and postretirement benefit cost | | 4.7 | | 63.8 | | 37.4 |
| Tax effect of non-operating pension and postretirement benefit cost | | (1.9) | | (16.0) | | (10.1) |
| Purchase accounting depreciation and amortization attributable to Rockwell Automation | | 91.9 | | 43.2 | | 29.4 |
| Tax effect of purchase accounting depreciation and amortization attributable to Rockwell Automation | | (22.3) | | (10.5) | | (7.0) |
| Change in fair value of investments[1] | | 136.9 | | (397.4) | | (153.9) |
| Tax effect of change in fair value of investments[1] | | (30.8) | | 64.7 | | — |
| **ADJUSTED INCOME** | $ | **1,110.7** | $ | **1,105.9** | $ | **919.2** |
| Diluted EPS | $ | 7.97 | $ | 11.58 | $ | 8.77 |
| Non-operating pension and postretirement benefit cost | | 0.04 | | 0.55 | | 0.32 |
| Tax effect of non-operating pension and postretirement benefit cost | | (0.02) | | (0.14) | | (0.09) |
| Purchase accounting depreciation and amortization attributable to Rockwell Automation | | 0.78 | | 0.37 | | 0.25 |
| Tax effect of purchase accounting depreciation and amortization attributable to Rockwell Automation | | (0.19) | | (0.09) | | (0.06) |
| Change in fair value of investments[1] | | 1.17 | | (3.39) | | (1.32) |
| Tax effect of change in fair value of investments[1] | | (0.26) | | 0.55 | | — |
| **ADJUSTED EPS** | $ | **9.49** | $ | **9.43** | $ | **7.87** |
| Effective tax rate | | 14.4% | | 11.9% | | 9.9% |
| Tax effect of non-operating pension and postretirement benefit cost | | 0.1% | | 0.5% | | 0.6% |
| Tax effect of purchase accounting depreciation and amortization attributable to Rockwell Automation | | 0.6% | | 0.4% | | 0.4% |
| Tax effect of change in fair value of investments[1] | | 0.9% | | (1.2)% | | 1.5% |
| **ADJUSTED EFFECTIVE TAX RATE** | | **16.0%** | | **11.6%** | | **12.4%** |

(1)   *Primarily relates to the change in fair value of investment in PTC.*

PART II
ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

|  | Fiscal 2023 Guidance |
|---|---|
| Diluted EPS | $9.54 – $10.34 |
| Non-operating pension and postretirement benefit cost | 0.05 |
| Tax effect of non-operating pension and postretirement benefit cost | (0.01) |
| Purchase accounting depreciation and amortization attributable to Rockwell Automation | 0.81 |
| Tax effect of purchase accounting depreciation and amortization attributable to Rockwell Automation | (0.19) |
| Change in fair value of investments[1] | — |
| Tax effect of change in fair value of investments[1] | — |
| **ADJUSTED EPS[2]** | **$10.20 – $11.00** |
| Effective tax rate | ~ 17.7% |
| Tax effect of non-operating pension and postretirement benefit cost | ~ —% |
| Tax effect of purchase accounting depreciation and amortization attributable to Rockwell Automation | ~ 0.3% |
| Tax effect of change in fair value of investments[1] | ~ —% |
| **ADJUSTED EFFECTIVE TAX RATE** | **~ 18.0%** |

(1) *The year ended September 30, 2022, included a loss on investment of $136.9 million primarily due to the change in fair value of investment in PTC. Fiscal 2023 guidance excludes estimates of these adjustments on a forward-looking basis due to variability, complexity, and limited visibility of these items.*

(2) *Fiscal 2023 guidance based on Adjusted Income attributable to Rockwell, which includes an adjustment for SLB's non-controlling interest in Sensia.*

## ORGANIC ANNUAL RECURRING REVENUE

ARR is a key metric that enables measurement of progress in growing our recurring revenue business. It represents the annual contract value of all active recurring revenue contracts at any point in time. Recurring revenue is defined as a revenue stream that is contractual, typically for a period of 12 months or more, and has a high probability of renewal. The probability of renewal is based on historical renewal experience of the individual revenue streams, or management's best estimates if historical renewal experience is not available. Organic ARR growth is calculated as the dollar change in ARR, adjusted to exclude the effects of currency translation and acquisitions, divided by ARR as of the prior period. The effects of currency translation are excluded by calculating Organic ARR on a constant currency basis. When we acquire businesses, we exclude the effect of ARR in the current period for which there was no comparable ARR in the prior period. Organic ARR growth is also used as a financial measure of performance for our annual incentive compensation. Because ARR is based on annual contract value, it does not represent revenue recognized during a particular reporting period or revenue to be recognized in future reporting periods and is not intended to be a substitute for revenue, contract liabilities, or backlog.

## FINANCIAL CONDITION

The following is a summary of our cash flows from operating, investing, and financing activities, as reflected in the Consolidated Statement of Cash Flows (in millions):

|  | Year Ended September 30, | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
| Cash provided by (used for) | | | |
| Operating activities | $ 823.1 | $ 1,261.0 | $ 1,120.5 |
| Investing activities | (7.8) | (2,626.6) | (618.0) |
| Financing activities | (934.2) | 1,297.8 | (798.9) |
| Effect of exchange rate changes on cash | (52.6) | 16.8 | 8.4 |
| **DECREASE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH** | **$ (171.5)** | **$ (51.0)** | **$ (288.0)** |

The following table summarizes free cash flow, which is a non-GAAP financial measure (in millions):

| | | Year Ended September 30, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2020 |
| Cash provided by operating activities | $ | 823.1 | $ | 1,261.0 | $ | 1,120.5 |
| Capital expenditures | | (141.1) | | (120.3) | | (113.9) |
| **FREE CASH FLOW** | $ | 682.0 | $ | 1,140.7 | $ | 1,006.6 |

Our definition of free cash flow takes into consideration capital investments required to maintain the operations of our businesses and execute our strategy. Cash provided by operating activities adds back non-cash depreciation expense to earnings but does not reflect a charge for necessary capital expenditures. Our definition of free cash flow excludes the operating cash flows and capital expenditures related to our discontinued operations, if any. Operating, investing, and financing cash flows of our discontinued operations, if any, are presented separately in our Consolidated Statement of Cash Flows. In our opinion, free cash flow provides useful information to investors regarding our ability to generate cash from business operations that is available for acquisitions and other investments, service of debt principal, dividends, and share repurchases. We use free cash flow, as defined, as one measure to monitor and evaluate our performance, including as a financial measure for our annual incentive compensation. Our definition of free cash flow may be different from definitions used by other companies.

Cash provided by operating activities was $823.1 million for the year ended September 30, 2022, compared to $1,261.0 million for the year ended September 30, 2021. Free cash flow was $682.0 million for the year ended September 30, 2022, compared to $1,140.7 million for the year ended September 30, 2021. The year-over-year decreases in cash provided by operating activities and free cash flow were primarily due to increases in working

capital, including higher receivables and inventory to support business growth, and higher incentive compensation payments in fiscal 2022 compared to fiscal 2021. Supply chain constraints have also negatively impacted our working capital efficiency.

We repurchased approximately 1.3 million shares of our common stock under our share repurchase program in 2022 at a total cost of $301.1 million and an average cost of $223.05 per share. In 2021, we repurchased approximately 1.1 million shares of our common stock under our share repurchase program in 2021 at a total cost of $301.4 million and an average cost of $263.43 per share. At September 30, 2022, there were $1.6 million of outstanding common stock share repurchases recorded in Accounts payable that did not settle until 2023. At September 30, 2021, there were $1.8 million of outstanding common stock share repurchases recorded in Accounts payable that did not settle until 2022. Our decision to repurchase shares in 2023 will depend on business conditions, free cash flow generation, other cash requirements, and stock price. On both July 24, 2019, and May 2, 2022, the Board of Directors authorized us to expend an additional $1.0 billion to repurchase shares of our common stock. At September 30, 2022, we had approximately $1,251.3 million remaining for share repurchases under our existing board authorizations. See Item 5. *Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities*, for additional information regarding share repurchases.

We expect future uses of cash to include working capital requirements, capital expenditures, additional contributions to our retirement plans, acquisitions of businesses and other inorganic investments, dividends to shareowners, repurchases of common stock, and repayments of debt. We expect capital expenditures in 2023 to be approximately $190 million. Significant long-term uses of cash include the following (in millions):

| | | Payments by Period | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total | | 2023 | | 2024 | | 2025 | | 2026 | | 2027 | | Thereafter |
| Long-term debt and interest[1] | $ | 5,942.1 | $ | 713.0 | $ | 110.9 | $ | 406.6 | $ | 102.3 | $ | 102.3 | $ | 4,507.0 |
| Minimum lease payments (Note 18) | | 395.8 | | 98.8 | | 82.8 | | 59.6 | | 40.7 | | 29.8 | | 84.1 |
| Postretirement benefits[2] | | 44.2 | | 6.6 | | 6.1 | | 5.5 | | 5.0 | | 4.5 | | 16.5 |
| Pension funding contribution[3] | | 26.1 | | 26.1 | | — | | — | | — | | — | | — |
| Transition tax[4] | | 264.8 | | 31.1 | | 58.4 | | 77.9 | | 97.4 | | — | | — |
| **TOTAL** | $ | 6,673.0 | $ | 875.6 | $ | 258.2 | $ | 549.6 | $ | 245.4 | $ | 136.6 | $ | 4,607.6 |

(1) *The amounts for Long-term debt assume that the respective debt instruments will be outstanding until their scheduled maturity dates and include interest but exclude unamortized discount. See Note 7 in the Consolidated Financial Statements for more information regarding our Long-term debt.*

(2)  *Our postretirement benefit plans are unfunded and are subject to change. Amounts reported are estimates of future benefit payments, to the extent estimable.*

(3)  *Amounts reported for pension funding contributions reflect current estimates. Contributions to our pension plans beyond 2023 will depend on future investment performance of our pension plan assets, changes in discount rate assumptions, and governmental regulations in effect at the time. Amounts subsequent to 2023 are excluded from the summary above, as we are unable to make a reasonably reliable estimate of these amounts. The minimum contribution for our U.S. pension plan as required by the Employee Retirement Income Security Act (ERISA) is currently zero. We may make additional contributions to this plan at the discretion of management.*

(4)  *Under the Tax Cuts and Jobs Act of 2017 (the "Tax Act"), the Company may elect to pay the transition tax interest-free over eight years, with 8% due in each of the first five years, 15% in year six, 20% in year seven, and 25% in year eight.*

We expect to fund future uses of cash with a combination of existing cash balances, cash generated by operating activities, commercial paper borrowings, or a new issuance of debt or other securities. In addition, we have access to unsecured credit facilities with various banks.

At September 30, 2022, the majority of our Cash and cash equivalents were held by non-U.S. subsidiaries. As a result of the broad changes to the U.S. international tax system under the Tax Act, we account for taxes on earnings of substantially all of our non-U.S. subsidiaries including both non-U.S. and U.S. taxes. We have concluded that earnings of a limited number of our non-U.S. subsidiaries are indefinitely reinvested.

Our Short-term debt as of September 30, 2022 and 2021, includes commercial paper borrowings of $317.0 million and $484.0 million, respectively, with weighted average interest rates of 3.03 percent and 0.18 percent, respectively, and weighted average maturity periods of 22 days and 90 days, respectively. Also included in Short-term debt as of September 30, 2022 and 2021, are $42.3 million and 23.5 million, respectively, of interest-bearing loans from SLB to Sensia, due in December 2022.

In August 2021, we issued $1.5 billion aggregate principal amount of long-term notes in a registered public offering. The offering consisted of $600.0 million of 0.35% notes due in August 2023, $450.0 million of 1.75% notes due in August 2031, and $450.0 million of 2.80% notes due in August 2061, all issued at a discount. Net proceeds to the Company from the debt offering were $1,485.6 million. We used these net proceeds primarily to fund the acquisition of Plex. Refer to Note 4 in the Consolidated Financial Statements for additional information on this acquisition.

In March 2019, we issued $1.0 billion aggregate principal amount of long-term notes in a registered public offering. The offering consisted of $425.0 million of 3.50% notes due in March 2029 and $575.0 million of 4.20% notes due in March 2049, both issued at a discount. Net proceeds to the Company from the debt offering were $987.6 million. We used these net proceeds primarily to repay our outstanding commercial paper, with the remaining proceeds used for general corporate purposes.

We entered into treasury locks to manage the potential change in interest rates in anticipation of the issuance of the $1.5 billion aggregate notes in August 2021 and the $1.0 billion of fixed rate debt in March 2019. These treasury locks were designated as and accounted for as cash flow hedges. The effective differentials paid on these treasury locks were initially recorded in Accumulated other comprehensive loss, net of tax effect. As a result of the changes in the interest rates on the treasury locks between the time we entered into the treasury locks and the time we priced and issued

the notes, the Company made a net payment of $28.0 million to the counterparties from the August 2021 issuance and $35.7 million to the counterparty from the March 2019 issuance. The $28.0 million and $35.7 million net losses on the settlement of the treasury locks were recorded in Accumulated other comprehensive loss, net of tax effect, and are being amortized over the term of the corresponding notes, and recognized as an adjustment to Interest expense in the Consolidated Statement of Operations.

In April 2020, we entered into a $400.0 million senior unsecured 364-day term loan credit agreement and were advanced the full loan amount. Interest on these borrowings was based on short-term money market rates in effect during the period the borrowings were outstanding. We repaid the $400.0 million term loan in September 2020.

On June 29, 2022, we replaced our former $1.25 billion unsecured revolving credit facility with a new five-year $1.5 billion unsecured revolving credit facility, expiring in June 2027. We can increase the aggregate amount of this credit facility by up to $750.0 million, subject to the consent of the banks in the credit facility. We did not borrow against this credit facility or the former credit facility during the periods ended September 30, 2022 and 2021. Borrowings under our new $1.5 billion credit facility bear interest based on short-term money market rates in effect during the period the borrowings are outstanding. The terms of this credit facility contain covenants under which we agree to maintain an EBITDA-to-interest ratio of at least 3.0 to 1.0. The EBITDA-to-interest ratio is defined in the credit facility as the ratio of consolidated EBITDA (as defined in the facility) for the preceding four quarters to consolidated interest expense for the same period.

LIBOR was the primary basis for determining interest payments on borrowings under our former $1.25 billion credit facility. Our new $1.5 billion credit facility uses the secured overnight funding rate (SOFR) as the primary basis for determining interest payments.

Among other uses, we can draw on our credit facility as a standby liquidity facility to repay our outstanding commercial paper as it matures. This access to funds to repay maturing commercial paper is an important factor in maintaining the short-term credit ratings set forth in the table below. Under our current policy with respect to these ratings, we expect to limit our other borrowings under our credit facility, if any, to amounts that would leave enough credit available under the facility so that we could borrow, if needed, to repay all of our then outstanding commercial paper as it matures.

Separate short-term unsecured credit facilities of approximately $214.1 million at September 30, 2022, were available to non-U.S. subsidiaries, of which approximately $30.0 million was committed under letters of credit. Borrowings under our non-U.S. credit

facilities at September 30, 2022 and 2021, were not significant. We were in compliance with all covenants under our credit facilities at September 30, 2022 and 2021. There are no significant commitment fees or compensating balance requirements under our credit facilities.

During the fourth quarter of fiscal 2021, as a result of the additional leverage added to fund the Plex acquisition, Standard & Poor's elected to downgrade our Outlook from "Stable" to "Negative". No changes were made to existing ratings by Moody's or Fitch. The following is a summary of our credit ratings as of September 30, 2022:

| Credit Rating Agency | Short Term Rating | Long Term Rating | Outlook |
| --- | --- | --- | --- |
| Standard & Poor's | A-1 | A | Negative |
| Moody's | P-2 | A3 | Stable |
| Fitch Ratings | F1 | A | Stable |

Our ability to access the commercial paper market, and the related costs of these borrowings, is affected by the strength of our credit ratings and market conditions. We have not experienced any difficulty in accessing the commercial paper market. If our access to the commercial paper market is adversely affected due to a change in market conditions or otherwise, we would expect to rely on a combination of available cash and our unsecured committed credit facility to provide short-term funding. In such event, the cost of borrowings under our unsecured committed credit facility could be higher than the cost of commercial paper borrowings.

We regularly monitor the third-party depository institutions that hold our cash and cash equivalents and short-term investments. We diversify our cash and cash equivalents and short-term investments among counterparties to minimize exposure to any one of these entities.

On December 10, 2021, the Company entered a 10b5-1 plan related to our PTC Shares, pursuant to which a broker will make periodic sales of some of our PTC Shares on behalf of the Company, subject to the terms of the plan. Starting in June 2022, the Company made periodic sales of our PTC Shares in the open market, outside of the parameters of the existing 10b5-1 plan. All of our sales of PTC are consistent with the transfer restrictions in the securities purchase agreement, as amended, with PTC. As of September 30, 2022, the fiscal year-to-date sales of our PTC shares under our 10b5-1 plan and open market sales resulted in a gross inflow of $202.4 million. This excludes any tax liability related to the realized gain on investment. These proceeds, and any proceeds from future sales, will support our future uses of cash.

We use foreign currency forward exchange contracts to manage certain foreign currency risks. We enter into these contracts to hedge our exposure to foreign currency exchange rate variability in the expected future cash flows associated with certain third-party and intercompany transactions denominated in foreign currencies forecasted to occur within the next two years. We also use these contracts to hedge portions of our net investments in certain non-U.S. subsidiaries against the effect of exchange rate fluctuations on the translation of foreign currency balances to the U.S. dollar. In addition, we use foreign currency forward exchange contracts that are not designated as hedges to offset transaction gains or losses associated with some of our assets and liabilities resulting from intercompany loans or other transactions with third parties that are denominated in currencies other than our entities' functional currencies. Our foreign currency forward exchange contracts are usually denominated in currencies of major industrial countries. We diversify our foreign currency forward exchange contracts among counterparties to minimize exposure to any one of these entities.

Cash dividends declared to shareowners were $520.8 million in 2022 ($4.48 per common share), $497.5 million in 2021 ($4.28 per common share), and $472.8 million in 2020 ($4.08 per common share). Our quarterly dividend rate as of September 30, 2022, is $1.12 per common share ($4.48 per common share annually), which is determined at the sole discretion of our Board of Directors.

## SUPPLEMENTAL SALES INFORMATION

We translate sales of subsidiaries operating outside of the United States using exchange rates effective during the respective period. Therefore, changes in currency exchange rates affect our reported sales. Sales by acquired businesses also affect our reported sales. We believe that organic sales, defined as sales excluding the effects of acquisitions and changes in currency exchange rates, which is a non-GAAP financial measure, provides useful information to investors because it reflects regional and operating segment performance from the activities of our businesses without the effect of acquisitions and changes in currency exchange rates. We use organic sales as one measure to monitor and evaluate our regional and operating segment performance. When we acquire businesses, we exclude sales in the current period for which there are no comparable sales in the prior period. We determine the effect of changes in currency exchange rates by translating the respective period's sales using the same currency exchange rates that were in effect during the prior year. When we divest a business, we exclude sales in the prior period for which there are no comparable sales in the current period. Organic sales growth is calculated by comparing organic sales to reported sales in the prior year, excluding divestitures. We attribute sales to the geographic regions based on the country of destination.

The following is a reconciliation of reported sales to organic sales by geographic region (in millions):

| | Year Ended September 30, 2022 | | | | Year Ended September 30, 2021 |
| | Reported Sales | Less: Effect of Acquisitions | Effect of Changes in Currency | Organic Sales | Reported Sales |
| --- | --- | --- | --- | --- | --- |
| North America | $ 4,722.0 | $ 152.0 | $ (6.5) | $ 4,576.5 | $ 4,132.8 |
| Europe, Middle East and Africa | 1,437.6 | 6.8 | (140.5) | 1,571.3 | 1,405.7 |
| Asia Pacific | 1,088.0 | 0.4 | (34.4) | 1,122.0 | 1,012.2 |
| Latin America | 512.8 | 2.3 | (6.6) | 517.1 | 446.7 |
| **TOTAL COMPANY SALES** | **$ 7,760.4** | **$ 161.5** | **$ (188.0)** | **$ 7,786.9** | **$ 6,997.4** |

| | Year Ended September 30, 2021 | | | | Year Ended September 30, 2020 |
| | Reported Sales | Less: Effect of Acquisitions | Effect of Changes in Currency | Organic Sales | Reported Sales |
| --- | --- | --- | --- | --- | --- |
| North America | $ 4,132.8 | $ 48.1 | $ 24.6 | $ 4,060.1 | $ 3,760.2 |
| Europe, Middle East and Africa | 1,405.7 | 44.9 | 76.9 | 1,283.9 | 1,249.3 |
| Asia Pacific | 1,012.2 | 0.6 | 53.1 | 958.5 | 868.7 |
| Latin America | 446.7 | 0.3 | (4.7) | 451.1 | 451.6 |
| **TOTAL COMPANY SALES** | **$ 6,997.4** | **$ 93.9** | **$ 149.9** | **$ 6,753.6** | **$ 6,329.8** |

The following is a reconciliation of reported sales to organic sales by operating segment (in millions):

| | Year Ended September 30, 2022 | | | | Year Ended September 30, 2021 |
| | Reported Sales | Less: Effect of Acquisitions | Effect of Changes in Currency | Organic Sales | Reported Sales |
| --- | --- | --- | --- | --- | --- |
| Intelligent Devices | $ 3,544.6 | $ — | $ (89.8) | $ 3,634.4 | $ 3,311.9 |
| Software & Control | 2,312.9 | 150.6 | (52.7) | 2,215.0 | 1,947.0 |
| Lifecycle Services | 1,902.9 | 10.9 | (45.5) | 1,937.5 | 1,738.5 |
| **TOTAL COMPANY SALES** | **$ 7,760.4** | **$ 161.5** | **$ (188.0)** | **$ 7,786.9** | **$ 6,997.4** |

| | Year Ended September 30, 2021 | | | | Year Ended September 30, 2020 |
| | Reported Sales | Less: Effect of Acquisitions | Effect of Changes in Currency | Organic Sales | Reported Sales |
| --- | --- | --- | --- | --- | --- |
| Intelligent Devices | $ 3,311.9 | $ — | $ 70.5 | $ 3,241.4 | $ 2,956.0 |
| Software & Control | 1,947.0 | 54.8 | 42.1 | 1,850.1 | 1,681.3 |
| Lifecycle Services | 1,738.5 | 39.1 | 37.3 | 1,662.1 | 1,692.5 |
| **TOTAL COMPANY SALES** | **$ 6,997.4** | **$ 93.9** | **$ 149.9** | **$ 6,753.6** | **$ 6,329.8** |

# CRITICAL ACCOUNTING ESTIMATES

We believe the following accounting estimates are the most critical to the understanding of our financial statements as they could have the most significant effect on our reported results and require subjective or complex judgments by management. Accounting principles generally accepted in the United States require us to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the consolidated financial statements and revenues and expenses during the periods reported. These estimates are based on our best judgment about current and future conditions, but actual results could differ from those estimates. Refer to Note 1 in the Consolidated Financial Statements for information regarding our significant accounting policies.

## GOODWILL - SENSIA REPORTING UNIT

The quantitative test of goodwill for impairment requires us to estimate the fair value of our reporting units. During the second quarter of fiscal 2022, we performed our annual quantitative impairment test for our Sensia reporting unit. As a result of ongoing supply chain constraints and market volatility, we identified a triggering event in the fourth quarter of fiscal 2022 for our Sensia reporting unit, which required an interim quantitative impairment test. We determined the fair value of the reporting unit for both tests under a combination of an income approach derived from discounted cash flows and a market multiples approach using selected comparable public companies.

Critical assumptions used in this approach included management's estimated future revenue growth rates, estimated future margins, and discount rate. Estimated future revenue growth and margins are based on management's best estimate about current and future conditions. The revenue growth rate assumption reflects significant growth over the next five years before moderating back to a growth rate approximating longer term average inflationary rates. The forecasted near-term growth rate assumes that revenue will return to pre-pandemic levels due to the abatement of pandemic-related disruptions. Margin assumptions reflect that the cost pressure in the current year related to inflation and supply chain challenges will be compensated through pricing achieved on future orders. We believe the assumptions and estimates made were reasonable and appropriate, which are based on a number of factors, including historical experience, reference to external product available market and industry growth publications, analysis of peer group projections, and information obtained from reporting unit management, including backlog. Actual results and forecasts

of revenue growth and margins for our Sensia reporting unit may be impacted by its concentration within the Oil & Gas industry and with its customer base. Demand for Sensia hardware and software products, solutions, and services is sensitive to industry volatility and risks, including those related to commodity prices, supply and demand dynamics, production costs, geological activity, and political activities. If such factors impact our ability to achieve forecasted revenue growth rates and margins, the fair value of the reporting unit could decrease, which may result in an impairment. We determined the discount rate using our weighted average cost of capital adjusted for risk factors including risk associated with our above market revenue growth assumptions, historical performance, and industry-specific and economic factors.

Based on these assumptions and estimates, the fair value of the Sensia reporting unit exceeded its carrying value by approximately 20 percent in the second quarter and approximately 15 percent in the fourth quarter. Therefore, we deemed that no impairment existed during the year ended September 30, 2022, on $315.9 million of Goodwill allocated to the Sensia reporting unit.

More information regarding goodwill impairment testing is contained in Note 1 and Note 3 in the Consolidated Financial Statements.

## RETIREMENT BENEFITS - PENSION

Pension costs and obligations are actuarially determined and are influenced by assumptions used to estimate these amounts, including the discount rate. Changes in any of the assumptions and the amortization of differences between the assumptions and actual experience will affect the amount of pension expense in future periods.

Our global pension expense in 2022 was $74.4 million compared to $157.0 million in 2021. Approximately all of our 2022 global pension expense and 76 percent of our global projected benefit obligation relate to our U.S. pension plan. The discount rate used to determine our 2022 U.S. pension expense was 3.86 percent, compared to 2.90 percent for 2021.

For 2023, our U.S. discount rate will increase to 5.65 percent from 3.86 percent in 2022. The discount rate was set as of our September 30 measurement date and was determined by modeling a portfolio of bonds that match the expected cash flow of our benefit plans.

The changes in our discount rate has an inverse relationship with our net periodic benefit cost and projected benefit obligation. The following chart illustrates the estimated change in projected benefit obligation and annual net periodic benefit cost assuming a change of 25 basis points in the discount rate for our U.S. pension plans (in millions):

| | Pension Benefits | |
|---|---|---|
| | Change in Projected Benefit Obligation | Change in Net Periodic Benefit Cost[1] |
| Discount rate | $ 69.0 | $ 5.3 |

(1)  Change includes both operating and non-operating pension costs.

More information regarding pension benefits is contained in Note 14 in the Consolidated Financial Statements.

## REVENUE RECOGNITION – CUSTOMER INCENTIVES

We offer various incentive programs that provide distributors and direct sale customers with cash rebates, account credits, or additional hardware and software products, solutions, and services based on meeting specified program criteria. Customer incentives are recognized as a reduction of sales if distributed in cash or customer account credits. We record accruals at the time of revenue recognition as a current liability within Customer returns, rebates and incentives in our Consolidated Balance Sheet or, where a right of setoff exists, as a reduction of Receivables. Customer incentives for additional hardware and software products, solutions, and services to be provided are considered distinct performance obligations. As such, we allocate revenue to them based on relative standalone selling price. Until the incentive is redeemed, the revenue is recorded as a contract liability.

Our primary incentive program provides distributors with cash rebates or account credits based on agreed amounts that vary depending on the customer to whom our distributor ultimately sells the product. A critical assumption used in estimating the accrual for this program is the time period from when revenue is recognized to when the rebate is processed. Our estimate is based primarily on historical experience. If the time period were to change by 10 percent, the effect would be an adjustment to the accrual of approximately $25.7 million.

More information regarding our revenue recognition and returns, rebates and incentives policies are contained in Note 1 and Note 2 in the Consolidated Financial Statements.

## ACQUISITIONS – PLEX INTANGIBLE ASSETS VALUATION

The accounting for a business combination requires the excess of the purchase price for the acquisition over the net book value of assets acquired to be allocated to the identifiable assets of the acquired entity. Any unallocated portion is recognized as goodwill. We engaged an independent third-party valuation specialist to assist with the fair value allocation of the purchase price paid for the acquisition of Plex to intangible assets. This required the use of several assumptions and estimates including the customer attrition rate, forecasted cash flows attributable to existing customers, and the discount rate for the customer relationship intangible asset and the royalty rate, forecasted revenue growth rates, and the discount rate for the technology intangible asset. Although we believe the assumptions and estimates made were

reasonable and appropriate, these estimates require judgment and are based in part on historical experience and information obtained from Plex management.

The key assumption requiring the use of judgement in the valuation of the customer relationship intangible asset was the customer attrition rate of 5 percent. This rate was selected based on historical experience and information obtained from Plex management. A change in the customer attrition rate of 250 basis points would result in a change of $63 million in intangible assets. The key assumptions requiring the use of judgement in the valuation of the technology intangible asset were the royalty rate of 25 percent and the obsolescence factor. The royalty rate was based on a detailed analysis considering the importance of the technology to the overall enterprise and market royalty data. A change in the royalty rate of 500 basis points would result in a change of $47 million in intangible assets. The obsolescence factor was calculated assuming phase out over ten years based on discussions with Plex management, the nature of the technology, its integration into customers' manufacturing systems, and other third-party information for similar transactions. A two-year change in this assumption would result in a change of $52 million in intangible assets.

More information regarding this business combination is contained in Note 4 in the Consolidated Financial Statements.

## ACQUISITIONS – SENSIA JOINT VENTURE INTANGIBLE ASSETS VALUATION

We recorded assets acquired and liabilities assumed in connection with the formation of Sensia based on their estimated fair values as of the acquisition date of October 1, 2019. The accounting for a business combination requires the excess of the purchase price for the acquisition over the net book value of assets acquired to be allocated to the identifiable assets of the acquired entity. Any unallocated portion is recognized as goodwill. We engaged an independent third-party valuation specialist to assist with the fair value allocation of the purchase price paid in connection with formation of the Sensia joint venture to intangible assets, which required the use of several assumptions and estimates. Although we believe the assumptions and estimates made were reasonable and appropriate, these estimates are based on historical experience and information obtained from Sensia management. The key assumption requiring the use of judgment was the customer attrition rates ranging from 7.5 percent to 25 percent. A change in the customer attrition rate of 250 basis points would result in a change of $40.4 million in intangible assets.

## RECENT ACCOUNTING PRONOUNCEMENTS

See Note 1 in the Consolidated Financial Statements regarding recent accounting pronouncements.

# ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to market risk during the normal course of business from changes in foreign currency exchange rates and interest rates. We manage exposure to these risks through a combination of normal operating and financing activities as well as derivative financial instruments in the form of foreign currency forward exchange contracts. We sometimes use interest rate swap contracts to manage the balance of fixed and floating rate debt.

## FOREIGN CURRENCY RISK

We are exposed to foreign currency risks that arise from normal business operations. These risks include the translation of local currency balances of foreign subsidiaries, transaction gains and losses associated with intercompany loans with foreign subsidiaries, and transactions denominated in currencies other than a location's functional currency. Our objective is to minimize our exposure to these risks through a combination of normal operating activities and the use of foreign currency forward exchange contracts. Contracts are usually denominated in currencies of major industrial countries. The fair value of our foreign currency forward exchange contracts is an asset of $120.1 million and a liability of $32.2 million at September 30, 2022. We enter into these contracts with major financial institutions that we believe to be creditworthy.

We do not enter into derivative financial instruments for speculative purposes. The strengthening of the U.S. dollar against foreign currencies has an unfavorable impact on our sales and results of operations. While future changes in foreign currency exchange rates are difficult to predict, our sales and profitability may be adversely affected if the U.S. dollar strengthens relative to current levels.

Certain of our locations have assets and liabilities denominated in currencies other than their functional currencies. We enter into foreign currency forward exchange contracts to offset the transaction gains or losses associated with some of these assets and liabilities. For such assets and liabilities without offsetting foreign currency forward exchange contracts, a 10 percent adverse change in the underlying foreign currency exchange rates would reduce our pre-tax income by approximately $35.1 million.

We record all derivatives on the balance sheet at fair value regardless of the purpose for holding them. The use of foreign currency forward exchange contracts allows us to manage transactional exposure to exchange rate fluctuations as the gains or losses incurred on these contracts will offset, in whole or in part, losses or gains on the underlying foreign currency exposure. Derivatives that are not designated as hedges for accounting purposes are adjusted to fair value through earnings. For derivatives that are hedges, depending on the nature of the hedge, changes in fair value are either offset by changes in the fair value of the hedged assets, liabilities, or firm commitments through earnings or recognized in other comprehensive loss until the hedged item is recognized in earnings. We recognize the ineffective portion of a derivative's change in fair value in earnings immediately. There was no impact on earnings due to ineffective hedges in 2022, 2021, or 2020. A hypothetical 10 percent adverse change in underlying foreign currency exchange rates associated with the hedged exposures and related contracts would not be significant to our financial condition or results of operations.

## INTEREST RATE RISK

In addition to existing cash balances and cash provided by normal operating activities, we use a combination of short-term and long-term debt to finance operations. We are exposed to interest rate risk on certain of these debt obligations.

Our Short-term debt as of September 30, 2022 and 2021, includes commercial paper borrowings of $317.0 million and $484.0 million, respectively, with weighted average interest rates of 3.03 percent and 0.18 percent, respectively, and weighted average maturity periods of 22 days and 90 days, respectively. Also included in Short-term debt as of September 30, 2022 and 2021, is $42.3 million and $23.5 million, respectively, of interest-bearing loans from SLB to Sensia, due in December 2022. We have issued, and anticipate continuing to issue, short-term commercial paper obligations as needed. Changes in market interest rates on commercial paper borrowings affect our results of operations.

A hypothetical 50 basis point increase in average market interest rates related to our short-term debt would not be significant to our results of operations or financial condition.

We had outstanding fixed rate long-term and current portion of long-term debt obligations with a carrying value of $3,476.9 million at September 30, 2022, and $3,471.4 million at September 30, 2021. The fair value of this debt was approximately $3,074.5 million at September 30, 2022, and $3,881.6 million at September 30, 2021. The potential increase in fair value on such fixed-rate debt obligations from a hypothetical 50 basis point decrease in market interest rates would not be significant to our results of operations or financial condition. We currently have no plans to repurchase our outstanding fixed-rate instruments before their maturity and, therefore, fluctuations in market interest rates would not have an effect on our results of operations or shareowners' equity.

# ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## CONSOLIDATED BALANCE SHEET

### (IN MILLIONS, EXCEPT PER SHARE AMOUNTS)

| | September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 490.7 | $ 662.2 |
| Receivables | 1,736.7 | 1,424.5 |
| Inventories | 1,054.2 | 798.1 |
| Other current assets | 329.1 | 178.6 |
| Total current assets | 3,610.7 | 3,063.4 |
| Property, net of accumulated depreciation | 586.5 | 581.9 |
| Operating lease right-of-use assets | 321.0 | 377.7 |
| Goodwill | 3,524.0 | 3,625.9 |
| Other intangible assets, net | 902.0 | 1,021.8 |
| Deferred income taxes | 384.3 | 380.9 |
| Long-term investments | 1,056.0 | 1,363.5 |
| Other assets | 374.2 | 286.5 |
| **TOTAL** | **$ 10,758.7** | **$ 10,701.6** |
| **LIABILITIES AND SHAREOWNERS' EQUITY** | | |
| Current liabilities | | |
| Short-term debt | $ 359.3 | $ 509.7 |
| Current portion of long-term debt | 609.1 | 6.8 |
| Accounts payable | 1,028.0 | 889.8 |
| Compensation and benefits | 292.7 | 408.0 |
| Contract liabilities | 507.0 | 462.5 |
| Customer returns, rebates and incentives | 373.1 | 237.8 |
| Other current liabilities | 403.0 | 477.6 |
| Total current liabilities | 3,572.2 | 2,992.2 |
| Long-term debt | 2,867.8 | 3,464.6 |
| Retirement benefits | 471.2 | 720.6 |
| Operating lease liabilities | 263.5 | 313.6 |
| Other liabilities | 567.3 | 516.5 |
| Commitments and contingent liabilities (Note 17) | | |
| Shareowners' equity | | |
| Common stock ($1.00 par value, shares issued: 181.4) | 181.4 | 181.4 |
| Additional paid-in capital | 2,007.1 | 1,933.6 |
| Retained earnings | 8,411.8 | 8,000.4 |
| Accumulated other comprehensive loss | (917.5) | (1,017.1) |
| Common stock in treasury, at cost (shares held: 66.2 and 65.4, respectively) | (6,957.2) | (6,708.7) |
| Shareowners' equity attributable to Rockwell Automation, Inc. | 2,725.6 | 2,389.6 |
| Noncontrolling interests | 291.1 | 304.5 |
| Total shareowners' equity | 3,016.7 | 2,694.1 |
| **TOTAL** | **$ 10,758.7** | **$ 10,701.6** |

See Notes to Consolidated Financial Statements.

## CONSOLIDATED STATEMENT OF OPERATIONS

(IN MILLIONS, EXCEPT PER SHARE AMOUNTS)

| | | Year Ended September 30, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2020 |
| Sales | | | | | | |
| Products and solutions | $ | 6,993.4 | $ | 6,285.2 | $ | 5,663.6 |
| Services | | 767.0 | | 712.2 | | 666.2 |
| | | 7,760.4 | | 6,997.4 | | 6,329.8 |
| Cost of sales | | | | | | |
| Products and solutions | | (4,173.4) | | (3,638.7) | | (3,305.9) |
| Services | | (485.0) | | (461.0) | | (428.7) |
| | | (4,658.4) | | (4,099.7) | | (3,734.6) |
| Gross profit | | 3,102.0 | | 2,897.7 | | 2,595.2 |
| Selling, general and administrative expenses | | (1,766.7) | | (1,680.0) | | (1,479.8) |
| Change in fair value of investments | | (136.9) | | 397.4 | | 153.9 |
| Other (expense) income (Note 15) | | (1.6) | | 5.7 | | (29.7) |
| Interest expense | | (123.2) | | (94.6) | | (103.5) |
| Income before income taxes | | 1,073.6 | | 1,526.2 | | 1,136.1 |
| Income tax provision (Note 16) | | (154.5) | | (181.9) | | (112.9) |
| **NET INCOME** | | **919.1** | | **1,344.3** | | **1,023.2** |
| Net loss attributable to noncontrolling interests | | (13.1) | | (13.8) | | (0.2) |
| **NET INCOME ATTRIBUTABLE TO ROCKWELL AUTOMATION, INC.** | $ | **932.2** | $ | **1,358.1** | $ | **1,023.4** |
| Earnings per share: | | | | | | |
| Basic | $ | 8.02 | $ | 11.69 | $ | 8.83 |
| Diluted | $ | 7.97 | $ | 11.58 | $ | 8.77 |
| Weighted average outstanding shares: | | | | | | |
| Basic | | 115.9 | | 116.0 | | 115.8 |
| Diluted | | 116.7 | | 117.1 | | 116.6 |

See Notes to Consolidated Financial Statements.

## CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME

**(IN MILLIONS)**

| | | Year Ended September 30, | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Net income | $ 919.1 | $ 1,344.3 | $ 1,023.2 |
| Other comprehensive income (loss) | | | |
| Pension and other postretirement benefit plan adjustments (net of tax expense of ($76.0), ($181.0), and ($3.4)) | 246.5 | 576.4 | 9.3 |
| Currency translation adjustments | (185.4) | 31.4 | 25.7 |
| Net change in cash flow hedges (net of tax (expense) benefit of ($14.3), $3.1, and $6.6) | 38.2 | (11.4) | (18.5) |
| Other comprehensive income | 99.3 | 596.4 | 16.5 |
| Comprehensive income | 1,018.4 | 1,940.7 | 1,039.7 |
| Comprehensive loss attributable to noncontrolling interests | (13.4) | (14.5) | (0.5) |
| **COMPREHENSIVE INCOME ATTRIBUTABLE TO ROCKWELL AUTOMATION, INC.** | **$ 1,031.8** | **$ 1,955.2** | **$ 1,040.2** |

See Notes to Consolidated Financial Statements.

## CONSOLIDATED STATEMENT OF CASH FLOWS
(IN MILLIONS)

| | | Year Ended September 30, | | |
|---|---|---|---|---|
| | | 2022 | 2021 | 2020 |
| **Operating activities:** | | | | |
| Net income | $ | 919.1 | $ 1,344.3 | $ 1,023.2 |
| Adjustments to arrive at cash provided by operating activities | | | | |
| Depreciation | | 126.6 | 123.9 | 122.5 |
| Amortization of intangible assets | | 112.3 | 65.9 | 50.2 |
| Change in fair value of investments | | 136.9 | (397.4) | (153.9) |
| Share-based compensation expense | | 68.1 | 51.7 | 46.1 |
| Retirement benefit expense | | 76.4 | 155.1 | 129.5 |
| Pension contributions | | (53.6) | (35.8) | (84.1) |
| Deferred income taxes | | (33.6) | (184.1) | (65.7) |
| Net loss (gain) on disposition of property | | 0.6 | 0.5 | (12.4) |
| Settlement of interest rate derivatives | | — | (28.0) | 22.0 |
| Changes in assets and liabilities, excluding effects of acquisitions and foreign currency adjustments | | | | |
| Receivables | | (415.6) | (138.1) | (9.0) |
| Inventories | | (292.8) | (202.8) | 30.4 |
| Accounts payable | | 172.0 | 184.8 | (5.0) |
| Contract liabilities | | 102.0 | 104.4 | 43.3 |
| Compensation and benefits | | (78.2) | 174.6 | (44.6) |
| Income taxes | | (129.3) | 57.2 | (11.8) |
| Other assets and liabilities | | 112.2 | (15.2) | 39.8 |
| **Cash provided by operating activities** | | 823.1 | 1,261.0 | 1,120.5 |
| **Investing activities:** | | | | |
| Capital expenditures | | (141.1) | (120.3) | (113.9) |
| Acquisition of businesses, net of cash acquired | | (16.6) | (2,488.5) | (550.9) |
| Purchases of investments | | (59.8) | (13.6) | (10.7) |
| Proceeds from sale of investments | | 210.2 | — | 37.9 |
| Proceeds from sale of property | | 0.6 | 0.4 | 14.9 |
| Other investing activities | | (1.1) | (4.6) | 4.7 |
| **Cash used for investing activities** | | (7.8) | (2,626.6) | (618.0) |
| **Financing activities:** | | | | |
| Net issuance of short-term debt | | 40.8 | 275.9 | — |
| Issuance of short-term debt, net of issuance costs | | 18.8 | 211.4 | 423.6 |
| Issuance of long-term debt, net of discount and issuance costs | | — | 1,485.6 | — |
| Repayment of short-term debt | | (210.0) | (2.5) | (400.0) |
| Repayment of long-term debt | | — | — | (300.7) |
| Cash dividends | | (519.4) | (497.1) | (472.8) |
| Purchases of treasury stock | | (301.3) | (299.7) | (264.2) |
| Proceeds from the exercise of stock options | | 57.9 | 154.6 | 214.4 |
| Other financing activities | | (21.0) | (30.4) | 0.8 |
| **Cash (used for) provided by financing activities** | | (934.2) | 1,297.8 | (798.9) |
| Effect of exchange rate changes on cash | | (52.6) | 16.8 | 8.4 |
| **Decrease in cash, cash equivalents, and restricted cash** | | (171.5) | (51.0) | (288.0) |
| **Cash, cash equivalents, and restricted cash at beginning of year** | | 679.4 | 730.4 | 1,018.4 |
| **Cash, cash equivalents, and restricted cash at end of year** | $ | 507.9 | $ 679.4 | $ 730.4 |
| **Components of cash, cash equivalents, and restricted cash** | | | | |
| Cash and cash equivalents | $ | 490.7 | $ 662.2 | $ 704.6 |
| Restricted cash, current (Other current assets) | | 8.6 | — | — |
| Restricted cash, noncurrent (Other assets) | | 8.6 | 17.2 | 25.8 |
| **TOTAL CASH, CASH EQUIVALENTS, AND RESTRICTED CASH** | $ | 507.9 | $ 679.4 | $ 730.4 |

See Notes to Consolidated Financial Statements.

PART II
ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## CONSOLIDATED STATEMENT OF SHAREOWNERS' EQUITY

(IN MILLIONS, EXCEPT PER SHARE AMOUNTS)

| | Common stock | Additional paid-in capital | Retained earnings | Accumulated other comprehensive loss | Common stock in treasury, at cost | Total attributable to Rockwell Automation, Inc. | Noncontrolling interests | Total shareowners' equity |
|---|---|---|---|---|---|---|---|---|
| Balance at September 30, 2019 | $ 181.4 | $ 1,709.1 | $ 6,440.2 | $ (1,488.0) | $ (6,438.5) | $ 404.2 | $ — | $ 404.2 |
| Net income (loss) | — | — | 1,023.4 | — | — | 1,023.4 | (0.2) | 1,023.2 |
| Other comprehensive income (loss) | — | — | — | 16.8 | — | 16.8 | (0.3) | 16.5 |
| Common stock issued (including share-based compensation impact) | — | 77.0 | — | — | 183.5 | 260.5 | — | 260.5 |
| Share repurchases | — | — | — | — | (254.9) | (254.9) | — | (254.9) |
| Cash dividends declared[1] | — | — | (472.8) | — | — | (472.8) | — | (472.8) |
| Adoption of accounting standard | — | — | 149.0 | (146.8) | — | 2.2 | — | 2.2 |
| Change in noncontrolling interest | — | 44.6 | — | 3.8 | — | 48.4 | 319.5 | 367.9 |
| Balance at September 30, 2020 | $ 181.4 | $ 1,830.7 | $ 7,139.8 | $ (1,614.2) | $ (6,509.9) | $ 1,027.8 | $ 319.0 | $ 1,346.8 |
| Net income (loss) | — | — | 1,358.1 | — | — | 1,358.1 | (13.8) | 1,344.3 |
| Other comprehensive income (loss) | — | — | — | 597.1 | — | 597.1 | (0.7) | 596.4 |
| Common stock issued (including share-based compensation impact) | — | 103.5 | — | — | 102.7 | 206.2 | — | 206.2 |
| Share repurchases | — | — | — | — | (301.5) | (301.5) | — | (301.5) |
| Cash dividends declared[1] | — | — | (497.5) | — | — | (497.5) | — | (497.5) |
| Change in noncontrolling interest | — | (0.6) | — | — | — | (0.6) | — | (0.6) |
| Balance at September 30, 2021 | $ 181.4 | $ 1,933.6 | $ 8,000.4 | $ (1,017.1) | $ (6,708.7) | $ 2,389.6 | $ 304.5 | $ 2,694.1 |
| Net income (loss) | — | — | 932.2 | — | — | 932.2 | (13.1) | 919.1 |
| Other comprehensive income (loss) | — | — | — | 99.6 | — | 99.6 | (0.3) | 99.3 |
| Common stock issued (including share-based compensation impact) | — | 73.5 | — | — | 52.6 | 126.1 | — | 126.1 |
| Share repurchases | — | — | — | — | (301.1) | (301.1) | — | (301.1) |
| Cash dividends declared[1] | — | — | (520.8) | — | — | (520.8) | — | (520.8) |
| Balance at September 30, 2022 | $ 181.4 | $ 2,007.1 | $ 8,411.8 | $ (917.5) | $ (6,957.2) | $ 2,725.6 | $ 291.1 | $ 3,016.7 |

(1)   Cash dividends were $4.48 per share in 2022; $4.28 per share in 2021; and $4.08 per share in 2020.

See Notes to Consolidated Financial Statements.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1.  BASIS OF PRESENTATION AND ACCOUNTING POLICIES

Rockwell Automation, Inc. ("Rockwell Automation" or the "Company") is a global leader in industrial automation and digital transformation. We connect the imaginations of people with the potential of technology to expand what is humanly possible, making the world more productive and more sustainable.

### BASIS OF PRESENTATION

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP).

### PRINCIPLES OF CONSOLIDATION

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned and controlled majority-owned subsidiaries. Intercompany accounts and transactions have been eliminated in consolidation. Investments in affiliates over which we do not have control but exercise significant influence are accounted for using the equity method of accounting. These affiliated companies are not material individually or in the aggregate to our financial position, results of operations, or cash flows.

### USE OF ESTIMATES

The preparation of consolidated financial statements in accordance with U.S. GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the consolidated financial statements and revenues and expenses during the periods reported. Actual results could differ from those estimates. We use estimates in accounting for, among other items, customer returns, rebates, and incentives; allowance for doubtful accounts; excess and obsolete inventory; share-based compensation; acquisitions, including consolidation and intangible assets; goodwill impairment; product warranty obligations; capitalization of internal-use software; retirement benefits; litigation, claims, and contingencies, including environmental and asbestos matters, conditional asset retirement obligations, and contractual indemnifications; leases; and income taxes. We account for changes to estimates and assumptions prospectively when warranted by factually-based experience.

### REVENUE RECOGNITION

See Note 2 for our revenue recognition policy under Accounting Standards Codification (ASC) 606.

### RETURNS, REBATES AND INCENTIVES

Our primary incentive program provides distributors with cash rebates or account credits based on agreed amounts that vary depending on the customer to whom our distributor ultimately sells the product. We also offer various other incentive programs that provide distributors and direct sale customers with cash rebates, account credits, or additional hardware and software products, solutions, and services based on meeting specified program criteria. Certain distributors are offered a right to return product, subject to contractual limitations.

We record accruals for customer returns, rebates and incentives at the time of revenue recognition based primarily on historical experience. Returns are presented on the Consolidated Balance Sheet as a right of return asset and refund liability. Incentives in the form of rebates are estimated at the individual customer level and are recorded as a reduction of sales. Customer incentives for additional hardware and software products, solutions, and services to be provided are considered distinct performance obligations. As such, we allocate revenue to them based on relative standalone selling price. Until the incentive is redeemed, the revenue is recorded as a contract liability.

### TAXES ON REVENUE PRODUCING TRANSACTIONS

Taxes assessed by governmental authorities on revenue producing transactions, including sales, value added, excise, and use taxes, are recorded on a net basis (excluded from revenue).

### CASH AND CASH EQUIVALENTS

Cash and cash equivalents include time deposits, certificates of deposit, and other fixed income securities with original maturities of three months or less at the time of purchase.

### RECEIVABLES

We record an allowance for doubtful accounts based on customer-specific analysis and general matters such as current assessments of past due balances and economic conditions. Receivables are recorded net of an allowance for doubtful accounts of $13.1 million at September 30, 2022, and $13.2 million at September 30, 2021. In addition, receivables are recorded net of an allowance for certain customer returns, rebates, and incentives of $13.9 million at September 30, 2022, and $6.7 million at September 30, 2021. The changes to our allowance for doubtful accounts during the years ended September 30, 2022 and 2021, were not material and primarily consisted of current-period provisions, write-offs charged against the allowance, recoveries collected, and foreign currency translation.

### INVENTORIES

Inventories are recorded at the lower of cost or market using the first-in, first-out (FIFO) or average cost methods. Market is determined on the basis of estimated realizable values.

## INVESTMENTS

Investments include time deposits, certificates of deposit, other fixed income securities, and equity securities. Investments with original maturities longer than three months at the time of purchase and less than one year from period end are classified as short-term. All other investments are classified as long-term. Fixed income securities meeting the definition of a security are accounted for as available-for-sale and recorded at fair value. Equity securities with a readily determinable fair value are recorded at fair value. Equity securities that do not have a readily determinable fair value, which we account for using the measurement alternative under U.S. GAAP, are recorded at the investment cost, less impairment, plus or minus observable price changes (in orderly transactions) of an identical or similar investment of the same issuer. All other investments are recorded at cost, which approximates fair value.

## PROPERTY

Property, including internal-use software and software to provide a service (e.g. SaaS arrangements), is recorded at cost. Equipment under finance leases are stated at the present value of minimum lease payments. We calculate depreciation of property using the straight-line method over 3 to 40 years for buildings and improvements, 3 to 20 years for machinery and equipment, and 3 to 10 years for computer hardware and internal-use software. We capitalize significant renewals and enhancements and write off replaced units. Implementation costs incurred in a cloud computing arrangement that is a service contract are recorded in Other current assets and Other assets on the Consolidated Balance Sheet and are amortized over the expected service period. We expense maintenance and repairs, as well as renewals of minor amounts. Property acquired during the year that is accrued within Accounts payable or Other current liabilities at year end is considered to be a non-cash investing activity and is excluded from cash used for capital expenditures in the Consolidated Statement of Cash Flows. Capital expenditures of $23.0 million, $31.5 million, and $27.2 million were accrued within Accounts payable and Other current liabilities at September 30, 2022, 2021, and 2020, respectively.

## GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill and Other intangible assets generally result from business acquisitions. We account for business acquisitions by allocating the purchase price to tangible and intangible assets acquired and liabilities assumed at their fair values; the excess of the purchase price over the allocated amount is recorded as goodwill.

We perform our annual evaluation of goodwill and indefinite life intangible assets for impairment as required under U.S. GAAP during the second quarter of each year, or more frequently if events or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. Any excess in carrying value over the estimated fair value is charged to results of operations. For our annual evaluation of goodwill, we may perform a qualitative test to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount in order to determine whether it is necessary to perform a quantitative goodwill impairment test. Our reporting units for goodwill evaluation consist of the Intelligent Devices segment, the Software & Control segment, the Lifecycle Services segment (excluding Sensia), and Sensia. When performing the quantitative goodwill impairment test, we determine the fair value of each reporting unit under a combination of an income approach derived from discounted cash flows and a market multiples approach using selected comparable public companies.

Significant assumptions used in the income approach include: management's forecasted cash flows, including estimated future revenue growth rates and margins, discount rates, and terminal value. Forecasts of future revenue growth and margins are based on management's best estimates. Actual results and forecasts of revenue growth and margins for our Sensia reporting unit may be impacted by its concentration within the Oil & Gas industry and with its customer base. Demand for Sensia hardware and software products, solutions, and services is sensitive to industry volatility and risks, including those related to commodity prices, supply and demand dynamics, production costs, geological activity, and political activities. Discount rates are determined using a weighted average cost of capital adjusted for risk factors specific to the reporting unit, with comparison to market and industry data. The terminal value is estimated following the common methodology of calculating the present value of estimated perpetual cash flow beyond the last projected period assuming constant discount and long-term growth rates. Significant assumptions used in the market multiples approach include selection of the comparable public companies and calculation of the appropriate market multiples.

We amortize all intangible assets with finite useful lives on a straight-line basis over their estimated useful lives. Useful lives assigned range from 3 to 15 years for trademarks, 8 to 20 years for customer relationships, 4 to 17 years for technology, and 3 to 30 years for other intangible assets.

Intangible assets also include costs of on-premise software developed or purchased by our software business to be sold, leased, or otherwise marketed. Amortization of these computer software products is calculated on a product-by-product basis as the greater of (a) the unamortized cost at the beginning of the year times the ratio of the current year gross revenue for a product to the total of the current and anticipated future gross revenue for that product or (b) the straight-line amortization over the remaining estimated economic life of the product.

## IMPAIRMENT OF LONG-LIVED ASSETS

We evaluate the recoverability of the recorded amount of long-lived assets, including property, operating lease right-of-use assets, capitalized implementation costs of a cloud computing arrangement, and other intangible assets, whenever events or changes in circumstances indicate that the recorded amount of an asset may not be fully recoverable. Impairment is assessed when the undiscounted expected future cash flows derived from an asset are less than its carrying amount. If we determine that an asset is impaired, we measure the impairment to be recognized as

the amount by which the recorded amount of the asset exceeds its fair value. We report assets to be disposed of at the lower of the recorded amount or fair value less cost to sell. We determine fair value using a discounted future cash flow analysis.

## DERIVATIVE FINANCIAL INSTRUMENTS

We use derivative financial instruments in the form of foreign currency forward exchange contracts to manage certain foreign currency risks. We enter into these contracts to hedge our exposure to foreign currency exchange rate variability in the expected future cash flows associated with certain third-party and intercompany transactions denominated in foreign currencies forecasted to occur within the next two years. We also use these contracts to hedge portions of our net investments in certain non-U.S. subsidiaries against the effect of exchange rate fluctuations on the translation of foreign currency balances to the U.S. dollar. Additionally, we use derivative financial instruments in the form of interest rate swap contracts to manage our borrowing costs of certain long-term debt and use treasury locks to manage the potential change in interest rates in anticipation of issuance of fixed rate debt. We designate and account for these derivative financial instruments as hedges under U.S. GAAP.

Furthermore, we use foreign currency forward exchange contracts that are not designated as hedges to offset transaction gains or losses associated with some of our assets and liabilities resulting from intercompany loans or other transactions with third parties that are denominated in currencies other than our entities' functional currencies. It is our policy to execute such instruments with global financial institutions that we believe to be creditworthy and not to enter into derivative financial instruments for speculative purposes. Foreign currency forward exchange contracts are usually denominated in currencies of major industrial countries.

## FAIR VALUE OF FINANCIAL INSTRUMENTS

We record various financial instruments at fair value. U.S. GAAP defines fair value as the price that would be received for an asset or paid to transfer a liability (exit price) in an orderly transaction between market participants in the principal or most advantageous market for the asset or liability. U.S. GAAP also classifies the inputs used to measure fair value into the following hierarchy:

| Level 1: | Quoted prices in active markets for identical assets or liabilities. |
| Level 2: | Quoted prices in active markets for similar assets or liabilities, quoted prices for identical or similar assets or liabilities in markets that are not active, or inputs other than quoted prices that are observable for the asset or liability. |
| Level 3: | Unobservable inputs for the asset or liability. |

We hold financial instruments consisting of cash and short-term debt. The fair values of our cash and short-term debt approximate their carrying amounts as reported in our Consolidated Balance Sheet due to the short-term nature of these instruments. We also hold financial instruments consisting of long-term debt,

investments, and derivatives. The valuation methodologies for these financial instruments are described in Notes 7, 10, 11, and 14.

We also determine fair value assessments in conjunction with intangible valuations of acquisitions and our annual impairment testing of goodwill and indefinite lived intangible assets. The valuation methodologies for these assets are described in Notes 3 and 4.

The methods described in these Notes may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, while we believe our valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

## FOREIGN CURRENCY TRANSLATION

We translate assets and liabilities of subsidiaries operating outside of the United States with a functional currency other than the U.S. dollar into U.S. dollars using exchange rates at the end of the respective period. We translate sales, costs, and expenses at average exchange rates effective during the respective period. We report foreign currency translation adjustments as a component of Other comprehensive income (loss). Currency transaction gains and losses are included in results of operations in the period incurred.

## RESEARCH AND DEVELOPMENT EXPENSES

We expense research and development (R&D) costs as incurred; these costs were $440.9 million in 2022, $422.5 million in 2021, and $371.5 million in 2020. We include R&D expenses in Cost of sales in the Consolidated Statement of Operations.

## INCOME TAXES

We account for uncertain tax positions by determining whether it is more likely than not that a tax position will be sustained upon examination based on the technical merits of the position. For tax positions that meet the more likely than not recognition threshold, we determine the amount of benefit to recognize in the Consolidated Financial Statements based on our assertion of the most likely outcome resulting from an examination, including the resolution of any related appeals or litigation processes.

## EARNINGS PER SHARE

We present basic and diluted earnings per share (EPS) amounts. Basic EPS is calculated by dividing earnings available to common shareowners, which is income excluding the allocation to participating securities, by the weighted average number of common shares outstanding during the year, excluding restricted stock. Diluted EPS amounts are based upon the weighted average number of common and common-equivalent shares outstanding during the year. We use the treasury stock method to calculate the effect of outstanding share-based compensation awards, which requires us to compute total employee proceeds as the sum of the amount the employee must pay upon exercise of the award and the amount of unearned share-based compensation costs

attributed to future services. Share-based compensation awards for which the total employee proceeds of the award exceed the average market price of the same award over the period have an antidilutive effect on EPS, and accordingly, we exclude them from the calculation. Antidilutive share-based compensation awards for the years ended September 30, 2022 (0.4 million shares), 2021 (0.2 million shares), and 2020 (1.6 million shares), were excluded

from the diluted EPS calculation. U.S. GAAP requires unvested share-based payment awards that contain non-forfeitable rights to dividends or dividend equivalents, whether paid or unpaid, to be treated as participating securities and included in the computation of EPS pursuant to the two-class method. Our participating securities are composed of restricted stock and non-employee director restricted stock units.

The following table reconciles basic and diluted EPS amounts (in millions, except per share amounts):

| | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Net income attributable to Rockwell Automation, Inc. | $ | 932.2 | $ | 1,358.1 | $ | 1,023.4 |
| Less: Allocation to participating securities | | (2.9) | | (2.1) | | (1.0) |
| **NET INCOME AVAILABLE TO COMMON SHAREOWNERS** | **$** | **929.3** | **$** | **1,356.0** | **$** | **1,022.4** |
| Basic weighted average outstanding shares | | 115.9 | | 116.0 | | 115.8 |
| Effect of dilutive securities | | | | | | |
| Stock options | | 0.7 | | 1.0 | | 0.7 |
| Performance shares | | 0.1 | | 0.1 | | 0.1 |
| **DILUTED WEIGHTED AVERAGE OUTSTANDING SHARES** | | **116.7** | | **117.1** | | **116.6** |
| Earnings per share: | | | | | | |
| Basic | $ | 8.02 | $ | 11.69 | $ | 8.83 |
| Diluted | $ | 7.97 | $ | 11.58 | $ | 8.77 |

## SHARE-BASED COMPENSATION

We recognize share-based compensation expense for equity awards on a straight-line basis over the service period of the award based on the fair value of the award as of the grant date.

## PRODUCT AND WORKERS' COMPENSATION LIABILITIES

We record accruals for product and workers' compensation claims in the period in which they are probable and reasonably estimable. Our principal self-insurance programs include product liability and workers' compensation where we self-insure up to a specified dollar amount. Claims exceeding this amount up to specified limits are covered by insurance policies purchased from commercial insurers. We estimate the liability for the majority of the self-insured claims using our claims experience for the periods being valued.

## ENVIRONMENTAL AND ASBESTOS MATTERS

We record liabilities for environmental and asbestos matters in the period in which our responsibility is probable and the costs can be reasonably estimated. We make changes to the liabilities in the periods in which the estimated costs of remediation change. At third-party environmental sites where more than one potentially responsible party has been identified, we record a liability for our estimated allocable share of costs related to our involvement with the site, as well as an estimated allocable share of costs related to the involvement of insolvent or unidentified parties. If we determine that recovery from insurers or other third parties is probable and a right of setoff exists, we record the liability net of the estimated recovery. If we determine that recovery from

insurers or other third parties is probable but a right of setoff does not exist, we record a liability for the total estimated costs of remediation and a receivable for the estimated recovery. At environmental sites where we are the sole responsible party, we record a liability for the total estimated costs of remediation. Ongoing operating and maintenance expenditures included in our environmental remediation obligations are discounted to present value over the probable future remediation period. Our remaining environmental remediation obligations are undiscounted due to subjectivity of timing and/or amount of future cash payments.

## CONDITIONAL ASSET RETIREMENT OBLIGATIONS

We record liabilities for costs related to legal obligations associated with the retirement of a tangible, long-lived asset that results from the acquisition, construction, development, or the normal operation of the long-lived asset. The obligation to perform the asset retirement activity is not conditional even though the timing or method may be conditional.

## LEASES

We have operating leases primarily for real estate, vehicles, and equipment. We have finance leases primarily for equipment. We determine if a contract is, or contains, a lease at contract inception. A right-of-use (ROU) asset and a corresponding lease liability are recognized at commencement for contracts that are, or contain, a lease with an original term greater than 12 months. ROU assets represent our right to use an underlying asset during the lease term, including periods for which renewal options are reasonably certain to be exercised, and lease liabilities represent our obligation to make lease payments arising from the lease. Operating lease expense is recognized on a straight-line basis over

the lease term for leases with an original term of 12 months or less. Amortization expense of the ROU asset for finance leases is recognized on a straight-line basis over the lease term and interest expense for finance leases is recognized based on the incremental borrowing rate.

Some leasing arrangements require variable payments that are dependent on usage or may vary for other reasons, such as payments for insurance and tax payments. A portion of our real estate leases is generally subject to annual changes based upon an index. The changes based upon the index are treated as variable lease payments. The variable portion of lease payments is not included in our ROU assets or lease liabilities and is expensed when incurred. We elected to not separate lease and nonlease components of contracts for most underlying asset classes. Accordingly, all expenses associated with a lease contract are accounted for as lease expenses.

Lease liabilities are recognized at the contract commencement date based on the present value of remaining lease payments over the lease term. To calculate the lease liabilities we use our incremental borrowing rate. We determine our incremental borrowing rate at the commencement date using our unsecured borrowing rate, adjusted for collateralization and lease term. For leases denominated in a currency other than the U.S. dollar, the collateralized borrowing rate in the foreign currency is determined using the U.S. dollar and foreign currency swap spread. Long-term operating lease liabilities are presented as Operating lease liabilities and current operating lease liabilities are included in Other current liabilities in the Consolidated Balance Sheet. Long-term finance lease liabilities are presented as Long-term debt and current finance lease liabilities are included in Other current liabilities in the Consolidated Balance Sheet.

ROU assets are recognized at the contract commencement date at the value of the related lease liability, adjusted for any prepayments, lease incentives received, and initial direct costs incurred. Operating lease ROU assets are presented as Operating lease right-of-use assets and finance lease ROU assets are presented as Property in the Consolidated Balance Sheet.

Lease expenses, including amortization of ROU assets, for operating and finance leases are recognized on a straight-line basis over the lease term and recorded in Cost of sales and Selling, general and administrative expenses in the Consolidated Statement of Operations. Interest expense for finance leases is recorded in Interest expense in the Consolidated Statement of Operations.

## RECENTLY ADOPTED ACCOUNTING PRONOUNCEMENTS

In February 2016, the Financial Accounting Standards Board (FASB) issued a new standard on accounting for leases that requires lessees to recognize ROU assets and lease liabilities for most leases, among other changes to existing lease accounting guidance. This standard also requires additional qualitative and quantitative disclosures about leasing activities. We adopted this standard using the modified retrospective transition method, which resulted in an immaterial cumulative-effect adjustment to the opening balance of retained earnings as of October 1, 2019, our adoption date. The amount of lease ROU assets and corresponding lease liabilities recorded in the Consolidated Balance Sheet upon adoption were $316 million and $329 million, respectively. We have implemented necessary changes to accounting policies, processes, controls and systems to enable compliance with this standard.

In February 2018, the FASB issued a new standard regarding the reporting of comprehensive loss, which gives entities the option to reclassify tax effects of the Tax Cuts and Jobs Act of 2017 (the "Tax Act") stranded in accumulated other comprehensive loss into retained earnings. We adopted this standard as of October 1, 2019, and elected to reclassify tax effects of approximately $147 million from accumulated other comprehensive loss into retained earnings.

In June 2016, the FASB issued a new standard that requires companies to utilize a current expected credit losses impairment (CECL) model for certain financial assets, including trade and other receivables. The CECL model requires that estimated expected credit losses, including allowance for doubtful accounts, consider a broader range of information such as economic conditions and expected changes in market conditions. We adopted the new standard as of October 1, 2020. The adoption of this standard did not have a material impact on our Consolidated Financial Statements.

In October 2021, the FASB issued a new standard that requires companies to apply ASC 606 to recognize and measure contract assets and contract liabilities in a business combination. We retroactively adopted the new standard as of October 1, 2021. The adoption of this standard did not have a material impact on our Consolidated Financial Statements.

## RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In September 2022, the FASB issued a new standard, which requires the buyer in a supplier finance program to disclose information about the key terms of the program, outstanding confirmed amounts as of the end of the period, a rollforward of such amounts during each annual period, and a description of where in the financial statements outstanding amounts are presented. We are currently assessing the impact of this standard on our financial statement disclosures.

We do not expect any other recently issued accounting pronouncements to have a material impact on our Consolidated Financial Statements and related disclosures.

# NOTE 2. REVENUE RECOGNITION

## NATURE OF PRODUCTS AND SERVICES

Substantially all of our revenue is from contracts with customers. We recognize revenue as promised products are transferred to, or services are performed for, customers in an amount that reflects the consideration to which we expect to be entitled in exchange for those products and services. Our offerings consist of industrial automation and information products, solutions, and services.

Our products include hardware, software, and configured-to-order products. Our solutions include custom-engineered systems and software. Our services include customer technical support and repair, asset management and optimization consulting, and training. Also included in our services is a portion of revenue related to spare parts that are managed within our services offering.

Our operations are comprised of the Intelligent Devices segment, the Software & Control segment, and the Lifecycle Services segment. Revenue from the Intelligent Devices and Software & Control segments is predominantly comprised of product sales, which are recognized at a point in time. The Software & Control segment also contains revenue from software products, which may be recognized over time if certain criteria are met. Revenue from the Lifecycle Services segment is predominantly comprised of solutions and services, which are primarily recognized over time. See Note 19 for more information.

In most countries, we sell primarily through independent distributors in conjunction with our direct sales force. We sell large systems and service offerings principally through our direct sales force, though opportunities are sometimes identified through distributors.

## PERFORMANCE OBLIGATIONS

We use executed sales agreements and purchase orders to determine the existence of a customer contract.

For each customer contract, we determine if the products and services promised to the customer are distinct performance obligations. A product or service is distinct if both of the following criteria are met at contract inception: (i) the customer can benefit from the product or service on its own or together with other readily available resources, and (ii) our promise to transfer the product or perform the service is separately identifiable from other promises in the contract. The fact that we regularly sell a product or service separately is an indicator that the customer can benefit from a product or service on its own or with other readily available resources.

The objective when assessing whether our promises to transfer products or perform services are distinct within the context of the contract is to determine whether the nature of the promise is to transfer each of those products or perform those services individually, or whether the promise is to transfer a combined item or items to which the promised products or services are inputs. If a promised product or service is not distinct, we combine that product or service with other promised products or services until it comprises a bundle of products or services that is distinct, which may result in accounting for all the products or services in a contract as a single performance obligation.

For each performance obligation in a contract, we determine whether the performance obligation is satisfied over time. A performance obligation is satisfied over time if it meets any of the following criteria: (i) the customer simultaneously receives and consumes the benefits provided by our performance as we perform, or (ii) our performance creates or enhances an asset that the customer controls as the asset is created or enhanced, or (iii) our performance does not create an asset for which we have an alternative use and we have an enforceable right to payment for performance completed to date. If one or more of these criteria are met, then we recognize revenue over time using a method that depicts performance. If none of the criteria are met, then control transfers to the customer at a point in time and we recognize revenue at that point in time.

Our products represent standard, catalog products for which we have an alternative use, and therefore we recognize revenue at a point in time when control of the product transfers to the customer. For the majority of our products, control transfers upon shipment, though for some contracts control may transfer upon delivery. Product-type contracts are generally one year or less in length.

Revenue in our Software & Control segment also includes revenue from perpetual and subscription software licenses under on-premise and SaaS arrangements. When on-premise software licenses are determined to be distinct performance obligations, we recognize the related revenue at a point in time when the customer is provided the right to use the license, while revenue allocated to upgrades and support are recognized over the term of the contract. To the extent that the on-premise license is not considered distinct, revenue is recognized over time over the period the related services are performed. Revenue from SaaS arrangements, which allow customers to use hosted software over the contract period without taking possession of the software, are recognized over time during the period the customer is provided the right to use the software.

We offer a wide variety of solutions and services to our customers, for which we recognize revenue over time or at a point in time based on the contract as well as the type of solution or service. If one or more of the three criteria above for over-time revenue recognition are met, we recognize revenue over time as cost is incurred, as work is performed, or based on time elapsed, depending on the type of customer contract. If none of these criteria are met, we recognize revenue at a point in time when control of the asset being created or enhanced transfers to the customer, typically upon delivery. More than half of our solutions and services revenue is from contracts that are one year or less in length. For certain solutions and services offerings, when we have the right to invoice our customers in an amount that corresponds to our performance completed to date, we apply the practical expedient to measure progress and recognize revenue based on the amount for which we have the right to invoice the customer.

When assessing whether we have an alternative use for an asset, we consider both contractual and practical limitations. These include: (i) the level and cost of customization of the asset that is required to meet a customer's needs, (ii) the activities, cost, and profit margin after any rework that would be required before the asset could be directed for another use, and (iii) the portion of the asset that could not be reworked for an alternative use.

At times we provide products and services free of charge to our customers as incentives when the customers purchase other products or services. These represent distinct performance obligations. As such, we allocate revenue to them based on relative standalone selling price.

Most of our global warranties are assurance in nature and do not represent distinct performance obligations. See Note 9 for additional information and disclosures. We occasionally offer extended warranties to our customers that are considered a distinct performance obligation, to which we allocate revenue, which is recognized over the extended warranty period.

We account for shipping and handling activities performed after control of a product has been transferred to the customer as a fulfillment cost. As such, we have applied the practical expedient and we accrue for the costs of shipping and handling activities if revenue is recognized before contractually agreed shipping and handling activities occur.

## UNFULFILLED PERFORMANCE OBLIGATIONS

As of September 30, 2022, we expect to recognize approximately $1,200 million of revenue in future periods from unfulfilled performance obligations from existing contracts with customers. We expect to recognize revenue of approximately $520 million from our remaining performance obligations over the next 12 months with the remaining balance recognized thereafter.

We have applied the practical expedient to exclude the value of remaining performance obligations for (i) contracts with an original term of one year or less and (ii) contracts for which we recognize revenue in proportion to the amount we have the right to invoice for services performed. The amounts above also do not include the impact of contract renewal options that are unexercised as of September 30, 2022.

## TRANSACTION PRICE

The transaction price is the amount of consideration to which we expect to be entitled in exchange for transferring products to, or

performing services for, a customer. We estimate the transaction price at contract inception, and update the estimate each reporting period for any changes in circumstances. In some cases a contract may involve variable consideration, including rebates, credits, allowances for returns, or other similar items that generally decrease the transaction price. We use historical experience to estimate variable consideration, including any constraint.

The transaction price (including any discounts and variable consideration) is allocated between separate products and services based on their relative standalone selling prices. The standalone selling prices are determined based on the prices at which we separately sell each good or service. For items that are not sold separately, we estimate the standalone selling price using available information such as market reference points and other observable data.

We have elected the practical expedient to exclude sales taxes and other similar taxes from the measurement of the transaction price.

## SIGNIFICANT PAYMENT TERMS

Our standard payment terms vary globally but do not result in a significant delay between the timing of invoice and payment. We occasionally negotiate other payment terms during the contracting process. We do not typically include significant financing components in our contracts with customers. We have elected the practical expedient to not adjust the transaction price for the period between transfer of products or performance of services and customer payment if expected to be one year or less.

For most of our products, we invoice at the time of shipment and we do not typically have significant contract balances. For our solutions and services as well as some of our products, timing may differ between revenue recognition and billing. Depending on the terms agreed to with the customer, we may invoice in advance of performance or we may invoice after performance. When revenue recognition exceeds billing we recognize a receivable, and when billing exceeds revenue recognition we recognize a contract liability.

## DISAGGREGATION OF REVENUE

The following table presents our revenue disaggregation by geographic region for our three operating segments (in millions). We attribute sales to the geographic regions based on the country of destination.

| | Year Ended September 30, 2022 | | | | Year Ended September 30, 2021 | | | |
| | Intelligent Devices | Software & Control | Lifecycle Services | Total | Intelligent Devices | Software & Control | Lifecycle Services | Total |
|---|---|---|---|---|---|---|---|---|
| North America | $ 2,223.7 | $ 1,542.2 | $ 956.1 | $ 4,722.0 | $ 2,075.4 | $ 1,186.3 | $ 871.1 | $ 4,132.8 |
| Europe, Middle East and Africa | 629.3 | 350.4 | 457.9 | 1,437.6 | 595.9 | 375.0 | 434.8 | 1,405.7 |
| Asia Pacific | 443.5 | 291.8 | 352.7 | 1,088.0 | 432.5 | 273.9 | 305.8 | 1,012.2 |
| Latin America | 248.1 | 128.5 | 136.2 | 512.8 | 208.1 | 111.8 | 126.8 | 446.7 |
| **TOTAL COMPANY SALES** | **$ 3,544.6** | **$ 2,312.9** | **$ 1,902.9** | **$ 7,760.4** | **$ 3,311.9** | **$ 1,947.0** | **$ 1,738.5** | **$ 6,997.4** |

PART II
ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## CONTRACT LIABILITIES

Contract liabilities primarily relate to consideration received in advance of performance under the contract.

Below is a summary of our Contract liabilities balance, the portion not expected to be recognized within twelve months is included within Other liabilities in the Consolidated Balance Sheet (in millions):

|  | September 30, 2022 | September 30, 2021 |
|---|---|---|
| Balance as of beginning of fiscal year | $ 462.5 | $ 325.3 |
| Balance as of end of period | 541.3 | 462.5 |

The most significant changes in our Contract liabilities balance during the twelve months ended September 30, 2022 and 2021, were due to amounts billed, partially offset by revenue recognized on amounts billed during the period and revenue recognized that was included in the Contract liabilities balance at the beginning of the period.

In the twelve months ended September 30, 2022, we recognized revenue of approximately $373.1 million that was included in the Contract liabilities balance at September 30, 2021. In the twelve months ended September 30, 2021, we recognized revenue of approximately $256.1 million that was included in the Contract liabilities balance at September 30, 2020. We did not have a material amount of revenue recognized in the twelve months ended September 30, 2022 and 2021, from performance obligations satisfied or partially satisfied in previous periods.

## COSTS TO OBTAIN AND FULFILL A CONTRACT

We capitalize and amortize certain incremental costs to obtain and fulfill contracts. These costs primarily consist of incentives paid to sales personnel, which are considered incremental costs to obtain customer contracts. We elected the practical expedient to expense incremental costs to obtain a contract when the contract has a duration of one year or less for most classes of contracts. Our capitalized contract costs, which are included in Other assets in our Consolidated Balance Sheet, are not significant as of September 30, 2022 and 2021. There was no impairment loss in relation to capitalized costs in the period.

## NOTE 3.   GOODWILL AND OTHER INTANGIBLE ASSETS

Changes in the carrying amount of Goodwill were (in millions):

|  | Intelligent Devices | Software & Control | Lifecycle Services | Total |
|---|---|---|---|---|
| Balance as of October 1, 2020 | $ 535.1 | $ 497.3 | $ 617.9 | $ 1,650.3 |
| Acquisition of businesses | — | 1,937.3 | 12.8 | 1,950.1 |
| Translation | 8.0 | 12.9 | 4.6 | 25.5 |
| Balance as of September 30, 2021 | $ 543.1 | $ 2,447.5 | $ 635.3 | $ 3,625.9 |
| Acquisition of businesses | — | — | 12.1 | 12.1 |
| Translation and other | (40.1) | (48.8) | (25.1) | (114.0) |
| **BALANCE AS OF SEPTEMBER 30, 2022** | **$ 503.0** | **$ 2,398.7** | **$ 622.3** | **$ 3,524.0** |

We performed our annual evaluation of goodwill and indefinite life intangible assets for impairment during the second quarter of fiscal 2022 and concluded that these assets were not impaired. For our annual evaluation, we performed qualitative tests for our Intelligent Devices, Software & Control, and Lifecycle Services (excluding Sensia) reporting units and a quantitative test for our Sensia reporting unit. As a result of ongoing supply chain constraints and market volatility, we identified a triggering event in the fourth quarter of fiscal 2022 for our Sensia reporting unit, which required an interim quantitative impairment test. As a result of that quantitative test, we concluded that the $315.9 million of Goodwill within the Sensia reporting unit was not impaired. Refer to Note 1 for additional information on our goodwill impairment evaluations.

Other intangible assets consist of (in millions):

| | September 30, 2022 | | |
| --- | --- | --- | --- |
| | Carrying Amount | Accumulated Amortization | Net |
| Amortized intangible assets | | | |
| Software products | $ 97.6 | $ 57.9 | $ 39.7 |
| Customer relationships | 582.7 | 107.2 | 475.5 |
| Technology | 410.8 | 119.3 | 291.5 |
| Trademarks | 70.4 | 19.4 | 51.0 |
| Other | 6.4 | 5.8 | 0.6 |
| Total amortized intangible assets | 1,167.9 | 309.6 | 858.3 |
| Allen-Bradley® trademark not subject to amortization | 43.7 | — | 43.7 |
| **OTHER INTANGIBLE ASSETS** | **$ 1,211.6** | **$ 309.6** | **$ 902.0** |

| | September 30, 2021 | | |
| --- | --- | --- | --- |
| | Carrying Amount | Accumulated Amortization | Net |
| Amortized intangible assets | | | |
| Software products | $ 90.4 | $ 43.2 | $ 47.2 |
| Customer relationships | 595.9 | 75.4 | 520.5 |
| Technology | 420.8 | 71.7 | 349.1 |
| Trademarks | 73.8 | 13.3 | 60.5 |
| Other | 7.1 | 6.3 | 0.8 |
| Total amortized intangible assets | 1,188.0 | 209.9 | 978.1 |
| Allen-Bradley® trademark not subject to amortization | 43.7 | — | 43.7 |
| **OTHER INTANGIBLE ASSETS** | **$ 1,231.7** | **$ 209.9** | **$ 1,021.8** |

Software products represent costs of computer software to be sold, leased, or otherwise marketed. Software products amortization expense was $9.4 million in 2022, $11.9 million in 2021, and $10.2 million in 2020. Estimated total amortization expense for all amortized intangible assets is $110.2 million in 2023, $107.1 million in 2024, $103.8 million in 2025, $102.7 million in 2026, and $95.8 million in 2027.

## NOTE 4. ACQUISITIONS

### FISCAL 2022 ACQUISITIONS

In November 2021, we acquired AVATA, a services provider for supply chain management, enterprise resource planning, and enterprise performance management solutions. We assigned the full amount of goodwill related to this acquisition to our Lifecycle Services segment.

In March 2022, we, through our Sensia affiliate, acquired Swinton Technology, a provider of metering supervisory systems and measurement expertise in the Oil & Gas industry. We assigned the full amount of goodwill related to this acquisition to our Lifecycle Services segment.

Pro forma consolidated sales for the year ended September 30, 2022 and 2021, were approximately $7.8 billion and $7.1 billion, respectively, and the impact on earnings is not material. The preceding pro forma consolidated financial results of operations are as if the preceding fiscal 2022 acquisitions and the October 2022 acquisition of CUBIC (see Note 20) occurred on October 1, 2020. The pro forma information is presented for informational purposes only and is not indicative of the results of operations that would have been achieved had the transaction occurred as of that time. Acquisition-related costs recorded as expenses in the year ended September 30, 2022, were not material.

PART II
**ITEM 8.** FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## FISCAL 2021 ACQUISITIONS

### PLEX ACQUISITION

In August 2021, we acquired Plex Systems, a cloud-native smart manufacturing platform. Plex offers a single-instance, multi-tenant Software-as-a-Service manufacturing platform operating at scale, including advanced manufacturing execution systems, quality, and supply chain management capabilities.

We recorded assets acquired and liabilities assumed in connection with this acquisition based on their estimated fair values as of the acquisition date of August 31, 2021. The aggregate purchase price allocation is as follows (in millions):

|  | Purchase Price Allocation |
|---|---|
| Accounts receivable | $ 14.8 |
| All other assets | 28.3 |
| Goodwill | 1,730.0 |
| Intangible assets | 531.4 |
| Total assets acquired | 2,304.5 |
| Less: Contract liabilities | (29.2) |
| Less: Other liabilities assumed | (33.4) |
| Less: Deferred income taxes | (36.4) |
| **NET ASSETS ACQUIRED** | **$ 2,205.5** |

|  | Purchase Consideration |
|---|---|
| **TOTAL PURCHASE CONSIDERATION, NET OF CASH ACQUIRED** | **$ 2,205.5** |

Intangible assets identified include $276.4 million of customer relationships, $232.8 million of technology, and $22.2 million of trade names (approximately 12-year weighted average useful life). We assigned the full amount of goodwill and all other assets acquired to our Software & Control segment. The goodwill recorded represents intangible assets that do not qualify for separate recognition. This goodwill arises because the purchase price for Plex reflects a number of factors including the future earnings and cash flow potential of the business, the strategic fit and resulting synergies from the complementary portfolio of leading software-as-a-service applications, industry expertise, and market access. We do not expect the goodwill to be deductible for tax purposes. The intangible assets were valued using an income approach, specifically the relief from royalty method and multi-period excess earnings method. The relief from royalty method calculates value based on hypothetical payments that would be saved by owning an asset rather than licensing it. The multi-period excess earnings method is the isolation of cash flows from a single intangible asset and measures fair value by discounting them to present value. These values are considered level 3 measurements under the U.S. GAAP fair value hierarchy.

The key assumption requiring the use of judgement in the valuation of the customer relationship intangible asset was the customer attrition rate of 5 percent; other assumptions included forecasted cash flows attributable to the existing customers and the discount rate. The key assumptions requiring the use of judgement in the valuation of the technology intangible asset were the royalty rate of 25 percent and the obsolescence factor estimating a phase out over 10 years; other assumptions included forecasted revenue growth rates and the discount rate.

### OTHER ACQUISITIONS

In October 2020, we acquired Oylo, a privately-held industrial cybersecurity services provider based in Barcelona, Spain. We assigned the full amount of goodwill related to this acquisition to our Lifecycle Services segment.

In December 2020, we acquired Fiix Inc., a privately-held, artificial intelligence enabled computerized maintenance management system (CMMS) company based in Toronto, Ontario, Canada. We assigned the full amount of goodwill related to this acquisition to our Software & Control segment.

We recorded assets acquired and liabilities assumed in connection with these acquisitions based on their estimated fair values as of the respective acquisition dates. The aggregate purchase price allocation for these acquisitions is as follows (in millions):

|  | Purchase Price Allocation |
|---|---|
| Accounts receivable | $ 6.0 |
| All other assets | 15.9 |
| Goodwill | 224.8 |
| Intangible assets | 69.6 |
| Total assets acquired | 316.3 |
| Less: Liabilities assumed | (25.5) |
| Less: Deferred income taxes | (3.7) |
| **NET ASSETS ACQUIRED** | **$ 287.1** |

|  | Purchase Consideration |
|---|---|
| **TOTAL PURCHASE CONSIDERATION, NET OF CASH ACQUIRED** | **$ 287.1** |

Intangible assets identified include $69.6 million of customer relationships, technology, and trade names (approximately 11-year weighted average useful life). We assigned $12.8 million of goodwill to our Lifecycle Services segment and $212.0 million of goodwill to our Software & Control segment, which represents intangible assets that do not qualify for separate recognition. We do not expect the goodwill to be deductible for tax purposes.

The total sales included in our consolidated results for all of the preceding acquisitions for the year ended September 30, 2021, were approximately $27.9 million.

Pro forma consolidated sales for the year ended September 30, 2021 and 2020, were approximately $7.2 billion and $6.5 billion, respectively, and the impact on earnings is not material. The preceding pro forma consolidated financial results of operations are as if all of preceding fiscal 2021 acquisitions occurred on October 1, 2019. The pro forma information is presented for informational purposes only and is not indicative of the results of operations that would have been achieved had the transaction occurred as of that time.

Acquisition-related costs recorded as expenses for all of the preceding acquisitions in the year ended September 30, 2021, were not material.

## FISCAL 2020 ACQUISITIONS

### SENSIA JOINT VENTURE

On October 1, 2019, we completed the formation of a joint venture, Sensia, a fully integrated digital oilfield automation solutions provider. Rockwell Automation owns 53% of Sensia and SLB owns 47% of Sensia. As part of the transaction, we made $247.0 million of net cash payments to SLB, which were funded by cash on hand. We control Sensia and, as of October 1, 2019, have consolidated Sensia in our financial results. As part of the joint venture operations, Sensia regularly transacts with SLB, primarily relating to purchases and sales of goods and services. These transactions are not material to Rockwell Automation for the years ended September 30, 2022, 2021, and 2020.

We recorded assets acquired and liabilities assumed in connection with the formation of Sensia based on their estimated fair values as of the acquisition date of October 1, 2019. The purchase price allocation is as follows (in millions):

|  | Purchase Price Allocation |
|---|---|
| Accounts receivable | $ 31.2 |
| Inventory | 33.2 |
| Other current assets | 1.2 |
| Property, plant and equipment | 9.3 |
| Other assets | 6.2 |
| Goodwill | 307.4 |
| Intangible assets | 254.1 |
| Total assets acquired | 642.6 |
| Less: Liabilities assumed | (18.3) |
| Less: Deferred income taxes | (2.6) |
| Less: Noncontrolling interest portion | (293.8) |
| **NET ASSETS ACQUIRED** | $ 327.9 |

|  | Purchase Consideration |
|---|---|
| Cash, net of cash acquired | $ 247.0 |
| Noncontrolling interest portion of Rockwell Automation's contributed business | 25.8 |
| Additional paid in capital adjustment | 48.1 |
| Other | 7.0 |
| **TOTAL PURCHASE CONSIDERATION, NET OF CASH ACQUIRED** | $ 327.9 |

Intangible assets assigned include $254.1 million of customer relationships, technology, and trade names (approximately 11-year weighted average useful life). We assigned the full amount of goodwill and all other assets acquired to our Lifecycle Services segment. The majority of the goodwill recorded is expected to be deductible for tax purposes. The assets were valued using an income approach, specifically the relief from royalty method and multi-period excess earnings method. The relief from royalty method calculates value based on hypothetical payments that would be saved by owning an asset rather than licensing it. The multi-period excess earnings method is the isolation of cash flows from a single intangible asset and measures fair value by discounting them to present value. These values are considered level 3 measurements under the U.S. GAAP fair value hierarchy. Key assumptions used in the valuation of these intangible assets included: (1) a discount rate of 11%, (2) the estimated remaining life of technology and trademarks of from 5 to 15 years, and (3) the customer attrition rate ranging from 7.5% to 25%.

The fair value of the noncontrolling interest of the contributed business upon acquisition was $293.8 million. The consolidated value of Sensia at October 1, 2019, was recorded at fair value for SLB's contribution and at carrying value for Rockwell Automation's contribution.

The total incremental sales resulting from the Sensia joint venture included in our consolidated results for the twelve months ended September 30, 2020, were approximately $191.0 million.

## OTHER ACQUISITIONS

In October 2019, we acquired MESTECH Services (MESTECH), a global provider of Manufacturing Execution Systems/Manufacturing Operations Management, digital solutions consulting, and systems integration services. We assigned the full amount of goodwill related to this acquisition to our Lifecycle Services segment.

In January 2020, we acquired Avnet Data Security, LTD (Avnet), an Israel-based cybersecurity provider with over 20 years of experience providing cybersecurity services. We assigned the full amount of goodwill related to this acquisition to our Lifecycle Services segment.

In April 2020, we acquired ASEM, S.p.A. (ASEM), a leading provider of digital automation technologies. We assigned the full amount of goodwill related to this acquisition to our Software & Control segment.

In April 2020, we also acquired Kalypso, LP (Kalypso), a privately-held U.S.-based software delivery and consulting firm specializing in the digital transformation of industrial companies with a strong client base in life sciences, consumer products and industrial high-tech. We assigned the full amount of goodwill related to this acquisition to our Lifecycle Services segment.

We recorded assets acquired and liabilities assumed in connection with these acquisitions based on their estimated fair values as of the respective acquisition dates. The aggregate purchase price allocation for these acquisitions is as follows (in millions):

|  | | Purchase Price Allocation |
|---|---|---|
| Accounts receivable | $ | 33.8 |
| Inventory | | 9.6 |
| Other current assets | | 1.0 |
| Property, plant and equipment | | 5.9 |
| Other assets | | 2.2 |
| Goodwill | | 244.5 |
| Intangible assets | | 76.5 |
| Total assets acquired | | 373.5 |
| Less: Liabilities assumed | | (28.6) |
| Less: Deferred income taxes | | (14.4) |
| **NET ASSETS ACQUIRED** | **$** | **330.5** |

|  | | Purchase Consideration |
|---|---|---|
| **TOTAL PURCHASE CONSIDERATION, NET OF CASH ACQUIRED** | **$** | **330.5** |

Intangible assets assigned include $76.5 million of customer relationships, technology, and trade names (approximately 10-year weighted average useful life). We assigned $161.2 million of goodwill to our Software & Control segment and $83.3 million of goodwill to our Lifecycle Services segment. Approximately $69.0 million of the goodwill recorded is expected to be deductible for tax purposes. The purchase consideration includes $25.8 million of contingent consideration held in an escrow account and recorded in other assets as restricted cash in the Consolidated Balance Sheet.

The total sales included in our consolidated results from these four acquisitions for the twelve months ended September 30, 2020, were approximately $41.8 million.

Acquisition-related costs recorded as expenses for all of the preceding acquisitions in the year ended September 30, 2020, were not material.

## NOTE 5. INVENTORIES

Inventories consist of (in millions):

|  | | September 30, | | |
|---|---|---|---|---|
|  | | 2022 | | 2021 |
| Finished goods | $ | 325.0 | $ | 287.0 |
| Work in process | | 317.3 | | 229.3 |
| Raw materials | | 411.9 | | 281.8 |
| **INVENTORIES** | **$** | **1,054.2** | **$** | **798.1** |

## NOTE 6.  PROPERTY, NET

Property consists of (in millions):

| | | September 30, | |
| --- | --- | --- | --- |
| | | 2022 | 2021 |
| Land | $ | 4.6 | $ 4.8 |
| Buildings and improvements | | 399.0 | 397.6 |
| Machinery and equipment | | 1,201.6 | 1,244.3 |
| Internal-use software | | 540.7 | 522.4 |
| Construction in progress | | 142.9 | 156.4 |
| Total | | 2,288.8 | 2,325.5 |
| Less: Accumulated depreciation | | (1,702.3) | (1,743.6) |
| **PROPERTY, NET** | $ | **586.5** | $ **581.9** |

## NOTE 7.  LONG-TERM AND SHORT-TERM DEBT

Long-term debt consists of (in millions):

| | | September 30, | |
| --- | --- | --- | --- |
| | | 2022 | 2021 |
| 0.35% notes, payable in August 2023 | $ | 600.0 | $ 600.0 |
| 2.875% notes, payable in March 2025 | | 311.0 | 315.6 |
| 6.70% debentures, payable in January 2028 | | 250.0 | 250.0 |
| 3.50% notes, payable in March 2029 | | 425.0 | 425.0 |
| 1.75% notes, payable in August 2031 | | 450.0 | 450.0 |
| 6.25% notes, payable in December 2037 | | 250.0 | 250.0 |
| 4.20% notes, payable in March 2049 | | 575.0 | 575.0 |
| 2.80% notes, payable in August 2061 | | 450.0 | 450.0 |
| 5.20% debentures, payable in January 2098 | | 200.0 | 200.0 |
| Unamortized discount, capitalized lease obligations and other | | (34.1) | (44.2) |
| Total debt | | 3,476.9 | 3,471.4 |
| Less: Current portion | | (609.1) | (6.8) |
| **LONG-TERM DEBT** | $ | **2,867.8** | $ **3,464.6** |

Our Short-term debt as of September 30, 2022 and 2021, includes commercial paper borrowings of $317.0 million and $484.0 million, respectively, with weighted average interest rates of 3.03 percent and 0.18 percent, respectively, and weighted average maturity periods of 22 days and 90 days, respectively. Also included in Short-term debt as of September 30, 2022 and 2021, are $42.3 million and $23.5 million, respectively, of interest-bearing loans from SLB to Sensia, due in December 2022.

In August 2021, we issued $1.5 billion aggregate principal amount of long-term notes in a registered public offering. The offering consisted of $600.0 million of 0.35% notes due in August 2023, $450.0 million of 1.75% notes due in August 2031, and $450.0 million of 2.80% notes due in August 2061, all issued at a discount. Net proceeds to the Company from the debt offering were $1,485.6 million. We used these net proceeds primarily to fund the acquisition of Plex. Refer to Note 4 for additional information on this acquisition.

In March 2019, we issued $1.0 billion aggregate principal amount of long-term notes in a registered public offering. The offering consisted of $425.0 million of 3.50% notes due in March 2029 and $575.0 million of 4.20% notes due in March 2049, both issued at a discount. Net proceeds to the Company from the debt offering were $987.6 million. We used these net proceeds primarily to repay our outstanding commercial paper, with the remaining proceeds used for general corporate purposes.

We entered into treasury locks to manage the potential change in interest rates in anticipation of the issuance of the $1.5 billion aggregate notes in August 2021 and the $1.0 billion of fixed rate debt in March 2019. These treasury locks were designated as and accounted for as cash flow hedges. The effective differentials paid on these treasury locks were initially recorded in Accumulated other comprehensive loss, net of tax effect. As a result of the changes in the interest rates on the treasury locks between the time we entered into the treasury locks and the time we priced and issued the notes, the Company made a net payment of $28.0 million to the counterparties from the August 2021 issuance and $35.7 million to the counterparty from the March 2019 issuance. The $28.0 million and $35.7 million net losses on the settlement of the treasury locks were recorded in Accumulated other comprehensive loss, net of tax effect, and are being amortized over the term of the corresponding notes, and recognized as an adjustment to Interest expense in the Consolidated Statement of Operations.

On June 29, 2022, we replaced our former $1.25 billion unsecured revolving credit facility with a new five-year $1.5 billion unsecured revolving credit facility, expiring in June 2027. We can increase the aggregate amount of this credit facility by up to $750.0 million, subject to the consent of the banks in the credit facility. We did not borrow against this credit facility or the former credit facility during the periods ended September 30, 2022, or 2021. Borrowings under this credit facility bear interest based on short-term money market rates in effect during the period the borrowings are outstanding. The terms of this credit facility contain covenants under which we agree to maintain an EBITDA-to-interest ratio of at least 3.0 to 1.0. The EBITDA-to-interest ratio is defined in the credit facility as the ratio of consolidated EBITDA (as defined in the facility) for the preceding four quarters to consolidated interest expense for the same period.

Among other uses, we can draw on our credit facility as a standby liquidity facility to repay our outstanding commercial paper as it matures. Under our current policy, we expect to limit our other borrowings under our credit facility, if any, to amounts that would leave enough credit available under the facility so that we could borrow, if needed, to repay all of our then outstanding commercial paper as it matures.

Separate short-term unsecured credit facilities of approximately $214.1 million at September 30, 2022, were available to non-U.S. subsidiaries, of which approximately $30.0 million was committed under letters of credit. Borrowings under our non-U.S. credit facilities at September 30, 2022 and 2021, were not significant. We were in compliance with financial covenants under our credit facilities at September 30, 2022 and 2021. There are no significant commitment fees or compensating balance requirements under our credit facilities.

Interest payments were $120.4 million during 2022, $91.8 million during 2021, and $101.7 million during 2020.

The following table presents the carrying amounts and estimated fair values of Long-term debt in the Consolidated Balance Sheet (in millions):

| | September 30, 2022 | | September 30, 2021 | |
| --- | --- | --- | --- | --- |
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
| Current portion of long-term debt | $ 609.1 | $ 589.1 | $ 6.8 | $ 6.8 |
| Long-term debt | 2,867.8 | 2,485.4 | 3,464.6 | 3,874.8 |

We base the fair value of long-term debt upon quoted market prices for the same or similar issues and therefore consider this a Level 2 fair value measurement. The fair value of long-term debt considers the terms of the debt excluding the impact of derivative and hedging activity. Refer to Note 1 for further information regarding levels in the fair value hierarchy. The carrying value of our short-term debt approximates fair value.

## NOTE 8.  OTHER CURRENT LIABILITIES

Other current liabilities consist of (in millions):

| | September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Unrealized losses on foreign exchange contracts (Note 11) | $ 31.2 | $ 16.9 |
| Product warranty obligations (Note 9) | 16.5 | 18.0 |
| Taxes other than income taxes | 65.6 | 59.8 |
| Accrued interest | 18.1 | 17.8 |
| Income taxes payable | 81.1 | 188.4 |
| Operating lease liabilities | 83.3 | 89.9 |
| Other | 107.2 | 86.8 |
| **OTHER CURRENT LIABILITIES** | **$ 403.0** | **$ 477.6** |

PART II
ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## NOTE 9. PRODUCT WARRANTY OBLIGATIONS

We record a liability for product warranty obligations at the time of sale to a customer based upon historical warranty experience. Most of our products are covered under a warranty period that runs for twelve months from either the date of sale or installation. We also record a liability for specific warranty matters when they become known and reasonably estimable.

Changes in product warranty obligations were (in millions):

| | September 30, | | | |
|---|---|---|---|---|
| | | 2022 | | 2021 |
| Beginning balance | $ | 18.0 | $ | 20.8 |
| Warranties recorded at time of sale | | 14.5 | | 17.3 |
| Adjustments to pre-existing warranties | | (3.6) | | (6.2) |
| Settlements of warranty claims | | (12.4) | | (13.9) |
| **ENDING BALANCE** | **$** | **16.5** | **$** | **18.0** |

## NOTE 10. INVESTMENTS

Our investments consist of (in millions):

| | September 30, | | | |
|---|---|---|---|---|
| | | 2022 | | 2021 |
| Fixed income securities | $ | 12.6 | $ | 0.6 |
| Equity securities (level 1) | | 928.8 | | 1,267.6 |
| Equity securities (other) | | 76.4 | | 27.1 |
| Other | | 50.8 | | 68.8 |
| Total investments | | 1,068.6 | | 1,364.1 |
| Less: Short-term investments[1] | | (12.6) | | (0.6) |
| **LONG-TERM INVESTMENTS** | **$** | **1,056.0** | **$** | **1,363.5** |

(1)   Short-term investments are included in Other current assets in the Consolidated Balance Sheet.

### EQUITY SECURITIES

Equity securities (level 1) consist of 8,879,717 and 10,582,010 shares of PTC Inc. (PTC) common stock (the "PTC Shares") at September 30, 2022 and 2021, respectively. The PTC Shares are classified as level 1 in the fair value hierarchy, as described in Note 1, and are recognized at fair value in the Consolidated Balance Sheet using the most recent closing price of PTC common stock quoted on Nasdaq.

Equity securities (other) consist of various securities that do not have a readily determinable fair value, which we account for using the measurement alternative under U.S. GAAP. These securities are recorded at the investment cost, less impairment, plus or minus observable price changes (in orderly transactions) of an identical or similar investment of the same issuer in the Consolidated Balance Sheet. Observable price changes are classified as level 2 in the fair value hierarchy, as described in Note 1. The carrying values at September 30, 2022 and 2021, include cumulative upward adjustments from observed price changes of $17.2 million and $5.1 million, respectively.

We record gains and losses on investments within the Change in fair value of investments line in the Consolidated Statement of Operations. The gains and losses on investments we recorded for the following periods were (in millions):

| | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Net (loss) gain on equity securities (level 1) | $ | (136.4) | $ | 392.3 | $ | 153.9 |
| Net gain on equity securities (other) | | 15.1 | | 5.1 | | — |
| Equity method loss on Other investments | | (15.6) | | — | | — |
| Change in fair value of investments | | (136.9) | | 397.4 | | 153.9 |
| **TOTAL NET UNREALIZED (LOSS) GAIN ON EQUITY SECURITIES** | **$** | **(165.9)** | **$** | **397.4** | **$** | **153.9** |

Refer to Note 1 for further information regarding levels in the fair value hierarchy. We did not have any transfers between levels of fair value measurements during the periods presented.

# NOTE 11.   DERIVATIVE INSTRUMENTS

We use foreign currency forward exchange contracts and foreign currency denominated debt obligations to manage certain foreign currency risks. We also use interest rate swap contracts and treasury locks to manage risks associated with interest rate fluctuations. The following information explains how we use and value these types of derivative instruments and how they impact our consolidated financial statements.

Additional information related to the impacts of cash flow hedges on Other comprehensive income (loss) is included in Note 12.

## TYPES OF DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES

### CASH FLOW HEDGES

We enter into foreign currency forward exchange contracts to hedge our exposure to foreign currency exchange rate variability in the expected future cash flows associated with certain third-party and intercompany transactions denominated in foreign currencies forecasted to occur within the next two years (cash flow hedges). We report in Other comprehensive income (loss) the effective portion of the gain or loss on derivative financial instruments that we designate and that qualify as cash flow hedges. We reclassify these gains or losses into earnings in the same periods when the hedged transactions affect earnings. To the extent forward exchange contracts designated as cash flow hedges are ineffective, changes in value are recorded in earnings through the maturity date. There was no impact on earnings due to ineffective cash flow hedges. At September 30, 2022, we had a U.S. dollar-equivalent gross notional amount of $839.0 million of foreign currency forward exchange contracts designated as cash flow hedges. We entered into treasury locks to manage the potential change in interest rates in anticipation of the issuance of $1.5 billion and $1.0 billion of fixed rate debt in August 2021 and March 2019, respectively. Treasury locks are accounted for as cash flow hedges since they hedge the risk of an increase in treasury rates for the forecasted interest payments of an anticipated fixed-rate debt issuance.

The pre-tax amount of gains (losses) recorded in Other comprehensive income (loss) related to cash flow hedges that would have been recorded in the Consolidated Statement of Operations had they not been so designated was (in millions):

| | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Forward exchange contracts | $ | 70.5 | $ | (10.8) | $ | (9.7) |
| Treasury locks | | — | | (28.0) | | — |

The pre-tax amount of gains (losses) reclassified from Accumulated other comprehensive loss into the Consolidated Statement of Operations related to derivative forward exchange contracts designated as cash flow hedges, which offset the related gains and losses on the hedged items during the periods presented, was (in millions):

| | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Sales | $ | 0.7 | $ | 1.9 | $ | (0.7) |
| Cost of sales | | 21.8 | | (25.4) | | 19.6 |
| Selling, general and administrative expenses | | (0.9) | | 1.5 | | (1.4) |
| Interest expense | | (3.6) | | (2.3) | | (2.1) |
| **TOTAL** | **$** | **18.0** | **$** | **(24.3)** | **$** | **15.4** |

Approximately $39.3 million of pre-tax net unrealized gains on cash flow hedges as of September 30, 2022, will be reclassified into earnings during the next twelve months. We expect that these net unrealized gains will be offset when the hedged items are recognized in earnings.

## NET INVESTMENT HEDGES

We use foreign currency forward exchange contracts and foreign currency denominated debt obligations to hedge portions of our net investments in non-U.S. subsidiaries (net investment hedges) against the effect of exchange rate fluctuations on the translation of foreign currency balances to the U.S. dollar. For all instruments that are designated as net investment hedges and meet effectiveness requirements, the net changes in value of the designated hedging instruments are recorded in Accumulated other comprehensive loss within Shareowners' equity where they offset gains and losses recorded on our net investments globally. To the extent forward exchange contracts or foreign currency denominated debt designated as net investment hedges are ineffective, changes in value are recorded in earnings through the maturity date. There was no impact on earnings due to ineffective net investment hedges. At September 30, 2022, we had no foreign currency forward exchange contracts designated as net investment hedges.

The pre-tax amount of losses recorded in Other comprehensive income (loss) related to net investment hedges that would have been recorded in the Consolidated Statement of Operations had they not been so designated was (in millions):

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Forward exchange contracts | $ — | $ (0.8) | $ (1.3) |

## FAIR VALUE HEDGES

We used interest rate swap contracts to manage the borrowing costs of certain long-term debt. In February 2015, we issued $600.0 million aggregate principal amount of fixed rate notes ("2025 Notes"). Upon issuance of these notes, we entered into fixed-to-floating interest rate swap contracts that effectively converted these notes from fixed rate debt to floating rate debt. We designated these contracts as fair value hedges because they hedged the changes in fair value of the fixed rate notes resulting from changes in interest rates. The changes in value of these fair value hedges were recorded as gains or losses in Interest expense and are offset by the losses or gains on the underlying debt instruments, which are also recorded in Interest expense. In May 2020, we settled all outstanding interest rate swaps and received $22.0 million from the counterparties. This gain on the settlement of the interest rate swaps was recorded as an adjustment to the carrying value of the 2025 Notes and is being amortized over the remaining term of those notes as an adjustment to Interest expense in the Consolidated Statement of Operations.

The pre-tax amount of net gains recognized within the Consolidated Statement of Operations related to derivative instruments designated as fair value hedges, which fully offset the related net gains and losses on the hedged debt instruments during the periods presented, was (in millions):

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Interest income | $ — | $ — | $ 15.1 |

## DERIVATIVES NOT DESIGNATED AS HEDGING INSTRUMENTS

Certain of our locations have assets and liabilities denominated in currencies other than their functional currencies resulting from intercompany loans and other transactions with third parties denominated in foreign currencies. We enter into foreign currency forward exchange contracts that we do not designate as hedging instruments to offset the transaction gains or losses associated with some of these assets and liabilities. Gains and losses on derivative financial instruments for which we do not elect hedge accounting are recognized in the Consolidated Statement of Operations in each period, based on the change in the fair value of the derivative financial instruments. At September 30, 2022, we had a U.S. dollar-equivalent gross notional amount of $1,066.1 million of foreign currency forward exchange contracts not designated as hedging instruments.

The pre-tax amount of gains (losses) from forward exchange contracts not designated as hedging instruments recognized in the Consolidated Statement of Operations was (in millions):

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Cost of sales | $ 0.5 | $ (0.2) | $ 6.1 |
| Other (expense) income | 38.6 | (8.1) | (11.8) |
| **TOTAL** | **$ 39.1** | **$ (8.3)** | **$ (5.7)** |

## FAIR VALUE OF DERIVATIVE INSTRUMENTS

We recognize all derivative financial instruments as either assets or liabilities at fair value in the Consolidated Balance Sheet. We value our forward exchange contracts using a market approach. We use a valuation model based on inputs including forward and spot prices for currency and interest rate curves. We did not change our valuation techniques during fiscal 2022, 2021, or 2020. It is our policy to execute such instruments with major financial institutions that we believe to be creditworthy and not to enter into derivative financial instruments for speculative purposes.

We diversify our foreign currency forward exchange contracts among counterparties to minimize exposure to any one of these entities. Our foreign currency forward exchange contracts are usually denominated in currencies of major industrial countries. The U.S. dollar-equivalent gross notional amount of our forward exchange contracts totaled $1,905.1 million at September 30, 2022. Currency pairs (buy/sell) comprising the most significant contract notional values were Euro/United States dollar (USD), USD/Canadian dollar, and USD/Mexican peso.

The fair value of our derivatives and their location in our Consolidated Balance Sheet were (in millions):

| Derivatives Designated as Hedging Instruments | Balance Sheet Location | Fair Value (Level 2) | |
|---|---|---|---|
| | | September 30, 2022 | September 30, 2021 |
| Forward exchange contracts | Other current assets | $ 52.2 | $ 7.6 |
| Forward exchange contracts | Other assets | 8.0 | 2.1 |
| Forward exchange contracts | Other current liabilities | (10.2) | (7.4) |
| Forward exchange contracts | Other liabilities | (1.0) | (0.2) |
| **TOTAL** | | **$ 49.0** | **$ 2.1** |

| Derivatives Not Designated as Hedging Instruments | Balance Sheet Location | Fair Value (Level 2) | |
|---|---|---|---|
| | | September 30, 2022 | September 30, 2021 |
| Forward exchange contracts | Other current assets | $ 59.9 | $ 4.4 |
| Forward exchange contracts | Other current liabilities | (21.0) | (9.5) |
| **TOTAL** | | **$ 38.9** | **$ (5.1)** |

Refer to Note 1 for further information regarding levels in the fair value hierarchy.

## NOTE 12.  SHAREOWNERS' EQUITY

### COMMON STOCK

At September 30, 2022, the authorized stock of the Company consisted of one billion shares of common stock, par value $1.00 per share, and 25 million shares of preferred stock, without par value. At September 30, 2022, 15.0 million shares of authorized common stock were reserved for various incentive plans.

Changes in outstanding common shares are summarized as follows (in millions):

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Beginning balance | 116.0 | 116.2 | 115.7 |
| Treasury stock purchases | (1.3) | (1.1) | (1.4) |
| Common stock issued (including share-based compensation impact) | 0.5 | 0.9 | 1.9 |
| **ENDING BALANCE** | **115.2** | **116.0** | **116.2** |

At September 30, 2022 and 2021, there were $1.6 million and $1.8 million, respectively, of outstanding common stock share repurchases recorded in Accounts payable.

### ACCUMULATED OTHER COMPREHENSIVE LOSS

Changes in Accumulated other comprehensive loss attributable to Rockwell Automation by component were (in millions):

|  | Pension and other postretirement benefit plan adjustments, net of tax (Note 14) | Accumulated currency translation adjustments, net of tax | Net unrealized gains (losses) on cash flow hedges, net of tax | Total accumulated other comprehensive loss, net of tax |
|---|---|---|---|---|
| Balance as of September 30, 2019 | $ (1,133.7) | $ (341.3) | $ (13.0) | $ (1,488.0) |
| Other comprehensive (loss) income before reclassifications | (100.2) | 26.0 | (7.3) | (81.5) |
| Amounts reclassified from accumulated other comprehensive loss | 109.5 | — | (11.2) | 98.3 |
| Other comprehensive income (loss) | 9.3 | 26.0 | (18.5) | 16.8 |
| Adoption of accounting standard/other | (146.8) | 3.8 | — | (143.0) |
| **BALANCE AS OF SEPTEMBER 30, 2020** | **$ (1,271.2)** | **$ (311.5)** | **$ (31.5)** | **$ (1,614.2)** |
| Other comprehensive income (loss) before reclassifications | 438.9 | 31.4 | (29.2) | 441.1 |
| Amounts reclassified from accumulated other comprehensive loss | 138.2 | — | 17.8 | 156.0 |
| Other comprehensive income (loss) | 577.1 | 31.4 | (11.4) | 597.1 |
| **BALANCE AS OF SEPTEMBER 30, 2021** | **$ (694.1)** | **$ (280.1)** | **$ (42.9)** | **$ (1,017.1)** |
| Other comprehensive income (loss) before reclassifications | 170.7 | (184.9) | 51.2 | 37.0 |
| Amounts reclassified from accumulated other comprehensive loss | 75.6 | — | (13.0) | 62.6 |
| Other comprehensive income (loss) | 246.3 | (184.9) | 38.2 | 99.6 |
| **BALANCE AS OF SEPTEMBER 30, 2022** | **$ (447.8)** | **$ (465.0)** | **$ (4.7)** | **$ (917.5)** |

The reclassifications out of Accumulated other comprehensive loss to the Consolidated Statement of Operations were (in millions):

| | | Year Ended September 30, | | | | | Affected Line in the Consolidated Statement of Operations |
|---|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2020 | |
| Pension and other postretirement benefit plan adjustments[1] | | | | | | | |
| Amortization of prior service credit | $ | (0.2) | $ | (4.0) | $ | (4.5) | Other (expense) income |
| Amortization of net actuarial loss | | 60.1 | | 142.5 | | 148.7 | Other (expense) income |
| Settlement and curtailment charges | | 38.6 | | 39.8 | | — | Other (expense) income |
| | | 98.5 | | 178.3 | | 144.2 | Income before income taxes |
| | | (22.9) | | (40.1) | | (34.7) | Income tax provision |
| | $ | 75.6 | $ | 138.2 | $ | 109.5 | Net income attributable to Rockwell Automation, Inc. |
| Net unrealized (gains) losses on cash flow hedges | | | | | | | |
| Forward exchange contracts | $ | (0.7) | $ | (1.9) | $ | 0.7 | Sales |
| Forward exchange contracts | | (21.8) | | 25.4 | | (19.6) | Cost of sales |
| Forward exchange contracts | | 0.9 | | (1.5) | | 1.4 | Selling, general and administrative expenses |
| Treasury locks related to 2019 and 2021 debt issuances | | 3.6 | | 2.3 | | 2.1 | Interest expense |
| | | (18.0) | | 24.3 | | (15.4) | Income before income taxes |
| | | 5.0 | | (6.5) | | 4.2 | Income tax provision |
| | $ | (13.0) | $ | 17.8 | $ | (11.2) | Net income attributable to Rockwell Automation, Inc. |
| **TOTAL RECLASSIFICATIONS** | $ | **62.6** | $ | **156.0** | $ | **98.3** | Net income attributable to Rockwell Automation, Inc. |

(1)   These components are included in the computation of net periodic benefit costs. See Note 14 for further information.

## NOTE 13.   SHARE-BASED COMPENSATION

During 2022, 2021, and 2020, we recognized $68.1 million, $51.7 million, and $46.1 million of pre-tax share-based compensation expense, respectively. The total income tax benefit related to share-based compensation expense was $11.2 million, $8.6 million, and $7.7 million during 2022, 2021, and 2020, respectively. As of September 30, 2022, total unrecognized compensation cost related to share-based compensation awards, net of estimated forfeitures, was $101.9 million, which we expect to recognize over a weighted average period of approximately 2.0 years.

During 2020, we adopted, and our shareowners approved, our 2020 Long-Term Incentives Plan (2020 Plan), which replaced our 2012 Long-Term Incentives Plan, as amended (2012 Plan), and our 2003 Directors Stock Plan, as amended (Directors Plan). Our 2020 Plan authorizes us to deliver up to 13.0 million shares of our common stock upon exercise of stock options, upon grant, or in payment of stock appreciation rights, performance shares, performance units, restricted stock units, or restricted stock. Our Directors Plan authorized us to deliver up to 0.5 million shares of our common stock upon exercise of stock options, upon grant, or in payment of restricted stock units. Shares relating to awards under our 2012 Plan that terminate by expiration, forfeiture, cancellation, or otherwise without the issuance or delivery of shares or that are settled in cash in lieu of shares will be available for further awards under the 2020 Plan. Approximately 10.1 million shares under our 2020 Plan remain available for future grant or payment at September 30, 2022. We use treasury stock to deliver shares of our common stock under these plans. Our 2020 Plan does not permit share-based compensation awards to be granted after February 4, 2030.

## STOCK OPTIONS

We have granted non-qualified and incentive stock options to purchase our common stock under various incentive plans at prices equal to the fair market value of the stock on the grant dates. The exercise price for stock options granted under the plans may be paid in cash, already-owned shares of common stock, or a combination of cash and such shares. Stock options expire ten years after the grant date and vest ratably over three years.

The per share weighted average fair value of stock options granted during the years ended September 30, 2022, 2021, and 2020, was $87.68, $55.50, and $35.80, respectively. The total intrinsic value of stock options exercised was $52.8 million, $108.4 million, and $151.6 million during 2022, 2021, and 2020, respectively. We estimated the fair value of each stock option on the date of grant using the Black-Scholes pricing model and the following assumptions:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Average risk-free interest rate | 0.38% | 0.38% | 1.63% |
| Expected dividend yield | 1.28% | 1.73% | 2.08% |
| Expected volatility | 31% | 31% | 24% |
| Expected term (years) | 4.8 | 4.9 | 4.9 |

The average risk-free interest rate is based on U.S. Treasury security rates corresponding to the expected term in effect as of the grant date. The expected dividend yield is based on the expected annual dividend as a percentage of the market value of our common stock as of the grant date. We determined expected volatility using daily historical volatility of our stock price over the most recent period corresponding to the expected term as of the grant date. We determined the expected term of the stock options using historical data adjusted for the estimated exercise dates of unexercised options.

A summary of stock option activity for the year ended September 30, 2022, is as follows:

|  | Shares (in thousands) | | Wtd. Avg. Exercise Price | Wtd. Avg. Remaining Contractual Term (years) | | Aggregate Intrinsic Value of In-The-Money Options (in millions) |
|---|---|---|---|---|---|---|
| Outstanding at October 1, 2021 | 2,496 | $ | 173.07 | | | |
| Granted | 164 | | 350.75 | | | |
| Exercised | (363) | | 159.50 | | | |
| Forfeited | (48) | | 241.22 | | | |
| Canceled | (3) | | 221.49 | | | |
| **OUTSTANDING AT SEPTEMBER 30, 2022** | **2,246** | | **186.72** | **6.0** | **$** | **90.0** |
| Exercisable at September 30, 2022 | 1,717 | | 166.64 | 5.3 | | 84.9 |

The amount of options expected to vest is materially consistent with those outstanding and not yet exercisable.

## PERFORMANCE SHARE AWARDS

Certain officers and key employees are also eligible to receive shares of our common stock in payment of performance share awards granted to them. Grantees of performance shares will be eligible to receive shares of our common stock depending upon our total shareowner return, assuming reinvestment of all dividends, relative to the performance of companies in the S&P 500 Index over a three-year period for the awards granted in fiscal 2020. The number of shares actually earned for awards granted in fiscal 2020 will range from zero percent to 200 percent of the targeted number of performance shares for the three-year performance periods and will be paid, to the extent earned, in the fiscal quarter following the end of the applicable three-year performance period. Beginning with the awards granted in fiscal 2021, the total shareowner return is measured relative to the performance of companies in the following S&P 500 Selected GICS groups: Capital Goods, Software and Services, and Technology Hardware and Equipment. The number of shares actually earned for awards granted in fiscal 2022 and 2021 will range from zero percent to 200 percent of the targeted number of performance shares for the three-year performance periods and will be paid, to the extent earned, in the fiscal quarter following the end of the applicable three-year performance period.

A summary of performance share activity for the year ended September 30, 2022, is as follows:

| | Shares (in thousands) | | Wtd. Avg. Grant Date Share Fair Value |
|---|---|---|---|
| Outstanding at October 1, 2021 | 119 | $ | 232.94 |
| Granted[1] | 37 | | 481.28 |
| Adjustment for performance results achieved[2] | 21 | | 155.04 |
| Vested and issued | (68) | | 155.04 |
| Forfeited | (12) | | 316.27 |
| **OUTSTANDING AT SEPTEMBER 30, 2022** | **97** | | **354.29** |

(1) *Performance shares granted assuming achievement of performance goals at target.*
(2) *Adjustments were due to the number of shares vested under fiscal 2019 awards at the end of the three-year performance period ended September 30, 2021, being higher than the target number of shares.*

The following table summarizes information about performance shares vested during the years ended September 30, 2022, 2021, and 2020:

| | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Percent payout | | 144% | | 93% | | 77% |
| Shares vested (in thousands) | | 68 | | 31 | | 28 |
| Total fair value of shares vested (in millions) | $ | 23.4 | $ | 7.4 | $ | 5.6 |

For the three-year performance period ending September 30, 2022, the payout will be 177% of the target number of shares, with a maximum of approximately 48,000 shares to be delivered in payment under the awards in December 2022.

The per share fair value of performance share awards granted during the years ended September 30, 2022, 2021, and 2020, was $481.28, $298.10, and $265.04, respectively, which we determined using a Monte Carlo simulation and the following assumptions:

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Average risk-free interest rate | 0.94% | 0.19% | 1.58% |
| Expected dividend yield | 1.28% | 1.73% | 2.06% |
| Expected volatility | 36% | 37% | 25% |

The average risk-free interest rate is based on the three-year U.S. Treasury security rate in effect as of the grant date. The expected dividend yield is based on the expected annual dividend as a percentage of the market value of our common stock as of the grant date. The expected volatilities were determined using daily historical volatility for the most recent three-year period as of the grant date.

## RESTRICTED STOCK AND RESTRICTED STOCK UNITS

We grant restricted stock and restricted stock units to certain employees, and non-employee directors may elect to receive a portion of their compensation in restricted stock units. Restrictions on employee restricted stock and employee restricted stock units generally lapse over periods ranging from one to five years. Director restricted stock units generally are payable upon retirement. We value restricted stock and restricted stock units at the closing market value of our common stock on the date of grant. The weighted average fair value of restricted stock and restricted stock unit awards granted during the years ended September 30, 2022, 2021, and 2020, was $298.44, $265.32, and $200.36, respectively. The total fair value of shares vested during the years ended September 30, 2022, 2021, and 2020, was $35.6 million, $10.4 million, and $8.7 million, respectively.

A summary of restricted stock and restricted stock unit activity for the year ended September 30, 2022, is as follows:

| | Shares (in thousands) | | Wtd. Avg. Grant Date Share Fair Value |
|---|---|---|---|
| Outstanding at October 1, 2021 | 351 | $ | 239.89 |
| Granted | 252 | | 298.44 |
| Vested | (116) | | 231.97 |
| Forfeited | (39) | | 275.08 |
| **OUTSTANDING AT SEPTEMBER 30, 2022** | **448** | | **271.71** |

We also granted approximately 3,300 shares of unrestricted common stock to non-employee directors during the year ended September 30, 2022. The weighted average grant date fair value of the unrestricted stock awards granted during the years ended September 30, 2022, 2021, and 2020, was $345.00, $228.80, and $171.51, respectively.

# NOTE 14.  RETIREMENT BENEFITS

We sponsor funded and unfunded pension plans and other postretirement benefit plans for our employees. The pension plans provide for monthly pension payments to eligible employees after retirement. Pension benefits for salaried employees generally are based on years of credited service and average earnings. Pension benefits for hourly employees are primarily based on specified benefit amounts and years of service. Effective July 1, 2010, we closed participation in our U.S. and Canada pension plans to employees hired after June 30, 2010. Employees hired after June 30, 2010 are instead eligible to participate in defined contribution plans. Effective October 1, 2010, we also closed participation in our U.K. pension plan to employees hired after September 30, 2010, and these employees are now eligible for a defined contribution plan. Benefits to be provided to plan participants hired before July 1, 2010 or October 1, 2010, respectively, are not affected by these changes. Our policy with respect to funding our pension obligations is to fund at a minimum the amount required by applicable laws and governmental regulations. We were not required to make contributions to satisfy minimum funding requirements in our U.S. pension plans in 2022, 2021, or 2020. We did not make voluntary contributions to our U.S. qualified pension plan in 2022 and 2021.

We made a voluntary contribution of $50.0 million to our U.S. qualified pension plan in 2020.

We sponsor various defined contribution savings plans that allow eligible employees to contribute a portion of their income in accordance with plan specific guidelines. We contribute to savings plans and/or will match a percentage of the employee contributions up to certain limits. The Company contributions to defined contribution plans are based on age and years of service and range from 3% to 7% of eligible compensation. However, effective from May 2020 through November 2020, we temporarily suspended the 401(k) matching contribution for all U.S. employees to address the then-current and anticipated economic conditions resulting from the global COVID-19 pandemic. Expense related to these plans was $63.8 million in 2022, $58.5 million in 2021, and $50.9 million in 2020.

Other postretirement benefits are primarily in the form of retirement medical plans that cover certain employees in the U.S. and Canada and provide for the payment of certain medical costs of eligible employees and dependents after retirement. The postretirement benefit plan was closed to employees hired after December 31, 2004.

## NET PERIODIC BENEFIT COST

The components of net periodic benefit cost (income) were (in millions):

| | Pension Benefits | | | | | | Other Postretirement Benefits | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2020 | | 2022 | | 2021 | | 2020 | |
| Service cost | $ | 70.9 | $ | 90.1 | $ | 91.1 | $ | 0.8 | $ | 1.2 | $ | 1.0 |
| Interest cost | | 135.6 | | 125.6 | | 136.4 | | 1.3 | | 1.2 | | 1.6 |
| Expected return on plan assets | | (230.7) | | (241.3) | | (244.8) | | — | | — | | — |
| Amortization | | | | | | | | | | | | |
|     Prior service cost (credit) | | 0.6 | | 1.4 | | 0.9 | | (0.8) | | (5.4) | | (5.4) |
|     Net actuarial loss | | 59.4 | | 141.4 | | 147.3 | | 0.7 | | 1.1 | | 1.4 |
| Settlement and curtailment charges | | 38.6 | | 39.8 | | — | | — | | — | | — |
| **NET PERIODIC BENEFIT COST (INCOME)** | $ | **74.4** | $ | **157.0** | $ | **130.9** | $ | **2.0** | $ | **(1.9)** | $ | **(1.4)** |

The service cost component is included in Cost of sales and Selling, general and administrative expenses in the Consolidated Statement of Operations. All other components are included in Other (expense) income in the Consolidated Statement of Operations.

Significant assumptions used in determining net periodic benefit cost (income) were (in weighted averages):

| | Pension Benefits | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 |
| **U.S. PLANS** | | | | | | |
| Discount rate | 3.86% | 2.90% | 3.30% | 2.50% | 2.15% | 2.90% |
| Expected return on plan assets | 7.00% | 7.25% | 7.50% | — | — | — |
| Compensation increase rate | 3.40% | 3.40% | 3.40% | — | — | — |
| **NON-U.S. PLANS** | | | | | | |
| Discount rate | 2.01% | 1.56% | 1.60% | 2.90% | 2.20% | 2.65% |
| Expected return on plan assets | 4.59% | 4.68% | 5.11% | — | — | — |
| Compensation increase rate | 3.00% | 2.90% | 3.06% | — | — | — |

## NET BENEFIT OBLIGATION

Benefit obligation, plan assets, funded status, and net liability information is summarized as follows (in millions):

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Benefit obligation at beginning of year | $ 4,751.8 | $ 5,026.9 | $ 51.5 | $ 57.0 |
| Service cost | 70.9 | 90.1 | 0.8 | 1.2 |
| Interest cost | 135.6 | 125.6 | 1.3 | 1.2 |
| Actuarial gains | (1,216.8) | (162.6) | (1.1) | (4.9) |
| Plan amendments | 4.6 | 0.1 | — | — |
| Plan participant contributions | 2.2 | 2.8 | 3.8 | 3.1 |
| Benefits paid | (153.8) | (156.9) | (11.7) | (8.8) |
| Settlements and curtailments | (320.4) | (219.3) | — | — |
| Currency translation and other | (108.5) | 45.1 | (0.4) | 2.7 |
| Benefit obligation at end of year | 3,165.6 | 4,751.8 | 44.2 | 51.5 |
| Plan assets at beginning of year | 4,192.2 | 3,838.0 | — | — |
| Actual return on plan assets | (768.0) | 653.7 | — | — |
| Company contributions | 54.3 | 34.9 | 7.9 | 5.7 |
| Plan participant contributions | 2.2 | 2.8 | 3.8 | 3.1 |
| Benefits paid | (153.8) | (156.9) | (11.7) | (8.8) |
| Settlements and curtailments | (312.2) | (219.3) | — | — |
| Currency translation and other | (110.8) | 39.0 | — | — |
| Plan assets at end of year | 2,903.9 | 4,192.2 | — | — |
| **FUNDED STATUS OF PLANS** | **$ (261.7)** | **$ (559.6)** | **$ (44.2)** | **$ (51.5)** |
| Net amount on balance sheet consists of | | | | |
| Other assets | $ 158.8 | $ 118.5 | $ — | $ — |
| Compensation and benefits | (15.1) | (37.0) | (6.4) | (5.7) |
| Retirement benefits | (405.4) | (641.1) | (37.8) | (45.8) |
| **NET AMOUNT ON BALANCE SHEET** | **$ (261.7)** | **$ (559.6)** | **$ (44.2)** | **$ (51.5)** |

PART II
ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The actuarial gains recorded within the benefit obligation in 2022 were primarily the result of an increase in the discount rate for the U.S. Plans, which increased from 3.10% in 2021 to 5.65% in 2022. The actuarial gains recorded in 2021 were primarily the result of an increase in the discount rate for the U.S. Plans, which increased from 2.90% in 2020 to 3.10% in 2021. Approximately 76 percent of our 2022 global projected benefit obligation relates to our U.S. pension plan.

Amounts included in Accumulated other comprehensive loss, net of tax, which have not yet been recognized in net periodic benefit cost (income) are as follows (in millions):

| | Pension Benefits | | Other Postretirement Benefits | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Prior service (credit) cost | $ (61.3) | $ (30.7) | $ 4.7 | $ 4.1 |
| Net actuarial loss | 503.9 | 718.7 | 0.5 | 2.0 |
| **TOTAL** | **$ 442.6** | **$ 688.0** | **$ 5.2** | **$ 6.1** |

During 2022, we recognized prior service costs (credits), settlements, and curtailments of $38.4 million ($30.0 million net of tax) and net actuarial losses of $60.1 million ($45.6 million net of tax) in pension and other postretirement net periodic benefit cost (income), which were included in Accumulated other comprehensive loss at September 30, 2021.

The accumulated benefit obligation for our pension plans was $2,982.0 million and $4,393.0 million at September 30, 2022 and 2021, respectively.

Information regarding our pension plans with projected benefit obligations in excess of the fair value of plan assets (underfunded plans) are as follows (in millions):

| | 2022 | 2021 |
| --- | --- | --- |
| Projected benefit obligation | $ 2,529.0 | $ 4,210.5 |
| Fair value of plan assets | 2,108.5 | 3,532.4 |

Information regarding our pension plans with accumulated benefit obligations in excess of the fair value of plan assets (underfunded plans) are as follows (in millions):

| | 2022 | 2021 |
| --- | --- | --- |
| Accumulated benefit obligation | $ 2,365.5 | $ 3,510.7 |
| Fair value of plan assets | 2,108.5 | 3,156.7 |

Significant assumptions used in determining the benefit obligations were (in weighted averages):

| | Pension Benefits | | Other Postretirement Benefits | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| **U.S. PLANS** | | | | |
| Discount rate | 5.65% | 3.10% | 5.70% | 2.50% |
| Compensation increase rate | 3.30% | 3.40% | — | — |
| Health care cost trend rate[1] | — | — | 6.50% | 6.00% |
| **NON-U.S. PLANS** | | | | |
| Discount rate | 4.35% | 2.03% | 5.10% | 2.90% |
| Compensation increase rate | 3.03% | 3.00% | — | — |
| Health care cost trend rate[1] | — | — | 4.50% | 4.50% |

(1)   The health care cost trend rate reflects the estimated increase in gross medical claims costs. As a result of the plan amendment adopted effective October 1, 2002, our effective per person retiree medical cost increase is zero percent beginning in 2005 for the majority of our postretirement benefit plans. For our other plans, we assume the gross health care cost trend rate will remain at 6.50% in 2023 and decrease to 5.00% in 2025 for U.S. Plans and will not change in future periods for Non-U.S. Plans.

## ESTIMATED FUTURE PAYMENTS

We expect to contribute $26.1 million related to our global pension plans and $6.6 million to our postretirement benefit plans in 2023.

The following benefit payments, which include employees' expected future service, as applicable, are expected to be paid (in millions):

| | Pension Benefits | | Other Postretirement Benefits |
|---|---|---|---|
| 2023 | $ | 446.8 | $ | 6.6 |
| 2024 | | 219.9 | | 6.1 |
| 2025 | | 225.5 | | 5.5 |
| 2026 | | 229.6 | | 5.0 |
| 2027 | | 237.2 | | 4.5 |
| 2028-2032 | | 1,187.0 | | 16.5 |

## PLAN ASSETS

In determining the expected long-term rate of return on assets assumption, we consider actual returns on plan assets over the long term, adjusted for forward-looking considerations, such as inflation, interest rates, equity performance, and the active management of the plan's invested assets. We also considered our current and expected mix of plan assets in setting this assumption. This resulted in the selection of the weighted average long-term rate of return on assets assumption. Our global weighted average targeted and actual asset allocations at September 30, by asset category, are:

| Asset Category | Allocation Range | Target Allocations | September 30, | |
|---|---|---|---|---|
| | | | 2022 | 2021 |
| Equity securities | 40% – 65% | 50% | 53% | 56% |
| Debt securities | 30% – 50% | 43% | 41% | 38% |
| Other | 0% – 15% | 7% | 6% | 6% |

The investment objective for pension funds related to our defined benefit plans is to meet the plan's benefit obligations, while maximizing the long-term growth of assets without undue risk. We strive to achieve this objective by investing plan assets within target allocation ranges and diversification within asset categories. Target allocation ranges are guidelines that are adjusted periodically based on ongoing monitoring by plan fiduciaries. Investment risk is controlled by rebalancing to target allocations on a periodic basis and ongoing monitoring of investment manager performance relative to the investment guidelines established for each manager.

As of September 30, 2022 and 2021, our pension plans do not directly own our common stock.

In certain countries where we operate, there are no legal requirements or financial incentives provided to companies to pre-fund pension obligations. In these instances, we typically make benefit payments directly from cash as they become due, rather than by creating a separate pension fund.

The valuation methodologies used for our pension plans' investments measured at fair value are described as follows. There have been no changes in the methodologies used at September 30, 2022 and 2021.

*Common stock* — Valued at the closing price reported on the active market on which the individual securities are traded.

*Mutual funds* — Valued at the net asset value (NAV) reported by the fund.

*Corporate debt* — Valued at either the yields currently available on comparable securities of issuers with similar credit ratings or valued under a discounted cash flow approach that maximizes observable inputs, such as current yields of similar instruments, but includes adjustments for certain risks that may not be observable such as credit and liquidity risks.

*Government securities* — Valued at the most recent closing price on the active market on which the individual securities are traded or, absent an active market, utilizing observable inputs such as closing prices in less frequently traded markets.

*Common collective trusts* — Valued at the NAV as determined by the custodian of the fund. The NAV is based on the fair value of the underlying assets owned by the fund, minus its liabilities then divided by the number of units outstanding.

*Private equity and alternative equity* — Valued at the estimated fair value, as determined by the respective fund manager, based on the NAV of the investment units held at year end, which is subject to judgment.

*Real estate funds* — Consists of the real estate funds, which provide an indirect investment into a diversified and multi-sector portfolio of property assets. Publicly-traded real estate funds are

valued at the most recent closing price reported on the SIX Swiss Exchange. The remainder is valued at the estimated fair value, as determined by the respective fund manager, based on the NAV of the investment units held at year end, which is subject to judgment.

*Insurance contracts* — Valued at the aggregate amount of accumulated contribution and investment income less amounts used to make benefit payments and administrative expenses, which approximates fair value.

*Other* — Consists of other fixed income investments and common collective trusts with a mix of equity and fixed income underlying

assets. Other fixed income investments are valued at the most recent closing price reported in the markets in which the individual securities are traded, which may be infrequently.

Refer to Note 1 for further information regarding levels in the fair value hierarchy.

In accordance with ASC Subtopic 820-10, certain investments that are measured at fair value using the NAV (or its equivalent) practical expedient have not been classified in the fair value hierarchy. The fair value amounts presented in this table are intended to permit reconciliation of the fair value hierarchy to the line items presented in the consolidated financial statements.

The following table presents our pension plans' investments measured at fair value as of September 30, 2022 (in millions):

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **U.S. PLANS** | | | | |
| Cash and cash equivalents | $ 3.1 | $ — | $ — | $ 3.1 |
| Equity securities | | | | |
| Mutual funds | 53.1 | — | — | 53.1 |
| Common stock | 532.9 | — | — | 532.9 |
| Common collective trusts | — | 621.1 | — | 621.1 |
| Fixed income securities | | | | |
| Corporate debt | — | 453.1 | — | 453.1 |
| Government securities | 224.8 | 41.6 | — | 266.4 |
| Common collective trusts | — | 143.6 | — | 143.6 |
| Total U.S. Plans investments in fair value hierarchy | $ 813.9 | $ 1,259.4 | $ — | 2,073.3 |
| U.S. Plans investments measured at NAV | | | | |
| Private equity | | | | 18.0 |
| **TOTAL U.S. PLANS INVESTMENTS** | | | | **2,091.3** |
| **NON-U.S. PLANS** | | | | |
| Cash and cash equivalents | $ 13.3 | $ — | $ — | 13.3 |
| Equity securities | | | | |
| Common stock | 143.2 | — | — | 143.2 |
| Common collective trusts | — | 185.1 | — | 185.1 |
| Fixed income securities | | | | |
| Corporate debt | — | 39.7 | — | 39.7 |
| Government securities | 1.3 | — | — | 1.3 |
| Common collective trusts | — | 291.3 | — | 291.3 |
| Other types of investments | | | | |
| Real estate funds | — | 63.7 | — | 63.7 |
| Insurance contracts | — | — | 54.9 | 54.9 |
| Other | — | — | 3.8 | 3.8 |
| Total Non-U.S. Plans investments in fair value hierarchy | $ 157.8 | $ 579.8 | $ 58.7 | 796.3 |
| Non-U.S. Plans investments measured at NAV | | | | |
| Real estate funds | | | | 16.3 |
| **TOTAL NON-U.S. PLANS INVESTMENTS** | | | | **812.6** |
| **TOTAL INVESTMENTS MEASURED AT FAIR VALUE** | | | $ | **2,903.9** |

The following table presents our pension plans' investments measured at fair value as of September 30, 2021 (in millions):

| | | Level 1 | | Level 2 | | Level 3 | | Total |
|---|---|---|---|---|---|---|---|---|
| **U.S. PLANS** | | | | | | | | |
| Cash and cash equivalents | $ | 3.5 | $ | — | $ | — | $ | 3.5 |
| Equity securities | | | | | | | | |
| Mutual funds | | 88.7 | | — | | — | | 88.7 |
| Common stock | | 1,159.8 | | — | | — | | 1,159.8 |
| Common collective trusts | | — | | 609.2 | | — | | 609.2 |
| Fixed income securities | | | | | | | | |
| Corporate debt | | — | | 678.2 | | — | | 678.2 |
| Government securities | | 290.5 | | 66.5 | | — | | 357.0 |
| Common collective trusts | | — | | 119.7 | | — | | 119.7 |
| Other types of investments | | | | | | | | |
| Insurance contracts | | — | | — | | 0.9 | | 0.9 |
| Total U.S. Plans investments in fair value hierarchy | $ | 1,542.5 | $ | 1,473.6 | $ | 0.9 | | 3,017.0 |
| U.S. Plans investments measured at NAV | | | | | | | | |
| Private equity | | | | | | | | 30.3 |
| **TOTAL U.S. PLANS INVESTMENTS** | | | | | | | | **3,047.3** |
| **NON-U.S. PLANS** | | | | | | | | |
| Cash and cash equivalents | $ | 8.5 | $ | — | $ | — | | 8.5 |
| Equity securities | | | | | | | | |
| Common stock | | 170.3 | | — | | — | | 170.3 |
| Common collective trusts | | — | | 334.9 | | — | | 334.9 |
| Fixed income securities | | | | | | | | |
| Corporate debt | | — | | 64.7 | | — | | 64.7 |
| Government securities | | 1.4 | | — | | — | | 1.4 |
| Common collective trusts | | — | | 357.0 | | — | | 357.0 |
| Other types of investments | | | | | | | | |
| Real estate funds | | — | | 81.1 | | — | | 81.1 |
| Insurance contracts | | — | | — | | 106.2 | | 106.2 |
| Other | | — | | — | | 4.7 | | 4.7 |
| Total Non-U.S. Plans investments in fair value hierarchy | $ | 180.2 | $ | 837.7 | $ | 110.9 | | 1,128.8 |
| Non-U.S. Plans investments measured at NAV | | | | | | | | |
| Real estate funds | | | | | | | | 16.1 |
| **TOTAL NON-U.S. PLANS INVESTMENTS** | | | | | | | | **1,144.9** |
| **TOTAL INVESTMENTS MEASURED AT FAIR VALUE** | | | | | | | $ | **4,192.2** |

The table below sets forth a summary of changes in fair market value of our pension plans' Level 3 assets for the year ended September 30, 2022 (in millions):

| | Balance October 1, 2021 | Realized Gains (Losses) | Unrealized Gains (Losses) | Purchases, Sales, Issuances, and Settlements, Net | Balance September 30, 2022 |
|---|---|---|---|---|---|
| **U.S. PLANS** | | | | | |
| Insurance contracts | $ 0.9 | $ — | $ — | $ (0.9) | $ — |
| **NON-U.S. PLANS** | | | | | |
| Insurance contracts | 106.2 | — | (50.9) | (0.4) | 54.9 |
| Other | 4.7 | — | (0.7) | (0.2) | 3.8 |
| | $ 111.8 | $ — | $ (51.6) | $ (1.5) | $ 58.7 |

The table below sets forth a summary of changes in fair market value of our pension plans' Level 3 assets for the year ended September 30, 2021 (in millions):

| | Balance October 1, 2020 | Realized Gains (Losses) | Unrealized Gains (Losses) | Purchases, Sales, Issuances, and Settlements, Net | Balance September 30, 2021 |
|---|---|---|---|---|---|
| **U.S. PLANS** | | | | | |
| Insurance contracts | $ 0.9 | $ — | $ — | $ — | $ 0.9 |
| **NON-U.S. PLANS** | | | | | |
| Insurance contracts | 110.2 | — | (5.7) | 1.7 | 106.2 |
| Other | 4.6 | — | 0.1 | — | 4.7 |
| | $ 115.7 | $ — | $ (5.6) | $ 1.7 | $ 111.8 |

## NOTE 15.  OTHER (EXPENSE) INCOME

The components of Other (expense) income were (in millions):

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Interest income | $ 4.4 | $ 1.6 | $ 5.5 |
| Royalty income | 10.9 | 10.2 | 8.9 |
| Legacy product liability and environmental charges | (15.6) | (10.6) | (14.5) |
| Non-operating pension and postretirement benefit cost | (4.7) | (63.8) | (37.4) |
| Legal settlement (Note 17) | — | 70.0 | — |
| Other | 3.4 | (1.7) | 7.8 |
| **OTHER (EXPENSE) INCOME** | **$ (1.6)** | **$ 5.7** | **$ (29.7)** |

## NOTE 16.  INCOME TAXES

### SELECTED INCOME TAX DATA (IN MILLIONS):

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Components of Income before income taxes |  |  |  |
| United States | $ 371.3 | $ 885.1 | $ 556.2 |
| Non–United States | 702.3 | 641.1 | 579.9 |
| **TOTAL** | **$ 1,073.6** | **$ 1,526.2** | **$ 1,136.1** |
| Components of Income tax provision |  |  |  |
| Current |  |  |  |
| United States | $ 71.6 | $ 149.6 | $ 68.1 |
| Non–United States | 102.9 | 190.7 | 96.6 |
| State and local | 13.6 | 25.7 | 13.9 |
| **TOTAL CURRENT** | **188.1** | **366.0** | **178.6** |
| Deferred |  |  |  |
| United States | (10.7) | (154.7) | (32.8) |
| Non–United States | (13.0) | (19.0) | (24.7) |
| State and local | (9.9) | (10.4) | (8.2) |
| Total deferred | (33.6) | (184.1) | (65.7) |
| **INCOME TAX PROVISION** | **$ 154.5** | **$ 181.9** | **$ 112.9** |
| **TOTAL INCOME TAXES PAID** | **$ 340.2** | **$ 329.3** | **$ 187.9** |

Income tax liabilities of $233.7 million and $264.8 million related to the U.S. transition tax under the Tax Act that are payable greater than 12 months from September 30, 2022 and 2021, respectively, are recorded in Other liabilities in the Consolidated Balance Sheet. Furthermore, taxes paid as a result of the transition tax was $31.2 million in each of the years ended September 30, 2022 and 2021, respectively, and $28.7 million during the year ended September 30, 2020 as included in total income taxes paid.

### EFFECTIVE TAX RATE RECONCILIATION

The reconciliation between the U.S. federal statutory rate and our effective tax rate was:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Statutory tax rate | 21.0% | 21.0% | 21.0% |
| State and local income taxes | 0.5 | 1.4 | 0.8 |
| Non–United States taxes | (5.4) | (3.8) | (5.0) |
| Repatriation of foreign earnings | 1.1 | 0.9 | 1.3 |
| Foreign-derived intangible income | (0.5) | (2.8) | (1.0) |
| Settlements with taxing authorities | — | (1.0) | (0.2) |
| Sensia formation | 0.1 | 0.1 | (1.1) |
| Change in valuation allowance[1] | (0.5) | (1.7) | (2.7) |
| Share-based compensation | (1.0) | (1.1) | (1.9) |
| Research and development tax credit | (1.0) | (0.6) | (1.1) |
| Other | 0.1 | (0.5) | (0.2) |
| **EFFECTIVE INCOME TAX RATE** | **14.4%** | **11.9%** | **9.9%** |

(1)  During fiscal 2021, we reversed our valuation allowance against deferred tax assets associated with the change in fair value of the PTC Shares. This resulted in a decrease to the effective tax rate of 1.7% and no remaining valuation allowance related to PTC Shares, as described further in the table below.

We operate in certain non-U.S. tax jurisdictions under government-sponsored tax incentive programs, which may be extended if certain additional requirements are met. The program, which generates the primary benefit has been extended to expire in 2032. The tax benefit attributable to these programs was $58.3 million ($0.50 per diluted share) in 2022, $61.2 million ($0.52 per diluted share) in 2021, and $59.1 million ($0.51 per diluted share) in 2020.

## DEFERRED TAXES

The tax effects of temporary differences that give rise to our net deferred income tax assets (liabilities) consists of (in millions):

|  | 2022 | 2021 |
|---|---|---|
| Deferred income tax assets | | |
| Compensation and benefits | $ 26.7 | $ 41.7 |
| Inventory | 10.4 | 12.8 |
| Returns, rebates and incentives | 61.7 | 37.5 |
| Retirement benefits | 80.7 | 153.1 |
| Environmental remediation and other site-related costs | 23.6 | 22.8 |
| Share-based compensation | 21.5 | 18.5 |
| Other accruals and reserves | 249.9 | 250.2 |
| Net operating loss carryforwards | 85.2 | 130.4 |
| Tax credit carryforwards | 19.3 | 20.3 |
| Capital loss carryforwards | 13.0 | 15.3 |
| Other | 10.7 | 23.7 |
| Subtotal | 602.7 | 726.3 |
| Valuation allowance | (23.1) | (32.6) |
| Net deferred income tax assets | 579.6 | 693.7 |
| Deferred income tax liabilities | | |
| Property | (36.9) | (43.7) |
| Intangible assets | (149.8) | (160.5) |
| Investments | (26.0) | (64.3) |
| Unremitted earnings of foreign subsidiaries | (20.0) | (42.0) |
| Other | (2.1) | (2.3) |
| Deferred income tax liabilities | (234.8) | (312.8) |
| **TOTAL NET DEFERRED INCOME TAX ASSETS** | **$ 344.8** | **$ 380.9** |

We provide for deferred taxes on the majority of earnings of our non-U.S. subsidiaries and have done so since the enactment of the Tax Act in 2017. We do not provide for deferred taxes on a limited number of our non-U.S. subsidiaries established in jurisdictions that apply significant restrictions for repatriating cash. The amount of cumulative non-distributed earnings considered to be indefinitely reinvested outside the U.S. at September 30, 2022, is $120.4 million. It is not practicable to estimate the amount of additional taxes that may be payable upon distribution of these earnings.

We believe it is more likely than not that we will realize our deferred tax assets through the reduction of future taxable income, other than for the deferred tax assets reflected below.

Tax attributes and related valuation allowances at September 30, 2022 consists of (in millions):

| Tax attributes and related valuation allowances | Tax Benefit Amount | Valuation Allowance | Carryforward Period Ends |
|---|---|---|---|
| Non-United States net operating loss carryforward | $ 3.7 | $ 3.7 | 2023 - 2030 |
| Non-United States net operating loss carryforward | 42.2 | 1.6 | Indefinite |
| Non-United States capital loss carryforward | 12.9 | 12.8 | Indefinite |
| United States credit carryforward | 9.3 | — | 2030 - 2041 |
| United States capital loss carryforward | 0.1 | — | 2026 |
| United States net operating loss carryforward | 0.1 | — | 2023 - 2036 |
| United States net operating loss carryforward | 26.5 | — | Indefinite |
| State and local net operating loss carryforward | 12.7 | 1.1 | 2024 - 2040 |
| State tax credit carryforward | 10.0 | — | 2023 - 2037 |
| Subtotal | 117.5 | 19.2 | |
| Other deferred tax assets | 3.9 | 3.9 | Indefinite |
| **TOTAL** | **$ 121.4** | **$ 23.1** | |

## UNRECOGNIZED TAX BENEFITS

A reconciliation of our gross unrecognized tax benefits, excluding interest and penalties, is as follows (in millions):

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Gross unrecognized tax benefits balance at beginning of year | $ 4.3 | $ 25.5 | $ 19.9 |
| Additions based on tax positions related to the current year | 0.1 | 0.1 | — |
| Additions based on tax positions related to prior years | — | 0.4 | 5.6 |
| Reductions related to settlements with taxing authorities | (0.5) | (18.1) | — |
| Reductions related to lapses of statute of limitations | — | (3.6) | — |
| **GROSS UNRECOGNIZED TAX BENEFITS BALANCE AT END OF YEAR** | **$ 3.9** | **$ 4.3** | **$ 25.5** |

The amount of gross unrecognized tax benefits that would reduce our effective tax rate if recognized was $3.9 million, $4.3 million, and $25.5 million at September 30, 2022, 2021, and 2020, respectively.

Accrued interest and penalties related to unrecognized tax benefits were $1.4 million and $1.5 million at September 30, 2022 and 2021, respectively. We recognize interest and penalties related to unrecognized tax benefits in the income tax provision. In 2022, benefits and expenses net to zero. Benefits (expense) recognized in 2021 and 2020 were $2.5 million and ($0.7) million, respectively.

We believe it is reasonably possible that the amount of gross unrecognized tax benefits could be reduced by up to $3.3 million in the next 12 months as a result of the resolution of tax matters in various global jurisdictions and the lapses of statutes of limitations. If all of the unrecognized tax benefits were recognized, the net reduction to our income tax provision, including the recognition of interest and penalties and offsetting tax assets, could be up to $4.7 million.

We conduct business globally and are routinely audited by the various tax jurisdictions in which we operate. We are no longer subject to U.S. federal income tax examinations for years before 2018 and are no longer subject to state, local, and non-U.S. income tax examinations for years before 2014.

# NOTE 17. COMMITMENTS AND CONTINGENT LIABILITIES

## ENVIRONMENTAL MATTERS

Federal, state, and local requirements relating to the discharge of substances into the environment, the disposal of hazardous wastes, and other activities affecting the environment have and will continue to have an effect on our manufacturing operations. Thus far, compliance with environmental requirements and resolution of environmental claims have been accomplished without material effect on our business, financial condition, or results of operations.

We have been designated as a potentially responsible party at 14 Superfund sites, excluding sites as to which our records disclose no involvement or as to which our potential liability has

been finally determined and assumed by third parties. In addition, various other lawsuits, claims, and proceedings have been asserted against us seeking remediation of alleged environmental impairments, principally at previously owned properties.

Based on our assessment, we believe that our expenditures for environmental capital investment and remediation necessary to comply with present regulations governing environmental protection and other expenditures for the resolution of environmental claims will not have a material effect on our business, financial condition, or results of operations. We cannot assess the possible effect of compliance with future requirements. Environmental remediation cost liabilities, net of related expected recoveries, were $46.0 million and $53.6 million as of September 30, 2022 and 2021, respectively.

## CONDITIONAL ASSET RETIREMENT OBLIGATIONS

We accrue for costs related to a legal obligation associated with the retirement of a tangible long-lived asset that results from the acquisition, construction, development, or the normal operation of the long-lived asset. The obligation to perform the asset retirement activity is not conditional even though the timing or method may be conditional. Identified conditional asset retirement obligations include asbestos abatement and remediation of soil contamination beneath current and previously divested facilities. We estimate conditional asset retirement obligations using site-specific knowledge and historical industry expertise. There have been no significant changes in liabilities incurred, liabilities settled, accretion expense, or revisions in estimated cash flows for the years ended September 30, 2022, 2021, and 2020. Conditional asset retirement obligations, net of related expected recoveries, were $24.6 million and $23.6 million as of September 30, 2022 and 2021, respectively.

## OTHER MATTERS

Various other lawsuits, claims, and proceedings have been or may be instituted or asserted against us relating to the conduct of our business, including those pertaining to product liability, environmental, safety and health, intellectual property, employment, and contract matters. Although the outcome of litigation cannot be predicted with certainty and some lawsuits, claims, or proceedings may be disposed of unfavorably to us, we believe the disposition of matters that are pending or have been asserted will not have a material effect on our business, financial condition, or results of operations. The following outlines additional background for obligations associated with asbestos, divested businesses, and intellectual property.

We (including our subsidiaries) have been named as a defendant in lawsuits alleging personal injury as a result of exposure to asbestos that was used in certain components of our products many years ago, including products from divested businesses for which we have agreed to defend and indemnify claims. Currently there are lawsuits that name us as defendants, together with hundreds of other companies. But in all cases, for those claimants who do show that they worked with our products or products of divested businesses for which we are responsible, we nevertheless believe we have meritorious defenses, in substantial part due to the integrity of the products, the encapsulated nature of any asbestos-containing components, and the lack of any impairing medical condition caused by our products. We defend those cases vigorously. Historically, we have been dismissed from the vast majority of these claims with no payment to claimants.

Additionally, we have maintained insurance coverage that includes indemnity and defense costs, over and above self-insured retentions, for many of these claims. We believe these arrangements will provide substantial coverage for future defense and indemnity costs for these asbestos claims for many years into the future. The uncertainties of asbestos claim litigation make it difficult to predict accurately the ultimate outcome of asbestos claims. That uncertainty is increased by the possibility of adverse rulings or new legislation affecting asbestos claim litigation or the settlement process. Subject to these uncertainties and based on our experience defending asbestos claims, we do not believe these lawsuits will have a material effect on our business, financial condition, or results of operations. Asbestos liabilities, net of related insurance coverage, were $14.3 million and $6.2 million as of September 30, 2022 and 2021, respectively.

We have, from time to time, divested certain of our businesses. In connection with these divestitures, certain lawsuits, claims, and proceedings may be instituted or asserted against us related to the period that we owned the businesses, either because we agreed to retain certain liabilities related to these periods or because such liabilities fall upon us by operation of law. In some instances the divested business has assumed the liabilities; however, it is possible that we might be responsible to satisfy those liabilities if the divested business is unable to do so. We do not believe these liabilities will have a material effect on our business, financial condition, or results of operations.

In many countries we provide a limited intellectual property indemnity as part of our terms and conditions of sale and at times in other contracts with third parties. As of September 30, 2022, we were not aware of any material indemnification claims that were probable or reasonably possible of an unfavorable outcome. Historically, claims that have been made under the indemnification agreements have not had a material impact on our business, financial condition, or results of operations; however, to the extent that valid indemnification claims arise in the future, future payments by us could be significant and could have a material adverse effect on our business, financial condition, or results of operations in a particular period. During the first quarter of fiscal 2021, we reached a favorable settlement agreement regarding litigation of a trademark infringement and false advertising matter and received $70 million. The settlement gain is recorded in Other (expense) income in the Consolidated Statement of Operations.

# NOTE 18. LEASES

We have operating leases primarily for real estate, vehicles, and equipment. We have finance leases primarily for equipment. Our leases have remaining lease terms from less than one year to approximately 16 years.

We elected the package of practical expedients permitted under the transition guidance within the new standard on accounting for leases, which allows the Company to carry forward the historical assessments of whether contracts are, or contain, leases, lease classification, and initial direct costs. We also elected to not record lease ROU assets or lease liabilities for leases with an original term of 12 months or less. We elected to use the remaining lease term for purposes of calculating the incremental borrowing rate upon transition.

The components of lease expense were (in millions):

| | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|
| Operating lease expense[1] | $ 103.6 | $ | 109.8 | $ | 104.6 |
| Variable lease expense[2] | 16.6 | | 15.8 | | 15.6 |
| Finance lease expense | | | | | |
| Amortization of right-of-use assets | 6.9 | | 1.7 | | 1.3 |
| Interest on lease liabilities | 0.6 | | 0.4 | | 0.4 |
| **TOTAL LEASE EXPENSE** | **$ 127.7** | **$** | **127.7** | **$** | **121.9** |

(1)  *Operating lease expense includes short-term lease expense, which was not material.*
(2)  *Variable lease expense includes sublease income, which was not material.*

Supplemental balance sheet information related to leases consists of:

| | 2022 | 2021 |
|---|---|---|
| Weighted average remaining lease term | | |
| Operating leases | 6.3 years | 6.8 years |
| Finance leases | 3.0 years | 4.3 years |
| Weighted average discount rate | | |
| Operating leases | 2.07% | 1.79% |
| Finance leases | 2.04% | 3.96% |

Undiscounted maturities of lease liabilities as of September 30, 2022, were (in millions):

| | Finance Leases | | Operating Leases |
|---|---|---|---|
| 2023 | $ 9.5 | $ | 89.3 |
| 2024 | 8.2 | | 74.6 |
| 2025 | 4.6 | | 55.0 |
| 2026 | 1.6 | | 39.1 |
| 2027 | 1.6 | | 28.2 |
| Thereafter | 1.3 | | 82.8 |
| Total undiscounted lease payments | $ 26.8 | $ | 369.0 |
| Less: Imputed interest | (1.1) | | (22.5) |
| **TOTAL LEASE LIABILITIES** | **$ 25.7** | **$** | **346.5** |

As of September 30, 2022, we have additional operating leases for facilities that have not yet commenced with undiscounted lease obligations of approximately $11.0 million. These leases will commence in fiscal 2023.

Supplemental cash flow information related to leases consists of (in millions):

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities | | | |
| Operating cash flows from operating leases | $ 102.9 | $ 108.5 | $ 103.6 |
| Operating cash flows from finance leases | 0.6 | 0.4 | 0.4 |
| Financing cash flows from finance leases | 8.8 | 1.8 | 1.2 |
| Right-of-use assets obtained in exchange for lease obligations | | | |
| Operating leases | $ 63.4 | $ 90.6 | $ 131.2 |
| Financing leases | 11.8 | 0.9 | — |

## NOTE 19.  BUSINESS SEGMENT INFORMATION

We determine our operating segments based on the information used by our chief operating decision maker, our Chief Executive Officer, to allocate resources and assess performance. We organize our business into three operating segments: Intelligent Devices, Software & Control, and Lifecycle Services. This change simplifies our structure around essential offerings, leverages our sharpened industry focus, and recognizes the growing importance of software in delivering value to our customers. The composition of our segments is as follows:

### INTELLIGENT DEVICES

The Intelligent Devices operating segment combines a comprehensive portfolio of smart products that create the foundation of an agile, resilient, and sustainable production system. This comprehensive portfolio includes:

- Power Control - Low and medium voltage variable frequency drives as well as low and medium voltage motor control;
- Motion Control - Servo drives, rotary servo motors, linear actuators, and independent cart technologies offering a comprehensive portfolio of servo control technologies;
- Safety, Sensing, & Industrial Components - Safety devices, sensing devices, motor control and circuit protection devices, operator devices, signaling devices, relays, and electrical control accessories; and
- Micro Control & Distributed I/O - Micro programmable logic controllers and distributed input/output platforms.

### SOFTWARE & CONTROL

The Software & Control operating segment contains a comprehensive portfolio of production automation and production operations platforms, including hardware and software. This integrated portfolio is merging information technology (IT) and operational technology (OT), bringing the benefits of the Connected Enterprise to the production system.

Our production automation portfolio is multi-discipline and scalable with the ability to handle applications in discrete, batch/hybrid and continuous process, drives control, motion and robotics control, machine safety and process safety. Our products include programmable automation controllers, design, visualization and simulation software, human machine interface products, industrial computers, machine safety and process safety products, industrial networks, and security products.

Our production operations portfolio helps industrial clients to plan, execute, manage, and optimize their production leveraging industrial data and software. Our software products include manufacturing execution systems, performance, quality, supply chain management, data management, edge, analytics, and machine learning software that enables customers to improve operational productivity and meet regulatory requirements. These solutions enable enterprise visibility, reduction of unplanned downtime, and optimization of processes.

### LIFECYCLE SERVICES

The Lifecycle Services operating segment contains a complete portfolio of professionally delivered services and value-added solutions. This comprehensive portfolio combines technology and domain expertise to help maximize customers' investment and provide total lifecycle support as they innovate, design, operate, and sustain their business investments. This includes:

- consulting services including safety, security, and digital transformation strategy and design;
- professional services including global automation and information program and project management and delivery capabilities;
- connected services including operational technology/plant network, cybersecurity, cloud, predictive/prescriptive analytics, remote support, and managed services;
- field services including asset management, on-site support, and safety;
- workforce services including instructor-led and virtual training, learning, and enablement;
- Sensia Joint Venture, which exclusively serves the oil, gas, and petrochemical industry through a combination of connected products and digital automation services and solutions; and
- industrial automation and information solutions and custom-engineered systems that incorporate our own and third-party hardware and software products.

Sales and operating results of our reportable segments were (in millions):

| | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Sales | | | | | | |
| Intelligent Devices | $ | 3,544.6 | $ | 3,311.9 | $ | 2,956.0 |
| Software & Control | | 2,312.9 | | 1,947.0 | | 1,681.3 |
| Lifecycle Services | | 1,902.9 | | 1,738.5 | | 1,692.5 |
| **TOTAL** | **$** | **7,760.4** | **$** | **6,997.4** | **$** | **6,329.8** |
| Segment operating earnings | | | | | | |
| Intelligent Devices | $ | 717.6 | $ | 702.1 | $ | 587.8 |
| Software & Control | | 666.7 | | 531.0 | | 473.8 |
| Lifecycle Services | | 158.3 | | 158.2 | | 196.3 |
| Total | | 1,542.6 | | 1,391.3 | | 1,257.9 |
| Purchase accounting depreciation and amortization | | (103.9) | | (55.1) | | (41.4) |
| Corporate and other | | (104.7) | | (120.6) | | (98.9) |
| Non-operating pension and postretirement benefit cost | | (4.7) | | (63.8) | | (37.4) |
| Change in fair value of investments | | (136.9) | | 397.4 | | 153.9 |
| Legal settlement | | — | | 70.0 | | — |
| Interest expense, net | | (118.8) | | (93.0) | | (98.0) |
| **INCOME BEFORE INCOME TAXES** | **$** | **1,073.6** | **$** | **1,526.2** | **$** | **1,136.1** |

Among other considerations, we evaluate performance and allocate resources based upon segment operating earnings before purchase accounting depreciation and amortization, corporate and other, non-operating pension and postretirement benefit cost, change in fair value of investments, the $70 million legal settlement in fiscal 2021, interest expense, net, and income tax provision. Depending on the product, intersegment sales within a single legal entity are either at cost or cost plus a mark-up, which does not necessarily represent a market price. Sales between legal entities are at an appropriate transfer price. We allocate costs related to shared segment operating activities to the segments consistent with the methodology used by management to assess segment performance.

The following tables summarize the identifiable assets at September 30, 2022, 2021, and 2020, and the provision for depreciation and amortization and the amount of capital expenditures for property for the years then ended, for each of the reportable segments and Corporate (in millions):

|  | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| **Identifiable assets** | | | | | | |
| Intelligent Devices | $ | 2,070.0 | $ | 2,143.3 | $ | 1,585.0 |
| Software & Control | | 3,887.6 | | 4,000.4 | | 1,072.7 |
| Lifecycle Services | | 1,968.4 | | 2,124.3 | | 1,915.0 |
| Corporate | | 2,832.7 | | 2,433.6 | | 2,692.0 |
| **TOTAL** | $ | **10,758.7** | $ | **10,701.6** | $ | **7,264.7** |
| **Depreciation and amortization** | | | | | | |
| Intelligent Devices | $ | 45.8 | $ | 48.6 | $ | 51.8 |
| Software & Control | | 47.0 | | 49.1 | | 40.6 |
| Lifecycle Services | | 40.5 | | 35.3 | | 37.1 |
| Corporate | | 1.7 | | 1.7 | | 1.8 |
| Total | | 135.0 | | 134.7 | | 131.3 |
| Purchase accounting depreciation and amortization | | 103.9 | | 55.1 | | 41.4 |
| **TOTAL** | $ | **238.9** | $ | **189.8** | $ | **172.7** |
| **Capital expenditures for property** | | | | | | |
| Intelligent Devices | $ | 45.6 | $ | 52.0 | $ | 51.3 |
| Software & Control | | 29.7 | | 30.4 | | 19.3 |
| Lifecycle Services | | 32.9 | | 19.6 | | 24.9 |
| Corporate | | 32.9 | | 18.3 | | 18.4 |
| **TOTAL** | $ | **141.1** | $ | **120.3** | $ | **113.9** |

Identifiable assets at Corporate consist principally of cash, net deferred income tax assets, prepaid pension, and property. Property shared by the segments and used in operating activities is also reported in Corporate identifiable assets and Corporate capital expenditures. Corporate identifiable assets include shared net property balances of $205.8 million, $275.8 million, and $247.3 million at September 30, 2022, 2021, and 2020, respectively, for which depreciation expense has been allocated to segment operating earnings based on the expected benefit to be realized by each segment. Corporate capital expenditures in 2022, 2021, and 2020, primarily consist of property that will be shared by our operating segments.

We conduct a significant portion of our business activities outside the United States. The following tables present sales and property by geographic region (in millions):

|  | | Sales | | | | | | Property | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | | 2022 | | 2021 | | 2020 | | 2022 | | 2021 | | 2020 |
| North America | $ | 4,722.0 | $ | 4,132.8 | $ | 3,760.2 | $ | 430.7 | $ | 416.1 | $ | 429.4 |
| Europe, Middle East and Africa | | 1,437.6 | | 1,405.7 | | 1,249.3 | | 78.9 | | 91.1 | | 81.9 |
| Asia Pacific | | 1,088.0 | | 1,012.2 | | 868.7 | | 58.6 | | 54.8 | | 42.8 |
| Latin America | | 512.8 | | 446.7 | | 451.6 | | 18.3 | | 19.9 | | 20.3 |
| **TOTAL** | $ | **7,760.4** | $ | **6,997.4** | $ | **6,329.8** | $ | **586.5** | $ | **581.9** | $ | **574.4** |

We attribute sales to the geographic regions based on the country of destination. Sales in North America include $4,315.5 million, $3,740.2 million, and $3,425.1 million related to the U.S. in 2022, 2021, and 2020, respectively.

In most countries, we sell primarily through independent distributors in conjunction with our direct sales force. We sell large systems and service offerings principally through our direct sales force, though opportunities are sometimes identified through distributors. Sales to our largest distributor in 2022, 2021, and 2020, which are attributable to all three segments, were approximately 10 percent of our total sales.

# NOTE 20. SUBSEQUENT EVENT

On October 31, 2022, we acquired CUBIC, a company that specializes in modular systems for the construction of electrical panels, headquartered in Bronderslev, Denmark. As of the acquisition date, we will record a preliminary purchase price allocation for the assets acquired and liabilities assumed in connection with the acquisition based on their estimated fair values as of the acquisition date.

The preliminary purchase price allocation is as follows (in millions):

|  | | Purchase Price Allocation |
|---|---|---|
| Net current and other tangible assets, net of cash acquired | $ | 64.9 |
| Goodwill and other intangible assets | | 103.0 |
| Total assets acquired | | 167.9 |
| Less: Liabilities assumed | | (33.2) |
| **NET ASSETS ACQUIRED** | **$** | **134.7** |
|  | | Purchase Consideration |
| **TOTAL PURCHASE CONSIDERATION, NET OF CASH ACQUIRED** | **$** | **134.7** |

We will assign the full amount of goodwill to our Intelligent Devices segment. We do not expect the goodwill to be deductible for tax purposes.

The allocation of the purchase price to identifiable assets is based on preliminary information. We have not completed our analysis of identifying and estimating the fair value of identifiable intangible assets acquired. The allocation of the purchase price to identifiable assets above is based on the preliminary valuations performed to determine the fair value of the net assets as of the acquisition date. The measurement period for the valuation of net assets acquired ends as soon as information on the facts and circumstances that existed as of the acquisition date becomes available, but not to exceed 12 months following the acquisition date. Adjustments in purchase price allocations may require a change in the amounts allocated to net assets acquired during the periods in which the adjustments are determined.

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareowners and the Board of Directors of
Rockwell Automation, Inc.
Milwaukee, Wisconsin

## OPINIONS ON THE FINANCIAL STATEMENTS AND INTERNAL CONTROL OVER FINANCIAL REPORTING

We have audited the accompanying consolidated balance sheets of Rockwell Automation, Inc. and subsidiaries (the "Company") as of September 30, 2022 and 2021, the related consolidated statements of operations, comprehensive income, cash flows, and shareowners' equity for each of the three years in the period ended September 30, 2022, and the related notes and the schedule listed in the Index at Item 15 (a)(2) (collectively referred to as the "financial statements"). We also have audited the Company's internal control over financial reporting as of September 30, 2022, based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of September 30, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended September 30, 2022, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of September 30, 2022, based on criteria established in Internal Control — Integrated Framework (2013) issued by COSO.

## BASIS FOR OPINIONS

The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on these financial statements and an opinion on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the financial statements included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures to respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

## DEFINITION AND LIMITATIONS OF INTERNAL CONTROL OVER FINANCIAL REPORTING

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are

being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

## CRITICAL AUDIT MATTER

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

## GOODWILL VALUATION – SENSIA REPORTING UNIT – REFER TO NOTE 3 TO THE FINANCIAL STATEMENTS

### CRITICAL AUDIT MATTER DESCRIPTION

The Company performed an impairment evaluation of the goodwill for the Sensia reporting unit by comparing the estimated fair value of the reporting unit to its carrying value. In order to estimate the fair value of the reporting unit, management is required to make significant estimates and assumptions related to the discount rate and forecasts of future revenues and Earnings Before Interest Taxes Depreciation & Amortization ("EBITDA") margins. Changes in these assumptions could have a significant impact on the fair value of the reporting unit, the amount of any goodwill impairment charge, or both. The goodwill balance was $3,524.0 million as of September 30, 2022, of which $315.9 million related to the Sensia reporting unit. The Company performed their annual quantitative test for goodwill impairment during the second quarter of fiscal 2022. Further, the Company identified a triggering event in the fourth quarter of fiscal 2022 for the Sensia reporting unit due to ongoing supply chain constraints and market volatility, which required a quantitative test for goodwill impairment to be performed. The Company determined that the fair value of the Sensia reporting unit exceeded its carrying value by approximately 20 percent in the second quarter and approximately 15 percent in the fourth quarter; therefore, no impairment was recognized during the year ended September 30, 2022.

We identified the impairment evaluation of goodwill for the Sensia reporting unit as a critical audit matter because of the inherent subjectivity involved in management's estimates and assumptions related to the discount rate and forecasts of future revenues and EBITDA margins. The audit procedures to evaluate the reasonableness of management's estimates and assumptions related to the selection of the discount rate and forecasts of future revenues and EBITDA margins required a high degree of auditor judgment and an increased extent of effort, including the need to involve our fair value specialists.

### HOW THE CRITICAL AUDIT MATTER WAS ADDRESSED IN THE AUDIT

Our audit procedures related to the selection of the discount rate and forecasts of future revenues and EBITDA margins for the Sensia reporting unit included the following for both quantitative tests, among others:

- We tested the effectiveness of controls over management's goodwill impairment evaluation, including those over the selection of the discount rate and management's development of forecasts of future revenues and EBITDA margins.

- We evaluated the reasonableness of management's forecasts by comparing the forecasts to (1) historical results, (2) internal communications to management and those charged with governance of Sensia, and (3) forecasted information included in analyst and industry reports for the Company and its peer companies, including the impact of economic factors on Sensia's Oil & Gas customers.

- With the assistance of our fair value specialists, we evaluated the reasonableness of the discount rate by (1) testing the source information underlying the determination of the discount rate; (2) testing the mathematical accuracy of the calculations; and (3) developing a range of independent estimates and comparing those to the discount rate selected by management.

/s/ DELOITTE & TOUCHE LLP

Milwaukee, Wisconsin
November 8, 2022

We have served as the Company's auditor since 1967.

# ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

# ITEM 9A. CONTROLS AND PROCEDURES

## EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness, as of September 30, 2022, of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) under the Exchange Act. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of September 30, 2022.

## MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

We are responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our internal control over financial reporting based on the framework in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, management has concluded that our internal control over financial reporting was effective as of September 30, 2022.

The effectiveness of our internal control over financial reporting, as of September 30, 2022, has been audited by Deloitte & Touche LLP, as stated in their report that is included on the previous page.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

## CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

There has not been any change in our internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act) during the fiscal quarter to which this report relates that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

# ITEM 9B. OTHER INFORMATION

None.

# ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS

Not applicable.

# PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE

Other than the information below, the information required by this Item 10 is incorporated by reference to the sections entitled *Corporate Governance, Election of Directors,* and *Stock Ownership Information* in the Proxy Statement.

No nominee for director was selected pursuant to any arrangement or understanding between the nominee and any person other than the Company pursuant to which such person is or was to be selected as a director or nominee. See also the information about executive officers of the Company under Item 4A of Part I.

We have adopted a code of ethics that applies to our executive officers, including the principal executive officer, principal financial officer, and principal accounting officer. A copy of our Code of Conduct is posted on our Internet site at https://www.rockwellautomation.com under the "Investors" link. In the event that we amend or grant any waiver from a provision of the code of ethics that applies to the principal executive officer, principal financial officer, or principal accounting officer, and that requires disclosure under applicable SEC rules, we intend to disclose such amendment or waiver and the reasons therefor on our Internet site.

## ITEM 11. EXECUTIVE COMPENSATION

The information required by this Item 11 is incorporated by reference to the sections entitled *Executive Compensation, Election of Directors, Corporate Governance,* and *Compensation Committee Report* in the Proxy Statement.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Other than the information below, the information required by this Item 12 is incorporated by reference to the section entitled *Stock Ownership Information* in the Proxy Statement.

The following table provides information, as of September 30, 2022, about our common stock that may be issued upon the exercise of options, warrants, and rights granted to employees, consultants, or directors under all of our existing equity compensation plans.

| Plan Category | Number of Securities to be issued upon Exercise of Outstanding Options, Warrants, and Rights (a) | Weighted Average Exercise Price of Outstanding Options, Warrants, and Rights (b) | Number of Securities Remaining Available for Future Issuance under Equity Compensation Plans (excluding Securities reflected in Column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by shareowners | 2,862,970[1] | $  186.72[2] | 10,106,671[3] |
| Equity compensation plans not approved by shareowners | — | n/a | — |
| **TOTAL** | 2,862,970 | $  186.72 | 10,106,671 |

(1) *Represents outstanding options, shares issuable in payment of outstanding performance shares (at maximum payout), and restricted stock units under our 2020 Long-Term Incentives Plan, 2012 Long-Term Incentives Plan, 2008 Long-Term Incentives Plan, and 2003 Directors Stock Plan.*

(2) *Represents the weighted average exercise price of outstanding options and does not take into account the performance shares and restricted stock units.*

(3) *Represents shares available for future issuance under our 2020 Long-Term Incentives Plan.*

# ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this Item 13 is incorporated by reference to the sections entitled **Corporate Governance** and **Election of Directors** in the Proxy Statement.

# ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by this Item 14 is incorporated by reference to the section entitled **Audit Matters** in the Proxy Statement.

# PART IV

## ITEM 15.  EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) Financial Statements, Financial Statement Schedule, and Exhibits

(1) Financial Statements (all financial statements listed below are those of the Company and its consolidated subsidiaries)

|  | **Page** |
|---|---|
| Consolidated Balance Sheet,  September 30, 2022 and 2021 | 34 |
| Consolidated Statement of Operations, years ended September 30, 2022, 2021, and 2020 | 35 |
| Consolidated Statement of Comprehensive Income, years ended September 30, 2022, 2021, and 2020 | 36 |
| Consolidated Statement of Cash Flows, years ended September 30, 2022, 2021, and 2020 | 37 |
| Consolidated Statement of Shareowners' Equity, years ended September 30, 2022, 2021, and 2020 | 38 |
| Notes to Consolidated Financial Statements | 39 |
| Report of Independent Registered Public Accounting Firm (PCAOB ID No. 34) | 78 |

(2) Financial Statement Schedule for the years ended September 30, 2022, 2021, and 2020

|  | **Page** |
|---|---|
| Schedule II—Valuation and Qualifying Accounts | 88 |

Schedules not filed herewith are omitted because of the absence of conditions under which they are required or because the information called for is shown in the consolidated financial statements or notes thereto.

(3) Exhibits

| | |
|---|---|
| 3-a | Restated Certificate of Incorporation of the Company, filed as Exhibit 3 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002, is hereby incorporated by reference. |
| 3-b | By-Laws of the Company, as amended and restated effective June 8, 2016, filed as Exhibit 3.2 to the Company's Current Report on Form 8-K dated June 10, 2016, are hereby incorporated by reference. |
| 4-a-1 | Indenture dated as of December 1, 1996 between the Company and The Bank of New York Trust Company, N.A. (formerly JPMorgan Chase, successor to The Chase Manhattan Bank, successor to Mellon Bank, N.A.), as Trustee, filed as Exhibit 4-a to Registration Statement No. 333-43071, is hereby incorporated by reference. |
| 4-a-2 | Form of certificate for the Company's 6.70% Debentures due January 15, 2028, filed as Exhibit 4-b to the Company's Current Report on Form 8-K dated January 26, 1998, is hereby incorporated by reference. |
| 4-a-3 | Form of certificate for the Company's 5.20% Debentures due January 15, 2098, filed as Exhibit 4-c to the Company's Current Report on Form 8-K dated January 26, 1998, is hereby incorporated by reference. |
| 4-a-4 | Form of certificate for the Company's 6.25% Debentures due December 31, 2037, filed as Exhibit 4.2 to the Company's Current Report on Form 8-K dated December 3, 2007, is hereby incorporated by reference. |
| 4-a-5 | Form of certificate for the Company's 2.05% Notes due March 1, 2020, filed as Exhibit 4.1 to the Company's Current Report on Form 8-K dated February 17, 2015, is hereby incorporated by reference. |
| 4-a-6 | Form of certificate for the Company's 2.875% Notes due March 1, 2025, filed as Exhibit 4.2 to the Company's Current Report on Form 8-K dated February 17, 2015, is hereby incorporated by reference. |
| 4-a-7 | Form of certificate for the Company's 3.50% Notes due March 1, 2029, filed as Exhibit 4.1 to the Company's Current Report on Form 8-K dated March 1, 2019, is hereby incorporated by reference. |
| 4-a-8 | Form of certificate for the Company's 4.20% Notes due March 1, 2049, filed as Exhibit 4.2 to the Company's Current Report on Form 8-K dated March 1, 2019, is hereby incorporated by reference. |
| 4-a-9 | Description of the Company's Securities filed as Exhibit 4-a-9 to the Company's Annual Report on Form 10-K for the year ended September 30, 2019, is hereby incorporated by reference. |

| | |
|---|---|
| 4-a-10 | Form of certificate for the Company's 0.35% Notes due August 15, 2023, filed as Exhibit 4.1 to the Company's Current Report on Form 8-K dated August 17, 2021, is hereby incorporated by reference. |
| 4-a-11 | Form of certificate for the Company's 1.75% Notes due August 15, 2031, filed as Exhibit 4.2 to the Company's Current Report on Form 8-K dated August 17, 2021, is hereby incorporated by reference. |
| 4-a-12 | Form of certificate for the Company's 2.80% Notes due August 15, 2061, filed as Exhibit 4.3 to the Company's Current Report on Form 8-K dated August 17, 2021, is hereby incorporated by reference. |
| *10-a-1 | Copy of the Company's 2003 Directors Stock Plan, filed as Exhibit 4-d to the Company's Registration Statement on Form S-8 (No. 333-101780), is hereby incorporated by reference. |
| *10-a-2 | Memorandum of Amendments to the Company's 2003 Directors Stock Plan approved and adopted by the Board of Directors of the Company on April 25, 2003, filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2003, is hereby incorporated by reference. |
| *10-a-3 | Memorandum of Amendments to the Company's 2003 Directors Stock Plan approved and adopted by the Board of Directors of the Company on November 7, 2007, filed as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2007, is hereby incorporated by reference. |
| *10-a-4 | Memorandum of Amendments to the Company's 2003 Directors Stock Plan approved and adopted by the Board of Directors of the Company on September 3, 2008, filed as Exhibit 10-b-16 to the Company's Annual Report on Form 10-K for the year ended September 30, 2008, is hereby incorporated by reference. |
| *10-a-5 | Form of Restricted Stock Unit Agreement under Section 6 of the Company's 2003 Director's Stock Plan, as amended, filed as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, is hereby incorporated by reference. |
| *10-a-6 | Copy of the Company's Directors Deferred Compensation Plan approved and adopted by the Board of Directors of the Company on November 5, 2008, filed as Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2008, is hereby incorporated by reference. |
| *10-a-7 | Summary of Non-Employee Director Compensation and Benefits as of October 1, 2021. |
| *10-b-1 | Copy of the Company's 2008 Long-Term Incentives Plan, as amended and restated through June 4, 2010, filed as Exhibit 99 to the Company's Current Report on Form 8-K dated June 10, 2010, is hereby incorporated by reference. |
| *10-b-2 | Form of Stock Option Agreement under the Company's 2008 Long-Term Incentives Plan, filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2008, is hereby incorporated by reference. |
| *10-b-3 | Forms of Stock Option Agreement under the Company's 2008 Long-Term Incentives Plan for options granted to executive officers of the Company after December 1, 2008, filed as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2008, is hereby incorporated by reference. |
| *10-b-4 | Form of Stock Option Agreement under the Company's 2008 Long-Term Incentives Plan, as amended, for options granted to executive officers of the Company after December 6, 2010, filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2010, is hereby incorporated by reference. |
| *10-b-5 | Form of Stock Option Agreement under the Company's 2008 Long-Term Incentives Plan, as amended, for options granted to executive officers of the Company after November 30, 2011, filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2011, is hereby incorporated by reference. |
| *10-b-6 | Copy of the Company's 2012 Long-Term Incentives Plan, as amended and restated through February 2, 2016, filed as Exhibit 4-c to the Company's Registration Statement on Form S-8 (No. 333-209706), is hereby incorporated by reference. |
| *10-b-7 | Form of Stock Option Agreement under the Company's 2012 Long-Term Incentives Plan for options granted to executive officers of the Company after December 5, 2012, filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, is hereby incorporated by reference. |
| *10-b-8 | Form of Restricted Stock Agreement under the Company's 2012 Long-Term Incentives Plan for shares of restricted stock awarded to executive officers of the Company after December 5, 2012, filed as Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, is hereby incorporated by reference. |
| *10-b-9 | Form of Performance Share Agreement under the Company's 2012 Long-Term Incentives Plan for performance shares awarded to executive officers of the Company after December 5, 2012, filed as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, is hereby incorporated by reference. |
| *10-b-10 | Form of Restricted Stock Agreement under the Company's 2012 Long-Term Incentives Plan for certain awards of shares of restricted stock to executive officers of the Company after October 29, 2019, filed as Exhibit 10-b-10 to the Company's Annual Report on Form 10-K for the year ended September 30, 2019, is hereby incorporated by reference. |
| *10-b-11 | Copy of the Company's 2020 Long-Term Incentives Plan filed as Appendix A to the Company's Definitive Proxy Statement for the 2020 Annual Meeting of Shareowners is hereby incorporated by reference. |
| *10-b-12 | Form of Restricted Stock Agreement under the Company's 2020 Long-Term Incentives Plan for certain awards of shares of restricted stock to executive officers of the Company filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2020, is hereby incorporated by reference. |

| *10-b-13 | Form of Restricted Stock Unit Agreement under the Company's 2020 Long-Term Incentives Plan for certain awards of restricted stock units to executive officers of the Company, filed as Exhibit 10-b-13 to the Company's Annual Report on Form 10-K for the year ended September 30, 2020, is hereby incorporated by reference. |
|---|---|
| *10-b-14 | Form of Global Restricted Stock Unit Agreement under the Company's 2020 Long-Term Incentives Plan for certain awards of restricted stock units to executive officers of the Company after December 9, 2020, filed as Exhibit 10-b-14 to the Company's Annual Report on Form 10-K for the year ended September 30, 2020, is hereby incorporated by reference. |
| *10-b-15 | Form of Stock Option Agreement for U.S. Employees under the Company's 2020 Long-Term Incentives Plan for options awarded to executive officers of the Company after December 9, 2020, filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2020, is hereby incorporated by reference. |
| *10-b-16 | Form of Restricted Stock Unit Agreement for U.S. Employees under the Company's 2020 Long-Term Incentives Plan for restricted stock units awarded to executive officers of the Company after December 9, 2020, filed as Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2020, is hereby incorporated by reference. |
| *10-b-17 | Form of Performance Share Agreement for U.S. Employees under the Company's 2020 Long-Term Incentives Plan for performance shares awarded to executive officers of the Company after December 9, 2020, filed as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2020, is hereby incorporated by reference. |
| *10-c-1 | Copy of the Company's Deferred Compensation Plan, as amended and restated September 6, 2006, filed as Exhibit 10-f to the Company's Annual Report on Form 10-K for the year ended September 30, 2006, is hereby incorporated by reference. |
| *10-c-2 | Memorandum of Proposed Amendment and Restatement of the Company's Deferred Compensation Plan approved and adopted by the Board of Directors of the Company on November 7, 2007, filed as Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2007, is hereby incorporated by reference. |
| *10-d-1 | Copy of the Company's Incentive Compensation Plan effective October 1, 2020, filed as Exhibit 10-d-1 to the Company's Annual Report on Form 10-K for the year ended September 30, 2020, is hereby incorporated by reference. |
| *10-d-2 | Copy of the Company's Annual Incentive Compensation Plan for Senior Executive Officers, as amended December 3, 2003, filed as Exhibit 10-i-1 to the Company's Annual Report for the year ended September 30, 2004, is hereby incorporated by reference. |
| *10-e-1 | Change of Control Agreement dated as of September 30, 2022 between the Company and Blake D. Moret, filed as Exhibit 99.1 to the Company's Current Report on Form 8-K dated October 21, 2022, is hereby incorporated by reference. |
| *10-e-2 | Form of Change of Control Agreement between the Company and each of Nicholas C. Gangestad, Scott A. Genereux, Rebecca W. House, Frank Kulaszewicz, and certain other officers filed as Exhibit 99.2 to the Company's Current Report on Form 8-K dated October 21, 2022, is hereby incorporated by reference. |
| *10-e-3 | Letter Agreement dated September 3, 2009 between Registrant and Theodore D. Crandall, filed as Exhibit 99.2 to the Company's Current Report on Form 8-K dated September 8, 2009, is hereby incorporated by reference. |
| *10-e-4 | Letter Agreement dated July 1, 2016 between Registrant and Blake D. Moret, filed as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, is hereby incorporated by reference. |
| *10-e-5 | Letter Agreement dated February 7, 2017 between Registrant and Patrick P. Goris, filed as Exhibit 10 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2017, is hereby incorporated by reference. |
| *10-e-6 | Letter Agreement dated March 1, 2021 between Registrant and Nicholas C. Gangestad |
| 10-g-1 | Agreement and Plan of Distribution dated as of December 6, 1996, among Rockwell International Corporation (renamed Boeing North American, Inc.), the Company (formerly named New Rockwell International Corporation), Allen-Bradley Company, Inc., Rockwell Collins, Inc., Rockwell Semiconductor Systems, Inc., Rockwell Light Vehicle Systems, Inc. and Rockwell Heavy Vehicle Systems, Inc., filed as Exhibit I0-b to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 1996, is hereby incorporated by reference. |
| 10-g-2 | Post-Closing Covenants Agreement dated as of December 6, 1996, among Rockwell International Corporation (renamed Boeing North American, Inc.), The Boeing Company, Boeing NA, Inc. and the Company (formerly named New Rockwell International Corporation), filed as Exhibit 10-c to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 1996, is hereby incorporated by reference. |
| 10-g-3 | Tax Allocation Agreement dated as of December 6, 1996, among Rockwell International Corporation (renamed Boeing North American, Inc.), the Company (formerly named New Rockwell International Corporation) and The Boeing Company, filed as Exhibit 10-d to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 1996, is hereby incorporated by reference. |
| 10-h-I | Distribution Agreement dated as of September 30, 1997 by and between the Company and Meritor Automotive, Inc., filed as Exhibit 2.1 to the Company's Current Report on Form 8-K dated October 10, 1997, is hereby incorporated by reference. |
| 10-h-2 | Employee Matters Agreement dated as of September 30, 1997 by and between the Company and Meritor Automotive, Inc., filed as Exhibit 2.2 to the Company's Current Report on Form 8-K dated October 10, 1997, is hereby incorporated by reference. |
| 10-h-3 | Tax Allocation Agreement dated as of September 30, 1997 by and between the Company and Meritor Automotive, Inc., filed as Exhibit 2.3 to the Company's Current Report on Form 8-K dated October 10, 1997, is hereby incorporated by reference. |

| 10-i-1 | Distribution Agreement dated as of June 29, 2001 by and among the Company, Rockwell Collins, Inc. and Rockwell Scientific Company LLC, filed as Exhibit 2.1 to the Company's Current Report on Form 8-K dated July 11, 2001, is hereby incorporated by reference. |
|---|---|
| 10-i-2 | Employee Matters Agreement dated as of June 29, 2001 by and among the Company, Rockwell Collins, Inc. and Rockwell Scientific Company LLC, filed as Exhibit 2.2 to the Company's Current Report on Form 8-K dated July 11, 2001, is hereby incorporated by reference. |
| 10-i-3 | Tax Allocation Agreement dated as of June 29, 2001 by and between the Company and Rockwell Collins, Inc., filed as Exhibit 2.3 to the Company's Current Report on Form 8-K dated July 11, 2001, is hereby incorporated by reference. |
| 10-j-1 | $1,500,000,000 Five-Year Credit Agreement dated as of June 29, 2022, among the Company, the Banks listed on the signature pages thereof and Bank of America, N.A., as Administrative Agent, filed as Exhibit 99 to the Company's Current Report on Form 8-K dated July 1, 2022, is hereby incorporated by reference. |
| 10-k | Purchase and Sale Agreement dated as of August 24, 2005 by and between the Company and First Industrial Acquisitions, Inc., including the form of Lease Agreement attached as Exhibit I thereto, together with the First Amendment to Purchase and Sale Agreement dated as of September 30, 2005 and the Second Amendment to Purchase and Sale Agreement dated as of October 31, 2005, filed as Exhibit 10-p to the Company's Annual Report on Form 10-K for the year ended September 30, 2005, is hereby incorporated by reference. |
| 10-l-1 | Purchase Agreement, dated as of November 6, 2006, by and among Rockwell Automation, Inc., Rockwell Automation of Ohio, Inc., Rockwell Automation Canada Control Systems, Grupo Industrias Reliance S.A. de C.V., Rockwell Automation GmbH (formerly known as Rockwell International GmbH) and Baldor Electric Company, contained in the Company's Current Report on Form 8-K dated November 9, 2006, is hereby incorporated by reference. |
| 10-l-2 | First Amendment to Purchase Agreement dated as of January 24, 2007 by and among Rockwell Automation, Inc., Rockwell Automation of Ohio, Inc., Rockwell Automation Canada Control Systems, Grupo Industrias Reliance S.A. de C.V., Rockwell Automation GmbH and Baldor Electric Company, filed as Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007, is hereby incorporated by reference. |
| 10-m-1 | Securities Purchase Agreement, dated June 11, 2018, between the Company and PTC Inc., filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated June 11, 2018, is hereby incorporated by reference. |
| 10-m-2 | Registration Rights Agreement dated July 19, 2018, between the Company and PTC Inc., filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated July 20, 2018, is hereby incorporated by reference. |
| 10-m-3 | Amendment No. 1 to the Securities Purchase Agreement, dated May 11, 2021, between the Company and PTC Inc., filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated May 13, 2021, is hereby incorporated by reference. |
| 10-m-4 | Agreement and Plan of Merger, dated June 24, 2021, among Plex Systems Holdings Inc., the Company, Merger Sub and the Representative, filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated June 25, 2021, is hereby incorporated by reference. |
| 21 | List of Subsidiaries of the Company. |
| 23 | Consent of Independent Registered Public Accounting Firm. |
| 24 | Powers of Attorney authorizing certain persons to sign this Annual Report on Form 10-K on behalf of certain directors and officers of the Company. |
| 31.1 | Certification of Periodic Report by the Chief Executive Officer pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934. |
| 31.2 | Certification of Periodic Report by the Chief Financial Officer pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934. |
| 32.1 | Certification of Periodic Report by the Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Periodic Report by the Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101 | Interactive Data Files. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

*   *Management contract or compensatory plan or arrangement.*

# ITEM 16. FORM 10-K SUMMARY

None.

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ROCKWELL AUTOMATION, INC.

By    /s/ NICHOLAS C. GANGESTAD
       Nicholas C. Gangestad
       Senior Vice President and
       Chief Financial Officer

Dated: November 8, 2022

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on the 8th day of November 2022 by the following persons on behalf of the registrant and in the capacities indicated.

By    /s/ NICHOLAS C. GANGESTAD
       Nicholas C. Gangestad
       Senior Vice President and
       Chief Financial Officer
       (Principal Financial Officer)

By    /s/ TERRY L. RIESTERER
       Terry L. Riesterer
       Vice President and Controller
       (Principal Accounting Officer)

       Blake D. Moret*
       Chairman of the Board, President and
       Chief Executive Officer
       (Principal Executive Officer)
       and Director

       William P. Gipson*
       Director

       J. Phillip Holloman*
       Director

       Steven R. Kalmanson*
       Director

       James P. Keane*
       Director

       Pam Murphy*
       Director

       Donald R. Parfet*
       Director

       Lisa A. Payne*
       Director

       Thomas W. Rosamilia*
       Director

       Robert Soderbery*
       Director

       Patricia A. Watson*
       Director

*By    /s/ REBECCA W. HOUSE
       Rebecca W. House, Attorney-in-fact**

**By    authority of powers of attorney filed herewith

# SCHEDULE II

ROCKWELL AUTOMATION, INC.

## VALUATION AND QUALIFYING ACCOUNTS

FOR THE YEARS ENDED SEPTEMBER 30, 2022, 2021, AND 2020

| (in millions) | Balance at Beginning of Year | Additions Charged to Costs and Expenses | Additions Charged to Other Accounts | Deductions[2] | Balance at End of Year |
|---|---|---|---|---|---|
| **Description** | | | | | |
| Year ended September 30, 2022 | | | | | |
| Allowance for doubtful accounts[1] | $ 13.2 | $ 4.7 | $ — | $ 4.8 | $ 13.1 |
| Valuation allowance for deferred tax assets | 32.6 | 3.4 | 1.1 | 14.0 | 23.1 |
| Year ended September 30, 2021 | | | | | |
| Allowance for doubtful accounts[1] | $ 15.2 | $ 3.1 | $ 0.4 | $ 5.5 | $ 13.2 |
| Valuation allowance for deferred tax assets | 58.0 | 5.4 | 1.5 | 32.3 | 32.6 |
| Year ended September 30, 2020 | | | | | |
| Allowance for doubtful accounts[1] | $ 17.4 | $ 7.0 | $ 1.1 | $ 10.3 | $ 15.2 |
| Valuation allowance for deferred tax assets | 93.8 | 3.0 | 0.2 | 39.0 | 58.0 |

(1)  *Includes allowances for current and other long-term receivables.*
(2)  *Consists of amounts written off for the allowance for doubtful accounts and adjustments resulting from our ability to utilize foreign tax credits, capital losses, or net operating loss carryforwards for which a valuation allowance had previously been recorded.*

# INDEX TO EXHIBITS*

| Exhibit No. | Exhibit |
|---|---|
| 21 | List of Subsidiaries of the Company. |
| 23 | Consent of Independent Registered Public Accounting Firm. |
| 24 | Powers of Attorney authorizing certain persons to sign this Annual Report on Form 10-K on behalf of certain directors and officers of the Company. |
| 31.1 | Certification of Periodic Report by the Chief Executive Officer pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934. |
| 31.2 | Certification of Periodic Report by the Chief Financial Officer pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934. |
| 32.1 | Certification of Periodic Report by the Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Periodic Report by the Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101 | Interactive Data Files. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

*See Part IV, Item 15(a)(3) for exhibits incorporated by reference.*

# EXHIBIT 31.1

## CERTIFICATION

I, Blake D. Moret, certify that:

1. I have reviewed this Annual Report on Form 10-K of Rockwell Automation, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 8, 2022

/s/ BLAKE D. MORET

Blake D. Moret
President and Chief
Executive Officer

# EXHIBIT 31.2

## CERTIFICATION

I, Nicholas C. Gangestad, certify that:

1. I have reviewed this Annual Report on Form 10-K of Rockwell Automation, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 8, 2022

/s/ NICHOLAS C. GANGESTAD

Nicholas C. Gangestad
Senior Vice President and
Chief Financial Officer

# EXHIBIT 32.1

## CERTIFICATION OF PERIODIC REPORT

I, Blake D. Moret, President and Chief Executive Officer of Rockwell Automation, Inc. (the "Company") certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

(1) the Annual Report on Form 10-K of the Company for the year ended September 30, 2022 (the "Report") fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 8, 2022

/s/ BLAKE D. MORET

Blake D. Moret
President and Chief
Executive Officer

# EXHIBIT 32.2

## CERTIFICATION OF PERIODIC REPORT

I, Nicholas C. Gangestad, Senior Vice President and Chief Financial Officer of Rockwell Automation, Inc. (the "Company") certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

(1) the Annual Report on Form 10-K of the Company for the year ended September 30, 2022 (the "Report") fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 8, 2022

/s/ NICHOLAS C. GANGESTAD

Nicholas C. Gangestad
Senior Vice President and
Chief Financial Officer



Rockwell Automation, Inc.
1201 South Second Street
Milwaukee, Wisconsin 53204, USA

**www.rockwellautomation.com**

# Exhibit 2

 **United States Patent and Trademark Office**



Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

**Assignments on the Web** > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 4**

**Serial #:** 73261502    **Filing Dt:** 05/09/1980    **Reg #:** 1172995    **Reg. Dt:** 10/13/1981

**Registrant:** Allen-Bradley Company

**Mark:** A-B

## Assignment: 1

**Reel/Frame:** 0538/0718    **Recorded:** 09/24/1986    **Pages:** 6

**Conveyance:** CERTIFIED COPY OF MERGER FILED IN THE OFFICE OF THE SECRETARY OF STATE OF WISCONSIN, SHOWING MERGER OF ASSIGNORS AND CHANGE OF NAME OF THE SURVIVING CORPORATION ON DEC. 20, 1985

**Assignors:** ALLEN-BRADLEY COMPANY, MERGED INTO
   **Exec Dt:** 04/04/1986
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

NEW A-B CO. INC., CHANGED TO
   **Exec Dt:** 00/00/0000
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY COMPANY INC.
   **Entity Type:** UNKNOWN
   **Citizenship:** NONE

**Correspondent:** CORPORATE HEADQUARTERS
1201 SOUTH SECOND ST.
MILWAUKEE, WI 53204

## Assignment: 2

**Reel/Frame:** 2295/0288    **Recorded:** 04/25/2001    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, INC.
   **Exec Dt:** 04/28/1998
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY DELAWARE, INC.
1201 SOUTH SECOND STREET
MILWAUKEE, WISCONSIN 53204
   **Entity Type:** CORPORATION
   **Citizenship:** DELAWARE

**Correspondent:** ROCKEWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 3

**Reel/Frame:** 2295/0283    **Recorded:** 04/25/2001    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY DELAWARE, INC.
   **Exec Dt:** 04/29/1998
   **Entity Type:** CORPORATION
   **Citizenship:** DELAWARE

**Assignee:** ALLEN-BRADLEY COMPANY, LLC
1201 SOUTH SECOND STREET
MILWAUKEE, WISCONSIN 53204
   **Entity Type:** CORPORATION
   **Citizenship:** DELAWARE

**Correspondent:** ROCKWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 4

**Reel/Frame:** 2524/0523    **Recorded:** 06/06/2002    **Pages:** 6

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, LLC

**Exec Dt:** 03/28/2002
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** ROCKWELL AUTOMATION, INC.
1201 S. SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Correspondent:** ROCKWELL AUTOMATION, INC.
ALEXANDER M. GERASIMOW, ESQ.
1201 S. SECOND STREET
MILWAUKEE, WI 53204

Search Results as of: 03/16/2023 10:54 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.6
Web interface last modified: August 25, 2017 v.2.6

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

**United States Patent and Trademark Office**



## Assignments on the Web > <u>Trademark Query</u>

# Trademark Assignment Abstract of Title

**Total Assignments: 4**

| | | |
|---|---|---|
| **Serial #:** <u>72077414</u> | **Filing Dt:** 07/10/1959 | **Reg #:** <u>696401</u> | **Reg. Dt:** 04/19/1960 |

**Registrant:** ALLEN-BRADLEY COMPANY

**Mark:** A-B

## Assignment: 1

**Reel/Frame:** <u>0538/0718</u>          **Recorded:** 09/24/1986                    **Pages:** 6

**Conveyance:** CERTIFIED COPY OF MERGER FILED IN THE OFFICE OF THE SECRETARY OF STATE OF WISCONSIN, SHOWING MERGER OF ASSIGNORS AND CHANGE OF NAME OF THE SURVIVING CORPORATION ON DEC. 20, 1985

**Assignors:** <u>ALLEN-BRADLEY COMPANY, MERGED INTO</u>

**Exec Dt:** 04/04/1986
**Entity Type:** CORPORATION
**Citizenship:** WISCONSIN

<u>NEW A-B CO. INC., CHANGED TO</u>

**Exec Dt:** 00/00/0000
**Entity Type:** CORPORATION
**Citizenship:** WISCONSIN

**Assignee:** <u>ALLEN-BRADLEY COMPANY INC.</u>

**Entity Type:** UNKNOWN
**Citizenship:** NONE

**Correspondent:** CORPORATE HEADQUARTERS
1201 SOUTH SECOND ST.
MILWAUKEE, WI 53204

## Assignment: 2

**Reel/Frame:** <u>2295/0288</u>          **Recorded:** 04/25/2001                    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** <u>ALLEN-BRADLEY COMPANY, INC.</u>

**Exec Dt:** 04/28/1998
**Entity Type:** CORPORATION
**Citizenship:** WISCONSIN

**Assignee:** <u>ALLEN-BRADLEY DELAWARE, INC.</u>

**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Correspondent:** ROCKEWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 3

**Reel/Frame:** <u>2295/0283</u>          **Recorded:** 04/25/2001                    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** <u>ALLEN-BRADLEY DELAWARE, INC.</u>

**Exec Dt:** 04/29/1998
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** <u>ALLEN-BRADLEY COMPANY, LLC</u>
1201 SOUTH SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Correspondent:** ROCKEWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 4

**Reel/Frame:** <u>2524/0523</u>          **Recorded:** 06/06/2002                    **Pages:** 6

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, LLC

**Exec Dt:** 03/28/2002
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** ROCKWELL AUTOMATION, INC.
1201 S. SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Correspondent:** ROCKWELL AUTOMATION, INC.
ALEXANDER M. GERASIMOW, ESQ.
1201 S. SECOND STREET
MILWAUKEE, WI 53204

Search Results as of: 03/16/2023 10:54 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.6
Web interface last modified: August 25, 2017 v.2.6

 **United States Patent and Trademark Office** 

**Assignments on the Web** > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 4**

**Serial #:** 72077413    **Filing Dt:** 07/10/1959    **Reg #:** 693780    **Reg. Dt:** 03/01/1960

**Registrant:** ALLEN-BRADLEY COMPANY

**Mark:** A-B

## Assignment: 1

**Reel/Frame:** 0538/0718    **Recorded:** 09/24/1986    **Pages:** 6

**Conveyance:** CERTIFIED COPY OF MERGER FILED IN THE OFFICE OF THE SECRETARY OF STATE OF WISCONSIN, SHOWING MERGER OF ASSIGNORS AND CHANGE OF NAME OF THE SURVIVING CORPORATION ON DEC. 20, 1985

**Assignors:** ALLEN-BRADLEY COMPANY, MERGED INTO    **Exec Dt:** 04/04/1986
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

NEW A-B CO. INC., CHANGED TO    **Exec Dt:** 00/00/0000
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY COMPANY INC.    **Entity Type:** UNKNOWN
   **Citizenship:** NONE

**Correspondent:** CORPORATE HEADQUARTERS
1201 SOUTH SECOND ST.
MILWAUKEE, WI 53204

## Assignment: 2

**Reel/Frame:** 2295/0288    **Recorded:** 04/25/2001    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, INC.    **Exec Dt:** 04/28/1998
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY DELAWARE, INC.    **Entity Type:** CORPORATION
1201 SOUTH SECOND STREET    **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKEWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 3

**Reel/Frame:** 2295/0283    **Recorded:** 04/25/2001    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY DELAWARE, INC.    **Exec Dt:** 04/29/1998
   **Entity Type:** CORPORATION
   **Citizenship:** DELAWARE

**Assignee:** ALLEN-BRADLEY COMPANY, LLC    **Entity Type:** CORPORATION
1201 SOUTH SECOND STREET    **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKEWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 4

**Reel/Frame:** 2524/0523    **Recorded:** 06/06/2002    **Pages:** 6

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, LLC

**Exec Dt:** 03/28/2002
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** ROCKWELL AUTOMATION, INC.
1201 S. SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Correspondent:** ROCKWELL AUTOMATION, INC.
ALEXANDER M. GERASIMOW, ESQ.
1201 S. SECOND STREET
MILWAUKEE, WI 53204

Search Results as of: 03/16/2023 10:59 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.6
Web interface last modified: August 25, 2017 v.2.6

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



**United States Patent and Trademark Office**



**Assignments on the Web** > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 4**

**Serial #:** 73261500    **Filing Dt:** 05/09/1980    **Reg #:** 1172994    **Reg. Dt:** 10/13/1981

**Registrant:** Allen-Bradley Company

**Mark:** ALLEN-BRADLEY

## Assignment: 1

**Reel/Frame:** 0538/0718    **Recorded:** 09/24/1986    **Pages:** 6

**Conveyance:** CERTIFIED COPY OF MERGER FILED IN THE OFFICE OF THE SECRETARY OF STATE OF WISCONSIN, SHOWING MERGER OF ASSIGNORS AND CHANGE OF NAME OF THE SURVIVING CORPORATION ON DEC. 20, 1985

**Assignors:** ALLEN-BRADLEY COMPANY, MERGED INTO    **Exec Dt:** 04/04/1986
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

   NEW A-B CO. INC., CHANGED TO    **Exec Dt:** 00/00/0000
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY COMPANY INC.    **Entity Type:** UNKNOWN
   **Citizenship:** NONE

**Correspondent:** CORPORATE HEADQUARTERS
1201 SOUTH SECOND ST.
MILWAUKEE, WI 53204

## Assignment: 2

**Reel/Frame:** 2295/0288    **Recorded:** 04/25/2001    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, INC.    **Exec Dt:** 04/28/1998
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY DELAWARE, INC.    **Entity Type:** CORPORATION
1201 SOUTH SECOND STREET    **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKEWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 3

**Reel/Frame:** 2295/0283    **Recorded:** 04/25/2001    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY DELAWARE, INC.    **Exec Dt:** 04/29/1998
   **Entity Type:** CORPORATION
   **Citizenship:** DELAWARE

**Assignee:** ALLEN-BRADLEY COMPANY, LLC    **Entity Type:** CORPORATION
1201 SOUTH SECOND STREET    **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKEWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 4

**Reel/Frame:** 2524/0523    **Recorded:** 06/06/2002    **Pages:** 6

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, LLC

**Exec Dt:** 03/28/2002
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** ROCKWELL AUTOMATION, INC.
1201 S. SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Correspondent:** ROCKWELL AUTOMATION, INC.
ALEXANDER M. GERASIMOW, ESQ.
1201 S. SECOND STREET
MILWAUKEE, WI 53204

Search Results as of: 03/16/2023 11:01 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.6
Web interface last modified: August 25, 2017 v.2.6

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

 **United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Assignments on the Web > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 4**

**Serial #:** 72103889    **Filing Dt:** 09/06/1960    **Reg #:** 712800    **Reg. Dt:** 03/21/1961
**Registrant:** ALLEN-BRADLEY COMPANY
**Mark:** ALLEN-BRADLEY

## Assignment: 1

**Reel/Frame:** 0538/0718    **Recorded:** 09/24/1986    **Pages:** 6

**Conveyance:** CERTIFIED COPY OF MERGER FILED IN THE OFFICE OF THE SECRETARY OF STATE OF WISCONSIN, SHOWING MERGER OF ASSIGNORS AND CHANGE OF NAME OF THE SURVIVING CORPORATION ON DEC. 20, 1985

**Assignors:** ALLEN-BRADLEY COMPANY, MERGED INTO    **Exec Dt:** 04/04/1986
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

NEW A-B CO. INC., CHANGED TO    **Exec Dt:** 00/00/0000
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY COMPANY INC.    **Entity Type:** UNKNOWN
   **Citizenship:** NONE

**Correspondent:** CORPORATE HEADQUARTERS
1201 SOUTH SECOND ST.
MILWAUKEE, WI 53204

## Assignment: 2

**Reel/Frame:** 2295/0288    **Recorded:** 04/25/2001    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, INC.    **Exec Dt:** 04/28/1998
   **Entity Type:** CORPORATION
   **Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY DELAWARE, INC.    **Entity Type:** CORPORATION
1201 SOUTH SECOND STREET    **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKEWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 3

**Reel/Frame:** 2295/0283    **Recorded:** 04/25/2001    **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY DELAWARE, INC.    **Exec Dt:** 04/29/1998
   **Entity Type:** CORPORATION
   **Citizenship:** DELAWARE

**Assignee:** ALLEN-BRADLEY COMPANY, LLC    **Entity Type:** CORPORATION
1201 SOUTH SECOND STREET    **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 4

**Reel/Frame:** 2524/0523    **Recorded:** 06/06/2002    **Pages:** 6

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, LLC

**Exec Dt:** 03/28/2002
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** ROCKWELL AUTOMATION, INC.
1201 S. SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Correspondent:** ROCKWELL AUTOMATION, INC.
ALEXANDER M. GERASIMOW, ESQ.
1201 S. SECOND STREET
MILWAUKEE, WI 53204

Search Results as of: 03/16/2023 11:01 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.6
Web interface last modified: August 25, 2017 v.2.6

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

 **United States Patent and Trademark Office**

**Assignments on the Web** > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 4**

**Serial #:** 72103890   **Filing Dt:** 09/06/1960   **Reg #:** 712836   **Reg. Dt:** 03/21/1961
**Registrant:** ALLEN-BRAD;EU COMPANY
**Mark:** ALLEN-BRADLEY

## Assignment: 1

**Reel/Frame:** 0538/0718   **Recorded:** 09/24/1986   **Pages:** 6

**Conveyance:** CERTIFIED COPY OF MERGER FILED IN THE OFFICE OF THE SECRETARY OF STATE OF WISCONSIN, SHOWING MERGER OF ASSIGNORS AND CHANGE OF NAME OF THE SURVIVING CORPORATION ON DEC. 20, 1985

**Assignors:** ALLEN-BRADLEY COMPANY, MERGED INTO   **Exec Dt:** 04/04/1986
**Entity Type:** CORPORATION
**Citizenship:** WISCONSIN

NEW A-B CO. INC., CHANGED TO   **Exec Dt:** 00/00/0000
**Entity Type:** CORPORATION
**Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY COMPANY INC.   **Entity Type:** UNKNOWN
**Citizenship:** NONE

**Correspondent:** CORPORATE HEADQUARTERS
1201 SOUTH SECOND ST.
MILWAUKEE, WI 53204

## Assignment: 2

**Reel/Frame:** 2295/0288   **Recorded:** 04/25/2001   **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, INC.   **Exec Dt:** 04/28/1998
**Entity Type:** CORPORATION
**Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY DELAWARE, INC.   **Entity Type:** CORPORATION
**Citizenship:** DELAWARE
1201 SOUTH SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKEWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 3

**Reel/Frame:** 2295/0283   **Recorded:** 04/25/2001   **Pages:** 5

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY DELAWARE, INC.   **Exec Dt:** 04/29/1998
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** ALLEN-BRADLEY COMPANY, LLC   **Entity Type:** CORPORATION
**Citizenship:** DELAWARE
1201 SOUTH SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKWELL INTERNATIONAL CORPORATION
JOHN M. MILLER, ESQ.
777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202

## Assignment: 4

**Reel/Frame:** 2524/0523   **Recorded:** 06/06/2002   **Pages:** 6

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, LLC

**Exec Dt:** 03/28/2002
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** ROCKWELL AUTOMATION, INC.
1201 S. SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Correspondent:** ROCKWELL AUTOMATION, INC.
ALEXANDER M. GERASIMOW, ESQ.
1201 S. SECOND STREET
MILWAUKEE, WI 53204

Search Results as of: 03/16/2023 11:02 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.6
Web interface last modified: August 25, 2017 v.2.6

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

**United States Patent and Trademark Office**



Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Assignments on the Web > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 1**

**Serial #:** 76211973    **Filing Dt:** 02/16/2001    **Reg #:** 2510226    **Reg. Dt:** 11/20/2001

**Registrant:** Rockwell International Corporation

**Mark:** ROCKWELL AUTOMATION

**Assignment: 1**

**Reel/Frame:** 2592/0789    **Recorded:** 10/01/2002    **Pages:** 5

**Conveyance:** CHANGE OF NAME

**Assignor:** ROCKWELL INTERNATIONAL CORPORATION    **Exec Dt:** 02/25/2002
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** ROCKWELL AUTOMATION, INC.    **Entity Type:** CORPORATION
777 E. WISCONSIN AVENUE    **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53202

**Correspondent:** ROCKWELL AUTOMATION, INC.
JOHN M. MILLER
1201 SOUTH 2ND STREET
MILWAUKEE, WI 53204

Search Results as of: 03/16/2023 11:02 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.6
Web interface last modified: August 25, 2017 v.2.6

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

**United States Patent and Trademark Office**



Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

**Assignments on the Web** > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 1**

| | | |
|---|---|---|
| **Serial #:** 76213480 | **Filing Dt:** 02/16/2001 | **Reg #:** 2671196 | **Reg. Dt:** 01/07/2003 |

**Registrant:** Rockwell International Corporation

**Mark:** ROCKWELL AUTOMATION

**Assignment: 1**

**Reel/Frame:** 2724/0093          **Recorded:** 09/29/2003          **Pages:** 4

**Conveyance:** CHANGE OF NAME

**Assignor:** ROCKWELL INTERNATIONAL CORPORATION          **Exec Dt:** 02/25/2002
**Entity Type:** CORPORATION
**Citizenship:** NONE

**Assignee:** ROCKWELL AUTOMATION, INC.          **Entity Type:** CORPORATION
777 EAST WISCONSIN AVENUE          **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53202

**Correspondent:** ROCKWELL AUTOMATION, INC.
JOHN M. MILLER, ESQ.
1201 SOUTH SECOND STREET
LEGAL DEPARTMENT
MILWAUKEE, WI 53204-2496

Search Results as of: 03/16/2023 11:03 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.6
Web interface last modified: August 25, 2017 v.2.6

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

**United States Patent and Trademark Office**



Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

**Assignments on the Web** > **Trademark Query**

# Trademark Assignment Abstract of Title

**Total Assignments: 1**

**Serial #:** 76211967       **Filing Dt:** 02/16/2001       **Reg #:** 2701786       **Reg. Dt:** 04/01/2003

**Registrant:** Rockwell Automation, Inc.

**Mark:** ROCKWELL AUTOMATION

**Assignment: 1**

**Reel/Frame:** 2782/0065       **Recorded:** 01/21/2004       **Pages:** 4

**Conveyance:** CHANGE OF NAME

**Assignor:** ROCKWELL INTERNATIONAL CORPORATION       **Exec Dt:** 02/25/2002
**Entity Type:** CORPORATION
**Citizenship:** NONE

**Assignee:** ROCKWELL AUTOMATION, INC.       **Entity Type:** CORPORATION
777 EAST WISCONSIN AVENUE       **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53202

**Correspondent:** LINDA K. JANSEN
1201 SOUTH SECOND STREET
LEGAL DEPARTMENT
MILWAUKEE, WI 53204-2496

Search Results as of: 03/16/2023 11:03 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.6
Web interface last modified: August 25, 2017 v.2.6

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



**United States Patent and Trademark Office**



Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Assignments on the Web > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 3**

| | | | |
|---|---|---|---|
| **Serial #:** 75239936 | **Filing Dt:** 02/11/1997 | **Reg #:** 2412742 | **Reg. Dt:** 12/12/2000 |

**Registrant:** ALLEN-BRADLEY COMPANY, LLC

**Mark:** CONTROLLOGIX

## Assignment: 1

**Reel/Frame:** 2073/0626          **Recorded:** 05/04/2000                          **Pages:** 10

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, INC.                          **Exec Dt:** 04/28/1998
                                                                   **Entity Type:** CORPORATION
                                                                   **Citizenship:** WISCONSIN

**Assignee:** ALLEN-BRADLEY DELAWARE, INC.                          **Entity Type:** CORPORATION
INTELLECTUAL PROPERTY DEPT. 704P                                    **Citizenship:** DELAWARE
1201 SOUTH SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKWELL AUTOMATION
JOHN J. HORN
1201 SOUTH SECOND STREET
INTELLECTUAL PROPERTY DEPARTMENT 704P
MILWAUKEE, WI 53204

## Assignment: 2

**Reel/Frame:** 2073/0623          **Recorded:** 05/04/2000                          **Pages:** 3

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY DELAWARE, INC.                          **Exec Dt:** 04/29/1998
                                                                   **Entity Type:** CORPORATION
                                                                   **Citizenship:** DELAWARE

**Assignee:** ALLEN-BRADLEY COMPANY, LLC                            **Entity Type:** LIMITED LIABILITY COMPANY
INTELLECTUAL PROPERTY DEPT. 704P                                    **Citizenship:** NONE
1201 SOUTH SECOND STREET
MILWAUKEE, WISCONSIN 53204

**Correspondent:** JOHN J. HORN
ROCKWELL AUTOMATION
INTELLECTUAL PROPERTY DEPARTMENT 704P
1201 SOUTH SECOND STREET
MILWAUKEE, WI 53204

## Assignment: 3

**Reel/Frame:** 2524/0523          **Recorded:** 06/06/2002                          **Pages:** 6

**Conveyance:** MERGER

**Assignor:** ALLEN-BRADLEY COMPANY, LLC                            **Exec Dt:** 03/28/2002
                                                                   **Entity Type:** CORPORATION
                                                                   **Citizenship:** DELAWARE

**Assignee:** ROCKWELL AUTOMATION, INC.                             **Entity Type:** CORPORATION
1201 S. SECOND STREET                                               **Citizenship:** DELAWARE
MILWAUKEE, WISCONSIN 53204

**Correspondent:** ROCKWELL AUTOMATION, INC.
ALEXANDER M. GERASIMOW, ESQ.
1201 S. SECOND STREET
MILWAUKEE, WI 53204

Web interface last modified August 25, 2017 v.2.6

# Exhibit 3





















# Exhibit 4

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF DELAWARE

 3

 4    ROCKWELL AUTOMATION, INC.,     )
                                     )
 5               Plaintiff,          )No.21-1238
                                     )-CFC-GBW-JLH
 6          vs.                      )
                                     )
 7    PARCOP S.R.L., d/b/a           )
      WIAUTOMATION,                  )
 8                                   )
                 Defendant.          )
 9    ----------------------------

10

11

12

13          REMOTE VIDEOTAPED DEPOSITION OF

14                FULVIO COPPOLA

15

16          Wednesday, December 21, 2022

17

18

19

20

21

22

23    Reported by:
      LISA M. MURACO
24    JOB NO. 220088

25
```

Page 2

1
2                 Wednesday, December 21, 2022
3                 8:00 a.m., Eastern
4                 2:00 p.m., Central European
5
6        REMOTE Deposition of FULVIO COPPOLA,
7   held VIA ZOOM, before LISA M. MURACO, a
8   Notary Public of the State of New York and
9   Florida.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   A P P E A R A N C E S:
2   (REMOTE)
3
4
5        ALSTON & BIRD LLP
6        Attorneys for Plaintiff
7            90 Park Avenue
8            New York, NY 10016
9        BY:   NEAL McLAUGHLIN, ESQ.
10
11
12        BRACH EICHLER, LLC
13        Attorneys for Defendant
14            101 Eisenhower Parkway
15            Roseland, NJ 07068
16        BY:   BOB KASOLAS, ESQ.
17            ERIC ALVAREZ, ESQ.
18
19   ALSO PRESENT:
20   Italian Interpreter, Rosanna Giliberti
21   Legal Video Specialist, Brian Hood
22   Rockwell Automation, John Miller
23
24
25

Page 4

1        THE VIDEOGRAPHER:  Good afternoon
2   and good morning, Counselors.  My name is
3   Brian Hood and I'm the legal videographer
4   in association with TSG Reporting
5   Incorporated.  Because this is a remote
6   deposition, I will not be in the same room
7   with the witness.  Instead, I will record
8   this video-taped deposition remotely.
9        The reporter, Lisa Muraco, also will
10   not be in the same room and will swear the
11   witness in remotely.
12        Do all parties stipulate to the
13   validity of this video recording and remote
14   swearing and that it will be admissible in
15   the courtroom as if it had been taken
16   following Rule 30 of the Federal Rules of
17   Civil Procedures and the State's rules
18   where this case is pending?
19        MR. McLAUGHLIN:  On behalf of
20   Rockwell Automation, yes.
21        MR. KASOLAS:  On behalf of Bob
22   Kasolas, yes.
23        THE VIDEOGRAPHER:  Thank you.
24        This marks the beginning of recorded
25   video label number 1 of the remote video

Page 5

1   deposition of Fulvio Coppola in the matter
2   Rockwell Automation Incorporated versus
3   Parcop SRL doing business as WiAutomation
4   entered in the United States District Court
5   for the District of Delaware, Case
6   No. 21-1238-GBW-JLH.
7        Today's date is December the 21st,
8   2022, and the time is approximately
9   2:09 p.m., Central European time.
10        Again, my name is Brian Hood and I'm
11   the legal videographer from TSG Reporting
12   Incorporated, headquartered at 228
13   East 45th Street, Suite 810, New York, New
14   York 10017.
15        The court reporter is Lisa Muraco,
16   also in association with TSG Reporting.
17        Will counsel please introduce
18   yourselves for the record.
19        MR. McLAUGHLIN:  This is Neal
20   McLaughlin on behalf of the Rockwell
21   Automation.
22        MR. KASOLAS:  Good morning.  This is
23   Bob Kasolas with the law firm Brach Eichler
24   LLC on behalf of the defendant, Parcop SRL,
25   doing business as WiAutomation.

Page 6

1           THE VIDEOGRAPHER:  Thank you.
2           Will the court reporter please swear
3      in or affirm the witness and interpreter.
4      R O S A N N A   G I L I B E R T I, was duly
5      sworn to interpret the questions from English
6      into ITALIAN, and the answers from ITALIAN into
7      English.
8      F U L V I O   C O P P O L A, called as a
9      witness, having been duly sworn by a Notary
10     Public, was examined and testified through the
11     interpreter as follows:
12     EXAMINATION BY
13     MR. McLAUGHLIN:
14          Q.   Good afternoon, Mr. Coppola.
15               Have you ever been deposed before?
16          A.   No.
17          Q.   Today, I'll be asking you several
18     questions and I would ask that you wait for the
19     interpreter to interpret them if you need her
20     services.
21               If there is anything that is unclear
22     either in the question or in the translation of
23     question, please let us know so we can clarify.
24          A.   Okay.
25          Q.   And if you answer a question, is it

Page 7

1      fair to assume that you understand the
2      question?
3          A.   Okay.
4          Q.   Do you understand that you are here
5      today to testify on behalf of the company
6      Parcop doing business as WiAutomation?
7          A.   Yes.
8          Q.   I would like to share my screen now
9      and introduce the first exhibit.
10               (Coppola Exhibit 1, Rockwell's
11          Re-notice of Deposition of Parcop SRL d/b/a
12          WiAutomation, marked for identification.)
13     BY MR. McLAUGHLIN:
14          Q.   Can you see the document on the
15     screen?
16          A.   Yes.
17          Q.   Have you seen this document before
18     today?
19          A.   I would need to see all of it.
20               MR. McLAUGHLIN:  For the record,
21          this is the document that's been filed on
22          the docket as Docket 126, which is
23          Rockwell's Re-notice of Deposition of
24          Parcop SRL d/b/a WiAutomation.
25     BY MR. McLAUGHLIN:

Page 8

1          Q.   And scroll through the document.
2      It's 20 pages, I believe.  At the --
3               (Multiple speakers.)
4      BY MR. McLAUGHLIN:
5          Q.   And in the document there are
6      deposition Topics 1 through 89.
7               Mr. Coppola, I'll ask you again.
8      Have you seen this document before today?
9          A.   I believe, yes.
10          Q.   And the deposition topics in this
11     document, what did you do to prepare to testify
12     on those topics today?
13               MR. KASOLAS:  Objection to form to
14          the extent you are seeking attorney-client
15          privileged communications, you can ask the
16          question aside from any discussions he may
17          have had with counsel.
18          A.   I spoke for about an hour with the
19     attorneys.
20          Q.   When did this discussion take place?
21          A.   Sometime ago.  About ten days ago,
22     if I'm right -- if I'm right.
23          Q.   Did you review any documents to
24     prepare for today's deposition?
25          A.   No.

Page 9

1          Q.   Why not?
2               MR. KASOLAS:  Objection to the
3          extent it calls for the disclosure of
4          attorney-client privileged communications.
5               You can answer, but it doesn't
6          involve the disclosure of communications
7          with counsel.
8               THE INTERPRETER:  I'm sorry.  This
9          is the interpreter.  That was you can
10          answer and then do not --
11               MR. KASOLAS:  He can answer to the
12          extent it didn't involve him disclosing
13          communications with his lawyers.
14               THE INTERPRETER:  Thank you.
15          A.   Because I think that there was no
16     need to do it.
17          Q.   Okay.
18               Before starting WiAutomation, what
19     did you do for work?
20          A.   I was working in the restoration
21     industry.
22          Q.   Is that like construction?
23          A.   No.  Restoration, restaurant, food
24     industry.
25          Q.   What is the highest level of

Page 34

1      A.     So the client does not pay if the
2   client is calling just to get information
3   because it would be just like calling a
4   customer center, customer assistance center,
5   and ask for information about the product.
6          But if the client needs physical
7   assistance, technical assistance on a product
8   to fix a product, or to develop a project, yes,
9   the customer pays.
10     Q.     WiAutomation's website has changed
11  over the years, right?
12     A.     Yes.
13     Q.     When WiAutomation's website changes,
14  do you keep a record of what the old website
15  used to look like?
16     A.     I don't know because Porfirio
17  handles that.
18     Q.     You understand that you're here
19  today to testify on behalf of the company;
20  correct?
21          MR. KASOLAS:  Objection to form.
22          Neal, the client is here on both 30(b)(6)
23          and fact witness, as you know.
24  BY MR. McLAUGHLIN:
25     Q.     How does the WiAutomation, the

Page 35

1   company, maintain records of what its website
2   looks like?
3          MR. KASOLAS:  Objection to form.
4      A.     I already said that Porfirio handles
5   those things.
6      Q.     Are you able to testify today on the
7   topic of how WiAutomation archives what its
8   website looks like?
9          MR. KASOLAS:  Objection to form.
10     A.     I did not understand what you mean.
11     Q.     Are you able to testify today on
12  behalf of WiAutomation about how you keep
13  records of what your website looks like?
14     A.     Like I said -- like I said before,
15  Porfirio handles these things, and I will not
16  be able to specify how.
17     Q.     Before today's deposition, did you
18  do anything to learn how WiAutomation keeps
19  records of its website?
20     A.     That I'm aware of, we do not have
21  specific archives.
22     Q.     Would you know?
23          MR. KASOLAS:  Objection to form.
24          He just told you the answer.
25     A.     I will need to ask Porfirio.  He

Page 36

1   saves these things and he would have told me.
2      Q.     So as you sit here today, you don't
3   know whether or not WiAutomation keeps records
4   of what its old websites used to look like?
5          MR. KASOLAS:  Objection to form.
6          THE INTERPRETER:  I'm sorry.  The
7          interpreter did not understand.
8          May I ask for repetition?
9          MR. McLAUGHLIN:  Yes, please.
10     A.     If we had archives, Porfirio would
11  have told me.
12     Q.     Did you ask Porfirio if WiAutomation
13  has archives of its old websites?
14     A.     No.
15     Q.     So in order to understand the answer
16  to the question of whether or not WiAutomation
17  maintains archives of its old websites, you
18  would need to ask Porfirio for the answer;
19  correct?
20     A.     I told you.  If we had them, he
21  would have told me.
22     Q.     But you didn't ask him?
23          MR. KASOLAS:  Objection -- to form.
24          (Multiple speakers.)
25     A.     Presently, no.  In the past, yes, we

Page 37

1   talked about it.
2      Q.     When was the last time you talked
3   with Porfirio about archives of your website?
4      A.     I don't remember exactly.  It was
5   some time ago.  I believe a few months ago.
6      Q.     A few months ago did you have
7   archives of what WiAutomation's website used to
8   look like?
9      A.     I do not know because Porfirio
10  handles that.
11     Q.     So you don't recall the contents of
12  your conversation with Porfirio about
13  WiAutomation's archive of websites?
14     A.     I don't -- I don't remember.  But
15  like I said, if I ask him, he -- if I were to
16  ask him, he would tell me.  And -- and he would
17  have told me if we had it.
18     Q.     When WiAutomation changes the
19  language on its website, what does it need to
20  do?
21          THE INTERPRETER:  Sorry.  This is
22          the interpreter.  I need a clarification.
23          A language, meaning like different
24          language, Italian, or like the way it's
25          written, because in Italian --

1    MR. McLAUGHLIN:  The way -- the way
2  it's written.
3    THE INTERPRETER:  Thank you.
4    A.    What do you mean?  What does it
5  mean?  I'm not understanding.
6    Q.    What does WiAutomation need to do to
7  change what is written on its website?
8    MR. KASOLAS:  Objection to form.
9    A.    What do you mean what it needs to
10  do?  It needs to change the text.
11    Q.    If WiAutomation wants to change the
12  text on one of its websites, what is the first
13  thing that WiAutomation needs to do?
14    A.    Porfirio needs to get involved in
15  this.
16    Q.    Okay.
17    What does Porfirio do to change the
18  text on the WiAutomation website?
19    A.    I do not know.  He handles that.
20    Q.    In preparation for your deposition
21  today, did you ask Porfirio what he does to
22  change the text on WiAutomation's websites?
23    A.    Not technically.
24    Q.    What do you mean not technically?
25    A.    I do not know what he needs to

1  physically do to change something on the
2  website.
3    Q.    If Porfirio changes the text on a
4  WiAutomation website, what happens to the old
5  text?
6    MR. KASOLAS:  Objection to form.
7    THE INTERPRETER:  One second.  The
8    interpreter needs to read one word one more
9    time.
10    Thank you.
11    A.    I don't know because I'm not an
12  informatics person.
13    Q.    I'm going to share my screen with
14  what will be Exhibit 4.
15    (Coppola Exhibit 4, Screen Shot of
16    WiAutomation Website, marked for
17    identification.)
18  BY MR. McLAUGHLIN:
19    Q.    Do you see my screen?
20    A.    Yes.
21    Q.    This is a screen shot of what
22  WiAutomation's website used to look like for a
23  particular Allen-Bradley product with the
24  catalog number 1756-L73.
25    Do you see that?

1    A.    Yes, I see it.
2    Q.    Do you remember when WiAutomation's
3  website used to look like this?
4    A.    Yes, it was until the end of this
5  summer, if I remember correctly.
6    Q.    What happened to the old website?
7    A.    That I know, it was simply changed,
8  the graphic was simply changed.
9    Q.    Did WiAutomation do anything to
10  preserve records of what the old website used
11  to look like?
12    A.    Like I said before, Porfirio is the
13  one who handles the website for a change of the
14  graphics.
15    Q.    So as you sit here today, you do not
16  have an answer to that question?
17    A.    The website's changed on the
18  graphics aspect.
19    Q.    The question was:  What did
20  WiAutomation do to preserve records of what its
21  old website used to look like before you
22  changed it this summer?
23    MR. KASOLAS:  Objection to form.
24    A.    Porfirio is the one who handles
25  these things.  So I believe that he might have

1  saved the old graphics.
2    Q.    Where did he save them?
3    A.    I do not know.
4    Q.    What format were they saved in?
5    A.    He handles that.  I don't know.
6  What does it mean in what format?
7    Q.    Were they saved on a local disc at
8  your office?
9    A.    So he's the one handing this.  How
10  do I know if it saves on a disc or on a PC?  I
11  believe that he might have it on his hard disc
12  on his computer.
13    Q.    As you sit here today, do you know
14  whether or not WiAutomation saved images or
15  files that represent what its website used to
16  look like before you changed it this summer?
17    A.    I believe that Porfirio saves
18  something.
19    Q.    Do you know for sure, as you sit
20  here today, or would you need to ask him to be
21  sure?
22    A.    I would need to ask.
23    Q.    Looking back at this screen shot of
24  your old website, it says right under "in
25  stock" it says:  New factory sealed, original

Page 42

1  product, 12-month warranty.
2          Do you see that?
3          THE INTERPRETER:  This is Rosanna,
4      the interpreter.  Could you enlarge it a
5      little bit, please?  Thank you.
6      A.    Yes, I see that.
7      Q.    What does original product mean?
8      A.    A product that was produced by the
9  factory of the brand.
10     Q.    What does new factory sealed mean?
11     A.    That the product is new and it is
12 sealed.
13     Q.    Sealed by who?
14     A.    Sealed by the producer.  The one
15 produced -- producing it.
16     Q.    So on this website that advertises
17 an Allen-Bradley product does that mean that
18 the product that your customer would buy would
19 come sealed by Allen-Bradley or Rockwell
20 Automation?
21     A.    Yes.
22     Q.    On your old website it says:
23 12-months warranty.
24         Do you see that?
25         MR. KASOLAS:  Objection to form.

Page 43

1      A.    Yes.
2      Q.    What is that intended to convey to
3  your customers?
4      A.    That on products that they buy they
5  are 12 months of warranty.
6      Q.    Who was that warranty provided by?
7      A.    The warranty comes from us.  In
8  fact, Mr. Miller, in 2020, asked us to specify
9  this thing.
10     Q.    You said that this is what your
11 website looked like up until this past summer;
12 correct?
13     A.    Yes, but I don't know if changes
14 were made.
15     Q.    What do you mean by that answer?
16     A.    I want to say that I do not know if
17 there were changes made.
18     Q.    Changes made to what?
19     A.    To the terms and conditions of the
20 website.
21     Q.    But the terms and conditions are a
22 separate part of the website from what we're
23 looking at on the screen; correct?
24     A.    Yes.  But the warranty is specified.
25     Q.    So looking at this old screen shot

Page 44

1  of your website, a customer would need to go to
2  a different website, the terms and conditions
3  page, to understand what 12-months warranty
4  means?
5      A.    In order for a client to read our
6  website, must accept terms and conditions.
7      Q.    And that's on a different page than
8  what we're looking at on screen?
9      A.    Yes.  But before being able to
10 proceed to the purchase -- with the purchase,
11 the client needs to accept the terms and
12 conditions first.
13     Q.    Okay.
14         As I said, I'm going to mark this as
15 Exhibit 4.  I'm going to stop sharing my
16 screen.  And I'm going to switch my screen to
17 what that page looks like today.
18         MR. KASOLAS:  Objection to the
19     comments by counsel.
20         MR. McLAUGHLIN:  For the record,
21     we're showing now the Web page U.S.
22     WiAutomation.com, forward slash, Allen
23     hyphen Bradley forward slash, PLC hyphen
24     systems forward slash ControlLogix,
25     L-O-G-I-X, all one word, forward slash,

Page 45

1  1756 L73.
2          And I'll mark a screen shot of this
3  as Exhibit 5.
4          (Coppola Exhibit 5, Screen Shot,
5      marked for identification.)
6          MR. KASOLAS:  Neal, for the record,
7      is there a Bates stamp on this document?
8          MR. McLAUGHLIN:  This is a live Web
9      page, Bob.
10         MR. KASOLAS:  And what about the
11     previous exhibit.  I didn't see a Bates
12     stamp on that one.
13         MR. McLAUGHLIN:  That was from
14     paragraph 56 of the complaint.
15         MR. KASOLAS:  Okay.
16         But you didn't mark that as a Bates
17     stamp, the previous exhibit, and submit it
18     in discovery, did you?
19         MR. McLAUGHLIN:  We may have, but
20     it's not the PDF that I was showing him.
21         MR. KASOLAS:  I didn't see a number
22     on it.  That's why I'm asking you.
23 BY MR. McLAUGHLIN:
24     Q.    Mr. Coppola, do you see the website
25 up on your screen there?

Page 279

1   this Defense Number 3?
2        A.   So all the products, no, I'm sorry,
3   all of the invoices that I've already given you
4   including the RA Controls, Rockwell BV, so,
5   basically, when these people from Rockwell
6   needed to purchase products -- the products,
7   they purchase them from us.
8             And then Rockwell sued us.
9        Q.   Is there anything else you are able
10  to provide in terms of a factual basis for this
11  Defense Number 3?
12       A.   I would not know what to give more
13  than this.
14       Q.   So I'm going to scroll down to
15  Number 11.  And it says:  Defendant received
16  assurances from plaintiff and in reliance on
17  said assurances will suffer undue prejudice if
18  defendant ceases sale of Rockwell products.
19            Do you see that?
20            THE INTERPRETER:  One second.  I
21       have to look up a word.  The interpreter
22       needs to look up a word.
23            MR. KASOLAS:  Objection to form for
24       the same reasons given before.
25  BY MR. McLAUGHLIN:

Page 280

1        Q.   The question, Mr. Coppola, is:  What
2   assurances did WiAutomation receive from
3   Rockwell Automation?
4             THE INTERPRETER:  This is the
5        interpreter --
6             MR. KASOLAS:  Are you asking for the
7        client to reveal settlement discussions
8        here?
9             MR. McLAUGHLIN:  I'm asking what the
10       factual basis for this statement is.
11            MR. KASOLAS:  Are you asking the
12       witness to disclose settlement discussions?
13            MR. McLAUGHLIN:  I don't know what
14       is the basis for this statement dated
15       December 10th.
16            MR. KASOLAS:  Why don't you read the
17       --
18            (Multiple speakers.)
19            MR. KASOLAS:  -- a little closer,
20       and just let me know if you want the
21       witness to disclose settlement discussions
22       that were had between the two sides.
23            MR. McLAUGHLIN:  All right.  Let me
24       ask a clean question, then.
25            MR. KASOLAS:  I'm doing you a favor.

Page 281

1             MR. McLAUGHLIN:  Okay.
2   BY MR. McLAUGHLIN:
3        Q.   Other than settlement discussions
4   between WiAutomation and Rockwell Automation,
5   are there any other assurances that
6   WiAutomation received from Rockwell that are
7   referenced in this Defense Number 11?
8        A.   The suppliers always supply the
9   products to us, and we relied on this -- this
10  fact, on the fact that they were supplying us
11  the products.  And we -- we -- we are
12  counting -- we were counting on the suppliers
13  that today they are not answering, they are not
14  giving an answer because they don't want to
15  give the products to us.
16            So it's like they are causing us
17  damages.  It's like they're doing -- they're
18  into a commercial war with us.
19       Q.   Is there anything else?
20       A.   Yes.  That there are clearly other
21  people who continue to sell the products with
22  no problem.
23       Q.   Let's scroll down to Defense
24  Number 4.  It says:  Plaintiff's claims are
25  barred because it has failed to continuously

Page 282

1   use the marks at issue in this litigation as
2   required by applicable case law.
3             Do you see that?
4             THE INTERPRETER:  Reading to
5        herself.
6             (Document review.)
7             MR. McLAUGHLIN:  I think you are
8        translating the wrong sentence.
9             I'm at 14.
10            THE INTERPRETER:  Okay.  Wow.  I got
11       the longer one.  I'm sorry.
12            (Reading to herself.)
13  BY MR. McLAUGHLIN:
14       Q.   Mr. Coppola, does WiAutomation have
15  any evidence that Rockwell has not continuously
16  used the marks at issue in this litigation?
17            MR. KASOLAS:  Objection to form.
18       A.   What does it mean?  Rockwell is the
19  one who should prove this thing.
20       Q.   Do you have any information that
21  would support this Defense Number 11 -- Number
22  14, sorry.
23       A.   I talk about this with my attorney.
24       Q.   Do you have any facts to support
25  this Defense 14?

Page 283

1    A.    I'm telling I think that Rock is the
2  one who should prove this thing.
3    Q.    The -- for the Rockwell products
4  that WiAutomation sells, does WiAutomation
5  provide its customers with copies of Rockwell
6  Automation recall notices?
7    A.    The distributors should be the one
8  to communicate to us the recall of the product,
9  the notices of recall of the products.
10   Q.    Has WiAutomation ever sent one of
11 its customers a Rockwell recall notice?
12         MR. KASOLAS:  Objection to form.
13   A.    We never received such kind of a
14 letter from the authorized distributors.
15   Q.    I'm asking about WiAutomation's
16 communications with its customers, and the
17 question is:  Has WiAutomation ever sent to its
18 customers a Rockwell Automation recall notice?
19         MR. KASOLAS:  Objection to form.
20   A.    If we never received it, I think we
21 never sent it.
22   Q.    Has WiAutomation ever sent one of
23 its customers a Rockwell Automation safety
24 notice?
25         MR. KASOLAS:  Objection to form.

Page 284

1    A.    I don't think so.  And also because
2  we do not open the boxes of products.  If there
3  is one, it could be inside.
4    Q.    If a customer of WiAutomation who
5  purchased a Rockwell product wanted to know
6  where WiAutomation obtained that product from,
7  would you be able tell them?
8          MR. KASOLAS:  Objection to form.
9    A.    This would mean -- does it mean that
10 I should give the name of my supplier to the
11 client?  And this is the heart of the business.
12 If I give the name of the supplier to the
13 customer, we have no reason of existing.
14   Q.    So if a customer were to ask
15 WiAutomation where a Rockwell product that it
16 received came from, you would not give them the
17 answer; correct?
18         MR. KASOLAS:  Objection to form.
19   A.    I wouldn't know --
20         (Multiple speakers.)
21   A.    No, I would not, because this is at
22 the heart of the business.  For anything just
23 like for a car or another item, if you tell the
24 client where you buy them, then the company
25 could have no reason of existing.

Page 285

1    Q.    Have -- sorry.  Strike that.
2          Has any customer of WiAutomation
3  purchased more than $10,000 worth of Rockwell
4  products from WiAutomation?
5          MR. KASOLAS:  Objection to form.
6    A.    So I cannot remember that, but from
7  the invoices that you showed me before, I think
8  the amounts were above $10,000 or euro.
9    Q.    Does WiAutomation have any customers
10 in the United States that have purchased
11 $10,000 or more of Rockwell products?
12   A.    I do not remember exactly.  But yes,
13 it could be.
14   Q.    What are their names?
15   A.    If I do not remember exactly, I can
16 never remember the names.
17   Q.    Did you do anything to prepare for
18 today's deposition to be able to provide me
19 those names?
20         MR. KASOLAS:  Objection to form.
21   A.    Yes.  Some time ago, but I cannot
22 remember the names of clients for sure.
23   Q.    When you say some time ago, was it
24 more than a month ago?
25   A.    No, even more recently.

Page 286

1    Q.    What would you have to do to figure
2  out the names of your customers in the United
3  States who have purchased more than $10,000
4  worth of Rockwell product?
5          MR. KASOLAS:  Objection to form.
6    A.    I would need to look at invoices,
7  and if the brand is on the invoices.
8    Q.    Did you do any of that in
9  preparation for today's deposition?
10         MR. KASOLAS:  Objection to form.
11   A.    Like I told you before already, I
12 searched together with administration and the
13 girls in sales, but I -- I don't remember all
14 of these names.
15   Q.    Would you be able to provide a list
16 if you had more time to do it?
17         MR. KASOLAS:  Objection to form.
18   A.    I would need to redo the entire work
19 from the beginning.
20   Q.    But would it be possible?
21         MR. KASOLAS:  Objection to form.
22   A.    I do not know.
23   Q.    Were all of the Rockwell Automation
24 products that WiAutomation sells, do they all
25 come into the warehouse before being shipped to

Page 287

1  customers?
2       A.    Yes.
3       Q.    For any product that WiAutomation
4  sells, is there ever a situation where a
5  product gets shipped directly from one of your
6  sources to one of your customers?
7             MR. KASOLAS:  Objection to form.
8       A.    No, absolutely not, for the same
9  reasons I mentioned before.  If I tell one of
10 my clients who -- about my suppliers, my
11 company -- the company would have no reason to
12 exist.
13      Q.    What proportion of WiAutomation
14 sales of Rockwell Automation products are
15 sourced after receiving a customer's order?
16            MR. KASOLAS:  Objection to form.
17      A.    I do not know.  I can't establish
18 that exactly.
19      Q.    Is it more than half of orders?
20            MR. KASOLAS:  Objection to form.
21      A.    I don't know.  I won't be able to
22 say exactly.
23      Q.    What would you have to do in order
24 to be able to answer that question?
25      A.    I don't know.  I wanted to start

Page 288

1  monitoring this situation.
2       Q.    Did you do any of that in
3  preparation for today?
4       A.    No, it's impossible.
5       Q.    Has anyone at WiAutomation
6  communicated with a company called EDGE Global
7  Supply?
8       A.    Could you repeat the name?
9             THE INTERPRETER:  This is the
10 interpreter.
11            MR. McLAUGHLIN:  EDGE Global Supply.
12      A.    No.  We simply notice that it has
13 many distributors, authorized distributors, all
14 over the world.
15      Q.    Has anyone at WiAutomation
16 communicated with anyone at Rockwell?
17      A.    Not that I know.
18      Q.    What are WiAutomation's projected
19 sales of Rockwell Automation products for the
20 full year 2022?
21            THE INTERPRETER:  I'm sorry, fall,
22 F-A-L-L or F-U-L-L, full.
23            MR. McLAUGHLIN:  F-U-L-L.
24            THE INTERPRETER:  Thank you.
25      A.    I do not know for sure.  After the

Page 289

1  lawsuit they went down.  The distributors
2  caused the damage to us, but I wouldn't be able
3  to say -- to tell.
4       Q.    What are WiAutomation's sales of
5  Rockwell Automation products from the beginning
6  of 2022 to today?
7       A.    I do not know.
8       Q.    Did you do anything to prepare
9  yourself with an answer to that question in
10 advance of today's deposition?
11      A.    I had already looked in the past.
12      Q.    And those activities did not prepare
13 you to answer the question of how much revenue
14 WiAutomation has received to date for Rockwell
15 Automation products?
16      A.    The approximate estimate that we saw
17 before in the written answers.
18      Q.    That was dated in August.
19            Do you have any updated information?
20            MR. KASOLAS:  Objection to form.
21      A.    No, not at the moment.
22      Q.    Does WiAutomation have a projection
23 of the amount of sales of Rockwell products it
24 anticipates making in 2023?
25      A.    No, absolutely not.

Page 290

1       Q.    If a customer wanted to make a
2  complaint about a Rockwell Automation product,
3  what ways could they communicate with
4  WiAutomation to provide that complaint?
5       A.    They can send us an e-mail or also
6  call us over the phone.
7       Q.    Are there any other ways of
8  communication?
9       A.    No.  These are the ways we have to
10 communicate with clients.  And the chat.
11      Q.    What complaints has WiAutomation
12 received from customers regarding Rockwell
13 products?
14      A.    None that I recall.  Maybe only one
15 client, but the client had made a mistake in
16 purchasing the product.
17      Q.    What was the mistake?
18      A.    He made a mistake in the purchase
19 with the product code.  And he asked us to
20 change it with another one.
21      Q.    Are there any other complaints that
22 WiAutomation has received regarding Rockwell
23 products?
24      A.    Not that I know.
25      Q.    No WiAutomation customer ever



Exhibit 4

# Exhibit 5

# EXPERT REPORT OF PROFESSOR DAVID FRANKLYN CONCERNING CONSUMER PERCEPTIONS OF PRODUCT DIFFERENCES AND SELLER REPRESENTATIONS IN THE MATTER OF ROCKWELL v. PARCOP S.R.L. D/B/A WI AUTOMATION

Professor David Franklyn
University of Arizona, Sandra Day O'Connor College of Law
Executive Director, McCarthy Institute for Intellectual Property Law

January 2023

## TABLE OF CONTENTS

OVERVIEW OF EXPERT REPORT, EXPERTISE, AND SUMMARY OF EXPERT FINDINGS ....... 1

A GENERAL DESCRIPTION OF THE SURVEYS ....... 7

SURVEY 1: DETAILED SUMMARY ....... 7

    **Survey 1 Overview: Material Differences** ....... 7

    **Experimental Design** ....... 8

    **Relevant Universe of Interest** ....... 11

    **Sampling Plan** ....... 12

    **Double-Blind Interviewing** ....... 13

    **Interviewing Procedures** ....... 14

    **Interviewing Period** ....... 14

    SURVEY 1: DETAILED FINDINGS ....... 15

SURVEY 2: DETAILED SUMMARY ....... 

    **Survey 2 Overview: False Advertising** ....... 25

    **Experimental Design** ....... 25

    **Relevant Universe of Interest** ....... 34

    **Sampling Plan** ....... 36

    **Double-Blind Interviewing** ....... 37

    **Interviewing Procedures** ....... 37

    **Interviewing Period** ....... 38

    SURVEY 2: DETAILED FINDINGS ....... 39

CONCLUSION ....... 41

**APPENDIX A:** AUTHOR CV

**APPENDIX B:** QUESTIONNAIRES

**APPENDIX C:** SURVEY SCREENSHOTS

**APPENDIX D:** DATA FILE

## OVERVIEW OF EXPERT REPORT, EXPERTISE, AND SUMMARY OF EXPERT FINDINGS

1. Rockwell Automation, Inc. ("Rockwell Automation") has retained me as an expert to provide opinions in connection with the investigation against Parcop S.R.L d/b/a World Industrial Automation, Inc. ("WI"), filed in the United States District Court for the District of Delaware.  I am being compensated in this matter for my time at my standard hourly rate of $675. My compensation is not contingent upon the substance of my testimony or the outcome of this matter.

2. I am a professor of law and director of the McCarthy Institute for IP and Tech Law at Arizona State University ("ASU").

3. I am editor-in-chief and coauthor of McCarthy's Desk Encyclopedia of Intellectual Property Law.

4. The McCarthy Institute conducts wide-ranging survey research on consumer perception issues in both the United States and Europe.

5. A key focus of my academic work involves research and lecturing on issues concerning consumer perceptions in the area of trademark law.

6. I have consulted and/or qualified as an expert witness on behalf of clients in numerous cases involving consumer perception and behavior issues and related damages issues, including in matters in the United States (federal and various state courts), Asia, the European Union, the Middle East and South America.

7. In addition to my survey research experience, I hold a J.D. from University of Michigan Law School.

1

8.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

9.  I understand that Rockwell Automation manufactures, markets, and sells industrial, electronic, and electronic control equipment under the Allen-Bradley brand.

10. In addition to the product itself, Rockwell Automation provides a bundle of services that accompany the product, including service elements such as the direct manufacturer's "remanufacturing" warranty, guidance from Rockwell Automation employees during the pre-sale and post-sale stage, software and firmware updates, and proactive notification around product recalls and cybersecurity threats.

11. WI is a reseller of industrial, electrical, and electronic control equipment and parts.  WI sells through a website: www.wiautomation.com ("WI website").

12. The WI website sells, among other things, what WI has represented as "new" Allen-Bradley products that guaranteed a "12 month warranty."

13. Below is a screenshot of an exemplary Allen-Bradley product that was offered for sale on the WI website.

**Figure 1: World Industrial Website**



14. WI's website also provided various representations regarding Allen-Bradley products and accompanying services which are offered with a purchase of those products.

15. Rockwell Automation alleges that WI's practices in the resale of Allen-Bradley products involve trademark infringement and unfair competition by WI in connection with WI's resale of Allen-Bradley products.

16. Rockwell Automation further alleges that the guarantees made on WI's website concerning a 12 month warranty constitute false advertising in that it conveys to a purchaser that there is a manufacturer's warranty from Rockwell when there is not.

3

17.  Rockwell Automation and its counsel have retained me to study certain aspects of consumer perceptions related to the claims at-issue in this case, and to provide opinions based on the findings of those studies.

18.  I assume in my report that the following legal principles apply: trademark infringement focuses on whether there is a significant risk or likelihood that the reseller's practices confuse or mislead customers about the quality or characteristics of the reseller's goods; a key concern is that the customer cannot make an informed choice between buying directly from the manufacturer or its authorized distributors -- versus buying from the reseller.

19. One type of evidence customarily used in making this determination is customer surveys.  They include studies of consumer perceptions of differences between the goods/services offered by the original manufacturer, as compared to the reseller. They also include studies of consumer confusion about the equivalency of the goods/services.  A consumer survey can provide helpful information on the degree customers are misled by statements or omissions in the reseller's marketing materials.

20.  I have been retained here by Rockwell Automation and its counsel to conduct surveys and report my findings and conclusions, as they relate to WI's reselling activities and marketing representations.  In particular, I have been retained to provide my opinions in light of such surveys on the following:

  a.  Whether WI's resale of Allen-Bradley products (and accompanying services) are materially different than goods (and accompanying services) sold directly by Rockwell Automation or its authorized distributors, as perceived by relevant consumers, including whether and to what extent various differences are significant to the relevant consumer's purchasing decisions.

4

b.  Whether relevant consumers believe they will receive Rockwell Automation's manufacturer warranty when purchasing Allen-Bradley products from WI.

21. As part of my engagement for this matter, I have reviewed the following materials:
   - Complaint filed by Rockwell Automation on August 27, 2021
   - Answer filed by Rockwell Automation on December 10, 2021
   - Website of Defendant
   - Conversation with Rockwell Personnel

22. As part of my analysis, I have conducted two randomized surveys of qualified respondents in the United States to obtain their perceptions of statements made by WI on its website to determine what is important to them in terms of services Rockwell Automation provides in connection with the sale of New Allen Bradley products. The first survey, which I call the "Material Differences survey" collected data from a total of 231 respondents. The second survey, which I call the "False Advertising survey" collected data from a total of 200 respondents.

23. A brief summary of my findings and conclusions are set forth immediately below:

   a.  My understanding is that Rockwell Automation offers several services and benefits that accompany new products sold to its customers (through its authorized distributors or through direct sales from Rockwell to customers):

      i.  Manufacturer's warranty (which not only repairs the product but also provides all hardware, firmware, and software updates and specialized testing to ensure the product meets all manufacturer's specifications and replacement of product where applicable);

5

      ii.  Guidance from Rockwell Automation or its local authorized distributor experts to assist with post-sale technical support;

     iii.  A notification process for product recall notices;

     iv.  A notification process for product safety notices;

      v.  Receive most recent version of the product;

     vi.  Quality control maintained by the manufacturer or an authorized distributor of the manufacturer throughout the supply chain;

    vii.  Firmware and software updates;

   viii.  The original manufacturer's label that accurately reflects the product's version or manufactured date.

b.  The Material Differences survey demonstrates (i) that a substantial number of survey respondents considered all of these product and service attributes to be "very important" or "important" when making purchasing decisions and (ii) that the absence of these attributes would decrease consumers' interest in purchasing a product from WI.

c.  The False Advertising survey demonstrates (i) that a substantial number of survey respondents believe that they would receive the manufacturer's warranty when purchasing an Allen-Bradley product from WI and (ii) that they would be significantly less likely to make such a purchase if they knew a manufacturer's warranty would not accompany their purchase.

6

## A GENERAL DESCRIPTION OF THE SURVEYS

Material Differences:

The survey was conducted among purchasers, and those who influence purchase decisions, of industrial, electrical, and electronic control equipment to assess:

    a.  The importance of service offerings on their purchase decision;

    b.  Their expectations of the services that would accompany their purchase;

    c.   The impact on purchase interest of WI's product offerings if consumers were provided an accurate explanation of the product's condition and origin and the services that accompany the product.

False Advertising:

The survey was conducted among purchasers, and those who influence purchase decisions, of industrial, electrical, and electronic control equipment to assess:

    a.  Whether purchasers believe Allen-Bradley products offered by WI come with Rockwell's manufacturer's warranty; and

    b.  Whether purchasers would be less likely to purchase Allen-Bradley products from WI if they were to learn that those products were not accompanied by the manufacturer's warranty.

## SURVEY 1: DETAILED SUMMARY: MATERIAL DIFFERENCES

### **Survey Overview**

24. A total of 231 respondents participated in the survey, which consisted of a controlled experiment to test perceptions of the products and services that would be received if purchased from WI.

25. As more fully described in the Relevant Universe section, this survey was conducted among:

7

- Full-time professionals employed in Engineering and Manufacturing or Procurement and Purchasing;
- Who are primary decision makers or have influence on decision making for industrial, electrical, and electronic control devices; and
- Who consult product, retailer, or manufacturer websites as part of their research and selection process for industrial, electrical, and electronic control devices.

### Experimental Design

26. After respondents were screened and qualified to take the survey, they were exposed to a product currently for sale on the WI website and asked if they could see the image: [1]



27. After it was determined that respondents could see the image they were then presented with a series of paired questions, in a randomized order, to gauge the respondents' opinion on the importance of product attributes.

---

[1] Respondents who reported that they were unable to see the image were excluded.

28. The survey asked respondents how important each of these attributes was to them and whether or not the absence of these attributes would increase, decrease, or have no effect on their interest in purchasing a product.

29. In order to gauge the importance of a manufacturer's warranty, respondents were asked how important it was to them that there be the original manufacturer's warranty when purchasing a product like the one shown in the stimulus.



30. Respondents were then asked whether their interest would increase, decrease, or stay the same if they were to learn that the product did not come with a warranty from the manufacturer.

31. The same format was used throughout the survey to gauge the importance of each attribute. A copy of the Material Differences survey questionnaire is included in Appendix B.

32. For quality control, two additional questions were included which asked the respondents about the importance of the product's serial number being an even number, and the product being manufactured on a Tuesday.

33. Respondents who answered anything except "not at all important" to the above quality control questions were excluded from the final results.

34. It is important to note that these survey images appeared larger on respondents' computer screens, and respondents had the ability to increase the size of the text and images by zooming in using their browser. While the question text is necessarily reduced in size to fit onto a printed page, they were large and easy to read on-screen in the context of the survey.

### Relevant Universe of Interest

35. The relevant universe for this survey consisted of primary decision makers or those with purchase decision influence for industrial, electrical, or electronic control devices.  I determined the relevant universe based on my own analysis and by consulting with Rockwell personnel to confirm my understanding of who is included in the relevant universe.

36. Respondents were first asked about their current employment status.

37. Respondents were required to select full-time, part-time or self-employed to qualify for this survey.

38. Next, respondents were asked if they have any decision making role or influence in the following areas:  procurement, purchasing, engineering, manufacturing, information technology. Respondents were required to select "yes" to continue with the survey.

39. Next, respondents were asked to describe their personal involvement with purchase decisions related to industrial, electrical, and electronic control devices. Two other product types were also included as "distracters." Respondents were required to be either a primary decision maker on these purchases or have influence on purchase decisions for these products.

40. Respondents were then asked to select the companies they have purchased industrial, electrical or electronic control devices from within the past 10 years.

41. Next, respondents were presented with a list of eight companies in the industrial automation industry and were terminated if they responded that they were employed by Rockwell Automation.

11

42. Next, respondents were asked to select the number 8 for quality control purposes. Respondents who did not select the number 8 were terminated from the survey.

## **Sampling Plan**

43. The sample plan involved a random selection of respondents who are part of an online panel.  Online surveys are well-accepted in the field of survey research as a standard, reliable methodology.  Indeed, online surveys are now the most common method of conducting market research among consumers.  Businesses and other organizations routinely make decisions of importance based on the results of online survey research, and online surveys have been accepted in evidence in numerous U.S. District Court cases.  I have personally designed and executed numerous internet surveys that have been accepted by courts.

44. The sample of panelists used in the survey was provided by Dynata, a leading supplier of online sample for surveys.  Dynata is highly regarded as a reputable source of consumers for online surveys within the field of market research. Dynata utilizes appropriate industry procedures for ensuring the integrity and quality of its panels.  Dynata ensures data integrity through their continued review of their panelists' behavior on a variety of metrics:

- Timestamps to flag respondents who take surveys too quickly, indicating they are not paying sufficient attention.
- Identifying those who consistently tic items straight down or across grid-format questions, indicating a respondent is clicking without considering each item.
- Quality control questions to identify panelists' inattention.

12

● Real-time database analyses to stop fraudulent respondents.

45. Using data that had previously been collected (completely unrelated to this survey), Dynata targeted a subpopulation of engineers.  Invitations were then sent targeting those pre-identified panelists, thus giving a high degree of reliability that respondents entering the survey were indeed employed in the aforementioned field.  The purpose of the survey was withheld from respondents and nothing in the invitation to panelists indicated that they received the invitation because of the field in which they were employed.  Without knowing the purpose of the survey, respondents needed to meet the screening criteria in order to qualify for the survey.

46. As is standard practice, respondents who took the survey in less than one third of the median time were removed from the data set.

## Double-Blind Interviewing

47. This study was administered under "double-blind" conditions. Respondents were uninformed as to the purpose and sponsorship of the study.  The survey is also, by definition, "blind" in that there is no person administering the survey that can do anything to influence the results.

## Interviewing Procedures

48. The online survey questionnaire was designed and constructed under my direction.  Dynata handled programming, data collection, and processing.  I thoroughly tested the programmed survey prior to any potential consumers

receiving the invitation to participate in the survey.  The data set showing each consumer's answers to all questions will be provided in electronic form.


**<u>Interviewing Period</u>**

49.  Interviewing was conducted from December 26th, 2022 through January 3rd, 2023.

14

## SURVEY 1: DETAILED FINDINGS

---

**A.** *An overwhelming number of respondents found that all 8 attributes tested were either "important" or "very important" to their purchase decision, and a significant majority of respondents indicated that if they knew these attributes would not come with their purchased product, their interest in purchasing the product from WI's website would decrease*

50. An average of 92.8% of respondents found all 8 of the tested attributes to be either "important" or "very important." Furthermore, an average of 72.19% of respondents indicated that their interest in purchasing would decrease if the tested attributes were not included in their purchase decision.

51. These averages were calculated using metrics depicted in the charts below. Each chart provides a detailed breakdown of consumers' responses to each question tested in the main part of Survey 1, excluding the two quality control questions[2].

**B.** *An overwhelming number of respondents indicated that receiving the original manufacturer's warranty was "important" or "very important" to their purchase decision*

---

[2] Question 1 simply asked if respondents could see the displayed images.

15

*Table 1: Importance of Manufacturer's Warranty*

| Question 2a: *When purchasing new products like this one, how important is it for you to receive the original manufacturer's warranty?* | Count | Percent |
|---|---|---|
| Very important | 175 | 75.76% |
| Important | 44 | 19.05% |
| Slightly important | 9 | 3.90% |
| Not at all important | 3 | 1.30% |
| I don't Know | 0 | 0.00% |
| Total | 231 | 100% |

52. A total of 94.81% of respondents indicated that receiving the original manufacturer's warranty was either important or very important to their purchasing decision.

**C.** **An overwhelming number of respondents indicated that being notified of product recall notices was "important" or "very important" to their purchase decision**

*Table 2: Importance of Product Recall Notices*

| Question 3a: *When purchasing new products like this one, how important is it for you to be notified of any product recall notices when issued by the manufacturer?* | Count | Percent |
|---|---|---|
| Very important | 190 | 82.25% |
| Important | 34 | 14.72% |
| Slightly important | 6 | 2.60% |

16

| | | |
|---|---|---|
| Not at all important | 1 | 0.43% |
| I don't Know | 0 | 0.00% |
| Total | 231 | 100% |

53. A total of 96.97% of respondents indicated that receiving product recall notices from the manufacturer was either important or very important to their purchasing decision.

**D.** *An overwhelming number of respondents indicated that being notified of product safety notices was "important" or "very important" to their purchase decision*

*Table 3: Importance of Safety Notices*

| Question 4a: *When purchasing new products like this one, how important is it for you to be notified of any product safety notices when issued by the manufacturer?* | Count | Percent |
|---|---|---|
| Very important | 177 | 76.62% |
| Important | 45 | 19.48% |
| Slightly important | 7 | 3.03% |
| Not at all important | 2 | 0.87% |
| I don't Know | 0 | 0.00% |
| Total | 231 | 100% |

54. A total of 96.10% of respondents indicated that being notified of safety notices from the manufacturer was either important or very important to their purchasing decision.

**E. *A significant majority of respondents indicated that receiving post sale technical customer support from the manufacturer or authorized distributor was "important" or "very important" to their purchase decision***

*Table 4: Importance of Post-Sale Technical Support*

| Question 5a: *When purchasing new products like this one, how important is it for you to receive post sale technical customer support from the manufacturer or its authorized distributor?* | Count | Percent |
|---|---|---|
| Very important | 142 | 61.47% |
| Important | 61 | 26.41% |
| Slightly important | 26 | 11.26% |
| Not at all important | 2 | 0.87% |
| I don't Know | 0 | 0.00% |
| Total | 231 | 100% |

55. A total of 87.88% of respondents indicated that receiving post sale technical support from the manufacturer was either important or very important to their purchasing decision.

**F. An overwhelming number of respondents indicated that receiving the latest firmware or software related to the product was "important" or "very important" to their purchase decision**

Table 5: Importance of Latest Firmware/Software

| Question 6a: *When purchasing new products like this one, how important is it for you to be entitled to receive the latest firmware or software related to this product offered by the manufacturer?* | Count | Percent |
|---|---|---|
| Very important | 171 | 74.03% |
| Important | 50 | 21.65% |
| Slightly important | 9 | 3.90% |
| Not at all important | 1 | 0.43% |
| I don't Know | 0 | 0.00% |
| Total | 231 | 100% |

56. A total of 95.67% of respondents indicated that being entitled to receive the latest firmware/software was either "important" or "very important".

**G. An overwhelming number of respondents indicated that receiving the most recent version of the product was "important" or "very important" to their purchase decision**

Table 6: Importance of Receiving Latest Version of Product

19

| Question 7a: *When purchasing new products like this one, how important is it for you to receive the most recent version of this product available from the manufacturer?* | Count | Percent |
|---|---|---|
| Very important | 129 | 55.84% |
| Important | 78 | 33.77% |
| Slightly important | 20 | 8.66% |
| Not at all important | 4 | 1.73% |
| I don't Know | 0 | 0.00% |
| Total | 231 | 100% |

57. A total of 89.61% of respondents indicated that receiving the latest version of the product available from the manufacturer is either "important" or "very important."

**H.** ***An overwhelming number of respondents indicated that receiving a product that has had its quality control maintained by the manufacturer or authorized distributor was "important" or "very important" to their purchase decision***

Table 7: Importance of Quality Control Maintenance

| Question 8a: *When purchasing new products like this one, how important is it for you to receive a product that has had its quality control maintained by the manufacturer or an authorized distributor of the manufacturer throughout the supply chain until it is purchased by you?* | Count | Percent |
|---|---|---|
| Very important | 158 | 68.40% |

| | | |
|---|---|---|
| Important | 63 | 27.27% |
| Slightly important | 8 | 3.46% |
| Not at all important | 2 | 0.87% |
| I don't Know | 0 | 0.00% |
| Total | 231 | 100% |

58. A total of 95.67% of respondents indicated that receiving quality control maintenance from the manufacturer or an authorized distributor of the manufacturer is either "important" or "very important" to their purchasing decision.

***I. A significant majority of respondents indicated that receiving a product that did not have its original manufacturer's label removed or altered and replaced was "important" or "very important" to their purchase decision***

*Table 8: Importance of Original Manufacturer's Label*

| Question 9a: *When purchasing new products like this for a business application, how important is it for you to receive a product that did not have its original manufacturer's label removed or altered and replaced with a label that purports to be from the manufacturer but is not and may inaccurately reflect the product's version or manufactured date?* | Count | Percent |
|---|---|---|
| Very important | 166 | 71.86% |

| | | |
|---|---|---|
| Important | 32 | 13.85% |
| Slightly important | 12 | 5.19% |
| Not at all important | 20 | 8.66% |
| I don't Know | 1 | 0.43% |
| Total | 231 | 100% |

59. A total of 85.71% of respondents indicated that receiving a product with its original manufacturer's label intact was either important or very important.

**J.  *When exposed to a more realistic description of the product origin and its condition, as well as accompanying services, purchase interest declines for a significant number of consumers.***

60. After reviewing the hypothetical scenarios (all presented individually), a significant portion of consumers who indicated that a particular feature was "important" or "very important" showed a decrease of interest in purchasing the product from WI Automation.

*Table 9: Degree of decreased purchasing interest from WI amongst respondents who selected "important" or "very important" for a particular attribute*

| | n = | Decreased purchase interest based on scenario |
|---|---|---|
| | | |

| | | |
|---|---|---|
| *This product does not come with the manufacturer's warranty.* | 219 | 84.02% |
| *You would not be automatically enrolled to receive product recall notices from the manufacturer related to the product.* | 224 | 67.41% |
| *You would not be automatically enrolled to receive product safety notices from the manufacturer related to the product.* | 222 | 62.61% |
| *You would not be entitled to receive post sale technical customer support for the product from the manufacturer or its authorized distributor.* | 203 | 78.82% |
| *Any firmware or software on this product is unlicensed and you would not be entitled to receive any firmware or software updates from the manufacturer.* | 221 | 78.73% |
| *This product may not be the most recent version of this product available from the manufacturer.* | 207 | 67.15% |
| *The product has not had its quality control maintained by the manufacturer or an authorized distributor of the manufacturer throughout the supply chain until it was purchased by you.* | 221 | 76.92% |
| *The product that you would receive may have had its original manufacturer's label removed or altered and replaced with another label that purports to be from the manufacturer but is not and may inaccurately reflect the product's version or manufactured date.* | 198 | 90.91% |

61. A total of 84.02% of respondents who considered a manufacturer's warranty "important" or "very important" indicated that their interest in purchasing the product from WI's website would decrease if they would not receive the manufacturer's warranty when purchasing from WI's website.

62. A total of 67.41% of respondents who considered product recall notices "important" or "very important" indicated that their interest in purchasing the

product from WI's website would decrease if they were not automatically enrolled to receive product recall notices from the manufacturer.

63. A total of 62.61% of respondents who considered product safety notices "important" or "very important" indicated that their interest in purchasing the product from WI's website would decrease if they were not automatically enrolled to receive product safety notices from the manufacturer.

64. A total of 78.82% of respondents who considered post sale technical support "important" or "very important" indicated that their interest in purchasing the product from WI's website would decrease if they would not receive post sale technical support.

65. A total of 78.73% of respondents who considered updated software/firmware "important" or "very important" indicated that their interest in purchasing the product from WI's website would decrease if they learned that they would receive unlicensed firmware/software updates.

66. A total of 67.15% of respondents who considered the product version "important" or "very important" indicated that their interest in purchasing the product from WI's website would decrease if they learned that the product may not be the latest version available from the manufacturer.

67. A total of 76.92% of respondents who considered quality control maintenance "important" or "very important" indicated that their interest in purchasing the product from WI's website would decrease if they learned that the product has not had its quality control maintained by either the manufacturer or authorized distributor.

68. A total of 90.91% of respondents who considered the original manufacturer's label "important" or "very important" indicated that their interest in purchasing the product from WI's website would decrease if they learned that it may have had its original label altered and replaced with another label that purports to be from the manufacturer but may accurately reflect product version or manufacturer date.

## SURVEY 2: DETAILED SUMMARY: FALSE ADVERTISING

### Survey Overview

69. A total of 200 respondents participated in the survey, which consisted of a controlled experiment to test perceptions of the products and services that would be received if purchased on the WI website, and the relationship between Allen-Bradley and WI.

70. As more fully described in the Relevant Universe section, this survey was conducted among:

- Full-time professionals employed in Engineering and Manufacturing or Procurement and Purchasing;
- Who are primary decision makers or have influence on decision making for industrial, electrical, and electronic control devices; and
- Who consult product, retailer, or manufacturer websites as part of their research and selection process for industrial, electrical, and electronic control devices.

### Experimental Design

71. After respondents were screened and qualified to take the survey, they were exposed to screenshots of the WI landing page, a product featured on the WI website, and a screenshot of the WI warranty page. [3]



---

[3] Respondents who reported that they were unable to see the image were terminated.

26







Can you see the image above?

Select one

○ Yes

○ No

Continue >



## Can you see the image above?

Select one

◯ Yes

◯ No

Continue >



Can you see the image above?

Select one

○ No

○ Yes

Continue >

72. Respondents were then asked a series of substantive questions to gauge their impressions regarding the product warranty, and a quality control question.

73. Respondents were asked whether the product comes with a 12 month warranty from the manufacturer.



74. They were then asked if the absence of a 12 month manufacturer's warranty would affect their interest.

If you were to learn that this product does not come with a 12 month warranty from the manufacturer, would it influence your purchasing decision?

Select one

☐ Yes - it would increase my interest in purchasing

☐ Yes - it would decrease my interest in purchasing

☐ No - it would not influence my purchasing decision

☐ I don't know

Continue >

75. For quality control, respondents were asked if the product comes with a $1000 rebate and were excluded if they responded "yes."

76. It is important to note that these survey images appeared larger on respondents' computer screens, and respondents had the ability to increase the size of the text and images by zooming in using their browser.  While the question text is necessarily reduced in size to fit onto a printed page, they were large and easy to read on-screen in the context of the survey.

**Relevant Universe of Interest**

77. The relevant universe for this survey consisted of primary decision makers or those with purchase decision influence for industrial, electrical, or electronic control devices.  Further, respondents were required to consult product, retailer, or manufacturer websites as part of their research and selection process.  I determined the relevant universe based on my own analysis and by consulting with Rockwell personnel to confirm my understanding of who is included in the relevant universe.

78. Respondents were first asked about their current employment status.

33

79. Respondents were required to select full-time, part-time or self-employed to qualify for this survey.

80. Next, respondents were asked if they have any decision making role or influence in the following areas: procurement, purchasing, engineering, manufacturing, information technology.

81. Respondents were required to select "yes" to continue with the survey.

82. Next, respondents were asked to describe their personal involvement with purchase decisions related to industrial, electrical, and electronic control devices. Two other product types were also included as "distracters."

83. Respondents were required to be either a primary decision maker on these purchases or have influence on purchase decisions for these products.

84. Respondents were then asked to select the companies they have purchased industrial, electrical or electronic control devices from within the past 10 years.

85. Next, respondents were presented with a list of eight companies in the industrial automation industry and were terminated if they responded that they were employed by Rockwell Automation.

86. Respondents were then asked if, as part of their research, selection, and purchase process, they consult product, retailer, or manufacturer websites. Respondents were required to select "yes" to continue.

87. Next, respondents were asked to select the number 8 for quality control purposes. Respondents who did not select the number 8 were terminated from the survey.

## Sampling Plan

88. The sample plan involved a random selection of respondents who are part of an online panel.  Online surveys are well-accepted in the field of survey research as a standard, reliable methodology.  Indeed, online surveys are now the most common method of conducting market research among consumers.  Businesses and other organizations routinely make decisions of importance based on the results of online survey research, and online surveys have been accepted in evidence in numerous U.S. District Court cases.  I have personally designed and executed numerous internet surveys that have been accepted by courts.

89. The sample of panelists used in the survey was provided by Dynata, a leading supplier of online sample for surveys.  Dynata is highly regarded as a reputable source of consumers for online surveys within the field of market research. Dynata utilizes appropriate industry procedures for ensuring the integrity and quality of its panels.  Dynata ensures data integrity through their continued review of their panelists' behavior on a variety of metrics:

- Timestamps to flag respondents who take surveys too quickly, indicating they are not paying sufficient attention.
- Identifying those who consistently tic items straight down or across grid-format questions, indicating a respondent is clicking without considering each item.
- Quality control questions to identify panelists' inattention.
- Real-time database analysis to stop fraudulent respondents.

35

90. Using data that had previously been collected (completely unrelated to this survey), Dynata targeted a subpopulation of engineers.  Invitations were then sent targeting those pre-identified panelists, thus giving a high degree of reliability that respondents entering the survey were indeed employed in the aforementioned fields.  The purpose of the survey was withheld from respondents and nothing in the invitation to panelists indicated that they received the invitation because of the field in which they were employed.  Without knowing the purpose of the survey, respondents needed to meet the screening criteria in order to qualify for the survey.

91. As is standard practice, respondents who took the survey in less than one third of the median time were removed from the data set.

### Double-Blind Interviewing

92. This study was administered under "double-blind" conditions. Respondents were uninformed as to the purpose and sponsorship of the study.  The survey is also, by definition, "blind" in that there is no person administering the survey that can do anything to influence the results.

### Interviewing Procedures

93. The online survey questionnaire was designed and constructed under my direction.  Dynata handled programming, data collection, and processing.  I thoroughly tested the programmed survey prior to any potential consumers receiving the invitation to participate in the survey.  The data set showing each consumer's answers to all questions will be provided in electronic form.

36

**<u>Interviewing Period</u>**

94. Interviewing was conducted from December 26th, 2022 through December 27th, 2022.

## SURVEY 2: DETAILED FINDINGS

**A.  An overwhelming number of respondents believed that the product came with a manufacturer's warranty**

Table 10: Respondent Perception of Manufacturer Warranty

| Question 2: *Does this Product Come with a 12 month warranty from the manufacturer?* | Count | Percent |
|---|---|---|
| Yes | 180 | 90.00% |
| No | 9 | 4.50% |
| I don't know | 11 | 5.50% |
| Total | 200 | 100% |

95. To determine whether or not WI's website gave the false impression of including a manufacturer's warranty with the Allen-Bradley products, respondents were shown screenshots of the website and asked *"does this product come with a 12 month warranty from the manufacturer?"* Of the 200 respondents who were asked this question, 90% had the false impression that the product comes with a warranty from the manufacturer. Of the 10% remaining, 5.5% responded that they were unsure whether or not the product comes with a manufacturer's warranty. Only 4.5% of the total number of respondents indicated that they believed the product did not come with a manufacturer's warranty.

**B.** *A significant majority of consumers who believed the product came with a manufacturer's warranty stated that the lack of a manufacturer's warranty would decrease their interest in purchasing the product*

96. To determine the degree of reliance on the false impression of a manufacturer's warranty on respondent's purchasing decision, the data from those who had a false impression that the product came with a manufacturer's warranty was isolated and analyzed.  Of the 180 respondents who had a false impression that the product came with a manufacturer's warranty, 68.9% indicated that the lack of a manufacturer's warranty would decrease their interest in purchasing the product from WI's website.

## *Conclusion*

97. Based on the extensive consumer research I describe in this report, it is clear that the following attributes are important to consumer's purchasing decisions: (1) manufacturer's warranty, (2) guidance from Rockwell Automation or its local authorized distributor experts to assist with post-sale technical support, (3) a notification process for product recall notices, (4) a notification process for product safety notices (5) receiving the most recent version of the product, (6) quality control maintained by the manufacturer or an authorized distributor of the manufacturer throughout the supply chain, (7) firmware and software updates, and (8) the original manufacturer's label that accurately reflects the product's version or manufactured date.

98. Additionally, consumers' interest in purchasing a Rockwell product from WI's website decreases when they learn that the aforementioned attributes would not be included with the sale of a product.

99. Furthermore, the representations made on WI's website gave consumers a false impression that the warranty offered by WI for the Allen-Bradley products it sells is Rockwell's manufacturer's warranty. Were it not for these false impressions, consumers would be far less interested in purchasing Allen-Bradley products from WI's website.

Dated:  January 6, 2022

_David G. Franklyn_

Professor David Franklyn

41

# Exhibit 6

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            IN AND FOR THE DISTRICT OF DELAWARE
 3
    ROCKWELL AUTOMATION, INC.,      )
 4  --------------------Plaintiff,  )
 5                                  ) Case No.
          vs.                       ) 21-CV-1238-CLC-
 6                                  ) JLH
    PARCORP s.r.l.,                 )
 7                                  )
 8  --------------------Defendant.  )
 9          TRANSCRIPT OF DISCOVERY CONFERENCE
10          DISCOVERY CONFERENCE had before the
11  Honorable Jennifer L. Hall, U.S.M.J., via
12  teleconference on the 2nd of May, 2022.
13
14                 APPEARANCES
15    HEYMAN ENERIO GATTUSO & HIRZEL, LLP
         BY: DOMINICK GATTUSO, ESQ.
16
                   -and-
17
      ALSTON & BIRD LLP
18       BY: NEAL MCLAUGHLIN, ESQ.
19              Counsel for Plaintiff
20
      YOUNG, CONAWAY, STARGATT & TAYLOR
21       BY: ROBERT VRANA, ESQ.
22                 -and-
23    BRACH EICHLER LLC
         BY: BOB KASOLAS, ESQ.
24           ERIC ALVAREZ, ESQ.
25              Counsel for Defendant     03:06PM
```

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

2

```
 1          THE COURT:  Good afternoon, everyone.
 2  This is Jennifer Hall.  We're here for a
 3  discovery dispute teleconference.  This is
 4  Rockwell versus Parcorp.  It's Civil Action
 5  Number 21-1238-CFC-JLH.  We have a court
 6  reporter on the line today.  The court
 7  reporter is Deanna Warner.
 8          May I have appearances, please, for
 9  Plaintiff.
10          MR. GATTUSO:  Good afternoon, Your
11  Honor.  It's Dominick Gattuso on behalf of
12  Plaintiff Rockwell.  I also have with me on the
13  line Neal McLaughlin from Alston and Bird, and
14  Mr. Mclaughlin is going to be addressing the
15  questions Your Honor has.
16          THE COURT:  Very good.  Good
17  afternoon.
18          May I have appearances for Defendant.
19          MR. VRANA:  Good afternoon, Your
20  Honor.  It's Rob Vrana from Young Conaway
21  pinch-hitting this afternoon for Ms. Kraman,
22  who is in a trial.  With me on the line today
23  is Bob Kasolas and Eric Alvarez from Brach
24  Eichler in New Jersey.
25          THE COURT:  Good afternoon to all of
```

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

3

```
 1  you.
 2          Okay.  So I've taken a look at the
 3  letters and the attachments.  I also
 4  re-reviewed the complaint, and I also skimmed
 5  the motion for judgment on the pleadings.  I
 6  think I have a pretty good idea about what's
 7  going on here, but I'll give each side a few
 8  minutes to add anything they want to add to the
 9  letters.
10          This is Plaintiff's motion, so we'll hear
11  from Plaintiff first.  Go ahead, counsel.
12          MR. MCLAUGHLIN:  Thank you, Your
13  Honor.
14          I think the issues here are pretty
15  simple.  We put forward a complaint that lays
16  out in detail all the facts that we need to
17  support the claims that we have made.  Our
18  response to the motion for judgment on the
19  pleadings goes into much more detail on that
20  and discovery as we go.  We've issued our
21  requests.  They've issued theirs.  Our
22  response --
23          (Telephonic interruption.)
24          MR. MCLAUGHLIN:  Excuse me?
25          THE COURT:  This is Jen Hal.  I'm not
```

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

4

```
 1  sure whose voice that was.  You can continue.
 2  It wasn't me.
 3          MR. MCLAUGHLIN:  Okay.  So Rockwell's
 4  responses to Defendant's discovery requests are
 5  due later this week, on Thursday.  We'll be
 6  providing those on time.  Defendant's responses
 7  to Rockwell's requests were due initially
 8  March 14th.  They weren't provided until many,
 9  many days after that, and they were deficient
10  in many respects, and it's not because they
11  don't understand what we're asking for.  It's
12  just they don't think that we should be getting
13  it.  And, you know, there's no grounds under
14  the Federal Rules or otherwise for this sort of
15  two-stage, "show me yours and I'll show you
16  mine" type discovery.  Everybody needs to
17  participate equilaterally, and Rockwell has
18  every intent to do that.
19          THE COURT:  Thank you, Counsel.
20  Let's hear from Defendant.
21          MR. KASOLAS:  Thank you, Your Honor.
22  Bob Kasolas from Brach Eichler on behalf of
23  Parcorp.  It's always a pleasure, Judge.
24          Let's put the facts into context, what
25  Rockwell is saying.  We don't believe they've
```

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

**5**

1  alleged any factual detail in their pleading
2  that supports any kind of a cause of action or
3  Lanham Act.  Particularly, they don't name what
4  product, what SKU, what model is in the
03:11PM 5  automation system.  There's absolutely no
6  detail whatsoever as to what products, or
7  Rockwell product or alleged counterfeit
8  product, the type of counterfeit products my
9  client is selling in the marketplace --
03:11PM 10        THE COURT:  Does it matter?  Let me
11  ask you this:  They say that you're not an
12  authorized distributor.  I don't take you to
13  have ever contested that.  You admit that;
14  right?
03:11PM 15        MR. KASOLAS:  Correct, and we don't
16  have to be an authorized distributor to resell
17  the products.
18        THE COURT:  That's your legal
19  position, but if their legal position is
03:12PM 20  anything you all sell infringes their
21  trademark, then why isn't every product that
22  bears their trademark relevant?  Is there some
23  difference between the products that the Court
24  should take into account in ordering discovery?
03:12PM 25        MR. KASOLAS:  We sell our products.

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

**6**

1  We don't counterfeit anything.  We don't unseal
2  the package.
3        THE COURT:  I understand that.  I
4  understand that, but their position is any time
03:12PM 5  you're selling their product, it's trademark
6  infringement.  That's their position, so why
7  should I distinguish between the products?
8        MR. KASOLAS:  Because that's
9  completely unsupportable by law.  They need to
03:12PM 10  identify with some specificity what the alleged
11  product is that's being sold, okay, what's
12  different between that particular product, that
13  particular module, that particular component
14  that's being, quote/unquote, gray market or
03:12PM 15  pawned off as a Rockwell product versus what
16  it's supposed to have, okay, in terms of if it
17  was a genuine Rockwell product, what customer
18  complaints there are in the field as to that
19  particular product, what the confusion is
03:12PM 20  alleged in the marketplace.
21        You've got to put this into context.
22  We're not talking about some shoes here.  These
23  customers that buy this product, they're big
24  operators.  They have major assembly lines and
03:13PM 25  production lines that allow these clients to

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

**7**

1  claim their products.  These are very expensive
2  products, and if they were counterfeit or they
3  weren't legitimate or they weren't doing what
4  they were supposed to be doing, if they weren't
03:13PM 5  genuine Rockwell products, it would cause
6  serious problems in the entire production
7  system.
8        We have no allegations of that whatsoever
9  in the complaint.  We have no idea what
03:13PM 10  products, what customers, nothing.  Product
11  numbers, zero numbers, what part and where in
12  the assembly line in the production system this
13  module fits.  It's all products coming in and
14  out, it's all financials, it's all sources,
03:13PM 15  it's all purchasing, it's all sales.  And it's
16  not reasonable or proportional to the needs of
17  the case in this matter.
18        What I think is very telling is in the
19  letter submitted to Your Honor, they alleged
03:13PM 20  that just a couple weeks ago there was some
21  alleged, quote, gray market or, quote,
22  counterfeit goods sold in the United States
23  that was Rockwell products.  One would think,
24  Judge, on this particular motion in front of
03:14PM 25  Your Honor, if they actually had something like

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

**8**

1  that, they would have attached some of that to
2  the letter they submitted to the Court.
3  Photographs, customer complaints, something to
4  show that this alleged counterfeit or gray
03:14PM 5  market transaction that took place outside the
6  pleading.  But the reference is you'll see.
7        There's nothing specific in the
8  complaint, and there's nothing attached to
9  support the allegation outside the pleading.
03:14PM 10  I'm not trying to belay discovery.  I'm asking
11  him tell me specifically which products you
12  sell that you allege my client is grey
13  marketing or pawning off or causing
14  infringement in the marketplace and tailor your
03:14PM 15  discovery to that, not the entire company
16  across every single product, every single
17  customer, every single sale, and with the
18  entire financials from top to bottom.
19        We filed the motion under 12(c) for that
03:14PM 20  particular reason, and to demonstrate I'm not
21  willing to delay, I have no problem with Your
22  Honor, magistrate in the matter, deciding the
23  motion, if that speeds things up.  We'd like to
24  actually have some specificity to what they're
03:15PM 25  getting into, what they're looking for, what

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

9

1  products, what SKUs, what makes and models.
2  How do you respond to this?  Give everything
3  that has to do with your company from top to
4  bottom, your financials, your sources, who
03:15PM 5  you're selling to, where you buy them from,
6  where you're storing things --
7         THE COURT:  Just for their branded
8  products, though; right?
9         MR. KASOLAS:  They're alleging
03:15PM 10  Rockwell products but not which Rockwell
11  products.  They number in the thousands, from
12  what I understand.
13         THE COURT:  Maybe I'm beating a dead
14  horse here, but you disagree with their legal
03:15PM 15  position that you reselling their products in
16  the U.S. is trademark infringement.  You
17  disagree with that, but they are alleging that
18  any time you sell their products in the U.S. as
19  new that it's trademark infringement, so isn't
03:16PM 20  that specific enough to what their case is for
21  them to say Rockwell products?
22         MR. KASOLAS:  Your Honor, I don't
23  believe it satisfies the Twombly and Iqbal
24  standard, Judge.  While it's a liberal
03:16PM 25  standard, there has to be some specificity with

10

1  Twombly and Iqbal where I can actually read the
2  complaint and have some idea, be on fair
3  notice, of what the allegations are against my
4  client.  As we stand here, my client has no
03:16PM 5  idea what make/model product they're selling
6  that's alleged to be infringed, which customers
7  allegedly complained about infringement, what
8  the confusion is in the marketplace, what year,
9  what component inside this assembly line.
03:16PM 10         I have no idea what we're responding to.
11  It's an amorphous, conclusory, nonspecific,
12  conclusory allegation which falls outside the
13  requirement of Twombly and Iqbal.  You've got
14  to have some specificity and say, hey, Parcorp,
03:16PM 15  here, this module fits in this assembly line,
16  this is the SKU number, this is the make, this
17  is the model, this is the year, this is what
18  the difference is between what you're selling
19  and what we're actually selling.  They put
03:17PM 20  nothing like that.  It's --
21         THE COURT:  I think the difference is
22  that you're the one that's selling it.  That's
23  how I take their allegations to be.  That's the
24  difference.
03:17PM 25         MR. KASOLAS:  That's not trademark

11

1  infringement, Your Honor, violation of the
2  Lanham Act.  Anybody can resell anything they
3  buy.  There's no case law anywhere in any of
4  the 50 states or federal court that says if you
03:17PM 5  buy a product from an original owner, secondary
6  owner, you can't resell that product.
7         This idea that we're not an authorized
8  representative, we don't have to be an
9  authorized representative to sell their
03:17PM 10  product.  There are many, many resellers in the
11  marketplace that sell Rockwell products that
12  were bought from an authorized distributor or
13  bought directly from Rockwell or bought from a
14  third party.  That in and of itself doesn't
03:17PM 15  constitute violation of the Lanham Act.  You
16  have to prove putting a phony mark on a product
17  that's not a Rockwell product, and therefore
18  causing confusion in the marketplace.  You have
19  to demonstrate there's a false designation to
03:18PM 20  argue some kind of misleading to the source of
21  goods.
22         There is nothing in this complaint,
23  nothing in the detail.  If you're selling
24  products and we say you can't sell, therefore
03:18PM 25  it's trademark infringement.  That's not a

12

1  cause of action in the Lanham Act.  What they
2  should have done to satisfy Twombly and Iqbal
3  is have some tiny amount of specificity, this
4  make, this model, this particular product line.
03:18PM 5  You're selling this product into this stream of
6  commerce.  It's either not our product or you
7  modified it or you're making misrepresentations
8  of their product of what it does, what it
9  doesn't do when it comes to software or comes
03:18PM 10  to warranty.  It's just one conclusory
11  pleading.
12         And again, I'm not looking to delay the
13  case.  Maybe the solution is bifurcating,
14  producing the documents that go towards
03:18PM 15  liability before we get to financial damages.
16  Maybe like I said, I'm happy to do it.  I don't
17  know how the Court feels.  I don't know how
18  opposing counsel feels.  I don't know how the
19  judge in the case feels.  I'll let Your Honor
03:19PM 20  decide the Rule 12(c) motion if that speeds
21  things up just to demonstrate I'm not looking
22  to delay anything.  I just think it's --
23         THE COURT:  Thank you, Counsel.  I
24  understand your point.  Anything else you want
03:19PM 25  to add about any of the particular requests?

13

1 MR. KASOLAS: I don't think we'd be
2 waiving -- I'm sorry, Judge. Go ahead.
3 THE COURT: It's fine. If there's
4 any finer point you want to put on any of the
03:19PM 5 arguments in your letter.
6 MR. KASOLAS: It's in my letter. I
7 don't like repeating myself. I know Your Honor
8 read everything in the complaint, read the
9 letters, read through the motion. I don't
03:19PM 10 think we should be waiving the particular
11 issues. There was no prejudice to opposing
12 counsel or the client in this matter. Both of
13 our contacts in Italy got sick with COVID-19,
14 so I don't believe -- I think there's good
03:19PM 15 cause to excuse us from not producing
16 everything in the 30 days.
17 And this is -- we are a direct competitor
18 with them. As much as they want to argue we're
19 not, yes, we do not make Rockwell products, but
03:20PM 20 we certainly compete with Rockwell in the
21 marketplace selling Rockwell products, and they
22 are a direct competitor in that sense. For
23 them to be able to come in and look at every
24 single source of where we buy it from, where we
03:20PM 25 sell to what, what or not we sell for, all of

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

14

1 our financials, our markups, our gross profit
2 margins, our net margins, it's not fair at this
3 point with this pleading with such a lack of
4 specificity to be able to come and do this at a
03:20PM 5 preliminary phase. I think there has to be
6 some tailoring to meet the proportions of the
7 case at this juncture.
8 THE COURT: Thank you, Counsel.
9 Let's turn it back over to Plaintiff for the
03:20PM 10 last word.
11 MR. MCLAUGHLIN: Yeah, I think Your
12 Honor has it right. The accused products in
13 this case are every product that Defendant
14 sells that bears one or more of the asserted
03:21PM 15 trademarks. And if they sell thousands of
16 different types of Rockwell products, well,
17 then, those are the accused products because
18 every single sale of any one of those products
19 is a trademark infringement, and that's what
03:21PM 20 this case is about.
21 THE COURT: Let me ask you about your
22 request for their inventory and where their
23 inventory is. What can you tell me about the
24 relevance of that and anything to add to your
03:21PM 25 letter?

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

15

1 MR. MCLAUGHLIN: Two things, I think.
2 First is one of the material differences that
3 we've alleged relates to the quality of the
4 goods, so if these goods are being stored
03:21PM 5 improperly, then that can lead to physical
6 differences in the goods, and part of
7 requesting their location is so that we can ask
8 further questions about the storage in
9 depositions or in further interrogatories or
03:22PM 10 otherwise. It's some of the preliminary
11 "getting our foot in" with regard to where
12 these things are kept.
13 And then second of all --
14 THE COURT: Are things being stored
03:22PM 15 properly.
16 MR. MCLAUGHLIN: I'm sorry?
17 THE COURT: Is there any reason to
18 think that these products are being stored
19 improperly that Defendants are selling?
03:22PM 20 MR. MCLAUGHLIN: At this moment, I
21 don't know how they're storing these products,
22 so, no, I don't have any concrete evidence that
23 they're storing them improperly.
24 THE COURT: All right. I can tell
03:22PM 25 you before we got on the phone today, we spent

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

16

1 a lot of time reviewing the letters and the
2 papers in the case and have given this a great
3 deal of thought. The dispute that Defendant
4 has about the requested discovery really comes
03:22PM 5 down to what we think is a legal disagreement
6 with the plaintiffs about what may or may not
7 constitute trademark infringement.
8 Plaintiffs have a legal theory that it
9 does constitute trademark infringement. The
03:23PM 10 Court has ordered discovery to go forward.
11 We've reviewed each of the requests, and while
12 some of the information obtained by the
13 requests could be used by Plaintiffs for an
14 improper purpose, there is a protective order
03:23PM 15 in this case that limits the use of the
16 information for this litigation, and Plaintiff
17 has proffered the relevance of each of the
18 pieces of information they requested in their
19 interrogatories.
03:23PM 20 The interrogatories don't look to be
21 particularly burdensome. I understand what's
22 requested, and so the Court is going to order
23 that all of the interrogatories be responded by
24 Defendant within 30 days. Based on Defendant's
03:23PM 25 proffer that there was some pandemic-related

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

17

1   issues that prevented them from filing their
2   response on time, on this occasion, the Court
3   is going to find that the objections are not
4   waived, but moving forward, we'll request that
03:24PM  5   requests for extension of the deadline be asked
6   for before the deadline hits.
7           Any questions from counsel for Plaintiff?
8           MR. MCLAUGHLIN:  No, Your Honor.
9   Thank you.
03:24PM 10           THE COURT:  Any questions from
11   counsel for Defendant.
12           MR. KASOLAS:  No, Judge.  You put a
13   lot of time into this.  Thank you very much.
14           THE COURT:  Thank you, everyone.
03:24PM 15   Have a great afternoon.  Take care.
16
17
18
19
20
21
22
23
24
25

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

18

1           C E R T I F I C A T E

2   STATE OF DELAWARE        )
                             ) ss:
3   COUNTY OF NEW CASTLE     )

4           I, Deanna L. Warner, a Certified
5   Shorthand Reporter, do hereby certify that as
6   such Certified Shorthand Reporter, I was
7   present at and reported in Stenotype shorthand
8   the above and foregoing proceedings in Case
9   Number 21-CV-1238-CLC-JLH, *ROCKWELL AUTOMATION,*
10   *INC. Vs. PARCORP s.r.l.,* heard on May 2, 2022.
11           I further certify that a transcript of
12   my shorthand notes was typed and that the
13   foregoing transcript, consisting of 18
14   typewritten pages, is a true copy of said
15   DISCOVERY CONFERENCE.
16           SIGNED, OFFICIALLY SEALED, and FILED
17   with the Clerk of the District Court, NEW
18   CASTLE County, Delaware, this 10th day of May,
19   2022.
20
21           _____
             Deanna L. Warner, CSR, #1687
22           Speedbudget Enterprises, LLC
23
24
25

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, DE 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

# Exhibit 7

2

# DUNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **ROCKWELL AUTOMATION, INC.,** | Civil Action No. 1:21-cv-01238 |
| **PlaintiffPlaintiff** | |
| **v.** | |
| **PARCORP, S.R.L. D/B/A WI AUTOMATION,** | |
| **Defendants** | |

**TO:**    **Neal McLaughlin, Esq.**
       **Alston & Bird**
       **90 Park Avenue**
       **15th Floor**
       **New York, NY 10016-1387**

       **Dominick Gattuso**
       **Heyman Enerio Gattuso & Hirzel LLP**
       **300 Delaware Ave., Suite 200**
       **Wilmington, DE 19801**

**SIRS:**

    **PLEASE TAKE NOTICE** that defendant, Parcop, S.r.l. d/b/a WiAutomation ("WiAutomation"), by and through its undersigned counsel Brach Eichler L.L.C., serves its Third Amended Responses to plaintiff, Rockwell Automation, Inc.'s First Set of Interrogatories.

Dated:  August 5, 2022

Of Counsel:

Bob Kasolas
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600

HIGHLY CONFIDENTIAL PURSUANT TO D. DEL. LR 26.2

pkraman@ycst.com
Attorneys   for Defendant Parcop S.r.l. d/b/a WiAutomation

HIGHLY CONFIDENTIAL PURSUANT TO D. DEL. LR 26

- RCK5069-IB8S Euro 411,40 + 22% tax
- RCK22-HIM-C2S Euro 150,23 + 22% tax
- RCK5069-IB8S Euro 411,40 + 22% tax
- RCK22FD4P2N103 Euro 256,11 + 22% tax
- RCK25BB017N104 Euro 622,66
- RCK22-HIM-C2S Euro 155,48 + 22% tax
- RCK5094-IB16 Euro 217,83 + 22% tax
- RCK150-TC1 Euro 24.21 + 22% tax
- RCK2198-K57CKD15M Euro 69,56 + 22% tax
- RCK5069-OBV8S Euro 544,58 + 22% tax
- RCK1734-IE4S Euro 713,11 + 22% tax
- RCK2097-V34PR3 Euro 1.201,64 + 22% tax
- RCK5069-OBV8S Euro 544,58 + 22% tax
- RCK5069-RTB6-SPRING Euro 14,53 + 22% tax
- RCK5069-IB16F Euro 207,05 + 22% tax
- RCK5069-RTB6-SPRING Euro 14,53 + 22% tax
- RCK1734-4IOL Euro 185,01 + 22% tax
- RCK5069-RTB64-SCREW Euro 23,97 + 22% tax
- RCK1734-IE4S Euro 713,11 + 22% tax
- RCK150-C3NBD Euro 245,36 + 22% tax
- RCK2080-MEMBAK-RTC2 Euro 154,27 + 22% tax
- RCK1783-US8T Euro 144,18 + 22% tax
- RCK25BA8P0N114 Euro 374,78+ 22% tax
- RCK2713PT9WD1 Euro 1.550,84+ 22% tax
- RCK104-C09EJ22 Euro 135,45+ 22% tax
- RCK2198-H008-ERS2 Euro 1.184,18+ 22% tax
- RCK22FA2P5N113 Euro 122,25 + 22% tax
- RCK5094-IB16 Euro 217,83
- RCK25BB5P0N104 Euro 358,28+ 22% tax

Furthermore, pursuant to Fed. R. Civ. P. 33(d), WiAutomation states *see* WI003327-003433. WiAutomation further states that it is incapable of ascertaining what Rockwell Products it sold from 2018-2020 as it was a small company with limited resources and the records in WiAutomation's possession are incomplete. Furthermore, many of the records that WiAutomation has in its possession do not identify the product that was purchased/sold.  Thus, it is impossible toidentify the foregoing with any greater degree of specificity than already provided.**INTERROGATORY NO. 4:**

7

HIGHLY CONFIDENTIAL PURSUANT TO D. DEL. LR 26

Describe any differences between Rockwell Products sold or offered for sale by WI Automation and Rockwell Products sold or offered for sale by Rockwell or Rockwell Authorized Distributors that WI Automation has disclosed to its customers, including without limitation any disclaimer WI Automation provides to its customers regarding the sale of Rockwell Products.

**RESPONSE:** Objection.  This request is overly broad, vague,  and ambiguous to the extent it seeks information pertaining to any "differences" between Rockwell Products sold by WiAutomation and Rockwell or its "authorized distributors" that it disclosed to customers. WiAutomation further objects to the extent that this interrogatory calls for a legal conclusion. Subject to and without waiving its general or specific objections, WiAutomation states that there are no "differences" between Rockwell products sold or offered for sale by WiAutomation and Rockwell products sold or offered for sale by Rockwell or Rockwell Authorized Distributors. Nevertheless, WiAutomation provides the following terms and conditions on its website, which all purchasers of Rockwell products must agree to prior to purchase:

> WiAutomation is not an official distributor or representative brands on this site. The trademarks and names on this site belong to their respective owners.  Rockwell: WiAutomation is not an authorized dealer of surpluses or affiliate of the manufacturer. Products may have older date codes or be an older series than the one available directly from the factory or authorized dealers.  Since WiAutomation is not a Rockwell authorized distributor, the original manufacturer's warranty does not apply (12-month WiAutomation Warranty applies).  Some Allen-Bradley PLC products will have the firmware already installed, WiAutomation does not guarantee whether or not a PLC product will have firmware and, if it has firmware, if the firmware is the level of revision that is necessary for its application. WiAutomation also does not warrant the ability or right to download or otherwise obtain firmware for the product from Rockwell, its distributors, or any other source. WiAutomation will not obtain or provide firmware on behalf of the customer. It is customer's obligation to comply with the terms of any End User License Agreement or similar document relating to obtaining or installing the firmware.

**INTERROGATORY NO. 5:**

From 2015 to the present, identify the product name, quantity, product condition code, date of purchase, purchase price, product source name, date of sale, sale price, customer name, and discounts applied (if any) in the sourcing or selling of each unused Rockwell product.

**RESPONSE:**

Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests the identity of any and all Rockwell Product that

8

- 1606-XLB120E new factory sealed - purchased price n. 1 product approximately Euro 150,00

- 2080-IF4 new factory sealed - purchased price n. 1 product approximately Euro 150,00

- 1769-OW8 new factory sealed - purchased price n.1  product approximately Euro 250,00

- 4x 1769-OF8C new factory sealed - purchased price n. 1 product approximately Euro 1.800

- 10x 1734-OB8 new factory sealed - purchased price n. 1 product approximately Euro 260,00

- 3x 1769-ECR new factory sealed - purchased price n. 1 product approximately Euro 30,00

- 22B-D6P0N104 new factory sealed - purchased price n. 1 product approximately Euro 600,00

- 11x 1734-IB8 new factory sealed - purchased price n. 1 product approximately Euro 247,73

All products are located in Monte di Procida (NA) via Fiomarino III trav n. 13 at Parcop S.r.l. storage.The value of the current inventory is estimated to be between approximately Euro 60.000,00 – Euro 75.000,00

**INTERROGATORY NO. 9:**

Describe the product life cycle of unused Rockwell products sold by WI Automation, from acquisition through post-sale services, including without limitation sourcing, importation, inspecting, receiving, inventorying, warehousing, sorting by condition, marketing, sale, technical support and warranty and repair services, including all training provided to WI Automation personnel related to any of the foregoing.

**RESPONSE:** Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that WiAutomation describe the "product

HIGHLY CONFIDENTIAL PURSUANT TO D. DEL. LR 26

life cycle" as it pertains to an unspecified number of products that WiAutomation sells. WiAutomation further objects to the term "unused Rockwell products" as vague, ambiguous, and confusing. Subject to and without waiving its objections, WiAutomation acquires the products at issue from a Rockwell Authorized Distributor, or other reputable source.  WiAutomation only purchases new, genuine Rockwell products that are factory sealed. Once the product is in WiAutomation's possession, the sealed Rockwell packaging—which is never opened by WiAutomation—is then verified externally by Parcop's employees and then put in the storage (where new products are separated from used products). Once Parcop receives an order, the products are placed into a WiAutomation shipping box for delivery to WiAutomation's customers. WiAutomation provides its own 12 month warranty for each Rockwell product sold. If a customer sends a complaint about malfunction the customer care employ talks to the director   and he will approve to send the RMS for refund or replacement. All of the foregoing is based upon the following terms and conditions:

*The warranty for new and refurbished products is 12 months covered by WiAutomation from the delivery date, the used products are guaranteed for 3 months. If the item is not as described, you will have a full refund including all shipping costs. If the item is lost or damaged in transit will be refunded only in case of insurance. Whenever the User intends to make use of the remedies provided by the legal guarantee provided with the Products, the User shall contact the Holder at the email address info@wiautomation.com. The Holder shall promptly reply to the communication of the alleged lack of conformity and shall indicate to the User the specific procedure to be followed, taking into account the category of goods relating to the Product, and / or the alleged defect. In any case, defects due to transport by courier, improper use or assembly or inadequate storage or maintenance of the Products and degradation resulting from use are excluded from the Warranty.*

*At the time of delivery, the Customer is required to verify the conformity of the Product with the Order.*

*WIAUTOMATION UNDERTAKES TO REPLACE NON-INTACT OR NON-COMPLIANT PRODUCTS AND REPAIR OR REPLACE PRODUCTS RECOGNIZED AS DEFECTIVE AND COVERED BY THE WARRANTY.*

*Returns are accepted only if previously authorized in writing by WiAutomation by sending the relative RMA (Return Material Authorization) code; upon receipt, WiAutomation examines the returns to verify that the Product is the one sold, that the defect exists, is attributable to its responsibility and is covered by the Warranty and, only in this case, replaces the defective Products. The Warranty is the only one provided by WiAutomation and replaces any other warranty, whether written, oral or implicit, except as provided below for the Consumer.*

*The report of defects and / or non-conformities of the Products must be communicated to WiAutomation in writing, by email (sales@wiautomation.com), under penalty of forfeiture, (i)*

16

HIGHLY CONFIDENTIAL PURSUANT TO D. DEL. LR 26

*within 5 (five) days of delivery in the case of discrepancies of the Product or obvious defects and (ii) within 8 (eight) days of discovery in the case of hidden defects.*

*WiAutomation is not an official distributor or representative of the brands on this site. The trademarks and names on this site belong to their respective owners. Rockwell: WiAutomation is not an authorized dealer of surpluses or affiliate of the manufacturer. Products may have older date codes or be an older series than the one available directly from the factory or authorized dealers. Since WiAutomation is not a rockwell authorized distributor, the original manufacturer's warranty does not apply (the 12-month WiAutomation warranty applies). Some Allen-Bradley PLC products will have the firmware already installed, WiAutomation does not guarantee whether or not a PLC product will have firmware and, if it has firmware, if the firmware is the level of revision that is necessary for its application. WiAutomation also does not warrant the ability or right to download or otherwise obtain firmware for the product from Rockwell, its distributors, or any other source. WiAutomation will not obtain or provide firmware on behalf of the customer. It is customer's obligation to comply with the terms of any End User License Agreement or similar document relating to obtaining or installing the firmware.*

**INTERROGATORY NO. 10:**

Identify any contracts, agreements, or pricing documents that relate to Rockwell and/or Rockwell's Authorized Distributors that WI Automation has reviewed in connection with the sourcing or sale of unused Rockwell products.

**RESPONSE:** Objection. This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it demands WiAutomation identify any and all "contracts, agreements, or pricing documents" relating to "Rockwell or Rockwell's Authorized Distributors" that WiAutomation has reviewed. WiAutomation further objects to the extent that this interrogatory seeks irrelevant information that is outside the scope of permissible discovery . WiAutomation's review of any particular contract or agreement has no bearing on the Plaintiff's claims or defenses. WiAutomation further objects to the extent that this interrogatory seeks information protected by the attorney-client privilege and/or work product protection. Subject to and without waiving its general and specific objections, WiAutomation states that WiAutomation has not reviewed any relevant agreements between Rockwell and its Authorized Distributors.

**INTERROGATORY NO. 11:**

If you contend that any of Your sales of unused Rockwell Products were authorized by Rockwell, identify all such sales, describe why you contend that they were authorized.

HIGHLY CONFIDENTIAL PURSUANT TO D. DEL. LR 26

## **VERIFICATION OF INTERROGATORY ANSWERS**

I, Fulvio Coppola, am President and CEO of Parcop, S.r.l. d/b/a WiAutomation. I believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Dated: August _____, 2022

HIGHLY CONFIDENTIAL PURSUANT TO D. DEL. LR 26

# Exhibit 8

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., | |
| Plaintiff, | |
| v. | No. :21-cv-01238-GBW-JLH |
| PARCORP S.R.L. d/b/a WI AUTOMATION, | |
| Defendant. | |

**DECLARATION OF MARK PALISZEWSKI**

I, Mark Paliszewski, hereby declare as follows:

1.      I have personal knowledge of the matters set forth in this declaration.  If I am called to testify I could and would testify competently to these matters under oath.

2.      I am the Director of the Consulting and Investigative Group at Recon Management Group, LLC ("Recon"), which is based in Birmingham Farms, Michigan.  I have worked at Recon since 2009 in various roles conducting internal and external investigations for clients.  Before that, I worked for nearly twenty years as an investigator for the law firm Dickinson Wright PLLC, which is headquartered in Detroit, Michigan.  I graduated from Madonna University, located in Livonia, Michigan, in 1991 with a Bachelor of Science degree in Criminal Justice.

3.      Rockwell Automation, Inc. ("Rockwell") retained the services of Recon to conduct test purchases of certain products from Parcop S.R.L. d/b/a WI Automation ("WI Automation"). I received Rockwell's requests for these services and oversaw Recon's work to complete them.

4.      In April, 2020, acting on a request from Ryan Smaglik at Rockwell, I emailed WI Automation using the company name "J&J Systems" to request a quote for a number of different

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Rockwell products and ultimately placed an order for two of the products to be delivered to an address in Texas.

5.      The products that I ordered from WI Automation were delivered in May, 2020 to the address that I provided.  Upon receipt of the products from WI Automation, I took photographs of the packaging and products and maintained those photographs in my file as was customary in the ordinary course of business and in accordance with the manner that I normally and regularly conduct my investigation activities.  I sent these photographs to Mr. Smaglik on May 12, 2020 via email.

6.      The photographs attached as Exhibit A to this declaration are true and accurate copies of the photographs that I took in May of 2020 of the products received from WI Automation. Exhibit A also includes true and correct images of the invoice and shipping label provided in and on the package.

7.      In March of 2022, I was asked again by Mr. Smaglik to contact WI Automation to obtain a quote and initiate a purchase of certain Rockwell products.  This time using the company name "Image-Tek Displays & Graphics," I initiated a purchase of three Rockwell products from WI Automation for delivery to an address in Michigan.

8.      The products that I ordered from WI Automation were delivered in April, 2022 to the address that I provided.  Upon receipt of the products from WI Automation, I took photographs of the packaging and products and maintained those photographs in my file as was customary in the ordinary course of business and in accordance with the manner that I normally and regularly conduct my investigation activities.  I sent these photographs to Mr. Smaglik on April 4, 2022 and April 14, 2022 via email.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

9.      The photographs attached as Exhibit B to this declaration are true and accurate copies of the photographs that I took in April of 2022 of the products received from WI Automation.

10.     After taking photographs, I sent the package received from WI Automation in April, 2022 to Neal McLaughlin, outside counsel for Rockwell.


I certify under penalty of perjury that the foregoing is true and correct.

DATED:  February 17, 2023



_____
Mark Paliszewski

# EXHIBIT A



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2

ROCK-00000217



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2

ROCK-00000221



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2

ROCK-00000222



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2

ROCK-00000226



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2

**PARCOP**

# INVOICE
## 350E/ 2020
## REF. 10724

J&J system
251 SW Wilshire Blvd, Ste 124-756
Burleson, TX 76028

Monte di Procida 04/05/2020
Ref. N°: 10724/2020
Object: ALLEN BRADLEY
PARTS

Attn. Jason Miller

| ITEM | CONDITION | PART NUMBER | DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|------|-----------|-------------|-------------|-----|------------|-------|
| 1 | NEW | 1756-CNB | 1756-CNB ALLEN-BRADLEY | 2 | $ 628 | $ 1256 |

|  |  |
|--|--|
| SHIPPING COSTS TO USA FOR 2 KG | $ 40 |

**Total (USD )**          **$ 1296**

CONDITIONS / DELIVERY TIME

ALL PRODUCTS ARE COVERED BY 12 MONTHS WARRANTY

3 DAYS AFTER PAYMENT VERIFICATION

TERMS AND PAYMENTS :

PAYMENT : ADVANCED BY BANK TRANSFER

VALIDITY : 1 WEEK or SUBJECT TO PRIOR SALE

BILLING ADDRESS:

Parcop s.r.l.
Via Madame De Stael, 9
80070 Bacoli (NA) Italy
VAT-ID: IT-08668021218

CONTACTS:

Mon-Fri / 8AM–17PM CET
Tel +39 02 87189214
Tel +39 081 8682064
info@wiautomation.com
sales@wiautomation.com

BANK DETAILS:

Beneficiary:   Parcop s.r.l.
Bank Name: UBI Banca Monte di Procida
IBAN: IT69H0311140101000000000236
BIC (SWIFT): BLOPIT22XXX

All terms and conditions are on wiautomation.com



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2

ROCK-00000229

# EXHIBIT B



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2

ROCK-00000126



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2

ROCK-00000127



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2



Highly Confidential - Attorney's Eyes Only - Subject to L.R. 26.2



ROCK-00000130



Confidential - Subject to Protective Order

Confidential - Subject to Protective Order



*SN 83575322*

Logix 5000™ Series

MAT NO PN-346126

FW

1.063

ROCK-00015735



ROCK-00015737

Confidential - Subject to Protective Order



ROCK-00015738



Confidential - Subject to Protective Order

ROCK-00015740



Confidential - Subject to Protective Order

ROCK-00015741

Confidential - Subject to Protective Order



ROCK-00015743



Confidential - Subject to Protective Order



world industrial
automation



# WiAutomation

## INDUSTRIAL AND MARINE AUTOMATION
### Products for Industry and OEM

WiAutomation.com property of Parcop s.r.l.
Via Madame De Stael, 9 - 80070 Bacoli (NA) ITALY
Ph.: +39 02 871 892 14   *www.wiautomation.com*   email: info@wiautomation.com

ROCK-00015748

Confidential - Subject to Protective Order



**PARCOP SRL**
VIA FILOMARINO III TRAV., 13
80070 MONTE DI PROCIDA (NA)
VAT N. IT08668021218

Image-Tek Displays & Graphics
40300 Grand River Ave. Novi, MI 49375

STATI UNITI D'AMERICA          EE

INVOICE N.    5440    of   29/03/2022

## Product details

| Product | Product / service description | UM | QTY | Net | Discount | Net total | Rate |
|---------|-------------------------------|-----|-----|-----|----------|-----------|------|
| | 5069-L306ER Allen-Bradley Dual Channel Ethernet/IP Controller, 0.6MB Memory, 8 Local I/O Expansion (max), 16 EtherNet/IP Nodes, DIN Rai l mount HS CODE 8537101090 | | 1,000 | 2.195,000 | | 2.195,00 | 320 |
| | 9324-RLM9100ENM Allen-Bradley - RSLogix Micro Starter Edition NED S/W HS CODE 8537101090 | | 2,000 | 115,000 | | 230,00 | 320 |
| | SHIPPING | | 1,000 | 40,000 | | 40,00 | 320 |

**ADDITIONAL INFORMATIONS**
Invoice reason   Vendita          P.O.          Order n.          P74522

| Invoice summary | |
|-----------------|--|
| Payment | CREDIT CARD |
| IBAN | IT65L0329601601000067339825 |
| Total | 2.465,00 |

USD

ROCK-0001574?



ROCK-00015776

Confidential - Subject to Protective Order

Confidential - Subject to Protective Order



ROCK-00015778



Confidential - Subject to Protective Order

ROCK-00015779



Confidential - Subject to Protective Order

ROCK-00015781



Confidential - Subject to Protective Order

Confidential - Subject to Protective Order



ROCK-00015784



Confidential - Subject to Protective Order

Confidential - Subject to Protective Order

ROCK-00015805

# Exhibit 9

1                        LUCA COPPOLA

2                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
3
                   C.A. NO.: 21-1238-CFC-JLH
4

5   -----------------------------------------x

6   ROCKWELL AUTOMATION, INC.,

7                 Plaintiff,

8        vs.

9   PARCORP S.R.L., d/b/a
   WIAUTOMATION,
10                Defendant.

11  -----------------------------------------x

12

13                Tuesday, December 6, 2022
                2:03 p.m. Central European Time
14               Rome, Italy

15

16      VIDEOTAPE DEPOSITION OF LUCA COPPOLA

17         (Through the Interpreter)

18        Taken on behalf of the Plaintiff before

19  Michael J. D'Amato, RMR, Notary Public in and for the

20  State of Florida at Large, pursuant to Notice of Taking

21  Deposition in the above cause.

22

23

24  Reported by: Michael J. D'Amato,
   Registered Merit Reporter
25  Job No. 220085

Page 2

LUCA COPPOLA

1                LUCA COPPOLA
2             REMOTE APPEARANCES
3               ——————————
4  For the Plaintiff:
5
6        ALSTON & BIRD LLP
7        90 Park Avenue
8        New York, NY 10016
9        BY: NEAL McLAUGHLIN, ESQ.
10
11
12  For the Defendant:
13
14        BRACH EICHLER, LLC
15        101 Eisenhower Parkway
16        Roseland, NJ 07068
17        BY: BOB KASOLAS, ESQ.
18          ERIC ALVAREZ, ESQ.
19
20  Also Present: Brian Hood, Legal Videographer, TSG
21             John Miller, Rockwell in-house counsel
22             Rosanna Giliberti, Italian Interpreter
23
24
25

Page 3

LUCA COPPOLA

1                LUCA COPPOLA
2            I N D E X
3  Witness            Direct     Cross    Redir.
4  LUCA COPPOLA
5   By Mr. McLaughlin........7.......................155
6   By Mr. Kasolas........................146
7
8  Certificate of Oath (Interpreter)........157
9  Certificate of Oath (Witness)............158
10  Certificate of Reporter..................159
11  Errata sheet (to be forwarded upon execution)....160
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

LUCA COPPOLA

1                LUCA COPPOLA
2         E X H I B I T   I N D E X
3   Description                        Page
4  EXHIBIT 1 Photograph of front gate to WiAutomation....44
5  EXHIBIT 2 Screenshot of US.wiautomation.com website...59
6  EXHIBIT 3 Screenshot of website page
7  US.WiAutomation.com/join-our-team.....................64
8  EXHIBIT 4 Email with Bates WI2605 and 2606...........68
9  EXHIBIT 5 Email with Bates Bates WI3025 to 3030.......70
10  EXHIBIT 6 Web page for LinkedIn.com/company/
11  WiAutomation/people...................................80
12  EXHIBIT 7 Screenshot of website page
13  US.WiAutomation.com/allen-Bradley/PLC-
14  systems/controllogix/1756L71..........................98
15  EXHIBIT 8 Web page for catalog product
16  20YD460NOANNANAO.....................................101
17  EXHIBIT 9 Web page for WiAutomation product catalog
18  number 9324-RLM0100ENM...............................104
19
20
21
22
23
24
25

Page 5

LUCA COPPOLA

1                LUCA COPPOLA
2     THE VIDEOGRAPHER:  Good morning and good
3  afternoon.  Counselors, my name is Brian Hood and
4  I'm the legal videographer in association with TSG
5  Reporting Incorporated.  Because this is a remote
6  deposition, I will not be in the same room with the
7  witness.  Instead, I will record this videotaped
8  deposition remotely.  The reporter, Michael
9  D'Amato, also will not be in the same room and will
10  swear the witness remotely.
11     All parties stipulate to the validity of
12  this video recording and the remote swearing and
13  that it will be admissible in the courtroom as if
14  it had boon taken following Rule 30 of the Federal
15  Rules of Civil Procedures and the state's rules
16  where this case is pending?
17     MR. McLAUGHLIN:  On behalf of Rockwell
18  Automation, yes.
19     MR. KASOLAS:  Yes, on behalf of Parcorp.
20     THE VIDEOGRAPHER:  Thank you.  This marks the
21  beginning of the recorded media labeled No. 1 of
22  the remote video deposition of Luca Coppola in the
23  matter Rockwell Automation, Inc. v. Parcorp S.R.L.,
24  d/b/a WiAutomation entered in the United States
25  District Court for the District of Delaware, Case

Page 6

LUCA COPPOLA

1                    LUCA COPPOLA
2    No. 21-1238-GBW-JLA.
3        Today's date is December 6, 2022 and the time
4    in Rome, Italy is approximately 2:059 P.M. Central
5    European Time.  Again, my name is Brian Hood and
6    I'm the legal videographer from TSG Reporting,
7    Incorporated headquartered at 228 East 45th Street,
8    New York, New York 10017.  The court reporter is
9    Michael D'Amato also in association with TSG
10   Reporting.  Will counsel please introduce
11   yourselves for the record.
12       MR. McLAUGHLIN:  This is Neal McLaughlin of
13   Alston & Bird on behalf of Rockwell Automation.
14       MR. KASOLAS:  Good morning.  Bob Kasolas from
15   the law firm of Brach Eichler LLC on behalf of
16   Parcorp doing business as WiAutomation.  Nice to
17   meet you.
18       THE VIDEOGRAPHER:  The court reporter will now
19   swear in or affirm the witness and interpreter.
20   THEREUPON,
21            ROSANNA GILIBERTI,
22   being by me first duly sworn or affirmed to truly and
23   accurately translate the questions in English to Italian
24   and the answers in Italian to English, as hereinafter
25   certified, responded and testified as follows:

Page 7

LUCA COPPOLA

1                    LUCA COPPOLA
2       THE INTERPRETER:  I will do my best.
3   THEREUPON:
4              LUCA COPPOLA,
5    being by me first duly sworn or affirmed through the
6    interpreter to tell the truth, the whole truth and
7    nothing but the truth, as hereinafter certified,
8    responded and testified as follows:
9       THE WITNESS: I do.
10       DIRECT EXAMINATION
11  BY MR. McLAUGHLIN:
12    Q.   Mr. Coppola, good afternoon.  My name is Neal
13   McLaughlin.  I'll be asking you the questions today.
14   Have you ever been deposed before?
15    A.   No.
16    Q.   So today if there are any questions that I ask
17   that are unclear to you would you please let me know so
18   that I can clarify them?
19    A.   Of course.
20    Q.   And if you answer a question is it fair to
21   assume that you understood the question?
22    A.   Yeah.
23    Q.   What did you do to prepare for today's
24   deposition?
25    A.   I spoke with my Italian attorney and with my

Page 8

LUCA COPPOLA

1                  LUCA COPPOLA
2    brother.
3    Q.   What is the name of your Italian attorney?
4    A.   Nico Palumbo.
5    Q.   Did you review any documents in preparation
6   for today?
7    A.   No.
8    Q.   Approximately how long did you spend with Mr.
9   Palumbo?
10    A.   About an hour this morning.
11    Q.   How much time did you spend with your brother
12   to prepare for today?
13    A.   Same time.
14    Q.   Is your brother Fulvio Coppola?
15    A.   Yes.
16    Q.   What is your current occupation?
17    A.   I manage the warehouse.
18    Q.   For what company?
19    A.   Parcorp S.R.L.
20    Q.   Before you managed the warehouse at Parcorp
21   what was your employment, if any?
22    A.   I was managing the restoration [sic] places of
23   my father's.
24    Q.   What do you mean the restoration places?
25    A.   Restaurants.

Page 9

LUCA COPPOLA

1                  LUCA COPPOLA
2    Q.   So your father owns restaurants and you were
3   managing those?
4    A.   Yes.
5    Q.   Did you have any employment before that?
6    A.   No, I was studying.
7    Q.   Where were you studying?
8    A.   The high school here in Italy.
9    Q.   Did you go to university?
10    A.   Yes.
11    Q.   Which university?
12    A.   In Bologna.
13    Q.   Did you receive a degree from the University?
14    A.   No, I only attended one year.
15    Q.   So after high school the only two jobs that
16   you've had are first managing your father's restaurants
17   and second at Parcorp?
18    A.   Yes.
19    Q.   How long ago did you start working at Parcorp?
20    A.   2017.
21    Q.   Did Parcorp exist before 2017?
22    A.   No.
23    Q.   So you've worked at Parcorp since the
24   beginning of Parcorp?
25    A.   Yes.

LUCA COPPOLA

1

2    Q.    But you don't know for sure who sealed the

3    boxes?

4    A.    If it arrives sealed I do not know who sealed

5    it.

6         MR. McLAUGHLIN:  Let's take a five-minute

7    break.

8         THE VIDEOGRAPHER:  The time is 2:59 p.m. and

9    we're off the record.

10        (Recess taken in the proceedings)

11        THE VIDEOGRAPHER:  This is the start of media

12   labeled No. 2.  The time is 3:06 p.m. and we're

13   back on the record.

14   BY MR. McLAUGHLIN:

15   Q.    For the boxes that you receive that contain

16   Rockwell Automation products, are there ever any other

17   products with different brands in that same box?

18        MR. KASOLAS:  Objection to form.

19   A.    No.

20   Q.    So the boxes that you receive with Rockwell

21   Automation parts, it's always only Rockwell Automation

22   parts, right?

23   A.    Yes.

24   Q.    For the sources that you receive Rockwell

25   products from do you know if WiAutomation purchases

LUCA COPPOLA

1

2    other brand products from those same sources?

3         MR. KASOLAS:  Objection to form.

4    A.    Yes.

5    Q.    But they come in different boxes?

6    A.    Yes.

7    Q.    Do you know why that is?

8    A.    No.

9         MR. KASOLAS:  Objection to form.

10   A.    No, I do not know the reason why they are in

11   different boxes.

12   Q.    These pieces of paper that you receive from

13   Fulvio to compare against the shipments that you

14   receive, what do you do with the pieces of paper after

15   you are through with them.

16   A.    Put them in a folder.

17   Q.    Where is that folder?

18   A.    In the warehouse.

19   Q.    So there's a folder of shipment documents that

20   say what's in the shipments that Parcorp receives?

21   A.    Yes, there is a folder.  And then when the

22   folder gets full and there is too much in it I destroy

23   what's in it.

24   Q.    When was the last time you destroyed what was

25   in that folder?

LUCA COPPOLA

1

2    A.    I don't know.  I destroy it when the folder is

3    full, but I don't look, I don't see how long ago I

4    destroyed it.

5    Q.    Were any of the documents from the folder

6    provided to your lawyers?

7         THE INTERPRETER:  I'm sorry, was it "by your

8    lawyers"?

9    Q.    Were any of the documents in the folder

10   provided to your lawyers in this case?

11        THE INTERPRETER:  Thank you.

12   A.    I don't know.  Fulvio talks to the attorney.

13   Q.    Did you yourself receive any requests for

14   these documents in connection with this case?

15   A.    No.

16   Q.    So after you open the boxes and you see what

17   the products are, what do you do with them?

18   A.    I already answered.  I place them on the

19   shelves.

20   Q.    Do you place the products on a particular

21   shelf?

22   A.    Yes, I give it to Danilo.  Danilo knows that

23   he has to separate them by brands.

24   Q.    Is there a separate shelf for used products?

25   A.    Yes.

LUCA COPPOLA

1

2    Q.    Is there a shelf for used Rockwell Automation

3    products?

4    A.    Used products go all together.

5    Q.    Is there a shelf for new Rockwell Automation

6    products?

7    A.    Yes.

8    Q.    Is there more than one shelf for new Rockwell

9    Automation products?

10   A.    No.  A shelf is divided -- a shelf is divided

11   by -- has five shelfs.

12        THE INTERPRETER:  This is the interpreter.  In

13   Italian shelf can mean the whole shelf or it can

14   also mean like one shelf, like a specified.  So I

15   will interpret what I understood and then you go

16   from there.

17        MR. McLAUGHLIN:  Thank you.

18   A.    Each shelf has five shelves.

19   Q.    Approximately how many Rockwell Automation

20   products are on the shelf at any one time?

21   A.    More or less I think about 50, but I cannot

22   tell you precisely.

23   Q.    Is part of your responsibility at WiAutomation

24   taking products off of the shelf to ship to customers?

25   A.    Yes, it is my responsibility, but I tell to

LUCA COPPOLA

1  the other guys.
2  Q.   When a product -- sorry.  Strike that.
3       When a customer orders a Rockwell Automation
4  product are there different parts of your inventory
5  that go to customers in the United States versus the
6  rest of the world?
7  A.   Outside from where?
8  Q.   When you ship a Rockwell Automation product to
9  a customer do you look to see where it goes?
10      MR. KASOLAS:  Objection to form.
11 A.   Yes.
12 Q.   What do you do with that information?
13 A.   I have to place the label on the box, on the
14 package so that the client receives it.
15 Q.   In your inventory of Rockwell Automation
16 products do you have one part of the inventory that's
17 for customers in the United States and another part of
18 the inventory that's for customers in other countries
19 of the world?
20 A.   No.
21 Q.   So the inventory that you have at WiAutomation
22 for Rockwell Automation products is all mixed together?
23      MR. KASOLAS:  Objection to form.
24 A.   Yes, our products on the inventory are all

LUCA COPPOLA

1  together.
2  Q.   When you're preparing a shipment to a customer
3  that includes Rockwell Automation products, how do you
4  know which products to include in a package?
5       MR. KASOLAS:  Objection to form.
6  A.   Fulvio will give me the information for the
7  order and the products to put in.
8  Q.   Does this information for the order come in a
9  piece of paper?
10 A.   No.
11 Q.   How do you receive the information from
12 Fulvio?
13 A.   On my PC.
14 Q.   Is there a particular computer program that
15 you use to receive this information from Fulvio?
16 A.   No.  We send messages via WhatsApp.
17 Q.   Does Fulvio work in the same building that you
18 do?
19 A.   Yes.
20 Q.   Does he work upstairs?
21 A.   What do you mean upstairs?
22 Q.   Where in the building does Fulvio work?
23 A.   He works in the office.
24 Q.   So when a shipment needs to get sent to a

LUCA COPPOLA

1  customer, Fulvio sends you a WhatsApp message with the
2  information for what is supposed to go inside the
3  package?
4  A.   Yes.
5  Q.   Do you ever receive that information any other
6  way from Fulvio?
7  A.   No.
8  Q.   The entire time that you've worked at Parcorp
9  as the warehouse manager you've always received
10 shipping information from your brother via WhatsApp?
11 A.   No, also by voice.
12 Q.   Was there a time when you and your brother
13 worked in the same part of the building that you could
14 speak order information to one another?
15 A.   Yes, in the old office.
16 Q.   You mentioned a PC.  Is there a computer in
17 the warehouse that you use?
18 A.   Yes, I already said yes.
19 Q.   Other than receiving WhatsApp messages from
20 your brother, do you use the computer in the warehouse
21 for anything else?
22 A.   Yes.
23 Q.   What else do you use it for?
24 A.   I use it to print labels.

LUCA COPPOLA

1  Q.   Where do you receive the information for the
2  labels from?
3  A.   Always via message from my brother.
4  Q.   And these messages with the shipping
5  information are received by WhatsApp also?
6  A.   Yes.
7  Q.   These WhatsApp messages from your brother,
8  would they include the brand name of the products that
9  you're preparing for shipment?
10 A.   Yes.
11 Q.   Is it ever the case that you receive
12 information for a shipment and you do not have the
13 products on hand at that time?
14 A.   Yes, it happened.
15 Q.   What do you do in those cases?
16 A.   I answer that I do not have it.
17 Q.   Do you know what happens next?
18      THE INTERPRETER:  I'm sorry, the interpreter
19 could not hear the full answer.
20 A.   Of course.  I think it needs to be bought,
21 purchased.
22 Q.   For all of the purchases that WiAutomation's
23 customers make do all of those products go through your
24 warehouse?

Page 38

LUCA COPPOLA

1
2      A.   Yes.
3      Q.   So WiAutomation does not arrange for drop
4  shipping from any of your sources to any of your
5  customers directly?
6      A.   No.
7      Q.   Do you use packaging material in the packages
8  that you send to customers?
9      A.   Of course.
10     Q.   Is any of that packaging antistatic packaging?
11     A.   Only if products are open.
12     Q.   For any new products that you send out, do you
13 include any antistatic packaging?
14     A.   Sometimes yes, but the majority of products
15 already have the antistatic paper inside the box.  But
16 I am not sure.  But yes, sometimes it happens.
17     Q.   The computer that's in the warehouse, do you
18 use it for anything other than sending and receiving
19 WhatsApp messages and printing shipping labels?
20     A.   Yes.
21     Q.   What do you use it for?
22     A.   I use it to send email.
23     Q.   Are these emails that you send on behalf of
24 WiAutomation?
25     A.   Yes.

Page 39

LUCA COPPOLA

1
2      Q.   We talked earlier that you sometimes send
3  emails to customs officers.  Do you send emails to
4  anyone else?
5      A.   No, I do not send messages other places, but
6  it happened very few times to send messages to customs.
7      Q.   So the only emails that you send are to
8  customs?
9      A.   I sent to customs and sometimes to some
10 courier.
11     Q.   So the only emails that you send are to
12 customs and to couriers?
13     A.   Yes.  By working in the warehouse that's all I
14 need to do with the email.
15     Q.   Do you use the computer for anything else?
16     A.   No.
17     Q.   From the computer are you able to look up
18 information about shipments?
19     A.   I can produce labels for shipment, but -- what
20 do you mean by if I can look information about the
21 shipments?
22     Q.   Using the computer in the warehouse are you
23 able to look up what products should be included in any
24 particular shipment?
25     A.   No, as I said, Fulvio sends me the products

Page 40

LUCA COPPOLA

1  that need to be included in shipments.
2
3      Q.   Using the computer in the warehouse are you
4  able to look up any of WiAutomation's purchases?
5      A.   No, in the warehouse computer I don't see the
6  purchases.
7      Q.   In the computer at the warehouse are you able
8  to look up any customer orders?
9      A.   No, as I said, Fulvio sends me the orders from
10 customers.
11     Q.   Have you ever seen a Rockwell Automation
12 recall notice?
13     A.   No.  The products have been purchased.  When
14 we receive the products that were purchased I don't
15 think there is any recall.
16     Q.   Have you ever visited the Rockwell Automation
17 website?
18     A.   Yes, it happens that I saw it.
19     Q.   What have you seen on the Rockwell Automation
20 website?
21     A.   Porfirio at the beginning showed me what was
22 talked about in this sector, in this industry.
23     Q.   Have you ever seen a Rockwell Automation
24 recall notice on Rockwell's website?
25     A.   I saw a long time ago the Rockwell Automation

Page 41

LUCA COPPOLA

1  website.  I don't remember if I saw anything about the
2  recall of a product.
3      Q.   When you receive a Rockwell Automation product
4  from one of your sources is it a part of your
5  procedures to see whether or not that product is
6  subject to a recall?
7          MR. KASOLAS:  Objection to form.
8      A.   No.  It's not my task to check if a product
9  was recalled or not because I think that when the
10 product arrives it was not recalled, if the product
11 arrives.
12     Q.   Do you know whether WiAutomation's sources
13 check to see if a product has been recalled?
14         MR. KASOLAS:  Objection to form.
15     A.   I think yes, because Fulvio tells me.  Fulvio
16 is the one who talks with the suppliers and they will
17 tell him if a product was recalled or not.
18     Q.   Have you ever seen a Rockwell product safety
19 notice?
20     A.   When Porfirio showed me the website at the
21 beginning I might have for sure erased it.
22     Q.   When you ship Rockwell Automation products to
23 customers have you ever included a Rockwell product
24 safety notice in the box?

# Exhibit 10

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
ROCKWELL AUTOMATION,        )
INC.,                       )
                            )
          Plaintiff,        )
                            )  C.A. No. 21-1238-CFC-JLH
     v.                     )
                            )
PARCORP S.R.L. d/b/a WI     )
AUTOMATION,                 )
                            )
          Defendant.        )
```

Wednesday, March 30, 2022
10:00 a.m.
Teleconference


844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE JENNIFER L. HALL
United States District Court Judge


APPEARANCES:

          HEYMAN ENERIO GATTUSO & HIRZEL
          BY:  DOMINICK T. GATTUSO, ESQ.

          -and-

          ALSTON & BIRD LLP
          BY:  NEAL J. MCLAUGHLIN, ESQ.

               Counsel for the Plaintiff

---

2

APPEARANCES CONTINUED:


          YOUNG CONAWAY STARGATT & TAYLOR
          BY:  PILAR GABRIELLE KRAMAN, ESQ.


               -and-

          BRACH EICHLER, LLC
          BY:  BOB KASOLAS, ESQ.
          BY:  ERIC ALVAREZ, ESQ.

               Counsel for the Defendant


- - - - - - - - - -

---

3

          P R O C E E D I N G S

     (Proceedings commenced via teleconference beginning
at 10:00 a.m.)

          THE COURT:  Good morning, everyone.  This is
Jennifer Hall.  We are on the line today for a protective
order dispute.

          This is Rockwell Automation versus
WiAutomation.  It's Civil Action No. 21-1238-CFC-JLH.

          We have a court reporter on the line today.
The court reporter is Bonnie Archer.

          May I have appearances please for plaintiff
starting with Delaware counsel.

          MR. GATTUSO:  Good morning, Your Honor.  It's
Dominick Gattuso from Partner, Heyman Enerio Gattuso &
Hirzel on behalf of Rockwell Automation.

          I also have with me on the line Neal McLaughlin
from Alston & Bird.  And Mr. McLaughlin is going to speak
on behalf of Rockwell today, Your Honor.

          THE COURT:  Very good.  Welcome.

          May I have appearances for defendant please
starting with Delaware counsel.

          MS. KRAMAN:  Good morning, Your Honor.  This is
Pilar Kraman at Young Conaway, and with me on the line is
Bob Kasolas and Eric Alvarez of Brach Eichler, and

---

4

Mr. Kasolas will be doing the argument today.

          THE COURT:  Very good.  Good morning to all of
you.

          So I can tell you that I've read all of the
papers.  I think I have an understanding as to what's
going on here.  I'll give each side a chance to say
anything they want to add to the letters.

          So it's basically mirror images of a dispute;
although, I understand there are different facts with
respect to the different attorneys proposed to be
receiving the information.

          So let's hear from plaintiff first.  Go ahead
when you're ready, Counsel.

          MR. McLAUGHLIN:  Good morning, Your Honor.

          So you're right that the issues are similar,
but I think that there's some important differences that
have come out in the briefing and that should be noted
here.  The first, with respect to defendants' Italian
counsel, Mr. Palumbo.  We asked these basic questions of
defendants:  Who he is, does he have any affiliation with
the defendant, whether it's business or familial.  And,
you know, more information about what exactly his needs
are for plaintiff's highly confidential information.  And
there has been no real identification of a need for this
highly confidential information.

5

1   He's not -- Mr. Palumbo is not a trademark
2   lawyer. He's lot a litigator, it seems. He's not entered
3   a declaration in support of any of the claims in the
4   letter briefs. And we're still left with no real idea of
5   why he needs this information or who he is.
6           With respect to Mr. Miller, he is a long time
7   employee of Rockwell Automation. He's stated in the
8   declaration exactly what his involvement is and isn't, and
9   he's a U.S. attorney. He's bound by his ethical
10  obligations to the Court. And he has every intention of
11  abiding by those. And so I think every question has been
12  answered about Mr. Miller, but none really has about
13  Mr. Palumbo.
14          **THE COURT:** Let me ask you about Mr. Palumbo.
15  Is part of your issue that he's an outside counsel?
16          So there was an oral order cited by one of the
17  parties from Judge Stark that talked about disclosure to
18  an in-house counsel. Would you have an issue with him if
19  he was in-house counsel?
20          I mean, part of the issue here I think they're
21  saying is, we don't have in-house counsel, but we ought to
22  be able to have counsel of our choice in the country where
23  we are.
24          **MR. McLAUGHLIN:** Well, I think we wouldn't have
25  an issue if he were in-house counsel and were involved in

6

1   the litigation the way that Mr. Miller is.
2           Here, it doesn't seem that he is involved in
3   any of the actual litigation, just sort of communications
4   between the two U.S. law firms that they already have as
5   outside counsel and the principles of the company.
6           For example, in their response to the letter
7   briefing, they said that they need his feedback as to the
8   nature of WiAutomation's business. Well, I mean, that
9   sounds like assisting them with discovery, which is
10  another issue. It doesn't require the need for Rockwell's
11  highly confidential information.
12          **THE COURT:** Well, let me ask you this. We were
13  talking about this in chambers the other day. What do you
14  anticipate that Rockwell is going to mark highly
15  confidential here?
16          I mean, this is not a patent case, right? What
17  do you think you're going to be marking confidential;
18  what's the volume of stuff we're talking about?
19          **MR. McLAUGHLIN:** We've laid it out in our
20  response. I think in the -- sorry, in our opening for the
21  Mr. Palumbo letter. And it's going to be composed
22  primarily of pricing information, the information
23  regarding discounts to certain customers, and discounts
24  between Rockwell and its authorized distributors.
25          And all of this information could be used by a

7

1   competitor or someone who's trying to compete with
2   Rockwell and its authorized distributors to undercut us on
3   price.
4           There's also going to be highly confidential
5   internal procedures of Rockwell with regard to how it, for
6   example, maintains its inventory and the measures that it
7   does in-house to service warranty repairs.
8           All of this information is highly confidential
9   and proprietary, and in the wrong hands, could put
10  Rockwell at a great disadvantage.
11          **THE COURT:** Okay. All right. Let's hear from
12  the other side.
13          **MR. KASOLAS:** Thank you, Your Honor. Pleasure
14  to appear before the Court. Bob Kasolas. I'm going to
15  apologize, I lost my voice the last couple of days. So if
16  I'm scratchy, I regret it.
17          **THE COURT:** You're fine.
18          **MR. KASOLAS:** Thank you, Judge. A couple of
19  things. I think that Your Honor hit a couple of nails on
20  the head. One is that Mr. Palumbo is outside counsel,
21  he's not in-house counsel. We're a small company. But he
22  does serve a similar function to that of an in-house
23  counsel just to assist my client in reviewing all of the
24  information, the facts, explaining the law to the client.
25  Obviously the client's Italian, they don't speak English

8

1   the way we speak English; although, they do a pretty good
2   job. And he's critical in this case and will
3   continue to be critical in this case for us to evaluate
4   the -- the information, the documents, the legal arguments
5   being made by Rockwell, what legal arguments we want to
6   take with our client. We simply cannot do our job without
7   him.
8           So he says, we don't see the need for why
9   Mr. Palumbo is involved in the case. He is absolutely
10  pivotal and critical in our ability to represent this
11  client.
12          And Your Honor's opinion in the Evertz
13  Microsystems case, you know, is directly on point. I find
14  it very interesting and telling that the opposing side
15  elected not to cite that case.
16          But that case is, I think, directly on point.
17  Your Honor made some good observations in that case. One
18  is that even though it was a Canadian company seeking to
19  provide its outside Canadian counsel with this alleged
20  highly confidential information, Your Honor noted the
21  party involved is has a strong interest in choosing its
22  own counsel, citing the British Telecoms PLC case in the
23  Third District in 2019. And Counsel's status as a
24  Canadian attorney was of no concern, since Mr. Palumbo, as
25  well, would have no problem agreeing to be bound by

9

```
 1   protective order submitted to this Court's jurisdiction to
 2   enforce compliance in complying with Delaware Rules of
 3   Professional Conduct that permits foreign lawyers to
 4   temporarily practice and appear before the Court.
 5            And the same with Judge Stark's opinion in the
 6   Onyx case.  The same with the District Court decision in
 7   iCeutica.  It's the same factual paradigm.
 8            With respect to this argument that somehow
 9   they're going to produce this very highly critical
10   confidential information, the allegations in this case are
11   that somehow my client is selling knockoff products or
12   gray market products or packaging the price differently --
13   they're open from their package and resealed.
14            My client doesn't provide the same warranty
15   that Rockwell provides.  My client doesn't provide the
16   same customer service.  I'm struggled with this entire
17   process to understand where Mr. McLaughlin's getting this
18   confidential information he's planning on turning over to
19   us.  Because I don't think I've asked for some of this
20   stuff.  So I'm not sure --
21            THE COURT:  I think that's where sort of --
22   this is sort of where I'm struggling.  So if you haven't
23   asked for it, I think that's sort of an implicit
24   acknowledgment that you don't need it to defend the case.
25   And if you don't need it to defend the case, I'm
```

10

```
 1   struggling as to why Mr. Palumbo needs to see it.
 2            So is there -- is there a way we can mediate
 3   this a little bit, work this out about what exactly you
 4   think Mr. Palumbo needs to see to be advising the client.
 5            I mean, if he doesn't need to see internal
 6   procedures of Rockwell.  Does he need to see this pricing
 7   information that they're talking about?  I mean, maybe
 8   there's no really no problem at all.  He can see the
 9   confidential information, but he can't see the highly
10   confidential information.
11            Is there a particular document you think he
12   needs to see to be able to assist the client with the
13   case?
14            Can we talk about what those are today or can
15   we talk about those in the future if they come up?
16            MR. KASOLAS:  We can talk about them both.
17            I mean, this case to me -- I think at some
18   point, Rockwell has to demonstrate that somewhere in the
19   stream of commerce, my client is selling gray market goods
20   or knockoff goods, and they're not interchangeable terms.
21   And that was the critical issue.  And somehow my client is
22   not providing the alleged quality control measures that
23   are supposed to accompany the product or is not, you know,
24   honoring warranties.
25            I mean, I need Mr. Palumbo for that kind of
```

11

```
 1   information to discuss it with him.  He needs to convey it
 2   to the client, and we can discuss it amongst all of
 3   ourselves to understand the legal impact, the legal
 4   arguments, the applicable law, the facts.
 5            THE COURT:  Absolutely.  Does he need the
 6   plaintiff's pricing information?
 7            MR. KASOLAS:  No.  The pricing information is
 8   irrelevant unless Mr. McLaughlin's client is going to
 9   somehow argue that place in his argument of some likely to
10   confuse in the marketplace or likely dilution or false
11   origin of goods or something along those lines.
12            This is the first I'm hearing about pricing
13   information, to be quite honest with you.
14            THE COURT:  All right.  Well, let's switch it
15   back over to Mr. McLaughlin real quick.
16            I'm hearing from Mr. Kasolas that they don't
17   need to be showing Mr. Palumbo any pricing information.
18   Do you think this is something you all might be able to
19   work out?
20            I know you've negotiated sort of the general
21   terms of highly confidential information, but maybe you
22   can sort of redefine those in the proposed protective
23   order to accommodate the interest that both of you are
24   talking about.
25            MR. McLAUGHLIN:  Yeah, and I think we alluded
```

12

```
 1   to the fact that we're open to some sort of negotiation
 2   here in one of our footnotes in the opening.  And that is
 3   that, you know, this pricing information is going to be
 4   core to our damages case.
 5            You know, we come into this litigation with the
 6   benefit of having litigated all of these issues before in
 7   New Jersey and the ITC.  And we've done this case before,
 8   so we know what documents exist and that are going to be
 9   essential to our case.
10            So that's why we're, you know, bringing this to
11   the forefront now is that these highly confidential
12   documents are going to be at issue.
13            So if there is some sort of middle ground --
14   and again, we have no objection to Mr. Palumbo being
15   involved in this case.  What we do object to is him
16   receiving these highly confidential documents.
17            And so I think, you know, if we can draw that
18   middle line where Mr. Palumbo would be allowed to review
19   confidential, but not highly confidential, and then if
20   there's a particular highly confidential document that he
21   has a need to show and to receive, then we can discuss
22   that at the appropriate time when we have that document in
23   front of us.
24            I think that --
25            THE COURT:  Okay.  Mr. Kasolas, what do you
```

think about what we just heard from Mr. McLaughlin?

MR. KASOLAS:  It's refreshing.  It hasn't been proposed previously.  I am very happy to try to work out some kind of a medium with Mr. McLaughlin as to the damage calculation.

I don't understand his damage calculation, to be quite honest with Your Honor, but I'm certainly going to work it out with him, if I can.  And to the extent I'm going to need Mr. Palumbo to review the damage calculation, I'm going to need to compare, obviously, whatever price information Mr. McLaughlin's client is relying upon and juxtapose it to whatever figures my client has to find out that delta.  So...

THE COURT:  So this -- yeah, no, and I get that.  Here's what I'd like you to do, especially given that Mr. McLaughlin has done the case before, it sounds like we're at a different position than in a lot of litigation for we know exactly what documents exist and what's going to be in them.

And so I think we might be able to get most of it resolved.  It sounds like there may be some issues with pricing.

What I'd like for you both to do is we will stick with Mr. Palumbo for now.  I need defendants to provide the plaintiff some more information in the form of

a declaration from Mr. Palumbo as to who he is, what's his affiliation and any other questions that plaintiff has about his association with the defendant, to the extent there is one, aside from him just being their local Italian attorney.  That declaration needs to be signed and under oath.

Mr. Palumbo will have to, if he receives any confidential information, submit to the jurisdiction of the Court and sign an acknowledgement, which can be the one that's set forth in the parties' proposed order.  Or if plaintiff has additional provisions they want to discuss with the defendant, the parties should discuss that as well.

And then have a conversation with each other about what the documents are and about what defendant really needs to be able to show to Mr. Palumbo to help defend the case.

And I'm inclined to say that there could be some pricing information that Mr. Palumbo might need to help assist the client, as Mr. Kasolas pointed out today, that there is a strong interest in the client being able to retain an attorney of their choice.  And it doesn't have to be an attorney that an expert in the field or even a U.S. attorney, but I also understand plaintiffs' concern about their confidential information.

So I do think this should be able to be worked out with respect to Mr. Palumbo.

Just sticking with Mr. Palumbo for a moment, are there any questions about what I just said from Mr. McLaughlin?

MR. KASOLAS:  No problem at all, Your Honor.  And I can make it clear to the Court now and for Mr. McLaughlin that Mr. Palumbo has no affiliation with Parcorp.

He's not a shareholder.  He's not an officer.  He's not a director.  He's not a family member.  He doesn't own any company that's an affiliate.  He doesn't manage any company that's an affiliate.  He's strictly an outside independent attorney, who represents this client, same exact way that I do.

We will get that declaration for the Court though.

THE COURT:  Okay.  Great.  Any questions, Mr. McLaughlin?

MR. McLAUGHLIN:  None from me.

THE COURT:  Okay.  Very good.  All right.  Let's switch to Mr. Miller.  I think the ball is your Court, Mr. Kasolas.

Given where we are with Mr. Palumbo, what's the problem with having Mr. Miller have access to the clients'

highly confidential information if he agrees to be bound by the terms of the protective order?

MR. KASOLAS:  Thank you, Your Honor.

So we were able to get extremely little information about Mr. Miller leading up to the exchange with the Court and the letters that were submitted.

We were not ever made aware of the fact that he's actually a senior officer of Rockwell Automated Technology, LLC, which was never disclosed to us at any point in time.

In the interchange, for the first time ever we -- I guess the term we use up here is sandbagging.  I don't know what they call it down in Delaware.

But the certification was submitted for the first time from Mr. Miller setting forth what his alleged roles are at Rockwell Automation and Rockwell Automation Technology, LLC.

But from our vantage point -- he's been there 26 years.  He's the chief legal officer for intellectual property.  He's a vice president.  He heads another unit in charge of licensing and intellectual property holdings.

It appears that he wears a lot of hats.  He's not just your stereotypical in-house attorney.  And in that capacity as an officer, director, a board member, running a division of Rockwell, overseeing all

17

1  intellectual property litigation and patents, I believe he
2  has certainly the capability of inadvertently disclosing
3  my client's confidential information to other individuals
4  or associates at Rockwell Automation.
5          And I believe he's a competitive decision
6  maker.  I mean, they acknowledge in their papers he's in
7  charge of licensing.
8              Well, our clients are competitors.  As much as
9  Rockwell wants to say we don't design anything, we don't
10 make anything; that's true.  We don't.  We don't compete
11 in that sector of the field or the trade.
12             But we do compete in the distribution network
13 phase of things, and they sell their products.  We sell
14 our products.  We sell Rockwell products.  We sell
15 Rockwell competitor products.  Right.
16             So absolutely our client is in direct
17 competition with Rockwell in the distribution sector of
18 these types of products.
19             And what we're concerned about is we believe
20 this case has been filed not because my client did
21 anything wrong, because they haven't, but it's been filed
22 because Rockwell's become increasingly frustrated with its
23 authorized distribution throughout the world.
24             They have what's called "leakers."  A leaker is
25 a term for an authorized distributor who sells outside the

18

1  authorized stream of commerce that they have a license to
2  sell to with a parent company, in this case Rockwell.
3          So what they're trying to do is they're trying
4  to minimize and shrink the various channels and
5  distribution numbers for their product in the stream of
6  commerce throughout the world, so they can control it.
7  They can price it better.  They can eliminate competition
8  to the sale of their products to -- that they want to sell
9  them.
10         So there's a serious concern my client has
11 because Mr. Miller is not just in-house counsel, but he's
12 an actual officer of the company.  He may be a director, I
13 don't know.
14         He had this other -- he's in charge of
15 licensing which involved Rockwell's authorized
16 distribution network: who they sell to, when they can
17 sell, what they have to price things at.  That he is
18 really in charge of a campaign to eliminate competition in
19 the field by companies like my client.
20         So I do believe there's a serious concern here
21 that he is a competitive decision maker who's not just
22 going to manage this litigation and help.  You know, the
23 Alston & Bird firm manages the case, litigate it, defend
24 it, put papers together, do discovery, you know, frame
25 their case.  But it's actually part of a mission to shut

19

1  down my client and other clients like him, who are
2  competing with Rockwell in the distribution side of this
3  industry.
4          THE COURT:  So I get -- I guess this is a
5  question I have.  I think maybe I'm simplifying this too
6  much.
7          What you're worried about is that you don't
8  want them to find out where you're getting some of your
9  products; is that fair to say?
10         MR. KASOLAS:  That's correct because what they
11 can do is they can go --
12         THE COURT:  Yeah.  So the problem I guess I'm
13 having is like isn't that -- isn't that the case?
14         Doesn't he need to have that information for
15 the case, and isn't that going to come out as part of
16 discovery in the case?
17         I mean, who else at the company, for their
18 side, is going to know whether or not people are
19 distributing the products that are supposed to be
20 distributing the products without asking them?
21         MR. KASOLAS:  Their allegation -- and they were
22 required to conduct due diligence before filing this
23 lawsuit and to do background -- is that we are selling
24 products into the field of commerce, into the stream of
25 commerce that is labeled Rockwell but is not a Rockwell

20

1  product or is a gray market product because it doesn't
2  come with the bells and whistles that Rockwell products
3  are supposed to come with.
4          They should have evidence in their possession
5  already that they have come across that evidence that.
6  They can't use discovery as a fishing expedition and say,
7  okay, we want to know where you're getting your stuff from
8  because we think you are violating the Lanham Act or you
9  are selling what we consider gray market.  They should
10 have that already.
11         I think they should have to first demonstrate
12 that to the Court somehow through the discovery process
13 that they have evidence that we have done this in the
14 chain of commerce.
15         Because what they can't do is not have that in
16 their possession and then use this case as a fishing
17 expedition to find out who is actually selling to us to
18 try to shut them down, so we don't compete with Rockwell.
19         We actually sell legitimate, authentic,
20 unpackaged Rockwell products, Judge.  We do not sell
21 knockoff products, as Rockwell alleges in this case.
22         THE COURT:  All right.  I think I understand
23 your position.  Let me turn it over to Mr. McLaughlin for
24 the last word.
25         I'm hearing some concern from Mr. Kasolas about

21

1  your discovery request.  Is this a protective order issue
2  and is there anything else you want to say in response to
3  Mr. Kasolas' comment about Mr. Miller being a competitive
4  decision maker?
5          MR. McLAUGHLIN:  This is Mr. McLaughlin.
6          I think Your Honor hit it right on the head is
7  that these issues about where defendant is getting its
8  product are core to their defense.
9          And, you know, if Rockwell can't know where
10  they're getting their product from, how do -- how does
11  Rockwell expect it to litigate the case?  That's what it
12  really comes down to.
13          I think the Hyundai Motor case that we cited in
14  our responsive brief took this issue head on and said
15  yeah, an accused gray marketer, their sources are
16  direct -- are essential to the claims and defenses.  And
17  so in-house counsel should be allowed to see that
18  information.
19          Something Mr. Kasolas said, you know, really
20  goes to the heart of it.  And that is if people are
21  selling Rockwell products that are unauthorized to do so,
22  that's trademark infringement.  And that's why we're here.
23          So, you know, this isn't a fishing expedition.
24  You know, if defendant had any doubts as to the statements
25  made in our complaint, they could have moved to dismiss

22

1  it, but they didn't.
2          So we need to litigate this case and go through
3  discovery.  And Mr. Miller needs to be a part of that.
4          THE COURT:  Okay.  So I'm ready to rule on the
5  portion of the dispute involving Mr. Miller.
6          The concerns I'm hearing from the defendant are
7  not really protective order issues, and based on the
8  arguments today and the arguments in the paper, papers, I
9  agree with plaintiff that it's appropriate for Mr. Miller
10  to have access to this information in order to adequately
11  represent the client.
12          I'm not seeing in the papers that there's a
13  serious risk of inadvertent disclosure based on the
14  records before the Court.  And, of course, Mr. Miller has
15  also agreed to undertake the acknowledgement attached to
16  the proposed protective order.
17          So I think that resolves both issues here
18  today.  If there are any remaining issues about
19  Mr. Palumbo, and I don't anticipate that there will be
20  based on what I was hearing today, you can raise those by
21  filing another motion for a teleconference.
22          Any questions from plaintiff?
23          MR. McLAUGHLIN:  No questions, Your Honor.
24          THE COURT:  Any questions from defendant?
25          MR. KASOLAS:  None, Your Honor.  Thank you so

23

1  much for your time and courtesy today.  Greatly
2  appreciated.
3          THE COURT:  Thanks to everyone.  Good to hear
4  from you.  Take care.
5      (The proceedings concluded at 10:26 p.m.)

24

2          CERTIFICATE OF COURT REPORTER

4      I hereby certify that the foregoing is a true and
5  accurate transcript from my stenographic notes in the
6  proceeding.

8                          /s/ Bonnie R. Archer
                           Bonnie R. Archer, RPR
9                          Official Court Reporter
                           U. S. District Court

# Exhibit 11

PUBLIC VERSION

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN INDUSTRIAL AUTOMATION SYSTEMS AND COMPONENTS THEREOF INCLUDING CONTROL SYSTEMS, CONTROLLERS, VISUALIZATION HARDWARE, MOTION CONTROL SYSTEMS, NETWORKING EQUIPMENT, SAFETY DEVICES, AND POWER SUPPLIES** | **Inv. No.  337-TA-1074** |

## INITIAL DETERMINATION ON VIOLATION OF SECTION 337; AND RECOMMENDED DETERMINATION ON REMEDY, BONDING, AND THE PUBLIC INTEREST

Administrative Law Judge Dee Lord

(October 23, 2018)

**On the Briefs:**

*For Complainant Rockwell Automation, Inc.:*

Adam D. Swain, Esq. and Thomas W. Davison, Esq. of Alston & Bird LLP in Washington, DC; Paul J. Tanck, Esq., Gregory J. Carbo, Esq., and Neal J. McLaughlin, Esq. of Alston & Bird LLP in New York, NY.

*For the Commission Investigative Staff:*

Brian B. Koo, Esq., Jeffrey T. Hsu, Esq. and Margaret D. Macdonald, Esq. of the Office of Unfair Import Investigations, U.S. International Trade Commission of Washington, DC.

**PUBLIC VERSION**

Pursuant to the Notice of Investigation (Oct. 10, 2017) and Commission Rule 210.42, this is the administrative law judge's final initial determination and recommended determination in the matter of *Certain Industrial Automation Systems and Components Thereof including Control Systems, Controllers, Visualization Hardware, Motion Control Systems, Networking Equipment, Safety Devices, and Power Supplies*, Inv. No. 337-TA-1074.  19 C.F.R. § 210.42(a)(1)(i).

For the reasons discussed herein, it is my final initial determination that there is a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and/or the sale within the United States after importation of certain industrial automation systems and components thereof including control systems, controllers, visualization hardware, motion control systems, networking equipment, safety devices, and power supplies.

PUBLIC VERSION

TABLE OF CONTENTS

I.     BACKGROUND.................................................................................................... 1
       A.   Procedural History ........................................................................................ 1
       B.   The Private Parties ........................................................................................ 3
       C.   Products at Issue ........................................................................................... 5
       D.   Evidentiary Record ....................................................................................... 6
II.    JURISDICTION .................................................................................................. 7
III.   TRADEMARK INFRINGEMENT .................................................................. 10
       A.   Legal Standard ............................................................................................ 10
       B.   Validity and Ownership .............................................................................. 13
       C.   Accused Products ........................................................................................ 14
       D.   Material Differences ................................................................................... 17
       E.   Authorized Sales ......................................................................................... 23
       F.   Domestic Industry ...................................................................................... 30
IV.    COPYRIGHT INFRINGEMENT ..................................................................... 32
       A.   Legal Standard ............................................................................................ 32
       B.   Asserted Copyrights .................................................................................... 33
       C.   Accused Products ........................................................................................ 34
       D.   Underlying Direct Infringement ................................................................. 36
       E.   Contributory Infringement .......................................................................... 40
       F.   Domestic Industry ...................................................................................... 43
V.     TORTIOUS INTERFERENCE ........................................................................ 51
       A.   Legal Standard ............................................................................................ 52
       B.   Tortious Interference with EULA ............................................................... 53
       C.   Tortious Interference with Distributor Agreements .................................... 55
       D.   Injury to Domestic Industry ....................................................................... 58
VI.    RECOMMENDED DETERMINATION ........................................................... 60
       A.   Limited Exclusion Order ............................................................................ 60
       B.   General Exclusion Order ............................................................................. 60
       C.   Cease and Desist Order ............................................................................... 63
       D.   Bond ............................................................................................................ 64
       E.   Public Interest ............................................................................................. 65
VII.   CONCLUSIONS OF LAW ................................................................................ 67

**PUBLIC VERSION**

The following abbreviations may be used in this Initial Determination:

| Tr. | Transcript |
|---|---|
| **WS** | Witness Statement |
| **DWS** | Direct Witness Statement |
| **RWS** | Rebuttal Witness Statement |
| **JX** | Joint Exhibit |
| **CX** | Complainant's exhibit |
| **CPX** | Complainant's physical exhibit |
| **CDX** | Complainant's demonstrative exhibit |
| **RX** | Respondent's exhibit |
| **RPX** | Respondent's physical exhibit |
| **RDX** | Respondent's demonstrative exhibit |
| **CPHB** | Complainant's pre-hearing brief |
| **CIB** | Complainant's initial post-hearing brief |
| **CRB** | Complainant's reply post-hearing brief |
| **RPHB** | Respondent's pre-hearing brief |
| **SPHB** | Staff's pre-hearing brief |
| **SB** | Staff's post-hearing brief |

PUBLIC VERSION

# I.     BACKGROUND

## A.     Procedural History

The Commission instituted this investigation on October 10, 2017, in response to a

complaint alleging violations of section 337 of the Tariff Act of 1930, as amended, by reason of

infringement of U.S. Trademark Reg. Nos. 1172995, 696401, 693780, 1172994, 712800,

712836, 2510226, 2671196, 2701786, and 2412742; and U.S. Copyright Reg. Nos.

TX0008389890, TX0008389887, TX0008390098, TX0008390094, TX0008390077,

TX0008390088, TX0008390116, and TX0008390111.  The Commission ordered that an

investigation be instituted to determine:

> (a) whether there is a violation of subsection (a)(l)(C) of section 337 in the
> importation into the United States, the sale for importation, or the sale
> within the United States after importation of certain industrial
> automation systems and components thereof including control
> systems, controllers, visualization hardware, motion and motor control
> systems, networking equipment, safety devices, and power supplies,
> by reason of infringement of the '995 trademark; the '401 trademark;
> the '780 trademark; the '994 trademark; the '800 trademark; the '836
> trademark; the '226 trademark; the '196 trademark; the '786
> trademark; and the '742 trademark; and whether an industry in the
> United States exists as required by subsection (a)(2) of section 337;
>
> (b) whether there is a violation of subsection (a)(1)(B) of section 337 in
> the importation into the United States, the sale for importation, or the
> sale within the United States after importation of certain industrial
> automation systems and components thereof including control
> systems, controllers, visualization hardware, motion and motor control
> systems, networking equipment, safety devices, and power supplies,
> by reason of infringement of the '890 copyright; the '887 copyright;
> the '098 copyright; the '094 copyright; the '077 copyright; the '088
> copyright; the '116 copyright; and the '111 copyright; and
>
> (c) whether there is a violation of subsection (a)(1)(A) in the importation
> or sale of certain industrial automation systems and components
> thereof including control systems, controllers, visualization hardware,
> motion and motor control systems, networking equipment, safety
> devices, and power supplies, by reason of unfair methods of
> competitions and unfair acts, the threat or effect of which is to destroy
> or substantially injure an industry in the United States . . . .

**PUBLIC VERSION**

Notice of Investigation at 2-3. The Commission further ordered:

> Pursuant to Commission Rule 210.50(b)(1), 19 C.F.R. 210.50(b)(1), the presiding Administrative Law Judge shall take evidence or other information and hear arguments from the parties or other interested persons with respect to the public interest in this investigation, as appropriate, and provide the Commission with findings of fact and a recommended determination on this issue, which shall be limited to the statutory public interest factors set forth in 19 U.S.C. sections 1337(d)(1), (f)(1), (g)(1) . . . .

*Id.* at 3. The investigation was instituted upon publication of the Notice of Investigation in the *Federal Register* on Monday, October 16, 2017. 82 Fed. Reg. 48113-15 (2017); *see* 19 C.F.R. § 210.10(b).

The Complainant is Rockwell Automation, Inc. ("Rockwell"). Notice of Investigation at 3. The Office of Unfair Import Investigations was named as a party in this investigation. *Id.* at 5. The complaint named fifteen respondents, *id.* at 3-5, but only one respondent filed an answer, Radwell International, Inc. ("Radwell"). Response to the Complaint and Notice of Investigation (Oct. 31, 2017). On February 1, 2018, Respondents Fractioni (Hongkong) Ltd.; GreySolution Limited d/b/a Fibica; KBS Electronics Suzhou Co., Ltd.; Shanghai EuoSource Electronic Co., Ltd.; ShenZhen T-Tide Trading Co., Ltd.; SoBuy Commercial (HK) Co. Limited; and Suzhou Yi Micro Optical Co., Ltd. were found to be in default. Order No. 17 (Feb. 1, 2018), *not reviewed by* Comm'n Notice (Feb. 26, 2018). On June 28, 2018, Respondents Yaspro Electronics (Shanghai) Co. Ltd. and Can Electric Limited were found to be in default. Order No. 32 (June 28, 2018), *not reviewed by* Comm'n Notice (July 24, 2018). On July 17, 2018, Respondents Capnil (HK) Company Limited; Fujian Dahong Trade Co., Ltd.; Huang Wei Feng d/b/a A-O-M Industry; PLC-VIP Shop d/b/a VIP Tech Limited; and Wenzhou Sparker Group Co. were terminated from the investigation based on Rockwell's withdrawal of its allegations. Order No. 41 (July 17, 2018), *not reviewed by* Comm'n Notice (Aug. 13, 2018). On July 20,

2

**PUBLIC VERSION**

2018, Radwell was terminated from the investigation pursuant to a consent order. Order No. 42 (July 20, 2018), *not reviewed by* Comm'n Notice (Aug. 15, 2018).

Prior to being terminated from the investigation, Radwell filed a pre-hearing brief (RPHB) on June 25, 2018. Rockwell also filed a pre-hearing brief (CPHB) on June 25, 2018. Staff filed a pre-hearing brief (SPHB) on July 13, 2018.

On July 12, 2018, summary determination was granted with respect to the economic prong of the domestic industry requirement for nine of the asserted trademarks. Order No. 39 (July 12, 2018), *not reviewed by* Comm'n Notice (Aug. 14, 2018).

Because there are no active respondents remaining in the investigation, the evidentiary hearing was suspended pursuant to Order No. 42 (July 20, 2018). Rockwell moved for leave to file a motion for summary determination of violation by the remaining defaulted respondents on July 24, 2018, which was denied pursuant to Order No. 43 (Aug. 3, 2018). Rockwell and the Staff agreed to proceed with a hearing on the written record, based on the pre-hearing briefs that had already been filed and the evidence, including witness statements, that had already been submitted. Order No. 44 (Aug. 14, 2018). Rockwell filed its initial post-hearing brief (CIB) on Friday, August 24, 2018. Staff filed its post-hearing brief (SB) on Wednesday, September 5, 2018. Rockwell filed a reply post-hearing brief (CRB) on September 12, 2018.

### B. The Private Parties

#### 1. Complainant

Complainant Rockwell Automation, Inc. ("Rockwell") is a corporation organized and existing under the laws of Delaware with its principal place of business in Milwaukee, Wisconsin. CIB at 7; Complaint ¶ 14.

**PUBLIC VERSION**

### 2.    Respondents

Nine defaulted respondents remain in this investigation: Can Electric Limited ("Can Electric"); Fractioni (Hongkong) Ltd. ("Fractioni"); GreySolution Limited d/b/a Fibica ("GreySolution"); KBS Electronics Suzhou Co, Ltd. ("KBS"); Shanghai EuoSource Electronic Co., Ltd. ("EuoSource"); ShenZhen T-Tide Trading Co., Ltd. ("T-Tide"); SoBuy Commercial (HK) Co. Limited ("SoBuy"); Suzhou Yi Micro Optical Co., Ltd. ("Yi Micro"); and Yaspro Electronics (Shanghai) Co., Ltd. ("Yaspro") (collectively, the "Defaulted Respondents").

Can Electric is a Chinese company located in Guangzhou, China, offering products for sale to United States customers at www.can-electric.com and Alibaba.com.  Complaint ¶ 36. Fractioni is a Chinese company located in Shanghai, China, offering products for sale to United States customers at fractioni.com and on eBay.com.  *Id.* ¶¶ 40-41.  GreySolution is a Chinese company located in Hong Kong, offering products for sale to United States customers on eBay.com.  *Id.* ¶¶ 44-45.  KBS is a Chinese company located in Shanghai, China, offering products for sale to United States customers on Alibaba.com.  *Id.* ¶ 47.  EuoSource is a Chinese company located in Shanghai, China, offering products for sale to United States customers at www.euosource.com and Alibaba.com.  *Id.* ¶ 52.  T-Tide is a Chinese company located in Shenzhen, China, offering products for sale to United States customers on eBay.com.  *Id.* ¶ 54. SoBuy is a Chinese company located in Hong Kong, offering products for sale to United States customers on eBay.com.  *Id.* ¶¶ 55-56.  Yi Micro is a Chinese company located in Suzhou, China, offering products for sale to United States customers on eBay.com.  *Id.* ¶¶ 57-58.  Yaspro is a Chinese company located in Shanghai, China, offering products for sale to United States customers at www.yaspro.com and Alibaba.com.  *Id.* ¶ 61.

PUBLIC VERSION

### C.   Products at Issue

The products at issue in this investigation are from Rockwell's Allen-Bradley® industrial automation product line.  Complaint ¶ 76; CIB at 4.  This includes programmable controllers, visualization hardware, motors, safety devices, and power supplies.  *Id.* ¶¶ 76-86.

### 1.   Asserted Trademarks

Rockwell asserts ten of its registered trademarks, U.S. Trademark Reg. Nos. 1172995, 696401, 693780, 1172994, 712800, 712836, 2510226, 2671196, 2701786, and 2412742, described below:

| Trademark | Reg. No. | Exhibit | Example Embodiment |
|---|---|---|---|
| A-B (and Design) | 1172995 | JX-0002 | |
| A-B (and Design) | 696401 | JX-0003 | |
| A-B (and Design) | 693780 | JX-0004 | |
| ALLEN-BRADLEY | 1172994 | JX-0005 | |
| ALLEN-BRADLEY | 712800 | JX-0006 | |
| ALLEN-BRADLEY | 712836 | JX-0007 | |
| ROCKWELL AUTOMATION | 2510226 | JX-0008 | |
| ROCKWELL AUTOMATION | 2671196 | JX-0009 | |
| ROCKWELL AUTOMATION | 2701786 | JX-0010 | |
| CONTROLLOGIX | 2412742 | JX-0011 | |

Complaint ¶ 63; CIB at 9.

### 2.   Asserted Copyrights

Rockwell asserts eight of its registered copyrights, Copyright Reg. Nos. TX0008389890, TX0008389887, TX0008390098, TX0008390094, TX0008390077, TX0008390088, TX0008390116, and TX0008390111, described below:

**PUBLIC VERSION**

| Name | Reg. No. | Reg. Date | 1st Pub. Date | Exhibit |
|---|---|---|---|---|
| Firmware (Version 16) for CompactLogix® L3x Controllers | TX0008389890 | Aug. 1, 2017 | Jan. 31, 2007 | JX-0012 |
| Firmware (Version 16) for ControlLogix® L6 Controllers | TX0008389887 | Aug. 1, 2017 | Jan. 31, 2007 | JX-0013 |
| Firmware (Version 20) for CompactLogix® L3x Controllers | TX0008390098 | Aug. 9, 2017 | Dec. 15, 2011 | JX-0014 |
| Firmware (Version 20) for CompactLogix® L3y Controllers | TX0008390094 | Aug. 9, 2017 | Dec. 15, 2011 | JX-0015 |
| Firmware (Version 20) for ControlLogix® L6 Controllers | TX0008390077 | Aug. 9, 2017 | Dec. 15, 2011 | JX-0016 |
| Firmware (Version 20) for ControlLogix® L7 Controllers | TX0008390088 | Aug. 9, 2017 | Dec. 15, 2011 | JX-0017 |
| Firmware (Version 30) for CompactLogix® L3y Controllers | TX0008390116 | Aug. 9, 2017 | Dec. 15, 2011 | JX-0018 |
| Firmware (Version 30) for ControlLogix® L7 Controllers | TX0008390111 | Aug. 9, 2017 | Dec. 8, 2016 | JX-0020 |

Complaint ¶ 73; CIB at 9.

### D.    Evidentiary Record

Pursuant to Order No. 43 (Aug. 3, 2018) and Order No. 44 (Aug. 14, 2018), all of Rockwell's submitted exhibits, including witness statements, were received into evidence. Pursuant to Order No. 46 (Sept. 7, 2018), three additional exhibits were admitted at Staff's request, RX-0054C, RX-0064C, and RX-0505C.  An additional exhibit from Rockwell, CX-1189, was admitted pursuant to Order No. 47 (Oct. 16, 2018).

In addition, pursuant to Commission Rule 210.39(a), the record includes "all pleadings, the notice of investigation, motions and responses, all briefs and written statements, and other documents and things properly filed with the Secretary, in addition to all orders, notices, and initial determinations of the administrative law judge, orders and notices of the Commission, hearing and conference transcripts, evidence admitted into the record (including physical exhibits), and any other items certified into the record by the administrative law judge or the Commission."  19 C.F.R. § 210.38(a).

PUBLIC VERSION

## II.    JURISDICTION

In order to have the power to decide a case, a court or agency must have both subject

matter jurisdiction and jurisdiction over either the parties or the property involved. 19 U.S.C.

§ 1337; *Certain Steel Rod Treating Apparatus and Components Thereof*, Inv. No. 337-TA-97,

Commission Memorandum Opinion, 215 U.S.P.Q. 229, 231 (1981). Section 337 confers subject

matter jurisdiction on the Commission to investigate, and if appropriate, to provide a remedy for,

unfair acts and unfair methods of competition in the importation, the sale for importation, or the

sale after importation of articles into the United States. *See* 19 U.S.C. §§ 1337(a)(1)(A), (B), and

(C). The Federal Circuit has held that a complainant's allegation that respondents import

accused products is sufficient to confer subject matter jurisdiction pursuant to section 337.

*Amgen Inc. v. Int'l Trade Comm'n*, 565 F.3d 846, 854 (Fed. Cir. 2009). In addition, the

Commission has *in rem* jurisdiction over imported articles. *Sealed Air Corp. v. U.S. Int'l Trade

Comm'n*, 645 F.2d 976, 985-86 (C.C.P.A. 1981) (holding that the ITC's jurisdiction over

imported articles is sufficient to exclude such articles).

Rockwell attached evidence to its complaint showing that each of the Defaulted

Respondents imported Rockwell products. CIB at 16-17, 61-62; CX-0027C (Complaint,

Confidential Exhibit 26); Supplement to Complaint (Sept. 29, 2017).[1] Rockwell has also

---

[1] These attachments to the complaint are declarations by Adam D. Swain, an attorney
representing Rockwell, and Rockwell's expert, Dr. Stephen Prowse, relies on CX-0027C as
evidence of Rockwell products offered for sale. CX-1042C at Q/A 28, 156, 159, 162. The
exhibits attached to these declarations are the evidence of importation and sale by Defaulted
Respondents that was relied upon in Rockwell's complaint.

**PUBLIC VERSION**

identified evidence that certain respondents sold additional Rockwell products ███████. CPX-0039C.[2]

For Fractioni, Rockwell's complaint identified the purchase of a "New Allen-Bradley AB Contact Block 800F-X10, 1-Year Warranty!" from eBay on July 20, 2017, which arrived in the United States on July 27, 2017. CX-0027C, Ex. A. Rockwell further identified the purchase of a "New Factory Sealed Allen-Bradley AB Controller 1756-L7SP, 1-Year Warranty!" from eBay on August 21, 2017. *Id.*, Ex. B. Rockwell also identifies records showing sales of a few thousand Rockwell products from Fractioni ███████, dating from 2011 to 2016. CPX-0039C.

For GreySolution, Rockwell identified the purchase of a "New CompactLogix Allen Bradley AB 1769-ECL Programmable Logic Controller" from eBay on August 2, 2017, which arrived in the United States on August 15, 2017. CX-0027C, Ex. C. Rockwell further identified the purchase of a "New in Sealed Box" Allen Bradley 1756-L7SP Safety Controller from eBay on August 21, 2017, which arrived in the United States on August 29, 2017. *Id.*, Ex. D.

For SoBuy and T-Tide, Rockwell identified the purchases of a "NEW Allen Bradley 1745-TOP Terminal Block," a "New 1PC In Box 1734-TB3 Allen Bradley PLC Module Screw Terminal," and a "New In Box Allen Bradley PLC Module Terminal Base Unit 1734-TB" from eBay on July 20, 2017, each of which arrived in the United States on July 26, 2017. CX-0027C, Exs. E, F, G. Rockwell further identified the purchase of a "New in box" AB Allen Bradley 1756-L7SP GuardLogix Safety Controller from eBay on August 22, 2017, which was delivered in the United States on August 29, 2017. *Id.*, Ex. D. Rockwell also identified the purchase of a

---

[2] CPX-0039C contains importation data ████████████████████ compiled in a spreadsheet prepared by Rockwell's expert, Dr. Stephen Prowse. CX-1042C at Q/A 32-34.

PUBLIC VERSION

"New" Allen Bradley 1769 L16ER CompactLogix Safety Controller from eBay on September 1, 2017. *Id.*, Ex. X.

For Yi Micro, Rockwell identified the purchase of "ONE New AB Allen Bradley 1734-TOP Terminal Base in Box" from eBay on July 20, 2017, which was delivered in the United States on August 8, 2017. CX-0027C, Ex. I. Rockwell also identified the purchase of a "NEW Allen Bradley AB 1769-ECL" from eBay on July 20, 2017, which was delivered in the United States on July 24, 2017. *Id.*, Ex. J. Rockwell further identified the purchase of a "NEW AB Allen Bradley 1756-L7SP GuardLogix Safety Controller 1756" from eBay on July 20, 2017, which was delivered in the United States on August 29, 2017. *Id.*, Ex. K.

For Can Electric, Rockwell identified the purchase of two 1756-L7SP modules from plc-vip.com on August 29, 2017. CX-0027C, Ex. R. These modules were delivered in the United States on or about September 11, 2017. Supplement to Complaint (Sept. 29, 2018), Ex. R.

For KBS, Euosource, and Yaspro, Rockwell identified the purchase of an Allen-Bradley CompactLogix 1756-L7SP on Alibaba.com on September 3, 2017. CX-0027C, Ex. W. This product arrived in the United States on or about September 11, 2017. Supplement to Complaint (Sept. 29, 2018), Ex. W. In addition, Rockwell identifies the sale of several hundred Rockwell products from Yaspro ███████ between 2014 and 2017, including a sale of five 802T-NX159 products on December 28, 2017. CPX-0039C.

Based on this evidence of importation and sales, I find that the Commission has subject matter jurisdiction and *in rem* jurisdiction over the imported Rockwell products.

PUBLIC VERSION

## III.   TRADEMARK INFRINGEMENT

### A.   Legal Standard

Section 337 makes unlawful, *inter alia,* "the importation into the United States, the sale for importation, or the sale within the United States after importation . . . of articles that infringe a valid and enforceable United States trademark registered under the Trademark Act of 1946 [15 U.S.C.A. 1051 et seq.]." 19 U.S.C. § 1337(1)(C). "Thus, section 1337 grants the ITC the power to prevent the importation of goods that, if sold in the United States, would violate one of the provisions of the federal trademark statute, the Lanham Act." *Bourdeau Bros. v. Int'l Trade Comm'n,* 444 F.3d 1317, 1320 (Fed. Cir. 2006).

Gray market goods are "'produced by the owner of the United States trademark or with its consent, but not authorized for sale in the United States.'" *Id.* (quoting *Gamut Trading Co. v. U.S. Int'l Trade Comm'n,* 200 F.3d 775, 777 (Fed. Cir. 1999)). The sale of articles known as gray market goods may violate the Lanham Act. The cause of action arising under section 337 from importation of gray market goods typically involves goods manufactured abroad but bearing a U.S. trademark. "Generally, gray market goods are defined as 'genuine goods that . . . are of foreign manufacture, bearing a legally affixed foreign trademark that is the same mark as is registered in the United States; gray goods are legally acquired abroad and then imported without the consent of the U.S. trademark holder.'" *SKF USA Inc. v. Int'l. Trade Comm'n,* 423 F.3d 1307, 1312 (Fed. Cir. 2005) (quoting *Gamut,* 200 F.3d at 778). A similar action may be brought by a trademark holder who produces goods domestically and whose products are re-sold without authorization. *E.g., Bose Corp. v. Ejaz,* 732 F.3d 1726-27 (1st Cir. 2013); *Mary Kay, Inc. v. Weber, Inc.,* 661 F.Supp.2d 632, 642 (N.D. Tex. 2009) (citing *Warner-Lambert Co. v. Northside Development Corp.,* 86 F.3d 3, 6 (2nd Cir. 1996)).

10

**PUBLIC VERSION**

Until the Supreme Court's decision in *A. Bourjois & Co. v. Katzel,* 260 U.S. 689 (1923), "the prevailing rule in the United States was that the authorized sale of a validly trademarked product, anywhere in the world, exhausted the trademark's exclusionary rights; thus the holder of the corresponding registered United States trademark was believed to have no right to bar the importation and sale of authentically marked foreign goods." *Gamut,* 200 F.3d at 778. Since *Bourjois,* the courts have recognized "that the reputation and goodwill of the holder of the corresponding United States mark warrants protection against unauthorized importation of goods bearing the same mark, although the mark was validly affixed in the foreign country." *Id.* As a result, the courts will exclude gray market goods "when there are material differences between the domestic product and the foreign product bearing the same mark." *Id.* at 779. The protection afforded against gray market infringement extends to the importation of "genuine, but unauthorized" products when such imports "differ materially from authentic goods authorized for sale in the domestic market." *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 638 (1st Cir. 1992).

A material difference is one that relates to "the quality and nature of the product bearing the mark." *Gamut,* 200 F.3d at 779. "The rationale behind preventing importation of these goods is that the public associates a trademark with goods having certain characteristics. To the extent that foreign goods bearing a trademark have different characteristics than those trademarked goods authorized for sale in the United States, the public is likely to become confused or deceived as to which characteristics are properly associated with the trademark,

11

**PUBLIC VERSION**

thereby possibly eroding the goodwill of the trademark holder in the United States." *Bourdeau*,

444 F.3d at 1320 (citing *Gamut*, 200 F.3d at 778-79).[3]

      The threshold for finding materiality is low, "requiring no more than showing that

consumers would be likely to consider the differences between the foreign and domestic

products to be significant when purchasing the product, for such difference would suffice to

erode the goodwill of the domestic source." *SKF USA Inc. v. Int'l. Trade Comm'n*, 423 F.3d

1307, 1313 (Fed. Cir. 2005). "[D]ifferences that may be readily apparent to consumers may

nevertheless be material." *Gamut*, 200 F.3d at 781. The trademark itself has been held to create

consumer expectations which, when defeated, may erode "the trademark holder's reputation and

goodwill." *Id.* (citations omitted). Material differences may be physical as well as non-

physical. *SKF*, 423 F.3d at 1312-14 (holding that nonphysical characteristics include services

provided after sale). "[S]imilar goods lacking those associated characteristics may be believed

by consumers to have originated from the trademark owner and, lacking such traits, may mislead

the consumer and damage the owner's goodwill." *Id.* at 1312 (quoting *Gamut*, 200 F.3d at 779).

*See also Nestle*, 982 F.2d at 639 n.7 ("[D]ifferences in, say, warranty protection or service

commitments—may well render products non-identical in the relevant Lanham Act sense.").

Once material differences are established, there is no burden on the trademark holder to

demonstrate actual consumer confusion. "In a gray market goods case, 'a material difference

---

[3] Courts have viewed the material differences doctrine as an "exception" to the first sale bar. *See* SB at 18-21 and n. 7. In two recent decisions concerning intellectual property, the Supreme Court applied the first sale bar to overseas sales. *Impression Prods,, Inc. v. Lexmark Int'l, Inc.*, 137 S.Ct. 1523 (2017) (Patent Act); *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2013) (Copyright Act). It is unclear how these cases may apply, if at all, to claims of trademark infringement based on gray market sales.

**PUBLIC VERSION**

between goods simultaneously sold in the same market under the same name creates a presumption of consumer confusion as a matter of law.'" *Bose,* 732 F.3d at 27 (quoting *Nestle*).[4]

In addition to establishing material differences, a complainant in a case of gray market infringement must demonstrate that "all or substantially all" of its authorized sales are accompanied by the asserted material differences. *Bourdeau,* 444 F.3d at 1321; *SKF,* 423 F.3d at 1315. "If less than all or substantially all of a trademark owner's products possess the material difference, then the trademark owner has placed into the stream of commerce a substantial quantity of goods that are or may be the same or similar to those of the importer, and then there is no material difference." *SKF,* 423 F.3d at 1315. As stated by the Federal Circuit: "To permit recovery by a trademark owner when less than 'substantially all' of its goods bear the material difference from the gray goods [] would allow the owner itself to contribute to the confusion by consumers that it accuses gray market importers of creating." *Id.*

### B.    Validity and Ownership

Rockwell is the owner of the entire right and title to and interest in the asserted trademarks. CX-1037C (Michael WS) Q/A at 41-44. Trademark registration certificates for the asserted trademarks create a statutory presumption that each of the marks is valid, that Rockwell is the owner of the mark, and that Rockwell has the exclusive right to use the registered mark. JX-0002-JX-0011; 15 U.S.C. § 1057(b). *See Lovely Skin, Inc. v. Ishtar Skin Care Prods, LLC,* 745 F.3d 877, 882 (8th Cir. 2014). No party has challenged the validity and enforceability of the asserted trademarks, and the trademarks are therefore presumed to be valid. *See Lannom Mfg.*

---

[4] The First Circuit opined in *Nestle* that the alleged infringer, "of course, may attempt to rebut this presumption . . . but in order to do so he must be able to prove by preponderant evidence that the differences are not of the kind that consumers, on average, would likely consider in purchasing the product." 982 F.2d at 641.

13

**PUBLIC VERSION**

*Co. v. Int'l Trade Comm'n*, 799 F.2d 1572, 1579-80 (Fed. Cir. 1986) (precluding Commission from finding a patent invalid when no defense of invalidity was raised).

### C.    Accused Products

Rockwell sells its products under a variety of brand names directly and through a network of authorized distributors, both domestically and abroad. CX-1037C (Michael WS) at Q/A 55, 56. Rockwell makes the same products for sale in the U.S. and overseas, but it sells its products overseas at lower prices than consumers pay in the U.S. *Id.* at Q/A 57. This price structure makes it possible for overseas actors to purchase Rockwell products at lower prices and re-sell them in the U.S. at a profit.

The Defaulted Respondents each sold at least one item over the internet to counsel for Rockwell and its agents. CIB at 18, *see* CX-0027C.0002. These sales form the basis of Rockwell's gray market infringement allegations. The marks at issue are "A-B," "ALLEN-BRADLEY," "ROCKWELL AUTOMATION" and "CONTROLLOGIX," CIB at 9, which must appear on the product itself or its packaging. CX-1012C.0015-0019) (Rockwell Automation Global Product Marking Requirements).

Details regarding the Defaulted Respondents' importations are set forth in CX-0027C and CPX-0039C, and are summarized in the table below.

| Respondent | Act | Unauthorized Rockwell Products | Proof of Importation |
|---|---|---|---|
| Fractioni (Hong Kong) Ltd. – *Defaulted* | • Selling for importation<br>• Importing<br>• Sale after importation | "New Allen-Bradley AB Contact Block 800F-X10, 1-Year Warranty!"<br>"New Factory Sealed Allen-Bradley AB Controller 1756-L7SP, 1-Year Warranty!"<br>CPX-0039C shows the sale and importation of ███ | CX-0027C at ¶¶2-3 and Exs. A-1, A-2, A-3, A-4, B-1, and B-2; CPX-0039C |

14

|  |  | products from Fractioni ▆▆▆▆. |  |
|---|---|---|---|
| GreySolution Ltd. d/b/a Fibica – *Defaulted* | • Selling for importation<br>• Importing<br>• Sale after importation | "New CompactLogix Allen Bradley AB 1769-ECL Programmable Logic Controller"<br>"New in Sealed Box" Allen Bradley 1756-L7SP Safety Controller | CX-0027C at ¶¶4-5 and Exs. C-1, C-2, C-3, C-4, C-5, C-6, D-1, D-2, D-3 |
| ShenZhen T-Tide Trading co., Ltd. - *Defaulted*<br><br>SoBuy Commercial (HK) Co. Ltd. – *Defaulted* | • Selling for importation<br>• Importing | "NEW Allen Bradley 1734-TOP Terminal Block"<br>"New 1PC In Box 1734-TB3 Allen Bradley PLC Module Screw Terminal"<br>"New In Box Allen Bradley PLC Module Terminal Base Unit 1734-TB"<br>"New in box" AB Allen Bradley 1756-L7SP GuardLogix Safety Controller<br>"New" Allen Bradley CompactLogix 1769 L16ER CompactLogix Safety Controller | CX-0027C at ¶¶6-10 and Exs. E-1, E-2, E-3, F-1, F-2, F-3, G-1, G-2, H-1, H-2, H-3, and X-1 |
| Suzhou Yi Micro Optical Co., Ltd. d/b/a Suzhou Yiwei Guangxue Youxiangongsi – *Defaulted* | • Selling for importation<br>• Importing | "ONE New AB Allen Bradley 1734-TOP Terminal Base In Box"<br>"NEW Allen Bradley AB 1769-ECL"<br>"NEW AB Allen Bradley 1756-L7SP GuardLogix Safety Controller 1756[5]" | CX-0027C at ¶¶11-13 and Exs. I-1, I-2, I-3, I-4, J-1, J-2, J-3, K-1, and K-2 |
| Can Electric Ltd. – *Defaulted* | • Selling for importation<br>• Importing | • 1756-L7SP Modules (x2) | CX-0027C at ¶¶21-22 and Exs. R-1 and R-2; EDIS Doc. No. 624329, Sept. 9, 2017 Supplement to the Complaint at ¶30, R-3 |

---

[5] Paragraph 13 of CX-0027C inadvertently listed "ONE New AB Allen Bradley 1734-TOP Terminal Base In Box" instead of "NEW AB Allen Bradley 1756-L7SP GuardLogix Safety Controller 1756." *See* CX-0027C, Ex. K-1 (CX-0027C.0119). CIB at 17 n.6.

| KBS Electronics Suzhou Co., Ltd. – *Defaulted*<br><br>Yaspro Electronics (Shanghai) Co., Ltd. – *Defaulted*<br><br>Shanghai EuoSource Electronic Co., Ltd. – *Defaulted* | • Selling for importation<br>• Importing | 1756-L7SP<br>CPX-0039C shows the sale and importation of ██ products from Yaspro ██ ██. | CX-0027C at ¶¶27-28 and Exs. W-1, W-2, W-3, W-4, W-5, W-6, and W-7; EDIS Doc. No. 624329, Sept. 9, 2017 Supplement to the Complaint at ¶31, W-8; CPX-0039C |

For example, Complainants purchased a 1756-L7SP from each of the defaulting respondents (CX-0027C at ¶3 (Fractioni Ltd.), ¶5 (GreySolution d/b/a Fibica), ¶9 (ShenZhen T-Tide Trading Co., Ltd and SoBuy Commercial (HK) Co. Limited), ¶13 (Suzhou Yi Micro Optical Co., Ltd), ¶21-22 (Can Electric Limited) ¶¶27, 28 (KBS Electronics Suzhou Co, Ltd; Yaspro Electronics (Shanghai) Co., Ltd. Shanghai EuoSource Electronic Co., Ltd.); EDIS Doc. No. 624329, Sept. 9, 2017 Supplement to the Complaint at ¶¶30-31). The 1756-L7SP bears the A-B, ALLEN-BRADLEY, and ROCKWELL AUTOMATION Asserted Trademarks (CX-0027C at CX-0027C.0119, CX-0027C.0026, CX-0027C.0031, CX-0027C.0059, CX-0027C.0090, CX-0027C.0092, CX-0027C.0154).

Staff disagrees with Rockwell on whether there is evidence of importation by each respondent of items bearing the CONTROLLOGIX trademark. SB at 24-25. Staff maintains that Rockwell has demonstrated only that respondents Fractioni and Yaspro imported a product bearing the CONTROLLOGIX trademark, citing CPX-0039C (spreadsheet showing ██████ alleged purchases of imported gray market products). Staff says there is no evidence that Rockwell's 1756L controllers bear the CONTROLLOGIX mark on the packaging, noting that the 1756-L7SP actually bears the "GuardLogix" name. *Id.* (citing CX-0053C.0003). Staff asserts correctly that the product or packaging must bear the trademark. CX-1012C.0015-0019.

**PUBLIC VERSION**

In reply, Rockwell contends that all of its 1756-L61 controllers bear the CONTROLLOGIX trademark. *See* CRB at 10. No evidence, however, links importation of the 1756-L61 controller with respondents other than respondents Fractioni and Yaspro. I agree with Staff that Rockwell has failed to demonstrate infringement of the CONTROLLOGIX trademark by respondents other than Fractioni and Yaspro.

### D.    Material Differences

Rockwell points to several "material differences" between the accused items sold on the gray market and the items sold with Rockwell's authorization. Each of these "material differences" is non-physical and arises from Rockwell's corporate policies with respect to unauthorized sales. The asserted differences are (1) lack of manufacturer's warranty; (2) lack of probable cause reporting; (3) lack of product safety advisories and product notices; (4) lack of quality control; (5) lack of customer support; (6) lack of licensed software/firmware; (7) lack of intellectual property indemnity; and (8) sale of counterfeit goods. CIB at 21-44.

### 1.    Lack of Manufacturer's Warranty

Rockwell's warranty provides full replacement or remanufacture. CX-1037C (Michael WS) at Q/A 75, 131-134; JX-0268 ("The following manufacturer's warranty is extended to customers purchasing Allen-Bradley® or Rockwell Software™ products (including related services) directly from Rockwell Automation or an authorized Allen-Bradley distributor."). Rockwell asserts that its warranty procedures are specific to Rockwell, involving internal testing equipment and protocols as well as design updates. CX-1037C (Michael WS) at Q/A 135-136; JX-0268; CX-1185C (Martin WS) at Q/A 23-26, 35). Rockwell will not warrant products that it does not sell itself or that are not sold by an authorized distributor. CX-1037C (Michael WS) at

**PUBLIC VERSION**

Q/A 135; JX-0268C; CX-1185C (Martin WS) at Q/A 18.  No contradictory evidence appears in the record.

None of the respondents is an authorized distributor.  Accordingly, none of the products sold by respondents is covered by Rockwell's warranty.  The evidence shows that no respondent does or could offer an equivalent warranty.  As discussed above, the courts have recognized as material warranty provisions that differ between the products sold by the trademark holder and products sold by accused infringers.  Rockwell surveyed consumers and found that a large majority (78%) view warranty protection as important to the decision to purchase a Rockwell product.  *See* CX-1041C (Franklyn WS) at Q/A 24, 68-69.

### 2. Lack of Probable Cause Reporting

Rockwell explains that when it receives a product for warranty work, it collaborates with its customer to determine the cause of any problem.  CX-1037C (Michael WS) at Q/A 138; CX-1185C (Martin WS) at Q/A 35, 38.  This process, according to Rockwell, prevents or minimizes future product failures.  There is no evidence that respondents offer similar services and Rockwell contends that, even if they did, such services would be inferior to Rockwell's.  There is no evidence in the record to the contrary.  Based on its experience and on feedback, Rockwell maintains that its methods of failure analysis are important to customers.  *Id.* at Q/A 38, 55.  Rockwell's survey shows that 87% of those responding rated as important "Equivalent accompanying post-sales services."  CX-1041C (Franklyn WS) at Q/A 68-69.  I agree that this is a material difference.

### 3. Lack of Product Safety Advisories and Product Notices

Rockwell monitors feedback on its products directly and through its authorized dealers, and tracks problems through its own research and development activities.  CX-1038C (DeVilbiss

18

WS) at Q/A 9. This enables Rockwell to notify its customers of problems through Product

Safety Advisories ("PSAs") and Product Notices ("PNs"). *Id.* at Q/A/11. Rockwell distributes

these notices using contact information from customers who purchase products directly from

Rockwell or through its authorized distributors. *Id.* at Q/A 13-16. Rockwell notifies affected

customers by mail, working with authorized distributors who are contractually required to

provide customer information for such purposes. *Id.* at Q/A 13-16; CX-0734C. The information

in PSAs and PNs also includes tracking data for the specific product affected by the notice,

which enables the customer to identify the product and assists in providing solutions. *Id.* at Q/A

23-26.

Authorized distributors are contractually obligated to provide the identity of their

customers to Rockwell, allowing the customer to receive notices of PSAs and PNs. Rockwell

does not send notices to customers who purchase from unauthorized dealers. *Id.* at Q/A 9, 12-14,

16. Customers can sign up to receive such notices, but Rockwell states they are unlikely to do

so. *Id.* at Q/A 21.

Rockwell maintains that not receiving PSAs and PNs harms the consumer, because the

notices may involve "critical safety and commercial issues." *Id.* at Q/A 10, 30. Rockwell's

customer concerns surveys support the materiality of such notices. *Id.* at Q/A 31. A survey

conducted by Rockwell's expert "found that 91% of those surveyed stated that receiving safety

recall information was important or very important to their purchasing decision." CX-1041C

(Franklyn WS) at Q/A 68-69. I find that the lack of notice of PSAs and PNs for products

purchased from unauthorized purveyors of Rockwell products is material.

### 4. Lack of Quality Control

Rockwell's authorized distributors "all enter into contracts with Rockwell" to obtain the

right to sell genuine Rockwell products. CX-1037C (Michael WS) at Q/A 60, 62, 64, 66-68, 75.

The contracts obligate authorized distributors to maintain quality controls "in the sale, shipping,

handling, installation, support for, and marketing of" genuine Rockwell products. *See Id.* at Q/A

152; JX-0337C; CX-0940C; CX-0988C; CX-0989C; CX-0990C; CX-0991C; CX-0993C;

CX-0994C; CX-0995C; CX-0996C; CX-0997C; CX-0998C; CX-0999C; CX-1000C; CX-

1001C, CX 1002C; CPX-037C). Because many Rockwell products "include electronic

equipment or other sensitive parts that are vulnerable to shock, vibration, compression,

temperature, contamination, moisture, and electrostatic discharge and can be permanently

damaged or weakened, sometimes, without any observable way to detect such weakening," the

authorized distributors' quality controls are important. CX-1037C (Michael WS) at Q/A 151-

152. Rockwell employs personnel to monitor the operations of authorized distributors to ensure

compliance, and maintains audit rights with respect to quality control procedures. *Id.* at Q/A

157.

Rockwell also discontinues products that are defective and instructs its authorized

distributors to pull products from the shelves when necessary, and monitors the inventory held

by authorized distributors, to permit notification of products with issues requiring remediation.

*Id.* at Q/A 152, 155. No evidence in the record contradicts Rockwell's assertions in this regard.

I find that Rockwell's evidence concerning quality control procedures demonstrates that

these characteristics are material, and distinguishes products sold by authorized Rockwell dealers

from products that are not authorized to be sold by Rockwell. The evidence shows that quality

control procedures are important to customers. *Id.* at Q/A 153; CX-1041C (Franklyn WS) at

PUBLIC VERSION

Q/A 68-69 (88% of customers rate as important "New-in-box and in the manufacturer's packaging;" 68% rate as important "Direct sourcing from the manufacturer.").[6]

### 5. Lack of Customer Support

Rockwell trains its own employees and those of its authorized distributors to provide pre- and post-sale customer support. CX-1037C (Michael WS) at Q/A 165-166, 170. These services are undisputed. Rockwell maintains that they can be provided only by Rockwell and its authorized distributors, and there is no evidence in the record concerning any customer support procedures that may be provided by respondents. Customer support is material to consumers. Rockwell's expert found that 87% of those surveyed stated that post-sales services are important or very important to the purchasing decision. CX-1041C (Franklyn WS) at Q/A 68-69.

### 6. Hardware with Lack of Licensed Software/Firmware

Certain Rockwell products require firmware to operate, but the firmware is not pre-installed. "[O]nly Genuine Rockwell Products purchased through a Rockwell AD (authorized distributor) or directly from Rockwell itself are eligible to have licensed firmware; Unauthorized Rockwell Products are not eligible to have the licensed firmware." SB at 33 (citing CX-1023). CX-1023 is a Rockwell Automation End User License Agreement ("EULA"), in which the user agrees to the terms and conditions set by Rockwell concerning use of the software provided.

For example, firmware for Rockwell's programmable logic controllers ("PLCs") must be downloaded from Rockwell. CX-1037C (Michael WS) at Q/A 177-182. The EULA states that

---

[6] In a previous investigation, the Commission took no position on whether the alleged infringer's "lack of quality control over gray market [] distribution, storage, and transportation constitutes a material difference for gray market infringement analysis." *Certain Cigarettes and Packaging Thereof* ("*Cigarettes*")*,* Inv. No. 337-TA-643, Comm'n Op., 2009 WL 6751505 at *8 (Oct. 1, 2009).

**PUBLIC VERSION**

only purchasers from authorized Rockwell distributors are entitled to download the necessary firmware. *Id.* at Q/A 182. Rockwell maintains that its customers are ethical and "thousands" of them "accept the terms of Rockwell's EULA when they download firmware from Rockwell's website every week." CIB at 39 (citing CX-1037C (Michael WS) at Q/A 182.

Based on the dollar amount of allegedly infringing sales, however, *see* CX-1042C (Prowse WS) at Q/A 125 (███████████████), thousands of "unethical" customers also must be downloading the firmware. Staff's contention that "the installation of firmware in order to be operational [is] *per se* significant to customers," SB at 33, misses the point, which is not whether consumers want the purchased item to work, but whether they are willing to download the firmware in order to make it work, irrespective of whether they obtained the product from an authorized seller. Apparently, large numbers of buyers are not deterred by Rockwell's EULA from downloading the firmware necessary to operate their purchases. Rockwell presents no survey results or other objective evidence of materiality concerning whether it is important to a consumer to download authorized software/firmware, as opposed to unauthorized firmware, as long as the product using the firmware is operational. Rockwell has not carried its burden to demonstrate materiality with respect to this characteristic.

### 7. Lack of Intellectual Property Indemnity

Subject to its terms, Rockwell indemnifies purchasers of genuine Rockwell products against claims of infringement of intellectual property rights. CX-1037C (Michael WS) at Q/A 188; CX-1022C at 4-5. Rockwell states that the indemnity is valuable to customers, *see* CX-1037C (Michael WS) at Q/A 191, but Rockwell presents no survey results or other objective evidence of materiality. Rockwell therefore has not carried its burden with respect to this characteristic.

22

**PUBLIC VERSION**

### 8.  Sale of "Counterfeit" Goods

Rockwell relies on anecdotal evidence regarding purchasers who thought they were buying new products but were supplied with outdated or broken items.  CIB at 41-44.  Although Rockwell describes such instances as sales of "counterfeit" products, *id.*, these instances do not describe gray market infringement.  The products in these instances simply were not as advertised, *e.g.,* "new."  The relevant inquiry to establish liability under a gray market theory, as discussed above, is the existence of material differences between the product authorized for sale and the unauthorized product that may confuse a buyer.  False statements *about* a product may give rise to a different cause of action, but do not constitute material differences between an authorized product and a gray market product.

In sum, I find that Rockwell has demonstrated material differences with respect to importations by defaulting respondents based on lack of manufacturer's warranty, lack of probable cause reporting, lack of product safety advisories and product notices, lack of quality control, and lack of customer support.[7]

### E.  Authorized Sales

As discussed above, where a trademark owner itself sells or authorizes the sale of a substantial number of gray market goods, such sales may defeat a claim of trademark

---

[7] Radwell maintained during the period of its participation in the investigation that the differences identified above were not material to sophisticated consumers of Radwell products, who neither expected nor wanted Rockwell warranties, customer service, *etc.*  Gray market infringement cases do not rely on the actual expectation of actual customers to determine the materiality of product differences, as discussed above.  In any event, I find no survey or other objective evidence in this record concerning respondents' customers' expectations regarding the products they bought.

**PUBLIC VERSION**

infringement. The trademark holder bears the burden of demonstrating that substantially all of its own sales were accompanied by the material differences. *Bourdeau*, 444 F.3d at 1325.

During this investigation, former respondent Radwell maintained that Rockwell permits a substantial number of products to be re-sold by original equipment manufacturers ("OEMs"), which sales, like the sales made by the respondents, lack the material differences discussed above. In other words, Radwell alleged that Rockwell itself introduces a substantial number of gray market products into commerce. Radwell Mem. in Opposition to Rockwell Motion for Summary Determination Re "Authorization" to Sell Rockwell Products (Motion Docket No. 1074-024) at 1-2 ("Radwell Opp. to MSD"), addressed in Order No. 33 (Jun. 29, 2018).[8] To be clear, these items are genuine Rockwell products sold by Rockwell or its authorized dealers and allegedly re-sold by OEMs (or others, *see infra*), without the original Rockwell warranty and other material differences described above. Radwell maintained that Rockwell condones such sales, and thus that Rockwell cannot recover for alleged gray market infringement.

Rockwell responds with several arguments. First, Rockwell argues that sales by OEMs do not count as gray market sales because "the doctrine of first sale likely applies to those sales." CIB at 45 (quoting *Certain Bearings and Packaging Thereof,* Inv. No. 337-TA-469, Comm'n

---

[8] As stated above, Commission Rule 210.39(a) defines the record as "all pleadings, the notice of investigation, motions and responses, all briefs and written statements, and other documents and things properly filed with the Secretary, in addition to all orders, notices, and initial determinations of the administrative law judge, orders and notices of the Commission, hearing and conference transcripts, evidence admitted into the record (including physical exhibits), and any other items certified into the record by the administrative law judge or the Commission." 19 C.F.R. § 210.38(a). Because the hearing in this case, which was conducted by written submissions, did not include a submission by Radwell, which withdrew from the investigation before hearing, the decision draws on pertinent portions of the record that were submitted before the hearing. The remaining parties, Rockwell and Staff, were on notice that this decision would be based on the entire record. *See* Order No. 43 at 6.

**PUBLIC VERSION**

Op., 2004 WL 1598763 at *17 (June 30, 2004)).  Rockwell's reliance on the first sale doctrine conflicts with the underlying premise of gray market infringement.  Rockwell and Staff have maintained throughout this investigation that the first sale bar does not apply where re-sold products are materially different, *i.e.,* the products lack the Rockwell warranty, customer services, *etc.*  Using the logic espoused by Rockwell and Staff, that material differences constitute an *exception* to the first sale bar, it cannot be the case that OEM sales are entirely excluded from the calculation of gray market sales *because* of the first sale bar.

To the extent that sales by OEMs may be in a separate category from sales by Radwell or by the Defaulted Respondents, such a distinction would need to be based on a showing that the OEMs do not re-sell Rockwell products with material differences to consumers.  If it were demonstrated that OEMs did make such sales, the sales would count against Rockwell's claim of gray market infringement.  This presents a fact issue, rather than a blanket exception for OEMs.

I address below the factual question of whether substantial amounts of infringing products enter the marketplace through re-sales by OEMs and others.  After that discussion, I address the question whether such sales are made with Rockwell's consent, express or implied.

In addition to the sales by OEMs, former respondent Radwell maintained that Rockwell sells substantial amounts of products to value-added systems integrators ("VARs"), who market systems incorporating Rockwell products along with those of other manufacturers into large, complex machines and systems.  Radwell Pre-Hearing Brief ("Radwell Brief") at 26.  According to Radwell, ▮▮▮▮▮▮ the Allen-Bradley products placed into commerce by Rockwell reach their end users through such VAR sales.  *Id.* (citing RX-0505C).  Radwell asserted that none of the VAR sales are accompanied by the alleged "material differences."  Radwell pointed, for example, to the lack of a warranty, which attaches only to products bought directly from

**PUBLIC VERSION**

Rockwell or an authorized distributor (which a VAR is not). *See id.* at 27 (citing RX-1891C (Rockwell Warranty)). Radwell asserted that VARs are permitted to sell stand-alone Rockwell products to customers for use "as needed" for integration into systems solutions. *Id.* at 28. Radwell disputed Rockwell's characterizations of VAR sales as sales by OEMs and argued that, even assuming OEMs should be excluded from the calculation, ███████ Rockwell's sales to end users "indisputably" were made by VARs. *Id. See* Radwell Opp. to MSD, Ex. 6 (Rockwell sales chart).[9]

Rockwell responds that the vast majority of sales by OEMs and VARs take place in the context of commercial transactions involving complex items that incorporate Rockwell products into larger products or systems. Rockwell argues that consumers of "black box" items or complex systems will not be confused by the inclusion of Rockwell products that do not carry a Rockwell warranty, for example. They will expect (according to Rockwell) that the supplier of the black box item will address quality issues, even if the problem arises from a Rockwell part.[10]

The record is unclear as to the kinds of sales that are made by OEMs and VARs, however, and is almost entirely silent as to the actual expectations of the customers who buy Rockwell products from OEMs and VARs. Part of the confusion arises from bewildering terminology. The term OEM stands for original equipment manufacturer, but it is questionable whether the equipment means a "black box," finished good, a system, a panel, or something else.

---

[9] Radwell also alleged that ███████████████████████████████████ ████████████████████████████████████████████████████. CX-1185C (Martin WS) at Q/A 66-71, 19-49, 76-77.

[10] Staff proposes this analogy: "Apple is not 'reselling' a Qualcomm semiconductor chip or a Samsung display screen when a consumer purchases an iPhone that incorporates those components . . . ." SB at 35.

**PUBLIC VERSION**

The term VAR is used in the record in at least a couple of different ways. In one exhibit, the term VAR represents "value add systems integrator (as that term is generally defined in the industry) for manufacturing information and automation control solutions." CX-0759C.0002, ¶ 7.3. As explained by one Rockwell witness, a VAR is not selling a box; the VAR is selling a system that is customized to the needs of the consumer. Radwell Opp. Ex. 3 (Moriarty Dep.) at 121:9-12 ("They're selling a solution."). Staff, on the other hand, says VAR stands for "Value Added Resellers, which include, but are not limited to, panel builders, systems integrators, and original equipment manufacturers . . . ." SB at 35.

To compound the confusion in terminology, Rockwell uses the two terms, OEMs and VARs, interchangeably. *E.g.,* CIB at 45 ("As with the OEMs at issue in *Certain Bearings*, sales by VARs involve the incorporation of a Rockwell Genuine Product into a larger, more complex machine or system."). *See* Radwell Opp. Ex. 3 (Moriarty Dep.) at 30:15-16 ("I was told yesterday by [Rockwell witness] Mr. Michael that Mr. Michael considers OEMs VARs."). It does not appear, however, that the terms OEM and VAR are necessarily synonymous. An OEM sells only parts incorporated into a black-box, mass-produced finished product. *See* Radwell Brief at 33. A VAR, on the other hand, may sell stand-alone Rockwell products to the VAR's customer as spare parts. Radwell Opp. Ex. 2 (Michael Dep.) at 205:6-9. In addition, there seem to be many different categories of VARs. *See* Radwell Opp. Ex. 6 (sales chart listing sales by "A&E, EPC," "Consultant," "Contractor", "Educational Inst.," "End User," "Non-authorized Distr," "OEM," "Panel Builder," "RA Authorized Distr," "System Integrator," and "Unknown"). Most VARs and OEMs are not contractually bound to Rockwell in any way; they are simply customers. Radwell Opp. Ex. 2 (Michael Dep.) at 205:15-21.

27

**PUBLIC VERSION**

Some VARs do have a contractual relationship with Rockwell, however.  Rockwell maintains that there are about 2,400 systems integrator companies in "our program."  Radwell Opp. Ex. 3 (Moriarty Dep.) at 30:20-21.  Of these, some 300 are "recognized end solution partners" listed on Rockwell's website.  Radwell Opp. at 29; *see, e.g.,* Moriarty Dep. at 37:25-38:1.  The "recognized system integrators" who partner with Rockwell have contractual obligations under Rockwell's "Recognized System Integrator Program."  *See* CX-0759C.  Among these obligations is that the VAR "will resell Products, including spare parts, only as part of the solution it offers to customers.   [The VAR] is not authorized to and will not resell Products on a stand-alone basis."  CX-0759C.0003.  The remaining 2,100 VARs in Rockwell's "program" do not seem to have those contractual obligations.

This is a confusing record.  VARs who have no contractual obligation to Rockwell may be selling a large number of products into the gray market, as Radwell alleged.  Radwell argued that Rockwell provides discounts to favored VARs to incentivize them to sell Rockwell products.  *See* RPHB at 30 (citing RX-2190C (Moriarty Dep.) at 82:3-83:1, 212:2-8).[11]  But Radwell did not identify any specific instance in which a VAR re-sold a stand-alone Rockwell product.  Rockwell, on the other hand, has submitted evidence that such sales are not approved by Rockwell, expressly or impliedly, even if they occur.

Sales of materially different goods do not count against the trademark owner unless they were made with the owner's consent, express or implied.  The Commission borrows from the law of agency to determine if sales by a third party should be attributed to the trademark owner.  *Cigarettes,* 2009 WL 6751505 at *4.  "Apparent authority is created when: '[T]he principal,

---

[11] Radwell's proposed exhibits were not admitted into evidence.  The pertinent excerpts from the Moriarty deposition are found at Radwell Opp. Ex. 3.

**PUBLIC VERSION**

either intentionally or by lack of ordinary care, induces third persons to believe that an individual is his agent even though no actual authority, express or implied, has been granted to such individual.'" *Id.* (quoting *Certain Agricultural Vehicles and Components Thereof,* Inv. No. 337-TA-487, Comm'n Remand Op. at 16 (Sept. 18, 2008)).

Rockwell makes the case that its OEMs and VARs are not authorized to re-sell products on the open market,



CX-0983C.0004. The contracts with "Recognized System Integrators" contain a similar limitation. CX-1003C.0003. No evidence appears in the record of any action or behavior by Rockwell that could be interpreted as permitting stand-alone sales of Rockwell products by parties other than Rockwell or its authorized distributors. There is evidence to the contrary, showing that Rockwell actively polices non-compliance by VARs. *See* CIB at 47 (citing two examples of VARs with whom Rockwell ceased doing business when it learned they were re-selling stand-alone Rockwell products); CX-1183C (Bentley WS) at Q/A 18-29. Further, Rockwell submits evidence that stand-alone re-sales are insubstantial. Rockwell states that sales of spare parts by OEMs constitute less than ▇ of OEM sales. CX-1182C (Penick WS) at Q/A 26, 31. One VAR says its sales of spare parts would amount to ▇▇▇▇▇▇ ▇▇▇▇▇ sold by the entity. CX-0561C (Tinsley Decl.) at ¶ 15.

In sum, Rockwell has demonstrated that substantially all of its authorized sales bear the material differences that distinguish them from the items sold by respondents. Rockwell has thus shown gray market infringement by all of the Defaulted Respondents. As discussed above, all of the Defaulted Respondents infringe the first nine asserted trademarks, covering the A-B,

**PUBLIC VERSION**

ALLEN-BRADLEY, and ROCKWELL AUTOMATION marks.  Fractioni and Yaspro further infringe the CONTROLLOGIX trademark.

### F.     Domestic Industry

The domestic industry requirement under section 337 arises from the statutory language governing intellectual property-based proceedings in subsection 337(a)(2), which requires that a complainant establish that "an industry in the United States, relating to the articles protected by the patent, copyright, trademark, mask work, or design concerned, exists or is in the process of being established."  19 U.S.C. § 1337(a)(2).  Subsection (3) of section 337(a) provides:

> For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –
>
> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3).  The domestic industry requirement consists of an "economic prong" and a "technical prong."  *Certain Stringed Musical Instruments*, Inv. No. 337-TA-586, Comm'n Op. at 13, 2009 WL 5134139, at *10 (May 16, 2008).  The "economic prong" of the domestic industry requirement is satisfied when it is determined that the economic activities and investments set forth in one of the subprongs of subsection 337(a)(3) has taken place.  *Certain Variable Speed Wind Turbines & Components Thereof*, Inv. No. 337-TA-376, USITC Pub. No. 3003, Comm'n Op. at 21 (Nov. 1996).  The "technical prong" is satisfied when the articles at issue are protected by the asserted intellectual property, *i.e.*, they bear the asserted trademarks. *Certain Protective Cases and Components Thereof*, Inv. No. 337-TA-780, Initial Determination at 90 (June 29, 2012), *not reviewed in relevant part by* Comm'n Notice (Aug. 30, 2012).

**PUBLIC VERSION**

As discussed above, Mr. Michael testified that "[a]ll Rockwell Products sold by Rockwell bear the Asserted Trademarks," and accordingly, these products satisfy the technical prong of the domestic industry requirement.  CX-1037C (Michael DWS) at Q/A 45.  No party raised any dispute that the technical prong is satisfied.  CIB at 54; *see* SB at 39-40; RPHB at 62.

Pursuant to Order No. 39, summary determination was granted with respect to the economic prong of the domestic industry requirement for the ControlLogix® and PanelView® product lines that Rockwell identified as bearing asserted trademark registration nos. 1172995, 696401, 693780, 1172994, 712800, 712836, 2510226, 2671196, and 2701786.  Order No. 39 at 10-15 (July 12, 2018), *not reviewed by* Comm'n Notice (Aug. 14, 2018).  Rockwell submits that the economic prong is also satisfied with respect to trademark registration no. 2412742, which is the ControlLogix® mark.  CIB at 73-75.  Because the economic prong was found to be satisfied with respect to the ControlLogix® product line on summary determination, this finding also applies to the ControlLogix® mark.[12]  Accordingly, the economic prong of the domestic industry requirement is satisfied with respect to all of the asserted trademarks.

Rockwell has thus established the existence of a domestic industry in the asserted trademarks pursuant to section 337(a)(2).

---

[12] There appears to be some discrepancy between Mr. Michael's testimony that "[a]ll Rockwell Products sold by Rockwell bear the Asserted Trademarks," CX-1037C (Michael DWS) at Q/A 45, and Rockwell's arguments that associate the ControlLogix® mark with only the ControlLogix® products.  CIB at 73-75; *see* SB at 40 ("The tenth Asserted Trademark to CONTROLLOGIX, Registration No. 2412742, is used only on the ControlLogix® product line.").  Regardless of whether the ControlLogix® mark appears on any other products, the domestic industry requirement is satisfied for this mark by Rockwell's investments in the ControlLogix® products, which were found to be significant in Order No. 39.

**PUBLIC VERSION**

## IV.    COPYRIGHT INFRINGEMENT

Rockwell accuses each of the Defaulted Respondents of copyright infringement based on the importation of accused products that are used with copyrighted software that is downloaded in the United States after importation.  CIB at 54-62; SB at 40-47.

### A.    Legal Standard

Rockwell's asserted claim against the Defaulted Respondents is one of contributory copyright infringement under section 337(a)(1)(B)(i), which prohibits "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that — (i) infringe . . . a valid and enforceable United States copyright registered under title 17." 19 U.S.C. § 1337(a)(1)(B)(i).  In *Suprema Inc. v. International Trade Comm'n*, the Federal Circuit affirmed the Commission's application of this subsection of the statute to induced and contributory patent infringement.  796 F.3d 1338, 1347 (Fed. Cir. 2015).[13]

---

[13] In *Suprema*, the Federal Circuit relied on the statutory definitions of induced and contributory patent infringement in sections 271(b) and (c) of the Patent Act.  *Id.* at 1347 (citing 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."), § 271(c) ("Whoever offers to sell or sells ... a component of a patented machine ... shall be liable as an infringer.")).  There is no corresponding statutory language in the Copyright Act, although a cause of action for contributory copyright infringement has been recognized through common law principles of vicarious liability.  *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 434 (1984).  Because contributory copyright infringement arises under common law rather than by statute, it is not clear whether the precedent in *Suprema* extends to a claim of contributory copyright infringement under section 337(a)(1)(B)(i).  Nevertheless, Rockwell would likely have a cause of action under subsection (a)(1)(A), as the Commission has previously recognized contributory copyright infringement as an "unfair act" under the pre-1988 version of section 337.  *See Certain Personal Computers and Components Thereof*, Inv. No. 337-TA-140, USITC Pub. No. 1504, Comm'n Op. at 27-40 (March 1984); *see* Initial Determination, 1983 WL 207160, *8-15 (Dec. 9, 1983) ("Infringement under Section 501(a) of the Copyright Act may be 'direct' or 'contributory.'").
The same federal common law of contributory copyright infringement would apply under either section 337(a)(1)(A) or (a)(1)(B).  *See TianRui Group Co. Ltd. v. Int'l Trade Comm'n*, 661

32

Under the Copyright Act, Title 17 of the U.S. Code, copyright owners have exclusive rights, including the right "(1) to reproduce the copyrighted work in copies" and "(3) to distribute copies . . . of the copyrighted work to the public by sale or transfer of ownership . . . ." 17 U.S.C. § 106. "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright. 17 U.S.C. § 501(a).

"One infringes contributorily by intentionally inducing or encouraging direct infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 545 U.S. 913, 930 (2005). To establish contributory infringement, the copyright holder must demonstrate an underlying direct infringement. *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 937 (9th Cir. 2010). In the context of patent infringement, the Federal Circuit has held that induced infringement "requires knowledge that the induced acts constitute . . . infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). Courts have applied this standard in the context of copyright infringement, holding that it is not enough to prove that an inducer "should have known" of infringement but that "proving contributory infringement requires proof of at least willful blindness; negligence is insufficient." *BMG Rights Management (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 310 (4th Cir. 2018).

## B.    Asserted Copyrights

Rockwell asserts eight registered copyrights: Copyright Reg. Nos. TX0008389890 (JX-0012), TX0008389887 (JX-0013), TX0008390098 (JX-0014), TX0008390094 (JX-0015),

---

F.3d 1322, 1327-28 (Fed. Cir. 2011) (applying "federal common law" to a case of trade secret misappropriation). The only substantive difference between an (a)(1)(A) and (a)(1)(B) claim would be the standards for establishing a domestic industry, but because Rockwell has asserted a tortious interference claim based on its copyrighted software under subsection (a)(1)(A), an analysis of the relevant domestic industry has been briefed under both standards and is addressed herein. *See infra.*, section V.D.

**PUBLIC VERSION**

TX0008390077 (JX-0016), TX0008390088 (JX-0017), TX0008390116 (JX-0018), and

TX0008390111 (JX-0020). The copyright registration certificates in the record establish that

Rockwell is the owner of each of these copyrights, and pursuant to the Copyright Act, the

certificates are *prima facie* evidence of their validity. 17 U.S.C. § 410(c). No party has

challenged the validity of the asserted copyrights. *See* SB at 44. Accordingly, the asserted

copyrights are presumed valid. *See Lannom Mfg. Co. v. Int'l Trade Comm'n*, 799 F.2d 1572,

1579-80 (Fed. Cir. 1986) (precluding Commission from finding a patent invalid when no defense

of invalidity was raised).

Each of the asserted copyrights protects a version of firmware for certain of Rockwell's

controller products. CIB at 9; CX-1037C at Q/A 217-18. Copyright Reg. No. TX0008389890

protects firmware version 16 for CompactLogix® L3x Controllers, Copyright Reg. No.

TX0008389887 protects firmware version 16 for ControlLogix® L6 Controllers, Copyright Reg.

No. TX0008390098 protects firmware version 20 for CompactLogix® L3x Controllers,

Copyright Reg. No. TX0008390094 protects firmware version 20 for CompactLogix® L3y

Controllers, Copyright Reg. No. TX0008390077 protects firmware version 20 for

ControlLogix® L6 Controllers, Copyright Reg. No. TX0008390088 protects firmware version

20 for ControlLogix® L7 Controllers, Copyright Reg. No. TX0008390116 protects firmware

version 30 for CompactLogix® L3y Controllers, and Copyright Reg. No. TX0008390111

protects firmware version 30 for ControlLogix® L7 Controllers. *Id.*

## C.   Accused Products

The Defaulted Respondents are accused of infringing different asserted copyrights based

on the products they have imported. CIB at 61-62.

**PUBLIC VERSION**

Fractioni is accused of infringing Copyright Reg. Nos. TX0008389890 and TX0008390098 based on sales of four Allen Bradley 1769-L32E ControlLogix® controllers. *Id.*; CPX-0039C. Fractioni is also accused of infringing Copyright Reg. Nos. TX0008389887 and TX0008390077 based on sales of four Allen Bradley 1756-L61 ControlLogix® controllers. *Id.* Fractioni is further accused of infringing Copyright Reg. Nos. TX0008390088 and TX0008390111 based on its sale of an Allen Bradley 1756-L7SP ControlLogix® Safety Controller. *Id.*; *see* CX-0027C, Ex. B.

GreySolution is accused of infringing Copyright Reg. Nos. TX0008390088 and TX0008390111 based on its sale of an Allen Bradley 1756-L7SP ControlLogix® Safety Controller. *Id.*; *see* CX-0027C, Ex. D.

SoBuy and T-Tide are accused of infringing Copyright Reg. Nos. TX0008390094 and TX0008390116 based on their sale of an Allen Bradley 1769-L16ER CompactLogix® Safety Controller. *Id.*; *see* CX-0027C, Ex. E. SoBuy and T-Tide are also accused of infringing Copyright Reg. Nos. TX0008390088 and TX0008390111 based on their sale of an Allen Bradley 1756-L7SP GuardLogix® Safety Controller. *Id.*; *see* CX-0027C, Ex. X.

Can Electric is accused of infringing Copyright Reg. Nos. TX0008390088 and TX0008390111 based on its sale of two Allen Bradley 1756-L7SP ControlLogix® Safety Controller. *Id.*; *see* CX-0027C, Ex. R.

KBS, Euosource, and Yaspro are accused of infringing Copyright Reg. Nos. TX0008390088 and TX0008390111 based on their sale of one Allen Bradley 1756-L7SP ControlLogix® Safety Controller. *Id.*; *see* CX-0027C, Ex. W.[14]

---

[14] Rockwell also alleges that "Yaspro continue[s] to sell Unauthorized Rockwell Copyright Products to this day," citing a URL that appears to point to a search on Yaspro's web site. CIB

**PUBLIC VERSION**

In the copyright infringement section of their briefs, neither Rockwell nor Staff identify any product sold by Yi Micro. CIB at 61-62; SB at 45. As discussed above in the context of trademark infringement, however, a product purchased from Yi Micro was misidentified in the Complaint—Yi Micro had offered for sale an Allen Bradley 1756-L7SP GuardLogix® Safety Controller, which would use firmware that infringes Copyright Reg. Nos. TX0008390088 and TX0008390111. *See* CX-0027C, Ex. K.[15,16]

### D. Underlying Direct Infringement

"To establish secondary infringement, [a copyright holder] must first demonstrate direct infringement." *MDY Industries*, 629 F.3d at 937; *see also Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3rd Cir. 2016) ("[T]o prove a claim of contributory or vicarious infringement, a plaintiff must first show direct infringement by a third party."); *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1181 (10th Cir. 2009) ("[B]oth contributory and vicarious infringements require someone to have directly infringed the copyright.").

The requirement to prove an underlying direct infringement is well-established in patent infringement cases involving induced and contributory infringement. *See Certain Automated Teller Machines, ATM Products, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-972, Initial Determination at 150-58 (Nov. 30, 2016) (discussing legal standards for

---

at 62 n.13. This evidence is not part of the record and will not be considered as part of this determination. The Rockwell product identified in the newly admitted exhibit, CX-1189, is not accused of copyright infringement.

[15] *See supra*, n.5.

[16] In its post-hearing brief, Rockwell argues that Yi Micro "sell[s] Unauthorized Rockwell Copyright Products to this day," but cites only to two recent eBay listings that were not admitted into evidence and only show evidence of offers for sale without evidence of importation into the United States. CIB at 62 n.12.

induced and contributory patent infringement).  This direct infringement may be proven either by specific instances of infringement or by circumstantial evidence showing the accused device "necessarily infringes the patent in suit." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).  Circumstantial evidence must show that at least one person directly infringed an asserted claim during the relevant time period. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009).

Although the issue of underlying direct infringement was briefed extensively in the context of a summary determination motion, *see* Order No. 38 (July 12, 2018), neither Rockwell nor Staff addressed the issue in their post-hearing briefs. *See* CIB at 54-62; SB at 40-47.  The only reference to direct infringement in Rockwell's post-hearing brief is in its recitation of legal standards, where Rockwell acknowledges that "[t]o establish a claim of contributory infringement, a complainant must show: '(1) a third party directly infringed the plaintiff's copyright . . . .'" CIB at 57-58 (quoting *Leonard*, 834 F.3d at 387).

In their pre-hearing briefs, Rockwell and Staff indicated that they intended to prove direct infringement through circumstantial evidence surrounding Radwell's sale of Rockwell products. CPHB, Vol. III at 7-10; SPHB at 52-53.  Rodney Michael, Rockwell's Director of Global Market Access, testified that Rockwell's ControlLogix® and CompactLogix® controllers are sold without firmware and are inoperable without downloading the necessary firmware. CX-1037C at Q/A 177-80.  Rockwell's expert, Dr. Prowse, identified ███████ Rockwell products recently sold by Radwell that are associated with firmware protected by the asserted copyrights. CX-1042C at Q/A 117.  The total value of these products was over ███████ with purchase prices ranging from ███████.  *Id.*  From this evidence, Rockwell argued that "[i]t is impossible to conclude that *not a single user* of any of these ██ products ███████

37

**PUBLIC VERSION**

█████████ ever used these products." CPHB at 9-10 (emphasis in original).  Staff argued

that "[t]he only reasonable conclusion to be drawn is that end users who purchase the

unauthorized Rockwell Copyright Products from Radwell necessarily download the firmware in

the United States from Rockwell's website and infringe one or more of the Asserted

Copyrights."  SPHB at 53.

The circumstantial evidence cited by Dr. Prowse may have been sufficient to support a

finding of direct infringement by Radwell's customers, but there is no comparable circumstantial

evidence regarding the Defaulted Respondents' sales.  With respect to GreySolution, SoBuy, T-

Tide, Can Electric, KBS, Euosource, Yaspro, and Yi Micro, Rockwell has only identified the

sale of one or two accused products.  Products purchased from GreySolution, SoBuy/T-Tide, and

Yi Micro were delivered to what appears to be a residential address in Alexandria, Virginia.  *See*

CX-0027C, Exs. D-3, E-2, K-2.[17]  There is no evidence that these products were ever used in an

industrial setting—the photographs attached to the Complaint only show unopened packages.  *Id.*

A declaration attached to the Complaint states that these products were purchased at the direction

of Rockwell's counsel, for the purpose of filing the complaint in this investigation, not for any

industrial use.  *Id.*, Decl. of Adam Swain.  The circumstantial evidence in the record thus makes

it unlikely that any copyrighted firmware was ever downloaded on these imported products.[18]

---

[17] A second product was purchased from SoBuy/T-Tide, a 1756-L7SP controller, but there was
no evidence attached to the complaint showing that it arrived in the United States.  *See* CX-
0027C, Ex. X.  Similarly, there is no evidence that a 1756-L7SP controller purchased from
Fractioni arrived in the United States.  *See Id.*, Ex. B.

[18] Even if firmware were downloaded onto these products, it is not clear that the download would
constitute copyright infringement, because Mr. Swain was acting on behalf of Rockwell, the
copyright owner.

The products purchased from Can Electric and KBS/Euosource/Yaspro were shipped to a business address in Laurel, Maryland. *See* CX-0027C, Exs. R-1, W-6. Again, however, the photographs attached by Rockwell only show unopened packages. *See* Supplement to Complaint (Sept. 29, 2018), Ex. R-3, W-8. The addressee on these two packages was redacted from Rockwell's filing, although the payment record for the Euosource order identifies the addressee as "Adam Swain." CX-0027C, Exs. W-3, W-6. Mr. Swain is an attorney for Rockwell in this investigation,[19] and the circumstantial evidence surrounding these sales thus similarly points to a conclusion that it is unlikely that copyrighted firmware was ever downloaded on these imported products.

With respect to Fractioni, Rockwell identifies additional evidence of accused products that were sold ▉▉▉▉. *See* CPX-0039C. Specifically, importation data ▉▉▉▉▉▉▉▉ shows four Allen Bradley 1769-L32E ControlLogix® controllers sold by Fractioni ▉▉▉▉ on April 21, 2011. *Id.*[20] It also shows four Allen Bradley 1756-L61 ControlLogix® controllers sold by Fractioni ▉▉▉▉, with three sold on April 21, 2011, and one sold on June 15, 2011. *Id.*[21] Rockwell does not allege any direct infringement ▉▉▉▉, however, and there is no evidence that ▉▉▉ ever downloaded firmware for the products that it purchased from Fractioni. Dr. Prowse's analysis of ▉▉▉ copyright infringement was limited to products acquired after

---

[19] *See supra*, n.18.

[20] Although Rockwell accuses these products of infringing two asserted copyrights, only the earlier copyright could have been infringed at the time of this sale in April 2011, because Version 20 of the firmware for L3x controllers was not published until December 2011, more than seven months later. *See* JX-0014.

[21] Only the earlier of the two asserted copyrights could have been infringed at the time of this sale in April and 2011, because Version 20 of the firmware for L6 controllers was not published until December 2011. *See* JX-0016; *see supra*, n.20.

**PUBLIC VERSION**

March 2015, placing these 2011 Fractioni sales outside the scope of his testimony. *See* CX-1042C (Prowse DWS) at Q/A 117-18. There is no evidence of direct infringement with respect to these Fractioni imports, and accordingly, Rockwell has not shown direct infringement of any asserted copyright in connection with products sold by any of the Defaulted Respondents.

### E.    Contributory Infringement

Separate from the showing of direct infringement, Rockwell must show that each respondent "knowingly takes steps that are substantially certain to result in such direct infringement." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1171 (9th Cir. 2007). To satisfy this knowledge requirement, Rockwell and Staff point to evidence in the record that several of the defaulted respondents are experienced in the industrial supply business. CIB at 60-61; SB at 46-47. Public documents from websites associated with some of the respondents were attached to the Complaint, showing that these respondents are professional suppliers of industrial parts: CX-0028 (www.can-electric.com); CX-0033 (www.euosource.com); CX-0037 (www.yaspro.com); CX-0044 (fractioni.com). A page associated with Can Electric at alibaba.com states that Can Electric is a "professional global automation supplier, built on over 10 years of experience." CX-0029. A page associated with EuoSource offers "[c]ustomer service in 1-4 hours" and an "[e]xperienced technichal [*sic*] support team." CX-0035. Yaspro's homepage claims "a proven history of high quality, performance, and reliability," and states that "[a]ll the parts will be tested before shipment." CX-0037. The eBay listing associated with respondent Fractioni contains the statement: "We been in this factory/process automation business for 19 years." CX-0027C, Ex. B-1. Rockwell argues that experienced professional suppliers such as these would know that Rockwell products are sold in an unusable state that requires the download of Rockwell's firmware. CIB at 60. As discussed above, Mr. Michael

**PUBLIC VERSION**

testified that the products at issue are inoperable without downloading the necessary firmware. CX-1037C at Q/A 177-80. The firmware can be downloaded from Rockwell's website, which "requires users to affirmatively consent to Rockwell's EULA [End User License Agreement], which prohibits download and use of the firmware unless the product for which it was downloaded was purchased from Rockwell or an Authorized Distributor." *Id.* at Q/A 186.

I agree with Rockwell and Staff that the cited evidence is sufficient to show that Fractioni, Can Electric, and KBS/Euosource/Yaspro had knowledge that firmware would be required to use Rockwell's products. Neither Rockwell nor Staff cite any similar evidence for GreySolution, SoBuy/T-Tide, or Yi Micro, however.

Merely showing these respondents' knowledge of Rockwell's firmware is not sufficient to prove contributory infringement. Rockwell must further show that the respondents knew that a customer's download would constitute copyright infringement. As discussed by the Federal Circuit, "*Grokster* has clarified that the intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement." *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (citing *Grokster*, 545 U.S. at 936). "The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990). In the context of Rockwell's allegations, this would require evidence that the respondents knew their customers would not be authorized to download the copyrighted firmware. Rockwell identifies circumstantial evidence of this knowledge with respect to Yaspro, noting that Yaspro purports to have tested the products, and any testing would require downloading Rockwell firmware, including review of the EULA. CIB at 61. These statements from Yaspro's website appear to be advertising

**PUBLIC VERSION**

puffery, however, and I cannot conclude that Yaspro downloaded any Rockwell firmware and reviewed the EULA based solely on a statement that, "[a]ll the parts will be tested before shipment." CX-0037. The evidence that Rockwell and Staff cite with respect to Can Electric and Fractioni is even less convincing, merely identifying Rockwell products on an "advantage Product-List," CX-0028, and stating: "We been in this factory/process automation business for 19 years." CX-0027C, Ex. B-1. These statements on the websites and eBay listings of the Defaulted Respondents are not reliable, and in some cases are demonstrably false, such as Fractioni's representation that "[w]e only source direct from manufacturers themselves or authorized distributors." *Id.*

In the alternative, Rockwell argues that all of the respondents would have been on notice that they were inducing copyright infringement after service of the complaint, service occurred after the alleged acts of inducement.[22]  Rockwell has thus failed to carry its burden to show the requisite knowledge for proving contributory infringement.  Accordingly, because there is no evidence of underlying direct infringement and insufficient evidence of knowledge by the Defaulted Respondents, Rockwell has failed to prove contributory copyright infringement.

---

[22] Fractioni's alleged sale for importation occurred on August 21, 2017; Fractioni was not served the Complaint until October 10, 2017.  The alleged importation by Yi Micro occurred on August 29, 2017; Yi Micro was served the Complaint on October 10, 2017.  Can Electric's alleged importation occurred on September 11, 2017; Can Electric was served the Complaint on December 22, 2017.  The alleged importation by KBS/Euosource/Yaspro occurred on September 11, 2017; KBS and Euosource were served the complaint on October 10, 2017, while Yaspro was served on December 22, 2017.

**PUBLIC VERSION**

### F.    Domestic Industry

Rockwell previously moved for summary determination on the economic prong of the domestic industry requirement, but the motion was denied with respect to the asserted copyrights.  Order No. 39 (July 12, 2018).

#### 1.    Technical Prong

Rockwell relies on Mr. Michael's testimony to establish that certain of its products are protected by the asserted copyrights.  CX-1037C at Q/A 214-226.  Each asserted copyright corresponds to a version of firmware that is used in certain ControlLogix® and CompactLogix® controllers.  *Id.* at Q/A 217.  Copyright Reg. Nos. TX0008389887 and TX0008390077 protect firmware for ControlLogix® L6 Controllers, Copyright Reg. Nos. TX0008390088 and TX0008390111 protect firmware for ControlLogix® L7 Controllers, Copyright Reg. Nos. TX0008389890 and TX0008390098 protect firmware for CompactLogix® L3x Controllers, and Copyright Reg. Nos. TX0008390094 and TX0008390116 protect firmware for CompactLogix® L3y Controllers.  *Id.* at Q/A 218.  There is no contrary evidence in the record, and accordingly, Rockwell has satisfied the technical prong of the domestic industry requirement for each of the asserted copyrights.

#### 2.    Economic Prong

Rockwell submits that it has satisfied the domestic industry requirement with respect to each asserted copyright under subsections (B) and (C) of section 337(a)(3).  CIB at 76-79. Rockwell's asserted investments are divided between two of its product lines that practice the asserted copyrights: (1) the ControlLogix® product line, which is manufactured, assembled, and tested entirely in Rockwell's Twinsburg, Ohio facility; and (2) the CompactLogix® product line,

which is manufactured overseas but was designed, developed, and tested in the United States. *Id.* at 66-70.

### a.  ControlLogix® Products

For the ControlLogix® product line, Rockwell identifies ███████████ manufacturing labor expenditures between FY 2013 and FY 2017. CX-1042C (Prowse DWS) at Q/A 70; *see also* Order No. 39 at 10. An additional ██████████ was spent on capital expenditures in that timeframe for the ControlLogix® product line. *Id.* Rockwell reported warranty and repair expenditures in a shorter timeframe, with warranty expenditures for the ControlLogix® product line ████████████████ from FY 2015 to FY 2017, and repair expenditures ██ ███████████████. *Id.* at Q/A 76; *see* Order No. 39 at 10. Rockwell invested ████████████████ in internal labor costs for research and development for the ControlLogix® product line from FY 2015 to FY 2017. *Id.* at Q/A 98; *see* Order No. 39 at 10. There was no challenge to these expenditures by Radwell or Staff in the context of Rockwell's motion for summary determination, and these amounts formed the basis for finding that Rockwell had satisfied the economic prong with respect to trademarks associated with the ControlLogix® products. Order No. 39 at 10-11 ("Rockwell's investments in manufacturing, service and repair, and research and development are significant enough to establish a domestic industry with respect to the ControlLogix® product line under subsection (B) of section 337(a)(3)."). These expenditures total ██████████ for the ControlLogix® product line.

Rockwell also asserts certain investments in planned labor services and field labor, which were not tracked by product line and were thus excluded from the domestic industry analysis on summary determination. *See* Order No. 39 at 13-14. Mr. Michael identified ████████████ U.S. field labor and █████████ planned service labor from FY 2015 to 2017. CX-1037C

(Michael DWS) at Q/A 247 (citing CPX-0031C). Mr. Michael also testified that "



." *Id.* at Q/A 243. Mr. Michael reviewed Rockwell

sales data to determine that ████ Rockwell's sales revenue from FY 2014 to 2017 was

attributable to the ControlLogix® product line. *Id.* at Q/A 245. Dr. Prowse used these sales

figures to allocate the field labor and planned service labor expenditures to the ControlLogix®

products. CX-1042C (Prowse DWS) at Q/A 77.

The Commission has recognized that "[a] sales-based allocation may be applied to

determine the investments 'relating to the articles protected by the patent.'" *Certain Collapsible*

*Sockets for Mobile Electronic Devices and Components Thereof*, Inv. No. 337-TA-1056,

Comm'n Op. at 16 (July 9, 2018) (quoting 19 U.S.C. § 1337(a)(3)). But as discussed in Order

No. 39, a sales-based allocation does not appear to be a reliable method for apportioning

Rockwell's service and repair expenditures between different product lines. Order No. 39 at 13-

14. There are large discrepancies between the sales reported for different Rockwell product lines

and the warranty and repair expenditures that are tracked by product line. *Id.* Mr. Michael

identifies sales revenue for ControlLogix® products ████████ that is more than double the

sales revenue for PanelView® products ████████, but the relationship between these

products is reversed for repairs—repair expenditures for the PanelView® products ████████

are more than five times the repair expenditures for the ControlLogix® products ████████.

*Compare* CX-1037C (Michael DWS) at Q/A 245 to Q/A 251. This inverse relationship between

repair expenditures and sales revenue makes it unlikely that a sales allocation would be reliable.

**PUBLIC VERSION**

In its post-hearing brief, Rockwell submits that the discrepancy can be explained by the fact that "PanelView products are product visualization devices with touchscreen displays, which may be more susceptible to breakage." CIB at 72. In recognition of this fact, Rockwell no longer relies on the PanelView® products as part of its asserted domestic industry. *Id.* Withdrawing the PanelView® products does not correct Dr. Prowse's misallocation, however— Rockwell's post-hearing brief relies on the same sales-based allocations for the ControlLogix® and CompactLogix® products that were cited in Rockwell's motion for summary determination and in Dr. Prowse's witness statement. *Id.* at 68. These allocations remain unreliable for the reasons discussed in Order No. 39. Based on Rockwell's representation that the PanelView® products are likely to require more repairs, a reliable allocation of planned service and field labor would assign a greater proportion of these expenses to the PanelView® products, and a smaller proportion to the ControlLogix® products. Without making any such correction, Dr. Prowse's allocations are likely to have overstated the service expenditures that can be properly attributed to ControlLogix® products by a significant amount. The amount of field labor and planned service labor that Rockwell attributes to the ControlLogix® products is therefore unreliable, and these expenditures will not be counted as part of Rockwell's asserted domestic industry. This leaves a total of ███████████ Rockwell's labor expenditures for the ControlLogix® product line, as discussed above.

Not all of Rockwell's ControlLogix® products use the copyrighted firmware, and it is therefore necessary to allocate these expenditures to the relevant domestic industry products. Dr. Prowse allocated Rockwell's ControlLogix® expenditures between products associated with the copyrighted firmware, CX-1042C at Q/A 101, but Staff identified an inaccuracy in Dr. Prowse's calculations where he relied on an incorrect value for the total sales of

46

ControlLogix® products.  SB at 60-62; CIB at 70-72.  Correcting for this mistake, Rockwell and Staff submit that the L6 products account for ███████ ControlLogix® sales over the relevant period, while the L7 products account for ██████ ControlLogix® sales.  *Id.*  A sales allocation appears to be a reliable method to apportion Rockwell's labor expenditures among different ControlLogix® products.  Applying these percentages to the ████████ total results in ████ ███████ expenditures for the L6 products and ██████████ for the L7 products.

Rockwell and Staff assert that these investments represent "significant employment of labor or capital" pursuant to section 337(a)(3)(B).  CIB at 76-78; SB at 60-62.  As recognized in Order No. 39, the ControlLogix® product line is manufactured entirely in the United States, and all hardware design and prototyping as well as software development is performed in the United States.  CX-1037C (Michael DWS) at Q/A 228, 252-54; Order No. 39 at 10-11.  Dr. Prowse reviewed the labor costs for manufacturing several ControlLogix® products, finding that the domestic labor expenditure was between approximately █████████ of the total cost of goods sold.  CX-1042C (Prowse DWS) at Q/A 87.  One of the products he reviewed was an L7 product, the ControlLogix® 1756-L71 (PN-114304), for which the domestic labor expenditure was ████ of the total cost of goods sold.  CIB at 77.[23]  The qualitative and quantitative factors for Rockwell's investments in the L6 and L7 products are thus similar to what was discussed in Order No. 39 for the ControlLogix® line overall.  *See* Order No. 39 at 10-11.  Accordingly, for the reasons discussed in Order No. 39, Rockwell has satisfied the domestic industry requirement for the ControlLogix® L6 and L7 products under section 337(a)(3)(B).

---

[23] Rockwell also submits that its total domestic investment in ControlLogix® products is approximately ████ of total sales revenue, but when the field labor and planned service labor expenditures are removed from the total, this is reduced to approximately ████.

**PUBLIC VERSION**

### b.     CompactLogix® Products

The CompactLogix® products are not manufactured in the United States, and Rockwell's domestic industry in these products relies on investments in engineering, research, and development, and investments in warranty and repair services. CIB at 66-72. As discussed above, Rockwell's engineering and R&D investments are tracked by product line—there were expenditures ██████████ in R&D labor for the CompactLogix® products between FY 2015 and 2017. CX-1037C (Michael DWS) at Q/A 257-58 (citing CPX-0034C). Warranty and repair services are also tracked by product line, with ██████████ warranty expenditures and ██████████ ██ repair expenditures for the CompactLogix® products between FY 2015 and 2017. *Id.* at Q/A 250, 251 (citing CPX-0034C). Rockwell also asserts investments in planned labor services and field labor, but as discussed above, Rockwell's allocation of these expenditures to different product lines is unreliable. For the same reasons discussed above in the context of the ControlLogix® products, it is likely that the sales-based allocation of these expenditures to CompactLogix® products greatly overstates the amount that actually relates to these products. Accordingly, the total domestic industry expenditures that can be reliably attributed to the CompactLogix® products is ██████████ from FY 2015 to 2017.

Rockwell and Staff allocated the CompactLogix® expenditures to the specific L3x and L3y models that use the copyrighted firmware. SB at 60-62; CIB at 70-72. As discussed above, Dr. Prowse's allocation used inaccurate sales data, and after correcting for this mistake, Rockwell and Staff agree that L3x sales account for ██████████ CompactLogix® sales while L3y sales account for ██████████ CompactLogix® sales. *Id.* As discussed above, a sales allocation is appropriate for distributing expenditures between different models within a Rockwell product

**PUBLIC VERSION**

line, and the allocation yields ████████ expenditures for the CompactLogix® L3x products and ████████ expenditures for the CompactLogix® L3y products.

Rockwell and Staff submit that these expenditures are significant under sub-prong (B) of section 337(a)(3) and substantial under sub-prong (C). CIB at 78-79; SB at 60-62, 64-65. The investments cited by Rockwell are relatively small in comparison to the sales revenue for these products, with the amounts cited above representing only ███ of the total value of CompactLogix® sales—even if the additional planned service and field labor expenditures were included, domestic expenditures only represent ███ of the value of CompactLogix® sales. CIB at 78-79. Mr. Michael provides additional evidence of qualitative significance, explaining that "[t]he ControlLogix® product line is conceived, designed, developed, and tested in the United States by employees located in in Milwaukee, Wisconsin, and Mayfield Heights, Ohio." CX-1037C at Q/A 252. He further explains that "[t]hese activities include all hardware design and prototyping as well as software." *Id.*

In the context of sub-prong (B), the qualitative factors are do not compensate for the quantitatively small investments in domestic labor and capital. The facts surrounding the CompactLogix® products are similar to those considered by the Commission in *Certain Solid State Storage Drives, Stacked Electronics Components, and Products Containing the Same* ("*Solid State Storage*"), where the administrative law judge's finding of no domestic industry was affirmed with respect to a product designed in the United States but manufactured overseas. Inv. No. 337-TA-1097, Comm'n Op. at 31-35 (Jun. 29, 2018). In *Solid State Storage*, the complainant relied on evidence similar to Rockwell's, asserting that management and design decisions occurred in the United States. *Id.* at 31-32. The Commission found that there was insufficient evidence to find a domestic industry where there was no comparison between foreign

49

**PUBLIC VERSION**

and domestic expenditures, no value-added analysis, and no comparison between expenditures on the asserted products and expenditures on other products. *Id*. at 34-35. The only quantitative comparison offered by Rockwell here is evidence that the domestic expenditures account for a small percentage of a CompactLogix® product's sales price. Based on the evidence in the record, it is likely that the amount of domestic labor and capital employed by Rockwell for the CompactLogix® product line is a small fraction of its foreign investments in the manufacture of these products, and accordingly, I find that Rockwell's investments are not significant under sub-prong (B).

The majority of Rockwell's domestic expenditures in the CompactLogix® product line also qualify under sub-prong (C)—the largest category of CompactLogix® investments are ▮ ▮ invested in engineering, research, and development. CX-1037C (Michael DWS) at Q/A 257-58 (citing CPX-0034C). This ▮ can be allocated between the L3x products ▮ and the L3y products ▮ using the sales allocation discussed above. *See* SB at 64. Mr. Michael explains that "[t]hese activities include all hardware design and prototyping as well as software." CX-1037C at Q/A 252. He further testifies that "over ▮ of our R&D worldwide occurs in the United States." *Id*. at Q/A 254. Also, "Rockwell's investments in R&D labor are ▮ devoted to software efforts (versus hardware efforts), which include investments in the R&D of the copyrighted firmware at issue." *Id*. at Q/A 259. Based on Mr. Michael's testimony, the asserted R&D investments meet the nexus requirement for sub-prong (C) because they are "closely related to and enable exploitation of" the copyrighted software. *Certain Marine Sonar Imaging Devices, Including Downscan and Sidescan Devices, Products Containing the Same, and Components Thereof* ("*Marine Sonar*"), Inv. No. 337-TA-921, Comm'n Op. at 65 (Jan. 6, 2016). Moreover, Rockwell's R&D

**PUBLIC VERSION**

expenditures are substantial under sub-prong (C) because "[t]he entirety of those expenditures is attributable to [] domestic investment in research and development and engineering." *Id.* In addition, "substantially all of the research and development and engineering for the [] products was conducted in the United States." *Id.* As the Commission recognized in *Marine Sonar*, this is a "classic case" for the application of sub-prong (C) "in which the complainant is engaged in substantial research and development involving the asserted [intellectual property]." *Id.* at 65-66. *See also Certain Automated Teller Machines, ATM Products, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-972, Initial Determination at 196-98 (Nov. 30, 2016) (finding domestic industry under sub-prong (C) where the development of a patented module "was almost entirely domestic"), *not reviewed by* Comm'n Notice (Jan. 30, 2017). Accordingly, because the evidence shows that Rockwell's development of the copyrighted software occurred almost exclusively in the United States, I find that the ██████████ R&D investments attributable to L3x products and the ██████████ R&D investments attributable to L3y products are substantial under sub-prong (C).

Rockwell has thus shown the existence of a domestic industry with respect to all of its asserted copyrights.

## V.   TORTIOUS INTERFERENCE

Rockwell accuses each of the Defaulted Respondents of tortious interference with Rockwell's End User License Agreement ("EULA"). CIB at 79-87; SB at 74-79. Staff further accuses the Defaulted Respondents of tortious interference with Rockwell's distributor agreements. SB at 67-74.

**PUBLIC VERSION**

A.     **Legal Standard**

Subsection (a)(1)(A) of section 337 prohibits "[u]nfair methods of competition and unfair

acts in the importation of articles . . . into the United States, or in the sale of such articles by the

owner, importer, or consignee, the threat or effect of which is . . . to destroy or substantially

injure an industry in the United States." 19 U.S.C. § 1337(a)(1)(A).  Claims under subsection

(a)(1)(A) may be based on causes of action recognized under federal common law. *Tianrui,* 661

F.3d at 1327-28.

Tortious interference with contract is a common law cause of action.  The Restatement

(Second) of Torts ("Restatement") § 766 (1979) describes the tort as follows:  "One who

intentionally and improperly interferes with the performance of a contract (except a contract to

marry) between another and a third person by inducing or otherwise causing the third person not

to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the

other from the failure of the third person to perform the contract."  Clearly, "[t]he cause of action

is for pecuniary loss resulting from the interference."  Restatement, § 766 cmt. t; *see Bressler v.*

*American Federal of Human Rights*, 44 Fed.Appx. 303, 341 (10th Cir. 2002) (citing

Restatement, § 766 cmt. t).

Courts interpreting this section of the Restatement have identified five elements that a

plaintiff must prove for a claim for tortious interference:  "(1) there was a contract, (2) about

which the particular defendant knew, (3) an intentional act that was a significant factor in

causing the breach of contract, (4) the act was without justification, and (5) it caused injury."

*WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012)

("Delaware courts follow Section 766 of the Restatement (Second) of Torts in assessing a

tortious interference claim"); *see also Blizzard Entertainment Inc. v. Ceiling Fan Software LLC*,

28 F.Supp.3d 1006, 1015 (C.D.Cal. Sept. 23, 2013) (applying California law to a claim of tortious interference with a EULA: "[t]he elements . . . for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.").

### B.    Tortious Interference with EULA

Rockwell accuses the Defaulted Respondents of tortious inference with the EULA by their sale and importation of ControlLogix® and CompactLogix® controllers that require copyrighted firmware—these same products were accused of copyright infringement. *See supra*, section IV.C. As described by Mr. Michael, these products are inoperable without downloading the necessary firmware. CX-1037C at Q/A 177-80. Moreover, when the firmware is downloaded from Rockwell's website, it "requires users to affirmatively consent to Rockwell's EULA, which prohibits download and use of the firmware unless the product for which it was downloaded was purchased from Rockwell or an Authorized Distributor." *Id.* at Q/A 186. This is stated explicitly in subsection 4.2.g of the EULA, which provides: "You may download and use Software for a Rockwell Automation product only if such product has been legitimately acquired directly from an authorized Rockwell Automation source. All other downloads and use thereof is strictly prohibited . . . ." CX-1023 at 3. The Defaulted Respondents are not authorized distributors for the accused products, and accordingly, any download of firmware by a customer would be a breach of the EULA.

As discussed above, however, Rockwell has failed to show that any firmware was downloaded in connection with any of the products sold by the Defaulted Respondents, because

**PUBLIC VERSION**

the products at issue were purchased by Rockwell's counsel for the purpose of filing the complaint, rather than for any industrial use. *See supra*, section IV.D. There is thus no evidence that any customer of the Defaulted Respondents entered into the EULA—or breached it. Rockwell has thus failed to establish the first prerequisite for a tortious interference claim: the existence of a contract that was breached. The existence of Rockwell's EULA is not in dispute, but a contract is not formed between Rockwell and a customer until the customer downloads firmware and accepts the EULA. *See* CX-1023 ("You accept and agree to be bound by the terms of this EULA by downloading, installing, copying, or otherwise using the software."). Rockwell has not adduced any evidence that a customer of any of the Defaulted Respondents has taken this step to enter into a contract with Rockwell. The Defaulted Respondents cannot be found liable for tortious interference on this record.

Rockwell attempts to overcome this lack of evidence by pointing to its allegations in the Complaint, asking the administrative law judge to presume the facts alleged in the Complaint to be true. CIB at 84-87. This presumption only applies to the issuance of a limited exclusion order against a defaulted respondent, however, pursuant to Commission Rule 210.16(c)(1) and section 337(g)(1) of the statute. 19 C.F.R. § 210.16(c)(1); 19 U.S.C. § 1337(g)(1). The statutory requirements for issuing a limited exclusion under section 337(g)(1) do not require a finding of a violation, and Commission Rule 210.16(c) explains that the Commission may issue an exclusion order immediately upon a finding of default. *Id.* The issuance of an exclusion order under section 337(d) requires a determination of violation, however, and the statute requires that such determinations be made "on the record." 19 U.S.C. § 1337(c), (d).[24] And in accordance with

---

[24] The Commission has held that a general exclusion order may issue against defaulted respondents under section 337(d)(2) "when a violation is established based on reliable, probative,

**PUBLIC VERSION**

Commission Rule 210.37, "[t]he proponent of any factual proposition shall be required to sustain the burden of proof with respect thereto." 19 C.F.R. § 210.37(a). A finding of violation by the Defaulted Respondents cannot be based merely on allegations in the complaint—there must be evidence that each of the Defaulted Respondents interfered with a Rockwell contract, and Rockwell has not carried its burden with respect to the EULA.

### C.   Tortious Interference with Distributor Agreements

Staff separately alleges that the Defaulted Respondents interfere with Rockwell's agreements with its distributors. SB at 67-74. Staff submits that Rockwell enters into distribution agreements and other contracts with its authorized distributors. *Id.* at 67-68. Several of these agreements are in the record, including an agreement between Rockwell and ████ ████████████████████████████ (CX-0757C) and sample agreements with system integrators (CX-0759C) and OEMs (CX-0761C).[25] According to Mr. Michael, these agreements restrict sales to certain designated geographic areas and prohibit the sale of stand-alone products to resellers. CX-1037C at Q/A 267-69. Staff argues that the Defaulted Respondents "must have been aware" of these distribution agreements, but the evidence does not support this assertion. SB at 68-69. Staff cites generally to the experience of the Defaulted Respondents in the industry of selling automation products, such as Fractioni's representation that they "have been in this factory/process automation business for 19 years." CX-0027C, Exhibit A-1, B-1. Fractioni further claims that they "only source direct from manufacturers themselves or authorized distributors." *Id.* Staff cites Can Electric's claim to be a "professional

---

and substantial evidence." *Certain Mobile Device Holders & Components Thereof*, Inv. No. 337-TA-1028, Comm'n Op. at 21-22 (Mar. 22, 2018).

[25] Staff's brief also cites to an exhibit JX-0034, which has been withdrawn.

**PUBLIC VERSION**

global automation supplier, built on over 10 years of experience." CX-0029. EuoSource was established in 2003 and claims to source products from "2000+ suppliers [to] . . . help you to get any components which is difficult to get." CX-0033; CX-0035. Yaspro represents that it provides "worldwide customer service" and "[t]echnology support." CX-0037. Staff thus contends that "it is highly unlikely that these Defaulted Respondents did not know that Rockwell's Authorized Distributors were contractually prohibited from selling Rockwell products to resellers." SB at 69.[26]

Staff does not identify any evidence in the record that any Defaulted Respondent had knowledge of the terms of any Rockwell distributor agreement, however. "It is a simple proposition that a person cannot intentionally interfere with a contract that he knows nothing about." *Trump Taj Mahal Assocs. v. Costruzioni Aeronautiche Giovanni Agusta, S.p.A.*, 761 F. Supp. 1143, 1164 (D.N.J. 1991) (citing Restatement of Torts (Second) § 766, comment i (1977). Evidence of experience in the industry does not prove knowledge of Rockwell's distributor contracts. The testimony of Mr. Michael and the distributor agreements in the record are marked confidential and appear to prohibit the disclosure of their terms to third parties. *See* CX-0757C at 9.1.1 ███████████████████████████████.

There is no evidence that Rockwell's contractual prohibitions were widely known to entities like the Defaulted Respondents, and when Radwell was asked about its first knowledge of such contractual terms in an interrogatory, it answered: ████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[26] Staff does not cite any similar evidence for Respondents GreySolution, SoBuy, T-Tide, KBS, or Yi Micro.

PUBLIC VERSION

██████████████████████ CX-0069C at 53-54 (Interrogatory No. 41).  Staff

does not explain how the Defaulted Respondents would have been privy to contractual terms ██

██████████████.

      Moreover, Staff has not identified any specific contract with any specific Rockwell

Authorized Distributor that is tied to any Defaulted Respondents' alleged tortious interference.

There is no evidence in the record showing how the Defaulted Respondents obtained any of the

accused products.  Staff argues that the only way the Defaulted Respondents could have obtained

Rockwell products was through tortious interfere with one of Rockwell's authorized distributors.

*See* SB at 68 ("Defaulting Respondents necessarily cause a Rockwell AD, VAR, or other

counterparty to an agreement with Rockwell to violate its contract with Rockwell.").  But Staff

fails to name any specific distributors and does not identify any particular contracts that are

allegedly breached.  In District Courts, "tortious interference claims are routinely dismissed

where the plaintiff fails to name specific contractual relationships that the defendant allegedly

interfered with." *Nyambal v. Alliedbarton Sec. Servs.*, LLC, 153 F. Supp. 3d 309, 316 (D.D.C.

2016).  This type of generalized allegation is not sufficient to prove a violation of section 337,

which requires a showing that the alleged unfair act is related to a specific importation or sale for

importation.  *See Certain Carbon and Alloy Steel Products*, Inv. No. 337-TA-1002, Order

No. 103 at 35 n.20 (Oct. 2, 2017) (rejecting Staff's argument that a complainant "need not

necessarily identify an individualized shipment" to prove importation), *not reviewed by* Comm'n

Notice (Nov. 1, 2017).  The evidence in the record here falls far short of proving a violation

based on tortious interference with contract.

### D.     Injury to Domestic Industry

Section 337(a)(1)(A) requires a complainant to show that the "threat or effect" of the alleged unfair act is "to destroy or substantially injure an industry in the United States." 19 U.S.C. § 1337(a)(1)(A).  This requires a causal nexus between the unfair acts and the injury. *Certain Ink Markers and Packaging Thereof*, Inv. No. 337-TA-522, Order No. 30, 2005 WL 2866049, at *27 (July 25, 2005) (citations omitted).

Rockwell submits that unauthorized sales by the Defaulted Respondents cause substantial financial harm through lost sales, harm to good will and customer relationships, and Rockwell's expenditure of resources to combat unauthorized sales.  CIB at 86-87; SB at 77-79.  As discussed above, however, the majority of the Defaulted Respondents' products accused of copyright infringement were purchased by Rockwell's counsel for the purpose of this litigation.  *See supra*, section IV.D.  These purchases do not represent lost sales for Rockwell and could not have caused harm to Rockwell's good will or customer relationships.  Although the purchases do represent part of Rockwell's efforts to combat unauthorized sales, Rockwell provides no accounting of these expenditures as it relates to the Defaulted Respondents, and it is not clear that such litigation expenditures would qualify as substantial injury to Rockwell's domestic industry.  *See John Mezzalingua Assoc., Inc. v. Int'l Trade Comm'n*, 660 F.3d 1322 (Fed. Cir. 2011) (affirming the Commission's discounting of litigation expenses to establish a domestic industry).

Rockwell's evidence of injury is based largely upon Dr. Prowse's analysis of products imported by Radwell.  CX-1042C (Prowse DWS) at Q/A 111-146.  With respect to the products accused of copyright infringement, Dr. Prowse considered ▮ products imported by Radwell between 2015 and 2017.  *Id.* at Q/A 117.  None of the Defaulted Respondents' products were

**PUBLIC VERSION**

considered as part of Dr. Prowse's analysis, and Rockwell fails to establish any nexus between the products imported by the Defaulted Respondents and the claimed injury to domestic industry. Even if Rockwell had presented evidence to establish a nexus, any injury would likely be *de minimis*. In connection with its allegations of tortious inference with the EULA, Rockwell has only identified sixteen imported products for eight named respondents. *See supra*, section IV.C. This is a negligible fraction of Rockwell's sales of these products. According to Dr. Prowse, Rockwell earned ████████████ revenue from 2014-2017 selling ControlLogix® and CompactLogix® controllers that use the copyrighted firmware. CX-1042C at Q/A 101. Any injury arising from the Defaulted Respondents' sale of sixteen such products could not be substantial in this context.

   To support its allegation of tortious interference with distributor agreements, Staff alleges injury to the domestic industry with respect to a broader set of products imported by the Defaulted Respondents. SB at 71-74. In comparison to the analysis above for tortious interference with the EULA, the products are the same for Can Electric and KBS/Euosource, and there is one additional product for GreySolution, three for SoBuy/T-Tide, and two for Yi Micro. *See supra*, section III.C. For these respondents, the analysis of domestic industry is not substantively different from that discussed above—any injury caused by the importation of these products would be *de minimis*. There are a significant number of additional products accused, however, for Fractioni ████████████ and Yaspro ████████████, based on products that these respondents sold ████████. *See* CPX-0039C. Neither Rockwell nor Staff address the circumstances of these sales, however, and the arguments raised by the parties with respect to injury do not apply in the case of sales to a reseller ████████. Sales to ██████ do not represent lost sales for Rockwell or its Authorized Distributors, who are prohibited from

selling products to resellers. Moreover, Rockwell has no good will or customer relationship with

███████████████████████████████████. Accordingly, Rockwell has failed to

carry its burden to show substantial injury caused by any alleged tortious inference by any of the

Defaulted Respondents.

## VI.    RECOMMENDED DETERMINATION

Pursuant to the Commission's order in the Notice of Investigation, I make the following

recommended determination on remedy, bonding, and the public interest pursuant to

Commission Rules 210.42(a)(1)(ii) and 210.50(b)(1).  19 C.F.R. § 210.50(b)(1).

### A.    Limited Exclusion Order

Pursuant to Commission Rule 210.16(c)(1) and section 337(g)(1), Rockwell may seek

immediate entry of a limited exclusion order against the Defaulted Respondents.  19 C.F.R.

§ 210.16(c)(1); 19 U.S.C. § 1337(g)(1).  In addition, section 337 provides that "[i]f the

Commission determines, as a result of an investigation under this section, that there is a violation

of this section, it shall direct that the articles concerned, imported by any person violating the

provision of this section, be excluded from entry into the United States . . . ."  19 U.S.C. §

1337(d)(1).  As discussed below, I recommend that the Commission issue a general exclusion

order, but if not, the Commission should issue a limited exclusion order against the Defaulted

Respondents.

### B.    General Exclusion Order

Rockwell seeks a general exclusion order (GEO) that will exclude all unauthorized

imports of the Rockwell products at issue.  CIB at 88-95.  Staff agrees that a general exclusion

order is appropriate in this investigation.  SB at 80-83.

**PUBLIC VERSION**

Pursuant to section 337(d)(2), "[a] general exclusion order may be ordered if: (A) a general exclusion from entry of articles is necessary to prevent circumvention of an exclusion order limited to products of named persons; or (B) there is a pattern of violation of this section and it is difficult to identify the source of infringing products." 19 U.S.C. § 1337(d)(2).[27]  A GEO may issue if either of these conditions is met. *See, e.g.*, *Certain Cigarettes and Packaging Thereof*, Inv. No. 337-TA-643, Comm'n Op., 2009 WL 6751505, at *12 (Oct. 1, 2009).

Rockwell submits that a general exclusion order is warranted because an exclusion order limited to the named respondents would be easily circumvented. CIB at 89-90. Dr. Prowse explains that the Defaulted Respondents do not manufacture the Rockwell products at issue but rather acquire these products abroad and resell them into the United States. CX-1042C at Q/A 162. This does not require any substantial investment in infrastructure or equipment, and it would not be difficult for the Defaulted Respondents to sell the same products under different names. *Id.* Some of the Defaulted Respondents already operate under several different names— the products purchased from Yaspro were actually invoiced by KBS, and payment was accepted by Euosource. *See* CX-0027C, ¶¶ 27-28; Ex. W-3 (KBS invoice); Ex. W-4 (Yaspro contract); Ex. W-6 (Euosource payment acceptance). The low barriers to entry and Respondents' use of multiple different entities to sell and import products supports a finding that a limited exclusion order would be easily circumvented. *See Certain Mobile Device Holders & Components Thereof*, Inv. No. 337-TA-1028, Comm'n Op. at 22 (Mar. 22, 2018) (finding GEO warranted

---

[27] The Commission has authority to issue a GEO under section 337(g)(2) in cases in which all of the respondents default. In cases such as this, however, where some respondents appear and are terminated from the investigation, while others default, the Commission's authority to issue a GEO stems from section 337(d)(2), not section 337(g)(2). *See Certain Handbags, Luggage, Accessories, and Packaging Thereof*, Inv. No. 337-TA-754, Comm'n Op. at 4-5 & n. 3 (May 30, 2012).

where "Respondents operate under different names, the number of parties attempting to import products infringing the accused patents is constantly changing and growing, importers continually shift their aliases, and there are low barriers to enter the market, while the demand continues to rise.").

Rockwell further submits that there has been a pattern of violation based on a large online market for unauthorized Rockwell products. CIB at 90-92. Dr. Prowse identified over 44,000 results in a recent search on eBay.com for relevant "Allen Bradley" products in "new" condition. CX-1042C at Q/A 159. He identified over 13,800 results in a recent search on Alibaba.com. *Id.* Rockwell further submits that it is difficult to identify the source of unauthorized Rockwell products. CIB at 92-94. Dr. Prowse cites the use of aliases on eBay and Alibaba and the fact that account and seller information is self-furnished on these online marketplaces. CX-1042C at Q/A 157. In addition, Rockwell notes the difficulty in this investigation of effecting service on respondents who were identified online by Rockwell prior to filing the complaint. CIB at 93. This evidence supports a finding that there is a pattern of violation and it is difficult to identify the source of infringing products. *See Certain Mobile Device Holders & Components Thereof,* Inv. No. 337-TA-1028, Comm'n Op. at 22-23 (Mar. 22, 2018) (finding GEO warranted where "[b]oth the Commission and [complainant] had difficulty serving some respondents" and "it was difficult to identify each of the numerous parties selling and manufacturing the infringing products."); *Certain Loom Kits for Creating Linked Articles,* Inv. No. 337-TA-923, Comm'n Op. at 14 (Jun. 26, 2015) (finding that "numerous online sales of infringing imported goods can constitute a pattern of violation of section 337.").

Accordingly, it is my recommended determination that a general exclusion order be issued in this investigation.

**PUBLIC VERSION**

### C.    Cease and Desist Order

Rockwell seeks a cease and desist order against Can Electric, Fractioni, Euosource, and

Yaspro, citing these respondents' English language websites that facilitate the sale of Rockwell

products in the United States. CIB at 95-96. Staff submits that the record does not support the

issuance of cease and desist orders against foreign respondents without evidence of

commercially significant inventories. SB at 84-85. Rockwell cites evidence that at least

Fractioni claims to have a warehouse in the United States, and argues that the other respondents

appear capable of stockpiling inventory in anticipation of an exclusion order. CRB at 11-12.

To obtain a CDO directed to a particular respondent, a complainant must demonstrate

that a "commercially significant" inventory of imported, infringing products is in the possession

of the respondent or related entities in the United States. *See, e.g.*, *Certain Electric Skin Care*

*Devices, Brushes and Chargers Therefor, and Kits Containing the Same*, Inv. No. 337-TA-959,

Comm'n Op. at 21-33 (Feb. 13, 2017) (issuing cease and desist orders against both domestic and

foreign defaulted respondents). The Commission presumes the maintenance of commercially

significant inventories in the case of domestic defaulted respondents, but there must be evidence

of such inventory to support the issuance of a cease and desist order against foreign defaulted

respondents. *Id.* at 31-33. In *Certain Arrowheads with Deploying Blades and Components*

*Therefor and Packaging Thereof* ("*Arrowheads*"), the Commission issued a cease and desist

order based on evidence of domestic distribution—the Commission identified one shipment of an

infringing article from a business location in the United States to a customer in the United States.

Inv. No. 337-TA-977, Comm'n Op. at 21 (Apr. 28, 2017). But against the other foreign

defaulted respondents in *Arrowheads*, the Commission declined to issue cease and desist orders

because all of their shipments originated overseas. *Id.* at 21-22. The Commission found that

**PUBLIC VERSION**

evidence of English language websites and communications via email to United States customers was not sufficient to establish significant activities in the United States to warrant the issuance of cease and desist orders. *Id.*

Rockwell has only identified evidence of significant domestic operations with respect to Fractioni. In particular, Fractioni's website states: "We have thousands of quality industrial parts available from our warehouses in USA, Taiwan, Hong Kong, and China. We have at least 10 units each for all products listed in store." CX-0044. Another part of Fractioni's website identifies the location of a warehouse in "San Jose, USA." CX-0874. This evidence is sufficient to infer the presence of significant domestic inventories, recognizing that detailed discovery cannot be obtained because Fractioni has defaulted. *See Arrowheads*, Comm'n Op. at 21. With respect to the other defaulted respondents, Rockwell does not identify any evidence beyond the existence of English language websites and shipments from abroad.

Accordingly, I recommend the issuance of a cease and desist order against Fractioni, but not against any of the other defaulted respondents.

**D.    Bond**

If the Commission decides to enter remedial orders, the affected articles still are entitled to entry under bond during the 60-day Presidential review period. 19 U.S.C. § 1337(j)(3). Commission Rule 210.50(a)(3) specifies that the amount of a bond must be "sufficient to protect the complainant from any injury." 19 C.F.R. § 210.50(a)(3). The Commission has set bond amounts based on the price difference between the infringing imports and the domestic industry products or on a reasonable royalty the respondent would otherwise pay to the complainant. *See Certain Inject Ink Supplies And Components Thereof*, Inv. No. 337-TA-691, Comm'n Op. at 15-18 (Nov. 1, 2011). Where the calculation of a price differential is impractical and there is

insufficient evidence in the record to determine a reasonable royalty, the Commission has set a bond in the amount of 100% of the entered value of the infringing products. *Certain Marine Sonar Imaging Devices, Including Downscan and Sidescan Devices, Products Containing the Same, and Components Thereof*, Inv. No. 337-TA-921, Comm'n Op. at 83-89 (Jan. 6, 2016). The Complainant bears the burden of establishing the need for a bond. *Certain Rubber Antidegradants, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-533, Comm'n Op. at 40 (July 21, 2006).

Dr. Prowse submits that calculating a sales price differential between unauthorized and authorized Rockwell products is impractical because the prices of these products vary substantially. CX-1042C at Q/A 167-68. Moreover, there is no evidence in the record for any comparable royalty. Rockwell and Staff thus seek entry of a 100% bond. CIB at 96-97; SB at 86-87. The Commission has set a 100% bond in cases where respondents have defaulted and provided no discovery regarding pricing, precluding any reliable determination of an appropriate bond amount. *Certain Loom Kits for Creating Linked Articles*, Inv. No. 337-TA-923, Comm'n Op. at 18-19 (Jun. 26, 2015). That is the case here, and accordingly, I recommend that the Commission set a bond in the amount of 100% of entered value.

### E.    Public Interest

Section 337 mandates consideration of the effect of exclusion on (1) public health and welfare; (2) competitive conditions in the U.S. economy; (3) U.S. production of articles that are like or directly competitive with the articles subject to the investigation; and (4) U.S. consumers. 19 U.S.C. § 1337(d)(1). Rockwell and Staff submit that there is no evidence of any significant adverse effect on these public interest factors. *See* CIB at 97-100; SB at 87-92.

**PUBLIC VERSION**

There is no evidence that a remedial order would have any adverse effect on public health

and welfare.  To the extent that any such issues are implicated, remedial orders would likely

promote public safety because purchasers of unauthorized Rockwell products do not receive

safety-related notices such as PSAs and PNs, as discussed above, and Rockwell is unable to

provide the same quality control and customer support for unauthorized products.  CX-1042C

(Prowse WS) at Q/A 170; *see supra*, section III.D.

Radwell has alleged in a separate investigation that Rockwell's business practices are

anticompetitive and in violation of U.S. antitrust laws, *Certain Programmable Logic Controolers*

*(PLCs), Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1105, but there

is insufficient evidence in the record here to determine whether remedial orders issued in the

present investigation would implicate the competitive concerns raise in that investigation.

There is no evidence that Rockwell would be unable to meet the market demand for

products that would be excluded by any remedial order.  The products at issue were originally

manufactured by Rockwell and thus consumers will be able to purchase them directly from

Rockwell.  Moreover, Dr. Prowse identified several competitors in the industrial automation

industry producing like or directly competitive articles.  CX-1042C at Q/A 172.

The only adverse effect to U.S. consumers would be the increased prices that consumers

would pay for authorized Rockwell products, as opposed to unauthorized Rockwell products.

The Commission has held, however, that "the benefit of lower prices to consumers does not

outweigh the benefit of providing complainants with an effective remedy for an intellectual

property-based section 337 violation."  *Certain Ink Cartridges and Components Thereof*, Inv.

No. 337-TA-565, Comm'n Op. at 27 (Aug. 28, 2009) (citing earlier Commission opinions

issuing exclusion orders).

**PUBLIC VERSION**

Accordingly, it is my recommended determination that issuance of remedial orders in this investigation would not be contrary to the statutory public interest factors.

## VII.   CONCLUSIONS OF LAW

Based on the foregoing, and the record as a whole, it is my final initial determination that there is a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and/or the sale within the United States after importation of certain industrial automation systems and components thereof including control systems, controllers, visualization hardware, motion control systems, networking equipment, safety devices, and power supplies.

This determination is based on the following conclusions of law:

1.  The Commission has subject matter jurisdiction over this investigation and *in rem* jurisdiction over the imported Rockwell products.

2.  There has been an importation into the United States, sale for importation, or sale within the United States after importation of Rockwell products by the Defaulted Respondents.

3.  The Defaulted Respondents have violated the Lanham Act by their sale and importation of gray market Rockwell products infringing the asserted trademarks.

4.  Rockwell has established a domestic industry in the asserted trademarks.

5.  The Defaulted Respondents have not been shown to have infringed the asserted copyrights.

6.  Rockwell has established a domestic industry in the asserted copyrights.

7.  The Defaulted Respondents have not been shown to have tortiously interfered with Rockwell contracts.

8.  Rockwell has not shown substantial injury to a domestic industry in connection with the alleged tortious interference.

I hereby certify the record in this investigation to the Commission with my final initial determination.  Pursuant to Commission Rule 210.38, the record further comprises the

**PUBLIC VERSION**

Complaint and exhibits thereto filed with the Secretary and the exhibits attached to the parties' summary determination motions and the responses thereto. 19 C.F.R. § 210.38(a).

Pursuant to Commission Rule 210.42(c), this initial determination shall become the determination of the Commission 45 days after the service thereof, unless a party files a petition for review pursuant to Commission Rule 210.43(a), the Commission orders its own review pursuant to Commission Rule 210.44, or the Commission changes the effective date of the initial determination. 19 C.F.R. § 210.42(h)(6).

Within ten (10) days of the date of this Initial Determination, each party shall submit to the Administrative Law Judge a statement as to whether or not it seeks to have any portion of this document deleted from the public version. *See* 19 C.F.R. § 210.5(f). A party seeking to have a portion of the order deleted from the public version thereof must attach to its submission a copy of the order with red brackets indicating the portion(s) asserted to contain confidential business information.[28] The parties' submissions under this subsection need not be filed with the Commission Secretary but shall be submitted by paper copy to the Administrative Law Judge and by e-mail to the Administrative Law Judge's attorney advisor.

**SO ORDERED.**

Dee Lord
Administrative Law Judge

---

[28] To avoid depriving the public of the basis for understanding the result and reasoning underlying the decision, redactions should be limited. Parties who submit excessive redactions may be required to provide an additional written statement, supported by declarations from individuals with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in Commission Rule 201.6(a). 19 C.F.R. § 201.6(a).

**CERTAIN INDUSTRIAL AUTOMATION SYSTEMS AND COMPONENTS THEREOF INCLUDING CONTROL SYSTEMS, CONTROLLERS, VISUALIZATION HARDWARE, MOTION CONTROL SYSTEMS, NETWORKING EQUIPMENT, SAFETY DEVICES, AND POWER SUPPLIES**

**Inv. No. 337-TA-1074**

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **INITIAL DETERMINATION** has been served by hand upon the Commission Investigative Attorney, **Brian Koo, Esq.**, and the following parties as indicated, on **11/15/2018**

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

### On Behalf of Complainants Rockwell Automation, Inc.:

Adam D. Swain
**ALSTON & BIRD LLP**
950 F Street NW
Washington, DC 20004

☐ Via Hand Delivery
☑ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

### On Behalf of Respondent Radwell International d/b/a PLC Center:

Deanna Tanner Okun
**ADDUCI, MASTRIANI & SCHAUMBERG LLP**
1133 Connecticut Ave., NW
Washington, DC 20036

☐ Via Hand Delivery
☑ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

# Exhibit 12

PUBLIC VERSION

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

| |
|---|
| **In the Matter of**<br><br>**CERTAIN INDUSTRIAL AUTOMATION SYSTEMS AND COMPONENTS THEREOF INCLUDING CONTROL SYSTEMS, CONTROLLERS, VISUALIZATION HARDWARE, MOTION AND MOTOR CONTROL SYSTEMS, NETWORKING EQUIPMENT, SAFETY DEVICES, AND POWER SUPPLIES** |

**Investigation No. 337-TA-1074**

## COMMISSION OPINION

On December 20, 2018, the Commission issued a notice determining not to review a final initial determination ("FID") by the presiding Administrative Law Judge ("ALJ") in the above-identified investigation, finding a violation of section 337 of the Tariff Act, as amended, 19 U.S.C. § 1337 ("section 337"), by the defaulted respondents based on the infringement of Complainant's asserted trademarks. *See* 83 Fed. Reg. 67346-48 (Dec. 28, 2018). The Commission's notice also requested written submissions on remedy, the public interest, and bonding. This investigation is now before the Commission on a final determination on remedy, the public interest, and bonding.

Upon consideration of the ALJ's recommendations on remedy, the public interest, and bonding, as well as the written submissions received, the Commission has determined to issue: (1) a general exclusion order ("GEO") prohibiting the unlicensed importation of certain industrial automation systems and components thereof including control systems, controllers, visualization hardware, motion and motor control systems, networking equipment, safety devices, and power supplies that infringe Complainant's asserted trademarks, and (2) a cease and

PUBLIC VERSION

desist order ("CDO") directed to respondent Fractioni (Hongkong) Ltd. ("Fractioni").   The Commission also finds that the public interest does not preclude the issuance of the GEO and CDO.   The Commission further sets a bond in the amount of 100 percent of the entered value of the infringing articles imported during the period of Presidential review.

## I.   BACKGROUND

### A.   Procedural Background

By publication in the Federal Register on October 16, 2017, the Commission instituted Investigation No. 337-TA-1074, based on a complaint filed by Rockwell Automation, Inc. of Milwaukee, Wisconsin ("Rockwell" or "Complainant").   *See* 82 Fed. Reg. 48113-15 (Oct. 16, 2017).   The complaint, as supplemented, alleges violations of section 337 based on the infringement of certain registered trademarks and copyrights and on unfair methods of competition and unfair acts in the importation or sale of certain industrial automation systems and components thereof including control systems, controllers, visualization hardware, motion and motor control systems, networking equipment, safety devices, and power supplies, the threat or effect of which is to destroy or substantially injure an industry in the United States.   *See id.* Specifically, the complaint alleges: (1) the infringement of certain registered trademarks under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), through the importation and/or sale of certain gray market Rockwell products in violation of section 337(a)(1)(C) (*see* Complaint at ¶¶ 3, 4); (2) the infringement of certain registered copyrights through the importation and/or sale of certain industrial controllers in violation of section 337(a)(1)(B) (*see* Complaint at ¶¶ 5, 6); and (3) unfair competition by respondents through their tortious interference with known contracts between Rockwell and its authorized foreign distributors, and through the inducement of breaches of the end user license agreement that end users must enter into before downloading

**PUBLIC VERSION**

the necessary Rockwell copyrighted firmware, in violation of section 337(a)(1)(A) (*see* Complaint at ¶¶ 7-9).   The asserted trademarks are U.S. Trademark Reg. Nos. 1172995, 696401, 693780, 1172994, 712800, 712836, 2510226, 2671196, 2701786, and 2412742.   *See* Complaint at ¶ 63; FID at 5.   The asserted trademarks correspond to the Allen-Bradley®, A-B®, Rockwell Automation®, and ControlLogix® marks.   *See id.*   And the asserted copyrights correspond to firmware for CompactLogix® and ControlLogix® controllers.   *See* Complaint at ¶ 73; FID at 5-6.

The notice of investigation identified the following fifteen respondents: Can Electric Limited of Guangzhou, China ("Can Electric"); Capnil (HK) Company Limited of Hong Kong ("Capnil"); Fractioni of Shanghai, China; Fujian Dahong Trade Co. of Fujian, China ("Dahong"); GreySolution Limited d/b/a Fibica of Hong Kong ("GreySolution"); Huang Wei Feng d/b/a A-O-M Industry of Shenzhen, China ("Huang"); KBS Electronics Suzhou Co, Ltd. of Shanghai, China ("KBS"); PLC-VIP Shop d/b/a VIP Tech Limited of Hong Kong ("PLC-VIP"); Radwell International, Inc. d/b/a PLC Center of Willingboro, New Jersey ("Radwell"); Shanghai EuoSource Electronic Co., Ltd of Shanghai, China ("EuoSource"); ShenZhen T-Tide Trading co., Ltd. of Shenzhen, China ("T-Tide"); SoBuy Commercial (HK) Co. Limited of Hong Kong ("SoBuy"); Suzhou Yi Micro Optical Co., Ltd., d/b/a Suzhou Yiwei Guangxue Youxiangongsi, d/b/a Easy Microoptics Co. LTD. of Jiangsu, China ("Suzhou"); Wenzhou Sparker Group Co. Ltd., d/b/a Sparker Instruments of Wenzhou, China ("Sparker"); and Yaspro Electronics (Shanghai) Co., Ltd. of Shanghai, China ("Yaspro").   *See id.*   In addition, the Office of Unfair Import Investigations ("OUII") is a party in this investigation.   *See id.*

On February 1, 2018, the ALJ issued an ID finding respondents Fractioni, GreySolution, KBS, EuoSource, T-Tide, SoBuy, and Suzhou in default.   *See* Order No. 17 (Feb. 1, 2018),

**PUBLIC VERSION**

*unreviewed*, Comm'n Notice (Feb. 26, 2018).   On June 28, 2018, the ALJ issued an ID finding

respondents Yaspro and Can Electric in default.[1]   *See* Order No. 32 (June 28, 2018),

*unreviewed*, Comm'n Notice (July 24, 2018).   On July 17, 2018, the ALJ issued an ID

terminating the investigation as to unserved respondents, namely, Capnil, Dahong, Huang, PLC-

VIP, and Sparker.   *See* Order No. 41 (July 17, 2018), *unreviewed*, Comm'n Notice (Aug. 13,

2018).   On July 20, 2018, the ALJ issued an ID terminating Radwell based on entry of a consent

order.   *See* Order No. 42 (July 20, 2018), *unreviewed*, Comm'n Notice (Aug. 15, 2018).

On October 23, 2018, the ALJ issued the FID finding a violation of section 337 by the

Defaulted Respondents.   Specifically, the ALJ determined that the Defaulted Respondents

violated the Lanham Act by their sale and importation of gray market products infringing

Complainant's asserted trademarks, but that Complainant failed to establish its two other claims,

namely, the infringement of Complainant's asserted copyrights and tortious interference with

Complainant's contracts.   The ALJ also recommended that the Commission:   (1) issue a GEO;

(2) issue a CDO against respondent Fractioni; and (3) set a bond during the period of Presidential

review at 100 percent of the entered value of the infringing products.   No petitions for review of

the FID were filed.

On October 25, 2018, the Commission issued a notice requesting statements on the public

interest ("PI Notice").   *See* 83 Fed. Reg. 54777-78 (Oct. 31, 2018).   On November 23, 2018,

Complainant and OUII submitted briefs in response to the PI Notice.

On December 20, 2018, the Commission issued a notice determining not to review the

FID.   *See* 83 Fed. Reg. 67346-48 (Dec. 28, 2018).   The Commission's determination resulted in

---

[1]  Hereinafter, the "Defaulted Respondents" refers to Fractioni, GreySolution, KBS, EuoSource,
T-Tide, SoBuy, Suzhou, Yaspro and Can Electric.

PUBLIC VERSION

a finding of a section 337 violation.  *See id.*  The Commission's notice also requested written submissions on remedy, the public interest, and bonding.  *See id.*  On February 15, 2019, Complainant and OUII submitted written submissions,[2] and on February 22, 2019, OUII submitted a reply submission[3] in response to the Commission's notice.

### B.   Domestic Industry Products

The domestic industry products are Rockwell's industrial automation systems which include programmable controllers, human machine interfaces, motors, drives, motor control systems, networking equipment, input/output modules, power supplies, and signaling devices. Complaint at ¶ 76.   All the domestic industry products bear the asserted trademarks.  *See id.*

### C.   The Accused Products

The accused products are gray market Rockwell products that are unauthorized for sale in the United States and that differ from genuine Rockwell products in several respects, including: lack of manufacturer's warranty, lack of product recall notices, lack of product safety notices, differences in customer support, lack of quality control, hardware with unlicensed software/firmware, differences in quality, and lack of an intellectual property indemnity.  *See* Complaint at ¶¶ 3, 92-163.

## II.   DISCUSSION AND ANALYSIS

In a Section 337 proceeding, the Commission has "broad discretion in selecting the form, scope, and extent of the remedy."  *See Viscofan, S.A. v. United States Int'l Trade Comm'n*, 787

---

[2] *See* Complainant's Submission on Remedy, the Public Interest, and Bonding (EDIS Doc. No. 667312) (hereinafter, "Complainant Br."); and OUII's Statement on Remedy, the Public Interest, and Bonding (EDIS Doc. No. 667241) (hereinafter, "OUII Br.").

[3] *See* OUII's Reply Statement on Remedy, the Public Interest, and Bonding (EDIS Doc. No. 667854) (hereinafter, "OUII Reply Br.").

**PUBLIC VERSION**

F.2d 544, 548 (Fed. Cir. 1986).   In this investigation, the ALJ recommended that the

Commission:   (1) issue a GEO; (2) issue a CDO against respondent Fractioni; and (3) set a bond

at 100 percent of the entered value of the infringing products during the period of Presidential

review.

### A.   General Exclusion Order

Because respondent Radwell appeared and participated in the investigation, section

337(d)(2), not section 337(g)(2), governs the issuance of a GEO.   *See Certain Mobile Device*

*Holders & Components Thereof*, Inv. No. 337-TA-1028, Comm'n Op. at 21-22 (Mar. 22, 2018)

("*Mobile Device Holders*"); *Certain Sildenafil or any Pharmaceutically Acceptable Salt Thereof,*

*Such as Sildenafil Citrate and Products Containing Same*, USITC Inv. No. 337-TA-489,

Comm'n Op. at 4-5 (July 26, 2004) ("*Sildenafil*").[4]   Subsection (d)(2) provides that "[t]he

authority of the Commission to order an exclusion from entry of articles shall be limited to

persons determined by the Commission to be violating this section unless the Commission

determines that (A) a general exclusion from entry of articles is necessary to prevent

circumvention of an exclusion order limited to products of named persons; or (B) there is a

pattern of violation of this section and it is difficult to identify the source of infringing products."

19 U.S.C. § 1337(d)(2); *see also* 19 C.F.R. § 210.50(c).

The Commission has determined to adopt the ALJ's recommendation that the

Commission issue a GEO.   *See RD* at 60-62.   The Commission finds that undisputed, reliable,

probative, and substantial evidence supports the FID's determination that Rockwell established a

section 337 violation by the Defaulted Respondents based on Rockwell's trademark infringement

---

[4] Nevertheless, there is no difference between the requirements of section 337(d)(2) and section 337(g)(2) as both require that a violation of section 337 be found by "substantial, reliable, and probative evidence."   *See Sildenafil*, Comm'n Op. at 4-5.

**PUBLIC VERSION**

claim and that the domestic industry requirement is satisfied for that claim.   In addition, the

Commission agrees with the ALJ that the requirements of section 337(d)(2) are met and that the

issuance of a GEO is warranted in this investigation.

As the ALJ noted, "the Defaulted Respondents do not manufacture the Rockwell

products at issue but rather acquire these products abroad and resell them into the United States"

and "[t]his does not require any substantial investment in infrastructure or equipment, and it

would not be difficult for the Defaulted Respondents to sell the same products under different

names." *See* RD at 61 (citing CX-1042C at Q/A 162 (Prowse[5])).   In fact, as the ALJ continued,

"[s]ome of the Defaulted Respondents already operate under several different names," and, for

example, "the products purchased from Yaspro were actually invoiced by KBS, and payment

was accepted by EuoSource." *See id.* (citing CX-27C, ¶¶ 27-28, Ex. W-3 (KBS invoice), Ex.

W-4 (Yaspro contract), Ex. W-6 (EuoSource payment acceptance)).   Thus, the Commission

agrees with the ALJ that "[t]he low barriers to entry and Respondents' use of multiple different

entities to sell and import products supports a finding that a limited exclusion order would be

easily circumvented." *See id.* (citing *Mobile Device Holders*, Comm'n Op. at 22); *accord*

Complainant Br. at 3-6; OUII Br. at 6-9 (citing *Certain Inkjet Ink Supplies and Components*

*Thereof*, Inv. No. 337-TA-730, Comm'n Op. at 4-5 (Feb. 24, 2012)); *see also* 19 U.S.C.

§ 1337(d)(2); 19 C.F.R. § 210.50(c).

The Commission also agrees with the ALJ that "[t]h[e] evidence supports a finding that

there is a pattern of violation and it is difficult to identify the source of infringing products."

*See* RD at 62 (citing *Mobile Device Holders*, Comm'n Op. at 22-23; *Certain Loom Kits for*

*Creating Linked Articles*, Inv. No. 337-TA-923, Comm'n Op. at 14, 2015 WL 5000874 (Jun. 26,

---

[5]   Dr. Stephen Prowse is one of Complainant Rockwell's experts.

**PUBLIC VERSION**

2015) ("*Loom Kits*")); *accord* Complainant Br. at 6-8; OUII Br. at 8-9; *see also* 19 U.S.C.

§ 1337(d)(2); 19 C.F.R. § 210.50(c).   As the ALJ noted, "Dr. Prowse identified over 44,000

results in a recent search on eBay.com for relevant 'Allen Bradley' products in 'new' condition,"

and "over 13,800 results in a recent search on Alibaba.com."   *See* RD at 62 (citing CX-1042C at

Q/A 159 (Prowse)).   The ALJ also noted that "it is difficult to identify the source of

unauthorized Rockwell products" due to "the use of aliases on eBay and Alibaba and the fact that

account and seller information is self-furnished on these online marketplaces."   *See id.* (citing

CX-1042C at Q/A 157 (Prowse)).   Still further, the ALJ notes Rockwell's "difficulty in this

investigation of effecting service on respondents who were identified online by Rockwell prior to

filing the complaint."   *See id.*

 Thus, in view of the foregoing evidence, the Commission has determined to issue a GEO

pursuant to 19 U.S.C. § 1337(d)(2).

**B.** <u>**Cease and Desist Order**</u>

 Section 337 provides that in addition to, or in lieu of, the issuance of an exclusion order,

the Commission may issue a CDO as a remedy for violation of section 337.   *See* 19 U.S.C.

§ 1337(f)(1); *see also* 19 U.S.C. § 1337(g)(1) (directing the Commission to issue an exclusion

order, a cease and desist order, or both, against a defaulting respondent).   The Commission

generally issues a CDO directed to a defaulting respondent when the evidence shows that the

respondent maintains a commercially significant inventory of imported infringing products in the

United States or has significant domestic operations that could undercut the remedy provided by

an exclusion order.   *See, e.g.*, *Certain Electric Skin Care Devices, Brushes and Chargers*

*Therefor, and Kits Containing the Same*, Inv. No. 337-TA-959, Comm'n Op., 2017 WL

8683854, *16 (Feb. 13, 2017) ("*Electric Skin Care Devices*").

PUBLIC VERSION

The Commission has determined to adopt the ALJ's recommendation that the Commission issue a CDO against respondent Fractioni but not against Can Electric, EuoSource, and Yaspro. *See* RD at 63-64.[6]

Specifically, the Commission agrees with the ALJ that "Rockwell has only identified evidence of significant domestic operations with respect to Fractioni." *See id.* at 64; *accord* OUII Br. at 9-11. As the ALJ noted, Fractioni's website states that "[they] have thousands of quality industrial parts available from [their] warehouses in USA, Taiwan, Hong Kong, and China" and "at least 10 units each for all products listed in store.'" *See* RD at 64 (citing CX-44). The ALJ further noted that "[a]nother part of Fractioni's website identifies the location of a warehouse in 'San Jose, USA.'" *See id.* (citing CX-874); *accord* Complainant Br. at 10. The Commission finds that the foregoing evidence supports the ALJ's conclusion that the existence of significant domestic inventories may be inferred with respect to respondent Fractioni. *See id.* (citing *Certain Arrowheads with Deploying Blades and Components Therefor and Packaging Thereof*, Inv. No. 337-TA-977, Comm'n Op. at 21 (Apr. 28, 2017)).

The Commission also agrees with the ALJ that the record does not support the issuance of a CDO against Can Electric, EuoSource, or Yaspro, because "Rockwell does not identify any evidence beyond the existence of English language websites and shipments from abroad." *See id.* Rockwell argues that Yaspro, Euosource, and Can Electric have significant U.S. operations, "contributing to the 'unending stream of infringing products from foreign manufacturers.'" *See* Complainant Br. at 10-11 (citing *Electric Skin Care Devices*, Comm'n. Op. at 32). Although Rockwell identifies significant U.S. sales of infringing products by Yaspro, Euosource, and Can

---

[6] Commissioner Schmidtlein supports issuing all four of the requested CDOs—against respondents Fractioni, Can Electric, EuoSource, and Yaspro—for the reasons provided in her separate views.

9

**PUBLIC VERSION**

Electric, *see* Complainant Br. at 10-11, Rockwell provides no evidence that those sales were made

from U.S. inventories. *Compare Electric Skin Care Devices*, 2017 WL 8683854, *17; *accord* OUII

Reply Br. at 3; *see also id.* at 2 ("Rockwell did not proffer any evidence of any shipments made by

Yaspro, EuoSource, or Can Electric from a U.S. business address.").

    Accordingly, the Commission has determined to issue a cease and desist order against

respondent Fractioni but not against Yaspro, Euosource, or Can Electric.

### C.   Public Interest

    Before issuing a GEO, the Commission must "consider[] the effect of such exclusion

upon the public health and welfare, competitive conditions in the United States economy, the

production of like or directly competitive articles in the United States, and United States

consumers." *See* 19 U.S.C. § 1337(d)(1). "[T]he statute does not require the Commission to

determine that a remedial order would advance the public interest factors but rather requires the

Commission to consider whether issuance of such an order will adversely affect the public

interest factors." *Loom Kits*, Comm'n Op., 2015 WL 5000874, *9 (citation omitted).

    The Commission directed "the presiding Administrative Law Judge [to] take evidence or

other information and hear arguments from the parties or other interested persons with respect to

the public interest in this investigation, as appropriate, and provide the Commission with

findings of fact and a recommended determination on this issue, which shall be limited to the

statutory public interest factors set forth in 19 U.S.C. 1337(d)(1), (f)(1), (g)(1)." *See* 82 Fed.

Reg. 48114 (Oct. 16, 2017).   The Commission has determined to adopt the ALJ's

recommendation that the "issuance of remedial orders in this investigation would not be contrary

to the statutory public interest factors." *See* RD at 67.

    With respect to the first public interest factor, public health and welfare, the Commission

agrees with the ALJ that "[t]here is no evidence that a remedial order would have any adverse

**PUBLIC VERSION**

effect on public health and welfare," but rather "remedial orders would likely promote public safety because purchasers of unauthorized Rockwell products do not receive safety-related notices . . . and Rockwell is unable to provide the same quality control and customer support for unauthorized products." *See id.* at 66 (citing CX-1042C at Q/A 170 (Prowse)); *accord* OUII Br. at 12; Complainant Br. at 12.

As to the second public interest factor, competitive conditions in the U.S. economy, the Commission also agrees with the ALJ that issuing remedial orders would not have an adverse effect on the competitive conditions in the U.S. economy.   As the ALJ noted, "Radwell[7] has alleged in a separate investigation that Rockwell's business practices are anticompetitive and in violation of U.S. antitrust laws, . . .but [the ALJ found] insufficient evidence in the record here to determine whether remedial orders issued in the present investigation would implicate the competitive concerns raise in that investigation."   *See* RD at 66 (referring to *Certain Programmable Logic Controllers (PLCs), Components Thereof, and Products Containing Same,* Inv. No. 337-TA-1105); *see also* OUII Br. at 12 ("OUII is unaware of any evidence that the competitive conditions in the U.S. economy would be affected if remedial orders issued in this Investigation."); Complainant Br. at 13 ("There is no evidence that prices of Genuine Rockwell Products or industrial automation products would increase whatsoever, nor is there any argument made, let alone supporting proof, that there would be a shortage of industrial automation products generally.").

With respect to the third public interest factor, relating to the production of like or directly competitive articles in the United States, the Commission agrees with the ALJ that

---

[7] As noted in Section I(A), *supra*, Radwell was terminated from the investigation after entry of a consent order.

**PUBLIC VERSION**

"[t]here is no evidence that Rockwell would be unable to meet the market demand for products

that would be excluded by any remedial order." *See* FID at 66.   As the ALJ noted, "Dr. Prowse

identified several competitors in the industrial automation industry producing like or directly

competitive articles." *See id.* (citing CX-1042C at Q/A 172 (Prowse)); *accord* OUII Br. at 13

("Rockwell can meet the demand for Allen-Bradley products in the U.S. market.   After all, the

accused Unauthorized Rockwell Products . . . were manufactured and supplied by Rockwell in

the first instance."); Complainant Br. at 13 ("[T]here are a number of competing industrial

automation suppliers that offer either identical or like or competitive features to the

Unauthorized Rockwell Products, so that the desired remedy will not impact the availability of

industrial automation systems.") (citing CX-1042C at Q/A 172 (Prowse)).

Lastly, with respect to the fourth public interest factor, *i.e.*, the effect on United States

consumers, the Commission agrees with the ALJ that "[t]he only adverse effect to U.S.

consumers would be the increased prices that consumers would pay for authorized Rockwell

products, as opposed to unauthorized Rockwell products." *See* RD at 66.   But as the ALJ

noted, "the benefit of lower prices to consumers does not outweigh the benefit of providing

complainants with an effective remedy for an intellectual property-based section 337 violation."

*See id.* (citing *Certain Ink Cartridges and Components Thereof*, Inv. No. 337-TA-565, Comm'n

Op. at 27 (Aug. 28, 2009)); *accord* OUII Br. at 14-15 ("By allowing intellectual property rights

to be violated for the sake of providing some consumers with lower prices in the short run

ultimately does not benefit U.S. consumers, as it reduces incentives for innovators to invest not

only the financial resources, but time and effort into developing new technologies and improving

processes that ultimately advance the greater good.") (citing CX-1042C at Q/A 173 (Prowse));

Complainant Br. at 14 ("In the long run, protection of intellectual property rights fosters research

**PUBLIC VERSION**

and development of new technologies and leads to greater competition in the marketplace, while also preventing the unfair trade of products.") (citing CX-1042C at Q/A 173 (Prowse)).

Thus, based on the record of this investigation, the Commission has determined that the public interest factors do not preclude the issuance of the remedial orders discussed above.

**D.** **Bond During Period of Presidential Review**

During the 60-day period of Presidential review under 19 U.S.C. § 1337(j), "articles directed to be excluded from entry under subsection (d) . . . shall . . . be entitled to entry under bond prescribed by the Secretary in an amount determined by the Commission to be sufficient to protect the complainant from any injury." *See* 19 U.S.C. § 1337(j)(3).  "The Commission typically sets the bond based on the price differential between the imported infringing product and the domestic industry article or based on a reasonable royalty.  However, where the available pricing or royalty information is inadequate, the bond may be set at one hundred (100) percent of the entered value of the infringing product." *Loom Kits*, Comm'n Op., 2015 WL 5000874, *11 (citations omitted).  The Commission has set a 100% bond in cases where respondents have defaulted and provided no discovery regarding pricing, precluding any reliable determination of an appropriate bond amount. *See id.* at *12.

The Commission has determined to adopt the ALJ's recommendation that the Commission set a bond of 100 percent during the period of Presidential review. *See* RD at 65. As the ALJ noted, "calculating a sales price differential between unauthorized and authorized Rockwell products is impractical because the prices of these products vary substantially." *See id.* (citing CX-1042C at Q/A 167-68 (Prowse)).  The Commission also agrees with the ALJ that "there is no evidence in the record for any comparable royalty." *See id.*; *accord* OUII Br. at 11; Complainant Br. at 14.

13

PUBLIC VERSION

Thus, the Commission has determined to set the bond at 100 percent of the entered value of the infringing products during the period of Presidential review.

## III.   **CONCLUSION**

For the foregoing reasons, the Commission has determined to issue:   (1) a GEO prohibiting the importation of certain industrial automation systems and components thereof including control systems, controllers, visualization hardware, motion and motor control systems, networking equipment, safety devices, and power supplies that infringe Complainant's asserted trademarks, and (2) a CDO against respondent Fractioni.   The Commission has also determined that the public interest does not preclude the issuance of the GEO and CDO.   The Commission has further determined to set the bond at 100 percent of the entered value of the infringing products during the period of Presidential review.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued:   April 23, 2019

14

PUBLIC VERSION

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN INDUSTRIAL AUTOMATION SYSTEMS AND COMPONENTS THEREOF INCLUDING CONTROL SYSTEMS, CONTROLLERS, VISUALIZATION HARDWARE, MOTION AND MOTOR CONTROL SYSTEMS, NETWORKING EQUIPMENT, SAFETY DEVICES, AND POWER SUPPLIES** | Investigation No. 337-TA-1074 |

## DISSENTING VIEWS OF COMMISSIONER
## RHONDA K. SCHMIDTLEIN ON CEASE AND DESIST ORDERS

I write separately because I support issuing all four of the cease and desist orders (CDOs) requested by complainant in this investigation. I find the majority's decision to deny the full scope of the requested CDO relief inconsistent with our governing statute, 19 U.S.C. § 1337. I therefore respectfully dissent on the denial of the full scope of the CDO relief requested. In particular, I dissent from the majority's decision declining to issue CDOs against three respondents—Can Electric, EuoSource, and Yaspro—and I concur with the majority's decision to issue a CDO against respondent Fractioni, although based on a different rationale.

It is undisputed that the requested CDO relief is governed by subsection (g), paragraph (1), of the Tariff Act, 19 U.S.C. § 1337(g)(1). In *Certain Electric Skin Care Devices* and *Certain Arrowheads with Deploying Blades and Components Thereof*, I explained my view that section 337(g)(1) requires the Commission to issue a requested CDO upon finding a violation. *See* Inv. No. 337-TA-959, Comm'n Op., Separate Views of Chairman Schmidtlein (Feb. 13, 2017) (Public Version); Inv. No. 337-TA-977, Comm'n Op., Dissenting Views of Chairman Schmidtlein (April 28, 2017) (Public Version). Specifically, subsection (g), paragraph (1), provides:

> **(g) Exclusion from entry or cease and desist order; conditions and procedures applicable**
>
> (1) If—
>
> (A) a complaint is filed against a person under this section;
>
> (B) the complaint and a notice of investigation are served on the person;

1

**PUBLIC VERSION**

(C)  the person fails to respond to the complaint and notice or otherwise fails to appear to answer the complaint and notice;

(D)  the person fails to show good cause why the person should not be found in default; and

(E)  the complainant seeks relief limited solely to that person;

the Commission shall presume the facts alleged in the complaint to be true and ***shall, upon request, issue*** an exclusion from entry or ***a cease and desist order***, or both, limited to that person unless, after considering the effect of such exclusion or order upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, the Commission finds that such exclusion or order should not be issued.

19 U.S.C. § 1337(g)(1) (emphasis added).

As I explained in my separate views in *Electric Skin Care Devices* and *Arrowheads*, Congress's use of the language "shall, upon request, issue" in section 337(g)(1) requires the Commission to issue a CDO against a defaulting respondent when the conditions listed in subparagraphs (A)-(E) are met, the complaint alleges a violation of section 337, and consideration of the public interest factors does not preclude such a remedy. Here, it is undisputed that the conditions of subparagraphs (A)-(E) are satisfied and that the complaint alleges a violation of section 337 against each of the defaulting respondents. It is also undisputed that the public interest factors do not preclude remedial relief of any kind.

The nondiscretionary duty under section 337(g)(1) to issue CDO relief requested by a complainant against defaulting respondents, absent public interest considerations to the contrary, is highlighted when contrasted with the permissive language used in section 337(f)(1), which governs the issuance of CDOs against participating respondents. *Compare* 19 U.S.C. § 1337(g)(1) *with* 19 U.S.C. § 1337(f)(1). Subsection (f), paragraph (1), states:

**(f)  Cease and desist orders; civil penalty for violation of orders**

(1)  In addition to, or in lieu of, taking action under subsection (d) or (e) of this section, the Commission ***may issue*** and cause to be served on any person violating this section, or believed to be violating this section, as the case may be, an order directing such person to cease and desist from engaging in the unfair methods or acts involved, unless after considering the effect of such order upon the public health and welfare, competitive conditions in the

2

**PUBLIC VERSION**

> United States economy, the production of like or directly
> competitive articles in the United States, and United States
> consumers, it finds that such order should not be issued. . . .

19 U.S.C. § 1337(f)(1) (emphasis added).[1]  Thus, absent public interest considerations to the
contrary, section 337(f)(1) requires some relief against a participating respondent, but leaves it to
the discretion of the Commission to decide whether to issue an exclusion order, a CDO, or both.

Congress knows how to confer discretion upon the Commission when it wishes; it did so
in section 337(f)(1) with its use of the term "may," but it chose not to use that term in section
337(g)(1).  The use of different terms in provisions addressing the same subject matter but in a
different context (defaulting respondents versus participating respondents) underscores that the
different terms were intended to have different meanings.  *See Kingdomware Techs., Inc. v.
United States*, 136 S.Ct. 1969, 1977 (2016) ("Unlike the word 'may,' which implies discretion,
the word 'shall' usually connotes a requirement."); *see also SAS Inst., Inc. v. Iancu*, 138 S. Ct.
1348, 1354 (2018) ("The word 'shall' generally imposes a nondiscretionary duty.").  Thus,
whereas section 337(f)(1) requires some relief against participating respondents but grants the
Commission discretion choose whether to issue a CDO as part of that relief, section 337(g)(1)
requires the Commission, when requested, to issue CDOs against defaulting respondents.
Indeed, the phrase "upon request" in section 337(g)(1) is unnecessary if Congress intended to
confer discretion upon the Commission.[2]  *See Bilski v. Kappos*, 561 U.S. 593, 607-08, 130 S. Ct.
3218, 3228 (2010) (discussing the statutory construction canon that guides "against interpreting
any statutory provision in a manner that would render another provision superfluous"); *see also
Dole Food Co. v. Patrickson*, 538 U.S. 468, 476-77, 123 S. Ct. 1655, 1661 (2003) ("Absent a
statutory text or structure that requires us to depart from normal rules of construction, we should
not construe the statute in a manner that is strained and, at the same time, would render a
statutory term superfluous.").

Interpreting the remedial language in section 337(g)(1) to be the same as section
337(f)(1), and thereby requiring support in the record for significant domestic inventory or
business operations as a prerequisite for a CDO, as the majority does, may have the perverse
effect of making it harder for a complainant to obtain a CDO against a foreign defaulting
respondent than against a foreign participating respondent.  This is because without discovery the

---

[1] Subsection (f), paragraph (1), references subsection (d), which governs the issuance of limited
exclusion orders against participating respondents found to be in violation of section 337.  *See* 19
U.S.C. § 1337 (f)(1) ("In addition to, or in lieu of, taking action under subsection (d) . . . ."); 19
U.S.C. § 1337(d)(1) ("If the Commission determines . . . that there is a violation of this section, it
***shall*** direct that the articles concerned . . . be excluded from entry into the United States[.]")
(emphasis added).  Subsection (f), paragraph (1), must therefore be read together with
subsection (d).

[2] Congress added subsection (g) to the statute in 1988.  There would have been no need to add
the remedial language in subsection (g), paragraph (1), for defaulting respondents if Congress
intended to grant the Commission the same discretion that appears in subsection (f),
paragraph (1).

3

**PUBLIC VERSION**

complainant may have no basis to marshal the evidence currently needed to obtain relief. The legislative history of section 337(g)(1) makes clear that this potential difficulty was the motivation for adding section 337(g)(1) and reflects Congress's intent to provide the maximum relief requested against defaulters. *See* H.R. Rep. No. 100-40, at 160-61 (1987) ("[The] new subsection . . . ***requires*** the Commission . . . ***upon request,*** to issue relief against the defaulting respondents. . . . This amendment is motivated by the fact that discovery is usually difficult or impossible to obtain from respondents who have chosen not to participate in a section 337 investigation.") (emphasis added). The fact that the Commission is issuing a general exclusion order does not change the statutory analysis. Therefore, in my view, the Commission is required to issue the requested CDO relief, including the CDOs against Can Electric, EuoSource, and Yaspro.

Additionally, even if one assumes that the statute confers discretion upon the Commission, it is unnecessary for the Commission to have to infer the existence of a commercially significant U.S. inventory in order to issue the CDOs requested here. Rather, the complaint and supporting evidence in this case show sales activities by Can Electric, EuoSource, and Yaspro directed to the United States as to the infringing grey market goods. *See* Complaint, ¶¶ 36-37 and Exs. 26-28; ¶¶ 52-53 and Exs. 26, 32-34; ¶¶ 61-62 and Exs. 26, 36-37 (alleging Can Electric, EuoSource, and Yaspro sell unauthorized grey market goods). These sales activities provide a basis to issue CDOs against Can Electric, EuoSource, and Yaspro without having to infer the existence of a U.S. inventory. By requiring more than what has been demonstrated, the majority effectively penalizes the complainant for the respondents' failure to respond or participate, which should be avoided.

Ultimately, because I believe the Commission must issue the four CDOs that complainant requested, I respectfully dissent from Section II(B) of the Commission's Opinion.

CERTAIN INDUSTRIAL AUTOMATION SYSTEMS AND      **Inv. No. 337-TA-1074**
COMPONENTS THEREOF INCLUDING CONTROL
SYSTEMS, CONTROLLERS, VISUALIZATION
HARDWARE, MOTION CONTROL SYSTEMS,
NETWORKING EQUIPMENT, SAFETY DEVICES, AND
POWER SUPPLIES

## PUBLIC CERTIFICATE OF SERVICE

    I, Lisa R. Barton, hereby certify that the attached **COMMISSION OPINION** has been served by hand upon the Commission Investigative Attorney, **Brian Koo, Esq.**, and the following parties as indicated, on **April 24, 2019**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainants Rockwell Automation, Inc.:**

| | |
|---|---|
| Adam D. Swain<br>**ALSTON & BIRD LLP**<br>950 F Street NW<br>Washington, DC 20004 | ☐ Via Hand Delivery<br>☒ Via Express Delivery<br>☐ Via First Class Mail<br>☐ Other:_____ |

**Respondents**

| | |
|---|---|
| Fractioni (Hongkong) Ltd.<br>#327 Siping Road<br>Shanghai 200092<br>China | ☐ Via Hand Delivery<br>☒ Via Express Delivery<br>☐ Via First Class Mail<br>☐ Other:_____ |
| GreySolution Limited d/b/a Fibica<br>Unit B601, 6/F Block A<br>Universal Ind. Ctr.<br>19-25 Shan Mei St Sha Tin,<br>Fo Tan, Hong Kong | ☐ Via Hand Delivery<br>☒ Via Express Delivery<br>☐ Via First Class Mail<br>☐ Other:_____ |
| KBS Electronics Suzhou Co, Ltd.<br>Block 7&43, No. 328 Hengyong Road,<br>Jiading district, Shanghai, China, 201806 | ☐ Via Hand Delivery<br>☒ Via Express Delivery<br>☐ Via First Class Mail<br>☐ Other:_____ |

**CERTAIN INDUSTRIAL AUTOMATION SYSTEMS AND COMPONENTS THEREOF INCLUDING CONTROL SYSTEMS, CONTROLLERS, VISUALIZATION HARDWARE, MOTION CONTROL SYSTEMS, NETWORKING EQUIPMENT, SAFETY DEVICES, AND POWER SUPPLIES**  **Inv. No. 337-TA-1074**

Certificate of Service – Page 2

Shanghai EuoSource Electronic Co., Ltd
Block 43, No. 328, Hengyong Road
Jiading District
Shanghai, China 201806

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

ShenZhen T-Tide Trading co., Ltd.
Room A-60S, Block.lexi.
Minle industrial park
Mei Ban Road '
Longhua District, Shcnzhen 51803 1
China

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

SOBuyCommercial (HK) Co. Limited
Flat B G/F Yeung Yiu Chung (No. 6)
Ind. Bldg. No. 19 Chetmg Shun Street
Lai Chi Kok Kowloon
Hong Kong

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

Suzhou Yi Micro Optical C0., Ltd.
d/b/a Suzhou Yiwei Guangxue Youxiangongsi
d/b/a Easy Micro-optics C0. LTD.
Office Building 5F, 91 Weixin Rd
Suzhou, SIP, Jiangsu
China, 215021

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

Yaspro Electronics (Shanghai) Co., Ltd.
Room 1808E,,No. 488, Vaohua Road
Pudong New District
Shanghai, China

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

Can Electric Limited
No. 2 Danan Rd, Yueziu District
Guangzhou, Guangdong, 510115
China

☐ Via Hand Delivery
☒ Via Express Delivery
☐ Via First Class Mail
☐ Other:_____

# Exhibit 13

**1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
 4    ROCKWELL AUTOMATION, INC.,    )
      --------------------Plaintiff, )
 5                                   ) Case No.
             vs.                     ) 21-CV-1238-CLC-
 6                                   ) JLH
      PARCORP s.r.l.,                )
 7                                   )
      --------------------Defendant. )
 8
 9
10              TRANSCRIPT OF DISCOVERY CONFERENCE
11
              DISCOVERY CONFERENCE had before the
12    Honorable Jennifer L. Hall, U.S.M.J., via
13    teleconference on the 15th of June, 2022.
14
15                       APPEARANCES
16    HEYMAN ENERIO GATTUSO & HIRZEL, LLP
      BY: DOMINICK GATTUSO, ESQ.
17
              -and-
18
      ALSTON & BIRD LLP
19    BY: NEAL MCLAUGHLIN, ESQ.
20                              Counsel for Plaintiff
21
      YOUNG, CONAWAY, STARGATT & TAYLOR
22    BY: ROBERT VRANA, ESQ.
23            -and-
24    BRACH EICHLER LLC
      BY: BOB KASOLAS, ESQ.
25
                              Counsel for Defendant
```

**2**

```
 1         THE COURT:  Good morning, everyone.
 2    This is Jennifer Hall.  We're here for a
 3    teleconference in Rockwell Automation versus
 4    Parcorp.  It's Civil Action Number
11:05AM  5    21-1238-CFC-JLH.
 6         May I have appearances, please, for
 7    Plaintiff, starting with Delaware counsel.
 8         MR. GATTUSO:  Good morning, Your
 9    Honor.  It's Dominck Gattuso from Heyman,
11:05AM 10    Enerio, Gattuso, and Hirzel on behalf of
11    Rockwell.  I have with me on the line Neal
12    McLaughlin from Alston and Bird, and
13    Mr. McLaughlin is going to present today.
14         THE COURT:  Good morning to all of
11:05AM 15    you.
16         May I have appearances, please, for
17    Defendant.
18         MR. VRANA:  Good morning, Your Honor.
19    This is Rob Vrana of Young Conaway.  I am
11:05AM 20    filling in this morning for Ms. Kraman, who
21    asked me to send her apologies.  She is
22    currently in the air on a flight.  And I'm
23    joined this morning by Bob Kasolas from New
24    Jersey, from Brach Eichler in New Jersey.
11:06AM 25         MR. KASOLAS:  Good morning, Your
```

**3**

```
 1    Honor.
 2         THE COURT:  Good morning.  Okay.  So
 3    we've got a couple things we need to figure out
 4    here today.  I think what I'd like to start
11:06AM  5    with is just figure out what the status is
 6    today of the discovery and any deficiencies
 7    that Plaintiff thinks exists, and we'll figure
 8    out what needs to be done, and then we'll move
 9    on to what the Court should order about any
11:06AM 10    past or present deficiencies.
11         So let's hear from Plaintiff.  I
12    understand you've gotten some interrogatory
13    responses in or around the same moment that you
14    filed your letter.  So you've had a chance to
11:06AM 15    look at those now, so why don't you take it
16    real slow and walk me through exactly what it
17    is you don't think you got that you're entitled
18    to.
19         MR. MCLAUGHLIN:  Good morning, Your
11:06AM 20    Honor.  Thank you.  This is Neal McLaughlin.
21         So, yeah, we did receive those
22    supplemental interrogatory responses shortly
23    before we filed that letter last week, and, you
24    know, we still don't have the basic information
11:07AM 25    we need to prosecute this case, and it starts
```

**4**

```
 1    with, for example, interrogatory number two.
 2    We asked them to identify their sources of the
 3    accused products.  They identified three
 4    sources, which is fine if those are the three
11:07AM  5    sources.
 6         But then interrogatory number three asks
 7    for each of those sources that you identified,
 8    provide us the name of the product, the
 9    quantity obtained, and the price paid.  And the
11:07AM 10    response that Defendants provided was just a
11    list of a couple dozen part numbers and a
12    price.  It didn't identify where they got these
13    products from, how many.  And it's this type of
14    thing that carries through the remainder of the
11:08AM 15    responses.  We're just a bit frustrated that we
16    can't get answers to those simple questions.
17         THE COURT:  I get that.  So 'rog
18    three says name of these products, where you --
19    which source you got it from, how many you got,
11:08AM 20    and the price you paid.  And so you got some
21    names of products and a price, but it doesn't
22    say how many or where you got it from; right?
23         MR. MCLAUGHLIN:  That's right.
24    That's right, Your Honor.
11:08AM 25         THE COURT:  Can we walk through the
```

5

1  rest. Because I want to be real specific here
2  about what needs to happen because general
3  orders and broad strokes don't seem to be
4  effective here for this case. So let's move
11:08AM 5  on.
6       Is four okay, or is there something you
7  need about four?
8       MR. MCLAUGHLIN: Four, I don't think,
9  if I'm remembering correctly, was not the
11:08AM 10  subject of your prior May 2nd order.
11       THE COURT: Okay.
12       MR. MCLAUGHLIN: I think we can skip
13  to interrogatory number five.
14       THE COURT: Five. Okay.
11:09AM 15       MR. MCLAUGHLIN: It requests the same
16  type of information about the accused products,
17  the quantity, the condition code, the date of
18  purchase, purchase price, purchase source, but
19  it also asks about the selling of those
11:09AM 20  products, the customer name, the discounts, and
21  the sale price and the date of sale. And all
22  we got from Defendants was -- I think we have
23  here eight different sales of particular
24  products and then for the remainder of the
11:09AM 25  sales, they point us to their website for their

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

6

1  current offerings. We have no information as
2  to the remainder of the sales of the accused
3  products from Defendants.
4       THE COURT: I guess there might only
11:09AM 5  be eight and then they've got a bunch in the
6  warehouse; right? That's a possibility. We
7  can ask them about that, but your view is you
8  think there's more or --
9       MR. MCLAUGHLIN: Based on their
11:10AM 10  responses, I know there's more. So when
11  we get to interrogatory number six and number
12  seven, it asks for their revenue attributable
13  to the sales of the accused products, and in
14  2020 they say their gross revenue was
11:10AM 15  3.5 million Euro, and then they say that the
16  sale of the accused products are approximately
17  15 percent of that. I don't think that amount
18  of money is captured by the eight sales that
19  they've identified here.
11:10AM 20       THE COURT: They never filed. Got
21  you.
22       MR. MCLAUGHLIN: Yeah, and including
23  sales that -- there's two sales in particular
24  that we know about that we provided them
11:10AM 25  discovery about, and those sales are not listed

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

7

1  in their response to interrogatory number five.
2       THE COURT: Got it. Okay. You know
3  there's more based on the numbers don't add up,
4  and you know there's more based on you've got
11:10AM 5  independent information there was other sales.
6       MR. MCLAUGHLIN: That's correct.
7       THE COURT: Okay. Got it.
8       And you said there's also, with respect
9  to the eight sales that are in interrogatory
11:11AM 10  number five, you're missing some of the
11  requested information as well? Did I hear you
12  say that?
13       MR. MCLAUGHLIN: Yes. You know, for
14  those products, we don't have any of the
11:11AM 15  purchase information. Those --
16       THE COURT: Got it.
17       MR. MCLAUGHLIN: -- appear to be just
18  the sales information, but none of the purchase
19  information.
11:11AM 20       THE COURT: Got it. All right. And
21  then what's the next one?
22       MR. MCLAUGHLIN: Well, we can go to
23  interrogatory number six. We've asked them to
24  identify the gross revenue, costs, expenses,
11:11AM 25  and profits of re: Automation, the whole

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

8

1  company, not just for the accused products on a
2  quarterly basis. And they've only provided us
3  annual numbers, and they have not included any
4  numbers at all for 2021.
11:12AM 5       THE COURT: So okay. All right.
6  Next interrogatory.
7       MR. MCLAUGHLIN: That's number seven.
8       THE COURT: Okay.
9       MR. MCLAUGHLIN: We've asked them to
11:12AM 10  identify revenue, costs, and expenses for the
11  sale of the accused products, and all we got
12  was just an approximate number, that 15 percent
13  of their total numbers are attributed to
14  Rockwell. It strikes me that they should have
11:12AM 15  more granular information than that approximate
16  number, and that's the number that we're asking
17  for.
18       THE COURT: Okay. Got it. Next one.
19       MR. MCLAUGHLIN: Interrogatory number
11:12AM 20  eight. We asked for the -- this is their
21  inventory numbers that we've asked for. We've
22  asked for the purchase price and the condition
23  and the current value. We have a list of some
24  product numbers, some quantities, and then a
11:13AM 25  value that I don't know if it's the purchase

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

9

1  price, their current valuation, or something
2  else.  So we just ask for, you know, clarity in
3  what information they're giving us here.
4        THE COURT:  So you may all have a
5  dispute about how current value might be
6  calculated.  You just want to know what this
7  number means that they've given you.
8        MR. MCLAUGHLIN:  Yeah, what are they
9  giving us here?  And you're right.  We could
10  have disputes about that, but that's not ripe
11  for discussion today.
12        THE COURT:  Okay.  All right.  Next.
13        MR. MCLAUGHLIN:  I think that might
14  be it for the interrogatories that are -- that
15  were the subject of the May 2nd order.
16        THE COURT:  All right.  And your
17  letter referenced some issues about documents
18  as well.  I guess there's not a deadline yet
19  for substantial completion of document
20  discovery.  Are there any disputes about
21  documents, or are you worried you might not get
22  them?
23        MR. MCLAUGHLIN:  We received some
24  documents earlier this week.  It was a single
25  PDF with 3,000 pages in it that appears to be

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

10

1  just a bunch of e-mails all jumbled together in
2  one PDF.  We're working through getting the
3  appropriate metadata and other information for
4  that document, but I don't think that's ripe
5  for today's discussion, but it's something
6  that's on our radar.
7        THE COURT:  All right.  I got it.
8        All right.  Let's turn it over to counsel
9  for Defendant.  Let's walk through here, these
10  interrogatories, and you can tell me what the
11  issue is.
12        So let's start with number three.  That
13  wants you to link up the distributors to what
14  they sold, how many, and how much.  What's the
15  problem with putting that in the interrogatory
16  response, if it asks?
17        MR. KASOLAS:  Right, Your Honor.
18  Thanks for your time today on this.
19        This is the first time I'm hearing about
20  anything specific concerning supplemental
21  interrogatory responses because there's nothing
22  specific in the letter that was submitted to
23  the Court on June 8th complaining about
24  my interrogatory responses so --
25        THE COURT:  What it appeared is they

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

11

1  had just gotten it; right?  So they were under
2  a deadline to respond to the Court.  I don't
3  know what time you gave it to them and what
4  time they had to file, and, frankly, I don't
5  care.
6        Let's just figure out right now --
7  because I'm looking at that, and I think it's
8  pretty clear what it asks for, and it's missing
9  some of this info.  So can you get that info,
10  and when can you do it?
11        MR. KASOLAS:  Sure, Judge.  If you
12  look at interrogatory response supplemental
13  number two, we disclose to them that our
14  sources are Rockwell authorized distributors,
15  Technology BSA, Sonepar Italia, and RS
16  Components s.r.l.  So he knows who the sources
17  are for interrogatory number two.
18        Then you go to interrogatory number
19  three.  For each source identified in two,
20  which we identified, he says -- I'm looking
21  here -- identify for that source the quantity
22  obtained and the price paid by Automation.  So
23  we go bullet point by bullet point, every
24  single product that we have purchased or sold,
25  regarding Rockwell.  I count 1, 2, 3, 4, 5, 6.

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

12

1        THE COURT:  I see it too.  I'm
2  looking at the language of three, and it says
3  for each source provide the name of each
4  product obtained from that source.  So I think
5  a reasonable reading of that, and maybe the
6  only reasonable reading of that, is they want
7  to know which products you got from which
8  sources.  If you didn't understand that, that's
9  fine.  When do you think you can get them that
10  information?
11        MR. KASOLAS:  Judge, that's really
12  burdensome to go and figure out where he got a
13  specific product.  He could have got it from
14  multiple distributors, and that's so tedious to
15  do.
16        We did give them, though, 3,300 pages.
17  Mr. McLaughlin claims that they're e-mails.
18  There's tons of sales and purchase order
19  information in those documents.  They tell the
20  source, the purchase price, the sale price.  He
21  has the information already in the document
22  production.
23        They produced 270 pages in response to
24  our document, most of which is a PowerPoint
25  presentation that they prepared internally at

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

13

1 Rockwell of what constitutes counterfeit goods.
2 They produced one photograph of an alleged
3 product that they claim was a counterfeit
4 product or a trademark infringement that they
11:17AM 5 apparently took after they filed the complaint.
6     THE COURT:  We're not going to go
7 back through and replow old ground here.
8     MR. KASOLAS:  I'm not interested to
9 do that.
11:18AM 10     THE COURT:  I'm asking you -- I'm
11 looking at this list.  I don't think it's
12 responsive to interrogatory number three.
13 You're going to need to answer interrogatory
14 number three with a chart that says for each
11:18AM 15 type of product sold, where it got -- where it
16 came from, how many were sold.  And if a
17 certain type of product was sold and it was
18 purchased from more than one distributor, that
19 needs to be clear too so they can figure out
11:18AM 20 exactly what you got and who it came from and
21 how much you paid.
22     And maybe you paid different amounts over
23 the course of time.  I don't know the answer to
24 that, but the chart needs to be able to reveal
11:18AM 25 all that information.  That's going to have to

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

14

1 be answered within the next seven days and
2 served on them.
3     Let's move on to interrogatory number
4 five.  We have similar types of issues here.
11:18AM 5 They want to know, they say, who these products
6 were sold to, customer names, and the sales
7 price.  Is there any issue with finding that
8 information?
9     MR. KASOLAS:  Judge, yeah.  First of
11:19AM 10 all, number three, I don't know if they can
11 create that chart with the inventory software
12 and inventory protocols.
13     THE COURT:  I need to have a
14 declaration from you that says why you can't do
11:19AM 15 it because one answer is, look, we don't keep
16 track of anything; right?  Then that needs to
17 go into your interrogatory response and it
18 needs to be signed under oath.  Okay?
19     If you can't answer it, I need somebody
11:19AM 20 to declare why and sign it under oath.
21     MR. KASOLAS:  Understood, Judge.
22 Understood.
23     With respect to five as well -- I'm just
24 getting -- just looking at my notes from what
11:19AM 25 Mr. McLaughlin said.

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

15

1     So again, the burdensome nature of this
2 has to go to each product you've ever sold and
3 find out how much you sold, the condition code,
4 which I don't know what that is, the date you
11:20AM 5 bought it, the date you sold it, the product
6 source.  I mean, this is really tedious stuff
7 to put into an interrogatory.
8     We gave him 3,300 pages of buy/sell
9 information for the products we sold, who we
11:20AM 10 got it from, who we sold it to.  That's
11 where -- an exercise they're supposed to put
12 together once they get the information.  I
13 don't know how my client is going to go about
14 putting together such detail.
11:20AM 15     So again, I will talk with them, and if
16 it's not something they can put together, which
17 I suspect they can, I will get a declaration
18 for the Court stating why they can't put that
19 together.  If they can, we'll provide
11:20AM 20 information.  But to go product-by-product we
21 ever sold and say the amount, the quantity, the
22 condition, the price, the sale, the source, the
23 customer name, the discount, I've never seen so
24 tedious in 20 years of practicing law for an
11:20AM 25 interrogatory.

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

16

1     THE COURT:  Here's the thing:  If
2 that can't be done, if it's in the information
3 you've given them and it can't be done, the
4 federal rules provide a very easy solution to
11:21AM 5 that problem, which is in Rule 33(d) that says,
6 "If the answer to an interrogatory may be
7 determined by examining a party's business
8 records, and if the burden will be
9 substantially the same for either party, the
11:21AM 10 responding party may answer by testifying the
11 record must be reviewed" -- that's not in your
12 response -- "in sufficient detail to enable the
13 interrogating party to locate and identify them
14 as readily as the responding party could."
11:21AM 15     Your answer needs to include that, and it
16 needs to be signed.
17     MR. KASOLAS:  Will do, Judge.
18     THE COURT:  Okay.  I'm going to just
19 caution everybody if that's the path you're
11:22AM 20 going to take, everybody better be dang well
21 sure that whatever records you specify contains
22 the information they're looking for.  If it
23 doesn't, some sort of explanation as to why
24 it's not there and why you couldn't find the
11:22AM 25 information.

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

17

1   Let's turn to number six. They say the
2   problem here is that you haven't answered the
3   question as to 2021 because a financial
4   statement is not yet approved. What does that
5   mean? It means you have one, but it hasn't
6   been approved? Is there some reason why you
7   can't just answer it and update it if the
8   financial statement gets changed later?
9       MR. KASOLAS: We don't want to
10  provide something that's not accurate.
11      THE COURT: Write what you have in
12  there and that it hasn't been approved and that
13  it's subject to change.
14      MR. KASOLAS: Okay, Judge.
15      THE COURT: Okay. Let's turn to
16  number seven. Is there some reason why you
17  can't run the calculation and get a number
18  that's more accurate than approximately
19  15 percent?
20      MR. KASOLAS: I'm just catching up
21  here.
22      Well, I don't think you can give a
23  specific number because some products may have
24  a higher cost of goods sold and margin, some
25  might have a lower one. They couldn't give a

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

18

1   specific number. I believe that's why the
2   option is 15 percent of gross revenue cost and
3   production.
4       THE COURT: I'm not an accountant. I
5   did take accounting for lawyers, but that was a
6   multiple choice at the end, but my recollection
7   of accounting is you can come up with some
8   number and then make a disclosure about what
9   that number is, so have a number with a decimal
10  point in it.
11      MR. KASOLAS: Yes, Judge.
12      THE COURT: All right. Let's move on
13  to -- by the way, I think I forgot. Let's move
14  back to five. Apologies.
15      They think there's more than eight sales.
16  So, again, if the point here is that it's in
17  the documents you gave them, that needs to be
18  clear as well.
19      MR. KASOLAS: Judge, for the record,
20  for the record, I don't know how Mr. McLaughlin
21  can make that representation as an officer of
22  the court. They produced a photograph of one
23  box, one product, that they bought somehow
24  after this lawsuit was filed. It's a Rockwell
25  authorized product. It's in a Rockwell box.

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

19

1   It's factory sealed. The reason they produced
2   it is because one or two seal numbers at the
3   end of the product were somehow erased or
4   damaged.
5       How does he make that representation to
6   the Court? His client produced nothing.
7   These -- the -- I would love to know how
8   counsel can get on this call and say we think
9   there's more. They didn't produce anything.
10      THE COURT: Okay. Well --
11      MR. KASOLAS: If I know where to look
12  for it, maybe he can enlighten me. Where is
13  the more than eight sales coming from?
14      THE COURT: If you've got an issue
15  with their production, you can file a motion,
16  and we'll go through that. What we're talking
17  about today is your responses, and I think I
18  heard them say they think there's more based on
19  independent verification but also they think
20  there's more because they're looking at your
21  other answers, and the numbers aren't adding
22  up.
23      If the answer is you haven't gone through
24  the documents to compile the list, that's fine.
25  Come up with a solution for that. But, again,

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

20

1   if you're going to make a list of sales, it's
2   got to be a complete list.
3       All right. Let's move on to
4   interrogatory number eight.
5       MR. KASOLAS: Just to be clear, Your
6   Honor wants a chart for number five as well?
7   Unless it can't be --
8       THE COURT: I think we went through
9   this. It's either got to be a chart or it's
10  got to comply with the rules for responding.
11      MR. KASOLAS: Thank you, Judge.
12      THE COURT: Okay. Are we ready to
13  move on to eight?
14      MR. KASOLAS: Yes, Your Honor.
15      THE COURT: All right. So in eight,
16  identify client name, quantity, condition,
17  purchase price, storage location, and value of
18  current inventory. They say that this
19  number -- they just want to know what these
20  numbers mean. You've got a person says 2,700
21  Euros. What's that? Is that how you value it?
22  What you paid for it? What you're going to
23  sell it for? I'd like to see you put that
24  information in there. Okay?
25      MR. KASOLAS: Okay, Judge.

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158 E-mail: deanna@speedbudget.biz

21

1    THE COURT:  All right.  Okay.  So
2  those responses all need to be updated within a
3  week of today at close of business.
4    Let's turn to Defendant's request for
5  certain remedies under Rule 37.  Defendants ask
6  the Court to strike -- or excuse me.  Sorry.
7  Plaintiff's request for certain remedies under
8  Rule 37.  Plaintiff has asked the Court to
9  strike Defendants' affirmative defenses.
10    MR. MCLAUGHLIN:  Your Honor, if I
11  could clarify just for a minute what we're
12  asking for.
13    THE COURT:  Yeah.
14    MR. MCLAUGHLIN:  What we're asking
15  for is two different categories of relief.  One
16  is the relief that we think is justified today,
17  and then the second category is the relief that
18  we think is justified if they continue to
19  withhold the information that we requested.
20    THE COURT:  Okay.  I got you.  Let's
21  talk about the relief that you want me to order
22  today.  That's the attorney's fees?
23    MR. MCLAUGHLIN:  Correct, and a
24  finding that the objections to the
25  interrogatories have been waived.

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

22

1    THE COURT:  What do you mean by that?
2  Objections to the interrogatories have been
3  waived?  What does that get to?  I get that's
4  what the rule says.  I'm trying to understand
5  what that means to help you going forward.
6  Maybe I need another coffee today.  Just walk
7  me through how you see this playing out.
8    MR. MCLAUGHLIN:  Sure.  And I think
9  we heard a little bit of it today again, just
10  arguments about what the interrogatories are
11  asking for and how they're burdensome to
12  respond to, and there's other interrogatories
13  that we haven't talked about today that I can
14  foresee being an issue before the close of
15  discovery.  The initial responses were served
16  19 days after the Federal Rules deadline.  We
17  don't want to have to keep coming back to Your
18  Honor and taking up Your Honor's time trying to
19  get answers to our interrogatories based on
20  objections that continue to keep bubbling
21  around.  So that's what we're looking for, is
22  just some clarity going forward in terms of
23  what information Defendants have to provide.
24    THE COURT:  Yeah, well, hopefully
25  today provided a lot of clarity.  At least in

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

23

1  my mind, it did.
2    They made burden objections before
3  May 2nd, and I'm not going to hold that those
4  are going to be waived.  I'm not seeing them
5  try to raise any new objections today.  It's
6  the same old objections.  I considered them.  I
7  overruled them.  I'm ordering them to answer
8  the interrogatories, so I don't really think it
9  gets us that far, so that request is going to
10  be denied.
11    I'm going to talk about the fees and
12  expenses.  So you've requested attorney's fees
13  incurred in getting these interrogatories
14  answered from them.  You said in your letter
15  the amount was $31,658 plus reasonable expenses
16  for filing the letter that you put that figure
17  in.
18    My order of June 6th required Defendants
19  to file a responsive letter showing cause why
20  the Court should not grant the requested
21  relief.  I didn't see any argument in
22  Defendant's letter of June 13th addressing at
23  all why the Court shouldn't grant the requested
24  attorney's fees, and so in light of that, I'm
25  going to order, consistent with Rule 37, that

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

24

1  Defendants pay the $31,658 in expenses incurred
2  in raising this dispute as well as whatever
3  expenses incurred in filing their June 8th
4  letter and getting on the phone here today.
5    And to be clear, this cost shifting is
6  required by Rule 37.  I gave Defendants a
7  chance to say why I shouldn't order it.  I
8  didn't hear an answer to it, and so it's going
9  to be ordered.
10    And that's going to conclude today's
11  hearing.  Is there anything else we need to
12  address while we're on the phone from
13  Plaintiff?
14    MR. MCLAUGHLIN:  No, Your Honor.
15  Thank you.
16    THE COURT:  Anything else from
17  Defendant?
18    MR. KASOLAS:  Yes, Judge.  With all
19  respect, I did address the issue in our June 13
20  letter regarding fees.  We pointed out -- it's
21  in the final paragraph of the letter regarding
22  the Bridgestone Sports factors and the
23  Pennypack factors.  The only thing is they
24  didn't make any effort to establish any of
25  those factors.

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

25

1    THE COURT:  To determine whether to
2  strike or exclude under Federal Rule of Civil
3  Procedure 37, so they asked about striking or
4  excluding.  I denied that.  You won that
5  argument for now.
6    Where did you talk about fees?  Explain
7  any Pennypack factors that -- the extreme
8  sanction of striking or excluding evidence.
9    MR. KASOLAS:  We also argued leading
10  up to today that they didn't identify in their
11  response to our supplemental production what
12  our alleged deficiencies were, so providing
13  interrogatories on both rounds of discovery
14  process.
15    I don't know how they get the $31,000
16  for -- basically, I guess they want us to pay
17  for them doing the work they would have done
18  anyway in doing discovery interrogatories and
19  analyzing the answer and demanding that more
20  specific documents be produced, interrogatories
21  be produced.  At a minimum, they should have to
22  provide some kind of certification of services
23  for the Court to back up this very, very
24  extreme number.
25    THE COURT:  Okay.  Here's the thing,

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

26

1  though.  You had an extra page and a half to
2  make those arguments in your letter.  I
3  specifically said in my order that you should
4  explain why the Court should not grant the
5  requested relief, so you had plenty of space to
6  do it.  You didn't do that.  At this point in
7  time, we're not going to rehash that.  That's
8  the Court's order.
9    Anything else from Defendant aside from
10  the fees issue?
11    MR. KASOLAS:  No, Your Honor.  Thank
12  you.
13    THE COURT:  All right.  Thanks,
14  everybody.  Take care.  We'll be adjourned.
15
16
17
18
19
20
21
22
23
24
25

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

27

1    C E R T I F I C A T E
2  STATE OF DELAWARE      )
            ) ss:
3  COUNTY OF NEW CASTLE    )
4    I, Deanna L. Warner, a Certified
5  Shorthand Reporter, do hereby certify that as
6  such Certified Shorthand Reporter, I was
7  present at and reported in Stenotype shorthand
8  the above and foregoing proceedings in Case
9  Number 21-CV-1238-CLC-JLH, *ROCKWELL AUTOMATION,*
10  *INC. Vs. PARCORP s.r.l.*, heard on
11  June 15, 2022.
12    I further certify that a transcript of
13  my shorthand notes was typed and that the
14  foregoing transcript, consisting of 27
15  typewritten pages, is a true copy of said
16  DISCOVERY CONFERENCE.
17    SIGNED, OFFICIALLY SEALED, and FILED
18  with the Clerk of the District Court, NEW
19  CASTLE County, Delaware, this 16th day of June,
20  2022.
21
22    _____
      Deanna L. Warner, CSR, #1687
23    Speedbudget Enterprises, LLC
24
25

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, DE 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

**wants** [2] - 10:13, 20:6
**warehouse** [1] - 6:6
**Warner** [1] - 27:22
**warner** [1] - 27:4
**website** [1] - 5:25
**week** [3] - 3:23, 9:24, 21:3
**whole** [1] - 7:25
**withhold** [1] - 21:19
**won** [1] - 25:4
**worried** [1] - 9:21
**write** [1] - 17:11

## Y

**years** [1] - 15:24
**YOUNG** [1] - 1:21
**Young** [1] - 2:19

# Exhibit 14

```
                                                        Page 1

 1                        - - -

 2          IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF DELAWARE

 3

                          - - -

 4

    ROCKWELL AUTOMATION, INC., :

 5                              :  CIVIL ACTION

            Plaintiff,          :

 6                              :

            vs.                 :

 7                              :

    PARACORP, S.R.L., d/b/a     :

 8  WI AUTOMATION,              :

                                :

 9          Defendant.          :  NO. 1:21-cv-GBW-JLH

10                        - - -

11          THURSDAY, NOVEMBER 17, 2022

12                        - - -

13          DISCOVERY MOTIONS taken at 844 N. King

14  Street, Courtroom 6C, Wilmington, Delaware,

15  commencing at 3:30 p.m., before John P. Donnelly,

16  Registered Diplomate Reporter, and Notary Public in

17  and for the Commonwealth of Pennsylvania and the

18  State of Delaware.

19          BEFORE: JENNIFER L. HALL, J.

20                        - - -

21

                VERITEXT LEGAL SOLUTIONS

22          Registered Professional Reporters

                300 Delaware Avenue, Suite 815

23                  Wilmington, DE 19801

                    (302)571-0510

24
```

Page 2

1 APPEARANCES:
2
3     HEYMAN ENERIO GATTUSO & HIRZEL, LLP
      BY:  DOMINICK T  GATTUSO, ESQUIRE
      300 Delaware Avenue
4     Suite 200
      Wilmington, Delaware 19801
5     302-472-7301
      dgattuso@heghlaw com
6     and
      PAUL J  TANCK, ESQUIRE PRO HAC VICE
7     Representing the Plaintiff
8
      YOUNG CONAWAY STARGATT & TAYLOR
9     BY:  PILAR GABRIELLE KRAMAN, ESQUIRE
      1000 North King Street
10    Wilmington, Delaware 19801
      302-576-3586
11    pkraman@ycst com
      and
12    BOB KASOLAS, ESQUIRE PRO HAC VICE
      Representing the Defendant
13
14
15
            - - -
16
17 ALSO PRESENT:
18
      ALEXIS STOMBAUGH
19
      MALIHEH ZARE
20
21          - - -
22
23
24

Page 3

1              INDEX
2            - - -
3
4            - - -
5            EXHIBITS
6            - - -
7 NUMBER          DESCRIPTION          PAGE
8 No exhibits were marked for identification.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          THE COURT:  Good afternoon, everyone.
2 We are here today for a discovery dispute conference
3 which is Rockwell Automated versus Parcorp, Civil
4 Action Number 21-1238-GBW-KLH.  Appearances for the
5 record starting with Delaware counsel.
6          MR. GATTUSO:  Good afternoon, Your
7 Honor.  Dominick Gattuso from Heyman Enerio Gattuso
8 & Hirzel on behalf of Rockwell.  With me is Paul
9 Tanck from Alston & Bird.
10          THE COURT:  Good afternoon.
11          MS. KRAMAN:  Good afternoon, Your
12 Honor.  Pilar Kraman from Young Conaway for
13 defendant.  With me is counsel is Bob Kasolas from
14 Brach Eichler, and Alexis Stombaugh and Maliheh
15 Zare.
16          THE COURT:  Good afternoon to all of
17 you.  So I've got all these letters.  Let me ask you
18 this first, where are we with settlement.  Let me
19 hear from plaintiff.
20          MR. TANCK:  Your Honor, Paul Tanck
21 with Alston & Bird.  Settlement has stalled.  We
22 have tried but I don't think there is going to be
23 any other productive movement.  So we are going to
24 have to proceed.

Page 5

1          THE COURT:  So you want them -- the
2 depositions you have already noticed?
3          MR. TANCK:  Correct, Your Honor.
4          THE COURT:  You want them to be done
5 within seven days, I guess --
6          MR. TANCK:  Not done within seven
7 days.  Just they give us dates within seven days.
8 The hard thing has been getting them to respond and
9 give us dates.  Get them seven days to give us dates
10 within the next, I believe, it's 30 days, or I
11 forget what is in the order.  There is a certain
12 amount of time for which they have to happen.
13          The goal here, Your Honor, is that we
14 don't want to move the dispositive deadline or the
15 trial deadline.  There is a lot of play in the
16 expert deadline.  So if we get these depositions
17 done, which I believe we can, in the next X number
18 of days, weeks, that will allow us to get expert
19 discovery done and, otherwise, keep the case on
20 track to go to trial the way it's been set.
21          THE COURT:  Further to what you are
22 saying -- there is nothing wrong with what you are
23 saying -- you don't want to move it.  It's not going
24 to get moved.  So it is what it is.  So I will just

2 (Pages 2 - 5)

DISCOVERY MOTIONS

Page 6

1  say that at the outset.
2          Let me ask you this, they want to
3  take a deposition of -- I want make sure my notes
4  are right.  They want to take a deposition of
5  Mr. Miller.  Is that right?  And you are moving for
6  a protective order.
7          MR. TANCK:  Correct.
8          THE COURT:  Why don't you tell me
9  about that.
10         MR. TANCK:  Defendants have sought
11  three depositions in this case.  Initially, they
12  were seeking a gentleman named Ryan Smaglik, who is
13  located in London.  He is in charge of our
14  investigations of trademarket goods.  He is a
15  non-attorney witness that has all of the information
16  about the investigations and things like that.
17         They also sought a 30(b)(6)
18  deposition on Rockwell on all topics they want
19  topics on.  They also then sought to have Mr. Miller
20  deposed, who is the in-house counsel at Rockwell who
21  is in charge of this litigation.  He is trial
22  counsel for us.
23         And so what we had offered initially
24  was that we would provide Mr. Smaglik, and the

Page 7

1  30(b)(6) witness, to answer everything and
2  everything they want in this case.  They were not
3  satisfied -- we gave them dates.  We gave them -- we
4  were all set to do it.  And they decided to withdraw
5  those depositions at the last minute even though we
6  were prepared and ready to go.
7          So the Miller deposition,
8  essentially, is our position is he's counsel.  It's
9  going to be fraught with issues involving privilege.
10  And they haven't, otherwise, shown why there is any
11  unique knowledge that Mr. Miller has that they can't
12  get from another witness.  We are in the unique
13  position now where because they didn't take any
14  other depositions of anyone else, they can't get it
15  from anyone else because they didn't take it from
16  anyone else, not that they couldn't have gotten it
17  from anyone else.
18         So we believe this is just harassing
19  and it shouldn't go forward.  And if they ever were
20  able to identify something unique that he had, well,
21  then we can talk about it then.  But I don't believe
22  they can, and nor have they shown that yet.
23         So we think it's appropriate to have
24  him protected at this point in time.  And, sure, if

Page 8

1  they want to come back at some later time with an
2  appropriate motion, then we can address that then.
3          THE COURT:  Okay.  Is it fair to say
4  if I give you the depositions you want, that you are
5  going to be open to letting them depose Mr. Smaglik,
6  both in his individual capacity and as a 30(b)(6)
7  witness.
8          MR. TANCK:  I mean, I understand how
9  that would be equitable in the circumstances.  I
10  just want to point out that we have been pursuing
11  depositions since July, and trying to get it done.
12  And we gave our witnesses so they chose not
13  to take them in not the same way, the other way.
14         So while I understand they want these
15  depositions, we gave Mr. Smaglik to them and they
16  didn't take it.  We had to prepare him.  We have
17  made travel arrangements from London, all these
18  things.  And it's prejudicial to have him do it
19  again.  But I understand, Your Honor, if that's what
20  Your Honor wants to do, obviously, to move this case
21  forward to get it done, we will get it done.
22         THE COURT:  Is there a dispute as to
23  what exactly happened and who said?  I realize what
24  it eventually devolved into was you are not going to

Page 9

1  depose my guys.  It eventually ended up that way.
2  But how do you get there?  Is there a dispute about
3  how it got there?  Is that undisputed?
4          MR. TANCK:  I think there is a little
5  bit of a he-said-she-said issue there.
6  Unfortunately, I don't want to get into finger
7  pointing and name calling.  But it's fair to say
8  that we completely disagree on what was the
9  arrangement at the end of discovery on whether we
10  should be going forward with those depositions or
11  not.
12         And our position was that we agreed
13  that any noticed depositions at the end of discovery
14  that hadn't been taken, can be taken after time.
15  And we knew that they had withdrawn those.  So we
16  felt they had foregone their opportunity.  They
17  believed that they didn't do that.  And at this
18  point in time, it's not worth getting into a
19  he-said-she-said.
20         THE COURT:  Agreed.  Thank you very
21  much.  Let's hear from the other side.
22         MR. KASOLAS:  Good afternoon, Your
23  Honor.  It's a pleasure to be before the District of
24  Delaware.

3 (Pages 6 - 9)

DISCOVERY MOTIONS

Page 10

1    THE COURT: I recognize your voice.
2  It's good to see you in person.
3    MR. KASOLAS: Same here, Judge.
4  First things first, I have never dealt with
5  Mr. Tanck in this case. I have only dealt with
6  Mr. Neal McLaughlin, whether it's settlement or
7  discovery, or working things out. He is not here
8  today. I find that a little bit disappointing to
9  say the least.
10    With respect to status of the
11  settlement discussions, I don't know why Mr. Tanck
12  says they stalled. I e-mailed Mr. McLaughlin this
13  morning, and I spoke with him last week. We are
14  down to a single issue. He seems to always have a
15  different interpretation of who is supposed to get
16  back to my guys.
17    But I think the idea to say that the
18  discussions have stalled is not an accurate one.
19  Again, I don't deal with Mr. Tanck. I deal with
20  Mr. McLaughlin, who is not here today.
21    I'm happy to talk about any topic
22  regarding today, any sequence --
23    THE COURT: Are there drafts getting
24  exchanged back and forth or is somebody all done?

Page 11

1    MR. KASOLAS: Many drafts have gone
2  back and forth.
3    THE COURT: Is somebody waiting on
4  one right now or has somebody told somebody --
5    MR. KASOLAS: As far as I'm
6  concerned, I am waiting on a draft from his partner.
7  His partner e-mailed me this morning saying I
8  thought I was waiting for you to get back to us,
9  which is not accurate. But it is what it is. So to
10  come in here and say the discussions have stalled is
11  just not accurate because I had a phone call with
12  Mr. McLaughlin last week.
13    I have brought my notes with the
14  call. I e-mailed him about the call this morning.
15  I said to him, get back to me on my latest draft. I
16  circulated the latest draft. To be candid with you,
17  we are down to basically one significant issue.
18    THE COURT: Don't tell me what it is.
19    MR. KASOLAS: But this kind of
20  exemplifies why we are here today is there seems to
21  be some kind of a disconnect communication-wise
22  between my side and what transpires on the Rockwell
23  side, whether it's with the firm, with the client.
24  But to me, Mr. McLaughlin is not here today. He is

Page 12

1  the one that's interacted with me, interfaced with
2  me since day one of all these matters.
3    And then I come and they say the
4  settlement is stalled. Why is it stalled? My
5  position, we've done all this work. We have one
6  basically significant issue outstanding. If it gets
7  resolved, we will be done. That is what I have to
8  say about that.
9    My position is laid out in the
10  letter.
11    THE COURT: If I let them -- first of
12  all, yes, the letter says you are willing to let
13  them depose your guys. Does that still remain the
14  case?
15    MR. KASOLAS: I have dates.
16    THE COURT: What are the dates?
17    MR. KASOLAS: I have to look through
18  my phone.
19    THE COURT: Fine, pull your phone
20  out. I would rather get this hashed out while
21  everyone is here in Delaware. Well, my hope is that
22  it would be more productive. That is how we would
23  go moving forward.
24    MR. KASOLAS: I apologize for the

Page 13

1  delay.
2    THE COURT: Take your time.
3    MR. KASOLAS: So I can produce Luca
4  Coppola on December 15, if that works for the other
5  side, or December 20.
6    For Firio -- I can't profound his
7  last name, I apologize -- another principal of the
8  company. He can be deposed January 13. And the
9  third principal, Fulvio Coppola, can be deposed
10  January 20. And I understand the last
11  correspondence from my client, they sounded like if
12  those exact dates don't work, they can play with the
13  Thursday or the Friday. If it is on a Thursday,
14  they can do Friday. If it is on a Friday, they can
15  do the Thursday.
16    THE COURT: Fulvio is also going to
17  be a 30(b)(6). Right?
18    MR. KASOLAS: Correct.
19    THE COURT: Is that going to be on
20  January 20 as well, does the other side need more
21  than one day for that?
22    MR. TANCK: So Your Honor, we
23  understand that some of the witnesses are going to
24  require translators or they are going to request

4 (Pages 10 - 13)

DISCOVERY MOTIONS

Page 14

1 translators, and we already have in our discovery
2 orders that they will carry over to the next day.
3 So we are going to need two days for each one.  And
4 so for the 30(b)(6), I imagine we can do it all in
5 those two days.
6          THE COURT:  For the record, I gave a
7 thumbs up.  So what about Luigi Scotto diCarlo, and
8 Pasquale Danilo Schiano DiCola?
9          MR. KASOLAS:  The one witness is no
10 longer with the company, diCarlo.  This was made
11 clear to them.  So I can't produce someone who is
12 not affiliated with the company anymore, doesn't
13 work with the company anymore.  The other two
14 witnesses I explained to Mr. McLaughlin --
15          THE COURT:  Wait, I thought it was
16 Emmanuele Scotto diCarlo that is no longer with the
17 company.
18          MR. KASOLAS:  Yes.
19          THE COURT:  What about Luigi Scotto
20 diCarlo?
21          MR. KASOLAS:  He can be made
22 available.  I don't have exact dates for him.  I
23 spoke with Mr. McLaughlin.  He said if we removed
24 him from our witness list or our individuals that

Page 15

1 have knowledge of the facts of the case, they would
2 forego those depositions.
3          THE COURT:  Okay.
4          MR. KASOLAS:  I can get him those
5 days in the next two to three days.  If
6 Mr. McLaughlin, who is not here today, is still
7 going to stand by that representation to me, there
8 is no need for us to be concerned with those
9 particular employees.
10          THE COURT:  We are doing these over
11 Zoom.  Right?
12          MR. KASOLAS:  Yes.
13          THE COURT:  So there is no time
14 between November 17 and January 20 for Mr. Coppola
15 to get deposed?
16          MR. KASOLAS:  Those are the dates I
17 have that are concrete right now, Judge.  I can get
18 different dates if Your Honor directs me to.
19          THE COURT:  Yeah.  All right.  Okay.
20 So those are the dates.  What do you want to tell me
21 about Mr. Miller?  What makes you think he's got
22 non-privileged information that is relevant to this
23 case?
24          MR. KASOLAS:  First of all, my

Page 16

1 position is they never moved for protective order of
2 this Court, never briefed the issue in their letter.
3 So our position is they waived that particular
4 topic.  On the first round of the September motions
5 in the letter submitted to Your Honor, they moved
6 for protective order.  And they briefed the issue.
7 I didn't move to compel Mr. Miller's deposition.
8          The second time around, they rely on
9 their September submissions to the Court, but they
10 change their position so now we have to move to
11 compel.  It's not how it works.  If he doesn't want
12 to produce Mr. Miller procedurally, it was their
13 obligation make a motion for a protective order.
14 And they failed to do it.  That is number one.
15          Number two, the proposition that
16 Mr. Miller is only an in-house counsel is simply not
17 accurate.  It is publicly available knowledge on the
18 record that Mr. Miller is the president, the
19 president of Rockwell Automated Technologies, LLC,
20 which is subsidiary owned by Rockwell company in
21 this matter.
22          Why is that important?  The entire
23 subject matter of this litigation is exactly that,
24 Rockwell Automated Technologies.  The modules, the

Page 17

1 components, the parts that my client sells into the
2 stream of commerce that they contend somehow are not
3 genuine, new Rockwell parts.  That somehow don't
4 come along with the bells and whistles allegedly.
5          So here you have an individual who is
6 the president of the component of Rockwell that is
7 in charge of Rockwell Automated Technologies, the
8 identical subject matter of this case.  And they
9 come in to the Court and say he has no personal
10 knowledge about the facts of this case because he is
11 a lawyer for the company in this case.  I find it
12 very difficult to believe.
13          And he also helped to prepare their
14 answers to interrogatories.  In the first answer to
15 interrogatories that we propounded on them, we asked
16 them delineate who assisted in the preparation of
17 these interrogatories, which asked for fact
18 information.  They put down Mr. Smaglik and
19 Mr. Miller.
20          Mr. Miller has definitely been
21 involved in the investigation and assembly of the
22 allegations against my client for this particular
23 matter.  He's also been involved in communications.
24 So I don't know how you come in here and say the man

5 (Pages 14 - 17)

DISCOVERY MOTIONS

Page 18

1 who is the president of a division of Rockwell, in
2 charge of Rockwell Automated Technologies, LLC, when
3 the subject matter in this case is exactly Rockwell
4 Automated Technology products, how can he not have
5 factual information?
6         With respect to privilege, I'm not
7 going ask privileged information.  And to the extent
8 I did, counsel is very capable of saying "objection,
9 privileged.  Do not answer."  That's simple.  We
10 cite a couple of cases from the District of Delaware
11 in our letter that state Courts here all the time
12 say to the extent that somehow you get into some
13 area of privilege, counsel is very capable, on both
14 sides, of navigating that issue.
15         So why do I have to take their word
16 for it that Mr. Miller doesn't know anything.  He is
17 not just in-house counsel.  He is an officer of the
18 division of his company in charge of the identical
19 subject matter in controversy here.  He must have
20 personal knowledge of facts in this case.
21         THE COURT:  I didn't take all that
22 from your letter.  I know we have page limits.  You
23 have some extra --
24         MR. KASOLAS:  We do highlight that

Page 19

1 Mr. Miller, in our letter, is the president of
2 Rockwell --
3         THE COURT:  A sub.  That's all I
4 heard was he was president of a sub.  I had no idea
5 how that sub relates to the case at all.
6         MR. KASOLAS:  I understand.  The
7 other issue is at some point I would expect Rockwell
8 in this case to come up with an expert report, which
9 I probably am going to move to strike as an opinion
10 saying based on my discussions with Mr. Miller and
11 Mr. Smaglik, here is my expert opinion.  Well, if
12 they are going to rely on Mr. Miller to assist the
13 expert in preparing an expert report, I absolutely
14 have the right to take Mr. Miller's deposition in
15 this case.
16         THE COURT:  That is putting himself
17 in issue, but they haven't done that yet.  Have a
18 seat, we will hear from other side about Mr. Miller.
19         MR. TANCK:  So Your Honor, I will
20 start with Mr. Miller first.  Just to point out, the
21 Rockwell Automated Technologies sub that he is the
22 president of has nothing to go do with what counsel
23 represented is what it does.  It is a licensing
24 entity.  It is simply a licensing entity and has

Page 20

1 nothing to do with the technologies of Rockwell and
2 the product, and things like that.
3         So that is probably why there was no
4 information about that in the letter because he
5 doesn't know what it actually does.
6         With regards to the deposition
7 dates -- unless you want to hear more about
8 Mr. Miller.
9         THE COURT:  No.
10         MR. TANCK:  On the deposition dates,
11 we -- Luigi diCarlo and for Pasquale, we do want
12 dates for them.  They were identified as witnesses
13 having relevant information.  And they identified
14 all the relevant information that they had in, both
15 in their initial disclosures and their Delaware
16 disclosures.  And we want their depositions.
17         And with regards to the dates, again,
18 we will be accommodating on the dates as best we
19 can.  But some of these we would like, especially
20 the 30(b)(6), prior to the 20th because we want to
21 get the expert depositions -- I'm sorry, the expert
22 reports done.  And to the extent they need
23 information from the defendants, having them happen
24 afterwards we are just going to have to supplement,

Page 21

1 which might be difficult.
2         That being said, whatever dates we do
3 decide on or the Court orders, we would like that
4 they not be rescinded.  Once they get set, they
5 can't be rescinded, if that's possible.
6         The last issue I will just point out,
7 you know, the accusations that my partner,
8 Mr. McLaughlin, is not here is something nefarious
9 or he doesn't want to be here.  He is on a plane
10 taking a deposition in another case.  I have been
11 working with him side-by-side, not only on this case
12 but for the last, I guess, seven, or eight years on
13 everything we do together.  So I know exactly what
14 is going on in this case.
15         And I can tell you with regards to
16 the settlement, that there have been drafts that
17 have gone back and forth.  And it's, again, another
18 issue of one side is clearly not agreeing with the
19 other side on what the status of this settlement
20 negotiation is.  And, frankly, we have been waiting
21 for them to abide by what they agreed to and they
22 are not.
23         I don't want to get into finger
24 pointing.  It's safe to say that we are not settling

6 (Pages 18 - 21)

DISCOVERY MOTIONS

Page 22

1  this case because it is -- we are very far apart.
2  And it is not being done in any other way to say
3  that counsel for both sides have had plenty of time
4  to get a deal done, if a deal was going to get done
5  and it is not getting done.  And, unfortunately, we
6  have to continue litigating this case until that
7  may -- a future opportunity may come around.
8        But there is no nefarious reason why
9  Mr. McLaughlin is not here.  I know exactly what is
10 going on in this case from day one.  We --
11       THE COURT:  Let me ask you this, and
12 I apologize if I already asked you this, but it's
13 been a long day.  Is Mr. Smaglik available
14 reasonably --
15       MR. TANCK:  We will get him -- I
16 mean, I don't know the dates specifically he is
17 available.  I will --
18       THE COURT:  Are we talking like a
19 month from now, or two months from now, or a week
20 from now?
21       MR. TANCK:  I would -- since he is
22 our 30(b)(6) witness, if that's what they are going
23 to be getting, I need to prepare him on all the
24 topics again.  I would need some time to do that.

Page 23

1  And it is Thanksgiving next week.  So I would say
2  probably -- certainly in December we will have him
3  available.  It's not a problem.
4        THE COURT:  Okay.  Have a seat.  Let
5  me tell you-all what I'm thinking here.  I was going
6  to tell you-all that it's all got to get done by
7  December 14, and then you need to work with each
8  other to get the expert reports and depositions
9  completed so that you can meet your current deadline
10 of March 17 for Daubert and case dispositive
11 motions.
12       I'm going to modify that a little
13 bit.  The March 17 deadline for the dispositive
14 motions and Daubert motions, that is going to stand.
15 That's not going to get changed.
16       Delaware counsel can tell you about
17 the reasons for that.  In short, we need the time
18 open between that and the trial date.  And the trial
19 date is not going to get moved.  So that is what we
20 are doing there.
21       So the reason why I was going to give
22 you a date certain to get the depositions done is
23 because I felt like if I didn't, this was going to
24 get drawn out.  And I don't want this to get drawn

Page 24

1  out because this needs to be over.
2        Quite frankly, I am a little bit at a
3  loss about when these can get done by, especially
4  since one side's witnesses are overseas.  That said,
5  I just -- it's really hard for me to believe that we
6  can't find a date do a Zoom deposition closer than
7  the next two months.  So I am frustrated by that.
8        So why don't we take a brief recess
9  on this issue and you talk to each other and come up
10 with what you think is a reasonable schedule to get
11 the depositions done by and the expert reports and
12 depositions done by.  And then we will come back and
13 order it because I don't know what else to do at
14 this point.
15       I don't feel like we can move forward
16 without having a date on those.  Or another
17 possibility is we can reconvene for a brief
18 teleconference Wednesday, once you have all had a
19 chance to talk to your clients and witnesses about
20 when can get these done.  Any ideas?
21       MR. TANCK:  Your Honor, I am fairly
22 certain that I can get things on our end done on any
23 deadline you set.  Because, like you said, things
24 need to get done.  And if we just keep pushing it

Page 25

1  out, it's never going to get done.
2        We had set forth, in our proposed
3  order, again, keeping the dispositive deadline where
4  it is, and the trial deadlines where it is, moving
5  the opening expert report to January 6.
6        So what I would say is that the party
7  needs to complete all depositions prior to the new
8  year.  And so we can work separately.  And I heard
9  some dates today from counsel that we can lock them
10 in on, if that's fine.  I'm happy to do all the
11 dates that they said, so long as they are before
12 January 1.  And, frankly, there may be one or two
13 that we can probably take after, but --
14       THE COURT:  You can do your expert
15 reports without them.
16       MR. TANCK:  Yes, but I want the
17 30(b)(6) prior to January 1.  But if Luigi can only
18 do it because he is traveling for the holidays, I
19 can do him maybe in January.  But I would like Your
20 Honor, if you look at again, this is document 111-2
21 in our proposed order.  That is a very -- we were
22 thoughtful about putting that expert schedule
23 together.  That gives us plenty of time to get the
24 experts done, deposed, prior to the deadline that

7 (Pages 22 - 25)

DISCOVERY MOTIONS

Page 26

1  the Court is holding fast to.
2          And I would just say that the
3  depositions have to be completed prior to that
4  January 6 date. And so I would say January 1, and
5  so by the end of the year. We will just get it
6  done.
7          THE COURT: By the end of the year.
8  All right. Comments from the other side on setting
9  a deadline by the end of the year for this. This is
10  more involved than I want to be, by the way. But
11  this is where we are.
12         MR. KASOLAS: Understood. The
13  problem I have now is my clients are seven hours
14  ahead, 11:00 p.m. I don't know if local counsel is
15  up. I don't know if the clients are up. I cannot
16  communicate with them today, unfortunately. I can
17  talk with counsel in the hallway based on what I
18  know and try to work it out with him. I do think
19  January 6 is a little bit overambitious. The last
20  two weeks of the year with Christmas and New Year.
21  Next week is Thanksgiving. That is three weeks that
22  are not part of the process.
23         THE COURT: I get that.
24         MR. KASOLAS: Happy to do that by the

Page 27

1  end of January, that's easy.
2          THE COURT: That is not what we are
3  going to do. I think it is pretty generous of the
4  other side to say they will take a deposition, for
5  example, on December 31st. And then to be prepared
6  to serve their expert reports on which they have the
7  burden of proof. So it's basically going to be the
8  end of the year unless you talk to your clients and
9  have a really good reason about why those can't get
10  done. Talk to them. Today's Thursday, tomorrow is
11  Friday. File something on Monday if you guys can't
12  get this worked out.
13         MR. KASOLAS: That's for everyone's
14  deposition, both sides?
15         THE COURT: That's right, absolutely.
16         MR. KASOLAS: That includes
17  Mr. Miller, as well, Your Honor?
18         THE COURT: No, it doesn't. Have a
19  seat. I will talk to you about that.
20         Here is what I will say about
21  Mr. Miller. So plaintiff's motion for a protective
22  order, I find it is not waived. I think it was
23  reasonably raised. I have considered it. Of
24  course, there is no general prohibition against

Page 28

1  obtaining a deposition of opposing counsel, subject
2  to the rules that govern all of discovery.
3          I'm not persuaded in this case that
4  Mr. Miller's conduct is the subject of a claim or
5  defense. I am persuaded that the subject matter of
6  the deposition is likely to be intertwined with
7  privileged information. I don't understand the
8  plaintiff to be seeking to ingest Mr. Miller's
9  advice or knowledge into the litigation. Of course,
10  that may turn out to be the case. And when it does,
11  we will revisit this issue.
12         But his role right now is not central
13  of the events at issue, nor is his knowledge
14  regarding the events at issue relevant to a claim or
15  defense.
16         So applying the rules and standards
17  set forth in Federal Rule of Civil Procedure 26, I
18  find that plaintiff has a strong interest in
19  avoiding the deposition of its chief IP counsel.
20         Defendant hasn't identified any
21  specific non-privileged information that can't be
22  obtained from another source. So either applying
23  the Shelton standards, which one of the parties
24  cited in their brief, or the Rule 26 standards, the

Page 29

1  proposed deposition is not proportional to the needs
2  of the case.
3          So I am going to grant the protective
4  order without prejudice to this issue getting
5  revisited later if it becomes an issue. But I
6  honestly hope that it doesn't. Is there anything
7  else we need to address today?
8          MR. TANCK: Nothing else from
9  plaintiff.
10         THE COURT: Thank you.
11         MR. KASOLAS: Very briefly. I
12  appreciate Your Honor's decision on the Mr. Miller
13  deposition. But if it comes out that the expert
14  does rely on information from Mr. Miller, it is
15  going to create a serious problem for scheduling.
16         THE COURT: I understand that. It is
17  not going to happen. That would really be a bone
18  headed move to put your advice of counsel at issue
19  into the litigation in an expert report. We have
20  experienced counsel here, but we will deal with it.
21         MR. KASOLAS: Thank you, Judge.
22         THE COURT: Okay. Thank you very
23  much.
24         (Whereupon, the hearing concluded at

8 (Pages 26 - 29)

DISCOVERY MOTIONS

Page 30

1  4:03 p.m.)
2           - - -
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 31

1        DISCOVERY MOTIONS
2           - - -
3        C E R T I F I C A T E
4           - - -
5
        I do hereby certify that I am a Notary
6  Public in good standing, that the aforesaid
   testimony was taken before me, pursuant to notice,
7  at the time and place indicated; that said deponent
   was by me duly sworn to tell the truth, the whole
8  truth, and nothing but the truth; that the testimony
   of said deponent was correctly recorded in machine
9  shorthand by me and thereafter transcribed under my
   supervision with computer-aided transcription; that
10 the deposition is a true and correct record of the
   testimony given by the witness; and that I am
11 neither of counsel nor kin to any party in said
   action, nor interested in the outcome thereof.
12
13      WITNESS my hand and official seal this 21ST
14 day of NOVEMBER 2022
15
16
17
18
        John P. Donnelly, RDR
19
        John P. Donnelly, RDR
20      Notary Public
21
22
23
24 Job No. 5582628

9 (Pages 30 - 31)