IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ROCKWELL AUTOMATION, INC.'S COMPENDIUM OF
CASES CITED IN THE FINAL JURY INSTRUCTIONS**

## LIST OF CITED CASES

| | |
|---|---|
| Exhibit 1 | Adapted from Final Jury Instructions *Cirba v. VMware,* 19-cv-742, Dkt. No. 1767 (D. Del. Apr. 28, 2023) |
| Exhibit 2 | Final Instructions – *Cirba Inc. v. Vmware*, 19-cv-742, Dkt. No. 526 sections 7.0 and 7.3 (D. Del. Jan. 22, 2020) |
| Exhibit 3 | Final Instructions - *Cirba Inc. v. VMware*, 19-cv-742, Dkt. No. 526 Section 15.2 p. 84 (D. Del. Jan. 22, 2020) |
| Exhibit 4 | *Rockwell Automation, Inc. v Radwell Int'l, Inc.*, 15-cv-5246, 2020 US Dist. Lexis 223998 (D.N.J. Nov. 24, 2020) |
| Exhibit 5 | Corpus Juris Secundum, 87 CJS Trademark § 304, Presumptions related to confusion or deception in civil actions on trademarks |
| Exhibit 6 | Adapted from Final Jury Instructions - *Luxottica Grp. v. Airport Mini Mall, LLC*, 15-cv-1422, Dkt. No. 155, pp. 8 and 18. (N.D. Ga. 2017) |
| Exhibit 7 | Jury Instructions - *Brand Marketing Group v. Intertek,* 12-cv-1572, Dkt. No. 178 p. 30 (W.D. Pa. Aug. 27, 2013) |
| Exhibit 8 | *New Balance Athletics, Inc. v. USA New Bunren Int'l. Co. Ltd. LLC,* 2020 U.S. Dist. LEXIS 170906 (D. Del. Sept. 18, 2020) |
| Exhibit 9 | Final Instructions - *American Cruise Lines, Inc. v. HMS American Queen Steamboat Co. LLC,* 13-cv-324, Dkt. No. 340, Section 10.2 (D. Del. 2019) |
| Exhibit 10 | Final Jury Instructions – *Surgiquest, Inc. v. Lexion Med., LLC*, 14-cv-382, Dkt. No. 265 at 1710-11 (D. Del. June 27, 2017) |
| Exhibit 11 | Jury Instructions - *Trust ID v. Next Caller,* 18-cv-172, Dkt. No. 295 p.47 (D. Del. July 16, 2021) |
| Exhibit 12 | Court's revised Jury Instructions - *Tiffany v. Costco,* 13cv1041 DKT 345 p.23 (S.D.N.Y. Sept. 27, 2016) |

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CIRBA INC. (d/b/a DENSIFY), as the
successor-in-interest to CIRBA IP INC.,

         Plaintiff,

        v.

VMWARE, INC.,

        Defendant.

C.A. No. 19- 742-GBW

JURY TRIAL DEMANDED

## **FINAL JURY INSTRUCTIONS**

# TABLE OF CONTENTS

1.0  GENERAL INSTRUCTIONS ........................................................................................ 1

    1.1  INTRODUCTION ............................................................................ 1
    1.2  JURORS' DUTIES ........................................................................... 2
    1.3  EVIDENCE DEFINED ..................................................................... 3
    1.4  DIRECT AND CIRCUMSTANTIAL EVIDENCE ........................... 5
    1.5  CONSIDERATION OF EVIDENCE ................................................ 6
    1.6  STATEMENTS OF COUNSEL ....................................................... 7
    1.7  CREDIBILITY OF WITNESSES .................................................... 8
    1.8  NUMBER OF WITNESSES ............................................................ 9
    1.9  EXPERT WITNESSES .................................................................... 10
    1.10  DEPOSITION TESTIMONY ........................................................... 11
    1.11  USE OF INTERROGATORIES ....................................................... 12
    1.12  EXHIBITS ....................................................................................... 13
    1.13  BURDENS OF PROOF ................................................................... 14
    1.14  USE OF NOTES .............................................................................. 16

2.0  THE PARTIES AND THEIR CONTENTIONS ....................................................... 17

    2.1  THE PARTIES................................................................................. 17
    2.2  THE PARTIES' CONTENTIONS ................................................... 18
    2.3  SUMMARY OF THE PATENT ISSUES ........................................ 19

3.0  THE PATENT CLAIMS ........................................................................................... 20

    3.1  PATENT LAWS............................................................................... 20
    3.2  PATENT "CLAIMS" GENERALLY................................................ 21
    3.3  CONSTRUCTION OF THE CLAIMS............................................. 22
    3.4  INDEPENDENT AND DEPENDENT CLAIMS .............................. 24
    3.5  OPEN ENDED OR "COMPRISING" CLAIMS................................ 25

4.0  PATENT INFRINGEMENT ...................................................................................... 26

    4.1  INFRINGEMENT GENERALLY.................................................... 26
    4.2  DIRECT INFRINGEMENT ............................................................ 27
    4.3  INDUCED INFRINGEMENT.......................................................... 29
    4.4  DIRECT INFRINGEMENT BY A THIRD PARTY ......................... 31
    4.5  AFFIRMATIVE ACTIONS INTENDED TO CAUSE INFRINGEMENT......... 32
    4.6  KNOWLEDGE THAT THE ACTS, IF TAKEN, WOULD CONSTITUTE
        INFRINGEMENT............................................................................ 33
    4.7  INDUCEMENT MUST CAUSE DIRECT INFRINGEMENT .......... 34
    4.8  WILLFUL INFRINGEMENT ......................................................... 35

5.0    INVALIDITY ................................................................................................ 36

       5.1    INVALIDITY GENERALLY ............................................................... 36
       5.2    PRIOR ART ......................................................................................... 38
       5.3    ANTICIPATION .................................................................................. 39
       5.4    OBVIOUSNESS GENERALLY ............................................................ 40
       5.5    SCOPE AND CONTENT OF THE PRIOR ART .................................. 42
       5.6    DIFFERENCES BETWEEN THE CLAIMED INVENTION AND PRIOR ART
              ............................................................................................................. 43
       5.7    LEVEL OF ORDINARY SKILL ........................................................... 45
       5.8    OBJECTIVE EVIDENCE OF NONOBVIOUSNESS ........................... 47

6.0    PATENT DAMAGES ................................................................................... 49

       6.1    DAMAGES INTRODUCTION ............................................................. 49
       6.2    DATE DAMAGES BEGIN AND END .................................................. 50
       6.3    METHODS FOR COMPUTING PATENT DAMAGES ......................... 53
       6.4    REASONABLE ROYALTY—GENERALLY ......................................... 54
       6.5    FACTORS FOR DETERMINING REASONABLE ROYALTY ............. 56
       6.6    REASONABLE ROYALTY—TIMING................................................. 59
       6.7    PATENT DAMAGES INTEREST......................................................... 60
       6.8    LIMITATIONS ON INDUCED INFRINGEMENT PATENT DAMAGES ....... 61

7.0    DELIBERATION AND VERDICT ............................................................... 62

       7.1    INTRODUCTION ................................................................................. 62
       7.2    UNANIMOUS VERDICT...................................................................... 63
       7.3    DUTY TO DELIBERATE ..................................................................... 64
       7.4    SOCIAL MEDIA .................................................................................. 65
       7.5    COURT HAS NO OPINION.................................................................. 66

## 1.0    GENERAL INSTRUCTIONS

### 1.1    INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence.

Then I will explain the positions of the parties and the law you will apply in this case. And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

### 1.2    JURORS' DUTIES

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way. You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not guess or speculate, and do not let any bias, sympathy, or prejudice you may feel toward one side or the other influence your decision in any way.

### 1.3   EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath (including deposition transcript testimony that has been played by video or read to you), the exhibits that I allowed into evidence, and the stipulations to which the parties agreed.

Certain charts and graphics have been used to illustrate testimony from witnesses. Unless I have specifically admitted them into evidence, these charts and graphics are not themselves evidence, even if they refer to, identify, or summarize evidence, and you will not have these demonstratives in the jury room.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. You should not be influenced by a lawyer's objection or by my ruling on that objection. Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

You should not be concerned with whether there were any earlier proceedings in this case

3

or, if there were, what the outcome of any such proceedings might have been. And as I have told

you previously, the Court has no opinion on the matters you are being asked to decide.

Make your decision based only on the evidence, as I have defined it here, and nothing

else.

## 1.4    DIRECT AND CIRCUMSTANTIAL EVIDENCE

You may have heard the terms "direct evidence" and "circumstantial evidence."

Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believe him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

## 1.5    CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## 1.6 STATEMENTS OF COUNSEL

A further word about statements of counsel and arguments of counsel. The attorneys' statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented.

If you remember the evidence differently from the way it was described by the attorneys, you should rely on your own recollection.

## 1.7 CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You may believe everything a witness says, or part of it, or none of it. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony he gave at the trial. You have the right to distrust such a witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

8

## 1.8    NUMBER OF WITNESSES

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

## 1.9    EXPERT WITNESSES

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

## 1.10   DEPOSITION TESTIMONY

Deposition testimony is out of court testimony given under oath and is entitled to the same consideration you would give it had the witnesses personally appeared in court.

During the trial, certain testimony was presented to you by the reading of a deposition transcript or the playing of video excerpts from a deposition. If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony. You should not attribute any significance to the fact that the deposition videos may appear to have been edited.

## 1.11   USE OF INTERROGATORIES

You may have heard answers that the parties gave in response to written questions submitted by the other side. The written questions are called "interrogatories." The written answers were given in writing and under oath, before the trial.

You must consider the parties' answers to interrogatories in the same manner as if the answers were made from the witness stand.

## 1.12 EXHIBITS

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room to consider as evidence for your deliberations.

The remainder of the exhibits (including charts, PowerPoint presentations and animations) were offered to help illustrate the testimony of the various witnesses. These illustrative exhibits, called "demonstrative exhibits," will not be in the jury room and have not been admitted, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

In some instances, certain charts and summaries may have been received into evidence to illustrate information brought out in the trial. You may use these charts and summaries as evidence, even though the underlying documents and records are not here. You should give them only such weight as you think they deserve.

13

### 1.13   BURDENS OF PROOF

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In a case such as this, there are two different burdens of proof that are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."

Cirba is accusing VMware of patent infringement. Cirba has the burden of proving its claims and the amount of its money damages, if any, by what is called a preponderance of evidence. That means that Cirba has to produce evidence which, when considered in light of all of the facts, leads you to believe that what Cirba claims is more likely true than not. To put it differently, if you were to put the evidence of Cirba and VMware concerning infringement on opposite sides of a scale, the evidence supporting Cirba's claims would have to make the scales tip somewhat on its side in each instance. If the scale should remain equal or tip in favor of the VMware, you must find for VMware.

If you find that VMware infringed one or more of the '687 patent claims that have been asserted in this case, then as a separate question, Cirba has also asserted that the infringement of the '687 patent was willful. Cirba has the burden of proving this additional contention by a preponderance of the evidence.

In this case, in addition to denying Cirba's claims, VMware asserts that Cirba's '687 patent is invalid. Patents, however, are presumed to be valid under the law. VMware therefore has the burden of proving that the '687 patent is invalid by clear and convincing evidence. Clear and convincing evidence means that it is highly probable that a fact is true. Proof by clear and convincing evidence is, thus, a higher burden than proof by a preponderance of the evidence.

Some of you may have heard the phrase "proof beyond a reasonable doubt." That burden of proof applies only in criminal cases and has nothing to do with a civil case like this one. You

14

should therefore not consider it in this case.

## 1.14   USE OF NOTES

You may use notes taken during trial to assist your memory. However, as I instructed you at the beginning of the case, you should use caution in consulting your notes. There is generally a tendency I think to attach undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.  Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

## 2.0    THE PARTIES AND THEIR CONTENTIONS

### 2.1    THE PARTIES

I will now review for you the parties in this action, and the positions of the parties that you will have to consider in reaching your verdict.

The plaintiff in this case is Cirba Inc. (d/b/a Densify) as the successor in interest to Cirba IP Inc., which I may refer to as "Cirba" or "Plaintiff." Cirba Inc. ("Inc.") is not a plaintiff by itself. You heard more about this from the parties, but in April 2022, Cirba Inc. and Cirba IP amalgamated into a single entity, but only Cirba IP's claims are at issue in this action.

The defendant in this case is VMware, Inc., which I will refer to as "VMware" or "Defendant."

## 2.2    THE PARTIES' CONTENTIONS

There are two patents at issue in this case. Cirba's patents are United States Patent Nos. 8,209,687 and 9,654,367. You heard the lawyers and witnesses in the case refer to Cirba's patents as the '687 and '367 patents or the "Cirba patents." I will do the same. Copies of the Cirba patents have been given to you.

Cirba contends that VMware directly infringed and induced infringement of the Cirba patents, that the infringement of the '687 patent was willful, and that Cirba is entitled to damages.

VMware denies that it infringed or induced infringement of the Cirba patents, or that it did so willfully. VMware also contends that the '687 patent is invalid. VMware also denies that Cirba is entitled to recover any damages related to the patents.

## 2.3    SUMMARY OF THE PATENT ISSUES

I will now summarize the patent issues that you must decide and for which I will provide instructions to guide your deliberations. The specific questions you must answer are listed on the verdict sheet you will be given. Here are the issues you must decide:

- Whether Cirba has proven by a preponderance of the evidence that VMware infringed one or more of the asserted claims of the '687 patent or the '367 patent.

- If you decide that Cirba has proven that VMware infringed one or more of the asserted claims of the '687 patent, whether Cirba has proven by a preponderance of the evidence that VMware willfully infringed that claim.

- Whether VMware has proven by clear and convincing evidence that one or more of the asserted claims of the '687 patent is invalid.

- If you decide that Cirba has proven that VMware infringed a claim not shown to be invalid, what monetary damages Cirba has proven by a preponderance of the evidence that it is entitled to.

I will provide more detailed instructions on each of the issues you must decide elsewhere in these jury instructions.

## 3.0    THE PATENT CLAIMS

### 3.1    PATENT LAWS

At the beginning of the trial, I gave you some general information about patents and the patent system and a brief overview of the patent laws relevant to this case. I will now give you more detailed instruction about the patent laws that specifically relate to this case.

## 3.2    PATENT "CLAIMS" GENERALLY

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims."

The patent claims are the numbered paragraphs at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers. Only the claims of a patent can be infringed.

The claims are intended to define, in words, the bounds of an invention. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage. Each of the asserted claims must be considered individually.

In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations." For example, a claim that covers the invention of a table may recite the tabletop, four legs, and the glue that secures the legs to the tabletop. The tabletop, legs, and glue are each separate limitations of the claim. When a thing (such as a product) meets each and every requirement of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim.

Each claim may cover more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You will first need to understand what each claim covers in order to decide whether there is infringement of the claim and to decide whether the claim is invalid. You must use the same claim meaning for both your decision on infringement and your decision on invalidity.

### 3.3 CONSTRUCTION OF THE CLAIMS

It is the Court's duty under the law to define what the patent claims mean. As I instructed you at the beginning of the case, I have made my determinations, and I will now instruct you on the meaning, or "construction", of the claim terms. You must apply the meaning that I give in each patent claim to decide if the claim is infringed or invalid. You must accept my definitions of these words in the claims as being correct. You must ignore any different definitions used by the witnesses or the attorneys.

You are advised that the following definitions for the following terms must be applied:

| Claim Term | Construction |
|---|---|
| "Evaluating each virtual guest against each virtual host and other virtual guests using one or more rule sets pertaining to said technical, business and workload constraints" <br><br> [claims 3 and 7 of the '687 Patent] | "Evaluating each virtual machine against each virtual host and other virtual machines, in each case using one or more rule sets pertaining to each of technical, business and workload constraints" |
| "Each virtual guest" <br><br> [claims 3 and 7 of the '687 Patent] | Plain and ordinary meaning to a person of ordinary skill in the art |
| "Each virtual host" <br><br> [claims 3 and 7 of the '687 Patent] | Plain and ordinary meaning to a person of ordinary skill in the art |
| "Identifying the existence of virtual machines with suboptimal placements" <br><br> [claim 7 of the '687 Patent] | "Identifying the existence of virtual machines with less than optimal placements as determined by the evaluation step" |
| "virtualized environment" <br><br> [claim 7 of the '687 Patent] | Plain and ordinary meaning to a person of ordinary skill in the art |

| "Business constraint"<br><br>[claims 3 and 7 of the '687 Patent] | "A restriction or limitation based on a business parameter, such as physical location, organization department, data segregation requirements, owner, service level agreements, maintenance windows, hardware lease agreements, or software licensing agreements" |
|---|---|
| "Determine whether the utilization or performance of an entity is in an acceptable range relative to its capacity or performance limits"<br><br>[claims 1 and 13 of the '367 Patent] | "Determine whether an entity's utilization or performance is within an acceptable range, relative to that entity's capacity or performance limits" |

For any words in the claim for which I have not provided you with a definition, you should apply the plain and ordinary meaning to a person of ordinary skill in the art.

### 3.4 INDEPENDENT AND DEPENDENT CLAIMS

This case involves two types of patent claims: independent claims and dependent claims.

An independent claim does not refer to any other claim of the patent and sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers.

In this case, claims 3 and 7 of the '687 patent and claims 1 and 13 of the '367 patent are independent claims. An independent claim must be read separately from the other claims to determine the scope of the claim.

The remaining asserted claims are dependent claims. A dependent claim does not itself recite all of the requirements of the claim but refers to another claim or claims for some of its requirements. In this way, the claim "depends" on another claim or claims. A dependent claim incorporates all of the requirements of the claims to which it refers. The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other independent claims to which it refers.

### 3.5 OPEN ENDED OR "COMPRISING" CLAIMS

The beginning portion, or preamble, of several of the asserted claims has the word "comprising." The word "comprising" means "including the following but not excluding others." A claim that uses the word "comprising" or "including" is not limited to products having only the elements that are recited in the claim, but also covers products that have additional elements.

If you find, for example, that the accused products include all of the elements of a particular claim, the fact that the accused products might include additional elements would not avoid infringement of the claim.

## 4.0   PATENT INFRINGEMENT

### 4.1   INFRINGEMENT GENERALLY

I will now instruct you on the rules you must follow when deciding whether Cirba has proven by a preponderance of the evidence that VMware has infringed the asserted claims.

Patent law gives the owner of a patent the right to keep others from making, using, selling, or offering to sell a patented product or perform a patented method within the United States during the term of the patent. Any person or business entity that has made, used, sold, or offered to sell a patented product or performed the patented method in the United States during the term of the patent without the patent owner's permission, infringes the patent, so long as the patent is not found to be invalid.

To prove infringement, Cirba must prove by a preponderance of the evidence that each accused product or method, standing alone, contains each and every one of the elements of the patent claim that is asserted against that product or method. If a particular product or method does not contain each and every element of the claim, you must find that the product or method does not infringe.

If, as here, a patent owner asserts multiple patent claims against the same product or method, then you must compare each claim separately against the product or method to determine whether the product or method infringes that individual patent claim.

You must determine whether Cirba has proven that VMware infringed or induced infringement of any of the asserted claims in the Cirba patents.]

26

## 4.2 DIRECT INFRINGEMENT

Cirba alleges that VMware literally infringes or did literally infringe the '687 and '367 patents.

In order to prove direct infringement, Cirba must prove that it is more likely than not that VMware made, used, offered for sale, or sold its products in a manner that meets all of the elements of any one claim literally. Infringement requires comparing products to the claims, not the specification.

Literal Infringement occurs when a party's product practices every element of another party's patent claim.

Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the patent claim. I have already made this decision and I have already instructed you as to the meaning of some terms of the Cirba patent claims. The second step is to decide whether the party accused of infringement has made, used, sold, offered for sale or imported within the United States an accused product or method covered by an asserted claim of the Cirba patents.

To decide whether VMware's computing products and/or their use directly infringe an asserted claim, you must compare that product and/or use with the patent claim and determine whether every element (or as they also are called, limitation) of the claim is included. If so, then VMware's product and/or its use directly infringes or did infringe that claim. If not, then the accused product and/or its use does not directly infringe that claim.

You must determine, separately for each asserted claim, whether or not there is any infringement. There is one exception to this rule. If you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers to that independent claim. On the other hand, if you find that an independent claim has

27

been infringed, you must still decide, separately, whether the use meets the additional requirements of any claims that depend on the independent claim, and, thus, whether those claims have also been infringed. A dependent claim includes all the requirements of any of the claims to which it refers plus additional requirements of its own.

You may find direct infringement based on as little as one instance of the claimed use being performed. Proof of direct infringement may be based on circumstantial evidence.

To show direct infringement of a method claim, Cirba must show that VMware performed each and every step in the claimed method in the United States.

For direct infringement, Cirba is not required to prove that VMware intended to infringe or knew of the patent. Whether or not VMware knew its accused products infringed or even knew of the patent does not matter in determining direct infringement. Instead, all that matters is whether VMware's use of the product is covered by any one of the claims.

### 4.3 INDUCED INFRINGEMENT

Cirba alleges that VMware has induced others to directly infringe the '687 and '367 patents.

Inducement to infringe a claim cannot occur unintentionally. This is different from direct infringement, which, as I have told you, can occur unintentionally.

Cirba alleges that VMware is liable for infringement by actively inducing others, including customers, to directly infringe the '687 and '367 patents. More particularly, Cirba asserts that VMware induced patent infringement after it became aware of the Cirba patents by encouraging its customers to use its infringing product. It is not sufficient that VMware was aware of the act or acts by the third party that allegedly constitute the direct infringement.

To be liable for inducement to infringe, VMware must have known of the patent and encouraged or instructed another person how to use a product in a manner that you, the jury, find infringes or did infringe the asserted claims and must have had knowledge, or have acted with willful blindness, that the induced acts constituted patent infringement. To find willful blindness (1) VMware must have subjectively believed that there was a high probability that a patent existed covering the accused products, and (2) VMware must have taken deliberate actions to avoid learning of that infringement. The mere fact, if true, that VMware knew or should have known that there was a substantial risk that its customers' acts would infringe the Cirba patents would not be sufficient for active inducement of infringement.

As with direct infringement, you must determine whether there has been inducement on a claim-by-claim basis.

VMware is liable for inducement of infringement of a claim only if the other party proves by a preponderance of the evidence each of the following:

1. That allegedly infringing acts were carried out by a third party that literally infringed

29

one or more of the claims of the Cirba patents, meeting all the criteria discussed in my instructions on the topic stated above;

2. That VMware took some affirmative action, or that VMware continued to take an action specifically intending to cause the third parties to directly infringe the Cirba patents;

3. That VMware knew of the Cirba patents—and that (i) VMware knew that the infringing acts, if taken, would constitute direct infringement of the Cirba patents; or (ii) VMware believed that there was a high probability that the actions taken by others infringed the Cirba patents—and took deliberate steps to avoid learning of that infringement;

4. That VMware's alleged inducement, as opposed to other factors, actually caused the third parties to directly infringe.

In order to establish inducement of infringement, it is not sufficient that the third party directly infringed the claim. Nor is it sufficient that VMware was aware of the act or acts by the third party that allegedly constitute the direct infringement. Rather, you must find that VMware specifically intended that the third party infringe the other party's patents or that VMware believed there was a high probability the third party would infringe Cirba's patents but remained willfully blind to the infringing nature of the third party's acts, in order to find inducement of infringement.

If you find that no claim of the Cirba patents has been directly infringed, you cannot find VMware liable for inducement.

### 4.4    DIRECT INFRINGEMENT BY A THIRD PARTY

The first requirement for induced infringement, which I just discussed, is that Cirba must prove by a preponderance of the evidence that the allegedly infringing acts were carried out by a third party that directly infringed one or more of the claims of the Cirba patents.

To directly infringe a method claim, a third party must perform each and every step of the claimed method in the United States. It is not enough that the accused product is capable of infringing use.

If you do not find that there is direct infringement by a single actor, or if you do not find that VMware actively induced these acts, you must find that VMware did not induce infringement of the patent.

### 4.5    AFFIRMATIVE ACTIONS INTENDED TO CAUSE INFRINGEMENT

The second requirement for induced infringement, which I just discussed, is that Cirba must prove by a preponderance of the evidence that VMware took actions with the specific intent to cause third parties to engage in infringing acts. This can be shown through direct or circumstantial evidence.

In order to establish inducement of infringement, it is not sufficient that the third parties infringe the Cirba patents. Nor is it sufficient that VMware was aware of acts by others that would directly infringe. Rather, in order to find inducement, you must find that VMware intended others to use its products in at least some ways that would infringe the asserted claims of the Cirba patents, took affirmative acts to encourage direct infringement, and that those actions actually caused the direct infringement of the asserted claims of the Cirba patents.

Cirba must prove by a preponderance of the evidence that VMware took affirmative acts intending to induce infringement.

**4.6   KNOWLEDGE THAT THE ACTS, IF TAKEN, WOULD CONSTITUTE INFRINGEMENT**

The third requirement for induced infringement, which I just discussed, is that Cirba must prove by a preponderance of the evidence that VMware knew of the Cirba patents. Cirba must also prove by a preponderance of the evidence that VMware knew that the acts it induced third parties to take would, if taken, constitute infringement of the Cirba patents, or that VMware believed there was a high probability that the actions taken by third parties would infringe the Cirba patents and took deliberate steps to avoid learning of that infringement.

Inducing infringement cannot occur unintentionally. It is not enough for VMware to lead another to engage in conduct that happens to amount to infringement. Rather, to induce infringement, VMware must persuade another to engage in conduct that it knows—or believes with high probability, but deliberately avoided confirming—is infringement.

## 4.7 INDUCEMENT MUST CAUSE DIRECT INFRINGEMENT

Finally, Cirba must prove that VMware's alleged inducement, as opposed to other factors, actually caused third parties to directly infringe the Cirba patents. This means that VMware cannot be liable for induced infringement where Cirba does not show that VMware successfully communicated with and induced a third-party direct infringer and that the communication was the cause of the direct infringement by the third-party infringer.

Like all other disputed issues in this case, this final element of induced infringement can be proven by circumstantial evidence. Cirba is not required to present direct proof of any direct infringer third party stating, for example, that VMware caused her to infringe. Cirba must prove that VMware's actions led third parties to directly infringe a claim of the Cirba patents, but Cirba may do so with circumstantial—as opposed to direct—evidence. Such circumstantial evidence must be sufficient to prove that VMware's actions led third parties to directly infringe a claim of the Cirba patents by performing each and every step of the claimed method in the United States. Circumstantial evidence of induced infringement is sufficient for a finding of such indirect infringement without requiring proof that any individual third-party direct infringer was actually persuaded to infringe.

### 4.8 WILLFUL INFRINGEMENT

In this case, Cirba argues that VMware willfully infringed Cirba's '687 patent.

If you have decided that VMware has infringed a valid claim of the '687 patent, you must go on and address the additional issue of whether or not this infringement was willful. Willfulness requires you to determine whether Cirba proved by a preponderance of the evidence that VMware knew of the '687 patent before the lawsuit was filed and intentionally infringed them. However, you may not find that VMware's infringement was willful merely because VMware knew about the patent, without more.

In determining whether Cirba has proven that VMware's infringement was willful, you must consider all of the facts surrounding the alleged infringement including:

1. Whether VMware acted consistently with the standards of behavior for its industry;

2. Whether VMware copied a product that it knew was covered by an asserted claim;

3. Whether VMware reasonably believed it did not infringe or that the '687 patent was invalid;

4. Whether VMware made a good-faith effort to avoid infringing the '687 patent, for example, whether VMware attempted to design around the '687 patent (evidence that VMware attempted to avoid infringement by designing around the patent claims, even if that attempt was unsuccessful, is evidence that infringement was not willful); and

5. Whether VMware tried to cover up its infringement.

If you do decide that there was willful infringement, that decision should not affect any damages award you give in this case.

## 5.0    INVALIDITY

### 5.1    INVALIDITY GENERALLY

Patent invalidity is a defense to patent infringement. The granting of a patent by the United States Patent and Trademark Office carries with it the presumption that the patent is valid. The law presumes that the Patent and Trademark Office acted correctly in issuing the patent. Each of the asserted claims is presumed valid independently of the validity of each other claim. Nevertheless, when the validity of a patent has been put at issue as part of patent litigation, it is the responsibility of the jury to review what the Patent Office has done consistent with the Court's instructions on the law. However, the fact that a patent application is rejected or amended before the patent is issued has no bearing on its ultimate validity.

VMware has asserted as a defense to patent infringement in this case that Cirba's '687 patent is invalid. Because each of the asserted claims is presumed valid independently of the validity of each other claim, this puts the burden on VMware of proving invalidity by clear and convincing evidence on a claim-by-claim basis that each of the asserted claims of the '687 patents is invalid. VMware may rely on prior art that was before the patent examiner during prosecution. VMware's burden of proof remains the same regardless of whether the references on which VMware is relying to invalidate a patent have previously been before the patent examiner.

Even though the Patent Office examiner allowed the claims of a patent, you have the ultimate responsibility for deciding whether the claims of the patent are proven to be invalid. For a patent to be valid, the subject matter claimed in the individual claims of the patent must be new and non-obvious. A patent cannot take away from the right of anyone who wants to use what was already known or used by others, or what would have been obvious to those of skill in the art at the time the invention was made.

VMware alleges that the '687 patent is invalid because the asserted claims are anticipated by VMware's DRS 2006. VMware also alleges that the '687 patent is rendered obvious in light of DRS 2006 alone and in combination with other references.

I will now instruct you in more detail why VMware alleges that the asserted claims of the '687 patent are invalid.

## 5.2    PRIOR ART

Prior art is the legal term used to describe what others had done in the field before the invention was made. Prior art is the general body of knowledge in the public domain, such as articles, products, or other patents, before the invention was made. The prior art need not have been available to every member of the public, but it must have been available, without restriction, to that segment of the public most likely to avail itself of the prior art's contents.

For the asserted claims, prior art includes any of the following items received into evidence during trial:

• Any product or method known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention was made; or

• Any product or method patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the earliest effective filing date of the '687 patent, which is August 31, 2007.

### 5.3 ANTICIPATION

A party may claim a patent is invalid under a theory of anticipation. In order for someone to be entitled to a patent, the invention must actually be new. In general, inventions are new when the identical invention as claimed has not been used or disclosed before. If the claim is not new, we say that it was "anticipated" by prior art. A claim that is "anticipated" by the prior art is not entitled to patent protection.

Anticipation must be proved on a claim-by-claim basis. To anticipate a claim, each and every element in the claim must be present in a single item of prior art, and arranged or combined in the same way as recited in the claim. You may not combine two or more items of prior art to find anticipation.

To anticipate the invention, the disclosure in the prior art reference does not have to use the same words as the claim, but all of the requirements of the claim must be there, either stated expressly or inherently, so that someone of ordinary skill in the art to which the claimed invention pertains, looking at that one reference, could make and use the claimed invention. Thus, for purposes of anticipation, you should consider that which is expressly stated or present in the item of prior art, and also that which is inherently present.

In this case, VMware alleges that the asserted claims of the '687 patent are anticipated by DRS 2006. VMware must convince you that each claim was anticipated by clear and convincing evidence.

In assessing VMware's anticipation defense, you must decide whether VMware has proven by clear and convincing evidence that the prior art expressly or inherently discloses to a person of ordinary skill in the art all the physical steps of the claimed apparatus or method. Thus, you must compare the steps of the patent with the steps of the prior art method and assess whether there is a difference between them.

### 5.4 OBVIOUSNESS GENERALLY

Another basis for claiming that a patent is invalid is obviousness. Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, an invention must not have been obvious to a person of ordinary skill in the art at the time the invention was made. Obviousness may be shown by considering one or more than one item of prior art.

VMware contends that the asserted claims of Cirba's '687 patent are invalid based on obviousness. VMware bears the burden of proving obviousness by clear and convincing evidence. VMware must show, by clear and convincing evidence, that the claimed invention would have been obvious to a person having ordinary skill in the art at the time the invention was made. In determining whether the claimed invention was obvious, you must consider each claim separately. You should not use hindsight, such as by using Cirba's '687 patent as a roadmap to select from the prior art and retrace the path of the inventors. In other words, you should only consider what was known prior to the invention date, without the benefit of the later '687 patent and what that patent teaches.

In order to be patentable, an invention must not have been obvious to a person of ordinary skill in the art at the time the invention was made. The issue is not whether the claimed invention would be obvious today to you, as a layperson, to me as a judge, or to a genius in the art, but whether it would have been obvious to one of ordinary skill in the art at the time it was made. The existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art. To show obviousness, the law does not require that the prior art prove, to a statistical certainty, that the claimed result would work. In the context of obviousness, only a reasonable expectation of success is required, not conclusive proof or absolute predictability.

40

You must put yourself in the place of a person of ordinary skill in the art at the time of invention. In addition, you may consider whether there was a reason to combine or modify the prior art references in the fashion claimed by the patent at issue. To find that the prior art rendered a claimed invention obvious, you must find that a person having ordinary skill in the art would have had a reasonable expectation of successfully accomplishing the claimed method.

In determining obviousness or non-obviousness of the subject matter of each of the asserted claims, you should take the following steps, which I will explain further in just a moment:

1. Determine the scope and content of the prior art;

2. Identify the differences, if any, between each asserted claim and the prior art;

3. Determine the level of ordinary skill in the pertinent art at the time the invention of the patent was made; and

4. Consider objective factors of non-obviousness – that is, additional considerations, if any, that indicate that the invention was obvious or not obvious.

Against this background, you will then decide whether the subject matter of each asserted claim would have been obvious or nonobvious to a person of ordinary skill in the pertinent art.

## 5.5    SCOPE AND CONTENT OF THE PRIOR ART

In determining obviousness, you must first determine the scope and content of the prior art. This means that you must determine what prior art is reasonably pertinent to the particular problem that the inventors faced. Prior art is reasonably pertinent if it is in the same field as the claimed invention or is from another field that a person of ordinary skill would look to in trying to solve the problem the claimed invention was trying to solve. The prior art may include any of the items discussed above.

## 5.6   DIFFERENCES BETWEEN THE CLAIMED INVENTION AND PRIOR ART

Second, you should analyze whether there are any relevant differences between the prior art taken as a whole and the asserted claims of the '687 patent from the view of a person of ordinary skill in the art as of August 31, 2007. Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the invention as a whole, and not merely some portion of it.

In analyzing the differences between the claimed invention and the prior art, you do not need to look for a precise teaching in the prior art directed to the subject matter of the claimed invention. You may take into account the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention. For example, if the claimed invention combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art at the time of the invention, then this evidence would make it more likely that the claim was obvious.

On the other hand, if the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claim that successfully combined those elements was not obvious.

Importantly, a claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks long since uncovered, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the way the claimed invention does. The reason

43

could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of the problem to be solved, market demand, or common sense. Accordingly, you may evaluate whether there was some teaching, suggestion, or motivation to arrive at the claimed invention before the time of the claimed invention, although proof of this is not a requirement to prove obviousness.

If you find that a reason existed at the time of the invention to combine the elements of the prior art to arrive at the claimed invention, this evidence would make it more likely that the claimed invention was obvious.

Again, you must undertake this analysis separately for each claim that VMware contends is obvious.

## 5.7 LEVEL OF ORDINARY SKILL

Third, you must consider the perspective of a person of ordinary skill in the art, as explained previously. This person is presumed to know all the prior art that you have determined to be reasonably relevant. When faced with a problem, this ordinary skilled person is able to apply his or her experience and ability to the problem and also look to any available prior art to help solve the problem.

Factors to consider in determining the level of ordinary skill in the art include: (1) the educational level and experience of people working in the field; (2) the types of problems faced by workers in the art at the time of the invention and the solutions found to those problems; (3) the prior art patents, products or devices, and publications; and (4) the sophistication of the technology in the field at the time of the invention, including how rapid innovations were made in the art at the time of the invention.

Cirba contends that a person of ordinary skill in the art to which Cirba's '687 patent pertains would have been an individual with at least a bachelor's degree in computer engineering, computer science, or comparable degree and two years of experience developing software tools and/or computer systems for use in the area of information technology infrastructures and utilities in designing and evaluating virtualized environments. Cirba contends such a person would have been knowledgeable about virtualized software tools available at the time and their important features.

VMware contends that a person of ordinary skill in the art to which Cirba's '687 patent pertains would have had at least a bachelor's degree in computer science, computer engineering, or electrical engineering, and 2-3 years of experience relating to physical and virtualized computing environments, including virtual machines, hypervisors, and host servers. VMware further contends that such a person would have been familiar with designing, implementing,

45

monitoring, evaluating, optimizing, and managing physical and virtualized computing

environments.

## 5.8    OBJECTIVE EVIDENCE OF NONOBVIOUSNESS

Fourth, you must also take into account any objective evidence (sometimes called "objective indicia" or "secondary considerations") that may shed light on whether the claims were obvious. "Objective indicia" or "secondary considerations" must be considered before a conclusion on obviousness is reached.

"Objective indicia" or "secondary considerations" can include:

(A) Whether the invention was commercially successful at least in part as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities);

(B) Whether the invention satisfied a long-felt need;

(C) Whether others copied the invention;

(D) Whether the invention achieved unexpected results compared to the closest prior art; evidence of unexpected results may be used to rebut a case of obviousness even if that evidence was obtained after the patent's filing or issue date; there is no requirement that an invention's properties and advantages were fully known before the patent application was filed, or that the patent application contains all of the work done in studying the invention;

(E) Whether others tried and failed to make the invention;

(F) Whether others in the field praised the invention;

(G) Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

(H) Whether the inventor proceeded contrary to accepted wisdom in the field; and

(I) Whether others invented the invention at roughly the same time.

Cirba has the burden to show evidence of "objective indicia" or "secondary considerations" and to show that there is a connection, sometimes called a "nexus," between the

47

evidence showing any of these factors and the claimed invention, if this evidence is to be given

weight by you in arriving at your conclusion on the obviousness issue. However, VMware

always maintains the ultimate burden to show obviousness by clear and convincing evidence,

taking into account any objective indicia that you may find.

## 6.0   PATENT DAMAGES

### 6.1   DAMAGES INTRODUCTION

All the instructions that I have given you up to this point have been about determining liability, meaning the determination as to whether VMware has infringed Cirba's patents. If you find that VMware infringed or induced infringement of any valid claim of the Cirba patents, you must then consider what amount of damages to award to Cirba for the infringement. If you find that each of the asserted claims is either invalid or not infringed, then you should not consider damages in your deliberations.

I will instruct you now on how to determine the amount of damages, if any. By instructing you on damages, I am not suggesting which party should win this case, on any issue.

The damages you award must be adequate to compensate Cirba for the infringement, and Cirba is in any event entitled to no less than a reasonable royalty.

Damages are not meant to punish an infringer.

Cirba has the burden to establish each element of its damages, including the amount of the damages, by a preponderance of the evidence. In other words, you should award only those damages that Cirba establishes that it more likely than not suffered. Cirba must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

Cirba seeks damages for patent infringement as measured by a reasonable royalty. A reasonable royalty is defined as the money amount the parties would have agreed upon as a fee for use of the invention at the time prior to when infringement began.

I will now give you more detailed instructions regarding damages.

49

## 6.2    DATE DAMAGES BEGIN AND END

In determining the amount of damages for patent infringement, you must determine when the damages period begins. The damages period for each patent begins on the earlier of (1) the date that Cirba satisfied the applicable marking or notice requirements described herein, or (2) the date that Cirba filed its lawsuit against VMware, subject to some limitations discussed below.

In order for Cirba to collect pre-suit damages (i.e., damages before its April 25, 2019 lawsuit), Cirba must prove by a preponderance of the evidence that it satisfied applicable notice requirements with respect to its claims for patent infringement as of the dates from which damages are sought or awarded.

Cirba can prove by a preponderance of the evidence that it gave notice in either of two ways. First, Cirba may prove that it gave notice to the public in general by complying with applicable marking requirements for substantially all products it made, offered for sale, or sold within the United States that practiced each patent.  "Marking" is fixing either the word "patent" or the abbreviation "pat." with the patent's number on substantially all of the products that include the patented invention.  A patentee also may mark a patented product virtually by fixing the word "patent" or the abbreviation "pat.," with the address of a publicly available website that associates the patented product with the patent number. Marking, however, is required only to the extent that there is a tangible item to mark.

You may find that Cirba complied with the "marking" requirement if it can prove by a preponderance of the evidence that it and its licensees complied with the applicable marking requirements for substantially all of their products in the United States that practiced the asserted patents in a manner appropriate for the applicable products.

A second way Cirba can prove that it gave notice of the asserted patents is to prove that it directly notified VMware of its specific claim that the accused products infringed the asserted

patents. Cirba must prove by a preponderance of the evidence that it informed VMware of the identities of the asserted patents and of the alleged infringement by the accused products. If you find this type of "actual notice," then damages start from the date VMware received the actual notice.

If you find that Cirba satisfied the applicable marking or notice requirements before it filed its lawsuit on April 25, 2019, then you will need to consider other factors for purposes of determining the beginning of the eligible damages period for any infringement of Cirba's patents. Specifically:

For Cirba's '687 patent:

A) If you find that VMware has directly infringed the '687 patent, the damages period begins on the later of the date applicable marking or notice requirements were satisfied and the date on which all requirements of direct infringement had been satisfied, but not earlier than March 2015. Damages for direct infringement are only available for VMware's own use of its accused products and not its customers' use. This damages period continues through the present.

B) If you find that VMware has induced infringement of the '687 patent, the damages period begins on the later of the date on which all the requirements of induced infringement had been satisfied and the date applicable marking or notice requirements were satisfied, but not earlier than March 2015. This damages period continues through the present.

For Cirba's '367 patent:

A) If you find that VMware has directly infringed the '367 patent, the damages period begins on the later of May 16, 2017 and the date applicable marking or notice requirements were satisfied. Damages for direct infringement are only available for VMware's own use of its accused products and not its customers' use. This damages period continues through the present.

B) If you find that VMware has induced infringement of the '367 patent, the damages period begins on the later of the date on which all the requirements of such infringement had been satisfied and the date applicable marking or notice requirements were satisfied, but not earlier than May 16, 2017. This damages period continues through the present.

### 6.3    METHODS FOR COMPUTING PATENT DAMAGES

There are two methods for computing damages in a patent infringement case. One is called "lost profits" damages and the other is called "reasonable royalty" damages. In this case, Cirba is seeking damages for patent infringement as measured by a reasonable royalty.

## 6.4    REASONABLE ROYALTY—GENERALLY

Cirba is seeking damages in the form of a reasonable royalty in this case. A reasonable royalty is the royalty that would have resulted from a hypothetical negotiation between the patent owner and the alleged infringer just before the infringement began. In considering this hypothetical negotiation, you should focus on what the expectations of the patent owner and the infringer would have been if they had entered into an agreement at that time, and if they had acted reasonably in the negotiations. You should assume that both parties to the hypothetical negotiation believed the patent to be valid and infringed and that both parties are willing to enter into a license. You should also assume that the patent owner and the infringer would have acted reasonably and would have entered into a license agreement.

Having that in mind, you may consider any relevant fact in determining the reasonable royalty for the use of a patented invention, including the opinion testimony of experts. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

A reasonable royalty is typically made up of (1) a base and (2) a rate (or percentage) that is applied to that base. The reasonable royalty award must be apportioned and based only on the incremental value that the patented invention adds to the end product, and Cirba must apportion value between the patented features and any non-patented features contained in the accused products. The reasonable royalty for method claims must also be limited to only those circumstances in which the steps of the claimed method were performed. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product and no more. Although direct evidence is not required to prove all specific instances of infringement, the damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers. Damages for indirect infringement are

not limited to a specific number of instances of actual infringing use proven with direct evidence.

### 6.5 FACTORS FOR DETERMINING REASONABLE ROYALTY

In determining a reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

(1) The royalties received by the patent owner for the licensing of the patent in suit, proving or tending to prove an established royalty.

(2) The rates paid by the licensee for the use of other patents comparable to the patent in suit.

(3) The nature and the scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

(4) The patent owner's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity.

(5) The commercial relationship between the licensee and the patent owner at the time of the hypothetical negotiation, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

(6) The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the patent owner as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.

(7) The remaining life of the patents-in-suit and the terms of the license.

(8) The established profitability of the products made under the patents-in-suit; their commercial success; and their current popularity.

(9) The utility and advantages of the patent property over the old modes or devices, if any, that had been used for achieving similar results.

(10) The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the patent owner at the time of the hypothetical negotiation; and the benefits to those who have used the invention.

(11) The extent to which the licensee has made use of the invention; and any evidence probative of the value of that use.

(12) The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

(13) The portion of the realizable profit that should be credited to the inventions as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

(14) The opinion and testimony of qualified experts.

(15) The amount that a licensor (such as the patent owner) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

(16) Any other economic factor that a normally prudent businessperson would, under similar circumstances, take into consideration in negotiating the hypothetical license. This may include the availability of commercially acceptable, noninfringing alternatives at the time of the hypothetical negotiation.

No one of these factors is dispositive, and you can and should consider the evidence that has been presented to you on any of these factors. You may also consider any other factors that in your mind would have increased or decreased the royalty the infringer would have been willing to pay and the patent owner would have been willing to accept.

### 6.6    REASONABLE ROYALTY—TIMING

The relevant date for the hypothetical reasonable royalty negotiation is at the time the infringement began. However, you may also consider in your determination of reasonable royalty any information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

The damages period might not coincide with the date of the first infringement. There are two reasons for this. First, patent law limits damages to a six-year period before the filing of the complaint or counterclaim for infringement. Second, as I explained earlier in these instructions, if Cirba has not complied with applicable marking requirements or has not provided actual notice relating to its patents, then Cirba cannot recover pre-suit damages.

Remember, you may only award damages for any infringement you have found occurred during the damages period for each patent.

### 6.7    PATENT DAMAGES INTEREST

Neither party's calculations include interest. Therefore, in arriving at your damages calculation, you should not consider interest in any way because it is the function of the Court to award interest.

## 6.8 LIMITATIONS ON INDUCED INFRINGEMENT PATENT DAMAGES

If you award damages for induced infringement, you must limit the damages to circumstances in which all the elements needed to find induced infringement have been satisfied. In order to recover damages for induced infringement, the plaintiff must prove acts of direct infringement by others that were induced by the accused infringer. In order to recover damages for induced infringement of a method claim, it is not enough that the accused infringer's products are capable of infringing the asserted patents. The plaintiff must prove acts of direct infringement by others performing each step of the claimed method that were induced by the accused infringer. The amount of damages for induced infringement should be correlated, in some respect, to the extent of use of the claimed method. The plaintiff must prove that the accused infringer caused the acts of direct infringement of the asserted patents in the United States.

## 7.0    DELIBERATION AND VERDICT

### 7.1    INTRODUCTION

I have concluded the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. That should stay secret until you are finished.

## 7.2    UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. I will review it with you in a moment. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. You will then return to the Courtroom and my deputy will read aloud your verdict. Place the completed verdict sheet in the envelope we will give you. Do not show the completed verdict form to anyone or share it with anyone until you are in the Courtroom.

It is proper to add the caution that nothing said in these instructions, and nothing in the verdict form, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

## 7.3    DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that- your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

64

## 7.4   SOCIAL MEDIA

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, iPhone, Blackberry, tablet or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog or website such as Facebook, LinkedIn, YouTube, Instagram, Snapchat or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

## 7.5    COURT HAS NO OPINION

Let me finish by repeating something I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CIRBA INC. (d/b/a DENSIFY)
and CIRBA IP, INC.,

                Plaintiffs,

      v.

VMWARE, INC.,

                Defendant.

Civil Action No. 1:19-cv-00742-LPS

JURY TRIAL DEMANDED

## **FINAL JURY INSTRUCTIONS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... ii

1.0   GENERAL INSTRUCTIONS ................................................................................ 1

1.1   INTRODUCTION ........................................................................................... 1
1.2   JURORS' DUTIES ......................................................................................... 2
1.3   EVIDENCE DEFINED ................................................................................... 3
1.4   DIRECT AND CIRCUMSTANTIAL EVIDENCE ....................................... 5
1.5   CONSIDERATION OF EVIDENCE .............................................................. 6
1.6   STATEMENTS OF COUNSEL ..................................................................... 7
1.7   CREDIBILITY OF WITNESSES .................................................................. 8
1.8   NUMBER OF WITNESSES .......................................................................... 9
1.9   EXPERT WITNESSES ................................................................................ 10
1.10  DEPOSITION TESTIMONY ....................................................................... 11
1.11  USE OF INTERROGATORIES .................................................................. 12
1.12  EXHIBITS ................................................................................................... 13
1.13  BURDENS OF PROOF ............................................................................... 14
1.14  USE OF NOTES .......................................................................................... 16
2.0   THE PARTIES AND THEIR CONTENTIONS ................................................. 17

2.1   THE PARTIES ............................................................................................. 17
2.2.  THE PARTIES' CONTENTIONS ............................................................... 18
2.3.  SUMMARY OF THE PATENT ISSUES ..................................................... 19
3.0   THE PATENT CLAIMS .................................................................................... 20

3.1.  PATENT LAWS ........................................................................................... 20
3.2.  PATENT "CLAIMS" GENERALLY ........................................................... 21
3.3   CONSTRUCTION OF THE CLAIMS ......................................................... 22
3.4   INDEPENDENT AND DEPENDENT CLAIMS ........................................... 24
3.5   OPEN ENDED OR "COMPRISING" CLAIMS ........................................... 25
4.0   PATENT INFRINGEMENT ............................................................................. 26

4.1.  INFRINGEMENT GENERALLY ............................................................... 26
4.2   DIRECT INFRINGEMENT ......................................................................... 27
4.3   INDUCED INFRINGEMENT ...................................................................... 29
4.4   DIRECT INFRINGEMENT BY A THIRD PARTY ..................................... 31
4.5   AFFIRMATIVE ACTIONS INTENDED TO CAUSE  INFRINGEMENT .. 32
4.6   KNOWLEDGE THAT THE ACTS, IF TAKEN, WOULD CONSTITUTE
INFRINGEMENT ................................................................................................... 33
4.7   INDUCEMENT MUST CAUSE DIRECT INFRINGEMENT ..................... 34
4.8   WILLFUL INFRINGEMENT ...................................................................... 35
5.0   INVALIDITY ..................................................................................................... 36

|       | 5.1  | INVALIDITY GENERALLY | 36 |
|       | 5.2  | PRIOR ART | 38 |
|       | 5.3  | ANTICIPATION | 39 |
|       | 5.4  | OBVIOUSNESS--GENERALLY | 40 |
|       | 5.5  | SCOPE AND CONTENT OF THE PRIOR ART | 42 |
|       | 5.6  | DIFFERENCES BETWEEN THE CLAIMED INVENTION AND PRIOR ART | 43 |
|       | 5.7  | LEVEL OF ORDINARY SKILL | 45 |
|       | 5.8  | OBJECTIVE EVIDENCE OF NONOBVIOUSNESS | 47 |
| 6.0   |      | SUMMARY OF THE NON-PATENT ISSUES | 49 |
| 7.0   |      | TRADEMARK LAW | 50 |
|       | 7.1  | HOW A TRADEMARK IS OBTAINED | 51 |
|       | 7.2  | TRADEMARK INTERESTS | 52 |
|       | 7.3  | LIKELIHOOD OF CONFUSION | 53 |
|       | 7.4  | TRADEMARK BURDENS OF PROOF | 54 |
|       | 7.5  | INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF | 55 |
|       | 7.6  | UNREGISTERED MARKS | 56 |
|       | 7.7  | UNREGISTERED MARK DISTINCTIVENESS | 57 |
|       | 7.8  | SPECTRUM OF MARKS | 58 |
|       | 7.9  | ARBITRARY TRADEMARKS | 59 |
|       | 7.10 | SUGGESTIVE TRADEMARKS | 60 |
|       | 7.11 | DESCRIPTIVE TRADEMARKS | 61 |
|       | 7.12 | GENERIC NAMES | 62 |
|       | 7.13 | MARK DISTINCTIVENESS AND VALIDITY | 63 |
| 8.0   |      | SECONDARY MEANING | 64 |
| 9.0   |      | OWNERSHIP AND PRIORITY | 66 |
| 10.0  |      | LIKELIHOOD OF CONFUSION – FACTORS | 67 |
| 11.0  |      | FAIR USE | 70 |
| 12.0  |      | DECEPTIVE TRADE PRACTICES | 71 |
| 13.0  |      | DAMAGES | 72 |
| 14.0  |      | PATENT DAMAGES INTRODUCTION | 73 |
|       | 14.1 | DATE DAMAGES BEGIN AND END | 74 |
|       | 14.2 | REASONABLE ROYALTY-GENERALLY | 75 |
|       | 14.3 | FACTORS FOR DETERMINING REASONABLE ROYALTY | 77 |
|       | 14.4 | REASONABLE ROYALTY - TIMING | 80 |
|       | 14.5 | PATENT DAMAGES INTEREST | 81 |
|       | 14.6 | LIMITATIONS OF PATENT DAMAGES | 82 |

15.0   NON-PATENT DAMAGES .................................................................. 83

    15.1   DAMAGES FOR TRADEMARK INFRINGEMENT – GENERALLY ....... 83
    15.2   ACTUAL DAMAGES ...................................................................... 84
16.0   DELIBERATION AND VERDICT ...................................................... 85

    16.1   INTRODUCTION ............................................................................ 85
    16.2   UNANIMOUS VERDICT ................................................................ 86
    16.3   DUTY TO DELIBERATE ................................................................ 87
    16.4   SOCIAL MEDIA ............................................................................. 88
    16.5   COURT HAS NO OPINION ........................................................... 89

# 1.0    GENERAL INSTRUCTIONS

## 1.1    INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence.

Then I will explain the positions of the parties and the law you will apply in this case. And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## 1.2    JURORS' DUTIES

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way. You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not guess or speculate, and do not let any bias, sympathy, or prejudice you may feel toward one side or the other influence your decision in any way.

## 1.3    EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath (including deposition transcript testimony that has been played by video or read to you), the exhibits that I allowed into evidence, and the stipulations to which the parties agreed.

Certain charts and graphics have been used to illustrate testimony from witnesses. Unless I have specifically admitted them into evidence, these charts and graphics are not themselves evidence, even if they refer to, identify, or summarize evidence, and you will not have these demonstratives in the jury room.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. You should not be influenced by a lawyer's objection or by my ruling on that objection. Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them

3

influence your decision in any way.

You should not be concerned with whether there were any earlier proceedings in this case or, if there were, what the outcome of any such proceedings might have been.  As I have told you previously, the Court has no opinion on the matters you are being asked to decide**.**

Make your decision based only on the evidence, as I have defined it here, and nothing else.

## 1.4    DIRECT AND CIRCUMSTANTIAL EVIDENCE

You may have heard the terms "direct evidence" and "circumstantial evidence."

Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believe him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact.  If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

## 1.5    CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## 1.6    STATEMENTS OF COUNSEL

A further word about statements of counsel and arguments of counsel. The attorneys' statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented.

If you remember the evidence differently from the way it is described by the attorneys, you should rely on your own recollection.

## 1.7    CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You may believe everything a witness says, or part of it, or none of it. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony he gave at the trial. You have the right to distrust such a witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

## 1.8    NUMBER OF WITNESSES

 One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

 Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

## 1.9    EXPERT WITNESSES

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

## 1.10   DEPOSITION TESTIMONY

Deposition testimony is out of court testimony given under oath and is entitled to the same consideration you would give it had the witnesses personally appeared in court.

During the trial, certain testimony was presented to you by the reading of a deposition transcript or the playing of video excerpts from a deposition. If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony. You should not attribute any significance to the fact that the deposition videos may appear to have been edited.

### 1.11 USE OF INTERROGATORIES

You may have heard answers that either Densify or VMware gave in response to written questions submitted by the other side. The written questions are called "interrogatories." The written answers were given in writing and under oath, before the trial.

You must consider the party's answers to interrogatories in the same manner as if the answers were made from the witness stand.

### 1.12 EXHIBITS

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room to consider as evidence for your deliberations.

The remainder of the exhibits (including charts, PowerPoint presentations and animations) were offered to help illustrate the testimony of the various witnesses. These illustrative exhibits, called "demonstrative exhibits," will not be in the jury room and have not been admitted, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

In some instances, certain charts and summaries may have been received into evidence to illustrate information brought out in the trial. You may use these charts and summaries as evidence, even though the underlying documents and records are not here. You should give them only such weight as you think they deserve.

### 1.13    BURDENS OF PROOF

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In a case such as this, there are two different burdens of proof that are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."

Densify is accusing VMware of patent infringement, trademark infringement (which I referred to as "unfair competition" in the preliminary instructions), and deceptive trade practices. Densify has the burden of proving its claims and the amount of its money damages, if any, by what is called a preponderance of evidence.  That means that Densify has to produce evidence which, when considered in light of all of the facts, leads you to believe that what Densify claims is more likely true than not.  To put it differently, if you were to put the evidence of Densify and VMware concerning infringement on opposite sides of a scale, the evidence supporting Densify's claims would have to make the scales tip somewhat on its side in each instance.  If the scale should remain equal or tip in favor of VMware, you must find for VMware.

If you find that VMware infringed one or more of the patent claims that have been asserted in this case, then as a separate question, Densify has also asserted that the infringement was willful. Densify has the burden of proving this additional contention by a preponderance of the evidence.

In this case, in addition to denying Densify's claims, VMware asserts that the '687 patent is invalid.  The patent, however, is presumed to be valid under the law.  VMware therefore has the burden of proving that the patent is invalid by clear and convincing evidence.  Clear and convincing evidence means that it is highly probable that a fact is true. Proof by clear and convincing evidence is, thus, a higher burden than proof by a preponderance of the evidence.

14

Some of you may have heard the phrase "proof beyond a reasonable doubt." That burden of proof applies only in criminal cases and has nothing to do with a civil case like this one. You should therefore not consider it in this case.

### 1.14   USE OF NOTES

You may use notes taken during trial to assist your memory. However, as I instructed you at the beginning of the case, you should use caution in consulting your notes. There is generally a tendency I think to attach undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.  Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

## 2.0    THE PARTIES AND THEIR CONTENTIONS

### 2.1    THE PARTIES

I will now review for you the parties in this action, and the positions of the parties that you will have to consider in reaching your verdict.

There are two plaintiffs in this case: Cirba, Inc., which does business under the name "Densify," and Cirba IP, Inc. I will refer to the plaintiffs collectively as "Densify." You should not attach evidentiary weight to the use at trial of the name "Densify" to refer to the two plaintiffs collectively. The defendant in this case is VMware, Inc., which I will refer to as "VMware" or "Defendant."

## 2.2. THE PARTIES' CONTENTIONS

There are two patents at issue in this case: United States Patent Nos. 8,209,687 and 9,654,367. You heard the lawyers and witnesses in the case refer to Densify's patents as the '687 and '367 patents or the "Densify patents." I will do the same. Copies of the Densify patents have been given to you.

Densify contends that VMware directly infringed and induced infringement of the Densify patents, that the infringement was willful, and that Densify is entitled to damages.

VMware denies that it infringed or induced infringement of the Densify patents, or that it did so willfully. VMware also contends that the '687 patent is invalid for several independent reasons. VMware also denies that Densify is entitled to recover any damages related to the patents.

### 2.3.    SUMMARY OF THE PATENT ISSUES

I will now summarize the patent issues that you must decide and for which I will provide instructions to guide your deliberations. The specific questions you must answer are listed on the verdict sheet you will be given. Here are the issues you must decide:

1.  Whether Densify has proven by a preponderance of the evidence that VMware literally infringed or induced literal infringement of one or more of the asserted claims of the '687 patent or the '367 patent;

2.  Whether VMware has proven by clear and convincing evidence that one or more of the asserted claims of the '687 patent are invalid; and

3.  If you decide that Densify has proven that VMware infringed or induced infringement of a claim not shown to be invalid, you will decide the money damages to be awarded to compensate Densify for that infringement.

4.   Whether Densify has proven by a preponderance of the evidence that VMware willfully infringed one or more of the asserted claims of the '687 patent or the '367 patent.

I will provide more detailed instructions on each of the issues you must decide elsewhere in these jury instructions.

**3.0    THE PATENT CLAIMS**

**3.1.    PATENT LAWS**

At the beginning of the trial, I gave you some general information about patents and the patent system and a brief overview of the patent laws relevant to this case. I will now give you more detailed instruction about the patent laws that specifically relate to this case.

## 3.2.    PATENT "CLAIMS" GENERALLY

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims."

The patent claims are the numbered paragraphs at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers. Only the claims of a patent can be infringed.

The claims are intended to define, in words, the bounds of an invention. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage. Each of the asserted claims must be considered individually.

In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations." For example, a claim that covers the invention of a table may recite the tabletop, four legs, and the glue that secures the legs to the tabletop. The tabletop, legs, and glue are each separate limitations of the claim. When a thing (such as a product) meets each and every requirement of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim.

Each claim may cover more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You will first need to understand what each claim covers in order to decide whether there is infringement of the claim and to decide whether the claim is invalid. You must use the same claim meaning for both your decision on infringement and your decision on invalidity.

### 3.3    CONSTRUCTION OF THE CLAIMS

It is the Court's duty under the law to define what the patent claims mean.  As I instructed you at the beginning of the case, I have made my determinations, and I will now instruct you on the meaning, or "construction," of the claim terms. You must apply the meaning that I give in each patent claim to decide if the claim is infringed or invalid. You must accept my definitions of these words in the claims as being correct. You must ignore any different definitions used by the witnesses or the attorneys.

You are advised that the following definitions for the following terms must be applied:

| Claim Term | Construction |
|---|---|
| **The "each" terms** | |
| "Evaluating each virtual guest against each virtual host and other virtual guests" | "Evaluating each virtual guest against each virtual host and other virtual machines" |
| "Each virtual guest" | Plain and ordinary meaning to a person of ordinary skill in the art |
| "Each virtual host" | Plain and ordinary meaning to a person of ordinary skill in the art |
| "Identifying the existence of virtual machines with suboptimal placements" | "Identifying the existence of virtual machines with less than optimal placements as determined by the evaluation step" |
| "Business constraint" | "A restriction or limitation based on a business parameter, such as physical location, organization department, data segregation requirements, owner, service level agreements, maintenance windows, hardware lease agreements, or software licensing agreements" |

| "Determine whether the utilization or performance of an entity is in an acceptable range relative to its capacity or performance limits" | "Determine whether an entity's utilization or performance is within an acceptable range, relative to that entity's capacity or performance limits" |
|---|---|
| "Virtualized environment" | Plain and ordinary meaning to a person of ordinary skill in the art |

For any words in the claim for which I have not provided you with a definition, you should apply the plain and ordinary meaning to a person of ordinary skill in the art.

### 3.4 INDEPENDENT AND DEPENDENT CLAIMS

This case involves two types of patent claims: independent claims and dependent claims.

An independent claim does not refer to any other claim of the patent and sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case, Claims 3 and 7 of the '687 patent and Claims 1 and 13 of the '367 patent are independent claims. An independent claim must be read separately from the other claims to determine the scope of the claim.

The remaining Asserted Claims are dependent claims. A dependent claim does not itself recite all of the requirements of the claim but refers to another claim or claims for some of its requirements. In this way, the claim "depends" on another claim or claims. A dependent claim incorporates all of the requirements of the claims to which it refers. The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other independent claims to which it refers.

### 3.5    OPEN ENDED OR "COMPRISING" CLAIMS

The beginning portion, or preamble, of several of the Asserted Claims has the word "comprising." The word "comprising" means "including the following but not excluding others." A claim that uses the word "comprising" or "including" is not limited to products having only the elements that are recited in the claim, but also covers products that have additional elements.

If you find, for example, that the Accused Products include all of the elements of a particular claim, the fact that the Accused Products might include additional elements would not avoid infringement of the claim.

## 4.0 PATENT INFRINGEMENT

### 4.1. INFRINGEMENT GENERALLY

I will now instruct you on how to decide whether Densify has proven by a preponderance of the evidence that VMware infringed the asserted claims of the '687 and '367 patents.

Recall that Densify must prove infringement by a preponderance of the evidence, i.e., that it is more likely than not that infringement has occurred.

You have heard evidence that both sides own other patents relating to computer virtualization products and services. As I stated earlier, there are only two patents at issue in this case: the '687 and '367 patents. Ownership of another patent by VMware is not a defense to patent infringement, nor is ownership of other patents evidence of infringement. In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed. You must compare each of the asserted patent claims, as I have defined them, to the accused product, and determine whether or not there is infringement. You should not compare the accused product with any specific example set out in the '687 or '367 patent, or with Densify's product or process. The only correct comparison is between the accused products and the language of the claim itself, as I have explained its meaning to you.

You must consider each claim individually and must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by the parties.

You must determine whether Densify has proven that VMware infringed or induced infringement of any of the claims in those two patents.

## 4.2    DIRECT INFRINGEMENT

Densify alleges that VMware literally infringes or did literally infringe the '687 and '367 patents.  In order to prove literal infringement (which I will hereafter refer to as "direct infringement"), Densify must prove that it is more likely than not that VMware made, used, offered for sale, or sold its products in a manner that meets all of the elements of any one claim. Infringement requires comparing products to the claims, not the specification.

Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the patent claim. I have already made this decision and I have already instructed you as to the meaning of some terms of the asserted patent claims. The second step is to decide whether VMware has made, used, sold, offered for sale or imported within the United States an accused product or method covered by an asserted claim of the '687 and '367 patents.

To decide whether any of VMware's computing products and/or their use directly infringe an asserted claim, you must compare that product and/or use with the patent claim and determine whether every element (or as they also are called, limitation) of the claim is included; If so, then VMware's product and/or its use directly infringes or did infringe that claim. If not, then the VMware product and/or its use does not directly infringe that claim.

You must determine, separately for each asserted claim, whether or not there is any infringement. There is one exception to this rule. If you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers to that independent claim. On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the use meets the additional requirements of any claims that depend on the independent claim, and, thus, whether those claims have also been infringed. A dependent claim includes all the requirements of any of the

claims to which it refers plus additional requirements of its own.

You may find direct infringement based on as little as one instance of the claimed use being performed.  Proof of direct infringement may be based on circumstantial evidence.

To show direct infringement of a method claim, Densify must show that VMware performed each and every step in the claimed method in the United States.

For direct infringement, Densify is not required to prove that VMware intended to infringe or knew of the patent. Whether or not VMware knew its accused products infringed or even knew of the patent does not matter in determining direct infringement. Instead, all that matters is whether VMware's use of the product is covered by any one of the claims.

### 4.3    INDUCED INFRINGEMENT

Densify alleges that VMware has induced others to directly infringe the '687 and '367 patents.  Inducement to infringe a claim cannot occur unintentionally. This is different from direct infringement, which, as I have told you, can occur unintentionally.

Densify alleges that VMware is liable for infringement by actively inducing others, including customers, to directly infringe the '687 and '367 patents. More particularly, Densify asserts that VMware induced patent infringement after it became aware of the Densify patents by encouraging its customers to use its infringing product. It is not sufficient that VMware was aware of the act or acts by the third party that allegedly constitute the direct infringement.

To be liable for inducement to infringe, VMware must have known of the patent and encouraged or instructed another person how to use a product in a manner that you, the jury, find infringes or did infringe the asserted claims and must have had knowledge, or have acted with willful blindness, that the induced acts constituted patent infringement. To find willful blindness (1) VMware must have subjectively believed that there was a high probability that a patent existed covering the accused products, and (2) VMware must have taken deliberate actions to avoid learning of that infringement.  The mere fact, if true, that VMware knew or should have known that there was a substantial risk that its customers' acts would infringe the asserted patents would not be sufficient for active inducement of infringement.

As with direct infringement, you must determine whether there has been inducement on a claim-by-claim basis.

VMware is liable for inducement of infringement of a claim only if Densify proves by a preponderance of the evidence each of the following:

    1.   That allegedly infringing acts were carried out by a third party that literally

infringed one or more of the claims of the '687 and '367 patents, meeting all the criteria discussed in my instructions on the topic stated above;

2. That VMware took some affirmative action, or that VMware continued to take an action specifically intending to cause the third parties to directly infringe the '687 and '367 patents;

3. That VMware knew of the '687 and '367 patents – and that (i) VMware knew that the infringing acts, if taken, would constitute direct infringement of the '687 and '367 patents; or (ii) VMware believed that there was a high probability that the actions taken by others infringed the '687 and '367 patents – and took deliberate steps to avoid learning of that infringement;

4. That VMware's alleged inducement, as opposed to other factors, actually caused the third parties to literally infringe.

In order to establish inducement of infringement, it is not sufficient that the third party directly infringed the claim. Nor is it sufficient that VMware was aware of the act or acts by the third party that allegedly constitute the direct infringement. Rather, you must find that VMware specifically intended that the third party infringe the Densify patents or that VMware believed there was a high probability the third party would infringe the Densify patents but remained willfully blind to the infringing nature of the third party's acts, in order to find inducement of infringement.

If you find that no claim of the Densify patents has been directly infringed, you cannot find VMware liable for inducement.

**4.4  DIRECT INFRINGEMENT BY A THIRD PARTY**

The first requirement for induced infringement, which I just discussed, is that Densify must prove by a preponderance of the evidence that the allegedly infringing acts were carried out by a third party that literally infringed one or more of the claims of the '687 and '367 patents.

To directly infringe a method claim, a third party must perform each and every step of the claimed method in the United States.  It is not enough that the accused product is capable of infringing use.

If you do not find that there is direct infringement by a single actor, or if you do not find that VMware actively induced these acts, you must find that VMware did not induce infringement of the patent.

### 4.5     AFFIRMATIVE ACTIONS INTENDED TO CAUSE
###           INFRINGEMENT

The second requirement for induced infringement, which I just discussed, is that Densify must prove by a preponderance of the evidence that VMware took actions with the specific intent to cause third parties to engage in infringing acts. This can be shown through direct or circumstantial evidence.

In order to establish inducement of infringement, it is not sufficient that the third parties infringe the Densify patents. Nor is it sufficient that VMware was aware of acts by others that would directly infringe. Rather, in order to find inducement, you must find that VMware intended others to use its products in at least some ways that would infringe the asserted claims of the Densify patents, took affirmative acts to encourage direct infringement, and that those actions actually caused the direct infringement of the asserted claims of the Densify patents.

Densify must prove by a preponderance of the evidence that VMware took affirmative actions intending to induce infringement.

## 4.6    KNOWLEDGE THAT THE ACTS, IF TAKEN, WOULD CONSTITUTE INFRINGEMENT

The third requirement for induced infringement, which I just discussed, is that Densify must prove by a preponderance of the evidence that VMware knew of the '687 and '367 patents. Densify must also prove by a preponderance of the evidence that VMware knew that the acts it induced third parties to take would, if taken, constitute infringement of the '687 and '367 patents, or that VMware believed there was a high probability that the actions taken by third parties would infringe the '687 and '367 patents and took deliberate steps to avoid learning of that infringement.

Inducing infringement cannot occur unintentionally. It is not enough for the accused inducer to lead another to engage in conduct that happens to amount to infringement. Rather, to induce infringement, the accused inducer must persuade another to engage in conduct that the inducer knows - or believes with high probability, but deliberately avoided confirming - is infringement.

### 4.7 INDUCEMENT MUST CAUSE DIRECT INFRINGEMENT

Finally, Densify must prove that VMware's alleged inducement, as opposed to other factors, actually caused third parties to directly infringe the Densify patents. This means that VMware cannot be liable for induced infringement where Densify does not show that VMware successfully communicated with and induced a third-party direct infringer and that the communication was the cause of the direct infringement by the third-party infringer.

Like all other disputed issues in this case, this final element of induced infringement can be proven by circumstantial evidence. Densify is not required to present direct proof of any direct infringer third party stating, for example, that VMware caused her to infringe. Densify must prove that VMware's actions led third parties to directly infringe a claim of the Densify patents, but Densify may do so with circumstantial – as opposed to direct – evidence. Such circumstantial evidence must be sufficient to prove that VMware's actions led third parties to directly infringe a claim of the asserted patents by performing each and every step of the claimed method in the United States. Circumstantial evidence of induced infringement is sufficient for a finding of such indirect infringement without requiring proof that any individual third-party direct infringer was actually persuaded to infringe.

### 4.8    WILLFUL INFRINGEMENT

In this case, Densify argues that VMware willfully infringed Densify's patents.

If you have decided that VMware has infringed a valid claim of the '367 or '687 patent, you must go on and address the additional issue of whether or not this infringement was willful. Willfulness requires you to determine whether Densify proved by a preponderance of the evidence that VMware knew of the asserted patents before the lawsuit was filed and intentionally infringed them. However, you may not find that VMware's infringement was willful merely because VMware knew about the patent, without more.

In determining whether Densify has proven that VMware's infringement was willful, you must consider all of the facts surrounding the alleged infringement including:

1. Whether VMware acted consistently with the standards of behavior for its industry;

2. Whether VMware intentionally copied a product of Densify that is covered by an asserted claim;

3. Whether VMware reasonably believed it did not infringe or that the asserted patent was invalid;

4. Whether VMware made a good-faith effort to avoid infringing the asserted patents, for example, whether VMware attempted to design around the asserted patents (evidence that the accused infringer attempted to avoid infringement by designing around the patent claims, even if that attempt was unsuccessful, is evidence that infringement was not willful); and

5. Whether VMware tried to cover up its infringement.

If you do decide that there was willful infringement, that decision should not affect any damages award you give in this case.

35

## 5.0    INVALIDITY

### 5.1    INVALIDITY GENERALLY

Patent invalidity is a defense to patent infringement.  The granting of a patent by the United States Patent and Trademark office carries with it the presumption that the patent is valid. The law presumes that the Patent and Trademark Office acted correctly in issuing the patent. Each of the asserted claims is presumed valid independently of the validity of each other claim. Nevertheless, when the validity of a patent has been put at issue as part of patent litigation, it is the responsibility of the jury to review what the Patent Office has done consistent with the Court's instructions on the law.  However, the fact that a patent application is rejected or amended before the patent is issued has no bearing on its ultimate validity.

VMware has asserted as a defense to patent infringement in this case that Densify's patents are invalid. Because each of the asserted claims is presumed valid independently of the validity of each other claim, this puts the burden on VMware of proving invalidity by clear and convincing evidence on a claim-by-claim basis that each of the asserted claims of the '687 patent is invalid. VMware may rely on prior art that was before the patent examiner during prosecution. VMware's burden of proof remains the same regardless of whether the references on which VMware is relying to invalidate a patent have previously been before the patent examiner.

Even though the Patent Office examiner allowed the claims of a patent, you have the ultimate responsibility for deciding whether the claims of the patent are proven to be invalid. For a patent to be valid, the subject matter claimed in the individual claims of the patent must be new and non-obvious. A patent cannot take away from the right of anyone who wants to use what was already known or used by others, or what would have been obvious to those of skill in the art at the time the invention was made.

36

VMware alleges that the '687 patent is invalid because the asserted claims are anticipated and/or rendered obvious in light of VMware's VirtualCenter 2 (DRS 2006).

I will now instruct you in more detail why VMware alleges that the asserted claims of the Densify patents are invalid.

## 5.2    PRIOR ART

Prior art is the legal term used to describe what others had done in the field before the invention was made. Prior art is the general body of knowledge in the public domain, such as articles, products, or other patents, before the invention was made. The prior art need not have been available to every member of the public, but it must have been available, without restriction, to that segment of the public most likely to avail itself of the prior art's contents.

For the asserted claims, prior art includes any of the following items received into evidence during trial:

- Any product or method known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention was made; or

- Any product or method patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the earliest effective filing date of the '687 patent (August 31, 2007).

## 5.3     ANTICIPATION

A party may claim a patent is invalid under a theory of anticipation. In order for someone to be entitled to a patent, the invention must actually be new. In general, inventions are new when the identical invention as claimed has not been used or disclosed before. If the claim is not new, we say that it was "anticipated" by prior art. A claim that is "anticipated" by the prior art is not entitled to patent protection.

Anticipation must be proved on a claim-by-claim basis.  In this case, VMware alleges that the asserted claims of the '687 patent are anticipated by VirtualCenter2 (DRS 2006). VMware must convince you that each claim was anticipated by clear and convincing evidence. To anticipate a claim, each and every element in the claim must be present in a single item of prior art, and arranged or combined in the same way as recited in the claim. You may not combine two or more items of prior art to find anticipation.

To anticipate the invention, the disclosure in the prior art reference does not have to use the same words as the claim, but all of the requirements of the claim must be there, either stated expressly or inherently, so that someone of ordinary skill in the art to which the claimed invention pertains, looking at that one reference, could make and use the claimed invention. Thus, for purposes of anticipation, you should consider that which is expressly stated or present in the item of prior art, and also that which is inherently present.

In assessing VMware's anticipation defense, you must decide whether VMware has proven by clear and convincing evidence that the prior art expressly or inherently discloses to a person of ordinary skill in the art all the physical steps of the claimed apparatus or method. Thus, you must compare the steps of the patent with the steps of the prior art method and assess whether there is a difference between them.

### 5.4    OBVIOUSNESS--GENERALLY

Another basis for claiming that a patent is invalid is obviousness. Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, an invention must not have been obvious to a person of ordinary skill in the art at the time the invention was made. Obviousness may be shown by considering one or more than one item of prior art.

VMware contends that the asserted claims of the Densify patents are invalid for obviousness. VMware bears the burden of proving obviousness by clear and convincing evidence. VMware must show, by clear and convincing evidence, that the claimed invention would have obvious to a person having ordinary skill in the art at the time the invention was made. In determining whether the claimed invention was obvious, you must consider each claim separately. You should not use hindsight, such as by using the Densify patents as a roadmap to select from the prior art and retrace the path of the inventors. In other words, you should only consider what was known prior to the invention date, without the benefit of the later Densify patents and what those patents teach.

In order to be patentable, an invention must not have been obvious to a person of ordinary skill in the art at the time the invention was made. The issue is not whether the claimed invention would be obvious today to you, as a layperson, to me as a judge, or to a genius in the art, but whether it would have been obvious to one of ordinary skill in the art at the time it was made. The existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art. To show obviousness, the law does not require that the prior art prove, to a statistical certainty, that the claimed result would work. In the context of obviousness, only a reasonable expectation

of success is required, not conclusive proof or absolute predictability.

You must put yourself in the place of a person of ordinary skill in the art at the time of invention. In addition, you may consider whether there was a reason to combine or modify the prior art references in the fashion claimed by the patent at issue. To find that the prior art rendered a claimed invention obvious, you must find that a person having ordinary skill in the art would have had a reasonable expectation of successfully accomplishing the claimed method.

In determining obviousness or non-obviousness of the subject matter of each of the asserted claims, you should take the following steps, which I will explain further in just a moment:

1.    Determine the scope and content of the prior art;

2.    Identify the differences, if any, between each asserted claim and the prior art;

3.    Determine the level of ordinary skill in the pertinent art at the time the invention of the patent was made; and

4.    Consider objective factors of non-obviousness – that is, additional considerations, if any, that indicate that the invention was obvious or not obvious.

Against this background, you will then decide whether the subject matter of each asserted claim would have been obvious or nonobvious to a person of ordinary skill in the pertinent art.

## 5.5    SCOPE AND CONTENT OF THE PRIOR ART

In determining obviousness, you must first determine the scope and content of the prior art. This means that you must determine what prior art is reasonably pertinent to the particular problem that the inventors faced. Prior art is reasonably pertinent if it is in the same field as the claimed invention or is from another field that a person of ordinary skill would look to in trying to solve the problem the claimed invention was trying to solve. The prior art may include any of the items discussed above in Section 5.2.

### 5.6    DIFFERENCES BETWEEN THE CLAIMED INVENTION AND PRIOR ART

Second, you should analyze whether there are any relevant differences between the prior art taken as a whole and the asserted claims of the '687 patent from the view of a person of ordinary skill in the art as of August 31, 2007. Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the invention as a whole, and not merely some portion of it.

In analyzing the differences between the claimed invention and the prior art, you do not need to look for a precise teaching in the prior art directed to the subject matter of the claimed invention. You may take into account the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention. For example, if the claimed invention combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art at the time of the invention, then this evidence would make it more likely that the claim was obvious.

On the other hand, if the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claim that successfully combined those elements was not obvious.

Importantly, a claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks long since uncovered, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the

relevant field to combine the known elements in the way the claimed invention does. The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of the problem to be solved, market demand, or common sense. Accordingly, you may evaluate whether there was some teaching, suggestion, or motivation to arrive at the claimed invention before the time of the claimed invention, although proof of this is not a requirement to prove obviousness.

If you find that a reason existed at the time of the invention to combine the elements of the prior art to arrive at the claimed invention, this evidence would make it more likely that the claimed invention was obvious.

Again, you must undertake this analysis separately for each claim that VMware contends is obvious.

### 5.7     LEVEL OF ORDINARY SKILL

    Third, you must consider the perspective of a person of ordinary skill in the art, as explained previously. This person is presumed to know all the prior art that you have determined to be reasonably relevant. When faced with a problem, this ordinary skilled person is able to apply his or her experience and ability to the problem and also look to any available prior art to help solve the problem.

    Factors to consider in determining the level of ordinary skill in the art include: (1) the educational level and experience of people working in the field; (2) the types of problems faced by workers in the art at the time of the invention and the solutions found to those problems; (3) the prior art patents, products or devices, and publications; and (4) the sophistication of the technology in the field at the time of the invention, including how rapid innovations were made in the art at the time of the invention.

    Densify contends that a person of ordinary skill in the art to which the Densify patents pertain would have been an individual with at least a bachelor's degree in computer engineering, computer science, or comparable degree and two years of experience developing software tools and/or computer systems for use in the area of information technology infrastructures and utilities in designing and evaluating virtualized environments. Densify contends such a person would have been knowledgeable about virtualized software tools available at the time and their important features.

    VMware contends that a person of ordinary skill in the art to which the Densify patents pertain would have had at least a bachelor's degree in computer science, computer engineering, or electrical engineering, and 2-3 years of experience relating to

physical and virtualized computing environments, including virtual machines, hypervisors, and host servers. VMware further contends that such a person would have been familiar with designing, implementing, monitoring, evaluating, optimizing, and managing physical and virtualized computing environments.

### 5.8 OBJECTIVE EVIDENCE OF NONOBVIOUSNESS

Fourth, you must also take into account any objective evidence (sometimes called "objective indicia" or "secondary considerations") that may shed light on whether the claims were obvious. "Objective indicia" or "secondary considerations" must be considered before a conclusion on obviousness is reached.

"Objective indicia" or "secondary considerations" can include:

(A)     Whether the invention was commercially successful at least in part as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities);

(B)     Whether the invention satisfied a long-felt need;

(C)     Whether others copied the invention;

(D)     Whether the invention achieved unexpected results compared to the closest prior art; evidence of unexpected results may be used to rebut a case of obviousness even if that evidence was obtained after the patent's filing or issue date; there is no requirement that an invention's properties and advantages were fully known before the patent application was filed, or that the patent application contains all of the work done in studying the invention;

(E)     Whether others tried and failed to make the invention;

(F)     Whether others in the field praised the invention;

(G)     Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

(H)     Whether the inventor proceeded contrary to accepted wisdom in the field; and

(I)     Whether others invented the invention at roughly the same time.

Densify has the burden to show evidence of "objective indicia" or "secondary

considerations" and to show that there is a connection, sometimes called a "nexus," between the evidence showing any of these factors and the claimed invention, if this evidence is to be given weight by you in arriving at your conclusion on the obviousness issue. However, VMware always maintains the ultimate burden to show obviousness by clear and convincing evidence, taking into account any objective indicia that you may find.

## 6.0 SUMMARY OF THE NON-PATENT ISSUES

I will now summarize the non-patent issues that you must decide and for which I will provide more detailed instructions to guide your deliberations. Densify seeks damages against VMware for trademark infringement and deceptive trade practices. VMware denies that it engaged in trademark infringement or deceptive trade practices. Densify must prove these claims by a preponderance of the evidence.

Here are the issues you must decide:

1. Whether Densify has proven that "DENSIFY" is a valid and protectable trademark owned by Densify.

2. Whether Densify has proven it had trademark rights in "DENSIFY" before VMware first used that word in its marketing materials.

3. Whether Densify has proven that VMware engaged in trademark infringement.

4. Whether Densify has proven that VMware engaged in deceptive trade practices.

5. If you find that the VMware infringed Densify's trademark, you must also determine whether VMware did so intentionally.

6. If you decide that Densify has proven that VMware engaged in trademark infringement, you will decide the money damages to be awarded to compensate Densify for those acts.

I will now provide more detailed instructions on each of the non-patent issues you must decide.

## 7.0     TRADEMARK LAW

A trademark is a word, name, symbol, or device, or any combination of these items that indicates the source of goods. A trademark may be registered or unregistered.  Assuming that Densify proves it owns a valid and protectable trademark, your infringement analysis is the same regardless of registration. The owner of a trademark has the right to exclude others from using that trademark or a similar mark that is likely to cause confusion among the potential purchasers of goods and services in the relevant marketplace. The main function of a trademark is to identify and distinguish goods or services as the product of a particular manufacturer or merchant and to protect its goodwill.

### 7.1     HOW A TRADEMARK IS OBTAINED

A person acquires the right to exclude others from using the same mark or a similar mark that is likely to cause confusion in the marketplace by being the first to use it in the marketplace, or by using it before the alleged infringer. Rights in a trademark are obtained only through commercial use of the mark.

### 7.2    TRADEMARK INTERESTS

A trademark owner may enforce the right to exclude others in an action for trademark

infringement under both federal and state laws.

### 7.3     LIKELIHOOD OF CONFUSION

To prove infringement, Densify must prove, by a preponderance of the evidence, that VMware, without Densify's consent, used in commerce a reproduction, copy, counterfeit or colorable imitation of Densify's marks in connection with the distribution or advertisement of goods, such that VMware's use of the mark is likely to cause confusion as to the source of the origin of the goods or services; an affiliation, connection or association with another's goods; or the endorsement or approval of the goods or services by another. It is not necessary that the mark used by VMware be an exact copy of Densify's mark. Rather, Densify must demonstrate that, viewed in its entirety, the mark used by VMware is likely to cause confusion in the minds of reasonably prudent purchasers or users as to the source of the product in question.

## 7.4     TRADEMARK BURDENS OF PROOF

In this case, Densify contends that VMware has infringed a Densify trademark.  Densify has the burden of proving by a preponderance of the evidence that the asserted trademark is protectable, is owned by Densify, and that VMware infringed it.

In defense, VMware contends that the word that Densify claims is its trademark, "DENSIFY," is not used as or protectable as a trademark. VMware also contends that its use of the word is protected by the doctrine of fair use.  VMware has the burden of proving by a preponderance of the evidence that its use falls within the doctrine of fair use.

### 7.5    INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF

On Densify's claim for trademark infringement, Densify has the burden of proving each of the following elements by a preponderance of the evidence:

1. "DENSIFY" is a valid, protectable trademark;

2. Densify owns "DENSIFY" as a trademark and service mark; and

3. VMware used "DENSIFY" without Densify's consent in a manner that is likely to cause confusion among the ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods.

If you find that Densify has proved each of the elements on which it has the burden of proof, your verdict should be for Densify.  If, on the other hand, Densify has failed to prove any of these elements, your verdict should be for VMware.

### 7.6 UNREGISTERED MARKS

Densify's claimed mark is not registered. Unregistered trademarks can still be valid and provide the trademark owner with the exclusive right to use those marks. Densify must prove by a preponderance of the evidence that its unregistered mark is valid. A valid trademark is a word, name, symbol, device, or any combination of these items that is either:

1. inherently distinctive; or

2. descriptive, but has acquired a secondary meaning.

Only if you determine Densify proved by a preponderance of the evidence that "DENSIFY" is a valid trademark should you consider whether Densify owns that mark or whether VMware's actions infringed it.

Only if you determine that "DENSIFY" is not inherently distinctive should you consider whether it is descriptive but became distinctive through the development of secondary meaning. I will now explain the terms "inherently distinctive," "descriptive," and "secondary meaning."

## 7.7    UNREGISTERED MARK DISTINCTIVENESS

In determining distinctiveness, you must consider how strongly the trademark indicates that a good comes from a specific source. This is an important factor to consider in assessing its validity and for determining whether the trademark's use by the defendant creates for consumers a likelihood of confusion as to source, sponsorship, affiliation, or approval of the goods with the plaintiff's trademark.

Densify asserts that "DENSIFY" is a valid and protectable trademark and service mark for its software products used to optimize virtual machine placements in virtual environments and the related software and services Densify provides. Densify contends that VMware's use of that mark in connection with VMware's technology and services infringes or infringed Densify's mark and is likely to cause confusion about the origin of goods and services. In determining distinctiveness, you must consider how strongly "DENSIFY" indicates that a good comes from a specific source.  This is an important factor to consider in assessing its validity as a trademark and for determining whether VMware's use of this word creates for consumers a likelihood of confusion as to source, sponsorship, affiliation or approval of VMware's goods.

In order to determine if Densify has met its burden of showing that "DENSIFY" is a valid trademark, you should classify it on the spectrum of trademark distinctiveness that I will explain in the next instruction.

An inherently distinctive trademark is a word, symbol or device, or combination of them, which intrinsically identifies a particular source of a good in the market. The law assumes that an inherently distinctive trademark is one that almost automatically tells a consumer that it refers to a brand or a source for a product, and that consumers will be predisposed to equate the trademark with the source of a product.

### 7.8    SPECTRUM OF MARKS

Trademark law provides great protection to distinctive or strong trademarks. Conversely, trademarks that are not as distinctive or strong are called "weak" trademarks and receive less protection from infringing uses. Trademarks that are not distinctive are not entitled to any trademark protection. For deciding trademark protectability you must consider whether a trademark is inherently distinctive. Trademarks are grouped into four categories according to their relative strength or distinctiveness. These four categories are, in order of strength or distinctiveness: arbitrary (which is inherently distinctive), suggestive (which also is inherently distinctive), descriptive (which is protected only if it acquires in consumers' minds a "secondary meaning," which I explain further in another Instruction), and generic names (which are entitled to no protection).

## 7.9     ARBITRARY TRADEMARKS

The first category of "inherently distinctive" trademarks is arbitrary trademarks. They are considered strong marks and are clearly protectable. They involve the arbitrary, fanciful, or fictitious use of a word to designate the source of a product or service. Such a trademark is a word that in no way describes or has any relevance to the particular product or service it is meant to identify.  It may be a common word used in an unfamiliar way. It may be a newly-created word or parts of common words which are applied in a fanciful, fictitious, or unfamiliar way, solely as a trademark.

For instance, the common word "apple" became a strong and inherently distinctive trademark when used by a company to identify the personal computers that company sold.  The company's use of the word "apple" was arbitrary or fanciful because "apple" did not describe and was not related to what the computer was, its components, ingredients, quality, or characteristics.  "Apple" was being used in an arbitrary way to designate for consumers that the computer comes from a particular manufacturer or source.

### 7.10 SUGGESTIVE TRADEMARKS

The next category is suggestive trademarks. These trademarks are also inherently distinctive but are considered weaker than arbitrary trademarks. Unlike arbitrary trademarks, (which are in no way related to the product or service or its components, quality, or characteristics,) suggestive trademarks imply some characteristic or quality of the product or service to which they are attached. If the consumer must use imagination or any type of multi-stage reasoning to understand the trademark's significance, then the trademark does not describe the product's features, but merely suggests them.

A suggestive use of a word involves consumers associating the qualities the word suggests to the product or service to which the word is attached. For example, when "apple" is used not to indicate a certain company's computers, but rather "Apple–A–Day" Vitamins, it is being used as a suggestive trademark. "Apple" does not describe what the vitamins are. However, consumers may come to associate the healthfulness of "an apple a day keeping the doctor away" with the supposed benefits of taking "Apple–A–Day" Vitamins.

## 7.11 DESCRIPTIVE TRADEMARKS

The third category is descriptive trademarks. These trademarks directly identify or describe some aspect, characteristic, or quality of the product or service to which they are affixed in a straightforward way that requires no exercise of imagination to be understood.

For instance, the word "apple" is descriptive when used in the trademark "CranApple" to designate a cranberry-apple juice. It directly describes ingredients of the juice. Other common types of descriptive trademarks identify where a product comes from, or the name of the person who makes or sells the product. Thus, the words "Apple Valley Juice" affixed to cider from the town of Apple Valley is a descriptive trademark because it geographically describes where the cider comes from. Similarly, a descriptive trademark can be the personal name of the person who makes or sells the product. So, if a farmer in Apple Valley, Judy Brown, sold her cider under the label "Judy's Juice" (rather than CranApple) she is making a descriptive use of her personal name to indicate and describe who produced the apple cider and she is using her first name as a descriptive trademark.

## 7.12    GENERIC NAMES

The fourth category is entitled to no protection at all. They are called generic names and they refer to a general name of the product or service, as opposed to the plaintiff's brand for that product or service. Generic names are part of our common language that we need to identify all such similar products or services. A generic name is a name for the product or service on which it appears. If the primary significance of the alleged mark is to name the type of product or service rather than the manufacturer or provider, the term is a generic name and cannot be a valid trademark. If the majority of relevant consumers would understand the term to name the type of product rather than the manufacturer, the primary significance of the term is generic and not entitled to protection as a trademark.

The word "apple" can be used as a generic name and not be entitled to any trademark protection.  This occurs when the word is used to identify the fruit from an apple tree.

The computer maker who uses the word "apple" as a trademark to identify its personal computer, or the vitamin maker who uses that word as a trademark on vitamins, has no claim for trademark infringement against the grocer who used that same word to indicate the fruit sold in a store.  As used by the grocer, the word is generic and does not indicate any particular source of the product.  As applied to the fruit, "apple" is simply a commonly-used name for what is being sold.

### 7.13    MARK DISTINCTIVENESS AND VALIDITY

Densify believes that its mark is suggestive, and in the alternative, that the mark has achieved secondary meaning, while VMware claims that Densify's mark is merely descriptive and has not achieved secondary meaning.

If you decide that "DENSIFY" is arbitrary or suggestive, it is considered to be inherently distinctive.  An inherently distinctive trademark is valid and protectable.

On the other hand, if you determine that "DENSIFY" is generic, it cannot be distinctive and therefore is not valid nor protectable.  In that instance, you must render a verdict for VMware on the charges of trademark infringement.

If you decide that "DENSIFY" is descriptive, you will not know if it is valid or invalid until you consider whether it has gained distinctiveness by the acquisition of secondary meaning, which I explain in another Instruction.

## 8.0     SECONDARY MEANING

If you determine that "DENSIFY" is descriptive, you must consider the recognition it has among prospective consumers in order to determine whether it is valid and protectable even though it is descriptive.  This market recognition is called the trademark's "secondary meaning."

A word, name, symbol, or device (or any combination of these items) acquires a secondary meaning when it has been used in such a way that its primary significance in the minds of the prospective consumers is not the product itself, but the identification of the product with a single source, regardless of whether consumers know who or what that source is. You must find that the preponderance of the evidence shows that a significant number of the consuming public associates "DENSIFY" with a single source, in order to find that it has acquired secondary meaning.

When you are determining whether "DENSIFY" has acquired a secondary meaning, consider the following factors:

(1) Consumer Perception. Whether the people who purchase the products or services that bear the claimed trademark associate the trademark with Densify;

(2) Advertisement. To what degree and in what manner Densify may have advertised under the claimed trademark;

(3) Demonstrated Utility. Whether Densify successfully used this trademark to increase the sales of its products and services;

(4) Extent of Use. The length of time and manner in which Densify used the claimed trademark;

(5) Exclusivity. Whether Densify's use of the claimed trademark was exclusive;

(6) Copying. Whether the defendant intentionally copied Densify's trademark; and

(7) Actual Confusion. Whether VMware's use of Densify's trademark has led to actual confusion among a significant number of consumers.

Descriptive marks are protectable only to the extent you find they acquired distinctiveness through secondary meaning by the public coming to associate the marks with the owner of the marks. Descriptive marks are entitled to protection only as broad as the secondary meaning they have acquired, if any. If they have acquired no secondary meaning, they are entitled to no protection and cannot be considered valid marks.

Densify here alleges that its mark acquired secondary meaning in the relevant marketplace. Densify has the burden of proving that "DENSIFY" has acquired a secondary meaning. VMware has the burden of proving that "DENSIFY" lacks a secondary meaning. The mere fact that Densify is using the word "DENSIFY" or that Densify claims it began using it before VMware does not mean that the mark has acquired secondary meaning. There is no particular length of time that a trademark must be used before it acquires a secondary meaning.

## 9.0    OWNERSHIP AND PRIORITY

The law entitles the trademark owner to exclude others from using that trademark. A person acquires the right to exclude others from using a trademark by being the first to use it in the marketplace or by using it before the alleged infringer does. A person also acquires the right to exclude others from using a trademark if industry or public usage creates, for a majority of relevant consumers, an association between the person and the mark prior to the alleged infringer's use.

If you find "DENSIFY" to be inherently distinctive, you must consider whether Densify used it as a trademark for its products before VMware began to use the word "DENSIFY" to market its own products.

If you find "DENSIFY" to be descriptive but to have acquired secondary meaning, you must consider whether it acquired secondary meaning for Densify's products before VMware began to use the word "DENSIFY" to market its own products.

A trademark is "used" for purposes of this instruction when a product is transported or sold in commerce in the U.S. and the trademark is attached to the product or placed on its label or container, or if that is not practical, placed on documents associated with the goods or their sale.

If Densify has not shown by a preponderance of the evidence that Densify used "DENSIFY" as a valid trademark before VMware's use of the same, then you cannot conclude that Densify is the owner of the trademark.

## 10.0 LIKELIHOOD OF CONFUSION – FACTORS

You must consider whether VMware's use of "densify," "densifying," and "densification" is likely to cause confusion about the source of Densify's or VMware's goods.

I will suggest some factors you should consider in deciding likelihood of confusion. The presence or absence of any particular factor that I suggest should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence in making this determination.  As you consider the likelihood of confusion you should examine the following:

1. **Strength or Weakness of Densify's mark**. The more the consuming public recognizes Densify's mark as an indication of origin of virtual machine placement software and related software and services, the more likely it is that consumers would be confused about the source of VMware's own virtual machine placement software and related software and services if VMware uses similar marks.

2. **Similarity of Densify's mark and the words and symbols used by VMware.** If there is great similarity between Densify's mark and the terms and symbols used by VMware, there is a greater chance that consumers are likely to be confused by VMware's use of the relevant words and symbols.

3. **Similarity of Densify's and VMware's Goods and Services**. If VMware and Densify market the same or related kinds of virtual optimization computing goods and services, there may be a greater likelihood of confusion about the source of the virtual optimization computing goods and services than otherwise.

4. **Actual Confusion**. If there is evidence of actual buyer confusion concerning Densify's mark and the relevant words and symbols used by VMware, this

strongly suggests a likelihood of confusion. However, Densify need not produce evidence of actual buyer confusion in order for you to find that a likelihood of confusion exists.

5. **VMware's Intent in Adopting the Relevant Words.** Evidence that VMware adopted the relevant words with the intent to cause confusion between their virtual machine placement optimization software and services and Densify's virtual machine placement optimization software and services should be weighed heavily in favor of a finding of likelihood of confusion if: (a) VMware's intent to confuse or deceive is demonstrated by clear and convincing evidence, and (b) the virtual machine placement optimization software and services labeling and marketing are also affirmatively deceiving. On the other hand, any evidence of VMware's good faith in seeking to avoid confusion (including the prominent use or placement of VMware's name or trademarks in connection with the sale or provision of its virtual optimization computing goods and services) should be weighed against a finding of likelihood of confusion.

6. **Distribution Channels**. If Densify's and VMware's virtual machine placement optimization software and services are likely to be sold to the same or similar customers or through the same distribution channels, this increases the likelihood of confusion.

7. **The Degree of Purchaser Care**. The more costly the virtual machine placement optimization software and services, the more sophisticated, careful and discriminating the buyers are likely to be. Thus, they may be less likely to be confused by similarities in Densify's mark and VMware's use of "densify,"

"densifying," and "densification."

8. **The length of time VMware has used the mark without evidence of actual confusion arising.**

9. **Other**. Other facts suggesting that the consuming public might expect Densify to manufacture both products, or expect Densify to manufacture a product in VMware's market, or expect that Densify is likely to expand into VMware's market.

Although you should consider all of the above factors as part of making your decision, the above list is not intended to be exclusive and you should consider any other factors or evidence that bear on likelihood of confusion.

In considering these factors, your general knowledge, and any other evidence, you should not treat any single factor as dispositive; nor should you treat this as a simple mathematical exercise where the party with most of the above factors in its favor wins. In other words, while you should consider all the above factors, some factors may be more important than others in the context of this case. Thus, you should balance all the above factors and any other relevant factors or evidence to determine whether, in light of all the circumstances of this case, consumers are likely to be confused.

## 11.0   FAIR USE

The owner of a trademark cannot exclude others from making a fair use of that trademark. A defendant makes fair use of a mark when the defendant uses it as other than a trademark, to accurately describe the source of the defendant's own products or services.

VMware contends that it fairly used "densify," "densifying," and "densification" to describe VMware's software. A defendant makes fair use of a trademark when it:

1. uses the mark other than to distinguish the defendant's goods from the plaintiff's and to indicate the source of the defendant's goods;

2. uses the mark fairly and in good faith; and

3. uses the mark only to describe the defendant's goods or services as those of the defendant's and not at all to describe the plaintiff's product.

VMware has the burden of proving its fair use of "densify," "densifying," and "densification" by a preponderance of the evidence.

## 12.0    DECEPTIVE TRADE PRACTICES

Densify also alleges that VMware violates the Delaware Deceptive Trade Practices Act.

If you find for Densify on its trademark infringement claim, you should also find for Densify on its deceptive trade practice claim.  Similarly, if you find for VMware on Densify's trademark infringement claim, you should also find for VMware on Densify's deceptive trade practice claim.

## 13.0   DAMAGES

All the instructions that I have given you up to this point have been about determining liability, meaning the determination as to whether VMware has infringed Densify's patents, has infringed Densify's trademarks, or has engaged in deceptive trade practices.  If you determine that VMware is liable for any of the asserted claims, then you must consider the issue of the amount of damages that should be awarded to Densify. If you find that each of the asserted claims is either invalid or not infringed, then you should not consider damages in your deliberations. I will instruct you now on how to determine the amount of damages, if any.  By instructing you on damages, I am not suggesting which party should win this case, on any issue.

Densify has the burden to establish each element of its damages, including the amount of the damages, by a preponderance of the evidence. In other words, you should award only those damages that Densify establishes that it more likely than not suffered. Densify must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

In this case, Densify seeks damages as measured by a reasonable royalty. A reasonable royalty is defined as the money amount Densify and VMware would have agreed upon as a fee for use of the invention at the time prior to when infringement began.  I will now give you more detailed instructions regarding damages, looking first at damages for patent infringement and then at damages for the non-patent claims.

## 14.0   PATENT DAMAGES INTRODUCTION

If you find that VMware infringed or induced infringement of any valid claim of the

Densify patents, you must then consider what amount of damages to award to Densify for the

infringement.  If you find that each of the asserted claims is either invalid or not infringed, then

VMware is not liable for patent infringement and you need not address damages in your

deliberations.

The damages you award must be adequate to compensate Densify for the infringement.

They are not meant to punish an infringer.

## 14.1 DATE DAMAGES BEGIN AND END

Densify filed this lawsuit on April 25, 2019. Densify may seek patent damages for up to six years before this lawsuit was filed. Therefore, the maximum period over which Densify may recover damages for the '687 patent is from April 25, 2013 through the present.  For the '367 patent, the maximum damages period is May 16, 2017 through the present.

In determining damages, you must determine when the damages began for each asserted patent. For each patent, there are at least two potential damages starting dates in this case.

For the '687 Patent:

A) If you find that VMware has directly infringed the '687 Patent, the damages period begins on April 25, 2013 to the present, but damages are only available for VMware's own use of its accused products and not its customers' use; and

B) If you find that VMware has induced infringement of the '687 Patent, the damages period begins on the date on which all the requirements of such infringement had been satisfied to the present.

For the '367 Patent:

A) If you find that VMware has directly infringed the '367 Patent, the damages period begins on May 16, 2017, the date the '367 Patent issued, to the present, but damages are only available for VMware's own use of its accused products and not its customers' use; and

B) If you find that VMware has induced infringement of the '367 Patent, the damages period begins on the date on which all the requirements of such infringement had been satisfied to the present, but no earlier than May 16, 2017.

## 14.2   REASONABLE ROYALTY-GENERALLY

Densify is seeking damages in the form of a reasonable royalty in this case. A reasonable royalty is the royalty that would have resulted from a hypothetical negotiation between the patent owner and the alleged infringer just before the infringement began. In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been if they had entered into an agreement at that time, and if they had acted reasonably in the negotiations. You should assume that both parties to the hypothetical negotiation believed the patent to be valid and infringed and that both parties are willing to enter into a license. You should also assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement.

Having that in mind, you may consider any relevant fact in determining the reasonable royalty for the use of a patented invention, including the opinion testimony of experts. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

A reasonable royalty is typically made up of (1) a base and (2) a rate (or percentage) that is applied to that base. The reasonable royalty award must be apportioned and based only on the incremental value that the patented invention adds to the end product, and the patent holder must apportion value between the patented features and any non-patented features contained in the accused products. The reasonable royalty for method claims must also be limited to only those circumstances in which the steps of the claimed method were performed. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product and no more. Although direct evidence is not required to prove all specific instances of infringement, the damages award ought to be correlated, in some respect, to

the extent the infringing method is used by consumers. Damages for indirect infringement are

not limited to a specific number of instances of actual infringing use proven with direct evidence.

## 14.3    FACTORS FOR DETERMINING REASONABLE ROYALTY

In determining a reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

1.     The royalties received by the patent owner for the licensing of the patent in suit, proving or tending to prove an established royalty.

2.     The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3.     The nature and the scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4.     The patent owner's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity.

5.     The commercial relationship between the licensee and the patent owner at the time of the hypothetical negotiation, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6.     The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the patent owner as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.

7.     The remaining life of the patents-in-suit and the terms of the license.

8.     The established profitability of the products made under the patents-in-suit; their commercial success; and their current popularity.

9.      The utility and advantages of the patent property over the old modes or devices, if any, that had been used for achieving similar results.

10.     The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the patent owner at the time of the hypothetical negotiation; and the benefits to those who have used the invention.

11.     The extent to which the licensee has made use of the invention; and any evidence probative of the value of that use.

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.     The portion of the realizable profit that should be credited to the inventions as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.     The opinion and testimony of qualified experts.

15.     The amount that a licensor (such as the patent owner) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

16.     Any other economic factor that a normally prudent businessperson would, under similar circumstances, take into consideration in negotiating the hypothetical license. This may

include the availability of commercially acceptable, noninfringing alternatives at the time of the hypothetical negotiation.

No one of these factors is dispositive, and you can and should consider the evidence that has been presented to you on any of these factors. You may also consider any other factors that in your mind would have increased or decreased the royalty the accused infringer would have been willing to pay and the patent holder would have been willing to accept.

## 14.4   REASONABLE ROYALTY - TIMING

The relevant date for the hypothetical reasonable royalty negotiation is at the time the infringement began. However, you may also consider in your determination of reasonable royalty any information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

The damages period might not coincide with the date of the first infringement. That is because the patent law limits damages to a six-year period before the filing of the complaint or counterclaim for infringement.

Remember, however, you may only award damages for any infringement you have found occurred during the damages periods I previously provided to you in Instruction 14.1.

## 14.5    PATENT DAMAGES INTEREST

Neither Densify's nor VMware's calculations include interest. Therefore, in arriving at

your damages calculation, you should not consider interest in any way because it is the function

of the Court to award interest.

### 14.6 LIMITATIONS OF PATENT DAMAGES

If you award damages for induced infringement, you must limit the damages to circumstances in which all the elements needed to find induced infringement have been satisfied. In order to recover damages for induced infringement, Densify must either prove that the accused VMware products necessarily infringe the asserted patents or prove acts of direct infringement by others that were induced by VMware. The amount of damages for induced infringement is limited by the number of instances of direct infringement. Densify must prove acts of direct infringement of the asserted patents, for example, by showing individual acts of direct infringement or by showing that a particular class of uses directly infringes.

## 15.0   NON-PATENT DAMAGES

### 15.1   DAMAGES FOR TRADEMARK INFRINGEMENT – GENERALLY

If you find based on the instructions you have been given that VMware infringed

Densify's trademark and/or falsely designated the origin of its products, you may award Densify

damages in an amount you determine to be fair and equitable, consisting of Densify's actual

damages attributable to VMware's infringement.

## 15.2   ACTUAL DAMAGES

If you find for Densify on its trademark infringement claim, you must determine Densify's actual damages.

Densify has the burden of proving actual damages by a preponderance of the evidence.

Damages means the amount of money which will reasonably and fairly compensate Densify for any injury you find was caused by the VMware's infringement of Densify's trademark.

You should consider the following: (1) The injury to or loss of Densify's reputation; (2) The injury to or loss of Densify's goodwill, including injury to Densify's general business reputation; (3) The expense of preventing customers from being deceived; (4) The cost of future corrective advertising reasonably required to correct any public confusion caused by the infringement; and (5) other damages Densify suffered.

When considering prospective costs, you must not overcompensate. Accordingly, your award of such future costs should not exceed the actual damage to the value of Densify's mark at the time of the infringement by VMware.

## 16.0   DELIBERATION AND VERDICT

### 16.1   INTRODUCTION

I have concluded the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. That should stay secret until you are finished.

## 16.2    UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. I will review it with you in a moment. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form. You will then return to the Courtroom and my deputy will read aloud your verdict.  Place the completed verdict sheet in the envelope we will give you.  Do not show the completed verdict form to anyone or share it with anyone until you are in the Courtroom.

It is proper to add the caution that nothing said in these instructions, and nothing in the verdict form, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

## 16.3   DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that- your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

## 16.4   SOCIAL MEDIA

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, iPhone, blackberry, tablet or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog or website such as Facebook, LinkedIn, YouTube, Instagram, Snapchat, or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

## 16.5   COURT HAS NO OPINION

Let me finish by repeating something I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.

# EXHIBIT 3

**§1114. Remedies; infringement; innocent infringement by printers and publishers**

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

As used in this paragraph, the term "any person" includes the United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, or other persons acting for the United States and with the authorization and consent of the United States, and any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. The United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, other persons acting for the United States and with the authorization and consent of the United States, and any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

(2) Notwithstanding any other provision of this chapter, the remedies given to the owner of a right infringed under this chapter or to a person bringing an action under section 1125(a) or (d) of this title shall be limited as follows:

(A) Where an infringer or violator is engaged solely in the business of printing the mark or violating matter for others and establishes that he or she was an innocent infringer or innocent violator, the owner of the right infringed or person bringing the action under section 1125(a) of this title shall be entitled as against such infringer or violator only to an injunction against future printing.

(B) Where the infringement or violation complained of is contained in or is part of paid advertising matter in a newspaper, magazine, or other similar periodical or in an electronic communication as defined in section 2510(12) of title 18, the remedies of the owner of the right infringed or person bringing the action under section 1125(a) of this title as against the publisher or distributor of such newspaper, magazine, or other similar periodical or electronic communication shall be limited to an injunction against the presentation of such advertising matter in future issues of such newspapers, magazines, or other similar periodicals or in future transmissions of such electronic communications. The limitations of this subparagraph shall apply only to innocent infringers and innocent violators.

(C) Injunctive relief shall not be available to the owner of the right infringed or person bringing the action under section 1125(a) of this title with respect to an issue of a newspaper, magazine, or other similar periodical or an electronic communication containing infringing matter or violating matter where restraining the dissemination of such infringing matter or violating matter in any particular issue of such periodical or in an electronic communication would delay the delivery of such issue or transmission of such electronic communication after the regular time for such delivery or transmission, and such delay would be due to the method by which publication and distribution of such periodical or transmission of such electronic communication is customarily

conducted in accordance with sound business practice, and not due to any method or device adopted to evade this section or to prevent or delay the issuance of an injunction or restraining order with respect to such infringing matter or violating matter.

(D)(i)(I) A domain name registrar, a domain name registry, or other domain name registration authority that takes any action described under clause (ii) affecting a domain name shall not be liable for monetary relief or, except as provided in subclause (II), for injunctive relief, to any person for such action, regardless of whether the domain name is finally determined to infringe or dilute the mark.

(II) A domain name registrar, domain name registry, or other domain name registration authority described in subclause (I) may be subject to injunctive relief only if such registrar, registry, or other registration authority has—

(aa) not expeditiously deposited with a court, in which an action has been filed regarding the disposition of the domain name, documents sufficient for the court to establish the court's control and authority regarding the disposition of the registration and use of the domain name;

(bb) transferred, suspended, or otherwise modified the domain name during the pendency of the action, except upon order of the court; or

(cc) willfully failed to comply with any such court order.

(ii) An action referred to under clause (i)(I) is any action of refusing to register, removing from registration, transferring, temporarily disabling, or permanently canceling a domain name—

(I) in compliance with a court order under section 1125(d) of this title; or

(II) in the implementation of a reasonable policy by such registrar, registry, or authority prohibiting the registration of a domain name that is identical to, confusingly similar to, or dilutive of another's mark.

(iii) A domain name registrar, a domain name registry, or other domain name registration authority shall not be liable for damages under this section for the registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such registration or maintenance of the domain name.

(iv) If a registrar, registry, or other registration authority takes an action described under clause (ii) based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action. The court may also grant injunctive relief to the domain name registrant, including the reactivation of the domain name or the transfer of the domain name to the domain name registrant.

(v) A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

(E) As used in this paragraph—

(i) the term "violator" means a person who violates section 1125(a) of this title; and

(ii) the term "violating matter" means matter that is the subject of a violation under section 1125(a) of this title.

(3)(A) Any person who engages in the conduct described in paragraph (11) of section 110 of title 17 and who complies with the requirements set forth in that paragraph is not liable on account of such conduct for a violation of any right under this chapter. This subparagraph does not preclude liability, nor shall it be construed to restrict the defenses or limitations on rights granted under this chapter, of a person for conduct not described in paragraph (11) of section 110 of title 17, even if that person also engages in conduct described in paragraph (11) of section 110 of such title.

(B) A manufacturer, licensee, or licensor of technology that enables the making of limited portions of audio or video content of a motion picture imperceptible as described in subparagraph (A) is not liable on account of such manufacture or license for a violation of any right under this chapter, if such manufacturer, licensee, or licensor ensures that the technology provides a clear and conspicuous notice at the beginning of each performance that the performance of the motion picture is altered from the performance intended by the director or copyright holder of the motion picture. The limitations on liability in subparagraph (A) and this subparagraph shall not apply to a manufacturer, licensee, or licensor of technology that fails to comply with this paragraph.

(C) The requirement under subparagraph (B) to provide notice shall apply only with respect to technology manufactured after the end of the 180-day period beginning on April 27, 2005.

(D) Any failure by a manufacturer, licensee, or licensor of technology to qualify for the exemption under subparagraphs (A) and (B) shall not be construed to create an inference that any such party that engages in conduct described in paragraph (11) of section 110 of title 17 is liable for trademark infringement by reason of such conduct.

(July 5, 1946, ch. 540, title VI, §32, 60 Stat. 437; Pub. L. 87–772, §17, Oct. 9, 1962, 76 Stat. 773; Pub. L. 100–667, title I, §127, Nov. 16, 1988, 102 Stat. 3943; Pub. L. 102–542, §3(a), Oct. 27, 1992, 106 Stat. 3567; Pub. L. 105–330, title II, §201(a)(8), Oct. 30, 1998, 112 Stat. 3070; Pub. L. 106–43, §4(a), Aug. 5, 1999, 113 Stat. 219; Pub. L. 106–113, div. B, §1000(a)(9) [title III, §3004], Nov. 29, 1999, 113 Stat. 1536, 1501A-549; Pub. L. 109–9, title II, §202(b), Apr. 27, 2005, 119 Stat. 223.)

# EXHIBIT 4

 Caution
As of: June 30, 2023 11:28 PM Z

# Rockwell Automation, Inc. v. Radwell Int'l, Inc.

United States District Court for the District of New Jersey

November 24, 2020, Decided; November 24, 2020, Filed

Civil No. 15-05246 (RBK/JS)

**Reporter**
2020 U.S. Dist. LEXIS 223998 *

Rockwell Automation, Inc., Plaintiff, v. Radwell International, Inc., Defendant.

**Counsel:** **[*1]** For ROCKWELL AUTOMATION, INC., Plaintiff: JENNY R. KRAMER, LEAD ATTORNEY, ALSTON & BIRD, LLP, NEW YORK, NY.

For RADWELL INTERNATIONAL, INC., Defendant: PETER THOMAS SHAPIRO, LEAD ATTORNEY, LEWIS, BRISBOIS, BISGAARD & SMITH, LLP, NEW YORK, NY.

**Judges:** ROBERT B. KUGLER, United States District Judge.

**Opinion by:** ROBERT B. KUGLER

## Opinion

**KUGLER**, United States District Court Judge

Before the Court in this action concerning, among other things, trademark infringement, are two summary judgment motions under Federal Rule of Civil Procedure ["Fed. R. Civ. Proc.", "FRCP", or "Rule"] 56 (a) one from plaintiff Rockwell Automation ["Rockwell"] ["plaintiff's motion"] (ECF Doc. 526 and Docs. 530 through 534) and one from defendant Radwell International, Inc. ["Radwell"] ["defendant's motion"] (ECF Doc. 527 and Docs.528-529).

Plaintiff Rockwell is a 100 year-old company that manufactures electronic controllers (the brains of assembly lines), various motors (the muscle of assembly lines), and various input/output devices for assembly lines, which industrial automation equipment is used in such different applications as amusement parks to auto assembly lines to pharmaceutical companies. Rockwell also sells products and solutions in connection **[*2]** with and to support its industrial automation systems. Rockwell's business hinges on the quality of its products and solutions.

Defendant Radwell is a very large provider of new and used surplus, industrial electrical and electronic control equipment by buying new and used controls from plant closings, auctions and inventory overstock. It certifies the parts, ships them in custom Radwell packaging, and sells them for half of their original price. Radwell also sells 30% of its products outside the United States. Specifically, for this matter, Radwell purchases and resells Programmable Logic Circuits, including those manufactured by plaintiff.

Plaintiff's motion seeks summary judgment on Counts I, II, VII and VIII, of its second amended complaint ["the complaint"] (ECF Doc. 140) and against all of Radwell's Counterclaims I through V in order to dismiss them. (See ECF Doc. 222, Radwell's Second Amended Answer and Amended Counterclaims).

Defendant's motion (ECF Doc. 527) seeks summary judgment on Counts I, III, V, VII, VIII and X and Defendant's memorandum of law (ECF Doc. 528) also seeks summary judgment on Count VI.

Relevant to the complaint, there were originally 10 counts, one has been **[*3]** dismissed[1] and of the remaining nine, one count is not at issue here: Count IX, aiding and abetting fraud.

The seven counts from the complaint at issue in these motions are: Count I, trademark infringement, Lanham Act, 15 U.S.C. §1114 (plaintiff's and defendant's motions); Count II, false advertising, Lanham Act, 15 U.S.C. §1125(a) (1) (B) (plaintiff's motion); Count III, false designation of origin, Lanham Act, 15 U.S.C. §1125(a) (1) (A) (defendant's motion); Count V, statutory unfair competition, N.J. Stat. Ann. § 56:4-1 et seq. (defendant's motion); Count VII, tortious interference with contract (plaintiff's and defendant's motions); Count VIII, aiding and abetting tortious interference with contract (plaintiff's and defendant's motion); and Count X, unjust enrichment (defendant's motion).

Relative to Radwell's counterclaims (ECF Doc. 222), all five are at issue here: First, conspiracy in restraint of trade and commerce under Sherman Act 1, 15 U.S.C. § 1; Second, conspiracy to monopolize and monopolization under Sherman Act 2, 15 U.S.C. §2; Third, tortious interference with contract;

Fourth, tortious interference with prospective economic advantage; and

Fifth, specific state antitrust/consumer protection statutes under:

    California Cartwright Act, California Business and Professions Code § 16720 et seq.;

    Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 et seq.;

    Maine Monopolies and Profiteering Law, 10 M.R.S. § 1101 et seq.; **[*4]**

    Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 et seq.;
    Minnesota Antitrust Law, Minn. Stat. §§ 325D.49-.66;

    Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598A.010 et seq.;

    North Dakota Uniform Antitrust Act, North Dakota Century Code § 51-08.1-01 et seq.;
    New Mexico Antitrust Act, NMSA 57-1-1 to -15;

    New York Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq.;

    South Dakota Codified Laws § 37-1-3.1 et seq.;

    Vermont Consumer Protection Act, 9 V.S.A § 2451 et seq.; and
    Wisconsin. Stat. Ann. §§ 133.01-.18.

---

[1] Count IV of the complaint for trademark dilution under the Lanham Act, 15 U.S.C. §1125(c) was dismissed by the Court in Rockwell Automation, Inc. v. Radwell Int'l, Inc., No. 15-cv--5246 (RBK/JS), 2016 U.S. Dist. LEXIS 165633, 2016 WL 7018531 (D.N.J. 30 Nov 2016).

2020 U.S. Dist. LEXIS 223998, *4

As these motions for and against the complaint counts and against the counterclaims are interrelated and seek opposing rulings on the same issues of law and a similar set of material facts, the Court takes up both parties' motions in this opinion.

Table 1 shows the specific summary judgment requests from plaintiff and defendant.

**Table 1**

| Complaint Count | Law Pleaded | P Requested ECF Doc. 526 |
|---|---|---|
| I: Trademark Infringement | Federal | Grant |
| II: False Advertising | Federal | Grant |
| III: False Designation of Origin | | |
| V: Unfair Competition | NJ Statute | |
| VI. Common Law Unfair Competition | | |
| VII: Tortious Interference ["TI'] with Contract | State | Grant |
| VIII: Aiding/ Abetting TI with Contract | State | Grant |
| X. Unjust Enrichment | State | |

| Counterclaim (ECF Doc. 222) | Law Pleaded | P Requested ECF Doc. 526 |
|---|---|---|
| 1. Conspiracy of Restraint of Trade and Commerce | Federal | Grant to Dismiss |
| 2. Conspiracy to Monopolize and Monopolization | Federal | Grant to Dismiss |
| 3. Tortious Interference["TI'] with Contract | State | Grant to Dismiss |
| 4. **[*5]** TI with Prospective Economic Advantage | State | Grant to Dismiss |
| 5. State antitrust | State Statutory | Denial |

| Complaint Count | D Requested ECF Doc. 527 |
|---|---|
| I: Trademark Infringement | Denial |
| II: False Advertising | |

2020 U.S. Dist. LEXIS 223998, *5

| Complaint Count | D Requested ECF Doc. 527 |
|---|---|
| III: False Designation of Origin | Denial<br>Not briefed separately<br>but in combination with<br>Counts I, V, and VI |
| V: Unfair Competition | Grant<br>Not briefed separately<br>but in combination with<br>Counts I, III, and VI |
| VI. Common Law Unfair Competition | Grant<br>Not briefed separately<br>but in combination with<br>Counts I, III, and V |
| VII: Tortious Interference ["TI'] with Contract | Denial |
| VIII: Aiding/ Abetting TI with Contract | Denial |
| X. Unjust Enrichment | Denial |
| Counterclaim (ECF Doc. 222) | |
| 1. Conspiracy of Restraint of Trade and Commerce | |
| 2.Conspiracy to Monopolize and Monopolization | |
| 3.Tortious Interference["TI"] with Contract | |
| 4. TI with Prospective Economic Advantage | |
| 5.State antitrust | |

**The COURT HAVING REVIEWED** the parties' submissions (without a hearing in accordance with Rule 78.1 (b)) and for the reasons below, and for good cause shown,

As to Count I (Trademark Infringement), the Court **GRANTS** plaintiff's Motion for Summary Judgment on liability, **DENIES** defendant's Motion for Summary Judgment, and enters Judgment in favor of plaintiff and against defendant on this Count; **[*6]**

As to Count II (False Advertising), the Court **GRANTS** plaintiff's Motion for Summary Judgment on liability and enters Judgment in favor of plaintiff and against defendant on this Count;

As to Count III (False Designation of Origin), the Court **DENIES** defendant's Summary Judgment Motion;

As to Counts V and VI (State and Common Law Unfair Competition), the Court **DENIES** defendant's Motion for Summary Judgment;

As to Counts VII and VIII (Tortious Inference with Contract and Aiding and Abetting Such), the Court **DENIES** the Motions for Summary Judgment of plaintiff and defendant;

As to Count X (Unjust Enrichment), the Court **GRANTS** defendant's Motion for Summary Judgment Motion and enters Judgment in favor of Defendant and against Plaintiff on this Count; and

As to Counterclaims I through VI (Sherman Act §§1 and 2, Tortious Inference with Contract and with Prospective Advantage, and State Law Antitrust), the Court **GRANTS** plaintiff's Motion for Summary Judgment and Judgment is entered in favor of Plaintiff and against Defendant on all of the Counterclaims.

For the following issues, a jury trial remains and will be scheduled in due course: Plaintiff's damages for defendant's liability for trademark infringement **[*7]** and false advertising; Whether defendant is liable for state law and common law unfair competition (Counts V and VI); Whether defendant is liable for tortious interference with plaintiff's contracts and for aiding and abetting such tortious interference (Counts VII and VIII).

An appropriate Order of this date accompanies this Opinion.

## 1.0 Background and Procedure

There is a lengthy procedural history of this matter. The recounting below focuses on information relevant to the pending summary judgment motions.

To avoid ambiguity, here are the Court's definitions for several terms:

As used herein, a "'bare' reseller" refers to an entity that buys from one of plaintiff's Authorized Distributors ["AD"] a Programmable Logic Circuit ["PLC"], which is a solid-state, electronic device that operates a machine within a factory assembly line or other industrial setting through software logic programmed into its memory and includes a Central Processing Unit ("CPU"), memory caches, and circuits to receive input and output data. The "bare" reseller then re-sells the PLC without installing it into a factory installation, machine set-up, panel, or into a machine system. In other words, such a reseller does **[*8]** NOT add value, either in terms of technological solution or know-how.

As used herein, a "value-added reseller" or "VAR" refers to an entity that inserts the PLC into a ready-made pre-fab installation or designs an installation into which the PLC will articulate, or builds a machine panel for housing the PLC. All ways a VAR may articulate a PLC into an installation are contemplated here, even if not expressed.

As used herein, Rockwell's "customers" refers to VARs. This is how Rockwell regards VARs in their distribution chain, as discussed *infra* in detail.

As used herein, "end-user" refers to the entity that engages a VAR to perform a service that may include designing and/or building a factory installation or entire factory or a machine part or a control panel, e.g., a fuse box or an area where controls for an automated part are accessible as a technological innovation or the design plus PLC as know-how that the end-user buys from the VAR. ECF Doc. 140 (the Complaint) ¶28.

2020 U.S. Dist. LEXIS 223998, *8

As used herein, "consumer" can have two uses. When used as a generic term in this matter, "consumer" can have various legal meanings. For example, when used in consumer protection statutes, such as the Lanham Act, the **[*9]** statutory definitions of 'consumer' have common core features, which include: private individual or a sole proprietorship or a partnership acquiring goods or services, for whom the statute is protecting against unfair trade or deception by the purveyor.[2]

When used in a more specific way that relates to this matter, "consumer" refers to a theoretical individual member of the public that is presumed knowledgeable and discriminating enough about PLCs to understand distinctions among different brands of PLCs on the U.S. market so as to be capable of rationally choosing one PLC over the other. Typically, such individuals may include some employees of VARs, direct corporate purchasers, designers of factory installations, manufacturers of PLCs, as well as some employees of the end-users requesting VARs to build installations, panels, machines, and factories for them.

As used herein, there is an important distinction between "customer" and "consumer". "Customer" specifically refers to a Rockwell customer, which for 95% of Rockwell sales is a VAR and for 5% of which is a corporate entity purchasing directly from Rockwell itself. ECF Doc. 528:9-10 (Radwell Summary Judgment Motion); ECF Doc. **[*10]** 635:6 (Radwell Reply in Support of its Summary Judgment Motion).[3] In a specific use as described above, a "consumer" as opposed to a "customer" may refer to an "end-user", whereas a "customer" is not an "end-user".

Plaintiff Rockwell classifies itself as the world's largest firm that makes and sells a large number of products for various uses in industrial automation systems. Complaint, ECF Doc. 140 ¶5. These products include industrial manufacturing controls, equipment condition monitors, system sensors, safety components, and programmable controllers, especially Allen-Bradley-branded Programmable Logic Circuits ["PLCs"][4] . Since these products control all manner of automated systems, their overall safety and reliability, as well as that of their individual parts, are of paramount importance not only to customers and consumers, but also to Rockwell as a manufacturer to minimize quality problems and products liability claims. All of Rockwell's products bear one or more of its U.S. registered trademarks,[5] which Rockwell asserts are source identifiers to its U.S. customers of its warranty, quality control measures, and customer support for each product sold in the U.S. *Id.* ¶¶23-29.

To preserve **[*11]** its warranty and quality control, Rockwell sells its trademarked goods in the U.S. only through a contract-delimited supply chain of Authorized Distributors ["ADs"]. *Id.* ¶24. This agreement is the Allen-Bradley Automation Distributor Agreement ["AD agreement"]. ECF Doc. 531-3 (Declaration of Paul Tanck), Exhibit 27. To become Rockwell-authorized, a distributor must obligate itself via the AD agreement with Rockwell NOT to sell Rockwell goods to "bare" resellers, but only to value-added

---

[2] *See* Black's Law Dictionary, (11th ed. 2019).

[3] See also, ECF Doc. 530-3 (Declaration of Paul Tanck) Exhibit 20:34-52 (Transcript of Deposition [FRCP 30(b)(6)] of Rodney Michael, 28 March 2018) testifying in the 1074 ITC Investigation as to the percentages of sales each kind of VAR makes.

[4] A PLC is a solid-state, electronic device that operates a machine within a factory assembly line or other industrial setting through software logic programmed into its memory and includes a Central Processing Unit ("CPU"), memory caches, and circuits to receive input and output data. It operates machinery by continually scanning the software to determine if and when pre-programmed input conditions of the machine are met. Once input status indicates a start event should occur, the PLC executes the operation software of the machine to perform a function, and then updates output status of that performance.

[5] Rockwell owns twelve, in force trademark registrations at issue on the Principal Register of the U.S. Patent and Trademark Office ["USPTO"]. The marks brand Rockwell products as ALLEN-BRADLEY®, A-B®, ROCKWELL AUTOMATION®, and/or CONTROLLOGIX®.

resellers ["VARs"]. In other words, ADs must obligate themselves to sell Rockwell PLCs only to those VARs who have contracted with Rockwell or pledged not to engage in "bare" reselling.

Moreover, Rockwell has created an exclusive supply chain of its trademarked goods by obligating a vertical supply network of ADs to sell Rockwell trademarked goods ONLY to those customers who will NOT re-sell the goods on the gray market. Complaint, ECF Doc. 140 ¶24. Thus, only ADs may sell Rockwell's goods to only a VAR that must forego re-sale of bare PLCs. From the perspective of its business strategy of creating a closed distribution chain, Rockwell defines VARs as those entities that sell its PLCs only as part of **[*12]** an installation or assembly, thus selling a value add and not just the PLC.

On 6 July 2015, Rockwell initiated this action against defendant Radwell and on 16 February 2016, filed a first amended complaint. In response to Radwell's motion to dismiss, on 30 November 2016, the Court dismissed count IV of the complaint.[6] On 28 March 2017, Rockwell filed a second amended complaint, which is the controlling complaint here. On 27 June 2017, Radwell filed an

amended answer and its counterclaims. ECF Doc. 222.

On 15 August 2017, Rockwell filed a motion to dismiss the counterclaims (ECF Doc. 281) and on 6 September 2017, petitioned the ITC to institute an investigation of several respondents including Radwell pursuant to 19 U.S.C. §1337.[7] In the ITC petition, Rockwell alleged a similar trademark infringement count as in the complaint, but asserted different legal arguments for the unfair competition count and did not plead the other Lanham Act complaint counts for False Advertising and Designation of Origin.

On 10 October 2017, the ITC instituted **[*13]** Investigation No. 337-TA-1074 ["ITC 1074 investigation"] into Rockwell's claims. On 25 October 2017, Radwell sought a mandatory stay under 28 U.S.C. §1659 of all pending counts in the complaint in this action for the duration of the ITC 1074 investigation (ECF Doc. 255), which Rockwell countermanded with a request for a discretionary stay of all the complaint counts and of all counterclaims. ECF Doc. 261. On 21 November 2017, this Court granted Rockwell's motion for a discretionary stay of all counts and the counterclaims and ordered discovery in this matter stayed, pending final resolution of the ITC 1074 investigation. This meant all pending motions before the Court, including Rockwell's motion to dismiss the counterclaims, were terminated without prejudice. ECF Doc. 278.

---

[6] *See supra* note 1.

[7] Section 332 with Section 337 of the Tariff Act of 1930 authorizes the ITC to perform investigations into the unlawful importation, sale, or sale for importation into the United States of articles that infringe a valid, enforceable U.S. registered trademark. *19 U.S.C. §1332 and §1337(a)(1)(C).*

§337 investigations aim to prevent, investigate and redress unfair practices in import trade (*19 U.S.C. §1337*) and provide a venue other than federal courts for trademark owners seeking to redress trademark infringement and unfair competition. Not an Article III court but a quasi-adjudicative administrative agency, the ITC follows its own procedural rules, codified in the Federal Regulations ["CFR" or "Regulations"] largely at 19 C.F.R.§201.16 and part 210.

The ITC has the authority to grant the following remedies: exclusion orders of importing and selling (against parties); temporary limited exclusion orders (during the investigation); cease and desist orders; and temporary cease and desist orders (*19 U.S.C. 1337(d) - g)*), but cannot authorize damages, which can be granted in concurrent federal court filings Joseph H. Heckendorn *et al., Gray Market Trademark Infringement Actions at the U.S. International Trade Commission: The Benefits of the Forum and Analysis of Relevant Cases*, 8 J. MARSHAL REV. INTELL. PROP. L. 271, 273 & 277-278 (2009).

On 12 July 2018, in the ITC 1074 Investigation, Radwell voluntarily entered into a consent order stipulation with the ITC, by which it agreed it would stop selling, importing, and selling for import any goods bearing Rockwell marks. On 15 August 2018, the ITC Commission in full accepted Radwell's consent stipulation, thereby making the ITC consent order effective.

During the pendency of the ITC 1074 investigation, on 29 March 2018, **[*14]** Radwell sought to institute its own ITC investigation, No. 337-TA-1105 ["ITC 1105 investigation'"]. Radwell claimed Rockwell's AD network harmed the U.S. PLC industry by ultimately reducing competition in the U.S. PLC market. Radwell claimed Rockwell's vertical distribution system boycotted PLC resellers in the U.S. from gaining access to Rockwell PLCs and fixed the prices of Rockwell PLCs. These activities together stopped other PLC resellers from gaining access to Rockwell PLCs at a discounted price, which ultimately meant they could not gain revenue by selling PLCs in the U.S. at a discounted price. About six months later on 8 November 2018, Radwell filed an opposed motion to terminate the 1105 investigation, which the ALJ granted and the Commission affirmed on 14 December 2018, thereby terminated the 1105 investigation.[8] The stay of discovery under ECF Doc. 278 had also extended to the ITC 1055 investigation.

On February 25, 2019, the Court lifted that stay. ECF Docs. 302 & 320. On 25 April 2019, the Court ordered the transfer of the entire record from both the ITC 1074 and 1055 Investigations to this Court. ECF Doc. 388.

Filing a summary judgment motion on 22 Feb 2019 (ECF Doc. 314), **[*15]** Rockwell argued the voluntary consent order between Radwell and the ITC (which stopped Radwell's importation of Rockwell PLCs into the U.S.) worked *res judicata* to bar the same claims[9] raised before the ITC from being litigated in this Court. On 26 September 2019, this Court denied that motion, holding a voluntary consent order executed with the ITC BEFORE an ITC initial determination was not an adjudicated decision that resolved legal issues and therefore cannot preclude litigating those same issues in this Court. ECF Doc. 551.

On 12 March 2019, Radwell filed a summary judgment motion (ECF Doc. 331) arguing certain Supreme Court cases (involving patents and copyrights) ended the judge-made exception that material differences between U.S.-sold marked goods and imported gray goods no longer grounded trademark infringement against the gray goods seller. In denying that motion on 30 December 2019, this Court held the material differences jurisprudence of trademark infringement was alive and well in U.S. federal courts, and therefore justified a ruling of trademark infringement when unauthorized, marked goods were sold in the U.S. (either imported as gray goods into the U.S. or as goods **[*16]** acquired in the U.S.). ECF Doc. 470. This holding meant plaintiff's counts alleging defendant's trademark infringement under the Lanham Act remained in this action.

On 16 Dec 2019, plaintiff filed the summary judgment motion at issue here (ECF Doc. 526) in favor of its counts listed above and seeking dismissal of Radwell's counterclaims. On the same day, defendant filed its summary judgment motion at issue here (ECF Doc. 527) seeking dismissal of plaintiff's counts I, III, V, VII, VIII and X. Oppositions and replies were timely filed.


## 2.0 Parties' Contentions

---

[8] U.S. International Trade Commission Notice regarding Termination of Investigation No. 337-TA-1105 re Certain Programmable Logic Controller (PLCs), Components Thereof, and Products Containing Same, 83 Federal Register 249 (31 December 2018).

[9] The counts at issue before the ITC were: I Trademark Infringement; V Statutory Unfair Competition under N.J. law; VII Tortious Interference with Contract; VII Aiding / betting with Tortious Interference with Contract; IX Aiding /Abetting Fraud.

**Rockwell**

In the complaint, Rockwell alleges under the Lanham Act: Radwell's trademark infringement (15 U.S.C. §1114), false advertising (§1125(a)(1)(B)), and false designation of origin (15 U.S.C. §1125(a)(1)(A)). At the heart of Rockwell's complaint is the allegation that Radwell has been selling in the U.S. unauthorized Rockwell-branded products that, although identical in appearance, mark, and brand, are materially different from those Rockwell sells in the U.S. and thus create consumer confusion as to the source of the goods.

As used herein, the term "Radwell goods" refers to Rockwell-branded PLCs that Radwell sells in the U.S. To be clear, Radwell goods are either gray goods that **[*17]**  Radwell purchased overseas and imported into the U.S. or alternatively purchased in the U.S. either from a Rockwell AD or a VAR who itself acquired the PLC from an AD. Rockwell alleges that Radwell could acquire PLCs in the U.S. only by misrepresenting itself to an AD as a value-added reseller or having an agent or a third party act on its behalf to so misrepresent. Complaint, ECF Doc. 140 ¶¶185-196.

Rockwell alleges Radwell goods are infringing because, although Radwell U.S. goods appear identical to Rockwell-branded U.S. goods, Radwell goods lack Rockwell's warranty, quality control and customer support guarantees. They are therefore materially different from Rockwell's and thereby cause inevitable, inescapable consumer confusion when a purchaser of a Radwell U.S. good expects Rockwell to honor a warranty the Radwell good lacks. *Id.* ¶¶147-150. Specifically, the complaint alleges Radwell goods confuse the public as to their source and quality. *Id.*¶¶ 196-273.

To ensure that only its authorized goods—that is, those with warranties and customer service extras—are sold in the U.S., Rockwell has delimited distribution of its U.S. goods by creating a network of ADs that are, besides itself, **[*18]**  the exclusive suppliers of its U.S. goods. To execute on this strategy, Rockwell alleges it sells its U.S. products only to authorized dealers or, in a very limited way, it sells directly to customers. *Id.* at least at ¶158.

Rockwell asserts it established its AD network through executed agreements in which each AD promises not to sell Rockwell products to a reseller (for the purposes of this opinion, that means a "bare" reseller. *See* the definition *supra*) in the U.S. *Id.* ¶43. Said differently, Rockwell created a closed vertical distribution chain of its products via exclusive dealing contracts with its ADs. The Rockwell AD network functions this way: Rockwell assigns a specific territory in the U.S. to each of its ADs. In selling to its ADs, Rockwell discounts its prices and extends warranties and other product add-ons to the ADs through credit rebates. Although the AD agreements do not prohibit an AD from selling to a customer outside its assigned territory, Rockwell does not extend a credit rebate for such sales so that the AD does not realize as much profit if selling outside its territory as within. This practice disincentivizes encroachment on another ADs territory, and inhibits **[*19]** competition among ADs competing with each other for the same customer base), but does not prohibit it. Doc. 642-4:3 (Rockwell's Response to Radwell's Statement of Disputed Material Facts) [citing ECF Doc. 590, Ex. 60 (Rodney Michael Rebuttal Witness Statement in the ITC 1055 investigation) at Q55-56].

In authorizing ONLY a contractually-obligated distributor to sell its branded products, Rockwell offers differing credit rebates to its ADs depending on which class of customer—certain kinds of VARs vs an end-user—the AD is selling to. In turn, the AD can offer differing price points to different classes of customers to ensure a required level of revenue for itself and ultimately to Rockwell and build loyalty of the VARs as customers to ensure repeat sales. Thus, Rockwell and its ADs practice some form of third-degree price discrimination throughout Rockwell's vertical chain distribution, whereby different kinds of

consumers—whether one of the 4 kinds of VARs or an end-user—pay higher or lower prices for the same good. Complaint, ECF Doc. 140 ¶88; ¶¶147-148.

Rockwell asserts Radwell is not an authorized dealer of Rockwell goods in the U.S.; which Radwell does not dispute. Because of that, **[\*20]** Rockwell asserts Radwell goods necessarily lack the quality control, safety, warranty, and other quality benefits of AD-sold Rockwell goods, which make Radwell goods inferior and confuse the consumer as to source. *Id.*¶¶ 1, 5.

Rockwell further claims, in order to break into its closed vertical network of ADs, Radwell committed fraud by engaging third party agents--allegedly some who posed as VARs to Rockwell--that bought from ADs and sold to Radwell for Radwell's resale in the U.S. *Id.* ¶¶151 - 174; ¶¶188-191. S*ee* also *Id.*¶¶28-29 discussing that not only are ADs obligated not to sell to re-sellers, but the entities termed Value-Added Resellers ["VARs"] either obligate themselves formally or negotiate an informal bargained-for exchange with Rockwell and are policed by Rockwell not to re-sell "bare" PLCs.

Thus, Rockwell contends its ADs, intending to meet their contractual obligations to Rockwell, nonetheless sold goods they did not know were intended for Radwell's ultimate purchase and subsequent resale in the U.S. without authorization from Rockwell.[10] *Id.* ¶¶129 and 161. Rockwell alleges Radwell either deceived its ADs to breach the AD agreements or received unauthorized Rockwell Products **[\*21]** from unauthorized sources (*Id.* ¶¶ 113-119; ¶¶205-206) and could re-sell these products through only a deceptive marketing scheme, via an internet site that markets the products as "Radwell verified substitutes" for authorized Rockwell products. *Id.* ¶¶123-127. In addition, Rockwell alleges Radwell knew it could not obtain conforming Rockwell products overtly from a Rockwell AD and intentionally procured Rockwell products in a secretive way because otherwise Rockwell would stop selling to Radwell's source. *Id.*; *See* ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 23:127-128; 184-190 (Deposition of Edward Iannuzzi, Radwell Global Sales Manager, testifying in the ITC 1074 investigation); *see also id.*, Exhibit 22:96 (Deposition of Brian Radwell, Radwell CEO, testifying in a deposition in the ITC 1074 investigation).

## Radwell

In its counterclaims (ECF Doc. 222), Radwell asserts generally under Clayton Act §§4 and 16 (15 U.S.C. §§ 15 and 26) and Sherman Act §§ 1 and 2 (15 U.S.C. §§ 1 and 2) that:

Rockwell is a monopolist seller of its PLCs in the U.S.;

its monopoly arises from its collateral conduct with its ADs and which its exclusive dealing contracts with its ADs reinforce.

Such conduct is actually a conspiracy and a closed market **[\*22]** system;

that amounts to a non-competitive barrier to entry in the U.S. PLC market and bolsters a price fixing scheme in which Rockwell and its ADs collude. *See* ECF Doc. 222, ¶¶154-157, 168, 176-177 (Radwell's Amended Answer to the Complaint and Amended Counterclaims).

---

[10] The Court notes that Rockwell is careful not to allege any of its ADs could have intentionally sold Rockwell PLCs to Radwell or a Radwell agent, which would point to a breach of Rockwell's "closed" distribution system from within and ultimately to a need to sue one of its own ADs for breach of contract.

Radwell further asserts the relevant product market constitutes PLC products; and these have neither widely used substitutes (as no reasonably interchangeable products exist) nor cross-elasticity of demand (*Id.* ¶¶30-31). Moreover, the relevant geographic market is the United States. *Id.* ¶33. Radwell states it directly competes with Rockwell and its ADs in the sale of PLCs in each U.S. state and that U.S. PLC customers—which Rockwell defines as VARs, that is OEMs, system integrators, panel shops, and integrated suppliers—look to buy PLCs from only U.S. sellers. *Id.* ¶34.

Owing to the prohibitions in Rockwell's contracts that prevent ADs from selling non-Rockwell products (*Id.*:83-84), Radwell alleges these contracts create an "all or nothing" requirement to become a Rockwell AD and effectively prevents competing products from entering or penetrating into the U.S. PLC market, forcing an anti-competitive result. *Id.* ¶¶41-42; ¶150. The **[\*23]** Rockwell contract terms and behavior include:

Rockwell's assignment of a particular territory to each AD;

The AD's express obligation not to sell Rockwell-branded products to any U.S. customer that will resell that product without adding "value" to it;

Rockwell's refusal to offer credit rebates to ADs that sell product outside their assigned territory, which avoids ADs competing with each other by underbidding for the same customer.

Radwell describes that this anti-competitive result arises in the U.S. PLC market in part from end-user preferences about how PLCs are replaced in a factory or machine set up. Simply, after a PLC is installed, end-users replace it with the same brand. That Rockwell PLCs are well established in the U.S. PLC market works in partnership with the conservative buying preferences of end users to solidify the end-user base, thereby locking in the market niche, extent, and power of Rockwell over the sale of PLC products in the U.S. *See Id.* ¶¶100-102.

Radwell implies that, when considering Rockwell's 65% market share in the U.S. PLC market and U.S. consumer behavior in this market coupled with the prohibition that ADs not sell competing PLCs, Rockwell must be seen as **[\*24]** wielding the power of a monopolist to continually maintain very steep barriers to entry and thereby perpetuate its monopoly. *Id.* ¶¶44-46. Moreover, Radwell asserts this alleged monopoly power relieves Rockwell from price competition by other PLC manufacturers, which allows Rockwell to sell its PLCs at a premium in the U.S. *Id.* ¶¶ 49-53. Radwell asserts that 90% of Rockwell sales in the U.S. are done through the Rockwell AD network. *Id.* ¶56.

Radwell alleges the following combination of factors evidence price fixing between Rockwell and the ADs:

Rockwell sets a "suggested" specific resale price for each product;

ADs agree to charge the Rockwell-set resale price;

In effect, that resale price is not uniform inasmuch as Rockwell practices price discrimination of products to various classes of consumers—OEMs, system integrator, end-user, and integrated suppliers—which means a different class of consumer will be charged a different price for the same product.

ADs agree to this price discrimination system because their AD agreements with Rockwell prevent other ADs from underbidding each other (because Rockwell pricing rebates are not given to ADs selling outside their territory). This practice **[\*25]** tends to stabilize not only the customer base but also each

ADs revenue within its territory, and virtually bars an end-user an opportunity to "shop around" for a lower price.

Radwell asserts the combination of these factors makes disrupting Rockwell's pricing structure virtually impossible and alleges this behavior amount to price fixing and anti-competitive behavior. *Id.* ¶¶38-39; 43-44; 80-85; 92-95; 97-99; 115-118; 124. Radwell admits to acquiring Rockwell branded goods through various avenues and then re-selling them in the U.S. *Id.* ¶¶133-141.

In the past, Radwell had acquired Rockwell-branded goods sold outside of the U.S. and imported them into the U.S. as gray goods, an avenue now closed to Radwell because of its stipulated consent with the International Trade Commission ["ITC"] to stop such importation. *See supra.* Radwell also acquires Rockwell-branded goods sold inside the U.S. from either end-users that have excess, unneeded new products or buys used products and refurbishes them for re-sale. Radwell also buys Rockwell-branded goods in the U.S. from VARs that had obtained them from an AD at a discounted price only because it had agreed to Rockwell's pre-requisite to add the **[\*26]** product to a factory or machine set-up. That is, "faithless" VARs have paid less for the PLC than an end-user. In selling a "bare" product to Radwell, a VAR can gain income by arbitraging the Rockwell price. The VAR charges Radwell more than it paid; and, in turn, by paying less than the fair market value offered to an end-user, Radwell can gain an income opportunity, which is one way Radwell may conduct business in the U.S. PLC market. *See, e.g.,* *id.*¶¶151-153. And it is precisely this resale by VARs that Rockwell strives to put an end to by demanding ADs monitor closely and diligently their VARs' fidelity to the n0-resell policy. If a VAR does engage in re-selling to PLC price arbitragers, like Radwell, Rockwell has demanded and obligated ADs to cut off sales to that entity, "as agreed to in the AD agreement". *See, e.g.,* *id.*¶¶164-171.

## 3.0 Legal Standards

### 3.1 Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). A **[\*27]** fact is material only if it can affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *see also Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006). A material fact raises a genuine issue when the evidence could allow a reasonable jury to return a verdict for the non-moving party. *Id.*; *see also Healy v. N.Y. Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988).

In bearing the initial burden of proof, the movant must present those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant so demonstrates, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial" (*Fed. R. Civ. P.* 56(e); *Celotex,* 477 U.S. at 324)) through affidavits or otherwise as provided by Rule 56 and "identify those facts of record which would contradict the facts identified by the movant." *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir. 2002). If the non-movant fails to do so, the Court must grant summary judgment. *Big Apple BMW v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992). The evidence introduced to defeat or support a motion for summary judgment must be capable

of being admissible at trial. *Callahan v. AEV, Inc.*, 182 F.3d 237, 252 n. 11 (3d Cir.1999) (*citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1234 n. 9 (3d Cir.1993)).

Speculation, conclusory allegations, suspicions, or mere denials do not suffice to raise a genuine issue of material fact. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288-289 (3d Cir. 2018). Nor does reliance on the pleadings suffice. Rather, the non-moving party "must present affirmative evidence ... from which a jury **[*28]** might return a verdict in his favor." *Anderson*, 477 U.S. at 256.

In evaluating whether a genuine issue of material fact exists, the court considers all facts and ambiguities in the light most favorable to the non-moving party (*Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202; *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir.2013)) and draws all reasonable inferences in their favor. *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir.2011). The Court does not decide "the truth of the matter," but rather whether a genuine issue of material fact necessitates a trial. *Anderson*, 477 U.S. at 242; *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. The court therefore neither weighs evidence nor makes credibility judgments as these tasks are for the fact finder. *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230.

When contradictory, material facts are presented, a genuine issue is raised, which undercuts a decision for summary judgment. However, even with a presentation of contradictory facts, there can be no genuine issue when one party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. When the movant has completely failed to show an essential element of its case, all other facts are immaterial. *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir.1992).

### 3.2 Other Legal Standards

This opinion sets forth the legal standard for each issue in turn.

### 4.0 Discussion

### 4.1 Jurisdiction and Venue

This action alleging trademark infringement **[*29]** and other counts under the Lanham Act, 15 USC §1051 *et seq.*,1, and counterclaims under the Clayton Act, and Sherman Act I and II, the Court has subject matter jurisdiction under 15 U.S.C. §1121 and 28 U.S.C. §§1331 and 1338 (b). As all claims in this action "derive from a common nucleus of operative fact" and "are such that plaintiff would ordinarily be expected to try them all in one judicial proceeding" (*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); 28 U.S.C. §1367(a)), the Court also holds pendent jurisdiction over the state law claims. Venue is proper here under 28 U.S.C. 1391(b) (1) as defendant Radwell is headquartered in Burlington County, New Jersey, a designated county for this vicinage.

### 4.2 Lanham Act Questions

### 4.2.1 Trademark Infringement

In a previous summary judgment motion (ECF Doc. 331),[11] defendant argued that trademark infringement can no longer apply to a good sold in the U.S. that is identical in form and brand to a U.S. authorized good but which lacks the material differences the mark holder passed to only authorized goods. This Court resolved that motion by declaring the judge-made jurisprudence of trademark infringement owing to material differences between authorized and unauthorized goods was alive and well. *See Rockwell Automation, Inc. v. Radwell International, Inc.*, 15-cv-05246, 2019 U.S. Dist. LEXIS 222361, 2019 WL 7288946 (D.N.J. 30 Dec 2019). **[*30]** [12] To be clear, this Court's denial of Radwell's previous summary judgment motion was a decision about an erroneous legal theory, in which the Court neither undertook a review nor opined on the existence of a genuine issue of material fact as to Radwell's trademark infringement. Such a review is done here for the first time.

To properly plead trademark infringement of a registered mark under the Lanham Act, 15 U.S.C. §1114, a plaintiff must demonstrate it owns a valid and legally protectable mark (elements 1 and 2) and that defendant's use of the mark to identify goods/services causes a likelihood of confusion (element 3). *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

For elements 1 and 2, Rockwell's in-force registrations before the USPTO[13], which include the marks asserted here,[14] suffice.

For element 3, the court must analyze: (1) whether "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark," and (2) "the more elementary question of whether [defendants] made any use of the mark." *Nike, Inc. v. Eastern Ports Custom Brokers, Inc.*, 2:11-cv-4390-CCC-MF, 2018 U.S. Dist. LEXIS 120351, 2018 WL 3472628, at *4 (D.N.J. 19 July 2018) **[*31]** [*citing Zany Toys, LLC v. Pearl Enterprises, LLC*, No. 13-5262, 2014 U.S. Dist. LEXIS 70852, 2014 WL 2168415, at *8 (D.N.J. 23 May 2014).

It is undisputed that Radwell sold Rockwell goods bearing Rockwell marks in commerce and was not authorized to do so. ECF Doc. 596-1:13 (Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute).

Neither do the parties dispute that key to determining trademark infringement here is the likelihood of consumer confusion generated by Radwell's selling unauthorized goods for sale in the U.S. Thus, even if an unauthorized Rockwell-branded good is identical in form and function to an authorized good, trademark infringement may still lie when the unauthorized good lacks a material difference that causes consumer confusion as to the source of the goods sold in the U.S. *Société Des Produits Nestlé, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633 (1st Cir. 1992).

As for consumer confusion as to the source of the mark, the parties do not generally dispute the applicability of the legal theory of "material differences" infringement. That is, it is not disputed that

---

[11] *See infra* note 21

[12] *Opining* in response to defendant's previous summary judgment motion that recent Supreme Court cases on the exhaustion of rights for international sales of patented or copyrighted goods did not and could not vitiate the jurisprudence that marked goods sold in the U.S. lacking the material differences of goods authorized by the mark holder infringed the holder's mark.

[13] A list of LIVE U.S. trademarks owned by Rockwell Automation and found on the USPTO's TESS database on 25 Aug 2020 is here; Rockwell's Live U.S. Trade Mark Registrations

[14] *See supra* note 6.

2020 U.S. Dist. LEXIS 223998, *31

unauthorized sales in the U.S. of Rockwell-branded products that differ materially from authorized products sold in the U.S. could result in consumer confusion as to the authenticity of the materially different products. ECF Doc. 528:2-3 (Defendant's Summary Judgment **[*32]** Motion; ECF Doc. 530 (Plaintiff's Summary Judgment Motion).

In this Circuit, a material difference between goods simultaneously sold in the same market under the same mark creates a presumption of consumer confusion as a matter of law. *Ferrero U.S.A., Inc., v. Ozak Trading Co. et al.*, 753 F.Supp. 1240, 1246, judgment aff'd by *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 935 F.2d 1281 (3d Cir. 1991). *See also A & H Sportswear, Inc.*, 237 F.3d at 216 *stating* "the single most important factor in determining likelihood of confusion is the mark similarity". And, "If products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves [in determining likelihood of confusion] (citation omitted)." *Id.* at 214.

The plaintiff's burden of proof to establish trademark infringement is preponderance of the evidence. *See, e.g., KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 120, 125 S.Ct. 542, 160 L.Ed. 2d 440 (2004) [only when a plaintiff has shown likely confusion by a preponderance of the evidence does a defendant have any need of an affirmative defense]. Following the Supreme Court and the Third Circuit, this Court finds, since Radwell and Rockwell have each admitted to selling the same products in the U.S. market and that Radwell goods and Rockwell-authorized goods bear the same marks, Rockwell has met its burden of proof as to likelihood of confusion. Specifically, Radwell's unauthorized **[*33]** U.S. sales of Rockwell-branded goods likely cause consumer confusion not only because of the material differences between its goods and Rockwell's, but also because Rockwell, as holder of the intellectual property that identifies the source of the PLCs, had not authorized Radwell sales of the marked PLCs. Such lack of authorization is indisputable.

Besides the undisputed fact that Radwell sold in the U.S. Rockwell-branded goods that did not bear the same features of authorized goods (ECF Doc. 140 (the Complaint)), other facts are also undisputed. These include: the ITC 1074 investigation ended with Radwell's consent[15] **NOT TO ENGAGE** in certain behavior, namely, selling, or importing, or inducing a third party to import, in the U.S. unauthorized Rockwell-branded goods.

Thus, the ITC 1074 Investigation consent order concerned ONLY Radwell's prohibited behavior regarding "unauthorized gray goods"[16] and neither addressed nor prohibited Radwell's acquiring, selling,

---

[15] Certain Industrial Automation Systems and Components Thereof, Including Control Systems, Controllers, Visualization Hardware, Motion and Motor Control Systems, Networking Equipment, Safety Devices, and Power Supplies, Investigation No. 337-TA-1074, USITC Order No. 42 (20 July 2018). The Court takes note of this information as a matter of public notice.

[16] Considering Radwell's Evidentiary Objections and Motion to Strike in Connection with Its Opposition to Rockwell's Motion for Summary Judgment (ECF Doc. 596-2) in which Radwell objects to Rockwell's proffering as evidence of Radwell's infringement the decision in the ITC 1074 investigation AFTER Radwell had stipulated out, the Court relies here only on information that directly pertains to Radwell's agreement with the ITC, and not to any later proceedings where Radwell was no longer a party. Available as a matter of public record, this information the Court can take public notice of.

Actually, the 1074 ITC Investigation consent order could not be clearer:

..."**Radwell agrees not to sell for importation, import into the United States, or sell in the United States [*34]** after importation**, or knowingly aid, abet, encourage, participate in, **or induce the sale for importation, importation into the United States, or sale in the United States after importation**, of industrial automation systems and components thereof, including control systems, controllers, visualization hardware, motion and motor control systems, networking equipment, safety devices, and power supplies, that infringe U.S. Trademark No(s). 1,172,995; 696,401; 693,780; 1,172,994; 712,800 ; 712,836;

or distributing in the U.S. Rockwell-branded products from resellers located in the U.S., termed here "unauthorized domestic goods".

At a most fundamental level, the parties do not dispute that Radwell sold nonconforming goods in the U.S., which this Court finds were likely to cause consumer confusion. As used herein, the term "nonconforming" refers to Rockwell marked goods that do not bear the Rockwell warranty or customer service add-ons because Rockwell had not authorized these for sale in the U.S.

What the parties dispute is the standard of trademark law to be applied to the facts. In particular, the parties dispute whether the Third Circuit's or the Federal Circuit's standard should be applied to determine if Rockwell's own behavior would **[*35]** also create consumer confusion and thereby, give Radwell a defense that would relieve its infringement liability.

To the point, Radwell presumes that *SKF USA Inc. v. International Trade Commission*, 423 F.3d 1307 (Fed. Cir. 2005) is the more suitable legal precedent because there the Federal Circuit analyzed the alleged infringer's possible defense against infringement liability: whether the mark owner itself had created consumer confusion by importing and selling goods in the U.S. that were not accompanied by the material differences of conforming goods. No only relying on different case law than the Third Circuit's, Radwell also re-defines Rockwell's term, VARs (value-added resellers),[17] to mean simple, i.e., "bare", re-sellers. ECF Doc. 528:15-16. Radwell's re-definition of VARs is that, regardless of the integrated electrical, electronic, systemic, mechanical, or physical context into which a VAR inserts a PLC, a VAR is always a "bare" re-seller of that PLC. Radwell discounts the value-add of the installation context.

Redefining VARs as "bare" resellers grounds Radwell's argument that Rockwell's own behavior relieves Radwell of trademark infringement liability. Radwell alleges it is Rockwell's own nonconforming goods sold by VARs as "bare" resellers that create **[*36]** consumer confusion, and therefore provides Radwell a defense against its own infringement.

Put simply, Radwell claims all Rockwell PLCs sold by VARs in a value-added context cannot be said to bear the material differences of goods sold through Rockwell ADs. In a nutshell, and this is critical to Radwell's argument, this is because the PLCs that VARs "resell" to consumers cannot pass on the warranty and other features of the PLCs that the ADs sell. Therefore, all PLCs that the VARs sell are non-conforming and that the percentage of such resales is not within the percentage allowed by the Federal Circuit in *SKF*. Radwell contends the Rockwell-condoned re-selling by VARs creates consumer confusion as to which of Rockwell's own U.S. goods bear the material differences of warranty, quality, etc., and which do not. As *SKF* concerns a situation in which the mark holder sold in the U.S. more than 10% of its product lacking material differences, Radwell's reliance on Federal Circuit case law empowers it to argue that *SKF* as precedent removes a but-for cause of consumer confusion from Radwell's gray goods and gives Radwell a defense and a pass on its own liability for trademark infringement.

---

2,510,226; 2,671,196; 2,701,786; and/or 2,412,742 ("Asserted Trademarks"), or U.S. Copyright Reg. No(s). TX0008389890; TX0008389887; TX0008390098; TX0008390094; TX0008390077; TX0008390088; TX0008390116; TX0008390084; TX0008390111; and TX0008390091("Asserted Copyrights"), or are acquired or sold through unfair methods of competition and unfair acts in importation or sale (collectively "Accused Products") **except under consent, or a license from Rockwell, its successors or assignees**.

3. Upon entry of the Consent Order, **Radwell will not sell within the United States or otherwise transfer (except for exportation) any remaining inventory of imported Accused Products** in the United States.

[17] System Integrators, OEMs, panel shops, etc.

Rockwell **[*37]** argues the proper material differences infringement standard is the Third Circuit's in *Iberia Foods Corp. v. Romeo*, 150 F.3d 298 (3d Cir. 1998).

The parties' arguments notwithstanding, the situation here is more complicated than simply choosing between the Third Circuit's or the Federal Circuit's jurisprudence on the trademark infringement of materially different goods. Because of the ITC consent order with Radwell, this Court presumes that any possible trademark infringement by Radwell involving "unauthorized gray goods" ceased after 20 July 2018. Therefore, any possible trademark infringement by Radwell after the consent order can concern only "unauthorized domestic sales."

In this matter, then, there is an issue of trademark infringement arising from U.S. sales of non conforming (also termed equivalently here, as "unauthorized") products either imported as gray goods or acquired within the U.S. Since the original complaint dating to 7 July 2015 (ECF Doc. 1 ¶¶22-34) and the second amended complaint (ECF Doc. 140, at least at ¶¶51 to 150), which controls here, pleaded trademark infringement for unauthorized U.S. sales, material differences infringement for both "unauthorized gray goods" (those before the ITC consent order issued) and "unauthorized **[*38]** domestic goods" are considered here.

Not having been imported in the U.S., "unauthorized domestic sales"[18] could not properly be the subject of a §337 investigation[19] nor a Federal Circuit appellate review. Lacking a legal or factual basis for applying from the beginning Federal Circuit jurisprudence, the material differences standard for unauthorized domestic sales must begin with the Third Circuit's standard in *Iberia*. There, the court rejected the mark holder's simple assertion that the unauthorized vs. the authorized U.S.-sold products materially differed and required a showing of a non-pretextual difference between the two. *Iberia*, 150 F.3d at 304. The court found that a material difference need not be a formal or physical feature but included any quality or attribute that, if the product were sold without it, would likely damage the goodwill developed by the trademark owner. *Id relying on Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996) for the proposition that a "trademark holder must show that it uses substantial and non-pretextual ...procedures such that the nonconforming sales will diminish the value of the mark". *Id.* at 6.

As for whether importation of "unauthorized gray goods" should be considered under the Federal Circuit's or the Third Circuit's standard, **[*39]** this Court declines to supplant the Third Circuit's jurisprudence on any legal issue that the Third Circuit has ruled on. As practiced in all Districts, when full guidance of the home Circuit, here the Third, is lacking on a legal issue, the District Court looks to that of other Circuits, adopting it to a greater or lesser extent in alignment with the home Circuit's previous pronouncements. Thus, urging the Federal Circuit's jurisprudence over that of the Third's, instead of as a supplement to it, proposes a misguided hazard of unnecessarily muddling an uncontested Circuit precedent. This Court confirms the starting point for reviewing the motions here and the legal grounding of material differences infringement is *Iberia*. Should deciding these motions call for a more finely-tuned legal discrimination than in *Iberia*, this Court will look to the case law of other Circuits to fill in.[20]

---

[18] To reiterate, these are sales of products that Radwell may have acquired in the U.S. but which are unauthorized and do not bear the same features as authorized products sold in the U.S. These sales may also be called here "nonconforming".

[19] *See supra* note 8.

[20] An example of this Court's rounding out the Third Circuit's pronouncements with jurisprudence form other Circuits can be found in the opinion on defendant's previous summary judgment motion. *See Rockwell Automation, Inc. v. Radwell International, Inc.*, 15-cv-05246, 2019 U.S. Dist. LEXIS 222361, 2019 WL 7288946 (D.N.J. 30 Dec 2019) [this Court relying on a Second Circuit case to show that *Lexmark* and *Kirtsaeng* had no effect on the vigor of material differences jurisprudence].

The deciding issue in *Iberia* being whether the imported goods bore the same physical quality as the imported ones, the *Iberia* court faced a relatively straight-up yes or no answer as to whether material differences existed. *Iberia*, 150 F.3d at 302. In **[*40]** deciding the domestic and imported goods were not materially different, the *Iberia* court found the imported goods non-infringing and concluded that a single, non-pretextual material difference between conforming and non-conforming goods could justify infringement. *Id.* at 305-306.

However, neither in *Iberia* nor in other cases has the Third Circuit wrestled with the issue presented here by defendant: whether Rockwell's tolerance of resale by VARs of a greater than *de minimis* quantity of allegedly non-conforming goods vitiated the infringement claim against Radwell's U.S. sales of imported or domestic non-conforming goods. Put differently, defendant seeks this Court to resolve whether Rockwell's allegedly passive condoning of VARs re-selling of non-conforming U.S. goods confuses consumers and relieves Radwell of infringement liability. Case law from other Circuits fills in the *Iberia* guidance.

Since both parties seek summary judgment on the trademark infringement issue (*See supra* Table 1), this Court does not review the facts relating to infringement in a light favorable to either, but "[i]f upon review of cross motions for summary judgment, we find no genuine dispute over material facts, then we will **[*41]** order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts." *Iberia*, 150 F.3d at 302.

Defendant has urged the relevance of *SKF USA Inc. v. International Trade Commission*, 423 F.3d 1307 (Fed Cir. 2005) because it established a defense to trademark infringement when the mark holder's own nonconforming sales in the U.S. were above a certain percentage of its total U.S. sales. This Court considers such case law in its review of Radwell's defense to infringement.

In *SKF*, the Federal Circuit affirmed the ITC decision that the alleged infringer's importation of SKF gray goods, i.e., ball bearings, did not violate §337 (19 U.S.C. §1337). The ITC rationale was, not all or substantially all of the mark holder's own ball bearings sold or condoned for sale in the U.S. bore the material differences of its conforming U.S. goods, which the ITC found determinative in creating consumer confusion as to the source of the goods and relieving the alleged infringer of liability.

The relevant material differences were SKFs on-site technical services and hotline customer service. *SKF*, 423 F.3d at 1317. The ITC found dispositive that not all of SKFs U.S. sales done by its very own business unit, Chicago Rawhide, bore these extra services, which were actually discretionary and based on criteria chosen **[*42]** by SKF itself. *Id.* Importantly, the ITC decision hinged not on consumer expectations about receiving such extra services—and therefore on consumer confusion about not receiving them—but on the fact that not all, or substantially all, of SKF U.S. goods were "predictably and consistently" accompanied by material differences. *Id.*

Although not expressly defining the meaning of "substantially all sales", the Federal Circuit did reject the standard set forth in *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co*., 112 F.3d 1296 (5th Cir. 1997) that even one sale by, or condoned by, the mark holder of non-conforming goods relieves the gray goods importer of infringement liability. *Id.* at 1315-1316. Noting "the '*all or substantially all sales*' benchmark ...certainly permits a small amount of non-conforming goods". The Federal Circuit merely affirmed without much legal rationale, mainly because of SKF's discretion in deciding which customers got goods with material differences. *SKF*, 423 F.3d at 1317.

Partly because of that simplistic affirmance, the ITC finding that only 90% of all SKF U.S. sales were conforming has become the legal benchmark of when a mark holder's U.S. non-conforming sales suffice

to relieve infringement liability. Since SKF, the **[\*43]** Federal Circuit has, to a minor jurisprudential extent, refined this benchmark in a family of related cases involving Deere forage harvesters, starting with *Bourdeau Bros., Inc. v. ITC*, 444 F.3d 1317 (2006).[21]

In summary, *Iberia* provides that a single, non-pretextual material difference between authorized goods and unauthorized ones can justify a finding of trademark infringement. *SKF* fills in *Iberia* for the situation when not all or substantially all of the authorized U.S. goods are materially different from the unauthorized goods sold in the U.S. by a third party. From the *SKF* and the *Bourdeau-Deere* family of cases coupled with *Warner-Lambert*, the benchmark is that even 4.4% of non-conforming U.S. sales authorized by the mark holder does not vitiate a mark holder's claims of infringement, but 10% does.[22]

This review of relevant standards highlights those facts, if properly supported, which would resolve the parties' requests for summary judgment of Count I. They are:

1) whether Rockwell-branded PLCs sold by Radwell in the U.S. were materially different from conforming Rockwell PLCs sold in the U.S.; and

---

[21] There, the mark holder Deere had brought a §337 claim against its own European distributors for selling in the U.S. those Deere harvesters destined for the European market, and which materially differed from the harvesters authorized for sale in the U.S. *Id.* at 1320. In finding the European harvesters had infringed for lacking the material differences of the U.S. goods, the ITC issued an exclusion order.

On a first appeal, the Federal Circuit vacated and remanded the matter back to the ITC to require Deere to meet its burden of demonstrating either it had not condoned the importation of the European harvesters and / or the number of European-imported harvesters was small and not substantially all of its U.S. harvester sales. But, the Federal Circuit still did not expressly define what percentage of total U.S. sales constituted "not substantially all". *Id.* at 1325.

On the first remand, the ALJ found infringement because Deere had not authorized the importation of the European harvesters even though the number of European harvesters sold in the U.S. was so small as to have negligible effect on the goodwill of Deere's marks. *See Deere v. ITC*, 605 F.3d 1350 (Fed. Cir. 2010). The full ITC reversed the ALJ, finding Deere had indeed authorized the European harvester sales. The matter was again appealed. *Id.* at 1353.

On the second appeal, the Federal Circuit affirmed that Deere had so authorized the European harvester sales in the U.S but remanded for a second time to the ITC only for its proper calculation of the mark holder's non-conforming U.S. sales relative to the total U.S. sales, which devolved to this ratio:

Number of Deere European harvesters sold in the U.S.

Total number of Deere harvesters sold in the U.S.

*Id. at* 1358 - 1360. Deere had argued evidence to the ALJ that showed this ratio to be 141 / 1451, which meant the European harvesters sold in the U.S. constituted but 3.1% of all U.S.-sold harvesters. Deere had further argued to the ALJ that this percentage was insufficient to defeat its trademark claims against Bourdeau, relying on *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir.1996). There, the Second Circuit had found authorization of 4.4% of non-conforming sales to be small enough to allow the mark holder relief. Also, in its second appeal, the Federal Circuit agreed with Deere's argument.

On the second remand, as required, the ITC used the above ratio to determine whether that small percentage of non-conforming sales relieved infringement liability (*Id.* at 1359-1361) and in particular whether "96.6 to 96.9% [of sales that are conforming] is 'substantially all.'" *Id.* at 1362. Specifically, the ITC found that since the 96.6% of all U.S. sales were conforming, Deere's trademark infringement claims were viable.

There was a third appeal to the Federal Circuit, this time by Bourdeau, but that court affirmed the ITC's finding.

[22] However, there is still a lack of clarity as to how much more than 4.4% and less than 10% of the mark holder's nonconforming sales in the U.S. preserves trademark infringement liability.

2) whether Rockwell condoned **[*44]** sales of non-conforming PLCs in the U.S., and if so, what percentage of Rockwell's total U.S. PLC sales were non-conforming.

**1) Were Radwell's PLCs sold in the U.S. materially different from Rockwell-authorized, that is, conforming PLCs sold in the U.S.**?

First, Radwell does not dispute it lacks Rockwell's authorization to sell Rockwell-branded PLCs in the U.S. and that such PLCs bear Rockwell's asserted marks. ECF Doc. 528-1:1-2 (Radwell's Statement of Material Facts Not in Dispute); *see also* ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 24 (ECF Doc. 530-26) in which Radwell admits it is not an authorized Rockwell Dealer. It is also undisputed that Radwell sells PLCS in the U.S. bearing Rockwell's asserted marks.

Rockwell declares it attaches three material differences to its U.S. PLCs sold in the U.S.by its ADs or itself: its manufacturer warranty; its post manufacture quality control measures; and its product safety, recall and security notices that address safety issues. ECF Doc. 530-1:6-7; 14-16; and 30-32 (Rockwell's Statement of Material Facts Not in Dispute); *see also* ECF Doc. 140 ¶34 (the Complaint).

Rockwell also asserts that the Rockwell-branded PLCs Radwell sells in the **[*45]** U.S. lack these. ECF Doc. 530-1 ¶38 [different warranty because Rockwell does not extend its warranty to unauthorized PLCs]; *Id.* ¶¶86-92 [Radwell products lack disclaimers about their chain of control and ownership and whether they are factory new or not]; *Id.* ¶121 [Radwell admits it does not notify customers of product safety notices or bulletins as Rockwell alleges it does through its AD network.

Second, this Circuit's standard of review in *A&H Sportswear* for consumer confusion when marks of the conforming vs. non-conforming goods are identical compels this Court to find Radwell goods, because they were unauthorized, created consumer confusion as to source.

Third, in addition to this finding, Rockwell has demonstrated there is no genuine dispute of material fact that Radwell is liable for trademark infringement under *Iberia*: the absence of any of these material differences in Radwell's nonconforming goods sold in the U.S. would harm the goodwill of the asserted marks. To that end, Rockwell's survey expert found that 78% of his survey respondents (which included hundreds of purchasers of industrial, electrical, and electronic control equipment, and which this Court recognizes as potential **[*46]** consumers) reported that the original manufacturer's warranty was important / very important to their purchasing decision. If that warranty were absent, 73% said they would no longer be interested in purchasing. ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 30 (Witness Statement of David Franklyn) at Q68-69.

Radwell disputes whether Rockwell actively offered or could oversee effectively the transmission of two of these material differences, the quality control measures and the safety notices. ECF Doc. 596-1:7, 8-10 (Defendant's Response to Plaintiff's Statement of Material Facts Not In Dispute).[23]

The importance of a warranty, however, as a material difference that can affect the goodwill of the marks cannot be disputed. Radwell itself offers its own warranty on the unauthorized Rockwell PLCs it sells and

---

[23] However, Rockwell notes: Radwell admits quality control of the PLCs is important to customers and does not dispute its nonconforming products do not bear Rockwell's post-manufacturing quality control. ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 33 (Deposition of Jason Larsen, a Radwell employee with authority to represent Radwell before the ITC and self-reporting as Radwell's previous quality assurance manager, 28 Feb 2018) 93:19-94:2; 115:14-116:1; 118:4-119:4; 121:11-122:17; 279:1-9; 309:7-310:20 (addressing quality control); 424:9-425:17.

its president admitted a product warranty is important. ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 22 (Deposition of Brian Radwell, 14 Feb 2018) 99:15-19; 105:16-20). To that end, Radwell provides its own warranty. *Id.* at 98:3-20. This Court therefore finds that at a minimum Rockwell's product warranty is a material difference between authorized and unauthorized PLCs sold **[*47]** in the U.S.[24]

If Radwell could assert no defenses, the material difference of Rockwell's warranty on conforming goods vs. its absence on non-conforming goods would resolve finally Radwell's trademark infringement under *Iberia*.

**2) Whether Rockwell condoned non-conforming sales in the U.S. and what percentage of its total U.S. PLC sales were non-conforming**.

However, as *SKF* and the *Deere-Bourdeau* family of cases demonstrate, the defense for alleged trademark infringers requires a showing of the mark holder's toleration of non-conforming sales, which must equal 10 % or more of the total U.S. sales.

In asserting the defense, Radwell's argument is this:

- Once an AD buys a Rockwell PLC, the material differences pass to the ADs. Because of the ADs contractual obligations with Rockwell, when the ADs sell the PLC to a VAR, the material differences pass to the VAR.

- Importantly, Radwell alleges, as the vast majority of VARs have no contract either with Rockwell or the ADS, a VAR has no contractual obligation to pass on the Rockwell warranty (or incidentally other material differences) to the end-user.

- In short, since the VARs are not routinely obligated to pass on the warranty, Rockwell relies on **[*48]** the discretion of the VAR to pass the warranty on to end-users.

- Whenever a VAR buys an authorized Rockwell PLC in the U.S., the material differences accompanying that PLC may, at the VARs option, not reach the end-user. This lack of control by Rockwell over the routine, systematic transfer of material differences to every end-user prompts Radwell to re-define any resale by a VAR as non-conforming, whether Rockwell-condoned or not and regardless of Rockwell's efforts to have its ADs police VARs for non-value-added resales. ECF Doc. 528: 19-21 (Radwell's Summary Judgment Motion); *see also* ECF Doc. 596-1:7 -8 (Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute);

- since Rockwell has no control over whether VARs pass on the material difference, to wit the Rockwell warranty, end-users would consider all of Rockwell's PLCs non-conforming; and.

- to the point, the authorized Rockwell PLCs sold in the U.S. to VARs amount to about 70% of its total U.S. sales, which under *SKF* and the *Deere-Bourdeau* line of cases relieves Radwell of infringement liability. ECF Doc. 528:22 (Radwell's Summary Judgment Motion).

As for condoning a VAR "bare" resale, i.e., when the VAR has **[*49]** not added value, Rockwell alleges it took reasonable efforts to monitor and protect the brand against unauthorized resale by VARs. For example, it methodically sends letters from time to time to those VARs termed system integrators,

---

[24] In so doing, the Court makes no finding here about whether absence of the other two material differences harm or not the goodwill of the asserted marks, which plaintiff may seek to adjudicate.

warning them not to resell the product to their customers except for a value-added use. In fact, Rockwell cites several instances of its detection that certain VARs, without adding value, were re-selling Rockwell PLCs to end-users, including Radwell, and that it had expended money and resources to investigate the origins and reasons for such sales and to end them. ECF Doc 530-1: 64-71 (Plaintiff's Statement of Material Facts Not in Dispute). Particularly salient are statements made by Kathleen Bentley, Rockwell's Director of Global Programs, whose job was to investigate alleged sales of gray market goods and to enforce Rockwell's policy prohibiting unauthorized resale of Rockwell's goods to end-users. *See* ECF Doc. 530-1:68-77, in which Ms. Bentley testified in the ITC 1074 investigation on 1 Jun 2018—one month BEFORE Radwell's stipulated consent order with the ITC[25] — as both a Direct and a Rebuttal Witness about at least 4 separate investigations that Rockwell **[*50]** conducted into VARs resales to end-users, including Radwell. For example, Ms. Bentley testified that Rockwell actually sent a person to Rochester Industry, a VAR located in China, only to discover there was no such entity, the given address was an empty apartment, and its given U.S. address was an empty lot in Rochester, New York. *Id.* at 70.

To the point, allegations in Radwell's own Counterclaims, while focused on showing Rockwell's alleged antitrust violations, nonetheless confirm Rockwell's engagement with its ADs to monitor and protect its brand from improper resale. ECF Doc. 222 ¶¶154-157. Particularly, Radwell emphasizes that not only do the AD distributor contracts create distributor exclusivity in the U.S. but obligate ADs to report to Rockwell the particulars of each sale so that Rockwell can review whether the VAR / end-user might be acting "competitively", in other words., engaging in "bare" resales. *Id.*¶¶ 161-169. Moreover, that Rockwell with some of its ADs created a decades-long, stable, working group devoted to looking into the kinds and quantity of unauthorized sales bespeaks Rockwell's lack of tolerance for such sales, particularly because, as Radwell notes, they erode Rockwell's **[*51]** own revenue. Id. ¶¶ 146-149.

Radwell alleges that even a cursory investigation by Rockwell into the behavior of certain VARs, such as CCED and others, would have revealed to Rockwell that these VARs were in the business of bare re-selling of Rockwell PLCs to end-users. ECF Doc. 528-1¶¶55-57 (Radwell Statement of Material Facts Not in Dispute). Radwell seems to imply that, since CCED had been in that business for long enough to sell millions of dollars of non-conforming goods, Rockwell either must have known about CCED's "real" business or was quite careless in its investigations.[26] Radwell misses the mark with this implication. *Iberia, SKF* and the *Deere-Bourdeau* case family do not require diligence in preventing nonconforming sales but simply turning a blind eye tolerance to them.[27]

---

[25] Radwell has requested to exclude evidence from the ITC 1074 investigation AFTER its consent order, dated 12 July 2018. Radwell argues that evidence collected in this ITC investigation cannot pertain possibly or logically to Radwell. Taking into account that Radwell could neither have rebutted nor been afforded due process for such evidence taken after this date, the Court does not consider testimony in the ITC 1074 investigation dated AFTER Radwell's consent order. However, Rockwell testimony before that date would have been afforded Radwell's cross-examination, review, and due process to rebut and correct. Therefore, Ms. Bentley's testimony, taken before Radwell's consent order and laid open to Radwell's review and objection, must be considered admissible here.

[26] When it learned that CCD, a Rockwell AD bound by its AD agreement, was selling unauthorized gray goods to Radwell, Rockwell sued CCD in Federal District Court for violating its agreement. ECF Doc. 530-3 (Declaration of Paul Tanck), Exhibit 9 (Rodney Michael Direct Witness Statement in the ITC 1074 Investigation at Q97, dated 1 June 2018). Rodney Michael was testifying as Rockwell's Director of Global Market Access.

[27] Moreover, testimony by Rodney Michael (*see supra* n. 21) during the ITC 1074 investigation belies Radwell's assertions of Rockwell's lack of diligence in following up suspicions that a particular VAR, LEC, was actually not adding value to customer-requested installations/systems. ECF Doc. 529-1 (Declaration of Peter Shapiro), Exhibit 1: 73-89 (Deposition [individual] of Michael Rodney in the ITC 1074 Investigation, dated 1 February 2018 [before Radwell's consent order]) [testifying to how Rodney actually confirmed LEC was a front for re-selling Rockwell PLCs].

Unlike here, in *SKF* and *Deere-Bourdeau*, the mark holder's non-conforming sales reveal a telltale tolerance. *SKF* and *Deere-Bourdeau* do not detail the mark holder's attempts to investigate and stop the non-conforming third party sales, let alone employ a manager whose sole function was to look into non-conforming gray goods sales and work with the ADs to end them. ECF Doc 530-1: 64-77 (Plaintiff's Statement **[*52]** of Material Facts Not in Dispute).

The Court finds that, since both parties disclose Rockwell's efforts to ferret out and terminate non-conforming sales—albeit with different reasons for the disclosure—there can be no genuine dispute of material fact that Rockwell did not condone non-conforming sales of its PLCs in the U.S.

But, that's a relatively minor part of the inquiry. Of greater import to Radwell's defense to trademark infringement is its allegation that all of Rockwell's authorized sales to the VARs are non-conforming because a VARs transfer of a material difference to the end-user relies on the discretion of the VAR. Radwell's argument attempts to re-create the *SKF* scenario whereby the material difference accompanying a conforming good is passed on only via discretion and not regularly. If supported by the facts, this allegation would negate Rockwell's showing of no tolerance for non-conforming sales and sustain Radwell's defense to trademark infringement.

The material fact determinative of Radwell's trademark liability is whether substantially all of Rockwell PLCs are sold to Rockwell's customers with a warranty. Radwell says no, they weren't. Rockwell says yes, they were.

At **[*53]** first glance, this disparity appears to raise a genuine dispute of material fact. However, as *Celotex*, 477 U.S. at 322-23 directs, Radwell, as movant of a summary judgment for non-infringement, must show that warranties do not attend substantially all of Rockwell's new, authorized PLCs sold in the U.S.. Also as *Celotex* directs, since Radwell must make this showing at trial, it is Radwell's burden to demonstrate this fact here. *Id.* If Radwell fails to show this essential element of its defense against trademark infringement, "all other facts are immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir.1992).

To be clear, this required showing by Radwell does not contradict or lessen Rockwell's burdens of proof required by *SKF* or the *Deere-Bourdeau* cases. That is, as movant of a summary judgment in favor of infringement, Rockwell bears the *SKF* burden of demonstrating Radwell has no defense because substantially all of its new, authorized PLCs sold in the U.S. entailed warranties to its

customers.

At this point, that the parties bear competing burdens does not necessarily translate into a genuine dispute of material fact. Only if both parties meet their burdens of proof as to whether warranties were or not included in substantially all U.S. sales will a genuine **[*54]** dispute of material fact emerge.

Both parties assert that Rockwell sells 5% of its authorized product in the U.S. directly to end-users and the rest to its ADs. ECF Doc. 528:9-10 (Radwell Summary Judgment Motion); ECF Doc. 635:6 (Radwell Reply in Support of its Summary Judgment Motion). Radwell also asserts that 70% of the PLCs sold to ADs eventually reach end-users by way of VAR "resales", which Radwell characterizes as "non-conforming". ECF Doc. 588: 9 (Radwell Opposition to Rockwell SJ Motion). Radwell further avers end-users receive no warranty from VARs.

Therefore, if this assertion is accurate, at least two-thirds of all authorized Rockwell sales in the U.S. are not conforming. This assertion, however, is not backed up by facts, but is merely Radwell's alternative

interpretation to the behavioral / economic reality of how Rockwell sells and warrants PLCs in the U.S., which relies on the following information from Rockwell Manufacturer's Warranty ECF Doc. 530-3 (Declaration of Paul Tanck) Exhibit 25 (Rockwell's Warranty) which states "The following manufacturer's warranty [which is 1-year for hardware] is extended to customers purchasing Allen-Bradley® or Rockwell Software™ Products **[*55]** (including related services) directly from Rockwell Automation or an authorized Allen-Bradley distributor; and a statement made in a deposition during the ITC 1074 investigation. ECF Doc. 529-1 (Declaration of Peter Shapiro), Exhibit 1: 73-89 (Deposition [individual] of Rodney Michael, Rockwell's Director of Global Market Access in the ITC 1074 Investigation, dated 1 February 2018); and *See* Declaration of Paul Tanck, Ex. 20 (Deposition of Rodney Michael, 27 March 2018) at 71:3-72:5) ("I said that the OEM might offer a two-year warranty on the product. That's their prerogative. But if the product fails within the warranty period that we've given the OEM and the customer returns it to them, **we will honor that warranty through the OEM.**")) [emphasis added].

To the point, Radwell's alternative interpretation relies on its legalistic conviction that, if Rockwell does not have a contractual, i.e. formal, obligation to provide the end-user the benefit of its warranty, then the warranty cannot possibly pass from AD to VAR and then from VAR to end-user to thereby accompany the PLC. That is, Radwell's assumption is that only a contractual obligation to the end-user can create a passing of the **[*56]** warranty. Further, this legalistic assertion that the end-user must receive Rockwell's formal obligation of warranty fully grounds Radwell's reframing of the function of the players in Rockwell's distribution chain. To that end, Radwell characterizes VARs not as **Value-added** resellers, but as simple ("bare") resellers, because no legal obligation requires them to pass their warranty on to end-users.

Radwell also re-characterizes Rockwell's business model in such a way as to assert the Rockwell warranty could passes ONLY to its ADs because Radwell construes ADs as first "buyers" in the distribution chain. This re-characterization is assertion only, not supported by the business realities, and in effect inaccurate describes how Rockwell characterizes its sales to ADs and how ADs function in Rockwell's distribution chain. This is because, although ADs are independent contractors, ADs function as Rockwell's distribution agents of IP-containing goods because of the very obligations they agree to in the AD agreement. ECF 531-3, Exhibit 27. Put differently, Rockwell "licenses" ADs the right to sell its marked goods and gives them a discounted price for the IP-containing goods in exchange for **[*57]** the AD's promise not to sell to "bare" resellers. To be clear, Rockwell does not specify that it gives AD a license, but it may be inferred that is what Rockwell does. Because of that, Rockwell does not regard its selling PLCs to ADs as "the first sale" to which a warranty is attached. Rather, Rockwell's sales to ADs is the pre-requisite of creating a distribution chain through which PLCs are offered for sale. To the point, Rockwell considers sales from an AD to a VAR as the "first sale" accompanied by its warranty and other material differences. Rockwell consequently regards VARs as its customers. In addition, the Rockwell Director of Global Market Access, Rodney Michael, testified that Rockwell provides warranties for all new sales of authorized U.S. PLCs even those sold by ADs outside their territory but within the U.S. ECF Doc. 591 (Declaration of Paul Tanck), Exhibit 60:Q55-56 (Rodney Michael Rebuttal Witness Statement in the ITC 1105 Investigation [which Radwell requested to initiate].

As stated above, Radwell's reinterpretation of Rockwell's business model also includes a re-labelling of the VAR's function such that the VAR becomes a "bare" re-seller. Such re-labelling fails **[*58]** to recognize the reality that a VAR sells a product / service fundamentally different from the actual PLC, which is but a part in the VARs installation. Equally distorting is Radwell's interpretation that the end-user must necessarily be Rockwell's customer, which then equates the end-user to be both Rockwell's customer and the legal consumer likely to be confused. Ultimately, Radwell must equate the customer with the consumer in Rockwell's distribution chain in order to create a "factual" basis for its assertion that Rockwell warranties do not flow to the "consumer". But, Radwell's re-labelling of the levels in Rockwell's

distribution chain is simply interpretation, and does not evidence how Rockwell's warranty obligations actually flow.

Although undisputed that Rockwell does not have an executed written contract with each VAR that buys from an AD, having such an agreement would be akin to having a contract with EACH purchasing customer. Radwell asserts this fact as proof that Rockwell does not extend a warranty to each "consumer". But, as clarified above, this is an ideation that misstates the business reality, which is that it is VARs that are Rockwell's customers and that Rockwell **[*59]** does indeed extend a warranty to every entity that purchases a PLC in the U.S., whether the sale occurs via an AD to a VAR as customer or as a direct sale from Rockwell to an end-user, as customer.

In the final analysis, Radwell's defense against infringement rests on the assertion that Rockwell's warranty does not flow from the VARs to the end-user and cannot do so in the absence of a contractual obligation between Rockwell and the end-user. But, that is neither supported by the facts nor sheds light on how Rockwell PLCs in a VAR installation are actually warrantied. There is no need for a VAR to be bound in an agreement with Rockwell to receive the warranty because Rockwell offers its special discounted pricing to a VAR (available exclusively from an AD) ONLY if the VAR promises not to engage in "bare" sales but to sell the PLC as part of its value-added installation / service. Thus, a VAR ONLY gets to buy a discounted PLC and become Rockwell's "first purchaser" and "customer" when it has engaged in a bargained-for exchange with Rockwell, which may or not be formalized in writing. Put differently, every VAR has a *quid pro quo* relationship with Rockwell in which there is a promise **[*60]** exchanged for a warranty: buy at a discount price and get Rockwell's warranty if one obligates oneself not to sell the PLC in a "bare" sale.

This bargained-for exchanged is the key fact that shows each VAR's installed PLCs is indeed warrantied. The facts show that Radwell has not backed up its interpretation that Rockwell does not honor its warranties with evidence that would show that to a jury, as *Celotex* requires. In addition and importantly, the facts also show that the end-user gets the benefit of Rockwell's warranty even if the end-user is not the actual recipient of the warranty. To clarify this with a simple analogy: when the motherboard in a consumer's laptop from, for example Acer, becomes corrupted within the warranty period, Acer does not refuse to fix the laptop because the motherboard came from Intel or Qualcomm. Rather, Acer takes back the computer and works with the motherboard manufacturer, **with whom Acer has the warranty**, to fix the motherboard or replace it. An even simpler analogy is: when a consumer's Maytag dishwasher goes on the blink within the warranty period, Maytag replaces the motor (or whatever broke) because Maytag has a warranty with the motor manufacturer. **[*61]** Such replacement is not a "bare" sale but repair under a warranty.

Likewise, in this case, even if the warranty period has run on the Rockwell PLC but the end-user now needs a new PLC, the VARs replacement of the out-of-warranty PLC is still not a "bare' sale but simply a repair of its value-added installation with a new PLC for which Rockwell gives the VAR a new warranty. The point here is that, in a machine, a factory installation or a panel built by a VAR with a Rockwell PLC, the end-user itself doesn't go back to Rockwell to get the installation fixed, but to the VAR which in turn reverts to Rockwell. To run the point to ground, the VAR that builds the installation, etc. is like Whirlpool to whom the customer reverts when the dish washer breaks within the warranty period. The VAR can then revert to Rockwell for a PLC repair or replacement within the Rockwell warranty period. And if the warranty period has ended, the VAR may replace the PLC with a new one bought from an AD and which now has a new warranty.

Moreover, for downstream repair scenarios, Radwell also asserts, without a showing of facts, that, since VARs do not predictably get a warranty from Rockwell, then the consumer **[*62]** cannot possibly be assured of a warranty on the PLC. For the reasons discussed above, the relationship between Rockwell and its VARs is not comparable to the situation in *SKF*. Here, there is NO discretion as to whether Rockwell honors its warranty to VARs so long as they abide by the bargained-for exchange. There can be **no** confusion to and by the end user that the PLC installed, replaced, or repaired in its value-added installation is in fact covered by a Rockwell warranty, regardless of the pathway by which the warranty is honored.

Radwell has elicited no facts to detail how VARs extend Rockwell's warranties to the end-user. Nor has Radwell evidenced that Rockwell does not honor its warranty consistently whenever the VAR notifies Rockwell of a problem with the installed PLC. However, Rockwell has provided testimony that a VAR, as Rockwell's customer, expects Rockwell to honor its warranty on the PLC upon a customer complaint from the end-user and does in fact honor its warranty with the VAR. *See* Declaration of Paul Tanck, Ex. 20 (Deposition of Rodney Michael, 27 March 2018) at 71:3-72:5) ("I said that the OEM might offer a two-year warranty on the product. That's their prerogative. **[*63]** But if the product fails within the warranty period that we've given the OEM and the customer returns it to them, we will honor that warranty through the OEM.")) To the point, Radwell does not dispute this testimony.

The undisputed material facts show Rockwell has met its burden under both *Celotex* and *SKF*, whereas Radwell has not met its burden. It is undisputed from the AD agreement and undisputed testimony from Rockwell managers that Rockwell consistently extends a warranty to every one of its VARs, i.e., its customers, that are entitled to buy PLCs at a discounted price. No VAR gets to install Rockwell PLCs into its value-added installation unless it has agreed to at least an informal bargained-for exchange with Rockwell. Since 95% of all Rockwell sales are executed by ADs to VARs, and all such VARs must promise not to engage in "bare" sales to become eligible to buy PLCs, **ALL** 95 % of Rockwell's total PLC sales to VARs must be deemed conforming because a material difference, the Rockwell's warranty, necessarily and indisputably accompanies each sale. Accordingly, Radwell can have no defense to trademark infringement as delineated in *SKF* and *Deere-Bourdeau* because Rockwell does not **[*64]** condone or actually allow more than 5% of its total U.S. PLC sales to be non-conforming. Moreover, neither can the remainder 5% of U.S. PLC sales made by Rockwell itself be seen as nonconforming because they are made directly to end-users and carry Rockwell's warranty.

Since the total number of Rockwell's U.S. PLC sales fall well within the percentage considered by *SKF* and *Deere-Bourdeau* as NOT SUBSTANTIALLY ALL, this Court finds that Radwell is liable for trademark infringement and lacks a defense to that liability. Accordingly, the Court grants Rockwell's motion for summary judgment of Count I for trademark infringement, and denies Radwell's motion for summary judgment of no trademark infringement under that Count.

## 4.3.2 Count II: False Advertising

Rockwell also seeks summary judgment on Count II of the complaint (ECF Doc. 140 ¶¶ 4017-411) under § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).[28] Rockwell alleged Radwell falsely marketed

---

[28] 15 U.S. Code § 1125. False designations of origin, false descriptions, and dilution forbidden

(a) Civil action

Rockwell's nonconforming PLCs—i.e., those lacking Rockwell's warranty—as legitimate Rockwell products to unsuspecting consumers. *Id.* In the Third Circuit, a plaintiff establishes a false advertising claim[29] by showing:

1) defendant made false **[*65]**  or misleading statements as to his own product [or another's];

2) actual deception or at least a tendency to deceive a substantial portion of the intended audience;

3) the deception is material since it is likely to influence purchasing decisions;

4) the advertised goods traveled in interstate commerce; and

5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Warner-Lambert v. Breathasure*, 204 F.3d 87, 91-92 (3d Cir.2000) [*citing Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3d Cir.1994)].

The standard of proof for liability under the Lanham Act depends on the type of relief sought. *See Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648-49 (3d Cir. 1958); *see also Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F.Supp. 2d 384, 480 (D.N.J. 2009) [*quoting Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997) ("A plaintiff suing to enjoin conduct that violates Lanham Act need not prove specific damage. In contrast, courts require a heightened level of proof of injury in order to recover money damages.")]. In its complaint (ECF Doc. 140 ¶419), Rockwell seeks injunctive relief[30] *(Id.* at Prayer for Relief at §B (b), (d), and (e)) and damages.[31] *Id.* Prayer for Relief at §D (1) damages. Consequently, in considering this count, the Court looks to Rockwell's showing of specific damage within the context of demonstrating the five elements below.


## 1) Falsity

A false or misleading statement supports a cause of action **[*66]**  under the Lanham Act if it is "either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Groupe SEB*

---

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person [THIS SECTION PROHIBITS **FALSE DESIGNATION**], or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act [THIS SECTION PROHIBITS **FALSE ADVERTISING** ]

[29] In the Third Circuit, different standards govern false designation and false advertising. *Mun. Revenue Serv., Inc. v. Xspand, Inc.*, 700 F. Supp. 2d 692, 716 n. 45 (M.D. Pa. 2010) [*citing Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1021 (3d Cir 2008) ["In fact, (a) (1) (A) requires only a likelihood of confusion whereas claims of impliedly false statements under (a) (1) (B) require showing actual confusion or misleading statements."]].

[30] to prohibit Radwell's use of Rockwell's marks or other source identifying indicia to market, advertise or designate the origin of products

[31] to be determined, that Rockwell has suffered as a result of Radwell's sales and marketing of Unauthorized Rockwell Products

*USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014) [internal quotations omitted] [*citing Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)]. If unable to prove the claim literally false, the plaintiff must prove the statement to be deceptive or misleading. "A determination of literal falsity rests on an analysis of the message in context." *Rhone-Poulenc Rorer Pharms.*, 19 F.3d at 129 [*citing U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir. 1990). In analyzing that context, courts in this Circuit consider "whether statements are false or misleading at the time they are made." *Bracco Diagnostics Inc.*, 627 F.Supp. 2d at 464 [internal quotation marks omitted]. "[O]nly an unambiguous message can be literally false." *Novartis*, 290 F.3d at 587. A literally false statement can be either expressed or imply in its entirety to the audience a claim as clearly as if it had been explicit. *Id.*

In the complaint, Rockwell alleges some examples of Radwell's false advertising. ECF Doc ¶¶ 307-308, 337, 339, 341. For example, Radwell advertised the nonconforming Rockwell-branded products it sells as "FNFP — Factory New Factory Package / Factory Warranty." (Exhibit J at 4.). In addition, there is evidence Radwell knew it was giving false information. Radwell's lead inventory manager, Jenna DiBernardo, emailed Edward Iannuzzi, Radwell's **[*67]** Global Purchasing Manager, stating: "I feel like we're shooting ourselves in the foot by sending [customers] what is essentially surplus and calling it [factory new]" and "I don't necessarily agree with the product that we are sending out all the time is [factory new]." In response, Ed Iannuzi replied to her that selling products in this manner was directed by Brian Radwell, Radwell's President and CEO. ECF Doc. 595-1 ¶17 (Plaintiff's Supplemental Statement of Material Facts) citing ECF Doc. 530-3 (Declaration of Paul Tanck, Exhibit 14, (Jenna DiBernardo email to Edward Iannuzzi et al. dated Feb 2016)). Radwell does not dispute this.

As discussed above for Count I, Radwell does not and cannot sell a Rockwell-branded product having a Rockwell factory warranty since it is neither a Rockwell AD or a VAR engaged in a bargained-for exchange with Rockwell. Although Radwell has since amended its website (ECF Doc. 140 ¶307 n. 4) to remove this falsity, nonetheless the Lanham Act applies to the statement at the time it was made. *Bracco Diagnostics Inc.*, 627 F.Supp. 2d at 464. Consequently, the Court finds this Radwell statement literally false.

In addition, Rockwell alleges Radwell falsely advertised in its product catalogs, especially for **[*68]** October 2011, that Radwell's Factory New Factory Package ["FNFP"} products come with a "factory warranty. ECF Doc. 104 (Complaint) ¶307 *citing* ECF Doc. 104-11, Exhibit K at 1, 5 (excerpt from Radwell's October 2011 catalog).**)**337. For the reasons stated above, the Court also finds Radwell set forth literally false statements in these catalogs directed towards consumers.

Moreover, at the time of the complaint (at least as late as 28 March 2017), Radwell had changed its marketing description of Rockwell-branded products to advertise four levels of these, based on their newness. Rockwell alleges that for each level of product Radwell offered a misleading statement. For example, for the newest, unused products, Radwell stated that "the Original Manufacturer's warranty **may** not apply" (emphasis added). ECF Doc. 104 (Complaint) ¶341. Knowing it was neither an authorized distributor nor a VAR, and its sales could not be entitled to a Rockwell warranty, such a statement cannot be termed ambiguous because Radwell could have known ONLY that Rockwell's manufacturer warranty would **never** apply to Radwell goods. In considering the entire context of this statement, the Court also finds this Radwell **[*69]** statement literally false and therefore that Rockwell has shown the element of falsity.

## 2) Deception of a Substantial Portion of the Intended Audience

As to the second element, if a plaintiff proves that an advertisement is unambiguous and literally false, actual deception or a tendency to deceive is presumed. *Pernod Ricard*, 653 F.3d 241, 248 (3d Cir. 2011); *Novartis*, 290 F.3d at 586. In such a situation, the Third Circuit has not required a plaintiff to produce a properly conducted survey to demonstrate actual deception. *See Novartis*, 290 F.3d at 587 [*finding* a plaintiff is not required to produce and rely on a survey when "consumer deception can be determined by examining the ...advertising on its face"]. Besides the presumption of actual deception based on Radwell's false statements, as discussed in the previous paragraph, there is evidence of intent to - deceive from the DiBernardo-Ianuzzi email exchange. The Court finds Rockwell has shown this element.

### 3) Materiality

"The materiality inquiry focuses on whether the false or misleading statement is likely to make a difference to consumers." *Bracco Diagnostics*, 627 F.Supp.2d at 478 (internal quotations omitted). Similar to the discussion of element two, materiality can be presumed from a literally false statement for a claim of injunctive relief. *U.S. Healthcare*, 898 F.2d at 922; *see also* Bracco Diagnostics, 627 F.Supp. 2d at 478 **[*70]** ["Once it is determined that a statement is false, it is presumed to be material" [citing *Telebrands Corp. v. E. Mishan & Sons*, No. 97-1414, 1997 U.S. Dist. LEXIS 6229, 1997 WL 232595, at *22 (S.D.N.Y. 7 May 1997)]]. The Second Circuit has provided further guidance that a statement is material when "the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiffs." *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 70-71 (2d Cir. 2016) [*citing Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980)].

Radwell having stated untruths in its advertising, those statements are presumed material under Third Circuit case law. Even assuming *arguendo*, Radwell's statements are not material, under Second Circuit guidance adopted in this Circuit, the materiality element of false advertising is further scrutinized not only under a falsity lens but also with the considerations of competition between the parties and the likelihood defendant's advertising would draw consumers to prefer its products over Rockwell's. Inasmuch as Radwell advertises to the end-user re-sale prices that are cheaper than Rockwell prices AND that a factory warranty is attached to the cheaper Rockwell product, there can be no reasonable inference that Radwell's advertising, even if ambiguous, is not material. The Court finds Rockwell has met this element.

### 4) Travel in Interstate Commerce

Radwell states that it does business in interstate commerce. ECF Doc. 222 (Radwell's Answer and Counterclaims). Rockwell does not dispute this. Plaintiff has satisfied this element.

### 5) Injury

Under both false advertising and false designation standards, **[*71]** a plaintiff must plead and demonstrate "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140, 134 S.Ct. 1377, 1395, 188 L. Ed. 2d 392. The *Lexmark* Court held that a plaintiff demonstrates proximate causation in Lanham Act cases by showing "economic or reputational injury flowing directly from deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133, 134 S.Ct. 1377, 1391.

Rockwell describes two situations in which large, sophisticated corporate consumers, Anheuser-Busch and Universal Studios, bought PLCs from Radwell unaware the Rockwell warranty and other material differences were not included. Upon their complaint to Rockwell about the lack of quality of the Radwell products, Rockwell informed them these products were non-conforming and lacked Rockwell warranty and other add-ons. Anheuser-Busch then purchased a replacement from a Rockwell AD. For Universal Studios, Rockwell replaced the part free of charge. ECF Doc. 530-1 ¶¶255-256 (Rockwell's Statement of Material Facts Not in Dispute *citing* ECF Doc. 530-3 Declaration of Paul Tanck, Exhibit 9 at 128 (Rodney Michael Direct Witness Statement **[*72]** in the ITC 1074 Investigation, dated 1 June 2018)).

These examples illustrate Radwell's claims of factory new warranty and cheaper price caused even large end-users, who are likely sophisticated purchasers, moved their trade from Rockwell. It may also be inferred that Rockwell felt compelled to replace the Radwell part because not to do so would have incurred damage to the goodwill of Rockwell's mark. While these two instances by no means constitute a consumer survey or a specific survey of Rockwell's end-users, as in *Newborn Bros. Co., Inc., v. Albion Engineering Company*, No. 12-2999 (NLH/KMW) 481 F. Supp. 3d 312, 2020 U.S. Dist. LEXIS 153456, 2020 WL 5015571 at *32-33 (D.N.J. 25 August 2020), the Court nonetheless arrives at an obvious conclusion that less sophisticated, direct purchasers would also have been so moved to buy Radwell products because of the cheaper price and deceptive advertising. The Court finds Rockwell has met the element of specific injury.

Radwell's response to this Count relies on its assertion that it cannot be liable for trademark infringement because the majority of Rockwell's own PLC sales in the U.S. were non-conforming for lacking a warranty, as discussed *supra*. In essence, Radwell argues, because of the lack of a Rockwell warranty on most of the PLCs Rockwell sold in the U.S., Radwell's own non-conforming **[*73]** PLCs can have incurred no economic or reputational injury to the goodwill of Rockwell's marks. ECF Doc. 588 at 8 (Radwell's Opposition to Rockwell's Motion for Summary Judgment). Moreover, Radwell argues that, since Rockwell has provided no consumer survey, especially of sophisticated, corporate consumers, it cannot imply or show consumers were misled by Radwell's advertisement. *Id.*

However, Radwell states an incorrect legal principle. See the discussion above of element 2, clarifying that when false statements are advertised, the Third Circuit does not require a consumer survey to demonstrate consumer deception, regardless of consumer sophistication. Alternatively, Radwell asserts, without more, there is a lack of evidence that any customer was injured.

In light of the Court's finding above that Rockwell has met its legal burden to show consumer deception, Radwell bears the burden of showing no consumer injury, which it has not met. It therefore does not raise a genuine dispute of material fact for this element. ECF Doc. 528-1 (Radwell's Statement of Material Facts Not in Dispute). Moreover, in ECF Doc 594-1 (Radwell's Supplemental Statement of Disputed Materials Facts) Radwell is silent **[*74]** about the false advertising claim. Considering the finding *supra* that Radwell's nonconforming goods were, and could not, be accompanied by Rockwell's warranty, Radwell's assertions do not rise to the level of evidence that no consumer has been injured and do not demonstrate a genuine issue of material fact.

Accordingly, the Court grants Rockwell's summary judgment motion as to Count II (False Advertising).


### 4.3.3 Count III: False Designation of Origin


**Count V: Statutory Unfair Competition under N.J. Stat. Ann. § 56:4-1 *et seq*.**

**Count VI: Common Law Unfair Competition**

Even though Radwell's motion (ECF Doc. 527) seeks summary Judgment on Counts I, III, V, VII, VIII, and X", Radwell's memorandum of law actually provides a combined argument regarding Counts I, III, V, and VI. ECF Doc. 528 at 23 [stating "CONCLUSION AS TO COUNTS I, IIII, V AND VI"]. In other words, Radwell's motion versus its memorandum of law seeks the Court's action on **different counts**.

Given that Radwell's brief does not present a separate argument for each of Counts III, V, and VI, but relies on *SKF* and *Bourdeau* to contend it is not liable for these counts because of its infringement defense, the Court assumes Radwell to apply its arguments for Count 1 to **[*75]** all three Counts, III, V, and VI.

As for Count III, a Lanham Act count, since Radwell's brief presents no standards of law for this, the Court assumes Radwell intended its discussion of the standard for trademark infringement to apply to this count. Moreover, Radwell has presented no evidence that demonstrate whether a genuine dispute of material fact exists for this count. Consequently, because of the finding that no defense to trademark infringement exists here, and since Radwell has not stated its trademark defense applies to false designation of origin, the Court must deny Radwell's summary judgment as to Count III's. There is insufficient demonstration whether a genuine dispute of material fact applies to this Count. The Court also notes it has not reviewed any material fact relating to this Count, which allows the Count to be presented at trial.

As for Counts V and VI, this Court declared in *Buying For the Home, LLC v. Humble Abode*, LLC, 459 F.Supp.2d 310, 317 (D.N.J. 2006) (Pisano, DJ) that "the elements of a claim of unfair competition under the Lanham Act are the same as for claims of unfair competition and trademark infringement under New Jersey statutory and common law." Because of the uniformity of legal standards across such claims, the *Humble Abode* court **[*76]** extended its trademark infringement analysis to the plaintiff's state law claims as well. *Id.* at 317-318 [*citing J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F.Supp.2d 358, 374 (D.N.J.2002) (the "elements for a claim for trademark infringement under the Lanham Act are the same as the elements for a claim of unfair competition under the Lanham Act and for claims of trademark infringement and unfair competition under New Jersey statutory and common law....") and *Harlem Wizards Entertainment Basketball, Inc. v. NBA Properties, Inc*., 952 F.Supp. *1084, 1091 (D.N.J.1997) (stating* "N.J.S.A. 56:4-1 is the statutory equivalent of Section 43(a) (1) of the Lanham Act")].

Recently, this Court adopted a similar approach in *Newborn Bros.*, 2020 U.S. Dist. LEXIS 153456, 2020 WL 5015571, at *39 n. 11. "The parties' briefs make no distinction between the Lanham Act claim and the unfair competition claim under New Jersey common law. The legal analysis is the same for both claims [citations omitted] ...Having concluded ... Plaintiff has made out its claims under the Lanham Act, the Court reaches the same conclusion regarding Plaintiff's state law claim without further analysis necessary." *Id.*

Guided by *Humble Abode* and *Newborn Bros.* and based on the discussion and decision *supra* on Count I for trademark infringement, this Court denies Radwell's motion for Summary Judgment as to, Count V (N.J. statutory unfair competition), and Count VI (common law unfair competition). To be clear, these Counts V and **[*77]** VI are summarily adjudicated here.


**4.4 Count VII: Tortious Interference with Contract**

**Count VIII: Aiding and Abetting Tortious Interference with Contract**

Rockwell seeks a grant of summary judgment on the Tortious Interference Counts, VII and VIII; Radwell seeks a denial. In interpreting New Jersey law, the Third Circuit has found "a plaintiff must demonstrate interference with a contractual relationship that is knowing, intentional, and wrongful. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir.1993) (citing *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir.1992); *Printing Mart-Morristown*, 563 A.2d at 37)." *Mylan Inc. v. Smith Kline Beecham*, 723 F.3d 413, 421 (3d Cir. 2013). Under New Jersey law, to prevail on a claim of tortious interference with contract (and the aiding and abetting thereof), a plaintiff must show the following five elements:

1) plaintiff's contract (or reasonable expectation of economic benefit or advantage);

2) defendant's knowledge of that contract or expectancy;

3) defendant's wrongful, intentional interference with that contract or expectancy;

4) reasonable probability the plaintiff would have received the anticipated economic benefit in the absence of interference, i.e. proximate cause; and

5) damages resulting from defendant's interference. *Fineman*, 980 F.2d at 186; *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 563 A.2d 31, 37 (N.J. 1989); *see also Amgro, Inc. v. Lincoln General Ins. Co.*, 361 F. App'x 338, 345 n. 9 (3d Cir.2010) [*quoti*ng *Velop, Inc. v. Kaplan*, 301 N.J. Super. 32, 693 A.2d 917, 926 (N.J.Super.1997)].

New Jersey courts have patterned this cause of action after **[*78]** the *Restatement (Second) Torts* §§ 766A and 766B. *See, e.g., Printing Mart*, 563 A.2d at 37; *Norwood Easthill Assocs. v. Norwood Easthill Watch*, 222 N.J. Super. 378, 536 A.2d 1317, 1319 (App.Div.1988). Element 3 is known as "malice" and is the *sine qua non* of this tort. *See Matrix Essentials, Inc. v. Cosmetic Gallery Inc.*, 870 F.Supp. 1237, 1248 (D.N.J. 1994) [*citing Printing Mart*, 563 A.2d at 37 (internal citations omitted)]. *See also Norwood Easthill Assocs.*, 222 N.J. Super. at 384, 536 A.2d at 1320 ["the bare elements of the tort of malicious interference with contractual relations are actual interference with a contract plus proof of the malicious nature of that interference."].

Proving malice does not require plaintiff to show ill will, but 'is defined to mean that the harm was inflicted intentionally and without justification or excuse.' *Printing Mart*, 116 N.J. at 751, 563 A.2d at 37." *See also Matrix Essentials*, 870 F.Supp. at 1248. Moreover, the *Printing Mart* Court concluded the New Jersey 'malice' inquiry to be substantially similar to the analysis in the *Restatement (Second) Torts* § 767 whether conduct is "improper" (*Printing Mart*, 116 N.J. at 752, 563 A.2d at 37), which New Jersey Courts have refined as a violation of standards of 'socially acceptable conduct. *Matrix Essentials*, 870 F.Supp. at 1248 [internal quotations omitted].

Malice being the key element to resolving liability for these torts, both parties' arguments focus on it. Rockwell must show not only that Radwell acted with intentionality and without justification or excuse in interfering with Rockwell's contracts but that the interference is the but-for cause of the damages Rockwell incurred. Radwell must show the converse. That is, intentionality and proximate **[*79]** cause or the lack of them must be shown at a minimum, otherwise there lies a genuine issue of material dispute as to this Count.

**1) Radwell's knowledge of Rockwell's contracts**

Rockwell asserts Radwell knew about the AD agreement and the Unauthorized Third Party Reseller Policy ["UTPR"], both of which obligated ADs not to sell authorized Rockwell products to VARs who would engage in "bare" resales. ECF 642:4-5 (Rockwell's Reply for its SJ Motion) citing ECF Doc. 530-1 ¶¶ 158-159, 163 (Rockwell's Statement of Undisputed Material Facts). Radwell disputes this. ECF Doc. 588 (Radwell's Opposition to Rockwell's SJ Motion).

## 2) Malice

Radwell argues Rockwell relied on an incorrect legal standard for demonstrating malice and that the correct one comes from the *Restatement (Second) of Torts §767*, which named seven factors[32] for determining whether intentional interference with a contract is "improper". ECF Doc. 635:13-14 (Radwell's Reply for its SJ Motion). In turn, Rockwell argues that, in *Varrallo v. Hammond, Inc.*, 94 F.3d 842, 848-849, the Third Circuit's review of malice did not follow the Restatement 7-factor test. Rockwell argues there is no requirement in the Third Circuit to depend exclusively on the seven factor analysis of the *Restatement (Second) of Torts §767*. ECF Doc. 642:5 (Rockwell's Reply for its **[*80]** SJ Motion).

In addition to the disagreement over the proper legal standard, the parties dispute whether Radwell's behavior actually demonstrates malice. Rockwell asserts that a common Radwell tactic was to induce certain entities to represent themselves to ADs as "VARs" ["the phony VARs"] in order to buy Rockwell goods at the Rockwell discount price. ECF Doc. 530:10-12 (Rockwell's SJ motion) [citing ECF Doc. 530-1 ¶¶169-75, 190-91 and 197-208 (Rockwell's Statement of Undisputed Material Facts)]. Rockwell further alleges Radwell induced some VARs that had already promised Rockwell not to re-sell PLCs without adding value to break that promise. *Id.* [citing ECF Doc. 530-1 ¶¶160-162 (Rockwell's Statement of Undisputed Material Facts)]. The inference is that both kinds of VARs engaged in "bare" sales of Rockwell goods to Radwell, which facilitated Radwell's competitive business strategy reliant on acquiring discounted Rockwell PLCs and arbitraging a resale price that was higher than Radwell's cost but lower than Rockwell's price. Rockwell argues Radwell's inducement has two malicious effects: 1) Rockwell induced genuine VARs to breach their promise to Rockwell; 2) Radwell's inducement of **[*81]** phony and genuine VARs to deceive ADs caused the ADs to breach unwittingly their AD agreements with Rockwell. For Rockwell, it is Radwell's inducement that grounds the interference and demonstrates malice. *Id. at 12*.

Radwell argues Rockwell has merely described a presumed generalized behavioral tactic but not provided specific evidence of:

an identified supplier, i.e., VAR, or

any particular contract the VAR had with Rockwell; or

a specific breaching act by the VAR; or

a specific tortious act of interference by Radwell.

---

[32] These are: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the party with whom the actor interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other party; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

Because of the lack of evidence on Rockwell's part, Radwell argues there can be no genuine dispute of material fact that Rockwell has failed to show malice. To the point, Radwell argues Rockwell merely asserts a supposition about Radwell's generalized strategy without support from specific facts. ECF Doc. 588:9 (Radwell's Opposition to Rockwell's SJ).

Radwell further asserts that Rockwell's claim—that Radwell's inducement to break a VAR's promises grounds the tort—must fail. Radwell cites Second Circuit case law for the proposition that where the "authorized seller" "needed no inducement to sell" to the "unacceptable retailer" there can be no interference. *Id.* at 10 [citing *John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F.Supp. 2d 462, 476-77 (S.D.N.Y. 2000) and *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir. 1990). The Court **[*82]** takes note that Radwell is arguing the law but not affirmatively denying Rockwell's assertion about Radwell's generalized strategy of deception.

The Court appreciates that competitive business tactics by themselves need not necessarily rise to the level of malice that amounts to the proximate cause of damages. It's one thing to pose as a VAR to an AD and lie about not reselling PLCs in order to acquire Rockwell's goods. But, it's quite another thing to show that this misrepresentation, without more, caused damages. And then again, it's quite another thing to cajole or partner with an AD to join in a price arbitraging scheme whereby both the AD and Radwell take advantage of Rockwell's discount pricing offered to ADs.

Since the arguments on both sides lack a certain vigor in showing / refuting intentional, unjustified behavior that resulted in damages, the Court ends the inquiry here because it has already found a genuine dispute as to the material facts of tortious interference with contract. Absent a legal finding that a tort has occurred, there can be no conclusion as to the aiding and abetting of that as-yet-undetermined tort. *State of N.J. Dep't. of Treasury, Div. of Inv. ex rel. McCormac v. Quent Comm'cations Int'l, Inc.*, 387 N.J. Super. 469, 481, 904 A.2d 775 (App. Div. 2006). Consequently, the Court denies Rockwell's motion for **[*83]** summary judgment as to Counts VII and VII.

### 4.5 Count X: Unjust Enrichment

Radwell seeks summary judgment of this Count relying on *In re Gerber Probiotic Sales Practices Litigation*, No. 12-835 (JLL), 2014 U.S. Dist. LEXIS 44810, 2014 WL 1310038 (D.N.J. 31 March 2014) for the proposition that "New Jersey does not recognize unjust enrichment as an independent tort cause of action." 2014 U.S. Dist. LEXIS 44810, [WL] at *41 *citing Castro v. NYT Television*, 370 N.J. Super. 282, 299, 851 A.2d 88 (App. Div. 2004). ECF Doc. 528:32 (Radwell's SJ Motion).

In *Neuss v. Rubi Rose, LLC*, No. 16-2339 (MAS), 2017 U.S. Dist. LEXIS 83444, 2017 WL 2367056 at *8 (D.N.J. 31 May 2017) [citations omitted], this Court recognized *Castro* as determinative New Jersey case law on the application of unjust enrichment liability. Specifically, the *Castro* court explained "unjust enrichment is a familiar basis for imposition of liability in the law of contracts. *See Restatement (Second) of Contracts* § 345(d) (1981)." *Castro*, 370 N.J. Super, at 299. However, "the role of unjust enrichment in the law of torts is limited for the most part to its use as a justification for other torts such as fraud or conversion". *Id.* "Rather, in the tort setting, 'an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched).'" *Id.* [*quoting Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999)].

Rockwell has not effectively marshalled facts to demonstrate how Radwell's alleged unjust enrichment could remotely lie in a contract or quasi-contract legal theory [*84] or in the tort of fraud. ECF Doc. 595: 39-40 (Rockwell's Opposition to Radwell's SJ Motion).

Accordingly, the Court grants Radwell's summary judgment motion as to Count X.


### 4.6 Radwell's Counterclaims

As a preliminary matter, the Court reviews Rockwell's argument that Radwell lacks standing to bring any antitrust claims because it is not a lawful "market competitor". ECF Doc. 642: 5-6. Rockwell generally relies on *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 599, 71 S.Ct. 971, 95 L.Ed. 1199 (1951)[33] . But, *Timken* states "[a] trademark cannot be legally used as a device for Sherman Act violation" (*Id.*), does not address standing specifically, and is not particularly useful. Specifically, Rockwell relies on *Cent. Benefits Mut. Ins. Co. v Blue Cross & Blue Shield Ass'n*, 711 F.Supp. 1423 (S.D. Ohio 1989), where the court concluded, "Only a party who is directly and adversely affected by the alleged antitrust violations can raise **the antitrust defense against claims of trademark infringement.**" *Id.* at 1434). Rockwell implies that, since Radwell is no "market competitor", Radwell cannot be adversely affected by alleged antitrust violations and can have no standing to antitrust counterclaims.

However, Rockwell has not correctly interpreted *Cent. Benefits* as to whether a putative trademark infringer has standing to claim the mark holder violates antitrust laws. To prove Radwell's [*85] lack of standing, Rockwell must show Radwell's **antitrust defense against trademark infringement** depends ONLY on, and requires, Radwell's allegations that the trademarks themselves have been misused, the so-called trademark misuse defense. *6 McCarthy on Trademarks and Unfair Competition § 31:91* (5th ed., Sept 2020 Update), Defenses to Infringement of Trademarks.

Put differently, Rockwell must prove that Radwell asserts the trademarks are the basic and crucial tool Rockwell uses to accomplish a violation of the antitrust laws. *See Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena*, 298 F. Supp. 1309 (S.D.N.Y. 1969), modified, 433 F.2d 686, 167 U.S.P.Q. 641 (2d Cir. 1970), *cert. denied*, 403 U.S. 905, 29 L. Ed. 2d 680, 91 S. Ct. 2205 (1971) [for the ground-breaking case on the subject and possibly the most thorough].

This is the trademark misuse issue raised in *Cent. Benefits Mut. Ins. Co.*; but it is not the issue Radwell raised here. As noted and discussed below, Radwell's antitrust allegations noticeably avoid the mention of trademarks or the commerce of marked products, but emphasize alleged, "collateral" behavior of Rockwell and its ADs to boycott Radwell from acquiring Rockwell's PLCs. These allegations do not implicate the misuse of the Rockwell's marks themselves. Accordingly, the Court finds that Rockwell has not proved Radwell lacks standing to assert its antitrust [*86] counterclaims.


### 4.6.1 Sherman Act §1

In its counterclaims (ECF Doc. 222), Radwell asserts antitrust and tortious interference counter claims against Rockwell, specifically, Conspiracy of Restraint of Trade and Commerce under the Sherman Act, 15 U.S.C. §1 (*Id.* ¶¶ 213-223); Conspiracy to Monopolize and Monopolization under the Sherman Act, 15

---

[33] For the sake of thoroughness, *Timken* was overruled by *Copperweld Corp. v. Independence Tube Corp.* 467 U.S. 752, 104 S. Ct. 2731, 81 L. Ed. 2d 628 on other grounds not relevant here.

U.S.C. §2 (*Id.* ¶¶ 224-237); State antitrust violations (*Id.* ¶¶ 253-372); and Tortious Interference ["TI"] with Contract (*Id.* ¶¶238-244), as well as with Prospective Economic Advantage (*Id.* ¶¶ 245-252)

The analysis begins with the antitrust claims. Sherman Act §1 provides "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." The Third Circuit has interpreted that § 1 bars contracts, combinations, and conspiracies that amount to unreasonable restraints of trade. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 158 (3d Cir.2003). There are two essential components of a § 1 claim: the existence of an agreement, which is the claim's "hallmark," and that the agreement imposes an unreasonable restraint upon trade. *In re Baby Food Antitrust Litigation*, 166 F.3d 112, 117 (3d Cir.1999). In other words, concerted action devolves to some form of agreement.

To prove these two elements—agreement and unreasonable restraint of trade—the antitrust **[*87]** plaintiff (here Radwell) must show (1) the antitrust defendant's (here Rockwell) agreement, that is, concerted action, (2) produced anti-competitive effects within the relevant product and geographic markets, (3) was illegal, and (4) the proximate cause of the antitrust plaintiff's injury. *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir.2010) [*quoting Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir.2005)].

Two kinds of concerted action[34] are defined by their differing end results. Correspondingly, two separate review standards apply. For concerted action resulting in price-fixing or market allocation by horizontal competitors,[35] the standard of review is a *per se* standard. *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007); *see also United States v. Topco Assocs.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) ("One of the classic examples of a *per se* violation of § 1 is an **agreement between competitors at the same level of the market structure** to allocate territories in order to minimize competition." (emphasis added).

However, for concerted action that "holds the promise of increasing a firm's efficiency and enabling it to compete more effectively", the review applies a rule of reason, which additionally considers the structure of the relevant market, defendants' market power, and, ultimately, **[*88]** anticompetitive effects. *Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed2d, 628. The rule of reason standard is "a case-by-case method that involves consideration of all of the circumstances of a case to decide whether certain concerted action should be prohibited because it amounts to an anti-competitive practice." *In re Baby Food*, 166 F.3d at 118.

Under either standard, an antitrust plaintiff's burden is to show by a preponderance of the evidence that the antitrust defendant entered into a contract, combination, or conspiracy with one or more other

---

[34] Concerted action is defined as a "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *Burtch v. Milberg Factors*, 662 F.3d 212, 221 [*quoting In re Ins. Brokerage Antitrust Litigation*, 618 F.3d 300, 315 (3d Cir.2010)) (internal quotation marks omitted)]. "[T]wo or more distinct entities [must] have agreed to take action against the plaintiff," and illustrating concerted action "requires proof of a causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator." *Gordon*, 423 F.3d at 207. Plaintiffs' proofs "must include evidence tending to exclude the possibility of independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) [*citing Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775)].

[35] A horizontal market allocation can be broadly defined as an agreement among **existing or potential direct competitors** to divide or otherwise restrict territories, output, customers, or product or service markets among themselves. *See, e.g., U.S. v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S. Ct. 1126, 31 L. Ed. 2d 515 (1972) ("an **agreement between competitors at the same level of the market structure** to allocate territories in order to minimize competition"). (emphasis added).

entities, thus proving the required element of concerted action. *Howard Hess*, 602 F.3d at 254; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) [*quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954)) (given the concerted action requirement, the "'crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express'") [alteration in original]; *InterVest [v. Bloomberg L.P.*], 340 F.3d [144] at 159 [3d Cir. 2003] ("Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation."). Indeed, **it is a pillar of antitrust law that a business "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently**." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (emphasis added).

As the Supreme Court has opined and countless lower court decisions **[*89]** following have reverberated, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case" and demands a court's careful discernment because mistaken inferences can "chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S., 574, 588, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1985). In reviewing Rockwell's motion to deny Radwell's antitrust counterclaims and dismiss them, the Court must exercise "careful discernment" whether Rockwell adduces evidence that no genuine dispute of material fact shows concerted action in a restraint of trade that enhanced its monopolistic power improperly.

In its counterclaims, Radwell asserts Rockwell and its ADs knowingly entered into a contract, combination or conspiracy to unreasonably restrain interstate trade and commerce and to monopolize the relevant market in violation of Sherman Act § 1 and §2. ECF Doc. 222 ¶¶ 213, 225. In essence, the asserted Sherman Act §1 injury is that, aided by the AD agreement (which created an exclusive distributorship network), Rockwell acted concertedly, that is, agreed through additional conduct, with its ADs to refuse to deal with Radwell and others so that the U.S. PLC market underwent reduced price competition and Radwell was closed out **[*90]** of the U.S. PLC market. ECF Doc. 588:12, 14 (Radwell's Opposition to Rockwell's SJ Motion). Simply, Radwell alleges Rockwell's refusal to deal with Radwell is not due solely to the AD agreement prohibiting the ADs "bare" PLC sales (ECF Doc. 588-14, Radwell's Opposition to Rockwell's SJ Motion), but because of Rockwell's additional, collateral agreement with its ADs to refuse to deal with Radwell and others in the U.S. PLC market. Radwell asserts such alleged, additional agreement caused Rockwell to effectively diminish price competition in the U.S. PLC market, which was anti-competitive. ECF Doc. 588 ¶¶214, 217,220.

Generally, the parties dispute not only that Rockwell "agreed" with its ADs to boycott Radwell (and others) but also vigorously disagree on the interpretation of these facts in terms of anticompetitive behavior and the application of relevant legal principles to them.

Before reviewing the proper legal standards, the Court notes a glaring omission in the legal perspective underlying Radwell's counterclaims (ECF Doc. 588). That is, the counterclaims do not really mention that Rockwell's PLCs bear and are covered by in force trademarks. The Court appreciates that Radwell's silence **[*91]** in its counterclaims about Rockwell's ownership of marked goods has the effect of avoiding applicable jurisprudence relating to the intersection of antitrust and intellectual property because such law typically situates the IP owner right in the middle of a government-granted monopoly and gives the IP owner monopoly rights from the beginning. The Court finds that it cannot consider summary judgment solely from Radwell's reframing of applicable law to involve only antitrust issues, but must also review the facts under the jurisprudence that intertwines intellectual property and antitrust. Therefore, what follows are two analyses: first, a review of the facts under only antitrust law, which largely confines consideration

to the Sherman Act §1 counterclaim, followed by a second review of the intersection of IP and antitrust law, which reverts to a consideration of the Sherman Act §2 counterclaim.

Under an antitrust law only perspective, an exclusive dealing arrangement can be categorized either as a vertical non-price restraint or as a refusal to deal. In *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271-272 (3d Cir. 2012), the Third Circuit declared "there is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust **[\*92]** law generally requires a showing of significant market power by the defendant, ...; substantial foreclosure, ...; contracts of sufficient duration **to prevent meaningful competition by rivals**, ...; and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." (emphasis added)

Moreover, the Supreme Court has revoked its own *per se* standard previously applied to vertical non-price restraints in the distribution of goods. *Continental T.V., Inc. v. GTE Sylvania*, 433 U.S. 36, 97 S. Ct. 2549, 53 L. Ed. 2d 568, (1977).[36] The *Continental* court considered the real-world, economic effects of such restraints, such as the possible promotion of interbrand competition, and increasing consumer demand that manufacturers take responsibility for the safety and quality of their products. *Id.* at 55 and at n. 23.

Other courts have also applied the rule of reason to exclusive dealing agreements brought under Sherman Act § 1[37]; so has the Federal Trade Commission.[38] The cases reflect a common inquiry: (1) Is the particular exclusion at issue is "unreasonably restrictive of competitive conditions" determined by whether the restraint clearly tends to harm competition; or (2)whether it facilitates more effective competition; or (3) **[\*93]** at a minimum, leaves competition unaffected.

An initial inquiry is whether Radwell stands as a direct competitor to Rockwell in the relevant U.S. PLC market. If there is no direct, i.e., horizontal, competitor relation, that affects what standard applies to an allegation of "concerted" action in a refusal to deal or vertical restraint.

---

[36] *Continental T.V.* is the leading Supreme Court decision on applying rule of reason to such restraints. At issue there was the legality under Sherman Act §1 of Sylvania's product distribution program adopted to stem the sharp decline in its share of the national television market to about only 1 to 2%. To attract more aggressive franchisees, Sylvania limited the number of franchises in any given territory and required each to sell only Sylvania products at only one franchise location in the territory. This strategy enabled Sylvania to increase its market share to approximately 5%. However, after the plaintiff's franchise tried, over Sylvania's objection, to open an unauthorized outlet in another franchisee's territory, Sylvania ended plaintiff's franchise.

*See also, Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S. Ct. 1515, 99 L. Ed. 2d 808 (1988), where the Court decided a rule of reason, rather than *per se* analysis, governed an agreement between a manufacturer and one of its dealers to terminate another dealer known for price-cutting; and *AT & T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 1988) ("Vertical restraints are generally not *per se* violations of the Sherman Act, even where a distributor and manufacturer also compete at the distribution level, i.e., have some form of horizontal relationship (a/k/a dual distributor arrangement),"

[37] *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284, 201 L. Ed. 2d 678 (2018); *North American Soccer League, LLC v. United States Soccer Federation, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018); *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corporation*, 846 F.3d 1297, 1310 (10th Cir. 2017); *Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Limited Company*, 838 F.3d 421, 438 (3d Cir. 2016); *O'Bannon v. National Collegiate Athletic Ass'n*, 802 F.3d 1049, 1069 (9th Cir. 2015); *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335-336 (7th Cir. 2012).

[38] U.S. Department of Justice and FTC, *Antitrust Guidelines for the Licensing of Intellectual Property* (Jan. 12, 2017), Sections 5.3 and 5.4 (distinguishing between the legal standards applied to tying restraints involving intellectual property, versus exclusive dealing restraints involving intellectual property).

2020 U.S. Dist. LEXIS 223998, *93

The Court agrees with Rockwell that Radwell cannot be considered a direct, horizontally-positioned competitor; Radwell is not a PLC manufacturer. Doc. 530:6 (Rockwell's SJ Motion). As a reseller of PLC products manufactured by both Rockwell and other entities, Radwell can be regarded as occupying a distributor status in the PLC market structure. More or less, Radwell stands at the same level as Rockwell's ADs and not at Rockwell's level, even when one considers that Rockwell sells directly to a small number of end-users, which the Court does not find determinative that Radwell is a competitor. Radwell claims it is a competitor to Rockwell but its description of such competition is at a distributing / marketing level in the PLC market structure. The Court finds Radwell is not a direct, horizontal **[*94]** competitor to Rockwell.

Looking at Rockwell's ADs position in the PLC market structure, the Court finds that neither are the ADs direct, horizontal competitors to Rockwell. This finding contradicts Radwell's assertions, which are used to support its allegation of a hub and spoke conspiracy between Rockwell add its ADs. ECF Doc. 588:22-27 (Radwell's Opposition to Rockwell's SJ Motion). The Court finds Rockwell's ADs are at about the same level as Radwell in the PLC market structure.

That Radwell as well as Rockwell ADs are not competitors to Rockwell excludes application of the *per se* standard under Sherman Act §1 (*U.S. v. Topco Assocs.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515). This conclusion in concert with the case law cited above confirms that the appropriate, standard applicable to Radwell's Sherman Act § 1 counterclaim is a rule of reason.[39]

Applying a rule of reason to Radwell's counterclaims demands that Rockwell show no genuine issue of material fact exists that Rockwell engaged in <u>concerted action with its ADs that was collateral to the AD agreement</u>, which resulted in a price fixing scheme that boycotted Radwell from the distribution of Rockwell branded PLCs. At the same time, the Court considers Radwell's asserted **[*95]** facts in the light most favorable to it (*Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202; *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir.2013)) and draws all reasonable inferences in its favor. *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir.2011).

To be clear, Radwell asserts that the mere existence of the unvarying price points of Rockwell PLCs that the ADs offered to those Rockwell customers (defined as VARs or resellers) unwilling to refrain from "bare" sales can only evidence concerted action of price fixing between Rockwell and its ADs. ECF Doc. 588: 14, 18-21 (Radwell Opposition to Rockwell's SJ Motion). Further, Radwell asserts there are numerous disputed facts that evidence a hub and spoke arrangement of equals between Rockwell and its ADs that resulted in price fixing in such a way that boycotted Radwell from the U.S. PLC market. *See especially*, ECF Doc. 594¶¶ 283, 284-317, 303 (Radwell's Supplemental Statement of Disputed Material Facts)

In reviewing the AD agreement (ECF Doc. No. 531-3, Exhibit 27), the Court finds it neither states, suggests, nor alludes to "collateral" (i.e. additional) concerted action between Rockwell and its ADs beyond the mere obligations of the AD agreement. To the contrary, the agreement states at §3.8

"Distributors will retain the exclusive and independent right to establish its resale prices **[*96]** for the Products, notwithstanding any suggested prices, multipliers, or discount rate published or specified by Rockwell Automation, whether generally or specific to any Distributor customer or Product order".

---

[39] Especially because *ZF Meritor* applies a rule of reason to a distribution arrangement of non-branded goods and, as discussed above, trademark owners get greater latitude than reasoned in *ZF Meritor* as to how they can restrict distribution of their marked goods.

Thus, the formal language of the AD agreement itself expressly declares ADs independence to set their own resale price of PLCs independent of Rockwell's proposals and persuasion and to thereby control their own revenue in the distribution of U.S. Rockwell-branded PLCs. The AD agreement itself thus negates Radwell's reliance on it as a logical support of "collateral" concerted action between Rockwell and its ADs.

In its Opposition to Rockwell's SJ Motion (ECF Doc. 588), Radwell's allegations of "collateral" concerted action and of the existence of a hub and spoke arrangement that fixed prices of Rockwell PLCs sold in the U.S. arise exclusively from its interpretation of two items: the facts cited in its Statement of Disputed Facts (ECF Doc. 594) (which are generally undisputed); and its reliance on a case it did not properly identify in the discussion and actually omitted from the Table of Authorities, *Rossi et al. v. Standard Roofing, Inc. et al.*, 156 F.3d 452 (3d Cir. 1998). Through paragraph after paragraph in its Statement of Disputed Facts (ECF Doc. **[*97]** 594), Radwell discusses collaboration between Rockwell and its ADs in determining policy regarding pricing and gray market goods exclusion. Radwell interprets the years-long collaborative behavior between Rockwell and the various AD committees as direct or strong circumstantial evidence of price fixing that excluded Radwell and others. *See* ECF Doc. 594¶¶226-317. Further, Radwell relies on *Rossi* to support its argument that Rockwell's collaboration with its ADs to end gray market sales in the U.S. and to adopt the required obligation "no sales to 'bare' resellers" can only be seen as direct proof of "collateral" concerted action of price fixing. ECF Doc.588:23 (Radwell Opposition to Rockwell's SJ Motion).

Even taking all 540 paragraphs of Radwell's Statement of Disputed Facts (ECF Doc. 594) in the light most favorable to it, the Court cannot agree with this interpretation. The meetings where Rockwell and a subset of its ADs discussed standard, negotiated, or long term pricing of PLCs (*Id.* ¶¶284-343) or efforts to prevent gray market sales (*See especially, Id.* ¶¶205-225 and 344-401) do not infer necessarily "collateral" concerted action even though Radwell's expert, Dr. Ramus, opined **[*98]** such collaboration can indicate the workings of a cartel. *Id.*¶283.

A truism is that an expert's interpretation of business behavior and strategy does not evidence a fact. In relying on Radwell's own Statement of Disputed Facts (ECF Doc. 594), many of which come directly from Rockwell declarations or discovery from Rockwell and as such cannot be considered disputed, the Court concludes there is no genuine issue of material fact that Rockwell acted unilaterally in managing the pricing of its PLCs and who could buy them.

As for pricing, s*ee especially, Id.*¶285 in that Rockwell and the ADs determined that, for negotiated special pricing, it was "best to leave the ultimate decision on price to Rockwell"; *Id.*¶303 stating "In buying product from Rockwell, all ADs buy from Rockwell at the exact same price"; and, *Id.* ¶331 stating "Long term agreements ...generally are negotiated by Rockwell on the distributor's behalf with the customer, including on price." Further, that *Id.* ¶320 states "...an ADs failure to provide [standard] pricing in line with Rockwell's direction can result in the [ADs] loss of pricing credits" can work in several ways: one is that Rockwell tamps down on an AD overcharging **[*99]** the VAR; the other is that Rockwell maintains a standard price so as to prevent ADs from over competing with each other; an a third is simply to keep the PLC price high. All of these possible reasons why Rockwell is controlling the price may be irrelevant; the fact shows that Rockwell, and not a cartel of Rockwell and the ADs, is controlling the price, i.e., unilateral action.

As for preventing gray market sales, *see especially, Id.* ¶388, stating:

"Rockwell implemented a disciplinary scheme for ADs that directly or indirectly assisted 'Gray Market' activity (citation omitted.) The discipline included: a lower score on the Distributor Operations Scorecard

that Rockwell uses to evaluate its ADs performance; warning letter sent to the ADs that included a timeline for the AD to remedy its behavior; and, for continued violations, potential loss of an ADs (distributorship territory)"; *Id.* ¶390 clarifying that in developing strategy for notifying its ADs which resellers were NOT Ok, Rockwell messaged its ADs with 'All reported reseller submissions are investigated" and if confirmed, "added to the global list' ... for all distributors to view /access"; and *Id.* ¶395 stating "Rockwell undertook **[*100]** efforts to provide its ADSs with 'Gray Market Awareness Training" to ensure the ADs would implement appropriate procedures to eliminate 'Gray Market' sales".

Far from indicating "collateral" behavior, Radwell's own submissions show that, while offering advice, ideas, persuasion, and even coercion on how to price Rockwell PLCs downstream, Rockwell gave no authority to ADs to set Rockwell's prices or to shape Rockwell's policies concerning VARs. Only Rockwell had unilateral authority to set (even with ADs input certainly) its pricing to its ADs and its resell restriction policies. This is not say that ADs had no input; they were clearly allowed to set their own downstream prices, even if they were eager to comply with Rockwell's suggestions. Pricing and distribution obligations flowed ONE WAY to the ADs, from Rockwell. A ONE WAY flow of obligations indicates a vertical structure of unilateral control, not "collateral" collusion, even taking into account there was cooperation and exchange of ideas among Rockwell and its ADs. It was Rockwell that obligated pricing procedure and gray market exclusion behavior. ADs had no choice but to comply with and conform to the pricing demands and gray **[*101]** market prevention obligations in order to remain in the Rockwell distribution structure.

Thus, relying solely on traditional Sherman Act §1 legal theories and on a review of Radwell's own statement of facts, the Court finds an absence of a genuine issue of material fact. Radwell's facts applied to a correct Sherman Act §1 standard shows Rockwell neither engaged in concerted action nor colluded with its ADs to use price fixing and exclusionary obligations that effectively boycotted Radwell from the U.S. PLC market.

Accordingly, the Court finds there is no genuine issue of material fact that Rockwell has violated Sherman Act § 1 and grants Rockwell's summary judgment motion to dismiss this Radwell counterclaim.

### 4.6.2 Sherman Act §2

Analyzing the rights of an IP owner to act as a monopolist in exploiting its own IP implicates Sherman Act §2. Coupling *Am. Needle, Inc. v. National Football League*, 560 U.S. 183, 190, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010) with *Copperweld*, 467 U.S., at 767, 104 S.Ct. 2731 leads to the conclusion that monopolization, or the threat of it, is a more narrow category of conduct than restraint of trade, consequently requiring even greater discernment in analyzing it. Moreover, the Supreme Court has established the now axiomatic principle that an IP holder / owner has the fundamental right to <u>unilaterally</u> choose its business **[*102]** partners and refuse to deal with those not selected. *See, e.g., Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438, 129 S. Ct. 1109, 1116, 172 L. Ed. 2d 836 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 124 S. Ct. 872, 157 L. Ed. 2d 823, (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his <u>own independent discretion</u> as to parties with whom he will deal.'") Thus, having determined no genuine issue of material fact exists as to whether Rockwell acted with "collateral" action to refuse to deal with Radwell, the Court looks at whether Rockwell used its

monopoly power over its trademarks to improperly reduce competition in the U.S. PLC market when it refused to deal with Radwell.

Decisions rooted in antitrust law that concern forcing trademark owners to distribute their marked goods to actual or potential competitors strongly consider the difference between the intellectual property rights of trademarks vs. those of patents or copyrights. That is, since a trademark excludes others from using identical / similar marks likely to cause confusion as to the source or quality of a product, **[*103]** it does not confer a legal monopoly over a good; it confers rights to a name only. *See, e.g., Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997) ("As other courts and commentators have observed, trademarks are by their very nature non-exclusionary."); *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, (7th Cir. 1976). Further, unlike patent and copyright rights, the actual protection provided by a trademark goes beyond the mark owner's interests and extends to the public, by preventing deception or confusion and thus unfair competition.[40] And, it is because of the specter of possible consumer confusion[41] that attempts to coerce a trademark owner into granting a license or authorization to those who would compete horizontally or vertically with it are often more liberally decided than antitrust decisions regarding other intellectual property.[42]

This greater latitude to trademark owners is important because of the recent ruling by the Ninth Circuit in *Federal Trade Commission v Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)[43] that is particularly applicable because it deals with Rockwell-like "hypercompetitive" behavior, but in a patent monopoly context. The *Qualcomm* court resolved that Qualcomm's exercise of its patent monopoly over its Standard Essential Patents ["SEPs"] (relating *inter alia* to communication protocols of devices in 3G and 4G networks), and over its **[*104]** non-SEP protocols and modem chips was NOT a barrier to entry in the 3G and 4G cell phone market space and was not anti-competitive because there were procompetitive effects to Qualcomm's business strategy.

As it turns out, Qualcomm's business strategy looks quite similar to Rockwell's. Qualcomm, a dominant modem chip manufacturer in the cell phone and other electronic device market, sold its patented modem chips to downstream cell phone manufacturers (such as Apple)--also called OEMs--**and at the same time also licensed** its SEP communication protocol patents to them. The license of the protocols cost close to nothing so long as the downstream OEMs that bought its patented chips agreed NOT to resell Qualcomm chips to upstream competitors of Qualcomm. *Id.* at 984-985.

Although the Qualcomm SEP communication protocol (which to be clear is patented software) worked with the rivals' chips, Qualcomm demanded from rival chip manufacturers a much higher royalty to

---

[40] *See, e.g., Federal Trade Commission v. Algoma Lumber Co.*, 291 U.S. 67, 78, 54 S. Ct. 315, 78 L. Ed. 655, 18 F.T.C. 669 (1934); *Smith v. Chanel, Inc.*, 402 F.2d 562, 566 (9th Cir. 1968).

[41] *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999) (reversing an FTC determination that a dental association's restrictions on discount and quality-of-service advertisements were unreasonable under the "quick look" rule of reason analysis and remanding the case for analysis under the full rule of reason, where the challenged restraints had plausible pro-competitive justifications to protect consumers from possible confusion or deception, and could not simply be presumed to result in higher prices, reduced service quality, or other anti-competitive harm.

[42] *Dawson Chemical v. Rohm & Haas, Co.*, 448 U.S. 176, 201,100 S. Ct. 2601, 65 L. Ed. 2d 696, *Matter of E. I. DuPont De Nemours & Co.*, 96 F.T.C. 653 1980 WL 339053 20 October 1980

[43] At the end of October 2020, the Ninth Circuit refused to re-visit the matter in a hearing *en banc*, which leaves the *Qualcomm* holding in place and the FTC's only option to seek certiorari. Order, *FTC v. Qualcomm*, 19-cv-16122, ECF Doc. No. 270 (28 Oct 2020 9th Cir).

license its SEP protocols than it charged downstream OEMs who promised not to resell. The end result of Qualcomm's business strategy is that its chips were not resold to rival manufacturers, which in effect avoided **[*105]** patent exhaustion of the patented SEP protocols licensed to the OEMs. Put simply, if OEMs used rival chips in a cell phone, the entire phone production was more expensive than if they used Qualcomm's chips because Qualcomm, as a patent monopolist, charged both its rival chip manufacturers and OEMs not using a Qualcomm chip a much higher price for licensing the SEP protocols. At the same time, Qualcomm kept the price of its chips relatively high to its downstream OEMs, who agreed not to resell the Qualcomm chips. Together the vertical restraint on the Qualcomm chips, the higher price on the Qualcomm chips AND the relatively free license of SEP protocols to compliant OEMs created a *de facto* vertical distribution network that closed out rival chip manufacturers from gaining or even keeping market share. The cost of Qualcomm chips, even if high, coupled with the relatively free license to use the SEP protocols was just too attractive to use rival chips. Thus, 1) Qualcomm's patents on both the chips and the SEP protocols coupled with 2) its refusal to license its SEP protocols to rival chip manufacturers and 3) its demand that downstream OEMs not resale Qualcomm chips allowed Qualcomm to **[*106]** exploit its IP monopoly in a way that increased its market share while closing out rival chip manufacturers.

As for the procedural history of *Qualcomm*, Apple in particular, a Qualcomm OEM, wanted to disrupt Qualcomm's strategy. Apple wanted neither to promise not to resell Qualcomm chips nor to pay for Qualcomm chips at Qualcomm's price. In essence, Apple wanted to get cheap chips from Qualcomm's rivals while keeping the cheap licensing royalty of Qualcomm's SEP protocols. It asked the Federal Trade Commission to charge Qualcomm with antitrust violations, that is, Sherman Act §1 and §2, for Qualcomm's refusal to its SEP communication protocols for rival chips. *Id.* at 985-6. The District Court found for the FTC, that Qualcomm's restraint on licensing the SEP protocols harmed competition. Qualcomm appealed and the Ninth Circuit reversed (*Id.* at 987) and considered research that shows antitrust economists, and in turn lawyers and judges, tend to treat novel business practices, like Qualcomm's, as automatically anticompetitive because of the apparent restraint of trade but without looking deeply at the possible procompetitive effects in the market. *Id.* at 991.

The *Qualcomm* Court kept true to the Sherman Act's requirement, **[*107]** that Qualcomm's business strategy had to be anti-competitive in the relevant markets (*Id.* at 993, 998) and found from the undisputed facts that the only potential chip manufacturer, Intel, in the relevant market during the relevant time period was NOT actually a viable competitor to Qualcomm. *Id.* at 1004 Thus, the Ninth Circuit concluded that although "[a]nticompetitive behavior is illegal under federal antitrust law[;] [h]ypercompetitive behavior is not." (*Id.* at 1005). The Ninth Circuit specifically found Qualcomm's obligations on its downstream OEMs—that is, if you want a free SEP license, you must buy Qualcomm chips and you can't resell them to Qualcomm's rivals—did not "impose an anticompetitive surcharge on rivals' model chip sales" even though rival chip makers had to pay more for the SEP license. Further this business strategy was not in violation of Sherman Act §2 because Qualcomm is "under no antitrust duty to license rival chip suppliers." *Id.* at 1005.

The Court notes here the remarkable similarity between Qualcomm's strategy and Rockwell's, especially Rockwell's refusal to deal its PLCs covered by IP to any but nominated distributors that in turn must promise contractually not to sell those products to downstream customers **[*108]** who would execute "bare" sales of the PLCs on the open market. Thus, Rockwell's ADs are akin to Qualcomm's downstream OEMs.

Taking a cue from *Qualcomm*, the Court finds that Rockwell did not violate Sherman Act §2. The *Qualcomm* reasoning applies here: Rockwell's refusal to offer resellers, such as Radwell, its discounted

rebate or differentiated pricing did not violate Sherman Act §2 because: 1) Rockwell was exercising its right to sell its monopoly products to entities of its choosing, which for trademarks are upheld more strongly than for patents; and 2) Rockwell's behavior, while hypercompetitive, to close out downstream resellers like Radwell from lower prices of its PLCs nonetheless had pro-competitive effects.

Simply, these effects are the benefits Rockwell as a mark holder provides end-user consumers, which are customers to the VARs. That is, VARs add value to their customers' PLC installations by ensuring the end-user gets the product it bargains for with the VAR, a product covered by a Rockwell warranty to the VAR. As the *Qualcomm* court asserted and we agree with, Rockwell was not required to sell its PLCs at a discount price to any entity but was free to choose whom to sell to and **[*109]** for what price. It was a monopolist by virtue of a government IP grant, trademark, which does not offer exclusionary benefits, like a patent or copyright, and therefore spurred the creation of a closed distribution scheme to limit which entities could access the IP-covered good. Ultimately, supplying a product to an end-user that bears the promised indicia of quality spurs interbrand competition in that rival manufacturers must compete as to the quality of their products. The Supreme Court has considered interbrand competition by striving to achieve a better quality product and better product liability coverage to have a procompetitive effect.

As discussed above, there are no disputed facts between the parties about Rockwell's closed distribution system and its effects on Radwell's attempts to disrupt that sow system. The genuine dispute between the parties is the interpretation of how the law applies to those facts. And, *Qualcomm*, in deciding the law on a similar IP driven distribution system, rules the day. Accordingly, the Court finds there is no genuine issue of material fact that Rockwell has violated Sherman Act § 2 and grants Rockwell's summary judgment motion to dismiss this Radwell **[*110]** counterclaim.

### 4.6.3 Counterclaim III. Tortious Interference with Existing Contractual Relations and

### Counterclaim IIV. Interference with Prospective Economic Advantage

New Jersey courts find actionable tortious interference both when there is an enforceable contract and when there isn't. *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751, 563 A.2d 31 (1989) [*citing Mayflower Industries v. Thor Corp.*, 15 *N.J. Super.* 337, 339, 83 *A.*2d 366 (Ch.Div.1951), *aff'd, 9* N.J. *605*, 89 *A.*2d 242 (1952)]. As discussed above for Rockwell's allegations regarding tortious interference, these torts require a showing of some protectable right that has been interfered with through malice by the accused party. Since malice is the *sine qua* non of these torts, Radwell must show there is no genuine dispute of material fact regarding Rockwell's malice.

Radwell asserts that for many years it had distributed considerable quantities of Rockwell PLCs to several large U.S. machine-parts businesses many Rockwell PLCs, and that Rockwell knew this and sent communications to these businesses asking them not to buy Rockwell products from Radwell any longer, warning about the risks of buying gray goods. ECF Doc. 222 ¶¶198-202; ECF 530:39 (Rockwell's SJ Motion). Radwell alleges these Rockwell communications formed an institutional practice of pressuring **[*111]** market participants to refuse to buy from Radwell and caused a significant drop in Radwell's commerce, which it had every reason to continue to expect.

Radwell also implies that it is Rockwell's own ADs that funnel Rockwell PLCs to Radwell in violation of their contractual obligation not to. Radwell suggests Rockwell's suit against Radwell is misplaced and frivolous because Rockwell should be suing its own faithless ADs instead. Id. ¶¶203-207. Further, Radwell's antitrust injury allegations seem to imply that by itself the contractual prohibition on ADs to sell

PLCs to "bare" resellers constitutes interference to Radwell's business relations by forcing it pay higher prices for the Rockwell PLCs and reducing Radwell's ability to compete in supplying "bare" PLCs to its large machine parts customers. *Id.* ¶208.

The only "malice" Radwell alleges is Rockwell's devoted and intentional behavior to maintain a closed vertical distribution system of its branded PLCs. Radwell does not allege discriminatory behavior against only itself; to wit, Rockwell's 1074 ITC investigation named several gray goods resellers. Rather Radwell implies it is entitled to acquire Rockwell's branded PLCs at a discounted **[*112]** price and then to sell them at prices that undercut Rockwell ADs. Rockwell's attempts to interfere with that entitlement is the basis of these allegations. But Radwell's sense of entitlement to its business strategy of arbitraging Rockwell's PLCs for a cheaper cost and a cheaper selling price does not give Radwell an untrammeled legal right to that strategy. This is so primarily because Rockwell is actually exercising its legal rights as mark holder to limit the distribution of its branded products. And taking another cue from *Qualcomm*, such hypercompetitive behavior for a trade mark owner does not indicate by itself malice.

Relying on Radwell's allegations and that Rockwell does not dispute them in essence, the Court finds that, based on the legal standards, Radwell's evidence has not shown a genuine dispute as to the necessary element of malice. Accordingly, Rockwell cannot be found liable for tortious interference of Radwell's contract or prospective business relations and the Court grants Rockwell's summary judgment motion to dismiss these counterclaims.

### 4.6.4 Counterclaim V: State Antitrust Law Violations

In its Counterclaims (ECF Doc. 222 ¶¶253-372), Radwell alleges violations of **[*113]** antitrust laws for the following states:

California Cartwright Act, California Business and Professions Code § 16720 *et seq.*;

Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq.*;

Maine Monopolies and Profiteering Law, 10 M.R.S. § 1101 *et seq.*;

Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 *et seq.*;

Minnesota Antitrust Law, Minn. Stat. §§ 325D.49-.66;

Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

North Dakota Uniform Antitrust Act, North Dakota Century Code § 51-08.1-01 *et seq.*;

New Mexico Antitrust Act, NMSA 57-1-1 to -15;

New York Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.*;

South Dakota Codified Laws § 37-1-3.1 *et seq.*;

Vermont Consumer Protection Act, 9 V.S.A § 2451 *et seq.*; and

Wisconsin. Stat. Ann. §§ 133.01-.18.

2020 U.S. Dist. LEXIS 223998, *113

In its summary judgment motion (ECF Doc. 530:38), Rockwell assertion that the antitrust laws of all 12 states Radwell cites in its counterclaims (see above) have been drafted or are interpreted to be consistent with Sherman Act §1 and §2. Therefore, the same arguments and reasons for why Radwell's Counterclaims 1 and 2 fail apply.

In its opposition (ECF Doc. 588:44) Radwell does not deny the assertion of similarity between the federal and the state antitrust laws and avers that even if such similarity between the federal and state laws is accepted, Radwell has shown through its marshalled facts and legal arguments that Rockwell has violated each statute.

There is no genuine dispute of material fact that Radwell's cited state laws are similar in standard and interpretation to the Sherman Act sections already **[*114]** reviewed and decided upon. For reasons discussed above, the Court finds Rockwell has violated none of these state antitrust laws and grants Rockwell's summary judgment motion as to counterclaim 5 and dismisses it.


**CONCLUSION**

For the reasons discussed above:

As to Complaint Count I (Trademark Infringement), the Court **GRANTS** plaintiff's Summary As to Count I (Trademark Infringement), the Court **GRANTS** plaintiff's Motion for Summary Judgment on liability, **DENIES** defendant's Motion for Summary Judgment, and enters Judgment in favor of plaintiff and against defendant on this Count;

As to Count II (False Advertising), the Court **GRANTS** plaintiff's Motion for Summary Judgment on liability and enters Judgment in favor of plaintiff and against defendant on this Count;

As to Count III (False Designation of Origin), the Court **DENIES** defendant's Summary Judgment Motion;

As to Counts V and VI (State and Common Law Unfair Competition), the Court **DENIES** defendant's Motion for Summary Judgment;

As to Counts VII and VIII (Tortious Inference with Contract and Aiding and Abetting Such), the Court **DENIES** the Motions for Summary Judgment of plaintiff and defendant;

As to Count X (Unjust Enrichment), the Court **GRANTS [*115]** defendant's Motion for Summary Judgment Motion and enters Judgment in favor of Defendant and against Plaintiff on this Count; and

As to Counterclaims I through VI (Sherman Act §§1 and 2, Tortious Inference with Contract and with Prospective Advantage, and State Law Antitrust), the Court **GRANTS** plaintiff's Motion for Summary Judgment and Judgment is entered in favor of Plaintiff and against Defendant on all of the Counterclaims.

A jury trial for the following issues will be scheduled in due course:

Plaintiff's damages for defendant's liability for trademark infringement and false advertising;

Whether defendant is liable for state and common law unfair competition (Counts V and VI);

Whether defendant is liable for tortious interference in plaintiff's contracts and for aiding and abetting such tortious interference (Counts VII and VIII).

Dated: 24 November 2020

/s/ Robert B. Kugler

ROBERT B. KUGLER

United States District Court Judge


**ORDER**

**KUGLER**, United States District Court Judge

Before the Court in this action concerning, among other things, trademark infringement, are two summary judgment motions under Federal Rule of Civil Procedure ["Fed. R. Civ. Proc.", "FRCP", or "Rule"] 56 (a) one from plaintiff **[*116]** Rockwell Automation ["Rockwell"] ["plaintiff's motion"] (ECF Doc. 526 and Docs. 530 through 534) and one from defendant Radwell International, Inc. ["Radwell"] ["defendant's motion"] (ECF Doc. 527 and Docs.528-529).

Plaintiff's motion seeks summary judgment on Counts I, II, VII and VIII, of its second amended complaint ["the complaint"] (ECF Doc. 140) and against all of Radwell's Counterclaims I through V in order to dismiss them. (S*ee* ECF Doc. 222, Radwell's Second Amended Answer and Amended Counterclaims).

Defendant's motion (ECF Doc. 527) seeks summary judgment on Counts I, III, V, VII, VIII and X and Defendant's memorandum of law (ECF Doc. 528) also seeks summary judgment on Count VI.

As for the complaint, there were originally 10 counts, one of which has been dismissed[1] and of the remaining nine, one count is not at issue here: Count IX, aiding and abetting fraud.

The seven counts from the complaint at issue in these motions are:

Count I, trademark infringement, Lanham Act, 15 U.S.C. §1114 (plaintiff's and defendant's motions);

Count II, false advertising, Lanham Act, 15 U.S.C. §1125(a) (1) (B) (plaintiff's motion);

Count III, false designation of origin, Lanham Act, 15 U.S.C. §1125(a) (1) (A) (defendant's motion);

Count V, statutory unfair competition, **[*117]** N.J. Stat. Ann. § 56:4-1 *et seq.* (defendant's motion);

Count VII, tortious interference with contract (plaintiff's and defendant's motions);

Count VIII, aiding and abetting tortious interference with contract (plaintiff's and defendant's motion); and Count X, unjust enrichment (defendant's motion).

Relative to Radwell's counterclaims (ECF Doc. 222), all five are at issue here:

First, conspiracy in restraint of trade and commerce under Sherman Act 1, 15 U.S.C. § 1;

Second, conspiracy to monopolize and monopolization under Sherman Act 2, 15 U.S.C. §2;

---

[1] Count IV of the complaint for trademark dilution under the Lanham Act, 15 U.S.C. §1125(c) was dismissed by the Court in Rockwell Automation, Inc. v. Radwell Int'l, Inc., No. 15-cv--5246 (RBK/JS), 2016 U.S. Dist. LEXIS 165633, 2016 WL 7018531 (D.N.J. 30 Nov 2016).

2020 U.S. Dist. LEXIS 223998, *117

Third, tortious interference with contract;

Fourth, tortious interference with prospective economic advantage; and

Fifth, specific state antitrust/consumer protection statutes under:

California Cartwright Act, California Business and Professions Code § 16720 *et seq.*;

Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq.*;

Maine Monopolies and Profiteering Law, 10 M.R.S. § 1101 *et seq.*;

Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 *et seq.*;
Minnesota Antitrust Law, Minn. Stat. §§ 325D.49-.66;

Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

North Dakota Uniform Antitrust Act, North Dakota Century Code § 51-08.1-01 *et seq.*;
New Mexico Antitrust Act, NMSA 57-1-1 to -15;

New York Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.*;

South Dakota Codified Laws § 37-1-3.1 *et seq.*;

Vermont Consumer Protection Act, 9 V.S.A § 2451 *et seq.*; and
Wisconsin. Stat. Ann. §§ 133.01-.18.

Table 1 outlines the specific summary judgment requests from plaintiff and defendant.

**Table 1**

| Complaint Count | Law Pleaded | P Requested ECF Doc. 526 |
|---|---|---|
| I: Trademark Infringement | Federal | Grant **[*118]** |
| II: False Advertising | Federal | Grant |
| III: False Designation of | Origin | |
| V: Unfair Competition | NJ Statute | |
| VI. Common Law Unfair Competition | | |
| VII: Tortious Interference ["TI'] with Contract | State | Grant |
| VIII: Aiding/ Abetting TI with Contract | State | Grant |

2020 U.S. Dist. LEXIS 223998, *118

| Complaint Count | Law Pleaded | P Requested ECF Doc. 526 |
|---|---|---|
| X. Unjust Enrichment | State | |

| Counterclaim (ECF Doc. 222) | Law Pleaded | P Requested ECF Doc. 526 |
|---|---|---|
| 1. Conspiracy of Restraint of Trade and Commerce | Federal | Grant to Dismiss |
| 2.Conspiracy to Monopolize and Monopolization | Federal | Grant to Dismiss |
| 3.Tortious Interference["TI"] with Contract | State | Grant to Dismiss |
| 4. TI with Prospective Economic Advantage | State | Grant to Dismiss |
| 5.State antitrust | State Statutory | Denial |

| Complaint Count | D Requested ECF Doc. 527 |
|---|---|
| I: Trademark Infringement | Denial |
| II: False Advertising | |
| III: False Designation of | Denial |
| | Not briefed separately but in combination with Counts I, V, and VI |
| V: Unfair Competition | Grant |
| | Not briefed separately but in combination with Counts I, III, and VI |
| VI. Common Law Unfair Competition | Grant |
| | Not briefed separately but in combination with Counts I, III, and V |
| VII: Tortious Interference ["TI'] with Contract | Denial |
| VIII: Aiding/ Abetting TI with Contract | Denial |
| X. Unjust Enrichment | Denial |

Counterclaim (ECF Doc. 222)

1. Conspiracy of Restraint of Trade and Commerce

2.Conspiracy **[*119]** to Monopolize and Monopolization

3.Tortious Interference["TI"] with Contract

2020 U.S. Dist. LEXIS 223998, *119

| Complaint Count | D Requested |
|---|---|
| | ECF Doc. 527 |
| 4. TI with Prospective Economic Advantage | |
| 5. State antitrust | |

**The COURT HAVING REVIEWED** the parties' submissions (without a hearing in accordance with Rule 78.1 (b)) and for the reasons below, and for good cause shown,

As to Count I (Trademark Infringement), the Court **GRANTS** plaintiff's Motion for Summary Judgment on liability, **DENIES** defendant's Motion for Summary Judgment, and enters Judgment in favor of plaintiff and against defendant on this Count;

As to Count II (False Advertising), the Court **GRANTS** plaintiff's Motion for Summary Judgment on liability and enters Judgment in favor of plaintiff and against defendant on this Count;

As to Count III (False Designation of Origin), the Court **DENIES** defendant's Summary Judgment Motion;

As to Counts V and VI (State and Common Law Unfair Competition), the Court **DENIES** defendant's Motion for Summary Judgment;

As to Counts VII and VIII (Tortious Inference with Contract and Aiding and Abetting Such), the Court **DENIES** the Motions for Summary Judgment of plaintiff and defendant;

As to Count X (Unjust Enrichment), the Court **GRANTS** defendant's Motion for Summary Judgment Motion and enters Judgment **[\*120]** in favor of Defendant and against Plaintiff on this Count; and

As to Counterclaims I through VI (Sherman Act §§1 and 2, Tortious Inference with Contract and with Prospective Advantage, and State Law Antitrust), the Court **GRANTS** plaintiff's Motion for Summary Judgment and Judgment is entered in favor of Plaintiff and against Defendant on all of the Counterclaims.

For the following issues, a jury trial remains and will be scheduled in due course: Plaintiff's damages for defendant's liability for trademark infringement and false advertising; Whether defendant is liable for state law and common law unfair competition (Counts V and VI); Whether defendant is liable for tortious interference with plaintiff's contracts and for aiding and abetting such tortious interference (Counts VII and VIII).

An Opinion of this date accompanies this Order.Dated: 24 November 2020

/s/ Robert B. Kugler

ROBERT B. KUGLER

United States District Court Judge

---

**End of Document**

# EXHIBIT 5

Case 1:21-cv-01238-GBW-JLH   Document 296   Filed 06/30/23   Page 223 of 576 PageID #: 12147

§ 304. Presumptions related to confusion or deception u..., 87 C.J.S. Trademarks,...

**87 C.J.S. Trademarks, Etc. § 304**

Corpus Juris Secundum   |   May 2023 Update

**Trademarks, Trade Names, and Unfair Competition**
Lonnie E. Griffith, Jr., J.D.; Glenda K. Harnad, J.D. and Thomas Muskus, J.D.

**IX. Remedies and Procedure**

**A. Civil Actions**

**4. Evidence and Proof in Civil Actions on Trademarks**

**a. Evidentiary Presumptions in Civil Actions on Trademarks**

## § 304. Presumptions related to confusion or deception in civil actions on trademarks

Topic Summary   |   References   |   Correlation Table

---

**West's Key Number Digest**

West's Key Number Digest, Trademarks🔑1609

---

**Under the Lanham Act, presumptions may apply in determining the elements of public confusion or deception in trademark actions, particularly from counterfeit or copied marks and gray market goods.**

Under the Lanham Act,[1] the elements of public confusion or deception in trademark actions, whether for infringement[2] or unfair competition,[3] may be presumed when a trademark is counterfeit,[4] since a counterfeit mark is inherently confusing.[5] The use of a counterfeit is equated with the infringer's intent to confuse the public.[6]

In a gray market goods trademark infringement case, a material difference between goods simultaneously sold in the same market under the same name creates a presumption of consumer confusion as a matter of law.[7] The presumption of consumer confusion arises since the threshold of materiality for the difference between gray market goods and authorized goods is quite low, such that the existence of any difference between the trademark owner's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion.[8]

The continued use of another's mark without authorization can give rise to a presumption of likely confusion.[9] In contrast, the absence of any actual confusion in the marketplace over a substantial period of time creates a strong inference that there is no likelihood of confusion.[10] When parties with allegedly similar marks have coexisted over many years with no evidence of actual confusion, there is a strong inference that the marks or names at issue are not likely to cause consumer confusion.[11]

---

Case 1:21-cv-01238-GBW-JLH Document 296 Filed 06/30/23 Page 224 of 576 PageID #: 12148

§ 304. Presumptions related to confusion or deception u..., 87 C.J.S. Trademarks,...

A presumption of likely confusion arises from intentionally copying someone else's trademark or trade dress.[12] The presumption arises when the copier intends to exploit the good will created by an already registered trademark.[13] The presumption arises on a showing that the defendant intended to use the allegedly infringing mark with knowledge of the predecessor's mark, thereby intending to cause confusion to the public.[14] When a defendant uses a plaintiff's exact marks, a thorough analysis of the digits of confusion is unnecessary, in an action for trademark infringement, and a presumption of confusion exists.[15] Evidence that the alleged infringer chose a mark with the intent to copy, rather than randomly or by accident, typically supports an inference of likelihood of confusion.[16]

Intentional copying or adopting a mark similar to another's mark raises an inference or presumption of likely confusion.[17] A defendant's use of its mark with knowledge of a senior user's mark may give rise to a presumption that the defendant intended to cause public confusion and does so.[18] When an alleged infringer knowingly adopts a mark identical or similar to another's mark, the court presumes that the defendant can accomplish the purpose of deceiving the public,[19] and all doubts must be resolved against the defendant.[20] The presumption arises only when the copier intends to exploit the good will created by an already registered trademark.[21] Although the inference may be a strong one,[22] it is merely permissive.[23] An intent to confuse may be reasonably inferred from the similarity of the marks if the senior mark has attained great notoriety.[24]

The likelihood of confusion should not be inferred in a trademark infringement case from proof that an actor intentionally copies the other's designation, if the copying was done in good faith under circumstances that do not otherwise indicate an intent to cause confusion or deception.[25] However, a competitor's intentional bad faith in adopting another's marks gave rise to a presumption in favor of the likelihood of confusion in a trademark infringement action.[26]

### Packaging.

Actual confusion could be inferred from a competitor's sale of nearly identically packaged accused products in response to specific customer requests for genuine items, and thus favored a finding of likely confusion on a trademark infringement claim.[27]

### Level of buyer sophistication.

In a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed merely from the similarity in a trade name.[28]

Westlaw. © 2023 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

| | |
|---|---|
| 1 | 15 U.S.C.A. §§ 1051 et seq. |
| 2 | §§ 108 et seq. |
| 3 | § 148. |
| 4 | U.S.—Romag Fasteners, Inc. v. Fossil, Inc., 979 F. Supp. 2d 264 (D. Conn. 2013); C=Holdings B.V. v. Asiarim Corporation, 992 F. Supp. 2d 223 (S.D. N.Y. 2013); Ohio State University v. Skreened Ltd., 16 F. Supp. 3d 905, 310 Ed. Law Rep. 264 (S.D. Ohio 2014); Phoenix Entertainment Partners LLC v. Boyte, 247 F. Supp. 3d 791 (S.D. Tex. 2017). |

**A.L.R. Library**

Case 1:21-cv-01238-GBW-JLH  Document 296  Filed 06/30/23  Page 225 of 576 PageID #: 12149

§ 304. Presumptions related to confusion or deception un..., 87 U.S. Trademarks,...

Validity, Construction, and Application of State Trademark Counterfeiting Statutes, 63 A.L.R.6th 303.

5      U.S.—C=Holdings B.V. v. Asiarim Corporation, 992 F. Supp. 2d 223 (S.D. N.Y. 2013).

6      U.S.—Romag Fasteners, Inc. v. Fossil, Inc., 979 F. Supp. 2d 264 (D. Conn. 2013).

7      U.S.—Bose Corp. v. Ejaz, 732 F.3d 17 (1st Cir. 2013).

8      U.S.—AFL Telecommunications LLC v. SurplusEQ.com Inc., 946 F. Supp. 2d 928 (D. Ariz. 2013).

9      U.S.—C=Holdings B.V. v. Asiarim Corporation, 992 F. Supp. 2d 223 (S.D. N.Y. 2013); Choice Hotels
       International, Inc. v. Zeal, LLC, 135 F. Supp. 3d 451 (D.S.C. 2015).

10     U.S.—Choice Hotels International, Inc. v. Zeal, LLC, 135 F. Supp. 3d 451 (D.S.C. 2015).

11     U.S.—Harp v. Rahme, 984 F. Supp. 2d 398 (E.D. Pa. 2013), aff'd, (3rd cir 13-4808) (Aug. 13, 2014).

12     U.S.—Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144 (4th Cir. 2012).

13     U.S.—Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144 (4th Cir. 2012).

14     U.S.—Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477 (5th Cir. 2004).

15     U.S.—Choice Hotels Intern., Inc. v. Patel, 940 F. Supp. 2d 532 (S.D. Tex. 2013).

16     U.S.—John Allan Co. v. Craig Allen Co. L.L.C., 540 F.3d 1133 (10th Cir. 2008).

17     U.S.—General Motors Corp. v. Keystone Automotive Industries, Inc., 453 F.3d 351, 2006 FED App. 0221P
       (6th Cir. 2006); Abercrombie & Fitch Co. v. Moose Creek, Inc., 486 F.3d 629 (9th Cir. 2007).

18     U.S.—Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc., 851 F.3d 440 (5th Cir. 2017).

19     U.S.—La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V., 762 F.3d 867 (9th Cir. 2014); UL LLC v. Space
       Chariot Inc., 250 F. Supp. 3d 596 (C.D. Cal. 2017).

20     U.S.—Water Pik, Inc. v. Med-Systems, Inc., 848 F. Supp. 2d 1262 (D. Colo. 2012), aff'd, 726 F.3d 1136,
       92 Fed. R. Evid. Serv. 136 (10th Cir. 2013).

21     U.S.—Shakespeare Co. v. Silstar Corp. of America, Inc., 110 F.3d 234 (4th Cir. 1997).

22     U.S.—John Allan Co. v. Craig Allen Co. L.L.C., 540 F.3d 1133 (10th Cir. 2008).

23     U.S.—Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97 (2d Cir. 2009); John Allan Co. v. Craig
       Allen Co. L.L.C., 540 F.3d 1133 (10th Cir. 2008).

24     U.S.—AutoZone, Inc. v. Strick, 543 F.3d 923 (7th Cir. 2008).

25     U.S.—Shakespeare Co. v. Silstar Corp. of America, Inc., 110 F.3d 234 (4th Cir. 1997).

26     U.S.—Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp., 97 F. Supp. 3d 485 (S.D. N.Y. 2015).

27     U.S.—Johnson & Johnson Consumer Companies, Inc. v. Aini, 540 F. Supp. 2d 374 (E.D. N.Y. 2008).

28     U.S.—Perini Corp. v. Perini Const., Inc., 915 F.2d 121 (4th Cir. 1990).

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government
                                                                                                    Works.

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LUXOTTICA GROUP, S.p.A., an
Italian corporation, and OAKLEY,
INC., a Washington corporation,

     Plaintiffs,

v.

AIRPORT MINI MALL, LLC, d/b/a
OLD NATIONAL DISCOUNT MALL,
a Georgia limited liability company,
YES ASSETS, LLC, a Georgia limited
liability company, CHIENJUNG YEH
a/k/a JEROME C. YEH, DONALD C.
YEH, JENNY YEH, and ALICE
JAMISON, individually,

     Defendants.

CIVIL ACTION NO.
1:15-cv-01422-AT

## JURY INSTRUCTIONS

### I. INTRODUCTION

Members of the jury:

It is my duty to instruct you on the rules of law that you must use in deciding this case.

When I have finished you will go to the jury room and begin your discussions, sometimes called deliberations.

### II. GENERAL INSTRUCTIONS

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against

anyone. You must follow the law as I explain it − even if you do not agree with the law − and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.

As I instructed you at the beginning of this case, the Plaintiffs here are Luxottica Group S.p.A. and Oakley, Inc., which are legal entities known as corporations. The Defendants are Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and Alice Jamison. Airport Mini Mall, LLC, and Yes Assets, LLC, are legal entities known as limited liability companies.

The fact that a corporation or limited liability company is involved as a party must not affect your decision in any way. A corporation, limited liability company, and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a corporation or limited liability company is involved, of course, it may act only through people as its employees or agents; and, in general, a corporation or limited liability corporation is responsible under the law for the acts and statements of its officers, employees, and agents that are made within the scope of their duties for the company.

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But, anything the lawyers say is not evidence and is not binding on you.

2

You should not assume from anything I have said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts

Your own recollection and interpretation of the evidence is what matters. In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You should not be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact.

There is no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must consider all the evidence, I do not mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point does not necessarily matter.

3

To decide whether you believe any witness I suggest that you ask yourself a few questions:

- Did the witness impress you as one who was telling the truth?
- Did the witness have any particular reason not to tell the truth?
- Did the witness have a personal interest in the outcome of the case?
- Did the witness seem to have a good memory?
- Did the witness have the opportunity and ability to accurately observe the things he or she testified about?
- Did the witness appear to understand the questions clearly and answer them directly?
- Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or did not say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake does not mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

4

**BURDEN OF PROOF**

In this case it is the responsibility of the Plaintiffs Luxottica and Oakley to prove every essential part of their claims by a "preponderance of the evidence." This is sometimes called the "burden of proof" or the "burden of persuasion."

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that the Plaintiffs' claim is more likely true than not true.

If the proof fails to establish any essential part of a claim or contention by a preponderance of the evidence, you should find against the Plaintiffs.

When more than one claim is involved, you should consider each claim separately.

In deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of the Plaintiffs' claim by a preponderance of the evidence, you should find for the Defendants Yes Assets, LLC, Airport Mini Mall, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and Alice Jamison as to that claim.

You should remember all of my prior instructions about the prohibition on consulting outside sources or individuals. For example, you should not Google or

5

search online or offline for any information about the case, the parties, or the law while deliberating. The law forbids jurors from talking with anyone else about the case and forbids anyone else to talk to the jurors about it. It is very important that you understand why these rules exist and why they're so important. You must base your decision only on the testimony and other evidence presented in the courtroom. It is not fair to the parties if you base your decision in any way on information you acquire outside the courtroom. For example, the law often uses words and phrases in special ways, so it is important that any definitions you hear come only from me and not from any other source. Only you jurors can decide a verdict in this case. The law sees only you as fair, and only you have promised to be fair – no one else is so qualified.

When specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter. But that does not mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

Sometimes the parties have agreed that certain facts are true. This agreement is called a stipulation. You must treat these facts as proved for this case.

The "chain of custody" refers to the movement and location of real evidence, and the history of those persons who had it in their custody, from the

6

time it is obtained to the time it is presented in court. Gaps in the chain of custody bear on the weight you give this evidence.

## III.  TRADEMARK INFRINGEMENT

Plaintiffs Luxottica Group S.p.A. and Oakley, Inc. seek damages against Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh and Alice Jamison for contributory trademark infringement. To help you understand the evidence presented in this case, I will explain some of the legal terms you have heard during this trial.

This case involves trademarks, which are sometimes referred to simply as "marks." A trademark is a word, name, symbol, device or some combination of these used by a person or company to identify their product, to identify and distinguish their product from those manufactured or offered by others, and to indicate the source of their product.

The main function of a trademark is to identify and distinguish the product of a particular merchant and to protect its goodwill against the sale of another's product as its own.

The purpose of trademark law is to prevent confusion among consumers about the source of products and to permit trademark owners to show ownership of their products and control their products' reputation.

A trademark is also a merchandising symbol that helps a prospective purchaser to select the goods or services that the purchaser wants. A trademark

7

signifies that all goods bearing the mark derive from a single source and are equivalent in quality. There is thus a public interest in the use of trademarks.

A counterfeit trademark or counterfeit mark is a non-genuine or unauthorized copy of a trademark. It is identical with, or substantially indistinguishable from, a registered trademark. The distribution, sale, or offer for sale of goods bearing a counterfeit mark is illegal under federal law and a form of trademark infringement referred to as "counterfeiting." This is true even if a person merely sells or offers for sale goods bearing a counterfeit mark and plays no part in affixing or placing the counterfeit mark on the goods, or otherwise designing or manufacturing the goods.

The law entitles the owner of a trademark to exclude others from using that trademark without its permission. The unauthorized use of a trademark is called "infringement" of the trademark if the use of the mark in commerce creates a likelihood of confusion, mistake, or deception as to the source, affiliation or sponsorship of the goods. The owner of a trademark may enforce the right to exclude its use by others in an action for trademark infringement.

Trademark owners have a duty to police the use of their own trademarks and to take reasonable steps to maintain their rights in the subject trademarks. A trademark owner is not required to take action against every infringing use no matter how inconsequential. A trademark owner's efforts at policing its trademarks is proof of the strength of its marks.

8

You are instructed that Luxottica and Oakley own the federal registrations for the trademarks they seek to protect in this action and have the incontestable right to use these registered trademarks in commerce for the products they sell under the trademarks.

Because Luxottica and Oakley own federal registrations for their trademarks, Defendants and their vendors are deemed to have knowledge of these registrations and of the rights claimed in the registrations. This is known as "constructive notice," and Defendants and their vendors cannot claim that they adopted the words, symbols or designations they used on their goods without knowledge of Luxottica's and Oakley's trademarks. In this case, Luxottica and Oakley enjoy nationwide constructive notice of rights dating back to the filing date of their trademark applications, which are reflected in the trademark registration certificates entered into evidence.

Plaintiffs as the holders of registered trademarks can bring a trademark infringement claim against any person who, without Plaintiffs' consent, (1) uses any reproduction, counterfeit, copy, or colorable imitation of a registered mark; (2) in commerce; (3) in connection with the sale, offering for sale, distribution, or advertising of any goods or services; (4) where such use is likely to cause confusion, or to cause mistake, or to deceive as to the source, origin, affiliation, approval, or sponsorship of Plaintiffs' goods.

9

## CONTRIBUTORY LIABILITY

Plaintiffs' claim in this case is for what the law calls contributory trademark infringement. Plaintiffs do not allege that Defendants directly sold or offered for sale counterfeit Ray-Ban and Oakley merchandise. Instead, Plaintiffs contend that through their actions or inactions, Defendants contributed to the counterfeit trademark infringement activity of its tenants/vendors that is alleged to have taken place at the Old National Discount Mall during a number of years. Liability for trademark infringement can extend beyond those who directly engage in infringement under certain circumstances. To find Defendants liable, you must first determine whether or not any of the vendors at the Old National Discount Mall infringed any of Luxottica and/or Oakley's trademarks. In other words, liability for contributory trademark infringement must be premised on some direct infringement by a third party, in this case the individual tenants/vendors who rent space within the Old National Discount Mall.

In order to establish their claim for contributory trademark infringement against the Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison, Luxottica and Oakley must prove each of the following by a preponderance of the evidence:

First: One or more of the tenants/vendors of Old National Discount Mall were selling, offering for sale, or distributing merchandise bearing counterfeit Ray-Ban and/or Oakley trademarks; and,

10

<u>Second</u>:  Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison either knew, or had reason to know, or were willfully blind that one or more of the tenants/vendors of the Old National Discount Mall were selling, offering for sale, or distributing merchandise bearing counterfeit Ray-Ban and/or Oakley trademarks; and

<u>Third</u>: Defendant Airport Mini Mall, LLC, through its owners, managers, or agents Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison continued to provide services including but not limited to space, utilities, parking, advertising and customers to any tenant/vendor that it either knew or had reason to know was selling, offering for sale, or distributing products bearing counterfeits of any of Luxottica's or Oakley's trademarks, or was willfully blind to such activity; and,

<u>Fourth</u>: Defendant Yes Assets, LLC through its owners, managers, or agents Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison continued to provide services including but not limited to space, utilities, parking, advertising and customers to its tenant, Airport Mini Mall, LLC, that it knew or had reason to know was allowing its tenants/vendors to sell, offer for sale, or distribute products bearing counterfeits of any of Luxottica's or Oakley's trademarks, or was willfully blind to such activity; and,

<u>Fifth</u>: Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison possessed the power and authority

11

to exercise control over the means of the tenants/vendors' sale, offering for sale, or distribution of counterfeit merchandise.

Any act or omission by an officer, representative, employee, or other agent of Airport Mini Mall, LLC or Yes Assets, LLC in the performance of his or her duty is held in law to be the act or omission of Airport Mini Mall, LLC or Yes Assets, LLC. In addition to Jerome Yeh, Jenny Yeh, Donald Yeh, and Alice Jamison, Greg Dickerson is one of the representatives of Airport Mini Mall, LLC with management authority over daily operations at the Old National Discount Mall. Although not individually named as a Defendant, you may consider his knowledge, actions, or omissions in determining the liability of the Defendants. You should decide the case as to each Defendant separately. However, in doing so you might find that one person took actions on behalf of more than one Defendant.

I will now separately discuss each of these elements in more detail.

In order to establish the first element, that the vendors at the Old National Discount Mall infringed their trademarks, Luxottica and Oakley must show that: (1) they own a valid trademark; and (2) the vendors at the Old National Discount Mall Discount Mall used a word, symbol or other designation on their products that created a likelihood of confusion, mistake, or deception among consumers as to the source, affiliation, or sponsorship of Luxottica and Oakley's products.

12

As I have already explained to you, Plaintiffs are the owners and holders of certain registered trademarks used on Ray-Ban and Oakley merchandise and products.

You must consider whether Defendants' tenants/vendors infringed Luxottica's and Oakley's trademarks. That is, you must determine if vendors at the Old Discount Mall, without Luxottica or Oakley's consent, used the same or similar trademarks in connection with the sale of, or the offer to sell, goods in a manner that is likely to cause confusion among consumers as to the source, affiliation, approval, or sponsorship of the goods. "Source," "origin," "affiliation," "approval," or "sponsorship" means that the public believes that the merchandise sold by the vendors come from, are affiliated with, are approved by, or sponsored by Luxottica and/or Oakley. It is not necessary that the trademark used by the tenants/vendors be an exact copy of Plaintiffs' trademark.

In deciding whether Luxottica and Oakley have established a likelihood of confusion, you may consider the following factors: (1) the distinctiveness or strength of the trademarks that Luxottica and Oakley allege to have been infringed; (2) the similarity of the words, symbols or designations used by the vendors on products they sold at the Old Discount Mall to Luxottica's and Oakley's trademarks; (3) the similarity between the goods or services sold or offered for sale by the vendors and those sold by Luxottica and Oakley under their trademarks; (4) the similarity of the trade channels used by the parties; (5)

13

the similarity of advertising methods; (6) the bad faith intent of the vendors in adopting words, symbols or designations for their products that resemble Luxottica's and Oakley's trademarks; and (7) the existence and extent of any actual confusion among consumers. Because the presence of actual confusion usually is difficult to show, a finding of actual confusion is not required to find trademark infringement. No single factor or consideration controls, and Plaintiffs are not required to prove all, or even most, of the factors are present in any particular case. You should weigh all of the relevant evidence in determining whether a likelihood of confusion exists.

In the case of an alleged tenant/vendor's use of a counterfeit trademark, likelihood of confusion may be presumed.

A defendant has no affirmative duty to take precautions against the sale of counterfeit goods or to seek out and prevent alleged trademark violations and cannot be found liable if he or she simply fails to take reasonable precautions against sales of counterfeit items. As explained above, however, a defendant may be contributorily liable for infringement if the defendant continues to supply its services including but not limited to space, utilities, parking, advertising and customers to any tenant/vendor whom the defendant either knew or had reason to know was selling, offering for sale, or distributing products bearing counterfeits of Plaintiffs' trademarks.

14

**KNOWLEDGE**

In order to establish the element of knowledge, Plaintiffs have the burden of proving by a preponderance of the evidence that Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison:

(1) possessed actual knowledge that tenants/vendors of the Old National Discount Mall were selling, offering for sale, or distributing counterfeit Ray-Ban and/or Oakley products;

or, alternatively, (2) had reason to know that tenants/vendors of the Old National Discount Mall were selling, offering for sale, or distributing counterfeit Ray-Ban and/or Oakley products;

or, alternatively, (3) were willfully blind that the tenants/vendors of the Old National Discount Mall were selling, offering for sale, or distributing counterfeit Ray-Ban and/or Oakley products.

"Actual knowledge" means the Defendants possess specific knowledge that one or more tenants/vendors were selling counterfeit Ray-Ban and/or Oakley goods. Actual knowledge exists where it can be shown by the conduct, statements or observations of Defendants Airport Mini Mall, LLC or Yes Assets, LLC, by or through any one of their agents Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison that Defendants had knowledge of any vendor who was selling or offering for sale counterfeit Ray-Ban and/or Oakley goods.

15

"Reason to know" means that a reasonably prudent owner, manager, landlord or its agents would or should have known of the sale of counterfeit goods by their tenants/vendors. In considering whether Defendants Airport Mini Mall, LLC or Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, Alice Jamison, knew or had reason to know, you must determine what a reasonably prudent owner, manager, landlord or its agents would have understood in light of all the facts and circumstances.

"Willful blindness" means that the landlord or its agents had reason to suspect that counterfeit goods were being offered or sold, but deliberately failed to investigate, or looked the other way to avoid seeing such activity. Willful blindness may be sufficient to establish a contributory trademark infringement claim, but mere negligence is not. Willful blindness asks what the defendant suspected and what he did with such suspicion. Thus, a defendant can be found liable for contributory trademark infringement if he or she suspects wrongdoing and deliberately fails to investigate.

In determining the scope of Defendants' knowledge, you may consider the nature and extent of the communication between Defendants and their tenants/vendors regarding the infringing acts and whether or not Defendants explicitly or implicitly encouraged the infringing activity. You may also consider the extent and nature of the alleged infringement. If the infringement is serious

16

and widespread, it is more likely that the Defendants knew about and condoned the acts of its tenants/vendors.

### CONTROL

The element of control may be satisfied by proof by a preponderance of the evidence that Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison possessed the right, ability or authority to control either (i) the use of the physical retail space that it rented at the Discount Mall, or (ii) the activities that any of its vendors could engage in while occupying such space at the Discount Mall.    Plaintiffs may establish control by proof by a preponderance of the evidence that that Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison possessed the necessary control over the means of infringement if Defendants had the right, ability or authority to evict a tenant/vendor, to terminate a tenant/vendor's lease, or to decline to renew a tenant/vendor's lease. Plaintiffs may also establish control by proof by a preponderance of the evidence that Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison possessed the necessary power or authority to restrict through provisions in the lease agreements, by promulgating rules and regulations, or otherwise, the activities in which tenants/vendors were permitted to engage at the Discount Mall.  The issue is whether Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh,

17

and/or Alice Jamison possessed such power and authority, not whether they chose to exercise it in a particular case. In determining whether Defendants Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, and/or Alice Jamison are liable for contributory trademark infringement, you may consider whether there was a bad faith refusal by Defendants to exercise a clear contractual power to halt the infringing activities of its tenants/vendors.

Defendants contend that the individual vendors within the Old National Discount Mall, as tenants of Airport Mini Mall, LLC, operate under formal lease agreements and are entitled to certain protections under Georgia law. As a result, Defendants contend that in order to evict any tenants/vendors from the Old National Discount Mall for selling counterfeit goods in violation of their lease agreements, Defendants are required to bring a successful dispossessory action in court. Plaintiffs contend that Defendants had the authority and the power under the terms of the lease agreement to terminate the lease and reenter and take possession without bringing a formal dispossessory action.

I instruct you under Georgia law, if, under the terms of a commercial lease, a landlord has the right to terminate a lease for breach of rules established by the lease, for specific reasons identified in the lease, or if it has the right to reenter and take possession of the premises immediately or within a specified number of days advance notice, the landlord may do so without filing or going through a dispossessory proceeding in court if this can be accomplished. A landlord is

18

therefore entitled to rely upon default provisions in a commercial lease agreement, which gives him the right to terminate the lease or reenter and take possession without resort to legal proceedings or a dispossessory proceeding, and he properly acts pursuant to the terms of lease in reentering and taking possession of premises upon default by tenants, without being subject to liability to the tenant for trespass, breach of implied covenant of quiet enjoyment of the premises, or breach of terms of lease agreement. A landlord similarly has the right to terminate or decline to renew a commercial property lease at its date of conclusion and then reenter and take possession of the premises without filing or resort to a dispossessory proceeding, so long as he can take possession without a breach of the peace. A breach of the peace is a violation or disturbance of the public tranquility and order. If a commercial landlord is unable to reenter the premises and take possession without a breach of the peace, he is required to file a dispossessory lawsuit.

Evidence has been presented in this case and you have heard testimony about the sale of counterfeit goods of brands other than Luxottica and Oakley at the Old National Discount Mall. The Defendants cannot be held liable to Luxottica and Oakley for the infringing sale of counterfeit merchandise bearing other trademarks, such as Louis Vuitton or Coach, by tenants/vendors of the Old National Discount Mall. Evidence of these other sales may be relevant to your evaluation of the scope of evidence of the widespread counterfeiting problem

19

alleged by Plaintiffs and Defendants' knowledge (or blindness) of the sale of counterfeit goods at the Discount Mall and Defendants' exercise of control or lack thereof of the infringing conduct of its tenants/vendors.

## IV. STATUTORY DAMAGES

If you find from a preponderance of the evidence that any Defendant is liable to the Plaintiffs for contributory counterfeit trademark infringement, you must consider the issue of damages.

Under the federal trademark infringement laws, Luxottica and Oakley are entitled to recover an award of statutory damages for each of their trademarks that were counterfeited on any of the goods that were sold, offered for sale or distributed by the vendors at the Old National Discount Mall.

In order to recover statutory damages, Luxottica and Oakley need not prove any actual damages they suffered or the profits that Defendants earned from the sale of counterfeit products. Rather, the purpose of awarding statutory damages for trademark infringement is to deter Defendants and other contributory infringers, actual or potential, from engaging in similar conduct.

In determining the amount to award Luxottica and Oakley, you must first determine which of Plaintiffs' trademarks, if any, appeared on the counterfeit goods that were sold, offered for sale, or distributed by Defendants' tenants/vendors (the "Counterfeit Marks") at the Discount Mall. Second, for each of the Counterfeited Marks, you must determine the number of different

20

types of goods upon which the Counterfeited Mark appears. For example, if you find that the Ray-Ban script appears on eyeglasses and cases, this would count as two types of goods on which the counterfeit mark appears.

Finally, by statute you may award between $1,000 and $200,000 for each Counterfeited Mark used, for each type of goods sold, offered for sale, or distributed by the tenants/vendors at the Old National Discount Mall. If, however, you find that any Defendant's conduct was "willful," you may award statutory damages up to $2,000,000 per counterfeited mark per type of goods sold or offered for sale. "Willful" infringement means that the Defendants acted with actual knowledge or with reckless disregard that their conduct was contributorily infringing or causing infringement of a trademark. A finding of willfulness, however, is not required in order to award statutory damages.

You may select an amount as you consider just based upon the facts and circumstances of this case, and you may consider a number of factors, including, but not limited to:

1.  the degree of willfulness or the culpability of the Defendants;

2.  the Defendants' cooperation or lack of cooperation in providing information about infringing activity;

3.  the profits, if any, realized by the Defendants as a result of the infringing activity;

4.  the value of the trademarks that were infringed;

21

5.     the revenues, if any, lost by Luxottica and Oakley as a proximate result of the Defendants' conduct; and

6.     the need to deter the defendants and other parties similarly situated from engaging in contributory trademark infringement.

## V.     DUTY TO DELIBERATE

Your verdict must be unanimous – in other words, you must all agree. Your deliberations are secret, and you will never have to explain your verdict to anyone. Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you are discussing the case, do not hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you are judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case

## VI.     ELECTION OF FOREPERSON EXPLANATION OF VERDICT FORM

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and speak for you in court.  A verdict form has been prepared for your convenience.

[Explain verdict]

22

Take the verdict form with you to the jury room. When you've all agreed on the verdict, your foreperson must fill in the form, sign it and date it. Then you'll return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The court security officer will bring it to me and I'll respond as promptly as possible – either in writing or by talking to you in the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response. But I caution you not to tell me how many jurors have voted one way or the other at that time. That type of information should remain in the jury room and not be shared with anyone, including me, in your note or question.

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRAND MARKETING GROUP, LLC *doing business as* THERMABLASTER,

        Plaintiff,

        v.

INTERTEK TESTING SERVICES NA, INC. *doing business as* INTERTEK TESTING SERVICES

        Defendant.

12cv1572

**ELECTRONICALLY FILED**

# FINAL JURY INSTRUCTIONS

## I. General Instructions

Now that you have heard the evidence and the argument, it is my duty to instruct you on the law.

We have given you copies of the special Verdict Form on which you will answer specific questions. Please take a few minutes to read the Verdict Form, because the instructions I am about to give you will help you answer those questions.

When you retire to the jury room to deliberate, you may take these instructions with you, along with your notes, the exhibits that the Court has admitted into evidence, and the Verdict Form. You should select

one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open Court.

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in Court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, under the appropriate burden of proof, the parties have established their claims.  In other words, it is your duty to determine from the evidence what actually happened in this case, applying the law as I now explain it.

It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All the instructions are important, and you should consider them together as a whole; do not disregard or give special attention to

2

any one instruction; and do not question the wisdom of any rule of law or rule of evidence I state.   In other words, do not substitute your own notion or opinion as to what the law is or ought to be.

Perform these duties fairly.  Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

As jurors, you have a duty to consult with each other and to deliberate with the intention of reaching a verdict.  Each of you must decide the case for yourself, but only after a full and impartial consideration of all of the evidence with your fellow jurors.  Listen to each other carefully. In the course of your deliberations, you should feel free to re-examine your own views and to change your opinion based upon the evidence.  But you should not give up your honest convictions about the evidence just because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

When you start deliberating, do not talk to the bailiff, to me, or to anyone but each other about the case.  During your deliberations, you

must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a cell phone, a smart phone like Blackberries, Droids, or iPhones, or a computer of any kind; the internet, any internet service, or any text or instant messaging service like Twitter; or any internet chat room, blog, website, or social networking service such as Facebook, Twitter, MySpace, LinkedIn, or YouTube, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the bailiff. The bailiff will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.

One more thing about messages: Never write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that a certain number is voting one way or another. Your votes should stay secret until you are finished.

4

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, each juror must agree to the verdict. Your verdict must be unanimous.

A Verdict Form has been prepared for you. It has a series of questions for you to answer. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in, date the form, and each of you will sign it. You will then return to the courtroom and your foreperson will deliver your verdict to the bailiff. Unless I direct you otherwise, do not reveal your answers until you are discharged. After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be. It is your sole and exclusive duty and responsibility to determine the verdict.

## II. Evidence

### What is Evidence

I have mentioned the word "evidence." The "evidence" in this case consists of the testimony of witnesses, the documents and other physical items, if any, received as exhibits, and any facts stipulated by the parties.

### Exhibits

Counsel for Brand and Intertek have agreed to the legal admissibility of various exhibits. This means that these exhibits meet the requirements of the rules of evidence and therefore have been admitted for your consideration. This does not mean that the parties agree as to the inferences or conclusions that you should or may draw from any exhibit.

### Stipulations of Fact

The parties have agreed, or stipulated, to certain facts as being true and those stipulations have been placed on the record in this trial. You must treat any stipulations of fact as having been proved for the purposes of this case.

**What is Not Evidence**

The following things are not evidence:

1.  Statements, arguments, questions and comments by the lawyers are not evidence.

2.  Likewise, objections are not evidence.  Lawyers have every right to object when they believe something is improper.  You should not be influenced by the objection.  If I sustained an objection to a question, you must ignore the question and must not try to guess what the answer might have been.

3.  Any testimony that I ordered stricken from the record, or told you to disregard, is not evidence and you must not consider any such matter.

4.  Anything you saw or heard about this case outside the courtroom is not evidence.  You must decide the case only on the evidence presented here in the courtroom.  Do not let rumors, suspicions, or anything else that you may see or hear outside of court influence your decision in any way.

## Evidence, Inferences, and Common Sense

While you may consider only the evidence in the case in arriving at your verdict, you are permitted to draw such reasonable inferences from the testimony and exhibits you feel are justified in the light of your common experience, reason and common sense.

## Direct and Circumstantial Evidence

In this regard, you may consider either direct or circumstantial evidence. "Direct evidence" is the testimony of someone who asserts actual knowledge of a fact, such as an eyewitness. "Circumstantial evidence" is proof of a chain of facts and circumstances from which you may infer that something either did or did not happen. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It requires only that you weigh all of the evidence and be convinced that the party has met the burden of proof before you return a verdict for that party.

## Bias, Sympathy And Prejudice

You may not allow sympathy or personal feelings to influence your determination. Your duty is to decide the case solely on the basis

8

of the evidence or lack of evidence and the law as I have instructed you, without bias, prejudice, or sympathy for or against the parties or their counsel. Both the parties and the public expect that you will carefully and impartially consider all of the evidence in the case, follow the law as stated by the court, and reach a just verdict regardless of the consequences.

### Evidence Admitted for a Limited Purpose

In certain instances evidence may be admitted only for a particular purpose and not generally for all purposes. Whenever evidence was admitted for a limited purpose, consider it only for that purpose, and no other purpose.

In this regard, Plaintiff's exhibit number 20 is not to be considered for the truth of the matters asserted therein, such as whether a sales restriction on the Thermablaster heaters was indeed lifted. The information set forth in the e-mail is only considered to be true to the extent that Mr. Campo testified to his first-hand knowledge of the matters contained therein.

Plaintiff's exhibit number 21 is not to be considered for the truth of the matters asserted therein, such as what the ANSI standard states or means. The information set forth in the e-mail is only considered to be true to the extent that Mr. Campo testified to his first-hand knowledge of the matters contained therein.

**Jurors' Notes**

Your notes are not evidence in the case and must not take precedence over your independent recollection of the evidence. Notes are only an aid to your recollection and are not entitled to greater weight than your recollection of what the evidence actually is. You should not disclose any notes taken to anyone other than a fellow juror.

You were not obligated to take notes. If you did not take notes you should not be influenced by the notes of another juror, but instead should rely upon your own recollection of the evidence.

**III. Credibility of Witnesses / Weight of Testimony in General**

**In General**

You must consider all of the evidence, but this does not mean you must accept all of the evidence as true or accurate. You are the sole

10

judges of the credibility of the witnesses and the weight their testimony deserves.

You may be guided by the appearance and conduct of the witness, by the manner in which the witness testifies, by the character of the testimony given and by evidence or testimony to the contrary.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. Consider each witness' intelligence, motive, state of mind, and demeanor or manner while on the stand. Consider the witness' ability to have observed the matters as to which he or she has testified, and whether he or she impresses you as having an accurate recollection of these matters. Consider any business, personal or other relationship a witness might have with either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

### Inconsistencies or Discrepancies

Consider inconsistencies or discrepancies in the testimony of a witness or between different witnesses, which may or may not cause you to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently, and innocent mis-recollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

After making your own judgment, give the testimony of each witness the weight you think it deserves. You may, in short, accept or reject the testimony of any witness in whole or in part.

### False In One, False In All

If you find that a witness has lied to you in any material portion of his or her testimony, you may disregard that witness' testimony in its entirety. I say that you may disregard such testimony, not that you must. However, you should consider whether the untrue part of the testimony

was the result of a mistake or inadvertence, or was, rather, willful and stated with a design or intent to deceive.

### Not Required to Accept Uncontradicted Testimony

You are not required to accept any testimony, even though the testimony is not contradicted and the witness is not impeached. You may decide, because of the witness' bearing and demeanor, because of the inherent improbability of his or her testimony, or because of other reasons sufficient to you, that such testimony is not worthy of belief.

### Number of Witnesses Not Important

The weight of the evidence is not determined by the number of witnesses testifying for either side. You may find that the testimony of a small number of witnesses as to any fact is more credible than that of a larger number of witnesses to the contrary. In short, what is most important is how believable the witnesses were, and how much weight you think their testimony deserves.

### Depositions - Use as Evidence

Certain out-of-Court testimony of witnesses has been presented to you. Such testimony was given under oath prior to this trial, during

depositions of the witnesses. This method is permitted in order to simplify the presentation of the evidence, and you should not regard evidence presented in this way as any different from any other oral testimony. You may assess the credibility of witnesses who have testified by deposition in the same manner as you do witnesses who testify directly in open Court.

### Expert Testimony

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. An exception to this rule exists for "expert witnesses." An expert witness is a person who, by education and experience has become expert in some art, science, profession, or calling. Expert witnesses may state their opinions as to matters in which they profess to be expert, and may also state their reasons for their opinions.

You should consider each expert opinion received in evidence in this case, and give it such weight as you think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons

given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely. All that I have explained to you about impeachment of witnesses also applies to expert witnesses.  If you find the expert's testimony is less than credible, you may disregard all or part of that testimony according to your assessment of its truth.

In general, the opinion of an expert has value only when you accept the facts upon which it is based.  This is true whether the facts are assumed hypothetically by the expert, or they come from the expert's personal knowledge, from some other proper source, or from some combination of these.

Questions have been asked in which an expert witness was invited to assume that certain facts were true and give an opinion based upon that assumption.  These are called hypothetical questions.  If you find that any material fact assumed in a particular hypothetical question has not been established by the evidence, you should disregard the opinion of the expert given in response to that question. By material fact, we mean one that was important to the expert in forming his or her opinion

Similarly, if the expert has made it clear that his/her opinion is based on the assumption that a particular fact did not exist and, from the evidence you find that it did exist and that it was material, you should give no weight to the opinion so expressed.

**Burdens of Proof**

The burden of proof is on Brand to establish each element of its claims and the burden of proof is on Intertek to establish each element of its counterclaims. The burden of proof varies from claim to claim. Some claims require proof by clear and convincing evidence while other claims require proof by a preponderance of the evidence. I will now explain those two burdens of proof.

   **(1)   Preponderance of the Evidence**

A preponderance of the evidence means such evidence as, when considered and compared with that opposed to it, has more convincing force, and produces in your minds the belief that what is sought to be proved is more likely true than not true. This rule does not require proof to an absolute certainty, because absolute certainty is seldom if ever possible.

16

When you go into the jury room imagine that you have on the table the scales of justice on which two trays are hanging evenly in balance. Now label the right-hand tray "Brand's tray" and put on to that tray all the evidence on a particular claim which you feel favors Brand, giving to that evidence the weight that you believe it is fairly entitled to receive. Next, place on the left-hand tray, "Intertek's tray," all of the evidence in the case that favors Intertek's side of that claim; again, giving to that evidence the weight that you believe Intertek is fairly entitled to receive.

Remember, the weight of the evidence is <u>not</u> the number of persons testifying against either party; rather, it is the quality of the testimony given. For example, one person who saw an event and testified accurately as to what was seen may have the same weight as ten persons testifying to the same event on the other side.

After considering the weight of the evidence, if you think that the scales tip, ever so slightly or to the slightest degree, in favor of Brand, then Brand has sustained its burden of proof by a preponderance of the evidence and your verdict should be for the Brand and against Intertek on that claim. For Intertek's Counterclaims, the scales would have to

tip, ever so slightly, in favor of Intertek for Intertek to sustain its burden of proof.

### (2)    Clear and Convincing Evidence

Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction that the allegations sought to be proved by the evidence are true. Clear and convincing evidence involves a higher degree of persuasion than is necessary to meet the preponderance of the evidence standard. But it does not require proof beyond a reasonable doubt, the standard applied in criminal cases.

### Intertek's Status Does Not Infer Liability

Simply because a defendant is sued does not mean that the defendant is liable.  Anyone can file a lawsuit.  The fact that Brand filed this lawsuit does not, in itself, mean that Intertek has done anything that the law prohibits.  That is for you to decide on the basis of the evidence.

### Equality of Parties

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.  A corporation is entitled to the same

fair trial as a private individual. All persons, including corporations stand equal before the law, and are to be treated as equals.

## IV. Applicable Law

In this case, Brand has made the following two (2) claims, or causes of action, against Intertek: that Intertek (1) fraudulently and (2) negligently misrepresented itself to Brand. Intertek denies those allegations. Intertek, on the other hand, has made the following three (3) counterclaims, or causes of action, against Brand: (1) Brand infringed the trademark rights of Intertek; (2) Brand made fraudulent misrepresentations; and (3) Brand fraudulently concealed its use of Intertek's ETL mark. Brand denies these allegations. I will now go through the necessary elements to prove first the claims of Brand, and second, the counterclaims of Intertek in the order you will see them on the verdict form.

# I. Brand's Two Claims Against Intertek

1. **Fraudulent Misrepresentation**:

    A.  Elements of claim –

Brand must prove the following six elements by clear and convincing evidence, which I have previously explained to you, in order to succeed on its fraudulent misrepresentation claim: (1) a representation; (2) which is material to the transaction; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another; (5) justifiable reliance; and (6) resulting injury.

"Misrepresentation" defined –

A misrepresentation is any assertion by words or conduct that is not in accordance with the facts.

"Material" defined –

A fact is material if it is one that would be of importance to a reasonable person in determining a choice of action. A material fact, however, need not be the sole or even a substantial factor in inducing or

influencing a reasonable person's decision. A fact is also material if the person who fails to disclose it knows that the person to whom it is made is likely to regard it as important even though a reasonable person would not regard it as important.

"Reliance" defined –

Reliance means a person would not have acted as he did unless he considered the misrepresentation to be true.

"Fraud" defined –

Fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.  Fraud may occur by false or misleading allegations or by concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment.

B.    Factual Cause

In order for Brand to recover in this case, Intertek's fraudulent conduct must have been a factual cause in bringing about harm. Conduct

is a factual cause of harm when the harm would not have occurred

absent the conduct. To be a factual cause, the conduct must have been an

actual, real factor in causing the harm, even if the result is unusual or

unexpected. A factual cause cannot be an imaginary or fanciful factor

having no connection or only an insignificant connection with the harm.

To be a factual cause, Intertek's conduct need not be the only

factual cause. The fact that some other causes concur with Intertek's

fraud in producing an injury does not relieve Intertek from liability as

long as its own fraud is a factual cause of the injury.

C.    Defense - Puffery

Advertising puffery alone on a company website cannot support a

claim for misrepresentation.   Representations regarding the quality of

the program amount to mere 'puffing,' rather than fraud.

Puffery is defined as vague and general statements of optimism

understood by reasonable persons as such.  In general, the more precise

and concrete the statement, the less likely the statement is to be puffery.

## 2.   Negligent Misrepresentation

### A.   Elements of claim -

One who, in the course of its business, profession or employment, or in any other transaction in which it has a pecuniary interest, supplies false information for the guidance of others in its business transactions, is subject to liability for pecuniary loss caused to others by their justifiable reliance upon the information, if it fails to exercise reasonable care or competence in obtaining or communicating the information.

Brand must prove the following four elements by a preponderance of the evidence, which I have previously explained to you, in order to succeed on its negligent misrepresentation claim: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known of its falsity; (3) with an intent to induce another, here being Brand, to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.

Intertek is only liable to Brand for negligent misrepresentation if Intertek provided he information for the benefit and guidance of Brand or knew that Brand would reasonably rely upon the information .

23

In order to succeed on its claim for negligent misrepresentation, Brand must establish that it justifiably relied on Intertek. Again, commercial puffery in advertising alone cannot support a claim for negligent misrepresentation.

### B.   Factual Cause

In order for Brand to recover in this case, Intertek's negligent conduct must have been a factual cause, which I have previously defined at pages 21-22, in bringing about harm.

## 3.   **Damages**

### A.   Compensatory Damages

If you find that Brand has prevailed in either, or both, its negligent misrepresentation or fraudulent misrepresentation action, Brand is entitled to recovery for the loss caused by the concealment or misrepresentation.

Brand is entitled to be fairly and adequately compensated for the actual monetary loss it has suffered. Actual monetary loss includes:

1. the difference between the value it gave or amount it paid and the actual, real, or intrinsic value of what it received at the time of the transaction; and

2. all other monetary loss suffered as a consequence of the misrepresentation or nondisclosure, including the additional expenses and losses incurred as a result of the misrepresentation or nondisclosure, including, the profit Brand has shown to a reasonable certainty that it would have made.

In an action based on fraud, the measure of damages is "actual loss", and not the benefit, or value, of that bargain. The victim is entitled to all pecuniary losses which result as a consequence of its reliance on the truth of the representations.

The standard for determining future damages is that Brand bears the burden of proof by a preponderance of the evidence. Under this criterion, Brand is required to furnish only a reasonable quantity of information from which you may fairly estimate the amount of damages.

Justice and public policy require that the wrongdoer bear the risk of uncertainty which his own wrong has created and which prevents the

precise computation of damages. You, the fact-finder, however, still may not render a verdict based on speculation or guesswork.

You may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable and inferential, as well as upon direct and positive proof. While you may not use sheer conjecture as a basis for arriving at a verdict, you may use a measure of speculation in aiming at a verdict or an award of damages, and an even greater degree of flexibility is granted in regard to testimony concerning prospective or future damages, which are at best, not always easy or certain of ascertainment and are to a large extent based on probabilities and uncertainties. Generally, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences.

It is only required that the proof afford a reasonable basis from which you can calculate Brand loss.

B. <u>Punitive Damages</u>

If you find that the conduct of Intertek was outrageous, you may award punitive damages, as well as any compensatory damages, in order

to punish Intertek for its conduct and to deter Intertek and others from committing similar acts.

A company's conduct is "outrageous" when it is malicious, wanton, willful, or oppressive, or shows reckless indifference to the interests of others.

If you decide that Brand is entitled to an award of punitive damages, it is your job to fix the amount of such damages. In doing so, you may consider any or all of the following factors:

1.      The character of Intertek's act;

2.      The nature and extent of the harm to Brand that Intertek caused or intended to cause; and

3. The wealth of Intertek insofar as it is relevant in fixing an amount that will punish it, and deter it and others from like conduct in the future.

It is not necessary that you award compensatory damages to Brand in order to assess punitive damages against Intertek, as long as you find in favor of Brand and against Intertek on the question of liability.

The amount of punitive damages awarded must not be the result of passion or prejudice against Intertek on the part of the jury. The sole purpose of punitive damages is to punish Intertek's outrageous conduct and to deter Intertek and others from similar acts.

## II. Intertek's Three Counterclaims Against Brand

### 4. Trademark Infringement/Lanham Act

#### A. Elements of claim

Intertek claims that Brand has infringed Intertek's trademark. A trademark is a word, symbol, or combination of words or symbols used by a company to identify its product, to distinguish its product from those manufactured or sold by others, and to indicate the source of its product.

Intertek claims that Brand infringed Intertek's ETA trademark by using the ETA mark on Thermablasters. Brand denies that it is liable for trademark infringement because it argues that Intertek did not suffer any harm as a result of the alleged infringement.

Intertek must prove the following four elements by a preponderance of the evidence, which I have previously explained to

you, in order to succeed on its Lantham Act claim: (1) that Intertek owns the ETA trademark; (2) that Intertek's trademark is a valid trademark; (3) that Brand used the ETA trademark in interstate commerce; and (4) that Brand used the ETA trademark in a manner that is likely to cause confusion or mistake as to the approval of Brand's product.

The parties have stipulated or agreed that Intertek owns the ETA trademark and that it is a valid trademark.

"Use" Defined

As to the requirement that Brand used the ETA trademark in interstate commerce, it is sufficient for Intertek to prove that a third-party used the ETA trademark in interstate commerce if Brand continued to supply infringing Thermablasters when Brand knew or had reason to know that doing so would cause the third party to sell infringing Thermablasters.

"Confusion or Mistake" Defined

As to the requirement that that Brand used the trademark in a manner that is likely to cause confusion or mistake as to the approval of Brand's product, if you find that Brand used the ETA trademark on its

Thermablasters, the law presumes that such use is likely to cause
confusion or mistake as to the approval of Brand's products. Brand can
rebut this presumption with evidence that the use of the ETA mark was
not likely to cause confusion or mistake as to the approval of Brand's
product.

B.  Willfulness

If you find that Brand infringed Intertek's trademark, you must
also determine whether Intertek NA has proven that, at the time Brand
infringed the trademark, Brand acted willfully. Brand acted willfully if it
knew that it was infringing Intertek NA's trademark or if it acted with
indifference to Intertek NA's trademark rights.

C.  Damages under Lanham Act

To recover damages on its trademark infringement counterclaim
under the Lanham Act, Intertek must prove two things by a
preponderance of the evidence: (1) Brand's infringement caused actual
confusion among consumers; and (2) as a result, Intertek sustained
injury.

If you find that Intertek has proven these things, then you must consider what amount of money to award to Intertek as damages, if any.

Damages consist of the amount of money required to compensate Intertek for the injury caused by Brand's infringement. Intertek must prove its damages by a preponderance of the evidence.

You may consider the following types of damages: (1) Intertek's lost profits on lost sales, which consists of the revenue Intertek would have earned but for Brand's infringement, less the expenses Intertek would have sustained in earning those revenues ; (2) Loss of goodwill. Goodwill is consumer recognition or drawing power of a trademark. In determining loss of goodwill, you should compare the value of Intertek's goodwill before the infringement with the value of Intertek's goodwill after the infringement.

Disgorgement of Profits

In addition to Intertek's damages, Intertek may recover the profits Brand gained from the trademark infringement. You may not, however, include in any award of profits any amount that you took into account in determining actual damages.

31

## "Profit" Defined

Profit is determined by deducting expenses from gross revenue. Gross revenue is all of the money Brand received due to its use of the trademark. Intertek is required only to prove Brand's gross revenue. Brand is required to prove any expenses that it argues should be deducted in determining its profits.

Intertek is entitled to recover Brand's total profits from its use of the trademark unless Brand proves that a portion of the profit is due to factors other than use of the trademark.

## 5.    **Fraudulent Misrepresentation**

A.    Elements of claim –

Intertek must prove the following six elements by clear and convincing evidence, which I have previously explained to you, in order to succeed on its fraudulent misrepresentation counterclaim: (1) a representation; (2) which is material to the transaction; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another; (5) justifiable reliance; and (6) resulting injury.

I have previously explained the elements of fraudulent misrepresentation at pages 20-21 and you should apply those same definitions to Interterk's counterclaim as you did for Brand's claim

B.    Factual Cause

In order for Intertek to recover in this case, Brand's fraudulent conduct must have been a factual cause, which I have previously defined at pages 21-22, in bringing about harm.

C.    Damages for Fraudulent Misrepresentation

1.    Compensatory Damages

If you find that Intertek has prevailed in its fraudulent misrepresentations action, Intertek is entitled to recovery for the loss caused by the misrepresentation.

Intertek is entitled to be fairly and adequately compensated for the actual monetary loss it has suffered.  Actual monetary loss includes:

1. the difference between the value it gave or amount it paid and the actual, real, or intrinsic value of what it received at the time of the transaction; and

2. all other monetary loss suffered as a consequence of the concealment, including the additional expenses and losses incurred as a result of the concealment.

I have previously explained to you how such determinations should be made and you should follow the same instructions with respect to Intertek's counterclaim as with Brand's claims.

## 2. Punitive Damages

If you find that the conduct of Brand was outrageous, you may award punitive damages, as well as any compensatory damages, in order to punish Brand for its conduct and to deter Brand and others from committing similar acts. I have previously explained the considerations in awarding punitive damages and you should follow the same instructions with respect to Intertek's counterclaim as with Brand's claim.

## 6. **Fraudulent Concealment**

A. Elements of claim –

Intertek must prove the following five elements by clear and convincing evidence, which I have previously explained to you, in order

to succeed on its fraudulent concealment claim: (1) a concealment; (2) which is material to the transaction; (3) with the intent of misleading another; (4) justifiable reliance; and (5) resulting injury.

"Concealment" Defined

Brand concealed a fact that it knew, if, by conduct, or by written or oral words, or by a combination of conduct and words, it created a false impression of the actual fact in the mind of Intertek by either (1) covering up the truth or (2) by preventing Intertek from discovering the actual fact for itself.

I have previously defined the terms material, reliance, and fraud at pages 20-21 and you should use those definitions when deciding if Intertek has met its burden of proof with respect to its fraudulent concealment claim.

B.   Factual Cause

In order for Intertek to recover in this case, Brand's fraudulent conduct must have been a factual cause, which I have previously defined at pages 21-22, in bringing about harm.

C.    Damages for Fraudulent Concealment

1.    Compensatory Damages

If you find that Intertek has prevailed in its fraudulent concealment action, Intertek is entitled to recovery for the loss caused by the concealment or misrepresentation.

Intertek is entitled to be fairly and adequately compensated for the actual monetary loss it has suffered.  Actual monetary loss includes:

1. the difference between the value it gave or amount it paid and the actual, real, or intrinsic value of what it received at the time of the transaction; and

2. all other monetary loss suffered as a consequence of the concealment, including the additional expenses and losses incurred as a result of the concealment.

I have previously explained to you how such determinations should be made and you should follow the same instructions with respect to Intertek's counterclaim as with Brand's claims.

## 2. Punitive Damages

If you find that the conduct of Brand was outrageous, you may award punitive damages, as well as any compensatory damages, in order to punish Brand for its conduct and to deter Brand and others from committing similar acts. I have previously explained the considerations in awarding punitive damages and you should follow the same instructions found at pages 26-27 with respect to Intertek's counterclaim as with Brand's claim.

## V. Process of Jury Deliberation

Your verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree. In other words, your verdict must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so, without violation to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of all the evidence in the case with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember, at all times you are not partisans. You are judges -- judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

Upon retiring to the jury room you should first select one of your number to act as your foreperson who will preside over your deliberations and will be your spokesperson here in court. You can make this selection and conduct your deliberations in whatever manner you think best, but I offer some suggestions that other juries have found helpful to allow full participation by all jurors and to arrive at a verdict that satisfies everyone.

The foreperson should encourage open communication, cooperation and participation by all jurors, and be willing and able to facilitate discussions when disagreements and disputes arise.

The foreperson should let each of you speak and be heard before expressing her or his views.

The foreperson should never attempt to promote or permit anyone else to promote his or her personal opinions by coercion or bullying.

The foreperson should make sure that deliberations are not rushed. Some people are better at facilitating than others, and if it becomes clear that someone else would be a more effective foreperson, you might want to consider selecting a different person, with no hard feelings.

You also may think it wise to select a secretary to record votes, which should probably be cast by secret ballot, and to keep track of whether everyone has spoken.

Some juries think it will be useful to take a preliminary vote before discussions are started, however, such an early vote often proves counter-productive for several reasons, including that it tends to "lock-in" a particular point of view before alternative points of view are covered.

You should listen carefully and attentively to each other, and hear what each other person is saying before responding. Don't interrupt and

don't monopolize the discussion.  Speak one at a time.  Be patient and respectful of other opinions, and don't take it personally if someone disagrees with you.

A verdict form has been prepared for you, and you have reviewed a copy.  You will take the original verdict form to the jury room and when you have reached a unanimous agreement as to your verdict, you will each sign it, have your foreperson date it, and then signal the bailiff that you are prepared to return to the courtroom.

You will also be provided with copies of these instructions for your use during deliberations.  If, during your deliberations, you should desire to communicate with the court, please reduce your message or question to writing signed by the foreperson, and pass the note to the bailiff who will bring it to my attention.  After consulting with the lawyers, I will then respond as promptly as possible, either in writing or by having you returned to the courtroom so that I can address you orally. I caution you, however, with regard to any message or question you might send, that you should never state or specify your numerical division at the time.

40

It is proper to add the caution that nothing said in these instructions and nothing in the Verdict Form prepared for your convenience is meant to suggest or hint in any way what verdict I think you should find.

What the verdict shall be is your sole and exclusive duty and responsibility. You will note from the oath about to be taken by the bailiff that she too, as well as all other persons, are forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

[swear Bailiff(s) and send jury out]

# EXHIBIT 8

 Neutral
As of: June 30, 2023 11:29 PM Z

# New Balance Ath., Inc. v. USA New Bunren Int'l Co. LLC

United States District Court for the District of Delaware

September 18, 2020, Decided

C.A. No. 17-1700 (MN)

**Reporter**
2020 U.S. Dist. LEXIS 170906 *; 2020 WL 5593932

NEW BALANCE ATHLETICS, INC., Plaintiff, v. USA NEW BUNREN INTERNATIONAL CO. LIMITED LLC, Defendant.

**Prior History:** New Balance Ath., Inc. v. USA New Bunren Int'l Co. Ltd. LLC, 424 F. Supp. 3d 334, 2019 U.S. Dist. LEXIS 208759, 2019 WL 6528043 (D. Del., Dec. 4, 2019)

**Counsel:** [*1] For Plaintiff: Arthur G. Connolly, III, Ryan P. Newell, Stephanie Smiertka Riley, CONNOLLY GALLAGHER LLP, Wilmington, Delaware, Thomas L. Holt, Jeremy L. Buxbaum, PERKINS COIE LLP, Chicago, Illinois.

For Defendant: Dennis J. Butler, John D. Simmons, PANITCH SCHWARZE BELISARIO & NADEL LLP, Wilmington, Delaware; Timothy T. Wang, NI, WANG & MASSAND, PLLC, Dallas, Texas.

**Judges:** Honorable Maryellen Noreika, United States District Judge.

**Opinion by:** Maryellen Noreika

# Opinion

<u>**MEMORANDUM OPINION**</u>

September 18, 2020

Wilmington, Delaware

/s/ Noreika

**NOREIKA, U.S. DISTRICT JUDGE**

On cross-motions for summary judgment, Plaintiff New Balance Athletics, Inc. ("New Balance") sought, among other things, a ruling that is was entitled to statutory damages and attorneys' fees from Defendant USA New Bunren International Co. Limited LLC ("New Bunren") pursuant to 15 U.S.C. § 1117. (D.I. 52; D.I. 58). On December 4, 2019, the Court granted New Balance's motion for statutory damages under § 1117(c)(1), but denied without prejudice its motion for statutory damages under § 1117(c)(2) and attorneys' fees under § 1117(a) or (b). (D.I. 73 at 22-25; D.I. 74). For reasons stated in the opinion, the Court did not determine at that time the amount of statutory damages to award.

On December 18, 2019, the **[*2]** Court granted the parties' request to forego a trial and instead resolve the two remaining issues through supplemental briefing. The issues are: (i) the amount of statutory

damages to which New Balance is entitled and (ii) whether New Balance is entitled to attorneys' fees and costs. (D.I. 77). The parties have filed supplemental briefing. (D.I. 85; D.I. 86; D.I. 87). For the following reasons, the Court will award $504,000 in statutory damages but nothing in attorneys' fees and costs.

# I. <u>DISCUSSION</u>

## A. Statutory Damages

As stated previously, the Court has already determined that New Bunren is liable for statutory damages under 15 U.S.C. § 1117(c). (D.I. 73 at 24). Thus, the only issue left to decide is the amount of damages to award.[1] Section 1117(c) authorizes statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed." 15 U.S.C. § 1117(c)(1). If the defendant's infringement was willful, then the maximum award is trebled to $2 million per mark per type of good. 15 U.S.C. § 1117(c)(2). The specific dollar amount within the applicable range is the amount "the court considers just." 15 U.S.C. § 1117(c). Thus, to calculate the total amount of statutory damages, the court, in an exercise of **[*3]** its discretion, sets a dollar amount per violation and then multiplies that amount by three variables: (i) the number of counterfeit marks, (ii) the number of types of goods, and (iii) an appropriate amount if the infringement was willful. Each variable is addressed in turn.

## 1. Number of Marks

Several courts in this circuit have determined the number of "counterfeit marks" by looking to the number of plaintiff's registered marks that were counterfeited by defendant. *See, e.g., Chanel, Inc. v. Matos*, 133 F. Supp. 3d 678, 687-88 (D.N.J. 2015) (multiplying statutory damages by three for the number of plaintiff's infringed trademark registrations); *Coach, Inc. v. Ocean Point Gifts*, C.A. No. 09-4215 (JBS), 2010 U.S. Dist. LEXIS 59003, 2010 WL 2521444, at *7 (D.N.J. June 14, 2010) (multiplying statutory damages by five based on the number of plaintiff's infringed trademark registrations); *see also* D.I. 85 at 9-10 (collecting cases). New Bunren does not dispute that this is the correct way to determine the number of counterfeit marks. New Bunren also does not dispute that the number of New Balance's counterfeited trademark registrations is four. (D.I. 86 at 19-20). Accordingly, the Court will use four marks in its calculation.

## 2. Number of Type of Goods

Statutory damages are measured "per type of goods or services sold, offered for sale, or distributed." 15 U.S.C. § 1117(c). One type of good **[*4]** is counted separately from another type of good if the "functional purpose of the product[s] are different. *A.M. Surgical, Inc. v. Akhtar*, No. 15-CV-1318 (ADS)(SIL), 2016 U.S. Dist. LEXIS 53055, 2016 WL 11543560, at *10 (E.D.N.Y. Apr. 19, 2016) (holding

---

[1] New Bunren spent the bulk of its supplemental brief re-arguing liability. (*See* D.I. 86). The time, however, for New Bunren to argue that it is not liable for statutory damages because advertising and promotion are not, as a matter of law, "offers for sale" under § 1117(c) was in the cross-motions for summary judgement. Indeed, New Bunren argued at that time that no offers for sale took place and lost. (D.I. 53 at 10; D.I. 73; *see also* D.I. 95 (Memorandum Order denying motion for reargument). For these reasons, the Court will not consider arguments in the supplemental brief that do not address the limited issue before it.

that scalpels, scissors, forceps, retractors, and probes were all different types of goods); *see also* *Chanel*, 133 F. Supp. 3d at 688 (holding that shirts and pants are different types of goods).

A court may use the list of goods recited in a defendant's trademark application to determine the number of types of goods, because "defendant's own registration application to the PTO demonstrates that each type of good was identified differently, treated separately, and thus distinguished from one another by defendant." *Rolls-Royce PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 159 (E.D.N.Y. 2010). Here, New Bunren's Statement of Use for its "N" mark application listed 21 different types of goods: hats, socks, gloves, belts, shoes, bodysuits, scarves, dance tops, dance bottoms, swimsuits, t-shirts, polo shirts, short-sleeve shirts, long-sleeve shirts, shorts, pants, sweaters, pullovers, tights, jackets, and hooded sweatshirts.[2]

New Bunren does not dispute that a court may rely on a Statement of Use to determine the number of type of goods. New Bunren also does not dispute that each of the 21 goods in its Statement of Use should be counted **[*5]** as a different type. Although several goods appear to be cumulative, for example t-shirts, polo shirts, and short sleeve shirts, or pullovers and hoodies, New Bunren's Statement of Use and the absence of any argument to the contrary demonstrate that it considers these goods to be separate types. *See Rolls-Royce*, 688 F. Supp. 2d at 159 (counting 20 different categories of product even though most of them were different kinds of shirts because defendant's registration application demonstrates that each type of good was identified differently by defendant). Accordingly, the Court will calculate damages using 21 types of goods.


### 3. Willfulness

Willful trademark infringement requires "an intent to infringe or a deliberate disregard of a mark holder's rights." *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3d Cir. 1999), superseded by statute on other grounds as stated in *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 173-76 (3d Cir. 2005). New Balance argues that willfulness can be inferred here because: (1) New Bunren continued its infringing activity after being given notice of New Balance's infringement concerns; (2) New Bunren used virtually identical marks on virtually identical goods to deliberately deceive customers; and (3) New Bunren offered its counterfeit goods for sale on the Internet, enabling wide dissemination of the infringing products. **[*6]** (D.I. 85 at 6).

The first two arguments merit a finding of willfulness.[3] "Willfulness can be inferred by the fact that a defendant continued infringing behavior after being given notice." *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002). New Bunren was put on notice of its infringing activity in January 2016, when New Balance filed a cancellation petition with the Trademark Trial and Appeal Board. (D.I. 85 at 6; D.I. 60 ¶ 40; D.I. 64 ¶ 40). But New Bunren nevertheless continued its infringing

---

[2] In the Statement of Use, New Bunren also declared under oath that the "N" mark was "in use in commerce on or in connection with all of the goods/services" identified in the application. (D.I. 72-1, Exs. 47-52). For purposes of registration, a mark is used "in commerce" when "the goods are sold or transported in commerce." 15 U.S.C. § 1127. Thus, by filing the Statement of Use for its "N" mark applications, New Bunren represented under oath that it sold or transported in commerce each of the 21 types of goods listed in these filings.

[3] The Court is not persuaded by New Balance's argument that use of the Internet, as opposed to a brick and mortar store, is grounds to find willfulness. (D.I. 85 at 7-8). In the cited cases, courts increased the amount of damages when the Internet allowed for more widespread dissemination of the counterfeit products, but the courts did not state that use of the Internet meant the defendant's actions were willful. *See, e.g,* *Chanel*, 133 F. Supp. 3d at 688.

activity. By New Bunren's own admission, it continued to operate its website, www.new-bunren.com, until at least 2017, at least a year after it received notice. (D.I. 64 ¶ 33). New Bunren did not voluntarily withdraw its counterfeit registrations until June 2018. (*Id.* ¶ 41). And New Bunren admitted — multiple times — that its counterfeit products continued to be offered for sale and distribution in the U.S. until at least July 31, 2018. (D.I. 72-1, Ex. 39 at 66:4-7; 91:12-19; 95:22-96:7; 147:2-7).

A court may also find willfulness if a defendant uses counterfeit marks that are "identical to . . . strong and established marks," because such actions demonstrate a defendant's "desire and purpose to trade upon [a plaintiff's] goodwill." *Chanel, Inc. v. Gordashevsky*, C.A. No. 5-5270(RBK), 2007 U.S. Dist. LEXIS 6576, 2007 WL 316433, at *5 & *5 n.4 (D.N.J. Jan. 29, 2007) **[*7]** ; *N.V.E., Inc. v. Day*, 2009 U.S. Dist. LEXIS 72934, 2009 WL 2526744, at *3 (D.N.J. Aug. 18, 2009) (finding that defendants "acted willfully because they deliberately deceived consumers and traded upon [plaintiff's] good will by selling counterfeit versions of [plaintiff's] products bearing [plaintiff's] trademarks"). The Court has already found that New Balance's "N" mark is strong and established, indeed famous. (D.I. 73 at 12, 18). And, New Bunren's "N" mark is identical and appears on identical products. (*Id.* at 11-12). Given that New Bunren used identical marks on identical products and continued its infringing activity for several months after receiving notice, the Court finds that New Bunren's trademark infringement was willful.

### 4. Exercise of Discretion — Dollar Amount Per Violation

"The Court possesses wide discretion in determining the proper and just amount of damages." *Coach, Inc. v. Quisqueya Agency Inc.*, Civ. No. 13-3261 (CCC), 2014 U.S. Dist. LEXIS 92285, 2014 WL 3345434, at *2 (D.N.J. July 8, 2014). In the exercise of that discretion, the Court observes that New Bunren is not a particularly sophisticated operation.[4] It had a somewhat obscure market presence for a relatively short period of time.[5] And, there is no evidence in the record that New Bunren made any profits from its scheme. For these reasons, a low dollar amount per violation is likely to have a meaningful impact **[*8]** on New Bunren and, therefore, act as an effective deterrent. *See, e.g., Delta Air Lines, Inc. v. Fly Tech, LLC*, C.A. No. 16-2599, 2018 U.S. Dist. LEXIS 53008, 2018 WL 1535231, at *4 (D.N.J. Mar. 29, 2018) (stating that "a large award is less appropriate where there is limited evidence of large-scale operations or profits"); *Holt's Co. v. Hoboken Cigars, LLC*, Civ. No. 09-3782 (WJM), 2010 U.S. Dist. LEXIS 119423, 2010 WL 4687843, at *3 (D.N.J. Nov. 10, 2010) ("Since the Defendants in this case profited very little, only minor statutory damages are necessary to deter both these defendants and others."). Accordingly, the Court will set the dollar amount per violation at $2,000. The amount per violation multiplied by the 4 counterfeited marks, 21 types of goods, and treble damages for willfulness, means the Court will award $504,000 in statutory damages.

### B. Attorneys' Fees

Section 1117 lays out an integrated scheme for plaintiffs in trademark actions to recover damages and attorney's fees. Under § 1117(a), a plaintiff that establishes a violation of any trademark right is entitled to actual damages and, in "exceptional cases," reasonable attorney's fees. 15 U.S.C. § 1117(a). A case is

---

[4] New Bunren is owned and operated by a single individual who also works as a cashier at a retail store, and New Bunren used Legalzoom.com to prepare its trademark application. (D.I. 86 at 3, 19).

[5] New Bunren had only two point of sale locations: (i) its own website, which did not include purchasing instructions, and (ii) the Chinese website Taobao.com, which requires use of a third-party intermediary to complete the transaction. (D.I. 73 at 8; D.I. 86 at 10).

2020 U.S. Dist. LEXIS 170906, *8

exceptional if "(a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 315, 61 V.I. 797 (3d Cir. 2014). Under § 1117(b), if a plaintiff is seeking actual damages under § 1117(a) for trademark infringement under § 1114, then the plaintiff is entitled to three **[*9]** times the actual damages "together with a reasonable attorney's fee" if two conditions are met: (i) the infringement involves "counterfeit marks," and (ii) there are no "extenuating circumstances." 15 U.S.C. § 1117(b). Finally, a plaintiff may eschew actual damages under § 1117(a) in favor of statutory damages under § 1117(c). Section 1117(c) itself makes no provision for attorney's fees.

The Court declines to award attorneys' fees under § 1117(a) or (b). For subsection (a), New Bunren's positions were not wholly without merit, and it did not litigate the case in an unreasonable manner, so the case does not qualify as exceptional. For subsection (b), the plain language of the statute suggests that attorneys' fees are not available unless New Balance is seeking actual damages, which it is not.[6] Because New Balance did not address all of the requirements for an award of attorneys' fees under subsection (b), it has not shown that it is entitled to such fees. (D.I. 85 at 18-19).

## II. **CONCLUSION**

For the foregoing reasons, the Court will award $504,000 in statutory damages pursuant to 15 U.S.C. § 1117(c) and deny New Balance's request for attorneys' fees pursuant to 15 U.S.C. § 1117(a) or (b).

## **ORDER**

For the reasons stated in the Memorandum Opinion issued on this date, IT IS HEREBY ORDERED this 18th day of September 2020, that:

1. Plaintiff **[*10]**  New Balance is entitled to $504,000 in statutory damages pursuant to 15 U.S.C. § 1117(c).

2. Plaintiff New Balance's request for attorneys' fees pursuant to 15 U.S.C. § 1117(a) or (b) is DENIED.

3. On or before September 25, 2020, the parties shall confer and submit to the Court a form of judgement.

/s/ Maryellen Noreika

The Honorable Maryellen Noreika

United States District Judge

---

**End of Document**

---

[6] At least one appellate court has held that there is no statutory basis for awarding attorneys' fees under § 1117(b) if the plaintiff has elected statutory damages under § 1117(c). *See K & N Engineering, Inc. v. Bulat*, 510 F.3d 1079, 1082 (9th Cir. 2007).

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN CRUISE LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-324 (RGA) |
| | ) | |
| HMS AMERICAN QUEEN STEAMBOAT | ) | |
| COMPANY LLC, and AMERICAN QUEEN | ) | |
| STEAMBOAT OPERATING COMPANY, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

****************

# FINAL JURY INSTRUCTIONS

# **INDEX**

1. GENERAL JURY INSTRUCTIONS.................................................................. 5

   INSTRUCTION 1.1: JURORS' DUTIES .................................................. 6

   INSTRUCTION 1.2: BURDENS OF PROOF ........................................... 7

   INSTRUCTION 1.3: EVIDENCE DEFINED ............................................ 8

   INSTRUCTION 1.4: CONSIDERATION OF EVIDENCE.......................... 9

   INSTRUCTION 1.5: CREDIBILITY OF WITNESSES .......................... 10

   INSTRUCTION 1.6: NUMBER OF WITNESSES ................................. 11

   INSTRUCTION 1.7: EXPERT WITNESSES ........................................ 12

   INSTRUCTION 1.8: DEMONSTRATIVE EXHIBITS .......................... 13

   INSTRUCTION 1.9: USE OF NOTES................................................... 14

   INSTRUCTION 1.10: STIPULATION OF FACT................................... 15

   INSTRUCTION 1.11: USE OF DEPOSITIONS...................................... 16

2. OVERVIEW OF TRADEMARK LAW ......................................................... 17

   INSTRUCTION 2.1: DEFINITION OF "TRADEMARK" ..................... 17

   INSTRUCTION 2.2: OBTAINING A TRADEMARK.............................. 18

   INSTRUCTION 2.3: SECONDARY MEANING...................................... 19

   INSTRUCTION 2.4: TRADEMARK REGISTRATIONS ........................ 20

   INSTRUCTION 2.5: PRESUMPTIONS ENJOYED BY REGISTRANT OF A

        TRADEMARK ................................................................................ 21

   INSTRUCTION 2.6: ASSIGNMENT OF TRADEMARKS........................ 22

3.   "FAMILY OF MARKS" ........................................................................ 23

    INSTRUCTION 3.1: DEFINED .......................................................... 23

    INSTRUCTION 3.2: OWNERSHIP AND VALIDITY ....................................... 24

4.   TRADEMARK INFRINGEMENT ............................................................. 25

    INSTRUCTION 4.1: ELEMENTS OF TRADEMARK INFRINGEMENT ..................... 26

    INSTRUCTION 4.2: LIKELIHOOD OF CONFUSION FACTORS ......................... 27

5.   ACL'S CLAIMS ............................................................................ 30

    INSTRUCTION 5.1: BRAND INFRINGEMENT CLAIM ................................. 31

    INSTRUCTION 5.2: FAMILY INFRINGEMENT CLAIM ................................. 32

6.   HMS'S TRADEMARK INFRINGEMENT COUNTERCLAIM ................................. 33

7.   ACL'S AFFIRMATIVE DEFENSES ........................................................ 34

    INSTRUCTION 7.1.1: TRADEMARK ABANDONMENT - GENERAL ..................... 35

    INSTRUCTION 7.1.2: TRADEMARK ABANDONMENT - PRESUMPTIONS AND

        BURDEN OF PROOF ............................................................... 36

    INSTRUCTION 7.1.3: TRADEMARK ABANDONMENT - ELEMENTS ..................... 37

    INSTRUCTION 7.1.4: ABANDONMENT – ELEMENTS – NON-USE ..................... 38

    INSTRUCTION 7.1.5: ABANDONMENT – ELEMENTS – INTENT NOT TO RESUME

        USE ............................................................................. 39

    INSTRUCTION 7.1.6: ABANDONMENT – RESIDUAL GOODWILL ..................... 40

    INSTRUCTION 7.2: INVALID ASSIGNMENT OF TRADEMARK ......................... 41

8.   UNREGISTERED OR COMMON LAW MARK ............................................. 42

INSTRUCTION 8.1: RIGHTS IN UNREGISTERED TRADEMARKS – OWNERSHIP 43

INSTRUCTION 8.2: RIGHTS IN UNREGISTERED TRADEMARKS - VALIDITY .... 44

9.   WILLFUL TRADEMARK INFRINGEMENT ................................................. 45

10. DISORGEMENT OF PROFITS ...................................................................... 46

INSTRUCTION 10.1: WHEN TO CONSIDER DISORGEMENT OF PROFITS ........ 46

INSTRUCTION 10.2: DISORGEMENT OF PROFITS ................................................ 47

11. FINAL INSTRUCTIONS AND REMINDERS................................................. 48

INSTRUCTION 11.1: DELIBERATIONS AND VERDICT-INTRODUCTION ............. 48

INSTRUCTION 11.2: UNANIMOUS VERDICT ........................................................... 49

INSTRUCTION 11.3: DUTY TO DELIBERATE ........................................................... 50

INSTRUCTION 11.4: SOCIAL MEDIA........................................................................ 51

INSTRUCTION 11.5: COURT HAS NO OPINION ...................................................... 52

# 1. GENERAL JURY INSTRUCTIONS

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case. Finally, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say. In following my instructions, you must follow all of them and not single out some and ignore others. They are all important.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## INSTRUCTION 1.1: JURORS' DUTIES

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

6

## INSTRUCTION 1.2: BURDENS OF PROOF

When I say a particular party must prove something by "a preponderance of the evidence," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that what a party is claiming is more likely so than not so. To say it differently: if you were to put the evidence favorable to one side of the argument and the evidence favorable to the other side of the argument on opposite sides of the scales, the party with the burden of proof would have to make the scales tip somewhat on its side.

When I say a particular party must prove something by "clear and convincing evidence", this is what I mean: When you have considered all the evidence in the case, you must have in your mind a firm belief or conviction that the allegations sought to be proved by the evidence are true. Clear and convincing evidence involves a higher degree of persuasion than is necessary to meet the preponderance of the evidence standard. But it does not require proof beyond a reasonable doubt, the standard applied in criminal cases.

## INSTRUCTION 1.3: EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, deposition testimony that was presented to you, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and any other evidence that I have judicially noticed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. My comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way. Sometimes testimony and exhibits are received only for a limited purpose. When I give instructions regarding that limited purpose, you must follow it.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

8

## INSTRUCTION 1.4: CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## INSTRUCTION 1.5: CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, to make one harmonious story of it all. But if you cannot do this, then it is your duty and privilege to believe the portions of testimony that, in your judgment, are most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he or she gave at the trial. You have the right to distrust such witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail. This instruction applies to all witnesses, including expert witnesses.

10

## INSTRUCTION 1.6: NUMBER OF WITNESSES

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

## INSTRUCTION 1.7: EXPERT WITNESSES

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – called an expert witness – is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

## INSTRUCTION 1.8: DEMONSTRATIVE EXHIBITS

During the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations. The other exhibits (including charts and animations presented by attorneys and witnesses) were offered to help illustrate the testimony of the various witnesses. These illustrations, called "demonstrative exhibits," have not been admitted as evidence, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

## INSTRUCTION 1.9: USE OF NOTES

You may use notes taken during trial to assist your memory. However, you should use caution in consulting your notes. There is always a tendency to attach undue importance to matters that you have written down. Some testimony that is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

# INSTRUCTION 1.10: STIPULATION OF FACT

The parties have stipulated that certain facts are true, and those stipulations have been read to you during this trial. You must therefore treat these facts has having been proved for the purposes of this case.

## INSTRUCTION 1.11: USE OF DEPOSITIONS

Depositions were taken in this case and certain depositions have been presented to you by a video and/or by reading the transcript. Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

Do not place any significance on the behavior or tone of voice of any person reading the questions or answers from written deposition transcripts.

# 2. <u>OVERVIEW OF TRADEMARK LAW</u>

## INSTRUCTION 2.1: DEFINITION OF "TRADEMARK"

A trademark is a word, symbol, or device or any combination thereof used by a person or entity to identify and distinguish his or her goods from those manufactured or sold by others and to indicate the source of the goods. A service mark is like a trademark, but applies to services rather than goods. For example, a trademark used to identify a retail store service provider is considered a service mark. Trademarks and service marks can also simply be called "marks." Sometimes all these terms -- trademarks, service marks and marks -- are used interchangeably.

The purpose of a trademark is to prevent confusion among consumers about the source of products or services and to permit trademark owners to show ownership of their products and services and control their reputation. Trademarks support informed purchasing decisions and prevent confusion among consumers about the source of products or services.

17

## INSTRUCTION 2.2: OBTAINING A TRADEMARK

A person acquires the right to exclude others from using a trademark by being the first to use the trademark in the marketplace to indicate the source of goods or services. Rights in a trademark are obtained only through actual and continuous commercial use of the trademark in a market. The owner of a trademark has the right to exclude others unless the trademark has been abandoned.

Trademarks may be registered with the United States Patent and Trademark Office but need not be registered to be entitled to protection under the law.

## INSTRUCTION 2.3: SECONDARY MEANING

For ACL's family of marks claim and for HMS's common law mark claim you will be asked to decide if a mark has "secondary meaning."

Whether a mark has "secondary meaning" or "acquired distinctiveness" depends on the recognition that the mark has among prospective purchasers. A mark has secondary meaning when the public associates it with the source of the service even though the mark itself does not distinguish the service.

A party must establish secondary meaning in a mark at the time and place that the alleged infringer began using the mark.

To determine whether secondary meaning has attached to a party's common law mark, you must consider (1) whether the extent of sales and advertising by the party has led to consumers associating the mark with the party; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals and association with the party; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) whether evidence of actual confusion exists.

19

## INSTRUCTION 2.4: TRADEMARK REGISTRATIONS

Once the owner of a trademark has obtained the right to exclude others from using the trademark, the owner may obtain a certificate of registration issued by the United States Patent and Trademark Office. Afterwards, when the owner brings an action for infringement, the owner may rely on the registration certificate as evidence to prove the owner has the right to exclude others from using the trademark in connection with the type of goods or services specified in the certificate.

# INSTRUCTION 2.5: PRESUMPTIONS ENJOYED BY REGISTRANT OF A TRADEMARK

This case involves trademarks that are registered with the United States Patent and Trademark Office. A federal registration entitles the registrant to three presumptions: (1) the trademark is presumed valid; (2) the registrant is presumed to be the owner of the mark; and (3) the registrant is presumed to have the exclusive right to use the mark nationwide in commerce in connection with the goods and services specified in the certificate of registration.

# INSTRUCTION 2.6: ASSIGNMENT OF TRADEMARKS

A trademark symbolizes the public's confidence or goodwill in a particular product or service. "Goodwill" is that part of the value of a business that reflects the propensity of buyers to continue doing business with that seller because the buyer likes and/or needs what the seller is selling.

The owner of a trademark may transfer to another the owner's interest in the trademark, including the right to exclude others from using the trademark, provided the trademark is transferred along with the goodwill of the business. This transfer is called an assignment, and the person to whom this right is transferred is called an assignee. An assignment can be of a trademark for an entire business or for a distinct and separate part of a business.

Following a proper assignment, the assignee steps into the shoes of the assignor, and the assignee acquires all the legal advantages and obligations of the mark that the assignor enjoyed.

# 3. "FAMILY OF MARKS"

## INSTRUCTION 3.1: DEFINED

A "family of marks" is a group of marks having a recognizable common characteristic, where the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner.

## INSTRUCTION 3.2: OWNERSHIP AND VALIDITY

A party asserting ownership of a family of marks must establish the following by a preponderance of the evidence to demonstrate that it owns a valid and legally protectable family of trademarks:

(1) That they are the prior user of multiple trademarks that share a common characteristic (the common characteristic is known as the family surname);

(2) That the family surname has secondary meaning and is not so commonly used in the trade as not to constitute a distinguishing feature of any party's mark; and

(3) Prior to the infringer's first use of its mark, the family of marks were used in advertising or sales as to create common exposure to and recognition by the purchasing public such that the family surname is itself indicative of a common origin of goods or services or has otherwise developed secondary meaning.

## 4. **TRADEMARK INFRINGEMENT**

In this case you are being asked to decide three separate questions of trademark infringement: (1) whether HMS's AMERICAN QUEEN STEAMBOAT COMPANY mark infringes the AMERICAN CRUISE LINES marks; (2) whether HMS's fleet of "American" ships (i.e. the American Empress, the American Duchess and the American Countess) infringe ACL's family of "American" marks; and (3) whether ACL's AMERICAN EAGLE, AMERICAN PRIDE, AMERICAN SONG, AMERICAN HARMONY, or AMERICA marks infringe HMS's AMERICAN QUEEN mark.

# INSTRUCTION 4.1: ELEMENTS OF TRADEMARK INFRINGEMENT

To succeed on a claim for trademark infringement, the party asserting infringement must prove the following by a preponderance of the evidence:

1) There is a valid and legally protectable trademark;

2) It owns that mark; and

3) The other party uses the mark to identify goods or services and causes a likelihood of confusion.

# INSTRUCTION 4.2: LIKELIHOOD OF CONFUSION FACTORS

The core of a trademark infringement claim is likelihood of confusion. To establish whether a likelihood of confusion exists, you must look to a multi-factor test. Each factor analyzes the trademark and use by both the trademark owner and the alleged infringer to establish whether a significant number of people who buy or use, or consider buying or using, the product or service are likely to be confused if both parties are permitted to use their trademarks. As you consider whether there is a likelihood of confusion, examine the following factors:

1.  **Degree of Similarity Between the Marks at Issue.** In evaluating the similarity or dissimilarity of the respective marks, each mark must be considered as a whole. A finding of similarity between the respective marks cannot be based on dissection of a mark, that is, on only part of a mark. Although there is nothing improper in giving more or less weight to a particular feature of a mark, the ultimate conclusion as to the similarity or dissimilarity of the marks must rest on consideration of the marks in their entireties. You should consider the overall impression created by the marks, keeping in mind all the things that the general buying public will likely perceive and remember about the marks, including their similarities in sight, sound, and meaning, as well as designs, fonts, colors, and other elements.

2.  **Strength of the Trademark Being Infringed.** Some trademarks are stronger than others. The stronger the trademark, the more protection should be given to it. A strong trademark is one that carries widespread, immediate recognition that one party is associated with the mark, and so with the product or service provided. The more the consuming public recognizes the owner's trademark as an indication of origin of their goods or services, the more likely that it is that consumers would be confused about the source of the alleged

27

infringer's goods or services if the alleged infringer uses a similar mark. In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd. Use of similar marks by others in the market at issue weighs in favor of finding that a mark is relatively weak and that a likelihood of confusion does not exist.

3.  **The Price of the Goods and the Sophistication of the Purchasers.** The more sophisticated the potential buyers of the goods or services or the costlier the goods or services, the more careful and discriminating the potential purchaser exercising ordinary caution may be. They may be less likely to be confused by similarities in the trademarks at issue.

4.  **Evidence of Actual Confusion.** If use by the alleged infringer of a similar trademark has led to instances of actual confusion, this strongly suggests a likelihood of confusion. Because proving actual confusion is difficult, relatively little showing is required on the part of the party attempting to prove actual confusion. However, actual confusion is not required for a finding of likelihood of confusion. Even if actual confusion did not occur, the alleged infringer's use of the trademark may still be likely to cause confusion. As you consider whether the trademark used by the alleged infringer is confusing, you should weigh any instances of actual confusion against the opportunities for such confusion. If the instances of actual confusion have been relatively frequent, you may find that there has been substantial actual confusion. If, by contrast, there is a very large volume of sales, but only a few isolated instances of actual confusion you may find that there has not been substantial actual confusion.

5.  **Length of Time the Alleged Infringer Has Used the Mark Without Evidence of Actual Confusion.** If you find that one or more marks were used for an extended period of time without evidence of actual confusion, it can be inferred that continued marketing will not lead to consumer confusion in the future.

6.  **Intent of the Alleged Infringer.** Knowing use by the alleged infringer of the trademark at issue to identify similar services may show an intent to benefit from the reputation of the trademark owner – suggesting an intent to cause a likelihood of confusion. Evidence of a party's intentional use of another party's mark to cause confusion is not a prerequisite to proving infringement. However, evidence of intentional, willful and admitted adoption of a mark closely similar to an existing mark weighs in favor of finding a likelihood of confusion.

7.  **Similarity of Channels of Trade.** The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion. If the parties' goods or services are sold in the same or similar outlets, or advertised in similar media, there is a greater likelihood of confusion.

8.  **The Extent to Which the Targets of the Parties' Sales Efforts are the Same.** If the parties' services are sold or offered for sale to the same or similar customers, this may increase the likelihood of confusion. The parties agree that their respective sales efforts are targeted to the same class of consumers.

9.  **Similarity of the Services.** The more similar the services offered by the parties, the greater the likelihood of confusion.

The weight to be given to each of these factors is up to you to determine. No particular factor or number of factors is required to prove likelihood of confusion.

# 5. **ACL'S CLAIMS**

ACL brings two claims for trademark infringement against HMS. The first claim is a claim for infringement of the AMERICAN CRUISE LINES tradename and brand marks. The second claim is a claim for infringement of a family of "American" trademarks.

## INSTRUCTION 5.1: BRAND INFRINGEMENT CLAIM

To succeed on its claim of brand mark infringement ACL must prove:

1) That the AMERICAN CRUISE LINES marks are valid and legally protectable;

2) That it is the owner of the AMERICAN CRUISE LINES marks; and

3) That HMS's use of the name AMERICAN QUEEN STEAMBOAT COMPANY causes a likelihood of confusion.

In this case there is no dispute that the AMERICAN CRUISE LINES marks are valid and legally protectable or that ACL is the owner of the AMERICAN CRUISE LINES marks. ACL claims that there is a likelihood of confusion based on HMS's tradename and brand mark AMERICAN QUEEN STEAMBOAT COMPANY. HMS denies that there is a likelihood of confusion.

31

## INSTRUCTION 5.2: FAMILY INFRINGEMENT CLAIM

To succeed on its claim of infringement of a family of "American" trademarks ACL must prove:

1) That a family of "American" trademarks is valid and legally protectable;

2) That it is the owner of a family of "American" trademarks; and

3) That HMS's fleet of "American" ships (i.e. the American Empress, the American Duchess and the American Countess) causes a likelihood of confusion with the family of "American" trademarks.

In this case ACL claims that it owns a family of "American" trademarks including vessel name marks each containing the word "American" as the first word of the vessel name and that HMS's use of "American" for its fleet branding and the vessel name marks AMERICAN EMPRESS, AMERICAN DUCHESS and AMERICAN COUNTESS causes a likelihood of confusion. HMS denies that ACL has established a valid and legally protectable family of "American" trademarks and denies that there is a likelihood of confusion.

# 6.  HMS'S TRADEMARK INFRINGEMENT COUNTERCLAIM

HMS brings a counterclaim for trademark infringement and unfair competition against ACL. The claim is for infringement of the AMERICAN QUEEN marks.

To succeed on its counterclaim of trademark infringement HMS must prove:

1) That the AMERICAN QUEEN marks are valid and legally protectable;

2) That it is the owner of the AMERICAN QUEEN marks; and

3) That ACL's use of the vessel names AMERICAN EAGLE, AMERICAN PRIDE, AMERICAN SONG, AMERICAN HARMONY and/or AMERICA causes a likelihood of confusion.

ACL disputes that the AMERICAN QUEEN marks are valid and legally protectable or that HMS is the owner of the registered AMERICAN QUEEN marks.  HMS claims that there is a likelihood of confusion based on ACL's vessel names AMERICAN EAGLE, AMERICAN PRIDE, AMERICAN SONG, AMERICAN HARMONY and/or AMERICA.  ACL denies that there is a likelihood of confusion based on its vessel names.

# 7. **ACL'S AFFIRMATIVE DEFENSES**

An affirmative defense is defined as a matter asserted by a party against whom a claim or counterclaim is made, which, assuming the claim or counterclaim to be true, constitutes a defense to the claim.

In this case ACL denies that HMS has asserted a valid counterclaim and ACL asserts two affirmative defenses to that counterclaim. The first affirmative defense is that the AMERICAN QUEEN trademark registrations were abandoned and are no longer valid. The second affirmative defense is that the assignment of the AMERICAN QUEEN trademarks to HMS was invalid.

## INSTRUCTION 7.1.1: TRADEMARK ABANDONMENT - GENERAL

ACL asserts that the AMERICAN QUEEN trademarks have been abandoned as an affirmative defense to HMS's trademark infringement counterclaim. ACL bears the burden of proving this defense by clear and convincing evidence.

An entity can lose its rights to a trademark if the trademark has been abandoned. If you determine that the AMERICAN QUEEN registrations have been abandoned, then the registrations can no longer be used by HMS in its counterclaim against ACL and HMS must, therefore, rely on any unregistered or common law trademark rights to succeed on its counterclaim against ACL.

# INSTRUCTION 7.1.2: TRADEMARK ABANDONMENT - PRESUMPTIONS AND BURDEN OF PROOF

If a trademark is not used for three consecutive years, a presumption of abandonment is triggered. If you find that there was a three year period of non-use of the AMERICAN QUEEN trademark, then HMS must show by a preponderance of the evidence that there was an intent to resume use of the trademark by its owner or assignee or that there was excusable non-use of the mark during the non-use period.

If you find there was not a three year period of non-use, then the presumption of abandonment is not triggered, and ACL must show by clear and convincing evidence that there was an intent not to resume use of the AMERICAN QUEEN trademark by its owner or assignee.

## INSTRUCTION 7.1.3: TRADEMARK ABANDONMENT - ELEMENTS

To succeed on its abandonment defense, ACL must prove that: (1) the use of the AMERICAN QUEEN mark was discontinued in the ordinary course of trade; and (2) with the intent not to resume use in the reasonably foreseeable future.

## INSTRUCTION 7.1.4: ABANDONMENT – ELEMENTS – NON-USE

To prove the first element of abandonment, ACL must show that there was a period of time when the AMERICAN QUEEN trademark was not used. Use of a mark means the genuine use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark.

In this case, the booking of cruises constitutes use of a mark registered in connection with "transporting passengers and goods by steamers."

38

# INSTRUCTION 7.1.5: ABANDONMENT – ELEMENTS – INTENT NOT TO RESUME USE

If you find that there was a three year period of non-use, you must then consider whether HMS has shown that there was an intent by the owner or purchaser of the AMERICAN QUEEN trademark to resume use of the AMERICAN QUEEN trademark within a reasonable time in the future.

The cessation of a business does not automatically and immediately terminate rights to a trademark. You may consider whether the non-use of the mark was due to circumstances beyond the control of the owner, such as a bankruptcy, attempts to sell the business, or failures in the market.

If you find there was not a three year period of non-use, then ACL must prove that the owner or purchaser of the AMERICAN QUEEN trademark intended not to resume use of the AMERICAN QUEEN trademark. Intent not to resume may be inferred from circumstances.

## INSTRUCTION 7.1.6: ABANDONMENT – RESIDUAL GOODWILL

Intent not to resume use may be inferred from the circumstances. One circumstance you may consider when deciding whether the AMERICAN QUEEN mark was abandoned is whether AMERICAN QUEEN retained residual goodwill. Residual goodwill means that a mark had a continued, favorable association among the consuming public. If you find that there was residual goodwill in the AMERICAN QUEEN trademark during or after the alleged period of non-use, you may consider that fact when inferring whether Ambassadors had an intent not to resume use of the AMERICAN QUEEN mark.

However, residual goodwill must be considered along with the other facts and circumstances proved in the case. The law permits a party to abandon a mark even if that mark has residual goodwill.

## INSTRUCTION 7.2: INVALID ASSIGNMENT OF TRADEMARK

ACL asserts as an affirmative defense that the assignment of the AMERICAN QUEEN trademarks from Ambassadors to HMS is an invalid assignment. ACL has the burden of establishing an invalid assignment by clear and convincing evidence.

An assignment of a trademark without goodwill is invalid. A trademark symbolizes the public's confidence or goodwill in a product or service. Because a trademark is symbolic, it may be transferred or assigned only to represent the transfer of goodwill connected with a particular business and cannot be transferred separately from the goodwill of a business.

The fact that an agreement says it assigns goodwill along with the trademark is insufficient to demonstrate that goodwill has been transferred.

Even if the agreement does not expressly include goodwill as being transferred, if you determine that HMS is providing services that are substantially similar in nature and quality to those services previously provided under the AMERICAN QUEEN trademarks by Ambassadors then you must find that the AMERICAN QUEEN trademarks were properly assigned to HMS.

## 8. __UNREGISTERED OR COMMON LAW MARK__

If you find that the AMERICAN QUEEN mark was abandoned or improperly assigned, you must consider HMS's infringement counterclaim based on its unregistered marks. To do so, you must determine whether HMS has rights in an unregistered mark.

# INSTRUCTION 8.1: RIGHTS IN UNREGISTERED TRADEMARKS – OWNERSHIP

Trademark rights in unregistered marks are acquired through adoption and actual continuous use of a mark in a market. Use in a market is determined by market penetration, significant enough to show clear entitlement for protection.

To determine whether the market penetration of a trademark in an area is sufficient to warrant protection of a mark, you must consider (1) the volume of sales of the trademarked good or service; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the good or service in relation to the potential number of customers; and (4) the amount of advertising of the product or service in the area.

43

# INSTRUCTION 8.2: RIGHTS IN UNREGISTERED TRADEMARKS - VALIDITY

Unregistered trademarks can be valid and provide the trademark owner with the exclusive right to use that mark. To establish ownership of an unregistered trademark, the party asserting rights must prove by a preponderance of the evidence that the mark is valid.

For HMS to establish it has rights in a valid common law AMERICAN QUEEN mark it must prove by a preponderance of the evidence that AMERICAN QUEEN has secondary meaning.

# 9.  WILLFUL TRADEMARK INFRINGEMENT

If you find that either party has infringed the other's trademark, then you must also determine whether the party asserting infringement has proven by clear and convincing evidence that the infringement was willful.

An infringer has acted willfully if the infringer knew it was infringing the trademark at issue or if it acted with indifference to the trademark rights of the other party.  A party that acts with an intention to benefit from the goodwill or reputation of another acts willfully.  Infringement is not willful if the alleged infringer reasonably believed that its use of the mark at issue was not infringing.

# 10. **DISGORGEMENT OF PROFITS**

## INSTRUCTION 10.1: WHEN TO CONSIDER DISGORGEMENT OF PROFITS

If you decide that ACL has not established trademark infringement as to its claims, then you should not consider the question of disgorgement of profits as to any claim it has not established.

If you decide that HMS has not established trademark infringement or that one of ACL's affirmative defenses applies, then you should not consider disgorgement of profits as to that claim.

## INSTRUCTION 10.2: DISGORGEMENT OF PROFITS

A trademark owner may recover an infringer's profits attributable to the infringement. Profit is determined by deducting expenses from gross revenue. Gross revenue is all the money the infringer received due to its use of the trademarks in question. The trademark owner is required only to prove the infringer's gross revenue. The infringer is required to prove any expenses that it argues should be deducted in determining its profits. A trademark owner is entitled to recover the infringer's total profits from its use of the trademarks in question, unless the infringer proves that a portion of the profit is due to factors other than the use of the trademarks in question.

# 11. **FINAL INSTRUCTIONS AND REMINDERS**
## **INSTRUCTION 11.1: DELIBERATIONS AND VERDICT- INTRODUCTION**

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take me some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. That should stay secret until you are finished.

## INSTRUCTION 11.2: UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. For you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. You will then return to the courtroom and your foreperson will give your verdict.

## INSTRUCTION 11.3: DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that-your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

50

# INSTRUCTION 11.4: SOCIAL MEDIA

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, blackberry or computer, the internet, any internet service, any text or instant messaging service, any internet chat room, blog, or website such as Facebook, Myspace, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

# INSTRUCTION 11.5: COURT HAS NO OPINION

Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.

# EXHIBIT 10

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          -  -  -

 4    SURGIQUEST, INC.,                )      Civil Action
                                       )
 5              Plaintiff,             )
                Counterdefendant,      )
 6         v.                          )
                                       )
 7    LEXION MEDICAL, LLC,             )
                                       )
 8              Defendant,             )
                Counterplaintiff.  )      No. 14-382-GMS
 9
                            -  -  -
10
                      Wilmington, Delaware
11                    Tuesday, April 11, 2017
                      Day 7 of Jury Trial
12                         10:35 a.m.

13                          -  -  -

14    BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.,
                                      and a Jury
15

16    APPEARANCES:

17            DENISE S. KRAFT, ESQ.
              DLA Piper LLP
18                  -and-
              FRANCIS W. RYAN, ESQ., and
19            ERICA PASCAL, ESQ.
              DLA Piper LLP
20            (New York, NY)
                    -and-
21            MELISSA REINCKENS, ESQ.
              DLA Piper LLP
22            (San Diego, CA)

23                           Counsel for Plaintiff

24

25
```

APPEARANCES CONTINUED:

           DAVID E. MOORE, ESQ., and
           BINDU PALAPURA, ESQ.
           Potter Anderson & Corroon LLP
                   -and-
           DAVID G. WILLE, ESQ.,
           MEGAN LaDRIERE, ESQ., and
           PAUL J. REILLY, ESQ.
           Baker Botts LLP
           (Dallas, TX)

                           Counsel for Defendant

                       -   -   -

```
:27:16    1              THE COURT:  Good morning.

:27:17    2              (Counsel respond "Good morning.")

:27:17    3              THE COURT:  Please, take your seats.  We won't

:27:21    4    be long together.

:27:22    5              I think Ms. Felice has just sent you the

:27:25    6    relevant sections of the instructions that we have revised.

:27:29    7              How long do you think it will take you to turn

:27:31    8    that around?

:27:32    9              MR. RYAN:  We are in the process of doing it

:27:34   10    now.  Maybe 20 minutes, 25 to 30 minutes.

:27:37   11              MS. KRAFT:  I think it will take a little less

:27:40   12    than that.  We need to get the damages section.  Thank you,

:27:42   13    Your Honor.

:27:43   14              THE COURT:  Perhaps we can expect to come back

:27:46   15    out at roughly quarter of?  Is that too aggressive?

:27:50   16              MS. KRAFT:  I would say just give us till ten

:27:55   17    minutes to 11.

:27:56   18              THE COURT:  Do you want to say 11?

:27:58   19              MS. KRAFT:  11:00 o'clock is fine, Your Honor,

:28:02   20    just to be sure.  I think we could have it done a little

:28:07   21    sooner.

:28:08   22              THE COURT:  As soon as they are done, you will

:28:11   23    knock and let us know.  Somewhere between 10:45 and 11 we

:28:16   24    will get out.

:28:17   25              The reason I came out was to discuss with you
```

| | | |
|---|---|---|
| :28:19 | 1 | the length.  I am going to put time limits on your closings. |
| :28:23 | 2 | I would like to hear from both sides as to how much time you |
| :28:27 | 3 | would like to have and I will let you know how much time you |
| :28:30 | 4 | are going to get. |
| :28:32 | 5 | MR. WILLE:  Your Honor, we would like an hour |
| :28:33 | 6 | and 15 minutes. |
| :28:36 | 7 | MR. RYAN:  We will be less than an hour, Your |
| :28:39 | 8 | Honor. |
| :28:39 | 9 | THE COURT:  You have got 45 minutes a side -- |
| :28:41 | 10 | you are going to need -- let's talk about this.  Who gets |
| :28:46 | 11 | rebuttal?  Have you arrived at a protocol, at a treaty on |
| :28:53 | 12 | this? |
| :28:53 | 13 | MR. WILLE:  Your Honor, we haven't.  We both |
| :28:59 | 14 | have claims.  I frankly would be fine if we just delivered |
| :29:02 | 15 | it with no rebuttal for either side. |
| :29:04 | 16 | MR. RYAN:  I agree, Your Honor. |
| :29:06 | 17 | THE COURT:  At last we have an agreement. |
| :29:10 | 18 | Hallelujah.  That is fine. |
| :29:13 | 19 | I probably misspoke at the outset.  This is not |
| :29:15 | 20 | an advisory jury.  This is a jury trial.  I will handle the |
| :29:21 | 21 | equitable matters that I must, disgorgement, that kind of |
| :29:26 | 22 | thing.  But Lexion is entitled to present this to the jury. |
| :29:33 | 23 | It is impossible to separate out many of the factual issues |
| :29:36 | 24 | that are going to have to be decided upon. |
| :29:40 | 25 | My point to you is I am not going to be making |

| | | |
|---|---|---|
| :29:45 | 1 | Rule 52 findings of fact and conclusions of law in this |
| :29:47 | 2 | case.  This is going to be a jury verdict. |
| :29:51 | 3 | Anybody want to add anything? |
| :29:55 | 4 | MR. WILLE:  No, Your Honor. |
| :29:56 | 5 | MR. RYAN:  No, Your Honor. |
| :29:57 | 6 | THE COURT:  Anything else?  Because the next |
| :30:00 | 7 | time we come out I am going to instruct the jury. |
| :30:03 | 8 | MR. WILLE:  Your Honor, we are playing one of |
| :30:05 | 9 | the video exhibits right at the beginning of our closings. |
| :30:13 | 10 | If the sound could be set so that the sound can be heard? |
| :30:17 | 11 | THE COURT:  I leave that to you folks.  You have |
| :30:22 | 12 | a very competent IT person. |
| :30:26 | 13 | MR. WILLE:  The second question, Your Honor, can |
| :30:28 | 14 | we move the podium and position it like we did? |
| :30:31 | 15 | THE COURT:  Sure.  Facing the jury, absolutely. |
| :30:33 | 16 | The only guidance I have now, you can venture |
| :30:36 | 17 | from the podium, don't crowd the jury box.  Okay?  That |
| :30:41 | 18 | middle pedestal in SurgiQuest's desk is probably as close as |
| :30:49 | 19 | you need to get. |
| :30:52 | 20 | Do you want me to give you a five-minute warning |
| :30:54 | 21 | when you have five minutes left? |
| :30:56 | 22 | MR. WILLE:  Mr. Barnes has a timer here.  I will |
| :31:00 | 23 | have him set the timer, and I think that's fine. |
| :31:03 | 24 | MR. RYAN:  We will do the same, thank you. |
| :31:05 | 25 | THE COURT:  We will see you shortly. |

:31:07    1          (Recess taken.)

:16:33    2          THE COURT:  Mr. Buckson.

:16:38    3          (Jury enters courtroom at 11:15 a.m.)

:16:46    4          THE COURT:  Good morning.

:16:49    5          (Jurors respond "Good morning.")

:16:50    6          THE COURT:  Please, take your seats.

:16:59    7          On behalf of the Court and the parties, I want

:17:01    8   to apologize for the delay.  You were here bright and early

:17:05    9   and on time as usual.  We weren't quite ready for you.  But

:17:09   10   we are now.

:17:10   11          Everyone should have your own set of jury

:17:14   12   instructions and a verdict form.

:17:17   13          As with the preliminary instructions, it's up to

:17:22   14   you how you want to follow along.  You will notice for those

:17:27   15   of you who are reading that I will sometimes deviate a

:17:31   16   little bit from the language.  But I won't deviate from the

:17:36   17   meaning that I have to say.

:17:38   18          A quick example of that, and sometimes I find, I

:17:43   19   come upon things in the instructions, in the mad dash to try

:17:47   20   to get these ready for you, I find little typos and things

:17:51   21   that need to be amended.  The last two pages are one such

:17:56   22   example, entitled Deliberation and Verdict, where you will

:18:00   23   see that the current format has an instruction on the second

:18:05   24   page that advises you that Juror No. 1 is typically the

:18:08   25   foreperson.  That's not the case.  But I will correct that

:18:14    1    when we get there.

:18:16    2              So ultimately, it's the paper and the words that

:18:20    3    are coming out of my mouth that you need to follow.

:18:33    4              Good morning, members of the jury.

:18:35    5              Again, it is the time for me to instruct you

:18:37    6    about the law that you must follow in deciding this case.

:18:41    7              Now, as you know, each of you has been provided

:18:44    8    a copy of these instructions.  We have already gone through

:18:47    9    that.  I am going to start these instructions by explaining

:18:50   10    your duties and the general rules that apply in every civil

:18:54   11    case.

:18:55   12              Then I will explain some rules that you must use

:18:57   13    in evaluating particular testimony and evidence.

:19:00   14              I will explain the positions of the parties and

:19:01   15    the law you will apply in this case.

:19:04   16              Finally, I will explain the rules that you must

:19:07   17    follow during your deliberations in the jury room and the

:19:11   18    possible verdicts you may return.

:19:13   19              I fully expect -- are both counsel planning to

:19:17   20    discuss the verdict forms in your closings?

:19:19   21              MR. WILLE:  No.

:19:21   22              THE COURT:  Mr. Ryan is, Mr. Wille is not.

:19:23   23              It is my view that the verdict form is

:19:26   24    self-explanatory and certainly, as I will inform you later

:19:29   25    on, if you have questions, you will be able to ask them.

But you will hear from Mr. Ryan at least on this particular matter.

Please listen carefully to everything I have to say.

Members of the jury, it is important that you bear in mind the distinction between your duties and mine. You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in this courtroom. You are the sole judges of the facts. It is your judgment, and your judgment alone, to determine what the facts are, and nothing that I have said or done during the trial was meant to influence your decision about the facts in any way.

The second is to take the law that I give to you, apply it to the facts, and decide if, by a preponderance of the evidence, the defendants are liable.

Now, as far as my duty is concerned, I have the duty of advising you about the law that you should apply to the facts as you find them. You are not to consider whether the principles I state to you are sound or whether they accord with your own views about policy. You are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. You must accept them despite how you feel about their wisdom or lack thereof. This

| | | |
|---|---|---|
| :20:51 | 1 | includes the instructions that I gave you before and during |
| :20:56 | 2 | the trial and these instructions as well.  All the |
| :20:58 | 3 | instructions are important, and you should consider them |
| :21:00 | 4 | together as a whole. |
| :21:02 | 5 | Perform these duties fairly.  Do not let any |
| :21:05 | 6 | bias, sympathy or prejudice that you may feel toward one |
| :21:09 | 7 | side or the other influence your decision in any way. |
| :21:13 | 8 | Evidence. |
| :21:14 | 9 | You must make your decision based only on the |
| :21:16 | 10 | evidence that you saw and heard here in Court.  Do not let |
| :21:20 | 11 | rumors, suspicions, or anything else that you may have seen |
| :21:24 | 12 | or heard outside of Court influence your decision in any |
| :21:27 | 13 | way. |
| :21:27 | 14 | The evidence in this case includes only what the |
| :21:29 | 15 | witnesses said while they were testifying under oath, the |
| :21:32 | 16 | exhibits that I allowed into evidence, and the stipulations |
| :21:35 | 17 | to which the lawyers may have agreed. |
| :21:38 | 18 | Nothing else is evidence.  The lawyers' |
| :21:40 | 19 | statements and arguments are not evidence.  The arguments of |
| :21:43 | 20 | the lawyers are offered solely as an aid to help you in your |
| :21:48 | 21 | determination of the facts. |
| :21:49 | 22 | Their questions and objections are not evidence. |
| :21:51 | 23 | My legal rulings are not evidence.  My comments and |
| :21:54 | 24 | questions are not evidence. |
| :21:55 | 25 | During the trial I may not have let you hear the |

:22:01   1   answers to some of the questions the lawyers asked.  I may

:22:04   2   have also ruled that you could not see some of the exhibits

:22:07   3   that the lawyers wanted you to see.  You must completely

:22:10   4   ignore all of these things.

:22:13   5          Do not speculate about what a witness might have

:22:15   6   said or what an exhibit might have shown.  These things are

:22:18   7   not evidence, and you are bound by your oath to not to let

:22:22   8   them influence your decision in any way.

:22:24   9          Make your decision based on the evidence as I

:22:27   10  have defined it here, and nothing else.

:22:29   11         You have heard about direct and circumstantial

:22:31   12  evidence.  Direct evidence is evidence like the testimony of

:22:34   13  an eyewitness which, if you believe it, directly proves a

:22:37   14  fact.

:22:39   15         If a witness testified that she saw it raining

:22:42   16  outside and you believed her, that would be direct evidence

:22:45   17  that it was raining.

:22:47   18         Circumstantial evidence is a chain of

:22:49   19  circumstances that indirectly proves a fact.  If someone

:22:53   20  walked into the courtroom this morning wearing a raincoat

:22:56   21  covered with drops of water and carrying a wet umbrella,

:22:59   22  that would be circumstantial evidence from which you could

:23:01   23  conclude if you so chose that it was raining.

:23:04   24         It is your job to decide how much weight to give

:23:08   25  the direct and circumstantial evidence.  The law makes no

| | |
|---|---|
| :23:10 | 1 |
| :23:13 | 2 |
| :23:16 | 3 |
| :23:20 | 4 |
| :23:24 | 5 |

distinction between the weight that you should give to either one, nor does it say that one is better than the other.  You should consider all the evidence, both circumstantial and direct, and give it whatever weight you believe it deserves.

You should use your common sense in weighing the evidence.  Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

A further word about statements and arguments of counsel.  The attorney's statements and arguments are not evidence, as I have told you before.  Instead, their statements and arguments are intended to help you review the evidence presented.  If you remember the evidence differently from the attorneys, you should rely on your recollection.

The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law.  An attorney may argue all reasonable conclusions from evidence in the record.  It is not proper, however, for an attorney to state an opinion as to the truth or falsity of any testimony or evidence.  What an attorney personally thinks or believes about the

:23:31　1　testimony or evidence in a case is simply not relevant, and

:23:36　2　you are instructed to disregard any personal opinion or

:23:38　3　belief concerning testimony or evidence that an attorney has

:23:41　4　offered during opening or closing statements, or at any

:23:45　5　other time during the course of these proceedings.

:23:53　6　　　　You are the sole judges of each witness's

:23:55　7　credibility. You should consider each witness's means of

:23:58　8　knowledge; strength of memory; opportunity to observe; how

:24:02　9　reasonable or unreasonable testimony is; whether it is

:24:05　10　consistent or inconsistent; whether it has been

:24:08　11　contradicted; the witness's biases, prejudices or interests;

:24:12　12　the witness's manner or demeanor on the witness stand; and

:24:15　13　all circumstances that, according to the evidence, could

:24:18　14　affect the credibility of the testimony.

:24:19　15　　　　If you find the testimony to be contradictory,

:24:23　16　you must try to reconcile it, if reasonably possible, so as

:24:27　17　to make one harmonious story of it all. But if you can't do

:24:31　18　this, then it is your duty and privilege to believe the

:24:34　19　testimony that, in your judgment, is most believable and

:24:37　20　disregard any testimony that, in your judgment, is not

:24:40　21　believable.

:24:40　22　　　　In determining the weight to give to the

:24:44　23　testimony of a witness, you should ask yourself whether

:24:47　24　there is evidence tending to prove that the witness

:24:49　25　testified falsely about some important fact, or, whether

:24:53   1   there was evidence that at some other time the witness said

:24:57   2   or did something, or failed to say or do something that was

:25:00   3   different from the testimony he or she gave at trial.  You

:25:03   4   have the right to distrust such witness's testimony in other

:25:07   5   particulars and you may reject all or some of the testimony

:25:10   6   of that witness or give it such credibility as you may think

:25:13   7   it deserves.

:25:14   8          You should remember that a simple mistake by a

:25:18   9   witness does not necessarily mean that the witness was not

:25:20   10  telling the truth.  People may tend to forget some things or

:25:25   11  remember other things inaccurately.  If a witness has made

:25:28   12  a misstatement, you must consider whether it was simply an

:25:32   13  innocence lapse of memory or an intentional falsehood, and

:25:37   14  that may depend upon whether it concerns an important fact

:25:40   15  or an unimportant detail.

:25:41   16         Now, this instruction applies to all witnesses.

:25:46   17         Expert testimony, opinion testimony it is still

:25:50   18  called, is testimony from a person who has an essential

:25:54   19  skill or knowledge in some science, profession or business.

:25:58   20  This skill or knowledge is not common to the average person

:26:00   21  but has been acquired by the expert through special study or

:26:03   22  experience.

:26:04   23         Now, in weighing expert testimony, you may

:26:06   24  consider the expert's qualifications, the reasons for the

:26:10   25  expert's opinions, and the reliability of the information

:26:13  1  supporting the expert's opinions, as well as the other

:26:18  2  factors I have previously mentioned for weighing testimony

:26:20  3  of any other witness.  Expert testimony should receive

:26:24  4  whatever weight and credit you think appropriate, given all

:26:28  5  the evidence in the case.

:26:33  6      During this trial, you have heard testimony from

:26:35  7  the playing of videotape excerpts or -- I don't think there

:26:41  8  have been excerpts read into the record.  It has been

:26:43  9  videotape excerpts.  A deposition is the sworn testimony of

:26:46  10  a witness taken before trial.  The witness is placed under

:26:50  11  oath to tell the truth and lawyers for each party may ask

:26:53  12  questions.  The questions and answers are recorded.

:26:56  13  Deposition testimony is entitled to the same consideration

:27:00  14  and is to be judged, insofar as possible, in the same way as

:27:04  15  if the witness testified here in person on the witness

:27:07  16  stand.

:27:10  17      One more point about the witnesses.  Sometimes

:27:12  18  jurors wonder if the number of witnesses who testified makes

:27:14  19  any difference.

:27:15  20      Do not make any decisions, ladies and gentlemen,

:27:17  21  based only on the number of witnesses who testified.  What

:27:19  22  is more important is how believable the witnesses were, and

:27:23  23  how much weight you think their testimony deserves.

:27:27  24  Concentrate on that, not the numbers.

:27:30  25      Now, this is a civil case, as you know.  The

|         |    |                                                                        |
|---------|----|------------------------------------------------------------------------|
| :27:32  | 1  | plaintiff has the burden of proving its claims and damages             |
| :27:35  | 2  | by what is known as a preponderance of the evidence.  Proof            |
| :27:38  | 3  | by a preponderance of the evidence means proof that                    |
| :27:40  | 4  | something is more likely true than not.  It means that                 |
| :27:43  | 5  | certain evidence, when compared to the evidence opposed to             |
| :27:47  | 6  | it, has the more convincing force and makes you believe that           |
| :27:49  | 7  | something is more likely true than not.                                |
| :27:52  | 8  | Preponderance of the evidence does not depend,                         |
| :27:55  | 9  | as I have told you, on the number of witnesses.  If the                |
| :27:57  | 10 | evidence as to a particular element or issue is evenly                 |
| :28:01  | 11 | balanced, the party has not proved the element by a                    |
| :28:06  | 12 | preponderance of the evidence and you must find against that           |
| :28:09  | 13 | party.  In determining whether any fact has been proven by a           |
| :28:12  | 14 | preponderance of the evidence, you may consider the                    |
| :28:15  | 15 | testimony of all witnesses, regardless of who called them              |
| :28:18  | 16 | and all exhibits received into evidence regardless of who              |
| :28:21  | 17 | produced them.                                                         |
| :28:22  | 18 | Those of you who are familiar with criminal                            |
| :28:25  | 19 | cases will have heard the term proof beyond a reasonable               |
| :28:27  | 20 | doubt.  Now, that burden does not apply in a civil case like           |
| :28:31  | 21 | this and you should therefore put it out of your mind in               |
| :28:33  | 22 | considering whether or not the party bearing the burden of             |
| :28:39  | 23 | proof has met its burden on the various issues.  That would            |
| :28:49  | 24 | be the plaintiff.                                                      |
| :28:49  | 25 | As to false advertising.                                               |

| | | |
|---|---|---|
| :28:50 | 1 | Each party has alleged that the other engaged in |
| :28:55 | 2 | false advertising under federal law also known as the United |
| :29:02 | 3 | States Lanham Act.  To be considered false advertising under |
| :29:05 | 4 | the Lanham Act, there must be a false or misleading |
| :29:09 | 5 | misrepresentation that is made in commercial advertising or |
| :29:12 | 6 | promotion, regarding the nature, characteristics, or |
| :29:16 | 7 | qualities of one's own product or another's product.  For a |
| :29:20 | 8 | false or misleading statement to violate the Lanham Act, it |
| :29:24 | 9 | must be "disseminated sufficiently to the relevant |
| :29:28 | 10 | purchasing public to constitute 'advertising' "or |
| :29:32 | 11 | 'promotion' within the industry."  The level of circulation |
| :29:37 | 12 | required to constitute advertising and promotion will vary |
| :29:40 | 13 | from industry to industry and from case to case.  The Lanham |
| :29:42 | 14 | Act does not mandate the form that such statement must take. |
| :29:46 | 15 | For example, oral statements by a company's sales |
| :29:49 | 16 | representatives concerning a product may constitute |
| :29:51 | 17 | 'commercial advertising or promotion' under the Lanham Act |
| :29:55 | 18 | if disseminated sufficiently to the relevant purchasing |
| :29:58 | 19 | public within the relevant industry.  Where a number of |
| :30:01 | 20 | separate, unique communications are made to individual |
| :30:04 | 21 | customers, but these communications share the same |
| :30:07 | 22 | competitive approach as part of an organized campaign to |
| :30:11 | 23 | penetrate the marketplace, you may view the communications |
| :30:13 | 24 | in the aggregate as a single advertising campaign. |
| :30:17 | 25 | Similarly, press releases and sales presentations may |

| | | |
|---|---|---|
| :30:21 | 1 | qualify as a commercial advertisement or promotion if they |
| :30:26 | 2 | are sufficiently disseminated to the relevant purchasing |
| :30:30 | 3 | public within the relevant industry. |
| :30:34 | 4 | In some cases, a product name can also qualify |
| :30:37 | 5 | as a false or misleading statement of fact.  But an omission |
| :30:40 | 6 | or failure to disclose a fact about a commercial product is |
| :30:43 | 7 | not considered false advertising under the Lanham Act. |
| :30:48 | 8 | That said, "To establish a claim for false |
| :30:51 | 9 | advertising, a Lanham Act plaintiff must prove five |
| :30:54 | 10 | elements" by a preponderance of the evidence. |
| :30:57 | 11 | First, that the defendant has made a false or |
| :31:02 | 12 | misleading statements as to his own product or another's; |
| :31:06 | 13 | that there is actual deception or at least a |
| :31:09 | 14 | tendency to deceive a substantial portion of the intended |
| :31:12 | 15 | audience; |
| :31:12 | 16 | that the deception is material in that it is |
| :31:16 | 17 | likely to influence purchasing decisions; |
| :31:21 | 18 | that the advertised goods traveled in interstate |
| :31:23 | 19 | commerce; and |
| :31:25 | 20 | that there is a likelihood of injury to the |
| :31:27 | 21 | plaintiff in terms of declining sales, loss of goodwill, et |
| :31:30 | 22 | cetera. |
| :31:30 | 23 | The burden rests with the plaintiff.  You must |
| :31:32 | 24 | evaluate the elements for each allegedly false or misleading |
| :31:35 | 25 | statement.  If a party meets its burden as to any one |

allegedly false or misleading statement by a preponderance
of the evidence, then you may find the other party engaged
in false advertising as to that particular statement.

A party can prevail in a false advertising
action if it proves that the defendant's advertising
statement is either (1) false on its face or literally
false; or (2) literally true or ambiguous, but is still
likely to mislead and confuse consumers.  There need not be
a direct comparison to a competitor for a statement to be
actionable.

As to literal falsity, in deciding whether an
advertising claim is literally false, you may decide or must
decide, first, whether the claim conveys an unambiguous
message and, second, whether that unambiguous message is
false.  Only an unambiguous message can be literally false.
The greater the degree to which a message relies upon the
viewer to integrate its components and draw the apparent
conclusion the less likely it is that a finding of literal
falsity will be supported.  This means, if a statement when
read in context is ambiguous or susceptible of more than one
reasonable meaning, it may not be found to be literally
false .

In some cases, a false statement is explicit or
false on its face.  In other cases, a statement is false
because it necessarily implies other messages that are

:34:06    1    literally false.  A message conveyed by necessary

:34:11    2    implication is one where the audience would consider the

:34:15    3    advertisement in its entirety and would recognize the

:34:19    4    message as being made as readily as if it had been

:34:23    5    explicitly stated.  If an advertising claim is untrue, it

:34:27    6    must be deemed literally false.

:34:29    7            Although the plaintiff normally has the burden

:34:31    8    to demonstrate that the defendant's advertising claim is

:34:34    9    false, you may find that a completely unsubstantiated

:34:37    10   advertising claim by the defendant is per se false without

:34:43    11   additional evidence from the plaintiff to that effect.  The

:34:50    12   message conveyed by an advertising claim must be

:34:52    13   substantiated by sufficiently reliable tests.  The

:34:56    14   sufficiently reliable standard assumes that the test in

:34:58    15   question, if reliable, would prove the proposition or

:35:04    16   propositions for which they are stated.  The party

:35:08    17   challenging an advertising claim has the burden to

:35:11    18   demonstrate by a preponderance of the evidence that the

:35:12    19   advertiser has not proven that its tests were reliable.

:35:16    20           Once a party proves literal falsity of an

:35:20    21   advertising claim, you may presume that all other aspects or

:35:24    22   elements of liability for a false advertising claim have

:35:27    23   been established and you may find the other party liable for

:35:31    24   false advertising without considering the advertising

:35:34    25   claim's impact on the purchases.  But for purposes of

| | | |
|---|---|---|
| :35:37 | 1 | establishing any amount of damages, you must find that the |
| :35:39 | 2 | false advertising caused harm to Lexion.  The foregoing does |
| :35:46 | 3 | not prevent the defendant from offering evidence to rebut |
| :35:49 | 4 | literal falsity. |
| :35:50 | 5 | A plaintiff must prove either literal falsity or |
| :35:56 | 6 | consumer confusion, but not both.  Where literal falsity is |
| :35:59 | 7 | demonstrated, consumer confusion is presumed. |
| :36:02 | 8 | If a party fails to prove that the other party's |
| :36:06 | 9 | advertising statement is literally false, it can still |
| :36:09 | 10 | prevail on a false advertising claim by proving that the |
| :36:12 | 11 | statement is misleading or impliedly false.  A statement is |
| :36:17 | 12 | misleading if it is true or ambiguous but has the tendency |
| :36:20 | 13 | to deceive a substantial portion of consumers.  When a |
| :36:23 | 14 | challenged advertisement is implicitly rather than |
| :36:30 | 15 | explicitly false, its tendency to violate the Lanham Act by |
| :36:36 | 16 | misleading -- its tendency to violate the Lanham Act by |
| :36:43 | 17 | misleading, confusing or -- there is a typo here.  There is |
| :36:53 | 18 | something missing.  Or something is there that shouldn't be |
| :37:05 | 19 | there. |
| :37:08 | 20 | Its tendency to violate the Lanham Act by |
| :37:11 | 21 | misleading, confusing or deceiving what? |
| :37:26 | 22 | MR. REILLY:  Proposed consumers, Your Honor. |
| :37:28 | 23 | MR. RYAN:  It is the relevant consumers. |
| :37:31 | 24 | THE COURT:  You have just heard, amazingly, |
| :37:33 | 25 | agreement by counsel, the parties. |

| | |
|---|---|
| :37:37 | 1 |
| :37:38 | 2 |
| :37:46 | 3 |
| :37:50 | 4 |
| :37:51 | 5 |
| :37:52 | 6 |
| :37:53 | 7 |
| :37:54 | 8 |
| :37:56 | 9 |
| :37:59 | 10 |
| :38:02 | 11 |
| :38:07 | 12 |
| :38:10 | 13 |
| :38:19 | 14 |
| :38:22 | 15 |
| :38:27 | 16 |
| :38:30 | 17 |
| :38:35 | 18 |
| :38:38 | 19 |
| :38:41 | 20 |
| :38:44 | 21 |
| :38:47 | 22 |
| :38:47 | 23 |
| :38:53 | 24 |
| :38:55 | 25 |

Ladies and gentlemen of the jury, this should read, its tendency to violate the Lanham Act by misleading, confusing or deceiving consumers should be tested by public reaction.

Agreed, counsel?

MR. RYAN:  Agreed.

MR. REILLY:  Yes, Your Honor.

THE COURT:  If an advertisement or product literature contains a disclosure that purports to change the apparent meaning of a claim or render it literally truthful, but that is so inconspicuously located or in such fine print that readers tend to overlook it, it will not remedy the false or misleading nature of the claim.

If a party does not prove an advertising claim to be literally false, it must prove that it is deceptive or misleading.  Whether an advertising statement is deceptive or misleading depends on the message that is conveyed to consumers.  For you to find that a statement is true but misleading, the party in the position of the plaintiff must show that the statement actually deceived or had the tendency to deceive a substantial segment of the audience. To put it differently, if a challenged advertisement is not literally false, a party cannot obtain relief under the Lanham Act statement by arguing how consumers could react; it must show how consumers actually do react.  Public

:39:00   1   reaction is the measure of a commercial impact.  Whether a

:39:04   2   challenged advertising, advertising statement is misleading

:39:07   3   may be proven by evidence of the diversion of sales,

:39:12   4   customer deception, publications, articles, salesperson

:39:17   5   deception, which may be probative to establish customer or

:39:21   6   purchasing deception or other evidence.  You must determine

:39:25   7   whether the purchasing public was in fact misled.

:39:29   8        Evidence of actually confusion is difficult to

:39:32   9   find and even a few incidents may therefore be probative.

:39:36   10       If a party demonstrates that the defendant has

:39:40   11   intentionally set out to deceive the public and its conduct

:39:43   12   in this regard is of an egregious nature, a presumption

:39:47   13   arises that consumers are, in fact, being deceived.

:39:51   14       The plaintiff must also show that defendant's

:39:53   15   misrepresentation is material in that it is likely to

:39:56   16   influence the purchasing decision.  Materiality focuses on

:40:00   17   whether the false or misleading statement is likely to make

:40:03   18   a difference to purchasers.  If a defendant's advertising

:40:05   19   statement is determined to be false, it is presumed to be

:40:08   20   material.  However, the defendant may rebut this presumption

:40:14   21   of materiality by providing sufficient evidence to show, by

:40:17   22   a preponderance of the evidence, that the false statement is

:40:20   23   immaterial to purchasing decisions.

:40:22   24       If a defendant's advertising statement is true

:40:26   25   but misleading, then the plaintiff must show that the

deceptive statement is material and that it is likely to influence purchasing decisions. Certain evidence may be used to show whether or not a false or misleading claim or claims or statements are material. Whether a claim or statement is material can also be shown by demonstrating that the statement concerns an inherent quality or characteristic of the product, or because it involves health, safety, or any other area influential to reasonable consumers.

A party in a position of the plaintiff must prove that the advertised products traveled in interstate commerce. This element is met if the defendant's products traveled across state lines. Here the parties have agreed that SurgiQuest's products and Lexion's products traveled in interstate commerce. Accordingly, neither party need prove this element.

A plaintiff must prove that it has been injured or is likely to be injured in terms of declining sales, lost goodwill, et cetera. To do this a party asserting a claim of false advertising must prove, by a preponderance of the evidence, that an allegedly false or misleading statement is likely to cause harm. A party's mere subjective belief that it is likely to be injured is insufficient to satisfy this element. Rather, the party asserting false advertising must demonstrate in some manner a causal link between the

:42:02 1 allegedly false or misleading statement and a likelihood of

:42:05 2 harm.  That is to say that the harm allegedly has a

:42:09 3 sufficiently close connection to the conduct the statute

:42:12 4 prohibits.  A plaintiff can establish a causal connection

:42:15 5 with a challenged advertising statement by showing a direct

:42:19 6 diversion of sales or the lessening of goodwill associated

:42:21 7 with the plaintiffs' products.  The causal connection may be

:42:24 8 established by either direct or circumstantial evidence.

:42:28 9    When one party's challenged advertisement

:42:32 10 references the other party's product by name and the party

:42:37 11 asserting a false advertising claim can establish that the

:42:42 12 comparison statements are both deceptive to consumers and

:42:45 13 material, it is presumed that the party has been injured by

:42:50 14 these statements.

:42:52 15    When one party's challenged advertisement

:42:56 16 doesn't explicitly reference the other party's product by

:42:58 17 name, a presumption of injury may still arise if you find,

:43:03 18 by a preponderance of the evidence, that given the nature of

:43:05 19 the market, it would be obvious to consumers that the

:43:07 20 advertisement is targeted at the products of the party

:43:11 21 asserting a false advertising claim even though that party's

:43:15 22 products are not identified by name.

:43:18 23    Each party contends here that the other has

:43:20 24 engaged in deceptive trade practices under the Delaware

:43:25 25 Uniform Deceptive Trade Practices Act.  To prove a violation

:43:29   1   **of the Delaware Deceptive Trade Practices Act, the party**

:43:32   2   **asserting the claim must prove by a preponderance of the**

:43:36   3   **evidence that in the course of the other's business it**

:43:39   4   **either, first, represents its goods have characteristics,**

:43:44   5   **uses or benefits that they do not have;**

:43:46   6   **Next, disparages the goods, services, or**

:43:51   7   **business or another by false or misleading representation or**

:43:55   8   **representations of fact;**

:43:56   9   **Next, advertises goods with an intent not to**

:44:00  10   **sell them as advertised; or,**

:44:04  11   **Finally, engaged in other conduct which creates**

:44:07  12   **a likelihood of confusion or misunderstanding.**

:44:10  13   **In order to prevail in an action under this**

:44:15  14   **chapter, a plaintiff need not prove competition between the**

:44:18  15   **parties or an actual confusion or misunderstanding.  The**

:44:21  16   **Delaware Deceptive Trade Practices Act is directed at**

:44:26  17   **patterns of deceptive conduct, not isolated statements or**

:44:30  18   **isolated incidents of consumer fraud.**

:44:37  19   **Each party also contends that the other has**

:44:40  20   **engaged in unfair competition under the common law of**

:44:43  21   **Delaware.**

:44:44  22   **The party in the position of the plaintiff**

:44:46  23   **asserting this claim must prove by a preponderance of the**

:44:48  24   **evidence:**

:44:48  25   **First, that the plaintiff had a reasonable**

:44:50  1   expectancy of entering a valid business relationship with

:44:54  2   its customers in the form of product sales;

:44:56  3           Next.  The defendant has wrongly interfered with

:44:59  4   the relationships and the defendant's actions have defeated

:45:03  5   the plaintiffs' legitimate expectancy of entering a valid

:45:06  6   business relationship.

:45:10  7           I will now instruct you on the standards for

:45:12  8   monetary relief as they relate to this case.  Only Lexion

:45:16  9   seeks to recover damages in this case, monetarily.  If you

:45:19  10  find for Lexion on any one of its claims of false

:45:23  11  advertising, or you find for Lexion on its claims of unfair

:45:27  12  competition, you must determine the amount of money, if any,

:45:32  13  that Lexion is entitled to be awarded.  I am instructing you

:45:34  14  on monetary relief only so that you have guidance in the

:45:36  15  event you find that SurgiQuest is liable and that Lexion is

:45:39  16  entitled to recovering money from it.  If Lexion has proven

:45:44  17  that Surgiquest has engaged in false advertising or unfair

:45:47  18  competition, then you may award any damage sustained by

:45:48  19  plaintiff, including harm to market reputation, any lost

:45:51  20  sales, or other lost revenue that Lexion has proven by a

:45:58  21  preponderance of the evidence.

:45:59  22          As to lost profits, Lexion claims that it is

:46:02  23  entitled to an award of profits that Lexion claims it lost

:46:05  24  from sales of its Insuflow or Synergy products from 2013

:46:11  25  through trial as a result of false or misleading statements

| | |
|---|---|
| :46:17 | 1 |
| :46:20 | 2 |
| :46:20 | 3 |
| :46:21 | 4 |
| :46:25 | 5 |
| :46:29 | 6 |
| :46:32 | 7 |
| :46:36 | 8 |
| :46:40 | 9 |
| :46:44 | 10 |
| :46:48 | 11 |
| :46:51 | 12 |
| :46:55 | 13 |
| :47:00 | 14 |
| :47:05 | 15 |
| :47:05 | 16 |
| :47:11 | 17 |
| :47:14 | 18 |
| :47:17 | 19 |
| :47:22 | 20 |
| :47:22 | 21 |
| :47:24 | 22 |
| :47:25 | 23 |
| :47:30 | 24 |
| :47:33 | 25 |

that SurgiQuest made about the AirSeal product.

For each advertising statement about AirSeal that you find to be false or misleading, if any, Lexion must show that the advertising statement was a material factor in causing Lexion to lose sales in order to recover lost profits damages in connection with that statement.  Put differently, to recover its own lost profits, Lexion must prove by a preponderance of the evidence that its actual damages were causally related to actual deception of the purchasing public.  However, this does not place upon Lexion a burden of proving detailed individualization of lost sales.  Such proof goes to the amount of damages, not to the very right to recover.  A causal link can be met with circumstantial evidence or direct evidence.

If literal falsity is found, Lexion does not need to prove actual deception of consumers to recover damages statements made by SurgiQuest.  Additionally, a finding of intentional willful deception by defendant will justify a presumption that consumer are, in fact, being deceived.

Once Lexion establishes SurgiQuest's deceptive intent, the burden then shifts to SurgiQuest to demonstrate the absence of customer deception.

Once Lexion establishes that it has been damaged, it must also provide a reasonable estimate of the

amount of damage.  Under the Lanham Act, Lexion's lost

profits would be calculated by estimating the revenue Lexion

lost due to SurgiQuest's false or misleading statements

about the AirSeal product and subtracting out what it would

have cost Lexion to generate that revenue.  In other words,

Lexion may prove lost profit damages by showing the amount

of sales it would have made, but did not make, because of

SurgiQuest's alleged false advertising and the amount of

profit that Lexion would have earned on each of those sales,

net of all operating costs, overhead costs, production

costs, and other deductible expenses that would have been

incurred in making those sales.

Another type of damage that may be recoverable

are damages for the cost of corrective advertising.  If

Lexion has proven that SurgiQuest has engaged in false

advertising or unfair competition, you may award any cost of

pretrial or posttrial corrective advertising that Lexion has

proven by a preponderance of the evidence.  The cost of

correct advertising may include reasonable expenditures made

by Lexion in order to prevent, correct, or mitigate the

confusion or deception of past and prospective purchasers

resulting from SurgiQuest's false advertising or unfair

competition.

If you decide to award compensatory damages to

Lexion for unfair competition under the Delaware Common Law,

|       |    |                                                                           |
|-------|----|---------------------------------------------------------------------------|
| :48:05 | 1  | you must determine whether SurgiQuest is also liable to                  |
| :48:09 | 2  | Lexion for punitive damages.                                             |
| :48:10 | 3  | Now, punitive damages are different from                                  |
| :48:12 | 4  | compensatory damages.  Compensatory damages are awarded to               |
| :48:16 | 5  | compensate the plaintiff or the plaintiffs for the jury                  |
| :48:19 | 6  | suffered.  Punitive damages, on the other hand, are awarded              |
| :48:21 | 7  | in addition to compensatory damages.  You may award punitive             |
| :48:24 | 8  | damages to punish a party for outrageous conduct and to                  |
| :48:27 | 9  | deter a party, and others like it, from engaging in similar              |
| :48:31 | 10 | conduct in the future.  To award punitive damages, you must              |
| :48:35 | 11 | find by a preponderance of the evidence that SurgiQuest                  |
| :48:38 | 12 | acted intentionally or recklessly.  Punitive damages cannot              |
| :48:43 | 13 | be awarded for mere inadvertence, mistake, errors of                     |
| :48:47 | 14 | judgment and the like, which constitute ordinary negligence.             |
| :48:49 | 15 | Intentional conduct means it is the person's                             |
| :48:52 | 16 | conscious object to engage in conduct of that nature.                    |
| :48:55 | 17 | Reckless conduct is a conscious indifference that amounts to             |
| :49:00 | 18 | an "I don't care" attitude.  Reckless conduct occurs when a              |
| :49:04 | 19 | person, with no intent to cause harm, performs an act so                 |
| :49:07 | 20 | unreasonable and dangerous that it knows or should know that             |
| :49:10 | 21 | there is an eminent likelihood of harm that can result.                  |
| :49:14 | 22 | Each requires that the defendant foresee that its conduct                |
| :49:17 | 23 | threatens a particular material harm to another.                         |
| :49:19 | 24 | In determining any award of punitive damages,                            |
| :49:21 | 25 | you may consider the nature of SurgiQuest's conduct and the              |

| | |
|---|---|
| :49:24 | 1 |
| :49:28 | 2 |
| :49:30 | 3 |
| :49:36 | 4 |
| :49:37 | 5 |
| :49:41 | 6 |
| :49:43 | 7 |
| :49:47 | 8 |
| :49:50 | 9 |
| :49:53 | 10 |
| :49:56 | 11 |
| :49:58 | 12 |
| :50:01 | 13 |
| :50:05 | 14 |
| :50:10 | 15 |
| :50:13 | 16 |
| :50:15 | 17 |
| :50:16 | 18 |
| :50:21 | 19 |
| :50:24 | 20 |
| :50:29 | 21 |
| :50:32 | 22 |
| :50:36 | 23 |
| :50:38 | 24 |
| :50:41 | 25 |

degree to which the conduct was reprehensible. Finally, you

may assess an amount of damages that will deter SurgiQuest

and others like it from similar conduct in the future. You

may consider SurgiQuest's financial condition when

evaluating deterrence. Any award of punitive damages must

bear a reasonable relationship to Lexion's compensatory

damages. If you find that Lexion is entitled to an award of

punitive damages, state the amount of punitive damages

separately on the verdict form.

Finally, how you conduct your deliberations,

ladies and gentlemen, is up to you.

There is an edit here I am going to impose right

now. I would suggest that selecting a foreperson at the

outset might facilitate your deliberations.

But, however you conduct those deliberations,

please remember that your verdict must represent the

considered judgment of each juror.

It is your duty, as jurors, to consult with one

another and to deliberate with a view toward reaching an

agreement, if you can do so without violence to your

individual judgment. Each of you must decide the case for

yourself, but do so only after an impartial consideration of

the evidence with your fellow jurors. In the course of your

deliberations, do not hesitate to reexamine your own views

and change your opinion, if convinced it is erroneous. But

:50:45 1  do not surrender your honest conviction as to the weight or

:50:48 2  effect of evidence solely because the opinion of your fellow

:50:51 3  jurors, or for the purpose of returning a verdict.  Remember

:50:54 4  at all times that you are not partisans.  You are judges --

:50:58 5  judges of the facts, not me.  Your sole interest is to seek

:51:02 6  the truth from the evidence in the case.  In order for you

:51:06 7  as a jury to return a verdict, it is necessary that each

:51:09 8  juror agree to the verdict.  In other words, your verdict

:51:11 9  must be unanimous.

:51:12 10         Now, a form of verdict, as I have told you, has

:51:15 11 been prepared.  You will take this form to the juryroom, and

:51:19 12 when you have reached unanimous agreement as to your

:51:21 13 verdict, you will have your foreperson fill in, sign and

:51:23 14 date the form.  You will then return to the courtroom and

:51:26 15 your foreperson will hand over the form to Mr. Buckson, and

:51:31 16 he will announce your verdict.

:51:32 17         It is proper to add the caution that nothing

:51:35 18 said in these instructions, and nothing in the form of

:51:38 19 verdict is meant to suggest or convey in any way or manner

:51:41 20 any intimation as to what verdict I think you should find.

:51:46 21 What the verdict shall be is your sole and exclusive duty

:51:50 22 and responsibility.

:51:51 23         Now, that concludes the part of my instructions

:51:53 24 explaining the rules for considering the testimony and

:51:55 25 evidence.  Now let me finish up by explaining how you

| :51:58 | 1 | communicate questions or messages to the Court. |
| :52:01 | 2 | Once you start deliberating do you not talk to |
| :52:03 | 3 | the Jury Officer, to my Deputy Clerk, or to me, or to anyone |
| :52:06 | 4 | else except each other about the case. If you have any |
| :52:09 | 5 | questions or messages, right write them down on a piece of |
| :52:13 | 6 | paper, have your foreperson sign them and give them to the |
| :52:15 | 7 | Jury Officer who will be outside your area. The question |
| :52:18 | 8 | will be given to me, and I will respond as soon as I can. I |
| :52:21 | 9 | may have to talk to the lawyers first about what you have |
| :52:24 | 10 | requested or asked, so it may take me a bit of time to get |
| :52:27 | 11 | back to you. |
| :52:29 | 12 | One more thing I want to say to the jury here. |
| :52:33 | 13 | Your deliberations will be completely confidential and |
| :52:35 | 14 | protected. You should therefore feel free to engage in any |
| :52:39 | 15 | discussion as vigorous and polite a manner as you so choose, |
| :52:45 | 16 | or impolite. The point is that your deliberations are |
| :52:52 | 17 | completely confidential. |
| :52:53 | 18 | One more thing about messages. Do not ever |
| :52:55 | 19 | write down or tell anyone else how you stand on your votes. |
| :52:59 | 20 | For example, do not write down or tell anyone else that you |
| :53:02 | 21 | are split 6-2, or 4-4, or whatever your vote happens to be. |
| :53:06 | 22 | That should stay secret until your deliberations are |
| :53:09 | 23 | completed. |
| :53:09 | 24 | Let me finish by repeating something I said to |
| :53:12 | 25 | you earlier. Nothing I have said or done during the course |

:53:16  1   of this trial was meant to influence your decision in favor

:53:19  2   of either party.  You must decide the case yourself based on

:53:23  3   the evidence presented.

:53:24  4              Okay.  Mr. Wille.

:53:26  5              MR. WILLE:  Your Honor, can we have a minute to

:53:27  6   get organized here?

:53:38  7              THE COURT:  Do any of the jurors need a quick

:53:39  8   break?  Okay?  We're all good?

:53:43  9              Okay.

:53:48  10             (Video played.)

:53:53  11             MR. WILLE:  That's not a seal.  And the product

:53:57  12  is not essentially equivalent to Insuflow, and the product

:54:01  13  does not protect the staff from the dangers of surgical

:54:04  14  smoke.  That is really what this case comes down to.

:54:07  15             I told you in opening statement that we would

:54:09  16  demonstrate false advertising in three different areas and

:54:13  17  we have done so.  And we have done so using SurgiQuest's own

:54:18  18  witness's testimony and we have done so using SurgiQuest's

:54:21  19  own documents.

:54:22  20             Let's look at what SurgiQuest knew.

:54:26  21             On humidity, December 12, 2010.  Mr. Azarbarzin

:54:30  22  signed the 510(k) application which acknowledges that

:54:33  23  moisture is removed from the patient.  I'll show this to you

:54:36  24  in a minute.

:54:36  25             February 22nd, 2012, Ralph Sterns does his

:54:40  1   humidity testing.  In his memo to the CEO, he states the

:54:46  2   AirSeal dehydrates and chills patient.

:54:48  3          With respect to air, early in 2010, SurgiQuest

:54:52  4   has an engineering specification that has 11 signatures on

:54:56  5   it that says AirSeal sucks air into the abdomen.

:54:59  6          February 22, 2012, Ralph Sterns's test data

:55:04  7   again to the CEO of SurgiQuest.  They know that over

:55:08  8   70 percent air can be in the abdomen during the use of the

:55:10  9   AirSeal system.  And,

:55:11  10          With respect to smoke, Mr. Azarbarzin testified

:55:15  11   that he knew from the beginning that the filter could not

:55:17  12   filter out toxic and carcinogenic gases.

:55:21  13          But what did SurgiQuest advertise?  SurgiQuest

:55:24  14   advertised that AirSeal does essentially the same thing as

:55:28  15   Insuflow.

:55:28  16          They advertise that AirSeal keeps tissues moist

:55:31  17   and eliminates the need for a hater/humidifier.

:55:35  18          With respect to air, they called it an AirSeal

:55:37  19   even though it sucks in air and releases gases into the

:55:40  20   operating room.

:55:41  21          They said it was a carbon dioxide insufflator

:55:45  22   which for decades only delivered carbon dioxide.  This

:55:48  23   delivered carbon dioxide and air.

:55:50  24          They said it maintains stable pneumoperitoneum.

:55:55  25   But it's stable.  The concentration of the carbon dioxide is

| | |
|---|---|
| :55:57 | 1 |
| :55:59 | 2 |
| :55:59 | 3 |
| :56:02 | 4 |
| :56:06 | 5 |
| :57:07 | 6 |
| :57:10 | 7 |
| :57:12 | 8 |
| :57:15 | 9 |
| :57:18 | 10 |
| :57:21 | 11 |
| :57:25 | 12 |
| :57:26 | 13 |
| :57:29 | 14 |
| :57:35 | 15 |
| :57:38 | 16 |
| :57:44 | 17 |
| :57:45 | 18 |
| :57:47 | 19 |
| :57:52 | 20 |
| :57:56 | 21 |
| :58:00 | 22 |
| :58:04 | 23 |
| :58:08 | 24 |
| :58:12 | 25 |

changing when there are leaks and the doctors don't know about that.

With respect to smoke, they said smoke-free working environment, smokeless laparoscopy, protects the operating room personnel from the dangers of smoke.

But you have now seen the evidence. You now know that the staff is not protected from the dangers of smoke. If anything, the dangers of smoke are hidden from the staff, because they think they are being protected, because the particles get taken out of the smoke, but the toxic and carcinogenic gasses get released into the operating room.

And what has SurgiQuest reaped? It sold the company to ConMed for 265 million dollars. Its CEO personally got ten million dollars out of this. And that was the plan. The plan was by 2016 to be on the beach. Mr. Azarbarzin has ten million dollars and if he wanted to be on the beach, he certainly could.

And what has Lexion lost? Lexion's sales increased every year until SurgiQuest's false advertising began. And once SurgiQuest's false advertising began, it had a slight increase during 2012 and then its sales started to dip. And they have continued to dip ever since.

Now, Mr. Ryan in opening statement said SurgiQuest told you that this case is about what surgeons

:58:14  1   want.  That is not exactly right.

:58:19  2          I acknowledged to you in opening statement that

:58:21  3   there are some good things about SurgiQuest's product.  It

:58:24  4   does some good things for patients.  But having a product

:58:28  5   that does some good things does not give them license to

:58:32  6   falsely advertise it in other respects.  That is what this

:58:35  7   case is really about.  And I am now going to review the

:58:37  8   evidence for you.  And I am going to apologize in advance.

:58:42  9   I am going to go through some of this evidence pretty fast.

:58:45  10  You are not going to have time to read everything on the

:58:45  11  slides.  My intent is simply to remind you of a lot of

:58:48  12  evidence as it was discussed during the case.  You have seen

:58:50  13  a lot of it multiple times.  I am going to pause at a few

:58:53  14  points.

:58:53  15         Again, I am going to go through it rather

:58:56  16  quickly, in the interests of time.

:59:02  17         Heat and humidity.  Again, the FDA filing, smoke

:59:07  18  and moisture is removed.  They told the FDA they removed

:59:09  19  moisture from the patient.  Mr. Stearns's memorandum, the

:59:13  20  PneumoSure dehydrates the abdominal cavity the most,

:59:17  21  followed by the iFS and then the DPS.  Chilling the patient.

:59:20  22  So they knew these things.  They knew these things back in

:59:24  23  2012.

:59:25  24         Mr. Azarbarzin testified that any humidity in

:59:28  25  the gas that's inside the patient came from the patient.

:59:33    1        Lexion humidifies the gas outside the patient,

:59:37    2   delivers humidified gas to the patient.  SurgiQuest robs the

:59:41    3   moisture from the patient and dehydrates the patient in the

:59:43    4   process.

:59:45    5        That's the difference between the products.  And

:59:46    6   Dr. Burban's testing showed you that.

:59:49    7        Lexion's product adds moisture to the abdomen.

:59:52    8   SurgiQuest's product removes moisture from the abdomen.

:59:56    9        Dr. Burban also explained to you the flaws in

:00:00   10   SurgiQuest's humidity testing, which really proved that the

:00:03   11   AirSeal dehydrates and cools the patient more than

:00:06   12   conventional insufflators, because all of the moisture

:00:11   13   during Mr. Stearns's test that he measured came from the

:00:14   14   patient.  That was all evaporated from the patient.

:00:19   15        What did SurgiQuest advertise?  Well, they told

:00:21   16   their sales reps that AirSeal performs essentially the same

:00:25   17   function.  And you have seen plenty of evidence in this case

:00:28   18   that the sales reps did exactly what they were trained and

:00:30   19   went out and told customers that it performed essentially

:00:33   20   the same function.

:00:35   21        For example, Mr. Fadem testified that they were

:00:39   22   trained to say we have a product that can replace what you

:00:41   23   are currently using and does everything of what yours

:00:45   24   currently does.

:00:46   25        Mr. Ross testified about an e-mail he sent that

:00:49    1    says the AirSeal system performs essentially the same

:00:52    2    function.  He communicated that to his customer.  And we

:00:57    3    will see more evidence of this as we look at the confusion

:01:00    4    evidence.

:01:00    5         What else did SurgiQuest advertise?  They

:01:03    6    advertised by electronic mail -- and you can believe, if

:01:06    7    they advertised by electronic mail, that there was many more

:01:11    8    oral conversations which went on with their sales reps,

:01:14    9    which also constitute advertising.

:01:16    10         The message in this industry is delivered in

:01:19    11    one-on-one communications.  You heard a lot of testimony

:01:22    12    about that from both sides.  So that's advertising, just

:01:24    13    like any other form of advertising.  And here, there is a

:01:28    14    number of e-mails in the record that they advertised, that

:01:32    15    they keep tissues moist.  And we showed you that there is

:01:36    16    over a hundred e-mails where they said that they keep

:01:39    17    tissues moist.

:01:40    18         Now, they tried to suggest that was only Craig

:01:43    19    Britten, but actually, if you go look at those exhibits,

:01:47    20    Ryan Hatfield, John Simpson, Paul Lozano, Daniel Edwards,

:01:52    21    there is multiple sale reps who made this.  Not only that,

:01:57    22    Mr. Britten testified that he got this information from

:02:00    23    Kevin Yeager, who was his regional manager and then became

:02:03    24    the area director for the entire Western United States for

:02:03    25    SurgiQuest.

:02:08  1    He also testified that that was part of the

:02:10  2  standard e-mail that he sent out.

:02:14  3    Now, these claims are also unsubstantiated.  And

:02:18  4  the Judge gave you some instructions about unsubstantiated

:02:20  5  claims.  Mr. Azarbarzin agrees there is nothing in the

:02:24  6  medical journals and no test that SurgiQuest has performed

:02:27  7  to prove that they keep tissues moist.  So these are

:02:31  8  unsubstantiated false claims.

:02:33  9    They also advertised that the warmer/humidifier

:02:36  10 is not needed.  Now, we expect SurgiQuest will get up and

:02:39  11 will focus you just on the not needed word, take it out of

:02:44  12 the advertising context, and say, well, some doctors

:02:48  13 disagree as to whether heating and humidification is good

:02:52  14 for the patient, so that is an ambiguous statement.

:02:54  15    This is not an ambiguous statement taken in

:02:57  16 context, because the context of the statement says, if you

:03:02  17 are currently using a CO2 warmer/humidifier, which can only

:03:06  18 be the Insuflow because it was the only one sold, you don't

:03:11  19 need it when you use AirSeal.  They are telling the customer

:03:15  20 that they can do the same thing as Insuflow.

:03:16  21    And the context of the line above it further

:03:19  22 supports that, because they also tell the customer, you

:03:22  23 don't need a smoke evacuator.  Well, again, the reason you

:03:26  24 don't need a smoke evacuator is because they claim to

:03:31  25 evacuate smoke.

:03:31  1    So the overall all context of this, there is

:03:33  2  only one reasonable meaning.  They are telling the customer,

:03:37  3  you don't need the Insuflow product because we heat and

:03:42  4  humidify.  But don't take my word for it.  Bryan Davies, a

:03:45  5  sales representative for SurgiQuest, we asked him, the

:03:48  6  reason you don't use a CO2 warmer/humidifier when you use

:03:52  7  AirSeal is because why? And he testified, Because from our

:03:56  8  experience the AirSeal unit acts in a similar fashion.

:03:59  9  Again, this goes back to what they were trained.  It

:04:01  10 performs essentially the same function.

:04:04  11    You heard from Derrek Smith, who had a customer

:04:08  12 actually point to something about eliminating CO2 warmers

:04:13  13 and humidifiers and saying, well, why do I need to trial

:04:17  14 another product if I already have one that performs that

:04:20  15 job?  So this is a customer looking at this advertisement

:04:23  16 and saying, that is what it meant to them.

:04:26  17    Materiality.  We don't think we have to prove

:04:27  18 materiality because we think we have proven falsity of the

:04:31  19 advertising.  But there is ample evidence of materiality for

:04:35  20 heating and humidification.  Dr. Dulemba testified it was

:04:39  21 very important for him, the heating and humidification

:04:43  22 capability.  You saw the evidence that Dr. Redan put in

:04:47  23 about the health effects to the patient.

:04:50  24    So one of the reasons something may be material

:04:52  25 is because it could impact the health or safety of the

:04:55    1    person that the device is being used on, and you heard that

:05:01    2    evidence from Dr. Redan.

:05:02    3              It is also material because there is market

:05:05    4    demand for heating and humidification, and SurgiQuest, Mr.

:05:05    5    Babini admits that at least 50 percent of the doctors want

:05:11    6    heating and humidification, and that's why he put it in

:05:13    7    customer requirements documents.

:05:16    8              Then, you heard yesterday from Mr. Tegan, a

:05:18    9    couple years later they do another customer survey.  And

:05:21   10    what does Mr. Tegan say?  Well, active humidification is

:05:27   11    highly desirable.

:05:29   12              Confusion.

:05:31   13              Customers were confused.  There is ample

:05:34   14    evidence of confusion.  Dr. Kobza testified that his

:05:37   15    understanding was AirSeal would provide heat and humidified

:05:41   16    air.  You heard from Dr. Dulemba, the sales rep said, yeah,

:05:46   17    does the same thing.  It's almost the same.  And he was

:05:49   18    pretty upset about it later when he found out it didn't do

:05:52   19    the same thing.

:05:54   20              Kristin Huth testified about somebody at Aurora

:05:57   21    Grafton, that they told her that they thought that the

:06:01   22    product heated and humidified.  You heard from Ms. Moriarty

:06:05   23    here in Court.  She identified four different hospitals that

:06:10   24    had told her that the product heated and humidified or did

:06:14   25    the same thing.

:06:16   1   Robert Danielewicz said he had heard doctors and

:06:19   2   nurses tell him the AirSeal heated and humidified.  And

:06:22   3   again, you heard Derrek Smith say, well, we don't need your

:06:27   4   product because we already have AirSeal and that performs

:06:30   5   the same function; and Kristin Huth at another hospital, who

:06:37   6   told her that it heated and humidified.

:06:40   7   Brett Emery, down in Texas, someone from Robotic

:06:46   8   Surgery, said, well, it did the same exact same thing the

:06:50   9   Insuflow and Synergy were doing when talking about the

:06:53   10   AirSeal system.

:06:54   11   Matthew Montano, any customer ever tell you

:06:57   12   this?

:06:57   13   Sure.  They spoke about it in the way it was

:07:01   14   doing the same thing that our product did.

:07:03   15   Even Intuitive Surgical, the maker of the robot,

:07:07   16   was confused.  They said, best of all, so that is relevant

:07:11   17   to materiality as well, it is an important thing they are

:07:15   18   saying, the pneumo is heated and humidified, again,

:07:20   19   incorrect.

:07:20   20   In another area of the country, we had Mr.

:07:24   21   Danielewicz, who met another Intuitive rep in Milwaukee who

:07:27   22   said, he explained how the Insuflow heated and humidified,

:07:30   23   and the Intuitive rep said, oh, so just like the AirSeal.

:07:37   24   In addition to the actual confusion of customers

:07:39   25   and the confusion of the Intuitive reps, there was also

| | |
|---|---|
| :07:43 | 1 |

published confusion.  And published confusion is especially important, because it is out there, it is published.  People can read it.  So the confusion can be reinforced year after year.

So there was this newsletter that was presented by Dr. Redan.  It talks about recirculating the CO2, rather than continually adding fresh cold gas.

But you know from hearing the evidence in this case that it actually does add fresh cold gas three to eight liters a minute.

So there is confusion.  And Dr. Redan also showed you two articles published by surgeons, actually one is an article and one is a treatise, where they believed that the Insuflow was heating the gas.

So there is lots of confusion out there engendered by SurgiQuest's false advertising.

Now let's talk about air.  The AirSeal does not seal.  The AirSeal sucks air into the abdomen.  That's what their engineering specification says.  So it doesn't seal out, lets over 70 percent air in.  You saw Dr. Burban's test, the Aspen test, the NAMSA test, they are all consistent.  It sucks in a lot of air when there is a significant leak.

Ralph Stearns also testified that it doesn't seal it in, either.  Gas and smoke can escape out the top of

:07:43   1   published confusion.  And published confusion is especially
:07:47   2   important, because it is out there, it is published.  People
:07:50   3   can read it.  So the confusion can be reinforced year after
:07:54   4   year.
:07:55   5           So there was this newsletter that was presented
:07:57   6   by Dr. Redan.  It talks about recirculating the CO2, rather
:08:02   7   than continually adding fresh cold gas.
:08:04   8           But you know from hearing the evidence in this
:08:07   9   case that it actually does add fresh cold gas three to eight
:08:11  10   liters a minute.
:08:12  11           So there is confusion.  And Dr. Redan also
:08:17  12   showed you two articles published by surgeons, actually one
:08:22  13   is an article and one is a treatise, where they believed
:08:26  14   that the Insuflow was heating the gas.
:08:28  15           So there is lots of confusion out there
:08:28  16   engendered by SurgiQuest's false advertising.
:08:31  17           Now let's talk about air.  The AirSeal does not
:08:35  18   seal.  The AirSeal sucks air into the abdomen.  That's what
:08:38  19   their engineering specification says.  So it doesn't seal
:08:42  20   out, lets over 70 percent air in.  You saw Dr. Burban's
:08:49  21   test, the Aspen test, the NAMSA test, they are all
:08:54  22   consistent.  It sucks in a lot of air when there is a
:08:54  23   significant leak.
:08:59  24           Ralph Stearns also testified that it doesn't
:09:01  25   seal it in, either.  Gas and smoke can escape out the top of

:09:06　　1　　the trocar.

:09:08　　2　　　　　　　The first false statement is the name of the

:09:11　　3　　product itself, AirSeal.  That conveys, that makes a false

:09:13　　4　　statement about the product to the customer.  The customer

:09:16　　5　　believes no air gets in on or out.  And you have seen

:09:21　　6　　evidence in this case that customers actually believe.

:09:23　　7　　　　　　　Now, Dr. Collins testified yesterday about his

:09:26　　8　　patent.  And the importance of this is that trocars have had

:09:30　　9　　seals for years.  So surgeons know what seals are.  Those

:09:35　　10　　seals preclude the passage of gas, that is what their

:09:38　　11　　purpose is.

:09:39　　12　　　　　　　So when you tell a customer you have an AirSeal,

:09:43　　13　　they think that no air gets in or out.  And we are going to

:09:46　　14　　show you the evidence of that.

:09:48　　15　　　　　　　They also say that there is unmatched

:09:51　　16　　performance in the maintenance of stable pneumoperitoneum,

:09:54　　17　　but it's not stable.  Again, the concentration of the CO2

:10:00　　18　　changes.

:10:01　　19　　　　　　　You have seen a couple of definitions of stable

:10:04　　20　　pneumoperitoneum.  This is SurgiQuest's definition in a

:10:08　　21　　press release that they issued that says there is no leakage

:10:11　　22　　of inflation throughout the entire procedure.

:10:12　　23　　　　　　　We know that's not true.  Three to eight liters

:10:15　　24　　a minute of gas has to leak out of the abdomen the way their

:10:19　　25　　product is designed.

|  | |
|---|---|
| :10:20 | 1 |

Then SurgiQuest the showed publication by Dr.
Ott to Dr. Burban, which indicates that one of the
characteristics of the pneumoperitoneum is the chemical
effects of the gas. Well, you change the concentration of
the gasses in the abdomen, you change the chemical effects
of the gas.

So the definitions where there is actual
evidence as opposed to an expert saying just I think what
this means, the definitions that are actually in print show
that the pneumoperitoneum is not stable.

They also advertise that they have an invisible
air barrier. What do their sales reps do with that
definition? The go out to explain to customers, they did
this air bladder demonstration for Ms. Brenton. They told
her, see, no air goes into the abdomen. She says, that's
how it keeps the pneumo, that's what he said, because of the
air barrier. And she said she was quite convinced he was
right.

So SurgiQuest is out there saying the air
barrier prevents air from getting into the abdomen and
customers are confused.

Craig Britten testified he did the same type of
air bladder demonstration and he explained to the customer
that the air barrier and the air seal prevents air from
escaping from the abdomen and he explained that the air

barrier prevents air from getting into the abdomen. He
explained both of those to the customer.

All false.

Carbon dioxide insufflator. You heard lots of
witnesses talk about this. And this is what you heard
universally.

Well, first of all, this is advertising. It is
included in packets of materials that were handed out at
trade shows. You heard that from Mr. Tegan yesterday and
you saw e-mails sent out by sales reps that attached this
document.

Just because the document originally came from
the FDA filing is irrelevant. The fact that it's put in a
packet of promotional materials and handouts makes it
advertising. And,

What you heard from witnesses about the truth of
that was Dr. Kobza said he would expect it to only deliver
carbon dioxide.

Mr. Fadem, 25 years selling products. He sold
these things. Not aware of an insufflator that delivers a
mix of carbon dioxide and air.

Dr. Redan: Carbon dioxide insufflator delivers
only carbon dioxide.

Dr. Lee: He agrees there is no other
insufflator, no other carbon dioxide that causes a mixture

```
 1    of air and CO2 in the abdomen.  And,

 2              Terry Redmond said that they understood it was

 3    only delivering carbon dioxide to the abdomen.  That is what

 4    he understood from the training.

 5              Okay.  Is this material?  Of course this is

 6    material.

 7              You know, SurgiQuest's own document shows this.

 8    Mr. Sterns's e-mail says when doctors find out about this,

 9    they look at you like you just ran their mother over in a

10    car.  And,

11              Then you also heard SurgiQuest was maybe going

12    to be acquired by Stryker.  They went and did a trial of the

13    product, and they went back and they told SurgiQuest:  Well,

14    if the DPS is pulling ambient down into the vortex, we have

15    a serious problem.

16              They were seriously concerned about air

17    entrainment.

18              Dr. Kobza:  If you knew that 20 percent air,

19    30 percent air could get in there, would you buy it?

20              No, he wouldn't buy it.

21              Dr. Dulemba:  Suppose you learn AirSeal sucked

22    in air in the presence of leaks.  What impact would that

23    have on your decision?

24              I would never use it.

25              Ms. Brenton, where they did this demonstration,
```

```
 1    this magician's trick for her:  Did the demonstration impact

 2    the hospital's decision to purchase AirSeal?

 3              Partially it did.  These are important issues in

 4    deciding whether to purchase the product.

 5              You heard surgeons say that, and Ms. Brenton is

 6    a robotic specialist at the PeaceHealth Hospital.

 7              Even SurgiQuest's own sales rep indicates that

 8    the air seal capability is an important selling point.  So

 9    this is an important thing they emphasize when they try to

10    sell the product, and that makes it a material falsity as

11    well.

12              And we all know, seeing SurgiQuest's patent, it

13    is also material because of the potential health impact.

14              SurgiQuest itself says it is undesirable for the

15    safety of the patient.  And you have heard the evidence on

16    that.

17              Risk of infection.  So we now have gas getting

18    in there without being filtered as Mr. Sterns testified to.

19              And SurgiQuest has known since 2007 that when

20    you change the CO2 concentration and put air in there, it

21    appears CO2 doesn't support bacterial growth, but you put

22    air in there you may have bacterial growth.

23              Dr. Redan explained, well, this is different

24    than open surgery.  One of the reasons we have less

25    infection with laparoscopic surgery is because of that CO2
```

1 environment in the abdomen. You don't have that with open
2 surgery. It has a higher rate of infection.
3 Risk of fire. SurgiQuest's own engineers did a
4 study about the risk of fire.
5 And even Dr. Earle agreed that you could have a
6 fire start in the abdomen if you got enough room air in
7 there and you the right flammable gases in there.
8 How is that different than open surgery? Well,
9 in open surgery, they can diffuse out into the room. In
10 laparoscopic surgery, they are confined in a pressurized
11 abdomen.
12 And you heard a lot from Dr. Redan about
13 subcutaneous emphysema.
14 This is also something that doesn't happen
15 during open surgery. This is a complication of laparoscopic
16 surgery because it is the fact that the gas is pressurized
17 and as it is trying to push out between the trocar and the
18 incision, some of it goes sideways into the tissue.
19 That is what Dr. Redan explained. He explained
20 how the air and CO2 are under pressure and that is different
21 from an open procedure.
22 Dr. Redan showed you the results of this.
23 People, people end up with air going all over their body,
24 sometimes to their face, they have a swollen face, swollen
25 eyelids. And,

1    SurgiQuest's CEO agrees that air entrainment can
2    exacerbate subcutaneous emphysema because air stays longer
3    in the body.
4    So SurgiQuest is well aware that sucking in air
5    is bad for the patient with respect to subcutaneous
6    emphysema.
7    Now, Dr. Redan, you will recall, we went over
8    this slide with him, and there is a series of exhibits here,
9    and we didn't show you all of these exhibits.  You can
10   request to see any of these as you deliberate.
11   But I'm going to point to, I'm going to show you
12   one of these.
13   The one I'm going to show you is from
14   Dr. Moawad.  So Dr. Moawad said I tried the AirSeal on, had
15   massive subcutaneous emphysema as I have never seen before.
16   Her entire body from the rib cage to her toes had
17   significant amounts of air that caused severe pain requiring
18   a 3-4 day hospital stay, which is extremely unusual for our
19   laparoscopic cases.
20   At the end of the paragraph, he says:  On the
21   other hand, the system provided no benefit in the case as
22   losing pneumoperitoneum is not a common problem in my cases
23   to justify the risk/cost.  And,
24   He says he initially planned on trying it on a
25   few more patients but after the patient suffered severe pain

```
 1    and a prolonged hospital stay, he is no longer interested.

 2              That is materiality.  That shows that this

 3    matters to people who don't know the truth.

 4              Now, Stryker also was concerned about

 5    subcutaneous emphysema.  Mr. Stearns testified that what

 6    Stryker was concerned about, and near the bottom here, for

 7    the fact that if you had emphysema, you would have a longer

 8    duration of it.  That is his understanding of what the

 9    problem was.

10              Well, that brings us to SurgiQuest's false

11    advertising claim.

12              So SurgiQuest said there is something false

13    about this chart that Lexion distributed.  We're not quite

14    sure what it is.

15              Dr. Lee seemed to suggest that it had something

16    to do with a standard rates of thee complications that were

17    chosen, but then he also said he testified, well, that is

18    really a matter of judgment.  Because there was no

19    universally accepted rate.  So how can something here be

20    true or false?  It's simply a matter of judgment.  And,

21    moreover, there is really nothing wrong with the rates that

22    Dr. Ott chose.

23              With respect to the rate for pneumomediastinum.

24    It is disclosed in the Murdock paper that SurgiQuest used in

25    its response to this graph, and they used the exact same
```

1    number Dr. Ott used.

2              With respect to subcutaneous emphysema, the

3    number that both parties used is in the Murdock paper.

4    Dr. Ott chose one end of the range, Dr. Ott chose the other

5    end of the range.

6              With respect to pneumothorax, the rate is

7    disclosed in one of the very papers that reported

8    complications about the AirSeal.

9              And you saw Dr. Redan's explanation of that as

10   well as the testimony of Dr. Lee.

11             So there is nothing false about that graph.

12             Moreover, SurgiQuest claims it is being

13   irreparably harmed, but they didn't give you a single

14   witness who testified that this had any impact on their

15   purchasing decision.  They gave you a survey, but they

16   didn't have any real customer, they didn't show you any

17   documentation showing they lost any sales or that this

18   mattered to any of their customers and meanwhile their sales

19   continued to go up.

20             Now, let's talk about the instructions for use.

21             With respect to the instructions for use, I

22   would ask you to carefully consider Instruction No. 13 that

23   the Court gave you on things that are inconspicuously

24   located because the instructions for use are not included

25   with any of the advertising on air that we discussed

1 earlier. They're somewhere else. And as you saw when I

2 handed it to Mr. Fadem, they're pretty fine print. They're

3 pretty hard to read. Moreover, the testimony in the case

4 consistently has been nobody reads these.

5 Mr. Kobza, have you read any instructions for

6 use?

7 No.

8 Mr. Fadem, did SurgiQuest even give them to you?

9 I don't think they ever did.

10 Did you read them?

11 No.

12 Did you ever refer a customer to them?

13 No.

14 Mr. Redmond gave similar testimony. Never

15 referred a customer to the instructions for use.

16 Even Dr. Lee, Dr. Ramirez, the two experts for

17 SurgiQuest, they weren't aware of air entrainment before

18 this case began. Nobody reads these things. This is a

19 sideshow. It is an effort to deflect you from the false

20 advertising and suggest, well, we told the truth somewhere,

21 that if you went and hunted far enough, you could find it.

22 That is not a defense to false advertising.

23 Moreover, as Dr. Burban explained, the

24 instructions for use themselves are false because the

25 instructions for use say that the displacement of air is

| | |
|---|---|
| :21:27 | 1 |
| :21:32 | 2 |
| :21:36 | 3 |
| :21:39 | 4 |
| :21:42 | 5 |
| :21:46 | 6 |
| :21:52 | 7 |
| :21:55 | 8 |
| :22:00 | 9 |
| :22:04 | 10 |
| :22:06 | 11 |
| :22:08 | 12 |
| :22:12 | 13 |
| :22:16 | 14 |
| :22:19 | 15 |
| :22:25 | 16 |
| :22:28 | 17 |
| :22:30 | 18 |
| :22:33 | 19 |
| :22:38 | 20 |
| :22:42 | 21 |
| :22:46 | 22 |
| :22:49 | 23 |
| :22:53 | 24 |
| :23:00 | 25 |

temporary and the entrained air will be displaced with CO2.
Well, importantly, they say that occurs during these
conditions as described above.  That's not true.

Dr. Burban's tests show that as long as the leak
is there, the air entrainment continues.  It's only when the
leak goes away that the air returns to more normal levels.

And then when somebody from Stryker pointed to
these and said, hey, there is air entrainment, a doctor
contacted them, what SurgiQuest's response?  They say it's
sales theatrics.

I think materiality, you can also consider in
this case that SurgiQuest did not really want to know about
this problem.  It's so material they really tried not to
know.  So they were going to do a study, and the study was
to determine an acceptable ratio of CO2 and air that did not
compromise the safety and efficacy of the system.  But they
didn't do the study.

And, you know, nobody knows the maximum amount
of air that gets into the system during an operation.  Mr.
Babini, he doesn't know how much, what the maximum is.  Mr.
Peters, he can't tell us what the maximum is.  Mr.
Azarbarzin, he can't tell us the maximum.  He knows it's
over 70 percent, but he can't tell us the maximum.  Dr.
Ramirez, their expert, can't tell us the maximum.

Gary Tegan couldn't tell us, either.

:23:04    1    FDA approval.

:23:05    2         We have heard a lot of discussion about FDA

:23:08    3    approval in this case.  The FDA does not approve SurgiQuest

:23:12    4    advertising.  You have heard no testimony to that effect.

:23:15    5         So we look at SurgiQuest's advertising for what

:23:19    6    it is.  SurgiQuest is trying to tell you, well, the FDA

:23:22    7    approved this so it must be safe.  Well, you have just seen

:23:24    8    a lot of evidence on subcutaneous emphysema showing that it

:23:28    9    is not safe and that real doctors actually have an issue

:23:33   10    with subcutaneous emphysema, and that a multi-billion-dollar

:23:37   11    company, Stryker, had an issue with subcutaneous emphysema

:23:42   12    when deciding whether to purchase SurgiQuest.

:23:44   13         But what the FDA does here in a 510(k), they

:23:47   14    rely on SurgiQuest for the information.  And here is what

:23:52   15    they didn't know.  They did not know that air entrainment is

:23:54   16    typically undesirable for the safety of the patient, because

:23:59   17    SurgiQuest did not tell them that.  They didn't supply their

:24:01   18    patent or any other information conveying that.

:24:06   19         The FDA did not know that the air levels could

:24:06   20    be up to 70 percent in the abdomen, per what Mr. Stearns's

:24:12   21    testing showed.

:24:12   22         The FDA also did not know that the shutdown

:24:15   23    safety feature had been removed.

:24:18   24         Now, SurgiQuest during this case has tried to

:24:21   25    minimize the important of leaks.  One example was the alarm.

:24:26    1    You may recall, Dr. Lee testified, the alarm is very

:24:30    2    annoying and very loud, and he says, there is no way I can

:24:36    3    proceed on a case with that alarm going on.

:24:40    4           I ask you to consider the credibility of Dr.

:24:43    5    Lee's testimony.  For everything he said, based upon that

:24:46    6    answer, you heard the alarm yesterday.  It was three little

:24:50    7    beeps.  It doesn't repeat itself.  Of course, you can

:24:53    8    proceed with the case with that alarm going on because it's

:24:55    9    just three little beeps that's over in two seconds.

:25:00   10           In addition, SurgiQuest's own documents show --

:25:05   11    what they sell this thing for is you can maintain pneumo.

:25:09   12    Where is that an issue?  That is an issue where you have

:25:12   13    leaks.  It's the leaks that cause the pneumoperitoneum to

:25:17   14    start to deflate.

:25:18   15           So what they are selling people is, you don't

:25:22   16    have to stop and worry about these leaks, you can keep

:25:27   17    operating because this will maintain pneumo.  And that is

:25:29   18    exactly what Worlds of Medicine, who helped develop the

:25:33   19    product, said.  He said the surgeon will spend less time and

:25:37   20    effort to look for and close leakages.  What that means for

:25:40   21    materiality is that there is going to be more air in the

:25:42   22    abdomen because the surgeon is not going to stop to fix the

:25:47   23    leaks.

:25:51   24           Okay.  Hysterectomies.  We have heard a lot of

:25:55   25    testimony about hysterectomies in this case.  But it is very

:25:58     1    important.

:25:58     2              The video I played at the beginning, Dr. Redan

:26:00     3    explained, that was done during a laparoscopic hysterectomy.

:26:05     4    And you can hear just listening to the video how much air is

:26:08     5    getting sucked into the abdomen.

:26:12     6              SurgiQuest advertises, well, you don't need an

:26:15     7    occluder.  So they are encouraging the surgery to be done

:26:19     8    with the vaginal canal wide open, so the leak is greater.

:26:23     9    When the leak is greater, more air gets sucked in.

:26:27    10              Terry Redmond testified about this and he said

:26:31    11    that's what they were encouraged to do.  He testified he

:26:35    12    didn't see doctors do it, but did SurgiQuest tell him that

:26:37    13    air could enter the abdomen when that was happening?  No.

:26:38    14    That was not discussed.  That's what Mr. Redmond said.

:26:42    15              And how long does this last?  Well, Dr. Dulemba,

:26:47    16    who is a very well-respected gynecological surgeon, who gets

:26:52    17    patients from all over the United States, and

:26:55    18    internationally, says that that leak is going to be

:26:58    19    somewhere in the 20 to 25-minute range, and all the time

:27:02    20    that is happening, huge amounts of air are sucked into the

:27:06    21    abdomen.  Does the warning message come up during

:27:10    22    hysterectomies?  You bet.

:27:11    23              Listen to their sales reps.  Mr. Zacharias.  He

:27:14    24    has seen that message come up during a hysterectomy.  Mr.

:27:17    25    Britten, Mr. Ross, both talk about the colpotomy.  The

:27:20　1　colpotomy is when the uterus is removed during the

:27:24　2　hysterectomy.  They have seen that excessive leakage alarm

:27:28　3　come up.

:27:29　4　　　　　　What happens?  Do you recall the surgeon doing

:27:30　5　anything in response to the warning?

:27:34　6　　　　　　No.  Mr. Zacharias says they don't do anything.

:27:37　7　Why?  Because AirSeal -- SurgiQuest tells them, well, we

:27:42　8　have the AirSeal, that is going to keep your pneumo

:27:45　9　inflated.  You don't have to fix the leak.  So surgeons

:27:49　10　don't fix these leaks, and meanwhile, air continues to get

:27:52　11　sucked in as this procedure is done.

:27:54　12　　　　　　More testimony from Mr. Zacharias.  What does he

:27:56　13　tell the doctor when there is this big leak during

:28:00　14　hysterectomy?  There is a leak and that AirSeal is managing

:28:02　15　it.  The AirSeal is managing it.  And at that point, it was

:28:05　16　during the hysterectomy and during the colpotomy, and they

:28:08　17　understood it.

:28:09　18　　　　　　Oh, we are doing a hysterectomy.  We have a

:28:12　19　leak.  What he doesn't tell them, because he doesn't even

:28:15　20　know, is that they continue to suck in air.

:28:19　21　　　　　　Okay.  Confusion.  Well, we have Ms. Brenton.

:28:19　22　This is the woman who had the demonstration done for her,

:28:29　23　where an artificial bladder was brought into the hospital to

:28:32　24　show her that no air gets into the abdomen.

:28:35　25　　　　　　And the sales rep told her, well, it keeps

| :28:39 | 1 | pneumo because of the air barrier.  No air goes in, is what |
| :28:42 | 2 | she was told.  What was her reaction?  She was convinced he |
| :28:46 | 3 | was right.  So she is confused. |
| :28:49 | 4 | Dr. Dulemba, did you have an understanding as to |
| :28:50 | 5 | whether gas could escape? |
| :28:52 | 6 | He assumed that it didn't escape.  He said, they |
| :28:56 | 7 | described it as an air barrier.  Things can't penetrate in |
| :28:57 | 8 | or out.  Dr. Dulemba was confused. |
| :28:59 | 9 | Kristin Huth had a situation where she overheard |
| :29:03 | 10 | a conversation between a SurgiQuest sales rep and a |
| :29:07 | 11 | customer.  The customer said, can air get in?  The AirSeal |
| :29:11 | 12 | rep's, response?  No.  Air doesn't get in. |
| :29:14 | 13 | So SurgiQuest is out there telling people that |
| :29:19 | 14 | air does not get in.  That's what they were trained. |
| :29:19 | 15 | And you heard all of those sales reps testify, |
| :29:22 | 16 | they were honest people, they would never try to deceive a |
| :29:25 | 17 | customer.  The deception is not coming from the sales reps. |
| :29:29 | 18 | The deception is coming from SurgiQuest's management.  The |
| :29:32 | 19 | sales reps were not trained the truth.  They were told no |
| :29:36 | 20 | air gets in or out, and that's what they trained customers. |
| :29:42 | 21 | That's what the management trained them.  It's not the sales |
| :29:44 | 22 | reps that are being dishonest here. |
| :29:46 | 23 | Mr. Brenton did similar demonstrations.  And |
| :29:51 | 24 | they told him, no, air does not get sucked into the port. |
| :29:51 | 25 | Bottom of the screen, the customers accepted that it's not |

```
:29:56    1    sucking in a bunch of air.

:29:57    2            Now, sales rep confusion.  The Court has some

:30:04    3    instructions about that as well.  Sales rep confusion is

:30:07    4    important because these are the people having the one-on-one

:30:10    5    conversations with the surgeons.  If the sales reps are

:30:14    6    confused, if they don't have the right information, then

:30:18    7    when the customer says, well, does air get in, they tell

:30:24    8    them, no, air doesn't get in, just like the last two sales

:30:24    9    reps you saw, so the fact that all these sales reps don't

:30:27   10    know the truth means that they are telling other people

:30:30   11    things that are incorrect as well.

:30:31   12            So Mr. Gilbo testified that he believed that the

:30:35   13    AirSeal seals the abdomen from outside air, and that was

:30:41   14    part of his training, that the AirSeal seals the abdomen

:30:44   15    from outside air.

:30:45   16            Mr. Ross, similarly, he doesn't believe it sucks

:30:48   17    in air.  Mr. Britton, he finds it unlikely that air could

:30:54   18    get sucked in.

:30:54   19            Other sales reps, they don't know if air can get

:30:59   20    sucked in.  SurgiQuest did not tell their sales reps the

:30:59   21    truth.

:31:05   22            Finally, published confusion.  There is evidence

:31:07   23    in the record that people were confused because this

:31:11   24    publication, they said, this surgeon said, well, there is no

:31:14   25    gas loss.  Again, we know that's not true.  So again we have
```

:31:17    1    an instance of published confusion.

:31:19    2         Okay.  Smoke.  SurgiQuest agrees that the filter

:31:25    3    doesn't filter smoke.  You have heard plenty of evidence on

:31:28    4    that and the smoke can escape.

:31:30    5         So what do they advertise?  Smoke-free working

:31:34    6    environment.  Smokeless laparoscopy.  I asked Mr. Babini:

:31:38    7         Do you believe it would be accurate to say it's

:31:38    8    smokeless laparoscopy?

:31:42    9         He said, No, not with the correct iteration.

:31:43   10         And then the rest of these advertisements, I

:31:46   11    would ask you to look at Instruction No. 11, this is really

:31:51   12    a collection of different statements, but they all convey

:31:54   13    the same thing, that the staff is protected from the dangers

:32:00   14    of surgical smoke.

:32:02   15         The website says, Operate in a clear field

:32:06   16    without fear of venting surgical smoke, and plume inter-op,

:32:06   17    OR suite.

:32:09   18         Protect your patient, your staff and yourself.

:32:12   19    A smoke-free OR.  A smoke-free environment for your staff.

:32:17   20    Staff not exposed to smoke plume.

:32:19   21         We asked the sales rep, is that a true

:32:23   22    statement?  That it provides a smoke-free environment for

:32:27   23    your staff?  Mr. Davies said, no, it does not.

:32:30   24         So, is this material?  Absolutely.

:32:33   25         Dr. Dulemba was asked, are safety concerns

| :32:35 | 1 | relevant?  Very relevant to him. |
|---|---|---|
| :32:35 | 2 | Ms. Brenton:  Was it your belief that it |
| :32:39 | 3 | filtered out carcinogenic gas? |
| :32:39 | 4 | Yes. |
| :32:41 | 5 | If smoke was released did you have a concern |
| :32:44 | 6 | about it? |
| :32:44 | 7 | Sure, we do. |
| :32:45 | 8 | They are concerned about the health impact. |
| :32:52 | 9 | Bryan Davies, four nurses were impressed with |
| :32:52 | 10 | our benefits, specifically, the fact that it filters smoke |
| :32:55 | 11 | and provides a smoke-free environment. |
| :32:57 | 12 | These are things that matters to customers. |
| :33:00 | 13 | Carlos Babini, he is aware that people that were |
| :33:06 | 14 | selling this provided information to nurses on the health |
| :33:09 | 15 | effects and used it as a selling point. |
| :33:15 | 16 | The SurgiQuest's own internal training manuals, |
| :33:15 | 17 | they acknowledge smoke as dangerous.  This is what they |
| :33:15 | 18 | train their sales reps. |
| :33:20 | 19 | So the health and safety issues with respect to |
| :33:21 | 20 | smoke are another reason these are material. |
| :33:25 | 21 | Confusion.  Again, Ms. Brenton, was it your |
| :33:29 | 22 | belief that it filtered out carcinogenic gasses? |
| :33:32 | 23 | Yes.  Ms. Brenton was confused. |
|  | 24 | Dr. Dulemba:  He didn't think that smoke would |
|  | 25 | vent out the AirSeal trocars.  He was confused. |

1    Ryan Hatfield.  He trained doctors that

2    carcinogenic gasses are filtered.  So those customers would

3    be confused.

4    Andre Gilbo:  Did you tell customers that it was

5    the best filter on the market?  Yes.  But we all know that

6    is not true.

7    Mr. Brenton:  Did it filter out gasses?  Yes.

8    The sales reps again were confused here.  They

9    didn't know it didn't filter out smoke.  They didn't know

10   smoke escaped from the trocar, and a number of them

11   testified of that.

12   Then, of course, we have the published article

13   from Catara, where the doctor wanted a smoke-free operating

14   room and he thought he was getting one with SurgiQuest.

15   Let's talk about damages.

16   So, yesterday, when I was cross-examining Dr.

17   Ugone, you saw some of this testimony up on the screen from

18   Ms. Amman.

19   The Intuitive Laboratory is key here.  Lexion

20   got into the Intuitive Laboratory, was starting to make a

21   lot of sales to robotic hospitals.  In fact, doctors were

22   calling Lexion asking to buy the product, when SurgiQuest

23   came along and started making its claims, basically, they

24   started taking away our sales.  This is important because,

25   you know, they argued at the beginning of the case we didn't

1    innovate.  What you heard during the case, that is actually

2    not true.  The Synergy trocar was made to help maintain

3    pneumoperitoneum in robotic cases.  It has the highest flow

4    of any conventional trocar on the market.  None of those

5    billion-dollar companies came out with a high flow trocar

6    for robotic surgery.  Lexion did, and it got innovation of

7    the year for that product.so if customers buy AirSeal

8    because of some of the false advertising and the concerns

9    that arise from that, the next best choice is the Synergy

10   trocar.

11              Now, Dr. Ugone gave some testimony about that he

12   thought the $22.1 million damages calculation was too high.

13   Let me show you something.

14              In the year before the false advertising began,

15   so 2010 to the end of 2011, the false advertising began in

16   2012, Lexion's growth rate was about eight percent.  If you

17   just say Lexion gets no advantage from being in the robotic

18   laboratory and just continues to grow as it grew in that

19   prior year, then Lexion lost $20 million worth of sales in

20   that time period.  And,

21              If we plot SurgiQuest's sales on this graph,

22   SurgiQuest sales are skyrocketing, and that is because

23   robotic surgery is increasing and people want the high flow

24   capability of the trocar.

25              So what SurgiQuest did is capture the very

         1    market that Lexion designed the Synergy trocar for, and one

         2    of the ways they did it is tell people that they heated and

         3    humidified gas.

         4         Now, corrective advertising.  Dr. Ugone says we

         5    can just put something on the website or sent a letter.

         6         That is not going to solve the problem.  You

         7    heard ample evidence in this case, and I will show it to

         8    you.

         9         Mr. Spearman:  One-on-one meetings.

        10         Ms. Moriarty:  We did conversations with

        11    surgeons.

        12         Ms. Amann:  One-on-one contact is huge.

        13         Dr. Lee:  Personal one-on-one conversation.

        14         That is how we got to corrective advertising.

        15    And that takes hiring a bigger sales force to go out and

        16    meet with people, and that is what Mr. Andrien's calculation

        17    was based upon.

        18         Now, willfulness.  This is an issue for you to

        19    decide.  Okay?  You are the judges of whether SurgiQuest did

        20    this willfully or not.  And I thank you for your attention

        21    during this case that will allow you to exercise your

        22    judgment on this issue.

        23         I'm not going to tell you whether the

        24    advertising was willful or not.  That is your decision.  But

        25    let me suggest a few thing you should consider in making

```
 1    your determination.

 2              Again, we went over earlier what SurgiQuest

 3    knew.  They have known about all these issues with their

 4    product for a long time.

 5              Mr. Fadem testified that they were trained to

 6    target Lexion's customers.

 7              They did these demonstrations with the

 8    artificial bladder to show people that the air seal keeps

 9    pneumo because of the air barrier and doesn't let air into

10    the abdomen.

11              And, Mr. Gilbo, who did the demonstration, we

12    asked him:  Did anyone at SurgiQuest teach you to do that

13    demonstration?

14              He said:  I believe in training we learned this.

15              They train their sales reps to deceive customers

16    by showing them that air doesn't go into the abdomen even

17    though they knew it did.

18              Mr. Britten:  Does the air get sucked into the

19    port?

20              He said:  No, it doesn't.  And they accepted

21    that.

22              Mr. Ross did these demonstrations with

23    artificial abdomens, and they would see, they would make

24    their own determinations.  But he did the same type of

25    demonstrations.
```

```
 1                  They also train sales reps no smoke escapes.

 2                  Did you gain the understanding that no smoke

 3       escapes outside the air barrier?

 4                  Yeah, I got that through my training.  That is

 5       what Mr. Gilbo said.

 6                  Mr. Fadem:  We were taught no air would escape.

 7                  Mr. Babini.  He helped train these people.  Did

 8       they train the reps that the toxic and carcinogenic gases

 9       did not escape?

10                  He said yes, that is what they trained them to

11       do.

12                  Okay.  So just kind of stepping back in this

13       case.  Yesterday, Mr. Tegan was asked:  If you understood

14       that a salesperson was making representations about a

15       product that were inconsistent with the way you wanted the

16       product to be marketed, what would you do?

17                  He said:  I would tell them to stop.

18                  Well, clearly the reps must have been doing what

19       he wanted them to do because we have seen plenty of evidence

20       that they were making lots of false statements.

21                  But I would leave you with a couple of other

22       thoughts.

23                  In 2012, Lexion did ask SurgiQuest to stop.

24       They wrote SurgiQuest a letter and said we think your false

25       advertising about heating and humidity.  We asked them to
```

```
 1    stop.  They said they would stop but then they continued
 2    doing it behind our back.  They didn't stop.
 3              Now, the only people that can make them stop are
 4    you.
 5              Thank you very much.
 6              THE COURT:  Thank you, Mr. Wille.
 7              Members of the jury, the lunches should be here.
 8    We'll come back at 1:30.  And we'll hear from Mr. Ryan.
 9              MR. RYAN:  Thank you.
10              (Lunch recess taken.)
11              *     *     *
12              1:30 p.m., Afternoon Session.
13              THE COURT:  Mr. Buckson.
14              (Jury returned.)
15              THE COURT:  Please take your seats.
16              Now we'll hear from Mr. Ryan.
17              MR. RYAN:  Your Honor, before I begin, I'd like
18    to thank you and your staff for all the help --
19              THE COURT:  Sure.
20              MR. RYAN:  -- and assistance you have given us
21    over the past week in this case.
22              Mr. Wille, I'd like to thank you and your team.
23    I don't agree with your conclusions but I know how hard you
24    have worked in this case so I respect that greatly.
25              I want to thank my team as well, our team as
```

          1    well.  I think you have made our client proud.  Our firm

          2    greatly appreciates the work you have done.  And,

          3              Ladies and gentlemen, I want to thank you as

          4    well.  I know it is difficult to sit through some of this

          5    testimony, and we greatly appreciate the attention you have

          6    given in this matter.

          7              The opening statement that -- the closing

          8    statement, pardon me, that Mr. Wille provided to you started

          9    with a video.  And I think that video sums up where he

         10    misunderstands the entire basis for this case.

         11              That was a video of a woman who is having a

         12    hysterectomy performed on her by a surgeon named Eileen

         13    Casares who is a surgeon at Florida Celebration Hospital.

         14    She is a surgeon who is a colleague of Dr. Reed who did

         15    that videotape.  You heard testimony about that.

         16              That surgeon uses the AirSeal system in the

         17    hysterectomies that she performs.  In fact, she is probably

         18    at Florida Celebration Hospital right now performing a

         19    hysterectomy with the AirSeal device.

         20              She is a GYN oncologist.  She uses the device to

         21    save lives of women everyday.

         22              And other hospitals, the top robotic hospitals

         23    around the hospital, Sloan Kettering, MD Anderson, and

         24    others, surgeons are using the AirSeal system.

         25    Neurologists, gynecologists, other surgeons are using it

1  because they believe it's the safest product on the market

2  for them to do their surgical procedures.

3              Where Mr. Wille, we believe, and Lexion misses

4  the mark entirely, is he fails to acknowledge, recognize

5  this.  This is why surgeons purchase the product.  And what

6  it has tried to do, and what they have tried to do in this

7  case, which we take great issue with, is they tried to

8  convince you that there is some bogeyman out there.  There

9  is some danger out there with this product.

10             And all of their false advertising claims is

11 based on an untruth that they have told.  That the reason

12 why all these statements purportedly were made are material

13 because the device is unsafe.  Somehow air is dangerous.

14 The type of smoke in the abdomen is dangerous, and heat and

15 humidity was an absolute must have.  Despite what surgeons

16 do, day after day after day.

17             The case Lexion presents to you requires you to

18 conclude that the AirSeal device is dangerous.  It's unsafe.

19 Because if you don't conclude that, all of the statements

20 that Mr. Wille talked to you about, they're not material at

21 all.  It doesn't matter if there is heat and humidity.  It

22 doesn't matter if there is smoke that comes out of a trocar.

23 And it doesn't matter if air goes into the abdomen.

24             They have taken great lengths, they have taken

25 lots much time, to convince you otherwise.

1   When it comes to this issue of AirSeal safety,

2   there is Lexion and there is everybody else, everybody else

3   in the world:  robotic surgeons, our core competitors, other

4   insufflator companies, Intuitive, there is everybody else.

5   They want you to apply their standard of what

6   they think is important to the AirSeal product, and we

7   submit to you as strongly as we possibly can that that is

8   not only inappropriate, it is wrong.

9   They sent letters out to our customers claiming

10  the AirSeal product increases subcutaneous emphysema.  They

11  manipulate the data.  And Mr. Wille stands up in front of

12  you and says the FDA is irrelevant.  The very group whose

13  very existence is to make sure safe products are put on the

14  market has approved this not once but four or five different

15  times.  The product is audited, the product is evaluated.

16  And how does he prove this?  How does he suggest

17  this to you?  He puts on the stand Dr. Burban, who we will

18  talk about.  He is not an FDA expert.  He works for his

19  brother.  He is his brother's employee.

20  Their own chief medical officer testified in

21  this case.  They wrote to the FDA, and in the letters they

22  write not one, two e-mails and a letter, they write all

23  these bad things that the AirSeal system purportedly does.

24  It brings in air.  It creates other problems.

25  The FDA doesn't respond to a single e-mail, nor

Case 1:14-cv-00882-GMS-JDI Document 265 Filed 06/30/23 Page 72 of 231 of 576 PageID #: 12347

1    does it respond to a letter, nor does it take a single

2    action, nothing with respect to this product.  Nothing.

3              And the reason they did this, the reason they

4    wrote to the FDA, they did it during the pendency of this

5    litigation.  What they tried to do is to get the FDA to

6    take action with respect to this product so that they could

7    improve their position in this litigation.

8              And we showed you these documents.

9              Let's go back to where we started, when I first

10   met you, when I first talked to you about this case and this

11   product.  I talked to you about two companies,

12   Lexion/SurgiQuest.

13             Ladies and gentlemen, innovation is not clean.

14   It's not linear.  Sometimes it's messy.  Sometimes as a

15   product is being developed and you go from an old version,

16   which they talk about repeatedly to try to convince you that

17   the iFS system is dangerous.  They talk about the DPS.  They

18   prove it's getting made.  You learn things about a product.

19             And internally in a company, those issues get

20   discussed and worked out so that when the ultimate product

21   is put on the market, it's a good product.  It's a safe

22   product.

23             What they did, over and over in this case, is

24   pointed to a product, a DPS from 2009.  That is not the

25   product in this case, and they know it isn't.

```
 1          They try to convince you that a product that

 2     sold 100 units was somehow the same as the iFS, a product in

 3     demand by every top robotic surgeon in the country, to scare

 4     you, to think there was some big problem with respect to air

 5     getting into the abdomen.

 6          Nothing could be further from the truth.

 7     Necessity is what drove the creation of the AirSeal system.

 8     Other insufflators, when they're used, the abdomen goes up

 9     and down and during suction, it can collapse.

10          But we heard the testimony about how important

11     it is for robotic surgeons to have a product that makes sure

12     that the abdomen remains inflated.  That's the system.

13          That's why Dr. Lee at U Penn and other surgeons,

14     Dr. Patel at Florida Celebration, used this device.  That's

15     the innovation of it.  It doesn't matter if air comes into

16     it.  They don't care.  What they want to make sure happens

17     is that the abdomen remains inflated, especially for robotic

18     procedures, because you heard what happens.  If that robot

19     is on top of a human being and then that thing goes bad,

20     guess what happens to all those trocars?  They rip out of

21     the belly.

22          They rip out, because the robot arms don't go up

23     and down.  That is why this is so important to them.

24          It's not dangerous.  The surgeons aren't worried

25     about air from this product getting in.
```

:43:08
:43:10
:43:13
:43:18
:43:21
:43:24
:43:29
:43:34
:43:37
:43:41
:43:45
:43:50
:43:58
:44:00
:44:03
:44:06
:44:09
:44:14
:44:17
:44:21
:44:27
:44:29
:44:33
:44:36
:44:39

1 We know they created different elements of the
2 product, including this trocar. This isn't just some
3 product that was created to create profits for a company.

4 This hole here, as explained to you by the
5 surgeons themselves, is designed to allow the surgeon to put
6 an instrument down there, down that hole, and cut tissue,
7 during a hysterectomy, during another procedure, some type
8 of cancer procedure. It allows the surgeon to manipulate
9 his or her equipment and then pull the entire piece of
10 infected or cancerous tissue out of that hole without
11 dropping any or losing any. It's innovative. And surgeons
12 love it. It's not unsafe.

13 The are three key benefits, and you heard about
14 them over and over and over again. In my opening statement
15 I showed you documents that ultimately Mr. Spearman even
16 admitted to that demonstrated these benefits of the AirSeal
17 system. Namely, stable pneumo, continuous improved smoke
18 removal, and valve-less access port. We are going to talk
19 about these, and what Mr. Wille is trying to convince you
20 about with respect to these.

21 This is a false advertising case. You don't
22 have to take my word for it. You don't have to take his
23 word for it. You don't. Look at what surgeons are doing,
24 look at what robotic surgeons are doing. They want you to
25 believe that SurgiQuest has pulled the wool over the eyes of

:44:42  1  the entire robotic surgical population in the U.S.

:44:45  2       None of them know how the product functions.  No

:44:49  3  idea.  The only ones who know, they want you to believe, is

:44:54  4  them.

:44:59  5       What's happened in the marketplace?  You should

:45:03  6  be proud of this.  600,000 successful uses to date.  And it

:45:07  7  is growing.  Why is it so important?  You heard this

:45:10  8  yesterday when Ms. Amman was on the stand.  This device

:45:13  9  allows surgeons to operate more quickly, which means they

:45:16  10  can do more surgeries, which means they can help more people

:45:19  11  and they can reduce costs for the hospitals, which allows

:45:22  12  the hospital to do more things.

:45:24  13       That's what this product does.

:45:26  14       He talks as if it is some death machine, unsafe

:45:29  15  product.  It's not.  See, you have heard surgeon after

:45:36  16  surgeon say, there is some air, it dissipates.  What's the

:45:39  17  problem?

:45:43  18       Now, Lexion, they had an idea.  It came up with

:45:48  19  some heating and humidity tubing.  And when it first

:45:53  20  launched the product, its sales did well.  It did.  It was

:45:57  21  new.  It was novel.  They were engaged, probably, at the

:46:02  22  time, maybe Mr. Spearman was paying attention at the time.

:46:05  23  Maybe he knew who the top customers were for him to focus on

:46:09  24  at that time.

:46:10  25       But what happened to it is it dropped, its

| | | |
|---|---|---|
| :46:13 | 1 | growth rate continued to slow and slow and slow and slow. |
| :46:17 | 2 | And it wasn't until this point, this point here, where the |
| :46:21 | 3 | SurgiQuest product ever entered the marketplace.  I told you |
| :46:25 | 4 | that, I showed you that when I opened with you. |
| :46:30 | 5 | This has nothing to do, their drop in sales, |
| :46:33 | 6 | nothing to do with SurgiQuest.  They couldn't even release a |
| :46:39 | 7 | successful product.  The SurgiQuest product, they keep |
| :46:41 | 8 | talking about how great it is.  It didn't even work with the |
| :46:45 | 9 | Intuitive robot.  There is evidence, and I showed you this |
| :46:48 | 10 | in the opening and you heard some of the testimony, it |
| :46:51 | 11 | didn't link up with the robot. |
| :46:53 | 12 | So they didn't want it.  Their own salespeople |
| :46:57 | 13 | got sick of trying to sell it so they stopped trying to sell |
| :47:01 | 14 | it.  That has nothing to do with SurgiQuest. |
| :47:04 | 15 | What did their own witnesses say about the |
| :47:06 | 16 | market importance, the penetration rate of this incredibly |
| :47:09 | 17 | valuable device, they claim?  Dr. Ott, one to two percent of |
| :47:14 | 18 | the surgeons wanted heat and humidity.  I think Ms. Amann |
| :47:18 | 19 | said four to five percent market share.  Less than one |
| :47:22 | 20 | percent of the trocar market was Patrick Spearman.  And I |
| :47:25 | 21 | think 94 percent of the market didn't care about heat and |
| :47:27 | 22 | humidity.  That is their expert, Dr. Redan. |
| :47:30 | 23 | This is the great technology we are hearing |
| :47:32 | 24 | about?  This is the great technology that the SurgiQuest |
| :47:36 | 25 | product took sales from? |

|   |   |
|---|---|
| :47:38 | 1 |
| :47:39 | 2 |
| :47:43 | 3 |
| :47:46 | 4 |
| :47:52 | 5 |
| :47:53 | 6 |
| :47:57 | 7 |
| :48:05 | 8 |
| :48:08 | 9 |
| :48:10 | 10 |
| :48:14 | 11 |
| :48:17 | 12 |
| :48:22 | 13 |
| :48:27 | 14 |
| :48:31 | 15 |
| :48:35 | 16 |
| :48:41 | 17 |
| :48:47 | 18 |
| :48:53 | 19 |
| :48:56 | 20 |
| :48:58 | 21 |
| :49:00 | 22 |
| :49:06 | 23 |
| :49:09 | 24 |
| :49:13 | 25 |

Ladies and gentlemen, common sense prevails here.  The marketplace tells us, tells you, what happened here.

Let's talk about who you heard from today -- I am sorry, during the trial.

Well, these two worked together for many, many, many years.  Spearman's brothers are part of the company, they have ownership interest in it.

Worked with Dr. Ott forever.  You didn't hear from Mr. Geisz.  He has been here the whole week.  He is also involved with the company.

And their big expert, Dr. Burban, is their employee.  Could you imagine if he had come here and said, you know what?  Insuflow is not so good, no one really wants it.  Do you think he would have a job when he left?

It all goes back to him.  It all goes back to his story about how SurgiQuest's AirSeal system is unsafe.

Then Dr. Ott's buddy Dr. Redan, 20-year friendship.

When I opened I told you what was going on in the marketplace.  We showed you documents and you heard about it.  The robotics trend, which the evidence has shown that Lexion missed, they missed it.  They didn't have a product on the market when robotics were increasing that could do what robotic surgeons wanted.  By the way, they

| | |
|---|---|
| :49:16 | 1 |

still don't to this day. They have no insufflator on the
market. They have a trocar, that's it. No insufflator that
pushes gas into the system.

They talk about flow rate. They need to be
hooked to an insufflator. They don't have a product that
competes. Barriers to entry, we heard this over and over
again. They were losing sales because they couldn't get
contracts. We saw salespeople over and over again say that.

Too much industry competition, they had a
questionable technology. And they didn't manage their
business very well, either.

Mr. Spearman couldn't even tell you who his top
customers were. He talked to you about Wal-Mart. They
don't sell to Wal-Mart.

So what did they do? As the company is going
down, let's find a target. Who are we going to blame?
Well, let's go to SurgiQuest.

So they send out, they start by sending out
misleading complication charts. This is where it starts
really with them, and it continues.

The issue in this case is not about the safety
of the AirSeal system. That's what they want you to
believe. That's what they want you to believe. And it's
not .

It's about whether or not consumers were

:50:40
:50:44
:50:47
:50:51
:50:54
:51:00
:51:03
:51:06
:51:09
:51:12
:51:13
:51:15
:51:20
:51:24

1    deceived to purchase the SurgiQuest AirSeal device.  I will

2    submit to you, there was no consumer deceived as to whether

3    it wanted to purchase a tube that heats and humidifies and a

4    $31,000 piece of equipment that allows an abdomen to be

5    inflated at all times so the surgeon doesn't have to worry

6    about having it collapse.  There is no way that that is

7    accurate.

8            Now, Mr. Wille didn't talk to you much about the

9    elements of these claims, what he had to prove.  He wanted

10   to get through it as fast as he could.  He told you, I am

11   going to do this quickly.

12           Actually, that is what this case is about.  If

13   you do it quickly, he can blow past people.  But if you stop

14   and think about it, he has to prove, he has to examine, he

15   has to show, and you realize the case is utterly baseless.

16           Now, he hasn't shown one, one false or

17   misleading statement.  Not one.  Every single advertising

18   statement was true.  And,

19           More importantly, what did he say was even

20   commercial advertising?  I don't know which claims he was

21   even talking about.  Which were commercial advertising?

22           And the FDA document he says is commercial

23   advertising?  A document no consumer ever sees, that is

24   commercial advertising?  He just puts it all on the stew and

25   puts it on to you and says figure it out.

1      Again, give me money, give me damages.  I can't

2   tell you what advertising is or not, what caused harm or

3   what didn't.  We're entitled to loss of money.  And,

4      He didn't use the word, I don't believe,

5   causation.  That something that SurgiQuest did, that a

6   specific statement was something that caused a surgeon to

7   make a decision, which caused them to lose a customer.  That

8   is what they're supposed to prove.

9      Well, we have lots of evidence to show that the

10   sales reps never said that the AirSeal system heated and

11   humidified.  You have seen all of it.  And then he points to

12   six, this is Dr. Burban points to six e-mails sent by sales

13   reps, as if that represents what the company was doing, that

14   represents what the company's plan was.  Six e-mails?  Six

15   e-mails.  Six individuals sending e-mails.  That is a

16   corporate policy, according to Mr. Wille.

17      70,000 surgeons in the United States, and they

18   claim that 125 e-mails saying that tissues remain moist --

19   which, by the way, the tests done, including the test by

20   Dr. Collins in MIT, graduate engineer, concludes that yes,

21   in fact the tissues remain moist.  They want to tell you

22   that that is false.  And,

23      By the way, it's important because it's material

24   because it is so dangerous, this product.  If it didn't do

25   this, it's dangerous.  That is why, that is why SurgiQuest

1     was trying to hide it. There are thresholds they must meet.

2             Customers are not deceived by this because many

3     of the issues that Mr. Wille has raised to you, they don't

4     care about.

5             Who are the customers? They're surgeons,

6     they're hospitals, highly sophisticated operations, who know

7     what they're doing. Do you think hospitals would purchase a

8     product and use it 600,000 times and believe it's unsafe?

9             I mean there are institutes, robotic institutes

10     around the country where the surgeons there demand this

11     product. They don't demand it because it purportedly heats

12     and humidifies. They could care less about that. They

13     demand it because those surgeons, in their time of most

14     need, when there is a bleed, their suction needs to be

15     applied, the device will not allow the abdomen to collapse.

16     And for them to suggest that surgeons were buying the

17     product because of what their product did is utterly

18     ridiculous.

19             How are sales achieved? It isn't some contact

20     with the surgeon and okay, let's go. We have a deal. That

21     is not what happens. It is a much more complicated process.

22             There is a product introduction. There are

23     review of clinical studies. There are product trials.

24     There are considerations by doctors, hospitals, committees.

25     And in those committees, they review the IFU, which is what

1  the testimony was, so they understand how the product

2  functions so they can test it.

3          The IFU, by the way, which is required by

4  federal law.  The FDA is not irrelevant as suggested by Mr.

5  Wille.

6          Then there is a purchase, and there is use.

7          It takes six months to do that.  This isn't some

8  confusion created or deception created by a salesperson.

9  These people who purchase this product are far more

10  sophisticated than that.

11          Well, here is the laundry list of claims.

12  Laundry list.  They don't tell you which one of these, if

13  any, caused a single penny of harm.  Not once.  They didn't

14  tell you.  Which one?  Which one of these did?  Which one of

15  these are even considered to be advertising?

16          These aren't, that's for sure.

17          So what do we have?  How did the customer

18  interpret the statements to mean?  What did the surgeons

19  think?  Would it have been easier to find out?

20          Just do a survey and ask robotic surgeons how

21  they perceive these statements.  They don't want to do that.

22  They wanted to haul in a bunch of sales reps, a bunch of

23  sales reps as if the sales reps know how the surgeons that

24  provide lifesaving surgery perceive these statements.

25  That's their brief.

1       It would have been so easy to have done a survey

2   but they didn't do it and you should ask why.

3       There has been no literal falsity here.  The

4   testing that was done establishes it.  AirSeal is not

5   literally false.  We'll go through these.

6       And what is important is if it is misleading,

7   it's got to be misleading to a substantial portion of the

8   intended consumers.

9       Where is the survey that shows a substantial

10  portion?  Where is any evidence that shows a substantial

11  portion of the intended consumer was deceived?  There isn't

12  any.

13      AirSeal and the invisible air barrier.  They

14  want you to believe that these were false, literally false,

15  and they want you to believe it based on this idea that

16  somehow air getting into the abdomen is unsafe, which we

17  know is not true.  We heard from Dr. Lee and others.

18      We asked them what do you think of these?  Well,

19  there is no rubber seal.

20      Even Mr. Spearman said during testimony, it

21  would be reasonable to conclude an interpretation it's not a

22  seal.

23      It's air.  It's air that creates a barrier.

24  It's an air seal.

25      This is Dr. Collins.  Again, MIT engineer:  It

1   creates that pressure barrier that maintains that stable

2   pneumoperitoneum.  Barriers don't have to block everything.

3           And that is what Dr. Burban actually said.  He

4   said a couple things inconsistently.

5           Is it reasonable to assume that AirSeal meant

6   they a seal of air, an air barrier?  That is all it was.

7   Would anybody think when you put a surgical device down the

8   middle of the trocar that air could not get in and out?

9   That is what they want you to believe.  Surgeons were using

10  it to put instruments down there.  It was simply a barrier,

11  right here (indicating), made of air.  That is all it was.

12  That is all it is.  And,

13          How did consumers interpret these statements?

14          Maintain stable pneumo, carbon dioxide

15  insufflator.  These other comments.

16          Well, the FDA called it a carbon dioxide

17  insufflator.  And if you look at it, by the way, it's got

18  CO2 tanks attached to it.  And if you listen to

19  Dr. Collins's testimony, CO2 flows into it at all times,

20  never stops.  And,

21          Remember why they want you to think this is

22  literally false.  Because they want you to believe that air

23  getting into the abdomen is a big deal.

24          It's not.  That is the basis for the literal

25  falsity claim.  Because you had to be hiding it, because air

```
 1    is so bad.

 2              Dr. Redan talked to all of the surgeons at

 3    Florida Celebration Hospital and told them that air got in.

 4    Do you know what they did?  So what.  They continued to use

 5    it.

 6              The video we showed, Dr. Casares uses it all the

 7    time.

 8              Dr. Patel, one of the finest robotic surgeons,

 9    uses it, only uses it for his surgery, his surgical

10    procedures.

11              Dr. Ramirez told you he will only use it unless

12    there is a waiting list and then he has got to use something

13    else.  And,

14              That is what Dr. Lee told you, too.

15              And they all said carbon dioxide insufflator,

16    because CO2 is used.

17              Then they try to tell you it's not stable

18    pneumoperitoneum because air gets in instead of CO2.  Yet

19    again, what do the experts say?

20              Okay.  I have written books about this.  Stable

21    pneumo means the abdomen remains stable.  It doesn't matter

22    if it's air coming in at times to protect the safety of the

23    patient.

24              Dr. Ott, in his own publication, said:

25    characteristics of pneumoperitoneum are related to
```

1     mechanical pressure effects regardless of the chemical

2     formula of the gas used.  That is their own chief medical

3     officer.  They come in here now and tell you that it can't

4     be stable pneumo when air gets in.  And their own chief

5     medical officer -- who, by the way, you never saw -- said

6     this.  (Indicating).

7             Well, we know that there are dictionaries that

8     also defined it.  It doesn't matter whether it is gas, air

9     or something else, stable pneumoperitoneum.

10            And then we have the documents submitted to the

11     Food and Drug Administration on numerous occasions where

12     they're told that air gets in.  And it gets approved by the

13     irrelevant FDA.  Literally false?

14            Now, there is smoke.  Now, the statements about

15     smoke relate to removing smoke from the abdomen.  That was

16     the important feature that surgeons -- and you heard Dr. Lee

17     and others testify -- they wanted smoke removed from the

18     abdomen so they can see.

19            And what these guys come in here and tell you

20     that there is cancerous smoke.  They go around the country

21     deposing people, using the words "cancerous smoke is

22     released" so they can come in here and tell you how

23     dangerous this product is.

24            You heard the testimony here.  The doctors said,

25     five percent of doctors just had that smoke released into

1  the operating room.  Not filtered.

2  Those surgeons that spend their lives saving

3  other people are, what, putting people at risk?  It's too

4  high of a risk?  This is a creation.  This is what they are

5  trying to create for you.

6  This is the basis upon which the entire case is

7  built.

8  Humidity.  Here is a test.  One of our engineers

9  tested it.  And it showed that our device actually, because

10  of the recirculation, keeps the abdomen warm.  And you heard

11  Dr. Ramirez testify that if you worried about whether the

12  patient is cold or not, you know what you can do?  Put a

13  blanket on them.  A bear-huggie.  That's the complicated

14  technology, the wildly valuable technology they want you to

15  believe they have.

16  It's the same thing as a blanket.

17  He tested it.  You heard Dr. Collins, again, MIT

18  engineer, tell you, that's fine.  It is as advertised.  It

19  maintains heat and humidity.

20  Did any of these consumers, a substantial

21  portion of them, were they deceived?  No way.  No chance.

22  Did they even bother asking any surgeons?  Nope.

23  How did customers interpret these?  Well, they

24  make a big deal out of this sample cost comparison.  Mr.

25  Tegan testified, this document was used for a period of

:03:33  1  time, a year or two, they stopped using it because hospitals

:03:36  2  had their own cost comparison document.  And what did their

:03:41  3  own witness say about whether or not this document was

:03:44  4  misleading.  Kassi Hidenreich, you saw her deposition

:03:48  5  yesterday, when you saw the cost analysis where they said

:03:52  6  humidifier not needed, do you understand that to mean that

:03:54  7  the AirSeal system heats and humidifies the CO2?

:03:59  8           "No."

:04:00  9           Matthew Montano, Lexion's sales rep:  Did any

:04:03  10  customer tell you that SurgiQuest had told them that the

:04:06  11  AirSeal actively heats and humidifies the insufflation gas?

:04:09  12           "No."

:04:11  13           Then Dr. Dulemba:  And was it obvious to you

:04:15  14  when you trialed the device that the AirSeal system does not

:04:17  15  actively heat and humidify the CO2?

:04:21  16           "Yeah, yeah."

:04:27  17           Smoke.  They don't even seek a penny of lost

:04:31  18  profits from SurgiQuest as a result of allegations of false

:04:36  19  advertising regarding smoke.  Not one penny.  What smoke was

:04:40  20  designed to do, ladies and gentlemen, it was designed to

:04:43  21  scare you, to make you think that the AirSeal system was

:04:48  22  releasing hazardous smoke into the operating room.

:04:53  23           The advertisements about smoke-free working

:04:56  24  environment were about the abdomen.  That was the key issue,

:05:00  25  removing smoke from the abdomen.  Were there a couple of

:05:04  1   sales reps that went too far?  Yeah, there were.  That

:05:08  2   happens with salespeople sometimes.  And you deal with them.

:05:11  3   You make sure the statements are proper.

:05:15  4       The core issue here was with smoke-free

:05:18  5   environment in the abdomen.  And they know that.  But they

:05:21  6   try to tell you it's something different, and they made up

:05:24  7   this big story about the hazards of smoke.

:05:33  8       There is no evidence at all of any literal

:05:35  9   falsity or anything misleading about these statements, none.

:05:40  10      That should end the case right here.  But we

:05:43  11  should go on, because what we should talk about too is

:05:46  12  materiality.  Materiality, what he wants you to believe and

:05:50  13  what he told you is materiality is all about the safety.

:05:53  14  These are real important issues about safety.  That is not

:05:56  15  what materiality is in a false advertising case.

:05:59  16  Materiality is whether or not the statement would drive a

:06:02  17  surgeon to purchase the product.  We know from hearing the

:06:05  18  surgeons, time and time again, they didn't care about air

:06:09  19  entrainment.  They didn't care about heat and humidity.  And

:06:12  20  smoke removal was a nonissue to them.

:06:14  21      That it what materiality is.  Not a single

:06:18  22  statement upon which they bring their false advertising

:06:21  23  claim was material, because no surgeons bought it because of

:06:24  24  those statements.

:06:27  25      The testimony you have seen already about what

1    the doctors were saying regarding heat and humidity, was it

2    needed, they wouldn't recommend it, they didn't care about

3    it, if it was such a great technology, if it were so

4    important, if surgeons wanted it so badly, why 4 percent of

5    the marketplace, before SurgiQuest ever brings its product

6    onto the market?

7              We know why.  Because surgeons didn't care about

8    it.  Maybe a small number thought it might be helpful.  And

9    they basically tried to bring every one of those people that

10   exists to tell you that it's important.  The vast, vast

11   majority of surgeons do not care.

12             We know even from the testifying experts, stable

13   pneumo, it is critical, valveless access, these are the

14   things that are driving sales, these are the things that are

15   driving demand.

16             Surgeons care about visibility, not filtration.

17   Mark Zacharias, In your experience selling the AirSeal

18   system, is the filtration of smoke an important

19   consideration in purchasing the product?

20             "Answer:  In my experience I don't think it is.

21             "Question:  Why not?

22             "Answer:  Doctors are more concerned with pneumo

23   and improved visibility and laparotomy, lower pressure."

24             This guy you saw, they brought him in, played

25   his videotape, he actually had a doctor tell him that the

```
 1    invisible smoke to the abdomen, that he could care less.

 2              And they didn't finish the Tiffany Benton piece,

 3    where she says that:  Not necessarily for the filtering

 4    system because they felt, that's important to them, but more

 5    important is the visualization portion of it.

 6              They left that part out, Mr. Wille did.

 7              Air entrainment, is it material?  Dr. Redan went

 8    back to his hospital, Florida Celebration, one of the top

 9    robotic hospitals in the United States, what did they do?

10    What did the robotic surgeons say?  They keep using it and

11    using and using it.  That tells you whether a statement is

12    material or not.  Not some effort to make you believe there

13    is some harm.

14              Memorial Sloan-Kettering uses it.  All these

15    hospitals use it.  They know full well about air getting in.

16              Dr. Redan talks about his own colleague, Dr.

17    Patel, who runs the Robotics Institute.  Dr. Patel knows

18    about it.  He uses it.

19              Air entrainment.  Dr. Lee, Dr. Ramirez, they

20    don't care.

21              Their sales rep, Montano, they are training him,

22    hey, use the fact that air gets into the abdomen to sell

23    against the AirSeal system.  So he does.  He uses that

24    because he believes that the surgeons are going to make a

25    change.  What does he say?  Surprisingly, the CO2/air
```

```
 1    conversion had not had as much of an impact as I would have
 2    imagined.
 3                 In other words, he didn't care.
 4                 None of these statements are material.
 5                 Injury, there is no causal link, no causal
 6    connection, he hasn't shown anything that connects any of
 7    these statements to any harm suffered by Lexion.
 8                 Let me give you an example.  Imagine it's M.D.
 9    Anderson, and there are six surgical systems, and the rest
10    of the operating rooms have a different insufflator.  Lexion
11    is free to sell to all of those.  They are not harmed
12    because SurgiQuest has sold an AirSeal system into the
13    hospital.  If humidification is so important, they can sell
14    to all these other operating rooms, and they don't, and they
15    can't, because customers don't want the product.
16                 They also ignore the market share that actually
17    exists out there.  This is a wildly competitive marketplace,
18    where people are fighting each other in a good way for what
19    their products can provide and what their products can do.
20    They are not going to be able to compete with these
21    companies.  And they are never going to be able to compete
22    against these companies.  Some of the most powerful medical
23    device companies in the world.  They have got no market
24    share.  None.  They face stiff competition, there is other
25    insufflator companies, other than ours, who may not want
```

1    their products, may not need their products, may not think

2    that much about their products.

3            Heat and humidity.  They want to tell you that's

4    what causes the surgeon to make a decision, it's going to

5    take an $80 product that's going to do the same thing, they

6    claim, Mr. Wille says the same thing, this product that

7    saves lives by making sure the abdomen remains inflated the

8    entire time?

9            The overwhelming evidence tells us that Lexion

10   lost sales, its business decreased some, for reasons that

11   had nothing to do with SurgiQuest.  We know that based on

12   when they released their product when sales slowed and

13   slowed and slowed and slowed.

14           We know that because they have a lot of

15   contracts, we know that because they are competing with

16   companies for products that they know other people want.

17           This is Mr. Andrien's -- it would be a

18   miraculous event where from one year to the next, this

19   product that has been dying slowly for a time, would have an

20   immediate jump, massive increase in sales.  You heard Mr.

21   Andrien's testimony.  We heard Dr. Ugone's testimony about

22   what Mr. Andrien did.  There is no basis for this conclusion

23   whatsoever.  There has been no showing of injury in this

24   case.

25           And what's most troubling, too, about what they

1   have tried to tell you, they tell you that with robotic

2   surgeons, if the SurgiQuest product was not on the market,

3   95 percent of every sale SurgiQuest made to a robotic

4   surgeon would go to them.  There is absolutely no basis for

5   that.  And that is the only damages opinion that they have

6   offered in this case.  95 percent of SurgiQuest's products

7   would end up going over, robotic surgeons, customers, would

8   go over there.

9           Again, they offered no opinion on anything to do

10  with smoke.  Yet they talk about smoke and smoke and smoke

11  in this case.

12          Corrective advertising, there is no explanation

13  provided to you about how a single one of those statements

14  requires any type of corrective advertising.  How much

15  corrective advertising would be required for just heat and

16  humidity?  Did they provide you any analysis as to that?

17  No.

18          What if it were just smoke removal?  Was there

19  any analysis as to how one of those statements caused harm

20  or would require corrective advertising?  No.  Again, put it

21  in a big stew, and just gave it to you, you figure it out.

22  At no time did they take any steps to connect a single lost

23  sale to anything that SurgiQuest did.

24          Disgorgement of profits, they put Mr. Andrien up

25  there and tell you that SurgiQuest has driven 120 million

```
 1    dollars in revenue, but they don't tell you all the

 2    expenses, the fact that the product has costs and that no

 3    profits have been made.

 4              Here is what the facts have shown.  They

 5    haven't shown a single penny of harm caused by SurgiQuest.

 6    They haven't shown a single penny as to why corrective

 7    advertising would be needed for any purpose.  This, you

 8    heard from Dr. Ugone the company hasn't even made any money

 9    yet.  It hopes to, we believe it will, but it hasn't to

10    date.

11              This is what we ask that Lexion get in the form

12    of damages:  nothing, because they haven't proved that they

13    have suffered any.

14              Ladies and gentlemen, when you get this verdict

15    form, we are going to ask you to fill it out and answer

16    Questions 1 through 7 no, because at no time did Lexion ever

17    prove that SurgiQuest caused it a single penny of damages,

18    and during the 45 minutes or so that I have been speaking to

19    you, more surgeons, top robotic surgeons, have started

20    surgical procedures using the AirSeal system to save more

21    people.

22              Thank you very much for your time.

23              THE COURT:  Thank you, Mr. Ryan.

24              Mr. Buckson, will you swear our jury officer,

25    please.
```

```
 1                    (At this point the jury officer was sworn.)

 2                    THE COURT:  Ladies and gentlemen, you are free

 3      to commence your deliberations.

 4                    (At 2:15 the jury retired to deliberate.)

 5                    (Court recessed.)

 6                    (Court resumed.)

 7                    THE COURT:  All right.  Please bring in our

 8      jury.  We have a verdict.

 9                    (Jury enters courtroom at 4:30 p.m.)

10                    THE COURT:  Take your seats, ladies and

11      gentlemen.

12                    Ladies and gentlemen, who speaks for you?

13                    JUROR NO. 1:  I do.

14                    THE COURT:  Juror No. 1, would you please rise.

15                    Have you and your colleagues reached a unanimous

16      verdict?

17                    JUROR NO. 1:  We have.

18                    THE COURT:  Would you please hand it over to Mr.

19      Buckson?

20                    (Juror No. 1 complies.)

21                    THE COURT:  And retake your seat.

22                    Ladies and gentlemen, we are going to review the

23      verdict form, and then I am going to ask you to listen

24      carefully as Mr. Buckson announces your verdict, as you may

25      be polled individually as to whether this is your individual
```

```
 1    verdict.  Okay.

 2                   (Pause.)

 3                   CHIEF DEPUTY CLERK BUCKSON:  Do you find that

 4    Lexion has proven, by a preponderance of the evidence, that

 5    SurgiQuest is liable for false advertising based on

 6    statements concerning heat and humidification?

 7                   Answer:  Yes.

 8                   Question:  Do you find that Lexion has proven,

 9    by a preponderance of the evidence, that SurgiQuest is

10    liable for false advertising based on statements concerning

11    air?

12                   Answer:  Yes.

13                   Question:  Do you find that Lexion has proven,

14    by a preponderance of the evidence, that SurgiQuest is

15    liable for false advertising based on statements concerning

16    smoke?

17                   Answer:  Yes.

18                   Do you find that Lexion has proven, by a

19    preponderance of the evidence, that SurgiQuest engaged in a

20    deceptive trade practice against Lexion?

21                   Answer:  No.

22                   Question:  Do you find that Lexion has proven,

23    by a preponderance of the evidence, that SurgiQuest

24    intentionally or willfully made a false advertising

25    statement?
```

```
 1              Answer:  Yes.

 2              Question:  Do you find that Lexion has proven,

 3   by a preponderance of the evidence, that SurgiQuest engaged

 4   in unfair competition against Lexion?

 5              Answer:  Yes.

 6              If you answered yes to Question 6, then do you

 7   find that Lexion has proven, by a preponderance of the

 8   evidence, that SurgiQuest intentionally or recklessly

 9   engaged in unfair competition?

10              Answer:  Yes.

11              Question:  If you answered yes to any of

12   Questions 1 through 3 or 6, what do you find is the amount

13   of Lexion's lost profit damages with respect to its claims?

14              Answer:  2.2 million.

15              If you answered yes to any of Questions 1

16   through 3 or 6, what do you find is the amount of Lexion's

17   amount of corrective advertising damages with respect to its

18   claims?

19              Answer:  Zero.

20              If you answered yes to Question 7 and awarded

21   compensatory damages to Questions 8 and/or 9, then please

22   enter the amount of punitive damages if any you have chosen

23   to award.

24              Amount.  Ten million.

25              Do you find that SurgiQuest has proven, by a
```

```
 1    preponderance of the evidence, that Lexion is liable for

 2    false advertising based on the complications chart?

 3              Answer:  No.

 4              Do you find that SurgiQuest has proven, by a

 5    preponderance of the evidence, that Lexion engaged in a

 6    deceptive trade practice against SurgiQuest?

 7              Answer:  No.

 8              "Question:  Do you find that SurgiQuest has

 9    proven, by a preponderance of the evidence, that Lexion

10    engaged in unfair competition against SurgiQuest?

11              Answer:  No.

12              THE COURT:  Does either party wish to have the

13    jury polled?

14              MR. RYAN:  Yes, Your Honor.

15              THE COURT:  Mr. Buckson, please.

16              CHIEF DEPUTY CLERK BUCKSON:  Juror No. 1, having

17    delivered the verdict, is that your verdict also?

18              JUROR NO. 1:  Yes.

19              CHIEF DEPUTY CLERK BUCKSON:  Juror No. 2, having

20    heard the verdict delivered by the foreperson, is that your

21    verdict also?

22              JUROR NO. 2:  Yes.

23              CHIEF DEPUTY CLERK BUCKSON:  Juror No. 3, having

24    heard the verdict delivered by the foreperson, is that your

25    verdict also?
```

```
 1                        JUROR NO. 3:  Yes.

 2                        CHIEF DEPUTY CLERK BUCKSON:  Juror No. 4, having

 3     heard the verdict delivered by the foreperson, is that your

 4     verdict also?

 5                        JUROR NO. 4:  Yes.

 6                        CHIEF DEPUTY CLERK BUCKSON:  Juror No. 5, having

 7     heard the verdict delivered by the foreperson, is that your

 8     verdict also?

 9                        JUROR NO. 5:  Yes.

10                        CHIEF DEPUTY CLERK BUCKSON:  Juror No. 6, having

11     heard the verdict delivered by the foreperson, is that your

12     verdict, also?

13                        JUROR NO. 6:  Yes.

14                        CHIEF DEPUTY CLERK BUCKSON:  Juror No. 7, having

15     heard the verdict delivered by the foreperson, is that your

16     verdict also?

17                        JUROR NO. 7:  Yes.

18                        CHIEF DEPUTY CLERK BUCKSON:  Juror No. 8, having

19     heard the verdict delivered by the foreperson, is that your

20     verdict also?

21                        JUROR NO. 8:  Yes.

22                        THE COURT:  Thank you, Mr. Buckson.

23                        The jury having been polled and having

24     reaffirmed that their verdict is unanimous, I will direct

25     the verdict be recorded.
```

```
 1                    On behalf of the Court and the parties, thank
 2      you, ladies and gentlemen.  You are hereby dismissed.
 3                    Thank you very much.
 4                    (At 4:34 p.m. the jury was dismissed.)
 5                    Counsel, what I would like you to do is take a
 6      little time, decompress, and discuss a schedule for
 7      posttrial matters and just submit a stipulation, and I will
 8      endorse the stipulation.
 9                    Any other matters that we need to discuss at
10      this point?
11                    I would like to see Mr. Wille and Mr. Ryan off
12      the record at sidebar.
13                    (Sidebar conference not reported.)
14                    (Trial concluded.)
15                              -   -   -
16
17
18
19
20
21
22
23
24
25
```

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRUSTID, INC.,                          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )   C.A. No. 18-172 (MN)
                                        )
NEXT CALLER INC.,                       )
                                        )
                Defendant.              )

## FINAL JURY INSTRUCTIONS

## TABLE OF CONTENTS

1.    GENERAL INSTRUCTIONS ................................................................... 1

    1.1   INTRODUCTION ......................................................................... 1

    1.2   JURORS' DUTIES ....................................................................... 2

    1.3   EVIDENCE DEFINED ................................................................ 3

    1.4   DIRECT AND CIRCUMSTANTIAL EVIDENCE ...................... 4

    1.5   CONSIDERATION OF EVIDENCE ........................................... 5

    1.6   CREDIBILITY OF WITNESSES ................................................ 6

    1.7   EXPERT WITNESSES ................................................................ 7

    1.8   DEPOSITION TESTIMONY ....................................................... 8

    1.9   USE OF NOTES ........................................................................... 9

    1.10  BURDENS OF PROOF ............................................................. 10

2.    THE PARTIES AND THEIR CONTENTIONS ..................................... 12

    2.1   THE PARTIES .......................................................................... 12

    2.2   THE PARTIES' CONTENTIONS ............................................ 13

3.    PATENT CLAIMS ............................................................................... 14

    3.1   SUMMARY OF THE PATENT ISSUES ................................. 14

    3.2   THE PATENT LAWS ............................................................... 15

    3.3   PATENTS – INTERPRETATION OF PATENT CLAIMS ............. 16

    3.4   PATENTS – INFRINGEMENT GENERALLY ............................... 18

    3.5   PATENTS – DIRECT INFRINGEMENT BY LITERAL INFRINGEMENT .. 19

    3.6   PATENT INFRINGEMENT – ACTIVE INDUCEMENT ............... 21

    3.7   PATENT INFRINGEMENT – CONTRIBUTORY INFRINGEMENT ........... 22

    3.8   PATENTS – WILLFUL INFRINGEMENT ..................................... 23

    3.9   PATENT INVALIDITY - GENERALLY ....................................... 25

    3.10  PATENT ELIGIBILITY ........................................................... 26

    3.11  PATENT INVALIDITY – ANTICIPATION ..................................... 27

    3.12  PATENT INVALIDITY – OBVIOUSNESS ..................................... 29

    3.13  PATENT INVALIDITY – LEVEL OF ORDINARY SKILL ......................... 31

    3.14  PATENT INFRINGEMENT DAMAGES – GENERALLY ............................ 32

    3.15  PATENT INFRINGEMENT DAMAGES – LOST PROFITS ......................... 34

    3.16  PATENT INFRINGEMENT DAMAGES – REASONABLE ROYALTY ....... 36

4.    FALSE ADVERTISING CLAIMS ....................................................... 38

|  | 4.1 | FALSE ADVERTISING – GENERALLY | 38 |
|  | 4.2 | FALSE ADVERTISING – ELEMENTS OF FALSE ADVERTISING | 40 |
|  | 4.3 | FALSE ADVERTISING – ELEMENT ONE – FALSE STATEMENTS | 41 |
|  | 4.4 | FALSE ADVERTISING – ELEMENT TWO – DECEPTION | 42 |
|  | 4.5 | FALSE ADVERTISING – ELEMENT THREE – TRAVEL IN INTERSTATE COMMERCE | 43 |
|  | 4.6 | FALSE ADVERTISING – ELEMENT FOUR – MATERIALITY | 44 |
|  | 4.7 | FALSE ADVERTISING – ELEMENT FIVE – INJURY OR LIKELIHOOD OF INJURY | 45 |
|  | 4.8 | FALSE ADVERTISING – WILLFULNESS | 46 |
|  | 4.9 | FALSE ADVERTISING DAMAGES – ACTUAL DAMAGES | 47 |
|  | 4.10 | FALSE ADVERTISING DAMAGES – DEFENDANT'S PROFITS | 48 |
| 5. | DAMAGES - PUNITIVE DAMAGES UNDER DELAWARE COMMON LAW | | 49 |
| 6. | DELIBERATION AND VERDICT | | 50 |
|  | 6.1 | INTRODUCTION | 50 |
|  | 6.2 | UNANIMOUS VERDICT | 51 |
|  | 6.3 | DUTY TO DELIBERATE | 52 |
|  | 6.4 | SOCIAL MEDIA | 53 |
|  | 6.5 | COURT HAS NO OPINION | 54 |

# 1. GENERAL INSTRUCTIONS

## 1.1 INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case. And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return. Please listen carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case. We will go over that briefly later.

### 1.2    <u>JURORS' DUTIES</u>

You have two duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.  You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes any instructions I gave you before and during the trial and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not guess or speculate, and do not let any bias, sympathy, or prejudice you may feel toward one side or the other influence your decision in any way.

### 1.3     <u>EVIDENCE DEFINED</u>

You must make your decision based only on the evidence that you saw and heard in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, including deposition testimony that has been played by video or read to you, the exhibits that I allowed into evidence, and any stipulations to which the parties agreed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. They are offered solely to help you in your determination of the facts. The lawyer's questions and objections are not evidence. My legal rulings are not evidence. You should not be influenced by a lawyer's objection or by my ruling on that objection. Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. Sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way. Make your decision based only on the evidence, as I have defined it, and nothing else.

### 1.4     <u>DIRECT AND CIRCUMSTANTIAL EVIDENCE</u>

During the preliminary instructions, I told you about "direct evidence" and "circumstantial evidence."  I will now remind you what each means.

Direct evidence is evidence like the testimony of an eyewitness, which if you believe it, directly proves a fact. If a witness testified that she saw it raining outside, and you believe her, that would be direct evidence that it was raining.

Circumstantial evidence is a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

### 1.5    <u>CONSIDERATION OF EVIDENCE</u>

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## 1.6    CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You may believe everything a witness says, or part of it, or none of it. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether the testimony is consistent or inconsistent; whether the testimony has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there is evidence tending to prove that the witness testified falsely about some important fact or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony he or she gave at the trial in person or by deposition testimony played by video or read to you. You have the right to distrust such witness's testimony and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

## 1.7    <u>EXPERT WITNESSES</u>

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.

## 1.8    DEPOSITION TESTIMONY

During the trial, certain testimony was presented to you by the playing of video excerpts or reading from a deposition. The deposition testimony may have been edited or cut to exclude irrelevant testimony as the parties have only a limited amount of time to present you with evidence. You should not attribute any significance to the fact that the deposition videos may appear to have been edited.

Deposition testimony is out of court testimony given under oath and is entitled to the same consideration you would give it had the witnesses personally appeared in court.

### 1.9    <u>USE OF NOTES</u>

You may have taken notes during trial to assist your memory. As I instructed you at the beginning of the case, you should use caution in consulting your notes. There is a tendency to attach undue importance to matters that have been written down. Some testimony that is considered unimportant at the time presented—and therefore was not written down—takes on greater importance later in the trial in light of all the evidence presented. Therefore, your notes are only a tool to aid your own memory and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence and are not a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

### 1.10    **BURDENS OF PROOF**

In any legal action, facts must be proven by a required standard of evidence known as the "burden of proof." In a patent case such as this, there are two different burdens of proof that are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."

Here, Plaintiff TRUSTID contends that Defendant Next Caller has committed acts of patent infringement and false advertising. TRUSTID had the burden of proving its claims and the amount of its money damages by the first evidentiary standard—a "preponderance of the evidence." That means TRUSTID had to prove to you, in light of all the evidence, that what it claims is more likely true than not. To say it differently, if you were to put the evidence in support of TRUSTID's claims and the evidence weighing against TRUSTID's claims on opposite sides of a scale, the evidence supporting TRUSTID's claims would have to make the scales tip in TRUSTID's favor in each instance. If the scale should remain equal or tip against TRUSTID's claims, you must find for Next Caller.

TRUSTID also had the burden of proving that any patent infringement and false advertising was willful by a preponderance of the evidence.

In this case, in addition to denying TRUSTID's claims, Next Caller asserts that the patents-in-suit are invalid.  Next Caller had the burden of proving the patents are not valid by what is called "clear and convincing evidence." Clear and convincing evidence is evidence that persuades you that it is highly probable that what Next Caller seeks to prove is true. Proof by clear and convincing evidence is therefore a higher burden than proof by a preponderance of the evidence.

You may have heard of the "beyond a reasonable doubt" burden of proof from criminal cases. That requirement is the highest burden of proof. It does not apply to civil cases such as this one and therefore you should put it out of your mind.

## 2.     THE PARTIES AND THEIR CONTENTIONS

### 2.1     THE PARTIES

I will now review for you the parties in this action, and the positions of the parties that you will have to consider in reaching your verdict.

As you know, the plaintiff in this case is TRUSTID and the defendant is Next Caller. TRUSTID is the owner of three patents: U.S. Patent Numbers 9,001,985; 8,238,532; 9,871,913. I may refer to these patents individually by their last three digits, such as the '985 patent, or collectively as the "patents-in-suit" or "TRUSTID's patents."

## 2.2    THE PARTIES' CONTENTIONS

TRUSTID contends that Next Caller infringes each of the patents-in-suit and that Next Caller's infringement was willful. TRUSTID contends that it is entitled to damages to compensate TRUSTID for Next Caller's infringement. Next Caller denies that it has infringed the patents-in-suit and contends that the patents-in-suit are invalid.

TRUSTID contends that Next Caller has engaged in false advertising by making false statements to consumers to TRUSTID's detriment. TRUSTID contends that Next Caller's false advertising has been willful and that TRUSTID is entitled to damages for Next Caller's false advertising. Next Caller denies it has engaged in false advertising.

### 3. PATENT CLAIMS

#### 3.1 SUMMARY OF THE PATENT ISSUES

I will now summarize the patent issues that you must decide and for which I will provide instructions to guide your deliberations. You must decide the following main issues:

1.       Whether TRUSTID has proven by a preponderance of the evidence that Next Caller has directly infringed any of the claims of the '985 Patent or '532 Patent.

2.       Whether TRUSTID has proven by a preponderance of the evidence that Next Caller has indirectly infringed any of the claims of the '913 Patent.

3.       Whether TRUSTID has proven by a preponderance of the evidence that Next Caller willfully infringed the claims of the patents-in-suit.

4.       Whether Next Caller has proven by clear and convincing evidence that the patents-in-suit are not valid.

## 3.2   __THE PATENT LAWS__

At the beginning of the trial, I gave you some general information about patents, the patent system, and the patent laws relevant to this case. I will now give you more detailed instructions about the patent laws that specifically relate to this case. If you would like to review my instructions at any time during your deliberations, you will have your copy available to you in the jury room.

### 3.3     PATENTS – INTERPRETATION OF PATENT CLAIMS

The claims of a patent are the numbered sentences at the end of a patent. The claims describe the invention and describe what the patent owner may prevent others from doing.  Before you decide whether Next Caller has infringed one or more of TRUSTID's patents, or whether the patents are invalid, you will have to understand the patent claims.

Patent claims may exist in two forms, referred to as independent claims or dependent claims. An independent claim does not refer to any other claim of the patent. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. For example, claim 1 of the '985 patent is an independent claim.

A dependent claim refers to at least one other claim in the patent. A dependent claim includes each of the limitations of the other claims or claims to which it refers, as well as the additional limitations of the dependent claim itself. Therefore, to determine what a dependent claim covers, it is necessary to look at both the dependent claim and the other claim or claims to which it refers. For example, claim 10 of the '985 patent is a dependent claim. To determine what dependent claim 10 of the '985 patent covers, the words of that claim, the words of dependent claim 8, and the words of independent claim 1 of the '985 patent must be read together.

It is my job as a judge to determine what the patent claims mean and to instruct you about that meaning.  You must accept the meanings I give you and use them when you decide whether or not the patents-in-suit are infringed and whether or not they are invalid.

The beginning, or preamble, portions of some of the claims use the word "comprising." "Comprising" means "including" or "containing." A claim that uses the word "comprising" or "comprises" is not limited to products or methods having only the elements or steps that are recited in the claim, but also covers products or methods that have additional elements or steps. For

example, if a claim recites a table "comprising" a tabletop, legs, and glue, the claim will cover any

table that contains these structures, even if the table also contains other structures, such as a leaf

or wheels on the legs.

I will next define the meaning of certain words used in the patent claims at issue. You must

use the definitions I provide to you in your consideration of infringement and invalidity issues:

1. The terms "is answered" / "answering" / "answer" means "actually or virtually [goes/going] off hook."

2. The term "consortium information" means "aggregated data from multiple external sources."

3. The term "source origin confidence matrix" means "source origin confidence metric."

4. The term "operational status information" means "characteristics about the functional state."

5. The term "call" means "any connection over a telecommunications or an information service network and includes, but is not limited to, landline, wireless, modem, facsimile, Session Initiation Protocol (SIP), and Voice over Internet Protocol (VoIP) transmissions."

6. The term "ancillary to" means "coupled as an adjunct to."

7. The term "source origin confidence metric" means "a number in a range that represents the credibility of the calling party number or the calling party billing number."

8. The phrase "A system for performing forensic analysis on calling party number information associated with an incoming call from a telephonic device, before the incoming call is answered, comprising:" is limiting.

For claim terms for which I have not provided you with a definition, you should apply the

ordinary meaning of that term in the field of the patent.

### 3.4    **PATENTS – INFRINGEMENT GENERALLY**

I will now instruct you as to the rules you must follow when deciding whether TRUSTID has proven that Next Caller has infringed TRUSTID's patents.

The United States' patent law gives the owner of a valid patent the right to exclude others from importing, making, using, offering to sell, or selling the patented product or method in the United States during the term of the patent.  Any person or company that has engaged in any of those acts without the patent owner's permission infringes the patent.

Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement of one claim but no infringement of another. In this case, there are three possible ways that a claim may be infringed.  The three types are called: (1) direct infringement; (2) induced infringement; and (3) contributory infringement.  Induced infringement and contributory infringement are referred to as indirect infringement. There cannot be indirect infringement of a claim unless someone other than Next Caller directly infringes that claim.

TRUSTID bears the burden of proving by a preponderance of the evidence that each of the claims in its patents is infringed. Therefore, you, the jury, must determine infringement for each patent and each claim separately.

I will now explain each type of infringement in more detail.

## 3.5    PATENTS – DIRECT INFRINGEMENT BY LITERAL INFRINGEMENT

TRUSTID seeks to prove direct infringement of the '985 and '532 patents.  To prove direct infringement, TRUSTID must prove by a preponderance of the evidence, i.e., that it is more likely than not, that Next Caller made, used, sold, offered for sale within, or imported into the United States a product or method that meets all of the requirements of a claim and did so without TRUSTID's permission. You must compare VeriCall and its functions with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met.

You must determine, separately for each asserted claim, whether or not there is infringement. There is one exception to this rule. If you find that a claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that claim. On the other hand, if you find that an independent claim has been infringed, you must still separately decide whether VeriCall or its functions meet additional requirements of any claims that depend from the independent claim to determine whether the dependent claims have also been infringed. Remember, a dependent claim includes all the requirements of any of the claims to which it refers plus additional requirements of its own.

You must compare the accused VeriCall and its functions with each asserted claim of TRUSTID's patents to determine whether each and every one of the requirements of that claim is satisfied. When performing this comparison, you should be careful not to compare the accused VeriCall with TRUSTID's products or the descriptions in TRUSTID's patents.

The presence of additional features in an accused product does not mean that the product does not infringe a patent claim. Whether or not VeriCall represents an improvement either over the patent claims or over another product is not relevant to whether or not VeriCall infringes TRUSTID's asserted patent claims. As long as VeriCall includes all of the elements of an asserted

19

patent claim, then that patent claim is infringed by VeriCall even if that service also has additional features.

You may find direct infringement based on one instance of the claimed use being performed by Next Caller. Proof of direct infringement may be based on circumstantial evidence.

Whether or not Next Caller knew that what it was doing was an infringement does not matter. An entity can be a direct infringer of a patent even if it believes in good faith that it is not infringing any patent or even if it does not know of the patent.

### 3.6    PATENT INFRINGEMENT – ACTIVE INDUCEMENT

TRUSTID alleges that Next Caller is liable for infringement of the '913 patent by actively inducing Next Caller's customers to directly infringe that patent. As with direct infringement, you must determine whether there has been inducement on a claim-by-claim basis.

A company induces patent infringement if it purposefully causes, urges or encourages another to infringe a patent. Inducing infringement cannot occur unintentionally. This is different from direct infringement, which can occur unintentionally.

In order to prove inducement, TRUSTID must prove by a preponderance of evidence that Next Caller knew of the '913 patent and encouraged or instructed one of its customers to use VeriCall in a manner that infringes that patent. TRUSTID must also prove by a preponderance of the evidence that Next Caller's customer(s) infringed the patent.

Thus, in order to prove that Next Caller induced patent infringement, TRUSTID must prove by a preponderance of the evidence that:

1.    the acts carried out by one of Next Caller's customers directly infringe at least one of the asserted claims of the '913 patent;

2.    Next Caller took action during the time the '913 patent was in force that was intended to cause and did cause the infringing acts by one of Next Caller's customers;

3.    Next Caller knew that the '913 patent existed and knew that the acts, if taken, would constitute infringement of that patent or that Next Caller believed there was a high probability that the acts by its customers would infringe at least one of the asserted claims of the '913 patent and Next Caller took deliberate steps to avoid learning of that infringement.

If, and only if, you are persuaded of each of these things may you find that Next Caller induced infringement of the '913 patent.

### 3.7     PATENT INFRINGEMENT – CONTRIBUTORY INFRINGEMENT

TRUSTID argues that Next Caller is liable for contributory infringement of the '913 patent by contributing to the direct infringement of that patent by Next Caller customers. As with direct infringement, you must determine contributory infringement on a claim-by-claim basis.

Contributory infringement can occur when a supplier provides a part, or component, to another for use in a patented product or machine, or in a patented process. In order for there to be contributory infringement, the person who received the component must infringe the patent. The component must also have certain characteristics. First, the component must be a material part of the invention. Second, the component must be especially made or adapted for use in a manner that infringes the patent, and the supplier must know that the component was especially made for that use. Third, the component must not have substantial uses that do not infringe the patent. A component that has a number of non-infringing uses is often referred to as a staple, or commodity, article. Providing such a staple or commodity article is not contributory infringement, even if the person to whom the article was supplied uses it in an infringing manner.

Thus, in order to establish that Next Caller has contributorily infringed an asserted claim of the '913 patent, TRUSTID must prove the following by a preponderance of the evidence that:

1.     Next Caller knew that the '913 patent existed or Next Caller believed that there was a high probability that a patent existed covering the subject matter of the asserted claims, and Next Caller took deliberate actions to avoid learning of the patent;

2.     Next Caller sold or supplied a material component of the claimed invention to a customer;

3.     Next Caller knew that the component was especially made for use in a manner that infringes the patent claims;

4.     The component is not a staple or commodity article; and

5.     One of Next Caller's customers actually used the component in a manner that you find infringed a patent claim of the '913 patent.

### 3.8    __PATENTS – WILLFUL INFRINGEMENT__

In this case, TRUSTID contends that Next Caller willfully infringed the patents-in-suit. If you find on the basis of the evidence and the law as I have explained it that Next Caller directly or indirectly infringes at least one claim of the patents-in-suit, you must then decide whether or not Next Caller's infringement was willful.

Willfulness requires you to determine whether TRUSTID proved that it is more likely than not that Next Caller knew of the asserted patents and that the infringement was deliberate or intentional. You may not determine that the infringement was willful just because Next Caller was aware of the asserted patents and infringed them. Instead, you must also find that Next Caller deliberately or intentionally ignored or recklessly disregarded the patents.

When a person becomes aware that a patent may have relevance to his or her activities, that person has a duty to exercise due care and investigate whether or not his or her activities or proposed activities infringe any valid, enforceable claim of the patent. If that person does not do so and infringes the patent claims, then the infringement is willful.

To determine whether Next Caller acted willfully, consider all the facts and assess Next Caller's knowledge and actions at the time of the challenged conduct. Facts that may be considered include, but are not limited, to:

1.    whether or not Next Caller acted consistently with the standards of behavior for its industry;

2.    whether or not Next Caller intentionally copied a product of TRUSTID that is covered by these patents;

3.    whether or not Next Caller reasonably believed it did not infringe or that the patent was invalid;

4.    whether Next Caller knew, or should have known, that its conduct involved an unreasonable risk of infringement;

5.      whether or not Next Caller made a good-faith effort to avoid infringing these patents, for example, whether Next Caller attempted to design around these patents; and

6.      whether or not Next Caller tried to cover up its infringement.

Consider all the facts to determine whether Next Caller acted willfully. You must find that

Next Caller knew about the '985 patent, '532 patent and '913 patent before this lawsuit was filed

on January 30, 2018 to determine that Next Caller acted willfully.

### 3.9    <u>PATENT INVALIDITY - GENERALLY</u>

Next Caller contends that the asserted claims of the patents-in-suit are invalid. Next Caller must prove by clear and convincing evidence that each asserted claim is invalid. In other words, you must be left with a clear conviction that the claim is invalid.

Like infringement, you must determine whether each of TRUSTID's patent claims is invalid on a claim-by-claim basis.  For example, even if an independent claim is invalid, this does not mean that the dependent claims that depend from it are automatically invalid.  However, if you find that a dependent claim is invalid, then you must find that the independent claim from which it depends is also invalid.

Next Caller contends that the asserted patent claims are ineligible for patent protection and invalid as anticipated or obvious.  I will now provide additional instructions regarding patent invalidity.

### 3.10    PATENT ELIGIBILITY

Next Caller contends that the claims of the patents-in-suit are invalid because they claim subject matter that is not eligible for patent protection. You must decide if Next Caller has proven by clear and convincing evidence that the elements in each of these claims, considered individually and as an ordered combination, involve only activities which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional at the time the patent applications were filed. The '532 and '985 patents were filed on May 19, 2009, and the '913 patent was filed on January 20, 2012.

Whether a particular technology was well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something was disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional. In determining whether a patent claim involves the performance of well-understood, routine, and conventional activities, you may consider statements made in the patent's specification, as well as evidence of the prior art.

### 3.11 PATENT INVALIDITY – ANTICIPATION

In order for someone to be entitled to a patent, the invention must actually be "new." In general, inventions are new when the claims cover that which has not been made, used, or disclosed before. If it is not new, we say that it was "anticipated" by the prior art. In other words, the invention is not new if it was already patented or described in a printed publication anywhere in the world before the date of invention, which is May 19, 2009, for the '532 patent and January 20, 2012, for the '913 patent. An invention that is "anticipated" by the prior art is not entitled to patent protection.

Next Caller contends that the claims of the patents-in-suit are invalid because the claimed inventions are anticipated. Next Caller must convince you of this by clear and convincing evidence, i.e., that the evidence highly probably demonstrates that the claims are invalid.

Anticipation must be determined on a claim-by-claim basis. In order for a patent claim to be anticipated by the prior art, each and every limitation of the claim must be present within a single item of prior art, whether that prior art is a publication, a prior patent, a prior invention, a prior public use or sale, or some other item of prior art. You may not find that the prior art anticipates a patent claim by combining two or more items of prior art.

A printed publication or patent will not anticipate a patent claim unless it contains a description of the invention covered by the patent claims that is sufficiently detailed that it teaches a skilled person how to make and use the invention without undue experimentation. That means that a skilled person reading the printed publication or patent would be able to make and use the invention using only an amount of experimentation that is appropriate for the complexity of the field of the invention and for the level of expertise and knowledge of persons skilled in that field. I will discuss the level of expertise and knowledge required of a person in the field a little bit later.

In deciding whether or not a single item of prior art anticipates a patent claim, you should consider what is expressly stated or present in the item of prior art and also that which is inherently present. Something is inherent in an item of prior art if it is always present in the prior art or always results from the practice of the prior art and if a skilled person would understand that to be the case.

### 3.12    PATENT INVALIDITY – OBVIOUSNESS

Next Caller contends that the claims of the patents-in-suit are invalid because the claimed inventions are "obvious."

A claimed invention is invalid as "obvious" if it would have been obvious to a person of ordinary skill in the art as of May 19, 2009 for the '532 patent and January 20, 2012 for the '913 patent. Unlike anticipation, which allows consideration of only one item of prior art, obviousness may be shown by considering one or more than one item of prior art. The prior art includes the following items received into evidence during trial:

1.    U.S. Patent Application Publication No. 2008/0084975 ("Schwartz") entitled "Method and System for Incoming Call Management";

2.    U.S. Patent Application Publication No. 2007/0081648 ("Abramson") entitled "Detection of Telephone Number Spoofing";

3.    U.S. Patent Application Publication No. 2003/225686 ("Mollett") entitled "Systems and Methods for Selective Validation of Phone Numbers"; and

4.    U.S. Patent No. 6,373,505 ("Khuc") entitled "Call Processing System for Handling Calls to a Call Center."

In deciding obviousness, you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the patent. You should not use the patent as a road map for selecting and combining items of prior art. You must put yourself in the place of a person of ordinary skill in the art as of May 19, 2009 for the '532 patent and January 20, 2012 for the '913 patent. The issue is not whether the claimed invention would have been obvious to you, to me as a judge, or to a genius in the art. Rather, the question is whether or not the invention would have been obvious to a person of ordinary skill in the art.

You must also keep in mind that the test for obviousness is not whether or not it would have been obvious to try to make the invention, but rather whether or not the invention would have

been obvious to a person of ordinary skill in the inventor's field at the time the invention was made. To find that the prior art rendered the invention obvious, you must find that it provided a reasonable expectation of success.

The following factors must be evaluated to determine whether Next Caller has established that the claimed invention is obvious:

1.      the scope and content of the prior art relied upon by Next Caller;

2.      the differences, if any, between the prior art and each claimed invention of the patents-in-suit that Next Caller contends is obvious;

3.      the level of ordinary skill in the art as of the May 19, 2009 for the '532 patent January 20, 2012 for the '913 patent; and

4.      additional considerations, if any, that indicate that the invention was obvious or not obvious.

Each of these factors must be evaluated, although they may be analyzed in any order, and you must perform a separate analysis for each of the claims. In making these assessments, you should take into account any objective evidence (sometimes called "secondary considerations") that may shed light on the obviousness or not of the claimed inventions, such as whether others in the field praised the invention.

Next Caller must prove by clear and convincing evidence that the inventions would have been obvious. Again, you must undertake this analysis separately for each claim that Next Caller contends is obvious.

### 3.13    PATENT INVALIDITY – LEVEL OF ORDINARY SKILL

To determine the validity or invalidity of the patent claims, you must determine the level of ordinary skill in the field of the invention on May 19, 2009 for the '532 and '985 patents and January 20, 2012 for the '913 patent. You must consider and assess this factor before reaching your conclusion in this case.

The person of ordinary skill is presumed to know all prior art that you have determined to be reasonably relevant. The person of ordinary skill is also a person of ordinary creativity that can use common sense to solve problems.

TRUSTID and Next Caller agree that, for purposes of this case, a person of ordinary skill in the art would have been someone who had a bachelor's degree in electrical engineering, computer engineering, computer science or a related engineering field and at least two years of experience with telecommunications.

### 3.14    PATENT INFRINGEMENT DAMAGES – GENERALLY

TRUSTID claims that it has suffered damages as a result of Next Caller's patent infringement in the form of lost profits that TRUSTID would have made if Next Caller had not infringed and a reasonable royalty on each of Next Caller's sales of the VeriCall service.

I am now going to give you some instructions related to damages. By instructing you on damages, I am not suggesting which party should win this case on any issue. These instructions are only to guide you in case you find that Next Caller infringed a valid claim of any of the patents-in-suit.

If you find that Next Caller has infringed any valid TRUSTID patent, you must then determine the money damages to award TRUSTID. The amount of those damages must be adequate to compensate TRUSTID for the infringement. In other words, the damages award should put TRUSTID in approximately the same financial position that it would have been in had the infringement not occurred. You should keep in mind that the damages you award are meant to compensate the patent holder and not to punish an infringer. Regardless of the type of damages you may choose to award, you must be careful to ensure that award is no more or no less than the value of the patented invention.

If you find that Next Caller has not infringed a valid claim of the patents-in-suit, then TRUSTID is not entitled to any damages and you should not make any findings about damages.

TRUSTID has the burden to prove that its calculation of damages is correct by a preponderance of the evidence. Although TRUSTID is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty. TRUSTID is not entitled to damages that are remote or speculative.

There are two types of damages for patent infringement: lost profits and a reasonable royalty. Lost profits damages compensate the patent owner for the additional profits that it would have made if the accused infringer had not infringed. You may hear this referred to as the "but for" test. I will discuss lost profits in more detail shortly.

I will also discuss a reasonable royalty later in more detail. Generally, a reasonable royalty is defined by the patent laws as a reasonable amount that someone wanting to use the patented invention should expect to pay to the patent owner and the owner should expect to receive. A reasonable royalty is the minimum amount of damages that a patent owner may recover.

The parties agree that any damages for patent infringement would begin on January 9, 2018 for the '985 and '532 patents and on January 16, 2018 for the '913 patent.

### 3.15    PATENT INFRINGEMENT DAMAGES – LOST PROFITS

I will first instruct you about lost profits damages.

TRUSTID is seeking lost profits damages in this case. To prove lost profits, TRUSTID must show that, but for Next Caller's infringement, there is a reasonable probability that TRUSTID would have made additional profits through the sale of all or a portion of the sales of VeriCall made by Next Caller. TRUSTID must prove this by a preponderance of the evidence, i.e., it is more likely than not that TRUSTID would have made additional profits if Next Caller had not infringed. Part of your job is to determine what the parties who used the allegedly infringing product from Next Caller would have done if the alleged infringement had not occurred. It is important to remember that the profits I have been referring to are the profits allegedly lost by TRUSTID, not the profits, if any, made by Next Caller on the allegedly infringing sales.

TRUSTID may establish "but for" causation and is entitled to an award of lost profits if you find that TRUSTID has shown each of the following four (4) elements by a preponderance of the evidence:

1.    That there was demand for the patented technology;

2.    That there were no available, acceptable, noninfringing substitute products or services, or if there were, TRUSTID's market share of the number of the sales made by Next Caller that TRUSTID would have made, despite the availability of other acceptable noninfringing substitutes;

3.    That TRUSTID had the manufacturing and marketing capacity to make any infringing sales actually made by Next Caller and for which TRUSTID seeks an award of lost profits—in other words, that TRUSTID was capable of satisfying the demand; and

4.    The amount of profit that TRUSTID would have made if Next Caller had not infringed.

If you find that there were only two suppliers in the market, TRUSTID does not need to prove the first two factors.  In a two-supplier market it is enough to show that there were two

suppliers, that TRUSTID was capable of satisfying the demand, and the amount of profit TRUSTID would have made if Next Caller had not infringed.  If you find that TRUSTID establishes those three factors, you may presume that TRUSTID is entitled to lost profits. Next Caller may rebut this presumption by showing that TRUSTID reasonably would not have made some or all of the diverted sales "but for" the infringement.

### 3.16    PATENT INFRINGEMENT DAMAGES – REASONABLE ROYALTY

TRUSTID is also asking for damages in the amount of a reasonable royalty.

If you find that TRUSTID has established infringement, it is entitled to at least a reasonable royalty to compensate it for that infringement. If you find that TRUSTID has not proved its claim for lost profits, or has proved its claim for lost profits for only a portion of the infringing sales, then you must award TRUSTID a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began. In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation. Although evidence of the actual profits an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. No one fact is dispositive and you should consider the evidence that has been presented to you in this case. You may also consider any other factors that in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.

## 4.    FALSE ADVERTISING CLAIMS

### 4.1    FALSE ADVERTISING – GENERALLY

TRUSTID has alleged that Next Caller engaged in false advertising under a federal law known as the Lanham Act and under the Delaware Deceptive Trade Practices Act.

To be considered false advertising under the Lanham Act, there must be a false statement that is made in commercial advertising or promotion, regarding the nature, characteristics or qualities of one's own product or another's product.  For a false statement to violate the Lanham Act, it must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within the industry. The level of circulation required to constitute advertising and promotion will vary from industry to industry and from case to case.

The Lanham Act does not mandate the form that a statement must take. For example, oral statements by a company's representatives concerning a product may constitute "commercial advertising or promotion" under the Lanham Act if disseminated sufficiently to the relevant purchasing public within the relevant industry. Where a number of separate, unique communications are made to individual customers, but these communications share the same competitive approach as part of an organized campaign to penetrate the marketplace, you may view the communications in the aggregate as a single advertising campaign. Similarly, press releases and sales presentations may qualify as a commercial advertisement or promotion if they are sufficiently disseminated to the relevant purchasing public within the relevant industry.

But an omission or failure to disclose a fact about a commercial product is not considered false advertising under the Lanham Act.

To be considered false advertising under the Delaware Deceptive Trade Practices Act, there must be, in the course of a business, a representation that goods or services have sponsorship,

approval, characteristics, ingredients, uses, benefits, or quantities that they do not have.  Here, TRUSTID must show that Next Caller represented that VeriCall has characteristics, uses, or benefits that it does not have.

### 4.2     <u>FALSE ADVERTISING – ELEMENTS OF FALSE ADVERTISING</u>

To establish a claim for false advertising under the Lanham Act, TRUSTID must prove the following elements by a preponderance of the evidence:

1.     That Next Caller made literally false statements as to their own product;

2.     That there was actual deception or a tendency to deceive a substantial portion of the intended audience;

3.     That the advertised goods traveled in interstate commerce;

4.     That any deception in making any false statements is material in being likely to influence purchasing decisions; and

5.     That there is a likelihood of injury to TRUSTID in terms of declining sales, loss of good will, etc.

The burden rests with TRUSTID. You must evaluate the elements for each allegedly false statement. If TRUSTID meets its burden as to any one allegedly false statement by a preponderance of the evidence, then you may find that Next Caller engaged in false advertising as to that particular statement.

**4.3     FALSE ADVERTISING – ELEMENT ONE – FALSE STATEMENTS**

TRUSTID can prevail in its false advertising action only if it proves that Next Caller's advertising statement is false on its face or literally false. There need not be a direct comparison to a competitor for a statement to be actionable.

As to literal falsity, in deciding whether an advertising claim is literally false, you must decide, first, whether the claim conveys an unambiguous message and, second, whether that unambiguous message is false.  Only an unambiguous message can be literally false.

In other cases, a statement is false because it necessarily implies other messages that are literally false. A message conveyed by necessary implication is one where the audience would consider the advertisement in its entirety and in context and would recognize the message as being made as readily as if it had been explicitly stated. If an advertising claim is untrue, it must be deemed literally false.

Although a plaintiff, such as TRUSTID, normally has the burden to demonstrate that Next Caller's advertising claims are false, you may find that a completely unsubstantiated advertising claim or claims by Next Caller is per se false without additional evidence from TRUSTID to that effect. A claim is completely unsubstantiated if you find that the advertiser had no semblance of support for the claim at the time it was made.

### 4.4 FALSE ADVERTISING – ELEMENT TWO – DECEPTION

TRUSTID must show that there was actual deception or a tendency to deceive a substantial portion of the intended audience.

Whether an advertising statement is deceptive "depends on the message that is conveyed to consumers." Survey evidence is needed to demonstrate a tendency to deceive a substantial portion of the intended audience. If TRUSTID is able to prove that a statement is completely unsubstantiated or literally false, survey evidence is not needed. If, however, a challenged advertising statement is not literally false, a party cannot obtain relief under the Lanham Act by arguing how consumers could react; it must show how consumers actually do react.

## 4.5     FALSE ADVERTISING – ELEMENT THREE – TRAVEL IN INTERSTATE COMMERCE

TRUSTID must also show that the advertised products traveled in interstate commerce. This element is met if Next Caller's products, for example, traveled across state lines or were advertised on a website accessible via the Internet. The parties do not dispute that this element has been met.

### 4.6     FALSE ADVERTISING – ELEMENT FOUR – MATERIALITY

TRUSTID must also show that any deception in making any false statements was material, because it made a difference in influencing customers' purchasing decisions.

If a defendant's advertising statement is determined to be false, it is presumed to be material. However, the defendant may rebut this presumption of materiality by providing sufficient evidence to show, by a preponderance of the evidence, that the false statement is immaterial to purchasing decisions.

### 4.7 FALSE ADVERTISING – ELEMENT FIVE – INJURY OR LIKELIHOOD OF INJURY

TRUSTID must prove that it has been injured or is likely to be injured in terms of declining sales, lost goodwill, et cetera. To do this TRUSTID must prove, by a preponderance of the evidence, that an allegedly false statement is likely to cause harm. A party's mere subjective belief that it is likely to be injured is insufficient to satisfy this element. Rather, TRUSTID must demonstrate in some manner a causal link between the allegedly false statement and a likelihood of harm.

The causal connection may be established by either direct or circumstantial evidence. TRUSTID can establish a causal connection with a challenged advertising statement by showing a direct diversion of sales or the lessening of goodwill associated with TRUSTID's products.

**4.8**     <u>**FALSE ADVERTISING – WILLFULNESS**</u>

If you find that Next Caller falsely advertised, you must also determine whether Next Caller intentionally and willfully committed acts of false advertising. Willfulness is defined as "when the person committing the violation knew or should have known that the conduct was of the nature prohibited."

**4.9**     **FALSE ADVERTISING DAMAGES – ACTUAL DAMAGES**

If you find based on the instructions you have been given that Next Caller committed acts of false advertising under the Lanham Act, then you may award TRUSTID damages in an amount you determine to be fair and equitable, consisting of the sum of (1) TRUSTID's actual damages attributable to Next Caller's false advertising; and (2) Next Caller's profits attributable to the false advertising.

If you find for TRUSTID on the false advertising claims under the Lanham Act, you must determine TRUSTID's actual damages. TRUSTID has the burden of proving actual damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate TRUSTID for any injury you find was caused by Next Caller's false advertising.

You should consider the following:

    1.     The injury to or loss of the TRUSTID's reputation;

    2.     The injury to or loss of TRUSTID's goodwill, including injury to TRUSTID's general business reputation;

    3.     The lost profits that TRUSTID would have earned but for Next Caller's false advertising;

    4.     The expense of preventing customers from being deceived; and

    5.     The cost of future corrective advertising reasonably required to correct any public confusion caused by the infringement.

In measuring the harm to TRUSTID's goodwill or reputation, you should consider TRUSTID's expenditures in building its reputation to estimate the harm to its reputation after Next Caller's bad acts.

## 4.10    FALSE ADVERTISING DAMAGES – DEFENDANT'S PROFITS

In addition to actual damages, TRUSTID is entitled to any profits earned by Next Caller that are attributable to the false advertising, which TRUSTID proves by a preponderance of the evidence. You may not, however, include in any award of profits any amount that you took into account in determining actual damages.

Under the Lanham Act, Defendant's profits would be calculated by estimating the revenue Next Caller made due to its false and material statements and subtracting out what it cost Next Caller to generate that revenue. In other words, profit is determined by deducting all expenses from gross revenue. Gross revenue is all of Next Caller's revenues resulting from false advertising.

Expenses are all operating, overhead and production costs incurred in producing the gross revenue. Next Caller has the burden of proving the expenses and the portion of the profit attributable to factors other than use of false advertising by a preponderance of the evidence.

Unless you find that a portion of the profit from Next Caller's use of false advertising is attributable to other factors, you shall find that the total profit is attributable to the false advertising.

## 5.     **DAMAGES - PUNITIVE DAMAGES UNDER DELAWARE COMMON LAW**

If you decide that Next Caller's false advertising caused TRUSTID harm, and if you award compensatory damages, then you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed TRUSTID and to discourage similar conduct in the future. Punitive damages are awarded in addition to compensatory damages.

You may award punitive damages against Next Caller to punish it for outrageous conduct and to deter it—and others—from engaging in similar conduct in the future. To award punitive damages, you must find by a preponderance of the evidence that Next Caller acted intentionally with conscious or reckless indifference, an "I don't care" attitude, or an evil motive. Punitive damages cannot be awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence.

Intentional conduct means it is the person's conscious object to engage in conduct of that nature. It requires that the defendant, in this case Next Caller, foresee that its conduct threatens a particular material harm to another.

In determining any award of punitive damages, you may consider the nature of Next Caller's conduct and the degree to which the conduct was reprehensible. Finally, you may assess an amount of damages that will deter Next Caller and others like it from similar conduct in the future. You may consider Next Caller's financial condition when evaluating deterrence. Any award of punitive damages must bear a reasonable relationship to TRUSTID's compensatory damages. If you find that TRUSTID is entitled to an award of punitive damages, state the amount of punitive damages separately on the verdict form.

*       *       *

## 6.  DELIBERATION AND VERDICT

### 6.1  INTRODUCTION

I have concluded the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  That should stay secret until you are finished.

### 6.2     **UNANIMOUS VERDICT**

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A verdict form has been prepared for you. I will review it with you in a moment. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. You will then return to the courtroom and my deputy will read aloud your verdict.

And I will remind you that nothing said in these instructions, and nothing in the form of a verdict, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

### 6.3    <u>DUTY TO DELIBERATE</u>

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that, your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds. Listen carefully to what the other jurors have to say, and then decide for yourself.

### 6.4   <u>SOCIAL MEDIA</u>

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, iPhone, iPad, Blackberry, tablet or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog or website such as Facebook, LinkedIn, YouTube, Instagram, Snapchat or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

### 6.5    <u>COURT HAS NO OPINION</u>

Let me finish by repeating something I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
500 PEARL STREET
NEW YORK, NEW YORK 10007

LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

TEL: (212)-805-0417
FAX: (212)-805-0426

September 27, 2016

VIA ECF
All Counsel of Record

Tiffany & Co. et al v. Costco Wholesale Corp.
Civil Action No. 13 Civ. 1041 (LTS)

MEMORANDUM TO COUNSEL

Dear Counsel:

Attached are clean and blacklined versions of the jury charge, reflecting the
Court's determinations at the charge conference. Please note that some additional changes have
been made, as reflected on pages 9, 12, 16-18, 30, 32 of the blackline, for consistency with the
text, clarity, or to address logistics.

A clean copy of the verdict form is also enclosed.

Sincerely yours,

Laura Taylor Swain

w /Enclosure

REFLECTING DISCUSSION AT CHARGE CONFERENCE

## <u>CONCLUDING JURY INSTRUCTIONS</u>

**Tiffany & Co. v. Costco Wholesale Corp.**

13 CV 1041

4  Ladies and gentlemen, before you begin your deliberations, I now am going

5  to instruct you on the law. You must pay close attention and I will be as clear as

6  possible.

7

8  It has been obvious to me and counsel that you have faithfully discharged

9  your duty to listen carefully and observe each witness who testified. Your interest

10  has never flagged, and you have followed the testimony with close attention.

11

12  I ask you to give me that same careful attention as I instruct you on the law.

13

14  ## <u>Role of the Court</u>

15  You have now heard all of the evidence in the case as well as the final

16  arguments of the lawyers for the parties.

17

18  My duty at this point is to instruct you as to the law. It is your duty to accept

19  these instructions of law and apply them to the facts as you determine them, just as

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    it has been my duty to preside over the trial and decide what testimony and

2    evidence is relevant under the law for your consideration.

3

4        On these legal matters, you must take the law as I give it to you.  If any

5    attorney has stated a legal principle different from any that I state to you in my

6    instructions, it is my instructions that you must follow.

7

8        You should not single out any instruction as alone stating the law, but you

9    should consider my instructions as a whole when you retire to deliberate in the jury

10   room.

11

12       You should not, any of you, be concerned about the wisdom of any rule that

13   I state.  Regardless of any opinion that you may have as to what the law may be –

14   or ought to be – it would violate your sworn duty to base a verdict upon any other

15   view of the law than that which I give you.

16

17                    **Role of the Jury**

18       As members of the jury, you are the sole and exclusive judges of the facts

19   that are disputed in this case.  You pass upon the evidence.  You determine the

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    credibility of the witnesses.  You resolve such conflicts as there may be in the

2    testimony.  You draw whatever reasonable inferences you decide to draw from the

3    facts as you have determined them, and you determine the weight of the evidence.

4

5           In determining these issues, no one may invade your province or functions

6    as jurors.  In order for you to determine the facts, you must rely upon your own

7    recollection of the evidence.  What the lawyers have said in their opening

8    statements, in their closing arguments, in the objections, or in their questions is not

9    evidence.  Nor is what I may have said – or what I may say in these instructions –

10   about a fact issue, evidence, unless I specifically instruct you to accept certain

11   facts.  In this connection, you should bear in mind that a question put to a witness

12   is never evidence.  It is only the answer which is evidence.  But you may not

13   consider any answer that I directed you to disregard or that I directed struck from

14   the record.  Do not consider such answers.

15

16          You may consider as evidence the background facts about the earlier phases

17   of this litigation and the Court's prior determinations that I read to you and

18   instructed you to accept at the beginning of the trial.  I will repeat those

19   background facts for you later in these instructions.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    Since you are the sole and exclusive judges of the disputed facts, I do not

2    mean to indicate any opinion as to what decision you should reach on the disputed

3    facts or as to what your verdict should be.  The rulings I have made during the trial

4    are not any indication of my views of what your decision should be as to whether

5    or not the plaintiff has proven its claims for monetary relief or the defendant has

6    established its defense.

7

8    You are expressly to understand that the Court has no opinion as to the

9    verdict you should render in this case.

10

11    As to the disputed facts in this case, ladies and gentlemen, you are the

12    exclusive judges.  You are to perform the duty of finding the facts without bias or

13    prejudice to any party.

14

15    **<u>Juror Oath</u>**

16    In determining the facts, you are reminded that you took an oath to render

17    judgment impartially and fairly, without prejudice or sympathy and without fear,

18    solely upon the evidence in the case and the applicable law.  I know that you will

19    do this and reach a just and true verdict.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    **Jury To Disregard Court's View**

2          With the exception of the facts that I have instructed you to accept as

3    established, I have not expressed nor have I intended to intimate any opinion as to

4    which witnesses are or are not worthy of belief, what facts are or are not

5    established, or what inference or inferences should be drawn from the evidence.  If

6    any expression of mine has seemed to indicate an opinion relating to any of these

7    disputed matters, I instruct you to disregard it.  You are, I repeat, the exclusive,

8    sole judges of all of the disputed questions of fact submitted to you and of the

9    credibility of the witnesses.  Your authority, however, is not to be exercised

10   arbitrarily; it must be exercised with sincere judgment, sound discretion, and in

11   accordance with the rules of law that I give you.  In making your determination of

12   the facts in this case, your judgment must be applied only to that which is properly

13   in evidence.  Arguments of counsel are not in evidence, although you may give

14   consideration to those arguments in making up your mind on what inferences to

15   draw from the facts which are in evidence.

16

17          From time to time, the Court has been called upon to pass upon the

18   admissibility of certain evidence, although I have tried to do so, in so far as it was

19   practicable, out of your hearing.  You have no concern with the reasons for any

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1   such rulings and you are not to draw any inferences from them.  Whether offered

2   evidence is admissible is purely a question of law in the province of the Court and

3   outside the province of the jury.  In admitting evidence to which objection has been

4   made, the Court does not determine what weight should be given to such evidence,

5   nor does it pass on the credibility of the evidence.  Of course, you must dismiss

6   from your minds, completely and entirely, any evidence which has been ruled out

7   of the case by the Court, and you must refrain from speculation or conjecture or

8   any guesswork about the nature or effect of any colloquy between Court and

9   counsel held out of your hearing or sight.

10

11                        **<u>Conduct of Counsel</u>**

12        It is the duty of the attorney on each side of a case to object when the other

13   side offers testimony or other evidence which the attorney believes is not properly

14   admissible.  Counsel also have the right and duty to ask the Court to make rulings

15   of law and to request conferences at the side bar out of the hearing of the jury.  All

16   those questions of law must be decided by me, the Court.  You should not show

17   any prejudice against an attorney or his or her client because the attorney objected

18   to the admissibility of evidence, or asked for a conference out of the hearing of the

19   jury, or asked the Court for a ruling on the law.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    As I already indicated, my rulings on the admissibility of evidence do not,

2    unless expressly stated by me, indicate any opinion as to the weight or effect of

3    such evidence.  You are the sole judges of the credibility of all witnesses and the

4    weight and effect of all evidence.

5

6                              **Remarks to Counsel**

7    It is the duty of the attorneys to offer evidence and press objections on

8    behalf of their side.  It is my function to cut off counsel from an improper line of

9    argument or questioning, to strike offending remarks and to reprimand counsel

10   when I think it is necessary.  But you should draw no inference from that.  It is

11   irrelevant whether you like a lawyer or whether you believe I like a lawyer.

12

13   Your verdict should be based on the facts as found by you from the evidence

14   and the law as instructed by the Court.

15

16                 **Burden of Proof-Preponderance of the Evidence**

17   In this civil case, the party with the burden of proof on any given issue has

18   the burden of proving every disputed element of his or her claim or defense to you

19   by a preponderance of the evidence.  If you conclude that the party bearing the

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1     burden of proof has failed to establish its proof on an issue by a preponderance of

2     the evidence, you must decide against that party on the issue you are considering.

3

4           What does a "preponderance of evidence" mean?  To establish a fact by a

5     preponderance of the evidence means to prove that the fact is more likely true than

6     not true.  A preponderance of the evidence means the greater weight of the

7     evidence.  It refers to the quality and persuasiveness of the evidence, not to the

8     number of witnesses or documents.  In determining whether a claim has been

9     proved by a preponderance of the evidence, you may consider the relevant

10    testimony of all witnesses, regardless of who may have called them, and all the

11    relevant exhibits received in evidence, regardless of who may have produced them.

12

13          If you find that the credible evidence on a given issue is evenly divided

14    between the parties – that it is equally probable that one side is right as it is that the

15    other side is right – then you must decide that issue against the party having this

16    burden of proof.  That is because the party bearing this burden must prove more

17    than simple equality of evidence – it must prove the element at issue by a

18    preponderance of the evidence.  On the other hand, the party with this burden of

19    proof need prove no more than a preponderance.  So long as you find that the

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    scales tip, however slightly, in favor of the party with this burden of proof – that

2    what the party claims is more likely true than not true – then that element will have

3    been proved by a preponderance of evidence.

4

## What Is and Is Not Evidence

6        The evidence in this case will consist of the following: (1) the sworn

7    testimony of the witnesses, no matter who called a witness; (2) all exhibits received

8    in evidence, regardless of who may have produced the exhibits; and (3) facts that I

9    instruct you to accept as established and that you must take as true for purposes of

10   this case.

11       In deciding the facts of this case, you are not to consider the following as

12   evidence: statements and arguments of the lawyers, questions and objections of the

13   lawyers, testimony that I instruct you to disregard, and anything you may see or

14   hear when the Court is not in session even if what you see or hear is done or said

15   by one of the parties or by one of the witnesses.

16

## Direct and Circumstantial Evidence

18       In deciding whether a party meets its burden of proof, you may consider

19   both direct and circumstantial evidence.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    "Direct evidence" is direct proof of a fact, such as testimony by a witness

2    about what the witness said or heard or did.

3    "Circumstantial evidence" is proof of one or more facts from which you

4    could find another fact.  To give a simple example, suppose that when you came

5    into the courthouse today, the sun was shining and it was a nice day, but the

6    courtroom blinds were drawn and you could not look outside.  Then later, as you

7    were sitting there, someone walked in with a dripping wet umbrella and soon after,

8    somebody else walked in with a dripping wet raincoat.  Now, on our assumed

9    facts, you cannot look outside of the courtroom and you cannot see whether or not

10   it was raining.  So you have no direct evidence of that fact.  But, on the

11   combination of the facts about the umbrella and the raincoat, it would be

12   reasonable for you to infer that it had begun raining.

13

14                        **<u>Inference Defined</u>**

15   You have heard the term "inference," and in their arguments the attorneys

16   may have asked you to infer, on the basis of your reason, experience, and common

17   sense, from one or more established facts, the existence of some other fact.

18

19   An inference is not a suspicion or a guess.  It is a reasoned, logical

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    conclusion that a disputed fact exists on the basis of another fact that has been

2    shown to exist.

3

4          There are times when different inferences may be drawn from facts, whether

5    proved by direct or circumstantial evidence.  The Plaintiffs ask you to draw one set

6    of inferences, while the Defendant asks you to draw another.  It is for you, and you

7    alone, to decide what inferences you will draw.

8

9          The process of drawing inferences from facts in evidence is not a matter of

10   guesswork or speculation.  An inference is a deduction or conclusion which you,

11   the jury, are permitted to draw – but not required to draw – from the facts that have

12   been established by either direct or circumstantial evidence.  In drawing inferences,

13   you should exercise your common sense.

14

15         So, while you are considering the evidence presented to you, you are

16   permitted to draw, from the facts that you find to be proven, such reasonable

17   inferences as would be justified in light of your experience.

18

19                              **Witness Credibility**

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    In deciding the facts, you may have to decide which testimony to believe

2    and which testimony not to believe.  You may believe anything a witness says, part

3    of it, or none of it.  In considering the testimony of any witness, you may take into

4    account many factors, including the witness' opportunity and ability to see or hear

5    or know the things the witness testified about; the quality of the witness' memory;

6    the witness' appearance and manner while testifying; the witness' interest in the

7    outcome of the case; any bias or prejudice the witness may have; other evidence

8    that may have contradicted the witness' testimony; and the reasonableness of the

9    witness' testimony in light of all the evidence.  The weight of the evidence does

10   not necessarily depend upon the number of witnesses who testify.

11

12                  **Impeachment by Prior Inconsistent Statements**

13          You have heard evidence that at some earlier time the witness has said or

14   done something which counsel argues is inconsistent with the witness' trial

15   testimony.

16

17          Evidence of a prior inconsistent statement is not to be considered by you as

18   affirmative evidence in determining liability.  Evidence of a prior inconsistent

19   statement was placed before you for the more limited purpose of helping you

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    decide whether to believe the trial testimony of the witness who contradicted

2    himself or herself.  If you find that the witness made an earlier statement that

3    conflicts with his or her trial testimony, you may consider that fact in deciding how

4    much of his or her trial testimony, if any, to believe.

5

6        In making this determination, you may consider whether the witness

7    purposely made a false statement or whether it was an innocent mistake; whether

8    the inconsistency concerns an important fact, or whether it had to do with a small

9    detail; whether the witness had an explanation for the inconsistency, and whether

10   that explanation appealed to your common sense.

11

12       It is exclusively your duty, based upon all the evidence and your own good

13   judgment, to determine whether the prior statement was inconsistent, and if so how

14   much, if any, weight to give to the inconsistent statement in determining whether

15   to believe all or part of the witness' testimony.

16

17                    **<u>Expert Witnesses - Generally</u>**

18       You have heard testimony from experts in this case.  An expert witness is

19   allowed to express his opinion on those matters about which he has special

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    knowledge and training.  Expert testimony is presented to you on the theory that

2    someone who is experienced in the field can assist you in understanding the

3    evidence or in reaching an independent decision on the facts.

4

5        In weighing the expert's testimony, you may consider the expert's

6    qualifications, his opinions, his reasons for testifying, as well as all of the other

7    considerations that ordinarily apply when you are deciding whether or not to

8    believe a witness' testimony.  You may give the expert testimony whatever weight,

9    if any, you find it deserves in light of all the evidence in this case. You should not,

10   however, accept the witness's testimony merely because he is an expert.  Nor

11   should you substitute it for your own reason, judgment, and common sense.  The

12   determination of the facts in this case rests solely with you.

13

14       **Tiffany's Claims, the Court's Previous Determinations, and Jury**
15       **Determinations Regarding Monetary Recovery**
16

17       With these general principles in mind, I will now instruct you on the matters

18   that have already been determined in this case, and on the legal principles

19   governing your determinations regarding monetary recovery.

20

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    As I explained at the outset of this trial, certain issues have already been

2    decided by the Court and your work in this case will be concerned only with

3    Tiffany's claims for monetary recovery.  I will now give you some more detailed

4    background information and instruct you as to how the earlier determinations of

5    the Court affect your deliberations in this case.

6

7    A federal statute known as the Lanham Act protects rights to use trademarks.

8    The term "trademark" includes any words, symbols or devices that a person or

9    company uses to identify its products and to distinguish them from those sold by

10   others.  Once a company has established its rights in a trademark, the right to use

11   the trademark belongs to that company exclusively, and it becomes its property.

12

13   This is a civil case in which the Plaintiffs, Tiffany and Company and Tiffany

14   (NJ) LLC, which I will refer to collectively as "Tiffany," brought claims that the

15   Defendant, Costco Wholesale Corporation, which I will refer to as "Costco,"

16   infringed Tiffany's federally registered trademark in the word "Tiffany," and

17   committed unfair competition by using the word "Tiffany" in certain signage in

18   display cases selling diamond engagement rings, and counterfeited the "Tiffany"

19   trademark by using it in that signage.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    I instruct you that Tiffany owns the federally registered trademark "Tiffany"

2    for use with jewelry products, including engagement rings.  Tiffany has not

3    authorized Costco to use its trademark to describe Costco's rings.

4

5    In an earlier phase of this case, the Court found that Tiffany has proven its

6    federal and state law claims that Costco infringed Tiffany's trademark and engaged

7    in unfair competition, and its federal claim that Costco counterfeited the Tiffany

8    trademark, by displaying solitaire diamond ring  jewelry in its stores next to

9    signage that included the word "Tiffany" as a standalone term not combined with

10   an immediately following modifying word such as "setting," "set," or "style."

11   None of the rings that Costco sold using such signage had been manufactured by

12   Tiffany.

13

14   The Court also found, and you are instructed to accept for purposes of your

15   determinations in this case, that Costco's use of the word "Tiffany" in its display

16   case signage, as a standalone term rather than as a combined term including an

17   immediately following modifier such as "setting," "set,"  or "style," infringed

18   Tiffany's federal trademark rights, and that Tiffany is therefore entitled to seek a

19   monetary award for such infringement of its federal trademark rights.  The Court

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1  also determined that Costco had committed trademark infringement and unfair

2  competition under New York State law.  The Court further found, and you are

3  instructed to accept for purposes of your determinations in this case, that Costco's

4  use of the "Tiffany" signage in the way that I have described was willful and

5  constituted counterfeiting of the Tiffany mark.  Tiffany is entitled to seek a

6  monetary award as a result of this counterfeiting.

7

8        In this trial you, as the jury, will be responsible for making determinations

9  regarding the monetary relief, if any, that Tiffany is entitled to recover as a result

10  of Costco's trademark infringement, unfair competition and counterfeiting.

11

12        It is important to note that Tiffany did not make any infringement or

13  counterfeiting claims regarding any use by Costco of the word "Tiffany" in a

14  combined term incorporating the word "setting," "set," "style," or any similar

15  immediately following modifier.  Accordingly, you are not to award damages

16  based on any use by Costco of the word "Tiffany" in a combined term

17  incorporating the word "setting," "set," "style," or any similar immediately

18  following modifier.

19

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1      **Prior Counterclaim and Appeal**

2          You have heard evidence that Costco filed a counterclaim to Tiffany's

3      lawsuit.  I instruct you that, when a civil lawsuit is filed in federal court, the

4      defendant is required to state as a counterclaim any claim that, at the time the

5      lawsuit is commenced, the defendant has against the plaintiff and wishes to assert,

6      if that claim arises out of the same transaction or occurrence that is the subject

7      matter of the plaintiff's lawsuit.  There was nothing unlawful about Costco's

8      assertion of its counterclaim.  In making your determinations in this case, you may

9      consider the counterclaim, in the context of all of the evidence, in determining the

10     weight and significance of Costco's assertion that it has accepted responsibility.

11         You have heard evidence that Costco attempted to take an immediate

12     appeal from the Court's prior ruling, and that the appeal was found premature.

13     There was nothing unlawful about the attempted appeal.  In making your

14     determinations in this case, you may consider the attempted appeal, in the context

15     of all of the evidence, in determining the weight and significance of Costco's

16     assertion that it has accepted responsibility.

17

18     **Legal Standards Governing Tiffany's Claims For Monetary Recovery**
19
20         I will now instruct you on Tiffany's claims for monetary recovery, the

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    determinations you will make regarding those claims, and the law that you will

2    apply in making those determinations.

3

4         The outcome of this trial will be determined based on your determinations

5    with respect to three different categories of monetary recovery.  The <u>first</u> is an

6    accounting for profits; the <u>second</u> is statutory damages under the federal Lanham

7    Act; and the <u>third</u> is punitive damages.  Your determinations as to each category of

8    potential recovery must be made independently of the others.  Following the trial,

9    decisions will be made as to which of the types of recovery will be awarded, so

10   your determinations as to each category of recovery must only take into

11   consideration the factors that I specify for you in connection with that particular

12   category of recovery.

13

14   <u>First Category - Accounting for Profits</u>

15        I will now instruct you as to the first category - an accounting for profits.

16   Tiffany is entitled to an award of all profits earned by Costco that are attributable

17   to Costco's misuse of Tiffany's trademark through infringement and/or

18   counterfeiting from February 14, 2007, to the present time.  You will determine the

19   total amount of any such profits by, <u>first</u>, determining the gross revenues that

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1   Costco received from the sale of rings on and after February 14, 2007, using the

2   improper signage, and, <u>second</u>, deducting from that gross revenue all expenses

3   attributable to those ring sales.

4

5        Gross revenue is all of Costco's receipts from the sale of rings using display

6   case signage that included the "Tiffany" mark as a standalone term, not combined

7   with any immediately following modifier such as "setting," "set" or "style."

8   Tiffany has the burden of proving the amount of Costco's gross revenue on the

9   rings by a preponderance of the evidence.  In this connection, you will have to

10  determine whether one sign, which used the word "Tiffany" on one line and the

11  word "set" at the beginning of the following line was a use of "Tiffany" as a

12  standalone term or a use of "Tiffany set" as a combined term in describing the

13  merchandise.  If you find that the particular sign was a standalone use of the word

14  "Tiffany," you will include any sales made under that signage in gross revenues.  If

15  you find that the particular sign was a use of "Tiffany set" as a combined term, you

16  will <u>not</u> include those sales in your gross revenue computation.

17

18       If you find that the amount of gross revenue from sales of rings using the

19  improper signage cannot be determined precisely due to a lack of records, you may

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    reach a reasoned approximation, resolving any doubts against Costco.

2

3         Once you have determined the amount of Costco's gross revenue on the sale

4    of the rings, you will determine what, if any, expenses are properly deducted from

5    that gross revenue.

6

7         Expenses are all operating, overhead and/or production costs incurred by

8    Costco in producing the gross revenue.  Costco has the burden of proving the

9    expenses, by a preponderance of the evidence.  Costco has the burden of

10   demonstrating a "sufficient nexus" between each expense claimed and the sales of

11   the rings.  When, as in this case, the infringement has been found to be willful, you

12   should give extra scrutiny to the categories of overhead expenses claimed by

13   Costco to insure that each category is directly and validly connected to the sale and

14   production of the rings.  You will subtract the proven expenses from the gross

15   revenue to determine the total profit made on the ring sales.

16

17        If Costco contends that any portion of the resulting profit calculation is

18   attributable to factors other than the use of the improper signage, Costco has the

19   burden of proving that contention by a preponderance of the evidence.  If Costco

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1   proves that some portion of the profit was not attributable to the use of improper

2   signage in the sale of the rings, you must subtract that portion of the profit in

3   making your award.  If Costco fails to prove that any portion of the profit was

4   attributable to factors other than use of the improper signage, you must award

5   Tiffany the total profit from the sale of the rings.

6

7           When you have determined the amount of profits that are attributable to

8   Costco's sale of rings using the improper signage, you will indicate the dollar

9   amount on the verdict form that will be provided to you in the jury room.

10

11          You will then indicate on the form whether you believe that the amount of

12  profits that you have calculated is an inadequate, or excessive, amount of monetary

13  recovery for Tiffany in light of the nature of Costco's wrongful conduct.  If you

14  believe that the amount is inadequate or excessive, you will then indicate the dollar

15  amount that you find is just as an award of profits under the circumstances of the

16  case.

17

18  <u>Second Category - Statutory Damages</u>

19          After you have made your determinations regarding an award of profits, you

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    will then proceed to the second category of recovery, and determine an appropriate

2    amount of statutory damages.  This is a separate determination from the findings

3    that you made regarding an award of profits.  You will make the statutory damages

4    determination by applying the following instructions.

5

6          Tiffany is entitled to recover statutory damages under the Lanham Act,

7    based on Costco's counterfeiting.  As I have explained to you earlier, the Court has

8    determined that Costco violated the Lanham Act by counterfeiting Tiffany's

9    trademark in selling rings on and after February 14, 2007, using the improper

10   signage. The Court has also determined that Costco's use of that counterfeit of the

11   "Tiffany" mark was willful.  You are bound by these determinations and must

12   accept them as established.

13

14         You must determine an amount of statutory damages, between $1000 and

15   $2 million, to be awarded to Tiffany as a result of the counterfeiting.

16

17         In determining what amount of statutory damages is appropriate, you should

18   consider factors such as (1) the expenses saved, if any, and the profits reaped, if

19   any; (2) the revenues lost by the plaintiff, if any; (3) the value of the trademark; (4)

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    the deterrent effect on others besides the defendant; (5) whether the defendant's

2    conduct was innocent or willful; (6) whether the defendant has cooperated in

3    providing particular records from which to assess the value of the infringing

4    materials products; and (7) the potential for discouraging the defendants.

5

6              I remind you that the Court has already found that Costco's use of the

7    "Tiffany" mark as a standalone term, not combined with any immediately

8    following modifier such as "setting," "set," or "style," was willful.  It is for you to

9    decide, based on all of the evidence that has been presented at the trial, the weight

10   of that finding in your determination regarding the amount of statutory damages to

11   be awarded.

12

13             You should specify an amount of statutory damages that you consider just.

14   Indicate the amount of your statutory damages award in the space provided on the

15   verdict form.

16

17   Third Category - Punitive Damages

18             The third category of damages that you will consider is punitive damages.

19   You will not be asked to determine a punitive damage award figure at this stage of

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1   the proceeding.  Instead, you will consider the following instructions and indicate

2   on the verdict form your determination as to whether Tiffany has proven that it is

3   entitled to recover punitive damages.

4

5        Under New York law, punitive damages are permitted where the wrong

6   complained of is morally culpable, or is actuated by evil and reprehensible

7   motives, not only to punish the defendant but to deter him, as well as others who

8   might otherwise be so prompted, from indulging in similar conduct in the future.

9   You may award punitive damages to Tiffany in connection with its claim for unfair

10  competition under New York State law if you find that Tiffany has proven that

11  Costco's conduct constituted gross, wanton, willful fraud or other morally culpable

12  conduct to an extreme degree.  To decide that punitive damages are warranted, you

13  must find that Costco's wrongdoing was not simply intentional but evinces a high

14  degree of moral turpitude and demonstrates such wanton dishonesty as to imply a

15  criminal indifference to civil obligations.

16

17       On your verdict form, you will indicate whether Tiffany is entitled to an

18  award of punitive damages, by answering a "yes" or "no" question.  Depending on

19  your verdict on this issue, there may be a second phase of the trial.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

## **<u>CONCLUDING INSTRUCTIONS</u>**

1

2         Now, for some general instructions that will guide you in your deliberations.

3 You will shortly retire to the jury room to begin your deliberations.  When you

4 retire to the jury room, you must have a foreperson.  That person will preside over

5 the deliberations and speak for you here in open court.  Other than those functions,

6 the foreperson will have no greater nor lesser authority than any other juror.

7

8         It is my custom in every case to select the foreperson of the jury.

9 Accordingly, I am now selecting juror number [   ] as your foreperson.

10

11         A copy of each of the exhibits that were admitted in paper form, and certain

12 of the objects admitted into evidence, will be provided to you in the jury room,

13 along with a complete list of all of the exhibits.  If you wish to review an exhibit

14 that was admitted only in electronic form, or an item of jewelry that was admitted

15 as a physical exhibit, you will be brought back into the courtroom, where the

16 evidence will be displayed for you.  Please make your requests as to electronic

17 evidence as specific as possible, as such evidence is voluminous and cannot be

18 displayed all at once.  Likewise, please be as specific as you can in any requests to

19 review witness testimony.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    Each of your requests, and any communication with the Court, should be

2    made to me in writing, signed by your foreperson, sealed in an envelope and given

3    to the Marshal, who will be available outside the jury room throughout your

4    deliberations.  After consulting with counsel, I will respond to any question or

5    request you have as promptly as possible, either in writing or by having you return

6    to the courtroom so that I can speak with you in person.  If you are divided, do not

7    reveal the split in your note or in any other fashion.  If you have reached a verdict,

8    do not reveal what it is until you are asked in open court.

9

10    You will now retire to decide the case.  In order to prevail, the Plaintiffs

11    must sustain their burden of proof as I have explained to you with respect to each

12    element of each of their claims.  If you find that the Plaintiffs have succeeded with

13    respect to a claim, you should return a verdict in their favor on that claim.  If you

14    find that the Plaintiffs have failed to sustain their burden on any element of a

15    particular claim, you should return a verdict against them on that claim.

16

17    It is your duty as jurors to consult with one another and to deliberate with a

18    view to reaching an agreement.  Each of you must decide the case for him or

19    herself, but you should do so only after a consideration of the case with your

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1   fellow jurors, and you should not hesitate to change an opinion when convinced

2   that it is erroneous.  Your verdict must be unanimous, but you are not bound to

3   surrender your honest convictions concerning the effect or weight of the evidence

4   for the mere purpose of returning a verdict or solely because of the opinion of other

5   jurors.  Discuss and weigh your respective opinions dispassionately, without regard

6   to sympathy, without regard to prejudice or favor for any party, and adopt that

7   conclusion which in your good conscience appears to be in accordance with the

8   truth.

9

10      Again, each of you must make your own decision about the proper outcome

11  of this case based on your consideration of the evidence and your discussions with

12  your fellow jurors.  No juror should surrender his or her conscientious beliefs

13  solely for the purpose of returning an unanimous verdict.

14

15      This case will be decided on the basis of the answers that you give to certain

16  questions that appear on a verdict form that you will take into the jury room with

17  you at the conclusion of these instructions.  You will be asked to respond to certain

18  questions as to each claim.  Each of the questions asked on the verdict form calls

19  for a "yes," "no," or numerical response.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    Your answers must be unanimous and must reflect the conscientious

2    judgment of each juror.  You should answer every question (except where the

3    verdict form indicates otherwise).  When you have agreed on any answer the

4    foreperson of the jury will write the answer in the space provided for each answer.

5    Once the form has been completed, the foreperson will sign and date it, seal it in an

6    envelope marked "verdict" and then give it to the Marshal and advise the Marshal

7    that you are ready to return to the courtroom.  In open court, we then read the

8    verdict and make sure that it is the verdict of all of you.  The reason we go through

9    this formality is to be absolutely certain that we have your verdict exactly as you

10   have rendered it.

11

12    The Marshal will be sworn in a few minutes and you will be escorted to the

13   jury room to begin your deliberations.  You may deliberate today until 6 p.m. and

14   on Thursday [tomorrow] until 6 p.m. as necessary.  On Friday, September 30,

15   2016, deliberations will end at 2:30 p.m.  There will be no deliberations on October

16   3 and 4, 2016.  Deliberations thereafter will resume, if necessary, on Wednesday

17   October 5, from 9:15 to 6:00 p.m. that day and each succeeding business day.  You

18   must only deliberate when all eight of you are present in the room.

19

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    You must not discuss this case, or anything or anyone having to do with this

2    case, outside the jury room or with any other person, whether directly, by

3    telephone, by posting or conveying information on social media or through any

4    other means of communication.  You must not look anything up on the Internet or

5    consult any other source of information.  Your verdict must be based solely on the

6    evidence presented here in Court and my instructions as to the law.

7

8    You will be brought back into the courtroom for dismissal.

9    [Confer with Counsel]

10   The Marshal will now be sworn.

11   [Mr/Ms] Marshal, please escort the jury to the jury room.

WordPerfect Document Compare Summary

Original document:  G:\LTS\CASES\13cv01041LP\Trial\Jury Instructions\Draft Jury
Instructions CCv2.wpd
Revised document:  G:\LTS\CASES\13cv01041LP\Trial\Jury Instructions\Draft Jury
Instructions CCv3.wpd
Deletions are shown with the following attributes and color:
  ~~Strikeout~~, Blue  RGB(0,0,255).
  Deleted text is shown as full text.
Insertions are shown with the following attributes and color:
  <u>Double Underline</u>, Redline, Red  RGB(255,0,0).

The document was marked with 63 Deletions, 55 Insertions, 0 Moves.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    **CONCLUDING JURY INSTRUCTIONS**

2    **Tiffany & Co. v. Costco Wholesale Corp.**

3    13 CV 1041

4    Ladies and gentlemen, before you begin your deliberations, I now am going

5    to instruct you on the law. You must pay close attention and I will be as clear as

6    possible.

7

8    It has been obvious to me and counsel that you have faithfully discharged

9    your duty to listen carefully and observe each witness who testified.  Your interest

10   has never flagged, and you have followed the testimony with close attention.

11

12   I ask you to give me that same careful attention as I instruct you on the law.

13

14   **Role of the Court**

15   You have now heard all of the evidence in the case as well as the final

16   arguments of the lawyers for the parties.

17

18   My duty at this point is to instruct you as to the law.  It is your duty to accept

19   these instructions of law and apply them to the facts as you determine them, just as

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    it has been my duty to preside over the trial and decide what testimony and

2    evidence is relevant under the law for your consideration.

3

4          On these legal matters, you must take the law as I give it to you.  If any

5    attorney has stated a legal principle different from any that I state to you in my

6    instructions, it is my instructions that you must follow.

7

8          You should not single out any instruction as alone stating the law, but you

9    should consider my instructions as a whole when you retire to deliberate in the jury

10   room.

11

12         You should not, any of you, be concerned about the wisdom of any rule that

13   I state.  Regardless of any opinion that you may have as to what the law may be –

14   or ought to be – it would violate your sworn duty to base a verdict upon any other

15   view of the law than that which I give you.

16

17                            **<u>Role of the Jury</u>**

18         As members of the jury, you are the sole and exclusive judges of the facts

19   that are disputed in this case.  You pass upon the evidence.  You determine the

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    credibility of the witnesses.  You resolve such conflicts as there may be in the

2    testimony.  You draw whatever reasonable inferences you decide to draw from the

3    facts as you have determined them, and you determine the weight of the evidence.

4

5        In determining these issues, no one may invade your province or functions

6    as jurors.  In order for you to determine the facts, you must rely upon your own

7    recollection of the evidence.  What the lawyers have said in their opening

8    statements, in their closing arguments, in the objections, or in their questions is not

9    evidence.  Nor is what I may have said – or what I may say in these instructions –

10   about a fact issue, evidence, unless I specifically instruct you to accept certain

11   facts.  In this connection, you should bear in mind that a question put to a witness

12   is never evidence, i. It is only the answer which is evidence.  But you may not

13   consider any answer that I directed you to disregard or that I directed struck from

14   the record.  Do not consider such answers.

15

16       You may consider as evidence the background facts about the earlier phases

17   of this litigation and the Court's prior determinations that I read to you and

18   instructed you to accept at the beginning of the trial.  I will repeat for you again

19   those background facts for you later in these instructions.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    Since you are the sole and exclusive judges of the disputed facts, I do not

2    mean to indicate any opinion as to what decision you should reach on the disputed

3    facts or as to what your verdict should be.  The rulings I have made during the trial

4    are not any indication of my views of what your decision should be as to whether

5    or not the plaintiff has proven its claims for monetary relief or the defendant has

6    established its defense.

7

8    You are expressly to understand that the ~~c~~Court has no opinion as to the

9    verdict you should render in this case.

10

11    As to the disputed facts in this case, ladies and gentlemen, you are the

12    exclusive judges.  You are to perform the duty of finding the facts without bias or

13    prejudice to any party.

14

15                                   **Juror Oath**

16    In determining the facts, you are reminded that you took an oath to render

17    judgment impartially and fairly, without prejudice or sympathy and without fear,

18    solely upon the evidence in the case and the applicable law.  I know that you will

19    do this and reach a just and true verdict.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1        ### Jury To Disregard Court's View

2        With the exception of the facts that I have instructed you to accept as

3   established, I have not expressed nor have I intended to intimate any opinion as to

4   which witnesses are or are not worthy of belief, what facts are or are not

5   established, or what inference or inferences should be drawn from the evidence.  If

6   any expression of mine has seemed to indicate an opinion relating to any of these

7   disputed matters, I instruct you to disregard it.  You are, I repeat, the exclusive,

8   sole judges of all of the disputed questions of fact submitted to you and of the

9   credibility of the witnesses.  Your authority, however, is not to be exercised

10  arbitrarily; it must be exercised with sincere judgment, sound discretion, and in

11  accordance with the rules of law that I give you.  In making your determination of

12  the facts in this case, your judgment must be applied only to that which is properly

13  in evidence.  Arguments of counsel are not in evidence, although you may give

14  consideration to those arguments in making up your mind on what inferences to

15  draw from the facts which are in evidence.

16

17        From time to time, the cCourt has been called upon to pass upon the

18  admissibility of certain evidence, although I have tried to do so, in so far as it was

19  practicable, out of your hearing.  You have no concern with the reasons for any

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    such rulings and you are not to draw any inferences from them.  Whether offered

2    evidence is admissible is purely a question of law in the province of the ~~c~~Court and

3    outside the province of the jury.  In admitting evidence to which objection has been

4    made, the ~~c~~Court does not determine what weight should be given to such

5    evidence, nor does it pass on the credibility of the evidence.  Of course, you

6    ~~will~~must dismiss from your mind~~s~~, completely and entirely, any evidence which

7    has been ruled out of the case by the ~~c~~Court, and you must refrain from speculation

8    or conjecture or any guesswork about the nature or effect of any colloquy between

9    ~~c~~Court and counsel held out of your hearing or sight.

10

11                          **<u>Conduct of Counsel</u>**

12          It is the duty of the attorney on each side of a case to object when the other

13    side offers testimony or other evidence which the attorney believes is not properly

14    admissible.  Counsel also have the right and duty to ask the ~~c~~Court to make rulings

15    of law and to request conferences at the side bar out of the hearing of the jury.  All

16    those questions of law must be decided by me, the ~~c~~Court.  You should not show

17    any prejudice against an attorney or his or her client because the attorney objected

18    to the admissibility of evidence, or asked for a conference out of the hearing of the

19    jury, or asked the ~~c~~Court for a ruling on the law.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1      As I already indicated, my rulings on the admissibility of evidence do not,

2      unless expressly stated by me, indicate any opinion as to the weight or effect of

3      such evidence.  You are the sole judges of the credibility of all witnesses and the

4      weight and effect of all evidence.

5

6      **Remarks to Counsel**

7      It is the duty of the attorneys to offer evidence and press objections on

8      behalf of their side.  It is my function to cut off counsel from an improper line of

9      argument or questioning, to strike offending remarks and to reprimand counsel

10     when I think it is necessary.  But you should draw no inference from that.  It is

11     irrelevant whether you like a lawyer or whether you believe I like a lawyer.

12

13     Your verdict should be based on the facts as found by you from the evidence

14     and the law as instructed by the Court.

15

16     **Burden of Proof-Preponderance of the Evidence**

17     In this civil case, the party with the burden of proof on any given issue has

18     the burden of proving every disputed element of his or her claim or defense to you

19     by a preponderance of the evidence.  If you conclude that the party bearing the

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1  burden of proof has failed to establish its proof on an issue by a preponderance of

2  the evidence, you must decide against that party on the issue you are considering.

3

4       What does a "preponderance of evidence" mean?  To establish a fact by a

5  preponderance of the evidence means to prove that the fact is more likely true than

6  not true.  A preponderance of the evidence means the greater weight of the

7  evidence.  It refers to the quality and persuasiveness of the evidence, not to the

8  number of witnesses or documents.  In determining whether a claim has been

9  proved by a preponderance of the evidence, you may consider the relevant

10  testimony of all witnesses, regardless of who may have called them, and all the

11  relevant exhibits received in evidence, regardless of who may have produced them.

12

13       If you find that the credible evidence on a given issue is evenly divided

14  between the parties – that it is equally probable that one side is right as it is that the

15  other side is right – then you must decide that issue against the party having this

16  burden of proof.  That is because the party bearing this burden must prove more

17  than simple equality of evidence – it must prove the element at issue by a

18  preponderance of the evidence.  On the other hand, the party with this burden of

19  proof need prove no more than a preponderance.  So long as you find that the

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    scales tip, however slightly, in favor of the party with this burden of proof – that

2    what the party claims is more likely true than not true – then that element will have

3    been proved by a preponderance of evidence.

4

5    **What Is and Is Not Evidence**

6        The evidence in this case will consist of the following: (1) the sworn

7    testimony of the witnesses, no matter who called a witness; (2) all exhibits received

8    in evidence, regardless of who may have produced the exhibits; ~~(3) stipulations of~~

9    ~~fact,~~ and (~~4~~3) facts that I instruct you to accept as established and that you must

10   take as true for purposes of this case.

11       In deciding the facts of this case, you are not to consider the following as

12   evidence: statements and arguments of the lawyers, questions and objections of the

13   lawyers, testimony that I instruct you to disregard, and anything you may see or

14   hear when the ~~c~~Court is not in session even if what you see or hear is done or said

15   by one of the parties or by one of the witnesses.

16

17   **Direct and Circumstantial Evidence**

18       In deciding whether a party meets its burden of proof, you may consider

19   both direct and circumstantial evidence.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    "Direct evidence" is direct proof of a fact, such as testimony by a witness

2    about what the witness said or heard or did.

3    "Circumstantial evidence" is proof of one or more facts from which you

4    could find another fact.  To give a simple example, suppose that when you came

5    into the courthouse today, the sun was shining and it was a nice day, but the

6    courtroom blinds were drawn and you could not look outside.  Then later, as you

7    were sitting there, someone walked in with a dripping wet umbrella and soon after,

8    somebody else walked in with a dripping wet raincoat.  Now, on our assumed

9    facts, you cannot look outside of the courtroom and you cannot see whether or not

10   it was raining.  So you have no direct evidence of that fact.  But, on the

11   combination of the facts about the umbrella and the raincoat, it would be

12   reasonable for you to infer that it had begun raining.

13

14                    **[Stipulations of Fact (If Applicable)]**

15   [The parties have agreed to certain facts [which were placed in evidence as Exhibit

16        [ ]] and were read to you.  You should therefore treat these facts as having been

17                                    proven.]

18

19

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1 **<u>Inference Defined</u>**

2      You have heard the term "inference," and in their arguments the attorneys

3 may have asked you to infer, on the basis of your reason, experience, and common

4 sense, from one or more established facts, the existence of some other fact.

5

6      An inference is not a suspicion or a guess.  It is a reasoned, logical

7 conclusion that a disputed fact exists on the basis of another fact that has been

8 shown to exist.

9

10      There are times when different inferences may be drawn from facts, whether

11 proved by direct or circumstantial evidence.  The ~~p~~Plaintiff~~s~~ asks you to draw one

12 set of inferences, while the ~~defense~~Defendant asks you to draw another.  It is for

13 you, and you alone, to decide what inferences you will draw.

14

15      The process of drawing inferences from facts in evidence is not a matter of

16 guesswork or speculation.  An inference is a deduction or conclusion which you,

17 the jury, are permitted to draw – but not required to draw – from the facts that have

18 been established by either direct or circumstantial evidence.  In drawing inferences,

19 you should exercise your common sense.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    So, while you are considering the evidence presented to you, you are

2    permitted to draw, from the facts that you find to be proven, such reasonable

3    inferences as would be justified in light of your experience.

4

5                          **Witness Credibility**

6    In deciding the facts, you may have to decide which testimony to believe

7    and which testimony not to believe.  You may believe anything a witness says, part

8    of it, or none of it.  In considering the testimony of any witness, you may take into

9    account many factors, including the witness' opportunity and ability to see or hear

10   or know the things the witness testified about; the quality of the witness' memory;

11   the witness' appearance and manner while testifying; the witness' interest in the

12   outcome of the case; any bias or prejudice the witness may have; other evidence

13   that may have contradicted the witness' testimony; and the reasonableness of the

14   witness' testimony in light of all the evidence.  The weight of the evidence does

15   not necessarily depend upon the number of witnesses who testify.

16

17                  **[Impeachment by Prior Inconsistent Statements (If Applicable)]**

18   [You have heard evidence that at some earlier time the witness has said or

19   done something which counsel argues is inconsistent with the witness' trial

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    testimony.

2

3         Evidence of a prior inconsistent statement is not to be considered by you as

4    affirmative evidence in determining liability.  Evidence of a prior inconsistent

5    statement was placed before you for the more limited purpose of helping you

6    decide whether to believe the trial testimony of the witness who contradicted

7    himself {or herself}.  If you find that the witness made an earlier statement that

8    conflicts with his {or her} trial testimony, you may consider that fact in deciding

9    how much of his {or her} trial testimony, if any, to believe.

10

11        In making this determination, you may consider whether the witness

12   purposely made a false statement or whether it was an innocent mistake; whether

13   the inconsistency concerns an important fact, or whether it had to do with a small

14   detail; whether the witness had an explanation for the inconsistency, and whether

15   that explanation appealed to your common sense.

16

17        It is exclusively your duty, based upon all the evidence and your own good

18   judgment, to determine whether the prior statement was inconsistent, and if so how

19   much, if any, weight to give to the inconsistent statement in determining whether

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    to believe all or part of the witness' testimony.]

2

3          **[Expert Witnesses-Generally (If Applicable)Witnesses - Generally]**

4          [You have heard testimony from experts in this case.  An expert witness is

5    allowed to express [his/her]his opinion on those matters about which [he/she]he

6    has special knowledge and training.  Expert testimony is presented to you on the

7    theory that someone who is experienced in the field can assist you in understanding

8    the evidence or in reaching an independent decision on the facts.

9

10          In weighing the expert's testimony, you may consider the expert's

11   qualifications, his [or her] opinions, his [or her] reasons for testifying, as well as all

12   of the other considerations that ordinarily apply when you are deciding whether or

13   not to believe a witness' testimony.  You may give the expert testimony whatever

14   weight, if any, you find it deserves in light of all the evidence in this case. You

15   should not, however, accept the witness's testimony merely because he [she] is an

16   expert.  Nor should you substitute it for your own reason, judgment, and common

17   sense.  The determination of the facts in this case rests solely with you.]

18

19

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    **Tiffany's Claims, the Court's Previous Determinations, and Jury**
2    **Determinations Regarding Monetary Recovery**
3

4    With these general principles in mind, I will now instruct you on the matters

5    that have already been determined in this case, and on the legal principles

6    governing your determinations regarding monetary recovery.

7

8    As I explained at the outset of this trial, certain issues have already been

9    decided by the Court and ~~that~~ your work in this case will be concerned only with

10   Tiffany's claims for monetary recovery. I will now give you some more detailed

11   background information and instruct you as to how the earlier determinations of

12   the Court affect your deliberations in this case.

13

14   A federal statute known as the Lanham Act protects rights to use trademarks.

15   The term "trademark" includes any words, symbols or devices that a person or

16   company uses to identify its products and to distinguish them from those sold by

17   others. Once a company has established its rights in a trademark, the right to use

18   the trademark belongs to that company exclusively, and it becomes its property.

19

20   This is a civil case in which the Plaintiffs, Tiffany, and Company and

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    Tiffany (NJ) LLC, which I will refer to collectively as "Tiffany," brought claims

2    that the Defendant, Costco Wholesale Corporation, which I will refer to as

3    "Costco," infringed Tiffany's federally registered trademark in the word "Tiffany,"

4    and committed unfair competition by using the word "Tiffany" in certain signage

5    in display cases selling diamond engagement rings, and counterfeited the "Tiffany"

6    trademark by using it in that signage.

7    _____

8            I instruct you that Tiffany owns the federally registered trademark "Tiffany"

9    for use with jewelry products, including engagement rings.  Tiffany has not

10   authorized Costco to use its trademark to describe Costco's rings.

11

12           In an earlier phase of this case, the Court found that Tiffany has proven its

13   federal and state law claims that Costco infringed Tiffany's trademark and engaged

14   in unfair competition, and its federal claim that Costco counterfeited the Tiffany

15   trademark, by displaying solitaire diamond ring  jewelry in its stores next to

16   signage that included the word "Tiffany" as a standalone term not combined with

17   an immediately following modifying word such as "setting," "set," or "style."

18   None of the rings that Costco sold using such signage had been manufactured by

19   Tiffany.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1

2        The Court also found, and you are instructed to accept for purposes of your

3        determinations in this case, that Costco's use of the word "Tiffany" in its display

4        case signage, as a standalone term rather than as a combined term including an

5        immediately following modifier such as "setting," "set," or "style," infringed

6        Tiffany's federal trademark rights, and that Tiffany is therefore entitled to seek a

7        monetary award for such infringement of its federal trademark rights.  The Court

8        also determined that Costco had committed trademark infringement and unfair

9        competition under New York State law.  The Court further found, and you are

10       instructed to accept for purposes of your determinations in this case, that Costco's

11       use of the "Tiffany" signage in the way that I have described was willful and

12       constituted counterfeiting of the Tiffany mark.  Tiffany is entitled to seek a

13       monetary award as a result of this counterfeiting.

14

15        In this trial you, as the jury, will be responsible for making determinations

16       regarding the monetary award or awardsrelief, if any, that Tiffany is entitled to

17       recover as a result of Costco's trademark infringement, unfair competition and

18       counterfeiting.

19

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    It is important to note that Tiffany did not make any infringement or

2    counterfeiting claims regarding any use by Costco of the word "Tiffany" in a

3    combined term incorporating the word "setting," "set," "style," or any similar

4    immediately following modifier.  Accordingly, you are not to award damages

5    based on any use by Costco of the word "Tiffany" in a combined term

6    incorporating the word "setting," "set," ~~"style"~~"style," or any similar immediately

7    following modifier.——

8

9                       **Prior Counterclaim and Appeal**

10    You have heard evidence that Costco filed a counterclaim to Tiffany's

11    lawsuit.  I instruct you that, when a civil lawsuit is filed in federal court, the

12    defendant is required to state as a counterclaim any claim that, at the time the

13    lawsuit is commenced, the defendant has against the plaintiff and wishes to assert,

14    if that claim arises out of the same transaction or occurrence that is the subject

15    matter of the plaintiff's lawsuit.  There was nothing unlawful about Costco's

16    assertion of its counterclaim.  In making your determinations in this case, you may

17    consider the counterclaim, in the context of all of the evidence, in determining the

18    weight and significance of Costco's assertion that it has accepted responsibility.

19                       You have heard evidence that Costco attempted to take an immediate

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    appeal from the Court's prior ruling, and that the appeal was found premature.

2    There was nothing unlawful about the attempted appeal.  In making your

3    determinations in this case, you may consider the attempted appeal, in the context

4    of all of the evidence, in determining the weight and significance of Costco's

5    assertion that it has accepted responsibility.

6

7    **Legal Standards Governing Tiffany's Claims For Monetary Recovery**
8
9           I will now instruct you on Tiffany's claims for monetary recovery, the

10   determinations you will make regarding those claims, and the law that you will

11   apply in making those determinations.

12

13          The outcome of this trial will be determined based on your determinations

14   with respect to three different categories of monetary recovery.  The <u>first</u> is an

15   accounting for profits; the <u>second</u> is statutory damages under the federal Lanham

16   Act; and the <u>third</u> is punitive damages.  Your determinations as to each category of

17   potential recovery must be made independently of the others.  Following the trial,

18   decisions will be made as to which of the types of recovery will be awarded, so

19   your determinations as to each category of recovery must only take into

20   consideration the factors that I specify for you in connection with that particular

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1   category of recovery.

2

3   <u>First Category - Accounting for Profits</u>

4       I will now instruct you as to the first category - an accounting for profits.

5   Tiffany is entitled to an award of all profits earned by Costco that are attributable

6   to Costco's misuse of Tiffany's trademark through infringement and/or

7   counterfeiting from February 14, 2007, to the present time.  You will determine the

8   total amount of any such profits by, <u>first</u>, determining the gross revenues that

9   Costco received from the sale of rings on and after February 14, 2007, using the

10   improper signage, and, <u>second</u>, deducting from that gross revenue all expenses

11   attributable to those ring sales.

12

13       Gross revenue is all of Costco's receipts from the sale of rings using display

14   case signage that included the "Tiffany" mark as a standalone term, not combined

15   with any immediately following modifier such as "setting," "set" or "style."

16   Tiffany has the burden of proving the amount of Costco's gross revenue on the

17   rings by a preponderance of the evidence.  In this connection, you will have to

18   determine whether one sign, which used the word "Tiffany" on one line and the

19   word "set" at the beginning of the following line was a use of "Tiffany" as a

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1   standalone term or a use of "Tiffany set" as a combined term in describing the

2   merchandise.  If you find that the particular sign was a standalone use of the word

3   "Tiffany," you will include any sales made under that signage in gross revenues.  If

4   you find that the particular sign was a use of "Tiffany set" as a combined term, you

5   will <u>not</u> include those sales in your gross revenue computation.

6

7         If you find that the amount of gross revenue from sales of rings using the

8   improper signage cannot be determined precisely due to a lack of records, you may

9   reach a reasoned approximation, resolving any doubts against Costco.

10

11        Once you have determined the amount of Costco's gross revenue on the sale

12  of the rings, you will determine what, if any, expenses are properly deducted from

13  that gross revenue.

14

15        Expenses are all operating, overhead and/or production costs incurred by

16  Costco in producing the gross revenue.  Costco has the burden of proving the

17  expenses, by a preponderance of the evidence.  Costco has the burden of

18  demonstrating a "sufficient nexus" between each expense claimed and the sales of

19  the rings.  When, as in this case, the infringement has been found to be willful, you

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    should give extra scrutiny to the categories of overhead expenses claimed by

2    Costco to insure that each category is directly and validly connected to the sale and

3    production of the rings.  You will subtract the proven expenses from the gross

4    revenue to determine the total profit made on the ring sales.

5

6         If Costco contends that any portion of the resulting profit calculation is

7    attributable to factors other than the use of the improper signage, Costco has the

8    burden of proving that contention by a preponderance of the evidence.  If Costco

9    proves that some portion of the profit was not attributable to the use of improper

10   signage in the sale of the rings, you must subtract that portion of the profit in

11   making your award.  If Costco fails to prove that any portion of the profit was

12   attributable to factors other than use of the improper signage, you must award

13   Tiffany the total profit from the sale of the rings.

14

15        When you have determined the amount of profits that are attributable to

16   Costco's sale of rings using the improper signage, you will indicate the dollar

17   amount on the verdict form that will be provided to you in the jury room.

18

19        You will then indicate on the form whether you believe that the amount of

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1   profits that you have calculated is an inadequate, or excessive, amount of monetary

2   recovery for Tiffany in light of the nature of Costco's wrongful conduct.  If you

3   believe that the amount is inadequate or excessive, you will then indicate the dollar

4   amount that you find is just as an award of profits under the circumstances of the

5   case.

6

7   <u>Second Category - Statutory Damages</u>

8        After you have made your determinations regarding an award of profits, you

9   will then proceed to the second category of recovery, and determine an appropriate

10  amount of statutory damages.  This is a separate determination from the findings

11  that you made regarding an award of profits.  You will make the statutory damages

12  determination by applying the following instructions.

13

14       Tiffany is entitled to recover statutory damages under the Lanham Act,

15  based on Costco's counterfeiting.  As I have explained to you earlier, the Court has

16  determined that Costco violated the Lanham Act by counterfeiting Tiffany's

17  trademark in selling rings on and after February 14, 2007, using the improper

18  signage. The Court has also determined that Costco's use of that counterfeit of the

19  "Tiffany" mark was willful.  You are bound by these determinations and must

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    accept them as established.

2

3         You must determine an amount of statutory damages, between $1000 and

4    $2 million, to be awarded to Tiffany as a result of the counterfeiting.

5

6         In determining what amount of statutory damages is appropriate, you should

7    consider factors such as (1) the expenses saved, if any, and the profits reaped, if

8    any; (2) the revenues lost by the plaintiff, if any; (3) the value of the trademark; (4)

9    the deterrent effect on others besides the defendant; (5) whether the defendant's

10   conduct was innocent or willful; (6) whether the defendant has cooperated in

11   providing particular records from which to assess the value of the infringing

12   materials products; and (7) the potential for discouraging the defendants.

13

14        I remind you that the Court has already found that Costco's ~~conduct~~use of

15   the "Tiffany" mark as a standalone term, not combined with any immediately

16   following modifier such as "setting," "set," or "style," was willful.  It is for you to

17   decide, based on all of the evidence that has been presented at the trial, the weight

18   of that finding in your determination regarding the amount of statutory damages to

19   be awarded.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    You should specify an amount of statutory damages that you consider just.

2    Indicate the amount of your statutory damages award in the space provided on the

3    verdict form.

4

5    <u>Third Category - Punitive Damages</u>

6    The third category of damages that you will consider is punitive damages.

7    You will not be asked to determine a punitive damage award figure at this stage of

8    the proceeding.  Instead, you will consider the following instructions and indicate

9    on the verdict form your determination as to whether Tiffany has proven that it is

10   entitled to recover punitive damages.

11

12   Under New York law, punitive damages are permitted where the wrong

13   complained of is morally culpable, or is actuated by evil and reprehensible

14   motives, not only to punish the defendant but to deter him, as well as others who

15   might otherwise be so prompted, from indulging in similar conduct in the future.

16   You may award punitive damages to Tiffany in connection with its claim for unfair

17   competition under New York State law if you find that Tiffany has proven that

18   Costco's conduct constituted gross, wanton, willful fraud or other morally

19   culpable conduct to an extreme degree.  To decide that punitive damages are

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1  warranted, you must find that Costco's wrongdoing was not simply intentional but

2  evinces a high degree of moral turpitude and demonstrates such wanton dishonesty

3  as to imply a criminal indifference to civil obligations.

4

5      On your verdict form, you will indicate whether Tiffany is entitled to an

6  award of punitive damages, by answering a "yes" or "no" question.  Depending on

7  your verdict on this issue, there may be a second phase of the trial.

8

9

10  **CONCLUDING INSTRUCTIONS**

11      Now, for some general instructions that will guide you in your deliberations.

12  You will shortly retire to the jury room to begin your deliberations.  When you

13  retire to the jury room, you must have a foreperson.  That person will preside over

14  the deliberations and speak for you here in open court.  Other than those functions,

15  the foreperson will have no greater nor lesser

16  authority than any other juror.

17

18      It is my custom in every case to select the foreperson of the jury.

19  Accordingly, I am now selecting juror number [   ] as your foreperson.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1      ~~You may request to see any~~ A copy of each of the exhibits that were

2      ~~entered~~ admitted in paper form, and certain of the objects admitted into evidence~~.~~

3      ~~[In all other respects, you will have to make your decisions based on your~~

4      ~~recollection of the evidence.  You will not have a written transcript to consult, and~~

5      ~~it is difficult and time consuming for the Court reporter to read back lengthy~~

6      ~~testimony.]~~  If you took notes you may use them for your own reference but you

7      ~~are not to share them or rely on any other juror's notes.  Any difference between a~~

8      ~~juror's recollection and a juror's notes should always be settled by reviewing the~~

9      ~~trial evidence.~~, will be provided to you in the jury room, along with a complete list

10     of all of the exhibits.  If you wish to review an exhibit that was admitted only in

11     electronic form, or an item of jewelry that was admitted as a physical exhibit, you

12     will be brought back into the courtroom, where the evidence will be displayed for

13     you.  Please make your requests as to electronic evidence as specific as possible, as

14     such evidence is voluminous and cannot be displayed all at once.  Likewise, please

15     be as specific as you can in any requests to review witness testimony.

16

17

18             Each of your requests, and any communication with the Court, should be

19     made to me in writing, signed by your foreperson, sealed in an envelope and given

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    to the Marshal, who will be available outside the jury room throughout your

2    deliberations.  After consulting with counsel, I will respond to any question or

3    request you have as promptly as possible, either in writing or by having you return

4    to the courtroom so that I can speak with you in person.  If you are divided, do not

5    reveal the split in your note or in any other fashion.  If you have reached a verdict,

6    do not reveal what it is until you are asked in open court.

7

8         You will now retire to decide the case.  In order to prevail, the Plaintiffs

9    must sustain ~~his~~their burden of proof as I have explained to you with respect to

10   each element of each of ~~his~~their claims.  If you find that the Plaintiffs ha~~s~~ve

11   succeeded with respect to a claim, you should return a verdict in ~~his~~their favor on

12   that claim.  If you find that the ~~Plaintiff~~Plaintiffs have failed to sustain ~~his~~their

13   burden on any element of a particular claim, you should return a verdict against

14   ~~him~~them on that claim.  ~~As I explained earlier, the Defendant has the burden of~~

15   ~~proof on each element of his affirmative defense of qualified immunity.~~

16

17        It is your duty as jurors to consult with one another and to deliberate with a

18   view to reaching an agreement.  Each of you must decide the case for him or

19   herself, but you should do so only after a consideration of the case with your

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    fellow jurors, and you should not hesitate to change an opinion when convinced

2    that it is erroneous.  Your verdict must be unanimous, but you are not bound to

3    surrender your honest convictions concerning the effect or weight of the evidence

4    for the mere purpose of returning a verdict or solely because of the opinion of other

5    jurors.  Discuss and weigh your respective opinions dispassionately, without regard

6    to sympathy, without regard to prejudice or favor for any party, and adopt that

7    conclusion which in your good conscience appears to be in accordance with the

8    truth.

9

10    Again, each of you must make your own decision about the proper outcome

11    of this case based on your consideration of the evidence and your discussions with

12    your fellow jurors.  No juror should surrender his or her conscientious beliefs

13    solely for the purpose of returning an unanimous verdict.

14

15    This case will be decided on the basis of the answers that you give to certain

16    questions that appear on a verdict form that you will take into the jury room with

17    you at the conclusion of these instructions.  You will be asked to respond to certain

18    questions as to each claim.  Each of the questions asked on the verdict form calls

19    for a "yes," "no," or numerical response.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1    Your answers must be unanimous and must reflect the conscientious

2    judgment of each juror.  You should answer every question (except where the

3    verdict form indicates otherwise).  When you have agreed on any answer the

4    foreperson of the jury will write the answer in the space provided for each answer.

5    Once the form has been completed, the foreperson will sign and date it, seal it in an

6    envelope marked "verdict" and then give it to the Marshal and advise the Marshal

7    that you are ready to return to the courtroom.  In open court, we then read the

8    verdict and make sure that it is the verdict of all of you.  The reason we go through

9    this formality is to be absolutely certain that we have your verdict exactly as you

10   have rendered it.

11

12    The Marshal will be sworn in a few minutes and you will be escorted to the

13   jury room to begin your deliberations.  You may deliberate today until [   ] pm 6

14   p.m. and on Thursday [tomorrow] until 6 p.m. as necessary.  On Friday, September

15   30, 2016, deliberations will end at 2:30 p.m.  There will be no deliberations on

16   October 3 and 4, 2016.  Deliberations thereafter will resume, if necessary, on

17   Wednesday October 5, from 9:15 to 6:00 p.m. that day and each succeeding

18   business day until [   ] pm as necessary.  You must only deliberate when all eight

19   of you are present in the room.

REFLECTING DISCUSSION AT CHARGE CONFERENCE

1

2          You must not discuss this case, or anything or anyone having to do with this

3    case, outside the jury room or with any other person, whether directly, by

4    telephone, by posting or conveying information on social media or through any

5    other means of communication.  You must not look anything up on the Internet or

6    consult any other source of information.  Your verdict must be based solely on the

7    evidence presented here in Court and my instructions as to the law.

8

9          You will be brought back into the courtroom for dismissal.

10          [Confer with Counsel]

11          The Marshal will now be sworn.

12          [Mr/Ms] Marshal, please escort the jury to the jury room.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

TIFFANY AND COMPANY and
TIFFANY (NJ) LLC,

          Plaintiffs,

      -v-                              No.  13CV1041-LTS-DCF

COSTCO WHOLESALE CORP.,

          Defendant.

-------------------------------------------------------x

## **VERDICT FORM**

We, the Jury in the above-captioned case, find unanimously as follows:

1.     **Accounting For Profits**

(a)    Please set forth the amount of profits (gross revenue minus deductions proved by Costco) earned by Costco from the sale of rings displayed with signs which used the "Tiffany" trademark without any immediately following modifiers such as "setting," "set," or "style."

       $_____

(b)    Do you believe that Costco's profits, as you have determined them, are inadequate or excessive as Tiffany's recovery, based on the circumstances of this case?

       YES_____               NO_____

(c)    If your answer to Question 1(b) is YES, please indicate what amount of monetary recovery you believe would be just as an award of profits:

       $_____

2. __Statutory Damages__

    Specify an award amount between $1,000 and $2,000,000:

    $_____

3. __New York Punitive Damages__

    Has Tiffany proven that it is entitled to an award of punitive damages?

    YES_____                    NO_____

Dated: New York, New York
       September __, 2016

                                        _____
                                        Signature of Foreperson

*Place the completed and signed form in an envelope marked "Verdict" and give it to the Marshal, telling him that you have reached a verdict.*