IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted - Public Version** |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## [PROPOSED] FINAL PRETRIAL
## ORDER

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
1105 North Market St., 12th Fl.
Wilmington, DE 19801
(302)298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO
GATTUSO & HIRZEL LLP
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Plaintiff*

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

Dated: June 30, 2023

**Plaintiff's Counsel:**

Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
1105 North Market St., 12th Fl.
Wilmington, DE 19801
(302)298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO
GATTUSO & HIRZEL LLP
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Plaintiff*

**Defendant's Counsel:**

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## **TABLE OF CONTENTS**

I.      NATURE OF THE CASE ................................................................................1

II.     JURISDICTION.............................................................................................2

III.    PENDING MOTIONS ....................................................................................2

IV.     FACTS ...........................................................................................................4

      A.      Uncontested Facts ...............................................................................4

      B.      Contested Facts ...................................................................................4

V.      ISSUES OF LAW ..........................................................................................5

VI.     STATEMENTS OF INTENDED PROOF ......................................................5

VII.    WITNESSES...................................................................................................6

      A.      Deposition Designations – See F.R.C.P. 76(a)(3)(a)(ii) ........................9

      B.      Impeachment with Prior Inconsistent Testimony ...............................15

      C.      Objections to Expert Testimony .........................................................15

VIII.   EXHIBITS ...................................................................................................16

      A.      Exhibits..............................................................................................16

      B.      Discovery Designations......................................................................20

      C.      Demonstrative Exhibits .....................................................................21

      D.      Translations and Objections to Translated Exhibits and Testimony ..23

IX.     MOTIONS IN LIMINE ................................................................................24

X.      AMENDMENTS TO THE PLEADINGS ....................................................25

XI.     NUMBER OF JURORS ...............................................................................25

XII.    LENGTH OF TRIAL....................................................................................25

XIII.  MOTIONS FOR JUDGMENT AS A MATTER OF LAW ..........................27

XIV.  JUROR NOTES AND JURY PROCEDURES............................................27

XV.  HANDLING OF CONFIDENTIAL INFORMATION AT TRIAL .............28

XVI.  ADDITIONAL MATTERS ..........................................................................29

  A.  Rockwell's List of Issues.......................................................30

  B.  WiAutomation's List of Issues.............................................31

XVII. SETTLEMENT ..............................................................................................32

The Court has scheduled a final pretrial conference pursuant to Rule 16 of the Federal Rules of Civil Procedure for **July 13, 2023**, at **3:00 p.m.**  Pursuant to Local Rule 16.3 and the Court's Scheduling Order (D.I. 21, as amended D.I. 245), the parties hereby submit for the Court's approval this proposed Final Pretrial Order governing the jury trial of C.A. No. 21-1238-GBW-JLH, which is scheduled to begin on **July 24, 2023**.

## I.      NATURE OF THE CASE

1.      This action was filed by plaintiff Rockwell Automation, Inc. ("Rockwell") against defendant Parcop s.r.l. d/b/a WiAutomation ("WiAutomation") alleging that WiAutomation's advertising and sale of certain Rockwell-branded products violate Sections 32 (trademark infringement **[Rockwell proposal:** including counterfeiting**]**) and 43 (false advertisement and false designation of origin) of the Lanham Act; 6 Del. C. § 2532 et seq. (deceptive trade practices), and Delaware common law unfair competition.

2.      Rockwell seeks damages, WiAutomation's profits, attorneys' fees, and costs to the fullest extent provided for by the Lanham Act, 6 Del. C. § 2532 and the common law of Delaware, including punitive damages, pre-judgment and post-judgment interest, injunctive relief, and such other and further relief as this Court deems just and equitable.

3.      WiAutomation denies liability for Rockwell's claims or that

Rockwell is entitled to any relief.  WiAutomation will seek a finding that this case is exceptional and for attorneys' fees and costs, and any other relief the Court deems equitable and proper.

## II.   JURISDICTION

4.      This is an action arising under Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)); Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); 6 Del. C. § 2532 et seq.; and Delaware common law.

5.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.

6.      This Court also has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship among the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

7.      No party contests that this Court has personal jurisdiction over WiAutomation for purposes of the claims in this case.

## III.   PENDING MOTIONS

### Rockwell's Pending Motions

8.      Motion for Summary Judgment, filed March 17, 2023 (D.I. 144)

9.      Motion to Preclude the Expert Testimony of Justin Blok, filed

March 17, 2023 (D.I. 149).

10.     Motion to Strike Part of Defendant's Motion for Summary

Judgment, filed March 31, 2023 (D.I. 194).

11.     Motion to Amend the Scheduling Order to Supplement the

Discovery Record to Include Recent Counterfeit Sales by Defendant, filed May

26, 2023 (D.I. 266).

**WiAutomation's Pending Motions**

12.     Motion for Judgment on the Pleadings, filed on April 12, 2022 (D.I.

42).

13.     Motion to Bifurcate and Stay the Issue of Damages for the Purposes

of Discovery and Trial, filed on June 13, 2022 (D.I. 61).

14.     Motion for Summary Judgment, filed on March 17, 2023 (D.I.

153).

15.     Motion to Preclude the Expert Testimony of Brett Reed, filed on

March 17, 2023 (D.I. 158).

16.     Motion to Preclude the Expert Testimony of David Franklyn, filed

on March 17, 2023 (D.I. 161).

17.     Motion for Leave to File a Sur-Reply Brief in Opposition to

Plaintiff's Motion for Summary Judgment, filed on April 21, 2023 (D.I. 247).

18.     Objections to Judge Hall's May 3 Order regarding Mark

Paliszewski and Recon, filed on May 17, 2023 (D.I. 261). *See also* Letter to The Honorable Gregory B. Williams and The Honorable Jennifer L. Hall from Pilar G. Kraman regarding Response to John W. Shaw's May 24, 2023 Letter and Subsequent Developments Related to Mark Paliszewski and Recon, filed on May 26, 2023 (D.I. 265).

19.     Motion for Leave to File Supplemental Briefing in Support of Motion for Summary Judgment, filed on June 16, 2023 (D.I. 281).

## IV.   FACTS

### A.   Uncontested Facts

20.     The parties' Joint Statement of Uncontested Facts is attached as **Exhibit 1**. The facts in Exhibit 1 are not disputed or have been stipulated to by the parties for purposes of trial.

21.     Any party, with prior notice to all other parties and the Court, may read any or all of the uncontested facts to the jury or the Court, and will be charged for the time used to do so.

22.     The parties reserve the right to modify or supplement the Joint Statement of Uncontested Facts to the extent necessary to reflect fairly the Court's rulings on any motions or subsequent orders of the Court, or by agreement of the parties.

### B.   Contested Facts

23.     Rockwell's statement of the facts in issue that it contends remain to be litigated is attached as **Exhibit 2**.

24.     WiAutomation's statement of the facts in issue that it contends remain to be litigated is attached as **Exhibit 3**.

25.     If this Court determines that any issue identified in the statements of facts in issue is more properly considered an issue of law, it should be so considered.

V.     **ISSUES OF LAW**

26.     Rockwell's statement of the issues of law which it contends remain to be litigated, and its citation of authorities relied upon, is attached at **Exhibit 4**.

27.     WiAutomation's statement of the issues of law which it contends remain to be litigated, and its citation of authorities relied upon, is attached as **Exhibit 5**.

28.     If this Court determines that any issue identified in the statements of the issues of law is more properly considered an issue of fact, it should be so considered.

VI.     **STATEMENTS OF INTENDED PROOF**

29.     Rockwell's statement of intended proof is attached as **Exhibit 6**.

30.     WiAutomation's statement of intended proof is attached as **Exhibit 7**.

## VII.  WITNESSES

31.    Rockwell's witness list, with WiAutomation's objections, is attached as **Exhibit 8**.  Rockwell reserves the right to call any witness that appears on WiAutomation's witness list without waiving any right to object to WiAutomation's presentation of such witnesses at trial, without waiving any objections to the admissibility of such testimony, and without waiving the right to move for the exclusion of any such testimony. Rockwell reserves all rights to call witnesses by deposition as identified in its deposition designations, counter-designations or counter-counter designations. Rockwell's representatives, employees, former employees, agents, and witnesses and any individual represented by Alston & Bird, Shaw Keller, or Heyman Enerio Gattuso & Hirzel should be contacted through them.

32.    WiAutomation's witness list, with Rockwell's objections, is attached as **Exhibit 9**.  WiAutomation reserves the right to call any witness that appears on Rockwell's witness list without waiving any right to object to Rockwell's presentation of such witnesses at trial, without waiving any objections to the admissibility of such testimony, and without waiving the right to move for the exclusion of any such testimony. WiAutomation reserves all rights to call witnesses by deposition as identified in its deposition designations, counter-designations or counter-counter designations. WiAutomation's representatives,

employees, former employees, agents, and witnesses and any individual represented by Brach Eichler or Young Conaway Stargatt & Taylor should be contacted through them.

33.     Any witness not properly identified on a party's witness list will be precluded from testifying, absent good cause shown.   **[WiAutomation's proposal:** Subject to the notice requirements addressed herein, the listing of a witness on a party's witness list does not require that party to call that witness to testify and does not imply or establish that the listing party has the power to compel the live testimony of that witness or make that witness available to the opposing party.**]**

34.     In the absence of an alternative agreement between the parties, fact witnesses will be sequestered pursuant to Rule 615 of the Federal Rules of Evidence. Each party may, however, designate an officer or employee to serve as its representative.  The party representatives may remain in the courtroom and is not otherwise be subject to the foregoing sequestration order.  Expert witnesses will not be sequestered.

35.     The parties agree that, prior to a party's rebuttal case, live witnesses will be called only once. Thus, for witnesses appearing live at trial, each party need not call witnesses from the adverse party in their case-in-chief, provided that such witness was properly identified as a witness on the offering party's

witness list.

36.     Nothing set forth herein is intended to abrogate or alter D. Del. LR 43.1.  For clarity, in keeping with Local Rule 43.1, the offering party may discuss with the witness his or her testimony during breaks while the witness is on direct examination.  **[Rockwell's proposal:**  Once cross examination of a witness is concluded and the witness is passed for re-direct examination, the offering party may again discuss with the witness his or her testimony during breaks after the witness has been passed and is on re-direct examination.]**

37.     By **6:00 p.m.**[1] on **July 10, 2023**, each party shall provide the other a good faith list of witnesses it intends to call live at the trial.

38.     By **6:00 p.m.** on **July 17, 2023**, the parties shall provide their "will call" witness list for trial, i.e., those witnesses a party will call live at trial.  The parties agree that a party's own witnesses appearing on a party's July 17, 2023 "will call" list identified as appearing live will be present for the trial and that trial subpoenas need not be independently served on those individuals.

39.     By **7:00 p.m. two (2) calendar days** before a witness will be called to testify live, including a direct examination of an adverse witness, the name of the witness shall be identified by email to opposing counsel and, if multiple witnesses are identified, the expected order of presentation. For

---

[1] All times are Eastern Daylight-Saving Time.

example, if a party intends to call a live witness on Monday, July 24, that party shall disclose that witness's name to the opposing party no later than 7:00 p.m. on Saturday, July 22.  Should a change be necessary (only by agreement or for good cause shown), parties shall notify opposing counsel of any changes to its identification of witnesses or to the order of presentation as soon as practicable.

40.   At the start of the examination of any witness (direct or cross), the parties agree to provide the other side with two copies of witness binders that contain all of the exhibits expected to be used during examination of that witness.[2]

41.   The order of the presentation of evidence will generally follow the burden of proof. Rockwell will go first and present its case in chief on Counts I through V of its Complaint (D.I. 1), including trademark infringement, false advertising, false designation of origin, deceptive trade practices, and common law unfair competition, as well as damages and remedies.  WiAutomation will then present its response on Rockwell's claims and damages.  Rockwell may then present its rebuttal on its claims and damages.

A.    **Deposition Designations – See F.R.C.P. 76(a)(3)(a)(ii)**

42.   Rockwell's designation of deposition testimony that it may

---

[2] Pursuant to the Court's procedures, the party examining the witness will also provide two (2) witness binders to the Court.

introduce at trial as to WiAutomation, WiAutomation's objections to such designations and counter-designations, and Rockwell's objections to WiAutomation's counter-designations and any counter-counter designations (collectively, "prior testimony") are attached as **Exhibit 10**.

43.     WiAutomation's designation of deposition testimony that it may introduce at trial as to Rockwell, Rockwell's objections to such designations and counter-designations, and WiAutomation's objections to Rockwell's counter-designations and any counter-counter designations (also collectively, "prior testimony") are attached as **Exhibit 11**.

44.     Except as otherwise set forth herein or ordered by the Court, this pretrial order contains the maximum universe of deposition designations, counter-designations, counter-counter-designations, and objections to admission of prior testimony; none of the foregoing shall be supplemented without approval of all parties or leave of the Court, on good cause shown, although parties may object to prior testimony based on future court rulings, including the Court's rulings on motions *in limine*. Notwithstanding the foregoing, the parties anticipate making further edits to delete designations prior to, and during, trial. The parties further agree that they may use each other's designated testimony.

45.     A party's designation of deposition testimony is not an admission that such testimony is relevant or admissible when offered by the opposing party

for the purpose that the opposing party wishes to designate the testimony.

46.    Unless otherwise agreed between the parties, the party offering

deposition testimony (other than for the purpose of impeachment or cross

examination) shall identify the (i) prior testimony intended to be offered from

previously exchanged designations, (ii) any transition statement(s) associated

with such prior testimony, and (iii) and any exhibits associated with the prior

testimony which the offering party intends to move into evidence by **7:00 p.m.**

**four (4) calendar days** prior to the testimony being offered into the record.  The

party receiving the designations shall inform the opposing party of any objections

and counter-designations and any additional exhibits sought to be admitted

through the prior testimony by **8:30 p.m. three (3) calendar days** prior to the

testimony being offered into the record.  The party offering the prior testimony

shall inform the opposing party of any objections to counter-designations and of

any counter-counter designations by **7:00 p.m. two (2) calendar days** prior to the

testimony being offered into the record.  By **8:30 p.m. that same day**, the

opposing party shall inform the party offering the deposition testimony of any

objections to counter-counter designations, and the parties will meet and confer

by **9:30 p.m.** that same day in a good faith effort to resolve any objections. If the

parties are unable to resolve the objections through the meet and confer process,

the party objecting to the witness's deposition designation and/or related

exhibit(s) shall provide the information in paragraph 47(i)-(iii) to the non-objecting party by **10:30 p.m.** that day, and the non-objecting party shall provide its response to the objection, pursuant to paragraph 47(iii) by **11:30 p.m.** that day.  During the exchange process, and in order to facilitate the submission of disputes to the Court, the parties agree to provide objections and responses using the chart attached to this Order (the "Objection Chart").

47.    By no later than **6:00 a.m.**, Delaware counsel shall notify the Court via email (gbw_civil@ded.uscourts.gov) of any objections to witnesses or prior testimony designations to be presented **one (1) calendar day** before the deposition testimony's anticipated use.[3] The submission to the Court of unresolved objections to prior testimony shall include (i) the relevant designations with disputed passages highlighted; (ii) any exhibits to be introduced with the prior testimony, if there remains a pending objection to that exhibit; and (iii) a copy of the Objection Chart identifying the pending objection(s) as well as a brief indication of the basis for the objection (no more

---

[3] For disputes raised with the Court during trial, pursuant to the 6:00 a.m. email, the parties will endeavor to send a joint email containing the disputes.  The parties further agree that Delaware counsel for the objecting party shall be responsible for preparing and sending the joint email to the Court by 6:00 a.m. and providing the Court with courtesy paper copies by 8:15 a.m.  If both parties raise disputes with the Court on the same day, the party raising the greatest number of disputes shall be responsible for preparing and sending the joint email to the Court by 6:00 a.m. and providing the Court with courtesy paper copies by 8:15 a.m.

than 50 words per objection) and the party's response (no more than 50 words per response) to it.  No later than **8:15 a.m.**, the parties shall deliver **two (2) courtesy paper copies** of the foregoing (i) – (iii) to Courtroom 6B, and shall leave the courtesy copies on the podium in the courtroom. Failure to comply with these procedures, absent an agreement of the parties and approval of the Court, shall result in waiver of the use of the prior testimony or waiver of the objection to the use of the prior testimony.

48.    If applicable, a party's designation of a page and line from a particular transcript shall be automatically deemed to include any errata indicated for that page and line in the attached errata sheets, unless such errata are objected to.

49.    The party introducing the prior testimony shall be responsible for editing the deposition video to include the testimony and any counter-designations and counter-counter-designations and shall provide a final version of the video to the other party the night before it is to be shown to the jury or state in writing that the prior testimony will be instead read into the record. The party calling the witness by designation shall choose the method of offering the prior testimony.  All irrelevant and redundant material, including colloquy between counsel and objections, will be eliminated when the prior testimony is read or viewed at trial.

50.     When the witness is called to testify by deposition designations at trial, the party calling the witness shall provide the Court with **three (3) copies** of the transcript of the designations, counter-designations, and counter-counter-designations that will be read or played as well as any exhibits sought to be admitted with the prior testimony.

51.     For those witnesses whose prior testimony will be played or read, the parties shall be permitted to make brief transition statements to introduce the witnesses by name, position or title, and/or the company to which he or she is associated, the time for which shall be charged to the party offering the witness's testimony, unless otherwise agreed to by the parties.  However, counsel shall not be permitted to argue or comment on the evidence during transition statements.

52.     The party calling the witness by deposition will be responsible for calculating the time. To enable the Court to accurately charge time to the designating parties, the party offering the designations (i) shall provide the Court with an accounting of time for each party's designations, counter-designations and counter-counter designations by actual time for video testimony; or (ii) if the prior testimony is read into the record, shall provide the Court with an accounting of the time based on the parties' proportional share of lines of testimony.  The parties will be charged for all time that elapses from the time the

witness is called by prior testimony until the next witness is called, according to the proportions to be provided by the parties.

53.    Each party's affirmative prior testimony designations from a single deposition will be introduced at trial together with the related counter-designations, and counter-counter designations in the sequence in which the testimony originally occurred.  Each party may present their affirmative designations in their case in chief, without including the other party's affirmative designations.

**B.    Impeachment with Prior Inconsistent Testimony**

54.    Pursuant to Fed. R. Evid. 613, deposition and other testimony or statements not specifically identified on a party's prior testimony designation list or exhibit list may be used at trial for the purpose of impeachment only if otherwise competent for that purpose. Impeachment by prior inconsistent testimony may be done through any means appropriate under the Federal Rules of Evidence. The parties agree that the Court should rule at trial on any objections based on lack of completeness and/or lack of inconsistency.  If the objection is overruled, the time arguing the objections will count against the party that raised the objection.

**C.    Objections to Expert Testimony**

55.    The parties request that the Court rule at trial on any objections to

expert testimony as beyond the scope of prior expert reports.  The time taken to argue and decide such objections will be charged to the losing party.

56.    The parties will observe the following procedures to address objections that testimony is beyond the scope of prior expert reports:

a.    If a party believes that an expert is offering an opinion beyond the scope of his or her reports, it should object;

b.    The examining attorney must then identify the specific paragraphs in the expert reports and/or deposition that disclose such testimony; and

c.    The Court will strike or exclude the expert's trial testimony if it determines that the identified paragraphs in the expert reports and/or deposition do not disclose the opinion at issue or if the examining attorney is not able to identify any such paragraphs.

## VIII.  EXHIBITS

### A.   <u>Exhibits</u>

57.  The parties' joint list of trial exhibits is attached as **Exhibit 12**.

58.   Rockwell's list of pre- marked exhibits to be offered at trial and WiAutomation's objections are attached as **Exhibit 13**.

59.   WiAutomation's list of pre-marked exhibits to be offered at trial and Rockwell's objections are attached as **Exhibit 14**.

60.     All trial exhibits will bear pages numbers using the exhibit designation (e.g., JTX-1.1, PTX-125.1, etc.).

61.     The parties agree that any exhibit used solely for purposes of impeachment need not be disclosed on the list of exhibits or deposition designations contained in this pretrial order, as set forth in Fed. R. Civ. P. 26(a)(3)(a)(i).

62.     Subject to paragraph 63, except for demonstrative exhibits and exhibits to be used solely for impeachment, **[Rockwell proposal:** and Rule 1006 exhibits,] this pretrial order contains the maximum universe of exhibits to be used in any party's case, whether on direct examination or cross- examination, as well as all objections to the admission of such exhibits, neither of which shall be supplemented without approval of all parties or leave of the Court, on good cause shown.  A party may offer any exhibit appearing on either party's exhibit list, either in direct examination of its own witness or on cross-examination of an adverse witness.  Exhibits not listed will not be admitted unless good cause is shown. Neither party will remove an exhibit from its exhibit list without agreement from the other party, unless the other party is provided the opportunity to add such exhibit to its own exhibit list.

63.     No exhibit will be admitted unless offered into evidence through a witness in compliance with the Federal Rules of Evidence who must at least be

shown the exhibit.  To the extent the parties stipulate to the authenticity of certain documents, such stipulation does not relieve a party from laying the proper foundation for such document or in complying with all other relevant Federal Rules of Evidence.

64.     For opening statements, only those exhibits that a party reasonably believes will be admitted into evidence may be shown to the jury. Exhibits may otherwise not be published, displayed or otherwise shown to the jury until after they have been formally moved into evidence by exhibit number. Once admitted, counsel may publish the exhibits to the jury without requesting to do so.

65.     The listing of a document on an exhibit list, including the parties' joint exhibit list, is not an admission that such document is relevant or admissible when offered by the opposing party for the purpose that the opposing party wishes to admit the document.  Each party reserves the right to object to the admissibility of any evidence offered by the other party, at the time such evidence is offered, in view of the specific context in which such evidence is offered.

66.     A party will identify exhibits to be used in connection with direct examination by **7:00 p.m. one (1) calendar day** before their intended use, and objections will be provided no later than **8:30 p.m.** the same day. The parties will meet and confer by **9:30 p.m.** that same day in a good faith effort to resolve any objections.  The parties agree to use the Objection Chart during the exchange

process. This paragraph shall not apply to adverse witnesses.

67.    If good faith efforts to resolve the objections fail, by no later than **6:00 a.m.**, Delaware counsel shall notify the Court via email (gbw_civil@ded.uscourts.gov) of any objections to evidence to be presented that trial day.  The parties shall submit the Objection Chart containing the objections (no more than one (1) sentence) as well as the non-objecting party's response (no more than one (1) sentence).  The parties shall also attach to the email the exhibits that are being objected to with the disputed portions highlighted or identified, if possible; and, no later than **8:15 a.m.**, the parties shall deliver **two (2) courtesy paper copies** of the objections and exhibits with the disputed portions highlighted to Courtroom 6B.  The parties shall leave the courtesy copies on the podium in the courtroom.  Failure to comply with these procedures, absent an agreement by the parties and approval by the Court, will result in waiver of the use of an exhibit or waiver of objection to the exhibit.

68.   The previous paragraph's procedures regarding disclosure of exhibits do not apply to exhibits used solely for impeachment or for cross-examination of a witness.

69.    The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding the listed document or any other listed document.

70.    On the Friday before the first day of trial, Rockwell will deliver to the Courtroom Deputy a completed AO Form 187 exhibit list setting forth the parties' joint exhibits (i.e., JTX) as well as its list of trial exhibits (i.e., PTX), which are not included in the list of joint trial exhibits. On that same day, WiAutomation will deliver to the Courtroom Deputy a completed AO Form 187 exhibit list setting forth its list of trial exhibits (i.e., DTX).

B.    **Discovery Designations**

71.    **[Rockwell's proposal:** Any party, with prior notice to all other parties and the Court, may read all or any portion or all of any of their designations of the adverse party's discovery responses to the jury or the Court, and will be charged for the time used to do so.] **[WiAutomation's proposal:** WiAutomation does not object to a procedure for reading in discovery responses, but does object to the manner in which this procedure was proposed by Rockwell. Rockwell provided this procedure the eve before the deadline to file the pretrial order, a month after the deadline to do so, leaving insufficient time for the parties to meet and confer or for WiAutomation to provide its proposed procedure or discovery designations.  WiAutomation will confer with Rockwell to discuss a procedure for reading in discovery responses prior to trial.]

72.    **[Rockwell's proposal:** Attached as **Exhibit 16** are Rockwell's discovery designations.] **[WiAutomation's proposal:** WiAutomation objects to

the inclusion of this exhibit for the same reasons stated in paragraph 71.**]**

       **C.**      **<u>Demonstrative Exhibits</u>**

     73.    The parties agree that the demonstrative exhibits that the parties intend to use at trial do not need to be included on their respective exhibit lists that are part of this pretrial order. Rockwell's demonstrative exhibits will be identified with PDX numbers. WiAutomation's demonstrative exhibits will be identified with DDX numbers.

     74.    For each demonstrative exhibit, the parties will disclose to the opposing party on the face of the demonstrative exhibit all trial exhibits that form the basis of the demonstrative exhibit.

     75.    The parties will exchange demonstratives and a list of exhibits that they intend to use in their opening statements by **8:00 p.m. two (2) calendar days before opening statements**. The parties will provide any objections to such demonstratives or exhibits by **12:00 p.m. (noon)** on the next day.  By **2:00 p.m.** that same day, the parties will meet and confer in a good faith effort to resolve any objections.  The parties agree to use the Objection Chart during the exchange process.

     76.    A party will provide demonstrative exhibits to be used in connection with direct examination by **7:00 p.m. one (1) calendar day** before their intended use, and objections will be provided not later than **8:30 p.m.** the

same day. The parties will meet and confer by **9:30 p.m.** that same day in a good faith effort to resolve any objections.  The parties agree to use the Objection Chart during the exchange process.  If any of the demonstratives change after the deadline, the party intending to use the demonstrative will promptly notify the opposing party of the change(s).

77.     The party seeking to use a demonstrative will provide a color representation of the demonstrative to the other side in PDF or other electronic form labeled with the exhibit or demonstrative number.  Any demonstrative that includes an animation, flash file, or similar moving image shall be exchanged in a manner sufficient to permit the receiving party to see the moving images. Exchange of large boards is not required, and these demonstrative exhibits may be exchanged in 8½" x 11" format with the PDF/electronic exhibits being exchanged at that same time.  In addition, blow-ups or highlights of exhibits or parts of exhibits or testimony that contain no additional markings, commentary, or alterations, are not required to be provided to the other side in advance of their use.

78.     The above procedures regarding disclosure of demonstratives do not apply to exhibits used solely for impeachment or for cross examination of a witness, none of which need to be provided to the other side in advance of their use.

22

79.     If good-faith efforts to resolve objections to demonstrative exhibits fail, by no later than **6:00 a.m.**, Delaware counsel shall notify the Court via email (gbw_civil@ded.uscourts.gov) of any objections to demonstrative exhibits to be presented that trial day.  The parties shall submit the Objection Chart containing the objections (no more than 50 words per objection) as well as the non-objecting party's response (no more than 50 words per response).  The parties shall also attach to the email the demonstratives that are being objected to and, no later than **8:15 a.m.**, the parties shall deliver **two (2) courtesy paper copies** of the objections and demonstratives to Courtroom 6B.  The parties shall leave the courtesy copies on the podium in the courtroom. Failure to comply with these procedures, absent an agreement by the parties and approval by the Court, will result in waiver of the use of a demonstrative or waiver of objection to the demonstrative.

<div align="center">

**D.**     **Translations and Objections to Translated Exhibits and Testimony**

</div>

80.     The parties will provide any objections to and propose corrections to all translated exhibits and/or deposition testimony on or before **July 5, 2023**.  The parties will continue to work diligently to resolve any objections to translated exhibits and/or deposition testimony without the need for court intervention by **July 10, 2023**.

81.     In the event that a party intends to bring a witness to testify live at

trial in Italian (provided the witness has been timely identified and disclosed in accordance with the provisions of the pretrial order) or the parties are unable to reach agreement on all disputed translation issues by **July 10, 2023**, the parties shall jointly retain an independent interpreter/translator at their shared expense to assist the parties and the Court in resolving disputed translations and/or providing translation services during trial.

## IX.    MOTIONS *IN LIMINE*

82.    Per the Court's Scheduling Order, attached hereto as **Exhibit 15** are the parties' motions *in limine*, responses, and replies.

83.    **Exhibits 15A, 15B and 15C** are Rockwell's motions *in limine*.

a.    Rockwell's Motion *in Limine* No. 1: To Preclude Evidence of any Criminal Background of Gary Monroe

b.    Rockwell's Motion *in Limine* No. 2: To Preclude Argument and Evidence Regarding Foreign Litigation

c.    Rockwell's Motion *in Limine* No. 3: To Preclude Defendant from Referring to Evidence not Produced in Discovery

84.    WiAutomation's motions *in limine* are attached hereto as **Exhibits 15D, 15E and 15F**.

a.    WiAutomation's Motion *in Limine* No. 1: To Preclude Rockwell From Introducing Unauthenticated Evidence From

Test Purchases

b.   WiAutomation's Motion *in Limine* No. 2: To Preclude

Rockwell From Introducing Hearsay Through A Fact

Witness's Trial Testimony

c.   WiAutomation's Motion *in Limine* No. 3: To Preclude

Rockwell From Introducing Testimony Concerning

Rockwell's Serial Number Database

## X.   AMENDMENTS TO THE PLEADINGS

85.   The parties are not seeking any amendments to the pleadings.

## XI.   NUMBER OF JURORS

86.   There shall be eight jurors.  The Court will conduct jury selection

through the "struck juror" method, beginning with the Court reading *voir dire*

to the jury panel in the courtroom, continuing by meeting with jurors

individually in the jury room and there addressing any challenges for cause,

and concluding back in the courtroom with peremptory strikes.

## XII.   LENGTH OF TRIAL

87.   The **five (5) day jury trial** in this action is scheduled to start on

**July 24, 2023**, at **9:00 a.m.**, with subsequent trial days beginning at **9:30 a.m.**

Until the case is submitted to the jury for deliberations, the jury will be excused

each day no later than **5:30 p.m.** There will be 45 minutes for lunch and a

fifteen-minute break in the morning and in the afternoon each day.

88.     The trial will be timed.  Unless otherwise ordered, time will be charged to a party for its opening statement, direct and redirect examinations of witnesses it calls, cross- examination of witnesses called by any other party, closing argument, and its argument on any motions for judgment as a matter of law.  With respect to argument on objections raised (outside the presence of the jury) to another party's exhibits and demonstrative exhibits, unless otherwise ordered, time shall be charged according to the amount of time each party spends making its arguments.  The Court reserves the discretion how to charge the time, for example, in cases in which there is a disparate allocation of time in the argument presentations or where one party continuously makes objections and does not prevail.

89.     The Courtroom Deputy will keep a running total of trial time used by counsel.  If any party uses all of its allotted trial time, the Court will terminate that party's trial presentation.

90.     Considering the Court's procedures for counting time, and considering the nature and extent of the parties' disputes, the parties request **11** hours per side for their trial presentations.

91.     Issues that need to be addressed outside of the presence of the jury will be taken up at 8:45 a.m., at lunch, or at the end of the trial day. As set forth

above, those issues – including objections to anticipated exhibits, demonstratives and/or testimony – must be brought to the Court's attention by email no later than 6:00 a.m. on the day on which the evidence and/or testimony objected to will be adduced in accordance with the procedures detailed herein.  If a party raises a dispute with the Court, the parties should be prepared to address that dispute with the Court at 8:45 a.m. before the jury is brought into the courtroom.

## XIII.   MOTIONS FOR JUDGMENT AS A MATTER OF LAW

92.   Motions for judgment as a matter of law ("JMOL motions") may be made to the Court orally. The parties request that the Court then decide, based on the motions presented orally, whether to entertain briefing on the JMOL motion. JMOL motions may be made at any time after a party concludes examination of witnesses on its witness list[4] and before the case is submitted to the jury.  The parties agree to give the adverse party advance notice of when it intends to make any JMOL motion. The parties further agree that any renewed JMOL motions will be addressed in connection with the schedule for post-trial briefing.

## XIV.   JUROR NOTES AND JURY PROCEDURES

---

[4] For example, because each witness will be called only once prior to a party's rebuttal case, in the event that WiAutomation witnesses on Rockwell's witness list are not questioned by Rockwell until those witnesses are presented by WiAutomation in its case-in-chief, a JMOL motion by WiAutomation would not be appropriate until after Rockwell has the opportunity to present testimony from those witnesses.

93.     The parties agree that the jurors be permitted to take handwritten notes on paper provided in a three-ring binder ('juror notebook") during the trial presentations. The jurors will be permitted to bring these juror notebooks into the deliberation room. Rockwell will provide the juror notebooks. **[Rockwell's proposal**: The three-ring binder should contain the photographs and names of all witnesses (as provided by the parties)] [WiAutomation's proposal:** WiAutomation objects to the inclusion of witness photographs in the juror notebooks.]

94.     The parties will provide lunch and snacks for the jury each day of trial and share equally in the cost of doing so.

## XV.   HANDLING OF CONFIDENTIAL INFORMATION AT TRIAL

95.     The parties agree that they will not remove any confidential markings from any trial documents, and will provide a preliminary jury instruction that will permit the Court to instruct the jury that certain documents were marked as confidential before trial and that if a document is to be kept confidential, the jury will be so instructed at the time the document is introduced.

96.     The parties anticipate that the trial will be open to the public and not sealed unless a party specifically requests that a particularly sensitive portion be sealed. If a party makes such a request, subject to the Court's approval, and in accordance with the Stipulated Protective Order, the courtroom shall be cleared of

those individuals not qualified to hear such confidential information under the Stipulated Protective Order entered in the case, except that each party's corporate representative(s) may remain in the courtroom throughout the entirety of trial subject to Rule 615 of the Federal Rules of Evidence.  In addition to the parties' representatives designated under Rule 615, the parties may attempt to show particular circumstances as appropriate under the case law to not exclude a party's officers or employees.

## XVI.  ADDITIONAL MATTERS

97.    The parties request that the Court grant them access to the courtroom at a reasonable time prior to the commencement of the trial, at a date convenient to the Court, to allow the parties to set up electronic and computer devices to be used at trial.

98.    The parties shall provide witness binders containing physical copies of documents (demonstratives, deposition transcripts, expert reports, etc.) to each witness.  Additionally, the parties will provide **two (2)** copies of each witness binder to be used on direct and/or cross-examination to the Court immediately before the witness takes the stand to testify. Further, by **7:30 a.m.** on each trial day, the parties shall provide to the Courtroom Deputy and Judicial Administrator electronic copies of witness folders containing the exhibits and demonstratives (if any) to be used on direct and/or cross-examination of any

witness expected to be called that day. In addition, by **7:30 a.m.** on each trial day, the parties will provide the court reporter with electronic copies of the deposition designations of any witness the parties intend to present that day.

99. The parties agree that all rights to appeal the Court's dispositions of pretrial motions for summary judgment, *Daubert* motions and motions *in limine* are preserved and do not need to be reasserted at trial to avoid waiver.

100. The parties provide the following list of additional issues requiring resolution prior to trial:

### A.    Rockwell's List of Issues

101. Rockwell submits that its pending Motion to Amend the Scheduling Order to Supplement the Discovery Record to Include Recent Counterfeit Sales by Defendant (D.I. 266) should be resolved prior to trial.

102. The parties will confer to agree on the retention of an independent interpreter to translate in real time at trial between English and Italian for any witness that speaks Italian but not English.

103. The parties have submitted competing verdict forms. Rockwell's objection to WiAutomation's proposed Verdict Form is: The Court should adopt Rockwell's proposed jury verdict form. WiAutomation's form is a complex labyrinth that improperly duplicates information from the jury instructions. For example, because WiAutomation repeats information from the

jury instructions, its form requires no fewer than five "Yes" responses for the

jury to determine that WiAutomation's conduct was false advertising. This

should be addressed in a single question. WiAutomation's form also omits any

questions related to statutory damages or WiAutomation's profits. If the jury

determines that WiAutomation counterfeited Rockwell's trademark, statutory

damages are available under 15 U.S. Code § 1117(c). Also, a "trademark owner

may recover an infringer's profits attributable to the infringement." *American*

*Cruise Lines, Inc. v. HMS American Queen Steamboat Co. LLC*, 13-cv-324,

Dkt. 340, Section 10.2 (D. Del. 2019). But WiAutomation's form omits any

ability for the jury to determine the amount of Rockwell's statutory damages or

its disgorgement remedy. This is inappropriate.  The Court should adopt

Rockwell's straightforward form, which mirrors the format this Court recently

adopted in *TrustID Inc. v. Next Caller Inc.,* 18-cv-00172-MN, Dkt. No. 297

(D.Del. July 16, 2021) and *American Cruise Lines, Inc.*, No. 13-cv-324-RGA at

Dkt. No. 341.]

> B.    **WiAutomation's List of Issues**

104.   WiAutomation's proposed jury verdict form is more appropriate

than Rockwell's over-simplified and conclusory form.  WiAutomation's jury

verdict form properly delineates each element for each cause of action (while

Rockwell's form attempts to avoid having the jury address each element within

each cause of action).   Each of those factual elements is necessary for the jury to determine the ultimate conclusion of law for such respective count.  And it does so in a simple, clear and concise manner to avoid any jury confusion, while providing the jury with a roadmap to ultimately determine each cause of action depending on their factual findings.  Notably, WiAutomation's jury verdict form also matches the jury charges proposed by the parties.

## XVII.  SETTLEMENT

105.  The parties hereby certify that they have engaged in a good faith effort to explore the resolution of the controversy by settlement.  To date, the parties have been unable to reach a resolution.

## <u>Objections Chart</u>

1. Deposition Designations

| Designation (s) | Objection (s) | Counter Designation (s) | Objection(s) to Counter Designation (s) |
|---|---|---|---|
| Deposition Designation [x] | | | |

2. Exhibits to be used with [insert witness name]

| Exhibit(s) | Objection(s) | Response(s) |
|---|---|---|
| Exhibit [x] | | |

3. Demonstratives to be used with [opening statement/insert witness name]

| Slide Number(s) | Objection(s) | Response(s) |
|---|---|---|
| Slide [x] | | |

**IT IS HEREBY ORDERED** that this order shall control the subsequent course of the action, unless modified by the Court to prevent manifest injustice.

Date: _____, 2023

_____
United States District Judge

Agreed to and submitted by,

| | |
|---|---|
| */s/ Karen E. Keller* | */s/ Pilar G. Kraman* |
| John W. Shaw (No. 3362) | Pilar G. Kraman (No. 5199) |
| Karen E. Keller (No. 4489) | Alexis N. Stombaugh (No. 6702) |
| Andrew E. Russell (No. 5382) | Maliheh Zare (No. 7133) |
| Emily S. DiBenedetto (No. 6779) | YOUNG CONAWAY STARGATT & |
| SHAW KELLER LLP | TAYLOR, LLP |
| I.M. Pei Building | Rodney Square |
| 1105 North Market Street, 12th | 1000 North King Street |
| Floor | Wilmington, DE 19801 |
| Wilmington, DE 19801 | (302) 571-6600 |
| (302) 298-0700 | pkraman@ycst.com |
| jshaw@shawkeller.com | astombaugh@ycst.com |
| kkeller@shawkeller.com | mzare@ycst.com |
| arussell@shawkeller.com | *Attorneys for Defendant* |
| edibenedetto@shawkeller.com | |

*-and-*

OF COUNSEL:
Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO &
HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law
*Attorneys for Plaintiff*

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 30, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, Karen E. Keller, hereby certify that on June 30, 2023, this document was

served on the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

Pilar G. Kraman
Alexis N. Stombaugh
YOUNG, CONAWAY, STARGATT
 & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com

Bob Kasolas
Eric J. Boden
Eric Alvarez
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com
eboden@bracheichler.com
ealvarez@bracheichler.com

*/s/Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

37

# EXHIBIT 1

## EXHIBIT 1

## <u>JOINT STATEMENT OF UNCONTESTED FACTS</u>

1.      Rockwell is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 1201 South Second Street, Milwaukee, Wisconsin 53204.

2.      Rockwell is a 120-year-old U.S. company dedicated to industrial automation and information technology.

3.      Rockwell manufactures and distributes its industrial automation technologies under its ALLEN-BRADLEY®, A-B®, ROCKWELL AUTOMATION®, and/or CONTROLLOGIX® trademarks (the "Asserted Trademarks").

4.      Rockwell's products include the brains (programmable controllers, or "PLCs"), muscle (motors and drives) and related devices (input/output devices, safety devices) that run a variety of industrial and commercial operations ranging from assembly lines (e.g. automotive lines, food processing plants and pharmaceutical plants), to (e.g. oil refineries), to amusement park rides.

5.      Rockwell is the registered owner of the Asserted Trademarks, which are registered on the Principal Register of the United States Patent and Trademark Office ("USPTO").

6.      WiAutomation has never been authorized by Rockwell to sell Rockwell-branded products.

7.      WiAutomation fulfills orders for Rockwell-branded products in the same manner from the same inventory regardless of where they are shipped to.

8.      The Rockwell-branded products sold by WiAutomation do not come with the Rockwell manufacturer's warranty.

9.      WiAutomation's sales to Rockwell distributors and affiliates totaled less than €100,000.

10.     WiAutomation does not develop or make anything.

11.     WiAutomation stated that it had "more or less 100" Rockwell-branded products in inventory.

12.     WiAutomation has never honored a warranty on a Rockwell-branded product that it sold.

13.     Part owner of WiAutomation, Luca Coppola, testified that he didn't know whether Rockwell products had expiration dates.

14.     WiAutomation's warehouse employee Luigi Scotto di Carlo testified that he did not know what "safety recalls" meant.

15.     WiAutomation is a corporation organized and existing under the laws of Italy, having its principal place of business at 9 Via Madame De Stael, 80070 Bacoli (NA), Italy.

2

16.     WiAutomation maintains a website through which it conducts business selling various automation components and products, including Rockwell-branded products.

17.     WiAutomation does not manufacture its own products for sale.

18.     WiAutomation sells Rockwell-branded products.

19.     WiAutomation does not automatically offer recall notices.

20.     When a customer purchases Rockwell-branded products from WiAutomation, that customer's sale and contact information is not provided to Rockwell.

21.     WiAutomation does not provide Product Safety Advisories via mail, electronic mail, or other means with respect to the Rockwell-branded products it sells.

22.     WiAutomation does not have a 100-year history as a manufacturer in the U.S.

23.     WiAutomation does not repair or remanufacture Rockwell products, and does not provide recall or safety notices for Rockwell products.

24.     The customer is in charge of selecting the VAR they want to work with.

25.     VARs make their own warranty arrangements and dictate their own warranty obligations to their own customers.

26.     Rockwell also advertises that its products are compatible with products from other brands.

27.     Rockwell's ADs pay Rockwell in exchange for Rockwell's products.

28.     Rockwell has written agreements with its Authorized Distributors ("ADs") and the following documents are representative of those agreements: PTX-1137; PTX-1138; PTX-1159; PTX-1183; PTX-1192; PTX-1209; PTX-1265; PTX-1576; PTX-1218; and PTX-1249.

29.     Rockwell sometimes has written agreements with entities called Value Added Resellers ("VARs") and the following documents are representative of those agreements: PTX-1137; PTX-1138; PTX-1159; PTX-1183; PTX-1192; PTX-1209; PTX-1265; PTX-1576; PTX-1218; and PTX-1249.

30.     The following documents are representative Rockwell product notices: PTX-852; PTX-853; PTX-911; PTX-913; PTX-942; PTX-956; PTX-971; PTX-973; PTX-982; PTX-990; PTX-992; PTX-1086; PTX-1089; PTX-1090; PTX-1091; PTX-1094; PTX-1095; PTX-1099; PTX-1101; PTX-1102; PTX-1106; PTX-1108; PTX-1109; PTX-1112; PTX-1113; PTX-1114; PTX-1682; PTX-1683; PTX-1685; PTX-1686; PTX-1687; PTX-1688; PTX-1689; PTX-1690; PTX-1691; PTX-1694; PTX-1697; PTX-1709; PTX-1710; PTX-1718; PTX-1719; PTX-1720; PTX-1721; PTX-1727; PTX-1730; PTX-1731; PTX-1736; PTX-1737; PTX-1745; and PTX-1747.

# EXHIBIT 2

# EXHIBIT 2

## <u>ROCKWELL'S STATEMENT OF FACTS THAT REMAIN TO BE LITIGATED</u>

This statement is based on the current status of the case and the Court's rulings to date. Rockwell reserves the right to revise, amend, supplement, or modify the following statement based on any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence, or other developments in the case, including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending motions, and similar developments. The following statement of issues of fact is not exhaustive, and Rockwell reserves the right to prove any matters identified in the pleadings, interrogatory responses, and/or expert reports. Rockwell intends to offer evidence as to the issues of fact and issues of law identified in this Pretrial Order. Rockwell further intends to offer evidence to rebut evidence offered by WiAutomation. To the extent that Rockwell's Statement of Issues of law to be Litigated set forth in Exhibit 4 contains issues of fact, those issues are incorporated herein by reference. Should the Court determine that any issue identified below is more appropriately considered an issue of law, Rockwell incorporates such issue by reference in Exhibit 4. Rockwell does not assume the burden of proof with regard to any of the below-listed issues of fact. Rockwell also incorporations by reference its expert reports to identify the issues to be resolved at trial.

1

1.      Rockwell only authorizes the sale of its products through one of two ways – directly, or through its Authorized Distributors.

2.      Rockwell has established procedures for identifying and investigating reports of unauthorized resellers and counterfeiters like WiAutomation.

3.      Large, sophisticated corporate customers bought Rockwell products from WiAutomation unaware the Rockwell warranty and other material differences were not included.

4.      There are many other examples of WiAutomation delivering counterfeit products and products with defaced labels to customers. Rockwell-branded products sold by WiAutomation have quality issues.

5.      The Rockwell-branded products sold by WiAutomation do not come with Rockwell's licensed software.

6.      WiAutomation does not employ anyone capable of providing technical assistance to customers.

7.      The (i) Rockwell manufacturer's warranty; (ii) Rockwell customer service, (iii) Rockwell product safety and recall notices that address potentially life-threatening safety issues; and (iv) Rockwell's post manufacture quality control measures (collectively, the "Vital Services") are material to customers.

8.      WiAutomation's sale of Rockwell-branded products in the United States was likely to cause confusion in connection with Rockwell's trademarks.

9.      WiAutomation used descriptions of Rockwell-branded products on its website in a manner that was likely to cause confusion among ordinary consumers as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of WiAutomation's activities with respect to the Rockwell Trademarks.

10.      WiAutomation made a false or misleading statement of fact in a commercial advertisement about the nature; quality; characteristic; geographic origin of its own product; service; commercial activities.

11.      WiAutomation has characterized Rockwell-branded products that it sold as "new" when they were not new.

12.      WiAutomation's statement(s) was misleading because it conveyed a false impression and actually misled consumer(s).

13.      WiAutomation's statement(s) actually deceived and/or had the tendency to deceive a substantial segment of WiAutomation's audience.

14.      WiAutomation's deception was likely to influence the purchasing decisions of consumers.

15.      WiAutomation caused the false statement to enter interstate commerce because WiAutomation's product; services; commercial activities are

transferred; advertised; sold across state lines or were advertised on a website accessible via the Internet and/or are imported into the United States.

16.     Rockwell has been or is likely to be injured as a result of the false statement(s).

17.     Rockwell has been or is likely to be injured because of the direct diversion of sales from Rockwell to WiAutomation.

18.     Rockwell has been or is likely to be injured because of a loss of goodwill associated with Rockwell's products.

19.     Rockwell had Rockwell-branded products purchased from WiAutomation to further investigate the quality and authenticity of products that WiAutomation was supplying to U.S. customers.

20.     In 2020, Rockwell's agent had two Rockwell products ordered from WiAutomation that were advertised as "new" with the explicit request that WiAutomation ship new products to the U.S.

21.     Despite being advertised as "new," the products that were received from WiAutomation in 2020 were not new – they were nearly 20 years old (manufactured in 2002 and 2008).

22.     WiAutomation has sold counterfeit Rockwell-branded products in the U.S.

23.     WiAutomation counterfeited Rockwell's trademarks, including, for example, the "Allen-Bradley," "A-B" and/or "ControlLogix" trademarks.

24.     Rockwell lost revenue due to WiAutomation's counterfeiting.

25.     Rockwell's trademarks are valuable.

26.     Rockwell has expended substantial amounts of time, effort and money in building its reputation.

27.     In another example in 2022, Rockwell's agent had another set of Rockwell-branded products ordered from WiAutomation to the U.S.

28.     One product WiAutomation sent in 2022 bore counterfeit labels with a fake serial number and unauthorized copies of at least three Asserted Trademarks.

29.     WiAutomation sold and shipped other counterfeit Rockwell-branded products to Syntegon and other customers in Europe and around the world that were fulfilled from the same WiAutomation inventory that was used to supply Rockwell-branded products to customers in the United States.

30.     Rockwell gave actual and constructive notice to WiAutomation that it was infringing Rockwell's trademarks.

31.     WiAutomation continued use or distribution of counterfeit or materially different Rockwell-branded products after being given notice by Rockwell of the alleged infringing activity.

32.	WiAutomation knew it was infringing Rockwell's trademarks at issue and/or acted with indifference to Rockwell's trademark rights.

33.	WiAutomation acted with an intention to benefit from the goodwill or reputation of Rockwell.

34.	WiAutomation willfully infringed and counterfeited Rockwell's trademarks.

35.	The differences between the Rockwell-branded products sold by WiAutomation and genuine Rockwell products are likely to damage and have damaged the goodwill developed by Rockwell.

36.	As a consequence of WiAutomation's behavior at issue here, Rockwell's injuries include lost profits directly attributable to WiAutomation' unauthorized sales, other price erosion, lost goodwill and direct expense associated with remediating the adverse impact of WiAutomation's behavior such that the estimated lost profits are between $0.41 million and $7.95 million (USD).

37.	Based on total revenue estimates provided by WiAutomation, and using a range of the proportion of sales associated with the Rockwell products supplied by WiAutomation, WiAutomation's gross revenue attributable to sales of Rockwell products during the relevant period of 2018 to 2022 is €2.1 million to €2.86 million

38.     WiAutomation has not cooperated in providing particular records from which to assess the value of the infringing materials products.

39.     WiAutomation's estimated revenue is €1,212,034 to €14,116,66 due to its use of Rockwell's trademarks for Rockwell products sold in the U.S.

40.     Rockwell has incurred expenses from preventing customers from being deceived.

41.     Rockwell will incur costs for future corrective advertising reasonably required to correct public confusion caused by WiAutomation's wrongful conduct.

42.     WiAutomation engaged in false designation of origin.

43.     WiAutomation willfully engaged in false designation of origin.

44.     WiAutomation knew or should have known that the conduct was of the nature prohibited.

45.     WiAutomation engaged in statutory unfair competition (deceptive trade practices).

46.     WiAutomation passes off goods or services as those of another.

47.     WiAutomation causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

48.     WiAutomation causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another.

49.     WiAutomation uses deceptive representations or designations of geographic origin in connection with goods or services.

50.     WiAutomation represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have.

51.     WiAutomation represents that goods are original or new when they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand.

52.     WiAutomation represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are of another.

53.     WiAutomation disparages the goods, services, or business of another by false or misleading representation of fact.

54.     WiAutomation advertises goods or services with intent not to sell them as advertised.

55.     WiAutomation advertises goods or services with intent not to supply reasonably expectable public demand.

56.     WiAutomation makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions.

57.     WiAutomation engages in other conduct which similarly creates a likelihood of confusion or of misunderstanding.

58.     WiAutomation engaged in common law unfair competition.

59.     WiAutomation willfully engaged in statutory and common law unfair competition.

60.     WiAutomation knew or should have known that the conduct was of the nature prohibited.

61.     WiAutomation engaged in false advertising.

62.     WiAutomation intentionally and willfully committed false advertising.

63.     WiAutomation knew or should have known that the conduct was of the nature prohibited.

64.     Rockwell sustained damages because of WiAutomation's infringement, unfair competition, false advertising, and/or false designation of origin.

65.     WiAutomation's conduct has been outrageous and WiAutomation has acted intentionally and/or recklessly.

66.     It was WiAutomation's conscious object to engage in outrageous and reckless conduct.

67.     WiAutomation's conduct was reckless because it acted so unreasonably and/or dangerously that it knew or should have known that there was an eminent likelihood of harm that can result.

68.     WiAutomation's conduct was reprehensible.

69.     Flame Networks hosts WiAutomation's website and online store.

70.     Flame Networks CEO gave a presentation that provided facts regarding the sales revenue, web traffic and other information regarding WiAutomation's business.

71.     WiAutomation offered for sale, sold, or distributed one or more counterfeit products that contained at least three of Rockwell's registered trademarks.

72.     WiAutomation offers to sell and sells Rockwell-branded products in the United States that are not genuine.

73.     WiAutomation offers to sell and sells Rockwell-branded products in the United States that are materially different then the genuine Rockwell products sold by Rockwell and its authorized distributors.

74.     Customers were confused and/or were likely confused as a result of WiAutomation's wrongful conduct.

75.      Rockwell has received awards for being an ethical company.

76.      Recon Management Group provides professional investigative services.

77.      Recon Management Group conducts all investigations with the highest professional, ethical and legal standards as required by local, state, and federal laws.

78.      All facts set forth in the Corrected Declaration of Mark Paliszewski (D.I. 263).

79.      WiAutomation caused injury to Rockwell's reputation.

80.      WiAutomation caused injury to Rockwell's goodwill.

81.      WiAutomation caused Rockwell to lose profits because of its wrongful conduct.

82.      Rockwell expends money to prevent customers from being deceived.

83.      Rockwell may need to expend money for future corrective advertising reasonably required to correct public confusion caused by the WiAutomation's wrongful conduct.

84.      Rockwell is entitled punitive damages.

85.      Rockwell is entitled to a disgorgement of WiAutomation's profits.

86.      Rockwell is entitled to compensatory damages

87.      Rockwell is entitled to statutory damages.

88.    Rockwell is entitled to reasonable attorneys fees and costs

89.    Rockwell is entitled to trebling of damages.

The facts supporting the opening and rebuttal expert reports of Rockwell's expert witnesses David Franklyn and Brett Reed.

# EXHIBIT 3

**Exhibit 3**

## <u>WIAUTOMATION'S STATEMENT OF FACTS THAT REMAIN TO BE LITIGATED</u>

Pursuant to Federal Rule of Civil Procedure 26(a)(3), WiAutomation provides the following statement of contested facts that remain to be litigated at trial with respect to Rockwell Automation Inc's ("Rockwell") claims in this action. WiAutomation bases this statement on the parties' pleadings, the parties' documentary and testimonial evidence, WiAutomation's current understanding of Rockwell's claims, and the Court's rulings to date.

WiAutomation reserves the right to revise, amend, supplement, or modify its statement of contested facts based on any pretrial rulings or to address any additional issues, arguments, evidence, or other developments in the case, including meet and confers or other negotiations between the parties, and pending and anticipated motions. WiAutomation further reserves the right to supplement this statement to rebut or otherwise address Rockwell's identification of contested facts. Should the Court determine that any issue identified in this statement is more properly an issue of law, WiAutomation incorporates those issues by reference into its Statement of Issues of Law.

The issues of fact (or mixed questions of law and fact) that remain to be litigated at trial are set forth below. To the extent the Court will determine certain factual issues instead of the jury, they are also included below.

1.    No large, sophisticated corporate purchaser bought Rockwell products from WiAutomation while unaware that Rockwell's manufacturer's warranty and other "product support" from Rockwell were not included.

2.    Purchasers of Rockwell products understand that they do not get the manufacturer warranty when purchasing from WiAutomation.

3.    Purchasers of Rockwell products understand that they do not get manufacturer support and services when purchasing from WiAutomation.

4.    WiAutomation's warranty exceeds Rockwell's warranty.

5.    WiAutomation's quality control measures meet or exceed the quality control measures of Rockwell's Authorized Distributors.

6.    WiAutomation never delivered counterfeit products or products with defaced labels to any customers.   The Rockwell-branded products sold by WiAutomation do not have quality control issues.

7.    The Rockwell-branded products sold by WiAutomation come with Rockwell's software.

8.    WiAutomation is able to provide technical assistance to customers, either through its employees or through a partner.

9.    The: (i) Rockwell manufacturer's warranty; (ii) Rockwell customer service; (iii) Rockwell product safety and recall notices; and/or (iv) Rockwell's post

manufacture quality control measures are not material to customers who seek to buy products from WiAutomation.

10.   Rockwell cannot show that WiAutomation made any infringing sales in the United States.

11.   Assuming Rockwell can show that WiAutomation sold products in the United States, WiAutomation's sale of Rockwell-branded products in the United States was not likely to cause confusion in connection with Rockwell's trademarks.

12.   WiAutomation's use of Rockwell's trademarks on its website is necessary to describe Rockwell-branded products.

13.   WiAutomation only uses Rockwell's trademarks on its website as necessary to describe Rockwell-branded products.

14.   WiAutomation did not use descriptions of Rockwell-branded products on its website in a manner that was likely to cause confusion among ordinary consumers as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of WiAutomation's activities with respect to the Rockwell Trademarks.

15.   WiAutomation did not make a false or misleading statement of fact in a commercial advertisement about the nature; quality; characteristic; geographic origin of its own product; service; or commercial activities.

16.   WiAutomation did not characterize any Rockwell-branded products as "new" that were not actually new.

17.   None of WiAutomation's statements misleadingly conveyed a false impression and WiAutomation did not actually mislead any consumer(s).

18.   None of WiAutomation's statements deceived and/or had the tendency to deceive any segment of defendant's audience.

19.   WiAutomation did nothing to deceptively influence the purchasing decisions of consumers.

20.   WiAutomation did not cause a false statement to enter interstate commerce because none of WiAutomation's product; services; commercial activities are transferred; advertised; were sold across state lines.  Rockwell cannot show that WiAutomation sold products in the United States at all.

21.   WiAutomation has not made any false statements, and Rockwell has not been injured by any statement that WiAutomation made.

22.   Rockwell has not been injured by any purported diversion of sales from Rockwell to WiAutomation.

23.   Rockwell has not suffered any loss of goodwill associated with its own products as the result of WiAutomation's conduct.

24.   WiAutomation never shipped any product to any Rockwell agent (or an agent of Rockwell's agent) that was not a genuine, new, and sealed Rockwell product.

25.   WiAutomation never sold any counterfeit Rockwell products in the United States.

26.   WiAutomation has never sold any counterfeit Rockwell products anywhere.

27.   WiAutomation never counterfeited any of Rockwell's trademarks.

28.   Rockwell did not lose any revenue due to any alleged "counterfeiting" from WiAutomation.

29.   Rockwell concealed during discovery that its own agent purchased the products that Rockwell claims are counterfeit.

30.   Rockwell concealed from WiAutomation that its own agent used other agents to purchase products from WiAutomation.

31.   The agent who purchased the product Rockwell claims contains counterfeit printing pleaded guilty to felony fraud charges and owns a company with complex printing capabilities.

32.   Rockwell concealed from WiAutomation that the agent who purchased the product Rockwell claims contains counterfeit printing pleaded guilty to felony fraud charges and owns a company with complex printing capabilities.

33.   Rockwell has not expended substantial amounts of time, effort, and/or money in building its reputation.

34.   Rockwell did not give constructive notice that WiAutomation was allegedly infringing Rockwell's trademarks.

35.   WiAutomation did not continue to use or distribute counterfeit or materially different Rockwell-branded products after Rockwell claims it gave notice of alleged infringing activity.

36.   WiAutomation never infringed Rockwell's trademark and thus, did not act with indifference to Rockwell's trademark rights.

37.   WiAutomation did not act with an intention to benefit from the goodwill or reputation of Rockwell.

38.   WiAutomation did not infringe Rockwell's trademarks, and thus did not willfully infringe or counterfeit Rockwell's trademarks.

39.   Any differences between the Rockwell-branded products sold by WiAutomation and the Rockwell-branded products sold by Rockwell Authorized Distributions are not likely to damage and have not damaged the goodwill developed by Rockwell.

40.   Rockwell has not suffered any injuries as a consequence of WiAutomation's conduct.  Thus, Rockwell has not suffered lost profits directly attributable to WiAutomation's sales, other price erosion, lost goodwill and direct

expense associated with remediating the adverse impact of WiAutomation's behavior, and has not sustained any lost profits, let alone lost profits between $0.41 million and $7.95 million (USD).

41.   WiAutomation has cooperated in providing particular records from which to assess the value of Rockwell materials WiAutomation bought and/or sold.

42.   WiAutomation's estimated revenue from its sale of Rockwell products in the United States is between 417,044€ and 425,275€.

43.   Rockwell has not incurred expenses from preventing customers from being deceived from WiAutomation.

44.   Rockwell will not incur costs for any future actions, such as, corrective advertising due to any of WiAutomation's conduct.

45.   WiAutomation did not engage in false designation of origin.

46.   WiAutomation did not willfully engage in false designation of origin.

47.   WiAutomation did not engage in any prohibited conduct.

48.   WiAutomation did not knowingly engage in any prohibited conduct.

49.   WiAutomation did not engage in statutory unfair competition (deceptive trade practices).

50.   WiAutomation did not engage in statutory unfair competition in Delaware.

51.   WiAutomation does not pass off goods or services as those of another.

52.  WiAutomation does not pass off goods or services of those of another in Delaware.

53.  WiAutomation does not cause any likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

54.  WiAutomation does not cause any likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services in Delaware.

55.  WiAutomation does not cause any likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another.

56.  WiAutomation does not cause any likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another in Delaware.

57.  WiAutomation does not use deceptive representations or designations of geographic origin in connection with goods or services.

58.  WiAutomation does not use deceptive representations or designations of geographic origin in connection with goods or services in Delaware.

59.  WiAutomation does not represent that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that

they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have.

60. WiAutomation does not represent that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have in Delaware.

61. WiAutomation does not represent that goods are original or new when they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand.

62. WiAutomation does not represent that goods are original or new when they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand in Delaware.

63. WiAutomation does not represent that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are of another.

64. WiAutomation does not represent that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are of another in Delaware.

65. WiAutomation does not disparage the goods, services, or business of another by false or misleading representation of fact.

66.  WiAutomation does not disparage the goods, services, or business of another by false or misleading representation of fact in Delaware.

67.  WiAutomation does not advertise goods or services with intent not to sell them as advertised.

68.  WiAutomation does not advertise goods or services with intent not to sell them as advertised in Delaware.

69.  WiAutomation does not advertise goods or services with intent not to supply reasonably expectable public demand.

70.  WiAutomation does not advertise goods or services with intent not to supply reasonably expectable public demand in Delaware.

71. WiAutomation does not make false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions.

72. WiAutomation does not make false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions in Delaware.

73.  WiAutomation does not engage in any conduct which creates a likelihood of confusion or of misunderstanding.

74.  WiAutomation does not engage in any conduct which creates a likelihood of confusion or of misunderstanding in Delaware.

75.  WiAutomation did not engage in common law unfair competition.

76.  WiAutomation did not engage in common law unfair competition in Delaware.

77.  WiAutomation did not willfully engage in statutory and/or common law unfair competition.

78.  WiAutomation did not willfully engage in statutory and/or common law unfair competition in Delaware.

79. Defendant did not engage in any prohibited conduct. WiAutomation thus did not know or should have known that any of their conduct was prohibited, because none of its conduct was prohibited.

80.  WiAutomation did not engage in false advertising.

81.  WiAutomation did not intentionally and/or willfully engage in false advertising.

82. Rockwell did not sustain any damages because of any of WiAutomation's conduct, including from Rockwell's alleged infringement, unfair competition, false advertising, and/or false designation of origin claims.

83. None of WiAutomation's conduct has been outrageous, and WiAutomation has not acted intentionally and/or reckless in connection with any misconduct.

84.  WiAutomation never had a conscious object to engage in outrageous and/or reckless conduct.

85.   None of WiAutomation's conduct was reckless, and WiAutomation never acted so unreasonably and/or dangerously that it knew or should have known that there was an eminent likelihood of harm that can result.

86.   WiAutomation's conduct was not reprehensible.

87.   The presentation from Flame Networks' CEO did not provide accurate facts or information regarding WiAutomation's sales revenue.

88.   WiAutomation did not cause any injury to Rockwell's reputation.

89.   WiAutomation did not cause any injury to Rockwell's goodwill.

90.   WiAutomation did not cause Rockwell to lose profits.

91.   Rockwell has not expended money to prevent customers from being deceived from WiAutomation.

92. Rockwell will not expend money for future corrective advertising required to correct public confusion caused by any of WiAutomation's conduct.

93. Rockwell is not entitled punitive damages.

94. Rockwell is not entitled to a disgorgement of WiAutomation's profits.

95. Rockwell is not entitled to compensatory damages

96. Rockwell is not entitled to statutory damages.

97. Rockwell is not entitled to reasonable attorneys' fees and costs

98. Rockwell is not entitled to trebling of damages.

99.  WiAutomation never advertised that it was authorized to distribute Rockwell products.

100. WiAutomation's website states that it is "not an official distributor" of Rockwell products.

101. WiAutomation never advertised a "Rockwell warranty," "manufacturer warranty," "factory warranty," or "original warranty."

102. Rockwell (d/b/a Lektronix") advertises that it offers a "12 month warranty" in connection with its sales of used products from other manufacturers.

103. At least one individual from a Rockwell authorized distributor stated "obviously our customers know buying from the gray market voids warranties, support agreements, etc."

104. At least one Rockwell employee admitted his local customer did not care whether WiAutomation was an authorized distributor because WiAutomation sold products cheaper than Rockwell or Rockwell's authorized distributors.

105. At least one individual from a Rockwell authorized distributor stated that WiAutomation is "advertising a warranty that exceeds that of the factory."

106. At least one Rockwell employee stated that WiAutomation "clearly have a reliable source for new, sealed in box" Rockwell products.

107. No purchaser contacted Rockwell concerning the warranty, recall notices, after-sale support, customer service, or firmware for Rockwell products that WiAutomation has sold.

108. WiAutomation sold over 200 products to Rockwell (d/b/a) and Rockwell's authorized distributors.

109. WiAutomation has sold new Rockwell products to Rockwell (d/b/a Lektronix) on multiple occasions.

110. Rockwell (d/b/a Lektronix) has never returned a Rockwell product it bought from WiAutomation.

111. Rockwell (d/b/a Lektronix) itself sold new Rockwell products to WiAutomation.

112. WiAutomation sold new Rockwell products to Rockwell's authorized distributor, RAControls.

113. The following Rockwell authorized distributors sold new Rockwell products to WiAutomation: (i) BSA Technology; (ii) Sonopar, S.A.; and (iii) RS Components.

114. Rockwell has no specific protocol documents like manuals or directions instructing its authorized distributors how Rockwell products are to be handled, shipped, or warehoused.

14

115. Rockwell's authorized distributors do not open the box to inspect the physical product as part of the quality control process.

116. Rockwell's 30(b)(6) representative testified that Rockwell has "hundreds of authorized distributors; their facilities vary. I couldn't generalize" how Rockwell authorized distributors store Rockwell products in their warehouses.

117. Rockwell does not have any particular standards that all authorized distributors must maintain for stocking Rockwell product in their warehouse facilities.

118. Rockwell's 30(b)(6) representative testified that he "could not generalize across so many distributors" how its authorized distributors ship Rockwell products.

119. Value Added Resellers ("VAR") generally buy products from all sorts of different manufacturers to create products beyond what Rockwell can provide.

120. Rockwell's authorized distributors can sell new Rockwell products to VARs without Rockwell's approval.

121. Rockwell's manufacturer warranty only carries to the first buyer and is thus not available to customers who purchased a machine from a VAR, even if that VAR bought Rockwell products used in such machine from a Rockwell authorized distributor.

122. Rockwell typically does not have a formal relationship with a VAR.

123. Rockwell has discretion to fulfil its manufacturer warranty through product replacement, repair, re-performance or modification of, or issuance of a credit for the purchase price.

124. Rockwell requires purchasers to pay return shipping costs when returning products under warranty.

125. WiAutomation's 12-month warranty includes a full refund including all shipping costs if the item is not as described.

126. Anyone can receive product notices or product safety advisories by signing up to receive such notices by email through Rockwell's knowledge base.

127. Rockwell communicates recall notices to customers that Rockwell can identify using data from direct sales or point of sale data that Rockwell's authorized distributors provide to Rockwell.

128. If a VAR bought a product, Rockwell would send the recall notice to the VAR, and relies on the VAR to relay the notice to the end user.

129. Rockwell's authorized distributors did not provide Rockwell with point-of-sale data for every product they sold to WiAutomation.

130. Rockwell does not have contact information for every customer who purchased Rockwell products from a Rockwell authorized distributor.

131. Rockwell's customers are very aware of who Rockwell's authorized distributors are.

16

132. In 2020, WiAutomation's website clearly represented that WiAutomation was an unauthorized reseller.

133. End users of Rockwell products make complex decisions and are highly interested in the technologies that they use.

134. Rockwell's attorneys in Italy came with an inspector to inspect WiAutomation's warehouse and the products stored there, and did not find any counterfeit products.

135. Rockwell (d/b/a Lektronix) claims it can convert products from over thirty brands to Rockwell products, including some with "minimal hassle."

136. WiAutomation inspects the physical condition of each box that contains Rockwell products and ensures that the label is intact.

137. WiAutomation also inspects each box for physical damage.

138. WiAutomation does not ship products in a box that shows signs of damage or humidity.

# EXHIBIT 4

## EXHIBIT 4

## ROCKWELL'S STATEMENT OF ISSUES OF LAW THAT <u>REMAIN TO BE LITIGATED</u>

Pursuant to Delaware Local Rule 16.3(c)(5), Plaintiff Rockwell

Automation, Inc. ("Rockwell") hereby submits the following statement of issues of

law that remain to be litigated with citations to authorities relied upon.

This statement is based on the current status of the case and the Court's

rulings to date. Rockwell reserves the right to revise, amend, supplement, or

modify the following statement based on any pretrial rulings by the Court and/or to

address any additional issues, arguments, evidence, or other developments in the

case, including edits to the draft pretrial order, any meet and confers or other

negotiations between the parties, pending motions, and similar developments. The

following statement of issues of law is not exhaustive, and Rockwell reserves the

right to prove any matters identified in the pleadings, interrogatory responses,

and/or expert reports. Rockwell intends to offer evidence as to the issues of fact

and issues of law identified in this Pretrial Order. Rockwell further intends to offer

evidence to rebut evidence offered by Parcop S.R.L. d/b/a WiAutomation.

("WiAutomation"). To the extent that Rockwell's Statement of Issues of Facts to

be Litigated set forth in Exhibit 2 contains issues of law, those issues are

incorporated herein by reference. Should the Court determine that any issue

identified below is more appropriately considered an issue of fact, Rockwell

1

incorporates such issue by reference in Exhibit 2. Rockwell does not assume the burden of proof with regard to any of the below-listed issues of law for which WiAutomation bears the burden of proof.

## I.   <u>Introduction</u>

1.   This action is based on defendant's false and misleading advertisement and sale of unauthorized gray market and counterfeit Rockwell-branded products that are materially different than those plaintiff authorizes for sale.  These infringing Rockwell-branded goods are violations of Sections 32 (trademark infringement including counterfeiting) and 43 (false advertisement and false designation of origin) of the Lanham Act; 6 Del. C. § 2532 et seq. (deceptive trade practices), and Delaware common law unfair competition.

## II.   <u>Trademark Infringement</u>

2.   To establish a claim for trademark infringement under 15 U.S.C. §1114, a plaintiff must show by a preponderance of the evidence that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 192 (3d Cir. 1990).

3.       The first two elements are established if the mark is registered on the USPTO's Principal Register. *See* 15 U.S.C. §§1057(b), 1115(a)-(b)); *Com. Nat'l Ins. Sersv., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).

4.       Gray market infringement claims arise where a reseller's goods lack a characteristic found in all or substantially all of the same trademarked goods sold by the manufacturer and its authorized distributors. *See, e.g.*, *Gamut Trading Co. v. Int'l Trade Comm'n*, 200 F.3d 775 (Fed. Cir. 1999).

5.       The trademark registration certificates for Rockwell's trademarks create a statutory presumption that each of the marks is valid, Rockwell is the owner of the mark, and Rockwell has the exclusive right to use the registered mark. *See* 15 U.S.C. §1057(b); *Georator Corp. v. U.S.*, 485 F.2d 283, 285 (4th Cir. 1973).

6.       As to the third element, "even if an unauthorized Rockwell-branded good is identical in form and function to an authorized good, trademark infringement may still lie when the unauthorized good lacks a material difference that causes consumer confusion as to the source of the goods sold in the United States." *Rockwell Automation, Inc. v. Radwell Int'l, Inc.*, 2020 U.S. Dist. LEXIS 223998, at *31 (D.N.J. Nov. 24, 2020).

7.      A "material difference between goods simultaneously sold in the same market under the same mark creates a presumption of consumer confusion as a matter of law." *Rockwell*, 2020 US Dist. LEXIS 223998, at *32.

8.      "[W]hen dealing with … gray goods, a reviewing court must necessarily be concerned with subtle differences, for it is by subtle difference that consumers are most easily confused." *Soiciete Des Produits Nestle S.A. v. Casa Helvetia,* 982 F.2d 633, 641 (1st Cir. 1992).

9.      Thus in gray goods cases, the "threshold of materiality is always quite low." *Id.*

10.     Courts require a low threshold of materiality, requiring no more than showing that consumers would be likely to consider the differences between the genuine and accused products to be significant when purchasing the product. *Gamut Trading Co. v. U.S. Int'l Trade Comm'n*, 200 F.3d 775, 779 (Fed Cir. 1999).

11.     In fact, "the existence of any difference ... that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a Lanham [Trademark] Act claim." *Id.* The presumption can be rebutted if the defendant has proven by a preponderance of the evidence that the material differences between the products sold by defendant and plaintiff bearing the trademark are not the type of difference that

consumers on average would likely consider when purchasing the plaintiff's product.

12.      "Because the likelihood of confusion increases as the differences between products become more subtle, the threshold for determining a material difference is low. The key question is whether a consumer is likely to consider a difference relevant when purchasing a product." *Hokto Kinoko Co. v. Concord Farms, Inc.,* 738 F.3d 1085, 1093 (9th Cir. 2013)

13.      "In the context of gray-market goods, … we apply a low threshold of materiality, requiring no more than a slight difference which consumers would likely deem relevant when considering a purchase of the product." *Zino Davidoff SA v. CVS Corp.,* 571 F.3d 238, 246 (2d Cir. 2009)

14.      "Courts have found both physical and non-physical material differences to cause consumer confusion and/or loss of goodwill in gray goods cases." *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F.supp2d 296 (S.D.N.Y. 2007).

15.      "Physical material differences are not required to establish trademark infringement ... because trademarked goods originating from the trademark owner may have nonphysical characteristics associated with them, including services, such that [the sale of] similar goods lacking those associated characteristics ... may mislead the consumer and damage the owner's

5

goodwill."  SKF USA Inc. v. Int'l Trade Comm'n, 423 F.3d 1307, 1312 (Fed. Cir. 2005).

16.      "The single most important factor in determining likelihood of confusion is the mark similarity" and "if products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves in determining likelihood of confusion." *Rockwell*, 2020 US Dist. LEXIS 223998, at \*32

17.      Defendant's unauthorized sales of Rockwell-branded goods causes consumer confusion not only because of the material differences between its goods and Rockwell's (as discussed in the next section below), but also because Rockwell, as holder of the intellectual property that identifies the source of the Rockwell goods, has not authorized Defendant's sales of the marked Rockwell goods. *Rockwell*, 2020 US Dist. LEXIS 223998, at \*32-33.

18.      Courts have held that lack of a manufacturer's warranty is a material difference. *Rockwell*, 2020 US Dist. LEXIS 223998, at \*45-46 (finding Rockwell warranty is a non-pretextual material difference on summary judgment in gray market goods case); *see, also Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1073 (10th Cir. 2009) (affirming grant of preliminary injunction in gray market infringement action based on defendant's lack of plaintiff's warranty); *Bourdeau Bros., Inc. v. Int'l Trade Comm'n*, 444 F.3d

6

1317, 1325 n.3 (Fed. Cir. 2006) (noting that "any difference[] in warranty coverage" can be a "material difference" and that "a finding of trademark infringement [can be] based upon a single material difference").

19.     Lack of product safety and recall notices is a material difference. *Beltronics USA, Inc. v. Midwest Inventory Distrib.*, LLC, 522 F. Supp. 2d 1318, 1327-28 (D. Kan. 2007) (safety and recall notices found to be material differences); *Zino Davidoff SA v. CVS Corp.*, 2007 U.S. Dist LEXIS 48128 at *22-23 (S.D.N.Y. July 2, 2007) (product recall notices are material differences).

20.     Lack of post manufacture quality control issues is a material difference. *See Rockwell Automation, Inc. v. Radwell Int'l, Inc.*, 2016 U.S. Dist. LEXIS 165633, at *8-9 at n. 2 (D.N.J. Nov. 28, 2016) ("[T]he Third Circuit has found differences in the post-manufacture quality control process alone to constitute material differences."); *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996) (differences in quality control supported material differences).

21.     Defendant's unauthorized sales of Rockwell-branded goods that are sold with broken factory seals, old Rockwell-branded goods that are sold as new, Rockwell-branded goods sold with damaged or altered serial numbers, and new Rockwell-branded goods that are sold as used are materially different from the new factory-sealed products that Rockwell sells. *See, e.g.*, *Zino Davidoff SA v. CVS*

*Corp.*, 571 F.3d 238, 246 (2d Cir. 2009) ("Mutilation of packaging to conceal markings may lead the consumer to suspect that the item is stolen merchandise, or is defective and has been diverted from a recall, or is otherwise untrustworthy . . . . It is a logical inference that consumers may regard a product whose packaging has been tampered as inferior and perhaps suspicious."); *see also Davidoff & CIE, S.A. v. ILD Int'l Corp.*, 263 F.3d 1297, 1303-04 (11th Cir. 2001) ("The caselaw supports the proposition that the resale of a trademarked product that has been altered, resulting in physical differences in the product, can create a likelihood of consumer confusion."); *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 313 (S.D.N.Y. 2007) ("Differences in product packaging have been found to constitute material differences in a variety of gray goods cases."); *Nitro Leisure Prods., L.L.C. v. Acushnet Co.*, 341 F.3d 1356, 1362 (Fed. Cir. 2003) ("[C]onsumers of new goods have different expectations than consumers of used goods" because "new goods, any variation of the product from a new condition . . . may signal imitation, counterfeiting, falsity or some other irregularity affecting a customer's decision whether to purchase the product.").

22.     Defendant's sale of Rockwell-branded products with unlicensed firmware and/or software is materially different than genuine Rockwell-branded products.

23.    Under Third Circuit law, "a single, non-pretextual material difference between authorized goods and unauthorized ones can justify a finding of trademark infringement." *Rockwell*, 2020 US Dist. LEXIS 223998, at *43.

24.    "[T]he absence of any of these material difference in [reseller's] nonconforming goods sold in the U.S. would harm the goodwill of the asserted [Rockwell] marks." *Id.* at *45.

25.    In this Circuit, "a material difference between goods simultaneously sold in the same market under the same mark creates a presumption of consumer confusion as a matter of law." *Id.* at *32.

26.    Survey results are deemed evidence of actual confusion. *See NFL Props. v. N.J. Giants, Inc.*, 637 F. Supp. 507, 513, 517-518 (D.N.J. 1986) (finding actual confusion based on a consumer survey); *see also Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987), *cert. denied*, 488 U.S. 933, 102 (1988) ("As to incidents of actual confusion, Mutual produced evidence of actual confusion in the form of a survey .... We consider this appropriate, for surveys are often used to demonstrate actual consumer confusion."; *Novartis Consumer Health, Inc. v. J & J Merck Consumer Pharm. Co.*, 290 F.3d 578, 594 (3d Cir. 2002) ("[S]urvey evidence of 15% confusion is sufficient to demonstrate actual confusion.").

9

27.     "[T]he "material differences" jurisprudence <u>excludes unauthorized gray goods from the first sale doctrine</u>…." *Rockwell Automation, Inc.*, *v. Radwell Int'l, Inc.*, 2019 WL 7288946, at *8 (D.N.J. Dec. 30, 2019).

28.     The principle of nominative fair use does not apply in gray market infringement cases. Nominative fair use only applies so long as there no likelihood of confusion. S*ee Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ.*, LLC, 823 F.3d 153, 166 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 624, 196 L. Ed. 2d 516 (2017) ("nominative fair use is not an affirmative defense because it does not protect a defendant from liability if there is, in fact, a likelihood of consumer confusion"); *In the Matter of Certain Cigarettes & Packaging Thereof,* Initial Determination & Recommended Determination, USITC Inv. No. 337-TA-424 (June 22, 2000) ("Given my finding that a likelihood of confusion results from PTI's actions, by PTI's own admission, this defense does not apply."); *see also McCarthy on Trademarks and Unfair Competition* § 23:11 (5th ed.) at 4 (nominative fair use "is a use of another's trademark to identify the trademark owner's goods or services. This is not an infringement so long as there is no likelihood of confusion."). When determining whether there is a likelihood of confusion in gray market goods cases, the likelihood of confusion is presumed if there is a finding that the products sold by Respondent are materially different from genuine Rockwell Products.  *Rockwell*, 2020 US Dist. LEXIS 223998, at *32

(A "material difference between goods simultaneously sold in the same market under the same mark creates a presumption of consumer confusion as a matter of law."). Accordingly, nominative fair use cannot apply in gray market infringement cases such as this one.

29.     Counterfeiting is the practice of placing a false trademark on a product, often of inferior quality, in order to make the product superficially indistinguishable from the genuine article. 35 U.S.C. 1114 prohibits the use in commerce of any counterfeit of a registered mark that is likely to cause confusion, or to cause mistake, or to deceive a consumer.

30.     A counterfeit mark is defined as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. §1127.

31.     A "spurious" trademark is "one that is false or inauthentic." *United States v. Petrosian*, 126 F.3d 1232, 1234 (9th Cir. 1997).

32.     While counterfeiting need not be intentional to violate 35 U.S.C. 1114, the scale of statutory damages is different in cases of willful counterfeiting and non-willful counterfeiting. *See* 15 U.S.C. §§ 1117(c)(1), (2).

33.     Counterfeiting occurs if infringer merely sells or offers for sale goods bearing a counterfeit mark and plays no part in affixing or placing the counterfeit mark on the goods, or otherwise designing or manufacturing the goods.

*Chanel, Inc. v. RealReal, Inc.*, 449 F.Supp.3d 422 (S.D.N.Y. 2020) (quoting *El Greco Leather Prods. Co.* 806 F.2d at 396 (2d Cir. 1986).

34.     If defendant sells or distributes a product in the United States bearing a counterfeit Rockwell trademark, there is a presumption that there is a likelihood of confusion and therefore trademark infringement. McCarthy on Trademarks §25:15.50 ("If an accused use is found to be a "counterfeit," this means it automatically satisfies the confusing similarity test of traditional infringement analysis. If the accused use is so closely similar as to be a "counterfeit," then traditional likelihood of confusion analysis is not necessary. Courts assume that if the goods are so closely similar as to be regarded as "counterfeit," then a likelihood of confusion must be present.") (collecting cases); Corpus Juris Secundum CJS Trademark § 304 Presumptions related to confusion or deception in civil actions on trademarks ("Under the Lanham Act, the elements of public confusion or deception in trademark actions, whether for infringement or unfair competition, may be presumed when a trademark is counterfeit since a counterfeit mark is inherently confusing."); Callmann on Unfair Competition, Trademarks and Monopolies (4th edition) § 22:36 Counterfeiting - Civil Liability ("In a federal trademark counterfeiting case, likelihood of confusion is presumed"); *Innovation Ventures, LLC v. Ultimate One Distributing Corp.,* 176 F.Supp.3d 137, 154 (E.D.N.Y. 2016) ("counterfeit marks are inherently

12

confusing"); *Gucci America, Inc. v. Duty Free Apparel, Ltd*., 286 F.Supp.2d 284, 287 (S.D.N.Y. 2003) ("counterfeits, by their very nature, cause confusion"); *Opticians Ass'n of Am. v. Indep. Opticians of Am., supra,* 920 F.2d at 195 ("[L]ikelihood of confusion is inevitable, when, as in this case, the identical mark is used concurrently by unrelated entities.")

35.     Willfulness can be inferred from continued use after being given notice. *New Balance Athletics, Inc. v. USA New Bunren Int'l. Co. Ltd. LLC*, 2020 U.S. Dist. LEXIS 170906, at *6 (D. Del. Sept. 18, 2020) ("A court may also find willfulness if a defendant uses counterfeit marks that are identical to … strong and established marks, because such actions demonstrate a defendant's desire and purpose to trade upon a plaintiff's goodwill.")(quotations omitted).

36.     A defendant acted willfully it had an intent to infringe, or it had a deliberate disregard of Rockwell's rights, or it had an aura of indifference as to Rockwell's rights.  *SecuraComm Consulting Inc. v. Securacom Inc.,* 166 F.3d 182, 187 (3d Cir.1999) ("[W]illful infringement … involves an intent to infringe or a deliberate disregard of a mark holder's rights. The Second Circuit has aptly described willful infringement as involving "an aura of indifference to plaintiff's rights….") *superseded by statute on other grounds as stated in Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 173–76 (3d Cir. 2005).

37.      "Evidence that there are discrepancies between a company's internal product-identification information and the actual characteristics of the contested goods is sufficient to establish a prima facie case that the goods were not manufactured by the trademark holder and thus are counterfeit." *See Chanel Inc. v. WGACA, LLC*, 2022 U.S. Dist. LEXIS 55880 at *42-43 (S.D.N.Y. March 28, 2022)

38.      Where counterfeit marks are involved, it is not necessary to perform a step-by-step examination of the likelihood of confusion "Lapp" factors because counterfeit marks are inherently confusing as a matter of law. *See Luxottica Grp. S.p.A. v. Accessory Consultants LLC*, 2020 U.S. Dist. LEXIS 68598, *n.2 (D.N.J. April 20, 2020); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 596-97 (S.D.N.Y. 2010) ("[W]here counterfeit marks are involved, the court need not engage in a [likelihood of confusion analysis] because counterfeit marks are inherently confusing.").

39.      Under the Lanham Act, a plaintiff in a trademark infringement case may recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 35 U.S.C. § 1117(a). The court shall assess such profits and damages or cause the same to be assessed under its direction. *Id.* In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant

must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. *Id.* If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. *Id.* Such sum in either of the above circumstances shall constitute compensation and not a penalty. *Id.* The court in exceptional cases may award reasonable attorney fees to the prevailing party. *Id.*

40.     A prevailing plaintiff in a civil counterfeiting case is entitled to attorneys' fees and treble damages or profits, or, in the alternative, may elect to obtain statutory damages. 15 U.S.C. § 1117.

## III.   <u>False Advertising and False Designation of Origin</u>

41.     To establish a false advertising or false designation of origin claim under §43(a) of the Lanham Act, the plaintiff must show: "(1) the defendant made false or misleading statements about the plaintiff's product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff. The plaintiff need not prove actual consumer

deception if the advertisement is literally false." *Rockwell*, 2016 U.S. Dist. LEXIS 165633, at *13 (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 171 (3d Cir. 2001)).

42.     "[C]onsumer surveys present the most reliable way of establishing the existence of falsity or deception." *See Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 955 (3d Cir. 1993).

43.     "The materiality inquiry focuses on whether the false or misleading statement is likely to make a difference to [consumers]." *Bracco Diagnostics Inc., v. Amersham Health, Inc.*, 627 F.Supp. 2d 384, 478 (D.N.J. 2009).

44.     "[F]alsely advis[ing] that the merchandise is protected by the manufacturer's warranty" when it does not causes harm. *See Osawa & Co. v. B & H Photo, Inc.*, 589 F. Supp. 1163, 1167-68 (S.D.N.Y.1984).

45.     Causing a false statement to enter interstate commerce occurs when the advertisements are on a website accessible via the Internet. *Laurel Capital Group, Inc. v. BT Fin. Corp.*, 45 F. Supp. 2d 469, 479 (W.D. Pa. 1999) (finding that maintaining a website satisfies the interstate commerce requirement).

46.     Importing products into the United States satisfies the interstate commerce element of a false advertising claim. *Philip Morris USA, Inc. v. Lee*, 481 F. Supp. 2d 742, 748 (5th Cir. 2006) ("The Lanham Act defines "commerce" to include "all commerce which may lawfully be regulated by Congress," *id.,* para. 3,

16

which of course includes the importation of goods from abroad, U.S. CONST. art. I, § 8."); *La Fabril, S.A. v. Mi Tierra Foods, LLC*, 2021 U.S. Dist. LEXIS 242132, *11 (D.N.J. Dec. 20, 2021) (In analyzing a false advertising claim under the Lanham Act, the court found "the goods traveled in interstate commerce because they were imported.").

47.     Remedies for false advertising and false designation of origin are identical to those available in actions based on infringement of registered trademarks. 15 U.S.C. § 1117.

2.     **Statutory Unfair Competition – Deceptive Trade Practices**

48.     Statutory unfair competition or Deceptive Trade Practices arise under the Delaware Deceptive Trade Practices Act ("DDTPA"), 6 Del. C. §2532, when a defendant causes "likelihood of confusion or of misunderstanding as to (a) the source, sponsorship, approval, or certification of the defendant's goods and services by plaintiffs; or (b) affiliation, connection, or association, or certification of the Defendant's goods and services by plaintiffs*." Military Certified Residential Specialist, LLC v. Fairway Indep. Mortg. Corp.*, 251 F.Supp.3d 750, 757 (D. Del. 2017).

49.     "Courts reviewing DDPTA violations apply the same standards as they apply to trademark infringement claims (i.e., valid and protectable mark, plaintiff owns mark, and likelihood of confusion)". *Id.*

50.      A finding of trademark infringement will also lead to a finding of deceptive trade practices.

51.      Separately, under 6 Del. C. §2532(a) a "person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person";

(1)   Passes off goods or services as those of another;

(2)   Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3)   Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4)   Uses deceptive representations or designations of geographic origin in connection with goods or services;

(5)   Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(6)   Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7)  Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8)  Disparages the goods, services, or business of another by false or misleading representation of fact;

(9)  Advertises goods or services with intent not to sell them as advertised;

(10)  Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11)  Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

(12)  Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

52.  In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding. 6 Del. C. §2532(b).

53.  Under 6 Del. C. § 2533 (a), "a person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of

19

monetary damage, loss of profits, or intent to deceive, is not required. Relief granted for the copying of an article shall be limited to the prevention of confusion or misunderstanding as to source."

54.      Additionally, under 6 Del. C. § 2533(b) the "[C]ourt in exceptional cases may award reasonable attorneys' fees to the prevailing party. Costs or attorneys' fees may be assessed against a defendant only if the court finds that defendant has willfully engaged in a deceptive trade practice."

55.      Under 6 Del. C. § 2533 (a) "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits, or intent to deceive, is not required. Relief granted for the copying of an article shall be limited to the prevention of confusion or misunderstanding as to source."

56.      Finally, under 6 Del. C. § 2533 (c) the "relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State. If damages are awarded to the aggrieved party under the common law or other statutes of this State, such damages awarded shall be treble the amount of the actual damages proved."

IV.   **Common Law Unfair Competition**

57.     Delaware common law unfair competition is governed by the same standard as trademark infringement. *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 847 at n.2 (D. Del. 2006).

58.     A finding of trademark infringement will also lead to a finding of unfair competition under the common law of Delaware.

59.     You may still find for Rockwell on its unfair competition claim if it proves by a preponderance of the evidence that (1) Rockwell had a reasonable expectancy of entering a valid business relationship with its customers in the form of product sales; and (2) WiAutomation has wrongly interfered with the relationships and its actions have defeated Rockwell's legitimate expectancy of product sales.  *Surgiquest, Inc. v. Lexion Med., LLC*, *14cv382*  Dkt 265 at 1710-11 (D. Del. June 27, 2017) ("First, that the plaintiff had a reasonable expectancy of entering a valid business relationship with its customers in the form of product **sales**; Next. The defendant has wrongly interfered with the relationships and the defendant's actions have defeated the plaintiffs' legitimate expectancy of entering a valid business relationship.")

60.      Section 1117(c) authorizes statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed." 15 U.S.C. § 1117(c)(1). If the defendant's

infringement was willful, then the maximum award is trebled to $2 million per mark per type of good. 15 U.S.C. § 1117(c)(2). The specific dollar amount within the applicable range is the amount "the court considers just." 15 U.S.C. § 1117(c). Thus, to calculate the total amount of statutory damages, the court, in an exercise of its discretion, sets a dollar amount per violation and then multiplies that amount by three variables: (i) the number of counterfeit marks, (ii) the number of types of goods, and (iii) an appropriate amount if the infringement was willful.

61.     Under Delaware common law, Rockwell is entitled to an award of compensatory damages to reasonably and fairly compensate Rockwell for (i) the injury to Rockwell's reputation; (ii) the injury to Rockwell's goodwill; (iii) any lost profits that Rockwell would have earned but for Defendant's wrongful conduct; (iv) the expense of preventing customers from being deceived; and/or (v) the cost of future corrective advertising reasonably required to correct public confusion caused by Defendant's wrongful conduct.

62.     Under Delaware common law Rockwell is entitled to an award of punitive damages to punish Defendant for outrageous conduct and to deter Defendant, and others like it, from engaging in similar conduct in the future. *See SurgiQuest v. Lexion Med., Inc.*, No. CV 14-382-GMS, 2018 WL 2247216, at *6-8 (D. Del. May 16, 2018) (concluding that evidence at trial was sufficient to support

22

a verdict awarding punitive damages under Delaware law because the jury found

that SurgiQuest intentionally or recklessly engaged in unfair competition).

**V.**   <u>**Remedies**</u>

63.   Rockwell seeks judgment that:

A. WiAutomation has willfully violated Section 32(1) of the Lanham

Act, 15 U.S.C. § 1114(1);

B. WiAutomation has willfully sold counterfeit Rockwell products;

C.  WiAutomation  has willfully engaged in false advertising in violation

of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B);

D. WiAutomation  has willfully engaged in false designation of origin in

violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A);

E. WiAutomation  has willfully engaged in deceptive trade practices in

violation of 6 Del. C. § 2532 et seq.; and

F. WiAutomation has willfully engaged in unfair competition in violation

of the common law of the State of Delaware.

64.    Rockwell also seeks a permanent injunction restraining and

enjoining WiAutomation and all of its agents, servants, employees, successors

and assigns, and all persons in active concert or participation with

WiAutomation (or its agents) from:

23

A. Selling, marketing, advertising, importing, or purchasing Unauthorized Rockwell Products;

B. Using any of Plaintiff's Trademarks and/or any other confusingly similar designation, alone or in combination with other words, phrases, symbols or designs, as trademarks, trade names, domain name components or otherwise, to market, advertise, or identify WiAutomation's goods or services;

C. Otherwise infringing Plaintiff's Trademarks;

D. Representing by any means whatsoever, directly or indirectly, that any products or services offered or provided by WiAutomation  are offered or authorized by Rockwell, or from otherwise taking any action likely to cause confusion, mistake, or deception on the part of consumers as to the source or origin of such products or services or as to any authorization, sponsorship, approval, or affiliation relationship between WiAutomation and Rockwell;

E. Affixing, applying, annexing, or using in connection with the manufacture, distribution, marketing, advertising, packaging, sale, and/or offering for sale or other use of any products or services, a false description or representation, including without limitation words, symbols, photographs, or product representations similar to those used

24

by Rockwell, tending to falsely describe or represent such products or

services as being those of Rockwell;

F. Unfairly competing with Rockwell in any manner whatsoever or

otherwise injuring its business reputation in the manner complained of

herein; and

G. Engaging in assignments or transfers, formation of new entities or

associations or utilization of any other device for the purpose of

circumventing or otherwise avoiding the prohibitions set forth in sub-

paragraphs (a) through (g) above.

65.    "According to well-established principles of equity, a plaintiff

seeking a permanent injunction must ... demonstrate: (1) that it has suffered an

irreparable injury; (2) that remedies available at law, such as monetary damages,

are inadequate to compensate for that injury; (3) that, considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted;

and (4) that the public interest would not be disserved by a permanent

injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

66.    "The law of trademark protects trademark owners in the exclusive

use of their marks when use by another would be likely to cause

confusion." *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383

F.3d 110, 131 (3d Cir. 2004). "A permanent injunction is the usual and normal

25

remedy once trademark infringement has been found in a final judgment." S&P

Global Inc., v. S&P Data LLC, 619 F.Supp.3d 445, 472 (D.Del. 2022).

67.   The Trademark Modernization Act states that plaintiffs seeking an

injunction "shall be entitled to a rebuttable presumption of irreparable harm ...

upon a finding of likelihood of success on the merits for a violation identified in

this subsection in the case of a motion for a preliminary injunction or temporary

restraining order." Pub. L. No. 116-260 § 226(a).

68.   Under 15 U.S.C. § 1116(a), a "plaintiff seeking any such

injunction shall be entitled to a rebuttable presumption of irreparable harm upon

a finding of a violation identified in this subsection in the case of a motion for a

permanent injunction."

69.   Rockwell also seeks an order, under 15 U.S.C. §§ 1116 and 1118,

requiring WiAutomation (including its employees and agents) to deliver to

Rockwell (or allow Rockwell to pick up), or requiring to be destroyed, all

Unauthorized Rockwell Products that are in WiAutomation's possession,

custody, or control.

70.   Rockwell seeks an order, pursuant to 15 U.S.C. § 1116, requiring

WiAutomation to file with this Court and serve upon Rockwell within 30 days

after the entry of the permanent injunction a report, in writing and under oath,

setting forth in detail the manner in which WiAutomation has complied with the

preceding two paragraphs.

71.    Rockwell seeks an order:

A. Awarding Rockwell, under 15 U.S.C. § 1117, all profits received by WI Automation from the sales and revenues of any kind made as a result of WI Automation's sales of Unauthorized Rockwell Products, and damages, to be determined, that Rockwell has suffered as a result of WiAutomation's sales and marketing of Unauthorized Rockwell Products (calculated past the close of discovery and up to judgment and including, but not limited to, Rockwell's lost profits, injury to Rockwell's reputation, injury to Rockwell's goodwill, the expense of preventing customers from being deceived, the cost of future corrective advertising reasonably required to correct public confusion caused by the WiAutomation's wrongful conduct, price erosion, and statutory and other damages awarded pursuant to 15 U.S.C. § 1117 and 6 Del. C. § 2532 et seq, trebled);

B. Awarding Rockwell damages, attorneys' fees, and costs to the fullest extent provided for by the Lanham Act, 6 Del. C. § 2532 and the common law of Delaware, including punitive damages;

C. Awarding Rockwell pre-judgment and post-judgment interest; and

D. Awarding Rockwell such other and further relief as this Court deems

just and equitable.

72.      A trademark owner may recover an infringer's profits attributable

to the trademark infringement, false advertising, false designation of origin claims,

or unfair competition claim. Profit is determined by deducting expenses from gross

revenue. Gross revenue is all the money the infringer received due to its use of the

trademarks in question.  The trademark owner is required only to prove the

infringer's gross revenue.  The infringer is required to prove any expenses that it

argues should be deducted in determining its profits. Expenses are all costs

incurred by WiAutomation in producing the gross revenue.  WiAutomation has the

burden of proving the expenses by a preponderance of the evidence.

WiAutomation also has the burden of demonstrating how any cost contributed to

the sale of a Rockwell-branded product.  Expenses cannot be speculative, and

should be rejected if any expense is not properly substantiated and documented for

each such expense. Cost estimates should be excluded when a party could have,

but failed to, introduce other, more reliable evidence as proof.  If the wrongful

conduct has been found to be willful by clear and convincing evidence, extra

scrutiny is given to the categories of overhead expenses claimed to ensure that each

category is directly and validly connected to the sale of the products.  Subtract the

proven expenses from the gross revenue to determine the total profit that should be

awarded. *Banjo Buddies, Inc.* 399 F.3d at 172, 176 (3d Cir. 2005) (affirming district court's rejection of costs that "did not show how 'each item of general expense contributed to the production of the infringing items in issue and offer a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items at issue.'"); *Hamil America Inc. v. GFI,* 193 F.3d 92, 107 (2d Cir. 1999) ("When infringement is found to be willful, the district court should give extra scrutiny to the categories of overhead expenses claimed by the infringer to insure that each category is directly and validly connected to the sale and production of the infringing product. Unless a strong nexus is established, the court should not permit a deduction for the overhead category.")

73.     Under 6 Del. C. § 2533 (b) "[t]he court in exceptional cases may award reasonable attorneys' fees to the prevailing party. Costs or attorneys' fees may be assessed against a defendant only if the court finds that defendant has wilfully engaged in a deceptive trade practice."

74.     Under 15 U.S.C. § 1117, "the court in exceptional cases may award reasonable attorney fees to the prevailing party" and "in a case involving use of a counterfeit mark, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of (1) intentionally using a mark or designation, knowing such mark or designation is a

counterfeit mark … in connection with the sale, offering for sale, or distribution of

a goods or services…."

# EXHIBIT 5

**Exhibit 5**

**WiAutomation's Statements of Issues of Law that Remain to Be Litigated**

Parcop S.r.l. d/b/a WiAutomation ("WiAutomation") identifies the following issues of law that remain to be litigated, with a citation to applicable authorities.  This statement is based on the arguments that WiAutomation anticipates making, and its understanding of the arguments that plaintiff Rockwell Automation, Inc. ("Rockwell") will likely make. WiAutomation reserves the right to supplement this statement if Rockwell seeks to introduce different or additional legal arguments.  This statement is based on the current status of the case and the Court's rulings to date.  WiAutomation reserves the right to modify or supplement this statement in response to any subsequent rulings and/or Rockwell's pretrial exchanges.  Should the Court find that any of the issues included here constitute factual issues, WiAutomation incorporates such issues by reference into its Statement of Issues of Fact To Be Litigated.  To the extent that WiAutomation's Statement of Issues of Fact To Be Litigated contains issues that the Court deems to be issues of law, WiAutomation incorporates those issues into this statement by reference.  WiAutomation reserves the right to rely on the legal authorities cited by Rockwell in its corresponding exhibit, Exhibit 4.  The authority cited in this statement is not exhaustive. Any party may rely on authority not cited here.

     **I.**    **As to All Lanham Act Claims**

    1.    The Lanham Act solely relates to conduct in the United States. *Abitron Austria GmbH et al. v. Hetronic International Inc.*, No. 21-1043, 2003 WL 4239255 (2023).  Thus, any foreign conduct is irrelevant under the Lanham Act.  *Id.*

     **II.**    **Trademark Infringement**

    2.    The Lanham Act grants trademark owners the right to control the sale of products bearing the owner's mark. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998).

3.      The trademark owner's first sale of its product into the stream of commerce "extinguishes the trademark owner's rights to maintain control over who buys, sells, and uses the product in its authorized form." *Id.* at 301, n.4.

4.      The "first sale" doctrine is fatal to any Lanham Act infringement claim where the products sold by the alleged infringer are genuine. *Id.*

5.      A product is genuine if it is not "materially different" from the product sold by the trademark owner. *Id.* at 302-03.

6.      "The purpose of the material differences test is to determine whether the allegedly infringing products are likely to injure the goodwill developed by the trademark owner in the trademarked goods." *Id.* at 303.

7.      Therefore, "[t]he Lanham Act does not proscribe material differences *per se*; it [only] proscribes sales . . . that are 'likely to cause confusion, or to cause mistake, or to deceive.'" *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1074 (10th Cir. 2009) (*citing* 15 U.S.C. § 1114(a)-(b)).

8.      The material differences analysis must therefore include "an examination of the products and markets at issue," *Id.* at 1073 (emphasis added), because "consumer preferences are as fickle and diverse as the human imagination." *Iberia Foods*, 150 F.3d at 304.

9.      Where the customers who bought the alleged infringer's goods "get precisely what they believed that they were purchasing . . . consumers' perceptions of the trademarked goods are not likely to be affected by the infringer's sales." *Id.* at 303

10.     Thus, "not all differences are material," *Beltronics USA, Inc.*, 562 F.3d at 1072.

11. "Not all value-added functions dictated by the manufacturer are required to insure a 'genuine' product." *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc. of Lafayette*, 988 F.2d 587, 591 (5th Cir. 1993).

12. Since the "material differences" test primarily concerns customer confusion, deception, and mistake, it is critical to consider the actual customers and market at issue. *See Beltronics USA, Inc.*, 562 F.3d at 1073 ("the materiality analysis . . . must include an 'examination of the products and markets at issue.'").

13. The Court should therefore consider the sophistication of the consumers who are buying the products at issue in its "material differences" analysis. *See Dan-Foam A/S and Tempur-Pedic, Inc. v. Brand Named Beds LLC*, 500 F. Supp. 2d 296, 311-12 (S.D.N.Y. 2007).

14. "Where the relevant products are expensive or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001).

15. "Where the relevant buyer class is composed solely of professional, or commercial purchasers, it is reasonable to set a higher standard of care than exists for consumers." *Id.* at 285 (citing 3 *McCarthy on Trademarks* § 23:101).

16. For example, the Third Circuit holds that customers of commercial electronic security control systems should be held to a higher standard because they were not making "impulse purchases," and "place great importance on, and take great care in, purchasing these products," especially since the products at issue are "essential to the customer's business needs." *Id.* at 276, 285-86.

17. The material differences "analysis must be done on a case-by-case basis." *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992).

18.     There are no material differences because WiAutomation's offerings are not likely to cause "confusion, or to cause mistake, or to deceive." *Beltronics USA, Inc.*, 562 F.3d at 1074.

19.     "[Q]uality control is not a talisman the mere utterance of which entitles the trademark owner to [a] judgment." *Iberia Foods*, 150 F.3d at 304.

20.     A "trademark holder must show that it uses substantial and non-pretextual quality control procedures such that nonconforming sales will diminish the value of the mark[.]" *Id.*

21.     For example, in *Iberia Foods*, the Third Circuit found the plaintiff's inspection for damage to exterior packaging was insufficient to create a material difference, because retailers were unlikely to display obviously damaged products on their shelves regardless of this inspection. *Id.* at 305.

22.     The *Iberia Foods* Court distinguished this external inspection from cases where quality control was a material difference, like: (i) where the trademark owner tested the product in a laboratory; or (ii) where the goods were not released until the trademark owner inspected the physical product. *Id.* at 305-06 (citing *Nestle*, 982 F.2d at 642-43; *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986)).

23.     Both WiAutomation and Rockwell's Authorized Distributors ("AD") perform the same examination to packaging exterior.  That an AD performs the check does not make it a "material difference." *Iberia Foods,* 150 F.3d at 304.

24.     Similarly, Rockwell's alleged customer service is not a "material difference" just because it comes from the manufacturer or its authorized distributors. *See Iberia Foods,* 150 F.3d at 304.

25.     That Rockwell allows, and even endorses, its end users to buy Rockwell products from Value Added Resellers, when the end user would not be entitled to Rockwell's customer service

demonstrates that its customer service is pretextual and is not a material difference. *See Id.* at 302-03.

26.     WiAutomation's full-refund warranty is superior to Rockwell's, since Rockwell's warranty reserves the discretion for Rockwell to fulfil its "manufacturer" warranty through "replacement, repair, re-performance or modification of, or issuance of a credit for the purchase price." Consequently, WiAutomation's warranty will not and cannot harm Rockwell's goodwill. *Iberia Foods.* 150 F.3d at 303.

27.     The manufacturer's warranty alone is not a material differences where there is also no: (i) difference in the physical product; (ii) direct examples of confusion; or (iii) objectively false advertising. *Bourdeau Bros v. It'l Trade Comm'n*, 444 F3d 1317, 1321 (Fed. Cir. 2006)(products had different safety features, labels and manuals in different languages, and were incompatible with accessories used in America); *Beltronics USA, Inc.*, 522 F. Supp. 2d at 1325, 1328 (Beltronics showed actual examples where consumers were confused whether they would receive the manufacturer warranty service, rebates, and recalls for products they purchased from the defendant); *Rockwell Automation Inc. v. Radwell Int'l Inc.*, 2020 U.S. Dist. LEXIS 223998, at *32 (D.N.J. Nov. 24, 2020)(Radwell falsely advertised a "factory warranty" knowing it was misleading).

28.     That Rockwell allows, and even endorses, its end users to purchase Rockwell products from "Value Added Resellers" when the end user is not entitled to Rockwell's manufacturer's warranty demonstrates that Rockwell's manufacturer's warranty is superficial and pretextual, and is not a material difference. *Iberia Foods,* 150 F.3d at 302-03.

29.     Rockwell makes its recall and safety notices publicly available. Further, Rockwell cannot provide recall or safety notices if its ADs do not provide sales data, which is a widespread issue given that Rockwell only had proof of ▮ of one of its AD's sales to WiAutomation. Thus,

the ability to purchase products cheaper from WiAutomation and obtain recall and safety notices from Rockwell's publicly available sources will not harm Rockwell's goodwill. *Iberia Foods.* 150 F.3d at 303.

30.     Rockwell has the burden of proof to establish that all or substantially all of its own authorized sales in the U.S. have or are accompanied by the thing that is the asserted material difference. *Bourdeau Bros. v. Int'l Trade Comm'n*, 444 F.3d 1317, 1327 (Fed. Cir. 2006) (the trademark holder had the burden of proving by a preponderance of the evidence that all or substantially all of its own authorized sales in the U.S. were materially different from the alleged gray market goods); *SKF USA Inc. v. Int'l Trade Comm'n*, 423 F.3d 1307, 1316 (Fed. Cir. 2005) (finding that no violation was found because the trademark holder failed to show that all or substantially all of the trademark owner's own authorized sales had the post-sale technical support that it claimed constituted a material difference and holding "a trademark owner must show that all or substantially all of its authorized goods are accompanied by each of the claimed material differences to satisfy that standard.")

31.     That Rockwell allows, and even endorses, its end users to buy Rockwell products from Value Added Resellers, when the end user may not receive Rockwell's safety and recall notices directly from Rockwell, demonstrates that receiving such notices from Rockwell is superficial and pretextual and is not a material difference. *Iberia Foods,* 150 F.3d at 302-03.

32.     Rockwell does not sell everyday consumer products to the masses. It sells "industrial automation products […] that run a variety of industrial and commercial operations."  End users of Rockwell products are making "complex decisions" and "are highly interested in the technologies that they use."  *See Checkpoint Sys., Inc.*, 269 at 284-285 ("Where the relevant

products are expensive or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations.")

33.     Accordingly, WiAutomation's customers know exactly what they are receiving when purchasing new Rockwell products from WiAutomation at a lower price than from Rockwell's ADs, and there are no "material differences." *Iberia Foods*, 150 F.3d at 303.

34.     Rockwell cannot establish any infringing conduct in the United States. *See Abitron Austria GmbH et al. v. Hetronic International Inc.*, No. 21-1043, 600 U.S. ____ (2023).

   **III.    False Advertising**

35.     To establish false advertising under Section 43(a)(1)(B) of the Lanham Act, a plaintiff must prove five elements: (1) the defendant has made false or misleading statements as to his own product or another's product; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014).

36.     Any plaintiff asserting a false advertising claim "ordinarily must show that its economic or reputational injury flows directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).

37.     Regarding the second element, actual deception or a tendency to deceive is presumed if a plaintiff proves an advertisement is unambiguous and literally false. *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.,* 290 F.3d 578, 586 (3d Cir. 2002).

38.     If the message conveyed by an advertisement is literally true or ambiguous, the plaintiff must prove actual deception or a tendency to deceive a substantial portion of the intended

audience. *Id.* at 586, 588-90; *Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharms., Inc.,* 19 F.3d 125, 129-31 (3d Cir. 1994).

## IV.    False Designation of Origin

39.    To establish a claim for false designation of origin, Rockwell must establish that WiAutomation: (1) used a "word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact"; and (2) that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. §1125(a)(1)(A).

40.    "The elements of a false designation of origin claim under Section § 43(a)(1)(A) of the Lanham Act overlap significantly with those of unfair competition or trademark infringement, with the exception that the party bringing the claim need not demonstrate valid registration." *Giannone v. Giannone*, 429 F. Supp. 3d 34, 41 (E.D. Pa. 2019).

41.    Under the Lanham Act, "the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks. . . . Whether we call the violation infringement, unfair competition or false designation of origin, **the test is identical—is there a 'likelihood of confusion.**" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992) (internal quotation omitted).

## V.    As to All Delaware State Law Claims

42.    "Delaware law presumes that a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted. Therefore, absent clear legislative intent, it is impermissible to punish an individual under Delaware law for an action occurring exclusively in another state." *Focus Financial Partners, LLC v. Holsopple*, 250 A.3d 939, 970 (Del C.

2020)(citations and quotations omitted); *See Marshall v. Priceline.com Inc.* 2006 WL 3175318, at *2 (Del. Super. Oct. 31, 2006(Delaware Consumer Fraud Act does not have extraterritorial effect).

43.     The Delaware Deceptive Trade Practices Act does not show that the legislature clearly intended it to apply to conduct outside of Delaware. ”), 6 Del. C. § 2531 *et seq.*

44.     Common law unfair competition is a tort claim. *Preston Hollow Capital LLC v. Nuveen LLC* 216 A.3d 1, 14 (Del C. 2019).  For tort claims, Delaware applies the law of the place where the misconduct primarily occurred. *Eureka Resources, LLC v. Range Resources-Appalachia, LLC* 62 A.3d 1233, 1236, n.20 (Del. Sup. C. 2012)

## VI.     Common Law Unfair Competition

45.     "The elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. Ct. 2001).

46.     Common law unfair competition is essentially the same tort as tortious interference with prospective business relations. *Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.32 1, 15 n.96 (Del. Ch. 2019). The plaintiff must submit "factual support" that "a business relationship with a specific party was reasonably probable." *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, No. 16-cv-194-GMS, 2016 WL 11697058, at *1 n.1 (D. Del. Sept. 7, 2016). Failure to establish a "reasonable expectancy" of a specific, valid business relationship with which the defendant interfered defeats a claim for common law unfair competition. *See Agilent Techs., Inc. v. Kirkland*, No. CIV.A.3512-VCS, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009).

47.     A plaintiff must also prove actual injury or harm. *See Tri-State Energy Sols. LLP v. KVAR Energy Sav. Inc.*, 884 F. Supp. 2d 168, 182–83 (D. Del. 2012).

9

## VII.   Statutory Unfair Competition

48.     A claim for violation of the Delaware Uniform Deceptive Trade Practices Act ("DUDTPA"), 6 Del. C. § 2531 *et seq.*, requires a showing that: (1) the mark at issue is valid and legally protectable; (2) plaintiff owns the mark; and (3) defendant's use of plaintiff's mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. *Sanofi– Aventis v. Advancis Pharm., Corp.,* 453 F. Supp. 2d 834, 847 (D. Del. 2006).

49.     Likelihood of confusion exists when "consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark. *Checkpoint Sys., Inc.,* 269 F.3d at 280.

50.     Courts reviewing DUDPTA violations apply the same standards as they apply to trademark infringement claims under the Lanham Act, i.e., a valid and protectable mark, plaintiff owns the mark, and likelihood of confusion. *Military Certified Residential Specialist, LLC v. Fairway Indep. Mortg. Corp.*, 251 F. Supp. 3d 750, 756 (D. Del. 2017).

51.     To establish advertising conveys an impliedly false message under the Lanham Act or DUDTPA, a "plaintiff bears the burden of proving *actual* deception by a preponderance of evidence;" and "it cannot obtain relief by arguing how customers could react," but rather "must show how customers actually do react." *Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, 702 F. Supp. 2d 266, 274 (D. Del. 2010).

## VIII.   Attorneys' Fees and Costs

52.     Under 6 Del C. § 2533 (b) "[t]he court in exceptional cases may aware reasonable attorneys' fees to the prevailing party.  Costs or attorneys' fees may be assessed against a defendant only if the court finds that defendant has willfully engaged in a deceptive trade practice."

53.     Under 15 U.S.C. § 1117, "the court in exceptional cases may aware reasonable attorney fees to the prevailing party."

## VIII.  WiAutomation's Affirmative Defenses

54.     The nominative fair use defense is available when the defendant is using the plaintiff's mark in order to refer to the goods of the trademark owner. *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 217 (3d Cir. 2005).

55.     In *Century 21*, the Third Circuit adopted a two-step approach in nominative fair use cases. First, the plaintiff must prove that confusion is likely due to the defendant's use of the plaintiff's mark. Second, once the plaintiff has met its burden of proving that confusion is likely, the burden then shifts to defendant to show that its nominative use of plaintiff's mark is nonetheless fair. *Id.* at 222.

56.     Although the *Lapp* factors are often helpful in determining whether a certain use of a mark is likely to confuse consumers, the Third Circuit has held that "the Lanham Act does not require that they be followed precisely so long as the relevant comparisons suggested by the test are made." *Id.* at 224 (quoting *A & H Sportswear II*, 237 F.3d 198, 207 (3d Cir. 2000)). In the context of a nominative use of a mark, certain *Lapp* factors are either unworkable or not suited or helpful as indicators of confusion in different contexts. Further, certain of the *Lapp* factors applied mechanically would inevitably point towards likelihood of confusion where no likelihood of confusion may actually exist. Thus, the courts must tailor the test and measure only those factors that are meaningful and probative in the context of nominative fair use. *Id.*

57.     To demonstrate fairness, the defendant must satisfy a three-pronged nominative fair use test. Under the Third Circuit's fairness test, a defendant must show: (1) Whether the use of plaintiff's mark is necessary to describe plaintiff's product or service and defendant's product or

11

service, (2) whether only so much of the plaintiff's mark is used as is necessary to describe plaintiff's products or services; and (3) whether the defendant's conduct or language reflects the true and accurate relationship between plaintiff and defendant's products or services. *Id.* at 228.

58.     The first prong is met when the court is satisfied that the identification by the defendant of plaintiff's product or service would be rendered significantly more difficult without the use of the mark. *Id.* at 229. It is important for a court to understand how necessary the use of the mark is to the identification of defendant's product. The more dependent the ready identification of defendant's product is on the description of plaintiff's product through the employment of plaintiff's mark, the more likely it is that the use is a fair one. *Id.*

59.     The second prong is met when the court is satisfied that only so much of plaintiff's mark as is reasonably necessary to identify plaintiff's product or service has been used by defendant. Consideration should be given at this state to the manner in which the mark is portrayed. *Id.* at 230.

60.     The third prong is met when the court is satisfied that the defendant's conduct of language reflects the true and accurate relationship between plaintiff and defendant's products or services. *Id.* at 231.

# EXHIBIT 6

**EXHIBIT 6**

**Plaintiff's Statement of Intended Proofs**

## I.      Introduction

1.      Rockwell is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 1201 South Second Street, Milwaukee, Wisconsin 53204.

2.      WiAutomation is a corporation organized and existing under the laws of Italy, having its principal place of business at 9 Via Madame De Stael, 80070 Bacoli (NA), Italy.

3.      WiAutomation's website lists its USA address as County Rte 561, Voorhees Township New Jersey, USA.

4.      Rockwell is the world's largest company dedicated to industrial automation and information. It is headquartered in Milwaukee, Wisconsin and employs over 22,000 people worldwide, with approximately 8,500 employed in the United States, and its annual spending on research and development of new and innovative products tops $250 million annually. Its core business is built around its industrial automation products, which include the brains (programmable controllers, or "PLCs"), muscle (motors and drives) and related devices (input/output devices, safety devices) that run a variety of industrial and commercial operations ranging from assembly lines (e.g. automotive lines, food

1

processing plants and pharmaceutical plants), to critical infrastructure (e.g. oil refineries), to automation involving safety of children (e.g., amusement park rides). While Rockwell's customers are diverse, they have one thing in common: breakdowns of operations are extremely costly and can be very dangerous, requiring that Rockwell's products run at very high reliability and safety levels 24/7 year after year.

5.      Because the failure of Rockwell's products can have costly – even catastrophic – results, Rockwell does not sell to a mass consumer market. It is also not just selling "a box" or a "widget." Instead, Rockwell sells industrial control products that include a quality assurance safety net that ensures that the products work safely and reliably over their lifetime. Rockwell controls the quality of its goods and services by selling its products in one of two ways: directly and through a network of authorized distributors ("ADs"). Rockwell ensures that highly trained domain experts work at each of these ADs – there are more than 1,000 such experts in North America alone – and engages in constant worldwide monitoring through its ADs of any problems with its products that arise anywhere so that Rockwell can assemble this information and use it to constantly evaluate whether to issue software and firmware upgrades, product safety notices, and even recalls for its customers. This comprehensive

monitoring system is an "early warning system" that is finely tuned to anticipate and correct any problems before they cause harm.

6.      In contrast to Rockwell, WiAutomation does not develop or make any products. Instead, WiAutomation engages in the unlawful sale and distribution within the United States of unauthorized gray market and counterfeit Rockwell-branded products, which are materially different from those sold by Rockwell and its authorized distributors in the United States ("Genuine Rockwell Products"). These unauthorized gray market and counterfeit products bear registered trademarks owned by Rockwell, such as Allen-Bradley®, A-B®, Rockwell Automation®, and ControlLogix® (defined infra as "Asserted Trademarks") yet differ from Genuine Rockwell Products in many respects as described in this Complaint.

7.      WiAutomation's offer to sell, sale and distribution of materially different Rockwell products infringe Rockwell's Asserted Trademarks; and, as described herein, WiAutomation's violations have caused and continue to cause confusion, mistake, and/or deception to the public and constitute willful and deliberate trademark infringement, false advertising, and unfair competition.

## II.      Trademark Infringement (§32 of the Lanham Act)

8.    Rockwell will prove by a preponderance of the evidence that (i) Rockwell is the owner of the trademarks at issue; (ii) the trademarks at issue are valid and entitled to protections; and (iii) WiAutomation was selling, offering for sale, or distributing products bearing Rockwell's trademarks that is likely to cause confusion among consumers as to the source, affiliation, approval or sponsorship of the products.

9.    Rockwell will prove that the Asserted Trademarks are incontestable and entitled to protection.

10.    Rockwell will prove that each of the products Rockwell has made issue of in this matter bear one or more of the Authorized Trademarks.

11.    Rockwell will prove that all Rockwell Products sold by Rockwell and its Authorized Distributors come with (i) the Rockwell manufacturer's warranty; (ii) Rockwell customer service, (iii) Rockwell product safety and recall notices that address potentially life-threatening safety issues; (iv) Rockwell's post manufacture quality control measures; (v) are new and factory sealed; and (vi) are entitled to Rockwell's Licensed Software (collectively, the "Vital Services").

12.    Rockwell will prove that Rockwell's Authorized Distributors are contractually required to deliver the Vital Services needed to ensure the safe, reliable operation of Rockwell's products and the facilities where they are installed.

13.     Rockwell will prove that Rockwell's Authorized Distributors are also contractually prohibited from selling Rockwell products to resellers who simply resell the product.

14.     Rockwell will prove that Rockwell actively polices its Authorized Distributors' compliance with their contractual obligations and unauthorized sales by third-party resellers like WiAutomation.

15.     Rockwell will prove by a preponderance of the evidence that the unauthorized Rockwell-branded products bearing Rockwell's trademarks that were sold, offered for sale or distributed by WiAutomation in the United States lack a material difference from the genuine Rockwell products sold by Rockwell and its authorized distributors.

16.     The Rockwell-branded products sold by WiAutomation did not come with entitlement to Rockwell's customer service.

17.     The Rockwell-branded products sold by WiAutomation did not come with enrollment to receive Rockwell's product safety and recall notices.

18.     When a customer purchases Rockwell Products from WiAutomation, that customer's sale and contact information is not provided to Rockwell and that customer does not receive Product Safety Advisories.

19.    WiAutomation does not have access to the proprietary technical knowledge regarding Genuine Rockwell Products that are only available to Rockwell and its Authorized Distributors.

20.    The Rockwell-branded products sold by WiAutomation did not come with entitlement to Rockwell's post manufacture quality control measures.

21.    Rockwell's survey expert found that 94.81% of his survey respondents (which included hundreds of purchasers of industrial, electrical and electronic control equipment) reported that the original manufacturer's warranty was important or very important to their purchasing decision and if that warranty were absent, 84.02% said they would no longer be interested in purchasing.

22.    Rockwell's survey expert found that other Vital Services were material to customers' purchasing decisions.

23.    Rockwell's survey expert also found that 90% of his survey respondents (which included hundreds of purchasers of industrial, electrical and electronic control equipment) reported the false impression that the warranty offered in the advertisement by WiAutomation's for the Rockwell products it sells is Rockwell's manufacturer's warranty.

24.    The survey also found that the deception was material as evidenced by the fact that were it not for these false impressions 68.9% of survey participants said

they would be far less interested in purchasing the Rockwell products from WiAutomation's website.

25.     The Rockwell-branded products sold by WiAutomation did not come with entitlement to Rockwell's Licensed Software.

26.     The Rockwell-branded products sold by WiAutomation are sometimes sold with broken factory seals.

27.     WiAutomation does not develop or make anything.

28.     WiAutomation does not have access to Rockwell's proprietary information about its products.

29.     Rockwell will prove by a preponderance of the evidence that WiAutomation sold, offered to sell or distributed one or more products bearing a counterfeit trademark in the United States.

30.     Rockwell will prove by clear and convincing evidence that WiAutomation's trademark infringement was willful.

31.     Rockwell will prove by clear and convincing evidence that WiAutomation's counterfeiting was willful.

32.     Rockwell receives complaints either directly from end users or through Authorized Distributors of old, malfunctioning or otherwise suspect Rockwell products that end users acquire from unauthorized resellers and counterfeiters like WiAutomation.

7

## III.   False Advertising (§43(a) of the Lanham Act)

33.   WiAutomation sells products bearing the Asserted Trademarks as "new," "factory sealed" and, as recently as last summer, "New Factory Sealed – Original product - 12 Months Warranty" to customers in the United States in interstate commerce.

34.   Rockwell will prove by a preponderance of the evidence that (i) WiAutomation made false or misleading statements on its website and through its sales and offer for sale of products; (ii) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (iii) the deception is material in that it is likely to influence purchasing decisions; (iv) the advertised goods traveled in interstate commerce; and (v) Rockwell has been or is likely to be injured as a result of the false statement.

35.   Rockwell will prove by clear and convincing evidence that WiAutomation's false advertising was willful.

## IV.   False Designation of Origin (§43(a) of the Lanham Act)

36.   Rockwell will prove by a preponderance of the evidence that (i) in connection with the sale of goods, WiAutomation used descriptions of Rockwell-branded products on its website in a manner that was likely to cause confusion among ordinary consumers as to the affiliation, connection, source, origin,

8

authorization, sponsorship, and/or approval of WiAutomation's activities with respect to the Rockwell Trademarks

37.     Rockwell will prove by clear and convincing evidence that WiAutomation's false designation of origin was conducted willfully.

## V.     Statutory Unfair Competition (6 Del. C. §2532, *et seq.*) – Deceptive Trade Practices

38.     Rockwell will prove by a preponderance of the evidence that WiAutomation committed one or more of the following wrongful actions:

(1)     Passes off goods or services as those of another;

(2)     Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3)     Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4)     Uses deceptive representations or designations of geographic origin in connection with goods or services;

(5)     Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(6)     Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7)     Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8)     Disparages the goods, services, or business of another by false or misleading representation of fact;

(9)     Advertises goods or services with intent not to sell them as advertised;

(10)   Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11)   Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

(12)   Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

39.    Rockwell will also prove by a preponderance of the evidence that WiAutomation has committed trademark infringement and has therefore committed deceptive trade practices as a result.

40.    Rockwell will prove by clear and convincing evidence that WiAutomation's deceptive trade practices were willful.

## VI.    Common Law Unfair Competition

41.    Rockwell will prove by a preponderance of the evidence that:

(1)    Rockwell had a reasonable expectancy of entering a valid business relationship with its customers in the form of product sales; and

(2)    WiAutomation has wrongly interfered with the relationships and its actions have defeated Rockwell's legitimate expectancy of product sales.

42.    Rockwell will also prove by a preponderance of the evidence that WiAutomation has committed trademark infringement and has therefore committed common law unfair competition as a result.

43.    Rockwell will prove by clear and convincing evidence that WiAutomation's unfair competition was willful.

11

44.     Rockwell will prove all elements of the claims and issues listed on its proposed final jury instructions and verdict form submitted to the Court on June 30, 2023.

## VII.   Remedies

45.     Rockwell seeks judgment that:

A. WiAutomation has willfully violated Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

B. WiAutomation has willfully sold counterfeit Rockwell products;

C.  WiAutomation has willfully engaged in false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B);

D. WiAutomation has willfully engaged in false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A);

E. WiAutomation has willfully engaged in deceptive trade practices in violation of 6 Del. C. § 2532 et seq.; and

F. WiAutomation has willfully engaged in unfair competition in violation of the common law of the State of Delaware.

46.     Rockwell also seeks a permanent injunction restraining and enjoining WiAutomation and all of its agents, servants, employees, successors and assigns, and all persons in active concert or participation with WiAutomation (or its agents) from:

12

A. Selling, marketing, advertising, importing, or purchasing Unauthorized Rockwell Products;

B. Using any of Plaintiff's Trademarks and/or any other confusingly similar designation, alone or in combination with other words, phrases, symbols or designs, as trademarks, trade names, domain name components or otherwise, to market, advertise, or identify WiAutomation's goods or services;

C. Otherwise infringing Plaintiff's Trademarks;

D. Representing by any means whatsoever, directly or indirectly, that any products or services offered or provided by WiAutomation are offered or authorized by Rockwell, or from otherwise taking any action likely to cause confusion, mistake, or deception on the part of consumers as to the source or origin of such products or services or as to any authorization, sponsorship, approval, or affiliation relationship between WiAutomation and Rockwell;

E. Affixing, applying, annexing, or using in connection with the manufacture, distribution, marketing, advertising, packaging, sale, and/or offering for sale or other use of any products or services, a false description or representation, including without limitation words, symbols, photographs, or product representations similar to those used

13

by Rockwell, tending to falsely describe or represent such products or services as being those of Rockwell;

F. Unfairly competing with Rockwell in any manner whatsoever or otherwise injuring its business reputation in the manner complained of herein; and

G. Engaging in assignments or transfers, formation of new entities or associations or utilization of any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in sub-paragraphs (a) through (g) above.

47.     Rockwell also seeks an order, under 15 U.S.C. §§ 1116 and 1118, requiring WiAutomation (including its employees and agents) to deliver to Rockwell (or allow Rockwell to pick up), or requiring to be destroyed, all Unauthorized Rockwell Products that are in WiAutomation's possession, custody, or control.

48.     Rockwell seeks an order, pursuant to 15 U.S.C. § 1116, requiring WiAutomation to file with this Court and serve upon Rockwell within 30 days after the entry of the permanent injunction a report, in writing and under oath, setting forth in detail the manner in which WiAutomation has complied with the preceding two paragraphs.

49.     Rockwell seeks an order:

14

A. Awarding Rockwell, under 15 U.S.C. § 1117, all profits received by

WI Automation from its sales and revenues of Rockwell-branded

products, and damages, to be determined, that Rockwell has suffered as a

result of WiAutomation's wrongful conduct (calculated past the close of

discovery and up to judgment and including, but not limited to,

Rockwell's lost profits, injury to Rockwell's reputation, injury to

Rockwell's goodwill, the expense of preventing customers from being

deceived, the cost of future corrective advertising reasonably required to

correct public confusion caused by the WiAutomation's wrongful

conduct, price erosion, and statutory and other damages awarded

pursuant to 15 U.S.C. § 1117 and 6 Del. C. § 2532 et seq, trebled);

B. Awarding Rockwell damages, attorneys' fees, and costs to the fullest

extent provided for by the Lanham Act, 6 Del. C. § 2532 and the

common law of Delaware, including punitive damages;

C. Awarding Rockwell pre-judgment and post-judgment interest; and

D. Awarding Rockwell such other and further relief as this Court deems

just and equitable.

50.     Under 6 Del. C. § 2533 (b) "[t]he court in exceptional cases may

award reasonable attorneys' fees to the prevailing party. Costs or attorneys' fees

may be assessed against a WiAutomation only if the court finds that WiAutomation has willfully engaged in a deceptive trade practice."

51.     Under 15 U.S.C. § 1117, "the court in exceptional cases may award reasonable attorney fees to the prevailing party" and "in a case involving use of a counterfeit mark, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark … in connection with the sale, offering for sale, or distribution of a goods or services…."

52.     Rockwell will prove all elements in connection with any remedies listed on its proposed final jury instructions and verdict form submitted to the Court on June 30, 2023.

# EXHIBIT 7

## Exhibit 7
## WiAutomation's Intended Proofs
**I.   Allegations of Trademark Infringement (§32 of the Lanham Act)**

1.     Rebuttal of any evidence offered by Rockwell that WiAutomation was selling, offering for sale, or distributing products bearing Rockwell's trademarks that is likely to cause confusion among consumers as to the source, affiliation, approval or sponsorship of the products.

2.     Rebuttal of any evidence offered by Rockwell that WiAutomation was selling, offering for sale, or distributing products bearing Rockwell's trademarks that is likely to cause mistake among consumers.

3.     Rebuttal of any evidence offered by Rockwell that WiAutomation was selling, offering for sale, or distributing products bearing Rockwell's trademarks that is likely to deceive consumers.

4.     Rebuttal of any evidence offered by Rockwell that WiAutomation was selling, offering for sale, or distributing products bearing Rockwell's trademarks that is likely to cause confusion, or to cause mistake, or to deceive consumers of Rockwell products.

5.     Rebuttal of any evidence offered by Rockwell that WiAutomation's sale of Rockwell's products is likely to injure Rockwell's goodwill.

6.     Rebuttal of any evidence offered by Rockwell that WiAutomation sold, offered to sell or distributed Rockwell products that are materially different from those sold by Rockwell and its authorized distributors.

7.      Rebuttal of any evidence offered by Rockwell that WiAutomation sold, offered to sell or distributed one or more products bearing a counterfeit trademark in the United States.

8.      Rebuttal of any evidence offered by Rockwell that WiAutomation willfully sold, offered to sell or distributed one or more products bearing a counterfeit trademark in the United States.

9.      Rebuttal of any evidence offered by Rockwell that WiAutomation counterfeited a Rockwell product.

10.     Rebuttal of any evidence offered by Rockwell that WiAutomation willfully counterfeited a Rockwell product.

11.     Rebuttal of any evidence offered by Rockwell that WiAutomation infringed any of Rockwell's trademarks.

12.     Rebuttal of any evidence offered by Rockwell that WiAutomation willfully infringed any of Rockwell's trademarks.

## II.    False Advertising (§43(a) of the Lanham Act)

13.     Rebuttal of any evidence offered by Rockwell that the advertisement on WiAutomation's webpage: "New Factory Sealed – Original product – 12 Months Warranty" was a false or misleading statement.

14.     Rebuttal of any evidence offered by Rockwell that the advertisement on WiAutomation's webpage: "New Factory Sealed – Original product – 12 Months

BE:13283467.1/PAR348-280966

Warranty" was actually deceptive or had a tendency to deceive a substantial portion of the intended audience.

15.     Rebuttal of any evidence offered by Rockwell that the advertisement on WiAutomation's webpage: "New Factory Sealed – Original product – 12 Months Warranty" was a material statement that likely influenced purchasing decisions under deceptive pretenses.

16.     Rebuttal of any evidence offered by Rockwell that the goods that were advertised "New Factory Sealed – Original product – 12 Months Warranty" traveled in interstate commerce.

17.     Rebuttal of any evidence offered by Rockwell that the advertisement on WiAutomation's webpage: "New Factory Sealed – Original product – 12 Months Warranty" was false.

18.     Rebuttal of any evidence offered by Rockwell that the advertisement on WiAutomation's webpage: "New Factory Sealed – Original product – 12 Months Warranty" was false and caused Rockwell an injury.

## III.     False Designation of Origin (§43(a) of the Lanham Act)

19.     Rebuttal of any evidence offered by Rockwell that WiAutomation used descriptions of Rockwell-branded products on its website in a manner that was likely to cause confusion among ordinary consumers as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of Defendant WiAutomation's activities with respect to the Rockwell Trademarks.

BE:13283467.1/PAR348-280966

20.     Rebuttal of any evidence offered by Rockwell that WiAutomation willfully used descriptions of Rockwell-branded products on its website in a manner that was likely to cause confusion among ordinary consumers as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of Defendant WiAutomation's activities with respect to the Rockwell Trademarks.

## IV.   Statutory Unfair Competition (6 Del. C. §2532, *et seq.*) – Deceptive Trade Practices

21.     Rebuttal of any evidence offered by Rockwell that WiAutomation committed one or more of the following wrongful actions:

  a.     Passes off goods or services as those of another;

  b.     Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

  c.     Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

  d.     Uses deceptive representations or designations of geographic origin in connection with goods or services;

  e.     Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

  f.     Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

BE:13283467.1/PAR348-280966

g.      Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

h.      Disparages the goods, services, or business of another by false or misleading representation of fact;

i.      Advertises goods or services with intent not to sell them as advertised;

j.      Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

k.      Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

l.      Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.


22.     Rebuttal of any evidence offered by Rockwell that WiAutomation has therefore committed deceptive trade practices as a result of trademark infringement.


23.     Rebuttal of any evidence offered by Rockwell that WiAutomation has committed deceptive trade practices as a result of wilfull trademark infringement.


**V.      Common Law Unfair Competition**

24.     Rebuttal of any evidence offered by Rockwell that Rockwell had a reasonable expectancy of entering a valid business relationship with customers who bought Rockwell products from WiAutomation.

BE:13283467.1/PAR348-280966

25.     Rebuttal of any evidence offered by Rockwell that WiAutomation has wrongly interfered with the relationships and its actions have defeated Rockwell's legitimate expectancy of product sales.

26.     Rebuttal of any evidence offered by Rockwell that WiAutomation has committed trademark infringement and has therefore committed common law unfair competition as a result.

27.     Rebuttal of any evidence offered by Rockwell that WiAutomation has willfully committed trademark infringement and has therefore committed common law unfair competition as a result.

BE:13283467.1/PAR348-280966

# EXHIBIT 8

**EXHIBIT 8**

**ROCKWELL'S WITNESS LIST**

Pursuant to Local Rule 16.3 and Federal Rule of Civil Procedure 16(a)(3)(A)(i) and (ii), Rockwell provides below an identification of the witnesses whose testimony it may present at trial. The inclusion of a witness on this list does not require Rockwell to call that witness to testify, and does not imply or establish that Rockwell has the power to compel the live testimony of that witness or make that witness available to the opposing party. Witnesses are listed alphabetically in each category and no representation is made as to the order in which fact or expert witnesses might be called at trial.

Rockwell has identified these witnesses based on the current understanding of WiAutomation's case-in-chief. Rockwell reserves the right to revise or supplement this listing. Rockwell expressly reserves the right to call any witness identified by WiAutomation at any point before or during trial, whether or not listed on Rockwell's list below, live or by deposition designations.

**I.   ROCKWELL'S WILL CALL WITNESSES**

Rockwell expects to call the following witnesses at trial:

**A.   FACT WITNESSES**

Christoph Bank (Live)

Warren DeVilbiss (Live)

Justin Orofino (Live)

Mark Paliszewski (Live)

Ryan Smaglik (Live)

**B.   EXPERT WITNESSES**

David Franklyn (Live)

Brett Reed (Live)

1

II.     **ROCKWELL'S MAY CALL WITNESSES**

Rockwell may call the following witnesses at trial, live or by deposition:

A.     **FACT WITNESSES**

Anna Barbacka (Live)

Laura Martin (Live)

Luigi Scotto Di Carlo (Deposition Designations or Live)

Danilo Schiano Di Cola (Deposition Designations or Live)

Fulvio Coppola (Deposition Designations or Live)

Luca Coppola (Deposition Designations or Live)

Porfirio Ladonea (Deposition Designations or Live)

Any WiAutomation representatives at trial (Live)

Any fact witness identified by WiAutomation

B.     **EXPERT WITNESSES**

Any WiAutomation expert witness at trial (by Deposition or Live)

**Exhibit 8**

**WIAUTOMATION'S OBJECTIONS TO ROCKWELL'S WITNESS LIST**

WiAutomation objects to Rockwell's witness list as detailed below. Because WiAutomation does not yet know what testimony Rockwell will solicit from each witness, WiAutomation's objections to Rockwell's witnesses are subject to amendment.  WiAutomation reserves the right to raise more objections in view of future disclosures by Rockwell and/or orders by the Court.  Further, because the parties only agreed to exchange each party's witnesses list at this time, and not to the eventual testimony offered by those witnesses, WiAutomation reserves the right to object to any and all testimony offered by each witness for any reason.

I.   **Rockwell's Will Call Fact Witnesses**

a. **Christoph Bank:** WiAutomation objects to Christoph Bank's testimony concerning any matter because he was not timely disclosed as a witness with knowledge. Fed. R. Civ. P. 37(c)(1).  WiAutomation further objects to Christoph Bank's testimony based on the arguments set forth in WiAutomation's opposition to Rockwell's Motion to Modify the Scheduling Order (D.I. 275-276).

b. **Mark Paliszewski:** WiAutomation objects to Mark Paliszewski's testimony because he was not timely disclosed as a witness with knowledge,

Fed. R. Civ. P. 37(c)(1), and for the reasons set forth in WiAutomation's pending objection to Magistrate Judge Hall's May 3, 2023 Order (D.I.261). WiAutomation objects to Mark Paliszewski testifying as to any matter in this matter because he lacks any personal knowledge of any relevant facts. *See* Fed. R. Evid. 602.   WiAutomation further objects to Mr. Paliszewski's testimony for the reasons set forth in WiAutomation's Motion in Limine.

**c. Ryan Smaglik**:  WiAutomation objects to Ryan Smaglik testifying as to any matter to which he lacks personal knowledge. *See* Fed. R. Evid. 602. WiAutomation objects to Ryan Smaglik testifying as to any matter that was first produced by Rockwell after the December 2022 depositions of Ryan Smaglik, because Rockwell refused to allow WiAutomation to continue the deposition of Ryan Smaglik to ask questions concerning these late-produced items.   Fed. R. Civ. P. 37(c)(1). WiAutomation further objects to Mr. Smaglik's testimony for the reasons set forth in WiAutomation's Motion in Limine.  Moreover, WiAutomation objects to Mr. Smaglik testifying as to any matter concerning Recon, Mark Paliszewski, and any of Recon or Mark Paliszewski's agents alleged purchase of products from WiAutomation.

## II.  Rockwell's Will Call Expert Witnesses

2

a. **David Franklyn**:   WiAutomation objects to David Franklyn's testimony for the reasons set forth in its pending Motion to Exclude the Expert Testimony of David Franklyn. (D.I. 161-163, 212-213)

b. **Brett Reed:**  WiAutomation objects to Brett Reed's testimony for the reasons set forth in its pending Motion to Exclude the Expert Testimony of Brett Reed. (D.I. 158-160, 216)

### III.   <u>Rockwell's May Call Fact Witnesses</u>

a. **Anna Barbacka**:  WiAutomation further objects to Anna Barbacka's testimony based on the arguments set forth in WiAutomation's opposition to Rockwell's Motion to Modify the Scheduling Order (D.I. 275-276). WiAutomation also objects to Anna Barbacka's testimony concerning any matter because she was not timely disclosed as a witness with knowledge. Fed. R. Civ. P. 37(c)(1).  WiAutomation objects to Anna Barbacka testifying as to any matter in this matter because she lacks any personal knowledge of any relevant facts. *See* Fed. R. Evid. 602.

b. **Laura Martin**:  WiAutomation objects to Laura Martin's testimony concerning any matter because she was not timely disclosed as a witness with knowledge. Fed. R. Civ. P. 37(c).  WiAutomation objects to Laura

Martin testifying as to any matter in this matter because she lacks any personal knowledge of any relevant facts. *See* Fed. R. Evid. 602.

4

# EXHIBIT 9

# EXHIBIT 9

## WiAutomation's Witness List

WiAutomation identifies the following witnesses whom it will or may call live or by prior testimony at trial, depending on the witnesses' availability.  WiAutomation reserves the right to supplement or amend its witness list in view of any order regarding the scope of the trial.  WiAutomation further reserves the right to call any witness that appears on Rockwell's witness list without waiving the right to (i) object to Rockwell's presentation of such witness at trial; (ii) object to the admissibility of the witness's testimony; and (iii) move to exclude any such testimony.  WiAutomation further reserves all rights to call witnesses by deposition as identified in its deposition designations, counter-designations, or counter-counter designations.  WiAutomation further reserves the right to revise or supplement this witness list.  Moreover, the following witness list does not include any witness who WiAutomation may be compelled to call as a rebuttal witness as may be necessary based on testimony of Rockwell witnesses and/or expert witnesses.

I.       **WiAutomation's Will Call Witnesses**

Subject to the reservation of rights above, WiAutomation expects to call the following witnesses at trial.

   A.  **Fact Witnesses**

   i.   Fulvio Coppola (Live)

   ii.  Porfirio Ladoneo (Live)

   iii. Luca Coppola (Live or Deposition Designation)

   iv.  Pasquale Danil Schiano Di Cola (Deposition Designation)

   v.   Luigi Scotto Di Carlo (Deposition Designation)

   B.  **Expert Witnesses**

        i.  Justin Blok (Live)

       ii.  Young-Hoon Park (Live)

**II.**      **WiAutomation's May Call Witnesses**

Subject to the reservation of rights above, WiAutomation may call the following witnesses at trial.

    **A.**  <u>**Fact Witnesses**</u>

        i.    Ryan Smaglik (Deposition Designation)

       ii.    Mark Paliszewski (Deposition Designation)

      iii.    Rodney Michel (Deposition Designation)

      iv.    Any Rockwell representatives at trial (Live)

    **B.**  <u>**Expert Witnesses**</u>

        i.    Any Rockwell expert witness at trial (by Deposition Designation or Live)

BE:13283804.1/PAR348-280966

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OBJECTIONS TO DEFENDANT'S LIST OF WITNESSES TO BE CALLED LIVE OF DEPOSITION**

Plaintiff Rockwell Automation, Inc. ("Plaintiff") lodges the following objections to Defendant's List of Witnesses to be Called Live or By Deposition. Intuitive offers the below general objections and a chart summarizing the specific objections it has to each witness.

**GENERAL OBJECTIONS**

1.      Plaintiff objects to Defendant's witness list to the extent it does not identify which witnesses Defendant will call live and which witnesses Defendant will call by deposition designation.

2.      Plaintiff objects to Defendant calling at trial any witness listed below by deposition testimony to the extent that witness listed below testifies live at trial.

3.      Plaintiff objects to Defendant calling Luca Coppola, Pasquale Danilo Schiano Di Cola, Luigi Scotto Di Carlo and/or Rodney Michel via deposition.  Defendant has not established that these witnesses – the first three of whom are plainly within Defendant's control -- are unavailable under Fed. R. Civ. P. 32(a)(4). Accordingly, their deposition testimony

constitutes hearsay and may not be admitted under Fed R. Evid. 802.

4.     Plaintiff objects to Defendant calling Porfirio Ladoneo.  Defendant previously conceded in a signed filing that Mr. Ladoneo "does not possess personal knowledge of the subject matter" and thus that Defendant "does not intend to call Mr. Ladoneo as a trial witness" and would "amend its initial disclosures to remove [him.]") D.I. 104 at 1. They reiterated these statements in a further letter to the Court barely three months ago. D.I. 157 at 2. Because defendant made both these statements to the Court in an effort to thwart Plaintiff's discovery into Mr. Ladoneo -- and failed to timely correct such statements, to the extent they contend they were false -- they are estopped from presenting his testimony pursuant Fed. R. Civ. P. 26 and 37.

5.     Plaintiff incorporates by reference any objection to proposed deposition testimony of any witness listed below as set forth in Defendant's objections to Defendant's deposition designations.

6.     Plaintiff objects to the testimony of any witness for which that witness lacks personal knowledge, testimony outside the scope of the Rule 30(b)(6) testimony for which they were designated, testimony beyond the description set forth in Defendant's initial disclosures, testimony beyond the scope of Defendant's interrogatory responses, or testimony not otherwise properly disclosed under the Federal Rules of Civil Procedure.

7.     Plaintiff objects to Defendant's witnesses' testimony to the extent the testimony is in the form of inadmissible lay opinion, including but not limited to any testimony that is based on scientific, technical, or other specialized knowledge that should properly be the subject of expert testimony under Federal Rule of Evidence 701.

8.     Plaintiff objects under Federal Rules of Evidence 702 and 703 to any proposed

expert witness who lacks the required scientific, technical, or other specialized knowledge necessary to support their anticipated testimony.

9.      Plaintiff objects to Defendant's witnesses' testimony to the extent the testimony is in the form of inadmissible evidence, including under Federal Rule of Evidence 408, testimony that is not relevant under Federal Rule of Evidence 402, and testimony concerning issues in which the probative value is substantially outweighed by the danger of unfair prejudice under Federal Rule of Evidence 403.

10.      Plaintiff reserves all rights to modify these objections if Defendant changes which witnesses it calls and in what form.

## **SPECIFIC OBJECTIONS**

| Name | Defendant's Proposed Presentation at Trial | Affiliation | Plaintiff's Objections |
|------|--------------------------------------------|-------------|------------------------|
| Fulvio Coppola | Live | Defendant | FRE 402, 403, 602, 701, 802 |
| Porfirio Ladoneo | Live | Defendant | FRE 402, 403, 602, 701, 802 |
| Luca Coppola | Live or Deposition Designation | Defendant | FRE 402, 403, 602, 701, 802 |
| Pasquale Danilo Schiano Di Cola | Deposition Designation | Defendant | FRE 402, 403, 602, 701, 802 |
| Luigi Scotto Di Carlo | Deposition Designation | Defendant | FRE 402, 403, 602, 701, 802 |
| Justin Blok | Live | Defendant | FRE 702, 703 |
| Young-Hoon Park | Live | Defendant | FRE 702, 703 |
| Ryan Smaglik | Deposition Designation | Plaintiff | FRE 802 |
| Mark Paliszewski | Deposition Designation | Plaintiff | FRE 802 |
| Rodney Michel | Deposition Designation | Plaintiff | FRE 802 |

EXHIBIT 10

**EXHIBIT 10**

**ROCKWELL'S DEPOSITION DESIGNATIONS**

Rockwell reserves the right to revise, amend, supplement or modify its deposition designations in light of any order regarding the scope of the trial, or in light of any information submitted by defendant Parcop S.R.L. d/b/a WiAutomation ("WiAutomation") as part of its trial filings or otherwise, such as the availability of its witnesses to testify live.  In the event that WiAutomation does not call designated "will call" live witnesses to trial, Rockwell reserves the right to identify additional designations.  Rockwell further reserves the right to supplement these deposition designations to rebut or otherwise address the deposition designations identified by WiAutomation.  Lastly, Rockwell also reserves the right to rely on any designations submitted by WiAutomation.

## I.     DEPOSITION OF FULVIO COPPOLA (December 21-22, 2022)

| Rockwell's Initial Designation | WiAutomation's Objections to Initial Designations | WiAutomation's Counter-Designations | Rockwell's Objections to WiAutomation's Counter-Designations |
|---|---|---|---|
| 6: 8-11 | | | |
| 7: 4-7; 10-12; 14-16 | | | |
| 8: 5-6; 8-12; 18-19; 23-25 | Attorney-client privilege/work product doctrine | | |
| 9: 1; 15-16; 18-25 | Attorney-client privilege/work product doctrine; relevance | | |
| 10: 1-10; 13-22 | Relevance | | |
| 11: 8-9; 20-25 | Vague, ambiguous | | |
| 12: 1-6 | Vague, ambiguous | | |
| 13: 2-6; 12-17; 20-25 | | | |
| 14: 1-10; 12-24 | Relevance | | |

BE:13283955.1/PAR348-280966

| | | | |
|---|---|---|---|
| 15: 6-25 | | | |
| 16: 1-3; 10-15; 17-19; 21-25 | Relevance, vague, ambiguous | | |
| 17: 1-3; 6-13 | Speculation, vague | | |
| 21: 10-16 | | | |
| 22: 2-15 | | | |
| 23: 3-25 | | | |
| 24: 1; 8-21; 25 | Misstates testimony; | | |
| 25: 1-11; 19-25 | | | |
| 26: 5-11; 21-23; 25 | Vague, ambiguous | | |
| 27: 1; 3; 21-25 | Vague, ambiguous | | |
| 28: 1-8 | | | |
| 29: 2-6; 11-18 | | | |
| 30: 10-23 | | | |
| 31: 1-12 | | | |
| 33: 21-24 | Calls for speculation, improper hypothetical | | |
| 34: 1-17; 25 | | | |
| 35: 1-5; 11-16 | Vague, ambiguous | | |
| 38: 11-19 | | | |
| 39: 13-25 | | | |
| 40: 1-5; 19-25 | Misstates testimony | | |
| 41: 1-3; 13-25 | | | |
| 42: 1-2; 6-24 | | | |
| 43: 1-5; 10-14 | | | |
| 44: 14-17; 20-25 | Counsel testifying; | | |
| 45: 1-5; 24-25 | | | |
| 46:1-8; 12-25 | | | |
| 47: 1-4; 14-17; 24-25 | | | |
| 48: 2-5; 11-17; 20-25 | Calls for speculation, vague, ambiguous | | |
| 49: 1-4; 6-22; 25 | | | |
| 50: 1-2; 4-6; 19-24 | Vague, ambiguous | | |

| | | | |
|---|---|---|---|
| 52: 15-22; 24 | Vague, ambiguous, lacks foundation | | |
| 58: 9-17; 20-25 | | | |
| 59: 1-2; 14-19 | | | |
| 61: 8-13; 18-23 | | | |
| 64: 9-24 | | | |
| 65: 9-25 | | | |
| 66: 1 | | | |
| 67: 4-7; 12-23 | | | |
| 68: 25 | | | |
| 69: 1-5 | | | |
| 71: 24-25 | | | |
| 72: 1-3; 9-16 | | | |
| 73: 22-25 | | | |
| 74: 1-4 | | | |
| 76: 7-23 | | | |
| 77: 6-9; 24-25 | | | |
| 78: 1-6 | | | |
| 80: 2-15 | | | |
| 81: 1-25 | | | |
| 82: 1-5; 7-25 | Vague, ambiguous | | |
| 83: 1-6; 14-25 | Calls for speculation; | | |
| 84: 1-3 | Calls for speculation | | |
| 90: 3-8; 10-18 | Lacks foundation. Calls for speculation | | |
| 91: 6-18; 20-24 | Misstates testimony, calls for speculation | | |
| 92: 1; 13-22 | Calls for speculation | | |
| 93: 2-11 | | | |
| 94: 20-24 | | | |
| 95: 10-14 | Calls for speculation | | |
| 99: 1-17; 21-23 | | | |
| 100: 16-17; 19-23; 25 | Calls for speculation; misstates testimony; | | |
| 101: 1-6; 11-25 | Misstates testimony, calls for speculation, | | |
| 102: 1-2; 22-25 | | | |

| | | | |
|---|---|---|---|
| 103: 1-9; 11-22; 24-25 | Attorney-client privilege/work product doctrine | | |
| 104: 1-9 | | | |
| 107: 4-12; 14-25 | Calls for speculation; lacks foundation | | |
| 108: 1-17 | | | |
| 109: 10-15 | | | |
| 110: 8-18 | | | |
| 111: 13-15; 20-25 | Calls for speculation; lacks foundation | | |
| 112: 1-4; 6-25 | Calls for speculation; lacks foundation | | |
| 113: 1-25 | | | |
| 114: 1-2; 9-13; 19-25 | Attorney-client privilege/work product doctrine | | |
| 115: 1; 17-19; 21 | Calls for speculation; lacks foundation; misstates testimony | | |
| 117: 8-11 | | | |
| 119: 6-12 | | | |
| 120: 7-22 | | | |
| 121: 2-6; 24-25 | | | |
| 122: 1-25 | | | |
| 123: 1; 14-17; 19-25 | | | |
| 124: 1-7; 11-12 | | | |
| 125: 7-11; 17-18; 22-25 | | | |
| 126: 1-6 | | | |
| 127: 6-19 | | | |
| 128; 5-6; 8-14; 16-25 | Misstates testimony, lacks foundation, attorney-client privilege | | |
| 129: 1-4; 7; 23-25 | Calls for speculation, vague, ambiguous | | |
| 130: 1-19; 25 | Counsel testifying, lacks foundation, | | |
| 131: 1-9; 11-17; 19-21 | Misstates testimony, lacks foundation | | |

| | | | |
|---|---|---|---|
| 132: 6-9; 16-19; 21 | Misstates testimony, lacks foundation | | |
| 133; 12-18; 20 | | | |
| 135: 5-10; 12-16; 18-21; 23-25 | Calls for speculation, lacks foundation, argumentative | | |
| 136: 1-2; 4-1; 21-25 | Misstates testimony, lacks foundation | | |
| 137: 1-4 | | | |
| 138; 18-25 | | | |
| 139: 1-4; 13-19; 24-25 | Vague, ambiguous, misstates testimony | | |
| 140; 1-2; 4; 11-12; 14-18; 21-22 | Vague, ambiguous, misstates testimony | | |
| 141: 1-23; 25 | | | |
| 142: 1-9 | | | |
| 143: 1-4; 6-7; 13-16; 23-25 | Calls for speculation; attorney-client privilege; | | |
| 144: 1-2; 4-10; 24-25 | Calls for speculation | | |
| 145: 1-2: 5-8; 10; 14-19; 22-25 | Vague, ambiguous, calls for speculation, | | |
| 146: 1-7 | Vague, ambiguous, calls for speculation, | | |
| 147: 1-3 | | | |
| 148: 5-9; 11-12 | Argumentative, calls for speculation | | |
| 149: 17-19; 23-25 | Vague, ambiguous | | |
| 150: 1 | | | |
| 151: 6-15 | Calls for speculation, misstates testimony | | |
| 152: 17-25 | | | |
| 153: 1-4; 6-7; 11-17 | | | |
| 161: 24-25 | | | |
| 162: 1-6 | | | |
| 163: 13-15 | | | |
| 166: 15-21 | | | |
| 168: 24-25 | Calls for speculation | | |

| | | | |
|---|---|---|---|
| 169: 2-3; 12-25 | Calls for speculation, lacks foundation | | |
| 170: 1-16 | | | |
| 171: 23-25 | | | |
| 172: 1-2; 4-12 | Attorney-client privilege | | |
| 173: 3-16; 21-25 | | | |
| 174: 4-11; 13-25 | Compound | | |
| 175: 5; 18-20 | Misstates testimony | | |
| 176: 3-5; 7-10 | Lacks foundation, relevance | | |
| 185: 22-25 | | | |
| 186: 1 | | | |
| 187: 16-19 | | | |
| 188: 6-25 | | | |
| 189: 18-21 | | | |
| 191: 7-25 | | | |
| 192:1-8 | | | |
| 195: 1-15; 17-25 | Misstates testimony | | |
| 196: 1-2 | | | |
| 197: 14-22; 24-25 | Vague, ambiguous, relevance | | |
| 198: 1-12 | | | |
| 199: 4-11; 13-15 | Vague, ambiguous, relevance | | |
| 204: 23-25 | | | |
| 205: 1-3 | | | |
| 206: 7-10; 12-25 | | | |
| 207: 2-25 | | | |
| 208: 1-25 | | | |
| 209: 1-7; 12-14; 17-22 | Relevance, lacks foundation | | |
| 210: 4-13 | Relevance, lacks foundation | | |
| 211: 2-12; 21-25 | Relevance, lacks foundation | | |
| 212: 1-5; 25 | Relevance, lacks foundation | | |
| 213: 1-6; 23-25 | Relevance | | |

| | | | |
|---|---|---|---|
| 214: 1-11; 15-18; 20-25 | Relevance | | |
| 215: 1-6; 9-15; 17-25 | Relevance, lacks foundation | | |
| 216: 1-14; 18-25 | Relevance, lacks foundation | | |
| 217: 1-21 | Relevance, lacks foundation | | |
| 218: 5-13; 18-25 | Relevance, lacks foundation | | |
| 219: 1-25 | Relevance, lacks foundation | | |
| 220: 1-21 | Relevance, lacks foundation | | |
| 221: 2-25 | Relevance, lacks foundation | | |
| 222: 1-16; 22-25 | Relevance, lacks foundation | | |
| 223: 1-4; 16-25 | Relevance, lacks foundation | | |
| 224: 1-25 | Relevance, lacks foundation, calls for speculation | | |
| 225: 1-3; 13-25 | Relevance, lacks foundation, calls for speculation | | |
| 226: 1; 13-22; 24-25 | Relevance, lacks foundation | | |
| 227: 1-25 | Calls for speculation | | |
| 228: 1-25 | Calls for speculation | | |
| 229: 1-9 | Misstates testimony | | |
| 230: 21-25 | | | |
| 231: 1-14 | | | |
| 232: 1-10; 15-22 | Misstates testimony | | |
| 233: 11-15; 17-23; 25 | Counsel testifying, vague, misstates testimony | | |
| 234: 1-5 | | | |
| 235: 14-25 | | | |
| 236: 1-10; 12-25 | | | |
| 237: 1-11; 13-15; 23-25 | Misstates testimony, vague, ambiguous, | | |

| | | | |
|---|---|---|---|
| 238: 1-11; 17-18 | | | |
| 239: 12-15; 19 | Argumentative, vague, ambiguous | | |
| 240: 21-23; 25 | | | |
| 241: 2-7; 9-25 | Vague, ambiguous, relevance | | |
| 242: 1-4; 6-25 | Argumentative, misstates testimony | | |
| 243: 1-5 | | | |
| 244: 13-19; 21-25 | Misstates testimony, vague, ambiguous | | |
| 245: 1-3; 6-11; 13-25 | Vague, ambiguous, misstates testimony | | |
| 246: 1-12; 14-23; 25 | Vague, ambiguous | | |
| 247: 1-21 | Vague, ambiguous, argumentative | | |
| 249: 8-20 | Argumentative, lacks foundation | | |
| 250: 2-16; 18-25 | Argumentative, lacks foundation | | |
| 251: 1-2; 7-10; 13-25 | Vague, ambiguous | | |
| 252: 1-25 | | | |
| 253: 1-21; 23-25 | Calls for speculation | | |
| 254: 2-22; 24-25 | | | |
| 255: 1-8; 10-25 | | | |
| 256: 1-5; 7-25 | | | |
| 257:1-24 | Calls for speculation | | |
| 258: 1-4; 6-25 | Calls for speculation | | |
| 259: 1-2; 6-24 | | | |
| 260: 1-3; 5-17; 20-25 | Misstates testimony, argumentative, lacks foundation | | |
| 261: 1-6; 21-25 | | | |
| 262: 1-4; 6-25 | Calls for speculation | | |
| 263: 1-18 | | | |
| 266: 4-8; 10-15; 17-23 | Vague, ambiguous, compound | | |

| | | | |
|---|---|---|---|
| 267: 1-10; 12-13; 21-25 | Vague, ambiguous, argumentative | | |
| 268: 1-17; 19-25 | Argumentative, misstates testimony | | |
| 269: 1-25 | Relevance, vague, ambiguous | | |
| 270: 2-25 | Relevance, vague, ambiguous | | |
| 271: 1-9 | | | |
| 272: 6-19 | Calls for speculation | | |
| 273: 4-13; 16-25 | | | |
| 274: 1-3; 8-10; 17-25 | | | |
| 275: 2-5; 7-22 | Calls for speculation, calls for legal conclusion | | |
| 276: 14-19 | Calls for speculation, calls for legal conclusion | | |
| 277: 7-9; 11-25 | Calls for speculation, calls for legal conclusion | | |
| 278: 1; 3-6; 8-9; 12-25 | Calls for speculation, calls for legal conclusion | | |
| 279: 1-19 | Calls for speculation, calls for legal conclusion | | |
| 280: 1-3 | Calls for speculation, calls for legal conclusion | | |
| 281: 3-25 | Calls for speculation, calls for legal conclusion | | |
| 282: 1-2; 14-16; 18-25 | Calls for speculation, calls for legal conclusion | | |
| 283: 1-11; 13-18; 20-24 | Calls for speculation, calls for legal conclusion, vague, ambiguous | | |
| 284; 1-7; 9-17; 19; 21-25 | Calls for speculation, calls for legal conclusion | | |

| 285: 9-19; 21-25 | Argumentative, lacks foundation | | |
| 286: 1-4; 6-9; 11-16; 18-20; 22-25 | Calls for speculation, attorney-client privilege, vague, ambiguous | | |
| 287: 1-6; 8-15; 17-18 | Vague, ambiguous calls for speculation | | |
| 288: 18-20; 25 | | | |
| 289: 1-19; 21-25 | Argumentative, vague, ambiguous | | |
| 290: 1-25 | Argumentative, lacks foundation, relevance | | |
| 291: 1-6; 8; 19-25 | Argumentative, lacks foundation, relevance | | |
| 292; 1-2; 14-15; 18-21 | Vague, ambiguous, relevance. | | |

## II.     DEPOSITION OF LUCA COPPOLA (December 6, 2022)

| Rockwell's Initial Designation | WiAutomation's Objections to Initial Designations | WiAutomation's Counter-Designations | Rockwell's Objections to WiAutomation's Counter-Designations |
|---|---|---|---|
| 7: 4-9 | | | |
| 8: 16-19 | | | |
| 9: 19-25 | | | |
| 12: 5-7; 21-25 | Relevance. | | |
| 13: 2-5 | | | |
| 15: 4-9; 24-25 | Calls for speculation, vague, ambiguous | | |
| 16: 2; 4-5; 7-9; 11-18; 20-22; 24 | | | |
| 17: 8-23 | | | |
| 18: 5-6; 11-14 | Calls for speculation, vague, ambiguous | | |
| 19: 23-24 | Calls for speculation, vague, ambiguous | | |
| 20: 2-6; 12-16 | | | |
| 21: 5-10; 13-14; 16-21- 24 | Calls for speculation, hearsay. | | |

| | | | |
|---|---|---|---|
| 22: 7-9; 11-17; 19 | Vague, ambiguous, calls for speculation | | |
| 23: 8-9; 11-13; 16-17; 21; 23-25 | Vague, ambiguous, relevance | | |
| 24: 2-4; 6; 11-16; 19-21; 24 | Vague, ambiguous | | |
| 25: 8-10; 12-19; 21-25 | Vague, ambiguous | | |
| 26: 2-4; 8-9; 11-17 | Vague, ambiguous | | |
| 27: 7-8; 10; 15-16; 18 | Vague, ambiguous | | |
| 28: 24-25 | Lacks foundation, vague, ambiguous | | |
| 29: 2; 4-11; 20-22 | Lacks foundation, vague, ambiguous | | |
| 30: 2-5 | | | |
| 31: 12-25 | | | |
| 32: 2-4; 13-25 | | | |
| 33: 5-11; 18-22 | | | |
| 34: 4-10; 12; 16-23; 25 | | | |
| 35: 2-5; 7-17; 25 | Vague, ambiguous | | |
| 36: 2-12; 20-25 | | | |
| 37 2-11; 23-25 | | | |
| 38: 2-6; 17-25 | | | |
| 39: 11-16 | | | |
| 40: 7-15; 23-25 | Vague, ambiguous, lacks foundation | | |
| 41: 2-7; 9-12 | Vague, ambiguous, lacks foundation | | |
| 42: 6-9; 17-23 | | | |
| 44: 11-14; 17 | | | |
| 45: 5-13; 18-25 | | | |
| 46: 5-7; 24-25 | | | |
| 47: 2-4; 6-14; 16-17 | | | |
| 49: 24-25 | | | |
| 50: 2-3 | | | |

| | | | |
|---|---|---|---|
| 52: 23-25 | | | |
| 53: 2-3; 8-10; 14-23 | Vague, ambiguous | | |
| 54: 16-22 | Relevance, vague, ambiguous | | |
| 55: 17-19; 24-25 | Relevance, vague, ambiguous | | |
| 56: 2-12 | Argumentative, misstates testimony | | |
| 57: 16-25 | | | |
| 58: 2 | | | |
| 59: 3-6; 17-19; 23-25 | | | |
| 60: 2-5 | | | |
| 61: 12-15; 24-25 | Calls for speculation | | |
| 62: 2-3 | | | |
| 64: 2-4 | | | |
| 65: 12-15 | Vague, Ambiguous | | |
| 67: 11-16 | Vague, Ambiguous | | |
| 71: 23-25 | Relevance | | |
| 79: 16-19 | | | |
| 81: 7-13; 20-23 | Vague, ambiguous | | |
| 83: 19-22; 24-25 | Vague, ambiguous, calls for speculation | | |
| 84: 2-3; 12-15; 17-18 | Vague, ambiguous, calls for speculation | | |
| 86: 9-16; 18-22; 24-25 | Compound, vague, ambiguous, calls for speculation. | | |
| 88: 8-16 | Vague, ambiguous | | |
| 89: 11-25 | | | |
| 90: 2-4; 6-25 | Misstates testimony | | |
| 91: 2-3 | | | |
| 92:24-25 | Vague, ambiguous | | |
| 93: 2-24 | | | |
| 94: 18-25 | | | |
| 95: 11-12; 14-22 | | | |
| 102: 16-18; 25 | Vague, ambiguous | | |

| | | | |
|---|---|---|---|
| 103: 2-6; 18-25 | Vague, ambiguous | | |
| 104: 2-3 | | | |
| 105: 11-14 | | | |
| 109: 10-17; 19-21 | Vague, ambiguous, calls for speculation | | |
| 112: 22-25 | Relevance, vague, ambiguous, | | |
| 113: 2; 8; 10-20 | Relevance, vague, ambiguous, | | |
| 114: 6-11; 13-16 | Relevance, vague, ambiguous, | | |
| 116: 6-8 | | | |
| 118: 20-22 | | | |
| 121: 23-25 | Vague, ambiguous | | |
| 122: 2 | | | |
| 124: 20-21; 23-25 | Vague, ambiguous | | |
| 125: 3-8; 10-11 | Vague, ambiguous | | |
| 126: 7-8; 10-11; 22-23; 25 | Attorney client privilege, vague, ambiguous, lacks foundation | | |
| 127: 2-3; 7-13 | Vague, ambiguous | | |
| 129: 22-25 | Argumentative, lacks foundation | | |
| 130: 3-4; 13-25 | Vague, ambiguous | | |
| 131: 11-13 | | | |
| 133: 20-22; 24-25 | Vague, ambiguous | | |
| 134: 2-4; 16-23 | Vague, ambiguous, compound, calls for speculation. | | |
| 135: 4; 16-19 | | | |
| 136: 5-8; 10-16 | Calls for speculation | | |
| 140: 9-16; 18-21; 23-25 | Vague, ambiguous, calls for speculation | | |
| 141: 2-3; 10-13 | | | |
| 143: 21-25 | | | |
| 144: 2-9 | | | |
| 155: 7-12; 17-23 | | | |

### III.    DEPOSITION OF PORFIRIO LADONEA (December 13, 2022)

| Rockwell's Initial Designation | WiAutomation's Objections to Initial Designations | WiAutomation's Counter-Designations | Rockwell's Objections to WiAutomation's Counter-Designations |
|---|---|---|---|
| 6: 11-14 | | | |
| 7: 22-25 | | | |
| 8: 2-4; 9-14 | | | |
| 13: 19-24 | | | |
| 14: 2-8; 15-19 | | | |
| 18: 12-17; 19 | Relevance | | |
| 19: 9 | Relevance | | |
| 20: 3; 11-15; 18-19 | Relevance | | |
| 25: 18-22 | Vague, ambiguous | | |
| 26: 2-6 | | | |
| 27: 17-22 | | | |
| 28: 18-25 | Relevance, lacks foundation | | |
| 29: 2-9 | Relevance | | |
| 30: 9-18 | | | |
| 31: 9-11; 13-18 | Vague, ambiguous, lacks foundation, calls for speculation. | | |
| 33: 2-7; 9-12 | Relevance, vague, ambiguous. | | |
| 35: 3-18; 20-25 | | | |
| 36: 2-22 | Vague, ambiguous, relevance | | |
| 37: 4-13; 25 | Calls for speculation | | |
| 38: 2-11; 22-25 | | | |
| 39: 2-20; 22-25 | Vague, ambiguous, relevance. | | |
| 40: 19-25 | Vague, ambiguous, relevance | | |
| 41: 7-18; 21-25 | | | |
| 42: 2-18 | | | |
| 43: 21-23 | Vague, ambiguous | | |

| | | | |
|---|---|---|---|
| 44: 2-5 | Vague, ambiguous | | |
| 46: 9-12; 14-25 | Vague, ambiguous, calls for speculation | | |
| 47: 2-9 | | | |
| 48: 6-15 | | | |
| 49: 3-5; 13-15; 17-20; 22-25 | Vague, ambiguous, lacks foundation, calls for speculation | | |
| | | | |
| 50: 2-4; 6-14; 16-18 | Vague, ambiguous, lacks foundation, calls for speculation. | | |
| 51: 7-10 | Vague, ambiguous, relevance | | |
| 52: 2; 4 | Vague, ambiguous, relevance | | |
| 53: 3-5; 17-25 | Vague, ambiguous, relevance | | |
| 57: 15-24 | | | |
| 58: 6-8 | | | |
| 59: 6-17; 20-25 | Vague, ambiguous | | |
| 61: 3-6; 8-13 | Vague, ambiguous | | |
| 64: 15-22 | | | |
| 67: 14-23; 25 | Vague, ambiguous, calls for speculation | | |
| 68: 2-5 | Vague, ambiguous, calls for speculation | | |
| 70: 12-21 | | | |
| 73: 4-6; 8-18 | | | |
| 74: 23-25 | | | |
| 75: 2-17 | | | |
| 77: 20-25 | Vague, ambiguous | | |
| 78: 2-11 | Vague, ambiguous | | |
| 79: 7-10; 14-16; 21-25 | Compound | | |
| 80: 2-6 | | | |
| 85: 12-14; 16-25 | Relevance | | |
| 86: 20-25 | | | |
| 87: 2-23 | | | |

| | | | |
|---|---|---|---|
| 88: 4-6; 10-13 | | | |
| 94: 4-8; 25 | | | |
| 95: 2-5; 7-10; 20-23 | Vague, ambiguous, calls for speculation. | | |
| 96: 7-13; 19-22; 25 | Vague, ambiguous, compound, calls for speculation. | | |
| 97: 2; 11-23; 25 | | | |
| 98: 2-11; 22-25 | | | |
| 99: 2 | | | |
| 100: 12-15 | | | |
| 106: 15-25 | Relevance, lacks foundation. | | |
| 107: 2-5;9-14; 16-25 | Relevance, lacks foundation | | |
| 108: 2-8; 10-18; 23-25 | Relevance, hearsay, lacks foundation | | |
| 109: 2; 15-25 | Relevance, hearsay, lacks foundation | | |
| 110: 2-7; 11-25 | Relevance, hearsay, lacks foundation | | |
| 111: 2-21 | Relevance, hearsay, lacks foundation | | |
| 112: 2-8; 15-17; 19-25 | Relevance, hearsay, lacks foundation, calls for speculation | | |
| 113: 2-3; 9-14; 17-19 | Hearsay, vague, ambiguous | | |
| 114: 13-15; 19-23 | Argumentative, misstates testimony | | |
| 116: 11- 18 | Relevance, hearsay, lacks foundation | | |
| 118: 12-22 | | | |
| 121: 16-18 | | | |
| 123: 3-15 | Relevance, hearsay, lacks foundation | | |
| 125: 10-14; 16 | Vague, ambiguous | | |
| 126: 16-19 | | | |
| 128: 17-19; 21-25 | Calls for speculation | | |
| 129: 6-9; 11-13; 18-25 | Lacks foundation, calls for speculation | | |

| 130: 2-6; 12-18 | | | |
|---|---|---|---|
| 131: 22-25 | | | |
| 132: 2; 16-21 | Lacks foundation, calls for speculation, vague, ambiguous | | |
| 133: 4-7 | Lacks foundation, calls for speculation, vague, ambiguous | | |
| 134: 14-23 | | | |
| 135: 11-12; 14-17 | Vague, ambiguous, calls for speculation | | |
| 137: 23-25 | | | |
| 138: 14-19; | | | |
| 139: 2-7; 9-12 | | | |
| 140: 22-25 | Vague, ambiguous | | |
| 141: 14-15; 17-22 | Vague, ambiguous, calls for speculation | | |
| 144: 10-14 | | | |
| 150: 5-7; 13-15 | Calls for speculation, lacks foundation | | |

## IV.    DEPOSITION OF DANILO SCHIANO DI COLA (December 1, 2022)

| Rockwell's Initial Designation | WiAutomation's Objections to Initial Designations | WiAutomation's Counter-Designations | Rockwell's Objections to WiAutomation's Counter-Designations |
|---|---|---|---|
| 7: 13-18 | | | |
| 8: 11-12; 24 | | | |
| 11: 8-11 | | | |
| 15: 9-15 | | | |
| 19: 2-5; 9-12; 20-23 | Relevance | | |
| 20: 3-6 | | | |
| 21: 2-13 | Relevance | | |
| 22: 6-13 | | | |
| 24: 2-10 | | | |
| 25: 8-12 | | | |

| | | | |
|---|---|---|---|
| 27: 23-25 | Vague, ambiguous, | | |
| 28: 2-25 | Vague, ambiguous | | |
| 29: 2-5; 9-21 | Lacks foundation, calls for speculation | | |
| 32: 23-25 | | | |
| 34: 14-16; 23-25 | | | |
| 35: 2-3; 16-22 | | | |
| 37: 11-25 | Calls for speculation. Vague. Ambiguous | | |
| 38: 2-22 | Relevance | | |
| 41: 13-17 | | | |
| 42: 9-17; 19-25 | Vague, ambiguous, calls for speculation, lacks foundation | | |
| 43: 2-5; 16-21 | Calls for speculation, vague and ambiguous | | |
| 44: 24-25 | Vague, ambiguous, calls for speculation | | |
| 45: 2-6; 9-14; 21-25 | Vague, ambiguous, calls for speculation | | |
| 46: 2-3; 6 | Calls for speculation, vague, ambiguous | | |
| 47: 22-24 | Calls for speculation, vague, ambiguous | | |
| 48: 8- 11 | Calls for speculation, vague, ambiguous | | |
| 49: 9-15 | Vague, ambiguous, calls for speculation, relevance | | |
| 54: 8-12 | | | |
| 56: 22-25 | Vague, ambiguous | | |
| 57: 2-6; 12-14; 16 | Vague, ambiguous, relevance, lacks foundation | | |
| 59: 4-7; 15-25 | Vague, ambiguous, lacks foundation | | |
| 62: 21-25 | | | |
| 63: 2-3 | | | |
| 64: 2-7; 9-13 | Vague, ambiguous | | |
| 65: 17-20 | | | |
| 67: 4-12 | Relevance, calls for speculation | | |

| 70: 12-15 | | | |
| 72: 8-12; 17-19; 21-25 | | | |
| 73: 2-3; 7-23 | Relevance, vague, ambiguous. | | |
| 78: 22-24 | Vague, ambiguous, relevance | | |
| 79: 2-7; 9-10 | Vague, ambiguous, relevance, compound | | |
| 82: 11-14; 16-20 | Vague, ambiguous, calls for legal conclusion | | |
| 83: 4-10; 12-17; 19 | Vague, ambiguous, calls for legal conclusion | | |
| 85: 20-23 | Lacks foundation, vague, ambiguous | | |
| 88: 5-13 | Vague, ambiguous | | |
| 93: 11-17; 20-22 | Vague, ambiguous, lacks foundation, calls for speculation. | | |
| 95: 10-13; 15-23 | Vague, ambiguous, lacks foundation, misstates testimony. | | |
| 97: 5-7; 9-16 | Vague, ambiguous, calls for speculation | | |
| 98: 5-7 | | | |
| 99: 6-7; 9-17 | Vague, ambiguous | | |

## V.    DEPOSITION OF LUIGI SCOTTO DI CARLO (November 29, 2022)

| Rockwell's Initial Designation | WiAutomation's Objections to Initial Designations | WiAutomation's Counter-Designations | Rockwell's Objections to WiAutomation's Counter-Designations |
|---|---|---|---|
| 7: 25 | | | |
| 8: 2-5; 8-12; 19 | | | |
| 14: 15-17 | | | |
| 15: 2-23 | Relevance | | |
| 16: 2-7 | Relevance | | |

| | | | |
|---|---|---|---|
| 19: 2-15; 19-21 | Relevance | | |
| 20: 10-16 | Relevance | | |
| 25: 14-25 | | | |
| 26: 2-3; 9-15; 22-25 | | | |
| 28: 19-22 | | | |
| 29: 9-14 | Relevance | | |
| 30: 6-17; 19-20; 22-24 | Misstates Testimony, relevance, | | |
| 32: 3-12; 17-22 | Relevance | | |
| 39: 8-10; 19-24 | Relevance | | |
| 43: 9-11 | | | |
| 46: 4; 9-16; 20-21 | | | |
| 47: 21-25 | | | |
| 48: 2-4 | | | |
| 49: 17-19 | | | |
| 50: 24-25 | | | |
| 51: 2 | | | |
| 55: 5-14 | Relevance, lacks foundation, vague, ambiguous | | |
| 58: 20-22 | Relevance, lacks foundation, vague, ambiguous | | |
| 59: 2-8; 12-17 | Relevance, lacks foundation, vague, ambiguous | | |
| 60: 21-23 | Relevance, lacks foundation, vague, ambiguous | | |
| 62: 8-9; 11-18; 22-24 | Relevance, lacks foundation, vague, ambiguous | | |
| 63: 6-8; 10-14; 16; 21-25 | Lacks foundation, calls for speculation | | |
| 64: 10-14; 19-21 | | | |
| 65: 3-9 | | | |
| 66: 20-24 | Lacks foundation | | |
| 67: 2-19; 21; 25 | Vague, ambiguous, calls for speculation | | |

| | | | |
|---|---|---|---|
| 68: 2-3 | | | |
| 69: 3-8 | | | |
| 70: 8-16 | | | |
| 71: 11-12; 19-20 | | | |
| 74: 11-12; 14-16; 18; 24-25 | Vague, ambiguous, calls for speculation, lacks foundation | | |
| 75: 3-9; 15-18; 22-25 | Vague, ambiguous, calls for speculation, lacks foundation | | |
| 76: 2; 4-13; 25 | Relevance, Misstates testimony | | |
| 77: 2-7 | Relevance | | |
| 80: 18-22; 25 | Argumentative, misstates testimony, relevance | | |
| 81: 2-8; 11-13 | Argumentative, misstates testimony, relevance | | |
| 82: 7-13 | Argumentative, misstates testimony, relevance | | |
| 83: 25 | | | |
| 84: 2; 4-6 | Lacks foundation, vague, ambiguous | | |
| 86: 12-25 | | | |
| 87: 2-5 | | | |
| 88: 3-5; 7-16; 20-25 | Argumentative, vague, ambiguous | | |
| 89: 2-16; 18 | Argumentative, vague, ambiguous | | |
| 93: 10-17; 22 | Vague, ambiguous | | |
| 94:4-8 | | | |
| 111: 20-22 | | | |

# EXHIBIT 11

**EXHIBIT 11**

**WiAutomation Deposition Designations**

I.    **RYAN SMAGLIK- December 19, 2022 & December 20, 2022 Deposition**

| WiAutomation's Initial Designation | Rockwell's Objections to Initial Designations | Rockwell's Counter-Designations | WiAutomation's Objections to Rockwell's Counter-Designations |
|---|---|---|---|
| 26:13-23 | **Rule 32** | | |
| 26:24-27:45 | **Rule 32** | | |
| 27:6-20 | **Rule 32** | | |
| 27:25-28:17 | **Rule 32** | | |
| 35:20-36:4 | **Rule 32** | **36:5-12** | **Rule 32, Lacks Foundation, Legal Conclusion** |
| 39:18-22 | **Rule 32** | | |
| 45:16-20 | **Rule 32,402, 403** | | |
| 46:4-7 | **Rule 32,402, 403** | | |
| 61:22-62:4 | **Rule 32,402, 403** | | |
| 66:9-14 | **Rule 32,402, 403** | | |
| 74:23-75:2 | **Rule 32,402, 403** | | |

| | | | |
|---|---|---|---|
| 88:11-15 | **Rule 32,402, 403, Foundation** | | |
| 88:16-22 | **Foundation, Rule 32,402, 403** | | |
| 88:23-3 | **Foundation , Rule 32,402, 403** | | |
| 89:4-9 | **Rule 32,402, 403, Foundation** | | |
| 171:3-12 | **Rule 32** | | |
| 171:20-25 | **Rule 32** | **172:8-13; 172:14-173:8** | **Rule 32, Lacks Foundation** |
| 172:14-173:11 | **Rule 32** | **172:8-13; 172:14-173:8** | **Rule 32, Lacks Foundation** |
| 173:18-174:4 | **Rule 32** | **172:8-13; 172:14-173:8** | **Rule 32, Lacks Foundation** |
| 180:22-181:16 | **Rule 32** | **179:4-180:21** | **MIL, Objection to Judge Hall's Order, Relevance, Foundation** |
| 190:12-191:7 | **Rule 32** | | |
| 191:11-24 | **Rule 32** | | |
| 192:16-21 | **Rule 32** | **192:17-25** | **Rule 32** |
| 196:9-21 | **Rule 32** | | |
| 197:2-198:2 | **Rule 32** | | |
| 199:2-5 | **Rule 32** | **199:11-14** | **MIL, Objection to Judge Hall's Order, Lacks Foundation** |

| 202:14-23 | **Rule 32** | | |
|---|---|---|---|
| 203:23-204:9 | **Rule 32** | **204:10-14** | **Rule 32** |
| 211:19-25 | **Rule 32** | | |
| 238:18-239:2 | **Rule 32** | **234:13-15; 235:4-238:16; 239:3-242:24** | **MIL, Objection to Judge Hall's Order, Lacks Foundation** |
| 239:3-6 | **Rule 32** | **234:13-15; 235:4-239:2; 239:7-242:24** | **MIL, Objection to Judge Hall's Order, Lacks Foundation** |
| 240:21-242:2 | **Rule 32** | **234:13-15; 235:4-242:24** | **MIL, Objection to Judge Hall's Order, Lacks Foundation** |
| 242:3-13 | **Rule 32** | **234:13-15; 235:4-242:24** | **MIL, Objection to Judge Hall's Order, Lacks Foundation** |
| 248:17-23 | **Rule 32** | **234:13-15; 235:4-242:24; 248:24-249:5** | **MIL, Objection to Judge Hall's Order, Lacks Foundation** |
| 250:8-19 | **Rule 32** | **250:20-251:3; 252:15-253:5** | **MIL, Lacks Foundation, Hearsay, Relevance** |
| 301:16-302:6 | **Rule 32, Foundation** | | |
| 304:24-305:3 | **Rule 32, Foundation** | | |
| 307:24-308:2 | **Rule 32,402, 403, Foundation** | | |

| | | | |
|---|---|---|---|
| 308:7-9 | **Rule 32,402, 403, Foundation** | | |
| 308:14-19 | **Rule 32,402, 403, Foundation** | | |
| 316:21-317:3 | **Rule 32, Foundation** | | |
| 317:4-20 | **Rule 32, Foundation** | | |
| 330:2-19 | **Foundation** | | |
| 331:18-25 | **Rule 32,402, 403, Foundation** | | |
| 344:6-18 | **Rule 32** | | |
| 356:24-357:2 | **Rule 32, 402, 403, Foundation** | **357:5-14; 359:13-17** | **Rule 32, Lack of Foundation, Legal Conclusion, Relevance** |
| 390:25-391:3 | **Rule 32, 402, 403, Foundation** | | |
| 391:13-20 | **Rule 32,402, 403, Foundation** | | |
| 394:8-11 | **Rule 32,402, 403, Foundation** | | |
| 394:12-17 | **Rule 32,402, 403, Foundation** | | |
| 394:18-395:4 | **Rule 32,402, 403, Foundation** | | |

| | | | |
|---|---|---|---|
| 397:21-398:14 | **Rule 32,402, 403, Foundation** | | |
| 398:15-18 | **Rule 32,402, 403, Foundation** | | |
| 398:19-24 | **Rule 32,402, 403, Foundation** | | |
| 417:24-418:7 | **Rule 32,402, 403, Foundation** | **418:8-14** | **Rule 32, Relevance** |
| 418:19-419:15 | **Rule 32,402, 403, Foundation, Assumes facts not in evidence** | | |
| 419:23-420:12 | **Rule 32,402, 403, Foundation, Assumes facts not in evidence** | | |
| 423:18-23 | **Rule 32** | **423:3-17** | **Rule 32, Hearsay, Lacks Foundation, MIL, Rule 602** |
| 423:24-424:14 | **Rule 32** | **424:15-425:2** | **Rule 32, Hearsay, Lacks Foundation, MIL, Relevance, Rule 602** |
| 429:10-14 | **Rule 32,402, 403, Foundation** | | |
| 436:8-24 | **Rule 32,402, 403, Foundation** | | |

| | | | |
|---|---|---|---|
| 440:19-25 | **Rule 32,402, 403, Foundation** | | |
| 441:9-18 | **Rule 32,402, 403, Foundation** | | |
| 458:3-16 | **Rule 32** | | |
| 458:17-459:3 | **Rule 32** | | |
| 460:8-15 | **Rule 32,402, 403, Foundation** | | |
| 465:22-466:12 | **Rule 32** | **468:18-470:5** | **Rule 32, Lacks Foundation, Hearsay** |
| 466:13-23 | **Rule 32** | **468:18-470:5** | **Rule 32, Lacks Foundation, Hearsay** |
| 455:24-467:7 | **Rule 32** | **468:18-470:5** | **Rule 32, Lacks Foundation, Hearsay** |
| 467:8-13 | **Rule 32** | **468:18-470:5** | **Rule 32, Lacks Foundation, Hearsay** |
| 467:14-25 | **Rule 32** | **468:18-470:5** | **Rule 32, Lacks Foundation, Hearsay** |
| 468:2-9 | **Rule 32** | **468:18-470:5** | **Rule 32, Lacks Foundation, Hearsay** |
| 507:21-508:5 | **Rule 32,402, 403, Foundation** | **508:6-14; 509:2-510:9** | **Rule 32, Lacks Foundation, Rule 602** |
| 508:15-19 | **Rule 32,402, 403, Foundation** | **508:6-14; 509:2-510:9** | **Rule 32, Lacks Foundation, Rule 602** |

## II.    Mark Paliszewski - May 19, 2023 Deposition[1]

| WiAutomation's Initial Designation | Rockwell's Objections to Initial Designations | Rockwell's Counter-Designations | WiAutomation's Objections to Rockwell's Counter-Designations |
|---|---|---|---|
| 41:16-21 | **Foundation** | **27:2-12; 40:9-42:9** | |
| 44:7-12 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

---

[1] This designation does not waive WiAutomation's argument that Mark Paliszewski should be barred from testifying in this matter.

| | | | |
|---|---|---|---|
| | | 15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 44:13-18 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| 44:19-23 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |
| 44:25-45:6 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | | |
|---|---|---|---|
| | | 288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 45:7-12 | **Foundation** | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | | |
|---|---|---|---|
| | | 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 45:15-19 | Foundation | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 282:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; | Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL |

| | | | |
|---|---|---|---|
| | | 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 103:13-20 | **Foundation** | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15- | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | | |
|---|---|---|---|
| | | 21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 104:7-12 | Foundation | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; | Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL |

| | | | |
|---|---|---|---|
| | | 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 104:13-18 | **Foundation** | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23- | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | | | |
|---|---|---|---|---|
| | | 25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | | |
| 104:19-23 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |
| 104:24-105:6 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23;** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3** |

| | | 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | Order, Objection to May 3 Order, MIL |
| 105:17-106:4 | Foundation | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; | Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL |

| | | | |
|---|---|---|---|
| | | 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 116:12-24 | **Foundation** | | |
| 117:1-12 | **Foundation** | **117:13-22** | |
| 124:14-18 | **Foundation** | | |
| 127:3-9 | **Foundation** | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22 | |
|---|---|---|---|
| 128:15-129:5 | **Foundation** | **129:10-20** | **Relevance, MIL, Objection to Judge Hall's Order** |
| 132:16-19 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |
| 132:23-133:3 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22;** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |
| 134:19-24 | **Foundation** | | |

| 137:4-16 | **Foundation** | | |
|---|---|---|---|
| 140:6-15 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |
| 140:16-141:9 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |
| 141:10-22 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23;** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22 | |
|---|---|---|---|
| 142:3-11 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |
| 145:7-17 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |
| 147:17-148:4 | **Foundation** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | 288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22 | |
|---|---|---|---|
| 161:13-162:9 | **Foundation** | | |
| 162:10-13 | **Foundation** | | |
| 165:5-17 | **Foundation** | **165:18-21** | **Relevance, MIL, Objection to Judge Hall's Order** |
| 177:3-7 | **Foundation, 402, 403** | **177:23-178:3** | **Relevance, MIL, Objection to Judge Hall's Order** |
| 177:10-19 | **Foundation, 402, 403** | **177:23-178:3** | **Relevance, MIL, Objection to Judge Hall's Order** |
| 177:20-22 | **Foundation, 402, 403** | **177:23-178:3** | **Relevance, MIL, Objection to Judge Hall's Order** |
| 178:12-14 | **Foundation, 402, 403** | | |
| 178:1517 | **Foundation, 402, 403** | | |
| 179:12-15 | **Foundation** | | |
| 179:19-24 | **Foundation, 402, 403** | | |
| 188:8-14 | **Foundation** | **276:18-279:23; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8;** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | | |
|---|---|---|---|
| | | 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 188:19-23 | Foundation | 276:18-279:23; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL |
| 253:20-254:11 | Foundation, 402, 403 | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20- | Foundation, Relevance, Unauthorized under |

| | | 23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | **Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |
| 257:12-258:7 | **Foundation, 402, 403** | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | | |
|---|---|---|---|
| | | 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 271:7-13 | Foundation, 402, 403 | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; | Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL |

| | | | |
|---|---|---|---|
| | | 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 271:24-272:4 | **Foundation, 402, 403** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8;** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | | |
|---|---|---|---|
| | | 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 272:12-20 | Foundation, 402, 403 | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21- | Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL |

| | | 305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
|---|---|---|---|
| 274:3-12 | **Foundation, 402, 403** | **276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-** | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | | |
|---|---|---|---|
| | | 15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; 312:22-313:6; 313:9; 314:5-20 | |
| 275:2-13 | **Foundation, 402, 403** | 276:18-280:4; 280:8-18; 280:2-3; 281:7-14; 282:20-23; 283:2-9; 283:18-23; 283:25-284:3; 284:9-285:14; 285:18-21; 285:23-287:3; 287:6-10; 287:13-16; 287:19-288:17; 288:23-289:3; 289:5-13; 289:16-21; 289:23-25; 290:3; 290:10-12; 290:14; 290:24-291:3; 291:7-23; 292:5-9; 292:11-16; 292:19-24; 293:2-4; 293:7-9; 293:11-13; 293:15-19; 293:21-294:3; 294:5-7; 294:10-13; 294:16-17; 294:19-22; 294:24-25; 295:19-13; 296:16-19; 296:21-297:2; 297:4-27; 2982-7; 298:10-12; 298:14-19; 298:21-299:2; 299:5-8; 299:9-300:2; 300:5-11; 300:13-22; 300:24-301:3; 301:6-301:20; 301:23-302:3; 302:5-6; 302:9-13; 302:15-21; 302:24-303:4; 303:6-304:11; 304:14-18; 304:21-305:18; 305:21-23; 306:3-8; 306:10-15; 306:18-22; 306:24-307:17; 307:19-22; 307:25-308:3; 308:5-6; 308:8-15; 308:18-22; 308:24; 309:5-8; 309:10-11; 309:13-15; 309:17-19; 309:21-24; 310:4-8; 310:10-11; 310:13-15; 310:17-19; 310:21-311:2; 311:5-12; 311:14-21; 311:23-25; 312:3-6; 312; 8-15; | **Foundation, Relevance, Unauthorized under Judge Hall's May 3 Order, Objection to May 3 Order, MIL** |

| | | 312:22-313:6; 313:9; 314:5-20 | |
|---|---|---|---|
| | | | |

## III.    Luca Coppola – December 6, 2022 Deposition

| WiAutomation's Initial Designation | Rockwell's Objections to Initial Designations | Rockwell's Counter-Designations | WiAutomation's Objections to Rockwell's Counter-Designations |
|---|---|---|---|
| 8:16-19 | **Rule 32, 802** | | |
| 8:20-25 | **Rule 32, 802** | | |
| 9:9-12 | **Rule 32, 802** | | |
| 9:19-25 | **Rule 32, 802** | | |
| 12:21-23 | **Rule 32, 802** | | |
| 15:4-9 | **Rule 32, 802** | | |
| 17:8-12 | **Rule 32, 802** | | |
| 17:13-20 | **Rule 32, 802** | | |
| 17:21-23 | **Rule 32, 802** | | |
| 22:7-12 | **Rule 32, 802** | | |
| 22:20-24 | **Rule 32, 802** | | |
| 22:25-23:13 | **Rule 32, 802** | | |
| 23:14-21 | **Rule 32, 802** | | |
| 23:22-24 | **Rule 32, 802** | | |
| 23:25:23:2 | **Rule 32, 802** | | |

| | | | |
|---|---|---|---|
| 26:8-15 | **Rule 32, 802** | | |
| 26:16-17 | **Rule 32, 802** | | |
| 26:18-23 | **Rule 32, 802** | | |
| 32:20-23 | **Rule 32, 802** | | |
| 32:24-25 | **Rule 32, 802** | | |
| 35:3-8 | **Rule 32, 802** | | |
| 45:5-9 | **Rule 32, 802** | | |
| 46:8-12 | **Rule 32, 802** | **46:13-16** | **Rule 32, Relevance** |
| 53:1416 | **Rule 32, 802** | | |
| 79:16-19 | **Rule 32, 802** | | |
| 81:7-13 | **Rule 32, 802** | **84:12-18** | **Rule 32, Relevance, Mischaracterizes Witness Testimony** |
| 81:14-19 | **Rule 32, 802** | **84:12-18** | **Rule 32, Relevance, Mischaracterizes Witness Testimony** |
| 81:20-23 | **Rule 32, 802** | **84:12-18** | **Rule 32, Relevance, Mischaracterizes Witness Testimony** |
| 82:4-15 | **Rule 32, 802** | **84:12-18** | **Rule 32, Relevance, Mischaracterizes Witness Testimony** |
| 83:12-18 | **Rule 32, 802** | **84:12-18** | **Rule 32, Relevance,** |

|  |  |  | **Mischaracterizes Witness Testimony** |
|---|---|---|---|
| 83:19-84:3 | **Rule 32, 802** | **84:12-18** | **Rule 32, Relevance, Mischaracterizes Witness Testimony** |
| 84:19-24 | **Rule 32, 802** | **84:12-18** | **Rule 32, Relevance, Mischaracterizes Witness Testimony** |
| 91:4-14 | **Rule 32, 802** | **90:3-4; 90:6-8** | **Rule 32, Relevance** |
| 92:12-14 | **Rule 32, 802,** |  |  |
| 92:17-93:4 | **Rule 32, 802** | **93:5-7; 93:12-24** | **Rule 32, Relevance,** |
| 93:8-11 | **Rule 32, 802** | **93:5-7; 93:12-24** | **Rule 32, Relevance,** |
| 103:18-105:3 | **Rule 32, 802** |  |  |
| 104:8-13 | **Rule 32, 802** |  |  |
| 108:8-11 | **Rule 32, 802** |  |  |
| 108:12-21 | **Rule 32, 802** |  |  |
| 116:9-12 | **Rule 32, 802, 402, 403, Foundation** |  |  |
| 116:16-18 | **Rule 32, 802, 402, 403, Foundation** |  |  |
| 116:24-117:5 | **Rule 32, 802, 402, 403, Foundation** |  |  |

| 117:6-11 | **Rule 32, 802** | **117:12-17** | **Rule 32, Relevance,** |
|---|---|---|---|
| 143:21-25 | **Rule 32, 802** | **144:2-9** | **Rule 32, Lacks Foundation** |
| 152:17-18 | **Rule 32, 802, Foundation, 402, 403, 106** | **146:8-152:16** | **Rule 32, Lacks Foundation, Hearsay** |
| 153:5-8 | **Rule 32, 802, Foundation, 402, 403, 106** | **146:8-152:16; 47:3-4; 47:6-20; 48-9-12** | **Rule 32, Lacks Foundation, Hearsay** |
| 153:9-13 | **Rule 32, 802, Foundation, 402, 403, 106** | **146:8-152:16; 47:3-4; 47:6-20; 48-9-12** | **Rule 32, Lacks Foundation, Hearsay** |
| 153:14-16 | **Rule 32, 802, Foundation, 402, 403, 106** | **146:8-152:16; 47:3-4; 47:6-20; 48-9-12** | **Rule 32, Lacks Foundation, Hearsay** |
| 153:17-21 | **Rule 32, 802, Foundation, 402, 403, 106** | **146:8-152:16; 47:3-4; 47:6-20; 48-9-12** | **Rule 32, Lacks Foundation, Hearsay** |
| 154:3-6 | **Rule 32, 802, Foundation, 402, 403, 106** | **146:8-152:16; 47:3-4; 47:6-20; 48-9-12** | **Rule 32, Lacks Foundation, Hearsay** |
| 154:18-24 | **Rule 32, 802, Foundation, 402, 403, 106** | **146:8-152:16; 47:3-4; 47:6-20; 48-9-12** | **Rule 32, Lacks Foundation, Hearsay Rule 32, Lacks Foundation, Hearsay** |
| 155:7-12 | **Rule 32, 802, Foundation, 402, 403, 106** | **146:8-152:16; 47:3-4; 47:6-20; 48-9-12** | **Rule 32, Lacks Foundation, Hearsay** |
| 155:17-20 | **Rule 32, 802, Foundation, 402, 403, 106** | **146:8-152:16; 47:3-4; 47:6-20; 48-9-12** | **Rule 32, Lacks Foundation, Hearsay** |

| 155:21-3 | Rule 32, 802, Foundation, 402, 403, 106 | 146:8-152:16; 47:3-4; 47:6-20; 48-9-12 | Rule 32, Lacks Foundation, Hearsay |
|---|---|---|---|

## IV.    Luigi Scotto Di Carlo – November 29, 2022 Deposition

| WiAutomation's Initial Designation | Rockwell's Objections to Initial Designations | Rockwell's Counter-Designations | WiAutomation's Objections to Rockwell's Counter-Designations |
|---|---|---|---|
| 15:17-19 | Rule 32, 802 | | |
| 21:12-20 | Rule 32, 802 | | |
| 22:3-23:6 | Rule 32, 802 | | |
| 23:13-15 | Rule 32, 802 | | |
| 24:10-15 | Rule 32, 802 | | |
| 25:22-26:3 | Rule 32, 802 | | |
| 26:9-15 | Rule 32, 802 | | |
| 29:9-14 | Rule 32, 802 | | |
| 29:15-23 | Rule 32, 802 | | |
| 29:24-30:2 | Rule 32, 802 | | |
| 32:17-22 | Rule 32, 802 | 30:6-17; 30:19-20; 30:22-24; 32:3-12 | Rule 32, Relevance, Lacks Foundation |
| 33:2-8 | Rule 32, 802 | 30:6-17; 30:19-20; 30:22-24; 32:3-12 | Rule 32, Relevance, Lacks Foundation |
| 39:25-40:7 | Rule 32, 802 | 39:8-10; 39:19-24 | Rule 32, Relevance, Lacks Foundation |

| 40:8-12 | **Rule 32, 802** | **39:8-10; 39:19-24** | **Rule 32, Relevance, Lacks Foundation** |
|---|---|---|---|
| 65:20-24 | **Rule 32, 802** | **62:8-9; 62:11-18; 63:21-25** | **Rule 32, Relevance, Lacks Foundation** |
| 65:25-66:7 | **Rule 32, 802** | **62:8-9; 62:11-18; 63:21-25** | **Rule 32, Relevance, Lacks Foundation** |
| 69:3-8 | **Rule 32, 802** | | |
| 86:22-87:5 | **Rule 32, 802** | **86:12-21** | **Rule 32, Relevance, Lacks Foundation** |
| 85:4-9 | **402, 403 Rule 32, 802** | | |
| 90:19-22 | **Rule 32, 802** | **90:23-91:4** | **Rule 32, Relevance, Lacks Foundation** |
| 91:8-12 | **Rule 32, 802** | **90:23-91:4** | **Rule 32, Relevance, Lacks Foundation** |
| 91:13-17 | **Rule 32, 802** | **90:23-91:4; 91:18-92:19** | **Rule 32, Relevance, Lacks Foundation** |
| 91:18-24 | **Rule 32, 802** | **90:23-91:4; 91:18-92:19** | **Rule 32, Relevance, Lacks Foundation** |
| 91:25-92:19 | **Rule 32, 802** | **90:23-91:4; 91:18-92:19** | **Rule 32, Relevance, Lacks Foundation** |

**V.    Pasquale Danilo Schiano Di Cola – December 1, 2022 Deposition**

| WiAutomation's Initial Designation | Rockwell's Objections to Initial Designations | Rockwell's Counter-Designations | WiAutomation's Objections to Rockwell's |
|---|---|---|---|

| | | | Counter-Designations |
|---|---|---|---|
| 11:5-7 | **Rule 32, 802** | | |
| 11:12-16 | **Rule 32, 802** | | |
| 11:17-12:5 | **Rule 32, 802** | | |
| 13:4-13 | **Rule 32, 802** | | |
| 15:9-11 | **Rule 32, 802** | **21:09-13; 22:06-13** | **Rule 32, Relevance, Lacks Foundation.** |
| 15:12-15 | **Rule 32, 802** | | |
| 15:16-16:3 | **Rule 32, 802** | | |
| 24:15-25:2 | **Rule 32, 802** | | |
| 25:8-12 | **Rule 32, 802** | | |
| 25:13-16 | **Rule 32, 802** | | |
| 26:13-16 | **Rule 32, 802** | | |
| 27:12-16 | **Rule 32, 802** | | |
| 28:3-11 | **Rule 32, 802** | | |
| 28:12-16 | **Rule 32, 802** | | |
| 31:3-14 | **Rule 32, 802** | | |
| 31:25-32:5 | **Rule 32, 802** | | |
| 32:6-10 | **Rule 32, 802** | | |
| 32:16-22 | **Rule 32, 802** | | |
| 33:12-15-22 | **Rule 32, 802** | | |
| 34:9-13 | **Rule 32, 802** | **34:14-16:34:23-35:3; 35:16-22; 36:04-37:03, 37:11-39:22, 97:05-09, 97:14-16, 98:05-07** | **Rule 32, Relevance** |

| | | | |
|---|---|---|---|
| 42:25-43:11 | **Rule 32, 802** | | |
| 43:16-21 | **Rule 32, 802** | **44:24-45:14; 45:21-46:3; 46:6** | **Rule 32, Relevance, Lacks Foundation** |
| 49:16-20 | **Rule 32, 802** | | |
| 56:22-57:3 | **Rule 32, 802** | | |
| 58:3-7 | **Rule 32, 802** | | |
| 58:8-23 | **Rule 32, 802** | | |
| 58:24-59:3 | **Rule 32, 802** | | |

## VI.    Rodney Michel (Publicly Available Versions of Transcripts)

| February 1, 2018 Deposition In Case No. 1:15-cv-05246-RBK-JS | | | |
|---|---|---|---|
| **WiAutomation's Initial Designation** | **Rockwell's Objections to Initial Designations** | **WiAutomation's Counter-Designations** | **WiAutomation's Objections to Rockwell's Counter-Designations** |
| 117:22-118:20 | **Rule 32, 802, 804, Foundation, 402, 403** | | |
| 119:5-11 | **Rule 32, 802, 804, Foundation, 402, 403** | | |
| 121:4-11 | **Rule 32, 802, 804, Foundation, 402, 403** | | |
| 121:13-122:6 | **Rule 32, 802, 804, Foundation, 402, 403** | **276:6-19; 276:24-277:3** | **Rule 32, Re: 2/1/18 Depo: Portion not publicly available per** |

| | | | |
|---|---|---|---|
| | | RM Depo March, 27 2018 71:3-72:5 | **Rockwell's own redactions, thus not judicially noticeable, and not produced in this case**<br><br>**Re 3/27/18 Depo: Lacks Foundation, omits other relevant testimony** |
| 123:12-17 | **Rule 32, 802, 804, Foundation, 402, 403** | | |
| 123:18-124:1 | **Rule 32, 802, 804, Foundation, 402, 403** | | |
| 205:6-17 | **Rule 32, 802, 804, Foundation, 402, 403** | **205:18-208:1; 217:22-218:17**<br><br>**242:14-245:20**<br><br>**RM Depo March, 27 2018 109:10-111:14; 112:4-21; 67:3-25** | **Rule 32,**<br><br>**Re: 2/1/18 Depo:  Lacks foundation,  Not publicly available or produced in this case thus not judicially noticeable.**<br><br>**Re: 3/27/18 Depo: Not publicly available and not produced in this case.** |
| 206:1-10 | **Rule 32, 802, 804, Foundation, 402, 403** | **205:18-208:1** | **Rule 32, Lacks foundation, Not publicly available or produced in this case thus not judicially noticeable.** |
| 298:5-16 | **Rule 32, 802, 804, Foundation, 402, 403** | | |
| 298:20-300:3 | **Rule 32, 802, 804, Foundation, 402, 403** | **296:21-297:19; 228:2:229-230:5; 301:15-302:12;** | **Rule 32, Lacks Foundation, 280:7-281:7 not publicly available or produced in this case, relevance** |

| | | 183:21-186:6; 280:7-281:7 | |
|---|---|---|---|
| **March 27, 2018 Deposition (Publicly Available on PACER)** **In Case No. 1:15-cv-05246-RBK-JS** | | | |
| 274:5-11 | **Rule 32, 802, 804, Foundation, 402, 403** | **71:3-72:5** **Feb 1 2018 Deposition 296:21-297:19; 228:2:229-230:5; 301:15-302:12; 183:21-186:6** | **Rule 32,** **Lacks Foundation, 280:7-281:7 not publicly available or produced in this case, relevance** |
| 274:17-25 | **Rule 32, 802, 804, Foundation, 402, 403** | **Feb 1 2018 Deposition 296:21-297:19; 228:2:229-230:5; 301:15-302:12; 183:21-186:6** | **Rule 32,** **Lacks Foundation, 280:7-281:7 not publicly available or produced in this case, relevance** |
| 275:2-7 | **Rule 32, 802, 804, Foundation, 402, 403** | **275:9-276:12; 280:7-281:7** **Feb 1, 2018 Deposition 242:14-245:20** | **Rule 32,** **Lacks Foundation, 280:7-281:7 & 242:14-245:20 not publicly available or produced in this case, relevance** |
| 275:9-23 | **Rule 32, 802, 804, Foundation, 402, 403** | **275:24-276:12; 280:7-281:7** **Feb 1, 2018 Deposition 242:14-245:20** | **Rule 32,** **Lacks Foundation, 280:7-281:7 & 242:14-245:20 not publicly available or produced in this case, relevance** |

EXHIBIT 12

# EXHIBIT 12

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | **JTX No.** | **PTX No.** | **DTX No.** | **Description** | **Beginning Bates** | **Ending Bates** | **Rockwell's Objections** | **WiAutomation's Objections** |
| 2 | JTX-001 | PTX-1576 | DTX 009 | Rockwell Distributor Agreement | ROCK-00012410 | ROCK-00012489 | | |
| 3 | JTX-002 | PTX-1594 | DTX 010 | SY.EL Correspondence | ROCK-00012548 | ROCK-00012553 | | Foundation, Relevance, Hearsay, Authenticity |
| 4 | JTX-003 | PTX-1634 | DTX 012 | SY.EL Correspondence | ROCK-00012890 | | 402, 403, 802, No translation | Foundation, Relevance, Hearsay, Authenticity |
| 5 | JTX-004 | PTX-1910 | DTX 033 | WiAutomation Warranty Page | ROCK-00012359 | ROCK-00012386 | 106, 802 | |
| 6 | JTX-005 | PTX-1911 | DTX 034 | WiAutomation Warranty Page | ROCK-00012387 | ROCK-00012390 | 106, 802 | |
| 7 | JTX-006 | PTX-1920 | DTX 016 | WiAutomation Purchase Documentation | WI-003327 | WI-003358 | 106, 403, 802, No translation | |
| 8 | JTX-007 | PTX-1921 | DTX 017 | WiAutomation Purchase Documentation | WI-003359 | WI-003433 | 106, 403, 802, No translation | |
| 9 | JTX-008 | PTX-1947 | DTX 021 | Rockwell General Terms and Conditions of Sale | | | | |

# EXHIBIT 13

## EXHIBIT 13

| PTX No. | Description | BegBates | End Bates | Objections |
|---|---|---|---|---|
| PTX-001 | Rockwell Publication | ROCK-00000001 | ROCK-00000002 | Relevance, foundation, undue prejudice, hearsay |
| PTX-002 | Rockwell Publication | ROCK-00000003 | ROCK-00000046 | Relevance, foundation, undue prejudice, hearsay |
| PTX-003 | Rockwell Publication | ROCK-00000047 | ROCK-00000060 | Relevance, foundation, undue prejudice, hearsay |
| PTX-004 | Rockwell Publication | ROCK-00000061 | ROCK-00000085 | Relevance, foundation, undue prejudice, hearsay |
| PTX-005 | Rockwell Publication | ROCK-00000086 | ROCK-00000089 | |
| PTX-006 | Rockwell Publication | ROCK-00000090 | ROCK-00000091 | Relevance, foundation, undue prejudice, hearsay |
| PTX-007 | Rockwell Publication | ROCK-00000092 | ROCK-00000092 | Relevance, foundation, undue prejudice, hearsay |
| PTX-008 | Rockwell Publication | ROCK-00000096 | ROCK-00000115 | Relevance, foundation, undue prejudice, hearsay |
| PTX-009 | Rockwell Publication | ROCK-00000116 | ROCK-00000121 | Relevance, foundation, undue prejudice, hearsay |
| PTX-010 | WiAutomation Product Photo | ROCK-00000126 | ROCK-00000126 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-011 | WiAutomation Product Photo | ROCK-00000127 | ROCK-00000127 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-012 | WiAutomation Product Photo | ROCK-00000128 | ROCK-00000128 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-013 | WiAutomation Product Photo | ROCK-00000129 | ROCK-00000129 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-014 | WiAutomation Product Photo | ROCK-00000130 | ROCK-00000130 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-015 | WiAutomation Product Photo | ROCK-00000131 | ROCK-00000131 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-016 | WiAutomation Product Photo | ROCK-00000132 | ROCK-00000132 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-017 | WiAutomation Product Photo | ROCK-00000133 | ROCK-00000133 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-018 | WiAutomation Product Photo | ROCK-00000134 | ROCK-00000134 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |

| PTX-019 | WiAutomation Product Photo | ROCK-00000135 | ROCK-00000135 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-020 | WiAutomation Product Photo | ROCK-00000136 | ROCK-00000136 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-021 | WiAutomation Product Photo | ROCK-00000137 | ROCK-00000137 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-022 | WiAutomation Product Photo | ROCK-00000138 | ROCK-00000138 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-023 | Website Chat Screenshot | ROCK-00000140 | ROCK-00000140 | Relevance, Hearsay,  Foundation, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-024 | Rockwell Policy | ROCK-00000196 | ROCK-00000216 | Foundation, Hearsay |
| PTX-025 | WiAutomation Product Photo | ROCK-00000217 | ROCK-00000217 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-026 | WiAutomation Product Photo | ROCK-00000218 | ROCK-00000218 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-027 | WiAutomation Product Photo | ROCK-00000219 | ROCK-00000219 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-028 | WiAutomation Product Photo | ROCK-00000220 | ROCK-00000220 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-029 | WiAutomation Product Photo | ROCK-00000221 | ROCK-00000221 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-030 | WiAutomation Product Photo | ROCK-00000222 | ROCK-00000222 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-031 | WiAutomation Product Photo | ROCK-00000223 | ROCK-00000223 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-032 | WiAutomation Product Photo | ROCK-00000224 | ROCK-00000224 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-033 | WiAutomation Product Photo | ROCK-00000225 | ROCK-00000225 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |

| PTX-034 | WiAutomation Product Photo | ROCK-00000226 | ROCK-00000226 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-035 | WiAutomation Product Photo | ROCK-00000227 | ROCK-00000227 | Rule 37, MIL, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-036 | WiAutomation Invoice | ROCK-00000228 | ROCK-00000229 | Rule 37, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-037 | WiAutomation Email | ROCK-00000230 | ROCK-00000240 | Rule 37, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-038 | WiAutomation Email | ROCK-00000241 | ROCK-00000245 | Rule 37, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-039 | WiAutomation Email | ROCK-00000246 | ROCK-00000246 | Rule 37, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-040 | WiAutomation Email | ROCK-00000247 | ROCK-00000254 | Rule 37, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-041 | WiAutomation Invoice (and translation) | ROCK-00000255 | ROCK-00000256 | Rule 37, Relevance, Hearsay, Undue Prejudice, Foundation, Authenticity |
| PTX-042 | Rockwell VAR Agreement | ROCK-00001231 | ROCK-00001234 | Hearsay, Lacks Foundation, Autenticity |
| PTX-047 | Rockwell VAR Agreement | ROCK-00001248 | ROCK-00001251 | Hearsay, Lacks Foundation, Autenticity |
| PTX-128 | Rockwell VAR Agreement | ROCK-00001544 | ROCK-00001547 | Hearsay, Lacks Foundation, Autenticity |
| PTX-196 | Rockwell VAR Agreement | ROCK-00001784 | ROCK-00001787 | Hearsay, Lacks Foundation, Autenticity |
| PTX-426 | Rockwell VAR Agreement | ROCK-00002905 | ROCK-00002908 | Hearsay, Lacks Foundation, Autenticity |
| PTX-747 | Rockwell Publication | ROCK-00004239 | ROCK-00004240 | Relevance, foundation, hearsay, authenticity, undue prejudice |
| PTX-748 | Rockwell Policy | ROCK-00004241 | ROCK-00004243 | Relevance |
| PTX-749 | Rockwell Policy | ROCK-00004244 | ROCK-00004272 | Relevance |
| PTX-750 | Rockwell Policy | ROCK-00004273 | ROCK-00004279 | Relevance |
| PTX-751 | Rockwell Policy | ROCK-00004280 | ROCK-00004300 | Relevance |
| PTX-752 | Rockwell Policy | ROCK-00004301 | ROCK-00004304 | Relevance |
| PTX-753 | Rockwell Policy | ROCK-00004305 | ROCK-00004321 | Foundation, Relevance |
| PTX-754 | Rockwell Policy | ROCK-00004322 | ROCK-00004325 | Relevance |
| PTX-755 | Rockwell Policy | ROCK-00004326 | ROCK-00004335 | Relevance |
| PTX-756 | Rockwell Policy | ROCK-00004336 | ROCK-00004341 | Relevance |
| PTX-757 | Rockwell Policy | ROCK-00004342 | ROCK-00004349 | Relevance |
| PTX-758 | Rockwell Policy | ROCK-00004350 | ROCK-00004356 | Relevance |
| PTX-759 | Rockwell Trademark Ownership Document | ROCK-00004357 | ROCK-00004362 | |
| PTX-760 | Rockwell Trademark Ownership Document | ROCK-00004363 | ROCK-00004365 | |
| PTX-761 | Rockwell Trademark Ownership Document | ROCK-00004366 | ROCK-00004375 | |
| PTX-762 | Rockwell Trademark Ownership Document | ROCK-00004376 | ROCK-00004380 | |
| PTX-763 | Rockwell Trademark Ownership Document | ROCK-00004381 | ROCK-00004385 | |

| PTX-764 | Rockwell Trademark Ownership Document | ROCK-00004386 | ROCK-00004391 | |
| PTX-765 | Rockwell Trademark Ownership Document | ROCK-00004392 | ROCK-00004396 | |
| PTX-766 | Rockwell Trademark Ownership Document | ROCK-00004397 | ROCK-00004400 | |
| PTX-767 | Rockwell Trademark Ownership Document | ROCK-00004401 | ROCK-00004404 | |
| PTX-768 | Rockwell Policy | ROCK-00004405 | ROCK-00004416 | Relevance, Foundation, Hearsay |
| PTX-769 | Rockwell Policy | ROCK-00004417 | ROCK-00004436 | |
| PTX-770 | Rockwell Policy | ROCK-00004437 | ROCK-00004439 | |
| PTX-771 | Rockwell Policy | ROCK-00004440 | ROCK-00004445 | |
| PTX-772 | Rockwell Product Notice | ROCK-00004446 | ROCK-00004451 | |
| PTX-773 | Rockwell Product Notice | ROCK-00004452 | ROCK-00004452 | |
| PTX-774 | Rockwell Product Technical Data | ROCK-00004453 | ROCK-00004500 | Relevance |
| PTX-775 | Rockwell Policy | ROCK-00004501 | ROCK-00004507 | Relevance |
| PTX-776 | Rockwell Policy | ROCK-00004508 | ROCK-00004518 | Relevance |
| PTX-777 | Rockwell Policy | ROCK-00004519 | ROCK-00004524 | Relevance |
| PTX-778 | Rockwell Policy | ROCK-00004525 | ROCK-00004537 | Relevance |
| PTX-779 | Rockwell Policy | ROCK-00004538 | ROCK-00004538 | Relevance |
| PTX-780 | Rockwell Policy | ROCK-00004539 | ROCK-00004543 | |
| PTX-781 | Rockwell Policy | ROCK-00004544 | ROCK-00004544 | Relevance |
| PTX-782 | Rockwell Policy | ROCK-00004545 | ROCK-00004558 | Relevance |
| PTX-783 | Rockwell Policy | ROCK-00004559 | ROCK-00004567 | Relevance |
| PTX-852 | Rockwell Product Notice | ROCK-00004935 | ROCK-00004938 | Hearsay, Lacks Foundation, Authenticity |
| PTX-853 | Rockwell Product Notice | ROCK-00004939 | ROCK-00004942 | Hearsay, Lacks Foundation, Authenticity |
| PTX-911 | Rockwell Product Notice | ROCK-00005307 | ROCK-00005311 | Hearsay, Lacks Foundation, Authenticity |
| PTX-913 | Rockwell Product Notice | ROCK-00005317 | ROCK-00005321 | Hearsay, Lacks Foundation, Authenticity |
| PTX-942 | Rockwell Product Notice | ROCK-00005514 | ROCK-00005521 | Hearsay, Lacks Foundation, Authenticity |
| PTX-956 | Rockwell Product Notice | ROCK-00005608 | ROCK-00005612 | Hearsay, Lacks Foundation, Authenticity |
| PTX-971 | Rockwell Product Notice | ROCK-00005736 | ROCK-00005739 | Hearsay, Lacks Foundation, Authenticity |
| PTX-973 | Rockwell Product Notice | ROCK-00005745 | ROCK-00005749 | Hearsay, Lacks Foundation, Authenticity |
| PTX-982 | Rockwell Product Notice | ROCK-00005790 | ROCK-00005793 | Hearsay, Lacks Foundation, Authenticity |
| PTX-990 | Rockwell Product Notice | ROCK-00005832 | ROCK-00005839 | Hearsay, Lacks Foundation, Authenticity |
| PTX-992 | Rockwell Product Notice | ROCK-00005846 | ROCK-00005851 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1086 | Rockwell Product Notice | ROCK-00006491 | ROCK-00006499 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1089 | Rockwell Product Notice | ROCK-00006508 | ROCK-00006511 | Hearsay, Lacks Foundation, Authenticity |

| PTX-1090 | Rockwell Product Notice | ROCK-00006512 | ROCK-00006519 | Hearsay, Lacks Foundation, Authenticity |
|---|---|---|---|---|
| PTX-1091 | Rockwell Product Notice | ROCK-00006520 | ROCK-00006527 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1094 | Rockwell Product Notice | ROCK-00006539 | ROCK-00006543 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1095 | Rockwell Product Notice | ROCK-00006544 | ROCK-00006549 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1099 | Rockwell Product Notice | ROCK-00006565 | ROCK-00006569 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1101 | Rockwell Product Notice | ROCK-00006576 | ROCK-00006580 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1102 | Rockwell Product Notice | ROCK-00006581 | ROCK-00006586 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1106 | Rockwell Product Notice | ROCK-00006611 | ROCK-00006615 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1108 | Rockwell Product Notice | ROCK-00006621 | ROCK-00006625 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1109 | Rockwell Product Notice | ROCK-00006626 | ROCK-00006630 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1112 | Rockwell Product Notice | ROCK-00006643 | ROCK-00006649 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1113 | Rockwell Product Notice | ROCK-00006650 | ROCK-00006656 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1114 | Rockwell Product Notice | ROCK-00006657 | ROCK-00006663 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1118 | Rockwell Policy | ROCK-00006677 | ROCK-00006678 | Relevance |
| PTX-1119 | Rockwell Policy | ROCK-00006679 | ROCK-00006679 | Relevance |
| PTX-1120 | Rockwell Policy | ROCK-00006680 | ROCK-00006682 | Relevance |
| PTX-1123 | Rockwell Policy | ROCK-00006686 | ROCK-00006690 | Relevance |
| PTX-1124 | Rockwell Policy | ROCK-00006691 | ROCK-00006706 | Relevance |
| PTX-1125 | Rockwell Policy | ROCK-00006707 | ROCK-00006707 | Relevance |
| PTX-1126 | Rockwell Policy | ROCK-00006708 | ROCK-00006718 | Relevance |
| PTX-1127 | Rockwell Policy | ROCK-00006719 | ROCK-00006740 | Relevance |
| PTX-1128 | Rockwell Policy | ROCK-00006741 | ROCK-00006762 | Relevance |
| PTX-1129 | Rockwell Policy | ROCK-00006763 | ROCK-00006783 | Relevance |
| PTX-1130 | Rockwell Policy | ROCK-00006784 | ROCK-00006792 | Relevance |
| PTX-1131 | Rockwell Policy | ROCK-00006793 | ROCK-00006798 | Relevance |
| PTX-1132 | Rockwell End User License Agreement | ROCK-00006799 | ROCK-00006806 | Relevance |
| PTX-1133 | Rockwell Warranty Information | ROCK-00006807 | ROCK-00006807 | Relevance, Foundation, Hearsay |
| **PTX-1137** | **Rockwell Distributor Agreement** | **ROCK-00006830** | **ROCK-00006861** | |
| **PTX-1138** | **Rockwell Distributor Agreement** | **ROCK-00006862** | **ROCK-00006888** | |
| PTX-1159 | Rockwell Distributor Agreement | ROCK-00007279 | ROCK-00007302 | |
| PTX-1183 | Rockwell Distributor Agreement | ROCK-00007799 | ROCK-00007819 | |
| PTX-1192 | Rockwell Distributor Agreement | ROCK-00007991 | ROCK-00008008 | |
| PTX-1209 | Rockwell Distributor Agreement | ROCK-00008435 | ROCK-00008456 | |

| PTX-1218 | Rockwell Distributor Agreement | ROCK-00008771 | ROCK-00008810 | TBD |
|---|---|---|---|---|
| PTX-1249 | Rockwell Distributor Agreement | ROCK-00009468 | ROCK-00009489 | TBD |
| PTX-1265 | Rockwell Distributor Agreement | ROCK-00009772 | ROCK-00009798 | TBD |
| PTX-1549 | PLC-City Correspondence | ROCK-00011805 | ROCK-00011806 | Relevance, Foundation, Hearsay, Unduly Prejudicial, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1550 | Complaint Correspondence | ROCK-00011807 | ROCK-00011810 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1553 | Complaint Correspondence | ROCK-00011820 | ROCK-00011821 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1555 | Complaint Correspondence | ROCK-00011826 | ROCK-00011826 | Relevance, Foundation, Hearsay, |
| PTX-1556 | Complaint Correspondence | ROCK-00011827 | ROCK-00011829 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1558 | Complaint Correspondence | ROCK-00011832 | ROCK-00011838 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1559 | Complaint Correspondence | ROCK-00011839 | ROCK-00011842 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1560 | Complaint Correspondence | ROCK-00011843 | ROCK-00011843 | Relevance, Foundation, Hearsay |
| PTX-1562 | Complaint Correspondence | ROCK-00011850 | ROCK-00011852 | Relevance, Foundation, Hearsay |
| PTX-1563 | Complaint Correspondence | ROCK-00011853 | ROCK-00011855 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1565 | Complaint Correspondence | ROCK-00011862 | ROCK-00011864 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1566 | Complaint Correspondence | ROCK-00011865 | ROCK-00011866 | Relevance, Foundation, Hearsay |
| PTX-1567 | Rockwell Financial Document | ROCK-00011894 | ROCK-00011939 | Foundation, Relevance |
| PTX-1568 | Rockwell Financial Document | ROCK-00011940 | ROCK-00011967 | Foundation, Relevance |
| PTX-1569 | Rockwell Financial Document | ROCK-00011972 | ROCK-00012067 | Foundation, Relevance |
| PTX-1570 | Rockwell Financial Document | ROCK-00012068 | ROCK-00012159 | Foundation, Relevance |
| PTX-1571 | Rockwell Financial Document | ROCK-00012160 | ROCK-00012251 | Foundation, Relevance |
| PTX-1572 | Rockwell Financial Document | ROCK-00012252 | ROCK-00012347 | Foundation, Relevance |
| PTX-1573 | Rockwell Correspondence With WiAutomation | ROCK-00012391 | ROCK-00012394 | Foundation, Relevance, Hearsay |
| PTX-1574 | Rockwell Correspondence With WiAutomation | ROCK-00012395 | ROCK-00012403 | Foundation, Relevance, Hearsay |
| PTX-1575 | Rockwell Correspondence With WiAutomation | ROCK-00012404 | ROCK-00012409 | Foundation, Relevance, Hearsay |
| PTX-1576 | Rockwell Distributor Agreement | ROCK-00012410 | ROCK-00012489 | |
| PTX-1577 | Complaint Correspondence | ROCK-00012490 | ROCK-00012491 | Relevance, Foundation, Hearsay |
| PTX-1578 | Complaint Correspondence | ROCK-00012492 | ROCK-00012492 | Relevance, Foundation, Hearsay, Unduly Prejudicial- Hetronic |
| PTX-1579 | Complaint Correspondence | ROCK-00012493 | ROCK-00012495 | Relevance, Foundation, Hearsay |

| PTX-1580 | Complaint Correspondence | ROCK-00012496 | ROCK-00012499 | Relevance, Foundation, Hearsay |
|---|---|---|---|---|
| PTX-1581 | Complaint Correspondence | ROCK-00012500 | ROCK-00012503 | Relevance, Foundation, Hearsay |
| PTX-1582 | Complaint Correspondence | ROCK-00012504 | ROCK-00012505 | Relevance, Foundation, Hearsay |
| PTX-1583 | Complaint Correspondence | ROCK-00012506 | ROCK-00012508 | Relevance, Foundation, Hearsay |
| PTX-1584 | Complaint Correspondence | ROCK-00012509 | ROCK-00012513 | Relevance, Foundation, Hearsay |
| PTX-1585 | Complaint Correspondence | ROCK-00012514 | ROCK-00012517 | Relevance, Foundation, Hearsay |
| PTX-1586 | Complaint Correspondence | ROCK-00012518 | ROCK-00012520 | Relevance, Foundation, Hearsay |
| PTX-1587 | Complaint Correspondence | ROCK-00012521 | ROCK-00012523 | Relevance, Foundation, Hearsay |
| PTX-1588 | Complaint Correspondence | ROCK-00012524 | ROCK-00012530 | Relevance, Foundation, Hearsay |
| PTX-1589 | Complaint Correspondence | ROCK-00012531 | ROCK-00012534 | Relevance, Foundation, Hearsay |
| PTX-1590 | Complaint Correspondence | ROCK-00012535 | ROCK-00012538 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1591 | Complaint Correspondence | ROCK-00012539 | ROCK-00012542 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1592 | Complaint Correspondence | ROCK-00012543 | ROCK-00012546 | Relevance, Foundation, Hearsay |
| PTX-1593 | Complaint Correspondence | ROCK-00012547 | ROCK-00012547 | Relevance, Foundation, Hearsay |
| PTX-1594 | SY.EL Correspondence | ROCK-00012548 | ROCK-00012553 | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1595 | Complaint Correspondence | ROCK-00012554 | ROCK-00012558 | Relevance, Foundation, Hearsay |
| PTX-1596 | Complaint Correspondence | ROCK-00012559 | ROCK-00012559 | Relevance, Foundation, Hearsay |
| PTX-1597 | Complaint Correspondence | ROCK-00012560 | ROCK-00012560 | Relevance, Foundation, Hearsay |
| PTX-1598 | Complaint Correspondence | ROCK-00012561 | ROCK-00012561 | Relevance, Foundation, Hearsay |
| PTX-1599 | Complaint Correspondence | ROCK-00012562 | ROCK-00012562 | Relevance, Foundation, Hearsay |
| PTX-1600 | Complaint Correspondence | ROCK-00012563 | ROCK-00012563 | Relevance, Foundation, Hearsay |
| PTX-1601 | Complaint Correspondence | ROCK-00012564 | ROCK-00012564 | Relevance, Foundation, Hearsay |
| PTX-1602 | WiAutomation Email | ROCK-00012565 | ROCK-00012569 | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1603 | WiAutomation Email | ROCK-00012570 | ROCK-00012570 | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1604 | WiAutomation Email | ROCK-00012571 | ROCK-00012578 | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1605 | WiAutomation Email | ROCK-00012579 | ROCK-00012589 | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1606 | Complaint Correspondence | ROCK-00012590 | ROCK-00012596 | Improperly withheld & not produced during discovery, Foundation, Relevance, Hearsay, Authenticity. Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1607 | Complaint Correspondence | ROCK-00012597 | ROCK-00012599 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1608 | Complaint Correspondence | ROCK-00012600 | ROCK-00012600 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| PTX-1609 | Complaint Correspondence | ROCK-00012601 | ROCK-00012623 | Foundation, Relevance, Hearsay, Authenticity |
|---|---|---|---|---|
| PTX-1611 | Complaint Correspondence | ROCK-00012624 | ROCK-00012625 | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1612 | Complaint Correspondence | ROCK-00012626 | ROCK-00012629 | Rule 37, Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1613 | Complaint Correspondence | ROCK-00012630 | ROCK-00012635 | Relevance, Foundation, Hearsay |
| PTX-1614 | Complaint Correspondence | ROCK-00012636 | ROCK-00012641 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1615 | Complaint Correspondence | ROCK-00012642 | ROCK-00012645 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1616 | Complaint Correspondence | ROCK-00012646 | ROCK-00012647 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1617 | Complaint Correspondence | ROCK-00012648 | ROCK-00012649 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1618 | Complaint Correspondence | ROCK-00012650 | ROCK-00012652 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1619 | Complaint Correspondence | ROCK-00012653 | ROCK-00012657 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1620 | Complaint Correspondence | ROCK-00012658 | ROCK-0012661 | Rule 37, Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1624 | Complaint Correspondence | ROCK-00012663 | ROCK-00012673 | MIL, Relevance, Foundation, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1625 | Technology BSA Correspondence | ROCK-00012674 | ROCK-00012675 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1626 | Complaint Correspondence | ROCK-00012676 | ROCK-00012678 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1627 | Rockwell Publication | ROCK-00012679 | ROCK-00012702 | |
| PTX-1628 | Rockwell Publication | ROCK-00012703 | ROCK-00012734 | |
| PTX-1629 | Rockwell Publication | ROCK-00012735 | ROCK-00012776 | |
| PTX-1630 | Rockwell Publication | ROCK-00012777 | ROCK-00012870 | |

| PTX-1632 | SY.EL Correspondence | ROCK-00012881 | ROCK-00012886 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
|---|---|---|---|---|
| PTX-1633 | SY.EL Correspondence | ROCK-00012887 | ROCK-00012889 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1634 | SY.EL Correspondence | ROCK-00012890 | ROCK-00012893 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1635 | PLC-City Correspondence | ROCK-00012894 | ROCK-00012894 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1636 | PLC-City Correspondence | ROCK-00012895 | ROCK-00012895 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1637 | Technology BSA Correspondence | ROCK-00012896 | ROCK-00012897 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1638 | Complaint Correspondence | ROCK-00012898 | ROCK-00012901 | Improperly withheld & not produced during discovery, Foundation, Relevance, Hearsay, Authenticity. Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1639 | Complaint Correspondence | ROCK-00012902 | ROCK-00012905 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1640 | Complaint Correspondence | ROCK-00012906 | ROCK-00012911 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1641 | RS Components Correspondence | ROCK-00012912 | ROCK-00012914 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1642 | Rockwell Policy | ROCK-00012916 | ROCK-00012920 | |
| PTX-1643 | RS Components Correspondence | ROCK-00012921 | ROCK-00012924 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1644 | Complaint Correspondence | ROCK-00012925 | ROCK-00012925 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1645 | Complaint Correspondence | ROCK-00012926 | ROCK-00012930 | MIL, Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| PTX-1649 | Complaint Correspondence | ROCK-00012931 | ROCK-00012933 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1650 | Complaint Correspondence | ROCK-00012934 | ROCK-00012949 | Relevance, Foundation, Hearsay, FRE 407, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1663 | Complaint Correspondence | ROCK-00012950 | ROCK-00012960 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1664 | RS Components Correspondence | ROCK-00012961 | ROCK-00012963 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1665 | Complaint Correspondence | ROCK-00012964 | ROCK-00012970 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1666 | SY.EL Correspondence | ROCK-00012971 | ROCK-00012976 | Relevance, Foundation, Hearsay |
| PTX-1667 | Complaint Correspondence | ROCK-00012977 | ROCK-00012979 | Relevance, Foundation, Hearsay |
| PTX-1668 | Complaint Correspondence | ROCK-00012980 | ROCK-00012981 | Relevance, Foundation, Hearsay, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1669 | SY.EL Correspondence | ROCK-00012982 | ROCK-00012987 | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1686 | Rockwell Product Notice | ROCK-00013078 | ROCK-00013083 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1687 | Rockwell Product Notice | ROCK-00013084 | ROCK-00013088 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1688 | Rockwell Product Notice | ROCK-00013089 | ROCK-00013106 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1689 | Rockwell Product Notice | ROCK-00013107 | ROCK-00013112 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1690 | Rockwell Product Notice | ROCK-00013113 | ROCK-00013119 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1691 | Rockwell Product Notice | ROCK-00013120 | ROCK-00013129 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1694 | Rockwell Product Notice | ROCK-00013141 | ROCK-00013146 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1697 | Rockwell Product Notice | ROCK-00013156 | ROCK-00013162 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1709 | Rockwell Product Notice | ROCK-00013235 | ROCK-00013239 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1710 | Rockwell Product Notice | ROCK-00013240 | ROCK-00013244 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1718 | Rockwell Product Notice | ROCK-00013286 | ROCK-00013290 | Hearsay, Lacks Foundation, Authenticity |

| PTX-1719 | Rockwell Product Notice | ROCK-00013291 | ROCK-00013295 | Hearsay, Lacks Foundation, Authenticity |
|---|---|---|---|---|
| PTX-1720 | Rockwell Product Notice | ROCK-00013296 | ROCK-00013300 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1721 | Rockwell Product Notice | ROCK-00013301 | ROCK-00013305 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1727 | Rockwell Product Notice | ROCK-00013336 | ROCK-00013340 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1730 | Rockwell Product Notice | ROCK-00013351 | ROCK-00013355 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1731 | Rockwell Product Notice | ROCK-00013356 | ROCK-00013359 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1736 | Rockwell Product Notice | ROCK-00013379 | ROCK-00013383 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1737 | Rockwell Product Notice | ROCK-00013384 | ROCK-00013388 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1745 | Rockwell Product Notice | ROCK-00013431 | ROCK-00013448 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1747 | Rockwell Product Notice | ROCK-00013454 | ROCK-00013464 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1751 | WiAutomation Product Photo | ROCK-00013480 | ROCK-00013480 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1752 | WiAutomation Product Photo | ROCK-00013481 | ROCK-00013481 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1753 | WiAutomation Product Photo | ROCK-00013482 | ROCK-00013482 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1754 | WiAutomation Product Photo | ROCK-00013483 | ROCK-00013483 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1755 | WiAutomation Product Photo | ROCK-00013484 | ROCK-00013484 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1756 | WiAutomation Product Photo | ROCK-00013485 | ROCK-00013485 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1757 | WiAutomation Product Photo | ROCK-00013486 | ROCK-00013486 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1758 | WiAutomation Product Photo | ROCK-00013487 | ROCK-00013487 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1759 | WiAutomation Product Photo | ROCK-00013488 | ROCK-00013488 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1760 | Rockwell Distributor Agreement | ROCK-00013489 | ROCK-00013489 | Foundation, Relevance |
| PTX-1761 | SY.EL Correspondence | ROCK-00013490 | ROCK-00013492 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1762 | SY.EL Correspondence | ROCK-00013493 | ROCK-00013493 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1763 | SY.EL Correspondence | ROCK-00013494 | ROCK-00013494 | Foundation, Relevance, Hearsay, Authenticity. |

| | | | | |
|---|---|---|---|---|
| PTX-1764 | WiAutomation Product Photo | ROCK-00013495 | ROCK-00013501 | MIL, Rule 37, Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1765 | Rockwell Sales Data | ROCK-00013502 | ROCK-00015455 | |
| PTX-1766 | Rockwell Sales Data | ROCK-00015456 | ROCK-00015457 | |
| PTX-1767 | ARC Market Research Study | ROCK-00015458 | ROCK-00015692 | Foundation, Relevance, Hearsay, Authenticity, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1768 | Flame Networks Presentation (and translation) | ROCK-00015859 | ROCK-00015859 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1769 | Flame Networks Presentation (and translation) | ROCK-00015861 | ROCK-00015861 | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1770 | Syntegon Correspondence | ROCK-00015862 | ROCK-00015862 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1771 | Syntegon Correspondence | ROCK-00015863 | ROCK-00015863 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1772 | Syntegon Correspondence | ROCK-00015864 | ROCK-00015864 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1773 | Syntegon Correspondence | ROCK-00015865 | ROCK-00015865 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1774 | Syntegon Correspondence | ROCK-00015866 | ROCK-00015866 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| PTX-1775 | Syntegon Correspondence | ROCK-00015867 | ROCK-00015867 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
|---|---|---|---|---|
| PTX-1776 | Syntegon Correspondence | ROCK-00015868 | ROCK-00015868 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1777 | Syntegon Correspondence | ROCK-00015895 | ROCK-00015896 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1778 | Syntegon Correspondence | ROCK-00015897 | ROCK-00015897 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1779 | Syntegon Correspondence | ROCK-00015898 | ROCK-00015899 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1780 | Syntegon Correspondence | ROCK-00015900 | ROCK-00015900 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1781 | Syntegon Correspondence | ROCK-00015901 | ROCK-00015902 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| | | | | |
|---|---|---|---|---|
| PTX-1782 | Syntegon Correspondence | ROCK-00015903 | ROCK-00015903 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1783 | Syntegon Correspondence | ROCK-00015904 | ROCK-00015906 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1784 | Syntegon Correspondence | ROCK-00015907 | ROCK-00015907 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1785 | Syntegon Correspondence | ROCK-00015908 | ROCK-00015908 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1786 | Syntegon Correspondence | ROCK-00015909 | ROCK-00015909 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1787 | Syntegon Correspondence | ROCK-00015910 | ROCK-00015911 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1788 | Syntegon Correspondence | ROCK-00015912 | ROCK-00015912 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| | | | | |
|---|---|---|---|---|
| PTX-1789 | Syntegon Correspondence | ROCK-00015913 | ROCK-00015913 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1790 | Syntegon Correspondence | ROCK-00015914 | ROCK-00015915 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1791 | Syntegon Correspondence | ROCK-00015916 | ROCK-00015916 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1792 | Syntegon Correspondence | ROCK-00015917 | ROCK-00015918 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1793 | Syntegon Correspondence | ROCK-00015919 | ROCK-00015919 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1794 | Syntegon Correspondence | ROCK-00015920 | ROCK-00015920 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1795 | Syntegon Correspondence | ROCK-00015921 | ROCK-00015922 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| | | | | |
|---|---|---|---|---|
| PTX-1796 | Syntegon Correspondence | ROCK-00015923 | ROCK-00015924 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1797 | Syntegon Correspondence | ROCK-00015925 | ROCK-00015925 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1798 | Syntegon Correspondence | ROCK-00015926 | ROCK-00015928 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1799 | Syntegon Correspondence | ROCK-00015929 | ROCK-00015931 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1800 | Syntegon Correspondence | ROCK-00015932 | ROCK-00015934 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1801 | Syntegon Correspondence | ROCK-00015935 | ROCK-00015938 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1802 | Syntegon Correspondence | ROCK-00015939 | ROCK-00015940 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| PTX-1803 | Syntegon Correspondence | ROCK-00015941 | ROCK-00015941 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1804 | Syntegon Correspondence | ROCK-00015942 | ROCK-00015942 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1805 | Syntegon Correspondence | ROCK-00015943 | ROCK-00015943 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1806 | Syntegon Correspondence | ROCK-00015944 | ROCK-00015944 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1807 | Syntegon Correspondence | ROCK-00015945 | ROCK-00015945 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1808 | Syntegon Correspondence | ROCK-00015946 | ROCK-00015946 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1809 | Syntegon Correspondence | ROCK-00015947 | ROCK-00015947 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| PTX-1810 | Syntegon Correspondence | ROCK-00015948 | ROCK-00015948 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
|---|---|---|---|---|
| PTX-1811 | Syntegon Correspondence | ROCK-00015949 | ROCK-00015949 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1812 | Syntegon Correspondence | ROCK-00015950 | ROCK-00015951 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1813 | Syntegon Correspondence | ROCK-00015952 | ROCK-00015952 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1814 | Syntegon Correspondence | ROCK-00015953 | ROCK-00015954 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1815 | Syntegon Correspondence | ROCK-00015955 | ROCK-00015956 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1816 | Syntegon Correspondence | ROCK-00015957 | ROCK-00015957 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| | | | | |
|---|---|---|---|---|
| PTX-1817 | Syntegon Correspondence | ROCK-00015958 | ROCK-00015959 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1818 | Syntegon Correspondence | ROCK-00015960 | ROCK-00015960 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1819 | Syntegon Correspondence | ROCK-00015961 | ROCK-00015962 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1820 | Syntegon Correspondence | ROCK-00015963 | ROCK-00015963 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1821 | Syntegon Correspondence | ROCK-00015964 | ROCK-00015966 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1822 | Syntegon Correspondence | ROCK-00015967 | ROCK-00015967 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1823 | Syntegon Correspondence | ROCK-00015968 | ROCK-00015968 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| | | | | |
|---|---|---|---|---|
| PTX-1824 | Syntegon Correspondence | ROCK-00015969 | ROCK-00015969 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1825 | Syntegon Correspondence | ROCK-00015970 | ROCK-00015971 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1826 | Syntegon Correspondence (and translation) | ROCK-00015972 | ROCK-00015973 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1827 | Syntegon Correspondence | ROCK-00015974 | ROCK-00015974 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1828 | Syntegon Correspondence | ROCK-00015975 | ROCK-00015976 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1829 | Syntegon Correspondence | ROCK-00015977 | ROCK-00015977 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1830 | Syntegon Correspondence | ROCK-00015978 | ROCK-00015980 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| | | | | |
|---|---|---|---|---|
| PTX-1831 | Syntegon Correspondence | ROCK-00015981 | ROCK-00015981 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1832 | Syntegon Correspondence | ROCK-00015982 | ROCK-00015984 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1833 | Syntegon Correspondence | ROCK-00015985 | ROCK-00015986 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1834 | Syntegon Correspondence | ROCK-00015987 | ROCK-00015987 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1835 | Syntegon Correspondence | ROCK-00015988 | ROCK-00015991 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1836 | Syntegon Correspondence | ROCK-00015992 | ROCK-00015992 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1837 | Syntegon Correspondence | ROCK-00015993 | ROCK-00015993 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| PTX-1838 | Syntegon Correspondence | ROCK-00015994 | ROCK-00015995 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1839 | Syntegon Correspondence | ROCK-00015996 | ROCK-00015998 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1840 | Syntegon Correspondence | ROCK-00015999 | ROCK-00015999 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1841 | WiAutomation Product Photos | ROCK-00016000 | ROCK-00016996 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1842 | Syntegon Sale Shipment Documentation | ROCK-00016997 | ROCK-00016997 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1843 | Syntegon Sale Shipment Documentation | ROCK-00016998 | ROCK-00016998 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1844 | Syntegon Sale Shipment Documentation | ROCK-00016999 | ROCK-00017000 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| | | | | |
|---|---|---|---|---|
| PTX-1845 | Syntegon Sale Shipment Documentation | ROCK-00017001 | ROCK-00017001 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1846 | Syntegon Sale Shipment Documentation | ROCK-00017002 | ROCK-00017002 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1847 | Syntegon Sale Shipment Documentation | ROCK-00017003 | ROCK-00017003 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1848 | Syntegon Sale Shipment Documentation | ROCK-00017004 | ROCK-00017008 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1849 | Syntegon Sale Shipment Documentation | ROCK-00017009 | ROCK-00017013 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1850 | Syntegon Sale Shipment Documentation | ROCK-00017014 | ROCK-00017014 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1851 | Syntegon Sale Shipment Documentation | ROCK-00017015 | ROCK-00017015 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |

| PTX-1852 | Syntegon Sale Shipment Documentation | ROCK-00017016 | ROCK-00017016 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1853 | Syntegon Sale Shipment Documentation | ROCK-00017017 | ROCK-00017017 | Objection to Amend the Scheduling Order to Reopen Discovery,Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Relevance - Hetronic, Unduly Prejudicial- Hetronic |
| PTX-1854 | Rockwell Correspondence With WiAutomation | WI-002511 | WI-002518 | Relevance |
| PTX-1855A | Trademark Registration No. 1,172,955 Physical Ribbon Copy (Previously Exhibit 1 to Complaint) | | | |
| PTX-1855B | Trademark Registration No. 696,401 Physical Ribbon Copy (Previously Exhibit 2 to Complaint) | | | |
| PTX-1855C | Trademark Registration No. 693,780 Physical Ribbon Copy (Previously Exhibit 3 to Complaint) | | | |
| PTX-1855D | Trademark Registration No. 1,172,994 Physical Ribbon Copy (Previously Exhibit 4 to Complaint) | | | |
| PTX-1855E | Trademark Registration No. 712,800 Physical Ribbon Copy (Previously Exhibit 5 to Complaint) | | | |
| PTX-1855F | Trademark Registration No. 712,836 Physical Ribbon Copy (Previously Exhibit 6 to Complaint) | | | |
| PTX-1855G | Trademark Registration No. 2,510,226 Physical Ribbon Copy (Previously Exhibit 7 to Complaint) | | | |
| PTX-1855H | Trademark Registration No. 2,671,196 Physical Ribbon Copy (Previously Exhibit 8 to Complaint) | | | |
| PTX-1855I | Trademark Registration No. 2,701,786 Physical Ribbon Copy (Previously Exhibit 9 to Complaint) | | | |
| PTX-1855J | Trademark Registration No. 2,412,742 Physical Ribbon Copy (Previously Exhibit 10 to Complaint) | | | |
| PTX-1856 | Informaiton from Rockwell's SAP Product Informaiton Database | | | MIL, Rule 37, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, |
| PTX-1857 | D.I. 148 (Tanck Decl.), Ex. 1 - Rockwell 2022 10-K | | | |
| PTX-1858 | D.I. 148 (Tanck Decl.), Ex. 2 - Asserted Trademarks Abstracts of Title | | | |
| PTX-1859 | D.I. 148 (Tanck Decl.), Ex. 3 - Asserted Trademarks Incontestability | | | |
| PTX-1860 | ITC Inv. No. 337-TA-1074 October 23, 2018 Initial Determination | | | Foundation, Relevance, Hearsay, Authenticity. |
| PTX-1861 | ITC Inv. No. 337-TA-1074 April 23, 2019 Commission Opinion | | | Foundation, Relevance, Hearsay, Authenticity. |

| | | | | |
|---|---|---|---|---|
| PTX-1862 | January 6, 2023 Expert Report of Brett Reed, Ex. 3 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1863 | January 6, 2023 Expert Report of Brett Reed, Ex. 4 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1864 | January 6, 2023 Expert Report of Brett Reed, Ex. 5 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1865 | January 6, 2023 Expert Report of Brett Reed, Ex. 6 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1866 | January 6, 2023 Expert Report of Brett Reed, Ex. 7 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1867 | January 6, 2023 Expert Report of Brett Reed, Ex. 8 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1868 | January 6, 2023 Expert Report of Brett Reed, Ex. 9 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1869 | January 6, 2023 Expert Report of Brett Reed, Ex. 10 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1870 | February 17, 2023 Expert Report of Brett Reed, Ex. 11 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1871 | February 17, 2023 Expert Report of Brett Reed, Ex. 12 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1872 | February 17, 2023 Expert Report of Brett Reed, Ex. 13 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1873 | February 17, 2023 Expert Report of Brett Reed, Ex. 14 | | | Daubert Motion, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1874 | Paliszewski Declaration with Exhibits (D.I. 263) | | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial |
| PTX-1875 | D.I. 191 (McLaughlin Decl.), Ex. 3 - Direct Witness Statement of Rodney Michael, ITC Investigation No. 337-TA-1074 | | | Rule 37 - not produced in discovery or publicly available. |
| PTX-1876 | D.I. 227 (Tanck Decl.), Ex. 6 - WiAutomation Webpage | | | |
| PTX-1877 | Luca Coppola Dep. Ex. 2 | | | |
| PTX-1878 | Luca Coppola Dep. Ex. 7 | | | FRE 407 |
| PTX-1879 | Luca Coppola Dep. Ex. 8 | | | FRE 407 |

| PTX-1880 | Luca Coppola Dep. Ex. 9 | | | FRE 407 |
|---|---|---|---|---|
| PTX-1881 | Porfirio Ladonea Dep. Ex. 1 | | | |
| PTX-1882 | Porfirio Ladonea Dep. Ex. 2 | | | FRE 407 |
| PTX-1883 | Porfirio Ladonea Dep. Ex. 4 (and translation) | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1884 | Porfirio Ladonea Dep. Ex. 5 | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1885 | Porfirio Ladonea Dep. Ex. 6 (and translation) | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1886 | Porfirio Ladonea Dep. Ex. 7 | | | |
| PTX-1887 | Porfirio Ladonea Dep. Ex. 8 (and translation) | | | |
| PTX-1888A | https://us.wiautomation.com and all subdomains thereof (English) | | | |
| PTX-1888B | https://it.wiautomation.com and all subdomains thereof (Italian) | | | |
| PTX-1889 | Fulvio Coppola Dep. Ex. 2 | | | |
| PTX-1890 | Fulvio Coppola Dep. Ex. 3 | | | |
| PTX-1891 | Fulvio Coppola Dep. Ex. 4 | | | |
| PTX-1892 | Fulvio Coppola Dep. Ex. 5 | | | FRE 407 |
| PTX-1893 | Fulvio Coppola Dep. Ex. 6 | | | MIL, Rule 37, Foundation, Relevance, Hearsay, Authenticity |
| PTX-1894 | Fulvio Coppola Dep. Ex. 7 | | | Foundation, Relevance, Hearsay, Authenticity, Relevance-Hetronic |
| PTX-1896 | Fulvio Coppola Dep. Ex. 9 | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1897 | Fulvio Coppola Dep. Ex. 10 | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1898 | Fulvio Coppola Dep. Ex. 11 | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1899 | https://www.rockwellautomation.com/en-us/company/about-us/our-history | | | |
| PTX-1900 | January 6, 2023 Expert Report of David Franklyn, Appx. B | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1901 | January 6, 2023 Expert Report of David Franklyn, Appx. C | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1902 | January 6, 2023 Expert Report of David Franklyn, Appx. D | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1903 | D.I. 193 (DeVilbiss Decl.) | | | Foundation, Relevance, Hearsay, Authenticity |
| PTX-1904 | D.I. 193 (DeVilbiss Decl.), Ex. 1 - Direct Witness Statement of Warren DeVilbiss, ITC Investigation No. 337-TA-1074 | | | Rule 37, not produced or publicly available, Foundation, Relevance, Hearsay, Authenticity, Speculation |
| PTX-1905 | WiAutomation Website | | | |
| PTX-1906 | WiAutomation Website | | | |
| PTX-1907 | WiAutomation Website | ROCK-00011867 | ROCK-00011871 | |
| PTX-1908 | WiAutomation Website | ROCK-00011968 | ROCK-00011971 | |
| PTX-1909 | WiAutomation Website | ROCK-00012354 | ROCK-00012358 | |
| PTX-1910 | WiAutomation Website | ROCK-00012359 | ROCK-00012386 | |
| PTX-1911 | WiAutomation Website | ROCK-00012387 | ROCK-00012390 | |

| | | | | |
|---|---|---|---|---|
| PTX-1912 | WiAutomation Website | | | Foundation, Relevance, Authenticity, Hearsay |
| PTX-1913 | WiAutomation Website | | | Foundation, Relevance, Authenticity, Hearsay |
| PTX-1914 | WiAutomation Website | | | Foundation, Relevance, Authenticity, Hearsay |
| PTX-1915 | WiAutomation Website | | | Foundation, Relevance, Authenticity, Hearsay |
| PTX-1916 | WiAutomation Website | ROCK-00012348 | ROCK-00012348 | |
| PTX-1917 | WiAutomation Website | ROCK-00012349 | ROCK-00012352 | |
| PTX-1918 | WiAutomation Website | ROCK-00012353 | ROCK-00012353 | |
| PTX-1919 | WiAutomation correspondence regarding sourcing | WI-0022615 | WI-003086 | Foundation, Relevance,  Hearsay |
| PTX-1920 | WiAutomation Purchase Documentation | WI-003327 | WI-003358 | |
| PTX-1921 | WiAutomation Purchase Documentation | WI-003359 | WI-003433 | |
| PTX-1922 | WiAutomation Financial Documents (and translation) | WI-003434 | WI-003441 | |
| PTX-1923 | WiAutomation Financial Documents (and translation) | WI-003442 | WI-03448 | |
| PTX-1924 | WiAutomation Financial Documents (and translation) | WI-003449 | WI-003455 | |
| PTX-1925 | WiAutomation Financial Documents (and translation) | WI-003456 | WI-003469 | |
| PTX-1926 | WiAutomation Website Traffic Data | ROCK-00015843 | ROCK-00015843 | Foundation, Hearsay |
| PTX-1927 | WiAutomation Website Traffic Data | ROCK-00015844 | ROCK-00015844 | Foundation, Hearsay |
| PTX-1928 | WiAutomation Website Traffic Data | ROCK-00015845 | ROCK-00015845 | Foundation, Hearsay |
| PTX-1929 | WiAutomation Website Traffic Data | ROCK-00015846 | ROCK-00015846 | Foundation, Hearsay |
| PTX-1930 | WiAutomation Website Traffic Data | ROCK-00015847 | ROCK-00015847 | Foundation, Hearsay |
| PTX-1931 | WiAutomation Website Traffic Data | ROCK-00015848 | ROCK-00015848 | Foundation, Hearsay |
| PTX-1932 | WiAutomation Website Traffic Data | ROCK-00015849 | ROCK-00015849 | Foundation, Hearsay |
| PTX-1933 | WiAutomation Website Traffic Data | ROCK-00015850 | ROCK-00015850 | Foundation, Hearsay |
| PTX-1934 | WiAutomation Website Traffic Data | ROCK-00015851 | ROCK-00015851 | Foundation, Hearsay |
| PTX-1935 | WiAutomation Website Traffic Data | ROCK-00015852 | ROCK-00015852 | Foundation, Hearsay |
| PTX-1936 | WiAutomation Website Traffic Data | ROCK-00015853 | ROCK-00015853 | Foundation, Hearsay |
| PTX-1937 | WiAutomation Website Traffic Data | ROCK-00015854 | ROCK-00015854 | Foundation, Hearsay |
| PTX-1938 | WiAutomation Website Traffic Data | ROCK-00015855 | ROCK-00015855 | Foundation, Hearsay |
| PTX-1939 | WiAutomation Website Traffic Data | ROCK-00015856 | ROCK-00015856 | Foundation, Hearsay |
| PTX-1940 | WiAutomation Website Traffic Data | ROCK-00015857 | ROCK-00015857 | Foundation, Hearsay |
| PTX-1941 | WiAutomation Website Traffic Data | ROCK-00015858 | ROCK-00015858 | Foundation, Hearsay |
| PTX-1942A | WiAutomation Website (English) | | | Foundation, Hearsay |
| PTX-1942B | WiAutomation Website (Italian) | | | Foundation, Hearsay |
| PTX-1943A | WiAutomation Website (English) | | | Foundation, Hearsay |
| PTX-1943B | WiAutomation Website (Italian) | | | Foundation, Hearsay |
| PTX-1944A | WiAutomation Website (English) | | | Foundation, Hearsay |
| PTX-1944B | WiAutomation Website (Italian) | | | Foundation, Hearsay |
| PTX-1945A | WiAutomation Website (English) | | | Foundation, Hearsay |
| PTX-1945B | WiAutomation Website (Italian) | | | Foundation, Hearsay |
| PTX-1946 | Certified Translation of December 14, 2022 Italian Court Document | ROCK-00015886 | ROCK-00015894 | Foundation, Hearsay |
| PTX-1947 | Rockwell General Terms and Conditions of Sale | | | Foundation, Hearsay |

| PTX-1948 | WiAutomation Product Photo | ROCK-00000217 | ROCK-00000229 | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
|---|---|---|---|---|
| PTX-1949 | WiAutomation Product Photo | Various | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1950 | WiAutomation Product Photo | ROCK-00015734 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1951 | WiAutomation Product Photo | ROCK-00015735 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1952 | WiAutomation Product Photo | ROCK-00015737 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1953 | WiAutomation Product Photo | ROCK-00015738 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1954 | WiAutomation Product Photo | ROCK-00015740 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1955 | WiAutomation Product Photo | ROCK-00015743 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1956 | WiAutomation Product Photo | ROCK-00015744 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1957 | WiAutomation Product Photo | ROCK-00015746 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1958 | WiAutomation Product Photo | ROCK-00015747 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1959 | WiAutomation Product Photo | ROCK-00015776 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1960 | WiAutomation Product Photo | ROCK-00015776 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1961 | WiAutomation Product Photo | ROCK-00015779 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1962 | WiAutomation Product Photo | ROCK-00015781 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |

| PTX-1963 | WiAutomation Product Photo | ROCK-00015782 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1964 | WiAutomation Product Photo | ROCK-00015784 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1965 | WiAutomation Product Photo | ROCK-00015785 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1966 | WiAutomation Product Photo | ROCK-00015805 | | Rule 37, MIL, Foundation, Relevance, Hearsay, Authenticity, Unduly Prejudicial, Untimely |
| PTX-1304 | Rockwell Policy | ROCK-00010790 | ROCK-00010789 | Foundation, Hearsay |
| PTX-1305 | Rockwell Policy | ROCK-00010812 | ROCK-00010789 | Foundation, Hearsay |
| PTX-1306 | Rockwell VAR Agreement | ROCK-00010828 | ROCK-00010789 | Hearsay, Lacks Foundation, Autenticity |
| PTX-1366 | Rockwell VAR Agreement | ROCK-00011068 | ROCK-00010789 | Hearsay, Lacks Foundation, Autenticity |
| PTX-1427 | Rockwell VAR Agreement | ROCK-00011310 | ROCK-00010789 | Hearsay, Lacks Foundation, Autenticity |
| PTX-1531 | Rockwell VAR Agreement | ROCK-00011727 | ROCK-00010789 | Hearsay, Lacks Foundation, Autenticity |
| PTX-1547 | Rockwell VAR Agreement | ROCK-00011791 | ROCK-00010789 | Hearsay, Lacks Foundation, Autenticity |
| PTX-1682 | Rockwell Product Notice | ROCK-00013058 | ROCK-00013062 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1683 | Rockwell Product Notice | ROCK-00013063 | ROCK-00013067 | Hearsay, Lacks Foundation, Authenticity |
| PTX-1685 | Rockwell Product Notice | ROCK-00013073 | ROCK-00013077 | Hearsay, Lacks Foundation, Authenticity |

# EXHIBIT 14

# EXHIBIT 14

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | DTX No. | Description | Beginning Bates | Ending Bates | Objections |
| 2 | DTX 001 | Distributor Agreement | ROCK-00007799 | ROCK-00007819 | 106 |
| 3 | DTX 002 | Distributor Agreement | ROCK-00009772 | ROCK-00009798 | 106, No translation |
| 4 | DTX 003 | Email Correspondence | ROCK-00011816 | ROCK-00011817 | 402, 403, 802 |
| 5 | DTX 004 | Email Correspondence | ROCK-00011818 | ROCK-00011819 | 106, 402, 403, 802 |
| 6 | DTX 005 | Email Correspondence | ROCK-00011822 | ROCK-00011825 | 106, 402, 403, 802 |
| 7 | DTX 006 | Email Correspondence | ROCK-00011830 | ROCK-00011831 | 106, 402, 403, 802 |
| 8 | DTX 007 | Email Correspondence | ROCK-00011845 | ROCK-00011846 | 402, 403, 802 |
| 9 | DTX 008 | Email Correspondence | ROCK-00011860 | ROCK-00011861 | 106, 402, 403, 802 |
| 10 | DTX 009 | Distributor Agreement | ROCK-00012410 | ROCK-00012488 | |
| 11 | DTX 010 | Correspondence from Rockwell | ROCK-00012548 | ROCK-00012553 | |
| 12 | DTX 011 | Email Correspondence | ROCK-00012871 | | 106, 402, 403, 802 |
| 13 | DTX 012 | Email Correspondence | ROCK-00012890 | | 402, 403, 802, No translation |
| 14 | DTX 013 | Distributor Sales Spreadsheet | ROCK-00012915 | | |
| 15 | DTX 014 | Distributor Sales Spreadsheet | ROCK-00015842 | | |
| 16 | DTX 015 | Purchase Invoices | WI-00387 | WI-003312 | 106, 403, 802, No translation |
| 17 | DTX 016 | Purchase Invoices | WI-003327 | WI-003358 | 106, 403, 802, No translation |
| 18 | DTX 017 | Purchase Invoices | WI-003359 | WI-003433 | 106, 403, 802, No translation |
| 19 | DTX 018 | Sales Invoices | WI-003474 | WI-003480 | 106, 802, No translation |
| 20 | DTX 019 | Email Correspondence | WI-003481 | WI-003488 | 802, No translation |
| 21 | DTX 020 | Publicly Available Portions of Rodney Michel ITC Statement (highlights in original) | | | 106, 802 |
| 22 | DTX 021 | Rockwell General Terms and Conditions of Sale | | | |
| 23 | DTX 022 | Lektronix Brochure | | | 402, 403, 802, Not disclosed |
| 24 | DTX 023 | Lektronix Conversion Website: https://www.lektronix.com/conversion | | | 402, 403, 802, Not disclosed |
| 25 | DTX 024 | Rockwell Support Website: https://www.rockwellautomation.com/en-us/support.html | | | 402, 403, Not disclosed |
| 26 | DTX 025 | Rockwell TechConnect Website - https://www.rockwellautomation.com/en-us/capabilities/industrial-maintenance-support/product-application-support/remote-support.html | | | 402, 403, Not disclosed |
| 27 | DTX 026 | Rockwell Literature Library Webpage - https://www.rockwellautomation.com/en-us/support/documentation/literature-library.html | | | 402, 403, Not disclosed |
| 28 | DTX 027 | Rockwell Knoweldge Base Website: https://www.rockwellautomation.com/en-us/support/documentation/literature-library.html | | | 402, 403, Not disclosed |

|    | A       | B                                                                                                                                                         | C             | D             | E                                                                            |
|----|---------|-----------------------------------------------------------------------------------------------------------------------------------------------------------|---------------|---------------|------------------------------------------------------------------------------|
| 29 | DTX 028 | "Take the Frustration Out of Device Intergration"                                                                                                         |               |               | 402, 403, 802, Not disclosed                                                 |
| 30 | DTX 029 | "The Problem of Mop Heads in the Era of Apps: Toward More Rigorous Standards of Value Apportionment in Contemporary Patent Law" by David Franklyn          |               |               | 402, 403, 802, Foundation                                                    |
| 31 | DTX 030 | "Electronic Control Devices: Legal Aspects Overview" https://www.ojp.gov/ncjrs/virtual-library/abstracts/electronic-control-devices-legal-aspects-overview |               |               | 402, 403, 802, Foundation                                                    |
| 32 | DTX 031 | New York State Police Electronic Control Device: https://troopers.ny.gov/electronic-control-device-ecd                                                    |               |               | 402, 403, 802, Foundation                                                    |
| 33 | DTX 032 | Exhibit 4 to Rebuttal Expert Report of Justin R. Blok                                                                                                     |               |               | 402, 403, 802, Daubert Motion, Foundation, Authenticity, Speculation         |
| 34 | DTX 033 | WiAutomation Warranty Webpage                                                                                                                             | ROCK-00012359 | ROCK-00012386 | 106, 802                                                                     |
| 35 | DTX 034 | WiAutomation Warranty Webpage                                                                                                                             | ROCK-00012387 | ROCK-00012390 | 106, 802                                                                     |
| 36 | DTX 035 | Paliszewski's Signed Declaration                                                                                                                           |               |               | 403                                                                          |
| 37 | DTX 036 | Exhibit Paliszewski 28 to Paliszewski Deposition                                                                                                          |               |               | 403                                                                          |
| 38 | DTX 037 | Corrected Declaration of Mark Paliszewski                                                                                                                  |               |               | 403                                                                          |
| 39 | DTX 038 | Judgment - December 14, 2022 - Court of Naples, Specialzed Section in Business Matters (Translated)                                                        |               |               | 106, 402, 403, 802, Foundation, Translation inaccurate                       |

# EXHIBIT 15A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROCKWELL AUTOMATION, INC.,　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　)　C.A. No. 21-1238-GBW-JLH
　　　　　　　　　　　　　　　　)
PARCOP S.R.L. d/b/a　　　　　　)
WIAUTOMATION,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　)

**ROCKWELL AUTOMATION, INC.'S MOTION *IN LIMINE*
TO PRECLUDE EVIDENCE OF ANY CRIMINAL
<u>BACKGROUND OF GARY MONROE</u>**

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 22, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL
LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

Rockwell moves to preclude evidence of any criminal background or indictment of Gary Monroe. Mr. Monroe will not be a witness, and WiAutomation has not denied that it made an infringing sale to Mr. Monroe. Yet WiAutomation seeks to use a 2006 guilty plea by Mr. Monroe, and an otherwise-dismissed 2003 indictment, to paint Rockwell as a bad actor in this action. *See, e.g.*, D.I. 281, Ex. 1, 4-5 (citing indictment and plea); Ex. 1, 6 (WiAutomation's deposition designations) (same); Ex. 2, ¶¶ 31-32 (WiAutomation's proposed statement of facts) (same). It is precluded from doing so under FRE 402/403, 404, 608, and 609.

Mr. Monroe's only connection to the case is that Rockwell's investigator, Mark Paliszewksi, directed Mr. Monroe and his company Image-Tek to purchase certain Rockwell-branded products from WiAutomation in March 2022. D.I. 263, ¶ 7. Mr. Monroe was formerly the CEO of Lason, Inc. ("Lason"), a company with over $500m in sales and over 12,000 employees. *U.S. v. Monroe*, 2007 WL 1072912, at *7 (E.D. Mich. Mar. 29, 2007).  In November 1999, over 22 years before the test purchase, Lason filed a 10-Q statement with the SEC that "overstated [its] revenue by more than $13 million." Ex. 3, 2-3.  The government indicted Mr. Monroe on 16 counts related to his activities as CEO, including that he "aided and abetted the making of false statements to a federal agency (the SEC)." *Id.*, 1; Ex. 4, 1. Ultimately, he pled guilty to the single count of aiding and abetting, and all other counts were withdrawn or dismissed. *Id*.

1

WiAutomation has never denied that Image-Tek made the 2022 test purchase and admits that Image-Tek bought and received a product. D.I. 281 at 4-5. Yet it implies to the Court, based solely on Mr. Monroe's 2006 plea relating to aiding and abetting false revenue statements in a 10-Q filing over 22 years prior, and his otherwise-dismissed indictment, that Mr. Monroe created a *fake* counterfeit product or a *fake* shipment from WiAutomation. *Id.*, Ex. 1, 4-5. But FRE 404(b)(1) precludes "[e]vidence of any other crime, wrong, or act ... to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character"—exactly what WiAutomation is attempting here. WiAutomation cannot show that the indictment or plea fall into the permitted uses under FRE 404(b)(2), because nothing about pleading guilty to aiding and abetting false revenue statements in a 10-Q filing "prov[es] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" for creating a fake counterfeit product or shipment.

This evidence is likewise irrelevant and prejudicial. FRE 402, 403. Mr. Paliszewski had no knowledge of Mr. Monroe's past indictment or plea. Ex. 5, 178:12-24. That plea resulted from Lason's filing of a 10-Q statement overstating revenue—not from anything regarding counterfeiting products and software. Ex. 3. Likewise, WiAutomation offers no evidence that the purported "multifaceted fraudulent accounting scheme" of the other, dismissed counts of the indictment

related to forgery or fake products or shipments either. *See U.S. v. Maldonado-Peña*, 4 F.4th 1, 36 (1st Cir. 2021) ("[A] party may not present extrinsic evidence for the sole purpose of impeaching a witness on a collateral matter.").

This evidence serves only to divert attention from WiAutomation's conduct in an attempt to color Rockwell as a bad actor, resulting in unfair prejudice under FRE 403.  The Rules recognize that "[c]haracter evidence is of slight probative value and may be very prejudicial" because it "tends to distract the trier of fact" and "permits [them] to reward the good man to punish the bad man … despite what the evidence … shows". FRE 404, Advisory Committee Notes (citation omitted). The Court should exclude this evidence under FRE 403 because it serves only to confuse the issues and mislead the jury into punishing Rockwell for the character and prior wrongs of Mr. Monroe.

Finally, FRE 608 precludes cross examination of a witness using the criminal background of a non-witness, *United States v. Saada*, 212 F.3d 210, 221-22 (3d Cir. 2000), and FRE 609 permits the use of a prior conviction only in examining *a witness*, *United States v. Lucas*, 357 F.3d 599, 607 (6th Cir. 2004); *see* FRE 609 Advisory Committee Notes (person must testify). Mr. Monroe is not a witness. Further, Mr. Monroe was sentenced in 2007 to a term of 15 months, (Ex. 4, 2), exceeding the 10-year limitation in FRE 609(b), and as discussed above the evidence's prejudicial effect outweighs any probative value.

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 22, 2023

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby confirm that this brief complies with the type and number limitations set forth in the November 10, 2022 Standing Order Regarding Briefing in All Cases. I certify that this document contains 750 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

5

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.1.1</u>

Plaintiff Rockwell Automation, Inc. certifies that a reasonable effort has been made to reach agreement with Parcop S.R.L. d/b/a WiAutomation regarding Plaintiff's Motion *in Limine* to Preclude Evidence of any Criminal Background of Gary Monroe. The parties were unable to reach agreement, and WiAutomation refused to agree to Rockwell's requested relief.

<div align="right">

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

</div>

## CERTIFICATE OF SERVICE

I, Emily S. DiBenedetto, hereby certify that on June 22, 2023, this document

was served on the persons listed below in the manner indicated:

**BY EMAIL**

Pilar G. Kraman
Alexis N. Stombaugh
YOUNG, CONAWAY, STARGATT
 & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com

Bob Kasolas
Eric J. Boden
Eric Alvarez
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com
eboden@bracheichler.com
ealvarez@bracheichler.com

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

**PROPOSED ORDER GRANTING ROCKWELL AUTOMATION, INC.'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF ANY CRIMINAL BACKGROUND OF GARY MONROE**

On this _____ day of _____, 2023, the Court having considered Rockwell Automation, Inc.'s Motion *in Limine* to Preclude Evidence of any Criminal Background of Gary Monroe, and all papers and argument submitted therewith,

IT IS ORDERED that the motion is GRANTED. Parcop S.R.L. d/b/a WiAutomation is PRECLUDED from offering testimony, evidence, or argument regarding any alleged criminal background of Gary Monroe, including but not limited to (1) his 2003 indictment in *U.S. v. Monroe*, C.A. NO. 03-80474 (E.D. Mich.); (2) his guilty plea, judgment, or sentencing following that indictment; and (3) any related conduct or actions.

Dated: _____

_____
United States District Court Judge

# Exhibit 1

**EXHIBIT 11**

**WiAutomation Deposition Designations**

I.    **RYAN SMAGLIK- December 19, 2022 & December 20, 2022 Deposition**

| WiAutomation's Initial Designation | Rockwell's Objections to Initial Designations | WiAutomation's Counter-Designations | Rockwell's Objections to WiAutomation's Counter-Designations |
|---|---|---|---|
| 26:13-23 | | | |
| 26:24-27:45 | | | |
| 27:6-20 | | | |
| 27:25-28:17 | | | |
| 35:20-36:4 | | | |
| 39:18-22 | | | |
| 45:16-20 | | | |
| 46:4-7 | | | |
| 61:22-62:4 | | | |
| 66:9-14 | | | |
| 74:23-75:2 | | | |
| 88:11-15 | | | |
| 88:16-22 | | | |
| 88:23-3 | | | |
| 89:4-9 | | | |
| 171:3-12 | | | |

| | | | |
|---|---|---|---|
| 458:17-459:3 | | | |
| 460:8-15 | | | |
| 465:22-466:12 | | | |
| 466:13-23 | | | |
| 455:24-467:7 | | | |
| 467:8-13 | | | |
| 467:14-25 | | | |
| 468:2-9 | | | |
| 507:21-508:5 | | | |
| 508:15-19 | | | |

## II.   Mark Paliszewski - May 19, 2023 Deposition[1]

| WiAutomation's Initial Designation | Rockwell's Objections to Initial Designations | WiAutomation's Counter-Designations | Rockwell's Objections to WiAutomation's Counter-Designations |
|---|---|---|---|
| 41:16-21 | | | |
| 44:7-12 | | | |
| 44:13-18 | | | |
| 44:19-23 | | | |
| 44:25-45:6 | | | |
| 45:7-12 | | | |
| 45:15-19 | | | |
| 103:13-20 | | | |

---

[1] This designation does not waive WiAutomation's argument that Mark Paliszewski should be barred from testifying in this matter.

| | | | |
|---|---|---|---|
| 177:10-19 | | | |
| 177:20-22 | | | |
| <mark>178:12-14</mark> | | | |
| <mark>178:1517</mark> | | | |
| 179:12-15 | | | |
| <mark>179:19-24</mark> | | | |
| 188:8-14 | | | |
| 188:19-23 | | | |
| 253:20-254:11 | | | |
| 257:12-258:7 | | | |
| 271:7-13 | | | |
| 271:24-272:4 | | | |
| 272:12-20 | | | |
| 274:3-12 | | | |
| 275:2-13 | | | |

III.    **Luca Coppola – December 6, 2022 Deposition**

| WiAutomation's Initial Designation | Rockwell's Objections to Initial Designations | WiAutomation's Counter-Designations | Rockwell's Objections to WiAutomation's Counter-Designations |
|---|---|---|---|
| 8:16-19 | | | |
| 8:20-25 | | | |
| 9:9-12 | | | |
| 9:19-25 | | | |

# Exhibit 2

**Exhibit 3**

<u>**WIAUTOMATION'S STATEMENT OF FACTS THAT REMAIN TO BE LITIGATED**</u>

Pursuant to Federal Rule of Civil Procedure 26(a)(3), WiAutomation provides the following statement of contested facts that remain to be litigated at trial with respect to Rockwell Automation Inc's ("Rockwell") claims in this action. WiAutomation bases this statement on the parties' pleadings, the parties' documentary and testimonial evidence, WiAutomation's current understanding of Rockwell's claims, and the Court's rulings to date.

WiAutomation reserves the right to revise, amend, supplement, or modify its statement of contested facts based on any pretrial rulings or to address any additional issues, arguments, evidence, or other developments in the case, including meet and confers or other negotiations between the parties, and pending and anticipated motions. WiAutomation further reserves the right to supplement this statement to rebut or otherwise address Rockwell's identification of contested facts. Should the Court determine that any issue identified in this statement is more properly an issue of law, WiAutomation incorporates those issues by reference into its Statement of Issues of Law.

The issues of fact (or mixed questions of law and fact) that remain to be litigated at trial are set forth below. To the extent the Court will determine certain factual issues instead of the jury, they are also included below.

1. No large, sophisticated corporate purchaser bought Rockwell products from WiAutomation while unaware that Rockwell's manufacturer's warranty and other "product support" from Rockwell were not included.

2. Purchasers of Rockwell products understand that they do not get the manufacturer warranty when purchasing from unauthorized resellers, like WiAutomation.

22. Rockwell has not been injured by any purported diversion of sales from Rockwell to WiAutomation.

23. Rockwell has not suffered any loss of goodwill associated with its own products as the result of WiAutomation's conduct.

24.  WiAutomation never shipped any product to any Rockwell agent (or an agent of Rockwell's agent) that was not a genuine, new, and sealed Rockwell product.

25. WiAutomation never sold any counterfeit Rockwell products in the United States.

26. WiAutomation has never sold any counterfeit Rockwell products anywhere.

27. WiAutomation never counterfeited any of Rockwell's trademarks.

28. Rockwell did not lose any revenue due to any alleged "counterfeiting" from WiAutomation.

29. Rockwell concealed during discovery that its own agent purchased the products that Rockwell claims are counterfeit.

30. Rockwell concealed from WiAutomation that its own agent used other agents to purchase products from WiAutomation.

31. The agent who purchased the product Rockwell claims contains counterfeit printing pleaded guilty to felony fraud charges and owns a company with complex printing capabilities.

32. Rockwell concealed from WiAutomation that the agent who purchased the product Rockwell claims contains counterfeit printing pleaded guilty to felony fraud charges and owns a company with complex printing capabilities.

33. Rockwell has not expended substantial amounts of time, effort, and/or money in building its reputation.

4

# Exhibit 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**F I L E D**

**NOV 0 6 2006**

CLERK'S OFFICE
U. S. DISTRICT COURT
EASTERN MICHIGAN

UNITED STATES OF AMERICA,

Plaintiff,

No. 03-CR-80474-DT

-vs-

Hon. Arthur J. Tarnow

D-1    GARY L. MONROE,

Offense: 18 U.S.C. § 1001, false
statements to a federal agency

Defendant.

Statutory Maximum Penalties: 5 years'
imprisonment, 3 years' supervised
release, an order of restitution, a
$250,000 fine, and a $100 special
assessment

/

### RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant Gary

L. Monroe and the government agree as follows:

**1.    Guilty Plea(s)**

**A.    Count(s) of Conviction**

Defendant will enter a plea of guilty to **Count 13 of the First Superseding**

**Indictment**, which alleges that he **aided and abetted the making of false statements to**

**a federal agency (the SEC)**, in violation of 18 U.S.C. § 1001.

**B.    Elements of Offense(s)**

The elements of Count 13 are as follows:

     (1)    that defendant knowingly made, caused to be made, or aided and abetted the making of false and fraudulent statements and representations;

     (2)    that the false and fraudulent statements and representations were made in a matter within the jurisdiction of a federal executive agency;

     (3)    that the false and fraudulent statements and representations were material; and

     (4)    that defendant acted with the intent to defraud or deceive.

## C.   Factual Basis for Guilty Plea(s)

The following facts are a sufficient and accurate basis for defendant's guilty plea(s):

Defendant Gary Monroe joined Lason, Inc., a company based in Troy, Michigan, in 1995 as an Executive VP and director. Lason became a publicly traded company in October 1996. Monroe became Lason's CEO in February 1996 and Chairman in April 1998. In the ordinary course of his responsibilities, he met with other Lason executives to discuss the financial performance of the company, among other topics. Defendant knew that as a publicly traded company, Lason was required to truthfully report on its financial performance and condition to the Securities and Exchange Commission (SEC) in quarterly reports (Forms 10-Q) and annual reports (Forms 10-K).

One of Lason's revenue items was "work-in-process" (sometimes referred to as "work-in-progress"), or "WIP." As distinguished from an account receivable, WIP is an estimate of work completed for a customer but not yet billed. WIP may be recognized as revenue by the company performing the work. Thus, a note to Lason's financial statements declared in part, "*Revenue Recognition. Revenues are recorded when the services are provided.*"

In October 1999, defendant met with other Lason executives to discuss the financial performance of the company. He learned that the revenues of the company were significantly lower than expected, which would result in Lason's failing to meet Wall Street analysts' expectations for its third quarter financial results. On or about October 21, 1999, at a meeting in the Lason executive conference room in Troy, Michigan, attended by defendant; William Rauwerdink, its CFO; John Messinger, its COO; and Robert Bassman, its Controller, it was decided that Lason would report revenue from WIP which they knew to be false to make up

the revenue shortfall.

Based on this agreement, Lason employees worked to increase the amount of the fictitious WIP to more than $13 million to cover the revenue shortfall and bring Lason's reported third quarter earnings per share to a level that met or exceeded Wall Street's consensus estimate for Lason's third quarter results. The fraudulent WIP numbers were reflected on the appropriate Lason accounting worksheets, called journal entries.

Defendant approved the issuance of a Lason press release, dated October 27, 1999, whose headline read, "Lason Reports Record Third Quarter Results." The press release "announced record revenues, income from operations . . . , and net income . . . for the third quarter ended September 30, 1999." The press release also reported, "'Lason continues to post strong financial results, including this record third quarter,' stated Gary L. Monroe, chairman and chief executive officer."

The next day, October 28, 1999, defendant participated in a conference call with stock analysts, defendant stated that Lason's third quarter performance "led to record operating income of [$]21.5 million, up 125 percent" from the third quarter of 1998. During the call, defendant also pointed out that earnings generated during the third quarter came out to an "EPS of 56 cents a share, which was up 93 percent over last year."

On or about November 15, 1999, Lason filed its third quarter 10-Q with the SEC. The 10-Q overstated Lason's revenue by more than $13 million, the final amount of fictitious WIP created by defendant and others. This revenue overstatement was material because it substantially misrepresented the financial performance of the company in the third quarter of 1999 and allowed Lason to report a basic earnings per share for that quarter of $0.59 and a diluted earnings per share of $0.56, figures that met or exceeded Wall Street's expectations.

## 2.    SENTENCING GUIDELINES

### A.    Standard of Proof

The Court will find sentencing factors by a preponderance of the evidence.

### B.    Guideline Range

The parties disagree on the applicability of the following guideline(s): **section 3B1.3,**

- 3 -

# Exhibit 4

245B [Rev. 12/03] Judgment in a Criminal Case
Sheet 1

# United States District Court
## Eastern District of Michigan

United States of America

V.

GARY L. MONROE

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 03CR80474-1

USM Number: 31631-039

Mark J. Kriger
Defendant's Attorney

**FILED**

APR 1 2 2007

CLERK'S OFFICE
U. S. DISTRICT COURT
EASTERN MICHIGAN

**THE DEFENDANT:**

■ Pleaded guilty to count(s) **13 of the First Superseding Indictment..**

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 1001 | False Statements to a Federal Agency | November 15, 1999 | 13 |

The defendant is sentenced as provided in pages **2 through 8** of this judgment. This sentence is imposed pursuant to the Sentencing Reform Act of 1984

■ Count(s) **1,2,4,5,6,7,9,10,11,12,14,15 and 16** are dismissed on the motion of the United States after a plea of not guilty.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 4, 2007
Date of Imposition of Judgment

Arthur J Tarnow
United States Judge

4-12-07
Date Signed

Judgment-Page 2 of 8

DEFENDANT: GARY L. MONROE
CASE NUMBER: 03CR80474-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of: **15 months.**

The court makes the following recommendations to the Bureau of Prisons: **placement in the Comprehensive Drug Treatment Program. FCI Morgantown, West Virginia is recommended.**

The defendant shall surrender for service of sentence at the institutuion designated by the Bureau of Prison: **before 2 p.m. on: After September 1, 2007**

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ a
_____, with a certified copy of this judgment.

_____
United States Marshal

_____
Deputy United States Marshal

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF DELAWARE
DOCKET NO: 21-1238-CFC


 ---------------------------X
ROCKWELL AUTOMATION, INC.,

                Plaintiff,

vs.

PARCORP S.R.L., d/b/a
 WI AUTOMATION,

                Defendants.
 ---------------------------X


                VIDEOTAPED

           ZOOM DEPOSITION OF

          MARK PALISZEWSKI

          FRIDAY, MAY 19, 2023

              10:04 A.M.




          BETH RADABAUGH, CCR

     D'AMICO CERTIFIED REPORTING, LLC

            908.546.7650

       damico.reporting@verizon.net

          DAMICOREPORTING.COM

Mark Paliszewski
5/19/2023

4

```
 1              M. Paliszewski - 5/19/23

 2                      INDEX

 3   WITNESS            EXAMINATION BY      PAGE:LINE

 4   MARK PALISZEWSKI   Mr. Kasolas           10:6

 5                      Mr. Tanck

 6

 7

 8

 9   -------------INFORMATION REQUESTS---------------

10   DIRECTIONS NOT TO ANSWER              (NONE)

11   REQUESTS FOR INFORMATION              (NONE)

12   MOTIONS                               (NONE)

13   RULINGS                               (NONE)

14   CONFIDENTIAL PORTIONS                 (NONE)

15

16

17

18

19

20

21

22

23

24

25
```

Mark Paliszewski
5/19/2023

175

```
 1                M. Paliszewski - 5/19/23
 2   too, so you can review it either way?
 3        A.    Okay.
 4        Q.    Whatever is better for you.
 5        A.    (Pause in proceedings.)
 6        Q.    Are you reviewing the document on
 7   your own or do you need the screen share?
 8        A.    No, I'm seeing it how you have it
 9   here.
10        Q.    Okay.  So we'll scroll down for you.
11        A.    (Pause in proceedings.)
12              Okay.
13        Q.    Are you ready to talk about
14   Paliszewski 8, sir?
15        A.    Yes.
16        Q.    Okay.  On the first page -- well,
17   it's a one-page document, right?
18        A.    One or two it appears, yes.
19        Q.    And this is a communication between
20   Gary Monroe and Wi Automation as well as Gary
21   Monroe and Dan DiBardino of your company, right?
22        A.    That's correct.
23        Q.    Okay. Who is Gary Monroe?
24        A.    Gary Monroe is the person who owns
25   Image Tek.
```

Mark Paliszewski
5/19/2023

176

M. Paliszewski - 5/19/23

1

2    Q.    Is he the sole owner?

3    A.    I don't know specifically.

4    Q.    What kind of company is Image Tek?

5    A.    They do -- they're involved in

6    signage and things I'm not -- I'm not sure what

7    all they're involved in but...

8    Q.    Well, how does ReCon Management know

9    Image Tek?

10   A.    Mr. DiBardino is a personal

11   associate with Mr. Monroe.

12   Q.    What does that mean, that they're

13   personal associates?

14   A.    They're friends.

15   Q.    Do you know how long they've been

16   friends?

17   A.    I don't know, no.

18   Q.    Has ReCon always worked with Image

19   Tek since the time you joined ReCon in 2009?

20   A.    How do you mean work with?  Was Mr.

21   DiBardino friends with him?

22   Q.    Well, the way this email seems like

23   ReCon is working with Gary Monroe.  Aren't they

24   working here together in a document Paliszewski

25   8?

Mark Paliszewski
5/19/2023

```
 1                    M. Paliszewski - 5/19/23
 2          A.     We did in this case, yes.
 3          Q.     How many times prior to the January
 4    18, 2022 email correspondence in Paliszewski 8
 5    had Mr. Dan DiBardino worked with Gary Monroe
 6    and Image Tek?
 7          A.     None that I'm aware of.
 8          Q.     None?
 9          A.     None.
10          Q.     So how did it come about that in
11    this particular instance concerning Wi
12    Automation, ReCon suddenly began trying to work
13    with Mr. Monroe and his company Image Tek to
14    make purchases --
15          A.     Mr. Monroe --
16          Q.     -- from Wi Automation?
17          A.     -- allowed us to use his email and
18    his mailing location to receive products in this
19    case.
20          Q.     Why did he do that?
21          A.     Because, again, he's friends with
22    Mr.  DiBardino.
23          Q.     Was Gary Monroe friends with Dan
24    DiBardino at the time Dan DiBardino started
25    ReCon Management?
```

Mark Paliszewski
5/19/2023

```
 1                 M. Paliszewski - 5/19/23
 2          A.    I don't know.  I believe so, but I
 3   don't know.
 4          Q.    Were they friends in 2007?
 5          A.    I don't know.
 6          Q.    What do you know about Gary Monroe
 7   personally?
 8          A.    I know -- I know that he's the owner
 9   of the company; I met him a couple of times, but
10   other than that, it's Mr. DiBardino personal
11   friend.
12          Q.    Are you aware the Gary Monroe is a
13   convicted felon?
14          A.    I have no idea.
15          Q.    Are you aware the pled guilty to
16   criminal conduct?
17          A.    I am not aware of that.
18          Q.    Are you aware that he was pursued by
19   the Securities and Exchange Commission?
20          A.    I am not aware of that.
21          Q.    If you were aware of it, would you
22   have engaged him to help you in this alleged
23   test purchase from Wi Automation?
24          A.    I don't know if I would have or not.
25          Q.    And you said that Mr. Monroe allowed
```

Mark Paliszewski
5/19/2023

```
 1                  M. Paliszewski - 5/19/23
 2     ReCon to use his company and his email, what do
 3     you mean by that?
 4           A.    His address to have product shipped
 5     to.
 6           Q.    Did you actually have access to his
 7     email and use it?
 8           A.    I did not, no.
 9           Q.    Did Dan have access to his Mr.
10     Monroe's email?
11           A.    He did not, he did not?
12           Q.    So whatever alleged purchase was
13     made from Wi Automation concerning Paliszewski
14     was done by Image Tek itself, right?
15           A.    Mr. Monroe at Image Tek, yes.
16           Q.    Are you aware that Mr. Monroe served
17     15 months in prison?
18           A.    I'm not aware of that.
19           Q.    If you were aware of that, would you
20     have engaged him and his firm to assist you in
21     trying to make purchases from Wi Automation?
22           A.    I don't know if I would have done
23     that based on -- I would have to know the
24     circumstances.
25           Q.    Okay.  And you say Image Tek is a
```

Mark Paliszewski
5/19/2023

180

```
 1                  M. Paliszewski - 5/19/23
 2    sign company?
 3          A.    I believe so, I don't know
 4    specifically exactly what they do, but signage,
 5    graphics type of thing.
 6          Q.    Image Tek has printing capabilities,
 7    doesn't it?
 8          A.    I don't know.
 9          Q.    Well, they make signs for events,
10    right?
11          A.    I don't -- I don't -- again, I don't
12    specifically know what they do.
13          Q.    So you have no idea what they do,
14    but you and your boss engaged them to help you
15    in making purchases from Wi Automation, is that
16    your testimony?
17          A.    Yes.
18          Q.    And why use them if you never used
19    them before as opposed to one of these companies
20    you like to partner with such as an
21    Investigation Services Company?
22          A.    Well, in this case, we had prior
23    dealings with Wi Automation and we didn't want
24    to be discovered in terms of making this second
25    inquiry.
```

Mark Paliszewski
5/19/2023

316

1

2                        CERTIFICATE

3

4

5   STATE OF NEW JERSEY  )
                         )
6   COUNTY OF HUNTERDON  )

7

8           I, BETH RADABAUGH, a Notary Public

9   within and for the State of New Jersey, do

10  hereby certify that MARK PALISZEWSKI, the

11  witness whose deposition is hereinbefore set

12  forth, was duly sworn by me and that such

13  deposition is a true record of the testimony

14  given by such witness.

15          I further certify that I am not related

16  to any of the parties to this action by blood or

17  marriage; and that I am in no way interested in

18  the outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto set my

20  hand this 25th day of May, 2023.

21

22          _____

23                  BETH RADABAUGH, CRR, RPR

24                  LICENSE NO.  30X100232500

25

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 21-1238-GBW-JLH |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## WIAUTOMATION'S OPPOSITION TO ROCKWELL'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OF ANY CRIMINAL BACKGROUND OF GARY MONROE

Dated:  June 27, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys  for Defendant*

Rockwell intends to offer evidence from Gary Monroe—namely his alleged purchase from WiAutomation of a product via his company Image-Tek.  (*See* D.I. 281, Ex. 1 at pp. 4-6.)  As Rockwell notes, however, Monroe will not be testifying at trial.  Rather, Rockwell intends to offer Monroe's hearsay statements via the testimony of Mark Paliszewski.  (MIL at p. 1.)[1]  These hearsay "statements" include words that Monroe allegedly said to Paliszewski, as well as nonverbal conduct, such as pointing or directing Paliszewski to a package Monroe allegedly received.  *See* FRE 801(a), Notes of Advisory Committee; *U.S. v. Silvas*, 1993 WL 261046, at *3 n.2 (5th Cir. 1993).

FRE 806 allows WiAutomation to impeach the credibility of Monroe's out-of-court statements with his fraud conviction.  *See U.S. v. Greenidge*, 495 F.3d 85, 97 (3d Cir. 2007) (affirming admission of prior conviction under FRE 609 to impeach hearsay declaration, noting that "'[t]he declarant of a hearsay statement which is admitted in evidence is in effect a witness.  His credibility should in fairness be subject to impeachment and support as though he had in fact testified.'" (quoting Advisory Committee Notes)).  Monroe's fraud conviction is admissible to impeach

---

[1] Paliszewski's improper testimony is the subject of WiAutomation's MIL No. 1, as well as other pending motions and outstanding objections to Judge Hall's May 3 discovery ruling.

Monroe's hearsay statements if its "probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."  FRE 609(b).[2]

Relevant facts to consider include the impeachment value of the prior crime, similarity of the past crime to present misconduct, and whether credibility is at issue. *U.S. v. Sims*, 588 F.2d 1145, 1149 (6th Cir. 1978).  First, Monroe admitted to making false statements to a federal agency,[3] a "crime akin to perjury[.]"  *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d. Cir. 1993) (allowing evidence of eighteen year-old conviction for making false statements to government agency).  A crime of dishonesty has "greater inherent probative weight."  *Robinson v. Clemons*, 1998 WL 151285, at *4 (D. Del. Mar. 14, 1998).

Second, Rockwell admits that Monroe's conviction is dissimilar to the conduct at issue.  (MIL at pp. 2-3.)  This factor supports admission because it would not "invite improper inferences."  *U.S. v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) (allowing a fraud conviction more than a decade old to impeach credibility).  Third, Rockwell put Monroe's credibility at issue by engaging him ***during this litigation*** to allegedly collect evidence from WiAutomation for use in this litigation, and then

---

[2] Rockwell does not contest that WiAutomation gave sufficient written notice of its intent to use this evidence.

[3] Monroe's plea agreement describes multiple steps he performed over several weeks to perpetrate this fraud.  (Ex. A at pp. 2-3.)

concealing his role, leaving WiAutomation unable to conduct any discovery regarding this and other alleged test purchases.  (*See* D.I. 281, Ex. 1 at pp. 4-5.)

The above facts and circumstances substantially outweigh any prejudice to Rockwell, especially since the risk of undue prejudice is much lower in a civil case than in a criminal case.  *Herbst v. L.B.O. Holding, Inc.*, 783 F.Supp.2d 262, 266 (D.N.H. 2011).

 Rockwell's cited cases are inapposite or support WiAutomation.  For example, in *U.S. v. Saada*, the court analyzed whether a party can impeach the credibility of a hearsay declarant through evidence of prior, non-criminal bad acts under Rule 608, not prior criminal convictions under Rule 609.  212 F.3d 210, 219, 221 (3d Cir. 2000).  In fact, regarding prior criminal convictions, the *Saada* court noted that "the credibility of the hearsay declarant—and indeed that of the witness testifying to the hearsay statement—***may be impeached with . . . evidence of criminal convictions under Rule 609***[.]"  *Id.* (emphasis added).  Similarly, in *U.S. v. Lucas*, the court noted that Rule 609 was not implicated because the individual whose prior convictions were at issue was not a witness or a hearsay declarant, but rather a third party who the defendant claimed committed the crime.  357 F.3d 599, 606-07 (6th Cir. 2004).

Evidence of Monroe's crime is permissible to impeach the testimony of Rockwell's witnesses, should the Court permit testimony regarding Monroe's purchase and hearsay statements.

Dated:  June 27, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies Defendant's Opposition to Rockwell's Motion *in Limine* to Preclude Evidence of Any Criminal Background of Gary Monroe is in Times New Roman 14-point font and contains 690 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.

Dated: June 27, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

/s/ *Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

1

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**F I L E D**

NOV 0 6 2006
CLERK'S OFFICE
U. S. DISTRICT COURT
EASTERN MICHIGAN

UNITED STATES OF AMERICA,

Plaintiff,

-vs-

D-1    GARY L. MONROE,

Defendant.

No. 03-CR-80474-DT

HON. ARTHUR J. TARNOW

OFFENSE: 18 U.S.C. § 1001, false statements to a federal agency

STATUTORY MAXIMUM PENALTIES: 5 years' imprisonment, 3 years' supervised release, an order of restitution, a $250,000 fine, and a $100 special assessment

_____/

## RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant GARY

L. MONROE and the government agree as follows:

**1.    GUILTY PLEA(S)**

**A.    Count(s) of Conviction**

Defendant will enter a plea of guilty to **Count 13 of the First Superseding**

**Indictment**, which alleges that he **aided and abetted the making of false statements to**

**a federal agency (the SEC)**, in violation of 18 U.S.C. § 1001.

**B.    Elements of Offense(s)**

The elements of Count 13 are as follows:

(1)    that defendant knowingly made, caused to be made, or aided and abetted the making of false and fraudulent statements and representations;

(2)    that the false and fraudulent statements and representations were made in a matter within the jurisdiction of a federal executive agency;

(3)    that the false and fraudulent statements and representations were material; and

(4)    that defendant acted with the intent to defraud or deceive.

## C.    Factual Basis for Guilty Plea(s)

The following facts are a sufficient and accurate basis for defendant's guilty plea(s):

Defendant Gary Monroe joined Lason, Inc., a company based in Troy, Michigan, in 1995 as an Executive VP and director. Lason became a publicly traded company in October 1996. Monroe became Lason's CEO in February 1996 and Chairman in April 1998. In the ordinary course of his responsibilities, he met with other Lason executives to discuss the financial performance of the company, among other topics. Defendant knew that as a publicly traded company, Lason was required to truthfully report on its financial performance and condition to the Securities and Exchange Commission (SEC) in quarterly reports (Forms 10-Q) and annual reports (Forms 10-K).

One of Lason's revenue items was "work-in-process" (sometimes referred to as "work-in-progress"), or "WIP." As distinguished from an account receivable, WIP is an estimate of work completed for a customer but not yet billed. WIP may be recognized as revenue by the company performing the work. Thus, a note to Lason's financial statements declared in part, "*Revenue Recognition. Revenues are recorded when the services are provided.*"

In October 1999, defendant met with other Lason executives to discuss the financial performance of the company. He learned that the revenues of the company were significantly lower than expected, which would result in Lason's failing to meet Wall Street analysts' expectations for its third quarter financial results. On or about October 21, 1999, at a meeting in the Lason executive conference room in Troy, Michigan, attended by defendant; William Rauwerdink, its CFO; John Messinger, its COO; and Robert Bassman, its Controller, it was decided that Lason would report revenue from WIP which they knew to be false to make up

- 2 -

the revenue shortfall.

Based on this agreement, Lason employees worked to increase the amount of the fictitious WIP to more than $13 million to cover the revenue shortfall and bring Lason's reported third quarter earnings per share to a level that met or exceeded Wall Street's consensus estimate for Lason's third quarter results. The fraudulent WIP numbers were reflected on the appropriate Lason accounting worksheets, called journal entries.

Defendant approved the issuance of a Lason press release, dated October 27, 1999, whose headline read, "Lason Reports Record Third Quarter Results." The press release "announced record revenues, income from operations . . . , and net income . . . for the third quarter ended September 30, 1999." The press release also reported, "'Lason continues to post strong financial results, including this record third quarter,' stated Gary L. Monroe, chairman and chief executive officer."

The next day, October 28, 1999, defendant participated in a conference call with stock analysts, defendant stated that Lason's third quarter performance "led to record operating income of [$]21.5 million, up 125 percent" from the third quarter of 1998. During the call, defendant also pointed out that earnings generated during the third quarter came out to an "EPS of 56 cents a share, which was up 93 percent over last year."

On or about November 15, 1999, Lason filed its third quarter 10-Q with the SEC. The 10-Q overstated Lason's revenue by more than $13 million, the final amount of fictitious WIP created by defendant and others. This revenue overstatement was material because it substantially misrepresented the financial performance of the company in the third quarter of 1999 and allowed Lason to report a basic earnings per share for that quarter of $0.59 and a diluted earnings per share of $0.56, figures that met or exceeded Wall Street's expectations.

## 2. SENTENCING GUIDELINES

### A. Standard of Proof

The Court will find sentencing factors by a preponderance of the evidence.

### B. Guideline Range

The parties disagree on the applicability of the following guideline(s): **section 3B1.3**,

- 3 -

providing for the addition of two offense levels if the defendant abused a position of private trust.

The government recommends that the Court determine that defendant's guideline range is **41-51 months**, as set forth on the attached worksheets. Defendant recommends that the Court determine that his guideline range is **33-41 months**, as set forth on the attached worksheet addendum. The Court is not bound by either party's recommendation concerning the guideline range, and defendant understands that he will have no right to withdraw his guilty plea if the Court does not follow defendant's recommendation. If the Court finds

(a) that defendant's criminal history category is higher than the category reflected on the attached worksheets, or

(b) that the offense level should be higher because, after pleading guilty, defendant made a false statement to or withheld information from his probation officer; otherwise demonstrated a lack of acceptance of responsibility for his offense(s); or obstructed justice or committed any crime,

and if any such finding results in a guideline range higher than 41-51 months, the higher guideline range becomes the agreed range. However, if the Court finds that defendant is a career offender, an armed career criminal, or a repeat and dangerous sex offender as defined under the sentencing guidelines or other federal law, and that finding is not already reflected on the attached worksheets, this paragraph does *not* authorize a corresponding increase in the agreed range.

Neither party may take a position concerning the applicable guidelines that is different than any position of that party as reflected on the attached worksheets, except as

- 4 -

necessary to the Court's determination regarding subsections (a) and (b) above.

3.  **SENTENCE**

The Court will impose a sentence pursuant to 18 U.S.C. § 3553, and in doing so must consider the guideline range.

   **A.    Imprisonment**

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) the sentence of imprisonment in this case may not exceed **the mid-point of the guideline range determined by the Court pursuant to Paragraph 2.B above, whichever is higher**.

   **B.    Supervised Release**

A term of supervised release, if imposed, follows the term of imprisonment. There is no agreement on supervised release. The Court may impose any term of supervised release up to the statutory maximum term, which in this case is **3 years**. The agreement concerning imprisonment set forth above in Paragraph 3.A does not apply to any term of imprisonment that results from any later revocation of supervised release.

   **C.    Special Assessment(s)**

Defendant will pay a special assessment of **$100.00** and must provide the government with a receipt for the payment before sentence is imposed.

   **D.    Fine**

There is no agreement on the fine. The Court may impose a fine on Count One in any amount up to **$250,000.00**.

- 5 -

E.    **Restitution**

The Court shall order restitution to every identifiable victim of defendant's offense(s) and all other relevant conduct. The victims, and the full amounts of restitution in this case, are as follows:  **This will be determined by the Court at the time of sentencing**.

4.    COOPERATION AGREEMENT

A.    **Defendant's Promise to Cooperate**

Defendant agrees to cooperate fully with the government in its investigation and prosecution of the "underlying offenses," which for purposes of this agreement is (are) defined as **any federal or state crime arising from false or fraudulent representations made in the financial statements of Lason, Inc. or from false or fraudulent representations concerning Lason's financial condition, transactions, or operating results made to any Lason shareholder, lender, auditor, or stock research analyst, or to any government agency, relating to the period 1997 through 2000**. This means that defendant must upon request

- provide to the government and federal law enforcement agencies (including but not necessarily limited to the FBI and the Securities and Exchange Commission)  all information of which he is aware and all documents, electronic media, and other objects in his possession, custody, or control relating directly or indirectly to the underlying offenses;

- make himself available to be interviewed/debriefed by the government and federal law enforcement agencies at the time and place requested and answer all questions truthfully, completely, and in good faith;

- testify truthfully, completely, and in good faith in any federal or state criminal, civil, or administrative proceeding relating to the underlying offenses (including but not necessarily limited to grand jury proceedings, trials,

- 6 -

hearings, and depositions);

- provide in writing to the government (1) a complete and truthful statement concerning his current financial condition, including but not necessarily limited to a description of assets (both tangible and intangible) and liabilities; a description of any possessory interest under a lease; and a description of income and expenses; (2) a complete and truthful statement concerning the sale, lease, transfer, or delivery of any of his assets (and, if requested, any asset of any other member of his immediate household) during the period January 1, 1998, to the present; and (3) if requested, any federal income tax return filed with the IRS for him or for any other member of his immediate household for any of the years 1990 to 1998, inclusive; and

- submit at the time and place requested by the government to one or more polygraph examinations administered by the government.

The term "in good faith" means that defendant must disclose all information necessary to make his statements and/or testimony not misleading in light of the circumstances under which they were given, whether or not he was asked directly about such information.

### B.  Limit on Use of Evidence Provided by Defendant

The government agrees that no statement made or other information or evidence provided by defendant pursuant to his promise to cooperate will be used against him at any resulting sentencing hearing with respect to the calculation of the guideline range, any argument for or against a sentence at any particular point within the guideline range, and any argument for or against a variance or departure from the guideline range.

The parties agree that the government may use any statement made (or not made) or other information or evidence provided by (or not provided by) defendant pursuant to his promise to cooperate (1) to impeach defendant if he testifies at any trial or hearing and/or

- 7 -

(2) as evidence in a separate prosecution of defendant for making false statements, obstructing justice, committing perjury, and/or making false declarations (18 U.S.C. §§ 1001, 1503, 1621, 1623). Each of these federal crimes carries a maximum penalty of five or ten years' imprisonment and a $250,000 fine. The parties agree that the government would also be able to use such evidence in a prosecution for criminal contempt of court (18 U.S.C. § 401(3)).

The parties also agree that nothing in this agreement prohibits the government from using against defendant in any proceeding for any purpose any evidence derived from any statement made or other information or evidence provided by defendant pursuant to his promise to cooperate.

### C.    Substantial Assistance Determination

If the government determines that defendant's cooperation constitutes "substantial assistance in the investigation or prosecution of another person who has committed an offense," it will file either a motion requesting the Court to depart downward from the guideline range found applicable by the Court (pursuant to U.S.S.G. § 5K1.1) or a motion for a reduction of defendant's sentence (pursuant to Fed. R. Crim. P. 35(b)). The government alone will determine whether and when defendant has provided "substantial assistance," and whether and when it should file a motion for a downward departure or a reduction of sentence.

### D.    Downward Departure or Reduction of Sentence

The parties agree that if the government files a motion for downward departure or

a motion for reduction of sentence, **the government will recommend that the Court impose a sentence in the range of 20 to 25 months** in light of the circumstances of this case and the nature and extent of defendant's cooperation. If the Court does not follow the government's recommendation, however, defendant nevertheless will have no right to withdraw his guilty plea or cancel this plea agreement.

### E.     Government's Remedies for Breach of Promise to Cooperate

Any dispute over whether defendant has breached his promise to cooperate will be decided  by the Court.  If defendant breaches his promise to cooperate before he is sentenced, the government may rescind this agreement and thereby relieve itself from having to comply with any provision in the agreement.  If the agreement is rescinded, the Court shall afford defendant the opportunity to withdraw his guilty plea(s) and advise defendant that if he does not withdraw his guilty plea(s), the Court may impose a sentence greater than the maximum penalties allowed by the agreement.

If defendant  breaches his promise to cooperate after he is sentenced, the government may (1) move to vacate defendant's conviction(s) and sentence and reprosecute him on the charge(s) to which he pleaded guilty, (2) move for the reinstatement of any charge that was dismissed pursuant to this plea agreement, (3) file additional charges against defendant relating to the underlying offense(s) notwithstanding any provision in this plea agreement to the contrary, or (4) invoke any combination of these options or all of them.

Defendant understands and agrees that if he breaches his promise to cooperate, he

waives any applicable federal right (1) not to be placed twice in jeopardy for any charge to which he pleaded guilty or that was dismissed pursuant to this plea agreement, and (2) to be charged or tried in a more speedy manner for any charge that is revived, reinstated, or filed as a result of the breach of defendant's promise to cooperate.

Defendant also understands and agrees that if he breaches his promise to cooperate, the government may use against him any statement made or other information or evidence provided by him pursuant to his promise to cooperate, and any evidence derived from such evidence, in any proceeding and for any purpose.

### 5. OTHER CHARGES

If the Court accepts this agreement, the government will move to dismiss all remaining charges pending against defendant in this case.

### 6. EACH PARTY'S RIGHT TO WITHDRAW FROM THIS AGREEMENT

The government may withdraw from this agreement if the Court finds the correct guideline range to be loser than 33-41 months.

Defendant may withdraw from this agreement, and may withdraw his guilty plea, if the Court decides to impose a sentence higher than the midpoint of the range determined by the Court in paragraph 2.B. This is the only reason for which defendant may withdraw from this agreement. The Court shall advise defendant that if he does not withdraw his guilty plea under this circumstance, the Court may impose a sentence greater than the maximum allowed by Part 3.

- 10 -

## 7.    RIGHT TO APPEAL

If the sentence imposed does not exceed the maximum allowed by Part 3 of this agreement, defendant waives any right he has to appeal his conviction or sentence. If the sentence imposed is within the guideline range of 41-51 months, the government agrees not to appeal the sentence, but retains its right to appeal any sentence below that range.

## 8.    CONSEQUENCES OF WITHDRAWAL OF GUILTY PLEA(S) OR VACATION OF CONVICTION(S)

If defendant is allowed to withdraw his guilty plea(s) or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against defendant within six months after the date the order vacating defendant's conviction or allowing him to withdraw his guilty plea(s) becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea(s) or to any conduct reflected on the attached worksheets, defendant waives his right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

## 9.    PARTIES TO PLEA AGREEMENT

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

## 10.    SCOPE OF PLEA AGREEMENT

This agreement, which includes all documents that it explicitly incorporates, is the

- 11 -

complete agreement between the parties. It supersedes all other promises, representations, understandings, and agreements between the parties concerning the subject matter of this plea agreement that are made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

This agreement does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

11. ACCEPTANCE OF PLEA OFFER BY DEFENDANT

This plea offer expires unless it has been received, fully signed, in the Office of the United States Attorney by 5:00 P.M. on **November 6, 2006**. The government reserves the right to modify or revoke this offer at any time before defendant pleads guilty.

STEPHEN J. MURPHY
*United States Attorney*

SHELDON N. LIGHT
*Assistant United States Attorney*
*Chief, Economic Crimes Unit*

JENNIFER M. GORLAND
*Assistant United States Attorney*

STEPHEN L. HIYAMA
*Assistant United States Attorney*

Date:

- 12 -

## DEFENDANT'S ACKNOWLEDGMENT

By signing below, defendant acknowledges that he has read (or been read) this entire document, understands it, and agrees to its terms. He also acknowledges that he is satisfied with his attorney's advice and representation. Defendant agrees that he has had a full and complete opportunity to confer with his attorney, and has had all of his questions answered by his attorney.

MARK J. KRIGER
Attorney for Defendant
Date:

GARY L. MONROE
Defendant

# WORKSHEET A   (Offense Levels)

Defendant:   GARY L. MONROE                     Count(s):

*CALCULATION BASED ON GUIDELINES FOR OFFENSE CONDUCT OCCURRING BEFORE 11/01/2001.*

Docket No.:                                     Statute(s):

Complete one Worksheet A for each count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction) before applying the multiple-count rules in U.S.S.G. ch. 3, pt. D.  However, in any case involving multiple counts of conviction, if the counts of conviction are all "closely related" to each other within the meaning of U.S.S.G. § 3D1.2(d), complete only a single Worksheet A.

**1.    BASE OFFENSE LEVEL AND SPECIFIC OFFENSE CHARACTERISTICS (U.S.S.G. ch. 2)**

| Guideline Section | Description | Levels |
|---|---|---|
| 2F1.1(a) | fraud | 6 |
| 2F1.1(b)(1)(P) | $10-$20 million | 15 |
| 2F1.1(b)(2) | more than minimal planning | 2 |
|  |  |  |
|  |  |  |

**2.    ADJUSTMENTS (U.S.S.G. ch. 3, pts. A, B, C)**

| Guideline Section | Description | Levels |
|---|---|---|
| 3B1.3 | abuse of position of private trust | 2 |
|  |  |  |
|  |  |  |

**3.    ADJUSTED OFFENSE LEVEL**

Enter the sum of the offense levels entered in Items 1 and 2.  If this Worksheet A does not cover every count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction), complete one or more additional Worksheets A and a single Worksheet B.

**25**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*If this is the only Worksheet A, check this box and skip Worksheet B.*   ✔

*If the defendant has no criminal history, check this box and skip Worksheet C.*

(rev. 06/01)

# WORKSHEET D   (Guideline Range)

**1.    (COMBINED) ADJUSTED OFFENSE LEVEL**

Enter the adjusted offense level entered in Item 3 of Worksheet A or the combined adjusted offense level entered in Item 8 of Worksheet B.

> **25**

**2.    ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY (U.S.S.G § 3E1.1)**

> **- 3**

**3.    TOTAL OFFENSE LEVEL**

Enter the difference between Items 1 and 2.

> **22**

**4.    CRIMINAL HISTORY CATEGORY**

Enter "I" if the defendant has no criminal history.  Otherwise, enter the criminal history category entered in Item 6 of Worksheet C.

> **I**

**5.    CAREER OFFENDER / CRIMINAL LIVELIHOOD / ARMED CAREER CRIMINAL (U.S.S.G. ch. 4, pt. B)**

a.  Total Offense Level:  If the career offender provision (U.S.S.G. § 4B1.1), the criminal livelihood provision (U.S.S.G. § 4B1.3), or the armed career criminal provision (U.S.S.G. § 4B1.4) results in a total offense level higher than the total offense level entered in Item 3, enter the higher offense level total.

b.  Criminal History Category:  If the career offender provision (U.S.S.G. § 4B1.1) or the armed career criminal provision (U.S.S.G. § 4B1.4) results in a criminal history category higher than the criminal history category entered in Item 4, enter the higher criminal history category.

**6.    GUIDELINE RANGE FROM SENTENCING TABLE (U.S.S.G. ch. 5, pt. A)**

Enter the guideline range in the Sentencing Table (see U.S.S.G. ch. 5, pt. A) produced by the total offense level entered in Item 3 or 5.a and the criminal history category entered in Item 4 or 5.b.

> **41 - 51**
> months

**7.    STATUTORY RESTRICTIONS ON OR SUPERSESSION OF GUIDELINE RANGE**

If the maximum sentence authorized by statute is below, or a minimum sentence required by statute is above the guideline range entered in Item 6, enter either the guideline range as restricted by statute or the sentence required by statute.  (See U.S.S.G. § 5G1.1.)  If the sentence on any count of conviction is required by statute to be consecutive to the sentence on any other count of conviction, explain why.

> months

(rev. 06/01)

# WORKSHEET E  (Authorized Guideline Sentences)

**1.    PROBATION** (U.S.S.G. ch. 5, pt. B)

    a.    <u>Imposition of a Term of Probation  (U.S.S.G. § 5B1.1)</u>

    ☑    1.  Probation is not authorized by the guidelines (minimum of guideline range > 6 months or statute of conviction is a Class A or a Class B felony).  If this box is checked, go to Item 2 (Split Sentence).

    ☐    2.  Probation is authorized by the guidelines (minimum of guideline range = zero months).

    ☐    3.  Probation is authorized by the guidelines, provided the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention satisfying the minimum of the guideline range (minimum of guideline range > 0 months but ≤ 6 months).

    b.    <u>Length of Term of Probation  (U.S.S.G. § 5B1.2)</u>

    ☐    1.  At least 1 year but not more than 5 years (total offense level ≥ 6).

    ☐    2.  No more than 3 years (total offense level < 6).

    c.    <u>Conditions of Probation  (U.S.S.G. § 5B1.3)</u>

    The court must impose certain conditions of probation and may impose other conditions of probation.

**2.    SPLIT SENTENCE** (U.S.S.G. § 5C1.1(c)(2), (d)(2))

    ☑    a.  A split sentence is not authorized (minimum of guideline range = 0 months or > 10 months).

    ☐    b.  A split sentence is authorized (minimum of guideline range > 0 months but ≤ 10 months).  The court may impose a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention for imprisonment, provided that at least one-half of the minimum of the guideline range is satisfied by imprisonment (if the minimum of the guideline range is 8, 9, or 10 months), or that at least one month is satisfied by imprisonment (if the minimum of the guideline range is 1, 2, 3, 4, or 6 months).  The authorized length of the term of supervised release is set forth below in Item 4.b

**3.    IMPRISONMENT** (U.S.S.G. ch. 5, pt. C)

    A term of imprisonment is authorized by the guidelines if it is within the applicable guideline range (entered in Item 6 of Worksheet D).  (*See* U.S.S.G. § 5C1.1.)

(rev. 06/01)

**4.    SUPERVISED RELEASE (U.S.S.G. ch 5., pt. D)**

a.    Imposition of a Term of Supervised Release  (U.S.S.G. § 5D1.1)

The court must impose a term of supervised release if it imposes a term of imprisonment of more than one year, or if it is required to do so by statute. The court may impose a term of supervised release if it imposes a term of imprisonment of one year or less.

b.    Length of Term of Supervised Release  (U.S.S.G. § 5D1.2)

- [ ] 1. At least 3 years but not more than 5 years, where the count of conviction is a Class A or a Class B felony, i.e., an offense carrying a maximum term of imprisonment ≥ 25 years.

- [x] 2. At least 2 years but not more than 3 years, where the count of conviction is a Class C or a Class D felony, i.e., an offense carrying a maximum term of imprisonment ≥ 5 years but < 25 years.

- [ ] 3. 1 year, where the count of conviction is a Class E felony or a Class A misdemeanor,  i.e., an offense carrying a maximum term of imprisonment > 6 months but < 5 years.

- [ ] 4. The statute of conviction requires a minimum term of supervised release of _____ months.

c.    Conditions of Supervised Release  (U.S.S.G. § 5D1.3)

The court must impose certain conditions of supervised release and may impose other conditions of supervised release.

**5.    RESTITUTION (U.S.S.G. § 5E1.1)**

- [ ] a. The court will determine whether restitution should be ordered and in what amount.

- [x] b. The court *must* order full restitution to the victim(s) of the offense(s) of conviction. (*See* 18 U.S.C. §§ 3556, 3663A.) The parties agree that full restitution is **$ to be determined by Court**.

- [ ] c. The parties agree that the court *may* order restitution to the victim(s) of the offense(s) of conviction in any amount up to and including $_____ . (*See* 18 U.S.C. § 3663(a)(3).)

- [ ] d. The parties agree that the court *may also* order restitution to persons other than the victim(s) of the offense(s) of conviction in any amount up to and including $_____ . (*See* 18 U.S.C. §§ 3663(a)(1)(A), 3663A(a)(3).)

- [ ] e. Restitution is not applicable.

(rev. 06/01)

**(WORKSHEET E, p. 3)**

## 6. FINE (U.S.S.G. § 5E1.2)

a. Fines for Individual Defendants

The court must impose a fine unless "the defendant establishes that he [or she] is unable to pay and is not likely to become able to pay any fine." (*See* U.S.S.G. § 5E1.2(a).) Generally, the fine authorized by the guidelines is limited to the range established in the Fine Table. (*See* U.S.S.G. § 5E1.2(b).) However, there are exceptions to this general rule. (*See* U.S.S.G. § 5E1.2(b), (c)(4).)

b. Fine Range from Fine Table (U.S.S.G. § 5E1.2(c)(3))

| Minimum Fine | Maximum Fine |
|:---:|:---:|
| **$7,500.00** | **$75,000.00** |

## 7. SPECIAL ASSESSMENT(S) (U.S.S.G. § 5E1.3)

The court must impose a special assessment on every count of conviction. The special assessments for individual defendants are

$100.00 for every count charging a felony ($50.00 if the offense was completed before April 24, 1996)
$ 25.00 for every count charging a Class A misdemeanor,
$ 10.00 for every count charging a Class B misdemeanor, and
$ 5.00 for every count charging a Class C misdemeanor or an infraction.

The defendant must pay a special assessment or special assessments in the total amount of **$100.00**.

## 8. ADDITIONAL APPLICABLE GUIDELINES, POLICY STATEMENTS, AND STATUTES

List any additional applicable guideline, policy statement, or statute: _____

_____

## 9. UPWARD OR DOWNWARD DEPARTURE (U.S.S.G. ch. 5, pts. H & K)

List any applicable aggravating or mitigating circumstance that might support a term of imprisonment above or below the applicable guideline range.

5K1.1 (downward departure for "substantial assistance"); 3553(a) factors post-Booker ____

_____

_____

(rev. 06/01)

# WORKSHEET ADDENDUM

## Defendant Gary Monroe's Guideline Calculation

| | | |
|---|---|---:|
| 2F1.1(a) | fraud (base offense level) | + 6 |
| 2F1.1(b)(1)(P) | $10,000,001- $20,000,000 loss | +15 |
| 2B1.1(b)(2)(A) | more than minimal planning | + 2 |
| 3E1.1 | acceptance of responsibility | - 3 |

TOTAL OFFENSE LEVEL                    20

CRIMINAL HISTORY CATEGORY                 I

GUIDELINE RANGE                    33-41 months

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ROCKWELL AUTOMATION, INC.'S REPLY IN SUPPORT OF ITS
MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF ANY CRIMINAL
<u>BACKGROUND OF GARY MONROE</u>**

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 30, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

As the proponent of this sideshow, WiAutomation bears the burden of demonstrating that any probative value of Mr. Monroe's 15-year-old guilty plea *substantially* outweighs its prejudicial effect. *Robinson v. Clemons*, C.A. 96-405-MMS, 1998 U.S. Dist. LEXIS 4053, at *6-*7, *12-*13 (D. Del. Mar. 24, 1998). They cannot do so.

"[C]onvictions over 10 years old will be admitted very rarely and only in exceptional circumstances." FRE 609 Judiciary Committee Notes, No. 93-1277. Defendant fails to cite *any* case from *anywhere* in the Third Circuit admitting evidence under 609(b).

*Robinson*, which Defendant cites without noting the holding, is instructive. As Defendant argues here, the Court found the declarant's earlier crime "involve[d] issues of honesty;" that his "credibility [wa]s important;" and that the ancient crime was "dissimilar[.]" The Court precluded the earlier conviction anyway:

> a fifteen year-old conviction is not subjected to the normal Rule 403 balancing test. In light of the stringent reverse Rule 403 balancing test implemented by 609(b), the importance of the plaintiff's testimony, and the lack of compelling facts and circumstances, the 1983 conviction cannot survive scrutiny.

*Robinson*, 1998 U.S. Dist. LEXIS 4053, at *13.

WiAutomation's case is worse because the conviction lacks probative value. Unlike *Robinson*, no eyewitness offers a competing story here, and WiAutomation has not disputed the sale occurred. *Id.* at *11-*12. Instead, WiAutomation would

1

imply—without evidence—a totally counterfactual counterfeiting scheme. These are not "exceptional circumstances" —the same claim could be made in any case— and it is not enough to meet WiAutomation's burden.

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 30, 2023

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

-and-

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby confirm that this brief complies with the type and number limitations set forth in the November 10, 2022 Standing Order Regarding Briefing in All Cases. I certify that this document contains 250 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

<div align="right">

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

</div>

3

## CERTIFICATE OF SERVICE

I, Emily S. DiBenedetto, hereby certify that on June 30, 2023, this document

was served on the persons listed below in the manner indicated:

**BY EMAIL**

Pilar G. Kraman
Alexis N. Stombaugh
YOUNG, CONAWAY, STARGATT
 & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com

Bob Kasolas
Eric J. Boden
Eric Alvarez
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com
eboden@bracheichler.com
ealvarez@bracheichler.com

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

4

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

5

# EXHIBIT 15B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | ███████████ |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ROCKWELL AUTOMATION, INC.'S MOTION *IN LIMINE* TO
PRECLUDE ARGUMENT AND EVIDENCE REGARDING
<u>FOREIGN LITIGATION</u>**

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 22, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

Rockwell moves *in limine* to preclude Defendant WiAutomation from presenting argument or evidence regarding the ongoing Italian litigation and other enforcement actions taken by Rockwell under FRE 401 and 403.

## I.    Background

In addition to this lawsuit, Rockwell has taken other steps to stop WiAutomation's misuse of Rockwell's trademarks and capitalize on Rockwell's reputation and goodwill.  In particular, Rockwell has initiated legal proceedings in Italy that have resulted in injunctions, seizures, and related appeals (the "Italian litigation").  While the Italian litigation is ongoing and no final judgements have been entered (both parties have won certain issues), WiAutomation indicates it may attempt to characterize preliminary rulings in that case relating to the "imminent harm" standard under Italian law for preliminary injunctions as determinative in this case or to paint Rockwell in a negative light. *See* Ex. 1, ¶ 61 (WiAutomation's Edits to Joint Statement of Facts); DTX-038 (Italian court decision that WiAutomation seeks to introduce at trial).

## II.    Argument

The court should not allow WiAutomation to present any argument or evidence regarding, or otherwise referencing, the Italian litigation, because it is not relevant to any issue in this case and should be excluded under FRE 401.  Indeed,

"[w]hen trade-mark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trademark rights of the parties are irrelevant and inadmissible." *E Remy Martin & Co, SA v. Shaw-Ross Int'l Imports, Inc*, 756 F2d 1525, 1531-32 (11th Cir., 1985) (quoting *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S. Ct. 96 (1956)). Foreign proceedings in trademark cases are particularly irrelevant because trademarks are "inherently territorial and exist[] in each country solely according to that particular country's statutory scheme." *Calzaturificio Rangoni SpA v. U.S. Shoe Corp.*, 868 F. Supp. 1414, 1418 (S.D.N.Y., 1994) (citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985)). Thus, even in cases where foreign courts have rendered a final judgement under that country's law, courts in the United States refuse to consider the outcome of those proceedings. *Id.* ("The Italian Judgment, based on Italian law, has no effect on the evaluation of [defendant's] rights to the use [] mark in the United States.").

Further, any reference to the Italian litigation should also be excluded under FRE 403, as they are not probative of any issue that will be decided by the jury. The claims at issue in the Italian litigation are different from those at issue here and are based upon Italian law. To present argument or evidence about foreign proceedings without a substantial risk of confusing the jury, WiAutomation would need an expert

in Italian law to testify to the issues and standards applicable in that case.  Yet, WiAutomation has not disclosed any such expert.  Instead, WiAutomation has included a translation of a single decision from the Italian court relating to Rockwell's application for immediate injunctive relief, which WiAutomation apparently intends to introduce to the jury. *See* DTX-038. As explained in Rockwell's Opposition to WiAutomation's Motion for Summary Judgment, that translation appears to be incorrect, having switched the labels for plaintiff and defendant (D.I. 190 at 16-20).  Thus, introducing the Italian litigation will inevitably create a sideshow about an issue that is of no probative value.

Courts in this District have excluded reference to foreign proceedings under FRE 403 where, as here, the claims at issue were not identical and were based upon different legal standards.  *See, e.g., Wasica Fin GmbH v Schrader Int'l, Inc,* 2020 WL 509182, at *1 (D. Del. Jan. 31, 2020) ("[R]eference to foreign patent litigation, about a different patent and applying different legal standards, is appropriately excluded pursuant to Federal Rule of Evidence 403 . . . as the risks of confusion, waste of time, and unfair prejudice far outweigh whatever minimal probative value such evidence may have."); *Edwards Lifesciences LLC v Medtronic Corevalve LLC,* 2014 WL 12927825, at *1 (D. Del. Jan. 2, 2014) ("Proceedings and the decisions arising from proceedings conducted in foreign jurisdictions, under foreign substantive law and foreign procedural rules, and concerning a foreign patent that is

3

not at issue in the instant action, are of dubious probative value."); *cf. Ioengine, LLC v. Paypal Holdings, Inc.*, 2022 WL 2800911, at *1-2 (D. Del. June 27, 2022) ("[T]he introduction of evidence regarding the IPRs will result in prejudice to IOENGINE that substantially outweighs any minimal probative value that the evidence may have.").

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 22, 2023

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

-and-

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

4

## CERTIFICATE OF COMPLIANCE

I hereby confirm that this brief complies with the type and number limitations set forth in the November 10, 2022 Standing Order Regarding Briefing in All Cases. I certify that this document contains 750 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

*/s/ Emily S. DiBenedetto*

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

5

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.1.1</u>

Plaintiff Rockwell Automation, Inc. certifies that a reasonable effort has been made to reach agreement with Parcop S.R.L. d/b/a WiAutomation regarding Plaintiff's Motion *in Limine* to Preclude Argument and Evidence Regarding Disputes Beyond this Litigation. The parties were unable to reach agreement, and WiAutomation refused to agree to Rockwell's requested relief.

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

6

## CERTIFICATE OF SERVICE

I, Emily S. DiBenedetto, hereby certify that on June 22, 2023, this document

was served on the persons listed below in the manner indicated:

**BY EMAIL**

Pilar G. Kraman
Alexis N. Stombaugh
YOUNG, CONAWAY, STARGATT
 & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com

Bob Kasolas
Eric J. Boden
Eric Alvarez
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com
eboden@bracheichler.com
ealvarez@bracheichler.com

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

7

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

**PROPOSED ORDER GRANTING ROCKWELL AUTOMATION, INC.'S
MOTION *IN LIMINE* TO EXCLUDE ARGUMENT AND EVIDENCE
REGARDING DISPUTES BEYOND THIS LITIGATION**

On this _____ day of _____, 2023, the Court having

considered Rockwell Automation, Inc.'s Motion *in Limine* to Preclude Argument

and Evidence Regarding Disputes Beyond this Litigation, and all papers and

argument submitted therewith,

IT IS ORDERED that the motion is GRANTED. Parcop S.R.L. d/b/a

WiAutomation is PRECLUDED from offering testimony, evidence, or argument

regarding the litigation and other enforcement actions taken by Rockwell in Italy.

1

Dated: _____

_____
United States District Court Judge

# Exhibit 1

**EXHIBIT 1**

**JOINT STATEMENT OF UNCONTESTED FACTS**

1.      Plaintiff Rockwell Automation, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 1201 South Second Street, Milwaukee, Wisconsin 53204.

2.      Rockwell Automation is a 120-year-old U.S. company dedicated to industrial automation and information technology.

3.      Rockwell manufactures and distributes its industrial automation technologies under its ALLEN-BRADLEY®, A-B®, ROCKWELL AUTOMATION®, and/or CONTROLLOGIX® trademarks (the "Asserted Trademarks").

4.      Rockwell's products include the brains (programmable controllers, or "PLCs"), muscle (motors and drives) and related devices (input/output devices, safety devices) that run a variety of industrial and commercial operations ranging from assembly lines (e.g. automotive lines, food processing plants and pharmaceutical plants), to ~~critical infrastructure~~ (e.g. oil refineries), to amusement park rides.

~~5.      While Rockwell's customers are diverse, they all have one thing in common: breakdowns of operations are extremely costly and can be very dangerous, both to users of those products (e.g. assembly line workers running massive equipment) and to the general public (e.g. safety of food, medicine, amusement park rides).~~

~~6.~~5.      Rockwell is the registered owner of the Asserted Trademarks, ~~which are valid~~ and registered on the Principal Register of the United States Patent and Trademark Office ("USPTO").

~~7.      The Asserted Trademarks are incontestable and entitled to protection.~~

1

57.     Rockwell does not have contact information for every customer who purchased Rockwell products from a Rockwell authorized distributor.

58.     Rockwell's customers are very aware of who Rockwell's authorized distributors are.

59.     In 2020, WiAutomation's website clearly represented that WiAutomation was an unauthorized reseller.

60.     End users of Rockwell products make complex decisions and are highly interested in the technologies that they use.

61.     Rockwell's attorneys in Italy came with an inspector to inspect WiAutomation's warehouse and the products stored there, and did not find any counterfeit products.

62.     Rockwell (d/b/a Lektronix) claims it can convert products from over thirty brands to Rockwell products, including some with "minimal hassle."

63.     Rockwell also advertises that its products are compatible with products from other brands.

64.     Rockwell's ADs pay Rockwell in exchange for Rockwell's products.

65.     WiAutomation inspects the physical condition of each box that contains Rockwell products and ensures that the label is intact.

66.     WiAutomation also inspects each box for physical damage.

67.     WiAutomation does not ship products in a box that shows signs of damage or humidity.

45.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 21-1238-GBW-JLH |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## WIAUTOMATION'S OPPOSITION TO ROCKWELL'S MOTION IN LIMINE TO PRECLUDE ARGUMENT AND EVIDENCE REGARDING FOREIGN LITIGATION

Dated:  June 27, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

Rockwell seeks to bar WiAutomation from relying on any factual or legal matter raised in the parallel litigation in Italy.  Rockwell provides no basis to exclude the relevant factual findings about the same proofs the parties rely on in this litigation.  Should the Court be inclined to grant Rockwell's motion (in whole or in part), any order barring the use of information concerning the Italian litigation should apply to both Rockwell and WiAutomation.

Courts have refused to exclude evidence from a foreign litigation that is relevant to an American litigation.  *See Pacific Biosciences of Cal., Inc. v. Oxford Nanopore Techs. Inc.*, 2020 WL 954938, at *2 (D. Del. Feb. 27, 2020) (denying a motion *in limine* seeking to exclude evidence from a foreign litigation because evidence from the foreign litigation was "probative of factual issues that will be tried before the jury").  *See also GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, No. 14-878-LPS-CJB, D.I. 379, Memo. Order at p. 2 (D. Del. May 25, 2017) (permitting evidence from a foreign proceeding and prior inconsistent testimony) (Ex. D); *Pfizer Inc. v. Ranbaxy Lab'ys Ltd.*, 2005 WL 3525681, at *3 (D. Del. Dec. 22, 2005) (denying a motion to exclude evidence from a foreign proceeding because the evidence had relevance and the movant failed to show sufficient prejudice under FRE 403).

The Italian Court made several factual findings that are relevant to the facts in this case and were subject to discovery in this litigation.  For example, the Italian

1

Court found that WiAutomation had a commercial relationship with Rockwell Automation d/b/a Lektronix since at least 2018.  (Ex. A at p. 6.)  Specifically, the Italian Court found that WiAutomation sold Rockwell products to Rockwell d/b/a Lektronix, and bought Rockwell products directly from Rockwell d/b/a Lektronix. (*Id.*)  This information is relevant under FRE 401 because Rockwell itself willingly chose to purchase Rockwell products from WiAutomation.  Further, Rockwell did not discover any problems with the Rockwell products it purchased from WiAutomation.  This evidence is not unduly prejudicial or surprising because WiAutomation disclosed during discovery that Rockwell and WiAutomation had a commercial relationship and that WiAutomation and Rockwell d/b/a Lektronix sold to and purchased Rockwell products from each other.  (*See, e.g.*, Ex. B at Rog 5; Ex C at 152:17-154:6, 155:17-23.)  Further, the Italian Court's finding was based on the fact that the two entities did business with each other, not on any interpretation of foreign law.  This factual finding is therefore admissible.  *See Pacific Biosciences of Cal., Inc.*, 2020 WL 954938, at *2.

It is also highly relevant that the Italian Court found that Rockwell provided insufficient proof that WiAutomation actually sold certain products.  (Ex. A at p. 7.) These products were purportedly purchased by a third-party, V.S.T. S.r.l. (*id.*), an entity that Rockwell never disclosed to WiAutomation in this case.  Rockwell disclosed for the first time in its summary judgment motion that these products were

allegedly purchased by Rockwell's Italian law firm, Notarbartolo & Gervasi. (D.I. 147 ¶ 61.)  The Italian Court's factual finding is relevant because, in this litigation, Rockwell relies on the same photographs that Rockwell used in the Italian litigation to claim that WiAutomation sold the same products.  (D.I. 187 ¶ 21; *compare* D.I. 186 at Ex 4 *to* D.I. 147 ¶¶ 66-67.)  The Italian Court's factual finding concerning this "evidence" is highly probative because it takes into account information and evidence that Rockwell improperly withheld from WiAutomation in this case, and that WiAutomation was unfairly unable to offer in its defense.

WiAutomation's use of the above-referenced factual findings are not unduly prejudicial and are highly probative for the reasons explained above.  However, it would be highly prejudicial and of minimal probative value if Rockwell could use any facts, evidence, or findings from foreign proceedings against WiAutomation if WiAutomation was not given the opportunity to pursue complete discovery on the related facts or evidence—such as any facts, evidence, or findings concerning Syntegon.  (D.I. 266, D.I. 267, D.I. 275, D.I. 276, D.I. 282.)  Further, any order barring WiAutomation from offering evidence concerning foreign litigations should apply equally to Rockwell.

Dated:  June 27, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies Defendant's Opposition to Rockwell's Motion *in Limine* to Preclude Argument and Evidence Regarding Foreign Litigation is in Times New Roman 14-point font and contains 678 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.

Dated: June 27, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

# Exhibit A

# D&T Translations – Professional Translation Agency

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-358-7570 | 911 Memorial Drive, Belleville, NJ, 07109 (By appointment only, email for more details) | www.dttranslations.com  support@dttranslations.com



17383/2022 rg

## COURT OF NAPLES
### SPECIALIZED SECTION IN BUSINESS MATTERS

The Court of Naples, Specialized Section in Business Matters, meeting in chambers in the persons of the magistrates:

- Nicola Graziano, J.D.          - president -

- Viviana Criscuolo, J.D.          - judge rapporteur -

- Mario Fucito, J.D.          - judge -

pronounced the following

### JUDGMENT

On the claim pursuant to art. 669 terdecies cpc promoted by ROCKWELL AUTOMATION INC, with registered office at 1201 South Second Street, Milwaukee, 53204-2496, United States, in the person of its pro tempore legal representative, Mr. John Miller (hereinafter, also, only "ROCKWELL"), represented and defended, as per the power of attorney attached to the ante-causam precautionary appeal by the lawyers Sarah Paola Franchina and by the lawyer Maurizio Borghese and electively domiciled at the office of Maurizio Borghese, Atty (Borghese and Giordano Studio Legale Associato) in 80121 Naples, Via San Pasquale 62.

CLAIMANT

TOWARDS

"PARCOP S.R.L.", with headquarters in Monte di Procida (NA) in Via Filomarino III Trav. no. 13, tax code, VAT number 08668021218 in the person of the pro tempore legal representative Fulvio Coppola, represented and defended, as per the power of attorney at the bottom of the defense brief filed in the precautionary proceeding RG 10853/2022, also severally, by the lawyers Mirko Palumbo of the Court of Naples, and Alessandro Bura of the Court of Milan with whom electively domiciled in Bacoli (NA) at viale Olimpico n. 42,

RESPONDENT

Against the order of rejection, against the order of order no. 9081/2022 communicated on 30

1



**D&T Translations** – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

| **Tel** +1 (973)-358-7570 | 911 Memorial Drive, Belleville, NJ, 07109 (By appointment only, email for more details) | www.dttranslations.com support@dttranslations.com |
| --- | --- | --- |

17383/2022 reg

June 2022, issued by the D.J. Francesca Reale, J.D., in the precautionary proceeding concerning G.R. 10853/2022,

<center>OBSERVES</center>

the claimant lodges a complaint against the order with which the Judge of first instance, revoking the decree issued without prior hearing of the other party, rejected the request for multiple measures as he considered, following the establishment of the hearing with the respondent, the risk of imminent and irreparable damage in non-existent default of the precautions required.

In particular, in the interim proceedings, today the claimant documented

1) to be the owner of multiple trademark registrations including the word trademark of the European Union, concerning the name Allen-Bradley, bearing no. 012864443, filed on 9 May 2014 and registered on 2 October 2014 (doc. 3), as well as the Italian word mark bearing no. 362019000013775 (doc. 4), which in turn concerns the Allen-Bradley denomination, the filing of which dates back to 1969; the word mark of the European Union no. 012864476 (doc. 5), concerning the letters A-B, dating back to the year 2014, as well as the Italian trademark no. 362021000021245; as well as, finally, the EU trademark no. 002184588 which protects the word ROCKWELL AUTOMATION;

2) to produce multiple articles for the field of industrial automation with a high technical content, including various components, among which: programmable controllers, software, motors, motor control systems, network equipment, power supplies, signaling devices and many other elements of high technical performance;

3) to have found for sale, on the website owned by the respondent company PARCOP SRL based in Monte Procida - see https://it.wiautomation.com/ - a very wide range of products marked with the activated signs, without any authorization to that effect, some of which coming from the People's Republic of China;

4) that the articles in question had therefore been purchased abroad and imported into Italy, where they are resold without authorization to that effect from the claimant.

2

# D&T Translations – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*



**Tel** +1 (973)-358-7570      911 Memorial Drive,          www.dttranslations.com
                              Belleville, NJ, 07109           support@dttranslations.com
                              (By appointment only, email for more details)

---

17383/2022 reg

It also argued that all products purchased from the website used by the respondent had alterations in the respective labeling and in the packaging of the claimant, allegedly made by the counterparty to prevent the traceability of the products, as they are all likely to come from outside the EU.

The Judge of first instance considered the presumption of sufficient legal basis required for the adoption of the precautionary measure to be integrated, since the activity carried out by the respondent not only strongly compromised the sale of the original products authorized on the Italian market, but also was likely to negatively affect the relations between ROCKWELL and its distributors, who found themselves having to face and compete even with unauthorized resellers in the territory where, on the other hand, they operated legitimately; therefore, also considering the risk of imminent and irreparable damage deriving from the continuation of the unlawful conduct of the counterparty to exist, he authorized the description and seizure of the products and the means of proof of the alleged violation without hearing, and at the same time inhibited Parcop from continuing the production, importation, detention, export, sale, advertising, marketing and distribution of the disputed products and, consequently, ordered the withdrawal from the market of the aforementioned products and related advertising material, also providing for penalties in the event of non-compliance.

Parcop S.r.l. prejudicially pleaded international *lis pendens* pursuant to art. 7 L. 218/1995 since a judicial proceeding is already pending between the same parties and with the same object, i.e. the protection of the Rockwell trademarks and the conviction of Parcop S.r.l. to compensation for damages after issuing an injunction aimed at obtaining the cessation of the alleged violations before the Delaware Federal Court.

The respondent then objected to the non-existence of the risk of imminent and irreparable damage as it deduced that Rockwell was aware of both the existence and the characteristics of the products marketed by Parcop since 2018, the year in which the claimant company sent it the first notice; consequently, he deduced the non-existence of the risk of imminent and irreparable

3

# D&T Translations – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

| **Tel** +1 (973)-358-7570 | 911 Memorial Drive,<br>Belleville, NJ, 07109<br>(By appointment only, email for more details) | www.dttranslations.com<br>support@dttranslations.com |
|---|---|---|



17383/2022 reg

damage due to the considerable amount of time that had elapsed.

As for the non-existence of the presumption of sufficient legal basis, the respondent deduced that the activity of Parcop s.r.l. - purchasing and reselling Rockwell-branded products on the parallel market outside the official distribution network - did not constitute an offense in itself, since the claimant had already authorized the placing on the market of the products in question even if produced and/or placed on the market for the first time outside the EU following the usual purchases made for over two years at Parcop of these products.

By the disputed decision, without prejudice to any assessment regarding the existence of the presumption of sufficient legal basis and the objection of *lis pendens* being deemed unfounded since these were different judgements, the Judge of first instance revoked his decree and rejected the precautionary application as he considered, following the establishment of the respondent, that the circumstances highlighted and documented by the respondent - in particular that the appellant, the current claimant, had warned it since July 2018, and that since 27 August 2021, before the Court of Delaware, United States of America, a judgment between the same parties was pending, which from the email correspondence between the parties dating back to 2019 clearly showed that the claimant was aware of the marketing of its products in Italy by Parcop - affected the risk of imminent and irreparable damage in default up to cancel any precautionary requirement.

The long lapse of time that elapsed between the moment of enforceability of the precautionary remedy - corresponding to the time in which the appellant had become aware of the unlawful conduct of the counterparty - and that of its effective proposition according to the first instance Judge determined, in accordance with what unanimously supported by the Jurisprudence on the merits, the non-existence of the risk of imminent and irreparable damage necessary to grant the precautionary protection invoked since the passage of time was symptomatic of a tolerance incompatible with the assumed urgency.

The first instance Judge also specified that, as regards the danger of dispersion of the evidence

4



# D&T Translations – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

| **Tel** +1 (973)-358-7570 | 911 Memorial Drive, Belleville, NJ, 07109 (By appointment only, email for more details) | www.dttranslations.com support@dttranslations.com |
| --- | --- | --- |

17383/2022 reg

by virtue of which the claimant had requested at least confirmation of the description with the opening of the envelopes and the products found by the bailiff, by virtue of the provisions of the decree of 05.13.22, the risk deduced had to be considered non-existent given the long period of time elapsed since the placing on the market of the products which made the proof easily available through the purchase of counterfeit articles for the field of industrial automation, products after all already purchased by the claimant; with reference to the accounting documentation, he deduced the absence of attachments of elements indicative of a danger of data dispersion.

Rockwell lodged a complaint against the decision rejecting the requested measures, deducing 1) that it was not aware of the marketing of its products by Parcop S.r.l., even in Italy; 2) that the warnings sent in 2018 and 2020 would have concerned only the sales carried out by Parcop in the United States of America and, "only thanks to the purchases of goods made through the website used by the counterparty", it would have known that Parcop marketed Rockwell products also in Italy.

On this point, the Panel highlights how correctly the Court in the contested judgment has already highlighted how the fact that the marketing took place via the internet does not allow us to believe that there could be "excluded" territorial areas, as claimed by the appellant/claimant when it states that it was not aware that Parcop marketed the products of the claimant in Italy, where, moreover, the respondent has its headquarters; indeed, even from the deeds filed by the claimant within the US proceeding it is clear that it had and has the object of the alleged illegality of the sales of its products through the Parcop website www.wiautomation.com all over the world and not only in a specific territorial area. Furthermore, in both warnings sent (in 2018 and 2020), Rockwell, specifically indicating the trademarks it intended to protect, included the logo, the name but also the territory (European) and the registration number (European).

Therefore, there is no doubt that the warnings sent in 2018 and 2020, largely preceding the proposition of this procedure, referred to the protection of the trademark also in relation to the

5

# D&T Translations – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-358-7570 | 911 Memorial Drive, Belleville, NJ, 07109 | www.dttranslations.com
(By appointment only, email for more details) | support@dttranslations.com



17383/2022 reg

marketing of products in the European territory (of which Italy is a part).

As for the observation that the claimant could not have been aware of the existence of the complained company, since the seller would have presented himself as "Wiautomation" on the website, this is documentarily denied by the circumstance that the claimant has always indicated, in addition to the commercial name Wiautomtion, its company name "Parcop S.r.l.", not only in the footer of the wiautomation.com website but also on the "terms and conditions" page and on the "privacy policy" page. Furthermore, in August 2021, Rockwell notified Parcop S.r.l. in Italy, the claim with which the case was introduced before the Federal Court of Delaware, indicating it as Parcop S.r.l. d/b/a (doing business as) Wiautomation. The circumstance that the claimant was aware of the management of the site by Parcop emerges in the attachment to the precautionary appeal the counterparty filed with the results of the WHOIS search service which allows to know the owner of a domain or an IP address; lastly, the claimant deduced and documented that between the parties there had been consolidated commercial relations for years (at least since 2018) concerning the purchase (both by Parcop and by Rockwell/Rockwell group company) of products distinguished by the trademarks "ALLEN BRADLEY" and/or "A-B" and/or "Rockwell Automation" as confirmed by the correspondence exchanged in December 2018 between Mr. Fulvio Coppola of Parcop and the representative of Rockwell Italia, Ms. Tamara Kohut-Piorecka and of Lektronix (company acquired by Rockwell, DOC. 018), Mr. Fabrizio Cecconetto, to which Parcop sent an order for an "Allen Bradley" component on behalf of one of its customers, also communicating all the data of Parcop itself for invoicing and for the delivery of the product.

As for the alteration of the serial identification codes of the products imported from China and marketed in Italy, a circumstance which would not have been assessed by the first instance Judge and which instead according to the claimant's presentation would constitute that contingency suitable for reaffirming the existence of the risk of imminent and irreparable damage in default also after her initial tolerance, having deduced that she had learned only in February 2022 of the illegitimate importation and marketing within the European Union of products intended to be

6

# D&T Translations – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-358-7570     911 Memorial Drive,          www.dttranslations.com
                             Belleville, NJ, 07109          support@dttranslations.com
                             (By appointment only, email for more details)



17383/2022 reg

marketed only in China bearing the alteration of the relative identification codes and brands, in the opinion of the Panel, the alteration of the codes by the respondent, as an independent and further counterfeiting act, was not sufficiently demonstrated by the claimant.

And indeed, given that the claimant has documented having sold Rockwell products to companies of the Rockwell group, producing both invoices and photographic reproductions of the products that show all the serial numbers in full, unlike the invoice shown by the claimant in relation to Rockwell products with codes allegedly counterfeit refers to a purchase of seven products made by a third party, namely V.S.T. S.r.l., which also in the past was supplied by Parcop; however, in consideration of the fact that the purchase was made by a third party company unrelated to the Rockwell group and its distribution network against the complaint formulated by the claimant that the products sent by her to the V.S.T. third party company would not correspond to those referred to in the photographic findings filed by Rockwell, and therefore the claimant has deduced nothing from the denial of having altered the serial numbers and modified the original packaging; indeed, since the claimant has not demonstrated the univocal and objective correspondence between the products partially shown in the photos and the products indicated on the invoice except in relation to the product model, the product box does not report any reference regarding the origin of the shipment from Parcop S.r.l. and finally, necessarily highlighting the (documented) circumstance that the companies of the claimant's group have made multiple purchases of Rockwell products in the last five years from the reseller Parcop srl without encountering any problems relating to packaging or labelling, in the opinion of the Board, there is presumption of sufficient legal basis regarding the circumstance that the alteration of the identification codes was unlawfully carried out by the claimant company.

In the absence of proof of a new conduct capable of eliminating the tolerance of the owner of the patent right manifested concretely in the absence of a challenge to the reseller's conduct after Rockwell had become aware of it, reason already explained by the first instance Judge with regard to the non-existence of the risk of imminent and irreparable damage, it must be reiterated

7

**D&T Translations** – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

| **Tel** +1 (973)-358-7570 | 911 Memorial Drive, Belleville, NJ, 07109 (By appointment only, email for more details) | www.dttranslations.com support@dttranslations.com |



17383/2022 reg

and shared, given that its recurrence must be excluded when an appreciable period of time has elapsed between the occurrence of the event envisaged as harmful and the filing of the legal claim, especially in the case, as in the present case, in which no objection has been formulated by the party in the period between the knowledge of the conduct assumed as harmful and the presentation of the first warning, then waiting for a further period of time before the presentation of the precautionary appeal, representing the elapsed time the symptom of an incompatible tolerance with the assumed urgency (see, among others, Milan court; Court of Milan court 04/14/2022),

Given the lack of the risk of imminent and irreparable damage requirement, any assessment regarding the existence of the presumption of sufficient legal basis remains absorbed.

In conclusion, the claim must be rejected due to lack of the necessary risk for the adoption of the requested precautionary requests.

The expenses as liquidated in the operative part of the judgment follow the unsuccessful outcome.

We acknowledge the existence of the conditions referred to in Article 13 c.1 quater of Presidential Decree 115/2002 for the payment of a further court fee of the same amount.

<div align="center">THEREFORE</div>

The Court of Naples, Specialized Section in Business Matters, definitively ruling on the claim, against the order issued on 12/20/2021, provides as follows:

- rejects the complaint.

- condemns the claimant to pay the expenses to the complained company in the amount of € 2500.00 for fees in addition to the reimbursement of general expenses in the amount of 15% VAT and advocates' pension fund if due

- acknowledges the existence of the conditions referred to in art.13 c.1 quater of Presidential Decree 115/2002 for the payment of a further court fee of the same amount.

So decided in Naples, in the council chamber of 12/14/2022

8



# D&T Translations – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-358-7570    911 Memorial Drive,      www.dttranslations.com
Belleville, NJ, 07109      support@dttranslations.com
(By appointment only, email for more details)

17383/2022 reg

THE PRESIDENT THE DRAFT JUDGE
Nicola Graziano, J.D.

JUDGE DRAFTING THE STATEMENT
Viviana Criscuolo, J.D.



## D&T Translations – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-358-7570

911 Memorial Drive,
Belleville, NJ, 07109
(By appointment only, email for more details)

www.dttranslations.com
support@dttranslations.com

# Certification of Translation Accuracy

D&T Translations, as a professional translation agency, certifies that a copy of a document entitled "JUDGMENT" belonging to ROCKWELL AUTOMATION INC and PARCOP S.R.L has been translated by our qualified contract translator who is fluent and competent to translate from Italian into English. In our best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a correct and true translation of the original document.

D&T Translations does not vouch for the authenticity of the aforementioned copy(ies) of the document(s) or statements contained therein. D&T Translations, including its translators and project managers, are not liable for any actions/losses taken by the holder of this translation.

Date: 01/21/2023

Signature:



Project Manager, Doniyor Askarov,
D&T Translations
Phone: +1 (973)-241-3614
Email: support@dttranslations.com
Address: 1110 Hamilton St., Belleville,
NJ, 07109, USA

17383/2022 rg

TRIBUNALE DI NAPOLI

SEZIONE SPECIALIZZATA IN MATERIA D'IMPRESA

Il Tribunale di Napoli, Sezione Specializzata in Materia d'Impresa, riunito in camera di consiglio nelle persone dei magistrati:

- dr. Nicola Graziano                                    - presidente –

- dr.ssa Viviana Criscuolo                          - giudice relatore -

- dr. Mario Fucito                                         - giudice -

ha pronunziato la seguente

ORDINANZA

Sul reclamo ex art. 669 terdecies cpc promosso da

ROCKWELL AUTOMATION INC , con sede legale in 1201 South Second Street, Milwaukee, 53204-2496, Stati Uniti, in persona del suo legale rappresentante pro tempore, Sig. John Miller (di seguito, anche, solo "ROCKWELL") rappresentata e difesa, come da procura allegata al ricorso cautelare ante-causam dagli Avv.ti Sarah Paola Franchina e dall'Avv. Maurizio Borghese ed elettivamente domiciliata presso lo studio dell'Avv. Maurizio Borghese (Borghese e Giordano Studio Legale Associato) in 80121 Napoli, Via San Pasquale 62.

RECLAMANTE

NEI CONFRONTI DI

"PARCOP S.R.L.", con sede in Monte di Procida (NA) alla Via Filomarino III Trav. n. 13, codice fiscale, Partita I.V.A. 08668021218 in persona del l.r.p.t. Fulvio Coppola , rappresentata e difesa, come da procura in calce alla memoria difensiva depositata nel procedimento cautelare RG 10853/2022, anche disgiuntamente tra loro dagli avv.ti Mirko Palumbo del Foro di Napoli, e Alessandro Bura del Foro di Milano con i quali elettivamente domiciliano in Bacoli (NA) al viale Olimpico n. 42,

1

17383/2022 rg

RECLAMATA

Avverso l'ordinanza di rigetto avverso l'ordinanza dell'ordinanza n. 9081/ 2022 comunicata in data 30 giugno 2022, emessa dal G.D. Dott.ssa Francesca Reale nel procedimento cautelare recante R.G. 10853/2022

OSSERVA

la ricorrente propone reclamo avverso l'ordinanza con la quale il Giudice di prime cure, revocando il decreto emesso inaudita altera parte, rigettava la richiesta delle plurime misure in quanto riteneva, a seguito dell'instaurazione del contraddittorio con la resistente, insussistente il *periculum in mora* delle cautele richieste.

In particolare, nel giudizio cautelare, parte ricorrente odierna reclamante documentava 1) di essere titolare di molteplici registrazioni di marchio tra cui il marchio denominativo dell'Unione Europea, avente ad oggetto la denominazione Allen-Bradley, recante num. 012864443, depositato il 9 maggio del 2014 e registrato il 2 ottobre del 2014 (doc. 3), nonché, il marchio denominativo italiano recante num. 362019000013775 (doc. 4), avente a sua volta ad oggetto la denominazione Allen-Bradley, il cui deposito risale al 1969; il marchio denominativo dell'Unione Europea num. 012864476 (doc. 5), avente ad oggetto le lettere A-B, risalente all'anno 2014, nonché, il marchio italiano num. 362021000021245; nonchè, infine il marchio EU num. 002184588 che tutela la parola ROCKWELL AUTOMATION; 2) di produrre molteplici articoli per il campo dell'automazione industriale ad alto contenuto tecnico, includenti svariati componenti che comprendono: controllori programmabili, software, motori, sistemi di controllo motori, apparecchiature di rete, alimentatori, dispositivi di segnalazione e molti altri elementi di alte prestazioni tecniche; 3) di aver riscontrato in vendita, sul sito internet di proprietà della società resistente PARCOP SRL con sede in Monte Procida – cfr. https://it.wiautomation.com/ - una gamma ampissima di prodotti contrassegnati dai segni azionati, senza alcuna autorizzazione in tal

2

17383/2022 rg

senso, alcuni dei quali provenienti dalla Repubblica Popolare Cinese; 4) che gli articoli de quibus erano quindi stati acquistati all'estero ed importati in Italia, ove sono ivi rivenduti senza autorizzazione in tal senso da parte della ricorrente.

Deduceva altresì che tutti prodotti acquistati dal sito internet in uso alla resistente presentavano delle alterazioni delle rispettive etichettature e nel packaging proprie della ricorrente asseritamente operata dalla controparte per non consentire la tracciabilità dei prodotti, in quanto verosimilmente tutti di provenienza extra UE.

Il Giudice di prime cure, riteneva integrato il *fumus boni iuris* richiesto per l'adozione del provvedimento cautelare in quanto l'attività realizzata dalla resistente, non solo comprometteva fortemente la vendita dei prodotti originali autorizzati sul mercato italiano, era inoltre idonea ad incidere negativamente sui rapporti tra ROCKWELL ed i propri distributori, che si ritrovavano a dover fronteggiare e competere anche con rivenditori non autorizzati nel territorio ove, invece, gli stessi operavano legittimamente; pertanto, ritenuto sussistente altresì il *periculum in mora* derivante dal perpetuarsi della condotta illegittima di controparte, autorizzava *inaudita altera parte* la descrizione ed il sequestro dei prodotti e dei mezzi di prova della violazione denunciata e contestualmente inibiva alla Parcop di continuare la produzione, importazione, detenzione, esportazione, vendita, pubblicizzazione, commercializzazione e distribuzione dei prodotti in contestazione e, conseguentemente, ordinava il ritiro dal mercato dei sopraindicati prodotti e del relativo materiale pubblicitario, prevedendo altresì delle penali in caso di inottemperanza.

Si costituiva la Parcop S.r.l. che eccepiva in via pregiudiziale la litispendenza internazionale ai sensi dell'art. 7 L. 218/1995 poiché già pendente un procedimento giudiziario tra le stesse parti e con medesimo oggetto, ossia la tutela dei marchi Rockwell e la condanna di Parcop S.r.l. al risarcimento dei danni previa emanazione di un provvedimento

3

17383/2022 rg

inibitorio volto ad ottenere la cessazione delle violazioni lamentate davanti alla Corte federale del Delaware.

Parte resistente eccepiva poi l'insussistenza del *periculum in mora* in quanto deduceva che Rockwell era a conoscenza tanto dell'esistenza quanto delle caratteristiche dei prodotti commercializzati da Parcop dal 2018, anno in cui la società ricorrente le inviava la prima diffida; conseguentemente, deduceva l'insussistenza del *periculum in mora* ragione del notevole lasso temporale trascorso.

Quanto all'insussistenza del *fumus boni iuris* , il resistente deduceva che l'attività della Parcop s.r.l. - di acquistare e rivendere prodotti a marchio Rockwell sul mercato parallelo al di fuori della rete di distribuzione ufficiale - di per sé non integrava un illecito, in quanto la ricorrente aveva già autorizzato l'immissione in commercio dei prodotti in questione pur se prodotti e/o immessi in commercio per la prima volta fuori dall'UE a fronte degli acquisti abituali effettuati per oltre due anni a Parcop di tali prodotti.

Con l'ordinanza impugnata, impregiudicata ogni valutazione in ordine all'esistenza del *fumus boni iuris* e ritenuta infondata l'eccezione di litispendenza trattandosi di giudizi diversi, il Giudice di prime cure revocava il proprio decreto e rigettava l'istanza cautelare in quanto riteneva, all'esito della costituzione della resistente, che le circostanze da questa evidenziate e documentate – in particolare  che la ricorrente, attuale reclamante, l'aveva diffidata sin dal luglio 2018 e che dal 27 agosto 2021 dinanzi la Corte del Delaware negli Stati Uniti d'America pendeva un giudizio tra le stesse parti, che dalla corrispondenza via mail tra le parti risalente al 2019 si evincesse chiaramente che l'odierna reclamante era a conoscenza della commercializzazione dei suoi prodotti in Italia da parte della Parcop - incidessero sul *periculum in mora* fino ad annullare qualsiasi esigenza cautelare.

Il lungo lasso di tempo intercorso fra il momento dell'azionabilità del rimedio cautelare - corrispondente al tempo in cui la ricorrente era venuta a conoscenza della condotta illegittima della controparte - e

4

17383/2022 rg

quello della sua effettiva proposizione  secondo il Giudice di prime cure determinava, conformemente a quanto sostenuto unanimemente dalla Giurisprudenza di merito, l'insussistenza del *periculum in mora* necessario per accordare la tutela cautelare invocata in quanto il trascorrere del tempo era sintomatico di una tolleranza incompatibile con l'assunta urgenza.

Il Giudice di prime cure precisava inoltre che, quanto al pericolo di dispersione della prova in virtù del quale la ricorrente aveva chiesto quanto meno la conferma della descrizione con apertura delle buste e dei prodotti rinvenuti dall'ufficiale giudiziario, in virtù di quanto disposto con decreto del 13.5.22, ugualmente doveva ritenersi insussistente il periculum dedotto atteso il lungo lasso di tempo trascorso dall'immissione in commercio dei prodotti che rendeva la prova facilmente reperibile attraverso l'acquisto di articoli per il campo dell'automazione industriale contraffatti, prodotti del resto già acquistati dalla ricorrente; con riferimento alla documentazione contabile deduceva l'assenza di allegazione di  elementi indicativi di un pericolo di dispersione dei dati.

Contro l'ordinanza di rigetto delle misure richieste proponeva reclamo la Rockwell deducendo 1) di non essere a conoscenza della commercializzazione di suoi prodotti da parte di Parcop S.r.l., anche in Italia; 2) che le diffide inviate nel 2018 e nel 2020 avrebbero riguardato soltanto le vendite poste in essere dalla Parcop negli Stati Uniti d'America e "solo grazie agli acquisti dei beni effettuati tramite il sito internet in uso a controparte" avrebbe saputo che Parcop commercializzava prodotti Rockwell anche in Italia.

Sul punto evidenzia il Collegio come correttamente il Tribunale nell'ordinanza impugnata ha già evidenziato come la circostanza che la commercializzazione avvenisse via internet non consente di ritenere che potessero esserci degli ambiti territoriali "esclusi", come sostenuto dalla ricorrente/reclamante quando afferma che non era a conoscenza che la Parcop commercializzava i prodotti della ricorrente Italia, dove peraltro

17383/2022 rg

la resistente ha la sua sede; invero anche dagli atti depositati dalla reclamante all'interno del procedimento statunitense si evince che esso aveva ed ha oggetto la presunta illiceità delle vendite dei suoi prodotti per il tramite del sito internet www.wiautomation.com di Parcop in tutto il mondo  e non solo in un ambito territoriale specifico e determinato. Inoltre, in entrambe le diffide inviate (nel 2018 e nel 2020) Rockwell indicando specificatamente i marchi che intendeva tutelare, ha inserito il logo, la denominazione ma anche il territorio (europeo) e il numero di registrazione (europeo).

Pertanto non vi è dubbio che le diffide inviate nel 2018 e nel 2020, largamente precedenti la proposizione della presente procedura, si riferivano alla tutela del marchio anche relativamente alla commercializzazione dei prodotti nel territorio Europeo (di cui l'Italia fa parte).

Quanto al rilievo che la reclamante non poteva essere a conoscenza dell'esistenza della società reclamata, in quanto sul sito il venditore si sarebbe presentato come "Wiautomation", esso è documentalmente smentito dalla circostanza che la reclamata ha sempre indicato, oltre al nome commerciale Wiautomtion, la propria denominazione sociale "Parcop S.r.l.", non solo nel *footer* del sito web wiautomation.com ma anche nella pagina "termini e condizioni" e nella pagina "policy privacy".

Inoltre nell'agosto del 2021, la Rockwell notificava alla Parcop S.r.l. in Italia il complaint con cui è stata introdotta la causa davanti alla Corte Federale del Delaware, indicandola come Parcop S.r.l. d/b/a (doing business as) Wiautomation.

La circostanza che la reclamante fosse consapevole della gestione del sito da parte di Parcop emerge in allegato al ricorso cautelare controparte ha depositato le risultanze del servizio di ricerca WHOIS che consente di conoscere il proprietario di un dominio o di un indirizzo IP; da ultimo la reclamata ha dedotto e documentato che tra le parti intercorrevano da anni (almeno dal 2018) consolidati rapporti commerciali aventi ad oggetto l'acquisto (sia da parte di Parcop che da

6

17383/2022 rg

parte di Rockwell/società del gruppo Rockwell) di prodotti contraddistinti dai marchi "ALLEN BRADLEY" e/o "A-B" e/o "Rockwell Automation" come confermato dalla corrispondenza intercorsa nel dicembre 2018 tra il sig. Fulvio Coppola di Parcop e la rappresentante di Rockwell Italia, la sig.ra Tamara Kohut-Piorecka e di Lektronix (società acquisita da Rockwell, DOC. 018), il sig. Fabrizio Cecconetto, in cui Parcop inviava un ordine di un componente "Allen Bradley" per conto di un proprio cliente, comunicando anche tutti i dati della stessa Parcop per la fatturazione e per la consegna del prodotto.

Quanto all'alterazione dei codici identificativi seriali dei prodotti importati dalla Cina e commercializzati in Italia, circostanza che non sarebbe stata valutata dal Giudice di prime cure e che invece secondo la prospettazione della reclamante costituirebbe quella sopravvenienza idonea a riaffermare la sussistenza del *periculum in mora* anche dopo un'iniziale sua tolleranza, avendo essa dedotto di aver appreso solo nel febbraio 2022 dell'illegittima importazione e commercializzazione all'interno dell'Unione Europea di prodotti destinati ad essere commercializzati solo in Cina recanti l'alterazione dei relativi codici identificativi e dei marchi, a giudizio del Collegio l'avvenuta alterazione dei codici, da parte della resistente, quale autonomo ed ulteriore atto contraffattivo, non è stata sufficiente dimostrata dalla reclamante.

Ed invero, premesso che la reclamata ha documentato di aver venduto prodotti Rockwell a società del gruppo Rockwell, producendo sia le fatture che le riproduzioni fotografiche dei prodotti che riportano integralmente tutti i numeri seriali, differentemente la fattura esibita dalla reclamante relativamente ai prodotti Rockwell con codici asseritamente contraffatti si riferisce ad un acquisto di sette prodotti fatto da un soggetto terzo cioè la V.S.T. S.r.l. che anche in passato si era rifornita da Parcop; orbene, in considerazione della circostanza che l'acquisto è stato effettuato da una società terza estranea al gruppo Rockwell ed alla sua rete distributiva, a fronte della contestazione formulata dalla reclamata che i prodotti da lei inviati alla società terza V.S.T. non corrisponderebbero a quelli di cui ai rilievi fotografici

7

17383/2022 rg

depositati dalla Rockwell, e quindi alla negazione di aver alterato i numeri seriali e modificato l'imballaggio originale, nulla ha dedotto la reclamante; invero, non avendo la reclamante dimostrato l'univoca e oggettiva corrispondenza tra i prodotti esibiti parzialmente in foto e i prodotti indicati in fattura se non in relazione al modello del prodotto, non riportando la scatola del prodotto alcun riferimento circa la provenienza della spedizione proprio da Parcop S.r.l. ed infine valorizzando necessariamente la circostanza (documentata) che le società del gruppo della reclamante hanno nell'ultimo quinquennio effettuato plurimi acquisti dei prodotti Rockwell proprio dal *reseller* Parcop srl senza riscontrare alcuna problematica relativamente all'imballaggio o all'etichettatura,  a giudizio del Collegio non sussiste il *fumus boni iuris* in ordine alla circostanza che l'alterazione dei codici identificativi sia stata illegittimamente effettuata dalla società reclamata.

In mancanza della prova di una condotta nuova idonea a far venir meno la tolleranza del titolare del diritto di privativa manifestatasi concretamente nell'assenza di contestazione della condotta del *reseller* dopo che la Rockwell ne era venuta a conoscenza, la motivazione già esplicitata dal Giudice di prime cure in ordine alla insussistenza del *periculum in mora* deve essere ribadita e condivisa, atteso che ne deve essere esclusa la ricorrenza allorquando tra il verificarsi dell'evento prospettato come dannoso e la proposizione della domanda giudiziaria sia decorso un apprezzabile periodo di tempo, soprattutto nell'ipotesi, come nel caso di specie, in cui alcuna contestazione sia stata formulata dalla parte nel periodo intercorrente tra la conoscenza della condotta assunta come lesiva e presentazione della prima diffida, attendendo, poi, un ulteriore lasso di tempo mesi prima della presentazione del ricorso cautelare, rappresentando il tempo trascorso il sintomo di una tolleranza incompatibile con l'assunta urgenza (cfr., fra le altre, trib. Milano; trib. Tribunale Milano 14/4/2022),

Stante la mancanza del requisito del *periculum in mora*, resta assorbita ogni valutazione in ordine alla sussistenza del *fumus boni iuris*.

17383/2022 rg

Conclusivamente il reclamo va rigettato per carenza del necessario periculum per l'adozione delle istanze cautelari richieste.

Le spese come liquidate in dispositivo seguono la soccombenza.

Si da atto della sussistenza dei presupposti di cui all'art.13 c.1 quater del D.P.R.115/2002 per il pagamento di ulteriore contributo unificato di pari importo.

<div align="center">PQM</div>

Il Tribunale di Napoli, Sezione Specializzata in Materia d'Impresa, definitivamente pronunziando sul reclamo, avverso all'ordinanza emessa il 20/12/2021, così provvede:

- rigetta il reclamo.
- Condanna la reclamata al pagamento delle spese nei confronti della società reclamata nella misura di euro 2500,00 per compensi oltre al rimborso delle spese generali nella misura del 15% iva e cpa se dovuti
- Si da atto della sussistenza dei presupposti di cui all'art.13 c.1 quater del D.P.R.115/2002 per il pagamento di ulteriore contributo unificato di pari importo.

Così deciso in Napoli, nella camera di consiglio del 14/12/2022

<div align="right">IL PRESIDENTE</div>

IL GIUDICE ESTENSORE                    Dott. Nicola Graziano

Dott.ssa Viviana Criscuolo

9

# Exhibit B

2

## DUNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **ROCKWELL AUTOMATION, INC.,** | : | Civil Action No. 1:21-cv-01238 |
| | : | |
| **PlaintiffPlaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PARCORP, S.R.L. D/B/A WI AUTOMATION,** | : | |
| | : | |
| **Defendants** | : | |

**TO:**   **Neal McLaughlin, Esq.**
**Alston & Bird**
**90 Park Avenue**
**15th Floor**
**New York, NY 10016-1387**

**Dominick Gattuso**
**Heyman Enerio Gattuso & Hirzel LLP**
**300 Delaware Ave., Suite 200**
**Wilmington, DE 19801**

**SIRS:**

**PLEASE TAKE NOTICE** that defendant, Parcop, S.r.l. d/b/a WiAutomation ("WiAutomation"), by and through its undersigned counsel Brach Eichler L.L.C., serves its Third Amended Responses to plaintiff, Rockwell Automation, Inc.'s First Set of Interrogatories.

Dated:  August 5, 2022

Of Counsel:

Bob Kasolas
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com

YOUNG   CONAWAY   STARGATT   &
TAYLOR, LLP

_____
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600

pkraman@ycst.com
Attorneys for Defendant Parcop S.r.l. d/b/a
WiAutomation

## **PRELIMINARY STATEMENT**

The party providing these responses to these Interrogatories does so without waiving or intending to waive, and expressly preserving:

1.      All questions as to competency, relevancy, materiality, privilege and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further preceding in this action (including the trial of this action) and in any other action;

2.      The right to object to the use of any such responses, or the subject matter thereof, on any ground in any further preceding of this action (including the trial of this action) and in any other action;

3.      The right to object on any ground at any time to a demand or request by the party who served the Interrogatories or responded to herein, for further responses (including further production of documents or answers to Interrogatories) or any other discovery proceedings involving or relating to the subject matter of this controversy;

4.      The right at any time to revise, correct, add to, supplement or clarify any of the responses contained herein; and

5.      In the event that any documents are inadvertently produced by the party providing these Interrogatory answers which fall within the attorney/client and/or attorney work product privileges, the said responding party shall not be deemed to have waived any privilege as to any such documents or the information contained therein or the right to assert the attorney/client or attorney work product privileges as to any other matter which arises during the course of this litigation or in any subsequent or related preceding.

## **GENERAL OBJECTIONS**

A.     WiAutomation objects to each Interrogatory to the extent that it seeks information outside the scope of the allegations contained in any Complaint, Counterclaim, Cross claim, Third-Party Complaint, Answer, Separate or Affirmative Defenses or any other affirmative pleading.

B.     WiAutomation objects to each Interrogatory to the extent that it calls for information that would impose upon WiAutomation a vexatious and undue burden on the ground that the request is oppressive and/or intended to harass WiAutomation.

C.     WiAutomation objects to each Interrogatory to the extent that it is vague, ambiguous, or otherwise lacks sufficient precision to permit a response.

D.     WiAutomation objects to each Interrogatory to the extent that is seeks material or information prepared by or developed at the direction of counsel to the extent that it is protected and privileged as attorney work product.

E.     WiAutomation objects to each Interrogatory insofar as it seeks information that is neither relevant to the issues in this lawsuit nor proportional to the needs of the case.

F.     WiAutomation objects to each Interrogatory insofar as it seeks information that is subject to the attorney/client or work product privileges.

G.     WiAutomation objects to each Interrogatory insofar as it seeks legal theories or conclusions rather than a factual response.

H.     WiAutomation objects to each Interrogatory insofar as it requests the responding parties to provide information (or documents) which are in the possession of entities and/or persons over whom WiAutomation has no control.

I.     WiAutomation objects to each Interrogatory insofar as it requests WiAutomation to provide information (or documents) which is in the possession of entities and/or persons over whom WiAutomation has no control.

3

J.      WiAutomation objects to each Interrogatory insofar as it requests WiAutomation to provide information which is confidential and/or proprietary in nature.

K.      WiAutomation objects to each Interrogatory purporting to require that WiAutomation state each fact or all facts, identify all occasions and circumstances, identify or produce each document or all documents related to, or identify each person or all persons who have knowledge of the responding parties claims, defenses, contentions and positions as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

L.      WiAutomation objects to the instructions and the definitions contained in the Interrogatories to the extent that those instructions and/or definitions are vague, ambiguous, overbroad, unduly burdensome, irrelevant, not reasonably calculated to lead to the discovery to admissible evidence and/or seek to impose obligations upon WiAutomation beyond those required by the Federal Rules of Civil Procedure.

M.      WiAutomation objects to the Interrogatories to the extent that they are repetitive of one another in whole or in part and/or to the extent that the information sought by said Interrogatories would be cumulative.

N.      Insofar as any Interrogatory seeks information falling within the scope of the foregoing General Objections, the foregoing General Objections are asserted and stated as part of WiAutomation's responses to said Interrogatories as if specifically set forth at length and incorporated therein by reference.

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

From 2015 to the present, identify all persons from whom you have received complaints about Rockwell Products sold, offered for sale, distributed, or advertised by you. Your response should include a description of each complaint, any responses given by WI Automation, and any actions taken by WI Automation related to each such complaint.

**RESPONSE:** Objection. This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks the identity of "all persons" whom have complained about a Rockwell product from 2015 to the present. WiAutomation further objects that this interrogatory is not adequately limited in time. Subject to and without waiving its general and specific objections, WiAutomation states that Parcop S.r.l. did not exist until 2017, and did not commence any business until 2018. Parcop S.r.l. began to sell to USA since November 2019. The only complaints that WiAutomation has received pertaining to the products that it sells are related to delivery times, over which WiAutomation has little to no control as it uses a third-party delivery service for all items that it sells. WiAutomation has had one Rockwell product returned to it.

**INTERROGATORY NO. 2:**

Identify the name and contact information for WI Automation's sources of unused Rockwell Products from 2015 to Present. To the extent the source is ebay or other online source, identify both the online source and the specific seller.

**RESPONSE:**

Objection. This interrogatory is overly broad, vague, ambiguous, unduly burdensome and not proportional to the needs of the case in that it seeks the name and contact information for each of the sources of Rockwell products that WiAutomation has sold. WiAutomation further objects that this interrogatory is not adequately limited in time. Additionally, WiAutomation objects to this interrogatory on the basis that it seeks irrelevant information that is outside the scope of discovery. WiAutomation further objects that this interrogatory improperly seeks WiAutomation's trade secrets.

Subject to and without waiving its general and specific objections, WiAutomation's sources are Rockwell authorized distributors Technology BSA S.p.A. and Sonepar Italia S.p.A. and distributor RS Components S.r.l. Furthermore, pursuant to Fed. R. Civ. P. 33(d), WiAutomation states *see* WI003327-003433.

**INTERROGATORY NO. 3:**

For each source identified in Interrogatory No. 2, provide the name of each product

obtained from that source, the quantity obtained, and price paid by WI Automation.

**RESPONSE:**

Objection. This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks each and every product obtained from each source, including the quantity obtained and price paid. WiAutomation further objects that this interrogatory is not adequately limited in time. Additionally, WiAutomation objects to this interrogatory on the basis that it seeks irrelevant information that is outside the scope of discovery. WiAutomation further objects that this interrogatory improperly seeks WiAutomation's trade secrets. Subject to and without waiving its general and specific objections, WiAutomation states that the following products have been obtained from the sources identified in Interrogatory No. 2:

- RCK1783-LMS5 Euro 300,00 + 22% tax
- RCK1783-US16T Euro 359,10 + 22% tax
- RCK22BE1P7N104   Euro 269,90 + 22% tax
- RCK1761-CBL-PM02 Euro 39,61 + 22% tax
- RCK25-RF033-DL Euro 89,70 + 22% tax
- RCK1783-US8T Euro 121,60
- RCK25-COMM-E2P Euro 146,73 + 22% tax
- RCK1734-AENTR Euro 307,00 + 22% tax
- RCK1734-IB8S Euro 243,00 + 22% tax
- RCK25CE3P0N104 Euro 643,25
- RCK1783-LMS8 Euro 529,10+ 22% tax
- RCK22-HIM-C2S Euro 150,23 + 22% tax
- RCK2711-CBL-PM05 Euro 144,10
- RCK2080-USBADAPTER Euro 22,00 + 22% tax
- RCK2080-LC10-12QBB Euro 64,80 + 22% tax
- RCK2080-TC2 Euro 86,30 + 22% tax
- RCK5069-IB8S Euro 411,40
- RCK1783-LMS8  Euro 529,10 + 22% tax
- RCK22BE1P7N104 Euro 415,00 + 22% tax
- RCK2198-DBR40-F Euro 298,10 + 22% tax
- RCK1783-LMS5 Euro 330,00 + 22% tax
- RCK5069-L306ERS2 Euro 969,10 + 22% tax

- RCK5069-IB8S Euro 411,40 + 22% tax
- RCK22-HIM-C2S Euro 150,23 + 22% tax
- RCK5069-IB8S Euro 411,40 + 22% tax
- RCK22FD4P2N103 Euro 256,11 + 22% tax
- RCK25BB017N104 Euro 622,66
- RCK22-HIM-C2S Euro 155,48 + 22% tax
- RCK5094-IB16 Euro 217,83 + 22% tax
- RCK150-TC1 Euro 24.21 + 22% tax
- RCK2198-K57CKD15M Euro 69,56 + 22% tax
- RCK5069-OBV8S Euro 544,58 + 22% tax
- RCK1734-IE4S Euro 713,11 + 22% tax
- RCK2097-V34PR3 Euro 1.201,64 + 22% tax
- RCK5069-OBV8S Euro 544,58 + 22% tax
- RCK5069-RTB6-SPRING Euro 14,53 + 22% tax
- RCK5069-IB16F Euro 207,05 + 22% tax
- RCK5069-RTB6-SPRING Euro 14,53 + 22% tax
- RCK1734-4IOL Euro 185,01 + 22% tax
- RCK5069-RTB64-SCREW Euro 23,97 + 22% tax
- RCK1734-IE4S Euro 713,11 + 22% tax
- RCK150-C3NBD Euro 245,36 + 22% tax
- RCK2080-MEMBAK-RTC2 Euro 154,27 + 22% tax
- RCK1783-US8T Euro 144,18 + 22% tax
- RCK25BA8P0N114 Euro 374,78+ 22% tax
- RCK2713PT9WD1 Euro 1.550,84+ 22% tax
- RCK104-C09EJ22 Euro 135,45+ 22% tax
- RCK2198-H008-ERS2 Euro 1.184,18+ 22% tax
- RCK22FA2P5N113 Euro 122,25 + 22% tax
- RCK5094-IB16 Euro 217,83
- RCK25BB5P0N104 Euro 358,28+ 22% tax

Furthermore, pursuant to Fed. R. Civ. P. 33(d), WiAutomation states *see* WI003327-003433. WiAutomation further states that it is incapable of ascertaining what Rockwell Products it sold from 2018-2020 as it was a small company with limited resources and the records in WiAutomation's possession are incomplete. Furthermore, many of the records that WiAutomation has in its possession do not identify the product that was purchased/sold.  Thus, it is impossible toidentify the foregoing with any greater degree of specificity than already provided.**INTERROGATORY NO. 4:**

Describe any differences between Rockwell Products sold or offered for sale by WI Automation and Rockwell Products sold or offered for sale by Rockwell or Rockwell Authorized Distributors that WI Automation has disclosed to its customers, including without limitation any disclaimer WI Automation provides to its customers regarding the sale of Rockwell Products.

**RESPONSE:** Objection.  This request is overly broad, vague,  and ambiguous to the extent it seeks information pertaining to any "differences" between Rockwell Products sold by WiAutomation and Rockwell or its "authorized distributors" that it disclosed to customers. WiAutomation further objects to the extent that this interrogatory calls for a legal conclusion. Subject to and without waiving its general or specific objections, WiAutomation states that there are no "differences" between Rockwell products sold or offered for sale by WiAutomation and Rockwell products sold or offered for sale by Rockwell or Rockwell Authorized Distributors. Nevertheless, WiAutomation provides the following terms and conditions on its website, which all purchasers of Rockwell products must agree to prior to purchase:

> WiAutomation is not an official distributor or representative brands on this site. The trademarks and names on this site belong to their respective owners.  Rockwell: WiAutomation is not an authorized dealer of surpluses or affiliate of the manufacturer. Products may have older date codes or be an older series than the one available directly from the factory or authorized dealers.  Since WiAutomation is not a Rockwell authorized distributor, the original manufacturer's warranty does not apply (12-month WiAutomation Warranty applies).  Some Allen-Bradley PLC products will have the firmware already installed, WiAutomation does not guarantee whether or not a PLC product will have firmware and, if it has firmware, if the firmware is the level of revision that is necessary for its application. WiAutomation also does not warrant the ability or right to download or otherwise obtain firmware for the product from Rockwell, its distributors, or any other source. WiAutomation will not obtain or provide firmware on behalf of the customer. It is customer's obligation to comply with the terms of any End User License Agreement or similar document relating to obtaining or installing the firmware.

**INTERROGATORY NO. 5:**

From 2015 to the present, identify the product name, quantity, product condition code, date of purchase, purchase price, product source name, date of sale, sale price, customer name, and discounts applied (if any) in the sourcing or selling of each unused Rockwell product.

**RESPONSE:**

Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests the identity of any and all Rockwell Product that

WiAutomation has sold from 2015 to the present.  WiAutomation further objects to the extent that this interrogatory is not adequately limited in time.  Furthermore, this interrogatory seeks irrelevant information that is outside the scope of permissible discovery.  Subject to and without waiving their general and specific objections, WiAutomation refers the Plaintiff to its current offerings of Rockwell products, available at us.wiautomation.com/allen-bradley.  Subject to and without waiving its general and specific objections, WiAutomation States that it has sold the following items, including to Rockwell Authorized Distributors:

- On 2020.12.18 Rockwell Automation B.V. Rivium Promenade 160 NL - 1 pc. NEW B Series Allen-Bradley 1756-L63 – price paid Euro 1.570,00;

- On 2021.05.10  Lektronix a Rockwell Automation business (in Katowice - Poland) n. 1 product 6155R-NPXP Allen-Bradley –  price paid Euro 2.528,14;

- 2021.12.22 RA Controls - Authorized Rockwell Distributors - n. 22 products 1734-IB8S Allen-Bradley + n. 22 products 1734-OB8S Allen-Bradley- total price paid Euro 29.739,00;

- 2022.03.02 RA Controls - n. 38 products 1734-AENTR ALLEN BRADLEY- n. 10 products 1734-IB8 ALLEN BRADLEY - n. 8 1756-EN2TR ALLEN BRADLEY - n. 2 products 1783-US8T ALLEN BRADLEY - n. 5 products 20-HIM-A6 ALLEN BRADLEY - total price paid Euro 45.840,00;

- 2021.04.01 Rockwell Automation BV Rivium Promenade 160 Netherland -n. 1 product  1756-BATM - ALLEN BRADLEY - price paid Euro 286.00

- 2021.03.21 Lektronix A Rockwell Automation business - n. 2 products 1734-AENT (serie C) - price paid Euro 480,00

- 2021.04.14 Rockwell Automation B.V. prodotto 6155R-NPXP Allen-Bradley importo Euro 2.621,00

- 2022.04.01 RAControls -  1756-EN2TR Allen-Bradley - price paid Euro 6.416,00;

- **INVOICE n. 1866/E** - date 2021.05.10 -  customer Lektronix a Rockwell Automation business (in Katowice - Poland) - product 6155R-NPXP Allen-Bradley –  quantity n. 1 - purchase price Euro approximately 2.100,00; sale price Euro 2.427,96 -

- **INVOICE n. 2738/01** - date 2022.04.01 - customer RAControls - product 1756-EN2TR Allen-Bradley - quantity n. 2 - purchase price

for n. 1 product approximately Euro 2.800,00 - sale price for n. 1 product Euro 3.200,00 - total price for n. 2 products Euro 6.416,00

- **INVOICE n. 12327/01** - date 2021.12.22 - customer RA Controls - Authorized Rockwell Distributor:

  o   n. 22 products 1734-IB8S Allen-Bradley - purchase price for n. 1 product EUro 580,00 - sale price for 1 product Euro 650,00 - total sale price for 22 products Euro 14.300,00

  o   n. 22 products 1734-OB8S Allen-Bradley- purchase price for n. 1 product Euro 620,00 - sale price for n. 1 product Euro 700,00 - total sale price for n. 22 product  Euro 15.400,00;

- **INVOICE n. 1703** - date 2022.03.02 - customer RA Controls:

  o   n. 38 products 1734-AENTR ALLEN BRADLEY- purchase price for n. 1 product  approximately Euro 400,00 - sale price for n. 1 product Euro 470,00 - totale sale price for n. 38 products Euro 17.860,00;

  o   n. 10 products 1734-IB8 ALLEN BRADLEY - purchase price for n. 1 product approximately Euro 60,00 - sale price for n. 1 product Euro 60,00 - total sale price fo n. 10 products Euro 600,00;

  o   n. 8 1756-EN2TR ALLEN BRADLEY - purchase price for n. 1 product Euro 2.827,00 - sale price for n. 1 product Euro 3.200,00 - total price for n. 8 products Euro 25.600,00;

  o   n. 2 products 1783-US8T ALLEN BRADLEY  - purchase price for n. 1 product Euro 200,00 - sale price for n. 1 product Euro 220,00 - total price for n. 2 products Euro 440,00;

  o   n. 5 products  20-HIM-A6 ALLEN BRADLEY - purchase price for n. 1 product approximately Euro 225,00 - sale price for n. 1 product Euro 225,00 - sale price for n. 1 product Euro 250,00 - total sale price for n. 5 products Euro 1.250,00

- **INVOICE** n. 1178 - date 2021.04.01 - customer Rockwell Automation BV Rivium Promenade 160 Netherland

  o n. 1 product  1756-BATM - ALLEN BRADLEY - purchase price approximately Euro 250,00 - sale price Euro 270.00

- **SALE** to customer Rockwell Automation B.V. Rivium Promenade 160 NL - date 2020.12.18

  o n. 1 pc. NEW B Series Allen-Bradley 1756-L63 – purchase price for n. 1 product  approximately euro 1.400,00 sale price Euro 1.570,00;

- **SALE** to customer Lektronix A Rockwell Automation business - date 2021.03.21

  o n. 2 products 1734-AENT (serie C) - purchase price for n. 1 product euro 205,00; sale price for n. 1 product Euro 230,00; total sale price for n. 2 products Euro 460,00

- **SALE** to customer Rockwell Automation B.V. - date 2021.04.14

  o n. 1 product 6155R-NPXP Allen-Bradley - quantity n. 1 - purchase price approximately Euro 2.100,00; sale price Euro 2.560,00;

WiAutomation further states that it is incapable of ascertaining what Rockwell Products it sold from 2018-2020 as it was a small company with limited resources and the records in WiAutomation's possession are incomplete. Furthermore, many of the records that WiAutomation has in its possession do not identify the product that was purchased/sold.  Thus, it is impossible to identify the foregoing with any greater degree of specificity than already provided.

**INTERROGATORY NO. 6:**

Identify the gross revenue, costs, expenses and profits of WI Automation on a quarterly

basis from 2015 to present.

**RESPONSE:**

Objection.  This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it requires Defendants to identify WiAutomation's

11

"gross revenue, costs, expenses, and profits" on a quarterly basis from 2015 to present. WiAutomation further objects to the extent that this interrogatory seeks irrelevant information and far exceeds the scope of permissible discovery and is, instead, merely a fishing expedition into WiAutomation's financials. Subject to and without waiving its general and specific objections, WiAutomation states:

**2018**
**gross revenue Euro 81.238,00**
**costs Euro 62.209,00**
**profit after taxes 13.915,00**

**2019**
**gross revenue Euro 459.823,00**
**costs Euro 402.470,00**
**profit after taxes Euro 37.578,00**

**2020**
**gross revenue Euro 3.574.533**
**costs Euro 3.484.446**
**profit after taxes Euro 53.955,00**

**2021 WiAutomation has not yet approved its financial statement for 2021 but is within the deadline to do so under Italian law.  Parcop changed its accounting software in November 2021, which caused delays in accounting activities.   Additionally, WiAutomation had additional delays due to a COVID-19 breakout that caused additional delays in finalizing the financial statement.   Subject to and without waiving its general and specific objections, WiAutomation states:**
**Gross revenue Euro 6.543.190,00**
**Costs Euro 5.299.830,00**
**Profit before taxes Euro 1.243.170,00**

**WiAutomation further states that it does not keep track of its revenue, costs, and profit on a quarterly basis.  Accordingly, WiAutomation does not have reliable figures to report for fiscal year 2022.  WiAutomation reserves the right to supplement this response as new information becomes available.**

**INTERROGATORY NO. 7:**

Identify the gross revenue, costs, expense and profits of WI Automation attributable to WI

Automation's sale of unused Rockwell Products from 2105 to present.

**RESPONSE:** Objection.  This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it requires Defendant to identify its gross revenue, costs, expense and profits pertaining to the sale of "unused Rockwell Products,"

from 2015 to the present.  WiAutomation further objects to the extent that this interrogatory seeks irrelevant information and far exceeds the scope of permissible discovery and is, instead, merely a fishing expedition into WiAutomation's financials.  Subject to and without waiving its general and specific objections, WiAutomation states that its gross revenue, costs and profits attributable to Wiautomation's sale of Rockwell Products are approximately 15% of total gross revenue, costs and profits.

For fiscal years 2018-2020, WiAutomation does not have records sufficient to identify the revenue, costs, expense, and profits attributable to the sale of Rockwell products as WiAutomation was a new company with limited resources.

For fiscal year 2021, WiAutomation collected gross revenue on Rockwell products of €1.046.880,00.  WiAutomation's costs for Rockwell products was €847.972,00, leaving a profit of €198.907,00.

For 2022, WiAutomation has generated €421.000,00 in gross revenue for Rockwell products.  Its costs for said products are $341.010,00, leaving a profit of €79.990,00.


**INTERROGATORY NO. 8:**

Identify the product names, quantity, condition, purchase price, storage location and

value of current inventory of unused Rockwell Product held by, or at the behest of WI

Automation.

**RESPONSE:**

Objection.  This request is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requires Defendants to "identify" each and every Rockwell Product that it currently has in inventory. Furthermore, Defendant further objects to the extent that this interrogatory seeks irrelevant information that is beyond the scope of permissible discovery. Subject to and without waiving its general and specific objections, WiAutomation states that it currently has the following Rockwell Products in storage, all of which are new unless otherwise stated:

Rockwell products located at Parcop's storage

- 13x 1769-L24ERQB1B  - new open product - purchase price n. 1 product Euro 2.800

- MPL-B430P-SK72AA - new factory sealed - purchased price n. 1 product Euro 900,00

- 1606-XLE240EN - new factory sealed - purchased price n. 1 product Euro 220,00

- 2097-V32PR2-LM - used - purchased price n. 1 product aproximately  Euro 600,00

- 5x 2711R-T4T - new factory sealed - purchased price n. 1 product approximately Euro 250.00

- 22F-RF026-CL  - new factory sealed - purchased price n. 1 product approximately Euro 60,00

- 6x 2711P-T7C21D8S - new factory sealed - purchased price n. 1 product approximately Euro 1.085,24

- 2198-DB42-F - new factory sealed - purchased price n. 1 product approximately Euro 244,00

- 1321-3R35-B - new factory sealed - purchased price n. 1 product approximately Euro 144,00

- MPL-A430N-HJ72AA  new  factory  sealed  -  purchased  price  n.  1  product approximately Euro 1.140,00

- 2711PC-T6C20D8 new factory sealed - purchased price n. 1 product approximately Euro 1.200,53

- 22RF024-CL new factory sealed - purchased price n. 1 product approximately Euro 137,00

- VPL-B072F-PK12AA  new  factory  sealed  -  purchased  price  n.  1  product approximately Euro 626,00

- 1606-XL480EP new factory sealed - purchased price n. 1 product approximately Euro 381,12

- 1769-IA16  new factory sealed - purchased price n. 1 product approximately Euro 250,00

- 6x 1783-US5T new factory sealed - purchased price n. 1 product approximately Euro 300,00

- 2x 1769-PA2 new factory sealed - purchased price n. 1 product approximately Euro 145,00

- 1606-XLB120E new factory sealed - purchased price n. 1 product approximately Euro 150,00

- 2080-IF4 new factory sealed - purchased price n. 1 product approximately Euro 150,00

- 1769-OW8 new factory sealed - purchased price n.1 product approximately Euro 250,00

- 4x 1769-OF8C new factory sealed - purchased price n. 1 product approximately Euro 1.800

- 10x 1734-OB8 new factory sealed - purchased price n. 1 product approximately Euro 260,00

- 3x 1769-ECR new factory sealed - purchased price n. 1 product approximately Euro 30,00

- 22B-D6P0N104 new factory sealed - purchased price n. 1 product approximately Euro 600,00

- 11x 1734-IB8 new factory sealed - purchased price n. 1 product approximately Euro 247,73

All products are located in Monte di Procida (NA) via Fiomarino III trav n. 13 at Parcop S.r.l. storage.The value of the current inventory is estimated to be between approximately Euro 60.000,00 – Euro 75.000,00

**INTERROGATORY NO. 9:**
Describe the product life cycle of unused Rockwell products sold by WI Automation, from acquisition through post-sale services, including without limitation sourcing, importation, inspecting, receiving, inventorying, warehousing, sorting by condition, marketing, sale, technical support and warranty and repair services, including all training provided to WI Automation personnel related to any of the foregoing.

**RESPONSE:** Objection. This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that WiAutomation describe the "product

life cycle" as it pertains to an unspecified number of products that WiAutomation sells. WiAutomation further objects to the term "unused Rockwell products" as vague, ambiguous, and confusing. Subject to and without waiving its objections, WiAutomation acquires the products at issue from a Rockwell Authorized Distributor, or other reputable source.  WiAutomation only purchases new, genuine Rockwell products that are factory sealed. Once the product is in WiAutomation's possession, the sealed Rockwell packaging—which is never opened by WiAutomation—is then verified externally by Parcop's employees and then put in the storage (where new products are separated from used products). Once Parcop receives an order, the products are placed into a WiAutomation shipping box for delivery to WiAutomation's customers. WiAutomation provides its own 12 month warranty for each Rockwell product sold. If a customer sends a complaint about malfunction the customer care employ talks to the director   and he will approve to send the RMS for refund or replacement. All of the foregoing is based upon the following terms and conditions:

*The warranty for new and refurbished products is 12 months covered by WiAutomation from the delivery date, the used products are guaranteed for 3 months. If the item is not as described, you will have a full refund including all shipping costs. If the item is lost or damaged in transit will be refunded only in case of insurance. Whenever the User intends to make use of the remedies provided by the legal guarantee provided with the Products, the User shall contact the Holder at the email address info@wiautomation.com. The Holder shall promptly reply to the communication of the alleged lack of conformity and shall indicate to the User the specific procedure to be followed, taking into account the category of goods relating to the Product, and / or the alleged defect. In any case, defects due to transport by courier, improper use or assembly or inadequate storage or maintenance of the Products and degradation resulting from use are excluded from the Warranty.*

*At the time of delivery, the Customer is required to verify the conformity of the Product with the Order.*

*WIAUTOMATION UNDERTAKES TO REPLACE NON-INTACT OR NON-COMPLIANT PRODUCTS AND REPAIR OR REPLACE PRODUCTS RECOGNIZED AS DEFECTIVE AND COVERED BY THE WARRANTY.*

*Returns are accepted only if previously authorized in writing by WiAutomation by sending the relative RMA (Return Material Authorization) code; upon receipt, WiAutomation examines the returns to verify that the Product is the one sold, that the defect exists, is attributable to its responsibility and is covered by the Warranty and, only in this case, replaces the defective Products. The Warranty is the only one provided by WiAutomation and replaces any other warranty, whether written, oral or implicit, except as provided below for the Consumer.*

*The report of defects and / or non-conformities of the Products must be communicated to WiAutomation in writing, by email (sales@wiautomation.com), under penalty of forfeiture, (i)*

*within 5 (five) days of delivery in the case of discrepancies of the Product or obvious defects and (ii) within 8 (eight) days of discovery in the case of hidden defects.*

*WiAutomation is not an official distributor or representative of the brands on this site. The trademarks and names on this site belong to their respective owners. Rockwell: WiAutomation is not an authorized dealer of surpluses or affiliate of the manufacturer. Products may have older date codes or be an older series than the one available directly from the factory or authorized dealers. Since WiAutomation is not a rockwell authorized distributor, the original manufacturer's warranty does not apply (the 12-month WiAutomation warranty applies). Some Allen-Bradley PLC products will have the firmware already installed, WiAutomation does not guarantee whether or not a PLC product will have firmware and, if it has firmware, if the firmware is the level of revision that is necessary for its application. WiAutomation also does not warrant the ability or right to download or otherwise obtain firmware for the product from Rockwell, its distributors, or any other source. WiAutomation will not obtain or provide firmware on behalf of the customer. It is customer's obligation to comply with the terms of any End User License Agreement or similar document relating to obtaining or installing the firmware.*

**INTERROGATORY NO. 10:**

Identify any contracts, agreements, or pricing documents that relate to Rockwell and/or Rockwell's Authorized Distributors that WI Automation has reviewed in connection with the sourcing or sale of unused Rockwell products.

**RESPONSE:** Objection.  This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it demands WiAutomation identify any and all "contracts, agreements, or pricing documents" relating to "Rockwell or Rockwell's Authorized Distributors" that WiAutomation has reviewed.  WiAutomation further objects to the extent that this interrogatory seeks irrelevant information that is outside the scope of permissible discovery .  WiAutomation's review of any particular contract or agreement has no bearing on the Plaintiff's claims or defenses.  WiAutomation further objects to the extent that this interrogatory seeks information protected by the attorney-client privilege and/or work product protection.  Subject to and without waiving its general and specific objections, WiAutomation states that WiAutomation has not reviewed any relevant agreements between Rockwell and its Authorized Distributors.

**INTERROGATORY NO. 11:**

If you contend that any of Your sales of unused Rockwell Products were authorized by Rockwell, identify all such sales, describe why you contend that they were authorized.

**RESPONSE:** Objection. This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that Defendant identify all sales that were "authorized" by Rockwell. WiAutomation further objects to the term "unused Rockwell products" as vague, ambiguous, and confusing. Additionally, WiAutomation objects to the extent that this interrogatory calls for legal conclusions as to what constitutes "authorization" to sell Rockwell products. Subject to and without waiving its objections, WiAutomation states that Rockwell and several of its authorized distributors have purchased products directly from WiAutomation. Furthermore, WiAutomation purchases products directly from Rockwell Authorized Distributors who know, actually and constructively, that WiAutomation will resell the product.

**INTERROGATORY NO. 12:**

If you contend that any of Your sales of unused Rockwell Products are not materially different than products sold by Rockwell, identify all such sales and describe why you contend they are not materially different.

**RESPONSE:** Objection. This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that Defendant identify and describe each and every transaction that WiAutomation has made pertaining to the Rockwell products that it sells. Furthermore, WiAutomation objects to the extent that this interrogatory is not adequately limited in time. Defendants further object to the extent that this interrogatory calls for a legal conclusion. Subject to and without waiving its general and specific objections, WiAutomation states that all of WiAutomation's sales of Rockwell products do not differ in any material way. WiAutomation sells only genuine, new Rockwell products. In other words, the products sold by WiAutomation are identical to the products sold by Rockwell.

**INTERROGATORY NO. 13:**

Describe all policies and procedures relating to pre-sale and post-sale customer support that You provide to Your customers who purchase unused Rockwell Products. To the extent the policies and procedures have changed from 2015 to present, Your response should identify how and when such changes were made.

**RESPONSE:** Objection. This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it demands that WiAutomation describe "all policies and procedures" pertaining to pre and post-sale customer service. Furthermore, WiAutomation objects that this interrogatory is not reasonably limited in time. Furthermore, WiAutomation objects to this interrogatory on the grounds that it demands WiAutomation account for any and all changes to the terms and conditions of its website, however

immaterial, from WiAutomation's inception to present day.  Subject to and without waiving its objections, WiAutomation refers Rockwell to its current terms and conditions, available at: https://us.wiautomation.com/terms-and-conditions.

**INTERROGATORY NO. 14:**

Identify all facts that support each of Defendant's defenses listed Defendant's Amended

Answer.

**RESPONSE:**  Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that Defendant identify "all facts" that support each and every one of the Defendants' Affirmative Defenses.  Defendant further objects to the extent that this interrogatory calls for legal conclusions.  Defendant further objects that its affirmative defenses are adequately pled and provide sufficient information for Rockwell to ascertain the precise nature of WiAutomation's affirmative defenses.  Indeed, WiAutomation has already amended its Answer to include additional information about its affirmative defenses after discussions with Rockwell's attorneys.

Subject to and without waiving its general and specific objections, WiAutomation states that it resells new Rockwell products after said products have been introduced into the stream of commerce by Rockwell and/or its authorized distributors.  Rockwell has known about WiAutomation's business for several years and tacitly accepted WiAutomation's role in re-selling Rockwell products by continuing to supply to WiAutomation and even purchasing from WiAutomation.

**INTERROGATORY NO. 15:**

Identify Your warranty policies, changes or modification to such policies, and any

customer or potential customer claims or inquiries regarding such policies.

**RESPONSE:**  Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that WiAutomation not only specify its warranty "policies, changes or modification to such policies" as well as any and all customer or potential customer "claims" or "inquiries" regarding WiAutomation's warranty policy.  WiAutomation further objects to this interrogatory to the extent that it seeks irrelevant information outside the permissible scope of discovery.  Subject to and without waiving its specific and general objections, the applicable warranty section of WiAutomation's terms and conditions on its website, which provides:

The warranty for new and refurbished products is 12 months covered by WiAutomation from the delivery date, the used products are guaranteed for 3

months. If the item is not as described, you will have a full refund including all shipping costs. If the item is lost or damaged in transit will be refunded only in case of insurance. Whenever the User intends to make use of the remedies provided by the legal guarantee provided with the Products, the User shall contact the Holder at the email address info@wiautomation.com. The Holder shall promptly reply to the communication of the alleged lack of conformity and shall indicate to the User the specific procedure to be followed, taking into account the category of goods relating to the Product, and / or the alleged defect. In any case, defects due to transport by courier, improper use or assembly or inadequate storage or maintenance of the Products and degradation resulting from use are excluded from the Warranty.

At the time of delivery, the Customer is required to verify the conformity of the Product with the Order.

WIAUTOMATION UNDERTAKES TO REPLACE NON-INTACT OR NON-COMPLIANT PRODUCTS AND REPAIR OR REPLACE PRODUCTS RECOGNIZED AS DEFECTIVE AND COVERED BY THE WARRANTY.

Returns are accepted only if previously authorized in writing by WiAutomation by sending the relative RMA (Return Material Authorization) code; upon receipt, WiAutomation examines the returns to verify that the Product is the one sold, that the defect exists, is attributable to its responsibility and is covered by the Warranty and, only in this case, replaces the defective Products. **The Warranty is the only one provided by WiAutomation** and replaces any other warranty, whether written, oral or implicit, except as provided below for the Consumer.
The report of defects and / or non-conformities of the Products must be communicated to WiAutomation in writing, by email (sales@wiautomation.com), under penalty of forfeiture, (i) within 5 (five) days of delivery in the case of discrepancies of the Product or obvious defects and (ii) within 8 (eight) days of discovery in the case of hidden defects.

**INTERROGATORY NO. 16:**

With regards to Rockwell software, firmware or operating systems, identify (1) the date when any of You, Your product sources, and any of Your customers performed any download of such Rockwell software, firmware or operating system and the product for which it was downloaded and/or used; (2) Your policies and procedures regarding advertising such Rockwell

software, firmware or operating systems for download or other delivery to Your customers, (3)

Your policies and procedures regarding making and/opr authorizing such downloads and (4) any

technical assistance provided to or communication with customers regarding the installation or

download of Rockwell software, firmware or operating systems.

      **RESPONSE:** Objection.  This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it demands that WiAutomation not only identify the date on which installation was made,  but also its "policies and procedures." WiAutomation further objects to the extent that this interrogatory seeks irrelevant information that is outside the scope of permissible discovery.  Subject to and without waiving its general and specific objections, WiAutomation refers the Plaintiff to the terms and conditions on its website, which every purchaser is required to agree to prior to purchase:

      Some Allen-Bradley PLC products will have the firmware already installed, WiAutomation does not guarantee whether or not a PLC product will have firmware and, if it has firmware, if the firmware is the level of revision that is necessary for its application. WiAutomation also does not warrant the ability or right to download or otherwise obtain firmware for the product from Rockwell, its distributors, or any other source. WiAutomation will not obtain or provide firmware on behalf of the customer. It is customer's obligation to comply with the terms of any End User License Agreement or similar document relating to obtaining or installing the firmware.

## VERIFICATION OF INTERROGATORY ANSWERS

I, Fulvio Coppola, am President and CEO of Parcop, S.r.l. d/b/a WiAutomation.  I believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Dated: August ____, 2022

22

# Exhibit C

1                      LUCA COPPOLA

2                      IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF DELAWARE
3
                       C.A. NO.: 21-1238-CFC-JLH
4

5    ---------------------------------------x

6    ROCKWELL AUTOMATION, INC.,

7                         Plaintiff,

8            vs.

9    PARCORP S.R.L., d/b/a
     WIAUTOMATION,
10                       Defendant.

11   ---------------------------------------x

12
                       Tuesday, December 6, 2022
13                     2:03 p.m. Central European Time
                       Rome, Italy
14

15

16        VIDEOTAPE DEPOSITION OF LUCA COPPOLA

17             (Through the Interpreter)

18        Taken on behalf of the Plaintiff before

19   Michael J. D'Amato, RMR, Notary Public in and for the

20   State of Florida at Large, pursuant to Notice of Taking

21   Deposition in the above cause.

22

23

24   Reported by: Michael J. D'Amato,
     Registered Merit Reporter
25   Job No. 220085

Page 2

```
1                 LUCA COPPOLA
2              REMOTE APPEARANCES
3              _____
4    For the Plaintiff:
5
6         ALSTON & BIRD LLP
7         90 Park Avenue
8         New York, NY 10016
9         BY: NEAL McLAUGHLIN, ESQ.
10
11
12   For the Defendant:
13
14        BRACH EICHLER, LLC
15        101 Eisenhower Parkway
16        Roseland, NJ 07068
17        BY: BOB KASOLAS, ESQ.
18             ERIC ALVAREZ, ESQ.
19
20   Also Present: Brian Hood, Legal Videographer, TSG
21                John Miller, Rockwell in-house counsel
22                Rosanna Giliberti, Italian Interpreter
23
24
25
```

Page 3

```
1                 LUCA COPPOLA
2                 I N D E X
3    Witness            Direct      Cross     Redir.
4    LUCA COPPOLA
5      By Mr. McLaughlin........7.......................155
6      By Mr. Kasolas.........................146
7
8    Certificate of Oath (Interpreter)........157
9    Certificate of Oath (Witness)...........158
10   Certificate of Reporter.................159
11   Errata sheet (to be forwarded upon execution)....160
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                 LUCA COPPOLA
2               E X H I B I T   I N D E X
3    Description                              Page
4    EXHIBIT 1 Photograph of front gate to WiAutomation....44
5    EXHIBIT 2 Screenshot of US.wiautomation.com website...59
6    EXHIBIT 3 Screenshot of website page
7    US.WiAutomation.com/join-our-team.....................64
8    EXHIBIT 4 Email with Bates WI2605 and 2606...........68
9    EXHIBIT 5 Email with Bates Bates WI3025 to 3030.......70
10   EXHIBIT 6 Web page for LinkedIn.com/company/
11   WiAutomation/people..................................80
12   EXHIBIT 7 Screenshot of website page
13   US.WiAutomation.com/allen-Bradley/PLC-
14   systems/controllogix/1756L71.........................98
15   EXHIBIT 8 Web page for catalog product
16   20YD460NOANNANAO.....................................101
17   EXHIBIT 9 Web page for WiAutomation product catalog
18   number 9324-RLM0100ENM...............................104
19
20
21
22
23
24
25
```

Page 5

```
1                 LUCA COPPOLA
2         THE VIDEOGRAPHER:  Good morning and good
3    afternoon.  Counselors, my name is Brian Hood and
4    I'm the legal videographer in association with TSG
5    Reporting Incorporated.  Because this is a remote
6    deposition, I will not be in the same room with the
7    witness.  Instead, I will record this videotaped
8    deposition remotely.  The reporter, Michael
9    D'Amato, also will not be in the same room and will
10   swear the witness remotely.
11        Do all parties stipulate to the validity of
12   this video recording and the remote swearing and
13   that it will be admissible in the courtroom as if
14   it had boon taken following Rule 30 of the Federal
15   Rules of Civil Procedures and the state's rules
16   where this case is pending?
17        MR. McLAUGHLIN:  On behalf of Rockwell
18   Automation, yes.
19        MR. KASOLAS:  Yes, on behalf of Parcorp.
20        THE VIDEOGRAPHER:  Thank you.  This marks the
21   beginning of the recorded media labeled No. 1 of
22   the remote video deposition of Luca Coppola in the
23   matter Rockwell Automation, Inc. v. Parcorp S.R.L.,
24   d/b/a WiAutomation entered in the United States
25   District Court for the District of Delaware, Case
```

Page 6

LUCA COPPOLA

1      LUCA COPPOLA
2   No. 21-1238-GBW-JLA.
3         Today's date is December 6, 2022 and the time
4   in Rome, Italy is approximately 2:059 P.M. Central
5   European Time.  Again, my name is Brian Hood and
6   I'm the legal videographer from TSG Reporting,
7   Incorporated headquartered at 228 East 45th Street,
8   New York, New York 10017.  The court reporter is
9   Michael D'Amato also in association with TSG
10  Reporting.  Will counsel please introduce
11  yourselves for the record.
12        MR. McLAUGHLIN:  This is Neal McLaughlin of
13  Alston & Bird on behalf of Rockwell Automation.
14        MR. KASOLAS:  Good morning.  Bob Kasolas from
15  the law firm of Brach Eichler LLC on behalf of
16  Parcorp doing business as WiAutomation.  Nice to
17  meet you.
18        THE VIDEOGRAPHER:  The court reporter will now
19  swear in or affirm the witness and interpreter.
20  THEREUPON,
21              ROSANNA GILIBERTI,
22  being by me first duly sworn or affirmed to truly and
23  accurately translate the questions in English to Italian
24  and the answers in Italian to English, as hereinafter
25  certified, responded and testified as follows:

Page 7

LUCA COPPOLA

1         THE INTERPRETER:  I will do my best.
2   THEREUPON:
3              LUCA COPPOLA,
4   being by me first duly sworn or affirmed through the
5   interpreter to tell the truth, the whole truth and
6   nothing but the truth, as hereinafter certified,
7   responded and testified as follows:
8         THE WITNESS: I do.
9              DIRECT EXAMINATION
10  BY MR. McLAUGHLIN:
11     Q.   Mr. Coppola, good afternoon.  My name is Neal
12  McLaughlin.  I'll be asking you the questions today.
13  Have you ever been deposed before?
14     A.   No.
15     Q.   So today if there are any questions that I ask
16  that are unclear to you would you please let me know so
17  that I can clarify them?
18     A.   Of course.
19     Q.   And if you answer a question is it fair to
20  assume that you understood the question?
21     A.   Yeah.
22     Q.   What did you do to prepare for today's
23  deposition?
24     A.   I spoke with my Italian attorney and with my

Page 8

LUCA COPPOLA

1   brother.
2      Q.   What is the name of your Italian attorney?
3      A.   Nico Palumbo.
4      Q.   Did you review any documents in preparation
5   for today?
6      A.   No.
7      Q.   Approximately how long did you spend with Mr.
8   Palumbo?
9      A.   About an hour this morning.
10     Q.   How much time did you spend with your brother
11  to prepare for today?
12     A.   Same time.
13     Q.   Is your brother Fulvio Coppola?
14     A.   Yes.
15     Q.   What is your current occupation?
16     A.   I manage the warehouse.
17     Q.   For what company?
18     A.   Parcorp S.R.L.
19     Q.   Before you managed the warehouse at Parcorp
20  what was your employment, if any?
21     A.   I was managing the restoration [sic] places of
22  my father's.
23     Q.   What do you mean the restoration places?
24     A.   Restaurants.

Page 9

LUCA COPPOLA

1      Q.   So your father owns restaurants and you were
2   managing those?
3      A.   Yes.
4      Q.   Did you have any employment before that?
5      A.   No, I was studying.
6      Q.   Where were you studying?
7      A.   The high school here in Italy.
8      Q.   Did you go to university?
9      A.   Yes.
10     Q.   Which university?
11     A.   In Bologna.
12     Q.   Did you receive a degree from the University?
13     A.   No, I only attended one year.
14     Q.   So after high school the only two jobs that
15  you've had are first managing your father's restaurants
16  and second at Parcorp?
17     A.   Yes.
18     Q.   How long ago did you start working at Parcorp?
19     A.   2017.
20     Q.   Did Parcorp exist before 2017?
21     A.   No.
22     Q.   So you've worked at Parcorp since the
23  beginning of Parcorp?
24     A.   Yes.

Page 150

LUCA COPPOLA

1
2  CM94LA, telephone +44 1621 879 527."
3      Then: "I apologize for this situation, but
4  unfortunately the company pot particulars right now
5  becomes always more complicated.  We remain at your
6  disposal and we invite you to get in touch with us
7  in the future, contact us in the future, for any
8  kind of problematic electronic problematic on Allen
9  Bradley and on other brands of the sector, example,
10 Siemens, but not only Siemens.  Highly
11 confidential."
12     Then, "Reference Lektronix International LTD
13 offer/invoice PR....  At your disposal for possible
14 clarifications I remain sincerely Tamara Kohut
15 Piorecka, customer service adviser, Via Ludovico di
16 Breme 13, 20156, Milano, Italy.  Receiver code/SDI:
17 RS76RHR, PEC electronic certified mail, PEC
18 Rockwell Automation SRL at legalmail.it.
19 Laboratorio code 39D, 40-155 Katowice Poland.  E:
20 TKOHUTP@RA.rockwell.com, telephone +39 0240708198,
21 + 48 32 7812070."
22     MR. McLAUGHLIN:  Bob, is there more of this
23 email that you need translated for some reason?
24     MR. KASOLAS:  You are finished right, Madam
25 Interpreter?

Page 151

LUCA COPPOLA

1
2      THE INTERPRETER:  I don't know.  Is there any
3  more?
4      MR. KASOLAS:  Well, the rest is English and
5  Polish so we don't need translation of that.
6      THE INTERPRETER:  Yeah, I finished then.
7      MR. KASOLAS:  Thank you.
8  BY MR. KASOLAS:
9      Q.  Luca, does reviewing this letter refresh your
10 recollection about what this letter was about?
11     A.  Yes, before Mr. Neal asked me why I had signed
12 this email.  I recall that my brother asked me to write
13 together with him this mail because we had a problem
14 with a supplier, in this case it's Lektronix, supplier
15 to WiAutomation, and since we haven't had a problem
16 with this supplier that's shipped the products always
17 in the right way.
18         This is the first time that after one month we
19 were not receiving the merchandise nor the money back.
20 So we wrote this email with my name because they were
21 not answering the phone, they were not answering the
22 messages, and that's why Fulvio asked me to write this
23 email with my name, a different name.
24         And since we have always received products
25 that we purchased, that we bought from them and also

Page 152

LUCA COPPOLA

1
2  products that we bought after from them, it seemed
3  strange that they were not answering us regarding this
4  order.
5         Also because they also, they're also our
6  client at one point, we sold Rockwell Automation
7  products to them.
8      MR. KASOLAS:  Is he finished with the answer?
9      A.  No, because in the email besides shipping
10 these products there are also products to Italy in the
11 PEC email and in the payment.
12     Q.  Who wrote the email that's marked Exhibit 5?
13     A.  Myself and my brother Fulvio wrote this email
14 together since he asked me to write the email together
15 because we were not receiving the product and we were
16 not receiving the money.
17     Q.  Who is Lektronix?
18     A.  An authorized reseller of Rockwell Automation.
19     Q.  And who is S.R.L.?
20     A.  Always Rockwell Automation.  It is an email,
21 in Italy the PEC email is an authorized email of legal
22 level.
23     Q.  Has -- I'm sorry.  Has WiAutomation ever sold
24 Rockwell products to Lektronix?
25     THE INTERPRETER:  I'm sorry.  If you could

Page 153

LUCA COPPOLA

1
2  repeat the question.  I was hearing the voice as I
3  was trying to interpret.
4      MR. KASOLAS:  That's okay.
5      Q.  Has WiAutomation ever sold Rockwell products
6  to Lektronix?
7      A.  Yes, we collaborated a lot.  We sent many
8  products to Lektronix.
9      Q.  Did anyone at Lektronix ever complain about
10 the authenticity of the Rockwell products that
11 WiAutomation shipped to Lektronix?
12     A.  As I recall no products were ever returned by
13 Lektronix.
14     Q.  And over the years has WiAutomation sold new
15 Rockwell products to Lektronix?
16     A.  Yes, as I remember they were new, sealed.
17     Q.  Did anyone at Lektronix ever complain that the
18 new products WiAutomation sold to Lektronix were not
19 new?
20     A.  No, nobody ever did and we shipped to them
21 several times.
22     Q.  And over the years did WiAutomation purchase
23 new Rockwell products from Lektronix?
24     A.  I did not -- no, I did not understand.  You
25 mean to say that they were aware that they were

LUCA COPPOLA

1                 LUCA COPPOLA

2   purchasing Rockwell products from WiAutomation?

3      Q.  No.  My question is has Lektronix sold new

4   Rockwell products to WiAutomation over the years?

5      A.  Yes, I received new products from them.  I

6   received and then some I shipped to them.

7      Q.  And did you resell those Lektronix-shipped

8   products that were new Rockwell products to your own

9   customers?

10     A.  Yes.

11     Q.  Before shipping the new Rockwell products that

12   WiAutomation received from Lektronix did anyone at

13   WiAutomation in any way tamper with the box that the

14   new Rockwell product arrived in from Lektronix?

15        MR. McLAUGHLIN:  Objection, form, leading.

16     A.  No.  As I said, we never opened sealed

17   products.

18     Q.  Do you know if any customer that WiAutomation

19   ever shipped new Rockwell products from received from

20   Lektronix ever complained that those shipped products

21   were not new?

22        MR. McLAUGHLIN:  Objection, form, foundation,

23   leading.

24     A.  No, never.

25        MR. KASOLAS:  I may be done.  I'm just

LUCA COPPOLA

1   checking my notes.

2

3        Nothing further for the witness.  Thank you.

4        MR. McLAUGHLIN:  I have one further question.

5              REDIRECT EXAMINATION

6   BY MR. McLAUGHLIN:

7     Q.  Just to be clear, it's your testimony today

8   that Lektronix was a source of Rockwell products to

9   WiAutomation?

10     A.  Yes, in the email that we saw we saw that not

11   me directly, but we got products from them and we

12   shipped out products to them.

13     Q.  What do you mean by not directly?

14     A.  Because like I said, I do not handle

15   purchasing.  That email I wrote it together with my

16   brother because there was a problem.

17     Q.  Was Lektronix a source of Rockwell products to

18   WiAutomation?

19     A.  Yes, of course we received products from them

20   quite -- quite a few.

21     Q.  And these products that you received were

22   Rockwell Automation products?

23     A.  Yes.

24        MR. McLAUGHLIN:  I have no further questions.

25        THE VIDEOGRAPHER:  Off the record?

LUCA COPPOLA

1        MR. McLAUGHLIN:  Yes, please.  Thank you.

2

3        THE VIDEOGRAPHER:  This concludes the

4   videotaped deposition of Luca Coppola.  The time is

5   11:16 p.m. and we are now off the record.

6        (Deposition concluded at 11:16 p.m.)

LUCA COPPOLA

3       CERTIFICATE OF OATH OF INTERPRETER

5   STATE OF FLORIDA

6   COUNTY OF PALM BEACH

8        I, Michael J. D'Amato, R.M.R., Notary Public,

9   State of Florida, certify that ROSANNA GILIBERTI

10   (Italian interpreter) personally appeared before me on

11   December 6, 2022 and was duly sworn.

13        Witness my hand and official seal this 9th day

14   of December 2022.

18              Michael J. D'Amato
                    Notary Public - State of Florida
                    My Commission # GG 960978

19                    Expires: June 13, 2024

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLAXOSMITHKLINE LLC and SMITHKLINE       :
BEECHAM (CORK) LIMITED                   :
                                         :
              Plaintiffs,                :
                                         :
       v.                                :        C.A. No. 14-878-LPS-CJB
                                         :
TEVA PHARMACEUTICALS USA, INC.           :
                                         :
              Defendant.                 :

---

## MEMORANDUM ORDER

At Wilmington this **25th** day of **May, 2017**, having reviewed the proposed pretrial order submitted by GlaxoSmithKline LLC, SmithKline Beecham (Cork) Limited ("GSK" or "Plaintiffs") and Teva Pharmaceuticals USA, Inc. ("Teva" or "Defendant") (D.I. 356, 360) ("PTO"), including briefing on various motions *in limine* ("MIL"),

**IT IS HEREBY ORDERED** that:

1.     GSK's MIL #1, to preclude Teva from arguing that physicians do not read generic drug labels, is DENIED. The evidence GSK seeks to exclude is relevant to the intent element of GSK's induced infringement claim and to damages. Unlike in a Hatch-Waxman case, this case involves an already-marketed product; evidence as to how many, if any, physicians and patients read the label on Teva's product (and Teva's understanding of how often its label is read) is probative evidence of Teva's intent and of the amount of damages Teva may owe GSK. The jury, properly instructed, is not so likely to be misled or confused as to render the Rule 403 balance one in which this relevant evidence should be excluded. Nor is the risk of unfair

1

prejudice nor waste of time so great as to cause the concerns of Rule 403 to substantially outweigh the probative weight of Teva's evidence.

2.    GSK's MIL #2, to preclude Teva from referencing foreign patent proceedings, is GRANTED.  Neither side shall inform the jury of the existence or outcome of any foreign patent proceedings.  Such evidence is not relevant to any of the issues in the case and, even if it were, its probative value would be substantially outweighed by the risk of confusion of the jury and unfair prejudice to GSK.  However, evidence that is otherwise relevant and admissible or otherwise permitted by the Rules of Evidence – such as portions of the prosecution history developed before the U.S.P.T.O., or prior inconsistent testimony – is not excluded by this Order solely because such evidence may also have been part of a foreign patent proceeding.

3.    GSK's MIL #3, to preclude Teva from referencing its patents related to manufacturing carvedilol, is DENIED.  This evidence is relevant at least to damages.  The parties should include in their proposed final jury instructions an instruction that ensures the jury will not mistakenly conclude that Teva cannot infringe GSK's asserted patent solely because Teva has its own patents.  GSK's concern that a properly-instructed jury will somehow reach a conclusion contrary to the law is unpersuasive.  The probative value of Teva's evidence substantially outweighs the risks identified by GSK.

4.    The parties should be prepared to address Teva's MIL #1, to preclude GSK from offering any testimony from their patent law expert (Nicholas Godici), at the pretrial conference ("PTC"), tomorrow.

5.    Teva's MIL #2, to exclude testimony from GSK's medical expert (Peter McCullough) regarding Teva's intent and state of mind, is DENIED.  Just as evidence as to

whether and how often physicians read Teva's labels (and what Teva knows about how often this happens) is probative of Teva's intent (*see supra* at ¶ 1), so, too, is the expert opinion of Dr. McCullough, as to how Teva's actions (including marketing materials) are understood by physicians.  The Court agrees with GSK that "[e]xpert testimony is appropriate to demonstrate how a person of skill in the art would understand Teva's actions and communications because those actions and communications include technical information that goes beyond the jury's knowledge." (D.I. 360-2 Ex. 11 at GSK Ans. at 2)  The Rule 403 balance does not provide a meritorious basis to exclude the challenged testimony.

6.      Teva's MIL #3, to exclude expert testimony regarding Teva's generic product's AB-rating and Teva's "inaction" (i.e., not telling physicians, pharmacists, and others that Teva's generic product was not FDA approved to reduce the risk of mortality caused by heart failure, during a particular period), is DENIED.  This evidence is relevant to GSK's induced infringement claim; the risks of unfair prejudice, confusion of the jury, or any of the other concerns of Rule 403 do not substantially outweigh the probative value of this evidence.  GSK does not rely solely on the AB-rating to support its inducement claim for the "skinny label" period, but rather the rating "*in combination with* other facts, such as [Teva] juxtaposing its AB-rating next to COREG® in informational material without mentioning that its carvedilol was not approved for heart failure." (D.I. 360-2 Ex. 11 at GSK Br. at 3)  Teva should propose jury instructions that preclude the possibility GSK will "attempt to confuse the jury into drawing a legally impermissible inference." (D.I. 360-2 Ex. 11 at Teva Rep. Br. at 1)

7.      Having identified certain disputes in the PTO, **IT IS FURTHER ORDERED** that:

a.      With respect to identifying and advising the Court of objections related to deposition testimony, the Court adopts GSK's proposal (PTO at 12-13) provided that the deadlines are modified so that the Court receives a submission with respect to any unresolved objections no later than 7:00 p.m. two (2) nights before the testimony will be offered (e.g., by 7:00 p.m. Monday for testimony to be offered on Wednesday).

b.      The Court adopts GSK's proposal (PTO at 16) with respect to use of documents not specifically identified or offered for admission.

c.      The Court adopts Teva's proposal (PTO at 18) to require the parties to exchange in advance demonstratives to be used in opening statements and closing arguments.

d.      The Courtroom Deputy will keep a running total of trial time used by counsel. If any party uses all of its allotted trial time, the Court *will* terminate that party's trial presentation. (*See* PTO at 20)

The parties shall be prepared to discuss any remaining disputes in the PTO, as well as any pending motions, at tomorrow's pretrial conference.

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE

4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ROCKWELL AUTOMATION, INC.'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE ARGUMENT AND <u>EVIDENCE REGARDING FOREIGN LITIGATION</u>

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 30, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL
LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

WiAutomation's response clarifies that it intends to ask the jury to credit factual findings by an Italian court rather than independently evaluate the evidence presented in this case (*see* Resp. at 2). WiAutomation intends to do so without any explanation of the facts before the Italian court or the legal standards it applied. As the cases cited by WiAutomation make perfectly clear, "[s]uch evidence is not relevant to any of the issues in this case and, even if it were, its probative value would be substantially outweighed by the risk of confusion of the jury and unfair prejudice to GSK." *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, No. 14-878-LPS-CJB, D.I. 379 at 2 (D. Del. May 25, 2017) (Memo. Order) (WiAutomation Response, Ex. D). Indeed, WiAutomation has not cited a single case where opinions of a foreign tribunal were allowed to be presented to a jury.

Further, the potential for prejudice and confusion is only compounded here, where the translation of the Italian opinion advanced by WiAutomation switches the labels for plaintiff and defendant (D.I. 190 at 16-20), which WiAutomation does not dispute (or address) in its response.

Finally, WiAutomation's arguments about fairness vis-à-vis evidence from Syntegon is misplaced. Rockwell does not seek to exclude underlying factual evidence produced in this litigation simply because it was used in the Italian proceeding. It is the existence of the Italian proceedings and the use of the Italian court's rulings that are irrelevant, prejudicial, and will be confusing to the jury.

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 30, 2023

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

-and-

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

2

## CERTIFICATE OF COMPLIANCE

I hereby confirm that this brief complies with the type and number limitations set forth in the November 10, 2022 Standing Order Regarding Briefing in All Cases. I certify that this document contains 248 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

/s/ Emily S. DiBenedetto
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

-and-

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

Attorneys for Rockwell Automation, Inc.

## CERTIFICATE OF SERVICE

I, Emily S. DiBenedetto, hereby certify that on June 30, 2023, this document

was served on the persons listed below in the manner indicated:

**BY EMAIL**

Pilar G. Kraman
Alexis N. Stombaugh
YOUNG, CONAWAY, STARGATT
 & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com

Bob Kasolas
Eric J. Boden
Eric Alvarez
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com
eboden@bracheichler.com
ealvarez@bracheichler.com

/s/ Emily S. DiBenedetto
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

4

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

EXHIBIT 15C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | ███████████ |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ROCKWELL AUTOMATION, INC.'S MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FROM REFERRING TO <u>EVIDENCE NOT PRODUCED IN DISCOVERY</u>

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)

OF COUNSEL:                          SHAW KELLER LLP
Paul Tanck                           I.M. Pei Building
Neal J. McLaughlin                   1105 North Market Street, 12th Floor
Christopher L. McArdle               Wilmington, DE 19801
Andrew J. Ligotti                    (302) 298-0700
ALSTON & BIRD LLP                    jshaw@shawkeller.com
90 Park Avenue                       arussell@shawkeller.com
New York, NY 10016                   edibenedetto@shawkeller.com
(212) 210-9400

                                     *-and-*

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 22, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

Rockwell moves under FRCP 37(c), FRE 1002, and FRE 1004 to preclude WiAutomation from introducing documentary and testimonial evidence relating to invoices and purchase orders for Rockwell-branded products that were responsive to Rockwell's interrogatories, requests for production, and 30(b)(6) topics but were not produced, and to preclude WiAutomation from introducing secondary evidence regarding that withheld material.

During discovery, Rockwell requested (i) a prepared 30(b)(6) witness regarding WiAutomation's purchases and invoices; (ii) sales invoices to understand the proportion of relevant U.S. sales; and (iii) supplier invoices to show its sources and costs for Rockwell-branded products. *See, e.g.*, D.I. 87 (Rockwell's 30(b)(6) Topic Nos. 26-29, 56, 65, 68-71, 84); Exhibit 1 (Rockwell's Interrogatory Nos. 2-3, 5); Exhibit 2 (Requests for Production Nos. 6-7, 14, 27, 82, 88).

WiAutomation's corporate deponent (its co-owner, president and CEO), however, lacked knowledge and was unprepared to answer questions addressing these 30(b)(6) topics regarding WiAutomation's purchases and invoices. *See, e.g.*, Exhibit 3 (F. Coppola Dep. Tr.), 61:2-7, 87:6-9, 89:14-90:25, 92:6-93:11, 113:1-20, 122:4-20, 129:1-7, 143:2-7, 143:25-144:10, 145:7-147:3, 148:5-12, 168:3-170:23, 194:16-195:21, 201:3-202:3, 204:8-208:25, 224:3-21, 231:5-233:19, 236:17-238:18, 240:4-241:24, 243:11-244:25, 246:8-25, 253:1-254:25, 285:1-286:22, 291:19-23.

Further, in response to Rockwell's interrogatories and requests for production WiAutomation produced invoices showing only €56,000 in purchases—less than 3% of WiAutomation's overall infringing sales—despite admitting additional materials existed. Exhibit 1, ROG 3; Exhibit 3, 142:24-143:1, 127:13-19; Exhibit 4 (Reed Report), ¶ 5 (€24.77m in sales). And WiAutomation produced only a handful of European sales invoices and refused to identify the rest despite repeated requests, in contravention of multiple Court orders. *See* Exhibit 1, ROG 5; Exhibit 3, 94:11-19; D.I. 278 (detailing WiAutomation's discovery failures).

Courts in the Third Circuit regularly preclude withheld evidence from trial. *See, e.g.*, *Medtronic Inc. v. Guidant Corp.*, 378 F. Supp. 2d 503, 504-05, n.2 (D. Del. 2005) (granting motion to "prevent defendants from making arguments in [their] defense that relied on documents never produced to [plaintiff]"); *Ford Motor Co. v. Edgewood Props.*, 2011 WL 5828661, *3 (D.N.J. Nov. 18, 2011) (noting "ample precedent" of "Courts [that] have precluded a delinquent party from submitting withheld evidence that was not produced in response to a Court Order."); *Utica Mut. Ins. Co. v. Cincinnati Ins. Co.*, 362 F. Supp. 3d 265, 272 (E.D. Pa. Jan. 23, 2019) (limiting defendant to documents and evidence produced during discovery to avoid unfair surprise).

The Court should apply FRCP 37(c) to preclude WiAutomation's trial witnesses from testifying as to the supplier and customer invoices it withheld. *See,*

2

*e.g.*, *Function Media, LLC. v. Google, Inc.*, 2010 WL 276093, *1 (E.D. Tex. Jan. 15, 2010) ("When the 30(b)(6) representative claims ignorance of a subject during the deposition, courts have precluded the corporation from later introducing evidence on that subject."); *Fujifilm N. Am. Corp. v. Big Value, Inc.*, 2018 WL 4210132, *5-6 (E.D.N.Y. Sept. 4, 2018) (not permitting gray market trademark infringer "to sandbag plaintiff with evidence plaintiff properly requested but which defendants never produced.").

WiAutomation cannot justify or cure its failures at this stage. *See 3G Licensing, SA et al. v. HTC Corporation et al.*, C.A. No, 17- 083-GBW, D.I. 658, 2-4 (D. Del. May 18, 2023) (precluding proponent "from using documents [it] did not produce during fact discovery"). Like WiAutomation here, the *3G* defendant "offer[ed] no plausible excuse for its actions—especially after being previously singled out by the Court for belated disclosures [which] evinces [it]'s willingness to flout the discovery rules." *Id.*, 3.

Finally, having withheld its supplier and customer invoices, WiAutomation should be precluded under FRE 1002 and 1004 from introducing secondary evidence at trial which attempts to establish those documents' contents. *See United States ex rel. Magid v. Wilderman*, 2004 WL 1987219, *3 (E.D. Pa. Aug. 18, 2004) (excluding circumstantial evidence because the original forms were not lost and proponent did not use reasonable means to obtain them). The withheld documents are the best

evidence of WiAutomation's potential revenue deductions and alleged "authorized" first sales. *See Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 179 (3d Cir. 2005) (excluding estimates where party "could have, but failed to, introduce other, more reliable evidence as proof").

WiAutomation cannot meet its burden to show that "all originals are lost or destroyed, and not by the proponent acting in bad faith" and therefore evidence regarding the withheld materials' substance should be barred. FRE 1004; *see Kaufman v. Warner Bros. Entm't Inc.*, 2018 WL 4351292, *2 (D. Ariz. Sept. 12, 2018) (proponent bears the burden). WiAutomation should not be allowed to ambush Rockwell at trial with evidence it withheld.

<div style="margin-left: 50%;">

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*
</div>

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 22, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL
LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby confirm that this brief complies with the type and number limitations set forth in the November 10, 2022 Standing Order Regarding Briefing in All Cases. I certify that this document contains 750 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

<div align="right">

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

</div>

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.1.1</u>

Plaintiff Rockwell Automation, Inc. certifies that a reasonable effort has been made to reach agreement with Parcop S.R.L. d/b/a WiAutomation regarding Plaintiff's Motion *in Limine* to Preclude Defendant from Referring to Evidence Not Produced in Discovery. The parties were unable to reach agreement, and WiAutomation refused to agree to Rockwell's requested relief.

/s/ Emily S. DiBenedetto
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

      I, Emily S. DiBenedetto, hereby certify that on June 22, 2023, this document

was served on the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

| | |
|---|---|
| Pilar G. Kraman | Bob Kasolas |
| Alexis N. Stombaugh | Eric J. Boden |
| YOUNG, CONAWAY, STARGATT | Eric Alvarez |
|  & TAYLOR LLP | BRACH EICHLER, LLC |
| Rodney Square | 101 Eisenhower Parkway |
| 1000 North King Street | Roseland, NJ 07068 |
| Wilmington, DE 19801 | (973) 228-5700 |
| (302) 571-6600 | bkasolas@bracheichler.com |
| pkraman@ycst.com | eboden@bracheichler.com |
| astombaugh@ycst.com | ealvarez@bracheichler.com |

          */s/ Emily S. DiBenedetto*
          John W. Shaw (No. 3362)
          Andrew E. Russell (No. 5382)
          Emily S. DiBenedetto (No. 6779)
          SHAW KELLER LLP
          I.M. Pei Building
          1105 North Market Street, 12th Floor
          Wilmington, DE 19801
          (302) 298-0700
          jshaw@shawkeller.com
          arussell@shawkeller.com
          edibenedetto@shawkeller.com

          *-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 21-1238-GBW-JLH |
| | ) |
| PARCOP S.R.L. d/b/a | ) |
| WIAUTOMATION, | ) |
| | ) |
| Defendant. | ) |

**PROPOSED ORDER GRANTING ROCKWELL AUTOMATION, INC.'S MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FROM REFERRING TO EVIDENCE NOT PRODUCED IN DISCOVERY**

On this _____ day of _____, 2023, the Court having considered Rockwell Automation, Inc.'s Motion *in Limine* to Preclude WiAutomation from Referring to Evidence Not Produced in Discovery, and all papers and argument submitted therewith,

IT IS ORDERED that the motion is GRANTED. Parcop S.R.L. d/b/a WiAutomation is PRECLUDED from offering testimony, evidence, or argument regarding purchase orders or invoices related to WiAutomation's purchase or sale of Rockwell-branded products that were not produced in discovery, including any secondary evidence which attempts to establish the contents of those documents.

1

Dated: _____                    _____
                                            United States District Court Judge

# Exhibit 1

2

# DUNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **ROCKWELL AUTOMATION, INC.,** | : | Civil Action No. 1:21-cv-01238 |
| | : | |
| **PlaintiffPlaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PARCORP, S.R.L. D/B/A WI** | : | |
| **AUTOMATION,** | : | |
| | : | |
| **Defendants** | : | |

**TO:**  **Neal McLaughlin, Esq.**
     **Alston & Bird**
     **90 Park Avenue**
     **15th Floor**
     **New York, NY 10016-1387**

     **Dominick Gattuso**
     **Heyman Enerio Gattuso & Hirzel LLP**
     **300 Delaware Ave., Suite 200**
     **Wilmington, DE 19801**


**SIRS:**

   **PLEASE TAKE NOTICE** that defendant, Parcop, S.r.l. d/b/a WiAutomation ("WiAutomation"), by and through its undersigned counsel Brach Eichler L.L.C., serves its Third Amended Responses to plaintiff, Rockwell Automation, Inc.'s First Set of Interrogatories.


Dated:  August 5, 2022                 YOUNG CONAWAY STARGATT &
                         TAYLOR, LLP
Of Counsel:

_Bob Kasolas_ (signature)
Bob Kasolas                        _____
BRACH EICHLER, LLC                 Pilar G. Kraman (No. 5199)
101 Eisenhower Parkway             Rodney Square
Roseland, NJ 07068                 1000 North King Street
(973) 228-5700                     Wilmington, Delaware 19801
bkasolas@bracheichler.com          (302) 571-6600

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

From 2015 to the present, identify all persons from whom you have received complaints about Rockwell Products sold, offered for sale, distributed, or advertised by you. Your response should include a description of each complaint, any responses given by WI Automation, and any actions taken by WI Automation related to each such complaint.

**RESPONSE:** Objection. This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks the identity of "all persons" whom have complained about a Rockwell product from 2015 to the present. WiAutomation further objects that this interrogatory is not adequately limited in time. Subject to and without waiving its general and specific objections, WiAutomation states that Parcop S.r.l. did not exist until 2017, and did not commence any business until 2018. Parcop S.r.l. began to sell to USA since November 2019. The only complaints that WiAutomation has received pertaining to the products that it sells are related to delivery times, over which WiAutomation has little to no control as it uses a third-party delivery service for all items that it sells. WiAutomation has had one Rockwell product returned to it.

**INTERROGATORY NO. 2:**

Identify the name and contact information for WI Automation's sources of unused Rockwell Products from 2015 to Present. To the extent the source is ebay or other online source, identify both the online source and the specific seller.

**RESPONSE:**

Objection. This interrogatory is overly broad, vague, ambiguous, unduly burdensome and not proportional to the needs of the case in that it seeks the name and contact information for each of the sources of Rockwell products that WiAutomation has sold. WiAutomation further objects that this interrogatory is not adequately limited in time. Additionally, WiAutomation objects to this interrogatory on the basis that it seeks irrelevant information that is outside the scope of discovery. WiAutomation further objects that this interrogatory improperly seeks WiAutomation's trade secrets.

Subject to and without waiving its general and specific objections, WiAutomation's sources are Rockwell authorized distributors Technology BSA S.p.A. and Sonepar Italia S.p.A. and distributor RS Components S.r.l. Furthermore, pursuant to Fed. R. Civ. P. 33(d), WiAutomation states *see* WI003327-003433.

**INTERROGATORY NO. 3:**
For each source identified in Interrogatory No. 2, provide the name of each product

obtained from that source, the quantity obtained, and price paid by WI Automation.

**RESPONSE:**

Objection. This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks each and every product obtained from each source, including the quantity obtained and price paid. WiAutomation further objects that this interrogatory is not adequately limited in time. Additionally, WiAutomation objects to this interrogatory on the basis that it seeks irrelevant information that is outside the scope of discovery. WiAutomation further objects that this interrogatory improperly seeks WiAutomation's trade secrets. Subject to and without waiving its general and specific objections, WiAutomation states that the following products have been obtained from the sources identified in Interrogatory No. 2:

- RCK1783-LMS5 Euro 300,00 + 22% tax
- RCK1783-US16T Euro 359,10 + 22% tax
- RCK22BE1P7N104   Euro 269,90 + 22% tax
- RCK1761-CBL-PM02 Euro 39,61 + 22% tax
- RCK25-RF033-DL Euro 89,70 + 22% tax
- RCK1783-US8T Euro 121,60
- RCK25-COMM-E2P Euro 146,73 + 22% tax
- RCK1734-AENTR Euro 307,00 + 22% tax
- RCK1734-IB8S Euro 243,00 + 22% tax
- RCK25CE3P0N104 Euro 643,25
- RCK1783-LMS8 Euro 529,10+ 22% tax
- RCK22-HIM-C2S Euro 150,23 + 22% tax
- RCK2711-CBL-PM05 Euro 144,10
- RCK2080-USBADAPTER Euro 22,00 + 22% tax
- RCK2080-LC10-12QBB Euro 64,80 + 22% tax
- RCK2080-TC2 Euro 86,30 + 22% tax
- RCK5069-IB8S Euro 411,40
- RCK1783-LMS8  Euro 529,10 + 22% tax
- RCK22BE1P7N104 Euro 415,00 + 22% tax
- RCK2198-DBR40-F Euro 298,10 + 22% tax
- RCK1783-LMS5 Euro 330,00 + 22% tax
- RCK5069-L306ERS2 Euro 969,10 + 22% tax

- RCK5069-IB8S Euro 411,40 + 22% tax
- RCK22-HIM-C2S Euro 150,23 + 22% tax
- RCK5069-IB8S Euro 411,40 + 22% tax
- RCK22FD4P2N103 Euro 256,11 + 22% tax
- RCK25BB017N104 Euro 622,66
- RCK22-HIM-C2S Euro 155,48 + 22% tax
- RCK5094-IB16 Euro 217,83 + 22% tax
- RCK150-TC1 Euro 24.21 + 22% tax
- RCK2198-K57CKD15M Euro 69,56 + 22% tax
- RCK5069-OBV8S Euro 544,58 + 22% tax
- RCK1734-IE4S Euro 713,11 + 22% tax
- RCK2097-V34PR3 Euro 1.201,64 + 22% tax
- RCK5069-OBV8S Euro 544,58 + 22% tax
- RCK5069-RTB6-SPRING Euro 14,53 + 22% tax
- RCK5069-IB16F Euro 207,05 + 22% tax
- RCK5069-RTB6-SPRING Euro 14,53 + 22% tax
- RCK1734-4IOL Euro 185,01 + 22% tax
- RCK5069-RTB64-SCREW Euro 23,97 + 22% tax
- RCK1734-IE4S Euro 713,11 + 22% tax
- RCK150-C3NBD Euro 245,36 + 22% tax
- RCK2080-MEMBAK-RTC2 Euro 154,27 + 22% tax
- RCK1783-US8T Euro 144,18 + 22% tax
- RCK25BA8P0N114 Euro 374,78+ 22% tax
- RCK2713PT9WD1 Euro 1.550,84+ 22% tax
- RCK104-C09EJ22 Euro 135,45+ 22% tax
- RCK2198-H008-ERS2 Euro 1.184,18+ 22% tax
- RCK22FA2P5N113 Euro 122,25 + 22% tax
- RCK5094-IB16 Euro 217,83
- RCK25BB5P0N104 Euro 358,28+ 22% tax

Furthermore, pursuant to Fed. R. Civ. P. 33(d), WiAutomation states *see* WI003327-003433. WiAutomation further states that it is incapable of ascertaining what Rockwell Products it sold from 2018-2020 as it was a small company with limited resources and the records in WiAutomation's possession are incomplete. Furthermore, many of the records that WiAutomation has in its possession do not identify the product that was purchased/sold. Thus, it is impossible toidentify the foregoing with any greater degree of specificity than already provided.**INTERROGATORY NO. 4:**

Describe any differences between Rockwell Products sold or offered for sale by WI Automation and Rockwell Products sold or offered for sale by Rockwell or Rockwell Authorized Distributors that WI Automation has disclosed to its customers, including without limitation any disclaimer WI Automation provides to its customers regarding the sale of Rockwell Products.

**RESPONSE:** Objection.  This request is overly broad, vague,  and ambiguous to the extent it seeks information pertaining to any "differences" between Rockwell Products sold by WiAutomation and Rockwell or its "authorized distributors" that it disclosed to customers. WiAutomation further objects to the extent that this interrogatory calls for a legal conclusion. Subject to and without waiving its general or specific objections, WiAutomation states that there are no "differences" between Rockwell products sold or offered for sale by WiAutomation and Rockwell products sold or offered for sale by Rockwell or Rockwell Authorized Distributors. Nevertheless, WiAutomation provides the following terms and conditions on its website, which all purchasers of Rockwell products must agree to prior to purchase:

> WiAutomation is not an official distributor or representative brands on this site. The trademarks and names on this site belong to their respective owners.  Rockwell: WiAutomation is not an authorized dealer of surpluses or affiliate of the manufacturer. Products may have older date codes or be an older series than the one available directly from the factory or authorized dealers.  Since WiAutomation is not a Rockwell authorized distributor, the original manufacturer's warranty does not apply (12-month WiAutomation Warranty applies).  Some Allen-Bradley PLC products will have the firmware already installed, WiAutomation does not guarantee whether or not a PLC product will have firmware and, if it has firmware, if the firmware is the level of revision that is necessary for its application. WiAutomation also does not warrant the ability or right to download or otherwise obtain firmware for the product from Rockwell, its distributors, or any other source. WiAutomation will not obtain or provide firmware on behalf of the customer. It is customer's obligation to comply with the terms of any End User License Agreement or similar document relating to obtaining or installing the firmware.

**INTERROGATORY NO. 5:**

From 2015 to the present, identify the product name, quantity, product condition code, date of purchase, purchase price, product source name, date of sale, sale price, customer name, and discounts applied (if any) in the sourcing or selling of each unused Rockwell product.

**RESPONSE:**

Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests the identity of any and all Rockwell Product that

WiAutomation has sold from 2015 to the present. WiAutomation further objects to the extent that this interrogatory is not adequately limited in time. Furthermore, this interrogatory seeks irrelevant information that is outside the scope of permissible discovery. Subject to and without waiving their general and specific objections, WiAutomation refers the Plaintiff to its current offerings of Rockwell products, available at us.wiautomation.com/allen-bradley. Subject to and without waiving its general and specific objections, WiAutomation States that it has sold the following items, including to Rockwell Authorized Distributors:

- On 2020.12.18 Rockwell Automation B.V. Rivium Promenade 160 NL - 1 pc. NEW B Series Allen-Bradley 1756-L63 – price paid Euro 1.570,00;

- On 2021.05.10 Lektronix a Rockwell Automation business (in Katowice - Poland) n. 1 product 6155R-NPXP Allen-Bradley – price paid Euro 2.528,14;

- 2021.12.22 RA Controls - Authorized Rockwell Distributors - n. 22 products 1734-IB8S Allen-Bradley + n. 22 products 1734-OB8S Allen-Bradley- total price paid Euro 29.739,00;

- 2022.03.02 RA Controls - n. 38 products 1734-AENTR ALLEN BRADLEY- n. 10 products 1734-IB8 ALLEN BRADLEY - n. 8 1756-EN2TR ALLEN BRADLEY - n. 2 products 1783-US8T ALLEN BRADLEY - n. 5 products 20-HIM-A6 ALLEN BRADLEY - total price paid Euro 45.840,00;

- 2021.04.01 Rockwell Automation BV Rivium Promenade 160 Netherland -n. 1 product 1756-BATM - ALLEN BRADLEY - price paid Euro 286.00

- 2021.03.21 Lektronix A Rockwell Automation business - n. 2 products 1734-AENT (serie C) - price paid Euro 480,00

- 2021.04.14 Rockwell Automation B.V. prodotto 6155R-NPXP Allen-Bradley importo Euro 2.621,00

- 2022.04.01 RAControls - 1756-EN2TR Allen-Bradley - price paid Euro 6.416,00;

- **INVOICE n. 1866/E** - date 2021.05.10 - customer Lektronix a Rockwell Automation business (in Katowice - Poland) - product 6155R-NPXP Allen-Bradley – quantity n. 1 - purchase price Euro approximately 2.100,00; sale price Euro 2.427,96 -

- **INVOICE n. 2738/01** - date 2022.04.01 - customer RAControls - product 1756-EN2TR Allen-Bradley - quantity n. 2 - purchase price

for n. 1 product approximately Euro 2.800,00 - sale price for n. 1 product Euro 3.200,00 - total price for n. 2 products Euro 6.416,00

- **INVOICE n. 12327/01** - date 2021.12.22 - customer RA Controls - Authorized Rockwell Distributor:

  o   n. 22 products 1734-IB8S Allen-Bradley - purchase price for n. 1 product EUro 580,00 - sale price for 1 product Euro 650,00 - total sale price for 22 products Euro 14.300,00

  o   n. 22 products 1734-OB8S Allen-Bradley- purchase price for n. 1 product Euro 620,00 - sale price for n. 1 product Euro 700,00 - total sale price for n. 22 product  Euro 15.400,00;

- **INVOICE n. 1703** - date 2022.03.02 - customer RA Controls:

  o   n. 38 products 1734-AENTR ALLEN BRADLEY- purchase price for n. 1 product  approximately Euro 400,00 - sale price for n. 1 product Euro 470,00 - totale sale price for n. 38 products Euro 17.860,00;

  o   n. 10 products 1734-IB8 ALLEN BRADLEY - purchase price for n. 1 product approximately Euro 60,00 - sale price for n. 1 product Euro 60,00 - total sale price fo n. 10 products Euro 600,00;

  o   n. 8 1756-EN2TR ALLEN BRADLEY - purchase price for n. 1 product Euro 2.827,00 - sale price for n. 1 product Euro 3.200,00 - total price for n. 8 products Euro 25.600,00;

  o   n. 2 products 1783-US8T ALLEN BRADLEY  - purchase price for n. 1 product Euro 200,00 - sale price for n. 1 product Euro 220,00 - total price for n. 2 products Euro 440,00;

  o   n. 5 products  20-HIM-A6 ALLEN BRADLEY - purchase price for n. 1 product approximately Euro 225,00 - sale price for n. 1 product Euro 225,00 - sale price for n. 1 product Euro 250,00 - total sale price for n. 5 products Euro 1.250,00

- **INVOICE** n. 1178 - date 2021.04.01 - customer Rockwell Automation BV Rivium Promenade 160 Netherland

  o n. 1 product  1756-BATM - ALLEN BRADLEY - purchase price approximately Euro 250,00 - sale price Euro 270.00


- **SALE** to customer Rockwell Automation B.V. Rivium Promenade 160 NL - date 2020.12.18

  o n. 1 pc. NEW B Series Allen-Bradley 1756-L63 – purchase price for n. 1 product  approximately euro 1.400,00 sale price Euro 1.570,00;

- **SALE** to customer Lektronix A Rockwell Automation business - date 2021.03.21

  o n. 2 products 1734-AENT (serie C) - purchase price for n. 1 product euro 205,00; sale price for n. 1 product Euro 230,00; total sale price for n. 2 products Euro 460,00


- **SALE** to customer Rockwell Automation B.V. - date 2021.04.14

  o n. 1 product 6155R-NPXP Allen-Bradley - quantity n. 1 - purchase price approximately Euro 2.100,00; sale price Euro 2.560,00;

WiAutomation further states that it is incapable of ascertaining what Rockwell Products it sold from 2018-2020 as it was a small company with limited resources and the records in WiAutomation's possession are incomplete. Furthermore, many of the records that WiAutomation has in its possession do not identify the product that was purchased/sold.  Thus, it is impossible to identify the foregoing with any greater degree of specificity than already provided.

**INTERROGATORY NO. 6:**

Identify the gross revenue, costs, expenses and profits of WI Automation on a quarterly

basis from 2015 to present.

**RESPONSE:**

Objection.  This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it requires Defendants to identify WiAutomation's

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-CFC |
| | ) | |
| PARCORP S.R.L. d/b/a WI AUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**WIAUTOMATION'S RESPONSES AND OBJECTIONS TO ROCKWELL'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS AND REQUESTS FOR INSPECTION**

Defendant, Parcorp, S.rl. d/b/a WiAutomation ("WiAutomation") by and through its undersigned counsel, serves responses to Plaintiff's Rockwell Automation, Inc.'s ("Rockwell") First Set of Requests for Production of Documents and Things and Requests for Inspection ("Document Demands").

**PRELIMINARY STATEMENT**

WiAutomation provides these responses to these Document Demands without waiving or intending to waive, and expressly preserving:

1.      All questions as to competency, relevancy, materiality, privilege and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further preceding in this action (including the trial of this action) and in any other action;

2.      The right to object to the use of any such responses, or the subject matter thereof, on any ground in any further preceding of this action (including the trial of this action) and in any other action;

**RESPONSE:** Objection.  This request is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "all documents and things" regarding "any of the allegations" at issue in this lawsuit.  Furthermore, Defendant objects to this request to the extent that it calls for legal conclusions.

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 4:**

All documents and things related to any of the defenses raised in Defendant's Amended

Answer.

**RESPONSE:** Objection.  This request is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "all documents and things related to any of the defenses" at issue in this lawsuit.  Furthermore, Defendant objects to this request to the extent that it calls for legal conclusions.

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 5:**

All documents and things, whether or not specifically requested to be identified, that

were consulted, reviewed, relied upon for, and/or otherwise relate to Your response to each

interrogatory served or to be served on You in this lawsuit.

**RESPONSE:** Objection.  This request is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "all documents and things" regarding "any of the allegations" at issue in this lawsuit.  Furthermore, Defendant objects to this request to the extent that it calls for information protected by the attorney-client privilege and/or work product protection.

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 6:**

Purchase orders, invoices, databases, and other documents sufficient to show the specific

products purchased, quantities, sellers, and purchase prices for all unused Rockwell Products

sourced, purchased or acquired by You.

**RESPONSE:** Objection.   This request is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "purchase orders, invoices, databases, and other documents" "sufficient to show" each and every particular Rockwell product that Defendants have sold.  Furthermore, Defendants object to the extent that the term "databases" is vague, ambiguous, undefined, and overly broad.

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 7:**

Documents sufficient to identify the persons from whom You sourced, purchased or

acquired unused Rockwell Products.

**RESPONSE:** Objection.   This request is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks documents "sufficient to show" the identity of "persons" from whom WiAutomation acquired "unused" Rockwell products.

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 8:**

All documents or communications by You or anyone acting on Your behalf with

Rockwell or any Rockwell authorized distributor regarding the marketing, advertising, sourcing,

offer for sale or sale of unused Rockwell Products.

**RESPONSE:** Objection. This request is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks "all documents or communications" between WiAutomation and Rockwell or "any Rockwell authorized distributor." Furthermore, Defendants object to the extent that the term "authorized distributor" is vague, ambiguous, and undefined.

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 9:**

All documents containing, recording, memorializing or otherwise reflecting any

**REQUEST FOR PRODUCTION NO. 14:**

Documents sufficient to show the price paid by You to purchase each unused Rockwell

Product bought by You or on Your behalf and the price charged by You in the resale of each such

unused Rockwell Product.

**RESPONSE:** Objection.  This request is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks "documents sufficient to show" the price paid and sold for each and every Rockwell product that WiAutomation has sold.  This request far exceeds the scope of permissible discovery and is, instead, merely a fishing expedition into WiAutomation's financials.

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to show projections, forecasts, market share reports, marketing

acceptance documents, business plans, financial plans, strategic plans, fiscal plans, marketing

strategies and plans, sales and strategies and plans, and advertising strategies and plans regarding

unused Rockwell Products.

**RESPONSE:** Objection.  This request is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it seeks "documents sufficient to show" each of the following "projections," "forecasts," "market share reports," "Marketing acceptance documents, business plans, financial plans, strategic plans, fiscal plans, marketing strategies and plans, sales and strategies and plans, and advertising strategies and plans" regarding Rockwell Products.  This request far exceeds the scope of permissible discovery and is, instead, merely a fishing expedition into WiAutomation's financials.

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case.

BE:12466328.1/PAR348-280966

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case, if any.

**REQUEST FOR PRODUCTION NO. 25:**

All agreements to which You are a party reflecting Your status as a distributor for any

product manufacturer, or any person's status as a distributor for You.

**RESPONSE:** Objection.  This request is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks "all agreements" to which WiAutomation is a party that reflect WiAutomation's status as a distributor, without limitation, for *any* product manufacturer.  Defendants further object to the extent that this seeks irrelevant information in that this has no bearing on the claims or defenses at issue.

Subject to, and without waiving, the general objections, and these specific objections, Defendant will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case, if any.

**REQUEST FOR PRODUCTION NO. 26:**

All documents regarding Your knowledge, discussion, analysis, opinions, and/or review

as to whether You should, or are permitted to, offer Rockwell Products for sale.

**RESPONSE:**  Objection.  This request is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks "all documents" regarding WiAutomation's "knowledge, discussion, analysis, opinions, and/or review" as to whether WiAutomation "should" or are "permitted" to sell Rockwell Products. Furthermore, this request seeks information protected by the attorney-client privilege.

**REQUEST FOR PRODUCTION NO. 27:**

All communications with any person who distributes unused Rockwell Products.

**RESPONSE:**  Objection.  This request is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks "all communications" with "any person" who "distributes" unused Rockwell Products.

Subject to, and without waiving, the general objections, and these specific objections, Defendants will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case, if any.

**REQUEST FOR PRODUCTION NO. 28:**

Documents sufficient to show Your organizational structure, including without limitation all organizational charts, Your articles of incorporation and operating agreements, and documents sufficient to identify Your officers, directors, board members, owners, and/or shareholders.

**RESPONSE:** Objection. This request is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks "documents sufficient to show" WiAutomation's "organizational structure." Furthermore, the categories of information sought are irrelevant to the claims and defenses at issue. WiAutomation's corporate structure, its officers and directors, and articles of incorporation, for example, have no bearing on whether or not WiAutomation engaged in the conduct alleged in the Complaint.

Subject to, and without waiving, the general objections, and these specific objections, Defendants will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case, if any.

**REQUEST FOR PRODUCTION NO. 29:**

All documents sufficient to identify all personal or private email addresses and/or other communication channels used in connection with You purchasing or selling Rockwell Products.

**RESPONSE:** Objection. This request is overly broad seeks irrelevant information to the case at hand. Furthermore, this request is overly broad and unduly burdensome in that it seeks "all documents" sufficient to identify "all personal or private email addresses and/or other communication channels" used in connection with purchasing and selling Rockwell Products.

Subject to, and without waiving, the general objections, and these specific objections, Defendants will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case, if any.

BE:12466328.1/PAR348-280966

Subject to, and without waiving, the general objections, and these specific objections, Defendants will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case, if any.

**REQUEST FOR PRODUCTION NO. 81:**

Documents sufficient to show Your policies or procedure for manufacturing, remanufacturing, refurbishing, restoring, reconditioning, repairing, certifying or testing Rockwell Products.

**RESPONSE:** Objection**.** This request is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it seeks "documents sufficient to show" WiAutomation's "policies and procedures" for making any physical alteration or testing for any of the products at issue.  Defendant further objects to the extent this request is not limited in scope or in time.

Subject to, and without waiving, the general objections, and these specific objections, Defendants will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case, if any.

**REQUEST FOR PRODUCTION NO. 82:**

All communications with sources of Rockwell Products about how those sources obtain those products, discounts, or what resale restrictions the source faces from Rockwell or a Rockwell Authorized Distributor.

**RESPONSE:** Objection**.** This request is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it seeks "all communications" with third-parties about how those third-parties obtain Rockwell Products. Defendant further objects to the extent this request is not limited in time.

Subject to, and without waiving, the general objections, and these specific objections, Defendants will produce non-privileged documents responsive to this request in their possession, custody and/or control to the extent proportional to the needs of the case, if any.

**REQUEST FOR PRODUCTION NO. 83:**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 21-1238-CFC |
| ) | |
| PARCORP S.R.L. d/b/a WI AUTOMATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**WIAUTOMATION'S RESPONSES AND OBJECTIONS TO ROCKWELL'S
SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
AND THINGS AND REQUESTS FOR INSPECTION**

Defendant, Parcorp, S.rl. d/b/a WiAutomation ("WiAutomation") by and through its undersigned counsel, serves responses to Plaintiff's Rockwell Automation, Inc.'s ("Rockwell") Second Set of Requests for Production of Documents and Things and Requests for Inspection ("Document Demands").

**PRELIMINARY STATEMENT**

WiAutomation provides these responses to these Document Demands without waiving or intending to waive, and expressly preserving:

1.      All questions as to competency, relevancy, materiality, privilege and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further preceding in this action (including the trial of this action) and in any other action;

2.      The right to object to the use of any such responses, or the subject matter thereof, on any ground in any further preceding of this action (including the trial of this action) and in any other action;

Highly Confidential

**REQUEST FOR PRODUCTION NO. 88:**

All Documents submitted to or filed with any governmental or juristic body, agency or department anywhere in the world regarding Rockwell Products that You sold to a U.S. customer, shipped to a customer in the U.S., purchased for the purpose of fulfilling an order from a U.S. customer or purchased for the purpose of fulfilling an order to be shipped to a customer in the U.S.

**RESPONSE:** Objection.  Defendant objects to this request as overly broad, unduly burdensome, vague, ambiguous, and disproportional to the needs of the case in that it seeks "All Documents" pertaining to orders of Rockwell products anywhere in the world.  Defendant further objects to this request as vague, ambiguous, and confusing as to exactly what category of documents Plaintiff seeks.  Defendant further objects to the extent this request seeks irrelevant information that is outside the scope of permissible discovery.  Subject to and without waiving its objections, Defendant will produce what relevant, non-privileged documents it has in its possession, proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 89:**

All documents and things seized from You in connection with any legal action anywhere in the world against You regarding Rockwell Products that You sold to a U.S. customer, shipped to a customer in the U.S., purchased for the purpose of fulfilling an order from a U.S. customer or purchased for the purpose of fulfilling an order to be shipped to a customer in the U.S.

**RESPONSE:**  Objection.  Defendant objects to this request as overly broad, unduly burdensome, vague, ambiguous, and disproportional to the needs of the case in that it seeks "All Documents" pertaining any "legal action" anywhere in the world.  Defendant further objects to this request as vague, ambiguous, and confusing as to exactly what category of documents

Highly Confidential

# Exhibit 3

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4  ROCKWELL AUTOMATION, INC.,    )
                               )

5             Plaintiff,    )No.21-1238
                             )-CFC-GBW-JLH

6           vs.           )
                             )

7  PARCOP S.R.L., d/b/a       )
  WIAUTOMATION,               )

8                          )
             Defendant.    )

9  ----------------------------

10

11

12

13       REMOTE VIDEOTAPED DEPOSITION OF

14            FULVIO COPPOLA

15

16       Wednesday, December 21, 2022

17

18

19

20

21

22

23  Reported by:
  LISA M. MURACO
24  JOB NO. 220088

25

Page 2

```
 1
 2                    Wednesday, December 21, 2022
 3                    8:00 a.m., Eastern
 4                    2:00 p.m., Central European
 5
 6         REMOTE Deposition of FULVIO COPPOLA,
 7    held VIA ZOOM, before LISA M. MURACO, a
 8    Notary Public of the State of New York and
 9    Florida.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1    A P P E A R A N C E S:
 2    (REMOTE)
 3
 4
 5         ALSTON & BIRD LLP
 6         Attorneys for Plaintiff
 7              90 Park Avenue
 8              New York, NY 10016
 9         BY:   NEAL McLAUGHLIN, ESQ.
10
11
12         BRACH EICHLER, LLC
13         Attorneys for Defendant
14              101 Eisenhower Parkway
15              Roseland, NJ 07068
16         BY:   BOB KASOLAS, ESQ.
17              ERIC ALVAREZ, ESQ.
18
19    ALSO PRESENT:
20    Italian Interpreter, Rosanna Giliberti
21    Legal Video Specialist, Brian Hood
22    Rockwell Automation, John Miller
23
24
25
```

Page 4

```
 1         THE VIDEOGRAPHER:  Good afternoon
 2    and good morning, Counselors.  My name is
 3    Brian Hood and I'm the legal videographer
 4    in association with TSG Reporting
 5    Incorporated.  Because this is a remote
 6    deposition, I will not be in the same room
 7    with the witness.  Instead, I will record
 8    this video-taped deposition remotely.
 9         The reporter, Lisa Muraco, also will
10    not be in the same room and will swear the
11    witness in remotely.
12         Do all parties stipulate to the
13    validity of this video recording and remote
14    swearing and that it will be admissible in
15    the courtroom as if it had been taken
16    following Rule 30 of the Federal Rules of
17    Civil Procedures and the State's rules
18    where this case is pending?
19         MR. McLAUGHLIN:  On behalf of
20    Rockwell Automation, yes.
21         MR. KASOLAS:  On behalf of Bob
22    Kasolas, yes.
23         THE VIDEOGRAPHER:  Thank you.
24         This marks the beginning of recorded
25    video label number 1 of the remote video
```

Page 5

```
 1    deposition of Fulvio Coppola in the matter
 2    Rockwell Automation Incorporated versus
 3    Parcop SRL doing business as WiAutomation
 4    entered in the United States District Court
 5    for the District of Delaware, Case
 6    No. 21-1238-GBW-JLH.
 7         Today's date is December the 21st,
 8    2022, and the time is approximately
 9    2:09 p.m., Central European time.
10         Again, my name is Brian Hood and I'm
11    the legal videographer from TSG Reporting
12    Incorporated, headquartered at 228
13    East 45th Street, Suite 810, New York, New
14    York 10017.
15         The court reporter is Lisa Muraco,
16    also in association with TSG Reporting.
17         Will counsel please introduce
18    yourselves for the record.
19         MR. McLAUGHLIN:  This is Neal
20    McLaughlin on behalf of the Rockwell
21    Automation.
22         MR. KASOLAS:  Good morning.  This is
23    Bob Kasolas with the law firm Brach Eichler
24    LLC on behalf of the defendant, Parcop SRL,
25    doing business as WiAutomation.
```

1          MR. KASOLAS:  Objection to form.
2     A.     Only used ones have the broken
3  label.  And only when the client asks for a
4  used product.
5     Q.     How does WiAutomation determine
6  whether a product is used or new opened?
7     A.     We don't sell new open products.  So
8  I don't buy them.
9     Q.     So is it accurate that the only two
10  conditions of Rockwell Automation products that
11  you sell are new and used?
12     A.     That I recall, yes.
13     Q.     And is it your testimony that all of
14  the new products, Rockwell Automation products,
15  that WiAutomation sells have intact original
16  factory seals?
17     A.     Yes.
18     Q.     When you receive -- sorry.  Strike
19  that.
20          Are there different ways that
21  WiAutomation can receive and order for a
22  product from a customer?
23     A.     Yes.  Directly from the website.  Or
24  can call us or can send us an e-mail.
25     Q.     Are there any other ways that you

1  receive orders from customers?
2     A.     No.
3     Q.     What proportion of your orders of
4  Rockwell Automation come directly from the
5  website?
6     A.     I do not know.  I would need to
7  check.
8     Q.     What would you need to check?
9     A.     I would need to go to look at
10  e-mails to see the orders and calculate which
11  are the ones from Rockwell.
12     Q.     What e-mails are you describing?
13     A.     Info@wiautomation.com.
14     Q.     When a customer orders a Rockwell
15  Automation product directly from your website,
16  does an e-mail get generated that gets sent to
17  that e-mail address?
18     A.     On the e-mail info@wiautomtion.com,
19  an e-mail is generated.
20     Q.     Are orders received from customers
21  directly from the website recorded in any other
22  place other than that e-mail that gets
23  generated?
24     A.     No.
25     Q.     So if you lose access to your e-mail

1  account, is there any way to determine what
2  orders you received?
3     A.     No.
4     Q.     There's no spreadsheet that you have
5  that tracks orders?
6     A.     No.
7     Q.     If you log onto a dashboard for your
8  website, there's no place there that you can
9  see that -- orders that you have received
10  through the website?
11     A.     No.  The orders come -- arrive on
12  the e-mail.
13     Q.     Do the e-mails that you receive that
14  are automatically generated from your website,
15  have any specific wording in the subject line
16  that lets you know that they came from a
17  website order?
18     A.     Yes.  Yes -- yes.  Yes.  There is
19  a -- an alphanumeric reference on the subject
20  line.
21     Q.     What is the alphanumeric reference?
22     A.     The alphanumeric reference is a mix
23  of letters and numbers.
24     Q.     Is there a unique reference for
25  every order?

1     A.     That I know, yes.
2     Q.     Do you have a way to search all of
3  the e-mails that you've received that have been
4  automatically generated from website orders?
5     A.     I don't know.  No, I don't know.  I
6  would need to ask Porfirio, and again, I'm not
7  an informatics technician.  I don't know.
8     Q.     In the e-mails that are
9  automatically generated from website orders,
10  does it include an identification of the
11  products that are ordered?
12     A.     Yes.  There is the code of the
13  product.
14     Q.     Does the automatically generated
15  e-mail contain a reference to the brand name of
16  the products that are ordered?
17     A.     Not that I remember.
18     Q.     What information is contained in the
19  automatically generated e-mails that identifies
20  the products that are ordered?
21     A.     The product code -- the products'
22  codes, the quantity, and the clients
23  information.
24     Q.     What do you mean by the product
25  code?

1    A.    The I.D. code of the product, to
2  identify the product.
3    Q.    So I'm going to share my screen
4  again, and I'll show what has been marked as
5  Exhibit 5.
6         Are you talking about this SKU
7  number?
8    A.    No.  So no.  I'm talking about the
9  code that you read to me before, the complete
10 code, 1756-L73.
11   Q.    Would it also include Allen-Bradley
12 for this particular product?
13   A.    I don't remember exactly, but I
14 don't think so.
15   Q.    But the automatically generated
16 e-mail that you would receive from this website
17 would include 1756-L73?
18   A.    Yes.
19   Q.    So if you wanted to, you could
20 search your e-mail to see how many
21 automatically generated e-mails you have with
22 item codes that match, for example, 1756;
23 right?
24         MR. KASOLAS:  Objection to form.
25   A.    No.  I would need to check each

1  e-mail one by one.
2    Q.    But you could search the e-mails for
3  the item codes that we're interested in; right?
4    A.    No.  No, I can search by subjects of
5  the e-mail.
6    Q.    Does WiAutomation have the
7  capability to search the contents of e-mails
8  for text strings?
9    A.    I do not know, because I'm not an
10 informatics technician.
11   Q.    These automatically generated
12 e-mails, you said that they have customer
13 information; right?
14   A.    Yes.
15   Q.    What types of customer information
16 is contained on these e-mails?
17   A.    Name of the company and address.
18   Q.    When WiAutomation sells Rockwell
19 Automation products to customers in the United
20 States, do those customers pay for shipping?
21   A.    Of course.
22   Q.    What is the proportion of sales of
23 Rockwell Automation products by WiAutomation
24 that happen over the phone?
25         MR. KASOLAS:  Objection to form.

1    A.    I do not know.
2    Q.    What would you have to do to find
3  out the answer?
4    A.    I might ask -- I might need to ask
5  the employees, the girls, the people who talk
6  to the clients over the phone.  But even then,
7  how can they remember the number of products
8  that they sold to the customers.
9    Q.    When WiAutomation receives an order
10 from a customer over the phone, how is that
11 order recorded?
12   A.    We ask -- we ask information by
13 phone from the client.
14   Q.    Does that information that you
15 receive from the client get written down?
16   A.    Yes.
17   Q.    Where does that information get
18 written down?
19   A.    On a page -- on a piece of paper.
20   Q.    Does WiAutomation retain records of
21 those pieces of paper where order information
22 is being recorded?
23   A.    No.  There is no need.  We save the
24 invoices.
25   Q.    What are these invoices that you are

1  describing?
2    A.    What do you --
3         (Multiple speakers.)
4    A.    I'm not understanding the question.
5  You are asking what an invoice is.  It's
6  something by law each company has to do -- each
7  company needs to do that.  But is this the
8  question?  What is the question?
9    Q.    So we have this piece of paper that
10 your phone -- sorry.  Strike that.
11        We have this piece of paper where a
12 customer's phone orders is written down.
13        How does the information on that
14 piece of paper get transferred to an invoice?
15   A.    When -- once the client places the
16 order -- once the client pays for the order,
17 the information is sent to the administration
18 department and the administration department
19 puts the information -- transfers the
20 information on an invoice.
21   Q.    What department is responsible for
22 answering phone calls for orders?
23   A.    Customer care.
24   Q.    How many people work in the customer
25 care department?

Page 82

1      A.      For sure some months ago.
2      Q.      So in the time period of those some
3  months, is it accurate that WiAutomation has
4  not had a source of new Rockwell Automation
5  products?
6              MR. KASOLAS:  Objection to form.
7      A.      Yes, I mentioned that before.
8      Q.      So aside from what Rockwell
9  Automation products you have in the warehouse
10  downstairs, you have no other source of new
11  Rockwell Automation products today; correct?
12      A.      Yes.  And I'm trying to ask them,
13  but I'm not receiving an answer.
14      Q.      So on your website when you are
15  adding together the inventory numbers from your
16  warehouse and the warehouse of your four
17  sources, that's not really an accurate
18  representation of how many Rockwell Automation
19  products you have in stock or available, is it?
20      A.      Well, I -- no, because I have not
21  the certainty that the suppliers have those
22  products available.  They never replied.  They
23  never let me know if and why they are not
24  willing to work with me again.
25      Q.      How much more time needs to pass

Page 83

1  before you update your website to reflect
2  accurately the inventory numbers in your
3  warehouse?
4      A.      I don't know.  It depends.  Porfirio
5  is the only one who update the website.  It
6  depends on Porfirio.
7      Q.      At what point will WiAutomation
8  update its website to become accurate?
9              MR. KASOLAS:  Objection to form.
10      A.      Well, we would need an answer from
11  the suppliers.  So until the suppliers reply
12  with an answer, and then Porfirio would need to
13  work on that.
14      Q.      We've already established that
15  WiAutomation has one warehouse, not four;
16  right?
17      A.      Yes.
18      Q.      When will that be updated on the
19  website?
20      A.      It depends on Porfirio.
21      Q.      And we've established that
22  WiAutomation has a physical presence in only
23  one country; right?
24      A.      Yes, physically, yes.
25      Q.      When will that be updated on the

Page 84

1  website?
2      A.      I don't know.  It depends on
3  Porfirio.
4      Q.      And we've established that
5  WiAutomation has no capability to repair any
6  products; right?
7              MR. KASOLAS:  Objection to form.
8      A.      We cooperate with third parties,
9  like I said before.
10      Q.      When will WiAutomation's inability
11  to repair products itself be updated on the
12  website?
13              MR. KASOLAS:  Objection to form.
14      A.      I don't think this is needed because
15  we use other -- we use third parties for
16  repairs.
17      Q.      So if a customer comes to your
18  website, you don't think it matters to them
19  whether the services you're advertising
20  come from you or somebody else?
21              MR. KASOLAS:  Objection to form.
22      A.      I think that the -- I think that the
23  result is what matters, so important that the
24  product is repaired.
25      Q.      Okay.

Page 85

1              MR. McLAUGHLIN:  I think we're at a
2  good time to take a little bit longer break
3  to get something to eat.  So we can go off
4  the record and discuss how long that should
5  be.
6              THE VIDEOGRAPHER:  The time is
7  5:46 p.m., and we are off the record.
8              (Recess is taken.)
9              THE VIDEOGRAPHER:  This is the start
10  of media labeled Number 4.  The time is
11  6:36 p.m., Central European time, and we
12  are back on the record.
13  BY MR. McLAUGHLIN:
14      Q.      Mr. Coppola, did you speak with
15  anyone during the break?
16      A.      I made a phone call home.
17      Q.      Did you speak with Luca or Porfirio
18  during the break?
19      A.      No.
20      Q.      Are they still in the room with you?
21      A.      Yes.
22      Q.      Is there anyone else in the room
23  with you?
24      A.      No.
25      Q.      When you make a decision to purchase

Page 86

1   a product from RS Components, do you always do
2   it via their website?
3        A.    Yes.
4        Q.    And the full price that's shown on
5   RS Components' website, is that always the
6   price that WiAutomation pays?
7        A.    Not all the time.
8        Q.    When is the full price not the price
9   that you pay to RS Components for Rockwell
10  Automation products?
11       A.    I don't remember exactly for which
12  product, but we have some discounts.
13       Q.    WiAutomation has discounts with
14  RS Components; is that right?
15       A.    Yes.
16       Q.    Was that a result of a negotiation
17  between you and RS Components?
18       A.    Yes.
19       Q.    Who at RS Components granted you
20  your discounts?
21       A.    I don't remember the name exactly.
22  But the person came -- sometime ago came to --
23  the person -- the person came to our offices
24  and told us that we could get some discounts.
25       Q.    Is there a discount code that you

Page 87

1   need to apply on their website?
2        A.    No.  No.  Basically, when I log
3   in -- when I do the login through the
4   account -- with the account, the prices show
5   already with discount -- with the discount.
6        Q.    How much is WiAutomation's discount
7   from RS Components?
8        A.    Like I said, I don't remember
9   exactly because it depends on the products.
10       Q.    Did WiAutomation have to provide any
11  information to RS Components in order to obtain
12  the discount?
13       A.    No.  Basically, I think that they
14  saw our purchases and they gave us a discount
15  so that we can purchase more -- to make us
16  purchase more.
17       Q.    When the person from RS Components
18  visited your office, did you invite him?
19       A.    I honestly do not remember this
20  detail.
21       Q.    When did the person from
22  RS Components visit your office?
23       A.    About, I think, two years ago.
24       Q.    So this would have been at your old
25  offices at the old address?

Page 88

1        A.    Yes, at the old office the one on --
2   one second.  Yes.  The office in Via Le Croci,
3   and it is spelled V as Victor, I, A, space,
4   L-E, space, C-R-O-C-I.
5        Q.    How long was that meeting?
6        A.    I don't remember exactly.  I believe
7   around one quarter of an hour.  Half hour.
8   More or less, this is the time.
9        Q.    Who was at that meeting?
10       A.    I was at the meeting and Emanuel was
11  at the meeting.
12       Q.    If you wanted to figure out the name
13  of the person that you met with, would it be in
14  your e-mail records?
15       A.    I don't remember exactly.  It might
16  be also that he called.
17       Q.    Is there any way that you have today
18  of finding out who it was from RS Components
19  that you met with?
20       A.    I could try to call RS.
21       Q.    Was the person that visited your
22  offices from RS Components from an Italian
23  office of RS Components?
24            MR. KASOLAS:  Objection to form.
25       A.    The person was, for sure, Italian.

Page 89

1   I don't know if the person works -- worked for
2   an Italian office or not.
3        Q.    What did you discuss?
4        A.    So he basically told me that he saw
5   that the purchases that we had made.  He
6   brought a catalog with all the products, all
7   the line of products that they were offering.
8            So he showed -- he showed all of the
9   products that -- the line of products that they
10  had.  And I told them in order for us to
11  purchase these products, can we have a
12  discount, and he said that it would have been
13  possible.
14       Q.    And the product lines that
15  RS Components offered to you at the time
16  included Allen-Bradley?
17       A.    I don't remember exactly if on the
18  catalog there were products -- Allen-Bradley
19  products, but I think, yes.
20       Q.    And the discount that you were able
21  to get from RS Components is effective on
22  Rockwell Automation products?
23       A.    Yes, I believe so.
24       Q.    But you don't know the amount of the
25  discount; right?

1      A.     No, I do not remember the exact
2  percentage.
3      Q.     When you purchase a product from
4  RS Components do they issue you an invoice?
5      A.     Yes.
6      Q.     On that invoice, is the amount of
7  your discount listed?
8      A.     I don't know --
9             (Multiple speakers.)
10     A.     I don't know.  I can check.  I don't
11 remember exactly this thing.  I don't think so.
12     Q.     How much Rockwell Automation product
13 has WiAutomation purchased from RS Components?
14     A.     I would need to -- I would need to
15 look at the invoices.  I would not know the
16 information to give.  I gave all of the
17 invoices that I found -- all of the RS invoices
18 that I have found.
19     Q.     Who did you give them to?
20     A.     I give them to the attorneys.
21     Q.     When did WiAutomation first start
22 purchasing Rockwell Automation products from
23 RS Components?
24            MR. KASOLAS:  Objection to form.
25     A.     I don't remember exactly.

1      Q.     Was it before 2021?
2      A.     I don't remember exactly.
3      Q.     What would you need to do to find
4  out the answer?
5      A.     Check the invoices.
6      Q.     So you have invoices going back from
7  the beginning of when you started purchasing
8  Rockwell Automation products from
9  RS Components?
10     A.     I believe, yes.
11     Q.     So everything that you have in terms
12 of invoices from RS Components you've produced
13 to us in this case?
14     A.     Yes.
15     Q.     So if those invoices totaled less
16 than 25,000 euros, you don't have any more
17 invoices in your records to show what you
18 purchased from RS Components?
19            MR. KASOLAS:  Objection to form.
20     A.     I do not know.  I gave everything
21 that I found.
22     Q.     There's no other places that you
23 could look to go and find more invoices from
24 RS Components?
25            MR. KASOLAS:  Objection to form.

1      A.     No.
2      Q.     Are you -- does WiAutomation
3  purchase products from RS Components other than
4  Rockwell Automation products?
5      A.     Yes.
6      Q.     From RS Components invoices are you
7  able to tell how much products that you
8  purchased from them are Rockwell Automation
9  versus other manufacturers?
10            MR. KASOLAS:  Objection to form.
11     A.     I would need to check again the
12 invoices.
13     Q.     In connection with this case, did
14 you ever review invoices from your sources to
15 determine how much Rockwell Automation products
16 WiAutomation has purchased?
17     A.     Yes.
18     Q.     When you reviewed invoices from
19 WiAutomation, how many Rockwell Automation
20 products has WiAutomation purchased from
21 RS Components?
22     A.     I do not know exactly.
23     Q.     Is there a point in time that you
24 knew the number?
25     A.     No.  I did not do a calculation, so

1  I don't know.
2      Q.     Did you do anything to prepare for
3  today's deposition to be able to provide that
4  number?
5      A.     No.
6      Q.     Of the products that WiAutomation
7  purchased from RS Components, are you able to
8  give any sort of proportion for how many of
9  those products were Rockwell Automation
10 products?
11     A.     No.
12     Q.     You wouldn't be able to tell me if
13 it's more than half?
14     A.     More than half of what?
15     Q.     Are you able to say that more than
16 half of the products that you purchased from
17 RS Components were Allen-Bradley products?
18     A.     You would have to look at the
19 invoices to be able to do that.
20            MR. KASOLAS:  Objection to form.
21     A.     Yes, I would say, yes.
22     Q.     But you haven't done that?
23     A.     I checked -- I checked some RS
24 invoices, but on our RS invoices the product --
25 the product code is not always listed.  It's

1  not always present.  That's why it's difficult
2  for me to check.
3      Q.    Has WiAutomation maintained any
4  records, on its side, of products that it
5  purchases?
6          MR. KASOLAS:  Objection to form.
7          THE INTERPRETER:  I'm sorry.  This
8      is Rosanna.  If you could repeat, I kind of
9      heard more than one voice at once.
10  BY MR. McLAUGHLIN:
11      Q.    The question is does WiAutomation
12  maintain any records, on its side, of the
13  products that it purchases?
14          THE INTERPRETER:  On its site or
15      side, D or T?
16          MR. McLAUGHLIN:  D.
17          THE INTERPRETER:  Thank you.
18      A.    There are invoices and e-mails of
19  these products.
20      Q.    What e-mails do you have with
21  RS Components regarding the products that you
22  purchase?
23      A.    The automatic e-mails that their
24  site generates, just like our site.
25      Q.    Do the automatic e-mails that

1  RS Components sends to WiAutomation include
2  information identifying the products that you
3  are purchasing?
4      A.    I would need to check.  I don't
5  remember now.
6      Q.    Does WiAutomation issue purchase
7  orders?
8      A.    No.  Like I said before, the
9  purchase is directly from the RS site.
10      Q.    Other than the e-mails that you
11  receive from RS Components, is there any other
12  way that you track what products that you've
13  purchased from your sources?
14      A.    No.  The e-mails and the invoices.
15      Q.    If you've ordered a Rockwell
16  Automation product from RS Components and your
17  customer calls your customer service department
18  and says, Where is my product, how can you give
19  them an answer?
20          MR. KASOLAS:  Objection to form.
21      A.    Usually RS delivers in 24 hours, so
22  it's very fast.
23      Q.    If a customer calls up WiAutomation
24  and says, Where is my product, how do you know
25  who you've purchased the product from?

1      A.    I check the e-mail to see where I
2  purchased from.
3      Q.    What do you do to check the e-mail?
4      A.    I go on the e-mail and check them.
5      Q.    What do you do to check?  Do you
6  search for something?  How do you do your
7  check?
8      A.    I check e-mail one by one.
9          (Multiple speakers.)
10      A.    Also because RS is the supplier, it
11  takes me less time to check.
12      Q.    Okay.
13          So for Rockwell components, you told
14  me you had four sources; right?
15      A.    No.  I mentioned three.
16      Q.    So for those three sources if you
17  need to buy a product that one of your
18  customers has ordered, it could come from any
19  one of those three sources; right?
20      A.    Yes.
21      Q.    So you purchase the product from
22  whoever has the better price and availability,
23  but what happens when your customer asks you
24  where the product is because they haven't
25  received it?

1          MR. KASOLAS:  Objection to form.
2      A.    When I purchase, I put down on a
3  sheet of paper.
4      Q.    So there's a sheet of paper that you
5  write down information about the products that
6  you purchase to fulfill the order?
7      A.    Yes, I write notes on this piece of
8  paper on this page.  And then I give that to
9  Luca, so that he checks to see what we have in
10  warehouse so that we -- if we need to, we buy
11  the product.
12      Q.    So if a customer calls WiAutomation,
13  and says, Where is my Rockwell Automation
14  product, I haven't received it yet, how do you
15  come up with an answer for that customer?
16          MR. KASOLAS:  Objection to form.
17      A.    I ask the customer which product was
18  purchased.
19      Q.    Okay.
20          And then what?
21      A.    And then I --
22          (Multiple speakers.)
23      A.    And then I check my notes to see
24  which is the product and understand from whom
25  the product is coming.

1      Q.     How do you keep these notes of
2  yours?
3      A.     There's simple pages of paper, I
4  keep them on the desk.
5      Q.     Is it in a bound notebook?
6      A.     No.
7      Q.     It's just sheets of paper on your
8  desk and those are your notes?
9      A.     Yes.
10      Q.     So if a customer calls and says, I
11  ordered a Rockwell Automation 1756-L73 and I
12  haven't received it yet, you would look on your
13  desk for a piece of paper with your handwritten
14  note with that item number on it?
15            MR. KASOLAS:  Objection to form.
16            THE INTERPRETER:  One second.
17      A.     Yes.  Because there is not a long
18  time that passes by.  Products are delivered
19  within 24 hours.
20      Q.     What do you do with these pieces of
21  paper after you receive the product?
22      A.     Like I said, I give this paper to
23  Luca -- piece of paper to Luca to see if the
24  product actually arrives.
25      Q.     Okay.

1            So when you make a purchase from
2  somebody like RS Components, you write down on
3  a piece of paper the products that you
4  purchased, and you give that piece of paper to
5  Luca; is that right?
6      A.     Yes.
7      Q.     What happens to that piece of paper
8  after Luca receives the product?
9      A.     I think he puts it in a folder.
10      Q.     Where is that folder?
11      A.     On Luca's desk.
12      Q.     Does that folder ever get emptied
13  out?
14      A.     Yes, when it gets full, yes.
15      Q.     And what happens to the pieces of
16  paper from that folder when it gets emptied
17  out?
18            THE INTERPRETER:  One second.  The
19            interpreter needs a clarification for a
20            word.
21      A.     So they are placed in a larger
22  folder -- in a folder that can keep several
23  folders inside.
24      Q.     Do you have records of products that
25  you've purchased for WiAutomation going back to

1  the beginning of WiAutomation?
2            MR. KASOLAS:  Objection to form.
3            THE INTERPRETER:  I'm sorry, could
4            you repeat, please.  This is the
5            interpreter.  Do you have records?
6            MR. McLAUGHLIN:  Lisa, could you
7            please repeat the question?
8            (Question was read back as follows:
9            "QUESTION:  Do you have records of
10            products that you've purchased for
11            WiAutomation going back to the beginning of
12            WiAutomation?")
13            THE INTERPRETER:  Thank you.
14      A.     No, because at the beginning we were
15  less organized.
16      Q.     What is the earliest record you have
17  of purchasing a Rockwell Automation product?
18            MR. KASOLAS:  Objection to form.
19      A.     I presently do not remember.  It's
20  what I gave you.
21      Q.     So we have every single invoice that
22  WiAutomation has regarding its purchases of
23  Rockwell Automation product?
24            MR. KASOLAS:  Objection to form.
25      A.     I think, yes.  I gave everything

1  that I found.
2      Q.     And if those records that you gave
3  us only go back to February of 2021, you're
4  saying that WiAutomation does not have records
5  of purchases of Rockwell Automation products
6  before that --
7            MR. KASOLAS:  Objection to form.
8            MR. McLAUGHLIN:
9      Q.     -- before then?
10            MR. KASOLAS:  Objection to form.
11      A.     No, not that I know.  As far as I
12  know, I cannot search by brand.  I would need
13  to look invoices one by one for each brand.
14      Q.     Did you search the invoices that
15  WiAutomation has for ones that record purchases
16  of Rockwell Automation products?
17      A.     And that's what I did.  I looked at
18  invoices to see which invoices had Rockwell
19  Automation products.
20      Q.     Everything that you found as a
21  result of your search has been produced?
22      A.     Yes.  Because I remembered more or
23  less that I remember all of the suppliers and I
24  gave everything that I found.
25      Q.     When WiAutomation purchases Rockwell

1  Automation products from Technology BSA, how do
2  you do that?
3       A.    So at the beginning we were doing it
4  on the website, through the website, because
5  BSA website had prices listed.
6       Q.    How did you first become aware of
7  Technology BSA?
8       A.    Porfirio know that.
9       Q.    How did Porfirio know Tech BSA?
10      A.    Because Porfirio was working with
11  PL --
12           THE INTERPRETER:  One second.
13      A.    Because Porfirio was working with
14  the company of PLC before starting the company
15  with us.
16      Q.    Does WiAutomation have a discount
17  with Tech BSA?
18      A.    I don't remember exactly because
19  Emanuel was the one exchanging e-mails with
20  Tech BSA, but I think sometimes they gave us a
21  discount.
22      Q.    When was the last time that
23  WiAutomation purchased a Rockwell Automation
24  product from Tech BSA?
25      A.    I do not remember exactly.

1       Q.    What was the first time that
2  WiAutomation purchased a Rockwell Automation
3  product from Tech BSA?
4       A.    Long time ago.  But I do not
5  remember when.
6       Q.    Did you do anything to prepare for
7  today's deposition to be able to provide
8  information about the purchases from
9  WiAutomation from Tech BSA?
10           MR. KASOLAS:  Objection to form.
11      A.    No.  Because I gave you -- had given
12  you already everything that I had.
13      Q.    What would you need to do to find
14  out the date of the first purchase that
15  WiAutomation made of a Rockwell Automation
16  product from Tech BSA?
17      A.    I would need to check invoices and
18  e-mail.
19      Q.    Does WiAutomation have invoices from
20  Tech BSA going back to the beginning of when it
21  purchased Rockwell Automation products from
22  Tech BSA?
23           MR. KASOLAS:  Objection to form.
24      A.    I believe, yes.
25      Q.    Have those all been provided to us

1  in this litigation?
2       A.    Yes.
3       Q.    So if the earliest Tech BSA invoice
4  that we have is dated in February 2021, you're
5  telling me that WiAutomation made no purchases
6  of Rockwell Automation products from Tech BSA
7  before then?
8       A.    Again, I gave all of the invoices
9  that I was able to find.
10      Q.    What is the amount of the discount
11  that WiAutomation has at Tech BSA?
12      A.    I don't remember exactly.
13      Q.    If you wanted to find out, what
14  would you need to do?
15      A.    Maybe read some e-mails or I should
16  ask Emanuel.
17      Q.    What e-mails would you read?
18      A.    I would need to look and find the
19  e-mail exchange between Emanuel and Tech BSA to
20  see if the discount was given to us via e-mail
21  or by phone.  I don't know.
22      Q.    How would you search for those
23  e-mails?
24      A.    I would need to look back in time
25  and see if there are e-mails -- there's an

1  e-mail exchange talking about this -- this
2  discount.
3       Q.    How would you search for those
4  e-mails?
5       A.    I need to check in the e-mail.
6       Q.    Would you do a text search?
7       A.    No.
8       Q.    Is there any way that you would
9  limit the inbox in order to perform the search
10  for that e-mail chain that you are looking for
11  with Tech BSA?
12           THE INTERPRETER:  I'm sorry.  Was
13           the word "limit the inbox"?
14           MR. McLAUGHLIN:  Yes, yes.
15           THE INTERPRETER:  Thank you.
16      A.    I would need to check by the subject
17  line.  Otherwise, I have no other way of
18  knowing how.
19      Q.    When you check by the subject line,
20  do you mean you search for text in the subject
21  line or something else?
22      A.    I search for the subjects of the
23  e-mail.
24      Q.    What would you search for in the
25  subject of the e-mail?

1      A.    I could search by the name of the
2 supplier, so BSA.
3      Q.    Who at Tech BSA was Emanuel
4 corresponding with?
5      A.    I'm not sure, but I think it was --
6 the name was Luca.
7      Q.    Is Luca still your contact at Tech
8 BSA?
9            THE INTERPRETER:  One second.
10 Clarification.
11     A.    He was our contact in the past.
12     Q.    Do you have a new contact at Tech
13 BSA?
14     A.    Actually, Tech BSA has a generic
15 e-mail and sometimes -- to ask, and sometimes
16 different people answer to this e-mail, generic
17 e-mail messages.  So I wouldn't know who the
18 contact could be.
19     Q.    What time -- sorry.  Strike that.
20           How long ago -- strike that.
21           When was the last time that
22 WiAutomation corresponded with Luca at Tech
23 BSA?
24     A.    I don't know exactly because Emanuel
25 was the one who was in touch with this Luca

1 from Tech BSA.  But probably one month ago, if
2 I remember correctly.  Not one month ago.  Some
3 months ago.
4      Q.    How much Rockwell product has
5 WiAutomation purchased from Tech BSA?
6      A.    Pretty much I think I gave all the
7 invoices that I was able to find.
8      Q.    So if those invoices show less than
9 30,000 euros worth of purchases from Tech BSA,
10 you don't have any more invoices about the
11 Rockwell Automation products that you've
12 purchased from Tech BSA?
13           MR. KASOLAS:  Objection to form.
14     A.    I don't know.  I don't remember
15 exactly.
16     Q.    The products that you purchased from
17 Tech BSA, were they all Rockwell Automation?
18     A.    I'm not sure, but I don't think so.
19     Q.    So there were other manufacturers'
20 products that you purchased from Tech BSA in
21 addition to Rockwell Automation; is that right?
22     A.    It could be.
23     Q.    When you purchase products from Tech
24 BSA do you do it via purchase order?
25     A.    At the beginning we were purchasing

1 directly from the website.  And then later on,
2 yes.
3      Q.    When you purchased directly from the
4 website, what sort of documentation would you
5 receive from Tech BSA?
6      A.    An e-mail confirmation for the order
7 automatically generated from their website.
8      Q.    Did the e-mail confirmation that you
9 receive include an identification of the
10 products that you ordered?
11     A.    I think so, that I remember.  I
12 think so.
13     Q.    Would the order confirmation e-mails
14 that you received from Tech BSA include the
15 price that you paid for the products that you
16 purchased?
17     A.    Yes.
18     Q.    Would the order confirmation e-mails
19 that you received from Tech BSA include the
20 discount that you received on your purchases?
21           MR. KASOLAS:  Objection to form.
22     A.    I do not remember.
23     Q.    So how would you be able to
24 determine what discount you get from Tech BSA?
25     A.    I said it before that I cannot

1 determine it.
2      Q.    If there is a problem with an order
3 that you place with Tech BSA, who do you
4 contact?
5      A.    Like I said, I never had direct
6 contact with BSA.  But if we had a problem, I
7 would probably call, but we never had a
8 problem.
9      Q.    Do you -- strike that.
10           Before, you told me that Tech BSA
11 has not been returning your communications
12 recently; is that right?
13     A.    Yes.  Recently it's not answering
14 anymore.  In fact, it's causing quite some
15 problems.
16     Q.    What --
17     A.    Well, in the past we cooperated.
18 But now, recently -- this is something that
19 happened.  Recently I received no answer.  And
20 if there is a client asking for a product, I do
21 not receive an answer, I can not supply the
22 product to the customer.  And, again, this is
23 something that happened recently.  It's been
24 happening recently.
25     Q.    What communications has Tech BSA not

1  responded to?

2      A.    Phone.

3      Q.    They just don't pick up their

4  telephone?

5      A.    Yes.  It actually does not let me

6  know the reason why does not want to supply me

7  the products -- with the products.

8      Q.    So you call Tech BSA's phone number

9  and just nobody answers?

10     A.    I did not say this.  I said that I

11 called BSA and they do not give me an answer

12 regarding the products that they don't want to

13 supply to me.

14     Q.    The answer is just that they cannot

15 supply you?

16     A.    Yes, exactly.

17     Q.    Okay.

18     A.    They tell me it is not available.

19     Q.    All right.

20           MR. McLAUGHLIN:  Let's take a

21 five-minute break.

22           THE VIDEOGRAPHER:  The time is

23 7:41 p.m., and we are off the record.

24           (Recess is taken.)

25           THE VIDEOGRAPHER:  This is the start

1  of media labeled Number 5.  The time is

2  7:56 p.m., and we are back on the record.

3  BY MR. McLAUGHLIN:

4      Q.    Mr. Coppola, before the break we

5  were talking about Tech BSA.  You mentioned at

6  some point your purchases with Tech BSA went

7  from direct purchases on the website to

8  purchases using purchase orders; is that right?

9           MR. KASOLAS:  Objection to form.

10     A.    Yes.

11     Q.    When did that change happen?

12     A.    I do not remember exactly.

13     Q.    Does WiAutomation keep track of the

14 purchase orders that it issues?

15     A.    They are in the e-mail.

16     Q.    So you have records of the purchase

17 orders that you issued to Tech BSA; is that

18 right?

19     A.    The ones that are in the e-mail.

20     Q.    In connection with this case, did

21 you review those purchase orders e-mails to

22 determine the amount of product that you

23 purchased from Tech BSA?

24     A.    I gave the e-mails that I found.

25     Q.    And so we should have every single

1  invoice and every single purchase order dealing

2  with Rockwell Automation products that

3  WiAutomation received from Tech BSA; is that

4  right?

5           MR. KASOLAS:  Objection to form.

6      A.    That I remember, they were sending

7  the estimate via e-mail, and Emanuel would

8  confirm it.

9      Q.    When the order happened as you

10 describe in an e-mail, with a quote and a

11 confirmation, would Tech BSA issue an invoice

12 for those orders?

13     A.    Yes.

14     Q.    And so if I look at the invoices

15 from Tech BSA and add everything up, that will

16 give an accurate number for the amount of

17 Rockwell Automation products that WiAutomation

18 purchased from Tech BSA?

19     A.    Yes, on the invoice there is the

20 price of the product.

21     Q.    And that price of the product

22 includes the discount that WiAutomation

23 receives from Tech BSA; is that right?

24           MR. KASOLAS:  Objection to form.

25     A.    Yes, I think so.

1      Q.    When was the first time that

2  WiAutomation purchased a Rockwell Automation

3  product from Sonepar?

4      A.    I don't remember exactly.

5      Q.    When was the last time that

6  WiAutomation purchased a Rockwell Automation

7  product from Sonepar?

8      A.    I don't remember exactly.

9      Q.    How much Rockwell Automation

10 products have WiAutomation purchased from

11 Sonepar in total?

12     A.    I don't know exactly.

13     Q.    If you wanted to know exactly, what

14 would you need to do?

15     A.    I would need to check the invoices.

16     Q.    When WiAutomation purchased Rockwell

17 Automation product from Sonepar, did Sonepar

18 issue an invoice to WiAutomation for every

19 single one of those purchases?

20     A.    I believe so, yes.

21     Q.    WiAutomation has not provided a

22 single invoice from Sonepar showing a Rockwell

23 Automation product purchase in this case.

24           Do those records exist?

25     A.    This means either that we did not

Page 118

1     Q.     When was the last time that anyone
2  at WiAutomation corresponded with Emanuel?
3     A.     Somebody at WiAutomation.  You mean,
4  me?
5     Q.     I mean anyone at WiAutomation.
6            MR. KASOLAS:  Objection to form.
7     A.     I'm not able to know.
8     Q.     When was the last time that you
9  personally corresponded with Emanuel?
10    A.     Corresponded, meaning talked?
11    Q.     When was the last time that you
12 spoke with Emanuel?
13    A.     When he left.
14    Q.     When was the last time that you sent
15 an e-mail to Emanuel?
16    A.     I did not send -- I did not send
17 e-mails to Emanuel.  We spoke over the phone.
18    Q.     So that last conversation over the
19 phone that you had with Emanuel is the last
20 time that you communicated with him?
21    A.     Yes.
22    Q.     Do you know of anyone at
23 WiAutomation that communicated with him after
24 that phone call?
25    A.     I'm not able to know.  I would need

Page 119

1  to ask each single person.
2     Q.     As you sit here now, are you aware
3  of anyone at WiAutomation communicating with
4  Emanuel after your phone call with him?
5     A.     No.
6     Q.     How would you purchase Rockwell
7  Automation products from Sonepar?
8     A.     Directly from their site.
9     Q.     When you placed an order with
10 Sonepar, would you receive any sort of
11 automatic e-mail in return?
12    A.     Yes.  If I'm not mistaking.
13    Q.     Other than directly on Sonepar's
14 website, were there any other means by which
15 you placed an order with Sonepar for Rockwell
16 Automation products?
17    A.     Not that I remember.  Sometimes
18 there might have been a phone call to check the
19 availability of a product or the delivery time.
20 But that's always been done through the
21 website.
22    Q.     Are you able to provide any
23 information about the first time that
24 WiAutomation purchased a Rockwell Automation
25 product from Sonepar?

Page 120

1     A.     I would need to check again through
2  the invoices or I should ask Emanuel.
3     Q.     How would you ask Emanuel?
4     A.     I would need to call him.
5     Q.     You still have his telephone number?
6     A.     Yes.
7     Q.     And in order to purchase from
8  Sonepar, I believe you said that you used your
9  Parcop@email.IT e-mail address; is that right?
10    A.     If I'm not mistaking, yes.
11    Q.     Are there any other e-mail addresses
12 that it could be?
13    A.     I don't believe so.  This is the one
14 that I recall.
15    Q.     Is WiAutomation aware that Rockwell
16 Automation prohibits authorized distributors
17 from selling to third parties?  Third-party
18 resellers.  Sorry.
19    A.     No.  No, they never told us this
20 thing.  They always sold us the products and
21 they're causing damages to us today.  And they
22 also -- moreover, they also purchased products
23 from us.
24    Q.     Has WiAutomation ever audited a
25 source of Rockwell Automation products?

Page 121

1     A.     I apologize.  What does that mean?
2     Q.     Have you ever investigated the
3  products that you are receiving from a source
4  for Rockwell Automation?
5     A.     I don't see the need to check a
6  product that comes from an authorized supplier.
7     Q.     So you don't check to see if the
8  Rockwell Automation products that you receive
9  are authentic?
10    A.     Luca is the one who handles to
11 check, to inspect the wrapping of a product.
12 But I don't see why we would need to do that if
13 the product is from an authorized dealer.
14           THE INTERPRETER:  This is the
15    interpreter.  If I may clarify one of the
16    words, if it's wrapping or crated.  Can I
17    double-check that, because in Italian it's
18    the same word.
19           MR. McLAUGHLIN:  Sure.
20           THE INTERPRETER:  Thank you.  Okay.
21    Thank you.
22    A.     So the Luca is the one inspecting
23 the box of the product.
24    Q.     How much Rockwell Automation product
25 has WiAutomation purchased from SY.EL?

Page 122

1    A.    Like I said before, SY.EL is not one
2    of our suppliers, but we -- we develop -- we
3    develop some projects together.
4    Q.    So my question, though, was:  What
5    is the amount of Rockwell Automation product
6    that WiAutomation has purchased from SY.EL?
7    A.    I do not know.  I can not quantify.
8    Q.    When you purchase Rockwell
9    Automation products from SY.EL, do they issue
10   you invoices?
11   A.    Like I said before, SY.EL is not one
12   of our suppliers.  It's not one -- our
13   supplier.  But if we did purchase anything,
14   SY.EL would have issued an invoice.
15   Q.    In connection with this litigation,
16   did you search for any invoices from SY.EL that
17   show Rockwell Automation product purchases?
18   A.    Yes.
19   Q.    Did you find any?
20   A.    No, I didn't find anything.  Also,
21   because SY.EL issues invoices, comprehensive
22   invoices including also other products, other
23   brands, so no, I did not find anything.
24        If I remember correctly, the only
25   thing that we purchased from SY.EL might be a

Page 123

1    software, but always for a project.
2    Q.    How do you know that the Rockwell
3    Automation software that you purchased from
4    SY.EL is for a project?
5    A.    Because with SY.EL cooperate only
6    for projects.
7    Q.    So if WiAutomation sold Rockwell
8    Automation software that came from SY.EL, it
9    would have been in connection with some sort of
10   project?
11   A.    Yes.
12   Q.    What kind of projects are these?
13   A.    I do not remember.
14   Q.    So I'm going to share my screen with
15   what I'm going to mark as Exhibit 6.
16        (Coppola Exhibit 6, WiAutomation
17        Invoice, marked for identification.)
18   BY MR. McLAUGHLIN:
19   Q.    Exhibit 6 is document bearing Bates
20   number ROCK-255.
21        Mr. Coppola, do you see this is an
22   invoice issued by WiAutomation?
23   A.    Yes.
24   Q.    The second line item on this invoice
25   is:  Rockwell software; correct?

Page 124

1    A.    I don't remember all of the products
2    codes.  So I don't know.
3    Q.    From this invoice, are you able to
4    tell what project this was in connection with?
5    A.    No, not from the invoice.
6    Q.    Who is Image-Tek Displays &
7    Graphics?
8        THE INTERPRETER:  I'm sorry.  Where
9        is that?  Could you repeat, please?  Thank
10       you.
11   A.    I think it's the heading of a
12   client.
13   Q.    How many clients do you perform
14   projects for that involve Rockwell Automation
15   products?
16   A.    Not many, but I do not remember.
17   Q.    If you performed a project for a
18   customer in March of 2022, would you remember
19   their name?
20   A.    No.  Nine months went by.
21   Q.    Who at WiAutomation is responsible
22   for these projects that you work on together
23   with SY.EL?
24   A.    In reality, there is nobody
25   responsible.  Clients ask the guys and then we

Page 125

1    interface with SY.EL.
2    Q.    So in connection with one of these
3    projects, if the customer needs Rockwell
4    Automation, why doesn't SY.EL sell it directly
5    to the customer?
6    A.    Because the client calls us.
7    Q.    When you sell Rockwell software that
8    came from SY.EL, does WiAutomation make any
9    money on that sale?
10   A.    Of course.
11   Q.    How much money --
12        (Multiple speakers.)
13        THE INTERPRETER:  The interpreter
14        could not understand.  I heard two voices
15        at once.
16   BY MR. McLAUGHLIN:
17   Q.    What is that markup?
18   A.    I don't remember exactly.
19   Q.    Is there a rule of thumb that
20   WiAutomation uses when setting its margins?
21   A.    No.
22   Q.    On this invoice it looks like
23   there's machine-printed type that describes the
24   products that are sold to the customer.
25        Do you see that?

Page 126

1    A.    Yes.
2    Q.    Where did -- when WiAutomation
3 creates these invoices to its customers, where
4 does that information come from?
5    A.    I don't know.  Administration makes
6 the invoices.
7    Q.    What information --
8          (Multiple speakers.)
9    A.    And the description is also on our
10 website.
11    Q.    So you told me before, that when an
12 order comes from a customer, you print out the
13 e-mail that's automatically generated from the
14 website, bring it over to administration, and
15 that's what they use to create the invoices.
16          Is that correct?
17    A.    Yes.  That's how it is.  And then
18 they check -- they look for the product code on
19 the website.  And they add the description, but
20 it is on -- it is not always like that.
21    Q.    When is it not like that?
22    A.    I don't know -- it -- I --
23          (Multiple speakers.)
24    A.    I don't know.  It depends on when
25 the administration makes the invoice and also

Page 127

1 because it's not required.
2    Q.    What do you mean it's not required?
3    A.    In Italy it's not required or
4 mandatory, required, to put the full
5 description of the article -- of the item.
6    Q.    What is the computer program that
7 your administration department uses to create
8 these invoices?
9    A.    I don't remember the name exactly.
10    Q.    Is the information contained in this
11 invoice also contained in some larger database
12 somewhere?
13    A.    Yes, in reality, in Italy it is
14 mandatory, the electronic invoice so, yes, in
15 the fiscal drawer.
16    Q.    So you have an electronic record of
17 every invoice that you've issued to your
18 customers; is that right?
19    A.    Yes.
20    Q.    And so for these two products here
21 that we see on this invoice, both are
22 identified with the trademark Allen-Bradley.
23          Do you see that?
24    A.    Yes, I see it.
25    Q.    Is it possible to search your

Page 128

1 electronic database of invoices to identify all
2 invoices that contain the term Allen-Bradley?
3    A.    No.  I don't think something like
4 that is possible.
5    Q.    So you have no way of searching your
6 database of electronic invoice records?
7          MR. KASOLAS:  Objection to form.
8    A.    For sure.  I have to open all of the
9 invoices.
10    Q.    Did you do anything in connection
11 with this litigation to review your database of
12 electronic invoices to determine how much
13 revenue WiAutomation received from the sale of
14 Rockwell Automation products?
15          MR. KASOLAS:  Objection to form.
16    A.    Yes.  I tried to search the
17 invoices, both the ones that are in fiscal
18 drawer and the invoices that are in
19 administration to see that, and I gave all the
20 invoices that I found.
21    Q.    So you gave us all of the invoices
22 that you could find that show a sale of a
23 Rockwell Automation product?
24    A.    All the ones that I was able to
25 find.

Page 129

1    Q.    And there's no more invoices that
2 WiAutomation has that would show a sale of a
3 Rockwell Automation product other than the ones
4 that you have provided?
5          MR. KASOLAS:  Objection to form --
6          objection to form.
7    A.    I don't think so.
8    Q.    Looking at this invoice that's on
9 the screen, at the bottom line of each of the
10 item lines there's an HS code.
11          Do you see that?
12    A.    Yes.
13    Q.    Where is the data for that code
14 pulled from to place on this invoice?
15    A.    I don't know.  Luca handles these
16 calls.  Or Porfirio, but I don't know.
17    Q.    Do you know what HS code means?
18    A.    HS, I don't know.  It's an acronym
19 of a -- I don't know of what.  But I know that
20 the HS code is a code that customs -- the
21 customs uses in order to tax customers when
22 they, the customers, receive the product.
23    Q.    Sir, here on the first line item
24 there's a catalog code number 5069-L306ER.
25          Do you see that?

Page 142

```
1   downstairs and you are standing over him
2   telling what to type into the label printing
3   computer?
4        A.   Yes, name of the client and address.
5        Q.   Is there any place that that
6   shipping label information gets stored at
7   WiAutomation?
8        A.   I'm not sure.  This is something
9   that Porfirio handles.
10       Q.   So if you wanted to know where in
11  the world, what countries in the world, does
12  WiAutomation ship Rockwell Automation products
13  to, what would you need to do to find out that
14  answer?
15            MR. KASOLAS:  Objection to form.
16            (Multiple speakers.)
17       A.   I can ask Luca and he can check on
18  the couriers' portals to see the shipments that
19  were made.
20       Q.   Is there any other way to find out
21  that information?
22       A.   Yes.  This information is written on
23  the invoices.
24       Q.   And do you have all of the invoices
25  for sales to your customers; is that right?
```

Page 143

```
1        A.   Yes.
2        Q.   How much Rockwell Automation
3   products has WiAutomation sold to customers in
4   the United States?
5            MR. KASOLAS:  Objection to form.
6        A.   I don't know exactly.  I do not have
7   a system that allows me to check this.
8        Q.   Did you do anything in preparation
9   for today's deposition to provide an answer to
10  that question?
11            MR. KASOLAS:  Objection to form.
12       A.   What do you mean?
13       Q.   Did you do anything in preparation
14  for today's deposition to learn how much
15  Rockwell Automation product has been sold by
16  WiAutomation to customers in the United States?
17            MR. KASOLAS:  Objection to form to
18            the extent that the answer would require
19            the witness to disclose attorney-client
20            privileged communications.  Without that
21            proviso, he can answer the question.
22       A.   I already looked in the past for
23  this information and I gave all the information
24  that I found.
25       Q.   Are you able to tell me how much
```

Page 144

```
1   Rockwell Automation product WiAutomation has
2   sold to customers in the United States?
3            MR. KASOLAS:  Objection to form.
4        A.   No, because we sell all over the
5   world.
6        Q.   And you are not able to break down
7   how much you sold in the United States?
8        A.   No.  I already said that I don't
9   have a system that allows me to check what was
10  sold by country.
11       Q.   Are you able to estimate if it was
12  more than 50 percent or less than 50 percent of
13  WiAutomation --
14            MR. KASOLAS:  Objection to form.
15            MR. McLAUGHLIN:  Can I ask my
16            question, Bob?
17            MR. KASOLAS:  You actually asked the
18            question.  You are adding something
19            compound on it.  I did you a favor, but go
20            ahead.
21  BY MR. McLAUGHLIN:
22       Q.   Are you able to provide an estimate
23  for whether -- strike that.
24            Are you able to provide any estimate
25  as to whether WiAutomation sales of Rockwell
```

Page 145

```
1   Automation products are more or less than
2   50 percent to customers in the United States?
3            MR. KASOLAS:  Objection to form.
4        Objection to form.
5        A.   Absolutely not 50 percent.  Much
6   less.
7        Q.   If you wanted to know the actual
8   percentage, what would you need to do?
9            MR. KASOLAS:  Objection to form.
10       A.   I will need to check the invoices.
11       Q.   So you haven't done that?
12            MR. KASOLAS:  Objection to form.
13       A.   What does it mean I have not done?
14       Q.   Have you checked WiAutomation's
15  invoices to determine the percentage of sales
16  of Rockwell Automation products to customers in
17  the United States?
18       A.   Yes, but I do not have an exact
19  number.
20            MR. KASOLAS:  Objection to form.
21  BY MR. McLAUGHLIN:
22       Q.   When you checked for this
23  information, what were you able to learn?
24       A.   What does it mean?
25       Q.   You told me that you checked the
```

1  invoices to determine the percentage of sales
2  in the United States, but were not able to come
3  up with a precise number.
4          And my question to you is:  When you
5  checked WiAutomation's invoices for the
6  percentage of sales to the United States, what
7  were you able to learn?
8          MR. KASOLAS:  Can you ask the
9          question again?  Everybody froze and I
10         didn't hear your question and I didn't hear
11         most of the interpretation.  I'm sorry.
12         MR. McLAUGHLIN:  Lisa, can you
13         please read it back?
14         (Question was read back as follows:
15         "QUESTION:  You told me that you
16         checked the invoices to determine the
17         percentage of sales in the United States,
18         but were not able to come up with a precise
19         number.
20         And my question to you is:  When you
21         checked WiAutomation's invoices for the
22         percentage of sales to the United States,
23         what were you able to learn?")
24         MR. KASOLAS:  Objection to form.
25  A.     On the invoices there is not the

1  brand's name.  But for sure, much less than
2  50 percent because there are not many.  The
3  name of the brand is not always present.
4  Q.     I'll show Exhibit 6 again.
5         This is the 2020 --
6         (Multiple speakers.)
7  BY MR. McLAUGHLIN:
8  Q.     This is the 2022 invoice that we
9  looked at before and right there for both of
10 these products it says Allen-Bradley.
11        Do you see that?
12        MR. KASOLAS:  Neal, just for the
13        record -- I'm sorry.
14        For the record, Neal, I can't see
15        the whole document and I can't see the
16        Bates stamp.  Just for the record, can you
17        give us the Bates stamp on this exhibit?
18        MR. McLAUGHLIN:  Yeah, I already
19        did, it's ROCK-255.
20        MR. KASOLAS:  Thank you.
21 A.     Like I said before, the name of the
22 brand is not always there.
23 Q.     When would it not be on the invoice?
24        MR. KASOLAS:  Objection to form.
25 A.     I already said -- before.

1          (Multiple speakers.)
2  A.     Like I already said before, it's not
3  always there, the name of the brand, because it
4  is not always required to be there.
5  Q.     So is it true then that your
6  recordkeeping is not adequate to give us an
7  answer as to the proportion of sales of
8  Rockwell Automation products to customers in
9  the U.S. versus other countries in the world?
10         MR. KASOLAS:  Objection to form.
11 A.     I give everything that I was able to
12 find.
13 Q.     Do you know anybody by the name of
14 Salvatore Coppola in New Jersey --
15         (Multiple speakers.)
16 A.     Yes.
17 Q.     And this person is in New Jersey?
18 A.     Yes, it's a cousin of mine.
19 Q.     What is his role at WiAutomation, if
20 any?
21 A.     No role, because he does not work at
22 WiAutomation.
23 Q.     Is there a reason why his address in
24 New Jersey would be listed on WiAutomation's
25 website?

1  A.     Because at the beginning we had
2  thought of developing a warehouse by him, but
3  then at the end the idea was not developed.
4  Q.     Does Mr. Coppola have any background
5  in industrial automation?
6          MR. KASOLAS:  Objection to form.
7          There's a lot of Coppolas flying around.
8          You might want to say which Coppola.
9  A.     Are you referring to Salvatore?
10 Q.     Yes.
11 A.     No, absolutely not.
12 Q.     Why does WiAutomation offer its own
13 warranty?
14 A.     Because in 2020, Miller asked us to
15 specify that it was our warranty.  Even though
16 we offered our own warranty since ever.
17 Q.     Since the beginning of WiAutomation,
18 why did you decide it was a good idea to offer
19 a warranty?
20         THE INTERPRETER:  I'm sorry.  The
21         interpreter could not hear the full
22         sentence.
23 A.     Because we know that Rockwell does
24 not offer warranty to nonauthorized.  Even
25 though, as far as I know, the law, Italian law,

Page 154

```
 1            THE VIDEOGRAPHER:  This concludes
 2      today's deposition of Fulvio Coppola.  The
 3      time is 10:13 p.m., Central European time,
 4      and we are off the record.
 5            (Time Noted: 10:13 p.m., Central
 6      European time.)
 7
 8
 9            ----------------------
10            FULVIO COPPOLA
11
12  Subscribed and sworn to before me
13  this       day of             2022.
14
15  ---------------------------------------
16
17
18
19
20
21
22
23
24
25
```

Page 155

```
 1                C E R T I F I C A T E
 2
 3  STATE OF NEW YORK   )
 4                      ) ss.:
 5  COUNTY OF NEW YORK   )
 6
 7        I, LISA M. MURACO, a Notary Public
 8    within and for the State of New York and
 9    Florida, do hereby certify:
10        That FULVIO COPPOLA, the witness
11    whose deposition is hereinbefore set forth,
12    was duly sworn by me and that such
13    deposition is a true record of the
14    testimony given by such witness.
15        I further certify that I am not
16    related to any of the parties to this
17    action by blood or marriage; and that I am
18    in no way interested in the outcome of this
19    matter.
20        IN WITNESS WHEREOF, I have hereunto
21    set my hand this 4th day of January,
22    2023.
23                         Lisa M Muraco
24            LISA M. MURACO
25
```

Page 156

```
 1                I N D E X
 2
 3  WITNESS                           PAGE
 4  FULVIO COPPOLA
 5  MR. McLAUGHLIN                     6
 6
 7            E X H I B I T S
 8  DESCRIPTION                       PAGE
 9  Coppola Exhibit 1, Rockwell's Re-notice   7
    of Deposition of Parcop SRL d/b/a
10  WiAutomation
11
12  Coppola Exhibit 2, Website        31
13
14  Coppola Exhibit 3, Screen Shot    31
15
16
    Coppola Exhibit 4, Screen Shot of  39
17  WiAutomation Website
18
19
    Coppola Exhibit 5, Screen Shot    45
20
21
    Coppola Exhibit 6, WiAutomation Invoice  123
22
23
    Coppola Exhibit 7, Document Bearing  153
24  Bates Number ROCK-140
25
```

Page 157

```
 1        ERRATA SHEET FOR THE TRANSCRIPT OF:
 2  Case Name:       ROCKWELL v PARCOP
    Dep. Date:       WEDNESDAY, DECEMBER 21, 2022
 3  Deponent:        FULVIO COPPOLA
 4           CORRECTIONS:
 5  Pg. Ln.  Now Reads     Should Read     Reason
 6  ___ ___  _____    _____    _____
 7  ___ ___  _____    _____    _____
 8  ___ ___  _____    _____    _____
 9  ___ ___  _____    _____    _____
10  ___ ___  _____    _____    _____
11  ___ ___  _____    _____    _____
12  ___ ___  _____    _____    _____
13  ___ ___  _____    _____    _____
14  ___ ___  _____    _____    _____
15  ___ ___  _____    _____    _____
16  ___ ___  _____    _____    _____
17
18            _____
19            Signature of Deponent
20  SUBSCRIBED AND SWORN BEFORE ME
21  THIS____DAY OF_____, 2022.
22
23  _____
24  (Notary Public)  MY COMMISSION EXPIRES:_____
25
```

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4   ROCKWELL AUTOMATION, INC.,     )
                                   )
5               Plaintiff,         )No.21-1238
                                   )-CFC GBEW-JLH
6          vs.                     )
                                   )
7   PARCOP S.R.L., d/b/a           )
    WIAUTOMATION,                  )
8                                  )
                Defendant.         )
9   ------------------------------

10

11

12                 VOLUME II

13   CONTINUED REMOTE VIDEOTAPED DEPOSITION OF

14                FULVIO COPPOLA

15

16          Thursday, December 22, 2022

17

18

19

20

21

22

23   Reported by:
     LISA M. MURACO
24   JOB NO. 220089

25

Page 159

```
1
2                    Thursday, December 22, 2022
3                    8:00 a.m. Eastern
4                    2:00 p.m. Central European
5
6       REMOTE Deposition of FULVIO COPPOLA,
7   held VIA ZOOM, before LISA M. MURACO, a
8   Notary Public of the State of New York and
9   Florida.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 160

```
1   A P P E A R A N C E S:
2   (REMOTE)
3
4       ALSTON & BIRD LLP
5       Attorneys for Plaintiff
6           90 Park Avenue
7           New York, NY 10016
8       BY:   NEAL McLAUGHLIN, ESQ.
9
10
11      BRACH EICHLER, LLC
12      Attorneys for Defendant
13          101 Eisenhower Parkway
14          Roseland, NJ 07068
15      BY:   BOB KASOLAS, ESQ.
16            ERIC BODEN, ESQ.
17
18
19  ALSO PRESENT:
20  Italian Interpreter, Rosanna Giliberti
21  Legal Video Specialist, Brian Hood
22  Rockwell Automation, John Miller
23
24
25
```

Page 161

```
1       THE VIDEOGRAPHER:  Good afternoon
2   and good morning, Counselors.  My name is
3   Brian Hood.  I'm the legal videographer in
4   association with TSG Reporting
5   Incorporated.  Because this is a remote
6   deposition, I will not be in the same room
7   and, instead, I will record this
8   video-taped deposition remotely.
9       The reporter, Lisa Muraco, also will
10  not be in the same room and will swear the
11  witness remotely.
12      Do all parties stipulate to the
13  validity of this video recording and remote
14  swearing and that it will admissible in the
15  courtroom as if it had been taken following
16  Rule 30 of the Federal Rules of Civil
17  Procedures and the State's rules where this
18  case is pending?
19      MR. McLAUGHLIN:  On behalf of
20  Rockwell Automation, yes.
21      MR. KASOLAS:  Good morning.  On
22  behalf of Bob Kasolas, yes.
23      THE VIDEOGRAPHER:  Thank you.
24      This marks the beginning of recorded
25  media label Number 1 of the continued
```

Page 162

```
1   remote video deposition of Fulvio Coppola
2   in the matter of Rockwell Automation
3   Incorporated versus Parcop SRL doing
4   business as WiAutomation, entered in the
5   United States District Court for the
6   District of Delaware, Case
7   No. 21-1238-GBW-JLH.
8       Today's date is December the 22nd,
9   2022, and the time is approximately
10  2:08 p.m. Central European time.
11      Again, my name is Brian Hood and I'm
12  the legal videographer from TSG Reporting
13  Incorporated, headquartered at 228
14  East 45th Street, Suite 810, New York, New
15  York 10017.
16      The court reporter is Lisa Muraco,
17  also in association with TSG Reporting.
18      Will counsel please introduce
19  yourselves for the record.
20      MR. McLAUGHLIN:  This is Neal
21  McLaughlin with Alston & Bird on behalf of
22  Rockwell Automation.
23      MR. KASOLAS:  Good morning.  Bob
24  Kasolas, member with Brach Eichler LLC, on
25  behalf of defendant Parcop SRL doing
```

1           MR. KASOLAS:  Objection to form.
2      A.    I did not understand well what it
3  means, but obviously yes, we start with -- we
4  consider the price that we pay for the product.
5      Q.    Where do you look to know how much
6  you paid for the products in your inventory?
7      A.    First of all, on the invoice, but
8  the price is set at the moment that we purchase
9  the product.
10     Q.    What do you mean the price is set?
11     A.    That at the moment that we purchase
12 the product, we assign the price.  So for
13 example, if we buy something at ten then at
14 that moment we assign the price of 11, 12, 13,
15 14, whatever.
16     Q.    And until you sell that product
17 completely out of your inventory, you never
18 change the price of that product on your
19 website?
20          MR. KASOLAS:  Objection to form.
21     A.    Usually, yes.
22     Q.    When you're looking at the invoices
23 of your purchases of Rockwell Automation
24 products is there something on the invoice that
25 tells you that this product was purchased to be

1  placed into your inventory?
2      A.    No.
3      Q.    How do you know which invoices from
4  your suppliers are for products that are --
5  that go into inventory versus products that get
6  shipped directly out to customers?
7          MR. KASOLAS:  Objection to form.
8      A.    Product -- products usually are not
9  shipped right away.  So I check with Luca which
10 are the ones that need to be shipped out and
11 the others go in the warehouse.
12          Then if I see that the product is
13 purchased often, I might get a little more of
14 that product to keep in the warehouse.
15     Q.    How do you know if a product is
16 purchased often?
17     A.    I can ask the staff by mouth.  I can
18 ask them or I might remember myself about that.
19     Q.    Do you have any data or spreadsheets
20 or anything written down that tells you what
21 are the more popular Rockwell Automation
22 products that you sell?
23     A.    No.
24     Q.    What is WiAutomation's average
25 margin on Rockwell Automation products?

1           MR. KASOLAS:  Objection to form.
2      A.    I do not have a tool that allows me
3  to -- to find out about this to verify this.
4      Q.    Are WiAutomation's margins on
5  Rockwell Automation products more or less than
6  its margins for other manufacturers' products?
7           MR. KASOLAS:  Objection to form.
8      A.    I do not have a tool to identify
9  that for Rockwell.  I do not have a tool, and I
10 do not have a tool for others as well.  So I
11 could not identify that.
12     Q.    You have invoices that you send to
13 your customers that would show how much you
14 sell Rockwell Automation products for; correct?
15     A.    Yes, there is the price, sales
16 price, on the invoice.
17     Q.    And you have invoices from your
18 suppliers that show how much you purchased
19 Rockwell Automation products for; correct?
20     A.    Yes.
21     Q.    And if you wanted to, you could
22 compare those two documents; could you not?
23     A.    Compare meaning to establish the
24 difference of price?
25     Q.    Yes.

1      A.    Only if I had them together at the
2  same time.
3      Q.    And you -- WiAutomation has all of
4  those invoices; correct?
5      A.    Yes.
6      Q.    So you could perform that comparison
7  if you wanted to; right?
8      A.    So I do not have a tool that allows
9  me to do that.  I will need to do that invoice
10 by invoice, manually.  And moreover, on the --
11 on the invoices there is not always the name of
12 the brand of the manufacturer.
13     Q.    On the invoices, though, even if
14 there's not the name of the manufacturers,
15 there's an item number; correct?
16     A.    The product code usually is there.
17     Q.    And if you enter that product code,
18 even in your own website, you could find out
19 what manufacturer makes that product code;
20 correct?
21          MR. KASOLAS:  Objection to form.
22     A.    Yes, the product code is not always
23 present.
24     Q.    So you are telling me that you have
25 invoices that have no product code on them and

Page 191

1 invoice. I don't remember exactly now.
2      Q.   Those documents would've also given
3 you the purchase date for each of these
4 products; correct?
5      A.   Yes, usually on the invoice there is
6 the date.
7      Q.   I scroll down to Interrogatory
8 Number 5, and Interrogatory Number 5 asks for
9 information regarding products sourced and sold
10 by WiAutomation.
11           And in response -- and in response
12 to this interrogatory, WiAutomation provides a
13 list of certain sales.
14           Do you see that?
15      A.   Yes.
16      Q.   Were you involved in the preparation
17 of this interrogatory response?
18      A.   Yes.
19      Q.   Looking just at the first line here,
20 there's a product identified, the Allen-Bradley
21 1756-L63.
22           Do you see that?
23      A.   Yes, I see it.
24      Q.   And then after it says: Price paid
25 euro 1,570.

Page 192

1           Do you see that?
2      A.   Yes.
3      Q.   Is that intended to signify the
4 amount that your customer paid for this product
5 or the amount that WiAutomation paid to acquire
6 the product?
7      A.   I believe it is the price that the
8 customer paid.
9      Q.   For this particular transaction, how
10 much did WiAutomation pay to acquire the
11 1756-L63 product?
12      A.   I do not remember exactly. I think
13 quite sometime went by.
14      Q.   Do you have any documents at
15 WiAutomation that would provide the answer to
16 that question?
17      A.   There should be the purchase
18 invoice.
19      Q.   When you were preparing this
20 interrogatory response, did you review those
21 invoices?
22      A.   Like I always said, I looked for
23 the -- for all of the invoices, but on the
24 invoices there is not always the brand or the
25 code or the product.

Page 193

1      Q.   Okay.
2           So I'm looking here at your response
3 to Interrogatory Number 5, and I don't see a
4 single instance where you've identified the
5 price. For these first few before we get to
6 the bolded, where it says: Invoice, for these
7 first few bullet points there's no price that's
8 listed for the amount that WiAutomation paid
9 for those products.
10           And my question to you is: Did you
11 perform a search of your invoices to try and
12 obtain that information?
13           MR. KASOLAS: Objection to form.
14           THE INTERPRETER: I'm sorry. Could
15      you read, like, the last portion of the
16      question after: To acquire the product.
17           THE COURT REPORTER: Are you asking
18      me?
19           THE INTERPRETER: Yes, please.
20           (Question was read back as follows:
21           "QUESTION: And my question to you
22      is: Did you perform a search of your
23      invoices to try and obtain that
24      information?")
25           THE INTERPRETER: No, the one after

Page 194

1      that.
2           THE COURT REPORTER: After that?
3      That's the question.
4           THE INTERPRETER: But there was
5      something before that.
6           MR. McLAUGHLIN: Let me just ask a
7      fresh question so we have a clean record.
8 BY MR. McLAUGHLIN:
9      Q.   WiAutomation's response to
10 Interrogatory Number 5 identifies a number of
11 bullet points, and the first eight bullet
12 points have no information for the amount that
13 WiAutomation paid to acquire these products.
14           Do you see that?
15      A.   Yes.
16      Q.   When you were preparing these
17 interrogatory responses, did you review any
18 invoices to try and figure out how much
19 WiAutomation paid to acquire these products?
20           MR. KASOLAS: Objection to form.
21      A.   So like I already said, I checked
22 with administration, but we had problems
23 because of COVID, so basically, these are the
24 products -- these are products that Rockwell
25 purchased from us.

Page 195

1    Q.    Do you have any information at
2  WiAutomation about how much WiAutomation paid
3  to acquire the products listed in the first
4  eight bullet points of your response to
5  Interrogatory Number 5?
6    A.    Like I already said, I checked with
7  administration.  We had problems, and I gave
8  everything that I was able to find.
9    Q.    So because there's no information
10 here in your response to Interrogatory Number 5
11 to these first eight bullet points regarding
12 the amount that WiAutomation paid for these
13 products, is it fair to assume that
14 WiAutomation has no records for how much it
15 paid?
16           MR. KASOLAS:  Objection to form.
17   A.    Like I always said, there should be
18 invoices, but on the invoices there is not
19 always the name of the producer and the code of
20 the item.  And I searched and I gave everything
21 that I was able to find.
22   Q.    Were you not able to find
23 information that would tell you how much
24 WiAutomation paid for these products?
25   A.    No.  Because if on the invoice there

Page 196

1  is not always the brand name or the item code,
2  I was not able to do this comparison.
3    Q.    Further down, in the response to
4  Interrogatory Number 5, there are other
5  transactions where there's an invoice number
6  identified in bold.
7           Do you see those?
8    A.    Yes.
9    Q.    So for this first bullet point that
10 I have highlighted, the first bolded one, it
11 says there's a purchase price of approximately
12 2,100 euros.
13           Do you see that?
14   A.    Yes.
15   Q.    Where does that information come
16 from?
17   A.    This information comes on the basis
18 of some -- somebody in administration
19 remembering it.
20   Q.    This is just off the top of their
21 head?
22   A.    Yes, that's why it's written
23 approximately.
24   Q.    So these purchase prices are not
25 based on any invoice or document that you

Page 197

1  reviewed in preparing these interrogatory
2  responses?
3    A.    Could you repeat the question?  I
4  did not understand it well.
5    Q.    When you say that the purchase price
6  for these products identified here was
7  approximately some number, is there any
8  document that you used to prepare those
9  responses?
10   A.    If I were sure of the exact amount,
11 I would have written the exact amount.  I
12 wrote -- I put approximately because I wasn't
13 sure of the amount.
14   Q.    So everywhere where you have
15 approximately, am I to understand that that is
16 a personal recollection of yours or someone
17 else in administration department?
18   A.    Yes.
19   Q.    I've scrolled down to Interrogatory
20 Number 6, which asks for the gross revenue,
21 costs, and expenses and profits of WiAutomation
22 on a quarterly basis from 2015 to present.
23           Do you see that?
24   A.    Yes.
25   Q.    Were you responsible for assisting

Page 198

1  with the preparation of this interrogatory
2  response?
3    A.    Yes.
4    Q.    In 2018, you have listed here that
5  WiAutomation's gross revenue was a little over
6  81,000 euros.
7           And my question to you is where does
8  that number come from?
9    A.    From administration.
10   Q.    What documents were used to obtain
11 that figure?
12   A.    The sum of the invoices.
13   Q.    So to respond to this interrogatory,
14 the people in the administration department at
15 WiAutomation took all of the invoices from 2018
16 and added them all up; is that right?
17   A.    This was already done time ago.
18   Q.    When was it already done?
19   A.    I don't remember exactly.  But it
20 was for sure for payment of taxes.
21   Q.    So these numbers come from
22 WiAutomation's tax filings?
23   A.    Yes.
24   Q.    And in order to prepare the numbers
25 for those tax filings, people at WiAutomation

1  added up all of the invoices to obtain the
2  revenue number?
3       A.    Yes.
4       Q.    Was that same method used to obtain
5  the revenue numbers for 2018, 2019, and 2020
6  that are listed here in response to
7  Interrogatory Number 6?
8       A.    Yes.
9       Q.    Does WiAutomation still have copies
10 of the invoices that were used in preparing its
11 2018, 2019, and 2020 tax filings?
12       MR. KASOLAS:  Objection to form.
13       A.    Yes, because if I'm not mistaken, in
14 Italy by law they need to be saved for five
15 years, if I'm not mistaken.
16       Q.    In 2021, there's a gross revenue
17 number that's listed here of a little bit over
18 6.5 million euros.
19       Do you see that?
20       A.    Yes.
21       Q.    How was that number obtained?
22       A.    Always with the same method.
23       Q.    Has WiAutomation finalized its tax
24 filings for 2021?
25       A.    Not yet.  We are working on it.

1  Like I said before, we had quite a few
2  problems.  That's why we are late.
3       Q.    Since this interrogatory response
4  was prepared in August of this year, are you
5  aware of any changes that need to be made to
6  these revenue numbers?
7       MR. KASOLAS:  Objection to form.
8       Objection to form.  Which numbers,
9  Neal?
10       A.    Which number?
11       Q.    2021 revenue number of just over
12 6.5 million euros is the number that I'm
13 referring to.
14       A.    Like I said before, we are working
15 on it.
16       Q.    As you sit here today, are you aware
17 of any adjustments that need to be made to that
18 6.5 million euro revenue number for 2021?
19       A.    I did not speak with administration
20 yet.  And they are working on it.
21       Q.    So as far as you know, sitting here
22 today, that 2021 revenue number is correct?
23       MR. KASOLAS:  Objection to form.
24       That's not what he said.
25       A.    It might be correct or not correct.

1  Like I said before, I did not speak with
2  administration yet.  They are working on it.
3       Q.    You understand that you've been
4  designated as the one individual at
5  WiAutomation to answer questions about
6  WiAutomation's revenue today?
7       A.    Yes.
8       Q.    What did you do to prepare for
9  today's deposition to be able to tell me
10 whether or not that 6.5 million euro revenue
11 number for 2021 is correct or not?
12       A.    I had said that if this number had
13 changed, they were supposed to let me know.
14 But as of now, they did not update me yet.
15       Q.    Did you ask them for an update?
16       A.    Like I said before already, I did
17 not talk to them yet.  They are working on it.
18       Q.    So in preparation for today's
19 deposition, you didn't ask anybody if this
20 number is correct?
21       MR. KASOLAS:  Objection to form.
22       A.    I had asked if this number had
23 changed or was correct, they were supposed to
24 let me know, but they did not let me know yet.
25       Q.    So you don't know whether this

1  number is correct?
2       A.    I already said before, it might be
3  correct; it might not be correct.
4       Q.    Is there a deadline by which you
5  need to finalize your 2021 tax filings?
6       A.    No, not in Italy.
7       Q.    So it could go on for years before
8  you finalize your 2021 tax filings?
9       A.    Yes, in Italy this thing is
10 possible.
11       Q.    From the beginning of 2022 to today,
12 what are WiAutomation's revenues?
13       MR. KASOLAS:  Objection to form.
14       A.    If the administration was not able
15 to complete yet 2021, I think they are still
16 working also on the 2022.
17       Q.    You're a part owner of WiAutomation;
18 right?
19       A.    Yes.
20       Q.    As a part owner of WiAutomation, are
21 you able to ask what the revenues for the
22 company have been for this past year?
23       A.    Yes, yes.
24       Q.    So you could have asked what are
25 WiAutomation's revenues for 2022; right?

Page 203

1    A.    Yes.
2    Q.    Do you ever have meetings between
3  you and Porfirio and Luca to discuss the
4  business of WiAutomation?
5    A.    Sometimes, yes.
6    Q.    Do you ever discuss WiAutomation's
7  revenues?
8    A.    Not very often.
9    Q.    When you discuss the revenues of
10  WiAutomation at your meetings, do you have data
11  that you are looking at?
12    A.    No.  More than anything, we talk
13  trying to find out how to grow.
14        MR. KASOLAS:  Neal, Eric Boden from
15        my firm is going sit in for a little bit
16        while I conduct a case management
17        conference in an unrelated New Jersey State
18        case; okay?
19        MR. McLAUGHLIN:  Is it something
20        that can be done -- how much do you think
21        you need for --
22        MR. KASOLAS:  I don't know.
23        MR. McLAUGHLIN:  -- the other thing.
24        MR. KASOLAS:  It's a very big case.
25        It could be half hour, it could be

Page 204

1  20 minutes, it could be an hour.  So I
2  don't want to play games and he's going to
3  sit in for me and I'm going to leave and
4  then I'll come back in; okay?
5        MR. McLAUGHLIN:  Okay.
6        MR. KASOLAS:  Thank you.
7  BY MR. McLAUGHLIN:
8    Q.    Mr. Coppola, when you ask for the
9  revenue numbers for WiAutomation where do those
10  numbers come from?
11    A.    From administration.
12    Q.    And if you were to ask
13  administration today, What are the revenues for
14  WiAutomation in 2022, what documents would they
15  need to look at?
16    A.    Invoices.
17    Q.    Is there any other document or
18  source of information at WiAutomation that
19  someone in administration could use to
20  determine how much revenue is received in 2022?
21    A.    No.  The invoice is calculated by
22  summing, adding the invoices.
23    Q.    So the only thing stopping
24  WiAutomation from determining how much revenue
25  it received in 2022 is the time that it would

Page 205

1  take to add up all of the invoices; is that
2  right?
3    A.    Yes.
4    Q.    Those invoices are not unreliable,
5  are they?
6    A.    What do you mean?
7    Q.    In your response to Interrogatory
8  Number 6 you say that WiAutomation does not
9  have reliable figures to report for fiscal year
10  2022.
11        And so my question to you is:  The
12  invoices that you would use to tabulate the
13  amount of revenue that WiAutomation receives in
14  2022 are not unreliable, are they?
15        THE INTERPRETER:  I'm sorry.  One
16        second.
17    A.    So we did -- the invoices that we
18  have, we can rely -- they are reliable, those
19  invoices.  It's the computing that is not
20  comprehensive yet.
21    Q.    By computing, you mean somebody in
22  administration may have entered a number in the
23  calculator wrong?
24    A.    It might have skipped some or some
25  invoices.

Page 206

1    Q.    So the problem would not be with the
2  invoices themselves, it would be with the
3  methods that you use to add them up; right?
4    A.    Like I already said before, they are
5  still working on 2021 because we had some
6  problems.
7    Q.    But there's no problems with the
8  actual invoices themselves for 2021 or 2022; is
9  that right?
10    A.    No, there are no problems.
11    Q.    Okay.
12        I've scrolled down now to
13  Interrogatory Number 7 which asks for the gross
14  revenue, cost, and expense and profits of
15  WiAutomation attributable to WiAutomation sales
16  of unused Rockwell Automation products.
17        Do you see that?
18    A.    Yes.
19    Q.    Were you involved in preparing the
20  response to this interrogatory?
21    A.    Yes.
22    Q.    In the response, at the bottom it
23  says:  For 2022, WiAutomation has generated
24  421,000 euros in gross revenue for Rockwell
25  Automation products.

Page 207

1    Do you see that?
2    A.    Yes, this is what we were able to
3    estimate.
4    Q.    What is that number based on?
5    A.    Always on the sum of the invoices.
6    Q.    So to prepare that number you took
7    all of the invoices that you had for 2022 up to
8    that point and added all of the sales for
9    Rockwell Automation products?
10   A.    Like I said before, it's an
11   estimate.  And the invoices do not always have
12   the name of the brand.
13   Q.    How did you estimate this number?
14   A.    I had to ask the people in sales
15   administration.  That's why it's an estimate.
16   Q.    What is the estimate based on?
17   A.    I already told you, it's an
18   estimate.  So I have to speak with the girls,
19   and with administration.
20   Q.    How did the people in administration
21   come up with this estimate?
22   A.    It's not easy.  I told you we had
23   quite a few problems.  They did some checks
24   and -- they checked a few things and this is
25   what we were able to estimate.

Page 208

1    Q.    What did they check?
2    A.    The girls try to remember sales to
3    clients, and in administration they tried to
4    check the invoices.  But like I told you, on
5    the invoices there's not always the name of the
6    brand or the code of the product.
7    Q.    So you have your invoices from --
8    (audio interruption) -- and the people in
9    administration check them and came up with this
10   number; is that what you are telling me?
11   A.    No, I did not say that.  I said that
12   I had to ask people in administration and also
13   girls in sales to remember of sales of
14   Rockwell, and we came up with that estimate.
15   Q.    Were any documents consulted in
16   order to come up with this estimate of 421,000
17   euros?
18   A.    Like I already said, no.
19   Q.    This estimate is just based on the
20   people in administration talking to the people
21   in sales, talking to you, and you come up with
22   this number; is that right?
23   A.    Yes, like I told you before, it is
24   an estimate.  And administration is still
25   working on 2021.

Page 209

1    Q.    Do you know the name FlameNetworks?
2    A.    Yes, it is familiar.
3    Q.    What is FlameNetworks?
4    A.    FlameNetworks is a company and --
5          (Multiple speakers.)
6    A.    FlameNetworks is a company, and
7    Porfirio usually deals with them.
8          THE INTERPRETER:  One second.  The
9          interpreter could not hear the rest of the
10         sentence because of speaking over the
11         interpretation.
12   A.    And FlameNetworks is -- deals with
13   informatics, and if I'm not mistaking, they are
14   the ones managing our -- our --
15         (The interpreter seeks
16         clarification.)
17   A.    They host the -- the site, the
18   website.
19   Q.    So FlameNetworks is the company
20   that's the host of WiAutomation's website;
21   right?
22   A.    Hosts the site WiAutomation, yes.
23   Q.    So when a customer places an order
24   on the WiAutomation website, it's
25   FlameNetworks' servers that process that order;

Page 210

1    right?
2    A.    That I know, absolutely not.  All of
3    the data of our orders is here.
4    Q.    When someone clicks on the purchase
5    button on WiAutomation's website, is that click
6    received by FlameNetworks' servers?
7    A.    Not that I know.  But of all this
8    technical and informatics things, Porfirio is
9    the one handling it.
10   Q.    Does WiAutomation use any other
11   website hosting service other than
12   FlameNetworks?
13   A.    No.
14   Q.    Are you aware of something called
15   Ecommerce HUB?
16   A.    Not that I know.
17   Q.    Have you ever spoken with a person
18   named Fabrizio Leo of FlameNetworks?
19   A.    No.  Like I said before, Porfirio is
20   the one relating with FlameNetworks because
21   they are informatics things.
22   Q.    How much has WiAutomation paid
23   FlameNetworks for its servers -- for its
24   services?
25   A.    I don't remember exactly, but there

Page 223

1    Q.    Over the course of 2020, did
2  WiAutomation experience an increase in the
3  number of orders that it received?
4    A.    Yes.
5    Q.    Was the increase in 2020 more or
6  less than the increase in 2021?
7    A.    I did not understand the question
8  well.  We are constantly growing.  But I did
9  not understand what you meant.
10   Q.    Did WiAutomation grow more in 2021
11 or 2020?
12   A.    I wouldn't be able to specify that
13 because administration is still working on
14 2021, so I don't have a certain date -- I don't
15 have an amount.
16   Q.    The next slide shows WiAutomation's
17 revenue.
18         Do you see that?
19   A.    Yes, I see it.
20   Q.    Is this information accurate?
21   A.    I wish.
22   Q.    This slide shows monthly revenue
23 information from December 2019 to August 2022.
24         And my question to you, Mr. Coppola,
25 is:  Does WiAutomation maintain monthly revenue

Page 224

1  figures?
2    A.    No, absolutely.
3    Q.    You told me before that in order to
4  determine your total revenue figures for the
5  year you add up all of the invoices for that
6  year; correct?
7    A.    Yes, correct.
8    Q.    If you wanted to, though, couldn't
9  you add up all of the invoices for one month?
10   A.    If I wanted, yes.
11   Q.    So if you wanted to, you could get
12 WiAutomation's monthly revenue numbers;
13 correct?
14   A.    If I wanted, yes.
15   Q.    And you could prove whether the
16 information on this slide is accurate or not;
17 correct?
18   A.    Yes, I could prove but, like I
19 already said before, we were not the ones to
20 give this information.  And I -- I ask the
21 attorney to handle it.
22   Q.    FlameNetworks' servers know when
23 WiAutomation's customers place an order, don't
24 they?
25   A.    Not that I know.  That I know is no.

Page 225

1  But again, like I said before for all of these
2  things about informatics, I'm not a technician.
3  I have to ask Porfirio.
4    Q.    That automatic e-mail that you
5  receive when a customer places an order, does
6  it come from a FlameNetworks' server?
7    A.    Not that I know.  It comes on our
8  server.
9    Q.    I'm asking about the server that
10 sends the e-mail, not the server that receives
11 the e-mail.
12         So the question is -- and the
13 question is:  Does FlameNetworks' server send
14 the automatic e-mails that you receive when a
15 customer places an order on your website?
16   A.    Like I already told you, I'm not an
17 informatics technician and for all of this
18 precise information, technical information, I
19 would need to ask Porfirio.
20   Q.    As you sit here today, are you aware
21 of any information that the automatic e-mails
22 that you receive from website orders do not get
23 sent by FlameNetworks?
24   A.    Like I already told you, I'm not an
25 informatics technician and I do not know all of

Page 226

1  these technical specifics -- things.
2    Q.    Okay?
3         MR. McLAUGHLIN:  I think it's time
4    now for a break.  Let's take ten minutes
5    this time, if that works for everybody.
6         THE VIDEOGRAPHER:  The time is
7    4:53 p.m., and we are off the record.
8         (Recess is taken.)
9         THE VIDEOGRAPHER:  This is the start
10   of media labeled Number 3.  The time is
11   5:09 p.m., and we are back on the record.
12 BY MR. McLAUGHLIN:
13   Q.    So I would like to mark a copy of
14 the slides that we were just looking at as
15 Exhibit 11.
16         (Coppola Exhibit 11, SlideShare
17   Slides, remotely introduced and provided
18   electronically to the reporter.)
19         MR. McLAUGHLIN:  And now I would
20   like to turn back what we had previously
21   marked as Exhibit 8, which is
22   WiAutomation's interrogatory responses.
23 BY MR. McLAUGHLIN:
24   Q.    Mr. Coppola, can you see
25 Interrogatory Number 7 on your screen?

Page 227

1      A.    Yes.
2      Q.    In the response it says
3  WiAutomation's gross revenue costs and profits
4  attributable to WiAutomation sales of Rockwell
5  Automation products are approximately
6  15 percent of total gross revenue costs and
7  profits.
8            Do you see that?
9      A.    Yes, I see it.
10     Q.    How was that 15 percent number
11 obtained?
12     A.    The number 15 percent, it's written.
13 It's approximately, because it's an estimate.
14     Q.    What is that estimate based on?
15           MR. KASOLAS:  Objection to form.
16     A.    Considering all of the brands that
17 we sell.
18     Q.    Did you look at any documents in
19 order to estimate that number?
20     A.    Like I said before, we don't have a
21 precise way to be able to make a precise
22 estimate.
23     Q.    So when you came up with this
24 15 percent number, were there any documents
25 that helped you create that estimate?

Page 228

1      A.    I checked with administration, with
2  sales.  We compared with e-mails, with
3  invoices.  And that's why we came up with an
4  approximately 15 percent, the 15 percent
5  number.
6      Q.    What -- what e-mails were reviewed
7  in order to provide a basis for this 15 percent
8  estimate?
9      A.    E-mails available from the last
10 orders.
11     Q.    Did you review all e-mails that were
12 orders?
13     A.    Like I already told you, I did not
14 review them all myself.  I asked for some help
15 from administration and the girls from sales.
16     Q.    Were all order e-mails reviewed in
17 order to obtain this 15 percent estimate or
18 were only some e-mails reviewed?
19     A.    I tried to look at all of them.
20     Q.    You also mentioned that you reviewed
21 invoices to come to this 15 percent estimate;
22 is that right?
23     A.    Yes, with administration.
24     Q.    Were all customer invoices reviewed
25 in preparing this 15 percent estimate?

Page 229

1      A.    I tried to have all of them
2  reviewed.
3      Q.    If you reviewed all of the estimates
4  and all of the order e-mails, could you not
5  have come to a precise answer?
6            MR. KASOLAS:  Objection to form.
7      A.    No, because like I told you before
8  already, on the invoices not always there is
9  the brand's name or the product code.
10     Q.    How often are invoices sent to
11 customers for Rockwell Automation products that
12 did not include an identification of the
13 products that would let you know the brand name
14 of the product?
15     A.    Often, because it's not required.
16 So when I ask the administration, they -- they
17 do something.
18     Q.    What does administration do?
19     A.    If it is requested, the
20 administration will input it.
21     Q.    So you have two kind of invoices to
22 customers, one that identifies Rockwell
23 Automation products as Rockwell Automation
24 products and the other type that does not
25 identify Rockwell Automation products as such;

Page 230

1  correct?
2      A.    In general, sometimes there is the
3  brand's name.  Sometimes there is the product's
4  code.  Sometimes there is a description.  We
5  have many brand, not just Rockwell Automation.
6      Q.    But when you reviewed all of the
7  order e-mails and all of the invoices to come
8  up with this estimate, you could have provided
9  a number for revenue that, for sure, you know
10 that you received related to Rockwell
11 Automation products.
12           And there would be some other
13 unknown portion where you would have to
14 estimate; is that right?
15           MR. KASOLAS:  Objection to form.
16     A.    No, because from the order the
17 invoice is not always generated with the
18 brands.  So if the brand is not on the invoice,
19 that is why I generated this number --
20 approximative number.
21     Q.    I'm going to share on my screen what
22 has previously been marked as Exhibit 6.
23           Can you see that?
24           On this WiAutomation invoice, there
25 are two Allen-Bradley products identified; is

Page 231

1  that correct?
2       A.   I don't remember the product, the
3  code of the product exactly, but the name of
4  the product is Allen-Bradley.
5       Q.   So when you reviewed invoices that
6  looked like this, that said Allen-Bradley, you
7  could have added up all of those sales; right?
8            MR. KASOLAS:  Objection to form.
9       A.   Yes.
10      Q.   Did you do that?
11      A.   That I remember, yes.
12      Q.   Where is that number provided?
13      A.   I don't remember.  I know that it is
14 somewhere, but it was not given to anybody.
15      Q.   So you kept it to yourself?
16      A.   What does this mean?  I'm sorry.
17 What does it mean?
18      Q.   You said that the number was not
19 given to anybody and my question is:  Do you
20 still have that number?
21      A.   For what?  For which thing?
22      Q.   When you added up all of the
23 invoices that said Allen-Bradley on them.
24      A.   All the ones that I was able to
25 find, I gave.

Page 232

1       Q.   Did you add up all of the invoices
2  that say Allen-Bradley on them?
3            MR. KASOLAS:  Objection to form.
4       A.   I don't remember exactly.  I asked
5  help from administration.
6       Q.   Did they add up all of the invoices
7  that say Allen-Bradley on them?
8       A.   That I know, yes.
9       Q.   What is that number?
10      A.   I don't remember it exactly.
11      Q.   In preparation for today, did you
12 ask for that number?
13      A.   No, because I had already given it
14 in the past -- previously.
15      Q.   I'm looking at WiAutomation's
16 response to Interrogatory Number 7 now.
17           This is Exhibit 8.
18           Where is that number given?
19      A.   The number -- the number, it's not
20 there.  Because, as I said, it's an approximate
21 estimate and that number is the approximate
22 estimate of 15 percent.
23      Q.   When your administration department
24 added up all of the invoices that said
25 Allen-Bradley on them and came to a number, has

Page 233

1  that number been provided in the context of
2  this litigation?
3       A.   It might have not been accurate.
4  There might have been other -- others where the
5  brand name was not present and that's why it
6  was given an approximate number.
7       Q.   Mr. Coppola, my question is very
8  simple and it's about one number and whether or
9  not WiAutomation has provided that one number
10 in the context of this litigation.
11           And the question is:  When the
12 administration department looked at all of the
13 invoices and added up the ones that said
14 Allen-Bradley on them and came to a number, has
15 that number been provided in this litigation?
16           MR. KASOLAS:  Objection to form.
17      A.   No.  Because it could have not been
18 an exact one, and we give an approximate
19 15 percent figure.
20      Q.   Looking back at Exhibit 8, it says
21 for fiscal year 2021, WiAutomation collected
22 gross revenue on Rockwell Automation products
23 of 1,046,880 euros.
24           Do you see that?
25      A.   Yes, I see it.

Page 234

1       Q.   Is that number accurate?
2       A.   It might be accurate; it might not
3  be accurate.  Because you insisted to have an
4  exact number, so I worked more on it.  And I
5  gave this number.
6       Q.   So it's your testimony today that
7  this number in WiAutomation's interrogatory
8  response might not be accurate?
9            MR. KASOLAS:  Objection to form.
10      A.   There might be some invoices even
11 without the Rockwell brand, so it might -- it
12 could change.
13      Q.   When could it change?
14      A.   Another check would need to be done
15 or maybe some invoices were also with other --
16 without the Rockwell brand.  Or maybe one --
17 somebody from the staff, a girl, might have
18 input the wrong code for the product.
19      Q.   Is WiAutomation currently in the
20 process of verifying whether or not this number
21 is accurate?
22      A.   They are always working on this
23 because, like I said, we had some problems and,
24 plus, this work that was asked, so in
25 administration, we are having some confusion.

1    Q.    When will you know whether or not
2  this number is accurate?
3          MR. KASOLAS:  Objection to form.
4    A.    I would need -- I would need to ask
5  administration because I asked them to inform
6  me, but they did not give me any information.
7  So at the moment, I don't have an update.
8    Q.    When was the last time you asked for
9  this information from administration?
10   A.    I don't remember exactly, some time
11 ago.
12   Q.    More than a month ago?
13   A.    Yes, more or less, I think, yes.
14   Q.    This number of slightly over one
15 million euros for WiAutomation's revenue of
16 Rockwell products in 2021, what is that based
17 on?
18   A.    From administration.
19   Q.    Is that a sum of all of the invoices
20 or something else?
21   A.    Like I said before, I had to check
22 with administration, with sales.  And so it is
23 an approximate estimate.
24   Q.    So this number is another estimate;
25 is that right?

1    A.    That's all I was able to find.
2    Q.    Is the process you used to obtain
3  this estimate for 2021 the same process that
4  you used to obtain the 15 percent number for
5  2018 and 2020?
6    A.    Yes.
7    Q.    This number for 2022, I asked you
8  about it already, is that an estimate using the
9  same method that you used for 2018
10 through 2021?
11         MR. KASOLAS:  Objection to form.
12   A.    Yes, like I already said, we had
13 problems in administration, so they had to work
14 on regular, normal workload plus the extra
15 workload, and we -- we did an approximate
16 estimate.
17   Q.    What proportion of WiAutomation
18 sales of Rockwell products are to customers
19 located in the United States?
20   A.    I do not have a tool that allows me
21 to check this.
22   Q.    But you have the invoices, though;
23 right?
24   A.    Yes, invoices, yes.
25   Q.    And the invoices tell you whether a

1  customer would be located in the United States,
2  or not; correct?
3    A.    You are talking about only Rockwell
4  products?
5    Q.    Correct.
6    A.    For all of the brands, yes.
7    Q.    So if you wanted to, during your
8  exercise of estimating the amount of Rockwell
9  revenue, you could have also estimated the
10 amount of Rockwell revenue to customers in the
11 United States; correct?
12         MR. KASOLAS:  Objection to form.
13   A.    I would have needed to check the
14 clients' addresses.  And I would -- it would
15 have taken me much longer.
16   Q.    I'm going to show back on my screen
17 what we've already marked as Exhibit 6.  It
18 says:  WiAutomation invoice, and right there it
19 says:  Stati Uniti d'America, under the
20 customer name.
21         Do you see that?
22   A.    Yes, I see it.
23   Q.    So in your process of estimating the
24 amount of Rockwell product revenue, you could
25 have also looked at the top of the invoices to

1  determine whether or not that Rockwell
2  Automation revenue came from a customer in the
3  United States; correct?
4    A.    Yes.
5    Q.    Did you do that?
6    A.    No.  Like I already said, I asked
7  help from administration, and we had many
8  problems.
9    Q.    What proportion of WiAutomation's
10 overall sales are to customers located in the
11 United States?
12         MR. KASOLAS:  Objection to form.
13         Asked many times yesterday as well.
14         THE INTERPRETER:  One second.  The
15         interpreter needs a clarification on a
16         word.
17   A.    So I would not be able to do an
18 estimate at the moment.
19   Q.    Why are you not able to do an
20 estimate at the moment?
21         MR. KASOLAS:  Objection to form.
22   A.    Because I'm here speaking to you.
23   Q.    Did you do anything --
24         (Multiple speakers.)
25   A.    I'm not able to do this thing now at

Page 239

```
1   this specific moment.
2        Q.   Did you do anything to prepare for
3   your deposition that would give you the
4   information you need in order to be able to
5   give me an estimate of how much of your sales
6   are from customers in the United States?
7        A.   It would not be a precise estimate
8   because the brand is not always on the invoice.
9        Q.   My question is about WiAutomation's
10  overall sales, not just about Rockwell
11  Automation.
12            And the question is:  Of
13  WiAutomation's overall sales, what proportion
14  of those sales are to customers in the United
15  States?
16            MR. KASOLAS:  Objection to form.
17       Asked and answered.  Here we go again,
18       Neal.
19       A.   It would not be a precise estimate.
20       Q.   Did you do anything to prepare for
21  today's deposition to help you give an answer
22  to that question?
23            MR. KASOLAS:  Objection to form.
24       A.   I did it in the past to answer the
25  question, yes.
```

Page 240

```
1        Q.   What was the answer in the past?
2        A.   That I do not have a tool available
3   allowing me to do this work.
4        Q.   If you were to look at all of your
5   invoices, would you not be able to figure out
6   what proportion of revenues came from customers
7   in the United States?
8            MR. KASOLAS:  Objection to form.
9        A.   Yes, I could have an estimate for
10  all of the brands, but not Rockwell.
11       Q.   Did you perform that work to obtain
12  an estimate for all of the brands?
13       A.   I tried.
14       Q.   And what were you able to come up
15  with?
16       A.   I was not --
17            (Multiple speakers.)
18       A.   I was not able to get a precise
19  number or estimate because I also worked on all
20  of the rest.
21       Q.   Even if you don't have a precise
22  number or estimate, is that an approximate that
23  you are able to give?
24            MR. KASOLAS:  Objection to form.
25       A.   No, I'm not able --
```

Page 241

```
1            (Multiple speakers.)
2        A.   No, I'm not able to give an
3   approximate number.
4        Q.   Are you able to give any
5   characterization at all about the proportion of
6   WiAutomation's overall sales to customers in
7   the United States versus the rest of the world?
8            MR. KASOLAS:  Objection to form.
9        A.   We sell all over the world, and so
10  I'm not able to make a precise estimate.
11       Q.   I'm not asking for a precise
12  estimate.  What I'm asking for is do you have
13  any information at all to provide any
14  characterization of the proportion of
15  WiAutomation's overall sales to customers in
16  the United States versus the rest of the world?
17       A.   They are not many.
18       Q.   What did you that mean?
19       A.   That means that we sell all over the
20  world more or less the same.  So I would not be
21  able to tell you if it's more or less.
22       Q.   Do you have any information at all
23  that forms the basis for that answer?
24       A.   No.  I already answered about this
25  that I do not have a tool that allows me to
```

Page 242

```
1   check this.
2        Q.   And you could have checked the
3   invoices, but you did not do that; is that
4   right?
5            MR. KASOLAS:  Objection to form.
6        A.   I checked the invoices, but I did
7   not focus on this information.  Because I do
8   not have a tool allowing me to get this
9   information, to get to this information.  I
10  will need to do it manually and it would -- it
11  would take a long time and it would not be
12  accurate.
13       Q.   Have you tried to perform that
14  manual review of invoices that you are talking
15  about?
16       A.   I asked administration for some
17  help.
18       Q.   Did they ever give you an answer?
19       A.   They did not update me yet.
20       Q.   Turning back to Exhibit 8, I'm
21  looking at the sentence here that says:
22  WiAutomation's costs for Rockwell products was
23  almost 850,000 euros.
24            Do you see that?
25       A.   Yes, I see it.
```

Page 243

1    Q.    How was this number calculated?
2    A.    On the basis of all of the invoices
3 that were found.
4    Q.    Is this number an estimate?
5    A.    Yes, it is always an estimate.
6    Q.    So you estimate down to the single
7 digit euros for what your costs were?
8    A.    Absolutely not.  But like I told
9 you, it's an approximate estimate.  And we had
10 problems, many problems, in administration.
11   Q.    How do you -- how did you come to
12 the estimate that your costs were 847,972 euros
13 and not 847,971 euros?
14   A.    I asked for some help in
15 administration.  It could be 972, just like
16 971.
17   Q.    Was there a formula used to
18 calculate this number?
19   A.    What does it mean a formula?  I told
20 you, I do not have a tool that allows me to
21 calculate this.
22   Q.    How did you arrive at this number,
23 at such a precise estimate?
24   A.    In fact, I told you the estimate is
25 not precise; it's approximate.

Page 244

1    Q.    It goes down to two euros.
2    That's precise; is it not?
3    MR. KASOLAS:  Objection.  Please
4 stop arguing with the witness, Neal.
5    A.    I told you that it could have been
6 also one.
7    Q.    What is the margin of error for this
8 estimate?
9    A.    I do not know.
10   Q.    What would you need to do to find
11 out?
12   A.    I do not know.
13   Q.    Were any invoices from your
14 suppliers reviewed as a basis for coming up
15 with this estimate?
16   A.    Yes.
17   Q.    What was the total amount of
18 Rockwell products purchased on the invoices
19 used to arrive at this estimate?
20   MR. KASOLAS:  Objection to form.
21   A.    I do not remember.
22   Q.    How many different invoices were
23 reviewed in coming up with this estimate?
24   A.    I do not remember exactly.  Invoices
25 and orders were reviewed.

Page 245

1    Q.    What orders were reviewed in coming
2 up with WiAutomation's costs for Rockwell
3 products?
4    THE INTERPRETER:  One second I would
5    need him to repeat that one more time.
6    A.    So the orders, the invoices, the
7 orders received from the suppliers, the e-mail,
8 were reviewed what do you mean with invoices?
9    Q.    Was every single invoice from a
10 source of Rockwell Automation products reviewed
11 in coming up with this estimate for 2021?
12   MR. KASOLAS:  Objection to form.
13   A.    We checked everything.
14   Q.    And all of those invoices have been
15 provided in this litigation?
16   A.    I believe, yes.
17   Q.    So if we were add up all of the
18 purchases of Rockwell Automation products from
19 those invoices that you provided, would that be
20 more or less than this estimate of 847,000
21 euros?
22   A.    It is an -- an approximate estimate.
23 So I don't know.
24   Q.    The difference between the number
25 that you would get if you add up all of the

Page 246

1 invoices from your suppliers and this estimate,
2 is that different, more or less, than the sum
3 of the invoices?
4    A.    I would not be able to say to tell
5 exactly.  We did not find all of the invoices
6 because not all of the suppliers put the brand
7 on the invoice.
8    Q.    The products that you think you
9 purchased from your sources that are Rockwell
10 Automation products, how were you able to
11 determine how many of those products did not
12 appear on an invoice?
13   MR. KASOLAS:  Objection to form.
14   A.    I already said many times that it is
15 an estimate, an approximate estimate.  So I
16 don't know.
17   Q.    Was that estimate made by you or
18 somebody in the administration department?
19   A.    Both.
20   Q.    Do you have any more information to
21 provide about how you came up with this
22 estimate for WiAutomation's costs for Rockwell
23 products in 2021?
24   MR. KASOLAS:  Objection to form.
25   A.    No.

Page 247

1      Q.    In 2021, WiAutomation says that its
2    costs for Rockwell Automation products was
3    $341,000; is that correct that that's dollars
4    and not euros?
5      A.    It might be an error.  I don't
6    remember exactly.
7      Q.    How is this 341,000 number
8    calculated?
9      A.    It is -- it is always an approximate
10   estimate, just like the 847,972 was calculated.
11     Q.    If you divide 1,046,880 -- sorry.
12   Strike that.
13           If you divide 847,972 by 1,046,880,
14   you get a very precise 81.0 percent.
15           Did you know that?
16     A.    No.
17     Q.    If you divide 34 -- 341,010 euro
18   into 421 euro, you get the same exact
19   81.00 percent.
20           Did you know that?
21     A.    No.
22     Q.    Were WiAutomation's costs for
23   Rockwell Automation products the same as a
24   proportion of its revenue in 2022 versus 2021?
25           THE INTERPRETER:  I'm sorry.  Could

Page 248

1    you read back the question, please?
2            MR. McLAUGHLIN:  Lisa, could you
3    please read it back?
4            (Question was read back as follows:
5            "QUESTION:  Were WiAutomation's
6    costs for Rockwell Automation products the
7    same as a proportion of its revenue in 2022
8    versus 2021?")
9            THE INTERPRETER:  Okay.  If you
10   could break it down in two parts, please.
11           One second.  Could you read that
12   back, please.
13           (Question was read back as follows:
14           "QUESTION:  Were WiAutomation's
15   costs for Rockwell Automation products the
16   same as a proportion of its revenue in 2022
17   versus 2021?")
18     A.    So like I said before, it's always
19   an estimate, but more or less the cost of
20   products is like that.  We don't have a -- a
21   fixed margin.
22     Q.    All right.
23           MR. McLAUGHLIN:  I think we are at a
24   good time to take a longer food break.  So
25   let's go off the record.

Page 249

1            THE VIDEOGRAPHER:  The time is
2    6:08 p.m., and we are off the record.
3            (Recess is taken.)
4            THE VIDEOGRAPHER:  This is the start
5    of media labeled Number 4.  The time is
6    6:53 p.m., and we are back on the record.
7    BY MR. McLAUGHLIN:
8      Q.    Mr. Coppola, I'm going to share my
9    screen back to Exhibit 8, which is the
10   interrogatory responses that we were looking at
11   earlier.
12           Can you see my screen?
13     A.    Yes.
14     Q.    If you take this 1,046,880 number
15   from WiAutomation's answer to Interrogatory
16   Number 7 from 2021 and divide it by
17   WiAutomation's total gross revenue number in
18   response to Interrogatory Number 6 for 2021,
19   you get a very precise 16.00 percent.
20           Are you aware of that?
21           THE INTERPRETER:  This is Rosanna.
22   If you could go back to the previous
23   figure, please.
24           MR. KASOLAS:  Objection to form.
25           THE INTERPRETER:  1,046,880 divided

Page 250

1    by?  Thank you.
2      A.    Yes, I see.
3      Q.    Was WiAutomation's answer to
4    Interrogatory Number 7 obtained by multiplying
5    its overall revenue for 2021 by 16 percent?
6      A.    Not that I recall.  But if you did
7    the calculation and this is the amount that
8    comes out, then yes.
9            (Coppola Exhibit 12, Bates number WI
10           3442 and ends with WI 3448, remotely
11           introduced and provided electronically to
12           the reporter.)
13           MR. McLAUGHLIN:  I would like to
14           introduce as Exhibit 12 a document here
15           that begins with Bates number WI 3442 and
16           ends with WI 3448.
17   BY MR. McLAUGHLIN:
18     Q.    Mr. Coppola, do you recognize this
19   document?
20     A.    Yes.
21     Q.    What is it?
22     A.    The estimate -- the balance sheet of
23   the operation of 2018.
24     Q.    Who prepared this document?
25     A.    The accountant.

Page 251

1    Q.    Is this an accountant that was
2  retained by WiAutomation?
3        THE INTERPRETER:  Clarification for
4    the Italian word.  Retained in Italian
5    could mean different things.  Hold on one
6    second.
7    A.    Yes, it's not hired, but it was
8  retained as an accountant.
9    Q.    So WiAutomation pays this accountant
10  to create this report; is that right?
11       MR. McLAUGHLIN:  Rosanna, you hit
12    the mute button.
13    A.    Paid in the past.
14    Q.    Does this document get filed with
15  the Italian government?
16    A.    Yes.
17    Q.    Is this document used in connection
18  with your tax filings?
19       MR. KASOLAS:  Objection to form.
20    A.    Yes, exactly.
21    Q.    So it's important that this document
22  is an accurate representation of the figures
23  that are included in it; correct?
24    A.    Yes, exactly.
25    Q.    So I'm going to scroll down to

Page 252

1  page 6 of 7 and there's a line item here for --
2  (reading in Italian).
3        Do you see that?
4    A.    Yes.
5    Q.    What does that line item represent?
6    A.    If I remember well, it's the revenue
7  of sales and services, the revenues.
8    Q.    So I'm going to flip back to
9  Exhibit 8, which is the interrogatory
10  responses, and in response to Interrogatory
11  Number 6 you provided the same exact gross
12  revenue number for 2018.
13        Do you see that?
14    A.    Yes.
15    Q.    In coming up with the answers to
16  Interrogatory Number 6, did you use the
17  information provided in your 2018 report to the
18  government?
19    A.    Yes, from administration.
20    Q.    Further down here there's a line
21  for -- (reading in Italian).
22    A.    Yes.
23    Q.    What is that intended to represent?
24    A.    This should mean all of the expenses
25  of the company, if I remember well.

Page 253

1    Q.    So if you look up a little bit, a
2  couple lines above, there's this line B6.
3        Can you tell me what line is
4  intended to represent?
5    A.    If I remember well, this should be
6  all of the purchases made.
7    Q.    What about this line B7; what is
8  that intended to represent?
9    A.    Generic services.
10    Q.    What kind of services does
11  WiAutomation pay for that are represented in
12  this line?
13    A.    Any generic service.
14    Q.    Would your accountant services be
15  included in this line?
16    A.    I believe, yes.
17    Q.    Would your bill from the electricity
18  company be included on this line?
19    A.    I believe, yes.
20    Q.    And something like your website
21  hosting would also be included on this line?
22       MR. KASOLAS:  Objection to form.
23    A.    It might be.  I'm not sure.
24    Q.    Would your rent for your offices be
25  included on this line also?

Page 254

1        MR. KASOLAS:  Objection to form.
2    A.    If I'm not mistaking, yes.
3    Q.    Okay.
4        So to arrive at this total cost of
5  production at the bottom, these numbers here
6  are added from B6 to B10; is that right?
7    A.    That's how it should be.
8    Q.    So this total cost of production
9  includes things like your electric bill, or --
10  (reading in Italian) -- which is your
11  employment costs; is that right?
12    A.    Yes.
13    Q.    Okay.
14        And the 62,209 number for the total
15  costs is the same number that you've reported
16  in your 2018 answer in response to
17  Interrogatory Number 6.
18        Do you see that?
19    A.    Yes.
20    Q.    Was the number that was provided in
21  response to Interrogatory Number 6 obtained
22  from your filing with the Italian government?
23       MR. KASOLAS:  Objection to form.
24    A.    Yes, I asked the administration, I
25  think, yes.

Page 283

1    A.   I'm telling I think that Rock is the
2  one who should prove this thing.
3    Q.   The -- for the Rockwell products
4  that WiAutomation sells, does WiAutomation
5  provide its customers with copies of Rockwell
6  Automation recall notices?
7    A.   The distributors should be the one
8  to communicate to us the recall of the product,
9  the notices of recall of the products.
10    Q.   Has WiAutomation ever sent one of
11  its customers a Rockwell recall notice?
12    MR. KASOLAS:  Objection to form.
13    A.   We never received such kind of a
14  letter from the authorized distributors.
15    Q.   I'm asking about WiAutomation's
16  communications with its customers, and the
17  question is:  Has WiAutomation ever sent to its
18  customers a Rockwell Automation recall notice?
19    MR. KASOLAS:  Objection to form.
20    A.   If we never received it, I think we
21  never sent it.
22    Q.   Has WiAutomation ever sent one of
23  its customers a Rockwell Automation safety
24  notice?
25    MR. KASOLAS:  Objection to form.

Page 284

1    A.   I don't think so.  And also because
2  we do not open the boxes of products.  If there
3  is one, it could be inside.
4    Q.   If a customer of WiAutomation who
5  purchased a Rockwell product wanted to know
6  where WiAutomation obtained that product from,
7  would you be able tell them?
8    MR. KASOLAS:  Objection to form.
9    A.   This would mean -- does it mean that
10  I should give the name of my supplier to the
11  client?  And this is the heart of the business.
12  If I give the name of the supplier to the
13  customer, we have no reason of existing.
14    Q.   So if a customer were to ask
15  WiAutomation where a Rockwell product that it
16  received came from, you would not give them the
17  answer; correct?
18    MR. KASOLAS:  Objection to form.
19    A.   I wouldn't know --
20    (Multiple speakers.)
21    A.   No, I would not, because this is at
22  the heart of the business.  For anything just
23  like for a car or another item, if you tell the
24  client where you buy them, then the company
25  could have no reason of existing.

Page 285

1    Q.   Have -- sorry.  Strike that.
2    Has any customer of WiAutomation
3  purchased more than $10,000 worth of Rockwell
4  products from WiAutomation?
5    MR. KASOLAS:  Objection to form.
6    A.   So I cannot remember that, but from
7  the invoices that you showed me before, I think
8  the amounts were above $10,000 or euro.
9    Q.   Does WiAutomation have any customers
10  in the United States that have purchased
11  $10,000 or more of Rockwell products?
12    A.   I do not remember exactly.  But yes,
13  it could be.
14    Q.   What are their names?
15    A.   If I do not remember exactly, I can
16  never remember the names.
17    Q.   Did you do anything to prepare for
18  today's deposition to be able to provide me
19  those names?
20    MR. KASOLAS:  Objection to form.
21    A.   Yes.  Some time ago, but I cannot
22  remember the names of clients for sure.
23    Q.   When you say some time ago, was it
24  more than a month ago?
25    A.   No, even more recently.

Page 286

1    Q.   What would you have to do to figure
2  out the names of your customers in the United
3  States who have purchased more than $10,000
4  worth of Rockwell product?
5    MR. KASOLAS:  Objection to form.
6    A.   I would need to look at invoices,
7  and if the brand is on the invoices.
8    Q.   Did you do any of that in
9  preparation for today's deposition?
10    MR. KASOLAS:  Objection to form.
11    A.   Like I told you before already, I
12  searched together with administration and the
13  girls in sales, but I -- I don't remember all
14  of these names.
15    Q.   Would you be able to provide a list
16  if you had more time to do it?
17    MR. KASOLAS:  Objection to form.
18    A.   I would need to redo the entire work
19  from the beginning.
20    Q.   But would it be possible?
21    MR. KASOLAS:  Objection to form.
22    A.   I do not know.
23    Q.   Were all of the Rockwell Automation
24  products that WiAutomation sells, do they all
25  come into the warehouse before being shipped to

1  customers?

2        A.    Yes.

3        Q.    For any product that WiAutomation

4  sells, is there ever a situation where a

5  product gets shipped directly from one of your

6  sources to one of your customers?

7              MR. KASOLAS:  Objection to form.

8        A.    No, absolutely not, for the same

9  reasons I mentioned before.  If I tell one of

10 my clients who -- about my suppliers, my

11 company -- the company would have no reason to

12 exist.

13       Q.    What proportion of WiAutomation

14 sales of Rockwell Automation products are

15 sourced after receiving a customer's order?

16             MR. KASOLAS:  Objection to form.

17       A.    I do not know.  I can't establish

18 that exactly.

19       Q.    Is it more than half of orders?

20             MR. KASOLAS:  Objection to form.

21       A.    I don't know.  I won't be able to

22 say exactly.

23       Q.    What would you have to do in order

24 to be able to answer that question?

25       A.    I don't know.  I wanted to start

1  monitoring this situation.

2        Q.    Did you do any of that in

3  preparation for today?

4        A.    No, it's impossible.

5        Q.    Has anyone at WiAutomation

6  communicated with a company called EDGE Global

7  Supply?

8        A.    Could you repeat the name?

9              THE INTERPRETER:  This is the

10 interpreter.

11             MR. McLAUGHLIN:  EDGE Global Supply.

12       A.    No.  We simply notice that it has

13 many distributors, authorized distributors, all

14 over the world.

15       Q.    Has anyone at WiAutomation

16 communicated with anyone at Rockwell?

17       A.    Not that I know.

18       Q.    What are WiAutomation's projected

19 sales of Rockwell Automation products for the

20 full year 2022?

21             THE INTERPRETER:  I'm sorry, fall,

22 F-A-L-L or F-U-L-L, full.

23             MR. McLAUGHLIN:  F-U-L-L.

24             THE INTERPRETER:  Thank you.

25       A.    I do not know for sure.  After the

1  lawsuit they went down.  The distributors

2  caused the damage to us, but I wouldn't be able

3  to say -- to tell.

4        Q.    What are WiAutomation's sales of

5  Rockwell Automation products from the beginning

6  of 2022 to today?

7        A.    I do not know.

8        Q.    Did you do anything to prepare

9  yourself with an answer to that question in

10 advance of today's deposition?

11       A.    I had already looked in the past.

12       Q.    And those activities did not prepare

13 you to answer the question of how much revenue

14 WiAutomation has received to date for Rockwell

15 Automation products?

16       A.    The approximate estimate that we saw

17 before in the written answers.

18       Q.    That was dated in August.

19             Do you have any updated information?

20             MR. KASOLAS:  Objection to form.

21       A.    No, not at the moment.

22       Q.    Does WiAutomation have a projection

23 of the amount of sales of Rockwell products it

24 anticipates making in 2023?

25       A.    No, absolutely not.

1        Q.    If a customer wanted to make a

2  complaint about a Rockwell Automation product,

3  what ways could they communicate with

4  WiAutomation to provide that complaint?

5        A.    They can send us an e-mail or also

6  call us over the phone.

7        Q.    Are there any other ways of

8  communication?

9        A.    No.  These are the ways we have to

10 communicate with clients.  And the chat.

11       Q.    What complaints has WiAutomation

12 received from customers regarding Rockwell

13 products?

14       A.    None that I recall.  Maybe only one

15 client, but the client had made a mistake in

16 purchasing the product.

17       Q.    What was the mistake?

18       A.    He made a mistake in the purchase

19 with the product code.  And he asked us to

20 change it with another one.

21       Q.    Are there any other complaints that

22 WiAutomation has received regarding Rockwell

23 products?

24       A.    Not that I know.

25       Q.    No WiAutomation customer ever

1  complained that the Rockwell products that they
2  received were old?
3       A.   I don't remember this thing.
4       Q.   No WiAutomation customer ever
5  complained that the Rockwell Automation product
6  that they received had a broken factory seal?
7            MR. KASOLAS:   Objection to form.
8       A.   That I recall.
9       Q.   Has WiAutomation ever paid any
10  person or entity more than a hundred thousand
11  dollars in connection with Rockwell Automation
12  products?
13            MR. KASOLAS:   Objection to form.
14       A.   Not that I recall.
15       Q.   Earlier today we talked about
16  WiAutomation's purchases from Lektronix.
17            Do you recall that conversation?
18       A.   Yes.
19       Q.   Were any of the products that
20  WiAutomation purchased from Lektronix sold to
21  customers in the United States?
22       A.   I do not recall.  It might be, yes;
23  it might be not.
24       Q.   Do you have any information that
25  would provide you that answer?

1       A.   No.  I said I don't recall.  I don't
2  remember.
3       Q.   All right.
4            I would like to take a five-minute
5  break just to wrap up my notes and I might be
6  done.  I'll let you know after the break.
7            THE VIDEOGRAPHER:   The time is
8  8:53 p.m., and we are off the record.
9            (Recess is taken.)
10            THE VIDEOGRAPHER:   This is the start
11  of media labeled Number 6.  The time is
12  8:58 p.m., and we are back on the record.
13  BY MR. McLAUGHLIN:
14       Q.   Does WiAutomation know that Rockwell
15  has contracts with its authorized distributors?
16            MR. KASOLAS:   Objection.  At what
17  point in time?
18       A.   I don't know, I suppose, yes.
19       Q.   What does WiAutomation know about
20  the contents of those contracts?
21       A.   Nothing.
22       Q.   Is WiAutomation looking for sources
23  of Rockwell Automation products right now?
24       A.   Yes, because I'm not receiving an
25  answer from the ones that I was using before.

1       Q.   Where are you looking?
2       A.   I looked -- I also looked on your
3  website, on your site, if there are other
4  authorized distributors in Italy.
5       Q.   Are there any other places that you
6  are looking?
7       A.   No.
8       Q.   Have you had any communications with
9  anyone outside of WiAutomation regarding
10  finding new sources for Rockwell Automation
11  products?
12       A.   No.
13            MR. McLAUGHLIN:   I don't have any
14  further questions at this point.
15            MR. KASOLAS:   Merry Christmas,
16  everybody.  Happy Hanukkah, happy holidays.
17            THE WITNESS:   Happy holidays,
18  everybody.
19            (Continued on the following page to
20  include jurat.)
21
22
23
24
25

1            THE VIDEOGRAPHER:   The time is
2  9:01 p.m.  This concludes the deposition of
3  Fulvio Coppola.  The time is 9:02 p.m.,
4  Central Eastern [sic] time, and we are now
5  off the record.
6            (Time Noted:  9:01 p.m.)
7
8
9            ---------------------
10            Fulvio Coppola
11
12  Subscribed and sworn to before me
13  this      day of              2022.
14
15  -------------------------------------
16
17
18
19
20
21
22
23
24
25

Page 295

```
1          C E R T I F I C A T E

2

3   STATE OF NEW YORK   )

4                       ) ss.:

5   COUNTY OF NEW YORK  )

6

7         I, LISA M. MURACO, a Notary Public

8   within and for the State of New York and

9   Florida, do hereby certify:

10        That FULVIO COPPOLA, the witness

11  whose deposition is hereinbefore set forth,

12  was duly sworn by me and that such

13  deposition is a true record of the

14  testimony given by such witness.

15        I further certify that I am not

16  related to any of the parties to this

17  action by blood or marriage; and that I am

18  in no way interested in the outcome of this

19  matter.

20        IN WITNESS WHEREOF, I have hereunto

21  set my hand this 5th day of January,

22  2023.

23       ------------------------------

24           LISA M. MURACO

25
```

Page 296

```
1

2                I N D E X

3

4   WITNESS                          PAGE

5   FULVIO COPPOLA

6   MR. McLAUGHLIN                   163

7

8             E X H I B I T S

9   DESCRIPTION                      PAGE

10  Coppola Exhibit 8, WiAutomation's   173
    August 5th Responses to Rockwell

11  Automation's Interrogatories

12

13  Coppola Exhibit 9, screen shot of   214
    Facebook

14

15

    Coppola Exhibit 11, SlideShare Slides   226

16

17

    Coppola Exhibit 12, Bates number WI   250

18  3442 and ends with WI 3448

19

20  Coppola Exhibit 13, Bates beginning at   255
    WI 3449 and ending WI 3455

21

22

    Coppola Exhibit 14, Bates Number WI   255

23  3456 and ending WI 3469

24

25  Coppola Exhibit 15, WiAutomation's   274
    Amended Answer files December 10, 2021
```

Page 297

```
1

2

          ERRATA SHEET FOR THE TRANSCRIPT OF:

3

    Case Name:     ROCKWELL v PARCOP

4   Dep. Date:     THURSDAY, DECEMBER 22, 2022
    Deponent:      FULVIO COPPOLA

5

              CORRECTIONS:

6

    Pg. Ln.  Now Reads      Should Read   Reason

7   ___ ___  _____    _____   _____

8   ___ ___  _____    _____   _____

9   ___ ___  _____    _____   _____

10  ___ ___  _____    _____   _____

11  ___ ___  _____    _____   _____

12  ___ ___  _____    _____   _____

13  ___ ___  _____    _____   _____

14  ___ ___  _____    _____   _____

15  ___ ___  _____    _____   _____

16  ___ ___  _____    _____   _____

17  ___ ___  _____    _____   _____

18

19                _____

20                Signature of Deponent

21  SUBSCRIBED AND SWORN BEFORE ME

22  THIS____DAY OF_____, 2022.

23

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:
```

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., | |
| Plaintiff, | |
| vs. | Case No. 1:21-cv-01238-GBW-JLH |
| PARCORP S.R.L. d/b/a WI AUTOMATION, | |
| Defendant. | |

**EXPERT REPORT OF BRETT REED**

**January 6, 2023**

1

## I.   INTRODUCTION

### a.   Qualifications

1.     I am an economist, and a co-founder and Director of Competition Economics LLC, an economic consulting and research firm. Competition Economics provides research and analysis in business, regulatory, and litigation matters. I specialize in the areas of intellectual property and damages analysis and have extensive experience working on such issues with firms and individuals in a wide variety of industries, particularly in high technology industries such as medical equipment and devices, automotive, biotechnology, health care, animal health, food products and related technology, data processing, computer components, software, oil field equipment, construction materials, educational materials, cell phones and networks, displays, television broadcasting, semiconductors and semiconductor manufacturing. I have written articles, lectured, and testified on intellectual property valuation and various damages issues relating to intellectual property.

2.     My resume is attached as Exhibit 1. It includes my testimony over at least the last four years (either in deposition or at trial), identifies other consulting experience, and lists my publications. Competition Economics charges $625 per hour for my professional services in this matter. Other staff members at Competition Economics working under my direction have billing rates of $300 to $425 per hour. Competition Economics' compensation is not contingent on the outcome of this matter in any way.

### b.   Statement of Assignment and Nature of Retention

3.     I was retained by Alston & Bird, LLP, counsel to Rockwell Automation, Inc. ("Rockwell") to analyze economic issues in connection with *Rockwell Automation, Inc. v. Parcorp s.r.l. d/b/a*

2

*WI Automation*, currently pending in the United States District Court, District of Delaware.[1] Specifically, I have been asked to assess the nature and amount of damages suffered by Rockwell as a result of Parcorp s.r.l. d/b/a WI Automation's ("WI Automation's") actions, as alleged by Rockwell, as well as the amount of WI Automation's revenue and profit attributable to its sale of Rockwell Products[2] that it sold as "new."

4.      In conducting my analysis, I reviewed documents produced by Rockwell and WI Automation in the course of this litigation, as well as certain Pleadings, Discovery Responses, deposition testimony and data produced by Rockwell and WI Automation, as well as publicly available information from certain third party sources.  I also spoke with several individuals with relevant knowledge during the course of my analysis, including Justin Orofino and Ryan Smaglik of Rockwell and Mark Paliszewski of Recon Management.  A complete list of materials considered in the course of my analysis to date is set forth in Exhibit 2 to this report.

5.      My analysis and conclusions are set forth in detail in the discussion below.  My principal conclusions can be summarized as follows:

- As a consequence of WI Automation's behavior at issue here, Rockwell has been injured.  The injuries include lost profits directly attributable to WI Automation's unauthorized sales, other price erosion, lost goodwill and direct expenses associated with remediating the adverse impact of WI Automation's behavior.

- I estimate Rockwell's lost profits to be between $0.41 million and $7.95 million (USD) (see Exhibits 5 and 6).

---

[1] *Rockwell Automation, Inc. v. Parcorp s.r.l. d/b/a WI Automation,* United States District Court, District of Delaware, Civil Action No. 1:21-cv-01238-GBW-JLH.

[2] The term "Rockwell Products" as used herein refers to any product bearing one of the Asserted Trademarks identified in the Complaint in this action, including, for example, the "Allen-Bradley," "A-B" or "ControlLogix" trademarks. *See* Complaint, Dkt. 1, ¶36.

3

- As a consequence of WI Automation's behavior at issue here, WI Automation has received revenue and profits that it would not otherwise have received.  That is, it has been unjustly enriched.  That unjust enrichment flows directly from WI Automation's unlawful sales of "new" Rockwell Products.

- An estimated range of WI Automation's revenue from sales of Rockwell products, while subject to very incomplete production of data, is €2.126 million (if one was to accept WI representations, through partial 2022) to €24.77 million based on alternative measures of sales (through calendar 2022), during the relevant period of 2018 to 2022. See Exhibit 3.

- Based on total revenue estimates provided by WI Automation, and using a range of the proportion of sales associated with the Rockwell products supplied by WI Automation, its revenue attributable to sales of Rockwell products over this same time period is between through partial 2022 is €2.1 million to €2.86 million. See Exhibit 3. However, there are third party presentation materials showing a much larger level of sales compared to what has been disclosed by WI Automation, leading to figures at substantially larger levels, as addressed in this report.

## II.    Parties

### a.    Rockwell

6.     Rockwell describes itself as a "leader in industrial automation …(o)ur hardware and software products, solutions and services are designed to meet our customers' needs to reduce the total cost of ownership, maximize asset utilization, improve time to market and reduce enterprise business risk."[3]  The company is headquartered in Milwaukee, WI and operates manufacturing and distribution facilities throughout the world.[4]

---

[3] Form 10-K Rockwell Automation, Inc., November 8, 2022 ("2022 10-K") at p. 3.

[4] See 2022 10-K (Item 2: Properties) at p. 12.

by the Court, and to create and/or use trial demonstratives or other graphical aids or depictions to assist me in presenting my opinions and findings.

## VII.   CONCLUSIONS

66.     As a consequence of WI Automation's behavior at issue here, Rockwell has been injured. The injuries include lost profits directly attributable to WI Automation's unauthorized sales, other price erosion, lost goodwill and direct expenses associated with remediating the adverse impact of WI Automation's behavior.   Given the information available in this case, I have calculated Rockwell's lost profits as set forth above in Table 1 and Table 2, with additional scenarios shown in the underlying source Exhibits.

67.     As a consequence of WI Automation's behavior at issue here, WI Automation has received revenue and profits that it would not otherwise have received.   That is, it has been unjustly enriched.   That unjust enrichment flows directly from the unlawful sales of "new" Rockwell Products.   WI Automation's unjust enrichment (revenue) is set forth above in Table 3, with additional scenarios shown in the underlying source Exhibit 3.

January 6, 2023

Brett Reed

34

# Rockwell Automation Damages Source Calculations

| | 2018 | 2019 | 2020 | 2021 | Partial 2022 | 2018 to P 2022 | |
|---|---|---|---|---|---|---|---|
| *(From ROG 6)* | | | | | | | |
| WI Total Gross Revenue | € 81,238 | € 459,823 | € 3,574,533 | € 6,543,190 | € 2,631,250 * | € 13,290,034 | (1) |
| WI Total Costs | € 62,209 | € 402,470 | € 3,484,446 | € 5,299,830 | € 2,131,313 ^ | € 11,380,268 | (2) |
| | | | | | | | |
| [Calculated] Cost/Revenue | 76.58% | 87.53% | 97.48% | 81.00% | 81.00% | | (3)=(2)/(1) |

\* [Calculated (4)/(7)] - 2022 reported to be partial year as of early August.
^ [Calculated (5)/(8)]

| | 2018 | 2019 | 2020 | 2021 | Partial 2022 | 2018 to P 2022 | |
|---|---|---|---|---|---|---|---|
| *(From ROG 7)* | | | | | | | |
| WI - Rockwell Revenue | | | | € 1,046,880 | 421,000 | | (4) |
| WI - Rockwell Costs | | | | € 847,972 | 341,010 | | (5) |
| WI - Rockwell Profit | | | | € 198,908 | 79,990 | | (6) |
| [Calculated] Rockwell Revenue/Overall Revenue | | | | 16.00% | 16.00% | | (7)=(4)/(1) |
| [Calculated] Rockwell Costs/Overall Costs | | | | 16.00% | 16.00% | | (8)=(5)/(8) |
| | | | | | | | |
| [Calculated] 15% of Revenue | € 12,186 | € 68,973 | € 536,180 | € 1,046,880 | € 421,000 | € 2,085,219 | (9)=(1)x15%, or (4) |
| [Calculated] 16% of Revenue | € 12,998 | € 73,572 | € 571,925 | € 1,046,880 | € 421,000 | € 2,126,375 | (10)=(1)x16%, or (4) |
| [Calculated] 15% of Cost | € 9,331 | € 60,371 | € 522,667 | € 847,972 | € 341,010 | € 1,781,351 | (11)=(2)x15%, or (5) |
| [Calculated] 16% of Cost | € 9,953 | € 64,395 | € 557,511 | € 847,972 | € 341,010 | € 1,820,842 | (12)=(2)x16%, or (5) |
| [Calculated] Profit (15%) | € 2,854 | € 8,603 | € 13,513 | € 198,908 | € 79,990 | € 303,868 | (13)=(9)-(11) |
| [Calculated] Profit (16%) | € 3,045 | € 9,176 | € 14,414 | € 198,908 | € 79,990 | € 305,533 | (14)=(10)-(12) |
| | | | | | | | |
| Annual Allocation of Cost | 0.5% | 3.5% | 30.6% | 46.7% | 18.7% | | (12') Annual Allocation of (12) |
| *(From Flame Networks Chart)* | | | | | | | |
| **Overall Revenue** | | | € 3,950,000 | € 24,400,000 | € 86,300,000 ** | | (15) |
| [Calculated] Rockwell 15% of Revenue | | | € 592,500 | € 3,660,000 | € 12,945,000 | | (16)=(15)x15% |
| [Calculated] Rockwell 16% of Revenue | | | € 632,000 | € 3,904,000 | € 13,808,000 | | (17)=(15)x16% |
| | | | | | | | |
| [Calculated] Cost at 81% of Revenue | € 9,953 | € 64,395 | € 511,920 | € 3,162,240 | € 11,184,480 ** | € 14,932,989 | (17')=.81x(17) or (12) |
| Annual Allocation of Cost | 0.1% | 0.4% | 3.4% | 21.2% | 74.9% | | (17'') Allocation |

\*\* Estimated full year 2022 - with last 4 months projected based on May to August 2022 monthly average.

| | 2018 to P 2022 (A) | 2018 to 2022 (B) | US Portion (C)=(A) x 57% | 57% - See Exhibit 10. | |
|---|---|---|---|---|---|
| *Calculation of WI Revenue* | | | | | |
| From WI Automation Disclosures (Total) | € 13,290,034 | | | | (18)=(1) |
| *Estimates - WI Revenue - Rockwell Parts* | | | | | |
| From WI Automation Disclosures (Rockwell @ 15% estimate) | € 2,085,219 | | € 1,188,575 | | (19)=(9) |
| From WI Automation Disclosures (Rockwell @ 16% estimate) | € 2,126,375 | | € 1,212,034 | | (20)=(10) |
| Using 21.5% market share and WI revenue data | € 2,857,357 | | € 1,628,694 | | (21)=(18) 21.5% |
| Using Flame Networks for 20-22 (Total - not Rockwell products only) | | € 115,191,061 | | | (22)=sum [(15) or (1)] |
| Using Flame Networks for 20-22 (Rockwell @ 15% estimate) | | € 17,278,659 | € 9,848,836 | | (23)=(22)x15% |
| Using Flame Networks for 20-22 (Rockwell @16% estimate) | | € 18,430,570 | € 10,505,425 | | (24)=(22)x16% |
| Using 21.5% market share and Flame Networks data | | € 24,766,078 | € 14,116,665 | | (25)=(22)x 21.5% |
| | | | | | |
| *Calculation of WI Cost for Rockwell Parts* | | | | | |
| From WI Automation Disclosures (Rockwell @ 15% estimate) | € 1,781,351 | | € 1,015,370 | | (26)=(11) |
| From WI Automation Disclosures (Rockwell @ 16% estimate) | € 1,820,842 | | € 1,037,880 | | (27)=(12) |
| Using 21.5% market share and WI revenue data | € 2,446,758 | | € 1,394,652 | | (28)=(2)x 21.5% |
| Using Flame Networks (@ estimated 81% of Revenue)(Rockwell @ 15% Estimate) | | € 13,999,677 | € 7,979,816 | | (29)=sum [(16) x81% or (11)] |
| Using Flame Networks (@ estimated 81% of Revenue)(Rockwell @ 16% Estimate) | | € 14,932,989 | € 8,511,804 | | (30)=(17') |
| Using 21.5% market share and Flame Networks data | | € 20,066,203 | € 11,437,736 | | (31)=sum [(15)x 21.5% x 81% or (2)x 21.5%] |

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 21-1238-GBW-JLH |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## WIAUTOMATION'S OPPOSITION TO ROCKWELL'S MOTION IN LIMINE TO PRECLUDE WIAUTOMATION FROM REFERRING TO EVIDENCE NOT PRODUCED IN DISCOVERY

Dated: June 27, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

Rockwell fails to satisfy or address the *Pennypack* factors that are necessary to exclude WiAutomation from testifying about WiAutomation's suppliers under Rule 37(c).   First, Rockwell must show that WiAutomation failed to disclose information.   Fed. R. Civ. P. 37(c).   Then, Rockwell must show: (i) prejudice or surprise from the "missing" evidence; (ii) its inability to cure this prejudice; (iii) disruption of the trial; and (iv) that WiAutomation withheld this information in bad faith.   *Myers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977).   All of these factors weigh against excluding testimony about WiAutomation's suppliers, regardless of whether invoices exist from such sales.

Rockwell has not demonstrated that WiAutomation withheld any information about its suppliers, including sales or purchase invoices.   Rockwell advanced this argument previously (*see, e.g.*, D.I. 143), and the Court ordered WiAutomation to file a declaration detailing its efforts to locate additional invoices (Ex. A, 42:10-43:4), which it complied with (D.I. 268).   Indeed, this unrefuted testimony explains why additional responsive materials cannot be located or produced.   (D.I. 268, 280.)

Further, Rockwell's vague motion[1] did not identify any specific testimony or evidence concerning WiAutomation's suppliers that may surprise or prejudice

---

[1] The vague nature of Rockwell's motion alone warrants denial.   *See Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276, 280 (D. Del. 2013) ("Evidentiary rulings, especially ones that encompass broad classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context.").

1

Rockwell at trial.  Nor can it.  WiAutomation has not identified any suppliers besides the three authorized distributors ("AD") referenced in WiAutomation's August 5, 2023 interrogatory responses (Ex. B, Rog 2), and Rockwell itself d/b/a Lektronix.

Rockwell should also not be surprised that additional records from these ADs are unavailable due to the ADs' poor record-keeping practices.  For example, Rockwell produced sales data from its ADs to WiAutomation (*see generally* Ex. C) that ADs are required to report to Rockwell (Ex. D, 301:16-302:6, 304:24-305:3). Tellingly, WiAutomation produced *dozens* of invoices concerning new Rockwell product sales that Rockwell's AD - Technology BSA - made to WiAutomation (Ex. E.), but Technology BSA only reported four of its product sales to Rockwell (Ex. C).  Rockwell's own ADs do not maintain the documentation Rockwell improperly faults WiAutomation for missing.  Since there is no surprise or undue prejudice concerning WiAutomation's suppliers, there is nothing to cure.  Furthermore, Rockwell does not argue that information about WiAutomation's suppliers will disrupt the trial.  Since Rockwell cannot satisfy a single *Pennypack* factor, testimony about WiAutomation's suppliers should not be barred.

FRE 1002 and 1004 are irrelevant to the identification of WiAutomation's suppliers because they only require the production of a record where a party is attempting to prove the content of a document that cannot be proven by other means. *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 578-79 (D. Md. 2007) ("For

example, proof that someone is married may be made by the testimony of a witness to the ceremony.  The marriage license is not required.  However, [FRE 1002] applies if the only proof of the marriage is by the record itself.").  WiAutomation does not need to prove the content of its purchase invoices to demonstrate where WiAutomation purchased Rockwell products.  WiAutomation's witnesses can testify where they purchased Rockwell products.  Therefore, FRE 1002 and 1004 are inapplicable.

For these same reasons, WiAutomation should not be excluded from testifying about its customer invoices.  Rockwell argues that any information about unavailable sales invoices should be excluded simply because they were not produced.  (MIL, p. 2.)  Again, Rockwell fails to address *any* of the *Pennypack* factors required to demonstrate this "extreme" relief is warranted.  *Pennypack*, 559 F.2d at 904-05 (exclusion "is an 'extreme' sanction").  Similarly, Rockwell continues to claim that WiAutomation is withholding sales invoices (MIL, p. 2), even though this assertion has no support in the record and is negated by unrebutted testimony (D.I. 268, 280).

Moreover, Rockwell contends that WiAutomation should be barred from estimating its profits because WiAutomation could not produce every single sale and purchase invoice.  (MIL, p. 4.)  This Circuit though allows experts to estimate profits based on available data, when complete records are unavailable.  *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 172, 176-78 (3d Cir. 2005); *NexStep Inc. v. Comcast Cable*

3

*Commc'ns, LLC*, 2022 WL 911252, at *5 (D. Del. Mar. 29, 2022).  Accordingly,

Rockwell's argument that WiAutomation should be barred from testifying about

profit estimates based on available data should be rejected.

Dated:  June 27, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

4

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies Defendant's Opposition to Rockwell's Motion in Limine to Preclude Evidence of Any Criminal Background of Gary Monroe is in Times New Roman 14-point font and contains 750 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.


Dated: June 27, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

/s/ *Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

# Exhibit A

1

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3              FOR THE DISTRICT OF DELAWARE
 4   ROCKWELL AUTOMATION,    )
     INC.,                   )
 5                           )
                 Plaintiff,  )
 6                           )  C.A. No. 21-1238-GBW-JLH
          v.                 )
 7                           )
     PARCORP S.R.L. d/b/a    )
 8   WIAUTOMATION,           )
                             )
 9              Defendant.   )
                             )
10
11
12              Wednesday, May 3, 2023
                1:09 p.m.
13              Discovery Dispute Conference
14
15              844 King Street
                Wilmington, Delaware
16
17   BEFORE: THE HONORABLE JENNIFER L. HALL
     United States District Magistrate Judge
18
19
20
21   APPEARANCES:
22              HEYMAN ENERIO GATTUSO & HIRZEL
                BY:  DOMINICK GATTUSO, ESQ.
23
                -and-
24
25
```

2

```
     APPEARANCES CONTINUED:
 1
 2
 3
 4              ALSTON & BIRD LLP
                BY:  PAUL TANCK, ESQ.
 5              BY:  NEAL J. MCLAUGHLIN, ESQ
 6                      Counsel for the Plaintiff
 7
 8
 9
10              YOUNG CONAWAY STARGATT & TAYLOR
                BY:  PILAR G. KRAMAN, ESQ.
11              BY:  ALEXIS N. STOMBAUGH, ESQ.
                BY:  MALIHEH ZARE, ESQ.
12
13              -and-
14
15              BRACH EICHLER, LLC
                BY:  BOB KASOLAS, ESQ.
16              BY:  ERIC BODEN, ESQ.
                      Counsel for the Defendant
17
18
19
20
21
22              _ _ _ _ _ _ _ _ _ _
23
24
25
```

3

```
 1              P R O C E E D I N G S
 2
 3         (Proceedings commenced in the courtroom beginning at
 4   1:09 p.m.)
 5              THE COURT:  Good afternoon, everyone.  Please
 6   have a seat.
 7              Can we have appearances for the record,
 8   please.
 9              MR. GATTUSO:  Good afternoon, Your Honor.
10   Dominick Gattuso from Heyman Eneria Gattuso & Hirzel on
11   behalf of Rockwell.  I have with me Paul Tanck and Neal
12   McLaughlin on behalf of -- with Alston & Bird on behalf
13   of Rockwell as well.
14              THE COURT:  All right.  Good afternoon.
15              MR. GATTUSO:  Thank you, Your Honor.
16              MS. KRAMAN:  Good afternoon, Your Honor.
17   Pilar Kraman from Young Conaway for the defendant.  And
18   with me from Young Conaway is Alexis Stombaugh and
19   Maliheh Zare, and then at counsel table from Brach
20   Eichler, Bob Kasolas and Eric Boden.
21              THE COURT:  Hi.
22              MR. KASOLAS:  Good afternoon, Your Honor.
23              THE COURT:  Good afternoon.  All right.  Have
24   a seat.
25              So we're here for the scheduled discovery
```

4

```
 1   dispute conference.  We have a lot going on here, but I
 2   have questions about -- let's start with Plaintiff's
 3   Motion to Compel.
 4              So let me just make sure I understand what's
 5   going on here with this one, you've got -- your position
 6   is that defendant needs to update its discovery
 7   responses.
 8              MR. TANCK:  In part, yes, Your Honor.  We,
 9   basically, have asked them, using the tools of discovery
10   in this case -- Interrogatories, document requests, and
11   depositions -- at all stages, there has been a failure to
12   produce information, and starting with the
13   Interrogatories.
14              There are Interrogatories that this Court has
15   ordered them to provide responses to, and after that
16   happened, they failed to do it, and they were sanctioned.
17   And then after that, the Court gave them one opportunity,
18   last opportunity to do it.
19              And what has been revealed in discovery is
20   that they continue to not provide the responses that
21   would be appropriate and responsive to your order.  And
22   that's on, in particular, Interrogatory Number 3.
23              That's, you know, the heart of this case,
24   essentially, is that defendant is counterfeiting and
25   selling used products as new.  And in order to get to the
```

41

1    **MR. KASOLAS:**  No, I'm not saying that at all.
2    I'm saying there are invoices that don't have anyone's
3    name on them, so you can't --
4         **THE COURT:**  Right.  So that's what I'm asking.
5    That they're for a Rockwell product?
6         **MR. KASOLAS:**  I can't make that
7    representation, neither can the client.
8         We don't -- we gave them everybody we bought
9    from, including, by the way, Your Honor, themselves.
10   They bought from us, and we gave them their own stuff,
11   which they didn't produce to us in discovery.
12        **THE COURT:**  We will get to that in a minute.
13        I guess I'm wondering, so you're saying of all
14   the invoices that have no names of any supplier on them
15   or any manufacturer on them, that none of those invoices
16   are Rockwell product.  You have no reason to think that's
17   the case?
18        **MR. KASOLAS:**  For example, Your Honor, the
19   invoices that's pasted into Justin Block's brief is their
20   authorized distributor's invoices, RS Components.
21        It does not say, "Rockwell" on it, but I
22   produced it.  It does not say, "Rockwell" on it, but I
23   produced it -- "I" being the client -- because there's a
24   chance it could be a Rockwell item, perhaps.
25        And if Your Honor looks at Page 6 of the

42

1    Justin Block -- where is it?  I can't find it -- I don't
2    see an invoice.
3         This is their authorized distributor invoice.
4    It doesn't say Rockwell on it.  We produced it.  Same
5    with all of the other distributors we sent them invoices
6    on.
7         So they can't come here and say we didn't
8    produce invoices to them just because Rockwell's name
9    isn't on them, because we did.
10        **THE COURT:**  All right.  Here's what we're
11   going to do about the invoices and the purchase orders.
12   And I think you all understand what I mean.  I want the
13   stuff coming and the stuff going out.
14        I want a declaration from someone with
15   knowledge on Rockwell's side that indicates to the Court
16   exactly what was done to search for purchase orders and
17   invoices, so that the Court can be satisfied that the
18   Court's prior order was complied with.
19        And so if the answer is, "I only searched for
20   stuff that had Rockwell on it," I will know that.
21        It should indicate to the Court, though, in a
22   way that the Court will be able to understand, if there
23   are potentially other invoices out there that exist for
24   which the client just wasn't able to figure out who they
25   were from.

43

1    And the more detail you can give the Court to
2    convince the Court that a thorough search was done, the
3    less of a chance that we're not all going to have to be
4    back here in Delaware during the summer.
5         **MR. KASOLAS:**  Understood, Your Honor.
6         I will note, my client signed the
7    Interrogatories.
8         **THE COURT:**  I understand that.
9         **MR. KASOLAS:**  You've got them in front of you.
10        **THE COURT:**  With that said, I want more detail
11   than what's in those.  So we do have a statement under
12   oath.  If it turns out that this is a different day, and
13   there's no way to get anymore, but I want to know what he
14   means when he says that invoices weren't created or that
15   he can't find them because of COVID.
16        I need to know which it is and exactly what
17   was looked for and what was come up with.
18        And I think, notwithstanding the fact that
19   discovery is closed, I think that's appropriate
20   considering that the Court has previously ordered that to
21   be done, and there is reason to think, based on the
22   record currently before the Court, that it wasn't done.
23        So that's how we're going to proceed with
24   respect to the invoices.
25        **MR. TANCK:**  One clarification, your Honor.

44

1         **THE COURT:**  Yes.
2         **MR. TANCK:**  You said you wanted Rockwell to
3    submit a declaration.  I think we all know what you
4    meant.
5         **THE COURT:**  Parcorp, yes, I'm sorry.  I only
6    do that like half the time.
7         **MR. KASOLAS:**  Judge, if I may.
8         **THE COURT:**  Yes.
9         **MR. KASOLAS:**  I think we need to do reciprocal
10   because, like I said, we have given them way more
11   authorized distributor sales that we bought from their
12   authorized distributor than they have.
13        **THE COURT:**  I understand that request.
14        **MR. KASOLAS:**  And that's a summary judgment
15   issue.
16        **THE COURT:**  I understand that request, and
17   that request is denied.
18        So that takes care of the invoices.
19        With respect to the payment of the $26,000,
20   what's the story with that?
21        **MR. KASOLAS:**  The story is, when you try a
22   case and you get to the end, you have competing amounts
23   possibly, and this is one of them.
24        They owe us -- we agreed on 26, but my client
25   got two awards against them in Italy on a related matter,

# Exhibit B

2

# DUNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ROCKWELL AUTOMATION, INC.,      :   Civil Action No. 1:21-cv-01238

       **PlaintiffPlaintiff**       :

            **v.**            :

PARCORP, S.R.L. D/B/A WI     :
AUTOMATION,              :

       **Defendants**       :

**TO:**   **Neal McLaughlin, Esq.**
       **Alston & Bird**
       **90 Park Avenue**
       **15th Floor**
       **New York, NY 10016-1387**

       **Dominick Gattuso**
       **Heyman Enerio Gattuso & Hirzel LLP**
       **300 Delaware Ave., Suite 200**
       **Wilmington, DE 19801**

**SIRS:**

     **PLEASE TAKE NOTICE** that defendant, Parcop, S.r.l. d/b/a WiAutomation

("WiAutomation"), by and through its undersigned counsel Brach Eichler L.L.C., serves its Third

Amended Responses to plaintiff, Rockwell Automation, Inc.'s First Set of Interrogatories.

Dated:  August 5, 2022

Of Counsel:

*[signature]*

Bob Kasolas
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com

YOUNG   CONAWAY   STARGATT   &
TAYLOR, LLP

_____
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600

pkraman@ycst.com
Attorneys for Defendant Parcop S.r.l. d/b/a WiAutomation

## **PRELIMINARY STATEMENT**

The party providing these responses to these Interrogatories does so without waiving or intending to waive, and expressly preserving:

1.      All questions as to competency, relevancy, materiality, privilege and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further preceding in this action (including the trial of this action) and in any other action;

2.      The right to object to the use of any such responses, or the subject matter thereof, on any ground in any further preceding of this action (including the trial of this action) and in any other action;

3.      The right to object on any ground at any time to a demand or request by the party who served the Interrogatories or responded to herein, for further responses (including further production of documents or answers to Interrogatories) or any other discovery proceedings involving or relating to the subject matter of this controversy;

4.      The right at any time to revise, correct, add to, supplement or clarify any of the responses contained herein; and

5.      In the event that any documents are inadvertently produced by the party providing these Interrogatory answers which fall within the attorney/client and/or attorney work product privileges, the said responding party shall not be deemed to have waived any privilege as to any such documents or the information contained therein or the right to assert the attorney/client or attorney work product privileges as to any other matter which arises during the course of this litigation or in any subsequent or related preceding.

## GENERAL OBJECTIONS

A.      WiAutomation objects to each Interrogatory to the extent that it seeks information outside the scope of the allegations contained in any Complaint, Counterclaim, Cross claim, Third-Party Complaint, Answer, Separate or Affirmative Defenses or any other affirmative pleading.

B.      WiAutomation objects to each Interrogatory to the extent that it calls for information that would impose upon WiAutomation a vexatious and undue burden on the ground that the request is oppressive and/or intended to harass WiAutomation.

C.      WiAutomation objects to each Interrogatory to the extent that it is vague, ambiguous, or otherwise lacks sufficient precision to permit a response.

D.      WiAutomation objects to each Interrogatory to the extent that is seeks material or information prepared by or developed at the direction of counsel to the extent that it is protected and privileged as attorney work product.

E.      WiAutomation objects to each Interrogatory insofar as it seeks information that is neither relevant to the issues in this lawsuit nor proportional to the needs of the case.

F.      WiAutomation objects to each Interrogatory insofar as it seeks information that is subject to the attorney/client or work product privileges.

G.      WiAutomation objects to each Interrogatory insofar as it seeks legal theories or conclusions rather than a factual response.

H.      WiAutomation objects to each Interrogatory insofar as it requests the responding parties to provide information (or documents) which are in the possession of entities and/or persons over whom WiAutomation has no control.

I.      WiAutomation objects to each Interrogatory insofar as it requests WiAutomation to provide information (or documents) which is in the possession of entities and/or persons over whom WiAutomation has no control.

J.      WiAutomation objects to each Interrogatory insofar as it requests WiAutomation to provide information which is confidential and/or proprietary in nature.

K.      WiAutomation objects to each Interrogatory purporting to require that WiAutomation state each fact or all facts, identify all occasions and circumstances, identify or produce each document or all documents related to, or identify each person or all persons who have knowledge of the responding parties claims, defenses, contentions and positions as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

L.      WiAutomation objects to the instructions and the definitions contained in the Interrogatories to the extent that those instructions and/or definitions are vague, ambiguous, overbroad, unduly burdensome, irrelevant, not reasonably calculated to lead to the discovery to admissible evidence and/or seek to impose obligations upon WiAutomation beyond those required by the Federal Rules of Civil Procedure.

M.      WiAutomation objects to the Interrogatories to the extent that they are repetitive of one another in whole or in part and/or to the extent that the information sought by said Interrogatories would be cumulative.

N.      Insofar as any Interrogatory seeks information falling within the scope of the foregoing General Objections, the foregoing General Objections are asserted and stated as part of WiAutomation's responses to said Interrogatories as if specifically set forth at length and incorporated therein by reference.

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

From 2015 to the present, identify all persons from whom you have received complaints about Rockwell Products sold, offered for sale, distributed, or advertised by you. Your response should include a description of each complaint, any responses given by WI Automation, and any actions taken by WI Automation related to each such complaint.

**RESPONSE:** Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks the identity of "all persons" whom have complained about a Rockwell product from 2015 to the present.  WiAutomation further objects that this interrogatory is not adequately limited in time.  Subject to and without waiving its general and specific objections, WiAutomation states that Parcop S.r.l. did not exist until 2017, and did not commence any business until 2018.  Parcop S.r.l. began to sell to USA since November 2019.  The only complaints that WiAutomation has received pertaining to the products that it sells are related to delivery times, over which WiAutomation has little to no control as it uses a third-party delivery service for all items that it sells.  WiAutomation has had one Rockwell product returned to it.

**INTERROGATORY NO. 2:**

Identify the name and contact information for WI Automation's sources of unused Rockwell Products from 2015 to Present. To the extent the source is ebay or other online source, identify both the online source and the specific seller.

**RESPONSE:**

Objection.  This interrogatory is overly broad, vague, ambiguous, unduly burdensome and not proportional to the needs of the case in that it seeks the name and contact information for each of the sources of Rockwell products that WiAutomation has sold.  WiAutomation further objects that this interrogatory is not adequately limited in time.  Additionally, WiAutomation objects to this interrogatory on the basis that it seeks irrelevant information that is outside the scope of discovery. WiAutomation further objects that this interrogatory improperly seeks WiAutomation's trade secrets.

Subject to and without waiving its general and specific objections, WiAutomation's sources are Rockwell authorized distributors Technology BSA S.p.A. and Sonepar Italia S.p.A. and distributor RS Components S.r.l. Furthermore, pursuant to Fed. R. Civ. P. 33(d), WiAutomation states *see* WI003327-003433.

**INTERROGATORY NO. 3:**

For each source identified in Interrogatory No. 2, provide the name of each product

obtained from that source, the quantity obtained, and price paid by WI Automation.

**RESPONSE:**

Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks each and every product obtained from each source, including the quantity obtained and price paid. WiAutomation further objects that this interrogatory is not adequately limited in time.  Additionally, WiAutomation objects to this interrogatory on the basis that it seeks irrelevant information that is outside the scope of discovery.  WiAutomation further objects that this interrogatory improperly seeks WiAutomation's trade secrets. Subject to and without waiving its general and specific objections, WiAutomation states that the following products have been obtained from the sources identified in Interrogatory No. 2:

- RCK1783-LMS5 Euro 300,00 + 22% tax
- RCK1783-US16T Euro 359,10 + 22% tax
- RCK22BE1P7N104   Euro 269,90 + 22% tax
- RCK1761-CBL-PM02 Euro 39,61 + 22% tax
- RCK25-RF033-DL Euro 89,70 + 22% tax
- RCK1783-US8T Euro 121,60
- RCK25-COMM-E2P Euro 146,73 + 22% tax
- RCK1734-AENTR Euro 307,00 + 22% tax
- RCK1734-IB8S Euro 243,00 + 22% tax
- RCK25CE3P0N104 Euro 643,25
- RCK1783-LMS8 Euro 529,10+ 22% tax
- RCK22-HIM-C2S Euro 150,23 + 22% tax
- RCK2711-CBL-PM05 Euro 144,10
- RCK2080-USBADAPTER Euro 22,00 + 22% tax
- RCK2080-LC10-12QBB Euro 64,80 + 22% tax
- RCK2080-TC2 Euro 86,30 + 22% tax
- RCK5069-IB8S Euro 411,40
- RCK1783-LMS8  Euro 529,10 + 22% tax
- RCK22BE1P7N104 Euro 415,00 + 22% tax
- RCK2198-DBR40-F Euro 298,10 + 22% tax
- RCK1783-LMS5 Euro 330,00 + 22% tax
- RCK5069-L306ERS2 Euro 969,10 + 22% tax

- RCK5069-IB8S Euro 411,40 + 22% tax
- RCK22-HIM-C2S Euro 150,23 + 22% tax
- RCK5069-IB8S Euro 411,40 + 22% tax
- RCK22FD4P2N103 Euro 256,11 + 22% tax
- RCK25BB017N104 Euro 622,66
- RCK22-HIM-C2S Euro 155,48 + 22% tax
- RCK5094-IB16 Euro 217,83 + 22% tax
- RCK150-TC1 Euro 24.21 + 22% tax
- RCK2198-K57CKD15M Euro 69,56 + 22% tax
- RCK5069-OBV8S Euro 544,58 + 22% tax
- RCK1734-IE4S Euro 713,11 + 22% tax
- RCK2097-V34PR3 Euro 1.201,64 + 22% tax
- RCK5069-OBV8S Euro 544,58 + 22% tax
- RCK5069-RTB6-SPRING Euro 14,53 + 22% tax
- RCK5069-IB16F Euro 207,05 + 22% tax
- RCK5069-RTB6-SPRING Euro 14,53 + 22% tax
- RCK1734-4IOL Euro 185,01 + 22% tax
- RCK5069-RTB64-SCREW Euro 23,97 + 22% tax
- RCK1734-IE4S Euro 713,11 + 22% tax
- RCK150-C3NBD Euro 245,36 + 22% tax
- RCK2080-MEMBAK-RTC2 Euro 154,27 + 22% tax
- RCK1783-US8T Euro 144,18 + 22% tax
- RCK25BA8P0N114 Euro 374,78+ 22% tax
- RCK2713PT9WD1 Euro 1.550,84+ 22% tax
- RCK104-C09EJ22 Euro 135,45+ 22% tax
- RCK2198-H008-ERS2 Euro 1.184,18+ 22% tax
- RCK22FA2P5N113 Euro 122,25 + 22% tax
- RCK5094-IB16 Euro 217,83
- RCK25BB5P0N104 Euro 358,28+ 22% tax

Furthermore, pursuant to Fed. R. Civ. P. 33(d), WiAutomation states *see* WI003327-003433.

WiAutomation further states that it is incapable of ascertaining what Rockwell Products it sold

from 2018-2020 as it was a small company with limited resources and the records in

WiAutomation's possession are incomplete. Furthermore, many of the records that WiAutomation

has in its possession do not identify the product that was purchased/sold.  Thus, it is impossible

toidentify the foregoing with any greater degree of specificity than already

provided.**INTERROGATORY NO. 4:**

Describe any differences between Rockwell Products sold or offered for sale by WI Automation and Rockwell Products sold or offered for sale by Rockwell or Rockwell Authorized Distributors that WI Automation has disclosed to its customers, including without limitation any disclaimer WI Automation provides to its customers regarding the sale of Rockwell Products.

**RESPONSE:** Objection.  This request is overly broad, vague,  and ambiguous to the extent it seeks information pertaining to any "differences" between Rockwell Products sold by WiAutomation and Rockwell or its "authorized distributors" that it disclosed to customers. WiAutomation further objects to the extent that this interrogatory calls for a legal conclusion. Subject to and without waiving its general or specific objections, WiAutomation states that there are no "differences" between Rockwell products sold or offered for sale by WiAutomation and Rockwell products sold or offered for sale by Rockwell or Rockwell Authorized Distributors. Nevertheless, WiAutomation provides the following terms and conditions on its website, which all purchasers of Rockwell products must agree to prior to purchase:

> WiAutomation is not an official distributor or representative brands on this site. The trademarks and names on this site belong to their respective owners.  Rockwell: WiAutomation is not an authorized dealer of surpluses or affiliate of the manufacturer. Products may have older date codes or be an older series than the one available directly from the factory or authorized dealers.  Since WiAutomation is not a Rockwell authorized distributor, the original manufacturer's warranty does not apply (12-month WiAutomation Warranty applies).  Some Allen-Bradley PLC products will have the firmware already installed, WiAutomation does not guarantee whether or not a PLC product will have firmware and, if it has firmware, if the firmware is the level of revision that is necessary for its application. WiAutomation also does not warrant the ability or right to download or otherwise obtain firmware for the product from Rockwell, its distributors, or any other source. WiAutomation will not obtain or provide firmware on behalf of the customer. It is customer's obligation to comply with the terms of any End User License Agreement or similar document relating to obtaining or installing the firmware.

**INTERROGATORY NO. 5:**

From 2015 to the present, identify the product name, quantity, product condition code, date of purchase, purchase price, product source name, date of sale, sale price, customer name, and discounts applied (if any) in the sourcing or selling of each unused Rockwell product.

**RESPONSE:**

Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests the identity of any and all Rockwell Product that

WiAutomation has sold from 2015 to the present. WiAutomation further objects to the extent that this interrogatory is not adequately limited in time. Furthermore, this interrogatory seeks irrelevant information that is outside the scope of permissible discovery. Subject to and without waiving their general and specific objections, WiAutomation refers the Plaintiff to its current offerings of Rockwell products, available at us.wiautomation.com/allen-bradley. Subject to and without waiving its general and specific objections, WiAutomation States that it has sold the following items, including to Rockwell Authorized Distributors:

- On 2020.12.18 Rockwell Automation B.V. Rivium Promenade 160 NL - 1 pc. NEW B Series Allen-Bradley 1756-L63 – price paid Euro 1.570,00;

- On 2021.05.10  Lektronix a Rockwell Automation business (in Katowice - Poland) n. 1 product 6155R-NPXP Allen-Bradley –  price paid Euro 2.528,14;

-  2021.12.22 RA Controls - Authorized Rockwell Distributors - n. 22 products 1734-IB8S Allen-Bradley + n. 22 products 1734-OB8S Allen-Bradley- total price paid Euro 29.739,00;

- 2022.03.02 RA Controls - n. 38 products 1734-AENTR ALLEN BRADLEY- n. 10 products 1734-IB8 ALLEN BRADLEY - n. 8 1756-EN2TR ALLEN BRADLEY - n. 2 products 1783-US8T ALLEN BRADLEY - n. 5 products 20-HIM-A6 ALLEN BRADLEY - total price paid Euro 45.840,00;

- 2021.04.01 Rockwell Automation BV Rivium Promenade 160 Netherland -n. 1 product  1756-BATM - ALLEN BRADLEY - price paid Euro 286.00

- 2021.03.21 Lektronix A Rockwell Automation business - n. 2 products 1734-AENT (serie C) - price paid Euro 480,00

- 2021.04.14 Rockwell Automation B.V. prodotto 6155R-NPXP Allen-Bradley importo Euro 2.621,00

- 2022.04.01 RAControls -  1756-EN2TR Allen-Bradley - price paid Euro 6.416,00;

- **INVOICE n. 1866/E** - date 2021.05.10 -  customer Lektronix a Rockwell Automation business (in Katowice - Poland) - product 6155R-NPXP Allen-Bradley –  quantity n. 1 - purchase price Euro approximately 2.100,00; sale price Euro 2.427,96 -

- **INVOICE n. 2738/01** - date 2022.04.01 - customer RAControls - product 1756-EN2TR Allen-Bradley - quantity n. 2 - purchase price

for n. 1 product approximately Euro 2.800,00 - sale price for n. 1 product Euro 3.200,00 - total price for n. 2 products Euro 6.416,00

- **INVOICE n. 12327/01** - date 2021.12.22 - customer RA Controls - Authorized Rockwell Distributor:

  - n. 22 products 1734-IB8S Allen-Bradley - purchase price for n. 1 product EUro 580,00 - sale price for 1 product Euro 650,00 - total sale price for 22 products Euro 14.300,00

  - n. 22 products 1734-OB8S Allen-Bradley- purchase price for n. 1 product Euro 620,00 - sale price for n. 1 product Euro 700,00 - total sale price for n. 22 product  Euro 15.400,00;

- **INVOICE n. 1703** - date 2022.03.02 - customer RA Controls:

  - n. 38 products 1734-AENTR ALLEN BRADLEY- purchase price for n. 1 product  approximately Euro 400,00 - sale price for n. 1 product Euro 470,00 - totale sale price for n. 38 products Euro 17.860,00;

  - n. 10 products 1734-IB8 ALLEN BRADLEY - purchase price for n. 1 product approximately Euro 60,00 - sale price for n. 1 product Euro 60,00 - total sale price fo n. 10 products Euro 600,00;

  - n. 8 1756-EN2TR ALLEN BRADLEY - purchase price for n. 1 product Euro 2.827,00 - sale price for n. 1 product Euro 3.200,00 - total price for n. 8 products Euro 25.600,00;

  - n. 2 products 1783-US8T ALLEN BRADLEY  - purchase price for n. 1 product Euro 200,00 - sale price for n. 1 product Euro 220,00 - total price for n. 2 products Euro 440,00;

  - n. 5 products  20-HIM-A6 ALLEN BRADLEY - purchase price for n. 1 product approximately Euro 225,00 - sale price for n. 1 product Euro 225,00 - sale price for n. 1 product Euro 250,00 - total sale price for n. 5 products Euro 1.250,00

- **INVOICE** n. 1178 - date 2021.04.01 - customer Rockwell Automation BV Rivium Promenade 160 Netherland

    o n. 1 product  1756-BATM - ALLEN BRADLEY - purchase price approximately Euro 250,00 - sale price Euro 270.00


- **SALE** to customer Rockwell Automation B.V. Rivium Promenade 160 NL - date 2020.12.18

    o n. 1 pc. NEW B Series Allen-Bradley 1756-L63 – purchase price for n. 1 product  approximately euro 1.400,00 sale price Euro 1.570,00;

- **SALE** to customer Lektronix A Rockwell Automation business - date 2021.03.21

    o n. 2 products 1734-AENT (serie C) - purchase price for n. 1 product euro 205,00; sale price for n. 1 product Euro 230,00; total sale price for n. 2 products Euro 460,00


- **SALE** to customer Rockwell Automation B.V. - date 2021.04.14

    o n. 1 product 6155R-NPXP Allen-Bradley - quantity n. 1 - purchase price approximately Euro 2.100,00; sale price Euro 2.560,00;

WiAutomation further states that it is incapable of ascertaining what Rockwell Products it sold from 2018-2020 as it was a small company with limited resources and the records in WiAutomation's possession are incomplete. Furthermore, many of the records that WiAutomation has in its possession do not identify the product that was purchased/sold.  Thus, it is impossible to identify the foregoing with any greater degree of specificity than already provided.

**INTERROGATORY NO. 6:**

Identify the gross revenue, costs, expenses and profits of WI Automation on a quarterly

basis from 2015 to present.

**RESPONSE:**

Objection.  This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it requires Defendants to identify WiAutomation's

"gross revenue, costs, expenses, and profits" on a quarterly basis from 2015 to present. WiAutomation further objects to the extent that this interrogatory seeks irrelevant information and far exceeds the scope of permissible discovery and is, instead, merely a fishing expedition into WiAutomation's financials. Subject to and without waiving its general and specific objections, WiAutomation states:

**2018**
**gross revenue Euro 81.238,00**
**costs Euro 62.209,00**
**profit after taxes 13.915,00**

**2019**
**gross revenue Euro 459.823,00**
**costs Euro 402.470,00**
**profit after taxes Euro 37.578,00**

**2020**
**gross revenue Euro 3.574.533**
**costs Euro 3.484.446**
**profit after taxes Euro 53.955,00**

**2021 WiAutomation has not yet approved its financial statement for 2021 but is within the deadline to do so under Italian law.  Parcop changed its accounting software in November 2021, which caused delays in accounting activities.   Additionally, WiAutomation had additional delays due to a COVID-19 breakout that caused additional delays in finalizing the financial statement.   Subject to and without waiving its general and specific objections, WiAutomation states:**
**Gross revenue Euro 6.543.190,00**
**Costs Euro 5.299.830,00**
**Profit before taxes Euro 1.243.170,00**

**WiAutomation further states that it does not keep track of its revenue, costs, and profit on a quarterly basis.  Accordingly, WiAutomation does not have reliable figures to report for fiscal year 2022.  WiAutomation reserves the right to supplement this response as new information becomes available.**

**INTERROGATORY NO. 7:**

Identify the gross revenue, costs, expense and profits of WI Automation attributable to WI

Automation's sale of unused Rockwell Products from 2105 to present.

**RESPONSE:** Objection.  This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it requires Defendant to identify its gross revenue, costs, expense and profits pertaining to the sale of "unused Rockwell Products,"

from 2015 to the present. WiAutomation further objects to the extent that this interrogatory seeks irrelevant information and far exceeds the scope of permissible discovery and is, instead, merely a fishing expedition into WiAutomation's financials. Subject to and without waiving its general and specific objections, WiAutomation states that its gross revenue, costs and profits attributable to Wiautomation's sale of Rockwell Products are approximately 15% of total gross revenue, costs and profits.

For fiscal years 2018-2020, WiAutomation does not have records sufficient to identify the revenue, costs, expense, and profits attributable to the sale of Rockwell products as WiAutomation was a new company with limited resources.

For fiscal year 2021, WiAutomation collected gross revenue on Rockwell products of €1.046.880,00. WiAutomation's costs for Rockwell products was €847.972,00, leaving a profit of €198.907,00.

For 2022, WiAutomation has generated €421.000,00 in gross revenue for Rockwell products. Its costs for said products are $341.010,00, leaving a profit of €79.990,00.

**INTERROGATORY NO. 8:**

Identify the product names, quantity, condition, purchase price, storage location and value of current inventory of unused Rockwell Product held by, or at the behest of WI Automation.

**RESPONSE:**

Objection. This request is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requires Defendants to "identify" each and every Rockwell Product that it currently has in inventory. Furthermore, Defendant further objects to the extent that this interrogatory seeks irrelevant information that is beyond the scope of permissible discovery. Subject to and without waiving its general and specific objections, WiAutomation states that it currently has the following Rockwell Products in storage, all of which are new unless otherwise stated:

Rockwell products located at Parcop's storage

- 13x 1769-L24ERQB1B  - new open product - purchase price n. 1 product Euro 2.800

- MPL-B430P-SK72AA - new factory sealed - purchased price n. 1 product Euro 900,00

- 1606-XLE240EN - new factory sealed - purchased price n. 1 product Euro 220,00

- 2097-V32PR2-LM - used - purchased price n. 1 product aproximately  Euro 600,00

- 5x 2711R-T4T - new factory sealed - purchased price n. 1 product approximately Euro 250.00

- 22F-RF026-CL  - new factory sealed - purchased price n. 1 product approximately Euro 60,00

- 6x 2711P-T7C21D8S - new factory sealed - purchased price n. 1 product approximately Euro 1.085,24

- 2198-DB42-F - new factory sealed - purchased price n. 1 product approximately Euro 244,00

- 1321-3R35-B - new factory sealed - purchased price n. 1 product approximately Euro 144,00

- MPL-A430N-HJ72AA  new  factory  sealed  -  purchased  price  n.  1  product approximately Euro 1.140,00

- 2711PC-T6C20D8 new factory sealed - purchased price n. 1 product approximately Euro 1.200,53

- 22RF024-CL new factory sealed - purchased price n. 1 product approximately Euro 137,00

- VPL-B072F-PK12AA  new  factory  sealed  -  purchased  price  n.  1  product approximately Euro 626,00

- 1606-XL480EP new factory sealed - purchased price n. 1 product approximately Euro 381,12

- 1769-IA16  new factory sealed - purchased price n. 1 product approximately Euro 250,00

- 6x 1783-US5T new factory sealed - purchased price n. 1 product approximately Euro 300,00

- 2x 1769-PA2 new factory sealed - purchased price n. 1 product approximately Euro 145,00

- 1606-XLB120E new factory sealed - purchased price n. 1 product approximately Euro 150,00

- 2080-IF4 new factory sealed - purchased price n. 1 product approximately Euro 150,00

- 1769-OW8 new factory sealed - purchased price n.1  product approximately Euro 250,00

- 4x 1769-OF8C new factory sealed - purchased price n. 1 product approximately Euro 1.800

- 10x 1734-OB8 new factory sealed - purchased price n. 1 product approximately Euro 260,00

- 3x 1769-ECR new factory sealed - purchased price n. 1 product approximately Euro 30,00

- 22B-D6P0N104 new factory sealed - purchased price n. 1 product approximately Euro 600,00

- 11x 1734-IB8 new factory sealed - purchased price n. 1 product approximately Euro 247,73

All products are located in Monte di Procida (NA) via Fiomarino III trav n. 13 at Parcop S.r.l. storage.The value of the current inventory is estimated to be between approximately Euro 60.000,00 – Euro 75.000,00

**INTERROGATORY NO. 9:**

Describe the product life cycle of unused Rockwell products sold by WI Automation, from acquisition through post-sale services, including without limitation sourcing, importation, inspecting, receiving, inventorying, warehousing, sorting by condition, marketing, sale, technical support and warranty and repair services, including all training provided to WI Automation personnel related to any of the foregoing.

**RESPONSE:** Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that WiAutomation describe the "product

life cycle" as it pertains to an unspecified number of products that WiAutomation sells. WiAutomation further objects to the term "unused Rockwell products" as vague, ambiguous, and confusing. Subject to and without waiving its objections, WiAutomation acquires the products at issue from a Rockwell Authorized Distributor, or other reputable source.  WiAutomation only purchases new, genuine Rockwell products that are factory sealed. Once the product is in WiAutomation's possession, the sealed Rockwell packaging—which is never opened by WiAutomation—is then verified externally by Parcop's employees and then put in the storage (where new products are separated from used products). Once Parcop receives an order, the products are placed into a WiAutomation shipping box for delivery to WiAutomation's customers. WiAutomation provides its own 12 month warranty for each Rockwell product sold. If a customer sends a complaint about malfunction the customer care employ talks to the director   and he will approve to send the RMS for refund or replacement. All of the foregoing is based upon the following terms and conditions:

*The warranty for new and refurbished products is 12 months covered by WiAutomation from the delivery date, the used products are guaranteed for 3 months. If the item is not as described, you will have a full refund including all shipping costs. If the item is lost or damaged in transit will be refunded only in case of insurance. Whenever the User intends to make use of the remedies provided by the legal guarantee provided with the Products, the User shall contact the Holder at the email address info@wiautomation.com. The Holder shall promptly reply to the communication of the alleged lack of conformity and shall indicate to the User the specific procedure to be followed, taking into account the category of goods relating to the Product, and / or the alleged defect. In any case, defects due to transport by courier, improper use or assembly or inadequate storage or maintenance of the Products and degradation resulting from use are excluded from the Warranty.*

*At the time of delivery, the Customer is required to verify the conformity of the Product with the Order.*

*WIAUTOMATION UNDERTAKES TO REPLACE NON-INTACT OR NON-COMPLIANT PRODUCTS AND REPAIR OR REPLACE PRODUCTS RECOGNIZED AS DEFECTIVE AND COVERED BY THE WARRANTY.*

*Returns are accepted only if previously authorized in writing by WiAutomation by sending the relative RMA (Return Material Authorization) code; upon receipt, WiAutomation examines the returns to verify that the Product is the one sold, that the defect exists, is attributable to its responsibility and is covered by the Warranty and, only in this case, replaces the defective Products. The Warranty is the only one provided by WiAutomation and replaces any other warranty, whether written, oral or implicit, except as provided below for the Consumer.*

*The report of defects and / or non-conformities of the Products must be communicated to WiAutomation in writing, by email (sales@wiautomation.com), under penalty of forfeiture, (i)*

*within 5 (five) days of delivery in the case of discrepancies of the Product or obvious defects and (ii) within 8 (eight) days of discovery in the case of hidden defects.*

*WiAutomation is not an official distributor or representative of the brands on this site. The trademarks and names on this site belong to their respective owners. Rockwell: WiAutomation is not an authorized dealer of surpluses or affiliate of the manufacturer. Products may have older date codes or be an older series than the one available directly from the factory or authorized dealers. Since WiAutomation is not a rockwell authorized distributor, the original manufacturer's warranty does not apply (the 12-month WiAutomation warranty applies). Some Allen-Bradley PLC products will have the firmware already installed, WiAutomation does not guarantee whether or not a PLC product will have firmware and, if it has firmware, if the firmware is the level of revision that is necessary for its application. WiAutomation also does not warrant the ability or right to download or otherwise obtain firmware for the product from Rockwell, its distributors, or any other source. WiAutomation will not obtain or provide firmware on behalf of the customer. It is customer's obligation to comply with the terms of any End User License Agreement or similar document relating to obtaining or installing the firmware.*

**INTERROGATORY NO. 10:**

Identify any contracts, agreements, or pricing documents that relate to Rockwell and/or Rockwell's Authorized Distributors that WI Automation has reviewed in connection with the sourcing or sale of unused Rockwell products.

**RESPONSE:** Objection. This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it demands WiAutomation identify any and all "contracts, agreements, or pricing documents" relating to "Rockwell or Rockwell's Authorized Distributors" that WiAutomation has reviewed. WiAutomation further objects to the extent that this interrogatory seeks irrelevant information that is outside the scope of permissible discovery . WiAutomation's review of any particular contract or agreement has no bearing on the Plaintiff's claims or defenses. WiAutomation further objects to the extent that this interrogatory seeks information protected by the attorney-client privilege and/or work product protection. Subject to and without waiving its general and specific objections, WiAutomation states that WiAutomation has not reviewed any relevant agreements between Rockwell and its Authorized Distributors.

**INTERROGATORY NO. 11:**

If you contend that any of Your sales of unused Rockwell Products were authorized by Rockwell, identify all such sales, describe why you contend that they were authorized.

**RESPONSE:** Objection. This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that Defendant identify all sales that were "authorized" by Rockwell. WiAutomation further objects to the term "unused Rockwell products" as vague, ambiguous, and confusing. Additionally, WiAutomation objects to the extent that this interrogatory calls for legal conclusions as to what constitutes "authorization" to sell Rockwell products. Subject to and without waiving its objections, WiAutomation states that Rockwell and several of its authorized distributors have purchased products directly from WiAutomation. Furthermore, WiAutomation purchases products directly from Rockwell Authorized Distributors who know, actually and constructively, that WiAutomation will resell the product.

**INTERROGATORY NO. 12:**

If you contend that any of Your sales of unused Rockwell Products are not materially different than products sold by Rockwell, identify all such sales and describe why you contend they are not materially different.

**RESPONSE:** Objection. This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that Defendant identify and describe each and every transaction that WiAutomation has made pertaining to the Rockwell products that it sells. Furthermore, WiAutomation objects to the extent that this interrogatory is not adequately limited in time. Defendants further object to the extent that this interrogatory calls for a legal conclusion. Subject to and without waiving its general and specific objections, WiAutomation states that all of WiAutomation's sales of Rockwell products do not differ in any material way. WiAutomation sells only genuine, new Rockwell products. In other words, the products sold by WiAutomation are identical to the products sold by Rockwell.

**INTERROGATORY NO. 13:**

Describe all policies and procedures relating to pre-sale and post-sale customer support that You provide to Your customers who purchase unused Rockwell Products. To the extent the policies and procedures have changed from 2015 to present, Your response should identify how and when such changes were made.

**RESPONSE:** Objection. This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it demands that WiAutomation describe "all policies and procedures" pertaining to pre and post-sale customer service. Furthermore, WiAutomation objects that this interrogatory is not reasonably limited in time. Furthermore, WiAutomation objects to this interrogatory on the grounds that it demands WiAutomation account for any and all changes to the terms and conditions of its website, however

[redacted]

immaterial, from WiAutomation's inception to present day.  Subject to and without waiving its objections, WiAutomation refers Rockwell to its current terms and conditions, available at: https://us.wiautomation.com/terms-and-conditions.

**INTERROGATORY NO. 14:**

Identify all facts that support each of Defendant's defenses listed Defendant's Amended

Answer.

**RESPONSE:**  Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that Defendant identify "all facts" that support each and every one of the Defendants' Affirmative Defenses.  Defendant further objects to the extent that this interrogatory calls for legal conclusions.  Defendant further objects that its affirmative defenses are adequately pled and provide sufficient information for Rockwell to ascertain the precise nature of WiAutomation's affirmative defenses.  Indeed, WiAutomation has already amended its Answer to include additional information about its affirmative defenses after discussions with Rockwell's attorneys.

Subject to and without waiving its general and specific objections, WiAutomation states that it resells new Rockwell products after said products have been introduced into the stream of commerce by Rockwell and/or its authorized distributors.  Rockwell has known about WiAutomation's business for several years and tacitly accepted WiAutomation's role in re-selling Rockwell products by continuing to supply to WiAutomation and even purchasing from WiAutomation.

**INTERROGATORY NO. 15:**

Identify Your warranty policies, changes or modification to such policies, and any

customer or potential customer claims or inquiries regarding such policies.

**RESPONSE:**  Objection.  This interrogatory is overly broad, unduly burdensome, and not proportional to the needs of the case in that it demands that WiAutomation not only specify its warranty "policies, changes or modification to such policies" as well as any and all customer or potential customer "claims" or "inquiries" regarding WiAutomation's warranty policy.  WiAutomation further objects to this interrogatory to the extent that it seeks irrelevant information outside the permissible scope of discovery.  Subject to and without waiving its specific and general objections, the applicable warranty section of WiAutomation's terms and conditions on its website, which provides:

The warranty for new and refurbished products is 12 months covered by WiAutomation from the delivery date, the used products are guaranteed for 3

months. If the item is not as described, you will have a full refund including all shipping costs. If the item is lost or damaged in transit will be refunded only in case of insurance. Whenever the User intends to make use of the remedies provided by the legal guarantee provided with the Products, the User shall contact the Holder at the email address info@wiautomation.com. The Holder shall promptly reply to the communication of the alleged lack of conformity and shall indicate to the User the specific procedure to be followed, taking into account the category of goods relating to the Product, and / or the alleged defect. In any case, defects due to transport by courier, improper use or assembly or inadequate storage or maintenance of the Products and degradation resulting from use are excluded from the Warranty.

At the time of delivery, the Customer is required to verify the conformity of the Product with the Order.

WIAUTOMATION UNDERTAKES TO REPLACE NON-INTACT OR NON-COMPLIANT PRODUCTS AND REPAIR OR REPLACE PRODUCTS RECOGNIZED AS DEFECTIVE AND COVERED BY THE WARRANTY.

Returns are accepted only if previously authorized in writing by WiAutomation by sending the relative RMA (Return Material Authorization) code; upon receipt, WiAutomation examines the returns to verify that the Product is the one sold, that the defect exists, is attributable to its responsibility and is covered by the Warranty and, only in this case, replaces the defective Products. **The Warranty is the only one provided by WiAutomation** and replaces any other warranty, whether written, oral or implicit, except as provided below for the Consumer.
The report of defects and / or non-conformities of the Products must be communicated to WiAutomation in writing, by email (sales@wiautomation.com), under penalty of forfeiture, (i) within 5 (five) days of delivery in the case of discrepancies of the Product or obvious defects and (ii) within 8 (eight) days of discovery in the case of hidden defects.

**INTERROGATORY NO. 16:**

With regards to Rockwell software, firmware or operating systems, identify (1) the date when any of You, Your product sources, and any of Your customers performed any download of such Rockwell software, firmware or operating system and the product for which it was downloaded and/or used; (2) Your policies and procedures regarding advertising such Rockwell

software, firmware or operating systems for download or other delivery to Your customers, (3) Your policies and procedures regarding making and/opr authorizing such downloads and (4) any technical assistance provided to or communication with customers regarding the installation or download of Rockwell software, firmware or operating systems.

**RESPONSE:** Objection.  This interrogatory is overly broad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case in that it demands that WiAutomation not only identify the date on which installation was made,  but also its "policies and procedures." WiAutomation further objects to the extent that this interrogatory seeks irrelevant information that is outside the scope of permissible discovery.  Subject to and without waiving its general and specific objections, WiAutomation refers the Plaintiff to the terms and conditions on its website, which every purchaser is required to agree to prior to purchase:

Some Allen-Bradley PLC products will have the firmware already installed, WiAutomation does not guarantee whether or not a PLC product will have firmware and, if it has firmware, if the firmware is the level of revision that is necessary for its application. WiAutomation also does not warrant the ability or right to download or otherwise obtain firmware for the product from Rockwell, its distributors, or any other source. WiAutomation will not obtain or provide firmware on behalf of the customer. It is customer's obligation to comply with the terms of any End User License Agreement or similar document relating to obtaining or installing the firmware.

## **VERIFICATION OF INTERROGATORY ANSWERS**

I, Fulvio Coppola, am President and CEO of Parcop, S.r.l. d/b/a WiAutomation.  I believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.


_____

Dated: August _____, 2022

# Exhibit C

# Document Produced in Native Format

ROCK-00015842







































# Exhibit D

# Condensed Transcript/Concordance

Rockwell Automation v. Parcorp

## Deposition of Ryan Smaglik

December 19, 2022

D'Amico Certified Reporting
908-546-7650
damico.reporting@verizon.net

Ryan Smaglik
12/19/2022

297

1            12/19/22 - R. Smaglik
2       witness.
3            (Whereupon, the record was rad.)
4    BY MR. KASOLAS:
5       Q.   Is there a minimum monetary
6    threshold that an authorized distributor must
7    expend to become an authorized distributor?
8       A.   I don't know the answer to that.
9       Q.   In order to become an authorized
10   distributor, does Rockwell Automation offer
11   training to the employees of the proposed
12   authorized distributor so that the authorized
13   distributor can actually become authorized?
14      A.   Certainly in one of the requirements
15   of the distributor, appointing a distributor,
16   that the distributor hires employees that will
17   subsequently be trained by Rockwell.  That's my
18   understanding, yes.
19      Q.   So are the employees of the
20   authorized distributor are trained after they
21   become an authorized distributor by Rockwell?
22      A.   It's a fair question, I -- I don't
23   know exactly how the situation works.  There may
24   be some leeway while they're be actually being
25   trained or some grace period, but I'd have to

298

1            12/19/22 - R. Smaglik
2    look in to that to get you a definite answer.
3       Q.   And what kind of improvement does
4    the authorized distributor require to make to
5    their staff in order to become an authorized
6    distributor?
7       A.   You mean the improvements between
8    not being authorized and -- being just Company A
9    and then being authorized distributor Company A?
10      Q.   Yes, sir.
11      A.   Like I said, they would have to meet
12   the requirements of the number of tech
13   specialists, the marketing staff, I believe and
14   then the -- the technical sale specialist.
15   Depending on the region, there's potentially
16   different requirements in the staffing levels
17   required.  But if the distributors didn't
18   already have those, then they would have to make
19   investments to meet those requirements.
20      Q.   So it means they have a marketing
21   department is what you're saying, correct?
22      A.   Our distributors generally do have
23   marketing departments.
24      Q.   And you're saying they also need to
25   have a sales department, correct?

299

1            12/19/22 - R. Smaglik
2       A.   Our distributors would -- I can't
3    think of any distributor that wouldn't have a
4    sales department.
5       Q.   What is a tech specialist?
6       A.   These are just technical experts in
7    products.  Again, I think I've also used the
8    term specialists; they are people who are
9    knowledgeable at the technology level in our
10   products who could have a -- an informed
11   conversation with the customer about the
12   technical requirements and which products might
13   be suitable for that particular customer's
14   application.
15      Q.   And how does the staff at these
16   authorized distributors gain that technical
17   knowledge?
18      A.   I'm -- my understanding is they're
19   trained by Rockwell Automation.
20      Q.   Do the authorized distributors
21   actually pay Rockwell Automation to train the
22   authorized distributor's staff?
23      A.   I don't know the answer to that
24   question; I would have to check.
25      Q.   Does anybody from Rockwell train the

300

1            12/19/22 - R. Smaglik
2    sales force at the authorized distributor as
3    part of the distributor being an authorized
4    distributor?
5       A.   I'm very sure that there is
6    something that would be considered training.
7    There's quite a close collaboration between
8    Rockwell Automation and the distributors,
9    particularly when they're onboarded to make sure
10   that they represent our product and our
11   technologies appropriately.
12      Q.   You're saying you're sure, what do
13   you make that statement based upon?
14      A.   I guess just my experience being a
15   Rockwell employee for the last 13 years.
16      Q.   What specific experience are you
17   basing that answer on?
18      A.   My interactions with our
19   distributors, my understanding from
20   conversations of colleagues in our broader
21   market access organization.
22      Q.   And does a distributor pay Rockwell
23   to train the sales force?
24      A.   I don't know whether the training is
25   paid for or not.

75  (Pages 297 to 300)

Ryan Smaglik
12/19/2022



301

1    **12/19/22 - R. Smaglik**
2        Q.   Can you tell me across the board
3    what training Rockwell provides to an authorized
4    distributor when it makes an authorized
5    distributor an authorized distributor?
6        **A.   I would have to check on the**
7    **specific portfolio training across the different**
8    **types of distributor staff that would be**
9    **required.**
10       Q.   As you sit here now, you can't tell
11   me?
12       **A.   I can't tell you for sure.  I would**
13   **have to go look at the specifics and I would**
14   **also have to understand whether or not there are**
15   **any regional variances in that.**
16       Q.   What about point of sale data, is
17   that something that an authorized distributor is
18   required to make available to Rockwell as part
19   of an authorized distributor agreement?
20       A.   Yes.
21       Q.   What specifically does an authorized
22   distributor have to do in its point of sale data
23   in order to become an authorized distributor for
24   Rockwell?
25       A.   In general, there is an IT project

302

1        12/19/22 - R. Smaglik
2    that commences between Rockwell Automation and
3    the distributor, so that the distributor can
4    access an API through which they will
5    proactively send Rockwell their point of sale
6    data on an agreed cadence.
7        Q.   What's the agreed upon cadence?
8        MR. TANCK:  So again, we're getting
9    in to specifics of the relationship, Bob,
10   and this is going to be confidential.
11   Whether they have to provide U.S. data is
12   one thing, but the cadence in which it's
13   done and how it's done and what it's done,
14   we are getting in to confidentiality.
15       You certainly can ask the questions,
16   we'll certainly provide answers to the
17   extent the witness knows.  But we are
18   going to have to ask your client to step
19   out on these sorts of questions because it
20   calls for highly confidential information.
21       MR. KASOLAS:  I totally disagree
22   with your position. I'm going to take it
23   up with The Court, but I'll have my client
24   leave the room now to get this over with.
25       MR. TANCK:  Sure.

303

1        12/19/22 - R. Smaglik
2        (Whereupon, the defendants exit the
3    Zoom deposition.)
4        MR. TANCK:  Marianne, we can
5    designate this portion highly
6    confidential.
7        * (WHEREUPON, THE FOLLOWING
8    TESTIMONY DEEMED HIGHLY CONFIDENTIAL.)
9        MR. KASOLAS:  Okay, client left the
10   deposition.
11       Madam Court Reporter, would you
12   kindly read back my question to the
13   witness.
14       (Whereupon, the record was read.)
15       A.   Cadence of the transmission of point
16   of sale data?
17       (Whereupon, the prior question and
18   answer were read.)
19   BY MR. KASOLAS:
20       A.   So the answer is I believe there is
21   some variation, but as to the absolute maximums
22   and minimums, I'm not familiar.  So for example,
23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮ has been my experience.

304

1        12/19/22 - R. Smaglik
2        Q.   What's the minimum and maximum range
3    of the cadence where an authorized distributor
4    reports POS data through Rockwell?
5        **A.   I'm not aware of the exact minimums**
6    **and maximums.  In my own personal experience my**
7    **observation, this is generally between a** ▮▮▮▮
8    ▮▮▮▮▮▮▮. I – I'm not saying -- there
9    **could be a situation where a distributor**
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **I think it**
12   **really comes down to the particulars of the**
13   **distributor's IT system, their business systems**
14   **and our business systems and how we can link**
15   **those up.**
16       Q.   What is the maximum cadence that an
17   authorized distributor reports its POS data to
18   Rockwell?
19       **A.   I don't know that.**
20       Q.   What do you think it is?
21       MR. TANCK:  Calls for speculation.
22   BY MR. KASOLAS:
23       **A.   I can only speculate.**
24       Q.   It's not required in the contracts,
25   is it?

76 (Pages 301 to 304)

D'Amico Certified Reporting
908-546-7650

Ryan Smaglik
12/19/2022

305

12/19/22 - R. Smaglik

1
2      A.   **The provision of the point of sale**
3   **data is required in the contract.**
4      Q.   But the cadence is not, correct?
5      A.   I would need to double-check the
6   contract's template.
7      Q.   Do you know why ██████████
8   ████████████████████████████
9   ██████████████████
10      MR. TANCK:  Objection to form.
11   Assumes -- lacks foundation, assumes facts
12   not in evidence.
13   BY MR. KASOLAS:
14      Q.   You can answer.
15      A.   I can only speculate, Mr. Kasolas.
16      Q.   I don't want you to speculate, I
17   don't want you to speculate.
18      A.   Okay, I don't know.
19      Q.   Do you know who RA Controls is?
20      A.   Yes, I know who RA Controls is --
21   well, can you give me -- there are few RA
22   Controls, what is the legal entity, the legal
23   entity's name?
24      Q.   You're going to teach me, I'm here
25   asking you questions, okay?

306

12/19/22 - R. Smaglik

1
2      A.   Yup.
3      Q.   Who is RA Controls?
4      A.   I'm aware of an RA Controls SP, I
5   think Z-O-O, from familiarity.  We have an
6   authorized distributor in a few Eastern European
7   countries by that name.
8      Q.   Is RA Controls a big European
9   distributor of Rockwell Automation products?
10      MR. TANCK:  Objection to form.
11   BY MR. KASOLAS:
12      A.   I would have to look at the
13   financials to know whether I would describe them
14   as big.  They are a distributor that I'm
15   familiar with.
16      Q.   Do you know what their territory is
17   in Europe?
18      A.   Not from memory their entire
19   territory.  I know that they at least look after
20   Poland, or part of Poland.
21      Q.   Do you know what other countries RA
22   Controls sells in besides Poland?
23      A.   From memory, I think there are
24   possibly one or two other Eastern European
25   countries, but I would only be guessing.  I

307

12/19/22 - R. Smaglik

1
2   would have to double-check.
3      Q.   You mention they have multiple
4   names, do you know what the other names are for
5   RA Controls in Europe?
6      A.   It would depend on the country.  I'm
7   only talking about the legal entity, the post
8   fix or whatever you call it.  The --
9      Q.   Is RA Controls a trade name for the
10   company that operates its business, is that what
11   you're saying to me?
12      A.   No, no, I'm just saying, like for
13   example, Rockwell Automation, Inc., Rockwell
14   Automation Limited.  RA Controls has I think
15   multiple entities in the countries that they do
16   business in.  So they span one legal entity in
17   Poland and they might have a legal entity in
18   another country that they conduct for us.
19      Q.   What is the cadence that RA Controls
20   reports as POS data to Rockwell Automation?
21      A.   I would have to check specifically
22   with the team on the particulars of that
23   distributor's arrangement.
24      Q.   Do you know who BSA is?
25      A.   I'm familiar with that Technology

308

12/19/22 - R. Smaglik

1
2   BSA, one of our distributors in Italy.
3      Q.   How often does Technology BSA report
4   its POS data to Rockwell Automation?
5      A.   I would have to check on the
6   cadence.
7      Q.   Do you know who RS Components is?
8      A.   Yes, I'm familiar with RS
9   Components, another authorized distributor.
10      Q.   How often does RS Components report
11   its POS data to Rockwell Automation?
12      A.   Again, I would have to check on the
13   particulars of their cadence arrangement.
14      Q.   Do you know who Sonepar Italia SRL
15   is?
16      A.   I think we spoke about this one
17   earlier.  I believe this is a parent company for
18   one of our distributors in Italy based on your
19   on previous conversation.
20      Q.   How often does Sonepar report its
21   POS sales data to Rockwell Automation?
22      A.   I would have to check with our team
23   to see what that cadence is.
24      Q.   Do you know who Electronics is?
25      A.   Yes, I know Electronics is.

77  (Pages 305 to 308)

# Exhibit E

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Madame De Stael ,9 80070 BACOLI (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000050/W** del **04/02/2021**
(Data arrivo 23/02/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1783-LMS5 NomenclaturaCombinata:85176200 EAN:0887172959455 | STRATIX2500 5PORT LIGHTLY MANAGED SWITCH | PC | 1,0000 | 300,0000 | | 300,00 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK1783-US16T NomenclaturaCombinata:85176200 EAN:00884951981430 | STRATIX 2000 16 PORT UNMANAGED SWITCH | PC | 1,0000 | 359,1000 | | 359,10 | 22,00% |
| 3. | | [AC] TRASPORTO | | | 12,3000 | | 12,30 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto \| Numero 1073 WEB del 2021-02-04 \| Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto \| Numero 1073 WEB del 2021-02-04 \| Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1073 WEB Del 04.02.21 |
| | Tracking Number: |
| | AT610013897010NN |
| Allegati | F-20210000050W__-21022308574444.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 04/02/2021 |
| Imponibile | 671,40 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 671,40 € | | 147,71 € |

| | |
|---|---|
| Totale documento | 819,11 € |
| Iva ad esigibilità immediata | |
| Importo da pagare | 819,11 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

Spett. **PARCOP** S.r.l.
Via Madame De Stael ,9 80070 BACOLI (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000068/W** del **15/02/2021**
(Data arrivo 23/02/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Articolo** | **Descrizione servizio/prodotto** | **UM** | **Qt.** | **Imp. unit. €** | **Sconto** | **Tot. netto €** | **Al. IVA** | |
| 1. | CodiceArticoloFornitore:RCK22B-E1P7N104 NomenclaturaCombinata:85044090 EAN:0820919147548 | PF40 3PHASE 600V 0.75kW 1.7A IP20 Pannello | NR | 3,0000 | 269,9000 | | 809,70 | 22,00% |
| 2. | | **[AC]** TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto  \|  Numero 1098 WEB del 2021-02-12  \|  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1098 WEB Del 12.02.21 |
| | Tracking Number: |
| | AT610019119 |
| **Allegati** | F-20210000068W__-21022308581039.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 15/02/2021 |
| Imponibile | 824,70 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 824,70 € | | 181,43 € |
| **Totale documento** | | | **1.006,13 €** |

Iva ad esigibilità immediata

Importo da pagare — 1.006,13 €

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. ▮▮▮▮▮▮▮
C.F. ▮▮▮▮▮▮▮
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Madame De Stael ,9 80070 BACOLI (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000069/W** del **16/02/2021**
(Data arrivo 23/02/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1761-CBL-PM02 NomenclaturaCombinata:85444290 | MICROLOGIX - CAVO CON 1 CONNETTORE 8-PIN MINI DIN ED 1 CONNETTORE 9-PIN D-SHELL, 2 M | NR | 3,0000 | 39,6100 | | 118,83 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK25-RF033-DL EAN:0884951990289 | PF520 SERIES EMC FILTER 33A 480V 3 PH | PC | 1,0000 | 89,7000 | | 89,70 | 22,00% |
| 3. | CodiceArticoloFornitore:RCK1783-US8T NomenclaturaCombinata:85176200 EAN:0884951981386 | STRATIX 2000 8 PORT ETHERNET SWITCH | N. | 1,0000 | 121,6000 | | 121,60 | 22,00% |
| 4. | | [AC] TRASPORTO | | | 12,2900 | | 12,29 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto \| Numero 1101 WEB del 2021-02-16 \| Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto \| Numero 1101 WEB del 2021-02-16 \| Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto \| Numero 1101 WEB del 2021-02-16 \| Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1101 WEB Del 16.02.21 |
| | Tracking Number: |
| | AT610019725 |
| Allegati | F-20210000069W__-21022308581189.PDF (.PDF) |

| Riepilogo fattura | | | |
|---|---|---|---|
| Pagamento | | | Bonifico |
| IBAN | | | ▮▮▮▮▮▮▮ |
| Data scadenza | | | 16/02/2021 |
| Imponibile | | | 342,42 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| 22% | 342,42 € | | 75,33 € |
| **Totale documento** | | | **417,75 €** |
| Iva ad esigibilità immediata | | | |
| Importo da pagare | | | 417,75 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. ████████████
C.F. ████████████
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Madame De Stael ,9 80070 BACOLI (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000013/AN** del **28/02/2021**
(Data arrivo 04/03/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | ANTICIPO SU FATTURA MATERIALE | | 1,0000 | 1245,0000 | | 1.245,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| Causale fattura | Vs.Ord. 1098-2 Web Del 15.02.21 |
| Allegati | F-20210000013AN_-21030416102797.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | ████████████ |
| Data scadenza | 28/02/2021 |
| Imponibile | 1.245,00 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 1.245,00 € | | 273,90 € |

| | |
|---|---|
| Totale documento | 1.518,90 € |
| Iva ad esigibilità immediata | |
| Importo da pagare | 1.518,90 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Madame De Stael ,9 80070 BACOLI (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000098/W** del **02/03/2021**
(Data arrivo 17/03/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Articolo** | **Descrizione servizio/prodotto** | **UM** | **Qt.** | **Imp. unit. €** | **Sconto** | **Tot. netto €** | **Al. IVA** |
| 1. | CodiceArticoloFornitore:RCK25-COMM-E2P NomenclaturaCombinata:85176200 EAN:0884951990081 | PF520 Series Dual Port Ethernet Adaptor | NR | 2,0000 | 146,7300 | | 293,46 | 22,00% |
| 2. | | **[AC]** TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto  \|  Numero 1107 WEB del 2011-03-02  \|  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1107 WEB Del 02.03.11 |
| | Tracking Number: |
| | AT610025777 |
| **Allegati** | F-20210000098W__-21030416383277.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 02/03/2021 |
| Imponibile | 308,46 € |
| IVA %    Imponibile    Arrotondamento | Imposta |
| 22%    308,46 €    | 67,86 € |
| **Totale documento** | **376,32 €** |
| Iva ad esigibilità immediata | |
| Importo da pagare | 376,32 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Madame De Stael ,9 80070 BACOLI (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000100/W** del **03/03/2021**
(Data arrivo 17/03/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1734-AENTR NomenclaturaCombinata:85176200 | DUAL PORT ETHERNET/IP ADAPTER 1734 DUAL-PORT EIP ADP | NR | 1,0000 | 307,0000 | | 307,00 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK1734-IB8S NomenclaturaCombinata:85389099 | SAFETY POINT I/O 8 CHANNEL SAFETY SINKING INPUT MODULE | NR | 1,0000 | 243,0000 | | 243,00 | 22,00% |
| 3. | CodiceArticoloFornitore:RCK25C-E3P0N104 | PowerFlex 527 1.5kW (2Hp) AC Drive ORDINE WEB 1111 | NR | 1,0000 | 643,2500 | | 643,25 | 22,00% |
| 4. | | [AC] TRASPORTO | | | 30,0000 | | 30,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto  \|  Numero 1109 WEB del 2021-03-03  \|  Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto  \|  Numero 1109 WEB del 2021-03-03  \|  Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto  \|  Numero 1109 WEB del 2021-03-03  \|  Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1109 WEB Del 03.03.21 |
| | Tracking Number: |
| | AT610026462 |
| Allegati | F-20210000100W__-21030416383571.PDF (.PDF) |

| Riepilogo fattura | | | |
|---|---|---|---|
| Pagamento | | | Bonifico |
| IBAN | | | |
| Data scadenza | | | 03/03/2021 |
| Imponibile | | | 1.223,25 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| 22% | 1.223,25 € | | 269,12 € |
| Totale documento | | | 1.492,37 € |
| Iva ad esigibilità immediata | | | |
| Importo da pagare | | | 1.492,37 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000267/W** del **17/06/2021**
(Data arrivo 12/07/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1783-LMS8 NomenclaturaCombinata:85176200 | Stratix 2500 Switch, Lightly Managed with 8x10/100 | NR | 2,0000 | 529,1000 | | 1.058,20 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK22-HIM-C2S NomenclaturaCombinata:85371098 EAN:0820919067464 | TASTIERA REMOTA (HIM) PER MONTAGGIO A FRONT | NR | 2,0000 | 150,2300 | | 300,46 | 22,00% |
| 3. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto  \|  Numero 1137 del 2021-06-16  \|  Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto  \|  Numero 1137 del 2021-06-16  \|  Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1137 Del 16.06.21 |
| Allegati | F-20210000267W__-21071209135498.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 17/06/2021 |
| Imponibile | 1.373,66 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 1.373,66 € | | 302,21 € |

| Totale documento | 1.675,87 € |
|---|---|
| Iva ad esigibilità immediata | |
| Importo da pagare | 1.675,87 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. ▓▓▓▓▓▓
C.F. ▓▓▓▓▓▓
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000273/W** del **21/06/2021**
(Data arrivo 12/07/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK2711-CBL-PM05 NomenclaturaCombinata:85444290 | CAVO RS-232 OPERATIVO/PROGRAMMING PER CONNE | NR | 1,0000 | 144,1000 | | 144,10 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK2080-USBADAPTER NomenclaturaCombinata:84718000 | USB ADAPTER PLUG FOR MICRO810 12-PT ONLY | NR | 2,0000 | 22,1000 | | 44,20 | 22,00% |
| 3. | CodiceArticoloFornitore:RCK2080-LC10-12QBB NomenclaturaCombinata:85371091 | MICRO810 MICROCONTR 8IN 24VDC 4AIN 10V 4SRC MICRO810 12 I/O SMART | PC | 1,0000 | 64,8000 | | 64,80 | 22,00% |
| 4. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto  \|  Numero 1141 WEB del 2021-06-21  \|  Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto  \|  Numero 1141 WEB del 2021-06-21  \|  Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto  \|  Numero 1141 WEB del 2021-06-21  \|  Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1141 WEB Del 21.06.21 |
| | Tracking Number: |
| | AT610078032 |
| Allegati | F-20210000273W__-21071209140389.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | ▓▓▓▓▓▓ |
| Data scadenza | 21/06/2021 |
| Imponibile | 268,10 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| 22% | 268,10 € | | 58,98 € |
| Totale documento | 327,08 € |
| Iva ad esigibilità immediata | |
| Importo da pagare | 327,08 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. █████████████
C.F. █████████████
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000289/W** del **30/06/2021**
(Data arrivo 12/07/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK2080-TC2 NomenclaturaCombinata:85389099 EAN:10885630058464 | MICRO800 2 CHANNEL TC PLUG-IN MICRO800 2 CHANNEL TC PLUG-IN | PC | 4,0000 | 86,3000 | | 345,20 | 22,00% |
| 2. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto  |  Numero 1145 WEB del 2021-06-29  |  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1145 WEB Del 29.06.21 |
| | Tracking Number: |
| | AT610082770 |
| **Allegati** | F-20210000289W__-21071209142774.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | ████████████ |
| Data scadenza | 30/06/2021 |
| Imponibile | 360,20 € |
| IVA %  Imponibile  Arrotondamento  Imposta | |
| 22%  360,20 €  Imposta | 79,24 € |
| **Totale documento** | **439,44 €** |
| Iva ad esigibilità immediata | |
| Importo da pagare | 439,44 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000303/W** del **06/07/2021**
(Data arrivo 12/07/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK5069-IB8S NomenclaturaCombinata:85389099 | 5069 Compact I/O 8 Channel 24VDC Sink Safety Input | NR | 1,0000 | 411,4000 | | 411,40 | 22,00% |
| 2. | | **[AC]** TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto  \|  Numero 1148 del 2021-07-05  \|  Linea riferimento: 1 |
|---|---|
| **Causale fattura** | ** Riferim.N.1148 Del 05.07.21 |
| | Tracking Number: |
| | AT610085601 |
| **Allegati** | F-20210000303W__-21071209472688.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 06/07/2021 |
| Imponibile | 426,40 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 426,40 € | | 93,81 € |

| | |
|---|---|
| **Totale documento** | **520,21 €** |
| Iva ad esigibilità immediata | |
| Importo da pagare | 520,21 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000317/W** del **12/07/2021**
(Data arrivo 20/07/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1783-LMS8 NomenclaturaCombinata:85176200 | Stratix 2500 Switch, Lightly Managed with 8x10/100 | NR | 1,0000 | 529,1000 | | 529,10 | 22,00% |
| 2. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto  \|  Numero 1153 WEB del 2021-07-09  \|  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1153 WEB Del 09.07.21 |
| | Tracking Number: |
| | AT610088247 |
| **Allegati** | F-20210000317W__-21072016594219.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 12/07/2021 |
| Imponibile | 544,10 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 544,10 € | | 119,70 € |

| | |
|---|---|
| **Totale documento** | **663,80 €** |
| Iva ad esigibilità immediata | |
| Importo da pagare | 663,80 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. ▮▮▮▮▮▮▮▮▮
C.F. ▮▮▮▮▮▮▮▮
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000324/W** del **14/07/2021**
(Data arrivo 20/07/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1783-LMS8 NomenclaturaCombinata:85176200 | Stratix 2500 Switch, Lightly Managed with 8x10/100 | NR | 1,0000 | 529,1000 | | 529,10 | 22,00% |
| 2. | | **[AC]** TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto  \|  Numero 1158 WEB del 2021-07-14  \|  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1158 WEB Del 14.07.21 |
| | Tracking Number: |
| | AT610089619 |
| **Allegati** | F-20210000324W__-21072016595249.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | ▮▮▮▮▮▮▮▮▮ |
| Data scadenza | 14/07/2021 |
| Imponibile | 544,10 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 544,10 € | | 119,70 € |

| | |
|---|---|
| **Totale documento** | **663,80 €** |
| Iva ad esigibilità immediata | |
| Importo da pagare | 663,80 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000334/W** del **21/07/2021**
(Data arrivo 08/08/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Articolo** | **Descrizione servizio/prodotto** | **UM** | **Qt.** | **Imp. unit. €** | **Sconto** | **Tot. netto €** | **Al. IVA** |
| 1. | CodiceArticoloFornitore:RCK22B-E1P7N104 NomenclaturaCombinata:85044090 EAN:0820919147548 | PF40 3PHASE 600V 0.75kW 1.7A IP20 Pannello | NR | 3,0000 | 415,0000 | | 1.245,00 | 22,00% |
| 2. | | DETRATTO ACCONTO Ord.Acc.:Vs.Ord. 1098 WEB Del 12.02.21 Ft.Acc.:Ft.Acc.21/ 13AN Del 28/02/21 | | | -1245,0000 | | -1.245,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| **CIG & CUP** | Tipo documento: Ordine di acquisto \| Numero 1098 WEB del 2021-02-12 \| Linea riferimento: 1 |
|---|---|
| **Causale fattura** | ** Riferim.N.1098 WEB Del 12.02.21 |
| | Tracking Number: |
| | AT610093174 |
| **Allegati** | F-20210000334W__-21080417443865.PDF (.PDF) |

| Riepilogo fattura | | | |
|---|---|---|---|
| Imponibile | | | 0,00 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| **Totale documento** | | | **0,00 €** |
| Iva ad esigibilità immediata | | | |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000345/W** del **30/07/2021**
(Data arrivo 08/08/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Articolo** | **Descrizione servizio/prodotto** | **UM** | **Qt.** | **Imp. unit. €** | **Sconto** | **Tot. netto €** | **Al. IVA** |
| 1. | CodiceArticoloFornitore:RCK2198-DBR40-F NomenclaturaCombinata:85437090 | Filtro EMC Kinetix 5700 40A 480VAC 3PHASE 50/60 H | NR | 1,0000 | 298,1000 | | 298,10 | 22,00% |
| 2. | | **[AC]** TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto \| Numero 1170 WEB del 2021-07-30 \| Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1170 WEB Del 30.07.21 |
| **Allegati** | F-20210000345W__-21080417445497.PDF (.PDF) |

| | Riepilogo fattura | | |
|---|---|---|---|
| Pagamento | | | Bonifico |
| IBAN | | | |
| Data scadenza | | | 30/07/2021 |
| Imponibile | | | 313,10 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| 22% | 313,10 € | | 68,88 € |
| **Totale documento** | | | 381,98 € |
| Iva ad esigibilità immediata | | | |
| Importo da pagare | | | 381,98 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. ▮▮▮▮▮▮▮▮
C.F. ▮▮▮▮▮▮▮▮
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000359/W** del **11/08/2021**
(Data arrivo 17/08/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1783-LMS5 NomenclaturaCombinata:85176200 EAN:0887172959455 | STRATIX2500 5PORT LIGHTLY MANAGED SWITCH | PC | 1,0000 | 330,0000 | | 330,00 | 22,00% |
| 2. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto | Numero 1178 WEB del 2021-08-11 | Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1178 WEB Del 11.08.21 |
| | Tracking Number: |
| | AT610102746 |
| **Allegati** | F-20210000359W__-21081708445721.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | ▮▮▮▮▮▮▮▮ |
| Data scadenza | 11/08/2021 |
| Imponibile | 345,00 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 345,00 € | | 75,90 € |
| **Totale documento** | | | **420,90 €** |

Iva ad esigibilità immediata

Importo da pagare                     420,90 €

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. ████████████
C.F. ████████████
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000360/W** del **12/08/2021**
(Data arrivo 17/08/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK5069-L306ERS2 NomenclaturaCombinata:85371091 EAN:0889508448961 | Compact GuardLogix SIL2 0.6/0.3M | PC | 1,0000 | 969,1000 | | 969,10 | 22,00% |
| 2. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto  \|  Numero 1185 WEB del 2021-08-12  \|  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1185 WEB Del 12.08.21 |
| | Tracking Number: |
| | AT610102991 |
| **Allegati** | F-20210000360W__-21081708445868.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | ████████████ |
| Data scadenza | 12/08/2021 |
| Imponibile | 984,10 € |
| IVA %    Imponibile    Arrotondamento | Imposta |
| 22%    984,10 €    | 216,50 € |
| **Totale documento** | **1.200,60 €** |
| Iva ad esigibilità immediata | |
| Importo da pagare | 1.200,60 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000364/W** del **20/08/2021**
(Data arrivo 01/09/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Articolo** | **Descrizione servizio/prodotto** | **UM** | **Qt.** | **Imp. unit. €** | **Sconto** | **Tot. netto €** | **Al. IVA** |
| 1. | CodiceArticoloFornitore:RCK5069-IB8S NomenclaturaCombinata:85389099 | 5069 Compact I/O 8 Channel 24VDC Sink Safety Input | NR | 1,0000 | 411,4000 | | 411,40 | 22,00% |
| 2. | CodiceArticoloFornitore:PHC2701875 EAN:4046356869324 | FL MGUARD RS2005 TX VPN SWITCH | PC | 2,0000 | 898,4900 | | 1.796,98 | 22,00% |
| 3. | | **[AC]** TRASPORTO | | | 30,0000 | | 30,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| **CIG & CUP** | Tipo documento: Ordine di acquisto  \|  Numero 1186 WEB del 2021-08-20  \|  Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto  \|  Numero 1187 WEB del 2021-08-20  \|  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1186 WEB Del 20.08.21 |
| | Tracking Number: |
| | AT610104656 |
| **Allegati** | F-20210000364W__-21090114043324.PDF (.PDF) |

| Riepilogo fattura | | | |
|---|---|---|---|
| Pagamento | | | Bonifico |
| IBAN | | | |
| Data scadenza | | | 20/08/2021 |
| Imponibile | | | 2.238,38 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| 22% | 2.238,38 € | | 492,44 € |
| **Totale documento** | | | **2.730,82 €** |
| Iva ad esigibilità immediata | | | |
| Importo da pagare | | | 2.730,82 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000382/W** del **27/08/2021**
(Data arrivo 01/09/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Articolo** | **Descrizione servizio/prodotto** | **UM** | **Qt.** | **Imp. unit. €** | **Sconto** | **Tot. netto €** | **Al. IVA** |
| 1. | CodiceArticoloFornitore:RCK22-HIM-C2S NomenclaturaCombinata:85371098 EAN:0820919067464 | TASTIERA REMOTA (HIM) PER MONTAGGIO A FRONT | NR | 1,0000 | 150,2300 | | 150,23 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK5069-IB8S NomenclaturaCombinata:85389099 | 5069 Compact I/O 8 Channel 24VDC Sink Safety Input | NR | 1,0000 | 411,4000 | | 411,40 | 22,00% |
| 3. | | **[AC]** TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| **CIG & CUP** | Tipo documento: Ordine di acquisto  \|  Numero 1197 WEB del 2021-08-26  \|  Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto  \|  Numero 1197 WEB del 2021-08-26  \|  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1197 WEB Del 26.08.21 |
| | Tracking Number: |
| | AT610107153 |
| **Allegati** | F-20210000382W__-21090114045999.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 27/08/2021 |
| Imponibile | 576,63 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 576,63 € | | 126,86 € |

| | |
|---|---|
| **Totale documento** | **703,49 €** |
| Iva ad esigibilità immediata | |
| Importo da pagare | 703,49 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. ▮▮▮▮▮▮▮▮
C.F. ▮▮▮▮▮▮▮▮
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000384/W** del **31/08/2021**
(Data arrivo 06/09/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Articolo** | **Descrizione servizio/prodotto** | **UM** | **Qt.** | **Imp. unit. €** | **Sconto** | **Tot. netto €** | **Al. IVA** |
| 1. | CodiceArticoloFornitore:PSTPLX31-MBTCP-MBS4 | Modbus TCP to Modbus Serial 4 Port Gateway | N. | 2,0000 | 850,0000 | | 1.700,00 | 22,00% |
| 2. | | **[AC]** TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto  \|  Numero MAIL del 2021-08-26  \|  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.MAIL Del 26.08.21 |
| | Tracking Number: |
| | AT610108463 |
| **Allegati** | F-20210000384W__-21090610595857.PDF (.PDF) |

| Riepilogo fattura | | | |
|---|---|---|---|
| Pagamento | | | Bonifico |
| IBAN | | | ▮▮▮▮▮▮▮▮ |
| Data scadenza | | | 31/08/2021 |
| Imponibile | | | 1.715,00 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| 22% | 1.715,00 € | | 377,30 € |
| **Totale documento** | | | **2.092,30 €** |
| Iva ad esigibilità immediata | | | |
| Importo da pagare | | | 2.092,30 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000396/W** del **06/09/2021**
(Data arrivo 10/09/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK22F-D4P2N103 NomenclaturaCombinata:85044090 EAN:0820919785184 | PF4M 480V 1.5kW 4.2A IP20 Display a LED AC DRIVE, 480VAC, 3PH, 4.2 AMPS, TYPE IP20 | NR | 2,0000 | 256,1100 | | 512,22 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK25B-B017N104 NomenclaturaCombinata:85044090 EAN:0884951885769 | PF 525 240V 3PH 5HP IP19 | PC | 1,0000 | 622,6600 | | 622,66 | 22,00% |
| 3. | CodiceArticoloFornitore:RCK22-HIM-C2S NomenclaturaCombinata:85371098 EAN:0820919067464 | TASTIERA REMOTA (HIM) PER MONTAGGIO A FRONT | NR | 11,0000 | 155,4800 | | 1.710,28 | 22,00% |
| 4. | | **[AC]** TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto  \|  Numero 1207 del 2021-09-06  \|  Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto  \|  Numero 1207 del 2021-09-06  \|  Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto  \|  Numero 1207 del 2021-09-06  \|  Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1207 Del 06.09.21 |
| | Tracking Number: |
| | AT610111629 |
| Allegati | F-20210000396W___-21091016440081.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 06/09/2021 |
| Imponibile | 2.860,16 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 2.860,16 € | | 629,24 € |

| Totale documento | 3.489,40 € |
|---|---|
| Iva ad esigibilità immediata | |
| Importo da pagare | 3.489,40 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. █████████████
C.F. █████████████
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000401/W** del **07/09/2021**
(Data arrivo 10/09/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK5094-IB16 NomenclaturaCombinata:85389099 | 5094 Digital 16 Input | NR | 3,0000 | 217,8300 | | 653,49 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK150-TC1 | CALOTTE COPRIMORSETTI PER SMC-FLEX CALOTTE COPRIMORSETTO PER DISPOSITIVI DA 108..135A MP | NR | 2,0000 | 24,2100 | | 48,42 | 22,00% |
| 3. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto  \|  Numero 1210 WEB del 2021-09-07  \|  Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto  \|  Numero 1210 WEB del 2021-09-07  \|  Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1210 WEB Del 07.09.21 |
| Allegati | F-20210000401W__-21091016550118.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | ████████████ |
| Data scadenza | 07/09/2021 |
| Imponibile | 716,91 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 716,91 € | | 157,72 € |

| Totale documento | 874,63 € |
|---|---|
| Iva ad esigibilità immediata | |
| Importo da pagare | 874,63 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. ▮▮▮▮▮▮
C.F. ▮▮▮▮▮▮
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000421/W** del **15/09/2021**
(Data arrivo 24/09/2021)

| Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Articolo** | **Descrizione servizio/prodotto** | **UM** | **Qt.** | **Imp. unit. €** | **Sconto** | **Tot. netto €** | **Al. IVA** |
| 1. CodiceArticoloFornitore:RCK2198-K57CK-D15M NomenclaturaCombinata:85366990 | Kit Connettore Kinetix 5701 | PC | 9,0000 | 69,5600 | | 626,04 | 22,00% |
| 2. | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto  \|  Numero 1218 WEB del 2021-09-15  \|  Linea riferimento: 1 |
|---|---|
| **Causale fattura** | ** Riferim.N.1218 WEB Del 15.09.21 |
| | Tracking Number: |
| | AT610117004 |
| **Allegati** | F-20210000421W__-21091715044048.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | ▮▮▮▮▮▮ |
| Data scadenza | 15/09/2021 |
| Imponibile | 641,04 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 641,04 € | | 141,03 € |

| Totale documento | 782,07 € |
|---|---|
| Iva ad esigibilità immediata | |
| Importo da pagare | 782,07 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000428/W** del **17/09/2021**
(Data arrivo 24/09/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK5069-OBV8S NomenclaturaCombinata:85389099 | 5069 Compact I/O 8 Channel 24VDC Configurable Safety Output Module (Sourcing or Bipolar) | NR | 1,0000 | 544,5800 | | 544,58 | 22,00% |
| 2. | | **[AC]** TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

| INFORMAZIONI AGGIUNTIVE | |
|---|---|
| CIG & CUP | Tipo documento: Ordine di acquisto  \|  Numero 1220 WEB del 2021-09-17  \|  Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1220 WEB Del 17.09.21 |
| Allegati | F-20210000428W__-21091715045094.PDF (.PDF) |

| Riepilogo fattura | | | |
|---|---|---|---|
| Pagamento | | | Bonifico |
| IBAN | | | |
| Data scadenza | | | 17/09/2021 |
| Imponibile | | | 559,58 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| 22% | 559,58 € | | 123,11 € |
| **Totale documento** | | | **682,69 €** |
| Iva ad esigibilità immediata | | | |
| Importo da pagare | | | 682,69 € |

WI003349
Pagina 1 di 1

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. [REDACTED]
C.F. [REDACTED]
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000434/W** del **20/09/2021**
(Data arrivo 06/10/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1734-IE4S NomenclaturaCombinata:85371098 EAN:10885630078578 | POINT IO SAFETY ANALOG INPUT MODULE | PC | 1,0000 | 713,1100 | | 713,11 | 22,00% |
| 2. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto  \|  Numero 1224 WEB del 2021-09-20  \|  Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1224 WEB Del 20.09.21 |
| | Tracking Number: |
| | AT610119629 |
| **Allegati** | F-20210000434W__-21092718110878.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | [REDACTED] |
| Data scadenza | 20/09/2021 |
| Imponibile | 728,11 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 728,11 € | | 160,18 € |
| **Totale documento** | | | **888,29 €** |
| Iva ad esigibilità immediata | | | |
| Importo da pagare | | | 888,29 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. [redacted]
C.F. [redacted]
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000438/W** del **22/09/2021**
(Data arrivo 06/10/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK2097-V34PR3 EAN:0884951147577 | 480 VAC THREE PHASE 2A RMS, | NR | 1,0000 | 1201,6400 | | 1.201,64 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK5069-OBV8S NomenclaturaCombinata:85389099 | 5069 Compact I/O 8 Channel 24VDC Configurable Safety Output Module (Sourcing or Bipolar) | NR | 1,0000 | 544,5800 | | 544,58 | 22,00% |
| 3. | CodiceArticoloFornitore:RCK5069-RTB6-SPRING NomenclaturaCombinata:85369010 | Morsettiera rimovibile CompactLogix | NR | 1,0000 | 14,5300 | | 14,53 | 22,00% |
| 4. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto | Numero 1230 WEB del 2021-09-22 | Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto | Numero 1230 WEB del 2021-09-22 | Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto | Numero 1230 WEB del 2021-09-22 | Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1230 WEB Del 22.09.21 |
| Allegati | F-20210000438W__-21092718111467.PDF (.PDF) |

| Riepilogo fattura | | |
|---|---|---|
| Pagamento | | Bonifico |
| IBAN | | [redacted] |
| Data scadenza | | 22/09/2021 |
| Imponibile | | 1.775,75 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| 22% | 1.775,75 € | | 390,67 € |
| Totale documento | | 2.166,42 € |
| Iva ad esigibilità immediata | | |
| Importo da pagare | | 2.166,42 € |

WI003351

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000444/W** del **23/09/2021**
(Data arrivo 05/10/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK5069-IB16F NomenclaturaCombinata:85389099 EAN:0885630530048 | 5069 FAST DC INPUT MODULE | PC | 1,0000 | 207,0500 | | 207,05 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK5069-RTB6-SPRING NomenclaturaCombinata:85369010 | Morsettiera rimovibile CompactLogix | NR | 1,0000 | 14,5300 | | 14,53 | 22,00% |
| 3. | CodiceArticoloFornitore:RCK1734-4IOL NomenclaturaCombinata:85176200 EAN:0887172307751 | POINT I/O 4CHANNEL IO-LINK MASTER MODULE | PC | 6,0000 | 185,0100 | | 1.110,06 | 22,00% |
| 4. | | [AC] TRASPORTO | | | 14,9900 | | 14,99 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto \| Numero 1232 WEB del 2021-09-23 \| Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto \| Numero 1232 WEB del 2021-09-23 \| Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto \| Numero 1232 WEB del 2021-09-23 \| Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1232 WEB Del 23.09.21 |
| | Tracking Number: |
| | AT610121884 |
| Allegati | F-20210000444W__-21092718112357.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 23/09/2021 |
| Imponibile | 1.346,63 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 1.346,63 € | | 296,26 € |

| Totale documento | 1.642,89 € |
|---|---|
| Iva ad esigibilità immediata | |
| Importo da pagare | 1.642,89 € |

HIGHLY CONFIDENTIAL

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000445/W** del **24/09/2021**
(Data arrivo 06/10/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK5069-RTB64-SCREW NomenclaturaCombinata:85369010 EAN:0887172727016 | COMPACT5000 SCREW RTB KIT | PC | 1,0000 | 23,9700 | | 23,97 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK1734-IE4S NomenclaturaCombinata:85371098 EAN:10885630078578 | POINT IO SAFETY ANALOG INPUT MODULE | PC | 4,0000 | 713,1100 | | 2.852,44 | 22,00% |
| 3. | | **[AC]** TRASPORTO | | | 6,6400 | | 6,64 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| **CIG & CUP** | Tipo documento: Ordine di acquisto \| Numero 1233 WEB del 2021-09-24 \| Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto \| Numero 1233 WEB del 2021-09-24 \| Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1233 WEB Del 24.09.21 |
| | Tracking Number: |
| | AT610122640 |
| **Allegati** | F-20210000445W__-21092718112503.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 24/09/2021 |
| Imponibile | 2.883,05 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 2.883,05 € | | 634,27 € |

| Totale documento | 3.517,32 € |
|---|---|
| Iva ad esigibilità immediata | |
| Importo da pagare | 3.517,32 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000448/W** del **27/09/2021**
(Data arrivo 11/10/2021)

| | | Dettaglio prodotti | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1734-IE4S NomenclaturaCombinata:85371098 EAN:10885630078578 | POINT IO SAFETY ANALOG INPUT MODULE | PC | 2,0000 | 713,1100 | | 1.426,22 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK150-C3NBD | SOFTSTARTER SMC-3 3 A 200-480 V 100-240VAC SOFT STARTER SMC-3, 1..3A, ENTRATA LINEA TENSIONE A 3 FASI 200..480V 50/60 HZ, TENSIONE DI COMANDO 1 00..240V AC | NR | 1,0000 | 245,3600 | | 245,36 | 22,00% |
| 3. | CodiceArticoloFornitore:RCK2080-MEMBAK-RTC2 EAN:0191326313339 | Micro800 Memory Module 4MB RTC Plug-In | PC | 1,0000 | 154,2700 | | 154,27 | 22,00% |
| 4. | | [AC] TRASPORTO | | | 15,0100 | | 15,01 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto │ Numero 1234 WEB del 2021-09-27 │ Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto │ Numero 1234 WEB del 2021-09-27 │ Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto │ Numero 1234 WEB del 2021-09-27 │ Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1234 WEB Del 27.09.21 |
| Allegati | F-20210000448W__-21092718112958.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 27/09/2021 |
| Imponibile | 1.840,86 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 1.840,86 € | | 404,99 € |
| Totale documento | | | 2.245,85 € |
| Iva ad esigibilità immediata | | | |
| Importo da pagare | | | 2.245,85 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

## Fattura N° **21/000455/W** del **28/09/2021**
(Data arrivo 11/10/2021)

| | | | **Dettaglio prodotti** | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK1783-US8T NomenclaturaCombinata:85176200 EAN:0884951981386 | STRATIX 2000 8 PORT ETHERNET SWITCH | N. | 1,0000 | 144,1800 | | 144,18 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK25B-A8P0N114 NomenclaturaCombinata:85044090 EAN:0884951885660 | PF 525 240V 1PH 2HP IP20 EMC | PC | 1,0000 | 374,7800 | | 374,78 | 22,00% |
| 3. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **CIG & CUP** | Tipo documento: Ordine di acquisto \| Numero 1236 WEB del 2021-09-28 \| Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto \| Numero 1236 WEB del 2021-09-28 \| Linea riferimento: 1 |
| **Causale fattura** | ** Riferim.N.1236 WEB Del 28.09.21 |
| | Tracking Number: |
| | AT610124624 |
| **Allegati** | F-20210000455W__-21100515331592.PDF (.PDF) |

| **Riepilogo fattura** | |
|---|---|
| Pagamento | Bonifico |
| IBAN | |
| Data scadenza | 28/09/2021 |
| Imponibile | 533,96 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 533,96 € | | 117,47 € |

| | |
|---|---|
| **Totale documento** | **651,43 €** |
| Iva ad esigibilità immediata | |
| Importo da pagare | 651,43 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P. ▮▮▮▮▮▮▮▮
C.F. ▮▮▮▮▮▮▮▮
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000080/AN** del **30/09/2021**
(Data arrivo 07/10/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Articolo** | **Descrizione servizio/prodotto** | **UM** | **Qt.** | **Imp. unit. €** | **Sconto** | **Tot. netto €** | **Al. IVA** |
| 1. | ANTICIPO SU FATTURA MATERIALE | | 1,0000 | 731,5600 | | 731,56 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| | |
|---|---|
| **Causale fattura** | Vs.Ord. 1216 WEB Del 15.09.21 |
| **Allegati** | F-20210000080AN_-21100311482353.PDF (.PDF) |

| Riepilogo fattura | |
|---|---|
| Pagamento | Bonifico |
| IBAN | ▮▮▮▮▮▮▮▮ |
| Data scadenza | 30/09/2021 |
| Imponibile | 731,56 € |

| IVA % | Imponibile | Arrotondamento | Imposta |
|---|---|---|---|
| 22% | 731,56 € | | 160,94 € |

| | |
|---|---|
| **Totale documento** | **892,50 €** |
| Iva ad esigibilità immediata | |
| Importo da pagare | 892,50 € |

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

**Spett. PARCOP S.r.l.**
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000468/W** del **01/10/2021**
(Data arrivo 11/10/2021)

| | Dettaglio prodotti | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK2713P-T9WD1 NomenclaturaCombinata:85371098 EAN:00889508728858 | PanelView 5310 9" Wide Graphic Terminal Touch screen,Wide aspect ratio Color, 24V DC, Single Ethernet port | PC | 1,0000 | 1550,8400 | | 1.550,84 | 22,00% |
| 2. | CodiceArticoloFornitore:RCK104-C09EJ22 NomenclaturaCombinata:85364190 | Inversione contattore IEC 9 A CONTACTOR,REVERSING 600V MAX 9 AMP MAX | PC | 3,0000 | 135,4500 | | 406,35 | 22,00% |
| 3. | CodiceArticoloFornitore:RCK2198-H008-ERS2 NomenclaturaCombinata:85044090 EAN:0885630902661 | KINETIX 5500 6.3 AMP SERVO DRIVE | PC | 1,0000 | 1184,1800 | | 1.184,18 | 22,00% |
| 4. | CodiceArticoloFornitore:RCK22F-A2P5N113 NomenclaturaCombinata:85044090 EAN:0820919785023 | PF4M 200-240V 0.4 kW 2.5A IP20 Filtro AC DRIVE, 240VAC, 1PH, 2.5 AMPS, TYPE IP20 | NR | 10,0000 | 122,2500 | | 1.222,50 | 22,00% |
| 5. | CodiceArticoloFornitore:RCK5094-IB16 NomenclaturaCombinata:85389099 | 5094 Digital 16 Input | NR | 9,0000 | 217,8300 | | 1.960,47 | 22,00% |
| 6. | | [AC] TRASPORTO | | | 30,0000 | | 30,00 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto \| Numero 1239 WEB del 2021-09-29 \| Linea riferimento: 1 |
|---|---|
| | Tipo documento: Ordine di acquisto \| Numero 1239 WEB del 2021-09-29 \| Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto \| Numero 1239 WEB del 2021-09-29 \| Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto \| Numero 1239 WEB del 2021-09-29 \| Linea riferimento: 1 |
| | Tipo documento: Ordine di acquisto \| Numero 1240 WEB del 2021-10-01 \| Linea riferimento: 1 |
| Causale fattura | ** Riferim.N.1239 WEB Del 29.09.21 |
| Allegati | F-20210000468W___-21100515333557.PDF (.PDF) |

**Riepilogo fattura**

| Pagamento | | | Bonifico |
|---|---|---|---|
| IBAN | | | |
| Data scadenza | | | 01/10/2021 |
| Imponibile | | | 6.354,34 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| 22% | 6.354,34 € | | 1.397,95 € |
| **Totale documento** | | | **7.752,29 €** |
| Iva ad esigibilità immediata | | | |
| Importo da pagare | | | 7.752,29 € |

WI003357
Pagina 1 di 1

**TECHNOLOGY BSA S.p.A.**
CORSO TRAPANI, 147/149 10141 TORINO (TO)
P.
C.F.
Regime fiscale RF01(Ordinario)

Spett. **PARCOP** S.r.l.
Via Le Croci, 20 80070 MONTE DI PROCIDA (NA)
P. IVA IT08668021218
C.F. 08668021218

Fattura N° **21/000574/W** del **26/11/2021**
(Data arrivo 01/12/2021)

| Dettaglio prodotti | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Articolo | Descrizione servizio/prodotto | UM | Qt. | Imp. unit. € | Sconto | Tot. netto € | Al. IVA |
| 1. | CodiceArticoloFornitore:RCK25B-B5P0N104 NomenclaturaCombinata:85044090 EAN:0884951885691 | PF 525 240V 3PH 1HP IP19 | NR | 2,0000 | 358,2800 | | 716,56 | 22,00% |
| 2. | | [AC] TRASPORTO | | | 15,0000 | | 15,00 | 22,00% |
| 3. | | DETRATTO ACCONTO Ord.Acc.:Vs.Ord. 1216 WEB Del 15.09.21 Ft.Acc.:Ft.Acc.21/ 80AN Del 30/09/21 | | | -731,5600 | | -731,56 | 22,00% |

**INFORMAZIONI AGGIUNTIVE**

| CIG & CUP | Tipo documento: Ordine di acquisto \| Numero 1216 WEB del 2021-09-15 \| Linea riferimento: 1 |
|---|---|
| Causale fattura | ** Riferim.N.1216 WEB Del 15.09.21 |
| Allegati | F-20210000574W___-21120110514966.PDF (.PDF) |

| Riepilogo fattura | | | |
|---|---|---|---|
| Imponibile | | | 0,00 € |
| IVA % | Imponibile | Arrotondamento | Imposta |
| **Totale documento** | | | **0,00 €** |
| Iva ad esigibilità immediata | | | |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ROCKWELL AUTOMATION, INC.'S REPLY IN SUPPORT OF ITS
MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FROM
<u>REFERRING TO EVIDENCE NOT PRODUCED IN DISCOVERY</u>**

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 30, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

Rockwell's motion is targeted—it seeks to preclude testimony and evidence at trial on **unproduced** evidence relating to WiAutomation's suppliers and customers, not all evidence. Motion, 2. WiAutomation's characterization of Rockwell's motion as "vague" is therefore misplaced.

WiAutomation incorrectly alleges Rockwell did not address *Pennypack's* factors. Rockwell's brief, however, demonstrated factor 1 through WiAutomation's failure to disclose documents and a prepared 30(b)(6) witness. Motion, 1-3. Rockwell then demonstrated factor 2 due to prejudice from belated testimony or surprise evidence relating to unproduced materials. *Id*. Factor 3 is met because WiAutomation "cannot justify or cure its failures at this stage," as Rockwell argued. *Id*., 3. Last, WiAutomation fails to meet its burden to show substantial justification and harmless error from withholding invoices and purchase orders. *Locke v. Jefferson Hills Manor*, 2020 WL 5363320, *2-3 (W.D. Pa. Sept. 8, 2020).

Fulvio Coppola's declaration is not "unrebutted," it is deficient and should be disregarded. D.I. 278. Mr. Coppola's declaration contradictorily addresses topics for which he was designated as WiAutomation's 30(b)(6) witness but was unable to provide substantive testimony, underscoring Rockwell's present motion. Motion, 1-2.

*Banjo Buddies* does not provide a bright-line rule allowing estimates, as WiAutomation suggests. Instead, the court "refused to estimate damages" based on

unreliable evidence when the infringer "could have, but failed to, introduce other, more reliable evidence as proof." *Banjo Buddies*, 399 F.3d at 178-79. So too here, WiAutomation withheld production of the best evidence despite corporate designee testimony that such records existed. Exhibit 3, 142:24-143:1, 127:13-19, 59:3-19, 95:23-96:11.

|  |  |
|---|---|
| | /s/ Emily S. DiBenedetto |
| OF COUNSEL: | John W. Shaw (No. 3362) |
| Paul Tanck | Andrew E. Russell (No. 5382) |
| Neal J. McLaughlin | Emily S. DiBenedetto (No. 6779) |
| Christopher L. McArdle | SHAW KELLER LLP |
| Andrew J. Ligotti | I.M. Pei Building |
| ALSTON & BIRD LLP | 1105 North Market Street, 12th Floor |
| 90 Park Avenue | Wilmington, DE 19801 |
| New York, NY 10016 | (302) 298-0700 |
| (212) 210-9400 | jshaw@shawkeller.com |
| | arussell@shawkeller.com |
| Matthew M. Welch | edibenedetto@shawkeller.com |
| ALSTON & BIRD LLP | |
| One South at The Plaza | -and- |
| 101 South Tryon Street | |
| Suite 4000 | Dominick T. Gattuso (No. 3630) |
| Charlotte, NC 28280-4000 | HEYMAN ENERIO GATTUSO & HIRZEL LLP |
| (704) 444-1000 | 300 Delaware Avenue, Suite 200 |
| | Wilmington, DE 19801 |
| Joshua M. Weeks | (302) 472-7311 |
| ALSTON & BIRD LLP | dgattuso@hegh.law |
| One Atlantic Center | |
| 1201 West Peachtree Street | *Attorneys for Rockwell Automation, Inc.* |
| Suite 4900 | |
| Atlanta, GA 30309-3424 | |
| (404) 881-7000 | |

Dated: June 30, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby confirm that this brief complies with the type and number limitations set forth in the November 10, 2022 Standing Order Regarding Briefing in All Cases. I certify that this document contains 250 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

<div align="right">

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

</div>

## CERTIFICATE OF SERVICE

I, Emily S. DiBenedetto, hereby certify that on June 30, 2023, this document

was served on the persons listed below in the manner indicated:

**BY EMAIL**

Pilar G. Kraman
Alexis N. Stombaugh
YOUNG, CONAWAY, STARGATT
 & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com

Bob Kasolas
Eric J. Boden
Eric Alvarez
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com
eboden@bracheichler.com
ealvarez@bracheichler.com

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

4

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

5

# EXHIBIT 15D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 21-1238-GBW-JLH |
| ) | |
| PARCOP S.R.L. d/b/a ) | |
| WIAUTOMATION, ) | |
| ) | |
| Defendant. ) | |

## EXHIBIT 15D: DEFENDANT'S MOTION IN LIMINE NO. 1 TO PRECLUDE ROCKWELL FROM INTRODUCING UNAUTHENTICATED EVIDENCE FROM TEST PURCHASES

Dated:  June 22, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys  for Defendant*

WiAutomation moves *in limine* to preclude Rockwell from introducing evidence obtained from test purchases that Rockwell cannot authenticate under the Federal Rules of Evidence ("FRE").  Rockwell has never identified a single witness who contacted WiAutomation, purchased products from WiAutomation, or received a product shipped from WiAutomation.

Rockwell previously represented that Mark Paliszewski made undercover purchases from WiAutomation using the names J&J Systems and Image-Tek.  (*See, e.g.*, D.I. 164 at p. 2; D.I. 265, Ex. 1 at 61:11-13, 76:21-25, 77:17-23.)  However, on May 19, 2023, Paliszewski admitted he never purchased or received a single product directly from WiAutomation, that his "knowledge" of what products were purchased or received is second-hand from other individuals from third party companies (none of whom were identified before May 2023), and that he does not know who interacted with WiAutomation with respect to one of the alleged purchases.  (Ex. A at 44:7-45:19, 91:8-94:11, 105:17-25, 116:12-24, 117:2-12, 127:3-9, 128:15-129:9, 135:9-18, 147:17-148:11, 182:5-183:21, 188:8-21, 256:13-257:2, 260:11-15; *see also* D.I. 281, Ex. 1 at pp. 2-3.)

Neither Paliszewski nor anybody on Rockwell's witness list has the personal knowledge to testify as to the products that were allegedly bought or received from WiAutomation.  Thus, nobody can authenticate the pictures of products Rockwell

claims came from WiAutomation ("Images"), including those identified in the attached Proposed Order.  FRE 901(b)(1).

The Images are also inadmissible under FRE 901(b)(4), which allows for authentication when the appearance or other "distinctive characteristics of the item, taken together with all the circumstances" support a finding that the item is what the proponent claims it is.  The Images are inadmissible under FRE 901(b)(4) given the dubious history surrounding their production and disclosure.  *Wi-Lan v. Sharp Elecs. Corp.*, 362 F.Supp.3d 226, 233 (D. Del. 2019) (rejecting authentication under FRE 901(b)(4) "given the highly dubious circumstances surrounding the production" of the offered evidence.).

Rockwell repeatedly made misrepresentations to WiAutomation and the Court concerning these Images.  (D.I. 265 at pp. 1-4.)  First, during fact discovery Rockwell misrepresented that the Images showed products obtained by a "customer," and did not identify that any Rockwell agent was involved with the purchase.  (D.I. 142, Ex. D, Rogs 11, 14.)  Second, after it was revealed that the "customer" was actually Rockwell's agent, Rockwell misrepresented to the Court that "[t]here was one agent involved, Paliszewski[.]"  (D.I. 164 at p. 2.)  Third, Rockwell misrepresented to the Court during the May 3, 2023 hearing that "Paliszewski was the one who purchased [the products] and provided the photos" (D.I. 265, Ex. 1, 76:21-25).  Fourth, Rockwell filed Paliszewski's false declaration

in support of its summary judgment motion.  (D.I. 148, Ex. 8; *see also* D.I. 281 Ex. 1, pp. 2-5.)  Rockwell's systematic efforts to conceal the circumstances surrounding this "evidence" is a clear sign that it is untrustworthy.

Further, the concealment of Gary Monroe's involvement in one test purchase further belies the Images' trustworthiness.  Gary Monroe of Image-Tek allegedly bought and received the only product Rockwell claims WiAutomation shipped to the U.S. with a "counterfeit" label.  (Ex. A at 182:5-183:21; Ex. B; D.I. 146 at ¶20 (citing D.I. 147 ¶¶59-60 & Ex. 9.)  Monroe was indicted for his involvement in a fraudulent accounting scheme, pleaded guilty to making material fraudulent statements to the government, was sentenced to 15 months in prison, and was ordered to pay $20 million in restitution.  *U.S. v. Monroe*, 2007 WL 1072912, *1, 8-9. (E.D. Mich. Mar. 29, 2007); (Ex. C.)  Rockwell further misrepresented that Image-Tek is a fake company controlled by Recon (May 3 Tr. at 77:19-23); when it is a functioning company that designs and creates displays for trade shows.  (Ex. A at 176:4-7, 179:25-180:5; Ex. D.)  This alleged "evidence" is not trustworthy.

Further, there is no reliable indication that the products Rockwell claims have counterfeit serial numbers actually came from WiAutomation, and not one of the many other companies Rockwell is investigating.  There is no WiAutomation logo or insignia on any box that contains the allegedly "counterfeit" serial number.  (Ex. E.)  Similarly, there is no image showing that any box with alleged "counterfeit"

3

information came inside a box bearing WiAutomation's logo.  (*Id.*)  Thus, the Images cannot be authenticated at trial.

The Images are also inadmissible as business records.  FRE 803(6).  As explained above, the source of the Images and circumstances surrounding their production lack trustworthiness.  FRE 803(6).  This is especially the case because the test purchases were made for the purposes of this litigation, including the Image-Tek purchase made after the case was filed.  *U.S. v. Casoni*, 950 F.2d 893, 910-912 (3d Cir. 1991).

Dated:  June 22, 2023

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that Defendant's Motion *in Limine* to Preclude Rockwell from Introducing Unauthenticated Evidence from Test Purchases is in Times New Roman 14-point font and contains 750 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.


Dated: June 22, 2023                              YOUNG CONAWAY STARGATT
                                                  & TAYLOR, LLP


*Of Counsel*:                                     /s/ *Pilar G. Kraman*
                                                  Pilar G. Kraman (No. 5199)
Bob Kasolas                                       Alexis N. Stombaugh (No. 6702)
Eric J. Boden                                     Maliheh Zare (No. 7133)
BRACH EICHLER, LLC                                Rodney Square
101 Eisenhower Parkway                            1000 North King Street
Roseland, NJ 07068                                Wilmington, DE 19801
(973) 403-3139                                    (302) 571-6600
bkasolas@bracheichler.com                         pkraman@ycst.com
eboden@bracheichler.com                           astombaugh@ycst.com
                                                  mzare@ycst.com

                                                  *Attorneys for Defendant*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>PARCOP S.R.L. d/b/a )<br>WIAUTOMATION, )<br><br>Defendant. ) | C.A. No. 21-1238-GBW-JLH |

## **[PROPOSED] ORDER**

In Wilmington, this __day of _____, 2023, in consideration of Defendant's Motion *in Limine* to Preclude Rockwell from Introducing Unauthenticated Evidence from Test Purchases, and any opposition thereto;

Defendant's Motion is GRANTED.  Rockwell may not admit testimony at trial from any witness regarding test purchases nor may Rockwell introduce at trial the following exhibits that purport to show evidence of test purchases, including the Declaration of Mark Paliszewski and the alleged photographs attached thereto: PPX-0001, 0002; PTX-10–22, 25–41, 1602–1605, 1751–1759, 1874, 1893.


_____
The Hon. Gregory B. Williams

# Exhibit A

# Condensed Transcript/Concordance

---

## Rockwell Automation, Inc. v. Parcorp

---

## Deposition of Mark Paliszewski

May 19, 2023

D'Amico Certified Reporting
908-546-7650
damico.reporting@verizon.net

Mark Paliszewski
5/19/2023

41

M. Paliszewski - 5/19/23
1
2  of, is this testimony you're giving here on the
3  record is under oath --
4      **A.  Yes.**
5      Q.   -- and subject to penalty of
6  perjury.
7      **A.  That's correct.**
8      Q.   So I want to have very accurate
9  testimony for obvious reasons for everyone's
10  sake.
11      **A.  And I want to give it, yes.**
12      Q.   So my question -- you say we
13  purchased.  When you say we, who are you
14  specifically referring to?
15      **A.  Recon Management Group.**
16      Q.   So it's your testimony today that
17  Recon Management, the entity, allegedly made
18  purchases of Rockwell Automation products from
19  Wi Automation?
20          MR. TANCK:  Objection to form.
21      **A.  Yes.**
22      Q.   The answer was yes?
23      **A.  We conducted investigations that**
24  **involved purchasing products, yes.**
25      Q.   I'm asking a very specific question.

42

M. Paliszewski - 5/19/23
1
2  Is it your testimony -- I don't care about your
3  investigation.  Is it your testimony that
4  Recon Management allegedly made purchases from
5  Wi Automation concerning Rockwell Automation
6  products?
7      **A.  We caused purchase --**
8          MR. TANCK:  Objection.
9      **A.  We caused purchases to be made, yes.**
10      Q.   Sir, answer my question.  Don't play
11  games with the words.  Okay?
12          Did your company Recon Management
13  ever actually make direct purchases of Rockwell
14  Automation products from my client, Wi
15  Automation?
16          MR. TANCK:  Objection to form.
17      Q.   I'm asking a very specific question.
18          MR. TANCK:  Objection to form.
19      **A.  If you're asking me if**
20  **Recon Management sent anyone money for products,**
21  **the answer is no.**
22      Q.   Okay.  And that's fine.  So let me
23  ask that question and then I'll ask another
24  question.  Did Recon Management ever send any
25  money, payment whatsoever to Wi Automation for

43

M. Paliszewski - 5/19/23
1
2  the purchase of Rockwell Automation products?
3          MR. TANCK:  Objection to form.
4      **A.  No.**
5      Q.   And Recon -- and Recon Management,
6  the entity itself also never actually made a
7  direct purchase of products of any kind from Wi
8  Automation, did it?
9          MR. TANCK:  Objection to form.
10      **A.  We did not make a direct purchase,**
11  **Recon Management Group.**
12      Q.   And just to be very, very specific,
13  isn't it true that Recon Management, the entity
14  never purchased any Rockwell Automation products
15  itself directly from Wi Automation?
16          MR. TANCK:  Objection to form.
17      **A.  Not directly.**
18      Q.   And isn't it true that
19  Recon Management never had any direct
20  communication of any kind between anyone at
21  Recon and anyone at
22  Wi Automation concerning the purchase of
23  Rockwell Automation products from Wi Automation?
24          MR. TANCK:  Objection to form.
25      **A.  No one at -- no one at Recon**

44

**M. Paliszewski - 5/19/23**
1
2  **communicated directly with anyone at Wi**
3  **Automation.**
4      Q.   So let's just do a summary here of
5  the answers we just went over.  No one ever --
6  strike that.
7          No one from Recon ever spoke with
8  anyone in any manner at Wi Automation concerning
9  the purchase of Rockwell Automation products,
10  correct?
11          MR. TANCK:  Objection to form.
12      **A.  Correct.**
13      Q.   And no one at Recon ever placed a
14  direct purchase order of any kind with Wi
15  Automation for Rockwell Automation products,
16  correct?
17          MR. TANCK:  Objection to form.
18      **A.  Correct.**
19      Q.   And no one from Recon Management
20  ever actually made a payment of any kind to Wi
21  Automation for the purchase of Rockwell
22  products, correct?
23      **A.  Not directly, correct.**
24          MR. TANCK:  Objection to form.
25      Q.   And no one at Recon Management ever

11 (Pages 41 to 44)

D'Amico Certified Reporting
908-546-7650

Mark Paliszewski
5/19/2023

45

```
 1              M. Paliszewski - 5/19/23
 2      had any type of contact whatsoever directly with
 3      anyone at Wi Automation concerning the purchase
 4      of Rockwell Automation products, correct?
 5              MR. TANCK:  Objection to form.
 6          A.   Correct.
 7          Q.   And isn't it true as well that no
 8      one at Recon ever directly received any Rockwell
 9      products of any kind from Wi Automation
10      concerning any purchase?
11              MR. TANCK:  Objection to form.
12          A.   Correct.
13          Q.   Wi Automation has never shipped a
14      single product -- strike that.
15              Wi Automation has never shipped a
16      single Rockwell product directly to Recon,
17      correct?
18              MR. TANCK:  Objection to form.
19          A.   Correct.
20          Q.   Can you tell me approximately how
21      many investigations Recon has performed for
22      Rockwell over the years since you joined Recon
23      in or about 2009?
24          A.   Many.  I couldn't even approximate
25      for you.  It's many.
```

46

```
 1              M. Paliszewski - 5/19/23
 2          Q.   Can you give me a range of how many
 3      investigations that Recon has conducted for
 4      Rockwell since you started working for Recon in
 5      2009?
 6          A.   You know, I would -- I would say
 7      it's in the hundreds.  I don't -- it would be
 8      very hard to approximate.
 9          Q.   How many companies in the
10      United States has Recon investigated for
11      Rockwell over the years?
12          A.   I couldn't estimate for you.
13          Q.   Do you know how much money your firm
14      has made performing investigation services for
15      Rockwell Automation over the years?
16          A.   I don't know that total amount, no.
17          Q.   Can you approximate for me?
18          A.   It would be very difficult.  I would
19      say, you know, less than $100,000.
20          Q.   Is Rockwell --
21          A.   And that would include product
22      costs, by the way.  So --
23          Q.   Is Rock --
24          A.   -- fees and costs.
25          Q.   I'm sorry, I keep cutting you off.
```

47

```
 1              M. Paliszewski - 5/19/23
 2          A.   That's okay.  I was just going to
 3      say that total approximation that I gave you
 4      would include fees and costs, product costs.
 5          Q.   Is Rockwell one of the biggest
 6      clients that Recon Management has?
 7          A.   No.
 8          Q.   And who do you interface with at
 9      Rockwell Automation since you started performing
10      work for them at Recon in 2009?
11          A.   Who?  Kathy Bentley was my contact
12      for a period, and that was --
13          Q.   Who's Kathy -- I'm sorry, who's
14      Kathy Bentley, sir?
15          A.   She was someone employed by
16      Rockwell.
17          Q.   Did she leave Rockwell at some point
18      in time?
19          A.   She did.
20          Q.   Do you recall when she left?
21          A.   I don't recall.
22          Q.   Who else at Rockwell Automation have
23      you interfaced with over the years concerning
24      Recon's business relationship with Rockwell?
25          A.   My contact after Ms. Bentley left is
```

48

```
 1              M. Paliszewski - 5/19/23
 2      Ryan Smaglik.
 3          Q.   Is there any other contacts you have
 4      at Rockwell Automation besides Mr. Smaglik?
 5          A.   There's a Lauren Acevedo who I've
 6      occasionally communicated with.
 7          Q.   Is there a particular type of work
 8      that you interface with Ms. Acevedo on in
 9      comparison to Mr. Smaglik?
10          A.   It's the same type of work.
11          Q.   Is there anyone else that you have
12      interfaced with over the years at Rockwell
13      Automation concerning investigation services
14      that Recon performs for Rockwell?
15          A.   I've communicated with other people
16      at Rockwell.  You'd have to define what you by
17      concerning investigative services.
18          Q.   Let me make it easier.  Who else
19      have you communicated with over the years at
20      Rockwell concerning any type of service that
21      Recon Management provided to Rockwell?
22          A.   There have been a number of people.
23      I don't even recall all their names, again,
24      because my primary contact is Ryan Smaglik.
25          Q.   Can you tell me all the other people
```

12  (Pages 45 to 48)

Mark Paliszewski
5/19/2023

---

89

```
 1              M. Paliszewski - 5/19/23
 2         MR. KASOLAS:  We'll do that for you.
 3         (Pause on the record.)
 4         MR. KASOLAS:  Paul, is it easier if
 5    I just paste it into the screen share, the
 6    chat box?
 7         MR. TANCK:  You can drop it in the
 8    chat box and I can download it.
 9         MR. KASOLAS:  How do you do that?
10         (Discussion held off the record.)
11    BY MR. KASOLAS:
12    Q.   Okay.  Mr. Paliszewski, I'm going to
13    show you what's been marked Paliszewski 2.
14    Okay?
15    A.   Okay.
16    Q.   I want you to take a look at the
17    second to last page Bates stamped Recon-0000076.
18    Okay?
19    A.   Okay.
20         MR. KASOLAS:  Now, Paul, this was
21    Bates stamped Recon, but you said you're
22    representing Mr. Paliszewski individually.
23    So are you changing your position as to
24    who you actually represent here today in
25    this case.
```

---

90

```
 1         MR. TANCK:  I'm not changing any
 2    position.
 3         MR. KASOLAS:  So do you represent
 4    Mark individually or the Recon entity.
 5         MR. TANCK:  I represent the witness.
 6         MR. KASOLAS:  In what capacity?
 7         MR. TANCK:  With respect to the
 8    subpoena.
 9         MR. KASOLAS:  Okay.  Individually or
10    on behalf of Recon?
11         MR. TANCK:  I guess -- what is the
12    subpoena to?  Is it a subpoena to Recon or
13    is it a subpoena to Mark?  I think it's a
14    subpoena to Mark.  So I represent Mark.
15         MR. KASOLAS:  Okay.  Well, the
16    subpoena says Mark Paliszewski, Recon
17    Management, LLC, care of Alston & Bird.
18    So I need you to clarify on the record --
19         MR. TANCK:  Okay.  We represent --
20         MR. KASOLAS:  -- who you represent.
21         MR. TANCK:  Yeah.  Yep.  Um-hmm.
22         MR. KASOLAS:  So you do represent
23    Recon today, correct?
24         MR. TANCK:  Yes, correct.
```

---

91

```
 1              M. Paliszewski - 5/19/23
 2         MR. KASOLAS:  So we got
 3    Recon, you represent Mark individually and
 4    obviously you represent Recon.  Thank you
 5    for clarifying that on the record.
 6         MR. TANCK:  You're welcome.
 7    BY MR. KASOLAS:
 8    Q.   Okay.  Mr. Paliszewski, on the page
 9    I just referenced you write an email to
10    Stephanie Voyles, V-o-o-y-l-e-s, and Joel Voyles
11    on March 31st, 2020, and the subject line is new
12    case, 2020-93 Wi Automation, importance high,
13    correct?
14    A.   Correct.
15    Q.   And did you, in fact, write this
16    email?
17    A.   It appears so, yes.
18    Q.   Okay.  Who is Stephanie Voyles?
19    A.   Stephanie Voyles is a person that
20    works for Investigative Services Company.
21    Q.   Which investigative services company
22    does she work for?
23    A.   That's the name of the company,
24    Investigative Services Company.
25    Q.   You mean Investigation Services
```

---

92

```
 1              M. Paliszewski - 5/19/23
 2    Company, correct?
 3    A.   Correct.
 4    Q.   And to be clear, the name of the
 5    company she works for is Investigation Services
 6    Company, LLC, correct?
 7    A.   Correct.
 8    Q.   And is she an owner of Investigation
 9    Services Company, LLC?
10    A.   I don't know specifically.
11    Q.   Who is Joel Voyles?
12    A.   He is also with Investigation
13    Services Company.
14    Q.   Is he an owner of that company?
15    A.   I don't know.
16    Q.   Are Stephanie and Joel Voyles
17    married?
18    A.   I believe so.
19    Q.   Okay.  And there's also another
20    woman on this email page.  Her name is Shelley
21    Swaim, S-h-e-l-l-e-y, and last name Swaim,
22    S-w-a-i-m as in mom, correct?
23    A.   Correct.
24    Q.   And who is Shelley Swaim?
25    A.   She also works for Investigation
```

---

23 (Pages 89 to 92)

Mark Paliszewski
5/19/2023

93

1          M. Paliszewski - 5/19/23
2     Services Company.
3          Q.   Is she an owner of Investigation
4     Services Company?
5          A.   I don't know.
6          Q.   Who is the owner of Investigation
7     Services Company?
8          A.   I'm not certain of that.
9          Q.   Why were you writing on March 31st,
10    2020 to Investigation Services Company and in
11    particular the Voyles?
12         A.   To have them do some work for us.
13         Q.   What work did you want them to do
14    for us, which I assume is Recon Management,
15    correct?
16         A.   Correct.
17         Q.   What work did Recon Management --
18    strike that.
19              What work did you want the Voyles
20    couple to do for Recon Management
21    in (inaudible).
22         A.   They were to solicit a quote for
23    products from Wi Automation.
24              (Interruption by the court
25         reporter.)

94

1          M. Paliszewski - 5/19/23
2          MR. KASOLAS:  Beth, are you okay?
3          THE COURT REPORTER:  No, I didn't
4     hear the rest of your question.
5          MR. KASOLAS:  Let me ask it again.
6          Q.   What work did Recon -- strike that.
7              What work in Paliszewski 2 were you
8     looking to have the Voyles perform for Recon
9     Management?
10         A.   To seek a quote for these certain
11    products from Wi Automation.
12         Q.   What products?
13         A.   The products that are listed in that
14    email.
15         Q.   And what products are those?
16         A.   I don't know what they are
17    specifically.  I know those are product numbers
18    provided by Rockwell Automation.
19         Q.   So you don't actually know what
20    those products are that are listed here with the
21    number/letter combinations on Recon 000076,
22    correct?
23         A.   I don't know what those products
24    are.
25         Q.   Do you have any kind of engineering

95

1          M. Paliszewski - 5/19/23
2     background?
3          A.   I do not.
4          Q.   Any kind of computer background?
5          A.   I do not.
6          Q.   Do you have any kind of industrial
7     background?
8          A.   I do not.
9          Q.   Do you have any kind of industrial
10    automation products background?
11         A.   I do not.
12         Q.   And why did you select Mr. and
13    Mrs. Voyles' company, Investigation Services
14    Company for this test purchase?
15         A.   Because they have -- we have a
16    relationship with them in terms of using them
17    for this type of inquiry.
18         Q.   Okay.  What's the relationship that
19    Recon has with Investigation Services Company?
20         A.   They're strategic partners of ours.
21         Q.   What does that mean?
22         A.   That means that we use them in
23    connection with these types of cases for our
24    clients.
25         Q.   What types of cases are you

96

1          M. Paliszewski - 5/19/23
2     referring to?
3          A.   Solicitation of quotes for products.
4          Q.   What types of specific products?
5          A.   Again, with respect to Wi Automation
6     it's these products here that are listed in the
7     email, Rockwell Automation products.
8          Q.   Is Investigation Services Company,
9     LLC some type of a specialist test purchaser in
10    the IP area?
11         A.   They do work in that area, IP, yes.
12         Q.   Did you tell anybody at Rockwell
13    that Recon was going to be using Investigation
14    Services Company, LLC to make this attempted
15    test purchase from Wi Automation?
16         A.   I don't know if I specifically
17    talked to them about what specific company we
18    were going to use.
19         Q.   Why don't you know?
20         A.   I don't recall if I specifically in
21    this instance talked to them about which company
22    we were going to use.
23         Q.   What specifically determines whether
24    or not Recon makes purchases itself directly as
25    opposed to using a third party to make the

24 (Pages 93 to 96)

Mark Paliszewski
5/19/2023

---

105

```
1              M. Paliszewski - 5/19/23
2    products that Investigation Services Company,
3    LLC purchased from Wi Automation in response to
4    your request that they do so on behalf of your
5    client Rockwell?
6         A.   They did not.
7         Q.   And on page 000074 of Paliszewski 2
8    there's an email from Investigation Services
9    Company to you forwarding a response from Wi
10   Automation, correct?
11        A.   That's correct, yes.
12        Q.   And on page one of Paliszewski 2
13   that's also correspondence between you
14   personally and Investigation Services Company,
15   correct?
16        A.   Yes, it appears so.
17        Q.   Who uses the email Investigation
18   Services Company, LLC, do you know?
19             MR. TANCK:  Object to form.
20        A.   I don't know.  I know that those
21   communications generally come from one of our
22   contacts at Investigation Services Company.
23        Q.   Is it one of the three people we
24   talked about already?
25        A.   I believe so, yes.
```

---

106

```
1              M. Paliszewski - 5/19/23
2         Q.   So it's either Joel Voyles,
3    Stephanie Voyles or Shelley Swaim, correct?
4         A.   That's correct.
5         Q.   Now, at the bottom of page one you
6    direct Investigation Services Company to make
7    specific purchases.  Do you see that?
8         A.   I do see that, yes.
9         Q.   Who directed you to do that
10   specifically at Rockwell?
11        A.   Ryan Smaglik would have directed me
12   to make that purchase.
13        Q.   And who told you to tell
14   Investigation Services Company, LLC that they
15   wanted, quote, don't want old stock - something
16   recently manufactured"?
17        A.   You know, that's my terminology that
18   I used apparently in that email.
19        Q.   Okay.
20        A.   I'm assuming that Ryan requested
21   that we ask for product that's not old.
22        Q.   Well, was that your decision or was
23   that Ryan Smaglik's decision to use that
24   terminology in placing the order with Wi
25   Automation?
```

---

107

```
1              M. Paliszewski - 5/19/23
2         A.   Well, that may or may not have been
3    Ryan's terminology.  What I'm saying is I don't
4    know exactly the words Ryan used to convey to me
5    that they wanted us to order something that
6    wasn't old.
7         Q.   Okay.  And you produced Paliszewski
8    2 in response to the subpoena that my law firm
9    served on you, correct?
10        A.   My attorneys produced these
11   documents.
12        Q.   Let me ask the question again.  You
13   produced the document marked Paliszewski 2 to
14   your attorneys in response to my subpoena,
15   correct?
16        A.   I assume so.  I provided all of the
17   documents to my attorneys and...
18        Q.   Well, who is J&J Systems?
19        A.   That is a company name that we use
20   through Investigation Services Company.
21        Q.   Who is we?
22        A.   Recon Management Group.
23        Q.   Is J&J Systems a company that Recon
24   uses or is J&J Systems a company that
25   Investigation Services Company, LLC uses?
```

---

108

```
1              M. Paliszewski - 5/19/23
2         A.   They use it at our direction to use
3    it.
4         Q.   What does that specifically mean?
5         A.   That means when we asked them in
6    this case to request a quote for those products
7    that you show in the email, we asked them to use
8    the
9    J&J Systems name to make the inquiry.
10        Q.   Well, is J&J Systems a real company?
11        A.   It is not a company that operates,
12   no.
13        Q.   Is it -- is it actually a registered
14   company with the Secretary of State in one of
15   the 50 states in the United States?
16        A.   I don't know that it's specifically
17   registered.
18        Q.   So it's not a company.
19        A.   I don't know.  Again, I don't know
20   the technicality of whether it's formed or how
21   it's formed, if it's a d/b/a, I'm not sure.
22   It's a name that we use to make these inquiries.
23        Q.   Did you ask Investigation Services
24   Company to use J&J by email?
25        A.   I don't recall if it was by email or
```

---

27 (Pages 105 to 108)

Mark Paliszewski
5/19/2023

---

113

M. Paliszewski - 5/19/23

1      Q.   But why?
2      **A.   I'm not sure.  You know, it's a**
3 **decision that we made.  That's an entity that we**
4 **wanted to use for that particular case.  I'm not**
5 **sure there's any specific reason I can give you**
6 **other than that's the one we chose.**
7      Q.   You said we.  Who is the we that
8 decided to use the J&J Systems name?
9      **A.   Recon Management Group.**
10     Q.   Who specifically at Recon
11 Management?
12     **A.   Me.**
13     Q.   Has the J&J Systems name been used
14 in the past in test purchases coordinated
15 between Recon and Investigation Services
16 Company, LLC?
17     **A.   With respect to Wi Automation?**
18     Q.   With respect to anybody.
19     **A.   Again, I'm not going to comment as**
20 **to work we did with other --**
21     Q.   Sir, you're going to answer this
22 question or I'm going to move to have you held
23 in contempt of court.
24     MR. KASOLAS:  So, Paul, I think you

---

114

M. Paliszewski - 5/19/23

1 need to instruct your witness to answer
2 the question, particularly now since we've
3 established you represent both Recon as
4 well as Mr. Paliszewski while also
5 representing Rockwell.  You need to direct
6 the witness to answer the question.
7     MR. TANCK:  What is your question?
8     MR. KASOLAS:  Madam Court Reporter,
9 can you please read my question back to
10 Mr. Paliszewski.
11     MR. TANCK:  I don't need the
12 question read back to me.  I'm saying what
13 is your question of me?
14     MR. KASOLAS:  I want you to direct
15 him to answer the question.
16     MR. TANCK:  Okay.  I'm not going to
17 direct him.  He answered your question.
18     MR. KASOLAS:  No, he didn't.  He
19 said I'm not answering your question he
20 said.
21     MR. TANCK:  That's his answer.
22     MR. KASOLAS:  He didn't answer the
23 question.
24     MR. TANCK:  That is his answer.

---

115

M. Paliszewski - 5/19/23

1     MR. KASOLAS:  Paul, you're really
2 digging a big hole for yourself here.
3 BY MR. KASOLAS:
4     Q.   Mr. Paliszewski, has Recon in the
5 past ever had Investigation Services Company,
6 LLC use the J&J Systems facade to make test
7 purchases for
8 Recon clients?
9     **A.   You're asking me to comment on cases**
10 **not involving Wi Automation in terms of what we**
11 **did and, again, I'm not going to do that.**
12     Q.   You're making that decision, not me.
13     **A.   Right.**
14     Q.   I'm here to obtain information about
15 what you allegedly did and didn't do.
16     **A.   Right.  Again, I'm happy to answer**
17 **questions as to what we did with respect to**
18 **Wi Automation, but I'm not going to comment on**
19 **investigations that we had outside of Wi**
20 **Automation.**
21     Q.   Was the J&J Systems name used for
22 the very first time ever by Investigation
23 Services Company in making test purchases for
24 the particular Wi Automation purchases set forth

---

116

M. Paliszewski - 5/19/23

1 in Paliszewski 2?
2     **A.   I don't believe so.**
3     Q.   And what is that answer based on?
4     **A.   That's based on my general**
5 **understanding.**
6     Q.   And does J&J Systems have an email
7 address of its own?
8     **A.   Yes.**
9     Q.   Who controls that email address?
10    **A.   ISC, Investigative Services Company.**
11    Q.   Does anybody at Recon have any
12 control over the email system that Investigation
13 Services Company uses in employing the J&J
14 Systems cover name?
15    **A.   We don't control that, no.**
16    Q.   Do you know who does at
17 Investigation Services Company, LLC?
18    **A.   I don't specifically know who**
19 **controls it, no.**
20    Q.   Does anybody at Recon have access to
21 the email system that Investigation Services
22 Company, LLC uses?
23    **A.   We don't access that email.**
24    Q.   Who's Jason Miller?

---

29 (Pages 113 to 116)

Mark Paliszewski
5/19/2023

---

117

1          M. Paliszewski - 5/19/23
2      A.   Jason Miller is a name that is used
3   in connection with J&J Systems.
4      Q.   Who uses that name?
5      A.   ISC uses that name.
6      Q.   Who specifically at Investigation
7   Services Company, LLC uses the name Jason
8   Miller?
9      A.   In connection with Wi Automation,
10  you know, one of our contacts there uses it.  It
11  is either of the three people that you
12  mentioned, Stephanie, Joel or Ms. Swaim.
13     Q.   So Jason Miller is not a real
14  person, correct?
15     A.   I don't believe so, no.
16     Q.   And who decided to use the
17  Jason Miller name in trying to place orders with
18  Wi Automation in this particular instance
19  involving Paliszewski 2?
20     A.   Again, that's a decision that we at
21  Recon Management make in terms of using J&J
22  Systems and Jason Miller.
23     Q.   And what input did you get from
24  Rockwell Automation about using the J&J Miller
25  -- using the Jason Miller name for making the

---

118

1          M. Paliszewski - 5/19/23
2   alleged test purchase?
3      A.   What do you mean by input?
4      Q.   What input did Rockwell Automation
5   have in the decision to use the Jason Miller
6   pseudonym for ISC to make the test purchase
7   allegedly?
8      A.   I don't have a specific recollection
9   as to whether I discussed that or not with
10  Rockwell.  There are times when they -- we
11  discuss it and other times that we don't.
12     Q.   Is there anybody else at
13  Investigation Services Company besides the
14  Voyles couple or Stephanie Swaim that may have
15  used the Jason Miller pseudonym?
16     A.   I don't know.
17          MR. KASOLAS:  All right.  You guys
18  want to take a lunch break now or take it
19  in a little while?  It's noon.
20          MR. TANCK:  I'm fine.  It's up to
21  Mark.
22          THE WITNESS:  You know, I'll leave
23  it up to you guys.  I'll be willing to
24  take a lunch break when everyone's ready.
25          MR. KASOLAS:  Beth, do you want to

---

119

1          M. Paliszewski - 5/19/23
2   take it now for a half hour?
3          THE COURT REPORTER:  Yeah, that's
4   fine.  I'll decide for you guys.  Yes.
5          MR. KASOLAS:  Thank you.
6      Okay.  So 30 minutes is enough for
7   everyone or, Beth, do you need more than
8   that?
9          THE COURT REPORTER:  No, that's
10  fine.
11         MR. KASOLAS:  Okay.  Paul, okay with
12  you?  Mr. Paliszewski, good with you?
13         THE WITNESS:  Yeah.  So we'll
14  reconvene at 1:00 -- or 12:30 rather.
15         MR. KASOLAS:  12:30, 12:35, yes,
16  sir.
17         THE WITNESS:  Okay.
18         MR. KASOLAS:  Thank you.
19         THE VIDEOGRAPHER:  We're now going
20  off the record.  The time is 12:01.
21         (Luncheon recess is taken at
22  12:01 p.m.)
23
24
25

---

120

1          M. Paliszewski - 5/19/23
2
3
4          AFTERNOON SESSION, 12:38 P.M.
5
6          THE VIDEOGRAPHER:  We are now back
7   on the record.  The time is 12:38.
8
9   MARK PALISZEWSKI,
10      Resumed the stand and testified further as
11  follows:
12
13  EXAMINATION - Continued
14  BY MR. KASOLAS:
15     Q.   Mr. Paliszewski, thank you for
16  resuming.  I hope everyone had a nice lunch.
17         Did you speak with Mr. Paul Tanck
18  during the break?
19     A.   I did.
20     Q.   What did you discuss with Mr. Paul
21  Tanck?
22         MR. TANCK:  Objection.  I don't want
23  you to reveal any attorney/client
24  privilege communication.
25         MR. KASOLAS:  Hold on.

---

30 (Pages 117 to 120)

Mark Paliszewski
5/19/2023

125

M. Paliszewski - 5/19/23
1
2    those emails at the time you made this request
3    in August 19, 2021, did you?
4        A.   It wouldn't appear so, no.
5        Q.   And where were the products that
6    were allegedly bought by Investigation Services
7    Company, LLC, that you referred to in this
8    email?
9        A.   I'll not sure where they would've
10   been at that point, I'm not positive.
11       Q.   And why did you need these email
12   communications that Stephanie Voyles had at Wi
13   Automation?
14       A.   Again, I don't specifically recall
15   why I asked her, but I obviously at the time
16   requested those emails for our files.
17       Q.   When representatives of
18   Investigation Services Company, LLC, were
19   emailing back and forth with Wi Automation, was
20   Investigation Services Company copying you
21   blindly on those email communications?
22       A.   They were not.
23       Q.   Would you please take a look at that
24   part of Paliszewski 3 00050 which we are going
25   to put up on the screen share for you, okay?

126

M. Paliszewski - 5/19/23
1
2        A.   Okay.
3        Q.   Take a look at this page and let me
4    know when you're ready to discuss it?
5        A.   Okay, I'm ready.
6        Q.   Have you seen this document before?
7        A.   I believe to.
8        Q.   Oh, this has J&J stamp in the upper
9    left corner, right?
10       A.   Yes.
11       Q.   Do you know who applied that stamp
12   for this document?
13       A.   I don't know.
14       Q.   Did you create this document?
15       A.   I did not create this document.
16       Q.   It says purchase order in upper
17   right corner, correct?
18       A.   It does.
19       Q.   Okay.  And you don't know who
20   actually created this document, correct?
21       A.   I do not.
22       Q.   And how did you get your hands on
23   this particular document to produce it to me in
24   response to the subpoena I served on you?
25       A.   I don't recall exactly; I assume it

127

M. Paliszewski - 5/19/23
1
2    was sent to me.
3        Q.   And you have no idea who was using
4    the Jason Mill pseudonym at Investigation
5    Services Company, LLC, during the correspondence
6    that Investigation Services Company had with Wi
7    Automation, correct?
8        A.   I don't know which specific
9    individual, no.
10       Q.   Do you know what JMX.com -- strike
11   that.
12            Can you please look Recon 000053 of
13   Paliszewski 3, which we're going to put on
14   screen share for you, okay?
15       A.   Okay.
16       Q.   And on that page, there's an email
17   there Jason.a.miller@gmx.com, do you see that?
18       A.   Yes.
19       Q.   Do you know whose email that is?
20       A.   I do not.
21       Q.   Do you know what gmx.com is?
22       A.   I don't know what GMX.com is.
23       Q.   Do you know if it's an email service
24   that provides free or inexpensive type of email
25   accounts?

128

M. Paliszewski - 5/19/23
1
2        A.   I don't know, I would assume so, I
3    don't know.
4        Q.   Is this the email account that
5    Investigation Services Company has used in the
6    past prior to Paliszewski 3 when it was trying
7    to make test purchases on behalf of Recon?
8        A.   I don't know if that specific email
9    has been used in the past.
10       Q.   Do you remember any of the emails
11   that Investigation Services Company, LLC, used
12   previously in making test purchases for ReCon?
13       A.   I don't specifically recall the
14   formats, no, I don't.
15       Q.   Do you know what products currently
16   are allegedly purchased by Investigation
17   Services Company from Wi Automation?
18       A.   In this -- in this instance?
19       Q.   Yes, in the instance with
20   Paliszewski 2 and Paliszewski three
21   correspondence, yes.
22       A.   Yes, I do.
23       Q.   What are they?
24       A.   They're in my possession, ReCon
25   management's possession.

Mark Paliszewski
5/19/2023

129

1                M. Paliszewski - 5/19/23
2        Q.   Okay.  How did they come to be in
3    your possession?
4        A.   They were delivered ed to us by the
5    people at ISC.
6        Q.   How were they delivered to you by
7    the people at ISC?
8        A.   They were shipped; I don't know
9    whether it was Fed Ex or UPS; I'm not certain.
10       Q.   Who directed them to ship the
11   products to ReCon?
12       A.   I did.
13       Q.   Why did you do that?
14       A.   Because we wanted to have them in
15   our possession.
16       Q.   Why did you want to have them in
17   your possession?
18       A.   Because we wanted to have them in
19   our possession in terms of having them in
20   connection with this tape.
21       Q.   Once you received the product that
22   ISC allegedly purchased from Wi Automation, did
23   you open the boxes?
24       A.   Yes.
25       Q.   Why did you open the boxes?

130

1                M. Paliszewski - 5/19/23
2        A.   To inspect the products that were in
3    there.
4        Q.   Why did you want to inspect the
5    products that were in there?
6        A.   Just to make sure that I was
7    familiar with what was sent to us.
8        Q.   But you testified you're not an
9    engineer or computer expert or industrial
10   automation expert, so how would you know whether
11   or not what's in the box is what's supposed to
12   be in there?
13       A.   Well, I know how the products are la
14   bled and whether that matches with what we were
15   dealing with.
16       Q.   How do you know what the labels are
17   supposed to be in the boxes?
18       A.   I don't know; I only know that I
19   looked at them to get a verification of what we
20   received.
21       Q.   Do you have any personal knowledge
22   about Rockwell serial numbers, by any chance?
23       A.   I don't have any personal knowledge
24   of that, no.
25       Q.   Do you have any personal knowledge

131

1                M. Paliszewski - 5/19/23
2    about Rockwell's product codes that --
3        A.   I do not.
4        Q.   -- are applied to products?
5        A.   I do not.
6        Q.   And how many products total did ISC
7    ship to you that they allegedly purchased from
8    Wi Automation?
9        A.   I believe it were the two 1756-B&Bs.
10       Q.   And do you know what kind of
11   products those are?
12       A.   I only know them by the number; I
13   don't know how they function if that's what
14   you're asking.
15       Q.   Did anybody from Rockwell ever come
16   visit ReCon to inspect the two products we just
17   discussed?
18       A.   They did not.
19       Q.   After you opened them, up the boxes?
20       A.   They did not.
21       Q.   Did they ask to ever come out and
22   inspect the products --
23       A.   They did not.
24       Q.   Strike that.
25            Did Rockwell ever ask anybody at

132

1                M. Paliszewski - 5/19/23
2    ReCon to come out and inspect the two products
3    that ISC shipped to you?
4        A.   They did not.
5        Q.   So why not just leave the products
6    in the boxes then?
7        A.   The answer is again, I wanted to
8    inspect what was sent to us.
9        Q.   Did you ever try and use the
10   products after you opened the boxes?
11       A.   I did not.
12       Q.   And before you received the boxes
13   from ISC, they sent you emails that had
14   photographed the boxes, correct?
15       A.   Correct.
16       Q.   And you didn't take those
17   photographs emailed to you by ISC; ISC sent you
18   those photographs, correct?
19       A.   That's correct.
20            MR. TANCK:  Object to form.
21   BY MR. KASOLAS:
22       Q.   And it was ISC -- strike that --
23            It was someone at ISC who
24   photographed the pictures of the boxes that were
25   then sent to you that you transmitted to

D'Amico Certified Reporting
908-546-7650

Mark Paliszewski
5/19/2023

---

133

1           M. Paliszewski - 5/19/23
2   Rockwell, correct?
3           **A.   That's correct.**
4           Q.   And do you know who specifically at
5   ISC photographed the boxes they were shipped to
6   ReCon?
7           **A.   I do.**
8           Q.   And how do you know that?
9           **A.   I know that because I spoke with**
10  **them.**
11          Who did you speak with that told you
12  they photographed the boxes in Texas before
13  shipping them to ReCon in Michigan?
14          **A.   Miss Swaim.**
15          Q.   She told you that by telephone?
16          **A.   Yes.**
17          Q.   Did she tell you kind of camera she
18  used?
19          **A.   Not specifically what kind of**
20  **camera, no.**
21          Q.   Did see tell you she took pictures
22  on her cell phone?
23          **A.   She did not tell me.**
24          Q.   Why did she photograph the boxes and
25  send you the pictures of the photographs?

---

134

1           M. Paliszewski - 5/19/23
2           **A.   Because I directed her to do that.**
3           Q.   Why not take those pictures yourself
4   since ISC was going to ship the products to you
5   in Michigan from Texas anyway?
6           **A.   I wanted to have the photographs as**
7   **soon as possible.**
8           Q.   And why was that?
9           **A.   Because I wanted to transmit them to**
10  **our client.**
11          Q.   Did you alter the photographs in any
12  way that ISC took the boxes before you sent them
13  to Rockwell?
14          **A.   I did not.**
15          Q.   Did you alter the photographs ISC
16  took of the boxes that it received from Wi
17  Automation in any fashion at any point in time?
18          **A.   I did not alter any photographs, no.**
19          Q.   Do you know if ISC ever altered any
20  of the photographs that they took?
21          **A.   They did not.**
22          Q.   Well, you only know that based on
23  something they would've told you, correct?
24          **A.   That's correct.**
25          Q.   You personally don't have any

---

135

1           M. Paliszewski - 5/19/23
2   knowledge as to whether or not anybody at ISC
3   altered photographs that they took of the boxes,
4   correct?
5           MR. TANCK:  Object to form.
6   BY MR. KASOLAS:
7           **A.   I have no knowledge of any**
8   **alteration of those photographs by anyone.**
9           Q.   And was anybody from ReCon present
10  in Texas where ISC operates out of at the time
11  Wi Automation shipped the Rockwell products to
12  ISC in Texas?
13          **A.   No, they were not.**
14          Q.   Do you know who actually received
15  the product, the Rockwell products from Wi
16  Automation at ISC's facility in Texas?
17          **A.   I don't know of a specific**
18  **individual who received them, no. 4.**
19          Q.   We're going to show you what we have
20  marked as Paliszewski 4, and we're going to give
21  you the opportunity to look at the document and
22  screen share before we discuss it with you,
23  okay?
24          **A.   Okay.**
25          Q.   And if we're going too fast

---

136

1           M. Paliszewski - 5/19/23
2   scrolling, please let us know and we'll go
3   slower for you, all right?
4           MR. TANCK: And again, Mark, if you
5   want, just click the chat, you can scroll
6   through it at your own pace, if you'd
7   like.
8           THE WITNESS:  Okay.
9   BY MR. KASOLAS:
10          **A.   (PAUSE IN PROCEEDINGS.)**
11  **Okay.**
12          Q.   Sir, do you need to look at any
13  other portion of the document before we start
14  talking about it?
15          **A.   Nope, I think I'm pretty clear on**
16  **what that is.**
17          Q.   Okay, great.
18          On the documents that comprise
19  Paliszewski 4 document you provided to your
20  counsel in response to our subpoena?
21          **A.   I believe so, yes.**
22          Q.   Now, on the very first page marked
23  ReCon-0000132, you write to Investigation
24  Services Company and you copy Stephanie Voyles
25  on May 11, 2020 regarding Wi Automation,

---

34 (Pages 133 to 136)

D'Amico Certified Reporting
908-546-7650

Mark Paliszewski
5/19/2023

---

145

M. Paliszewski - 5/19/23
1
2      **A.   It was sent to me by ISC.**
3      Q.   By email as well, correct?
4      **A.   Correct.**
5      Q.   And did you take this photograph?
6      **A.   I did not.**
7      Q.   Who took this photograph?
8      **A.   ISC took that photograph.**
9      Q.   Who took all the photographs that we
10     looked at that are part of Paliszewski 4?
11     **A.   Miss Swaim.**
12     Q.   You did not take any of these
13     photographs, did you?
14     **A.   I did not.**
15     Q.   You only say Miss Swaim because she
16     told you so, correct?
17     **A.   That's correct.**
18     Q.   You actually don't have any
19     independent personal knowledge as to whether or
20     not she took the photograph, did you?
21     MR. TANCK: Objection.
22     BY MR. KASOLAS:
23     **A.   Aside from her assurance to me that**
24     **she took them.**
25     Q.   And you have no idea whether or not

---

146

M. Paliszewski - 5/19/23
1
2      the photographs anybody took at ISC were in any
3      way altered before they were transmitted to you,
4      correct?
5      MR. TANCK: Object to form.
6      BY MR. KASOLAS:
7      Q.   You can answer the question, sir.
8      **A.   To my knowledge, there have been no**
9      **alterations to any of those photographs.**
10     Q.   Please answer my question.
11     MR. KASOLAS: Read my question back
12     to the witness, Madam Court Reporter.
13     (Whereupon, the record was read.)
14     BY MR. KASOLAS:
15     **A.   Yes, I do, Miss Swaim took the**
16     **photographs.**
17     Q.   Because she told you, that's why you
18     answered that way, correct?
19     **A.   That's correct.**
20     Q.   But you don't have personal
21     knowledge -- you didn't actually see her take
22     the photographs, did you?
23     **A.   I did not see her take the**
24     **photographs.**
25     Q.   And you have no idea what they did

---

147

M. Paliszewski - 5/19/23
1
2      with the photographs after they took them, but
3      before they transmitted them to you, correct?
4      MR. TANCK: Object to form.
5      **A.   I wasn't present when they took the**
6      **photographs.**
7      Q.   As a matter of fact, you have no
8      idea where these products ever even came from
9      because you weren't involved in the purchase by
10     ISC from Wi Automation, correct?
11     MR. TANCK: Object to form.
12     BY MR. KASOLAS:
13     **A.   I know where they came from in terms**
14     **of our instructions to ISC where to purchase**
15     **them from.**
16     Q.   No, listen to my question.
17     You don't know where ISC got these
18     products from because your company wasn't
19     involved in the purchase, payment and receipt of
20     them, correct?
21     MR. TANCK: Object to form.
22     BY MR. KASOLAS:
23     **A.   We weren't present when they were**
24     **received. We know that they were ordered from Wi**
25     **Automation and received at ISC.**

---

148

M. Paliszewski - 5/19/23
1
2      Q.   Only because of what someone at ISC
3      allegedly told you, correct?
4      **A.   That's correct.**
5      Q.   You don't have any independent
6      personal knowledge of that issue other than what
7      ISC told you, correct?
8      MR. TANCK: Object to form.
9      BY MR. KASOLAS:
10     **A.   I was not present when they were**
11     **received by ISC, so I wasn't there.**
12     Q.   Let's go to ReCon-0000148.
13     Have you seen this photograph
14     before?
15     **A.   I believe so, yes.**
16     Q.   And what is this a photograph of?
17     **A.   Product box.**
18     Q.   And did you take this photograph?
19     **A.   I did not.**
20     Q.   How did you obtain this photograph?
21     **A.   It was sent to me by ISC.**
22     Q.   And it was sent by email?
23     **A.   Yes.**
24     Q.   Let's look at the next photograph
25     marked ReCon-0000149.

---

37 (Pages 145 to 148)

Mark Paliszewski
5/19/2023

173

1           M. Paliszewski - 5/19/23
2           MR. KASOLAS:  I'll take a break for
3      anybody, we can take five minutes.
4           The videographer:  We're now going
5      off the record, the time is 1:32.
6           (Whereupon, a recess was taken.)
7           THE VIDEOGRAPHER:  We're now back on
8      the record, the time is 1:43.
9      BY MR. KASOLAS:
10          Q.   Mr. Paliszewski, do you still have
11     Paliszewski 6 in front of you.  I'm going to
12     direct your attention to ReCon-0000187, okay?
13          A.   Okay.
14          Q.   All right.
15          And I want to direct your attention
16     to near the top of the page, you sent an email
17     to Investigation Services Company and Stephanie
18     Voyles  on April 23, 2020, at 3:46 p.m.
19          Do you see that?
20          A.   I see that, yes.
21          Q.   Okay.  And you state in that email,
22     you write to her, "Can you please have them
23     shipped to you in Texas," do you see that?
24          A.   Yes.
25          Q.   And that's in reference to the

174

1           M. Paliszewski - 5/19/23
2      products that Investigation Services Company is
3      allegedly purchasing from Wi Automation,
4      correct?
5           A.   Yes.
6           Q.   And why did you write to Miss Voyles
7      to have Wi Automation ship the products being
8      purchased to Texas?
9           A.   I believe it was because maybe one
10     of the quotes that Wi Automation provided
11     indicated a shipping address to Mexico.  I don't
12     specifically recall, but I believe that to be
13     the case.
14          Q.   And why was Mexico on a shipping a
15     label?
16          A.   I have -- I have no idea.
17          Q.   Okay.  We're going to show you, Mr.
18     Paliszewski, an exhibit we have marked as
19     Paliszewski 8 and we're going allow you to
20     review it on the screen share with us and you
21     take a look at it and we'll scroll slowly and
22     you'll let us know when you're ready to discuss
23     it, okay?
24          A.   Okay.
25          Q.   We're going to put it a chat box,

175

1      too, so you can review it either way?
2           A.   Okay.
3           Q.   Whatever is better for you.
4           A.   (Pause in proceedings.)
5           Q.   Are you reviewing the document on
6      your own or do you need the screen share?
7           A.   No, I'm seeing it how you have it
8      here.
9           Okay.  So we'll scroll down for you.
10          A.   (Pause in proceedings.)
11          Okay.
12          Q.   Are you ready to talk about
13     Paliszewski 8, sir?
14          A.   Yes.
15          Q.   Okay.   On the first page -- well,
16     it's a one-page document, right?
17          A.   One or two it appears, yes.
18          Q.   And this is a communication between
19     Gary Monroe and Wi Automation as well as Gary
20     Monroe and Dan DiBardino of your company, right?
21          A.   That's correct.
22          Q.   Okay.  Who is Gary Monroe?
23          A.   Gary Monroe is the person who owns
24     Image Tek.

176

1           M. Paliszewski - 5/19/23
2           Q.   Is he the sole owner?
3           A.   I don't know specifically.
4           Q.   What kind of company is Image Tek?
5           A.   They do -- they're involved in
6      signage and things I'm not -- I'm not sure what
7      all they're involved in but...
8           Q.   Well, how does ReCon Management know
9      Image Tek?
10          A.   Mr. DiBardino is a personal
11     associate with Mr. Monroe.
12          Q.   What does that mean, that they're
13     personal associates?
14          A.   They're friends.
15          Q.   Do you know how long they've been
16     friends?
17          A.   I don't know, no.
18          Q.   Has ReCon always worked with Image
19     Tek since the time you joined ReCon in 2009?
20          A.   How do you mean work with?  Was Mr.
21     DiBardino friends with him?
22          Q.   Well, the way this email seems like
23     ReCon is working with Gary Monroe.  Aren't they
24     working here together in a document Paliszewski
25     8?

44 (Pages 173 to 176)

D'Amico Certified Reporting
908-546-7650

Mark Paliszewski
5/19/2023

---

**177**

M. Paliszewski - 5/19/23
1
2      A.   We did in this case, yes.
3      Q.   How many times prior to the January
4  18, 2022 email correspondence in Paliszewski 8
5  had Mr. Dan DiBardino worked with Gary Monroe
6  and Image Tek?
7      A.   None that I'm aware of.
8      Q.   None?
9      A.   None.
10     Q.   So how did it come about that in
11 this particular instance concerning Wi
12 Automation, ReCon suddenly began trying to work
13 with Mr. Monroe and his company Image Tek to
14 make purchases --
15     A.   Mr. Monroe --
16     Q.   -- from Wi Automation?
17     A.   -- allowed us to use his email and
18 his mailing location to receive products in this
19 case.
20     Q.   Why did he do that?
21     A.   Because, again, he's friends with
22 Mr. DiBardino.
23     Q.   Was Gary Monroe friends with Dan
24 DiBardino at the time Dan DiBardino started
25 ReCon Management?

---

**179**

M. Paliszewski - 5/19/23
1
2  ReCon to use his company and his email, what do
3  you mean by that?
4      A.   His address to have product shipped
5  to.
6      Q.   Did you actually have access to his
7  email and use it?
8      A.   I did not, no.
9      Q.   Did Dan have access to his Mr.
10 Monroe's email?
11     A.   He did not, he did not?
12     Q.   So whatever alleged purchase was
13 made from Wi Automation concerning Paliszewski
14 was done by Image Tek itself, right?
15     A.   Mr. Monroe at Image Tek, yes.
16     Q.   Are you aware that Mr. Monroe served
17 15 months in prison?
18     A.   I'm not aware of that.
19     Q.   If you were aware of that, would you
20 have engaged him and his firm to assist you in
21 trying to make purchases from Wi Automation?
22     A.   I don't know if I would have done
23 that based on -- I would have to know the
24 circumstances.
25     Q.   Okay.  And you say Image Tek is a

---

**178**

M. Paliszewski - 5/19/23
1
2      A.   I don't know.  I believe so, but I
3  don't know.
4      Q.   Were they friends in 2007?
5      A.   I don't know.
6      Q.   What do you know about Gary Monroe
7  personally?
8      A.   I know -- I know that he's the owner
9  of the company; I met him a couple of times, but
10 other than that, it's Mr. DiBardino personal
11 friend.
12     Q.   Are you aware the Gary Monroe is a
13 convicted felon?
14     A.   I have no idea.
15     Q.   Are you aware the pled guilty to
16 criminal conduct?
17     A.   I am not aware of that.
18     Q.   Are you aware that he was pursued by
19 the Securities and Exchange Commission?
20     A.   I am not aware of that.
21     Q.   If you were aware of it, would you
22 have engaged him to help you in this alleged
23 test purchase from Wi Automation?
24     A.   I don't know if I would have or not.
25     Q.   And you said that Mr. Monroe allowed

---

**180**

M. Paliszewski - 5/19/23
1
2  sign company?
3      A.   I believe so, I don't know
4  specifically exactly what they do, but signage,
5  graphics type of thing.
6      Q.   Image Tek has printing capabilities,
7  doesn't it?
8      A.   I don't know.
9      Q.   Well, they make signs for events,
10 right?
11     A.   I don't -- I don't -- again, I don't
12 specifically know what they do.
13     Q.   So you have no idea what they do,
14 but you and your boss engaged them to help you
15 in making purchases from Wi Automation, is that
16 your testimony?
17     A.   Yes.
18     Q.   And why use them if you never used
19 them before as opposed to one of these companies
20 you like to partner with such as an
21 Investigation Services Company?
22     A.   Well, in this case, we had prior
23 dealings with Wi Automation and we didn't want
24 to be discovered in terms of making this second
25 inquiry.

---

45 (Pages 177 to 180)

Mark Paliszewski
5/19/2023

181

1          M. Paliszewski - 5/19/23
2     Q.   Have you ever spoken to Gary Monroe?
3     A.   I have.
4     Q.   Did you speak with Gary Monroe about
5  anything pertaining to Wi Automation?
6     A.   I did.
7     Q.   What did you specifically discuss
8  with Gary Monroe about Wi Automation?
9     A.   I spoke with him about this specific
10  request.
11     Q.   What did you specifically discuss
12  with Mr. Monroe about this specific request as
13  you call it?
14     A.   What we would like him to do for us.
15     Q.   What did you tell him you wanted him
16  to do for you?
17     A.   To request a quote for certain
18  products.
19     Q.   What kind of products?
20     A.   I'm not exactly sure what they are.
21  There was a list of products that were provided
22  to me by Rockwell.
23     Q.   Who provided that list of products
24  to you?
25     A.   Ryan Smaglik.

182

1          M. Paliszewski - 5/19/23
2     Q.   And then you forwarded that to Mr.
3  Monroe, is that your testimony?
4     A.   That's correct.
5     Q.   But Mr. Monroe ran the whole show in
6  terms of making the purchase from Wi Automation,
7  correct?
8          MR. TANCK: Object to form.
9  BY MR. KASOLAS:
10     A.   Mr. Monroe ultimately arranged for a
11  purchase of products, yes.
12     Q.   Who made the purchase of those
13  products, Image Tek or ReCon?
14     A.   Image Tek.
15     Q.   Okay, and how do you know that?
16     A.   I know based on my discussions with
17  Mr. Monroe.
18     Q.   Okay, he actually placed the order
19  through Image Tek with Wi Automation?
20     A.   He did.
21     Q.   And who paid for those products?
22     A.   Initially he did.
23     Q.   Okay, he being Image Tek?
24     A.   Correct.
25     Q.   And Mr. Monroe, right?

183

1     A.   Yes.
2     Q.   Who received the products that were
3  purchased allegedly from Wi Automation?
4     A.   Image Tek, Mr. Monroe at Image Tek.
5     Q.   And where were those products
6  delivered to Image Tek?
7     A.   Novine, Michigan.
8     Q.   Okay, that's not the same address as
9  ReCon, correct?
10     A.   That's correct.
11     Q.   And that's not the same address as
12  Detroit Consulting, correct?
13     A.   That is correct.
14     Q.   And ReCon does not own the property
15  where Image Tek operates out of, correct?
16     A.   It does not.
17     Q.   And the only reasons you know about
18  where the alleged purchase was delivered to is
19  because I assume Mr. Monroe told you, correct?
20     A.   He did.
21     Q.   Let's take a look at Paliszewski 9.
22          Were you involved in discussions
23  between Gary Monroe and your boss, Dan, I can't
24  pronounce his last name, I keep messing it up?

184

1          M. Paliszewski - 5/19/23
2     A.   Dan DiBardino.
3     Q.   Dan DiBardino.
4          Were you involved in any
5  communications between yourself and Mark?
6          MR. TANCK: Can you place the exhibit
7  in the chat, when you get a chance.
8          MR. KASOLAS: We'll do it right now.
9  BY MR. KASOLAS:
10     Q.   Mr. Paliszewski, were you involved
11  in any communications between yourself and Dan
12  DiBardino and Gary Monroe concerning Wi
13  Automation?
14     A.   Yes.
15     Q.   Okay. What was the substance of
16  those conversation between the three of you?
17     A.   Again, relative to what we would
18  like Mr. Monroe to do in connection with this
19  purchase.
20     Q.   So was Dan DiBardino in charge the
21  Image Tek scope of work or were you in charge of
22  it?
23     A.   He was not, I was.
24     Q.   Well, why was he involved in the
25  communication then?

46 (Pages 181 to 184)

Mark Paliszewski
5/19/2023

---

185

M. Paliszewski - 5/19/23

1
2      A.   I think, you know, Dan -- Gary had
3  Dan's email and I think he just forwarded him
4  emails that Dan immediately forwarded to me.
5      Q.   Do you know what Dan and Gary do
6  together?
7      A.   I don't.
8      Q.   Have you ever gone out with them for
9  dinner?
10     A.   I have not.
11     Q.   Have you ever gone out with them for
12 drinks?
13     A.   I have not.
14     Q.   Have you ever gone to marketing
15 events with them?
16     A.   I have never socialized with Mr.
17 Monroe at all.
18     Q.   Let's take a look at Paliszewski 9,
19 okay? We're going to show you a document and
20 then I'll ask you some questions about it, all
21 right?
22     A.   Okay.
23          (Pause in proceedings.)
24     Q.   All right, sir, have you had chance
25 to look at Paliszewski 9?

---

186

M. Paliszewski - 5/19/23

1
2      A.   Yes.
3      Q.   Okay, can you tell me what this
4  email correspondence between yourself and Ryan
5  Smaglik and John Miller is all about?
6      A.   It appears -- well, I don't know
7  about John Miller.  If you go back up and show
8  me -- yes, Mr. Miller was there, it was a matter
9  of Mr. Smaglik cc'd him, but I was communicating
10 with Ryan.
11     Q.   So do these emails -- these do not
12 pertain to a second tranche of purchases from Wi
13 Automation that Rockwell allegedly wanted ReCon
14 to test purchase?
15     A.   Yes.
16     Q.   And this scope of work involved
17 ReCon outsourcing the purchases to Image Tek,
18 correct?
19     A.   We had, Image Tek, yes, allowed us
20 to use their facility and address and email,
21 yes.
22     Q.   All right.
23          And just to be clear again, ReCon
24 never made these purchases from Wi Automation,
25 correct?

---

187

M. Paliszewski - 5/19/23

1
2      A.   We did --
3          MR. TANCK:  Object to form.
4  BY MR. KASOLAS:
5      A.   -- not.
6      Q.   And ReCon never paid for the
7  purchases directly, correct?
8      A.   Not directly, no.
9      Q.   And ReCon did not receive the
10 products from Wi Automation, correct?
11         MR. TANCK:  Object to form.
12 BY MR. KASOLAS:
13     A.   Correct.
14     Q.   And ReCon never photographed the
15 products that were received by Image Tek either,
16 did they?
17     A.   Yes, I did.
18     Q.   How did you photograph the products?
19     A.   I had them in my office and I
20 photographed them.
21     Q.   Okay.  Isn't it true that Gary
22 Monroe photographed the products and sent the
23 photographs to you?
24     A.   It is not true, no.
25     Q.   But you didn't photograph them at

---

188

M. Paliszewski - 5/19/23

1
2  Image Tech's facility; you photographed them at
3  your facility after Image Tek sent them to your
4  facility, correct?
5      A.   No, that's not correct.
6      Q.   Okay.
7      A.   I would --
8      Q.   Explain to me how you photographed
9  the products that Image Tek received from Wi
10 Automation?
11     A.   I retrieved the box from Image Tek,
12 took it back to my office, photographed it as
13 the normal course that we would, the outer
14 packaging and the products inside at our office.
15     Q.   You drove to Image Tek after Image
16 Tek allegedly received products from Wi
17 Automation, correct?
18     A.   Correct.
19     Q.   And who gave you the products when
20 you got to Image Tek?
21     A.   Gary Monroe.
22     Q.   All right.  What did he say to you?
23     A.   He said, "Here's the box."
24     Q.   What box?
25     A.   The box that contained the Wi

---

47 (Pages 185 to 188)

253

```
1           M. Paliszewski - 5/19/23
2   that sentence, in paragraph 5, "In my file as
3   was customary in the ordinary course of business
4   and in accordance with the manner that I
5   normally rightly conduct my investigation
6   activities," I read that correctly, right?
7       A.  Yes.
8       Q.  Is it customary for you on
9   investigations to have the third party receiving
10  the product take the photographs?
11      A.  It does happen on occasion, yes.
12      Q.  And it happened with Investigations
13  Service Company, LLC, correct?
14      A.  With respect to this, yes, it did.
15      Q.  And paragraph 4 and 5 deals
16  specifically with the alleged test purchases
17  that Investigations Services Company, LLC, made
18  in 2020, right?
19      A.  Correct.
20      Q.  And you testified earlier that you
21  learned within the last week or so that your
22  Declaration was inaccurate, right?
23      A.  Correct.
24      Q.  Did you issue any directives for the
25  Declaration to be withdrawn or modified to
```

254

```
1           M. Paliszewski - 5/19/23
2   anyone?
3       A.  No.
4       Q.  Why?
5       A.  It's not something I did.
6       Q.  Are you aware that this document
7   will be submitted in the United States Court for
8   the District of Delaware?
9       A.  Yes, I'm not an attorney, so I rely
10  on the advice of my attorneys and so I didn't
11  recognize that as something I needed to do.
12      Q.  Take a look at paragraph 6, sir,
13  please, we can move down a little bit here.
14  We're going to be done soon so...
15      A.  Okay.
16      Q.  This is my last exhibit for you
17  today.  I appreciate the time and patience you
18  had for me today, thank you.
19          Paragraph 6 starts with the
20  sentence, "The photographs attached as Exhibit A
21  to this Declaration are true and accurate copies
22  of the photographs that I took in May of 2020 of
23  the products received from Wi Automation."
24          Did I read that correctly?
25      A.  You did.
```

255

```
1           M. Paliszewski - 5/19/23
2       Q.  And that entire sentence is not
3   accurate, is it?
4       A.  Again, it's a repeat of this same
5   improperly worded statement.
6       Q.  Okay.
7           That whole first sentence in
8   paragraph 6 is simply not true, is it?
9           MR. TANCK:  Objection to form,
10  mischaracterizes the witness' testimony.
11  BY MR. KASOLAS:
12      Q.  You can answer the question, sir.
13      A.  It is -- I directed those photos and
14  so again, it's improperly worded.
15      Q.  ..."That I took in May of 2020 of
16  the products received from Wi Automation,"
17  correct?
18      A.  Correct.
19      Q.  But you didn't take those
20  photographs of the products that Leslie bought
21  in May 2020, did you?
22      A.  I did not.
23      Q.  So that's not a true statement in
24  paragraph 6, is it?
25      A.  That's your terminology; I see it as
```

256

```
1           M. Paliszewski - 5/19/23
2   just an improperly worded statement.
3       Q.  I don't think the Cour tis going to
4   agree with you sir, but if that's what you want
5   to testify to, so be it.
6           Now, in the second sentence of
7   paragraph 6 says, "Exhibit A also includes true
8   and correct images of the invoice and shipping
9   label provided in and on the packaging" did I
10  read that correctly?
11      A.  Yes.
12      Q.  Okay.
13          You don't have any personal
14  knowledge of that because you didn't receive the
15  product from Wi Automation that Investigation
16  Services Company, LLC, allegedly purchased from
17  Wi Automation, right?
18      A.  My personal knowledge is based on
19  what IFC informed me of.
20      Q.  Okay.
21          But that's not personal knowledge,
22  is it? That's based on someone else's personal
23  knowledge, right?
24          MR. TANCK: Object to form.
25  BY MR. KASOLAS:
```

Mark Paliszewski
5/19/2023

---

**257**

M. Paliszewski - 5/19/23
2  A.   Correct.
3  Q.   You worked for the law firm for 20
4 years, correct?
5  A.   It's based on information provided
6 to me by someone who did this under my
7 direction.
8  Q.   But that's not what you said in
9 paragraph 6, was it?
10  A.   I know, again, it was improperly
11 worded.
12  Q.   Sir, we're looking at six to seven
13 untrue statements in this Declaration that you
14 somehow signed off on in this case?
15  A.   Well, again, I believe it's the same
16 mistake repeated several times. It's improperly
17 worded as I took as opposed to I directed to be
18 taken.
19  Q.   Do you know what it means to state
20 at the end of this Declaration, "I certify under
21 penalty of perjury that the foregoing is true
22 and correct"?
23  A.   I do.
24  Q.   What does that mean to you?
25  A.   That means that I was being

---

**258**

M. Paliszewski - 5/19/23
2 truthful.
3  Q.   But you weren't being truthful
4 because the statements in the document are not
5 truthful, correct?
6  A.   As it turns out, they are not
7 accurately written, no.
8  Q.   Did Rockwell pay you to sign this
9 declaration?
10  A.   They did not.
11  Q.   Okay, let's take a look at paragraph
12 7, please, of your Declaration marked
13 Paliszewski 1.
14    You state that in the first
15 sentence, "In March of 2022, I was asked again
16 by Mr. Smaglik to contact Wi Automation to
17 obtain a quote and initiate a purchase of
18 certain Rockwell products."
19    I want to focus on the second
20 sentence here. In the second sentence of
21 paragraph 7, it says, quote, "This time using
22 the company name Image Tek Displays and
23 Graphics, I initiated a purchase of the three
24 Rockwell products from Wi Automation for
25 delivery to an address in Michigan."

---

**259**

M. Paliszewski - 5/19/23
2 Did I read that correctly?
3  A.   You did.
4  Q.   Okay. What do you mean by, "I
5 initiated"?
6  A.   I directed Gary Monroe that request.
7  Q.   Well, this says here, you used the
8 company name, Image Tek Display and Graphics.
9  A.   I initiated that purchase by
10 directing Mr. Monroe to make that request.
11  Q.   Were you trying to tell the Court
12 here in Paragraph 7 that you personally had
13 purchased the products from Wi Automation under
14 the facade of Image Tek Displays and Graphics?
15  A.   I was not trying to tell The Court
16 that.
17  Q.   You could see why the Court would
18 think that when it reads that sentence though,
19 could you not?
20    MR. TANCK: Object to form.
21 BY MR. KASOLAS:
22  Q.   You can answer the question, sir.
23  A.   I cannot answer that question. I
24 don't know what the Court would do.
25  Q.   But to be clear you never made any

---

**260**

M. Paliszewski - 5/19/23
2 of the purchase of three Rockwell products
3 referenced in paragraph 7 of the Certification,
4 did you?
5  A.   I did not. I directed them to be
6 made.
7  Q.   And no one from ReCon made those
8 purchases of those three Rockwell products that
9 are referenced in Paragraph 7?
10  A.   They did not.
11  Q.   And no one from ReCon was at the
12 Image Tek facility at the time those products
13 were delivered to Gary Monroe at Image Tek,
14 correct?
15  A.   They were not.
16  Q.   Let's take a look at paragraph 8,
17 please, will you, the very first sentence, it
18 states, quote, "The products that I ordered from
19 Wi Automation were delivered in April 2022 to
20 the address I provided," did I read that
21 correctly?
22  A.   You did.
23  Q.   That's not a true statement, though,
24 is it?
25  A.   It is not worded properly. I should

# Exhibit B

Message

| | |
|---|---|
| **From**: | Dan [dandb@reconmgmt.com] |
| **Sent**: | 3/22/2022 5:36:26 PM |
| **To**: | mark@reconmgmt.com |
| **Subject**: | FW: [EM]FW: [EM]Invoice 11886 from Image-Tek Displays & Graphics |
| **Attachments**: | Invoice_11886_from_ImageTek_Exhibit_LLC.pdf |

**From:** Gary Monroe <gmonroe@image-tek.com>
**Sent:** Tuesday, March 22, 2022 1:18 PM
**To:** 'Dan' <dandb@reconmgmt.com>
**Subject:** [EM]FW: [EM]Invoice 11886 from Image-Tek Displays & Graphics

D here is your invoice from us. Just send a check to Image-Tek
Thx

Gary Monroe, President
Image-Tek Displays & Graphics
40300 Grand River Ave.
Novi, MI 49375
(248) 615-1124
(248)568-2718 - Cell
gmonroe@Image-tek.com

**From:** Image-Tek Exhibit LLC <quickbooks@notification.intuit.com>
**Sent:** Tuesday, March 22, 2022 1:16 PM
**To:** gmonroe@image-tek.com
**Subject:** [EM]Invoice 11886 from Image-Tek Displays & Graphics

INVOICE 11886

DUE 03/22/2022

# $2,465.00

**Print or save**

Powered by QuickBooks

RECON-0000027

Dear Recon Management Group,

Attached please find your Invoice. Please process it at your earliest convenience. If you have any questions, please contact us.

Thank you for your business.

Image-Tek Displays & Graphics
accounting@image-tek.com
248-615-1124

40300 Grand Rive Ave Novi, MI 48375

(248) 615-1124

menglehart@image-tek.com

If you receive an email that seems fraudulent, please check with the business owner before paying.

© Intuit, Inc. All rights reserved.

Privacy | Security | Terms of Service

RECON-0000028

# Invoice



40300 Grand Rive Ave
Novi, MI 48375
(248) 615-1124
menglehart@image-tek.com

**BILL TO**
Recon Management Group
30400 Telegraph Road
Suite 472
Bingham Farms, Michigan
48025

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|-----------|------|-----------|----------|-------|----------|
| 11886 | 03/22/2022 | $2,465.00 | 03/22/2022 | Due on receipt | |

## PROJECT NUMBER

recon-032222

| QTY | DESCRIPTION | PRICE EACH | AMOUNT |
|-----|-------------|------------|--------|
| 1 | Purchase of products from WiAutomation includes shipping (see detail invoice) | 2,465.00 | 2,465.00 |

Title to goods does not transfer until balance is paid. All payments are non-refundable.

**BALANCE DUE**

**$2,465.00**

Received and accepted:

_____

RECON-0000029

Message

| | |
|---|---|
| **From**: | Dan [dandb@reconmgmt.com] |
| **Sent**: | 3/30/2022 2:34:43 PM |
| **To**: | mark@reconmgmt.com |
| **Subject**: | FW: [EM]Fwd: [EM]INVOICE 5440 ORDER P74522 |
| **Attachments**: | INVOICE-5440-P74522.pdf; Untitled attachment 00011.htm |

**From:** gmonroe@image-tek.com <gmonroe@image-tek.com>
**Sent:** Wednesday, March 30, 2022 10:17 AM
**To:** Dan Dibardino <dandb@reconmgmt.com>
**Subject:** [EM]Fwd: [EM]INVOICE 5440 ORDER P74522

Here is invoice and shipping confirmation
Sent from my iPhone

Begin forwarded message:

> **From:** Ave Parascandolo | WiAutomation <info@wiautomation.com>
> **Date:** March 30, 2022 at 10:10:31 AM EDT
> **To:** Gmonroe@image-tek.com
> **Subject: [EM]INVOICE 5440 ORDER P74522**

Good day ,

thank you for purchasing on **WiAutomation.com** by Parcop Srl.
Your order is on the way to reach you soon.

Your tracking number was forwarded to your email address and your mobile phone from DHL
Express service.
This way you will be able to follow your shipment.

Please find your Invoice attached.

For any further information do not hesitate to contact me.

Best regards,

Ave Parascandolo

# WiAutomation

**PARCOP SRL**
VIA FILOMARINO III TRAV., 13
80070 MONTE DI PROCIDA (NA)
VAT N. IT08668021218

Image-Tek Displays & Graphics

40300 Grand River Ave. Novi, MI 49375

STATI UNITI D'AMERICA          EE

**INVOICE N.**    5440    **of**  29/03/2022

## Product details

| Product | Product / service description | UM | QTY | Net | Discount | Net total | Rate |
|---|---|---|---|---|---|---|---|
| | 5069-L306ER Allen-Bradley Dual Channel Ethernet/IP Controller, 0.6MB Memory, 8 Local I/O Expansion (max), 16 EtherNet/IP Nodes, DIN Rai 1 mount HS CODE 8537101090 | | | | | | |
| | | | 1,000 | 2.195,000 | | 2.195,00 | 320 |
| | 9324-RLM0100ENM Allen-Bradley - RSLogix Micro Starter Edition MED S/W HS CODE 8537101090 | | | | | | |
| | | | 2,000 | 115,000 | | 230,00 | 320 |
| | SHIPPING | | 1,000 | 40,000 | | 40,00 | 320 |

**ADDITIONAL INFORMATIONS**

**Invoice reason**  Vendita          P.O.          | **Order n.**          P74522

**Invoice summary**

Payment     CREDIT CARD
IBAN          IT65L0329601601000067339925

Total          2.465,00

USD

Message

| | |
|---|---|
| **From**: | Dan [dandb@reconmgmt.com] |
| **Sent**: | 3/16/2022 7:14:37 PM |
| **To**: | mark@reconmgmt.com |
| **Subject**: | FW: [EM]FW: [EM]Proforma P74522 |
| **Attachments**: | Proforma P74522.pdf |

**From:** Gary Monroe <gmonroe@image-tek.com>
**Sent:** Wednesday, March 16, 2022 2:12 PM
**To:** 'Dan' <dandb@reconmgmt.com>
**Subject:** [EM]FW: [EM]Proforma P74522

Here you go I'll place the order tomorrow.

Gary Monroe, President
Image-Tek Displays & Graphics
40300 Grand River Ave.
Novi, MI 49375
(248) 615-1124
(248)568-2718 - Cell
gmonroe@Image-tek.com

**From:** Cameron Penrod | WiAutomation <sales@wiautomation.com>
**Sent:** Wednesday, March 16, 2022 12:08 PM
**To:** Gary Monroe <gmonroe@image-tek.com>
**Subject:** [EM]Proforma P74522

Gary,

Attached you will find our Proforma for the **ALLEN BRADLEY** items you requested.

Below our Bank and Company Details in case you decide to proceed with purchase by bank transfer.
We accept credit card payment as well.

| | |
|---|---|
| **Beneficiary Name** | **PARCOP s.r.l.** |
| **Beneficiary Address** | **Via Filomarino III Traversa, n.13, 80070 Monte di Procida, Napoli** |
| **Bank** | **FIDEURAM - INTESA SANPAOLO PRIVATE BANKING SPA** |
| **Bank Address** | **VIA MONTEBELLO, N 18, MILANO, MI, ITALY** |
| **Account Number** | **67339925** |
| **IBAN Number** | **IT65L0329601601000067339925** |
| **Swift Code** | **FIBKITMM** |
| **ABA Number** | **-** |
| **Country Name** | **ITALY** |

Your order will be processed as soon as the payment is verified.

RECON-0000030

Awaiting for a kind reply and feedback.

Best regards,

Cameron

Il 15/03/2022 17:49, Cameron Penrod | WiAutomation ha scritto:

> Good day,
> and thank you for contacting WiAutomation.
>
> As you requested, please see our **ALLEN BRADLEY** offer below:
>
> **Item 1**
>
> **ALLEN BRADLEY**
> **5069-L306ER : 2,195 USD Unit price**
>
> New sealed condition
> 12 months warranty
> Delivery time: 5-7 working days
> **Quantity Required: 1 Unit**
>
>
> **Item 2**
>
> **ALLEN BRADLEY**
> **9324-RLM0100ENM  : 115 USD Unit price**
>
> New sealed condition
> 12 months warranty
> **1 ready for immediate shipping**
> **1 additional unit: 7-10 working days**
>
> Shipping costs to **USA** with Dhl Express Service : 40 USD
>
> Let us know if you are interested  in order to send you an official ProForma invoice.
> Please do not forget to specify your billing/delivery address and your VAT number.
>
> We can accept credit card and bank transfer as payment methods.
>
> Awaiting your kind reply and feedback
>
> Best regards,
> Cameron
> Il 14/03/2022 17:33, Gary Monroe ha scritto:
>
>> I am interested in purchased the following products.
>> QTY: 1x: 5069-L306ER this is a CompactLogix Controller
>> QTY: 2x: 9324-RLM0100ENM this is a software product
>>
>> The software (9324-RLM0100ENM) is most urgent and we would pay for separate
>> shipping if it can be delivered faster.
>> I am assuming these are new products.
>> Sincerely,

RECON-0000031

Gary Monroe, President
Image-Tek Displays & Graphics
40300 Grand River Ave.
Novi, MI 49375
(248) 615-1124
(248)568-2718 - Cell
gmonroe@Image-tek.com

**Cameron Penrod**
*Sales Representative*

*+39 0287189214 - International sales desk*

*VAT-IT: IT 08668021218 D-U-N-S: 438101173*

**Cameron Penrod**
*Sales Representative*

*+39 0287189214 - International sales desk*

*VAT-IT: IT 08668021218 D-U-N-S: 438101173*

RECON-0000032



# Proforma
# P74522/2022

*wiautomation.com a property of Parcop s.r.l.*

**Image-Tek Displays & Graphics**

40300 Grand River Ave. Novi, MI 49375
United States of America
gmonroe@image-tek.com Tel: (248) 615-1124

Monte di Procida 16/03/2022
Ref n°: P74522/2022
Object: ALLEN BRADLEY PARTS

| Item | Product | Condition | QTY | Unit Price | Total Price |
|------|---------|-----------|-----|------------|-------------|
| 1 | 5069-L306ER Allen-Bradley - Dual Channel Ethernet/IP Controller, 0.6MB Memory, 8 Local I/O Expansion (max), 16 EtherNet/IP Nodes, DIN Rail mount | New | 1 | $. 2,195.00 | $. 2,195.00 |
| 2 | 9324-RLM0100ENM Allen-Bradley - RSLogix Micro Starter Edition MED S/W | New | 2 | $. 115.00 | $. 230.00 |

**Shipping Costs**          **$. 40.00**

**Total (USD)**          **$. 2,465.00**

CONDITIONS / DELIVERY TIME
Carriage: DHL Express
Warranty: 12 month warranty
Delivery: 7-10 working days after payment verification
TERMS AND PAYMENTS:
Payment Terms: To Agree
Customer Reference:

**BILLING ADDRESS:**

PARCOP s.r.l.
Via Filomarino III traversa n.13
80070
Monte di Procida (NA) Italy
VAT-ID: IT-08668021218

**CONTACTS:**

Tel +39 02 87189214
Tel +39 081 8682064
info@wiautomation.com
sales@wiautomation.com

**BANK DETAILS:**

Bank Name:INTESA SANPAOLO
PRIVATE BANKING SPA
VIA MONTEBELLO 18, MILANO, IT
IBAN: IT65L0329601601000067339925
BIC (SWIFT): FIBKITMM
All terms and conditions on wiautomation.com

RECON-0000033

Message

| | |
|---|---|
| **From**: | mark@reconmgmt.com [mark@reconmgmt.com] |
| **Sent**: | 3/16/2022 3:02:03 PM |
| **To**: | 'Dan' [dandb@reconmgmt.com] |
| **Subject**: | RE: Quote P74522 |

Perfect.

Thank you!

Mark Paliszewski
Director
Consulting & Investigative Group
(248) 540-0160; ext. 207



### RECON MANAGEMENT GROUP, LLC
Delivering Security and Investigative Solutions Globally

30400 Telegraph Rd., Suite 472 • Bingham Farms, Michigan 48025-2364
(248) 540-0160 Fax: (248) 540-3622 • www.reconmgmt.com

The information contained in this communication may be confidential, is intended only for the use of the recipient(s) named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please return it to the sender immediately and delete the original message and any copy of it from your computer system. If you have any questions concerning this message, please contact the sender. **Privileged and Confidential.**

**From:** Dan <dandb@reconmgmt.com>
**Sent:** Wednesday, March 16, 2022 10:56 AM
**To:** mark@reconmgmt.com
**Subject:** FW: Quote P74522

He will purchase.

He will invoice after they receive it.

D

**From:** gmonroe@image-tek.com <gmonroe@image-tek.com>
**Sent:** Tuesday, March 15, 2022 12:58 PM
**To:** Dan Dibardino <dandb@reconmgmt.com>
**Subject:** Fwd: Quote P74522

What's next

Sent from my iPhone

Begin forwarded message:

> **From:** Cameron Penrod | WiAutomation <sales@wiautomation.com>
> **Date:** March 15, 2022 at 12:49:46 PM EDT

**To:** Gary Monroe <gmonroe@image-tek.com>
**Subject: Quote P74522**


Good day,
and thank you for contacting WiAutomation.

As you requested, please see our **ALLEN BRADLEY** offer below:

**Item 1**

**ALLEN BRADLEY**
**5069-L306ER : 2,195 USD Unit price**

New sealed condition
12 months warranty
Delivery time: 5-7 working days
**Quantity Required: 1 Unit**


**Item 2**

**ALLEN BRADLEY**
**9324-RLM0100ENM  : 115 USD Unit price**

New sealed condition
12 months warranty
**1 ready for immediate shipping**
**1 additional unit: 7-10 working days**

Shipping costs to **USA** with Dhl Express Service : 40 USD

Let us know if you are interested  in order to send you an official ProForma invoice.
Please do not forget to specify your billing/delivery address and your VAT number.

We can accept credit card and bank transfer as payment methods.

Awaiting your kind reply and feedback

Best regards,
Cameron
Il 14/03/2022 17:33, Gary Monroe ha scritto:

> I am interested in purchased the following products.
> QTY: 1x: 5069-L306ER this is a CompactLogix Controller
> QTY: 2x: 9324-RLM0100ENM this is a software product
>
> The software (9324-RLM0100ENM) is most urgent and we would pay for separate
> shipping if it can be delivered faster.
> I am assuming these are new products.
> Sincerely,


Gary Monroe, President

RECON-0000193

Image-Tek Displays & Graphics
40300 Grand River Ave.
Novi, MI 49375
(248) 615-1124
(248)568-2718 – Cell
gmonroe@Image-tek.com

--

## Cameron Penrod
*Sales Representative*

*+39 0287189214 - International sales desk*

*VAT-IT: IT 08668021218 D-U-N-S: 438101173*

RECON-0000194

# Exhibit C

Home | Previous Page

U.S. Securities and Exchange Commission

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Litigation Release No. 20495 / March 13, 2008

Accounting and Auditing Enforcement Release No. 2799 / March 13, 2008

*SECURITIES AND EXCHANGE COMMISSION v. GARY L. MONROE, WILLIAM J. RAUWERDINK, JOHN R. MESSINGER and ROBERT T. BASSMAN,* Civil Action No. 03-71840 (E.D. Mich.)

**SEC Settles Financial Fraud Charges Against Former Officers Of Lason, Inc.**

The Securities and Exchange Commission announced that on March 7, 2008, the Honorable Arthur J. Tarnow of the U.S. District Court for the Eastern District of Michigan, entered Final Judgments against Gary L. Monroe, William J. Rauwerdink, John R. Messinger, and Robert T. Bassman, the former CEO, CFO, COO and Controller, respectively, of Lason, Inc., a document management company based in Troy, Michigan. The Final Judgments permanently enjoin the defendants from violating the anti-fraud and record-keeping provisions of the federal securities laws and bar the defendants from serving as officers or directors of public companies. In addition, the Final Judgment against Bassman orders him to pay disgorgement and prejudgment interest of $240,761.70, payment of all but $35,000 of which is waived on the basis of his financial condition. The defendants consented to the entry of the Final Judgments without admitting or denying the Commission's allegations against them.

The Commission's complaint alleged that during 1998 and 1999, the defendants engaged in a fraudulent scheme to overstate Lason's earnings in order to meet or exceed Wall Street expectations. The scheme culminated in the third quarter of 1999, when Lason's earnings were overstated by approximately 65%.

According to the complaint:

- In a scheme called "tailwind," Monroe and Rauwerdink instructed companies that were acquired by Lason to delay recognizing revenue until after the acquisition was completed and to pre-pay certain expenses before the acquisition, thereby artificially increasing Lason's earnings during the first, third and fourth quarters of 1998.

- Monroe, Rauwerdink and Bassman improperly booked a forgiven loan as revenue for Lason in the fourth quarter of 1998.

- Lason improperly claimed an invalid invoice as a legitimate receivable in the fourth quarter of 1998. When Lason's auditors questioned the legitimacy of the receivable, Monroe, Messinger and Bassman developed a scheme to obtain a check that improperly appeared to make payment on the receivable.

- Lason made numerous fraudulent accounting entries in 1999, culminating in fraudulent Work in Process entries in the third quarter of 1999 that artificially boosted Lason's earnings by 65%.

- The defendants profited from the scheme through their salaries as well as bonuses, stock options and executive loans that were affected by Lason's artificially inflated stock price.

In 2007, in a related criminal action, Monroe and Messinger pled guilty to making false statements to a federal agency (the Commission) and Rauwerdink pled guilty to conspiracy and making false statements to a federal agency. Monroe, Messinger and Rauwerdink were sentenced to 15 months, 12 months, and 45 months imprisonment respectively. In addition, Monroe and Messinger were ordered to pay restitution of $20 million, and Rauwerdink was ordered to pay restitution of $285 million.

In related administrative proceedings, Bassman consented to an order under Rule 102(e) of the Commission's Rules of Practice suspending him from appearing or practicing before the Commission as an accountant for three years based on the entry of an injunction against him, and the Commission suspended Rauwerdink forthwith based on his criminal conviction, pursuant to Rule 102(e)(2).

The Commission wishes to thank the U.S. Attorney's Office for the Eastern District of Michigan and the Federal Bureau of Investigation for their assistance in this matter.

http://www.sec.gov/litigation/litreleases/2008/lr20495.htm

# Exhibit D



## Your Partner in Getting It Done

### Right the first time, and on time.

### No detail is too small.

Call Us for Consult        Send a message

Enjoy the best
*design and functions*

**Peace of mind.**
Providing Eye-Catching Exhibits since 1991

**No worries. Reduce Your Expenditures.**
We expertly provide innovative and cost effective solutions.

**Convenient. One stop shopping.**
FULL range of products, services, and custom made exhibits.

**Relational.**
Let us handle the thousand details for you. We are timely, attentive, and experienced. We are on your side!

**"Gary Monroe, our President and Co-founder, always says "the devil is in the detail."**

**Breathe easy.**
Our job is to cover every detail for you. It's our pleasure.

**Give us a call at (248) 615-1124**

GET STARTED NOW







## Services

– In-house exhibit storage and complete show service management

– Expert shipping management

– Nationwide Installation/Dismantle and complete trade show coordination (turn-key)

– In-house training on assembly and
dismantle of your display available upon request



## Exhibits

Our relationship with leading display manufacturers, combined with an **in-house ability to customize**, allows us to create the right display with the **best value** and **lowest total cost of ownership**.

**Visit our showroom for ideas on your next exhibit!**





– Experience with a wide range of graphic presentation materials.

* We provide templates, if you'd like to do art on your own.

# Full Service Exhibit House

**We are a full service end-to-end solution provider from Concept and Design to Fulfillment and Production.**

Custom Exhibit Design

Lobby & Showroom

Graphic Design and Production

Event Planning &Tradeshow Management

Brochures & Marketing Material Design and Production



National Onsite Installation, Dismantle & Shipping

OUR PHILOSOPHY

## Exhibit Management Program

Our expertise in nationwide exhibit resource management such as storage, shipping, installation/dismantling and trade show coordination will keep your trade show program running efficiently before, between and after shows. Click here to download our Exhibit Request Form for current storage clients or contact us.

**Repair and Refurbish**
If your display looks worn, let Image-Tek clean and refurbish your display. Contact us for additional information.

**Reconfigure**
Do you need a new look? Let Image-Tek reconfigure your current exhibit by modifying the layout or adding new components to give it a fresh new look.



Click or tap the photos for an expanded view







Image-Tek has been such a pleasure to work with over the past few years. They have helped us with trade show display development, installation and dismantle. The staff is very knowledgeable, professional, and always available…and makes us look good!

 **Jacki Spainhour**
Mktg. Coordinator  – G.Koch Sons, LLC

## *Meet the Team*

The People Behind The Magic





Gary
Co-Founder

Gary has run many different types of businesses in the last 30 years. In 2001, Gary and Maureen purchased Image-Tek, and the rest is "history." He is known in the office as the go to math wizard, custom exhibit mastermind, photographer, and "always the golfer." Gary firmly believes in providing all clients with unsurpassed customer service from start to finish. After the projects are done, and the clients are over the moon satisfied, he's sneaking off for a round of golf.





Maureen

Vice President

Maureen has been in the industry for 18 years. She is an attorney by trade and that is easy to see with her drive, analytical skills, and perseverance. Her attention to detail is unparalleled. On the same note, her passion and intensity has made Image-Tek Display & Graphics stand out in the exhibit industry. When she is not in the office she will be somewhere distant. She loves to travel and enjoys experiencing new destinations. Her co-workers most love her for her baking skills though, so they keep her around.





Mike S.

Service Manager

(Happy) Mike has been in the industry for 21 years. He's worn a few hats along the way. Aside from the amazing custom exhibits he has engineered, our client's know him most by his happy demeanor. From rewiring electrical to piecing together a multi room exhibit, there is nothing he can't do. When he's not here building, he's flying to a trade show. His spare time is spent enjoying "his people" and the great outdoors. He loves kayaking, fishing, and more.





Mike L.

*Graphics Genius*

Sometimes referred to as the "special helper guy," Michael has familiarity and experience in many aspects of the business. His experience ranges from graphic design work to shipping coordination and exhibit assembly. His most recently utilized skillset involves creating to-scale-renderings, to better illustrate proposed exhibits and displays. If Michael isn't currently being sarcastic, he is likely dancing. In other words, he doesn't dance much.





Kelly

Accounting

Kelly has years of experience in accounting and keeping the books. She wears many hats here from ordering and billing to following up on freight solutions. Kelly drives a few feet to the company mail box as soon as September hits. She is NOT a fan of cold weather. However, she has the warmest personality. Away from the office Kelly spends time with family, loves her walks and nature, and hoards candy corn.





Bryan

Account Manager

New to the Image-tek team, Bryan has years of experience in customer service and sales.  He focuses on the customers' needs and serving them with a smile.  He has recently graduated with a bachelor's degree in Business Management from Wayne State University.  When not in the office he likes to spend time with his friends and family. Bryan also likes to focus on playing bass and producing his own music.





Kurtis

Service Technician

Kurtis has been on-board for almost 3 years. He always has a "can-do" attitude and is quick on his feet. With his background in digital media arts, he is good to have around for technical resolve. When Kurtis isn't helping build exhibits and doing quality checks on display products; he's skateboarding. Terms like; Air, Alley-oop, and Bigflip best describe his boarding life. BTW, air is the name given to the trick of the skateboard and skater.



Contact Us



## Get in Touch

Address:
**40300 Grand River Ave, Novi, MI 48375**

Phone:
**(248) 615-1124**

Email:
sales@image-tek.com

HOME     TESTIMONIALS     ABOUT     OUR WORK

© 2023 for Image-Tek by Daffy Agency.

# Exhibit E

ROCK-00000128



Rockwell Automation, 1201 S 2nd St, Milwaukee, WI 53204, USA

Compact Logix 600KB Enet Controller

R-REM-RAA-5069-L3

PRODUCT OF SINGAPORE

CAT
5069-L306ER

0088950871268

*SN 83575322*

Logix 5000™ Series

MAT NO  PN-346126

SER        FW
A           1.063

PLANT 5170        DATE 2021/11/07

ROCK-00000129

## Allen-Bradley

**Rockwell Automation**
1201 S 2nd St, Milwaukee, WI 53204, USA
Compact Logix 600KB Enet Controller

CAT           SER    MAT NO
5069-L306ER    A    PN-346126

⟨Ex⟩ II 3 G
Ex nA IIC T4 GC
DEMKO15ATEX1455X
IECEx UL 15.007X
ASA 60EED0AE
  Logix 5000™ Series
    PRODUCT OF SINGAPORE

c(UL)us 99CM US LISTED
IND.CONT.EQ.
FOR HAZ.LOC.
CL I DIV.2
GP A,B,C,D

TEMP
CODE
T4

MOD:18-32VDC @ 450mA
SA:0-32VDC @ 10mA
SA:0-240VAC @ 25mA
47 - 63 Hz
ATEX/IECEx 0-125VAC
0° C < Ta < + 60°C
SEE MANUAL FOR INSTALL INFO
FW 1.063    SN 83575322

CE ЕАС

EtherNet/IP
PLANT 5170      DATE 2021/11/07

ROCK-0000130



ROCK-00015735

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ROCKWELL AUTOMATION, INC.'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* NO. 1

<table>
<tr>
<td></td>
<td>John W. Shaw (No. 3362)<br>Andrew E. Russell (No. 5382)<br>Emily S. DiBenedetto (6779)</td>
</tr>
<tr>
<td>OF COUNSEL:<br>Paul Tanck<br>Neal J. McLaughlin<br>Christopher L. McArdle<br>Andrew J. Ligotti<br>ALSTON & BIRD LLP<br>90 Park Avenue<br>New York, NY 10016<br>(212) 210-9400<br><br>Matthew M. Welch<br>ALSTON & BIRD LLP<br>One South at The Plaza<br>101 South Tryon Street<br>Suite 4000<br>Charlotte, NC 28280-4000<br>(704) 444-1000</td>
<td>SHAW KELLER LLP<br>I.M. Pei Building<br>1105 North Market Street, 12th Floor<br>Wilmington, DE 19801<br>(302) 298-0700<br>jshaw@shawkeller.com<br>arussell@shawkeller.com<br>edibenedetto@shawkeller.com<br><br>*-and-*</td>
</tr>
</table>

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 27, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

WiAutomation shortcuts FRE 901's two-step process to determine authentication of the evidence related to two test purchases made from WiAutomation. At this stage, Rockwell need only make "a prima facie showing, to the court, of authenticity, not a full argument on admissibility." *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927-28 (3d Cir. 1986). The "burden of proof for authentication is slight" at this step. *Id*. After Rockwell makes this showing, the inquiry proceeds to step two, where the jury receives the evidence and determines authenticity. *Id*.

WiAutomation improperly skips to step two. The relevant question is whether Rockwell provides material sufficient to meet the prima facie case to authenticate the test purchases. Rockwell has.

At issue are (1) boxes with WiAutomation's logo, (2) bearing shipping labels with WiAutomation's return address addressed to the purchaser, (3) containing WiAutomation invoices and the products identified on the invoices (PPX-0001, 2); photographs of these items (PTX-010-22, 25-36, 39-40, 1602-1603, 1751-59, 1893), and correspondence sent from a WiAutomation email address (PTX-037-38, 41, 1604-05). The boxes' contents match the invoices. *Compare* PTX-013, 19, 27, 1756 *with* PTX-036, 41. These internal consistencies confirm Rockwell's evidence is "sufficient to overcome the slight authentication admissibility burden." *Link*, 788 F.2d at 928 & n.9 (affirming final finding of authenticity solely on "characteristics

includ[ing] company logos and other trademarks, the professional appearance of …

handbooks and manuals, and the specific nature of the contents of the documents,

including their internal consistency."); *LG Display Co., Ltd. v. Au Optronics Corp.*,

265 F.R.D. 189, 196 (D. Del. 2010) (document origins can be "probative of their

authenticity").

Moreover, WiAutomation's brand name and logo, applied in the course of

business, indicates the boxes' origin and renders them self-authenticating under FRE

902(7). *Ultra-Mek, Inc. v. United Furniture Indus.*, 2022 WL 1632946, *1-2

(M.D.N.C. Apr. 11, 2022).

The persons (Paliszewski and Smaglik) who directed both purchases also will

authenticate the physical evidence at trial based on the circumstances of its receipt.

*U.S. v. Reilly*, 33 F.3d 1396, 1404-09 (3d Cir. 1994) (affirming authenticity based

on circumstances of messages' receipt). WiAutomation argues that Mr. Palaszewski

cannot authenticate this evidence because he himself did not buy or receive, but this

ignores that "Rule 901(b)(1) requires only knowledge, not contemporaneous

personal knowledge." *Egan v. Live Nation Worldwide, Inc.*, 764 F. App'x 204, 207

(3d Cir. 2019). Taken together, the testimony and internal consistency of the

evidence satisfies Rockwell's prima facie burden.

And even more authenticating evidence exists: e-mails between the purchaser

and WiAutomation forming sales contract terms, where the products delivered

matched those described in the contract (PTX-038-40); invoices with recipient names that match the names Mr. Palaszewski directed the third-party to use (PTX-1603, 1893); and for the 2020 purchase, e-mails reflecting the senders' contemporaneous impression of receiving counterfeit products. PTX-037; *see also* PTX-1874, ¶¶4-5, 7-8.

WiAutomation's attempt to analogize to *Wi-Lan's* "highly dubious circumstances" ignores that WiAutomation deposed Mr. Palaszewski and he will testify at trial. The jury will be able to consider his testimony and gauge his credibility. In *Wi-Lan* the witnesses were unavailable for trial, such that they could not be questioned, and the documents had significant internal inconsistences. *Wi-Lan Inc. v. Sharp Elecs. Corp.*, 362 F. Supp. 3d 226, 231-33 (D. Del., 2019). *Wi-Lan's* "dubious" circumstances do not exist here.

WiAutomation's full paragraph attack on Gary Monroe relies on inadmissible evidence (*i.e.*, an aged fraud conviction, FRE 404)[1] and is irrelevant at this stage in the evidentiary process as it does not speak to Rockwell's prima facie case of admissibility.

---

[1] Rockwell has moved *in limine* to preclude WiAutomation's inadmissible attacks against non-witness Gary Monroe under FRE 402-404, 608, and 609.

WiAutomation's short hearsay analysis is flawed. *First*, the physical evidence it seeks to preclude—photographs, boxes, and products—are not hearsay because they are not "statements" and "[t]he rules against hearsay, therefore, have nothing to say about the matter." *Laureano v. City of New York*, 2021 WL 3272002, *6 (S.D.N.Y. July 30, 2021). *Second*, the emails and invoices bearing WiAutomation's name are non-hearsay party opponent statements under FRE 801(d)(2)(a), and, further, are non-hearsay as those documents have legal operative effect. *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992) ("[V]arious communications -- e.g., conversations, letters, and telegrams -- relevant to the making of the contract are also not hearsay."). *Third*, the physical evidence is admissible via the residual exception (FRE 807(a)), after considering the totality of the circumstances described above which confer sufficient guarantees of trustworthiness. *Ultra-Mek.*, 2022 WL 1632946, *2-3.

<div style="float:right">

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

</div>

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000


Dated: June 27, 2023

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby confirm that this brief complies with the type and number limitations set forth in the November 10, 2022 Standing Order Regarding Briefing in All Cases. I certify that this document contains 749 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Emily S. DiBenedetto, hereby certify that on June 27, 2023, this document

was served on the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

| | |
|---|---|
| Pilar G. Kraman | Bob Kasolas |
| Alexis N. Stombaugh | Eric J. Boden |
| YOUNG, CONAWAY, STARGATT | Eric Alvarez |
| & TAYLOR LLP | BRACH EICHLER, LLC |
| Rodney Square | 101 Eisenhower Parkway |
| 1000 North King Street | Roseland, NJ 07068 |
| Wilmington, DE 19801 | (973) 228-5700 |
| (302) 571-6600 | bkasolas@bracheichler.com |
| pkraman@ycst.com | eboden@bracheichler.com |
| astombaugh@ycst.com | ealvarez@bracheichler.com |

/s/ Emily S. DiBenedetto
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 21-1238-GBW-JLH |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## EXHIBIT 15D: DEFENDANT'S REPLY BRIEF
## IN SUPPORT OF MOTION IN LIMINE NO. 1
## TO PRECLUDE ROCKWELL FROM INTRODUCING
## UNAUTHENTICATED EVIDENCE FROM TEST PURCHASES

Dated: June 30, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

Simply put, Rockwell cannot authenticate the Images.  Rockwell also offers no emails concerning the Image-Tek purchase.

Rockwell's case citations are irrelevant because, unlike here, every document admitted in those cases contained strong indicia the evidence came from a specific source.  *U.S. v. Reilly*, 33 F.3d 1396, 1405-06 (3d Cir. 1994) (messages bore sender's initials); *Egan v. Live Nation Worldwide, Inc.*, 764 F. App'x 204, 208-09 (3d Cir. 2019) (document contained defendant's contact information); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 928 (3d Cir. 1986) (documents contained company logos); *LG Display Co., Ltd. v. Au Optronics Corp.*, 265 F.R.D. 189, 196 (D. Del. 2010) (documents produced by IBM with IBM authenticity declaration).

Rockwell cannot authenticate these images under FRE 901(b)(4) because the "circumstances surrounding the [Images] render [them] unreliable." *Russo v. Estee Lauder Corp.*, 856 F.Supp.2d 437, 446-48 (E.D.N.Y. 2012).  At best, Rockwell and its agent demonstrated a reckless disregard for the truth about these alleged purchases.  (D.I. 265 at pp. 1-4.)  Moreover, *Egan* does not support allowing Paliszewski to testify that products came from WiAutomation based on hearsay from undisclosed Rockwell agents.  The *Egan* court merely found that Terms of Use were properly authenticated based on numerous evidence, including the testimony of the company's vice president that the document did in fact contain the company's Terms

of Use, *i.e.*, business records that he was familiar with.  *Egan,* 764 F. App'x at 208-09.

Dated:  June 30, 2023

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that Defendant's Reply Brief in Support of Motion in Limine No. 1 to Preclude Rockwell from Introducing Unauthenticated Evidence from Test Purchases is in Times New Roman 14-point font and contains 235 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.

Dated: June 30, 2023

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Of Counsel*:

*/s/ Pilar G. Kraman*

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

EXHIBIT 15E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 21-1238-GBW-JLH |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## EXHIBIT 15E: DEFENDANT'S MOTION IN LIMINE NO. 2 TO PRECLUDE ROCKWELL FROM INTRODUCING HEARSAY THROUGH A FACT WITNESS'S TRIAL TESTIMONY

Dated:  June 22, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

WiAutomation moves *in limine* to preclude Rockwell from using a fact witness, Ryan Smaglik, to present hearsay evidence under the guise of lay witness testimony under Federal Rule of Evidence ("FRE") 701.  Rockwell cannot use FRE 701 as a backdoor to insert inadmissible hearsay and unauthenticated documents into the evidentiary record.

WiAutomation expects Rockwell will attempt to elicit testimony from Smaglik about statements customers allegedly made to him.  For instance, Rockwell may seek to have Smaglik testify that customers expect new Rockwell products will come with a Rockwell warranty and Rockwell services (D.I. 147 ¶ 10), receiving a manufacturer's warranty and services is significant to customer's purchasing decisions (*id.* ¶ 15), and that customers bought products from WiAutomation unaware that they were not receiving Rockwell's warranty and services (*id.* ¶¶ 47, 50).  These claims are entirely supported by statements from unspecified consumers that were not produced in this matter.  Further, Smaglik will likely testify that certain images, PTX 1764, show products sold by WiAutomation to Rockwell's Italian law firm (*id.* ¶¶ 61-68).  Rockwell never disclosed this law firm in discovery and did not produce any correspondence transmitting these pictures.  Thus, Smaglik's testimony is fully based on statements this firm made to him.  All of these statements, to the extent they were actually made, are inadmissible hearsay.

Smaglik cannot recant hearsay statements as lay-witness opinion testimony under FRE 701.  A lay witness can only testify to "facts of which he has personal knowledge."  *Joy Mfg. Co. v. Sola Basic Indus.*, 697 F.2d 104, 111 (3d Cir. 1982). Therefore, unlike expert witnesses' opinion which may be based on information made known to them (FRE 703), lay opinion may not be based on hearsay.  *Teen-Ed, Inc. v. Kimball Int'l., Inc.*, 620 F.2d 399, 404 (3d Cir. 1980).  *See also Ramjeawan v. Bank of Am. Corp.*, 2010 WL 1645097, at *2 (S.D. Fla. Apr. 21, 2010) (an employee's lay opinion testimony "based on his discussions with peers, not his own perception," inadmissible under FRE 701); *Hall v. C.I.A.*, 538 F.Supp.2d 64, 69 (D.D.C. 2008).  The *Hall* court rejected the plaintiff's argument that out-of-court statements were admissible to show the witness's perception of what he was told, finding that "Plaintiff's interpretation of [Rule 701] is startling; if any third-party statement could be admitted merely because it was heard (and 'perceived') by the witness, the entirety of hearsay jurisprudence would be nullified.  It is clear that Rule 701 allows no such thing."  538 F.Supp.2d at 69.  Smaglik cannot testify based on statements allegedly made by Rockwell's customers.  FRE 602, 701, 802.

Moreover, Smaglik admitted that he "do[es] not have a lot of direct conversations with [Rockwell's] customer base in [his] role" (Ex. A at 423:18-23) and does not remember basic details about the few customers he allegedly interacted with (*id.* at 424:15-425:2).  Smaglik's testimony about customer perceptions is not

2

"rationally based" on his perception (FRE 701(a)) or helpful to "determine a fact in issue" (FRE 701(b)).  Smaglik lacks the experience needed to provide admissible lay opinion testimony on customer's perceptions. *Joy Mfg. Co.*, 697 F.2d at 111 (lay witness perception "must be gauged by the geographic proximity of the witness to the event, the length of time involved, and the existence of proper conditions for the exercise of powers of observation and perception.") *See Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City.*, 383 F.3d 110, 132-33 (3d Cir. 2004) (allowing public-facing bank tellers to testify about their observation of bank customers.) Smaglik, therefore, cannot provide testimony about consumer perceptions that is helpful and rationally based, as required by FRE 701(a), (b).

Indeed, "actual confusion evidence collected by employees of a party in a trademark action must be viewed with skepticism because it tends to be biased or self-serving." *Citizens Fin. Grp.*, 383 F.3d at 121-22 (only permitting certain examples of confusion that were supported by evidence and where parties acknowledged that consumers were frequently confused).  Here, WiAutomation vigorously disputes whether there is any confusion and there is no evidence suggesting that customers actually indicated to Smaglik they were confused. Smaglik's testimony reflecting customer statements (*e.g.,* D.I. 147 ¶¶ 10, 15, 47, 50) must be excluded.

Further, Smaglik cannot testify about inadmissible hearsay as an expert witness either.  Rockwell never disclosed Smaglik as an expert witness under FRCP 26(a)(2).  Surprise expert testimony by a lay witness at trial should be excluded.  *See* FRCP 37(c)(1); *Gavrieli Brands LLC v. Soto Massini (USA) Corp.*, No. 18-462-MN, 2019 WL 10248462, at \*1 (D. Del. Apr. 18, 2019).

Dated:  June 22, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/  Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies Defendant's Motion *in Limine* to Preclude Rockwell from Introducing Hearsay through a Fact Witness's Trial Testimony is in Times New Roman 14-point font and contains 750 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.


Dated: June 22, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

/s/  *Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 21-1238-GBW-JLH |
| ) | |
| PARCOP S.R.L. d/b/a ) | |
| WIAUTOMATION, ) | |
| ) | |
| Defendant. ) | |

## [PROPOSED] ORDER

In Wilmington, this ___day of _____, 2023, in consideration of Defendant's Motion *in Limine* to Preclude Rockwell from Introducing Hearsay through a Fact Witness's Trial Testimony, and any opposition thereto;

Defendant's Motion is GRANTED. Ryan Smaglik may not testify at trial regarding hearsay evidence, including with respect to reports of customers' confusions, customers' expectation that new Rockwell products will come with a Rockwell warranty and Rockwell services, the significance of manufacturer's warranty and services to customer's purchasing decisions, and customers' knowledge about whether they were receiving Rockwell's warranty and services when they bought products from WiAutomation. Further, Ryan Smaglik may not present testimony at trial about the hearsay statements by Rockwell's Italian law

firm that PTX 1764 purportedly shows products sold by WiAutomation to Rockwell's Italian law firm.

_____

The Hon. Gregory B. Williams

# Exhibit A

# Condensed Transcript/Concordance

---

## Rockwell Automation v. Parcorp

---

## Deposition of Ryan Smaglik

December 20, 2022

D'Amico Certified Reporting
908-546-7650
damico.reporting@verizon.net

Ryan Smaglik
12/20/2022

**419**

1      12/20/22 - R. Smaglik
2    BY MR. KASOLAS:
3        A.   And I guess what my answer is is
4    it's not really -- I would -- I would -- I would
5    believe that -- so value added resellers, I
6    think, generally have engineering know-how, they
7    have some type of experience that's valuable to
8    their customers; that's why they exist, and to
9    be that extent, there's some level of
10   sophistication there.  But the beauty of the
11   value added resellers in many cases is in the
12   customer's eyes; they are the ones who are
13   choosing that value added reseller to that
14   particular application to delivery of a machine
15   or system that meets their needs.
16       Q.   So the customers is relying on the
17   value added reseller for delivery of the machine
18   that the customer needs, correct?
19       A.   It's the customer's -- it goes to an
20   OEM, because they require a machine that does
21   something that's of some importance to them, is
22   my experience.
23       Q.   And the value added resellers, it's
24   really up to them how they conduct their
25   businesses and who they buy products from,

**420**

1      12/20/22 - R. Smaglik
2    correct?
3        MR. TANCK:  Objection to form.
4    BY MR. KASOLAS:
5        A.   The value added resellers generally
6    in my experience buy products from all sorts of
7    different manufacturers, machines that they
8    deliver require things, you know, beyond what
9    Rockwell can provide, you know, metals and
10   things that have to be -- many cable wiring, you
11   know, there's a lot of complexity that goes in
12   to what they deliver to their customers.
13       Q.   Does Rockwell publish to the
14   automation industry the fact that only sales of
15   Rockwell products from an authorized distributor
16   come with warranties and product support and
17   software licenses?
18       A.   Just so I answer correctly, can you
19   repeat the question, please?
20       MR. KASOLAS:  Sure.  Madam Court
21   Reporter, would you please read back my
22   question to the witness.
23       (Whereupon, the record was read.)
24   BY MR. KASOLAS:
25       A.   I would say, yes, we have -- we

**421**

1      12/20/22 - R. Smaglik
2    have, you know, taken out advertise -- I would
3    say the answer is yes.
4        Q.   Can you tell me why the answer is
5    yes.
6        A.   Well, we have, in my experience we
7    have done a lot of work around -- specific
8    examples, we've taken out advertisements within
9    automation publication, I'm forgetting the name
10   of it right now.  We have a public website that
11   has this detailed out public blog post; there
12   are a number of things publicly available that,
13   you know, detail these requirements.
14       Q.   So where in your website do you
15   publish the fact that only Rockwell sales from
16   an authorized distributor -- strike that.
17           Where in your website do you publish
18   that only authorized distributor sales of
19   Rockwell products come with the warranty and the
20   product support and firmware?
21       A.   In the sales section of our website,
22   there's a link that will take you to a page that
23   details these requirements.
24       Q.   Is Rockwell able to measure how many
25   people visit that section of your website?

**422**

1      12/20/22 - R. Smaglik
2        A.   I wouldn't know.  I would have to --
3    I would have to ask.
4        Q.   And how long has Rockwell published
5    that information on its website?
6        A.   I -- I believe it's been there for a
7    few years from memory now.
8        Q.   Are you sure or are you guessing?
9        A.   It's been there for at least a year,
10   it could be more.
11       Q.   And you mentioned you published ads
12   in just one periodical in the industrial
13   automation industry or other periodicals, too?
14       A.   I am only familiar with one single
15   ad.
16       Q.   And you mentioned there's some kind
17   of public blog, what is the public blog that
18   you're referencing?
19       A.   There's a Rockwell Automation blog
20   on our website.
21       Q.   Is that blog updated consistently?
22       A.   The blog posts one-time entry.
23       Q.   And where is that blog post located
24   on the website?
25       A.   I would have to look around to find

19 (Pages 419 to 422)

Ryan Smaglik
12/20/2022

423

```
 1            12/20/22 - R. Smaglik
 2    that.
 3        Q.   So do the value added resellers know
 4    that if they don't buy Rockwell products from an
 5    authorized distributor, they won't receive these
 6    additional material differences that you contend
 7    such as warranties, product support and
 8    firmware?
 9        A.   I would say many of them don't.
10        Q.   Why do you say that?
11        A.   Just it's been my experience that's
12    -- this is not always well understood, which is
13    why we, you know, spend a lot of time doing
14    education.
15        Q.   So did someone tell you this, from a
16    value added resellers?
17        A.   Tell me what?
18        Q.   That -- are they confused over the
19    issue or they don't know, what exactly -- have
20    you spoken to these value added resellers about
21    this issue?
22        A.   I -- I don't have a lot of direct
23    conversations with our customer base in my role.
24        Q.   So anything you know about that
25    particular topic as to whether or not they
```

424

```
 1            12/20/22 - R. Smaglik
 2    understand Rockwell's policy about buying
 3    Rockwell products from authorized distributors
 4    is just from other people at Rockwell, correct?
 5        MR. TANCK:  Objection to form.
 6    BY MR. KASOLAS:
 7        A.   I mean, I have -- I have some
 8    limited, you know, direct exposure to these
 9    types of expressions as well.  But it's my
10    understanding in speaking with colleagues and
11    across my career, that this is something that we
12    are constantly vigilant with regard to, you
13    know, not assuming that customers understand
14    this.
15        Q.   You said you have direct limited
16    exposure, what direct limited exposure do you
17    have on that topic?
18        A.   I mean just from memory, I have
19    spoken with a couple number of companies in the
20    past that did not understand these -- these
21    differences.
22        Q.   When you say companies, are you
23    talking about Value Added Reseller companies?
24        A.   I would, from my memory, I'm not
25    sure if they were end users or Value Added
```

425

```
 1            12/20/22 - R. Smaglik
 2    Resellers.
 3        Q.   Have you ever conducted an
 4    investigation of any kind to see whether or not
 5    any Value Added Resellers are confused about
 6    Rockwell's policy of selling its products to
 7    authorized distributor?
 8        A.   I have not conducted such an
 9    investigation.
10        Q.   Do you have anything in writing with
11    respect to Wi Automation or an authorized
12    distributor -- strike that.
13            Do you have anything in writing from
14    a Value Added Reseller expressing to Rockwell
15    that they were confused about the product they
16    purchased from Wi Automation?
17        A.   I would have to review
18    communications, all of which would've been
19    disclosed.
20        Q.   So to the extent that there was such
21    a document, you would've given it to your
22    lawyers in this case, correct?
23        A.   I -- I -- my -- my emails, my entire
24    email bank has been put on a discovery hold.
25        Q.   So to the extent that such a written
```

426

```
 1            12/20/22 - R. Smaglik
 2    document existed, at least your lawyers would
 3    have that document in this litigation, correct?
 4        A.   I -- I couldn't answer that for
 5    sure.
 6        Q.   Well, you also testified that the
 7    Value Added Resellers are sophisticated.  So if
 8    they're sophisticated, how could they be
 9    confused about what they get when they buy a
10    Rockwell product from an authorized distributor
11    versus an unauthorized distributor?
12        MR. TANCK:  Objection to form.
13    Argumentative.
14    BY MR. KASOLAS:
15        A.   Again, my -- my use of the term
16    sophisticated was with regard to their
17    capabilities, their engineering capabilities.
18    They are highly technical, you know, companies
19    that deliver complex solutions and machines to
20    customers.
21        Q.   Well, if a Value Added Reseller
22    doesn't purchase its Rockwell products it uses
23    from a Rockwell authorized distributor,
24    they're not entitled to any warranty protection
25    from Rockwell, are they?
```

20 (Pages 423 to 426)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ROCKWELL AUTOMATION, INC.'S OPPOSITION TO
DEFENDANT'S MOTION *IN LIMINE* NO. 2**


OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000


Dated: June 27, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

Rockwell will not elicit inadmissible hearsay from Ryan Smaglik, admit documents through him that cannot be authenticated, or assert that he is an expert witness. WiAutomation's arguments do not warrant prohibiting Smaglik from providing testimony concerning customer confusion, customer expectations, customer purchasing decisions, or the like in this case.

The type of testimony Smaglik will provide is routinely admitted in similar cases because it is *not hearsay* as the statements are *not* being offered for their truth. *Kos Pharms., Inc. v. Andrx Corp.*, is instructive:

> Berg could attest to having received more than 60 reports of confusion in his official capacity. *Berg's direct testimony that he received numerous and varied reports of alleged confusion is not hearsay* but a factual claim that, as discussed below, has independent evidentiary significance tending to show actual confusion.

369 F.3d 700, 719-20 (3d Cir. 2004) (emphasis added). The court identified other admissible customer statements relevant to confusion, including statements that proclaim confusion (admissible hearsay under FRE 803(3)), and statements that evidence the speaker's confusion (admissible non-hearsay because it is offered for its falsity, not truth). *Id.* at 719.

Other courts also allow evidence of customer complaints. *See, e.g.*, *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003-04 (2d Cir. 1997) ("The testimony . . . was not offered to prove that Fun-Damental was actually selling to some retailers at lower prices, but was probative of the declarant's

confusion."); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:15, 2 (5th ed. 2019) (same) (attached as Ex. 1); *SurgiQuest v. Lexion Med., Inc.*, 2018 U.S. Dist. LEXIS 82323, at *13, n.11 (D. Del. 2018) ("[S]tatements [] offered to show circumstantial evidence of customer confusion" were not hearsay.); *Rockland Mortg. Corp. v. S'holders Funding*, Inc., 835 F. Supp. 182, 187, n.4 (D. Del. 1993) (Flyer acknowledging confusion was not hearsay.).  Smaglik should be permitted to testify about similar reports of customer confusion he received.

Hall v. C.I.A., is distinguishable. 538 F.Supp.2d 64, 69 (D.D.C. 2008). Smaglik's testimony is not being offered to show how Smaglik perceived it. Instead, it is "probative of the declarant's confusion." *Fun-Damental*, 111 F.3d at 1003-04.

FRE 701 expressly permits non-experts like Smaglik to offer "testimony in the form of an opinion" if "rationally based on the witness's perception"; "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Such testimony may be based on the witness's "knowledge and participation in the day-to-day affairs of [the] business."  *U.S. v. Polishan*, 336 F.3d 234, 242 (3d Cir. 2003).

Testimony about customers is regularly permitted under these principles. For example, *Regscan, Inc. v. Brewer*, 2007 WL 879420, *19 (E.D. Pa. Mar. 16, 2007) held "a senior member of [the] sales and marketing group" could rely on work of others who searched a customer database "as well as his own experience, in concluding that the patented technology language did not affect consumer's purchasing decisions" under FRE 701, and the same evidence was admissible under FRE 803(3)). *Id.*, *17-*19. Smaglik can testify on similar subjects, provided he can establish the necessary predicates when he takes the stand.

The testimony WiAutomation cites to challenge Smaglik's experience (Op., 2-3) relate only to his current role. His prior positions included significant customer interactions. *See* Ex. 2, 111:12-112:20. Moreover, the cited testimony focuses on a narrow subset of customer perceptions, not all customer perceptions. WiAutomation failed to question Smaglik about how his "knowledge and participation in the day-to-day affairs of [the] business" informs his ability to testify about customer expectations and preferences. *Polishan*, 336 F.3d at 242.

Nor did *Citizens* establish a broad rule of admissibility about customer confusion testimony. Op., 3 (citing *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City.*, 383 F.3d 110 (3d Cir. 2004)). Rather, it asked whether the district court abused its discretion in refusing to admit portions of a written log concerning customer confusion, and notably *affirmed* the decision to admit log entries

constituting an "explanation or description of the event" (as Smaglik may present here). *Citizens*, 383 F.3d at 122.

Finally, WiAutomation's complaints about the Italian law firm are meritless. Testimony about what Smaglik asked that firm to do and the physical items he received is not hearsay.  *Kos*, 369 F.3d at 719-20 (testimony about witness's own perceptions and actions not hearsay); *U.S. v. May*, 622 F.2d 1000, 1007 (9th Cir. 1980) (photographs not hearsay).

|  |  |
|---|---|
|  | */s/ Emily S. DiBenedetto* |
|  | John W. Shaw (No. 3362) |
|  | Andrew E. Russell (No. 5382) |
|  | Emily S. DiBenedetto (No. 6779) |
|  | SHAW KELLER LLP |
|  | I.M. Pei Building |
|  | 1105 North Market Street, 12th Floor |
| OF COUNSEL: | Wilmington, DE 19801 |
| Paul Tanck | (302) 298-0700 |
| Neal J. McLaughlin | jshaw@shawkeller.com |
| Christopher L. McArdle | arussell@shawkeller.com |
| Andrew J. Ligotti | edibenedetto@shawkeller.com |
| ALSTON & BIRD LLP | |
| 90 Park Avenue | *-and-* |
| New York, NY 10016 | |
| (212) 210-9400 | Dominick T. Gattuso (No. 3630) |
|  | HEYMAN ENERIO GATTUSO & HIRZEL LLP |
| Matthew M. Welch | 300 Delaware Avenue, Suite 200 |
| ALSTON & BIRD LLP | Wilmington, DE 19801 |
| One South at The Plaza | (302) 472-7311 |
| 101 South Tryon Street | dgattuso@hegh.law |
| Suite 4000 | |
| Charlotte, NC 28280-4000 | *Attorneys for Rockwell Automation,* |
| (704) 444-1000 | *Inc.* |

4

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 27, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby confirm that this brief complies with the type and number limitations set forth in the November 10, 2022 Standing Order Regarding Briefing in All Cases. I certify that this document contains 748 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Emily S. DiBenedetto, hereby certify that on June 27, 2023, this document

was served on the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

Pilar G. Kraman
Alexis N. Stombaugh
YOUNG, CONAWAY, STARGATT
 & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com

Bob Kasolas
Eric J. Boden
Eric Alvarez
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
bkasolas@bracheichler.com
eboden@bracheichler.com
ealvarez@bracheichler.com

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

# Exhibit 1



**4 McCarthy on Trademarks and Unfair Competition § 23:15 (5th ed.)**

McCarthy on Trademarks and Unfair Competition, Fifth Edition    |    June 2023 Update
J. Thomas McCarthy

Chapter 23. Likelihood of Confusion: The Test of Trademark Infringement

I. Test of Likelihood of Confusion

B. Likelihood of Confusion Versus Actual Confusion

# § 23:15. Actual confusion as evidence of a likelihood of confusion—Hearsay problem

References

---

West's Key Number Digest

- West's Key Number Digest, Trademarks🔑1086
- West's Key Number Digest, Trademarks🔑1629(2)

---

***Employee Testimony as to Confused Customers.*** Evidence of actual confusion is sometimes introduced through the testimony of employees of plaintiff as to misdirected letters, phone calls, enquiries as to connection with defendant, and the like. The evidentiary problem is one of the hearsay nature of such testimony. For example, consider this hypothetical. Plaintiff APPLE seeks to introduce the testimony of employees of a retail sales outlet that sells the genuine APPLE iPOD MP3 device. The sales people will testify about customers who came in complaining about the high price, claiming that they saw APPLE iPODs on sale at an XYZ discount store nearby for $50 less. In fact, the products on sale at that XYZ store were not iPODs but iPOTs, the allegedly infringing competing product. The purpose of the evidence is not to prove that in fact genuine APPLE iPODs were on sale at the XYZ discount store, but that some consumers mistakenly thought that they were.

***The Minority View: Employee Testimony That There was Confusion is Barred as Hearsay.*** Some have rejected employee testimony that customers told them they were confused as unreliable hearsay which does not permit cross-examination of the customer, sender or caller as to the reason for the "confusion." [1] As the Eighth Circuit observed: "[T]he vague evidence of misdirected phone calls and mail is hearsay of a particularly unreliable nature given the lack of an opportunity for cross-

---

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    1

examination of the caller or sender regarding the reason for the 'confusion.'"[2] Similarly, a record kept by plaintiff's employees of instances of what they consider to be confusion by customers may be inadmissible into evidence because of the hearsay rule.[3]

**The Majority View: Employee Testimony is Admissible Evidence.** The majority of courts have held either that testimony of plaintiff's employees as to confused customers is not hearsay because it is not offered to prove the truth of any customer's assertion or is admissible under an exception to the hearsay rule.[4] The Second Circuit flatly stated that "there is no hearsay problem" because the testimony is not offered to prove the truth of the customer's assertion that there is a connection or affiliation between the parties, but only to prove the confused state of mind of the customer.[5] Still other courts rely on hearsay evidence without discussing the evidentiary problem.[6]

*Author's Opinion.* In my view, it is clear that testimony from the plaintiff-trademark owner's employees or others about what customers have told them about their mistaken beliefs should not be excluded from evidence as "hearsay." For example, assume that a retail sales employee of an outlet that sells plaintiff's ZEAL product testifies that: "In a two-week period, four customers telephoned and told me that they saw the ZEAL product on sale for a two-for-one discount price at the Crazy Ed's Discount Web site on the Internet and asked if we would meet that price." Since only the defendant-competitor's SEAL-branded products are sold at Crazy Ed's Discount Web site, not the plaintiff's genuine ZEAL product, this is evidence that those customers were confused and deceived, probably by the similarity of the marks. The testimony is not hearsay because it is not being offered to prove that in fact plaintiff's ZEAL products were sold at Crazy Ed's Discount Web site. Rather, it is only being offered to prove the state of mind of those four customers: they mistakenly thought that that was the case. That is evidence of actual confusion which in turn is probative of a likelihood of confusion continuing into the future.

Westlaw. © 2023 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

## Footnotes

1    Vitek Systems, Inc. v. Abbott Laboratories, 675 F.2d 190, 193, 216 U.S.P.Q. 476, 10 Fed. R. Evid. Serv. 1195 (8th Cir. 1982) (testimony of plaintiff's employees that customers told them that they were confused by the marks is "hearsay in nature" and "one of the most unsatisfactory kinds [of evidence] because it is capable of such varying interpretations"); Ocean Bio-Chem, Inc. v. Turner Network Television, Inc., 741 F. Supp. 1546, n.7, 18 Media L. Rep. (BNA) 1337, 16 U.S.P.Q.2d 1264, 1559 n.7 (S.D. Fla. 1990) (Disagreeing with prior cases and saying that an affidavit by an employee testifying to a misdirected phone call is double hearsay in that an out-of-court declarant (employee) attests to the out-of-court statement of another (caller). Such double hearsay is not admissible under the state of mind exception.); Alchemy II, Inc. v. Yes! Entertainment Corp., 844 F. Supp. 560, 570 n.12, 30 U.S.P.Q.2d 1770 (C.D. Cal. 1994) (evidence of phone calls to plaintiff enquiring as to where to buy defendant's product is "inadmissible hearsay"); Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 212, 33 U.S.P.Q.2d 1801, 1818 (3d Cir. 1995) (error to rely on hearsay evidence of an official of plaintiff who testified that his European sales manager told him that at trade shows some people told him that there would be confusion); Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 41, 38 U.S.P.Q.2d 1171 (D. Mass. 1995) (Rejecting as hearsay the testimony of plaintiff's president about consumer queries as to affiliation directed to store employees who told the president.).

2    Duluth News-Tribune, a Div. of Northwest Publications, Inc. v. Mesabi Pub. Co., 84 F.3d 1093, 1098, 24 Media L. Rep. (BNA) 1904, 38 U.S.P.Q.2d 1937 (8th Cir. 1996) (In addition, the court found the evidence "to be de minimis and to show inattentiveness on the part of the caller or sender rather than actual confusion"). *See*: Angel Flight of Georgia, Inc. v. Angel Flight America, Inc., 522 F.3d 1200, 1206, 86 U.S.P.Q.2d 1422 (11th Cir. 2008) (Lower court should not have credited the incidents of confusion told to

plaintiff's employees as having actually taken place. "By finding the incidents described to the employees by the out of court declarants had actually taken place, the court used the statements as evidence of the truth of the matters asserted—a classic hearsay purpose.").

3   Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291, 69 U.S.P.Q.2d 1603, 58 Fed. R. Evid. Serv. 509 (S.D. N.Y. 2001) (While the statements of customers would not be barred as hearsay (because related to state of mind), the records kept by the employees are hearsay. Such records kept for use in litigation were held not admissible under the business records exception to the hearsay rule. However, the records may be used at trial to refresh the recollection of the employees who made the records.).

4   **Second Circuit**
Programmed Tax Systems, Inc. v. Raytheon Co., 439 F. Supp. 1128, 197 U.S.P.Q. 509 (S.D. N.Y. 1977) (phone calls from allegedly confused persons: state of mind exception to hearsay); Fun-Damental Too, Ltd. v. Gemmy Industries Corp., 111 F.3d 993, 1003, 42 U.S.P.Q.2d 1348 (2d Cir. 1997) (Plaintiff's national sales manager testified that some retail customers complained because they saw defendant's product and mistakenly thought plaintiff was selling its product at a lower price to other retailers. "There is no hearsay problem. Hearsay is an out-of-court statement admitted for the truth of the matter asserted … . The testimony in question was not offered to prove that [plaintiff] was actually selling to some retailers at lower prices.")

**Third Circuit**
Kraft General Foods, Inc. v. BC-USA, Inc., 840 F. Supp. 344, 29 U.S.P.Q.2d 1919 (E.D. Pa. 1993) (testimony of plaintiff's employee as to what customers told him about their confusion is admissible under the state of mind exception to the hearsay rule; but employee's testimony about what a consultant told him about what consumers told the consultant is state of mind of third parties and is not admissible into evidence); Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City, 383 F.3d 110, 72 U.S.P.Q.2d 1389, 65 Fed. R. Evid. Serv. 350 (3d Cir. 2004)(Employees' testimony about their experience with confused customers is not hearsay and is admissible under Fed. R. Evid. 803(3) permitting statements of existing state of mind.)

**Fourth Circuit**
Lyons Partnership, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 58 U.S.P.Q.2d 1102, 56 Fed. R. Evid. Serv. 982 (4th Cir. 2001) (Evidence of newspaper articles and testimony from parents that their children mistakenly thought that defendant's accused costume was that of the plaintiff's BARNEY trademarked character was not inadmissible as "hearsay" because it was only offered to prove that the children and newspaper reporters expressed their belief that the costume depicted BARNEY. Court pointed to both Fed. R. Evid. 801(c) and 803(1).)

**Fifth Circuit**
Armco, Inc. v. Armco Burglar Alarm Co., Inc., 693 F.2d 1155, n.10, 217 U.S.P.Q. 145, 35 Fed. R. Serv. 2d 753 (5th Cir. 1982) (testimony of plaintiff's employees that they received phone calls from a person trying to reach defendant held inadmissible; not hearsay because not offered to prove truth of callers' assertions or else admissible under state of mind exception of Fed. R. Evid. 803(3)); Mary Kay, Inc. v. Weber, 601 F. Supp. 2d 839, 847 (N.D. Tex. 2009) (emails sent to plaintiff mistakenly complaining about products sold by defendant fall within the Fed. R. Evid. 803(3) exception to hearsay)

**Sixth Circuit**
CFE Racing Products, Inc. v. BMF Wheels, Inc., 793 F.3d 571, 589, 115 U.S.P.Q.2d 1505, 97 Fed. R. Evid. Serv. 1467 (6th Cir. 2015) (Plaintiff's marketing director's testimony of a conversation with a customer who mistakenly thought a product made by defendant was made by plaintiff was not inadmissible as hearsay. But when defendant offered at trial customer's declaration that he was not confused in that conversation, it was properly excluded because it was a statement of memory offered for

its truth.); Delta Air Lines, Inc. v. Influence Direct, LLC, 117 U.S.P.Q.2d 1652, 99 Fed. R. Evid. Serv. 646 (M.D. Tenn. 2016) (Consumer complaints made to plaintiff, mistakenly thinking Delta Airlines was sponsoring defendant travel club's promotional program were not inadmissible as hearsay.)

**Seventh Circuit**

Mile High Upholstery Fabric Co. v. General Tire & Rubber Co., 221 U.S.P.Q. 217, 1983 WL 51924 (N.D. Ill. 1983) (testimony of plaintiff's employees as to misdirected telephone calls is not inadmissible as hearsay under the Federal Rules of Evidence, disapproving of contrary cases); International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 6 U.S.P.Q.2d 1977 (7th Cir. 1988)(the weight of authority allows the admission of letters intended for the junior user but misdirected to the senior user; such letters are competent factual evidence of confusion on the part of the authors); American Eagle Outfitters, Inc. v. American Eagle Furniture, Inc., 2013 WL 6839815, *7 (N.D. Ill. 2013) (Statements of store managers documenting customer confusion were not hearsay because not offered to prove the truth of the statements made by the customers.); Weber-Stephen Products LLC v. Sears Holding Corporation, 145 F. Supp. 3d 793, 803 n.7 (N.D. Ill. 2015) (Testimony of consumer that an unidentified salesperson of defendant erroneously told him that the product was made by plaintiff was not inadmissible as hearsay.)

**Eighth Circuit**

A.I.G. Agency, Inc. v. American International Group, Inc., 33 F.4th 1031, 1036 n.1 (8th Cir. 2022) (Admissible were trademark owner's employees' records of phone calls asking for the defendant. "These records are not inadmissible hearsay … because they were not presented to prove the truth of the callers' statements, but to show the callers' states of mind at the time of the calls.")

**Ninth Circuit**

Mustang Motels, Inc. v. Patel, 226 U.S.P.Q. 526, 1985 WL 72659 (C.D. Cal. 1985) (testimony of plaintiff's employees that customers phoned plaintiff asking for information about defendant held not inadmissible as hearsay; the evidence is offered to prove that callers made the assertions, not to prove the truth of their statements); Conversive, Inc. v. Conversagent, Inc., 433 F. Supp. 2d 1079, 79 U.S.P.Q.2d 1284 (C.D. Cal. 2006)(plaintiff's employees' testimony as to what their customers told them is admissible evidence and is not barred by the hearsay rule); Sinhdarella, Inc. v. Vu, 85 U.S.P.Q.2d 2007, 2008 WL 410246 (N.D. Cal. 2008) (Declarations of restaurant plaintiff's employees as to confused patrons are not hearsay because not offered to prove the truth of the statements made by the patrons.); Lahoti v. Vericheck, Inc., 636 F.3d 501, 509, 97 U.S.P.Q.2d 1878 (9th Cir. 2011) (Evidence that senior user's customers phoned to complain they could not find information about the company on the junior user's Web site is admissible under the "state of the mind" exception.); JL Beverage Company, LLC v. Jim Beam Brands Co., 828 F.3d 1098, 1111, 119 U.S.P.Q.2d 1506 (9th Cir. 2016) (Distinguishing *Lahoti* where declarant said he'd received reports from friends and acquaintances that they had mistaken the two products. Here, lower court properly ruled the evidence hearsay and unreliable.)

**Tenth Circuit**

Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1487, 4 U.S.P.Q.2d 1216, 92 A.L.R. Fed. 1 (10th Cir. 1987) (Testimony that the witness was asked by others as to affiliation is admissible to show existing state of mind of those others, but is of little weight as to the confusion issue.)

**Wash.**

Puget Sound Rendering, Inc. v. Puget Sound By-Products, 26 Wash. App. 724, 615 P.2d 504, 213 U.S.P.Q. 84 (Div. 2 1980) (misdirected letters not hearsay)

**Trademark Trial and Appeal Board**—Toys "R" Us, Inc. v. Lamps R Us, 219 U.S.P.Q. 340, 1983 WL 50152 (T.T.A.B. 1983) (while sales clerk's testimony is not excluded as hearsay, the evidence has little weight if there is no evidence to indicate whether "the reason for the question as to affiliation was the result of the similarity of the marks"); National Rural Electric Cooperative Association v. Suzlon Wind Energy Corporation, 78 U.S.P.Q.2d 1881, n.4, 2006 WL 1151404 (T.T.A.B. 2006), aff'd, 214 Fed.

Appx. 987 (Fed. Cir. 2007) (e-mail from person asking if the defendant's mark might be an infringement was not inadmissible under the hearsay rule because it falls under the state of mind exception); Edom Laboratories, Inc. v. Llichter, 102 U.S.P.Q.2d 1546, 1552, 2012 WL 1267961 (T.T.A.B. 2012) (Evidence of misdirected phone calls are admissible under an exception to the hearsay rule. "The statements are not offered for the truth of the statement but rather simply for the fact that they were made.").

5    Fun-Damental Too, Ltd. v. Gemmy Industries Corp., 111 F.3d 993, 42 U.S.P.Q.2d 1348 (2d Cir. 1997) (court pointed to Fed. R. Evid. 803(3), allowing evidence, which was otherwise hearsay, to be admitted to show the declarant's then-existing state of mind).

6    Tools USA & Equip. Co. v. Champ Frame Straightening Equip., 87 F.3d 654, 39 U.S.P.Q.2d 1355 (4th Cir. 1996) (testimony of plaintiff's employees about confused customers' phone calls was relied on to support a finding of actual confusion; the court did not discuss the hearsay evidentiary problem).

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 2

# Condensed Transcript/Concordance

---

## Rockwell Automation v. Parcorp

---

## Deposition of Ryan Smaglik

### December 19, 2022

D'Amico Certified Reporting
908-546-7650
damico.reporting@verizon.net

Ryan Smaglik
12/19/2022

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
DOCKET NO.: 21-1238-CFC
---------------------------------------X
ROCKWELL AUTOMATION, INC.,
    Plaintiffs,
vs.
PARCORP S.R.L., d/b/a
WI AUTOMATION,
    Defendants.
---------------------------------------X

ZOOM DEPOSITION OF RYAN SMAGLIK
MONDAY, DECEMBER 19, 2022
7:11 A.M.
* * HIGHLY CONFIDENTIAL PORTIONS * *

MARIANNE D'AMICO CANDILOROS, CCR, CRR, CLR
D'AMICO CERTIFIED REPORTING, LLC
908.546.7650
damico.reporting@verizon.net
Damicoreporting.com

---

**2**

1
2              12/19/22 - R. Smaglik
3
4
5
6
7         ZOOM Deposition of RYAN SMAGLIK,
8  held REMOTELY via ZOOM, New Jersey,
9  pursuant to Notice, taken before Marianne
10  D'Amico Candiloros, a Certified Court
11  Reporter, a Certified Realtime Reporter
12  and a Notary Public of the States of New
13  Jersey and New York.
14
15
16
17
18
19
20
21
22
23
24
25

---

**3**

1       12/19/22 - R. Smaglik
2    APPEARANCES OF COUNSEL:
3
4
5    ALSTON & BIRD
6    Attorneys for Plaintiff
7      90 Park Avenue
8      New York, New York 10016
9  BY:   PAUL TANCK, ESQ.
10
11    BRACH EICHLER
12    Attorneys for Defendants
13      101 Eisenhower Parkway
14      Roseland, New Jersey 07068
15  BY:  BOBBY KASOLAS, ESQ.
16      ERIC ALVAREZ, ESQ.
17
18    ALSO PRESENT:
19     PORFIRIO PARASCANDOLA LADONEA
20     MIRKO PALUMBO
21
22
23
24
25

---

**4**

1       12/19/22 - R. Smaglik
2          INDEX
3  WITNESS    EXAMINATION BY   PAGE:LINE
4  R. SMAGLIK   MR. KASOLAS    13:08
5        MR. KASOLAS    207:11
6
7
8
9
10  ------------INFORMATION REQUESTS-----------
11  DIRECTIONS NOT TO ANSWER    (NONE)
12  REQUESTS FOR INFORMATION    (NONE)
13  MOTIONS         (NONE)
14  RULINGS         (NONE)
15  HIGHLY CONFIDENTIAL PORTIONS
16   HIGHLY CONFIDENTIAL    29-76
17          139
18  REGARDING RECON    140-252
19          303-346
20
21
22
23
24
25

---

1 (Pages 1 to 4)

Ryan Smaglik
12/19/2022

109

12/19/22 - R. Smaglik
1
2      Q.   Why did you spend another year and a
3    half in Singapore after the two-year program was
4    up on behalf of Rockwell?
5      A.   I moved in to a full time - well, I
6    was always in a full-time role, but I moved in
7    to like what we call an after program, you know,
8    what we consider a permanent placement that just
9    happened to be there.
10     Q.   And what was that new role you were
11   moved in to as part of that permanent placement
12   as a Rockwell employee?
13     A.   As a global product management
14   specialist supporting that same business; it was
15   virtually an extension of that assignment.
16     Q.   What was your scope of
17   responsibility as global product management
18   specialist for that particular product which you
19   called again, a variable --
20     A.   Frequency drive.
21     Q.   -- thank you.
22     A.   It was broadly the same.  So I
23   continued to, you know, conduct project
24   management work, I continued to support the
25   testing of the -- associated with the

110

12/19/22 - R. Smaglik
1
2    development of new product line, and I
3    continued to support the kind of product
4    marketing work that was being done there as
5    well.  It was virtually an expansion upon a --
6    for -- of the work that I was doing previously.
7      Q.   Do all authorized distributors of
8    Rockwell Automation sell variable frequency
9    drives?
10     A.   I -- variable frequency drives are
11   one of our primary product lines, many of our
12   authorized distributors would sell something in
13   the range, but there may be specialty
14   distributors somewhere that don't sell those
15   products.
16     Q.   Did you perform this exact scope of
17   work over that one and a half year period as
18   global project management specialist while you
19   were in Singapore?
20     A.   Sorry, two things, Mr. Kasolas.  It
21   was product management specialist, just to make
22   sure, and not project.
23     Q.   I'm sorry, global product management
24   specialist to be clear for the record, correct?
25     A.   Yes, sorry.  And then I forgot your

111

12/19/22 - R. Smaglik
1
2    question, could you please ask it again.
3      Q.   The question was.  The entire one
4    and a half years after you completed the two-
5    year program at Singapore was that entirely
6    dedicated to -- strike that.
7           How long did you hold the position
8    of global product management specialist for
9    Rockwell?
10     A.   Without my resumé in front of me
11   just about -- it was until about a year and a
12   half, plus or minus, plus, probably plus a few
13   months would be my recollection.
14     Q.   Did you change positions after that
15   approximate one and a half year period lapsed?
16     A.   Yes, I did.
17     Q.   What was the new position you
18   commenced at that point in time?
19     A.   I moved to the United Kingdom.  And
20   I took a role as a project manager in our
21   engineered, one of our engineered product
22   businesses.
23     Q.   And what was -- you said you took on
24   a role as a project manager in an engineered
25   product business, what business was that?

112

12/19/22 - R. Smaglik
1
2      A.   This was a business similar to the
3    one -- well, including the one that I had in one
4    of my leadership development program rotation.
5    So this was within our power control business,
6    and the business produced our low voltage motor
7    control centers as well as our medium voltage
8    variable frequency drives.
9      Q.   And could you describe for me what
10   your scope of work was as a project manager for
11   the engineered product business considering
12   these voltage motor control products?
13     A.   This was a customer facing project,
14   customer facing role.  So customers who
15   purchased these, and again, these would be
16   complex, engineered to order products.  So
17   customers who ordered these products, I would
18   work with them to ensure that their requirements
19   were met and that Rockwell's contractual
20   deliverables were delivered.
21     Q.   These products we're talking about
22   are not products that are sold by authorized
23   distributors, correct?
24     A.   They can be signed by an authorized
25   distributor, but they are built to order.

28 (Pages 109 to 112)

Ryan Smaglik
12/19/2022

113

12/19/22 - R. Smaglik
1
2    Q.   So how did the customer place the
3    order in order for these types of products to be
4    manufactured per order?
5    A.   It could be placed on the
6    distributor.  It could be placed on Rockwell.
7    It depends on who -- it depends on the
8    customer's normal route of business.  If the
9    customer is working with a distributor, they
10   would place the order with the distributor.
11   Q.   Can such a custom order be placed
12   with anyone other than Rockwell itself or
13   Rockwell authorized distributor?
14   A.   Could you rephrase that for me, Mr.
15   Kasolas?  I'm sorry.
16   Q.   These complex engineered products
17   that are made to order, can they be ordered by
18   anyone in any fashion other than through
19   Rockwell itself or a Rockwell authorized
20   distributor?
21   A.   To my -- no.
22   Q.   Would an authorized distributor
23   place an order for this type of a product unless
24   one of their own buyers had requested it?
25   MR. TANCK:  Objection to form.

114

12/19/22 - R. Smaglik
1
2    BY MR. KASOLAS:
3    A.   There are -- there are -- it's quite
4    complex.  If you given me a moment, I'll try to
5    find the best way to explain this.
6    Q.   Sure.
7    A.   So within this product business, we
8    do have -- there are multiple product lines; for
9    example, one of our product lines is slightly
10   more standardized, still built to order, but in
11   that situation, the distributor may order, you
12   know, certain sub assemblies of this device as
13   they would then sell to customers who might need
14   it on a rapid basis.
15   But what I was working on was a
16   product line that was primarily, entirely highly
17   custom, highly, you know, built to order, and,
18   generally, there would be a customer demand
19   before an order would be placed.
20   Q.   And who was the customer in that
21   circumstance that was highly complex engineered
22   products we're talking about?
23   A.   I have many, many customers.
24   Q.   Who are they?
25   A.   I've got to go back to memory here.

115

12/19/22 - R. Smaglik
1
2    Q.   Who is Rockwell's customer in its
3    highly engineered made-to-order products.
4    A.   One of the largest customers that I
5    worked with, the largest project that I worked
6    with were Thames Water, which is the water
7    utility here in London.
8    Q.   And they would buy that product
9    directly from Rockwell, correct?
10   A.   In this case, they purchased --
11   equipment was delivered, and this is a major,
12   major civil works and publicly funded project.
13   In this case, it was overseen by a consortium
14   engineering procurement company that purchased
15   the products from Rockwell to deliver to this
16   end user; the end user was Thames Water.
17   Q.   Who authorized distributor would've
18   been involved in that project, correct?
19   A.   From my memory I believe this was a
20   direct sale between Rockwell and the NPC.
21   Q.   And who else are customers of these
22   highly custom complex engineered products made
23   to order?
24   A.   I'm forgetting the names, but I can
25   just say in general, I worked with system

116

12/19/22 - R. Smaglik
1
2    integrators who were delivering projects to
3    power plants.  These would be major power plants
4    here in the U.K.  I worked with -- I had some
5    involvement in defense related customers here.
6    I will spare the name if it's okay as well.
7    MR. TANCK:  Bob, we've been going
8    another hour.  When you're done with these
9    questions, can we take a break?
10   MR. KASOLAS:  Yes, I'm almost done
11   with this line.  We can take a break, let
12   me finish up this here with this thought.
13   BY MR. KASOLAS:
14   Q.   What is a systems integrator?
15   A.   A systems integrator is a company
16   that will basically deliver some type of a
17   complex system.  Design, generally, they design,
18   generally they design; i.e. engineer, you know,
19   program, install, a some type of an overall
20   solution for a customer that would contain, you
21   know, our products as well as other people's
22   products as well as mechanical equipment, you
23   know.  Many customers don't have their own
24   design engineering, you know, teams.  So they
25   will go to a systems integrator to bring in that

29 (Pages 113 to 116)

Ryan Smaglik
12/19/2022

345

```
1          12/19/22 - R. Smaglik
2          MR. TANCK:  Are you going tomorrow
3   regardless?
4          MR. KASOLAS:  Yes, sir.
5          MR. TANCK:  So then let's just stop
6   here.
7          MR. KASOLAS:  Okay.
8          What time would you like to start
9   tomorrow?
10         THE VIDEOGRAPHER:  Let me end it
11  here, this concludes the deposition, the
12  time is 4 clock.
13         (Whereupon, at 4 o'clock p.m., the
14  deposition was adjourned.)
15
16
17
18  _____
19         MARIANNE D'AMICO CANDILOROS, CCR
20
21  Subscribed and sworn before me
22  this _____ day of _____, 2023.
23  _____
24
25
```

346

```
1          12/19/22 - R. Smaglik
2          C E R T I F I C A T E
3
4
5          I, MARIANNE D'AMICO, a Certified Court
6   Reporter, License No. XI01998, and Notary
7   Public, License No. 2013600, within and for the
8   States of New Jersey and New York, do hereby
9   certify:
10         That RYAN SMAGLIK, the witness whose
11  deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
13  record of the testimony given by the witness.
14         I further certify that I am not related
15  to any of the parties to this action by blood or
16  marriage, and that I am in no way interested in
17  the outcome of this matter.
18
19         ** The foregoing certification of
    this transcript does not apply to any
20  reproduction of the same by any means unless
    under the direct control and/or supervision of
    the certifying reporter. **
21
22
23  _____
    MARIANNE D'AMICO, CCR, CRR
    CCR NO. XI10998
24
25
```

87 (Pages 345 to 346)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 21-1238-GBW-JLH |
| ) | |
| PARCOP S.R.L. d/b/a ) | |
| WIAUTOMATION, ) | |
| ) | |
| Defendant. ) | |

## EXHIBIT 15E: DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION IN LIMINE NO. 2 TO PRECLUDE ROCKWELL FROM INTRODUCING HEARSAY THROUGH A FACT WITNESS'S TRIAL TESTIMONY

Dated:  June 30, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

These statements are inadmissible under FRE 803(3) because they were not made "contemporaneously" with customers' confusion. *Knit With v. Kniting Fever, Inc.*, 742 F.Supp.2d 568, 585 (E.D.Pa. 2010). FRE 803(3) does not apply to "confusion" testimony in trademark cases where "time passed from the moment of alleged confusion." *Idaho Golf Partners, Inc. v. Timberstone Mgmt., LLC.*, 2016 WL 4974944, at * 2 (D. Idaho Sept. 16, 2016). Testimony that representatives received calls from customers whose statements suggested they were confused ("Situation 1") is distinguishable from testimony where customers "report[ed], after the fact, that they had mistaken two products" ("Situation 2"). *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1111 (9th Cir. 2016). Situation 2 is inadmissible under FRE 803(3) because customers "had time to reflect and possibly fabricate or misrepresent [their] thoughts." *Knit With*, 742 F.Supp.2d at 585.

Smaglik's testimony regarding customers' statements is analogous with Situation 2. Rockwell sells directly to customers in "very limited" circumstances. (Ex. B, 433:10-15.) All other sales are through Rockwell's Authorized Distributors. (D.I. 146 ¶6.) Any contemporaneous customers' statements indicating confusion would thus be made to Authorized Distributors, not Rockwell's Global Director of Revenue and Brand Protection. (D.I. 147 ¶1.) Any statement made to Smaglik would, at best, be an after-the-fact report of consumer confusion.

1

Rockwell's cited cases are irrelevant since they involve Situation 1. *See, e.g.,*

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 719-20 (3d Cir. 2004) (doctor says

"We have plenty of Advicor" but points to Altocor).

Dated:  June 30, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies Defendant's Reply Brief in Support of Its Motion in Limine No. 2 to Preclude Rockwell from Introducing Hearsay through a Fact Witness's Trial Testimony is in Times New Roman 14-point font and contains 250 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.

Dated: June 30, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

1

# Exhibit B

# Condensed Transcript/Concordance

---

## Rockwell Automation v. Parcorp

---

## Deposition of Ryan Smaglik

### December 20, 2022

D'Amico Certified Reporting
908-546-7650
damico.reporting@verizon.net

Ryan Smaglik
12/20/2022

347

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
DOCKET NO.: 21-1238-CFC
--------------------------------------X
ROCKWELL AUTOMATION, INC.,
      Plaintiffs,
vs.
PARCORP S.R.L., d/b/a
WI AUTOMATION,
      Defendants.
--------------------------------------X

CONTINUED ZOOM DEPOSITION OF RYAN SMAGLIK
TUESDAY, DECEMBER 20, 2022
8:02 A.M.
* * HIGHLY CONFIDENTIAL PORTIONS * *

MARIANNE D'AMICO CANDILOROS, CCR, CRR, CLR
D'AMICO CERTIFIED REPORTING, LLC
908.546.7650
damico.reporting@verizon.net
damicoreporting.com

349

```
 1        12/20/22 - R. Smaglik
 2      APPEARANCES OF COUNSEL:
 3
 4     ALSTON & BIRD
 5     Attorneys for Plaintiff Rockwell
 6     Automation
 7        90 Park Avenue
 8        New York, New York 10016-1387
 9     BY:   PAUL TANCK, ESQ.
10
11
12     BRACH EICHLER
13     Attorneys for Defendant Wi Automation
14        101 Eisenhower Parkway
15        Roseland, New Jersey 07068
16     BY:   BOBBY KASOLAS ESQ.
17           ERIC ALVAREZ, ESQ.
18
19   ALSO PRESENT:
20     PORFIRIO PARASCANDOLA LADONEA
21     MIRKO PALUMBO
22
23
24
25
```

348

```
 1            12/20/22 - R. Smaglik
 2
 3
 4
 5
 6        Continued Zoom Deposition of RYAN
 7     SMAGLIK, held REMOTELY via ZOOM,  New
 8     Jersey, pursuant to Notice, taken before
 9     Marianne D'Amico Candiloros, a Certified
10     Court Reporter, a Certified Realtime
11     Reporter and a Notary Public of the States
12     of New Jersey and New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

350

```
 1        12/20/22 - R. Smaglik
 2             INDEX
 3   WITNESS      EXAMINATION BY     PAGE:LINE
 4   R. SMAGLIK    MR. KASOLAS    352:11
 5         MR. KASOLAS    520:11
 6         MR. TANCK     567:12
 7
 8
 9
10   -----------INFORMATION REQUESTS-----------
11   DIRECTIONS NOT TO ANSWER        (NONE)
12   REQUESTS FOR INFORMATION        (NONE)
13   MOTIONS            (NONE)
14   RULINGS           (NONE)
15   CONFIDENTIAL PORTIONS        353-365
16             405-415
17             448-457
18             493-548
19             551
20
21
22
23
24
25
```

1 (Pages 347 to 350)

Ryan Smaglik
12/20/2022

351

```
 1              12/20/22 - R. Smaglik
 2            PLAINTIFF'S EXHIBITS
 3    SMAGLIK        DESCRIPTION        PAGE
 4    50   United States Securities &
 5         Exchange Commission Form 10-K
 6         Rockwell Automation, For
 7         Year 2022              569
 8    51   United States Securities &
 9         Exchange Commission Rockwell
10         Automation Form 10-K for Year
11         Ending September 31, 2019       571
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

353

```
 1              12/20/22 - R. Smaglik
 2    we can begin.
 3
 4    R Y A N   S M A G L I K,
 5         Resumed the stand and testified further as
 6         follows:
 7              (WHEREUPON, THE FOLLOWING TESTIMONY
 8         REMAINS IN THE HIGHLY CONFIDENTIAL PORTION
 9         AS RESUMED FROM 12/19/22.)
10
11    EXAMINATION - CONTINUED
12    BY MR. KASOLAS:
13         Q.   Good morning or good afternoon in
14    the U.K., Mr. Smaglik.
15         A.   Good morning, Mr. Kasolas.
16         Q.   Yesterday we left off talking about
17    a spreadsheet that had been created by your team
18    from the POS data collected from your authorized
19    distributors, correct?
20         A.   The spreadsheet was not created by
21    my team, but I believe I understand the
22    spreadsheet you're referring to.
23         Q.   Who created the spreadsheet?
24         A.   It was -- we have a have a central
25    team in our -- partner data team that generates
```

352

```
 1              12/20/22 - R. Smaglik
 2            PROCEEDINGS, 8:02 A.M.
 3
 4         THE VIDEOGRAPHER:  My name the
 5    Daniel Buckley from D'Amico Certified
 6    Reporting, P.O. Box 380, Berkeley Heights,
 7    New Jersey, 07922.  The court reporter is
 8    Marianne Candiloros from D'Amico Certified
 9    Reporting.  Today's date is December 20th,
10    2022, the time is 8:05.  We are conducting
11    the deposition via Zoom.
12         We are here to record the deposition
13    of Ryan Smaglik.  The caption the case is
14    Rockwell Automation versus ParCorp.
15         Will each of the attorneys identify
16    themselves and state their interest in the
17    case.
18         MR. KASOLAS:  Good morning, Bob
19    Kasolas, member of the law firm of Brach
20    Eichler on behalf of ParCorp S.R.L. doing
21    business as Wi Automation.
22         MR. TANCK:  Paul Tanck on behalf of
23    the plaintiff.
24         THE VIDEOGRAPHER:  The court
25    reporter will now swear in the witness and
```

354

```
 1              12/20/22 - R. Smaglik
 2    these reports upon request.
 3         Q.   And the first time you pulled that
 4    POS data was some time in 2020 you testified,
 5    correct?
 6         A.   Correct.
 7         Q.   And you testified there were four
 8    total transactions or one transaction involving
 9    four products, correct?
10         A.   Yes, I'm not sure which off of
11    memory.
12         Q.   Do you know what those four products
13    were?
14         A.   I do not remember.
15         Q.   Does the spreadsheet list the four
16    products that were purchased in 2020 from
17    Technology BSA?
18         A.   Yes, it would've -- it would have
19    the product catalogue IDs and part numbers.
20         Q.   And does your counsel currently have
21    that spreadsheet?
22         A.   I believe it was part of my files
23    that I handed over so I would assume so...
24         Q.   Did you conduct any interviews
25    during your investigation of Wi Automation?
```

2  (Pages 351 to 354)

Ryan Smaglik
12/20/2022

431

```
1              12/20/22 - R. Smaglik
2    question, I would ask you once again
3    to please let him finish.
4              MR. KASOLAS:  I withdraw the
5    question.
6              MR. TANCK:  Also, Bob, don't cut me
7    off when I'm talking.
8              MR. KASOLAS:  I'll withdrew the
9    question.
10             MR. TANCK:  Bob, you're doing it
11   again.
12             MR. KASOLAS:  Paul, I withdrew the
13   question, you're not listening.
14             MR. TANCK:  Bob, you're doing it
15   again --
16             MR. KASOLAS:  It's my deposition
17   Paul, I withdrew the question, stop
18   talking, stop talking, I withdraw the
19   question.
20             MR. TANCK:  The problem with cutting
21   me off is you're making Marianne, the
22   reporter, very hard because she can't
23   transcribe you yelling at me.
24             MR. KASOLAS:  Marianne has been
25   transcribing for 20 years, don't worry
```

432

```
1              12/20/22 - R. Smaglik
2    about Marianne.
3              MR. TANCK:  Bob, Bob.
4              MR. KASOLAS:  Stop interrupting my
5    deposition, Paul.
6              MR. TANCK:  Bob.
7              MR. KASOLAS:  I withdrew the
8    question, stop interrupting me.
9              MR. TANCK:  You keep interrupting
10   me.
11             MR. KASOLAS:  I withdraw the
12   question.
13             MR. TANCK:  I understand.
14             MR. KASOLAS:  Do you understand
15   English?
16             MR. TANCK:  I do understand English.
17             MR. KASOLAS:  I withdrew the
18   question.
19             MR. TANCK:  Bob, you don't need to
20   be rude.
21             MR. KASOLAS:  You are being rude, I
22   withdrew the question.  You're littering
23   my record.  I'm asking a new question.
24             MR. TANCK:  Just please once again
25   let the witness finish his answers before
```

433

```
1              12/20/22 - R. Smaglik
2    you interrupt him, thank you.
3    BY MR. KASOLAS:
4         Q.   Mr. Smaglik, you said that end users
5    sometimes is Rockwell -- strike that.
6              You said sometimes the end user as
7    you called it buys directly from Rockwell,
8    correct?
9         A.   Yes, sometimes.
10        Q.   Does that involve direct sales by
11   Rockwell to the end user?
12        A.   In situations, in certain areas
13   there may be a direct sale -- oh, very limited
14   situations, there would be a direct sale to an
15   end user.
16        Q.   What situations would that be in?
17        A.   I couldn't possibly express all of
18   them.  A simple example would be a very large,
19   you know, equipment that I'm familiar with which
20   is highly customized, very large, custom
21   equipment may involve a direct sale with an end
22   user.
23        Q.   But in a situation where Rockwell is
24   not selling directly to the end user, the end
25   user is not a Rockwell customer, correct?
```

434

```
1              12/20/22 - R. Smaglik
2         A.   We broadly consider the companies
3    that use, you know, genuine Rockwell Automation
4    products purchased from authorized channels to
5    be part of our customer base.
6         Q.   Well, how would an end user know
7    whether or not a machine that they buy from an
8    OEM contains Rockwell products in it?
9         A.   Well, they may be informed by the
10   OEM, the customer may also have specified to the
11   OEM that, hey, we want Rockwell Automation
12   equipment in our product or in our machine.  It
13   depends on the particular circumstance.
14        Q.   You have no way of knowing that as
15   you sit here today, do you?
16             MR. KASOLAS:  Objection to form.
17   BY MR. KASOLAS: .
18        A.   I'm sorry, knowing what?
19        Q.   You have no way of knowing as you
20   sit here today whether or not any end user has
21   any idea of Rockwell products are inside a
22   machine that they buy from a Value Added
23   Reseller, correct?
24             MR. TANCK:  Objection to form.
25   BY MR. KASOLAS:
```

22  (Pages 431 to 434)

EXHIBIT 15F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 21-1238-GBW-JLH |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## EXHIBIT 15F: DEFENDANT'S MOTION IN LIMINE NO. 3
## TO PRECLUDE ROCKWELL FROM INTRODUCING TESTIMONY
## CONCERNING ROCKWELL'S SERIAL NUMBER DATABASE

Dated: June 22, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

WiAutomation moves *in limine* to preclude Rockwell from introducing testimony concerning its serial number database ("Database").  Such testimony is impermissible under Federal Rules of Evidence ("FRE") 1002 and 802.

Rockwell testified that WiAutomation sold a counterfeit product because its serial number did not match the records in Rockwell's Database.  (Ex. A, 237:15-240:10.)  Similarly, Rockwell's interrogatory response claims WiAutomation sold products with a non-existent serial number.  (Ex. B, Rog 14.)  But Rockwell did not produce any information or documents to support these claims.[1]  Rockwell should be barred from relying on unproduced serial number data.  FRE 1002.

FRE 1002 provides that an original writing is required to prove its content. Put differently, FRE 1002 requires the production of a record when the content of the record is at issue.  *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 578-79 (D. Md. 2007).  "For example, proof that someone is married may be made by the testimony of a witness to the ceremony.  The marriage license is not required. However, the rule applies if the only proof of the marriage is by the record itself." *Id.*  Here, Rockwell's only proof for its counterfeiting claim is the Database itself.

---

[1] This information was responsive to WiAutomation's discovery requests.  (*See, e.g.,* Ex. B, Rog 6 seeking documents consulted for rog responses; Rog 7 all documents relating to facts and theories of the case; and Rog 14 all facts supporting counterfeiting.)

Specifically, Rockwell seeks to prove its proprietary Database contains a proprietary record of every product Rockwell ever manufactured.  (Ex. A, 237:15-240:10.)  Rockwell has not identified any person who has witnessed the production of every unit of the product at issue and then entered corresponding production records into the Database.  (Ex. B, Rog 2.)  Thus, the only way to claim the Database contains records of every product that was manufactured is to produce a copy of the data that can be subject to discovery and cross-examination.  *See U.S. v. Rohalla*, 369 F.2d 220, 223-24 (7th Cir. 1966) ("There was no way that defense counsel could by cross-examination . . . challenge the authenticity or accuracy of a book that was not produced in court.").

Rockwell is not simply seeking testimony that a database of common events (*e.g.* customer complaints or phone calls) lacks evidence of a particular common event.   Rather, Rockwell is attempting to use the undisclosed contents of a proprietary Database to prove that a serial number missing from the Database makes a product counterfeit.  Since no data from the Database was produced, testimony concerning Rockwell's serial numbers or the Database must be excluded.  FRE 1002.

Further, the out-of-court entries in Rockwell's proprietary Database are hearsay.  FRE 802.  Rockwell cannot demonstrate that these records meet any exception to the hearsay rules, including the business records exception.

Rockwell cannot qualify the database as a business record without a "qualified witness" to attest that information was entered: regularly, contemporaneously with the production of products, and by someone with appropriate knowledge. *U.S. v. Console*, 13 F.3d 641, 657 (3d Cir 1993). Simply having access to the database does not make a witness "qualified" – "the focus of the business record exception is on the process by which the record is created, not the process by which it is accessed." *U.S. v. Kimble*, 54 F.4th 538, 545 (8th Cir. 2022); *see U.S. v. LeShore,* 543 F.3d 935, 942 (7th. Cir. 2008) (the qualified witness for serial number list was the person hired to "maintain and verify" the list who could "explain[] the procedure for creating the list in detail"). Rockwell has not identified any witness with the requisite knowledge of the database. (Ex. B, Rog 2.)

Moreover, the source of information lacks trustworthiness because the entries at issue were made during the course of this litigation, as they concern a product manufactured in November 2021 (Ex. C), after Rockwell filed its Complaint (D.I. 1). S*ee U.S. v. Casoni*, 950 F.2d 893, 911 (3d Cir. 1991)(document not business record where it was "a tool of controversy, not a routine record of fact."); *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 362 F. Supp. 3d 226, 232 (D. Del. 2019). These indicia of untrustworthiness are amplified by the fact that Rockwell has not produced any data from the Database and Rockwell's 30(b)(6) representative could not recall the correct serial number for the ***one*** product at issue. (Ex. A at 249:6-12.) Given the

3

circumstances, Rockwell cannot testify to untrustworthy information that WiAutomation was not given the opportunity to examine in discovery or challenge at trial.

Dated: June 22, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that Defendant's Motion *in Limine* to Preclude Rockwell from Introducing Testimony Concerning Rockwell's Serial Number Database is in Times New Roman 14-point font and contains 748 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.

Dated: June 22, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>PARCOP S.R.L. d/b/a )<br>WIAUTOMATION, )<br><br>Defendant. ) | C.A. No. 21-1238-GBW-JLH |

## **[PROPOSED] ORDER**

In Wilmington, this __day of _____, 2023, in consideration of Defendant's Motion *in Limine* to Preclude Rockwell from Introducing Testimony Concerning Rockwell's Serial Number Database, and any opposition thereto;

Defendant's Motion is GRANTED.  Rockwell may not admit testimony at trial from any witness regarding Rockwell's database of serial numbers or production records.

_____
The Hon. Gregory B. Williams

# Exhibit A

# Condensed Transcript/Concordance

---

## Rockwell Automation v. Parcorp

---

## Deposition of Ryan Smaglik

### December 19, 2022

D'Amico Certified Reporting
908-546-7650
damico.reporting@verizon.net

Ryan Smaglik
12/19/2022

233

1    12/19/22 - R. Smaglik
2  packaging, the correspondence from Wi
3  Automation, the invoice, you know, everything is
4  associated with the delivery of the items in
5  question.
6        Q.   What did they specifically give you
7  that relates to their purchase of the
8  CompactLogix controller from Wi Automation in
9  March 2022?
10       A.   Again, from my memory, they would've
11  given me -- they would've given me the, you
12  know, invoice showing the purchase between them
13  and Wi Automation.  They would've had -- they
14  would also have had, and I don't recall, they
15  would've also had some dialogue with Wi
16  Automation either via phone or email associated
17  with the purchase.  And then they provided me
18  with -- I think there was also some type of a
19  card or something that was inside the box,
20  photographs of the box itself, which has the
21  tracking slip on it with the tracking number,
22  you know, showing that the product traveled
23  between, you know, Wi Automation and Recon's
24  facility, the carrier which I believe was DHL.
25       Q.   So a card, photos, box, product and

234

1        12/19/22 - R. Smaglik
2  tracking slip, anything else?
3        MR. TANCK:  Objection to form.
4        Mischaracterizes the witness' testimony,
5        you can answer.
6  BY MR. KASOLAS:
7        A.   Not a tracking slip, sorry, it's the
8  label, the label actually applied, adhered to
9  the Wi Automation box shipping label.  That's
10  from my memory.  I would have to go in to the
11  case files to see if there was anything they
12  provided.
13       Q.   What did Recon specifically tell you
14  about the product that Wi Automation ships to
15  them in March 2022?
16       MR. TANCK:  So objection.  I don't
17       want you to reveal any privileged
18       communication, but if there's anything
19       that's not privileged, you can certainly
20       answer.
21       MR. KASOLAS:  Well, there wouldn't
22       be any privileged communication if it's
23       just between Ryan Smaglik and Recon, so
24       I'm not sure what you're referring to,
25       counsel.

235

1        12/19/22 - R. Smaglik
2        MR. TANCK:  Same instruction.
3  BY MR. KASOLAS:
4        A.   Recon -- I mean, I don't -- I can
5  recall no specific information but they, you
6  know, conveyed regarding the products.
7        Q.   What was depicted in the photographs
8  that they forwarded to you, the product from Wi
9  Automation in March 2022?
10       A.   Yes, so one the photo -- from
11  memory, there were photographs of the two
12  software license cassettes, which are a Rockwell
13  Automation branded plastic case that includes
14  the software license details, the activation
15  key, inside of the cassette.  There were photos
16  of both cassettes, and, then there were photos
17  of the outer -- outer box of the CompactLogix
18  controller, photos of the CompactLogix, supposed
19  CompactLogix controller, the inner packaging of
20  the CompactLogix, supposed CompactLogix
21  controller, and photographs of labels on the
22  CompactLogix controller device, supposed
23  CompactLogix controller device.
24       Q.   Anything other than the photographs
25  that Recon provided to you in March of 2020

236

1        12/19/22 - R. Smaglik
2  (sic) concerning the purchase that Recon made
3  from Wi Automation?
4        A.   Not from memory.
5        Q.   What do the photos of the outer box
6  of the Control Logix controller look like?
7        A.   A brown box bearing the
8  Allen-Bradley trademarks with a white label,
9  bearing the Allen-Bradley trademarks, and
10  purported product information printed in black
11  on the label.
12       Q.   Was it, in fact, a Rockwell box from
13  a Rockwell plant that the product arrived in?
14       MR. TANCK:  Objection to form.
15  BY MR. KASOLAS:
16       A.   I don't believe so.
17       Q.   What is that belief based on?
18       A.   The label, and I'm going off from
19  memory here.
20       Q.   I didn't ask you about a box, by the
21  way; I asked you about a label.
22       MR. TANCK:  I can answer the
23       question.
24  BY MR. KASOLAS:
25       A.   I'm trying to answer why I think the

59 (Pages 233 to 236)

Ryan Smaglik
12/19/2022

237

1          12/19/22 - R. Smaglik
2    box is counterfeit.
3          Q.   So the box is Counterfeit, that's
4    your testimony?
5          A.   I believe the box is likely a
6    counterfeit box.
7          Q.   Can you tell me why you think the
8    box that was in the photographs that Recon
9    provided to you March 2022 is somehow not a
10   genuine Rockwell box?
11         A.   What I was trying to say before is
12   because the labels on the product on the inside
13   of the box, the factory -- well, the supposedly
14   factory sealed box are counterfeit.
15         Q.   So the labels that are on the
16   product inside the box, those specific labels
17   are not genuine Rockwell labels?
18         A.   Correct.
19         Q.   And why do you say that?
20         A.   They bear information relating to
21   products that we never produced.
22         Q.   What do you mean it bears
23   information about products that Rockwell never
24   produced?
25         A.   The serial number that the label on

238

1          12/19/22 - R. Smaglik
2    the product inside of the box purported to be
3    was assigned to a different Rockwell Automation
4    product at a different point in time.
5          Q.   What was wrong with the serial
6    number that was on the label inside the box?
7          A.   I'm sorry, can you repeat that
8    question?
9          Q.   What was wrong with the serial
10   number on the label that was inside the box
11   depicted in the photograph that Recon sent to
12   you March 2022?
13         A.   So there's a -- just -- I'm confused
14   because there is a label on the outside of the
15   box and then there's a label attached to the
16   product itself.
17         Q.   I understand, sir.
18              Which label are you referring to
19   that had a serial number that you claim had an
20   issue?
21         A.   The label on the product inside the
22   box.  The outer box may have had the same issue;
23   I can't remember off the top of my head.  But
24   certainly, vividly, the label inside of the --
25   the label that was on the product inside of the

239

1          12/19/22 - R. Smaglik
2    box is a counterfeit label.
3          Q.   What was specifically wrong with the
4    label?
5          A.   Again, the information on it does
6    not match our production records.
7          Q.   What information?
8          A.   There's identity information
9    associated with the product, the serial number
10   of the product, there's secondary identifying
11   information on the product; there were issues
12   with that as well.  It's a multi-check process.
13         Q.   What was wrong with the identity
14   information on the label?
15         A.   It doesn't exist.
16         Q.   What does that mean?
17         A.   It means that if you type if you --
18   so, for example, let's say from memory, if this
19   product was L 306 ER, I think it was L 306 ER,
20   it might be ERM, I can't remember, but if I go
21   into the system and plug in that serial number,
22   the serial number that's reported on the label,
23   I can access our original production records
24   globally.  And I can see if it's a real product,
25   I can see a production record showing that that

240

1          12/19/22 - R. Smaglik
2    serial number was allocated to that particular
3    product.  And, in this case, I can see that that
4    product or that serial number was allocated to a
5    totally different product at a different point
6    in time.
7          Q.   When you say identity information,
8    are you referring to the serial number or
9    something different?
10         A.   Yes, the serial number.
11         Q.   So the identity information and the
12   serial number are the same thing, correct?
13         A.   Yes, it's the identity of the
14   product, unique identity of the product.
15         Q.   You had mentioned something about
16   secondary identification information, what is
17   secondary identification information?
18         A.   On certain products there are other
19   unique identifiers that would be unique to a
20   particular instance of a product.
21         Q.   What was the issue, if any, with the
22   secondary identification information on the
23   label in the photograph inside the box that
24   Recon sent to you in March 2022?
25         A.   I would have to -- I would have to

D'Amico Certified Reporting
908-546-7650

Ryan Smaglik
12/19/2022

241

1         12/19/22 - R. Smaglik
2 **double check on this particular instance, but in**
3 **general, like we often find, is that there are**
4 **usually two issues:  One is that the serial**
5 **number does not -- the serial number, which is**
6 **one of the two unique identifiers, does not**
7 **match the particular product type.  And there's**
8 **a second unique identifier, which is called an**
9 **ASA ID you can think of this as a software,**
10 **software serial number or a communications**
11 **serial number, and that unique identifier**
12 **doesn't match the serial number.  So it's in the**
13 **production system, the serial number should be**
14 **matched to that particular product type**
15 **manufactured on a particular date and the ASA ID**
16 **should also be matched to that serial number.**
17       Q.   You're telling me you don't know
18 whether or not that secondary identifier you
19 call the ASA identifying number had an issue
20 with the product that Recon purchased from Wi
21 Automation in March 2022, correct?
22       **A.   I just can't remember.  I would have**
23 **to pull up the photo and double-check the system**
24 **on that one.  But for sure from vivid memory and**
25 **conclusion, the serial number was never**

242

1         12/19/22 - R. Smaglik
2 **allocated to that particular product.**
3       Q.   Who applies the label with the
4 serial number on a Rockwell product at the time
5 the Rockwell product is manufactured inside the
6 Rockwell plant?
7       **A.   I, again, don't know exactly who**
8 **does that.**
9       Q.   Why don't you know, sir?
10       **A.   I mean, it's a production in play; I**
11 **just don't know who.  We have tens of thousands**
12 **of products and many, many manufacturing**
13 **facilities.**
14       Q.   So you don't know whether or not an
15 employee in a factory that's applying these
16 labels could've made a mistake or not if a label
17 doesn't match up with a product, correct?
18       **A.   In my professional experience in**
19 **purchasing from -- testing test purchases from**
20 **unauthorized suppliers, that is not the cause of**
21 **this issue.**
22       Q.   Can you please answer my question
23 now?
24       **A.   I just did.**
25       Q.   You did not.

243

1         12/19/22 - R. Smaglik
2       MR. KASOLAS:  Madam Court Reporter,
3 could you read back my question for Mr.
4 Smaglik.
5       (Whereupon, the record was read.)
6       MR. TANCK:  Can you read back his
7 answer.
8       MR. KASOLAS:  I don't want the
9 answer read back; I want him to answer the
10 question.
11       MR. TANCK:  I want to hear his
12 answer and he can answer it again.
13       MR. KASOLAS:  You don't need to read
14 the answer back.
15       MR. TANCK:  I would like his answer
16 read back.
17       MR. KASOLAS: It's my deposition; he
18 doesn't get to have the answer read back.
19 I asked him a question --
20       MR. TANCK:  He doesn't get to know
21 what his answer is?
22       MR. KASOLAS:  You can object to
23 form, you can object to privilege and
24 that's it.  Okay?  Let's move on.
25       MR. TANCK:  Madam Court Reporter, or

244

1         12/19/22 - R. Smaglik
2 Ms. Candiloros, would you please read back
3 his answer.
4       MR. KASOLAS:  I'm directing the
5 court reporter not to read his answer
6 back, he doesn't need any help from you.
7       MR. TANCK:  I'm not asking for help.
8 I just want his answer read back.
9       MR. KASOLAS:  You want to read the
10 question (sic) back to him so he can
11 parrot it; I'm not allowing it.
12       MR. TANCK:  Okay, are you
13 instructing the, you are instructing the
14 court reporter to not read back the answer
15 to your question?
16       MR. KASOLAS:  I'm instructing the
17 court reporter not to give an answer to my
18 question is what I'm doing.
19       MR. TANCK:  I'm just asking, when
20 this comes up later in front of The Court,
21 I just want to make it clear, that the
22 you're instructing the court reporter not
23 to read back his answer, is that correct?
24       MR. KASOLAS:  You are in violation
25 of the local rules of Delaware law

61 (Pages 241 to 244)

Ryan Smaglik
12/19/2022

245

1          12/19/22 - R. Smaglik
2    regarding depositions.  There are four
3    cases on point.  I'm not going to keep
4    pushing this issue.  If you keep pushing
5    it, I'm going to make a motion for
6    sanctions.
7          MR. TANCK:  I'm going to just state
8    my objection.  It is clear that counsel
9    for defendant is refusing or instructing
10   the court reporter from reading back an
11   answer to a question that he had read back
12   and I just want to make that clear on the
13   record.
14          You can go ahead with your question,
15   Bob.
16          MR. KASOLAS:  Please read my
17   question back to the witness, Madam Court
18   Reporter.
19          (Whereupon, the record was read.)
20          MR. TANCK:  Same objection.
21   Q.   You can answer, sir.
22          MR. TANCK:  Objection.  Asked and
23   answered.
24   Q.   You can answer.
25          MR. TANCK:  Same objection as

246

1          12/19/22 - R. Smaglik
2    previously.
3          MR. KASOLAS:  That's not a
4    legitimate objection.
5    BY MR. KASOLAS:
6    Q.   You can answer the question, Mr.
7    Smaglik.
8          MR. TANCK:  Same objection.
9    A.   Can I start talking now?
10          MR. TANCK:  Yes, go ahead.
11   A.   So, I'll expound upon my previous
12   answer.  So in my professional experience
13   conducting many investigations and my
14   understanding of the production process, that is
15   not the reason why the label does not match.  We
16   also have quality processes in place, you know,
17   to ensure that the correct labels apply to the
18   correct products.  You know, in the times of
19   manufacturing, these types of errors I have
20   never seen such a thing.
21   Q.   You're telling me that Rockwell's
22   absolutely perfect in how it labels its products
23   coming out of every single factory around the
24   world concerning every single product?
25          MR. TANCK:  Objection to form.

247

1          12/19/22 - R. Smaglik
2    BY MR. KASOLAS:
3    A.   I'm not saying we're perfect, but we
4    do have -- we do have significant controls in
5    place to catch these things.
6    Q.   So does Rockwell own all of its
7    production facilities or does it out-source
8    production of certain products to third-party
9    contract manufacturers?
10          MR. TANCK:  Objection to form.
11   Lacks foundation.
12   BY MR. KASOLAS:
13   Q.   You can answer.
14   A.   I said certain product lines may be
15   out-sourced; this product line is not.
16   Q.   How do you know that?
17   A.   I am very familiar with the people
18   who run the business for this product.  I'm
19   familiar with our production facilities and what
20   they produce.  These are Compaq and Control
21   Logix controllers are among the two flagship
22   products, two products that we are probably most
23   famously known for, among others, but certainly
24   them and they are produced in-house.
25   Q.   Where is the Control Logix

248

1          12/19/22 - R. Smaglik
2    controller produced for Rockwell?
3    A.   The Control Logix controller is
4    produced in Singapore -- I'm sorry, Control
5    Logix controller is produced in Cleveland.
6    Q.   Anywhere else in the world besides
7    Cleveland?
8    A.   There may be some production in
9    Mequon.
10   Q.   Where is Mequon?
11   A.   In Cleveland, Ohio, and then Mequon,
12   Wisconsin, which is not far from Milwaukee,
13   Wisconsin.
14   Q.   And are those two plants Rockwell
15   owned plants?
16   A.   Yes.
17   Q.   Now, the serial number issue raised,
18   what was actually wrong with the serial number
19   besides the fact that it doesn't show up in your
20   computer systems?
21   A.   I don't recall no other differences
22   in the label from memory.  I would have to go
23   back and look at it.
24   Q.   Did the serial number sequence match
25   a certain Rockwell number at any point?

62 (Pages 245 to 248)

Ryan Smaglik
12/19/2022

249

1          12/19/22 - R. Smaglik
2       A.   The serial number sequences, numeric
3    sequence that increments by one every time a
4    unique product is produced.  But it's unique
5    across all of our products, if that makes sense.
6       Q.   So what I'm trying to say is the
7    serial number that's on this product that was
8    purchased in March of 2022 by Recon, is it very
9    similar to the serial number for that particular
10   product?
11      A.   From memory, I would have to see it
12   again I would have to check.
13      Q.   Is the issue not that the serial
14   number doesn't exist but that some of the digits
15   were removed?
16      A.   Not in this -- not in this -- I'd
17   actually have to -- I actually have to -- there
18   may be an issue -- no.
19          So with regard to the label that was
20   on the device itself, my memory is very clear
21   that there was no, you know, removed digits,
22   sorry for the quotation marks, but I mean
23   removed in terms of the way Bob, and Mr.
24   Kasolas, you know said that to me.  But, from
25   memory I'm not sure if the outer box had any

250

1          12/19/22 - R. Smaglik
2    modification on it.
3       Q.   How about the product itself, did
4    you inspect the product itself inside the box?
5       A.   Officially we looked at the outside
6    of the product; we did not tear it apart or
7    power it on.
8       Q.   Who looked at the outside product?
9       A.   I did.
10      Q.   How?
11      A.   Using the photographs that were
12   provided to me by Recon.
13      Q.   Did you inspect the product
14   in-person?
15      A.   No, I did not.
16      Q.   Why not?
17      A.   Didn't really need to.  From the
18   photographs, I could make the determination that
19   I needed to make.
20      Q.   Why didn't you take the product
21   apart to see if it's a real Rockwell product
22   made in a Rockwell plant?
23      A.   I can already tell that it's not a
24   real Rockwell product because it bears false
25   identity information which we commonly see in

251

1          12/19/22 - R. Smaglik
2    the unauthorized market space; this is not a
3    unique occurrence.
4       Q.   So when do you actually tear a
5    product apart to determine whether or not it's a
6    valid Rockwell product?
7          MR. TANCK:  Objection to form.
8    BY MR. KASOLAS:
9       A.   It's a case-by-case basis.  It
10   depends on what specifically we're trying to
11   learn and it's not done every time.
12      Q.   So this product we're talking about
13   here that Rockwell received from Recon in
14   March 2022, as we sit here today, do you know
15   where the product came from?
16      A.   Yes.  The product -- sorry, could
17   you --
18      Q.   Who made the product that you claim
19   was counterfeit that Recon purchased from Wi
20   Automation in March 2022?
21      A.   I don't know who made it.
22      Q.   Do you know where it was made?
23      A.   I don't know where it was made.
24      Q.   Do you know if it fully integrates
25   with other Rockwell products that it's

252

1          12/19/22 - R. Smaglik
2    compatible with?
3       A.   I'm saying it's not a genuine
4    Rockwell product.
5       Q.   But you never took it apart,
6    correct?
7       A.   Again, our position is that a
8    genuine Rockwell product is a product purchased
9    from Rockwell Automation or an authorized source
10   and, you know, would also be a physically
11   genuine product bearing a, you know, valid
12   product identity and product identification
13   labels that were originally applied by Rockwell
14   Automation.
15      Q.   My definition of a Rockwell product
16   is a product that Rockwell made.  So can you
17   tell me whether or not Rockwell made the product
18   that Recon purchased from Wi Automation in
19   March 2022 that you claim is counterfeit?
20          *(WHEREUPON, THE FOLLOWING TESTIMONY
21   RESUMED IN NON-CONFIDENTIAL PORTION OF THE
22   TESTIMONY.)
23          MR. TANCK:  Objection to form.
24   BY MR. KASOLAS:
25      A.   The label is counterfeit.  So as an

63 (Pages 249 to 252)

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1238-GBW-JLH |
| | ) | |
| PARCORP S.R.L. d/b/a WI AUTOMATION, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## ROCKWELL'S SECOND SUPPLEMENTAL AND AMENDED OBJECTIONS AND RESPONSES TO DEFENDANT WI AUTOMATION'S INTERROGATORIES (NOS. 1-25)

Plaintiff Rockwell Automation, Inc. ("Rockwell" or "Plaintiff"), for its responses and objections to Defendant Parcorp S.R.L. d/b/a WI Automation's ("WI Automation," "WA," or "Defendant") First Set of Interrogatories dated April 5, 2022 (the "Interrogatories"), states as follows:

## GENERAL OBJECTIONS

1.      Rockwell objects to the Interrogatories to the extent they exceed the scope of permitted discovery or attempt to impose obligations that do not exist under the Federal Rules of Civil Procedure or otherwise.

2.      Rockwell objects to the Interrogatories to the extent that the Interrogatories, including all discrete subparts, exceed the 25 interrogatory limit established by the Federal Rules and the Scheduling Order in this case.

3.      Rockwell objects to the Interrogatories to the extent that they seek information or documents that are protected by the attorney-client privilege, the work-product doctrine, the

1

joint-defense privilege, or documents prepared in anticipation of litigation; documents that constitute or disclose the mental impressions, conclusions, opinions or legal theories of any attorney of Rockwell concerning this or any other litigation; or documents that are protected by any other applicable privilege or doctrine. Any production, inadvertent or otherwise, of any information protected from disclosure by virtue of any applicable privilege, doctrine, or other protections shall not be deemed or construed to constitute a waiver of any rights or privileges or other protection, and shall not prejudice the right of Rockwell to object to any subsequent use of such information. Rockwell reserves the right to demand the return of any such information or document, and any copies thereof, and the destruction of any materials that contain information derived from any such document.

4.    Rockwell objects to the Interrogatories to the extent that they call for information that may or could be obtained from publicly available sources or other sources to which Defendant has equal access.

5.    Rockwell objects to the Interrogatories to the extent that they seek information already in Defendant's possession, custody or control.

6.    Rockwell objects to the Interrogatories to the extent that they are vague, ambiguous, duplicative, unduly burdensome, overbroad, or outside the scope of permissible discovery.

7.    Rockwell objects to the Interrogatories to the extent that they seek information that is not relevant to any party's claim or defense or is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the

discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

8.      Rockwell objects to the Interrogatories to the extent that they are not limited to a reasonable time frame.

9.      Rockwell objects to, and will not be bound by, the Definitions and Instructions listed in the Interrogatories to the extent that they purport to impose vague, ambiguous, overly broad, unduly burdensome or oppressive demands beyond those imposed by the Federal Rules of Civil Procedure, Local Rules or otherwise.

10.     Rockwell objects to the definition of the terms "Rockwell," "Plaintiff," "you," and "your" set forth in the Definitions on the grounds that the definition is vague, indefinite, ambiguous, unduly broad, burdensome, and attempts to place a burden on Rockwell that is inconsistent with the Federal Rules of Civil Procedure and/or the Local Rules of this Court.

11.     Rockwell objects to the definition of the terms "WiAutomation" and "Defendant" to the extent that it includes "all persons who are authorized to act for or on its behalf" on the grounds that the definition is vague, indefinite, ambiguous, unduly broad and burdensome because Defendant has not positively identified any individuals "who are authorized to act for or on its behalf" for the purposes of this definition.

12.     Rockwell objects to the definition of the term "Complaint" the grounds that the definition is vague, indefinite and ambiguous, as no person or entity named "Chin" filed a complaint in this case.

13.     Rockwell objects to the definition of "state all facts" on the grounds that the definition is vague, indefinite, ambiguous, unduly broad, burdensome, not proportional to the needs of the case, results in the interrogatories being comprised of multiple distinct sub-parts

beyond the permissible number of interrogatories under the Federal Rules and the Scheduling Order in this case, and attempts to place a burden on Rockwell that is inconsistent with the Federal Rules of Civil Procedure and/or the Local Rules of this Court.

14.     Rockwell objects to the definition of "relating, concern, reflect, or refer to" and "relating, concerning, reflecting or referring to" as overbroad and overburdensome because it renders the term susceptible to being construed or applied with excessive and nearly limitless breadth. For example, through the definition, Defendant seeks information that "has any logical or factual connection with" any specified subject in any fashion whatsoever. Under such an expansive definition, a request for all documents relating to a contract would encompass the receipt for the pen that signed it. To avoid such overbreadth and unnecessary burden, Rockwell will interpret "relate to" and its variants to mean embodies, constitutes, comprises and consists.

15.     Rockwell objects to the defined term, "identify" (Definition Nos. 11-14) to the extent that the definitions result in the interrogatories being comprised of multiple distinct sub-parts beyond the permissible number of interrogatories under the Federal Rules and the Scheduling Order in this case and attempts to place a burden on Rockwell that is inconsistent with the Federal Rules of Civil Procedure and/or the Local Rules of this Court.

16.     The specific responses set forth below are based on information now available to Rockwell, and Rockwell reserves the right to revise, correct, add to, or clarify the objections or responses set forth herein at any time.

17.     Rockwell's responses to the Interrogatories shall not be deemed to constitute admissions as to any particular fact contained in the Interrogatories, that any statement or characterization in the Interrogatories is accurate or complete, or that any particular document exists, is discoverable, or is admissible into evidence.  No incidental or implied admissions are

intended by these answers. The fact that Rockwell has answered or objected to and/or not answered any Interrogatory should not be taken as an admission that Rockwell admits the existence of any facts set forth or assumed by such Interrogatory. That Rockwell has answered part or all of any Interrogatory is not intended to be, and shall not be construed to be, a waiver by Rockwell of any part of any objection to any Interrogatory.

18.    The General Objections set forth above are incorporated in each response set forth below, and shall be deemed to be continuing even though not specifically referred to in each response to each specific request. Inclusion of one or more of the General Objections in a specific objection to any given interrogatory does not constitute a waiver of the remainder of the objections for that interrogatory.

## SPECIFIC RESPONSES AND OBJECTIONS

**INTERROGATORY NO. 1:**

Identify each and every person who prepared or assisted in the preparation of the answers to these interrogatories, each and every person who provided information for the answers to these interrogatories, whether or not the information was finally used, and the specific interrogatories for which each such person provided information.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to this Interrogatory to the extent it seeks information and documents protected by the attorney-client privilege and/or work product doctrine.  Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "each and every person" be identified.  Rockwell objects to this Interrogatory to the extent it is duplicative of Interrogatory No. 2.

Subject to and without waiting its objections, Rockwell states that John Miller, Ryan Smaglik and its outside counsel prepared and assisted in the preparation of these interrogatory responses.

**INTERROGATORY NO. 2:**

Identify each and every person, including names, addresses and telephone numbers, having knowledge of any allegation of the Complaint or Answer and state separately for each person identified the allegations of the Complaint or Answer, by paragraph number, of which he or she has knowledge.

**RESPONSE:**

The General Objections are incorporated herein. Rockwell objects to this Interrogatory to the extent it seeks information and documents protected by the attorney-client privilege and/or work product doctrine. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "each and every person" with knowledge be identified. Rockwell objects to this Interrogatory to the extent it is duplicative of Interrogatory No. 1.

Subject to and without waiving its objections, Rockwell responds by listing some individuals below affiliated with Rockwell who may possess discoverable knowledge or information concerning the factual allegations made in the Complaint and the subject(s) of that information:

| Name/Address/Telephone | Subjects of Information |
|---|---|
| Ryan Smaglik<br>Rockwell<br>Automation, Inc.<br>c/o Plaintiff's Counsel<br>Alston & Bird LLP<br>90 Park Avenue<br>New York, NY 10016<br>(212)210-9400 | Ryan Smaglik likely has discoverable information about (a) Rockwell's pricing and sale of Rockwell Products (b) Rockwell's distributor agreements and the incorporated distributor policies; (c) the adverse impact on Rockwell and Rockwell's authorized distributors relating to the unauthorized sale of Rockwell Products; (d) gray market sales; (e) Rockwell's warranty and remanufacturing process; (f) material differences; (g) customer complaints; (h) Rockwell customers (i.e. OEM, System integrators, etc.) |
| Warren Devilbiss<br>Rockwell Automation, Inc. c/o Plaintiff's Counsel<br>Alston & Bird LLP<br>90 Park Avenue<br>New York, NY 10016<br>(212)210-9400 | Warren Devilbiss likely has discoverable information about Rockwell products and Rockwell's product safety and cybersecurity procedures and warranty and remanufacturing processes. |
| Justin Orofino<br>Rockwell Automation, Inc. c/o Plaintiff's Counsel<br>Alston & Bird LLP<br>90 Park Avenue<br>New York, NY 10016<br>(212)210-9400 | Justin Orofino likely has discoverable information about Rockwell products, including financial, sales, pricing information. |

| Current and former WA employees | One or more WA witnesses likely has discoverable information about (a) WA advertising, marketing, sales (including sales, revenues, customer lists, and other financial information), and offers to sell Rockwell Products; (b) WA's purchasing and acquisition of Rockwell Products, including the sources from whom WA obtains Rockwell Products and the prices paid by WA for such Rockwell Products; (c) WA's website, including the content of the website, modifications to the website, and communications posted or received on or via the website; (d) customer complaints, product returns, and warranty claims received by WA concerning Rockwell Products; (e) any warranty services provided or not provided by WA; (f) representations made by WA concerning the nature of Rockwell products, the steps taken to ensure the accuracy of such representations, and WA's awareness and knowledge of whether such representations were true; (g) any quality checks, tests or inspections conducted by WA on Rockwell Products offered for sale by WA; and (h) WA's organizational structure and the corporate relationship between and among WA and other related business entities. |
| --- | --- |
| Suppliers of WA | Suppliers of WA likely have discoverable information about (a) sourcing Rockwell products; (b) pricing of Rockwell products; (c) contractual limitations on Rockwell products; and (d) quality of Rockwell products. |

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 3:**

With respect to the allegations of damages set forth in the Complaint:

a.      describe the nature of each component of such damages and the dollar amount of each component of such damages you claim to have suffered;

b.      identify any documents which refer or relate to your claim of damages; and

c.      set forth any calculations employed by you to arrive at your damage figure and any component thereof, including any alternative calculations.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell further objects to the Interrogatory because it includes multiple discrete subparts, the sum of which, together with all other interrogatories and subparts, exceeds the 25 interrogatory limit established by the Federal Rules and the Scheduling Order in this case.  Rockwell objects to this Interrogatory to the extent it seeks information and documents protected by the attorney-client privilege and/or work product doctrine. Rockwell objects to this Interrogatory as vague and ambiguous as to the scope of the Interrogatory. Rockwell objects to this Interrogatory as vague and ambiguous, overbroad, unduly burdensome, and oppressive as to its request for the "nature of each component" and "dollar amount of each component." Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports. Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain purchase, sale and financial information related to the information sought by this interrogatory, but has not yet complied.  Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state of its

knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

Subject to and without waiving its objections, Rockwell states that, as a result of Defendant's conduct, Plaintiff has suffered damages, including but not limited to in the form of lost customers, lost sales, lost profits, and price erosion. In addition, Plaintiff has suffered from lost goodwill, and Rockwell's reputation with both its customers and its authorized distributors has been damaged. Furthermore, because of Defendant's conduct, Rockwell's leadership reputation has suffered in the market for Rockwell products. Rockwell has no adequate remedy at law for the continuing harm caused by Defendant, and thus, Rockwell is entitled to injunctive relief. Rockwell is entitled to an award of damages, treble damages, punitive damages, Defendant's profits, attorneys' fees, pre-judgment and post-judgment interest, and such other relief as the Court deems just and equitable.  For example, Rockwell seeks all profits received by WI Automation from the sales and revenues of any kind made as a result of WI Automation's sales of Unauthorized Rockwell Products.  These profits are not limited to profits from only the direct sales of Unauthorized Rockwell Products, but also from its sales of Rockwell products other than those alleged to be "new," sales of non-Rockwell products, repair services, and all other revenue attributable to or in any way resulting from its sale of allegedly "new" Rockwell products.

Rockwell further states, pursuant to Fed R. Civ. P. 33(d), that an answer may be derived from Defendant's purchase, sale revenue and costs records, Defendant's financial reports; Defendant's interrogatory responses regarding its purchases, sales, revenue and costs, information contained in the parties' financial reporting software, as well as from the following

10

documents:  ROCK-00007799-819;  ROCK-00008386-409;  ROCK-00009772-802;  ROCK-00011817-866; ROCK-00011894-967; ROCK-00011972-2252; and ROCK-00012410-987.

Rockwell further states that it may make available or produce further relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.


**INTERROGATORY NO. 4:**

Identify each person you anticipate, expect or intend to call as a witness at trial, and with respect to each such person:

a.      describe in detail the person's knowledge of the facts, theories and/or allegations concerning the matters asserted in the Complaint; and

b.      identify the subject matter on which he is expected to testify.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome.  Rockwell objects to this Interrogatory to the extent it seeks information and documents protected by the attorney-client privilege and/or work product doctrine, particularly as it explicitly requests disclosure of Rockwell's trial strategy.  Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell further

objects to the Interrogatory to the extent it is duplicative of Rockwell's disclosure requirements under the Federal Rules, Local Rules, and the Scheduling Order in this case.  Rockwell further objects to this interrogatory as premature in that trial is not currently scheduled to begin for more than fourteen months and Rockwell's anticipations, expectations and intentions as to the witnesses it may call to testify is not yet fully formed.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports.

Subject to and without waiving its objections, Rockwell states that it will disclose the information required in its pretrial and expert disclosures in accordance with the deadlines for doing so established by the Federal Rules, Local Rules, and the Scheduling Order in this case. Rockwell further responds by listing some individuals below affiliated with Rockwell who may possess discoverable knowledge or information concerning the factual allegations made in the Complaint and the subject(s) of that information:

| Name/Address/Telephone | Subjects of Information |
|---|---|
| Ryan Smaglik<br>Rockwell<br>Automation, Inc.<br>c/o Plaintiff's Counsel<br>Alston & Bird LLP<br>90 Park Avenue<br>New York, NY 10016<br>(212)210-9400 | Ryan Smaglik likely has discoverable information about (a) Rockwell's pricing and sale of Rockwell Products (b) Rockwell's distributor agreements and the incorporated distributor policies; (c) the adverse impact on Rockwell and Rockwell's authorized distributors relating to the unauthorized sale of Rockwell Products; (d) gray market sales; (e) Rockwell's warranty and remanufacturing process; (f) material differences; (g) customer complaints; (h) Rockwell customers (i.e. OEM, System integrators, etc.) |
| Warren Devilbiss<br>Rockwell Automation, Inc. c/o Plaintiff's Counsel<br>Alston & Bird LLP<br>90 Park Avenue<br>New York, NY 10016<br>(212)210-9400 | Warren Devilbiss likely has discoverable information about Rockwell products and Rockwell's product safety and cybersecurity procedures and warranty and remanufacturing processes. |
| Justin Orofino<br>Rockwell Automation, Inc. c/o Plaintiff's Counsel<br>Alston & Bird LLP<br>90 Park Avenue<br>New York, NY 10016<br>(212)210-9400 | Justin Orofino likely has discoverable information about Rockwell products, including financial, sales, pricing information. |

| Current and former WA employees | One or more WA witnesses likely has discoverable information about (a) WA advertising, marketing, sales (including sales, revenues, customer lists, and other financial information), and offers to sell Rockwell Products; (b) WA's purchasing and acquisition of Rockwell Products, including the sources from whom WA obtains Rockwell Products and the prices paid by WA for such Rockwell Products; (c) WA's website, including the content of the website, modifications to the website, and communications posted or received on or via the website; (d) customer complaints, product returns, and warranty claims received by WA concerning Rockwell Products; (e) any warranty services provided or not provided by WA; (f) representations made by WA concerning the nature of Rockwell products, the steps taken to ensure the accuracy of such representations, and WA's awareness and knowledge of whether such representations were true; (g) any quality checks, tests or inspections conducted by WA on Rockwell Products offered for sale by WA; and (h) WA's organizational structure and the corporate relationship between and among WA and other related business entities. |
|---|---|
| Suppliers of WA | Suppliers of WA likely have discoverable information about (a) sourcing Rockwell products; (b) pricing of Rockwell products; (c) contractual limitations on Rockwell products; and (d) quality of Rockwell products. |

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 5:**

Identify each person that you intend to call to testify as an expert witness at trial and with respect to each such person:

a. summarize his or her qualifications within the field in which he or she is expected to testify;

b. summarize the substance of the conclusions and opinions as to which each such expert is expected to testify and the bases for each such conclusion and opinion;

14

c.      identify all documents relied upon by each such expert in forming his or her opinion; and

d.      identify any reports or documents prepared by or on behalf of each such expert for this lawsuit.

**RESPONSE:**

The General Objections are incorporated herein.   Rockwell further objects to the Interrogatory because it includes multiple discrete subparts, the sum of which, together with all other interrogatories and subparts, exceeds the 25 interrogatory limit established by the Federal Rules and the Scheduling Order in this case.   Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome.   Rockwell objects to this Interrogatory to the extent it seeks information and documents protected by the attorney-client privilege and/or work product doctrine, particularly as it explicitly requests disclosure of Rockwell's trial strategy.   Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.   Rockwell further objects to the Interrogatory to the extent it is duplicative of Rockwell's disclosure requirements under the Federal Rules, Local Rules, and the Scheduling Order in this case.   Rockwell objects to this Interrogatory to the extent it requests information protected from disclosure by Fed. R. Civ. P. 26.   Rockwell further objects to this interrogatory as premature in that trial is not currently scheduled to begin for more than fourteen months and Rockwell's anticipations, expectations and intentions as to the witnesses it may call to testify is not yet fully formed.   Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports.

Subject to and without waiving its objections, Rockwell states that it will disclose the information required in its pretrial and expert disclosures in accordance with the deadlines for doing so established by the Federal Rules, Local Rules, and the Scheduling Order in this case.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 6:**

Identify all documents consulted during the preparation of the answers to these interrogatories. For each document identified, state by number the interrogatory answer or answers for which such document was consulted.

**RESPONSE:**

The General Objections are incorporated herein. Rockwell further objects to the Interrogatory because it includes multiple discrete subparts, the sum of which, together with all other interrogatories and subparts, exceeds the 25 interrogatory limit established by the Federal Rules and the Scheduling Order in this case. Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell objects to this Interrogatory to the extent it seeks information and documents protected by the attorney-client privilege and/or work product doctrine, particularly as it explicitly requests disclosure of Rockwell's trial strategy. Rockwell further objects to the Interrogatory to the extent it is duplicative of Rockwell's disclosure requirements under the Federal Rules, Local Rules, and the Scheduling Order in this case. Rockwell further objects to this interrogatory as premature in that trial is not currently scheduled to begin for more than fourteen months and Rockwell's anticipations, expectations and intentions as to the witnesses it may call to testify is not yet fully formed.

Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports.

Subject to and without waiving its objections, Rockwell states that the documents that it produced to Defendants and the few documents that Defendants have produced to Rockwell in this case have been reviewed in connection with Defendant's interrogatories.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 7:**

Identify all documents that refer or relate to the facts, theories and/or allegations underlying the claims and/or defenses raised in the Complaint and Answer, including, but not limited to (a) all documents that you intend to use to support your claims, and (b) all documents that you intend to offer as an exhibit at the time of trial.

**RESPONSE:**

The General Objections are incorporated herein. Rockwell further objects to the Interrogatory because it includes multiple discrete subparts, the sum of which, together with all other interrogatories and subparts, exceeds the 25 interrogatory limit established by the Federal Rules and the Scheduling Order in this case. Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. The General Objections are incorporated herein. Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "any" documents be identified. Rockwell objects

to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell objects to this Interrogatory to the extent it seeks information and documents protected by the attorney-client privilege and/or work product doctrine, particularly as it explicitly requests disclosure of Rockwell's trial strategy.  Rockwell further objects to the Interrogatory to the extent it is duplicative of Rockwell's disclosure requirements under the Federal Rules, Local Rules, and the Scheduling Order in this case. Rockwell further objects to this interrogatory as premature in that trial is not currently scheduled to begin for more than fourteen months and Rockwell's anticipations, expectations and intentions as to the documents it may use or offer as exhibits is not yet fully formed.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports.

Subject to and without waiving its objections, Rockwell states that it will disclose the information required in its pretrial and expert disclosures in accordance with the deadlines for doing so established by the Federal Rules, Local Rules, and the Scheduling Order in this case.

Rockwell further states that the documents that it produced to Defendants and the few documents that Defendants have produced to Rockwell in this case are relevant to the facts, theories and/or allegations underlying the claims and/or defenses raised in the Complaint and Answer.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 8:**

Describe in detail any non-privileged statements made by any person who is a party to this lawsuit, which refers or relates to the subject matter of the lawsuit, and provide a copy of any statement.

**RESPONSE:**

The General Objections are incorporated herein. Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "any" statements be described regardless of timeframe and whether they bear any relation to Defendant or the products Defendant sells.

Subject to and without waiving its objections, Rockwell states, pursuant to Fed R. Civ. P. 33(d), that an answer may be derived from the following documents that have been produced to Defendants: ROCK-00000001-092; ROCK00000096-125; ROCK-00011817-866; ROCK-00012391-396; ROCK-00012404-409 and ROCK-00000012490-987.

Rockwell further states that it may make available or produce further relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived relating to Defendant or the particular Accused Products sold by Defendant, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

19

**INTERROGATORY NO. 9:**

Describe in detail any statements made by any person who is not a party to this lawsuit, which refers or relates to the subject matter of the lawsuit and provide a copy of any statement.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "any" statements be described regardless of timeframe and whether they bear any relation to Defendant or the products Defendant sells.

Subject to and without waiving its objections, Rockwell states, pursuant to Fed R. Civ. P. 33(d), that an answer may be derived from the following documents that have been produced to Defendants: ROCK-00011817-866; ROCK-00012391-396; ROCK-00012404-409 and ROCK-00000012490-987.

Rockwell further states that it may make available or produce relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived relating to Defendant or the particular Accused Products sold by Defendant, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 10:**

Describe in detail any admissions and declarations against interest made by any person who is a party to this lawsuit, which refers or relates to the subject matter of the lawsuit, provide a copy of any documents including any admission or declaration against interest.

**RESPONSE:**

The General Objections are incorporated herein. Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "any" statements be described regardless of timeframe and whether they bear any relation to Defendant or the products Defendant sells.

Subject to and without waiving its objections, Rockwell states, pursuant to Fed R. Civ. P. 33(d), that an answer may be derived from correspondence sent by and other statements by Defendant, Fulvio Coppola and Luca Coppola to Defendant's customers and potential customers, Rockwell, Rockwell's Authorized Distributors, and Rockwell's customers and potential customers. Such documents include, without limitation, ROCK-00000140; ROCK-00000228-254; ROCK-00012395-396; ROCK-00012674-675; ROCK-00012895-897; WI002511-17; and WI002615-3086.

Rockwell further states that it may make available or produce further relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived relating to Defendant or the particular Accused Products sold by Defendant, to the extent such information exists. Rockwell

will provide this information in accordance with the Scheduling Order and the relevant Local Rules.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 11:**

Set forth in detail a summary of any and all non-privileged written and oral communications by and between you and any of your agents, employees or other representatives regarding the facts underlying the Complaint and Answer.

**RESPONSE:**

The General Objections are incorporated herein. Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "any" communications be described regardless of timeframe and whether they bear any relation to Defendant or the products Defendant sells.

Subject to and without waiving its objections, Rockwell states, pursuant to Fed R. Civ. P. 33(d), that an answer may be derived from the following documents that have been produced to Defendants: ROCK-00000001-092; ROCK00000096-125; ROCK-00011817-866; ROCK-00012391-396; ROCK-00012404-409 and ROCK-00000012490-987.Rockwell further states that it may make available or produce further relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived relating to Defendant or the particular Accused Products sold by

Defendant, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 12:**

Are you aware of any record or document concerning this action or its subject matter that has been altered or destroyed? If yes, state the nature of the record or document, the nature of the change or alteration, the date of the alteration or destruction, the persons involved with said alteration or destruction and the circumstances surrounding such incident.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in that references "any record or document" regardless of timeframe and whether they bear any relation to Defendant or the products Defendant sells.  Rockwell further objects to this interrogatory as overbroad, unduly burdensome, oppressive and not proportional to the needs of the case to the extent it calls for information relating to each time a relevant and discoverable document has been altered in the normal course of business, for example a company policy that has been updated over time.

Subject to and without waiving its objections, Rockwell states that from time to time, and in the ordinary course of business, it updates its internal and external policies, procedures, contracts and agreements that may be relevant to this case.  In all instances relevant to the timeframe of this case, no version of any such updated document has been destroyed.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 13:**

Identify all Rockwell Authorized Distributors that sell the Rockwell products at issue in this litigation.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, attorney work product doctrine or any other applicable privilege, immunity, or protection. Rockwell also objects to this Interrogatory to the extent it seeks information not relevant to any present claim or defense in this Investigation and is not reasonably calculated to lead to the discovery of admissible evidence. Rockwell further objects to this Interrogatory as overbroad and unduly burdensome. For example, Rockwell objects to the term "Rockwell Authorized Distributors" as undefined and therefore vague and ambiguous and overbroad and not calculated to lead to the discovery of relevant evidence to the extent that the term is intended to reference all time periods and all geographic regions without regard to the facts of this case.  Rockwell objects to this Interrogatory to the extent it seeks proprietary or confidential information relating to non-parties.  Rockwell further objects to this Interrogatory to the extent it seeks information not within Rockwell's possession, custody, or control, or equally available to Defendant.

Subject to and without waiving the foregoing objections, Rockwell states, pursuant to Fed R. Civ. P. 33(d), that an identification of entities to which it sells or authorizes sales of Rockwell Products may be derived from the following documents that have been produced to Defendants: ROCK-00001231-11795 and ROCK-00012410-489.

Rockwell further states that it may make available or produce further relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules. Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds.

**INTERROGATORY NO. 14:**

State all facts supporting your allegation in Paragraph 58 of the Complaint that "on information and belief, WI Automation is shipping customers used and counterfeit products and products obtained from unverified sources to fulfill orders for 'new' Rockwell products."

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, attorney work product doctrine or any other applicable privilege, immunity, or protection. Rockwell also objects to this Interrogatory to the extent it seeks information not relevant to any present claim or defense in this Investigation and is not reasonably calculated to lead to the discovery of admissible evidence. Rockwell further objects to this Interrogatory as overbroad and unduly burdensome. Rockwell objects to this Interrogatory to the extent it seeks proprietary or confidential information relating to non-parties.  Rockwell further objects to this Interrogatory to the extent it seeks information not within Rockwell's possession, custody, or control, or equally available to Defendant.

Subject to without waiving the foregoing objections, Rockwell states that Defendant shipped a product bearing an Asserted Trademark to a customer in the United States in attempted

fulfilment of an order for a "new" product that bore a counterfeit label and was enclosed in a box bearing a counterfeit "Factory Seal" label.  Both of these counterfeit labels contained a serial number that that did not match the type of product that was ordered and that was contained in the box.  Neither label was made or applied by Rockwell, yet both labels bore at least one Asserted Trademark.

Rockwell further states, pursuant to Fed. R. Civ. P. 33(d), that an answer may be derived from the following documents that have been produced to Defendants: ROCK-00000126-138 and ROCK-00000228-256.

Rockwell further states that it may make available or produce further relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules. Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds.

**INTERROGATORY NO. 15:**

State all facts supporting your allegation in Paragraph 61 of the Complaint that "[t]he Unauthorized Rockwell Products sold by WI Automation are all materially different from Genuine Rockwell Products sold by Rockwell and its authorized distributors."

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell further objects to this interrogatory to the extent that it is duplicative of Interrogatory No. 16.  Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof

26

that Rockwell may offer at trial.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports. Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain sourcing, purchase, sale, inventory and financial information related to the information sought by this interrogatory, but has not yet complied.  Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state of its knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

Subject to and without waiving its objections, Rockwell states that the Unauthorized Rockwell Products sold by Defendant as "new" are materially different from Genuine Rockwell Products in a number of different ways that are important to consumers.  For example, buyers of Unauthorized Rockwell Products sold by WI Automation are not entitled to receive a Rockwell Warranty. In contrast, buyers of Genuine Rockwell Products do receive a Rockwell Warranty. In another example, WI Automation does not provide Recall Notices via mail, electronic mail, or other means with respect to the Unauthorized Rockwell Products. In contrast, buyers of Genuine Rockwell Products do receive such notices.   In another example, WI Automation does not provide Product Safety Advisories via mail, electronic mail, or other means with respect to the Unauthorized Rockwell Products. In contrast, buyers of Genuine Rockwell Products do receive such notices.  In another example, WI Automation does not have access to the manufacturing

27

notices and other proprietary technical knowledge regarding Genuine Rockwell Products that are only available to Rockwell and its ADs. Accordingly, WI Automation cannot provide the same level of customer support that Rockwell offers in connection with Genuine Rockwell Products. In another example, many of the Unauthorized Rockwell Products are of different and/or subpar quality, in comparison with Genuine Rockwell Products because the Unauthorized Rockwell Products have been handled, packaged, preserved, shipped, purged (or not purged), and/or stored by WI Automation and/or its sources in a manner that is different from Rockwell's quality control procedures followed in connection with Genuine Rockwell Products.   In another example, buyers of Unauthorized Rockwell Products do not have a license to the software and/or firmware purporting to be Rockwell software and/or firmware that may be loaded on those goods or downloaded from Rockwell, whereas buyers of Genuine Rockwell Products do have a license to the Rockwell software and/or firmware that may be loaded on those authorized products or downloaded from Rockwell.  In another example, some Unauthorized Rockwell Products sold by WI Automation bear counterfeit labels not made or affied by Rockwell and come in boxes with a "Factory Seal" label not made or affied by Rockwell, whereas Genuine Rockwell Products are not counterfeit and do not bear counterfeit labels.   In another example, WI Automation customers experience a difference in lead times between what WI Automation advertises and promises with regard to Unauthorized Rockwell Products and the lead times actually experienced by those customers, whereas customers of Genuine Rockwell Products do not experience such a difference.  Each of these differences is important to the purchasing decisions of consumers.

Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds.

**INTERROGATORY NO. 16:**

Describe in specific detail how the Rockwell products sold by WiAutomation differ from the Rockwell products sold by Rockwell or a Rockwell Authorized Dealer.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell further objects to the Interrogatory as vague and ambiguous for at least the reason that the capitalized term "Rockwell Authorized Dealer" is not defined.  Rockwell further objects to this interrogatory to the extent that it is duplicative of Interrogatory No. 15.  Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports. Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain sourcing, purchase, sale, inventory and financial information related to the information sought by this interrogatory, but has not yet complied.  Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state of its knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

Subject to and without waiving its objections, Rockwell states that the Unauthorized Rockwell Products sold by Defendant as "new" are different from Genuine Rockwell Products in a number of different ways that are important to consumers. For example, buyers of Unauthorized Rockwell Products sold by WI Automation are not entitled to receive a Rockwell Warranty. In contrast, buyers of Genuine Rockwell Products do receive a Rockwell Warranty. In another example, WI Automation does not provide Recall Notices via mail, electronic mail, or other means with respect to the Unauthorized Rockwell Products. In contrast, buyers of Genuine Rockwell Products do receive such notices. In another example, WI Automation does not provide Product Safety Advisories via mail, electronic mail, or other means with respect to the Unauthorized Rockwell Products. In contrast, buyers of Genuine Rockwell Products do receive such notices. In another example, WI Automation does not have access to the manufacturing notices and other proprietary technical knowledge regarding Genuine Rockwell Products that are only available to Rockwell and its ADs. Accordingly, WI Automation cannot provide the same level of customer support that Rockwell offers in connection with Genuine Rockwell Products. In another example, many of the Unauthorized Rockwell Products are of different and/or subpar quality, in comparison with Genuine Rockwell Products because the Unauthorized Rockwell Products have been handled, packaged, preserved, shipped, purged (or not purged), and/or stored by WI Automation and/or its sources in a manner that is different from Rockwell's quality control procedures followed in connection with Genuine Rockwell Products. In another example, buyers of Unauthorized Rockwell Products do not have a license to the software and/or firmware purporting to be Rockwell software and/or firmware that may be loaded on those goods or downloaded from Rockwell, whereas buyers of Genuine Rockwell Products do have a license to the Rockwell software and/or firmware that may be loaded on those authorized products or

30

downloaded from Rockwell.  In another example, some Unauthorized Rockwell Products sold by WI Automation bear counterfeit labels not made or affied by Rockwell and come in boxes with a "Factory Seal" label not made or affied by Rockwell, whereas Genuine Rockwell Products are not counterfeit and do not bear counterfeit labels. In another example, WI Automation customers experience a difference in lead times between what WI Automation advertises and promises with regard to Unauthorized Rockwell Products and the lead times actually experienced by those customers, whereas customers of Genuine Rockwell Products do not experience such a difference.

Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds.

**INTERROGATORY NO. 17:**

Identify all documents, items, or things that in any way describe, embody, reflect, refer, or relate to your response to Interrogatory No. 18.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "all documents, items, or things" be identified.

Subject to and without waiving its objections, Rockwell states, pursuant to Fed R. Civ. P. 33(d), that an answer may be derived from the following documents that have been produced to Defendants: ROCK-00011817-866 and ROCK-00000012490-987. Rockwell further states that it may make available or produce further relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a

response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 18:**

Identify and describe all instances in which a customer of WiAutomation's has come to Rockwell with an issue with the product purchased from WiAutomation.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "all instances" be identified.

Subject to and without waiving its objections, Rockwell states, pursuant to Fed R. Civ. P. 33(d), that an answer may be derived from the following documents that have been produced to Defendants: ROCK-00011817-866 and ROCK-00000012490-987.

Rockwell further states that it may make available or produce further relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 19:**

State all facts supporting the allegations contained in Count I of the Complaint asserting that Wi Automation should be liable for Trademark Infringement.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome.  Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "all facts" be identified.  Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports. Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain sourcing, purchase, sale, inventory and financial information related to the information sought by this interrogatory, but has not yet complied.  Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state of its knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

Rockwell's business hinges on the quality of its products and solution.  Since the products control automated systems, their safety and reliability are of paramount importance to customers and consumers, and also to Rockwell to minimize quality problems and products

33

liability claims.   The USPTO has granted Rockwell federal trademark registrations for the trademarks asserted in the Complaint.  Rockwell's products bear one or more of the trademarks, which are source identifiers to its customers of its warranty, quality control measures, customer support and the other important product qualities cited in the Complaint.   These qualities are important to customers and consumers.  To preserve quality control and warranty and the other qualities, Rockwell sells products through its Authorized Distributors.  Rockwell does not extend it warranty to unauthorized sales. Rockwell has created an exclusive supply chain of its trademarked goods by obligating a vertical supply network of Authorized Distributors to sell Rockwell goods only to those customers who are not resellers of those products.  Rockwell discounts its prices and extend warranties and other product add-ons to the Authorized Distributors through credit rebates. WI Automation attempts to sell and/or sells products bearing Rockwell's trademarks that are not authorized to be sold by Rockwell.   WI Automation misleads Rockwell Authorized Distributors into selling goods without authorization from Rockwell.  WI Automation's sale and attempted sales have created a substantial likelihood of confusion and caused mistake and deception in consumers' minds because these unauthorized products are materially different from authorized Rockwell products.  Rockwell does not authorize, condone or otherwise allow the sale of non-conforming goods having the material differences found in the unauthorized products sold by WI Automation.  To that end, Rockwell takes reasonable efforts to monitor and protect the brand against unauthorized resales.

Subject to and without waiving its objections, Rockwell states that it will make available or produce relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the

Scheduling Order and the relevant Local Rules. Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds.  Notwithstanding the foregoing, the following documents   ROCK-00007799-819;   ROCK-00008386-409;   ROCK-00009772-802;   ROCK-00011817-866;   ROCK-00011894-967;   ROCK-00011972-2252;   and   ROCK-00012410-987;   ROCK-00000126-138   and   ROCK-00000228-256.   ROCK-00000140;   ROCK-00000228-254;   ROCK-00012395-396;      ROCK-00012674-675;      ROCK-00012895-897;      WI002511-17;   WI002615-3086; ROCK-00007799-819; ROCK-00008386-409; ROCK-00009772-802; ROCK-00011817-866 and ROCK-00000012490-987 support the allegations in Claim I.

Further facts that support the allegations in Claim I can be found in the Complaint.

**INTERROGATORY NO. 20:**

State all facts supporting the allegations contained in Count II of the Complaint asserting that WiAutomation should be liable for False Advertising.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome.  Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "all facts" be identified.  Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports. Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain sourcing, purchase, sale, inventory and financial information related to the information sought by this interrogatory, but has not yet complied.  Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state of its knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

WI Automation has made false and/or misleading statements in commercial advertising regarding the Unauthorized Rockwell Products, which are likely to cause confusion and mistake, and to misrepresent the nature and characteristics of the Unauthorized Rockwell Products and WI Automation's commercial activities, and have substantially affected interstate commerce. WI Automation has falsely advertised on its website and through other media that the Unauthorized Rockwell Products that it offered for sale and sold were "new" or "new factory sealed" or "original product" and that "[t]he warranty for new sealed products is 12 months from the delivery date" and "all products are covered by 12 months warranty" (implying coverage by the Rockwell warranty), despite knowing that the products were not new and did not come with the Rockwell warranty.  This is all entirely untrue. In reality, WI Automation is shipping customers used and counterfeit products and products obtained from unverified sources to fulfill orders for "new" Rockwell products. None of the products that WI Automation sold or sells to its customers were covered by Rockwell's warranty or entitled to Rockwell support.  Moreover, regardless of the actual verbiage used, the WI Automation website has always created a cumulative misimpression that leaves a customer not understanding that what WI Automation is selling as "new" Rockwell product is materially altered in many respects.  WI Automation employs this sleight of hand

because WI Automation cannot make new products, cannot "remanufacture" Rockwell Products to Rockwell's proprietary specifications, and does not have a sophisticated Rockwell-type distribution system to carefully monitor quality and ensure proper chain of custody.



WI Automation's unlawful conduct has deceived, and is likely to continue to deceive, a material segment of the consumers to whom WI Automation has directed its marketing activities. WI Automation's false and/or misleading statements are material in that they are likely to influence consumers to purchase products from WI Automation and cause competitive and other commercial injuries to Rockwell. WI Automation has made, and continues to make, its false and/or misleading statements with the intent to cause confusion and mistake, and to deceive the public as to the nature, quality, or characteristics of the Unauthorized Rockwell Products and WI Automation's commercial activities. Rockwell has been damaged as a result.

Subject to and without waiving its objections, Rockwell states that it will make available or produce relevant, non-privileged responsive information or documents in its possession,

custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules. Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds.  Notwithstanding the foregoing, the following documents  ROCK-00007799-819;  ROCK-00008386-409;  ROCK-00009772-802;  ROCK-00011817-866;  ROCK-00011894-967;  ROCK-00011972-2252;  and  ROCK-00012410-987; ROCK-00000126-138  and  ROCK-00000228-256.  ROCK-00000140;  ROCK-00000228-254; ROCK-00012395-396;     ROCK-00012674-675;     ROCK-00012895-897;     WI002511-17; WI002615-3086; ROCK-00007799-819; ROCK-00008386-409; ROCK-00009772-802; ROCK-00011817-866 and ROCK-00000012490-987 support the allegations in Claim II.

Further facts that support the allegations in Claim II can be found in the Complaint.


**INTERROGATORY NO. 21:**

State all facts supporting the allegations contained in Count III of the Complaint asserting that WiAutomation should be liable for False Designation of Origin.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome.  Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "all facts" be identified.  Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert

opinions, analyses and/or reports.  Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain sourcing, purchase, sale, inventory and financial information related to the information sought by this interrogatory, but has not yet complied.  Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state of its knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

Rockwell's business hinges on the quality of its products and solution.  Since the products control automated systems, their safety and reliability are of paramount importance to customers and consumers, and also to Rockwell to minimize quality problems and products liability claims.  The USPTO has granted Rockwell federal trademark registrations for the trademarks asserted in the Complaint.  Rockwell's products bear one or more of the trademarks, which are source identifiers to its customers of its warranty, quality control measures, customer support and the other important product qualities cited in the Complaint.  These qualities are important to customers and consumers.  To preserve quality control and warranty and the other qualities, Rockwell sells products through its Authorized Distributors.  Rockwell does not extend it warranty to unauthorized sales. Rockwell has created an exclusive supply chain of its trademarked goods by obligating a vertical supply network of Authorized Distributors to sell Rockwell goods only to those customers who are not resellers of those products.  Rockwell discounts its prices and extend warranties and other product add-ons to the Authorized Distributors through credit rebates. WI Automation attempts to sell and/or sells products bearing

Rockwell's trademarks that are not authorized to be sold by Rockwell.   WI Automation misleads Rockwell Authorized Distributors into selling goods without authorization from Rockwell.   WI Automation's sale and attempted sales have created a substantial likelihood of confusion and caused mistake and deception in consumers' minds because these unauthorized products are materially different from authorized Rockwell products.   The purchasing public is likely to attribute to Rockwell, WI Automation's use of Plaintiff's Trademarks as a source of origin, authorization, and/or sponsorship for the products WI Automation sells and, further, purchase products from WI Automation in the erroneous belief that WI Automation is authorized by, associated with, sponsored by, or affiliated with Rockwell, when WI Automation is not. Rockwell does not authorize, condone or otherwise allow the sale of non-conforming goods having the material differences found in the unauthorized products sold by WI Automation.   To that end, Rockwell takes reasonable efforts to monitor and protect the brand against unauthorized resales.

Subject to and without waiving its objections, Rockwell states that it will make available or produce relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules. Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds.   Notwithstanding the foregoing, the following documents   ROCK-00007799-819;   ROCK-00008386-409;   ROCK-00009772-802;   ROCK-00011817-866;   ROCK-00011894-967;   ROCK-00011972-2252;   and   ROCK-00012410-987; ROCK-00000126-138   and   ROCK-00000228-256.   ROCK-00000140;   ROCK-00000228-254; ROCK-00012395-396;   ROCK-00012674-675;   ROCK-00012895-897;   WI002511-17;

WI002615-3086; ROCK-00007799-819; ROCK-00008386-409; ROCK-00009772-802; ROCK-00011817-866 and ROCK-00000012490-987 support the allegations in Claim III.

Further facts that support the allegations in Claim III can be found in the Complaint.

**INTERROGATORY NO. 22:**

State all facts supporting the allegations contained in Count IV of the Complaint asserting that WiAutomation should be liable for Statutory Unfair Competition.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome.  Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "all facts" be identified.  Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports.  Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain sourcing, purchase, sale, inventory and financial information related to the information sought by this interrogatory, but has not yet complied.  Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state

of its knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

Rockwell's business hinges on the quality of its products and solution.  Since the products control automated systems, their safety and reliability are of paramount importance to customers and consumers, and also to Rockwell to minimize quality problems and products liability claims.   The USPTO has granted Rockwell federal trademark registrations for the trademarks asserted in the Complaint.  Rockwell's products bear one or more of the trademarks, which are source identifiers to its customers of its warranty, quality control measures, customers support and the other important product qualities cited in the Complaint.   These qualities are important to customers and consumers.  To preserve quality control and warranty and the other qualities, Rockwell sells products through its Authorized Distributors.  Rockwell does not extend it warranty to unauthorized sales. Rockwell has created an exclusive supply chain of its trademarked goods by obligating a vertical supply network of Authorized Distributors to sell Rockwell goods only to those customers who are not resellers of those products.   Rockwell discounts its prices and extend warranties and other product add ons to the AD's through credit rebates. WI Automation attempts to sell and/or sells products bearing Rockwell's trademarks that are not authorized to be sold by Rockwell.   Wi Automation misleads Rockwell Authorized Distributors into selling goods without authorization from Rockwell.  WI Automation's sale and attempted sales have created a substantial likelihood of confusion and caused mistake and deception in consumers' minds because these unauthorized products are materially different from authorized Rockwell products.  The purchasing public is likely to attribute to Rockwell, WI Automation's use of Plaintiff's Trademarks as a source of origin, authorization, and/or sponsorship for the products WI Automation sells and, further, purchase products from WI

42

Automation in the erroneous belief that WI Automation is authorized by, associated with, sponsored by, or affiliated with Rockwell, when WI Automation is not.  Rockwell does not authorize, condone or otherwise allow the sale of non conforming goods having the material differences found in the unauthorized products sold by WI Automation.  To that end, Rockwell takes reasonable efforts to monitor and protect the brand against unauthorized resales.  WI Automation's acts set forth above constitute unlawful, unfair, or fraudulent business practices in violation of 6 Del. C. § 2532 *et seq.*

Subject to and without waiving its objections, Rockwell states that it will make available or produce relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules. Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds.  Notwithstanding the foregoing, the following documents   ROCK-00007799-819;   ROCK-00008386-409;   ROCK-00009772-802;   ROCK-00011817-866;   ROCK-00011894-967;   ROCK-00011972-2252;   and   ROCK-00012410-987;   ROCK-00000126-138   and   ROCK-00000228-256.  ROCK-00000140;   ROCK-00000228-254;   ROCK-00012395-396;   ROCK-00012674-675;   ROCK-00012895-897;   WI002511-17;   WI002615-3086;   ROCK-00007799-819;   ROCK-00008386-409;   ROCK-00009772-802;   ROCK-00011817-866 and ROCK-00000012490-987 support the allegations in Claim IV.

Further facts that support the allegations in Claim IV can be found in the Complaint.

**INTERROGATORY NO. 23:**

State all facts supporting the allegations contained in Count V of the Complaint asserting that WiAutomation should be liable for Common Law Unfair Competition.

**RESPONSE:**

The General Objections are incorporated herein.  Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome.  Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "all facts" be identified.  Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial.  Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports. Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain sourcing, purchase, sale, inventory and financial information related to the information sought by this interrogatory, but has not yet complied.  Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state of its knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

WI Automation has made false and/or misleading statements in commercial advertising regarding the Unauthorized Rockwell Products, which are likely to cause confusion and mistake, and to misrepresent the nature and characteristics of the Unauthorized Rockwell Products and

WI Automation's commercial activities, and have substantially affected interstate commerce. WI Automation has falsely advertised on its website and through other media that the Unauthorized Rockwell Products that it offered for sale and sold were "new" or "new factory sealed" or "original product" and that "[t]he warranty for new sealed products is 12 months from the delivery date" and "all products are covered by 12 months warranty" (implying coverage by the Rockwell warranty), despite knowing that the products were not new and did not come with the Rockwell warranty.  This is all entirely untrue. In reality, WI Automation is shipping customers used and counterfeit products and products obtained from unverified sources to fulfill orders for "new" Rockwell products. None of the products that WI Automation sold or sells to its customers were covered by Rockwell's warranty or entitled to Rockwell support.  WI Automation has promoted and deceptively marketed the Unauthorized Rockwell Products to the detriment of Rockwell, as many of Rockwell's customers and prospective customers have been and will be induced to purchase the Unauthorized Rockwell Products instead of Rockwell products, based on WI Automation's statements and conduct.  WI Automation took these illegal actions despite knowing that the products it was selling were materially different and with the intent to harm Rockwell.

Rockwell's business hinges on the quality of its products and solution.  Since the products control automated systems, their safety and reliability are of paramount importance to customers and consumers, and also to Rockwell to minimize quality problems and products liability claims.  The USPTO has granted Rockwell federal trademark registrations for the trademarks asserted in the Complaint.  Rockwell's products bear one or more of the trademarks, which are source identifiers to its customers of its warranty, quality control measures, customers support and the other important product qualities cited in the Complaint.  These qualities are

important to customers and consumers.  To preserve quality control and warranty and the other qualities, Rockwell sells products through its Authorized Distributors.  Rockwell does not extend it warranty to unauthorized sales.  Rockwell has created an exclusive supply chain of its trademarked goods by obligating a vertical supply network of Authorized Distributors to sell Rockwell goods only to those customers who are not resellers of those products.  Rockwell discounts its prices and extend warranties and other product add-ons to the Authorized Distributors through credit rebates.  WI Automation attempts to sell and/or sells products bearing Rockwell's trademarks that are not authorized to be sold by Rockwell.  WI Automation misleads Rockwell Authorized Distributors into selling goods without authorization from Rockwell.  WI Automation's sale and attempted sales have created a substantial likelihood of confusion and caused mistake and deception in consumers' minds because these unauthorized products are materially different from authorized Rockwell products.  The purchasing public is likely to attribute to Rockwell, WI Automation's use of Plaintiff's Trademarks as a source of origin, authorization, and/or sponsorship for the products WI Automation sells and, further, purchase products from WI Automation in the erroneous belief that WI Automation is authorized by, associated with, sponsored by, or affiliated with Rockwell, when WI Automation is not. Rockwell does not authorize, condone or otherwise allow the sale of non-conforming goods having the material differences found in the unauthorized products sold by WI Automation.  To that end, Rockwell takes reasonable efforts to monitor and protect the brand against unauthorized resales.

Subject to and without waiving its objections, Rockwell states that it will make available or produce relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to

the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules. Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds Notwithstanding the foregoing, the following documents ROCK-00007799-819; ROCK-00008386-409; ROCK-00009772-802; ROCK-00011817-866; ROCK-00011894-967; ROCK-00011972-2252; and ROCK-00012410-987; ROCK-00000126-138 and ROCK-00000228-256. ROCK-00000140; ROCK-00000228-254; ROCK-00012395-396; ROCK-00012674-675; ROCK-00012895-897; WI002511-17; WI002615-3086; ROCK-00007799-819; ROCK-00008386-409; ROCK-00009772-802; ROCK-00011817-866 and ROCK-00000012490-987 support the allegations in Claim V.

Further facts that support the allegations in Claim V can be found in the Complaint.

**INTERROGATORY NO. 24:**

State all facts supporting the allegations contained in Count VI of the Complaint asserting that WiAutomation should be liable for Unjust Enrichment.

**RESPONSE:**

The General Objections are incorporated herein. Rockwell objects to the Interrogatory because it is overbroad, vague, ambiguous and unduly burdensome. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "all facts" be identified. Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial. Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert

47

opinions, analyses and/or reports. Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain sourcing, purchase, sale, inventory and financial information related to the information sought by this interrogatory, but has not yet complied. Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state of its knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

WI Automation has made false and/or misleading statements in commercial advertising regarding the Unauthorized Rockwell Products, which are likely to cause confusion and mistake, and to misrepresent the nature and characteristics of the Unauthorized Rockwell Products and WI Automation's commercial activities, and have substantially affected interstate commerce. WI Automation has falsely advertised on its website and through other media that the Unauthorized Rockwell Products that it offered for sale and sold were "new" or "new factory sealed" or "original product" and that "[t]he warranty for new sealed products is 12 months from the delivery date" and "all products are covered by 12 months warranty" (implying coverage by the Rockwell warranty), despite knowing that the products were not new and did not come with the Rockwell warranty. This is all entirely untrue. In reality, WI Automation is shipping customers used and counterfeit products and products obtained from unverified sources to fulfill orders for "new" Rockwell products. None of the products that WI Automation sold or sells to its customers were covered by Rockwell's warranty or entitled to Rockwell support. WI Automation has promoted and deceptively marketed the Unauthorized Rockwell Products to the detriment of

48

Rockwell, as many of Rockwell's customers and prospective customers have been and will be induced to purchase the Unauthorized Rockwell Products instead of Rockwell products, based on WI Automation's statements and conduct. WI Automation took these illegal actions despite knowing that the products it was selling were materially different and with the intent to harm Rockwell. WI Automation was aware of, and took advantage of, price discounts and rebates Rockwell provides to its Authorized Distributors through its deceptive conduct. WI Automation received an improper benefit in the form of Rockwell goods wrongfully acquired at an unreasonably low price, and profits from the improper resale of those goods. It would be inequitable to allow WI Automation to retain these goods and the profits derived from their sale due to their wrongful acquisition and improper marketing.

Rockwell's business hinges on the quality of its products and solution. Since the products control automated systems, their safety and reliability are of paramount importance to customers and consumers, and also to Rockwell to minimize quality problems and products liability claims. The USPTO has granted Rockwell federal trademark registrations for the trademarks asserted in the Complaint. Rockwell's products bear one or more of the trademarks, which are source identifiers to its customers of its warranty, quality control measures, customer support and the other important product qualities cited in the Complaint. These qualities are important to customers and consumers. To preserve quality control and warranty and the other qualities, Rockwell sells products through its Authorized Distributors. Rockwell does not extend it warranty to unauthorized sales. Rockwell has created an exclusive supply chain of its trademarked goods by obligating a vertical supply network of Authorized Distributors to sell Rockwell goods only to those customers who are not resellers of those products. Rockwell discounts its prices and extend warranties and other product add-ons to the Authorized

Distributors through credit rebates.  WI Automation attempts to sell and/or sells products bearing Rockwell's trademarks that are not authorized to be sold by Rockwell.  WI Automation misleads Rockwell Authorized Distributors into selling goods without authorization from Rockwell.  WI Automation's sale and attempted sales have created a substantial likelihood of confusion and caused mistake and deception in consumers' minds because these unauthorized products are materially different from authorized Rockwell products.  The purchasing public is likely to attribute to Rockwell, WI Automation's use of Plaintiff's Trademarks as a source of origin, authorization, and/or sponsorship for the products WI Automation sells and, further, purchase products from WI Automation in the erroneous belief that WI Automation is authorized by, associated with, sponsored by, or affiliated with Rockwell, when WI Automation is not. Rockwell does not authorize, condone or otherwise allow the sale of non-conforming goods having the material differences found in the unauthorized products sold by WI Automation.  To that end, Rockwell takes reasonable efforts to monitor and protect the brand against unauthorized resales.

Subject to and without waiving its objections, Rockwell states that it will make available or produce relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules. Rockwell reserves the right to alter, amend, or supplement this response as this case proceeds.  Notwithstanding the foregoing, the following documents   ROCK-00007799-819;   ROCK-00008386-409;   ROCK-00009772-802;   ROCK-00011817-866;   ROCK-00011894-967;   ROCK-00011972-2252;   and   ROCK-00012410-987; ROCK-00000126-138  and  ROCK-00000228-256.  ROCK-00000140;  ROCK-00000228-254;

ROCK-00012395-396;     ROCK-00012674-675;     ROCK-00012895-897;     WI002511-17; WI002615-3086; ROCK-00007799-819; ROCK-00008386-409; ROCK-00009772-802; ROCK-00011817-866 and ROCK-00000012490-987 support the allegations in Claim VI.

Further facts that support the allegations in Claim VI can be found in the Complaint.

**INTERROGATORY NO. 25:**

State all facts supporting the allegations contained in Paragraphs 146-147 of the Complaint alleging that WiAutomation's sale of Rockwell products "is likely to cause confusion or mistake, or to deceive customers," and that "Rockwell has suffered and will continue to suffer irreparable harm to its goodwill and reputation."

**RESPONSE:**

The General Objections are incorporated herein. Rockwell further objects to the Interrogatory because it includes multiple discrete subparts, the sum of which, together with all other interrogatories and subparts, exceeds the 25 interrogatory limit established by the Federal Rules and the Scheduling Order in this case. Rockwell further objects to the Interrogatory as overbroad, unduly burdensome, and oppressive in its request that "all facts" be identified. Rockwell objects to this interrogatory because it requires Rockwell to marshal all of its available proof or the proof that Rockwell may offer at trial. Rockwell objects to this Interrogatory as premature and calling for expert testimony and a legal conclusion. Rockwell further objects to this Interrogatory to the extent it prematurely seeks disclosure of expert opinions, analyses and/or reports. Rockwell further objects because this is a contention interrogatory and thus is premature in light of the present early stage of discovery.

Rockwell expects to receive documents and information through discovery that will concern and provide information responsive to this Interrogatory. For example, Defendant has been compelled to produce certain purchase, sale and financial information related to the information sought by this interrogatory, but has not yet complied.  Accordingly, in response to this Interrogatory, Rockwell will provide a response encompassing the current state of its knowledge, belief, and understanding, but reserves the right to supplement its Interrogatory response at the conclusion of discovery.

Subject to and without waiving its objections, Rockwell states that, as a result of Defendant's conduct, Plaintiff has suffered from lost goodwill, and Rockwell's reputation with both its customers and its authorized distributors has been damaged. Furthermore, because of Defendant's conduct, Rockwell's leadership reputation has suffered in the market for Rockwell products. Rockwell has no adequate remedy at law for the continuing harm caused by Defendant. Further, because the Unauthorized Rockwell Products sold by Defendant are materially different from Genuine Rockwell Products, a likelihood of confusion is presumed as a matter of law.

Rockwell further states, pursuant to Fed R. Civ. P. 33(d), that an answer may be derived from the following documents that have been produced to Defendants: ROCK-00007799-819; ROCK-00008386-409;  ROCK-00009772-802;  ROCK-00011817-866;  ROCK-00011894-967; ROCK-00011972-2252; and ROCK-00012410-987.

Rockwell further states that it may make available or produce further relevant, non-privileged responsive information or documents in its possession, custody or control pursuant to Fed. R. Civ. P. 33(d) from which a response may be derived, to the extent such information exists. Rockwell will provide this information in accordance with the Scheduling Order and the relevant Local Rules.

Rockwell's investigation is ongoing. Discovery is not yet complete, and Rockwell reserves the right to supplement its response to this Interrogatory.

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (No. 3630)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Plaintiff*

OF COUNSEL:

Paul Tanck
Neal J. McLaughlin
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel: (212) 210-9400
Fax: (212) 210-9444
paul.tanck@alston.com
neal.mclaughlin@alston.com

Dated:  September 19, 2022

# Exhibit C

ROCK-00000129



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 21-1238-GBW-JLH |
| | ) |
| PARCOP S.R.L. d/b/a | ) |
| WIAUTOMATION, | ) |
| | ) |
| Defendant. | ) |

**ROCKWELL AUTOMATION, INC.'S OPPOSITION TO
DEFENDANT'S MOTION *IN LIMINE* NO. 3**

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

OF COUNSEL:
Paul Tanck
Neal J. McLaughlin
Christopher L. McArdle
Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Matthew M. Welch
ALSTON & BIRD LLP
One South at The Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
(704) 444-1000

Joshua M. Weeks
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-7000

Dated: June 27, 2023

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

The trial testimony will show that a unique serial number is automatically generated by an SAP database for each Rockwell product when it is manufactured. A Rockwell employee compared the serial numbers affixed to Rockwell-branded products sold by WiAutomation against the database to determine if they had ever been assigned to those product models. *See* Ex. 1, 237:7-240:10. The employee found no records. *Id.*

Contrary to WiAutomation's motion, the absence of a record in a database does not fall within the scope of FRE 1002, as explained by the original Advisory Committee Note:

> Nor does the rule apply to testimony that books or records have been examined and found not to contain any reference to a designated matter.

Other courts have all held that witnesses may testify that a record does not exist without admitting the records or implicating FRE 1002. *See, e.g.*, *U.S. v. Valdovinos-Mendez,* 641 F.3d 1031, 1035 (9th Cir. 2011); *Allen v. Wells Fargo Bank Minnesota*, N.A., 334 B.R. 746, 750-51 (D.D.C. 2005); *Regscan, Inc. v. Brewer*, 2007 U.S. Dist. LEXIS 20087, at *21 (E.D. Pa. Mar. 16, 2007).

Defendant's hearsay arguments fail for the same reason—testimony that something does not appear in a record does not seek "to prove the contents" of the record. *See* FRE 1002 Advisory Committee Note; *Lindenbaum v. Realgy, LLC*, 606

F. Supp. 3d 732, 739-40 (N.D. Ohio 2022) (admitting "the testimony of Vrtis who searched for records, but found none").

Moreover, computer-generated serial number records are not hearsay.  FRE 801 defines a statement as "a *person's* oral assertion, written assertion, or nonverbal conduct, if the *person* intended it as an assertion." FRE 801(a) (emphasis added).  "[N]othing 'said' by a machine … is hearsay."  *U.S. v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003) (citation omitted).  Other Circuits examining the issue have all reached the same result. *See, e.g.*, *U.S. v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015) ("[T]he relevant assertion isn't made by a person; it's made by the Google Earth program"); *U.S. v. Lamons*, 532 F.3d 1251, 1263-64 (11th Cir. 2008) (concluding that a computer-generated spreadsheet of telephone billing data was not hearsay).

Even if the database were hearsay, Mr. Smaglik or another witness may establish that it qualifies as a business record. Under Third Circuit law, the term "qualified witness" is interpreted "broadly;" "to be qualified, a witness only needs to 'have familiarity with the record-keeping system' or 'understand[] the system.'" *U.S. v. Muhammad,* 512 F. App'x 154, 159-60 (3d Cir. 2013) (*quoting U.S. v. Console*, 13 F.3d 641, 657 (3d Cir. 1993)).  The witness need not have first-hand knowledge of the system. *Ioengine, LLC v. Paypal Holdings, Inc.,* 2022 U.S. Dist. LEXIS 129050, at *8 (D. Del. June 22, 2022) ("the witness's knowledge may be

obtained by investigating the record-keeping entity's practices, even if the affiant did not have firsthand familiarity with those practices").  Mr. Smaglik easily meets these criteria, as do others on Rockwell's witness list.

Defendant discloses no basis for its allegation that Mr. Smaglik could not testify that the database qualifies as a business record.  Defendant cites only an interrogatory response which states that Mr. Smaglik is knowledgeable about "sale of Rockwell products," and "gray market sales." *See* Op., 1; *id.*, Ex. B, 7.  Despite deposing Mr. Smaglik for two days, Defendant failed to identify a single question regarding the database that he could not answer.[1]  To the contrary, the transcript shows that—as Global Director of Revenue and Brand Protection—Mr. Smaglik understands how the database works. *See, e.g.*, Ex.1, 249:2-5 ("the serial number … numeric sequence [] increments by one every time a unique product is produced. But it's unique across all of our products"); *id.*, 241:3-16.

Mr. Smaglik's testimony is further admissible under FRE 1006,[2] which allows a witness to summarize voluminous records without admitting the

---

[1] WiAutomation's main complaint seems to be that he did not memorize the 10-digit alphanumeric serial number for the product in question in preparation for his deposition. *See* Op., 3; *id.*, Ex. C.

[2] Per FRE 1006, Rockwell will make the database available for examination at a reasonable time. Contrary to WiAutomation's complaints, Rockwell disclosed the database in its initial disclosures (Ex. 2 (identifying "SAP")), in response to Interrogatory 14 (Op., Ex. B, 24-25), and in Mr. Smaglik's deposition (Ex. 1, 239:7-240:6).  Defendant has never specifically requested it.

3

underlying documents. 6 Weinstein's Federal Evidence § 1006.05 at ¶ 2 (2023)

("Summary evidence … may take the form of a witness's oral testimony.")

(attached as Ex. 3).

|  |  |
|---|---|
| | */s/ Emily S. DiBenedetto* |
| OF COUNSEL: | John W. Shaw (No. 3362) |
| Paul Tanck | Andrew E. Russell (No. 5382) |
| Neal J. McLaughlin | Emily S. DiBenedetto (No. 6779) |
| Christopher L. McArdle | SHAW KELLER LLP |
| Andrew J. Ligotti | I.M. Pei Building |
| ALSTON & BIRD LLP | 1105 North Market Street, 12th Floor |
| 90 Park Avenue | Wilmington, DE 19801 |
| New York, NY 10016 | (302) 298-0700 |
| (212) 210-9400 | jshaw@shawkeller.com |
| | arussell@shawkeller.com |
| Matthew M. Welch | edibenedetto@shawkeller.com |
| ALSTON & BIRD LLP | |
| One South at The Plaza | *-and-* |
| 101 South Tryon Street | |
| Suite 4000 | Dominick T. Gattuso (No. 3630) |
| Charlotte, NC 28280-4000 | HEYMAN ENERIO GATTUSO & HIRZEL LLP |
| (704) 444-1000 | 300 Delaware Avenue, Suite 200 |
| | Wilmington, DE 19801 |
| Joshua M. Weeks | (302) 472-7311 |
| ALSTON & BIRD LLP | dgattuso@hegh.law |
| One Atlantic Center | |
| 1201 West Peachtree Street | *Attorneys for Rockwell Automation,* |
| Suite 4900 | *Inc.* |
| Atlanta, GA 30309-3424 | |
| (404) 881-7000 | |

Dated: June 27, 2023

## CERTIFICATE OF COMPLIANCE

I hereby confirm that this brief complies with the type and number limitations set forth in the November 10, 2022 Standing Order Regarding Briefing in All Cases. I certify that this document contains 750 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

*/s/ Emily S. DiBenedetto*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Emily S. DiBenedetto, hereby certify that on June 27, 2023, this document

was served on the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

| | |
|---|---|
| Pilar G. Kraman | Bob Kasolas |
| Alexis N. Stombaugh | Eric J. Boden |
| YOUNG, CONAWAY, STARGATT | Eric Alvarez |
| & TAYLOR LLP | BRACH EICHLER, LLC |
| Rodney Square | 101 Eisenhower Parkway |
| 1000 North King Street | Roseland, NJ 07068 |
| Wilmington, DE 19801 | (973) 228-5700 |
| (302) 571-6600 | bkasolas@bracheichler.com |
| pkraman@ycst.com | eboden@bracheichler.com |
| astombaugh@ycst.com | ealvarez@bracheichler.com |

/s/ Emily S. DiBenedetto
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Dominick T. Gattuso (No. 3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

*Attorneys for Rockwell Automation, Inc.*

# Exhibit 1

# Condensed Transcript/Concordance

---

## Rockwell Automation v. Parcorp

---

## Deposition of Ryan Smaglik

### December 19, 2022

D'Amico Certified Reporting
908-546-7650
damico.reporting@verizon.net

Ryan Smaglik
12/19/2022

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
DOCKET NO.: 21-1238-CFC
--------------------------------------X
ROCKWELL AUTOMATION, INC.,
    Plaintiffs,
vs.
PARCORP S.R.L., d/b/a
WI AUTOMATION,
    Defendants.
--------------------------------------X
ZOOM DEPOSITION OF RYAN SMAGLIK
MONDAY, DECEMBER 19, 2022
7:11 A.M.
* * HIGHLY CONFIDENTIAL PORTIONS * *

MARIANNE D'AMICO CANDILOROS, CCR, CRR, CLR
D'AMICO CERTIFIED REPORTING, LLC
908.546.7650
damico.reporting@verizon.net
Damicoreporting.com

**Page 2**

1
2    12/19/22 - R. Smaglik
3
4
5
6
7    ZOOM Deposition of RYAN SMAGLIK,
8  held REMOTELY via ZOOM, New Jersey,
9  pursuant to Notice, taken before Marianne
10  D'Amico Candiloros, a Certified Court
11  Reporter, a Certified Realtime Reporter
12  and a Notary Public of the States of New
13  Jersey and New York.

**Page 3**

1    12/19/22 - R. Smaglik
2  APPEARANCES OF COUNSEL:
3
4
5    ALSTON & BIRD
6    Attorneys for Plaintiff
7      90 Park Avenue
8      New York, New York 10016
9  BY:   PAUL TANCK, ESQ.
10
11    BRACH EICHLER
12    Attorneys for Defendants
13      101 Eisenhower Parkway
14      Roseland, New Jersey 07068
15  BY:  BOBBY KASOLAS, ESQ.
16      ERIC ALVAREZ, ESQ.
17
18    ALSO PRESENT:
19     PORFIRIO PARASCANDOLA LADONEA
20     MIRKO PALUMBO
21
22
23
24
25

**Page 4**

1    12/19/22 - R. Smaglik
2      INDEX
3  WITNESS     EXAMINATION BY   PAGE:LINE
4  R. SMAGLIK    MR. KASOLAS    13:08
5      MR. KASOLAS     207:11
6
7
8
9
10  -------------INFORMATION REQUESTS-----------
11  DIRECTIONS NOT TO ANSWER    (NONE)
12  REQUESTS FOR INFORMATION    (NONE)
13  MOTIONS        (NONE)
14  RULINGS        (NONE)
15  HIGHLY CONFIDENTIAL PORTIONS
16   HIGHLY CONFIDENTIAL     29-76
17       139
18   REGARDING RECON    140-252
19       303-346
20
21
22
23
24
25

1 (Pages 1 to 4)

Ryan Smaglik
12/19/2022

233

1      **12/19/22 - R. Smaglik**
2      **packaging, the correspondence from Wi**
3      **Automation, the invoice, you know, everything is**
4      **associated with the delivery of the items in**
5      **question.**
6           Q.   What did they specifically give you
7      that relates to their purchase of the
8      CompactLogix controller from Wi Automation in
9      March 2022?
10          **A.   Again, from my memory, they would've**
11     **given me -- they would've given me the, you**
12     **know, invoice showing the purchase between them**
13     **and Wi Automation.  They would've had -- they**
14     **would also have had, and I don't recall, they**
15     **would've also had some dialogue with Wi**
16     **Automation either via phone or email associated**
17     **with the purchase.  And then they provided me**
18     **with -- I think there was also some type of a**
19     **card or something that was inside the box,**
20     **photographs of the box itself, which has the**
21     **tracking slip on it with the tracking number,**
22     **you know, showing that the product traveled**
23     **between, you know, Wi Automation and Recon's**
24     **facility, the carrier which I believe was DHL.**
25          Q.   So a card, photos, box, product and

234

1           12/19/22 - R. Smaglik
2      tracking slip, anything else?
3           MR. TANCK:  Objection to form.
4           Mischaracterizes the witness' testimony,
5           you can answer.
6      BY MR. KASOLAS:
7           **A.   Not a tracking slip, sorry, it's the**
8      **label, the label actually applied, adhered to**
9      **the Wi Automation box shipping label.  That's**
10     **from my memory.  I would have to go in to the**
11     **case files to see if there was anything they**
12     **provided.**
13          Q.   What did Recon specifically tell you
14     about the product that Wi Automation ships to
15     them in March 2022?
16          MR. TANCK:  So objection.  I don't
17          want you to reveal any privileged
18          communication, but if there's anything
19          that's not privileged, you can certainly
20          answer.
21          MR. KASOLAS:  Well, there wouldn't
22          be any privileged communication if it's
23          just between Ryan Smaglik and Recon, so
24          I'm not sure what you're referring to,
25          counsel.

235

1           12/19/22 - R. Smaglik
2           MR. TANCK:  Same instruction.
3      BY MR. KASOLAS:
4           **A.   Recon -- I mean, I don't -- I can**
5      **recall no specific information but they, you**
6      **know, conveyed regarding the products.**
7           Q.   What was depicted in the photographs
8      that they forwarded to you, the product from Wi
9      Automation in March 2022?
10          **A.   Yes, so one the photo -- from**
11     **memory, there were photographs of the two**
12     **software license cassettes, which are a Rockwell**
13     **Automation branded plastic case that includes**
14     **the software license details, the activation**
15     **key, inside of the cassette.  There were photos**
16     **of both cassettes, and, then there were photos**
17     **of the outer -- outer box of the CompactLogix**
18     **controller, photos of the CompactLogix, supposed**
19     **CompactLogix controller, the inner packaging of**
20     **the CompactLogix, supposed CompactLogix**
21     **controller, and photographs of labels on the**
22     **CompactLogix controller device, supposed**
23     **CompactLogix controller device.**
24          Q.   Anything other than the photographs
25     that Recon provided to you in March of 2020

236

1           12/19/22 - R. Smaglik
2      (sic) concerning the purchase that Recon made
3      from Wi Automation?
4           **A.   Not from memory.**
5           Q.   What do the photos of the outer box
6      of the Control Logix controller look like?
7           **A.   A brown box bearing the**
8      **Allen-Bradley trademarks with a white label,**
9      **bearing the Allen-Bradley trademarks, and**
10     **purported product information printed in black**
11     **on the label.**
12          Q.   Was it, in fact, a Rockwell box from
13     a Rockwell plant that the product arrived in?
14          MR. TANCK:  Objection to form.
15     BY MR. KASOLAS:
16          **A.   I don't believe so.**
17          Q.   What is that belief based on?
18          **A.   The label, and I'm going off from**
19     **memory here.**
20          Q.   I didn't ask you about a box, by the
21     way; I asked you about a label.
22          MR. TANCK:  I can answer the
23          question.
24     BY MR. KASOLAS:
25          **A.   I'm trying to answer why I think the**

59 (Pages 233 to 236)

D'Amico Certified Reporting
908-546-7650

Ryan Smaglik
12/19/2022

237

```
 1           12/19/22 - R. Smaglik
 2   box is counterfeit.
 3        Q.   So the box is Counterfeit, that's
 4   your testimony?
 5        A.   I believe the box is likely a
 6   counterfeit box.
 7        Q.   Can you tell me why you think the
 8   box that was in the photographs that Recon
 9   provided to you March 2022 is somehow not a
10   genuine Rockwell box?
11        A.   What I was trying to say before is
12   because the labels on the product on the inside
13   of the box, the factory -- well, the supposedly
14   factory sealed box are counterfeit.
15        Q.   So the labels that are on the
16   product inside the box, those specific labels
17   are not genuine Rockwell labels?
18        A.   Correct.
19        Q.   And why do you say that?
20        A.   They bear information relating to
21   products that we never produced.
22        Q.   What do you mean it bears
23   information about products that Rockwell never
24   produced?
25        A.   The serial number that the label on
```

238

```
 1           12/19/22 - R. Smaglik
 2   the product inside of the box purported to be
 3   was assigned to a different Rockwell Automation
 4   product at a different point in time.
 5        Q.   What was wrong with the serial
 6   number that was on the label inside the box?
 7        A.   I'm sorry, can you repeat that
 8   question?
 9        Q.   What was wrong with the serial
10   number on the label that was inside the box
11   depicted in the photograph that Recon sent to
12   you March 2022?
13        A.   So there's a -- just -- I'm confused
14   because there is a label on the outside of the
15   box and then there's a label attached to the
16   product itself.
17        Q.   I understand, sir.
18        Which label are you referring to
19   that had a serial number that you claim had an
20   issue?
21        A.   The label on the product inside the
22   box.  The outer box may have had the same issue;
23   I can't remember off the top of my head.  But
24   certainly, vividly, the label inside of the --
25   the label that was on the product inside of the
```

239

```
 1           12/19/22 - R. Smaglik
 2   box is a counterfeit label.
 3        Q.   What was specifically wrong with the
 4   label?
 5        A.   Again, the information on it does
 6   not match our production records.
 7        Q.   What information?
 8        A.   There's identity information
 9   associated with the product, the serial number
10   of the product, there's secondary identifying
11   information on the product; there were issues
12   with that as well.  It's a multi-check process.
13        Q.   What was wrong with the identity
14   information on the label?
15        A.   It doesn't exist.
16        Q.   What does that mean?
17        A.   It means that if you type if you --
18   so, for example, let's say from memory, if this
19   product was L 306 ER, I think it was L 306 ER,
20   it might be ERM, I can't remember, but if I go
21   into the system and plug in that serial number,
22   the serial number that's reported on the label,
23   I can access our original production records
24   globally.  And I can see if it's a real product,
25   I can see a production record showing that that
```

240

```
 1           12/19/22 - R. Smaglik
 2   serial number was allocated to that particular
 3   product.  And, in this case, I can see that that
 4   product or that serial number was allocated to a
 5   totally different product at a different point
 6   in time.
 7        Q.   When you say identity information,
 8   are you referring to the serial number or
 9   something different?
10        A.   Yes, the serial number.
11        Q.   So the identity information and the
12   serial number are the same thing, correct?
13        A.   Yes, it's the identity of the
14   product, unique identity of the product.
15        Q.   You had mentioned something about
16   secondary identification information, what is
17   secondary identification information?
18        A.   On certain products there are other
19   unique identifiers that would be unique to a
20   particular instance of a product.
21        Q.   What was the issue, if any, with the
22   secondary identification information on the
23   label in the photograph inside the box that
24   Recon sent to you in March 2022?
25        A.   I would have to -- I would have to
```

60 (Pages 237 to 240)

241

1    12/19/22 - R. Smaglik
2    double check on this particular instance, but in
3    general, like we often find, is that there are
4    usually two issues:  One is that the serial
5    number does not -- the serial number, which is
6    one of the two unique identifiers, does not
7    match the particular product type.  And there's
8    a second unique identifier, which is called an
9    ASA ID you can think of this as a software,
10   software serial number or a communications
11   serial number, and that unique identifier
12   doesn't match the serial number.  So it's in the
13   production system, the serial number should be
14   matched to that particular product type
15   manufactured on a particular date and the ASA ID
16   should also be matched to that serial number.
17        Q.   You're telling me you don't know
18   whether or not that secondary identifier you
19   call the ASA identifying number had an issue
20   with the product that Recon purchased from Wi
21   Automation in March 2022, correct?
22        A.   I just can't remember.  I would have
23   to pull up the photo and double-check the system
24   on that one.  But for sure from vivid memory and
25   conclusion, the serial number was never

242

1    12/19/22 - R. Smaglik
2    allocated to that particular product.
3        Q.   Who applies the label with the
4    serial number on a Rockwell product at the time
5    the Rockwell product is manufactured inside the
6    Rockwell plant?
7        A.   I, again, don't know exactly who
8    does that.
9        Q.   Why don't you know, sir?
10       A.   I mean, it's a production in play; I
11   just don't know who.  We have tens of thousands
12   of products and many, many manufacturing
13   facilities.
14       Q.   So you don't know whether or not an
15   employee in a factory that's applying these
16   labels could've made a mistake or not if a label
17   doesn't match up with a product, correct?
18       A.   In my professional experience in
19   purchasing from -- testing test purchases from
20   unauthorized suppliers, that is not the cause of
21   this issue.
22       Q.   Can you please answer my question
23   now?
24       A.   I just did.
25       Q.   You did not.

243

1    12/19/22 - R. Smaglik
2         MR. KASOLAS:  Madam Court Reporter,
3    could you read back my question for Mr.
4    Smaglik.
5         (Whereupon, the record was read.)
6         MR. TANCK:  Can you read back his
7    answer.
8         MR. KASOLAS:  I don't want the
9    answer read back; I want him to answer the
10   question.
11        MR. TANCK:  I want to hear his
12   answer and he can answer it again.
13        MR. KASOLAS:  You don't need to read
14   the answer back.
15        MR. TANCK:  I would like his answer
16   read back.
17        MR. KASOLAS:  It's my deposition; he
18   doesn't get to have the answer read back.
19   I asked him a question --
20        MR. TANCK:  He doesn't get to know
21   what his answer is?
22        MR. KASOLAS:  You can object to
23   form, you can object to privilege and
24   that's it.  Okay?  Let's move on.
25        MR. TANCK:  Madam Court Reporter, or

244

1    12/19/22 - R. Smaglik
2    Ms. Candiloros, would you please read back
3    his answer.
4         MR. KASOLAS:  I'm directing the
5    court reporter not to read his answer
6    back, he doesn't need any help from you.
7         MR. TANCK:  I'm not asking for help.
8    I just want his answer read back.
9         MR. KASOLAS:  You want to read the
10   question (sic) back to him so he can
11   parrot it; I'm not allowing it.
12        MR. TANCK:  Okay, are you
13   instructing the, you are instructing the
14   court reporter to not read back the answer
15   to your question.
16        MR. KASOLAS:  I'm instructing the
17   court reporter not to give an answer to my
18   question is what I'm doing.
19        MR. TANCK:  I'm just asking, when
20   this comes up later in front of The Court,
21   I just want to make it clear, that the
22   you're instructing the court reporter not
23   to read back his answer, is that correct?
24        MR. KASOLAS:  You are in violation
25   of the local rules of Delaware law

61 (Pages 241 to 244)

Ryan Smaglik
12/19/2022

245

1          12/19/22 - R. Smaglik
2    regarding depositions.  There are four
3    cases on point.  I'm not going to keep
4    pushing this issue.  If you keep pushing
5    it, I'm going to make a motion for
6    sanctions.
7          MR. TANCK:  I'm going to just state
8    my objection.  It is clear that counsel
9    for defendant is refusing or instructing
10   the court reporter from reading back an
11   answer to a question that he had read back
12   and I just want to make that clear on the
13   record.
14         You can go ahead with your question,
15   Bob.
16         MR. KASOLAS:  Please read my
17   question back to the witness, Madam Court
18   Reporter.
19         (Whereupon, the record was read.)
20         MR. TANCK:  Same objection.
21   Q.   You can answer, sir.
22         MR. TANCK:  Objection.  Asked and
23   answered.
24   Q.   You can answer.
25         MR. TANCK:  Same objection as

246

1          12/19/22 - R. Smaglik
2    previously.
3          MR. KASOLAS:  That's not a
4    legitimate objection.
5    BY MR. KASOLAS:
6    Q.   You can answer the question, Mr.
7    Smaglik.
8          MR. TANCK:  Same objection.
9    A.   Can I start talking now?
10         MR. TANCK:  Yes, go ahead.
11   A.   So, I'll expound upon my previous
12   answer.  So in my professional experience
13   conducting many investigations and my
14   understanding of the production process, that is
15   not the reason why the label does not match.  We
16   also have quality processes in place, you know,
17   to ensure that the correct labels apply to the
18   correct products.  You know, in the times of
19   manufacturing, these types of errors I have
20   never seen such a thing.
21   Q.   You're telling me that Rockwell's
22   absolutely perfect in how it labels its products
23   coming out of every single factory around the
24   world concerning every single product?
25         MR. TANCK:  Objection to form.

247

1          12/19/22 - R. Smaglik
2    BY MR. KASOLAS:
3    A.   I'm not saying we're perfect, but we
4    do have -- we do have significant controls in
5    place to catch these things.
6    Q.   So does Rockwell own all of its
7    production facilities or does it out-source
8    production of certain products to third-party
9    contract manufacturers?
10         MR. TANCK:  Objection to form.
11    Lacks foundation.
12   BY MR. KASOLAS:
13   Q.   You can answer.
14   A.   I said certain product lines may be
15   out-sourced; this product line is not.
16   Q.   How do you know that?
17   A.   I am very familiar with the people
18   who run the business for this product.  I'm
19   familiar with our production facilities and what
20   they produce.  These are Compaq and Control
21   Logix controllers are among the two flagship
22   products, two products that we are probably most
23   famously known for, among others, but certainly
24   them and they are produced in-house.
25   Q.   Where is the Control Logix

248

1          12/19/22 - R. Smaglik
2    controller produced for Rockwell?
3    A.   The Control Logix controller is
4    produced in Singapore -- I'm sorry, Control
5    Logix controller is produced in Cleveland.
6    Q.   Anywhere else in the world besides
7    Cleveland?
8    A.   There may be some production in
9    Mequon.
10   Q.   Where is Mequon?
11   A.   In Cleveland, Ohio, and then Mequon,
12   Wisconsin, which is not far from Milwaukee,
13   Wisconsin.
14   Q.   And are those two plants Rockwell
15   owned plants?
16   A.   Yes.
17   Q.   Now, the serial number issue raised,
18   what was actually wrong with the serial number
19   besides the fact that it doesn't show up in your
20   computer systems?
21   A.   I don't recall no other differences
22   in the label from memory.  I would have to go
23   back and look at it.
24   Q.   Did the serial number sequence match
25   a certain Rockwell number at any point?

62 (Pages 245 to 248)

Ryan Smaglik
12/19/2022

249

1           12/19/22 - R. Smaglik
2       **A.   The serial number sequences, numeric**
3   **sequence that increments by one every time a**
4   **unique product is produced.  But it's unique**
5   **across all of our products, if that makes sense.**
6       Q.   So what I'm trying to say is the
7   serial number that's on this product that was
8   purchased in March of 2022 by Recon, is it very
9   similar to the serial number for that particular
10  product?
11      A.   From memory, I would have to see it
12  again I would have to check.
13      Q.   Is the issue not that the serial
14  number doesn't exist but that some of the digits
15  were removed?
16      A.   Not in this -- not in this -- I'd
17  actually have to -- I actually have to -- there
18  may be an issue -- no.
19          So with regard to the label that was
20  on the device itself, my memory is very clear
21  that there were no, you know, removed digits,
22  sorry for the quotation marks, but I mean
23  removed in terms of the way Bob, and Mr.
24  Kasolas, you know said that to me.  But, from
25  memory I'm not sure if the outer box had any

250

1           12/19/22 - R. Smaglik
2   modification on it.
3       Q.   How about the product itself, did
4   you inspect the product itself inside the box?
5       A.   Officially we looked at the outside
6   of the product; we did not tear it apart or
7   power it on.
8       Q.   Who looked at the outside product?
9       A.   I did.
10      Q.   How?
11      A.   Using the photographs that were
12  provided to me by Recon.
13      Q.   Did you inspect the product
14  in-person?
15      A.   No, I did not.
16      Q.   Why not?
17      A.   Didn't really need to.  From the
18  photographs, I could make the determination that
19  I needed to make.
20      Q.   Why didn't you take the product
21  apart to see if it's a real Rockwell product
22  made in a Rockwell plant?
23      A.   I can already tell that it's not a
24  real Rockwell product because it bears false
25  identity information which we commonly see in

251

1           12/19/22 - R. Smaglik
2   the unauthorized market space; this is not a
3   unique occurrence.
4       Q.   So when do you actually tear a
5   product apart to determine whether or not it's a
6   valid Rockwell product?
7           MR. TANCK:  Objection to form.
8   BY MR. KASOLAS:
9       A.   It's a case-by-case basis.  It
10  depends on what specifically we're trying to
11  learn and it's not done every time.
12      Q.   So this product we're talking about
13  here that Rockwell received from Recon in
14  March 2022, as we sit here today, do you know
15  where the product came from?
16      A.   Yes.  The product -- sorry, could
17  you --
18      Q.   Who made the product that you claim
19  was counterfeit that Recon purchased from Wi
20  Automation in March 2022?
21      A.   I don't know who made it.
22      Q.   Do you know where it was made?
23      A.   I don't know where it was made.
24      Q.   Do you know if it fully integrates
25  with other Rockwell products that it's

252

1           12/19/22 - R. Smaglik
2   compatible with?
3       A.   I'm saying it's not a genuine
4   Rockwell product.
5       Q.   But you never took it apart,
6   correct?
7       A.   Again, our position is that a
8   genuine Rockwell product is a product purchased
9   from Rockwell Automation or an authorized source
10  and, you know, would also be a physically
11  genuine product bearing a, you know, valid
12  product identity and product identification
13  labels that were originally applied by Rockwell
14  Automation.
15      Q.   My definition of a Rockwell product
16  is a product that Rockwell made.  So can you
17  tell me whether or not Rockwell made the product
18  that Recon purchased from Wi Automation in
19  March 2022 that you claim is counterfeit?
20          *(WHEREUPON, THE FOLLOWING TESTIMONY
21  RESUMED IN NON-CONFIDENTIAL PORTION OF THE
22  TESTIMONY.)
23          MR. TANCK:  Objection to form.
24  BY MR. KASOLAS:
25      A.   The label is counterfeit.  So as an

D'Amico Certified Reporting
908-546-7650

Ryan Smaglik
12/19/2022

253

1      **12/19/22 - R. Smaglik**
2      **assembly, it is a counterfeit assembly.  It is**
3      **not in a condition that left -- that it was**
4      **received not in a condition that a product**
5      **would've left our production facilities.**
6            Q.   I just want to say, so basically,
7      your entire reason for telling me that the March
8      2022 purchase of a controls logix controller is
9      counterfeit is the label that was stuck oath
10     product at some point in time which bears a
11     serial number that doesn't appear in the
12     computer system, correct?
13            MR. TANCK:  Objection to form.
14          Mischaracterizes the witness' testimony;
15          you can answer.
16     BY MR. KASOLAS:
17          **A.   There may be other discrepancies on**
18     **the labels; I'm just not remembering them at**
19     **this point in time, but from my memory,**
20     **certainly the serial number was not allocated to**
21     **a product, and we see this very commonly again,**
22     **with products sold in the unauthorized market**
23     **space and that was my determination.**
24          Q.   I just want to be clear, that answer
25     is based solely on the label that was attached

254

1            12/19/22 - R. Smaglik
2      inside the box to the product that had a serial
3      number you contend is not a Rockwell serial
4      number, correct?
5            MR. TANCK:  Objection to form.
6          Asked and answered, you can answer again.
7      BY MR. KASOLAS:
8          **A.   I'm saying I -- from memory, I at**
9      **least remember the serial number.  I would have**
10     **to go back and look at records to expound**
11     **further on that. I look at a lot of labels.**
12            MR. KASOLAS:  I'm going to take a
13     break a little bit.
14          Paul, how much time is it your
15     position we are in to this deposition, we
16     have had half hour break we didn't start
17     right on time, how long is it your
18     position that we are going to have for
19     this deposition today?
20            THE VIDEOGRAPHER:  We're now going
21     off the record, the time is 1:48.
22            MR. TANCK:  I know we started around
23     7:00 a.m., I haven't been tracking
24     specifically.  I can go back in to my
25     notes and look, but Daniel can give us a

255

1            12/19/22 - R. Smaglik
2      count on the video, a ball park.
3          (Whereupon, a recess was taken.)
4          (WHEREUPON, THE FOLLOWING TESTIMONY
5      RESUMES IN THE NON-HIGHLY CONFIDENTIAL
6      PORTION OF THE TRANSCRIPT.)
7            THE VIDEOGRAPHER:  We are now back
8      on the record, the time is 2:01 p.m.
9      BY MR. KASOLAS:
10          Q.   Mr. Smaglik, do you have any
11     graduate school degrees?
12          **A.   No, I don't have any graduate school**
13     **degrees.**
14          Q.   Do you have any certifications from
15     any kind of trade association?
16          **A.   Yes.**
17          Q.   What certifications do you have from
18     a trade association?
19          **A.   I'm an accredited counter fraud**
20     **specialist, ACFS.**
21          Q.   What is an accredited counter fraud
22     specialist?
23          **A.   It's a designation issued here in**
24     **the U.K., between one of the universities that**
25     **specializes in law enforcement, and, the City of**

256

1            **12/19/22 - R. Smaglik**
2      **London, Metropolitan police, as well as the**
3      **board of this, I think also the home office is**
4      **part of it.**
5          Q.   My question is:  What does it mean
6      to be a certified counter fraud specialist?
7          **A.   I've gone through about six months**
8      **of training with the City of London police,**
9      **covering topics from investigation, interview**
10     **techniques, case studies of economic crimes,**
11     **fraud, then passed a series of papers that had**
12     **to be written.**
13          Q.   When did you obtain that
14     certification?
15          **A.   That one I believe was in 2018 or**
16     **'19, I can't remember which.**
17          Q.   Why did you obtain that
18     certification from the City of London?
19          **A.   I live in the City of London.  I**
20     **live in London.**
21          Q.   Why did you obtain the certification
22     from the City of London?
23          **A.   That's a very respected teaching**
24     **institution here, the Metropolitan Police's**
25     **Economic Crimes School.**

64 (Pages 253 to 256)

Ryan Smaglik
12/19/2022

345

1          12/19/22 - R. Smaglik
2          MR. TANCK:  Are you going tomorrow
3     regardless?
4          MR. KASOLAS:  Yes, sir.
5          MR. TANCK:  So then let's just stop
6     here.
7          MR. KASOLAS:  Okay.
8          What time would you like to start
9     tomorrow?
10          THE VIDEOGRAPHER:  Let me end it
11    here, this concludes the deposition, the
12    time is 4 clock.
13          (Whereupon, at 4 o'clock p.m., the
14    deposition was adjourned.)
15
16
17
18    _____
19          MARIANNE D'AMICO CANDILOROS, CCR
20
21    Subscribed and sworn before me
22    this _____ day of _____, 2023.
23    _____
24
25

346

1          12/19/22 - R. Smaglik
2          C E R T I F I C A T E
3
4
5          I, MARIANNE D'AMICO, a Certified Court
6     Reporter, License No. XI01998, and Notary
7     Public, License No. 2013600, within and for the
8     States of New Jersey and New York, do hereby
9     certify:
10          That RYAN SMAGLIK, the witness whose
11    deposition is hereinbefore set forth, was duly
12    sworn by me and that such deposition is a true
13    record of the testimony given by the witness.
14          I further certify that I am not related
15    to any of the parties to this action by blood or
16    marriage, and that I am in no way interested in
17    the outcome of this matter.
18
19          ** The foregoing certification of
      this transcript does not apply to any
      reproduction of the same by any means unless
20    under the direct control and/or supervision of
      the certifying reporter. **
21
22
23    _____
      MARIANNE D'AMICO, CCR, CRR
      CCR NO. XI10998
24
25

87 (Pages 345 to 346)

D'Amico Certified Reporting
908-546-7650

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROCKWELL AUTOMATION, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>PARCORP S.R.L. d/b/a WI )<br>AUTOMATION, )<br>)<br>Defendant. )<br> ) | C.A. No. 21-1238-CFC |

## **DEFAULT STANDARD DISCOVERY DISCLOSURES**

Plaintiff Rockwell Automation, Inc. ("Rockwell") submits the following Default Standard Discovery Disclosures pursuant to the Court's local rules.

## **INTRODUCTION**

1.      These disclosures are based upon information reasonably available to Rockwell as of the date they were prepared. Rockwell's investigation of the facts, documents, and witnesses relevant to this case is ongoing. Rockwell expressly reserves the right to clarify, alter, amend, modify, or supplement the information contained in these disclosures if it should appear at any time that omissions or errors have been made, or if Rockwell obtains additional or more accurate information.

2.      By making these disclosures, Rockwell does not represent that it is identifying every document, item of electronically stored information, tangible thing, or witness that might be relevant or have relevant information related to the claims and defenses asserted in this action. Rather, Rockwell's disclosures represent a good faith

1

effort to identify information Rockwell reasonably believes to be relevant to Rockwell's claims and defendant Parcorp S.R.L. d/b/a WI Automation' s ("WA") defenses and counterclaims (bearing in mind that discovery is still ongoing in this action).

3.      These disclosures do not constitute a waiver of any objections Rockwell may have, now or in the future, to any discovery in this action. Rockwell expressly reserves any and all objections that it had, has, or may ever have, including, but not limited to, objections based upon: attorney-client privilege; work-product immunity; any other applicable privilege or immunity under federal or state law; relevance; competency; hearsay; immateriality; overbreadth; and undue burden or harassment.

4.      Rockwell expressly reserves the right to identify or call as witnesses other individuals in addition to those identified herein, and to identify additional documents, electronically stored information, and/or tangible things, if it discovers that such individuals have or might have knowledge of matters relevant to this action or that such additional documents, electronically stored information, and/or tangible things are relevant to this action. Rockwell also expressly reserves the right to identify or call expert witnesses in accordance with Federal Rule of Civil Procedure 26(a)(2) and any scheduling order entered in this action.

## DISCLOSURES

a.  Custodians

| Name | Title/Role | Subject Matter of Information |
|------|-----------|------------------------------|
| Ryan Smaglik | Head of Revenue and Brand Protection | Ryan Smaglik likely has discoverable information about (a) Rockwell's pricing and sale of Rockwell Products (b) Rockwell's distributor agreements and the incorporated distributor policies; (c) the adverse impact on Rockwell and Rockwell's authorized distributors relating to the unauthorized sale of Rockwell Products; (d) gray market sales; (e) Rockwell's warranty and remanufacturing process; (f) material differences; (g) customer complaints; (h) Rockwell customers (i.e. OEM, System integrators, etc.) |
| Warren Devilbiss | Manager, OGC Technology | Warren Devilbiss likely has discoverable information about Rockwell products, material differences and Rockwell's product safety and cybersecurity procedures and warranty and remanufacturing processes. |
| Justin Orofino | Manager, DGS Business Systems Analyst | Justin Orofino likely has discoverable information about Rockwell products and Rockwell's DGS business system. |
| Laura Martin | Director, Customer Care | Laura Martin likely has discoverable information about Rockwell products, including warranty, repair, and customer complaints |
| David Bassett | Vice President, | Dave Bassett likely has discoverable information about Rockwell pricing of Rockwell Products and the adverse impact on Rockwell |

| | Global Revenue | and Rockwell's distributors due to unauthorized sale of Rockwell Products. |
|---|---|---|
| Christina Mezzenzana | EMEA, Partner Relationship MGR | Cristina Mezzenzana likely has discoverable information about gray market sales and the adverse impact to Rockwell and Rockwell's distributors relating to the impact of unauthorized sale of Rockwell Products. |

b. Non-custodial data sources include Rockwell's website, www.rockwell.com, Rockwell's Literature Library, SAP, and DGS systems.

c. (i) Notice that other than electronic documents and emails that are retained for time periods pursuant to Rockwell's document retention policies, all other electronic discovery is not reasonably accessible.  Text, voicemail, and other electronic communication, other than email, are not reasonably accessible.

(ii) Rockwell anticipates third-party discovery of defendant's suppliers and distributors of Rockwell Product.

(iii) Rockwell is currently unaware of foreign laws that prevent discovery, but will raise such issues promptly should they arise.

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (# 3630)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
Tel: (302) 472-7311
dgattuso@hegh.law

*Attorneys for Plaintiffs*

OF COUNSEL:

Paul Tanck
Neal McLaughlin
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel: (212) 210-9400
Fax: (212) 210-9444
paul.tanck@alston.com
neal.mclaughlin@alston.com

Dated:  February 18, 2022

# Exhibit 3

## *6 Weinstein's Federal Evidence § 1006.05*

**Weinstein's Federal Evidence > Rule 1006 Summaries to Prove Content. > CHAPTER 1006 Summaries to Prove Content**

# § 1006.05 Presentation of Summary Evidence[*]

### [1] Use of Pretrial, Voir Dire and Discovery Procedures

Before admitting summaries, the court should find that they have a sufficient factual basis and that possible prejudice or confusion does not outweigh their usefulness in clarifying voluminous material. These matters should be determined, if possible, by stipulation before the trial.[1] However, a voir dire hearing out of the jury's presence is not required, and the court may require the opponent to challenge the probative force of the summaries on cross-examination once it is clear that the summary evidence is admissible.[2]

The problem of surprise can also be minimized by the parties' use of discovery procedures.[3] Pretrial hearings furnish a useful occasion for ensuring that there will be no surprise with respect to summaries.[4]

### [2] Use of Witnesses

Summary evidence need not be an exhibit, but may take the form of a witness's oral testimony.[5] Although there is no explicit requirement that the witness be an expert or have special expertise, practical considerations often

---

[*] Chapter revised in 1994 by Sandra D. Katz, member of the New York Bar, and in 1997 by Publisher's Editorial Staff.

[1] **Preference for pretrial resolution of issues.** *See United States v. Smyth, 556 F.2d 1179, 1184 n.12 (5th Cir. 1977)* ("We think that the framers of the rule clearly contemplated a pre-trial resolution of any issues that may be raised concerning the use of summaries").

[2] **Hearing out of jury's presence not required.** *United States v. Collins, 596 F.2d 166, 169 (6th Cir. 1979)* (voir dire not invariably required, especially when summaries are straightforward and their basis is clear).

[3] *See Fed. R. Civ. P. 34*, discussed in 7 **Moore's Federal Practice, Ch. 34, Production of Documents, Electronically Stored Information, and Things and Entry Upon Land For Inspection and Other Purposes** (Matthew Bender 3d ed.); *Fed. R. Crim. P. 16(b)*, discussed in 25 *Moore's Federal Practice, Ch. 616, Discovery and Inspection* (Matthew Bender 3d ed.).

[4] *See Fed. R. Civ. P. 16* discussed in 3 **Moore's Federal Practice, Ch. 16, Pretrial Conferences; Scheduling; Management** (Matthew Bender 3d ed.); *Fed. R. Crim. P. 17.1* discussed in 25 *Moore's Federal Practice, Ch. 617.1, Pretrial Conference* (Matthew Bender 3d ed.).

[5] **Oral testimony as summary.**

5th Circuit *Nichols v. Upjohn Co., 610 F.2d 293, 294 (5th Cir. 1980)* (in products liability action, defendant's witness was properly permitted to summarize contents of investigative reports contained in 94,000 pages composing New Drug Application filed with FDA; also, exhibit listing complaints received was admissible as summary based on documents made available to plaintiff for examination before trial).

6th Circuit *See United States v. Jackson-Randolph, 282 F.3d 369, 384–385 (6th Cir. 2002)* (in prosecution for fraudulent skimming from government reimbursements to defendant's food program, court properly admitted agent's summary testimony, based on testimony of defendant's employees and exhibits, including roll books and immunization records, estimating the highest number of meals defendant's corporation legitimately could have claimed during indictment period; agent did not judge

6 Weinstein's Federal Evidence § 1006.05

necessitate having technicians, such as accountants, testify or prepare exhibits. Whether the witness is an expert, or not, affects the weight of the evidence once the proponent has laid a proper foundation for the evidence (for discussion, *see* § 1006.06[3]). For discussion of the use of a witness to summarize prior testimony, see § 1006.04[3].

Rule 1006 "appears to contemplate" that the summary "will have been prepared by a witness available for cross-examination, not by the lawyers trying the case."[6]

## [3] Admissibility With Authenticating Witness

Before a summary may be admitted, its proponent must lay a proper foundation for the admissibility of the material summarized and show that the summary is accurate.[7]

As a practical matter, it is very difficult to authenticate the chart, summary, or calculation, or to establish its accuracy, without calling as a witness the person who is responsible for its preparation.[8] However, Rule 1006 does not expressly require that charts, summaries, or calculations be authenticated on the witness stand (*see* § 1004.05[4]). Courts have facilitated the authentication process by allowing supervisory personnel to attest to

---

reliability of testimony or comment on information's accuracy, and court gave instruction that summary was not independent evidence).

9th Circuit Goldberg v. United States, 789 F.2d 1341, 1343 (9th Cir. 1986) (no abuse of discretion in permitting revenue agent to testify concerning summaries of voluminous tax records).

[6] **Summary prepared by witness, not lawyers.** United States v. Grajales-Montoya, 117 F.3d 356, 361 (8th Cir. 1997) (admission of government-prepared chronology listing significant events in operation of charged drug conspiracy was error, but harmless).

[7] **Authentication is required.** Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec, Inc., 529 F.3d 371, 382 (7th Cir. 2008) (because plaintiff failed to properly authenticate summaries, trial court acted within its discretion by striking them).

[8] **Examples of preparer as authenticating witness.**

1st Circuit United States v. Nivica, 887 F.2d 1110, 1126 (1st Cir. 1989) (summaries were compiled by FBI agent who testified at length about reliance on various business records); United States v. Massachusetts Maritime Academy, 762 F.2d 142, 157 (1st Cir. 1985) (two witnesses testified as to method followed in preparing exhibits summarizing applicants' files; citing **Weinstein's**).

6th Circuit United States v. Gaitan-Acevedo, 148 F.3d 577, 587 (6th Cir. 1998) (11-page summary exhibit, depicting results of voluminous telephone records, was properly admitted in drug prosecution, since preparer explained his method of loading and compiling information into summary, information summarized consistently reflected the evidence, and preparer was available for cross-examination).

7th Circuit United States v. Radseck, 718 F.2d 233, 237 (7th Cir. 1983) (government witness who prepared summary was available for cross-examination).

8th Circuit United States v. Wainright, 351 F.3d 816, 821 (8th Cir. 2003) (in prosecution for interstate transportation of stolen property, state investigator explained in detail how he developed summary from voluminous logging records that had been introduced at trial, and explained how he determined when timber was stolen; and defense counsel cross-examined witness).

10th Circuit State Office Sys. v. Olivetti Corp., 762 F.2d 843, 845 (10th Cir. 1985) (president of company testified that he had helped prepare summary).

11th Circuit United States v. Norton, 867 F.2d 1354, 1362–1363 (11th Cir. 1989) (assumptions made in preparing charts were amply supported by preparer's testimony, and defense counsel had opportunity to cross-examine witness concerning charts).

the authenticity and accuracy of charts, summaries, or calculations in situations where many individuals, or possibly computers or other machines, are used to prepare the exhibits.[9]

## [4] Admissibility Without Authenticating Witness

In a departure from the usual practice, *Rule 1006* does not expressly require that charts, summaries, or calculations be authenticated on the witness stand, for example, by the person responsible for their preparation.[10] However, as a practical matter, such testimony is usually useful (*see* § 1004.05*[3]*).

In this regard, *Rule 1006* should be regarded as a special exception to the hearsay rule. Although admitting a chart, summary, or calculation offered as evidence without the testimony of the person responsible for its preparation might seem, at first blush, to be hearsay; the availability of the original or duplicate material on which the exhibit was based should adequately substitute for the absence of the person responsible for the exhibit's preparation. For further discussion, see *§ 1006.06[1]*.

In a criminal case, the preparer's failure to testify when the chart, summary, or calculation is offered as evidence against a criminal defendant raises the question of whether the defendant's constitutional right to confrontation under the *Sixth Amendment* is violated.[11] As a tactical matter, it is almost inconceivable that a prosecutor would not use a witness to explain a chart unless the defendant stipulated to its admission in evidence.

## [5] Risk of Undue Influence on Jury

There is some risk that a jury may be unduly impressed by the witness's credentials or style of presentation, and might accept the chart, summary, or calculation as accurate without independently assessing the data.[12] However, the risk is minimal.[13] If there is a dispute, the judge should instruct the jury to consider the accuracy of the material contained in a chart, summary, or calculation before accepting the material as a truthful representation of the facts sought to be proved.[14]

---

[9] **Supervisor as authenticating witness.** *See, e.g., United States v. Scales, 594 F.2d 558, 563 (6th Cir. 1978)* (person who supervised compilation of summary was proper person to attest to authenticity and accuracy of chart; citing **Weinstein's**).

[10] **Preparer's authentication not required.**

5th Circuit *See Chapman v. A.S., 2014 U.S. App. LEXIS 2054, at **8 (5th Cir. Feb. 3, 2014)* (unpublished) (trial court's admission in bench trial of summary exhibits used to determine damages was not abuse of discretion, even though chart preparer was not available for cross-examination, because defendant was able to argue about claimed inaccuracies, and court expressly took those claims into account).

6th Circuit *See, e.g., Ryder Truck Lines v. Teamsters Freight Local Union No. 480, 705 F.2d 851, 858 (6th Cir. 1983)* (witness who did not prepare summary statement was allowed introduce statement under *Rule 1006*).

[11] **Admissibility without authenticating witness as possible violation of confrontation right.** *See California v. Green, 399 U.S. 149, 155, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)* ("we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception").

[12] **Danger of undue influence on jury.** *Lloyd v. United States, 226 F.2d 9, 17 (5th Cir. 1955)* (visually impressive charts may unduly influence jury).

[13] **Minimal risk.** *See United States v. Nathan, 536 F.2d 988, 992 n.5 (2d Cir. 1976)* ("we take it that jurors are not so unsophisticated as to be likely to be misled by the size of a courtroom chart, in any event").

[14] **Cautionary instruction may mitigate risk.** *See United States v. Johnson, 319 U.S. 503, 519, 63 S. Ct. 1233, 87 L. Ed. 1546 (1943)* (judge's charge to jury was so correct and clear that jury could not possibly have been misled into the notion that they must accept the calculations of witness); *see also § 1006.04[3]*.

6 Weinstein's Federal Evidence § 1006.05

Weinstein's Federal Evidence
Copyright 2023,  Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**End of Document**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 21-1238-GBW-JLH |
| PARCOP S.R.L. d/b/a | ) | |
| WIAUTOMATION, | ) | |
| | ) | |
| Defendant. | ) | |

## EXHIBIT 15F: DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE NO. 3 TO PRECLUDE ROCKWELL FROM INTRODUCING TESTIMONY CONCERNING ROCKWELL'S <u>SERIAL NUMBER DATABASE</u>

Dated: June 30, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

Rockwell relies on FRE 1002's advisory note (Opp., p. 1), which states "application of the rule requires a resolution of the question whether contents are sought to be proved."   Rockwell seeks to prove the database contents (that it allegedly contains serial numbers for every Rockwell product) **and** that certain serial numbers are not in the database.  Rockwell though cannot testify about the database contents because Rockwell never produced any data or content from the database. Fed. R. Evid. 1002.

The content of the database entries was not at issue in any case Rockwell cited. *U.S. v. Valdovinos-Mendez*, 641 F.3d 1031, 1035 (9th Cir. 2011) (search to determine whether database stored defendant's application); *Allen v. Wells Fargo Bank Minn., N.A.*, 334 B.R. 746, 750-51 (D.D.C. 2005) (search for record of voice message); *Regscan, Inc. v. Brewer*, 2007 WL 879420, at *7 (E.D. Pa. Mar. 16, 2007) (absence of customer communications); *Lindenbaum v. Realgy, LLC*, 606 F.Supp.3d 732, 739-40 (N.D. Ohio 2022) (search for record of phone call).

In those cases, the fact that information was missing was relevant, regardless of the other entries' contents.  Here, a missing entry is irrelevant unless Rockwell first proves the database contents reflect information about every Rockwell product produced.  Yet, Rockwell failed to produce the relevant data and failed to disclose during discovery that it relied on "SAP" for its "counterfeit" claims (MIL, Ex. B,

Rog 14), even though WiAutomation's discovery requests required such disclosure and production (*id.*; Ex. D, RFP 1, 2, 13, 20, 21).

Dated: June 30, 2023

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Of Counsel*:

*/s/ Pilar G. Kraman*

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that Defendant's Motion in Limine to Preclude Rockwell from From Introducing Testimony Concerning Rockwell's Serial Number Database is in Times New Roman 14-point font and contains 250 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.

Dated: June 30, 2023

*Of Counsel*:

Bob Kasolas
Eric J. Boden
BRACH EICHLER, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-3139
bkasolas@bracheichler.com
eboden@bracheichler.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Alexis N. Stombaugh (No. 6702)
Maliheh Zare (No. 7133)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
astombaugh@ycst.com
mzare@ycst.com

*Attorneys for Defendant*

# Exhibit D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **ROCKWELL AUTOMATION, INC.,** | : Civil Action No. 1:21-cv-01238 |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **PARCORP, S.R.L. D/B/A** | : |
| **WIAUTOMATION,** | : |
| | : |
| **Defendants.** | : |

**TO:**   **Neal McLaughlin, Esq.**
          **Alston & Bird**
          **90 Park Avenue**
          **15th Floor**
          **New York, NY 10016-1387**

          **Dominick Gattuso**
          **Heyman Enerio Gattuso & Hirzel LLP**
          **300 Delaware Ave., Suite 200**
          **Wilmington, DE 19801**

### DEFENDANT'S REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO PLAINTIFF

Defendant Parcorp, S.r.l. d/b/a WiAutomation ("WiAutomation") hereby serves the following requests for production of documents on plaintiff Rockwell Automation, Inc. in accordance with the Federal Rules of Civil Procedure and the applicable Case Management Order.

## <u>DEFINITIONS AND INSTRUCTIONS</u>

1.      The terms "Rockwell," "Plaintiff," "you," and "your" shall mean Rockwell Automation, Inc. and all persons who (a) have acted or are acting for or on its behalf; (b) were or are its agents or representatives; and (c) were or are in any way associated or affiliated with it.

2.      The term "WiAutomation" or "Defendant" shall mean Paracorp S.r.l. d/b/a WiAutomation and all persons who are authorized to act for or on its behalf.

3.      The term "Complaint" refers to the Complaint that Chin filed in this case in the United States District Court for the District of Delaware on August 27, 2021.

4.      The term "Answer" refers to the Amended Answer and Affirmative Defenses that Defendant filed in this case on or about December 10, 2021.

5.      The term "date" means the exact day, month and year if ascertainable; if not, the closest approximation that can be made by means of relationship to other events, locations or matters should be identified.

6.      The term "person" means natural persons, associations, corporations, partnerships, governments (or governmental agencies), quasi-public entities, proprietorships, joint ventures, trusts, estates and all other forms of legal entities.

7.      The terms "relate, concern, reflect, or refer to" and "relating, concerning, reflecting or referring to," either taken collectively or appearing by themselves shall include, but are not limited to, "embodies," "constitutes," "comprises," "consists" and "has any logical or factual connection with" the subject matter or the document category in which such term is used.

8.      The term "communication" includes both oral and written communications, including any oral utterance heard or overheard, whether in person, by telephone or otherwise, as well as every document and every other mode of intentionally conveying meaning, including all correspondence.

9.      The term "document" includes any and all letters, correspondence, communications, memoranda, notes, telegrams, pamphlets, reports, sales reports, financial reports, ledgers, records, studies, books, working papers, diaries, logs, journals, calendars, charts, papers, notices, periodicals, contracts, agreements, minutes, appraisals, analyses, calculations, invoices, accounting entries, press releases, advertisements, drawings, sketches, graphs, data sheets, tapes, sound recordings, phonographic sound reproductions, and every manner of written, printed, recorded, graphic or photographic material, magnetic, electric, or electronic impulse or computer entry, including "E-Mail" and websites, however any of the above may be produced, reproduced, reduced, enlarged, recorded, stored, taped, transcribed or received, and any copies, duplicates, facsimiles or transmittals of the foregoing.

10.      Each request solicits all documents available to Defendant or obtainable from her agents, attorneys, representatives and all other persons acting in concert with her or on her behalf.

11.      These requests shall be deemed to be continuing so as to require a prompt supplemental response if you discover additional documents that should have been included in response to these requests after the time of your initial response.

12.      With respect to any request in which any privilege or doctrine is claimed as a basis for objection, state any privilege asserted, state the basis of the privilege, identify the attorney with respect to whom the privilege or doctrine is claimed and identify the information withheld with reasonable particularity to enable the parties and the Court to assess the validity of your objection.

13. Whenever any objection is made to any portion of any request, whether on the ground of privilege or any other ground, an answer shall be furnished to so much of the request as to which there is no objection.

BE:12398270.1/PAR348-280966

14.     In the event that you conclude that any instruction, definition or request is ambiguous, state the matter you deem ambiguous and state the construction chosen or used in your response.

15.     The singular form of any word includes the plural and the plural form includes the singular.

16.     The past tense of any verb includes the present tense and the present tense includes the past tense.

BE:12398270.1/PAR348-280966

## REQUESTS FOR PRODUCTION

1.      All documents that relate to any of the facts or events underlying the claims and allegations set forth in the Complaint and/or Answer, including but not limited to your investigation of the facts or events.

2.      All documents referred to in the Complaint and/or Answer or referred to in any interrogatories served upon you.

3.      All non-privileged documents you reviewed or consulted in preparing the Answer to Plaintiff's Complaint and Counterclaim.

4.      All non-privileged documents that refer or relate to any communications between you and any other person regarding the facts or events underlying the claims and allegations set forth in the Complaint and/or Answer.

5.      All non-privileged documents that refer or relate to any communications between and among any of your agents, employees or other representatives regarding the facts or events underlying the claims and allegations set forth in the Complaint and/or Answer.

6.      All documents that reflect, refer to or relate to any admission that you contend has been made at any time by any party to this action regarding the facts or events underlying the claims and allegations set forth in the Complaint and/or Answer.

7.      All documents that reflect, refer to or relate to any declaration against interest that you contend has, at any time, been made by any party to this action regarding the facts or events underlying the claims and allegations set forth in the Complaint and/or Answer.

8.      All documents that reflect, refer to or relate to any conversations, meetings or other communications, including emails or text messages, between you (or any of your current or former agents, employees or representatives) and Plaintiff (or any of its current or former agents,

- 4 -
BE:12398270.1/PAR348-280966

employees or representatives) regarding any of the issues, claims, defenses or factual allegations raised in the Complaint and/or Answer.

9.      All non-privileged documents that reflect, refer to or relate to any conversations, meetings or other communications between Rockwell and any third-party regarding any of the issues, claims, defenses or factual allegations raised in the Complaint and/or Answer.

10.     All non-privileged documents that reflect, refer to or relate to any conversations, meetings or other communications by and between Rockwell and its agents, employees and representatives regarding any of the issues, claims, defenses or factual allegations raised in the Complaint and/or Answer.

11.     All documents, excluding the pleadings and those documents prepared by counsel, which set forth your version or description of the facts or events underlying the claims and defenses alleged in the Complaint and/or Answer.

12.     All diaries, logs, calendars, notebooks or other documents or things maintained by Rockwell that contain any references to the facts or events underlying the claims and defenses alleged in the Complaint and/or Answer.

13.     All records or other writings that refer, relate to, concern or discuss the facts or events underlying the claims and defenses alleged in the Complaint and/or Answer.

14.     All documents that Rockwell intends to use as an exhibit at trial or at any evidentiary hearing in this matter.

15.     Any and all documents prepared by each and every expert retained by Rockwell, including, but not limited to, draft reports, whether or not previously provided to Rockwell by any such expert.

16.     With respect to each and every expert identified above or in any interrogatory answer, please provide any and all documents which:

(a)    state the expert witness' qualifications and the nature of the expert's specialty within his or her profession;

(b)    list any of the publications authored by the expert witness within the preceding ten years;

(c)    describe the compensation being paid to the expert witness for the study and/or testimony;

(d)    list any other cases in which the expert has testified as an expert at trial or by deposition;

(e)    state the subject matters on which the expert witness will testify in this case;

(f)    state the substance of the facts about which the expert witness will testify;

(g)    state the substance of the opinions about which the expert witness will testify and a complete summary of the specific grounds, including assumptions, for each such opinion;

(h)    constitute written reports with respect to the substance of the facts and/or opinions as to which the expert witness is expected to testify; and

(i)    the expert relies upon as a basis for his or her testimony, upon which the expert relies, upon which the expert's testimony is based, or from which such testimony is derived, in whole or in part.

17.    All documents provided to or received from any potential expert who may testify on your behalf at trial.

18.    All documents that refer or relate to any communications between any such expert and you or any of your representatives.

19.    All documents that Rockwell will rely upon to prove any monetary damages.

20.    All documents referring or relating to your allegation in Paragraph 58 of the Complaint that "on information and belief, WI Automation is shipping customers used and counterfeit products and products obtained from unverified sources to fulfill orders for 'new' Rockwell products."

BE:12398270.1/PAR348-280966

21.     All documents referring or relating to your allegation in Paragraph 61 of the Complaint that "[t]he Unauthorized Rockwell Products sold by WI Automation are all materially different from Genuine Rockwell Products sold by Rockwell and its authorized distributors."

22.     All documents referring or relating to products acquired from WiAutomation by Rockwell.

23.     All documents and things received from WiAutomation by Rockwell.

24.      All  non-privileged documents that refer, relate, embody, comprise, detail, or describe Rockwell's investigation into WiAutomation's sale of Rockwell products.

25.     Documents depicting, containing, or embodying Rockwell's network of Authorized Distributors.

26.     All documents sufficient to show Rockwell's organizational structure, including without limitation all organizational charts.

27.     All documents and communications regarding WiAutomation and/or its sale of Rockwell products.

28.     All documents concerning Rockwell's document destruction and/or document preservation policies and Rockwell's compliance with such policies.

29.     All documents referring or relating to Rockwell's warranty policies from 2015 through the present.

30.     All documents referring or relating to any of the alleged differences between the Rockwell products sold by Rockwell and its authorized distributors on the one hand, and WiAutomation on the other hand.

31.     All documents referring or relating to Rockwell customer inquiries, complaints, or other communications regarding WiAutomation.

32.     All documents referring or relating to any customer/consumer confusion regarding WiAutomation.

33.     All documents referring or relating to Rockwell's quality assurance/quality control measures referenced in the Complaint and Rockwell's adherence to them.

34.     All product recall notices for any of the Rockwell products at issue in this litigation.

35.     All documents referring or relating to Rockwell customer support policies and procedures and Rockwell's adherence to them.

36.     All documents relating to validity of the Asserted Trademarks referenced in the Complaint.

37.     All documents referring or relating to "value-added" distributors as referenced in Paragraph 33 of the Complaint, including Rockwell's policies and procedures for selling to such "value-added" distributors.

38.     All documents referring or relating to Rockwell's Unauthorized Third Party Resellers policy, referenced in Paragraph 34 of the Complaint.

BE:12398270.1/PAR348-280966

39.     All documents referring or relating to Rockwell's "reasonable efforts to protect its brands against improper resale" as referenced in Paragraph 42 of the Complaint.

40.     All documents referring or relating to the Rockwell Warranty referenced in Paragraph 65 of the Complaint.

41.     All documents referring or relating to Rockwell's software, hardware, and firmware support as referenced in Paragraph 116 of the Complaint.

42.     All documents referring or relating to Rockwell's "procedures in place that require that, from time-to-time, certain Rockwell products that have quality issues be removed from inventory in order to ensure that those products are not sold to customers" referenced in Paragraph 122 of the Complaint.

43.     All documents, items, or things that refer or relate to the allegations contained in Count I of the Complaint.

44.     All documents, items, or things that support the allegation contained in Paragraph 143 of the Complaint that "WI Automation's unauthorized sales and attempted sales of Unauthorized Rockwell Products containing Plaintiff's Trademarks to unsuspecting consumers is a violation of Section 32(1) of the Lanham Act, 15 U.S.C. §1114(1)."

45.     All documents, items, or things that support the allegation contained in Paragraph 144 of the Complaint that "WI Automation's sale and continued sale of Unauthorized Rockwell Products has created a substantial likelihood of confusion and caused mistake and deception in consumers' minds because the Unauthorized Rockwell Products, although physically similar to legitimate Rockwell products, are materially different from legitimate Rockwell products."

46.     All documents, items, or things that support the allegation contained in Paragraph 145 of the Complaint that "Rockwell does not authorize, condone or otherwise allow the sale of non-conforming goods having the material differences found in the Unauthorized Rockwell Products sold by WI Automation."

47.     All documents, items, or things that support the allegation contained in Paragraph 147 of the Complaint that "Rockwell has suffered and will continue to suffer irreparable harm to its goodwill and reputation not only with its customers, who confuse the Unauthorized Rockwell Products for legitimate Rockwell products, but also with its authorized distributors, whose prices WI Automation is able to undercut by selling Unauthorized Rockwell Products."

48.     All documents, items, or things that refer or relate to the allegations contained in Count II of the Complaint.

49.     All documents, items, or things that support the allegation contained in Paragraph 150 of the Complaint that "WI Automation's unauthorized sales and attempted sales of Unauthorized Rockwell Products as legitimate Rockwell products to unsuspecting consumers constitute[s] false advertising…"

50.     All documents, items, or things that support the allegation contained in Paragraph 151 of the Complaint that "WI Automation has made false and/or misleading statements in commercial advertising regarding the Unauthorized Rockwell Products, which are likely to cause confusion and mistake, and to misrepresent the nature and characteristics of the Unauthorized Rockwell Products and WI Automation's commercial activities, and have substantially affected interstate commerce."

51.     All documents, items, or things that refer or relate to the allegations contained in Count III of the Complaint.

52.     All documents items or things that support the allegation contained in Paragraph 157 of the Complaint that "[t]he purchasing public is likely to attribute to Rockwell, WI Automation's use of Plaintiff's Trademarks as a source of origin, authorization, and/or sponsorship for the products WI Automation sells and, further, purchase products from WI Automation in the erroneous belief that WI Automation is authorized by, associated with, sponsored by, or affiliated with  Rockwell, when WI Automation is not."

53.     All documents, items or things that support the allegation contained in Paragraph 159 of the Complaint that WiAutomation has made false and/or misleading statements that are likely to influence consumers to purchase products from WiAutomation

54.     All documents, items, or things that refer or relate to the allegations contained in Count IV of the Complaint.

55.     All documents, items, or things that support the allegation contained in Paragraph 163 of the Complaint that "WI Automation's acts set forth [in the Complaint] constitute unlawful, unfair, or fraudulent business practices in violation of 6 Del. C. §2532 *et seq.*"

56.     All documents, items, or things that support the allegation that "WI Automation's use of Plaintiff's Asserted Trademarks deceives customers and potential customers regarding the origin of goods and services offered by WI Automation."

57.     All documents, items, or things that refer or relate to the allegations contained in Count V of the Complaint.

58.     All documents, items, or things that support the allegation contained in Paragraph 172 of the Complaint that "WI Automation's conduct is likely to confuse a prospective buyer or customer as to the origin, source, or sponsorship of WI Automation's products, or to cause mistake or to deceive

the public into believing that WI Automation's sale of the Unauthorized Rockwell Products is authorized by Rockwell."

59.     All documents, items, or things that support the allegation contained in Paragraph 173 of the Complaint that "WI Automation has promoted and deceptively marketed the Unauthorized Rockwell Products to the detriment of Rockwell, as many of Rockwell's customers and prospective customers have been and will be induced to purchase the Unauthorized Rockwell Products instead of Rockwell products, based on WI Automation's statements and conduct…"

60.     All documents, items, or things that support the allegation contained in Paragraph 177 of the Complaint that "Because WI Automation's acts were undertaken with the intent to harm Rockwell in disregard of its rights, Rockwell is further entitled to an award of punitive damages against WI Automation…"

61.     All documents, items, or things that refer or relate to the allegations contained in Count VI of the Complaint.

62.     All documents, items, or things that support the allegation contained in Paragraph 180 of the Complaint that "Defendant WI Automation received an improper benefit in the form of Rockwell goods wrongfully acquired at an unreasonably low price, and the profits from the improper resale of those goods."

63.     All documents not otherwise requested that you may rely upon at the time of trial.

Respectfully submitted,


 /s/ Bob Kasolas, Esq.
Bob Kasolas, Esq.
**BRACH EICHLER LLC**
101 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone: 973-228-5700
Facsimile: 973-228-7852
*Attorneys for Defendants Parcorp, S.r.l. d/b/a WiAutomation*

Dated: April 5, 2022

EXHIBIT 16

**EXHIBIT 16**

**<u>Rockwell's Discovery Designations</u>**

1. WiAutomation's responses to Rockwell's Interrogatory Nos.1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16.

2. WiAutomation's declaration of Fulvio Coppola served in support thereof, dated June 22, 2022.