# Exhibit A

No.

IN THE

# Supreme Court of the United States

————

ABITRON AUSTRIA GMBH; ABITRON GERMANY GMBH;
HETRONIC GERMANY GMBH; HYDRONIC-
STEUERSYSTEME GMBH; ABI HOLDING GMBH; ALBERT
FUCHS,

*Petitioners,*

v.

HETRONIC INTERNATIONAL, INC.,

*Respondent.*

————

**On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the Tenth Circuit**

————

**PETITION FOR A WRIT OF CERTIORARI**

————

RYAN YEH
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
(212) 607-8160

JEFFREY A. LAMKEN
  *Counsel of Record*
LUCAS M. WALKER
JAMES A. BARTA
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Ave., N.W.
Washington, D.C.  20037
(202) 556-2000
jlamken@mololamken.com

*Counsel for Petitioners*

WILSON-EPES PRINTING CO., INC.  –  (202) 789-0096  –  WASHINGTON, D.C. 20002

## QUESTION PRESENTED

Petitioners—all foreign nationals—were subjected to a $90 million damages award under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, for allegedly infringing respondent's U.S. trademarks. While trademark rights are distinctly territorial, the accused sales occurred almost entirely abroad. Of approximately $90 million in sales, 97% were purely foreign: They were sales in foreign countries, by foreign sellers, to foreign customers, for use in foreign countries, that never reached the United States or confused U.S. consumers.

The Tenth Circuit nonetheless held that the Lanham Act applies extraterritorially to *all* of petitioners' foreign sales. Recognizing that the circuits have splintered in this area, the Tenth Circuit adopted an expansive view that other courts, including the Fourth Circuit, have concededly rejected. Under the Tenth Circuit's view, the Lanham Act applies extraterritorially whenever foreign defendants' foreign conduct allegedly diverts *foreign sales* from a *U.S. plaintiff*. Such an effect, the court held, sufficiently affects U.S. commerce because it prevents foreign revenue from flowing into the U.S. economy.

The question presented is:

Whether the court of appeals erred in applying the Lanham Act extraterritorially to petitioners' foreign sales, including purely foreign sales that never reached the United States or confused U.S. consumers.

ii

## PARTIES TO THE PROCEEDINGS BELOW

Petitioners Abitron Austria GmbH, Abitron Germany GmbH, Hetronic Germany GmbH, Hydronic-Steuer-systeme GmbH, ABI Holding GmbH, and Albert Fuchs were defendants in the district court and appellants in the court of appeals.

Respondent Hetronic International, Inc. was plaintiff in the district court and appellee in the court of appeals.

iii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to this Court's Rule 29.6, petitioners state that ABI Holding GmbH is the parent corporation of Abitron Austria GmbH, Abitron Germany GmbH, Hetronic Germany GmbH, and Hydronic-Steuersysteme GmbH.  They further certify that ABI Holding GmbH has no parent corporation and no publicly held company owns 10% or more of its stock.

iv

**STATEMENT OF RELATED PROCEEDINGS**

The following proceedings are directly related to this case within the meaning of Rule 14.1(b)(iii).

- *Hetronic International, Inc.* v. *Hetronic Germany GmbH, et al.*, Nos. 20-6057 & 20-6100 (10th Cir.), judgment entered on August 24, 2021;

- *Hetronic International, Inc.* v. *Hetronic Germany GmbH, et al.*, No. CIV-14-650-F (W.D. Okla.), judgment entered on May 29, 2020.

v

## TABLE OF CONTENTS

Page

Opinions Below .................................................................. 1

Statement of Jurisdiction ............................................ 2

Statutory Provisions Involved ................................... 2

Statement ........................................................................ 2

I.   The Lanham Act ................................................. 2

II.  Proceedings Below ............................................ 4

    A.  The Dispute's Origins ............................. 4

    B.  District Court Proceedings .................... 5

    C.  Tenth Circuit Proceedings .................... 10

Reasons for Granting the Petition ............................ 13

I.   The Courts of Appeals Are
     Divided Over the Lanham Act's
     Extraterritorial Effect .................................... 16

    A.  Uncertainty Pervades After *Steele* ....... 16

    B.  The Circuits Have Splintered
        Over Extraterritorial Application
        of the Lanham Act .................................. 17

        1.  The Circuits Have Fractured
            Over Lanham Act
            Extraterritoriality ............................ 17

        2.  The Circuits Are Divided
            Over the Tenth Circuit's
            Diversion-of-Foreign-Sales
            Theory ................................................ 20

II.  The Issue Is Important ................................... 22

III. The Decision Below Is Wrong ...................... 26

vi

TABLE OF CONTENTS—Continued

Page

    A.  The Lanham Act Does Not Apply
to Purely Foreign Sales ........................... 26

    B.  Properly Construed, the
Lanham Act Does Not Apply
Extraterritorially ..................................... 32

IV.  This Case Is an Excellent Vehicle................ 34

Conclusion.................................................... 35

Appendix A – Court of Appeals Opinion
(Aug. 24, 2021) .......................................... 1a

Appendix B – Summary Judgment Order
(Mar. 22, 2019) .......................................... 68a

Appendix C – Permanent Injunction
(Apr. 22, 2020)........................................... 113a

Appendix D – Memorandum re: Permanent
Injunction (Apr. 22, 2020) ...................... 122a

Appendix E – Final Judgment
(May 29, 2020)........................................... 133a

Appendix F – Ruling on Defendants' Motion
for Judgment as a Matter of Law
(Feb. 6, 2020) ............................................ 139a

Appendix G – Ruling on Defendants'
Motion to Clarify (Feb. 10, 2020)........................... 155a

Appendix H – Trial Ruling
(Feb. 25, 2020) .......................................... 162a

Appendix I – Trial Ruling
(Feb. 27, 2020) .......................................... 165a

Appendix J – Relevant Statutory Provisions........... 170a

vii

## TABLE OF AUTHORITIES

Page(s)

CASES

*A. Bourjois & Co.* v. *Katzel*,
260 U.S. 689 (1923)....................................  13, 26, 27

*American Circuit Breaker Corp.* v. *Oregon Breakers Inc.*,
406 F.3d 577 (9th Cir. 2005)..............................  26

*American Rice, Inc.* v. *Ark. Rice Growers Co-Op. Ass'n*,
701 F.2d 408 (5th Cir. 1983)..............................  18

*Atlantic Richfield Co.* v. *Arco Globus Int'l Co.*, 150 F.3d 189 (2d Cir. 1998)........................  27

*Baston* v. *United States*,
137 S. Ct. 850 (2017).........................................  30

*Crowell* v. *Benson*,
285 U.S. 22 (1932)..............................................  31

*EEOC* v. *Arabian Am. Oil Co.*,
499 U.S. 244 (1991)............................................  32

*F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155 (2004) ................................  23

*Fuji Photo Film Co.* v. *Shinohara Shoji Kabushiki Kaisha*,
754 F.2d 591 (5th Cir. 1985)..............................  26

*IMAPizza, LLC* v. *At Pizza Ltd.*,
965 F.3d 871 (D.C. Cir. 2020) ...........................  27

*International Café, S.A.L.* v. *Hard Rock Café Int'l (U.S.A.), Inc.*,
252 F.3d 1274 (11th Cir. 2001)...............  17, 22, 25

*Jesner* v. *Arab Bank, PLC*,
138 S. Ct. 1386 (2018).......................................  22

viii

## TABLE OF AUTHORITIES—Continued

Page(s)

*Juicy Couture, Inc.* v. *Bella Int'l Ltd.*,
    930 F. Supp. 2d 489 (S.D.N.Y. 2013) .............. 20

*Kiobel* v. *Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013) .................................. 13, 22, 26

*McBee* v. *Delica Co., Ltd.*,
    417 F.3d 107 (1st Cir. 2005) .......................... 18, 26

*Microsoft Corp.* v. *AT&T Corp.*,
    550 U.S. 437 (2007) ............................. 23, 24, 25, 29

*Morrison* v. *Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) ..................................... *passim*

*Nestlè USA Inc.* v. *Doe*,
    141 S. Ct. 1931 (2021) .......................................... 22

*Nintendo of Am. Inc.* v. *Aeropower Co., Ltd.*,
    34 F.3d 246 (4th Cir. 1994) ................................. 18

*Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985) .............................................. 27

*Paulsson Geophysical Servs., Inc.* v. *Sigmar*,
    529 F.3d 303 (5th Cir. 2008) ............................... 18

*Person's Co.* v. *Christman*,
    900 F.2d 1565 (Fed. Cir. 1990) ......................... 26

*RJR Nabisco, Inc.* v. *European Community*,
    579 U.S. 325 (2016) ..................................... *passim*

*Steele* v. *Bulova Watch Co.*,
    344 U.S. 280 (1952) ..................................... *passim*

*Sterling Drug, Inc.* v. *Bayer AG*,
    14 F.3d 733 (2d Cir. 1994) ................................. 20

*Tire Engineering & Distribution, LLC* v.
    *Shandong Linglong Rubber Co.*,
    682 F.3d 292 (4th Cir. 2012) ....................... *passim*

ix

TABLE OF AUTHORITIES—Continued

Page(s)

*Topps Co., Inc.* v. *Cadbury Stani S.A.I.C.*,
   526 F.3d 63 (2d Cir. 2008) ................................. 26

*Trade-Mark Cases*,
   100 U.S. (10 Otto) 82 (1879) ................. 3, 24, 31, 34

*Trader Joe's Co.* v. *Hallatt*,
   835 F.3d 960 (9th Cir. 2016) ............................. 18

*Update Art, Inc.* v. *Modiin Publ'g, Ltd.*,
   843 F.2d 67 (2d Cir. 1988) ................................. 24

*Vanity Fair Mills, Inc.* v. *T. Eaton Co.*,
   234 F.2d 633 (2d Cir. 1956) .................... 17, 27, 32

*WesternGeco LLC* v. *ION Geophysical Corp.*, 138 S. Ct. 2129 (2018) ......................... 22, 26

*Yee* v. *Escondido*,
   503 U.S. 519 (1992) ............................................ 31

*Zenger-Miller, Inc.* v. *Training Team, GmbH*, 757 F. Supp. 1062
   (C.D. Cal. 1991) ................................................. 20

CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. I, §8, cl. 3 ........................ 3, 26, 31, 33

The Lanham Act of 1946, 60 Stat. 427
   (codified as amended at 15 U.S.C.
   §1051 *et seq.*) ................................................. *passim*

     15 U.S.C. §1051(a)(1) .................................... 2
     15 U.S.C. §1114(1)(a) ......................... 2, 5, 27, 28
     15 U.S.C. §1116 ............................................ 9, 30
     15 U.S.C. §1117(a) ............................... 8, 25, 30
     15 U.S.C. §1125(a)(1) ......................... 2, 5, 27, 28
     15 U.S.C. §1126 ............................................ 25
     15 U.S.C. §1127 .................................... 3, 25, 33

28 U.S.C. §1254(1) .................................................. 2

x

TABLE OF AUTHORITIES—Continued

Page(s)

TREATY PROVISIONS

Paris Convention for the Protection of
Industrial Property, July 14, 1967,
[1970] 21 U.S.T. 1583 ........................................   25

FEDERAL RULES

Fed. R. Civ. P. 4(k)(2).............................................   23

Fed. R. Evid. 702 .................................................   9, 30

Fed. R. Evid. 703 .................................................   9, 30

OTHER AUTHORITIES

C. Bradley, *Territorial Intellectual
Property Rights in an Age of
Globalism*, 37 Va. J. Int'l
L. 505 (1997).............................................   19, 24, 33

M. Chon, *Kondo-ing* Steele v. Bulova:
*The Lanham Act's Extraterritorial
Reach Via the Effects Test*, 25 B.U. J.
Sci. & Tech. L. 530 (2019) .................   19, 23, 26, 33

T. Dornis, *Behind the* Steele *Curtain: An
Empirical Study of Trademark
Conflicts Law, 1952-2016*, 20 Vand. J.
Ent. & Tech. L. 567 (2018)............................   19, 24

T. Holbrook, *Is There a New
Extraterritoriality in Intellectual
Property?*, 44 Colum. J.L. &
Arts 457 (2021)....................................   19, 24, 25, 33

5 *McCarthy on Trademarks and Unfair
Competition* (5th ed. 2021) ...............   13, 26, 27, 34

IN THE

# Supreme Court of the United States

————

ABITRON AUSTRIA GMBH; ABITRON GERMANY GMBH;
HETRONIC GERMANY GMBH; HYDRONIC-
STEUERSYSTEME GMBH; ABI HOLDING GMBH; AND
ALBERT FUCHS,

*Petitioners,*

v.

HETRONIC INTERNATIONAL, INC.,

*Respondent.*

————

**On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the Tenth Circuit**

————

**PETITION FOR A WRIT OF CERTIORARI**

————

Abitron Austria GmbH, Abitron Germany GmbH, Hetronic Germany GmbH, Hydronic-Steuersysteme GmbH, ABI Holding GmbH, and Albert Fuchs respectfully petition for a writ of certiorari to review the judgment of the United States Court of Appeals for the Tenth Circuit.

## OPINIONS BELOW

The court of appeals' opinion (Pet. App. 1a-67a) is reported at 10 F.4th 1016. The district court's orders, opinions, and judgment (Pet. App. 68a-138a) are unreported.

2

## STATEMENT OF JURISDICTION

The court of appeals entered judgment on August 24, 2021. Pet. App. 1a. On November 15, 2021, Justice Gorsuch extended the time to file this petition until December 22, 2021, and on December 15, 2021, further extended the time until January 21, 2022. No. 21A153. This Court has jurisdiction under 28 U.S.C. § 1254(1).

## STATUTORY PROVISIONS INVOLVED

Relevant portions of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, are set forth in the Appendix, Pet. App. 170a-183a.

## STATEMENT

This case involves extraterritorial application of the Lanham Act, which provides civil remedies for infringement of U.S. trademarks. The Tenth Circuit upheld a $90 million damages judgment against petitioners—all foreign nationals—based on its holding that the Lanham Act applies extraterritorially to *all* their sales *worldwide*, including purely foreign sales that involved only foreign parties and never reached the United States. In doing so, the Tenth Circuit exacerbated an acknowledged circuit conflict.

## I.  THE LANHAM ACT

Under the Lanham Act, the owner of a mark "used in commerce" may register it with the U.S. Patent and Trademark Office. 15 U.S.C. § 1051(a)(1). The Act provides a private cause of action against anyone who "use[s] in commerce" a "counterfeit, copy, or colorable imitation of a registered mark" in a way "likely to cause confusion, or to cause mistake, or to deceive." § 1114(1)(a). The statute also addresses unregistered marks, creating a cause of action against anyone who uses in commerce any word, symbol, or device that is likely to confuse or deceive consumers about the origin of goods. § 1125(a)(1).

3

The statute defines "commerce" as "all commerce which may lawfully be regulated by Congress." § 1127. That definition was enacted after this Court declared unconstitutional a predecessor statute that was *not* limited to "the kind of commerce which Congress is authorized to regulate," *i.e.*, "commerce with foreign nations, commerce among the States, and commerce with the Indian tribes." *Trade-Mark Cases*, 100 U.S. (10 Otto) 82, 96-97 (1879); see U.S. Const. art. I, § 8, cl. 3.

This Court has considered the Lanham Act's application to foreign conduct only once, in *Steele* v. *Bulova Watch Co.*, 344 U.S. 280 (1952).  There, the Court held the Lanham Act could apply to "acts of trade-mark infringement and unfair competition consummated in a foreign country by a citizen and resident of the United States." *Id.* at 281.  The Court emphasized the defendant's U.S. citizenship, reasoning that "'Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States.'" *Id.* at 286.  The Court also emphasized that the defendant's "operations and their effects were not confined within the territorial limits of a foreign country." *Ibid.*  While the suit involved knockoff watches sold in Mexico, the watches "filtered through the Mexican border into this country," endangering the trademark owner's "reputation * * * here as well as abroad," and "essential steps" in the scheme were taken "in the United States." *Id.* at 286-287.

On "the facts of th[at] case," *Steele* concluded the defendant's "activities, when viewed as a whole, fall within the jurisdictional scope of the Lanham Act." 344 U.S. at 285.  The Court did not say whether the same conclusion would be warranted if the defendant were foreign or his

4

actions had more limited U.S. impacts. *Steele* thus "leaves much unanswered about the extent of the Lanham Act's extraterritorial reach," particularly "as it relates to foreign defendants." Pet. App. 21a-22a.

## II. PROCEEDINGS BELOW

This case concerns U.S. trademarks and trade dress for radio remote controls used to operate heavy equipment, such as cranes. In the 1980s, the German company Hetronic Steuersysteme GmbH invented radio remote controls. C.A. App. 3090. It created many of the products that respondent Hetronic International, Inc. ("International") now claims to own. C.A. App. 2556-2559, 2990-3003.

### A. The Dispute's Origins

In 2000, Hetronic Steuersysteme's founder, Max Heckl, moved to the United States and formed International as a U.S. corporation. Pet. App. 50a. International entered into a research-and-development agreement with Hetronic Steuersysteme and two co-developers. C.A. App. 2986-2987. The agreement provided that Hetronic Steuersysteme and its co-developers were "*sole owner[s] of all that which is done, produced or developed by [International], including but not limited to the know-how, technical information, designs, product descriptions, trademarks, [and] trade names*." C.A. App. 2988 (emphasis altered).

In 2008, Heckl sold International to Methode Electronics. C.A. App. 2613-2985. That sale did not include Hetronic Steuersysteme (by then renamed Hetronic Deutschland). C.A. App. 2633, 3914. Instead, Heckl sold Hetronic Steuersysteme (*i.e.*, Hetronic Deutschland) to petitioner Hetronic Germany in 2010.

5

After acquiring Hetronic Steuersysteme, petitioners Hetronic Germany and Hydronic-Steuersysteme (both owned by petitioner Albert Fuchs), licensed rights to the "Hetronic" name from International.   C.A. App. 3062-3080.   They also agreed to act as International's distributors.   *Ibid.*   At the time, Fuchs was unaware of the research-and-development agreement confirming that Hetronic Steuersysteme owned the trademarks and trade dress for the products being distributed.   C.A. App. 3673, 3680.

In 2011, a Hetronic Germany employee discovered the research-and-development agreement.   C.A. App. 3673.   "After consulting with legal counsel, Hetronic Germany" determined that it—not International—"owned all the technology developed under the agreement."   Pet. App. 5a.   Eventually, International terminated the distribution agreements.   *Ibid.*   Fuchs then formed two new companies, petitioners Abitron Austria and Abitron Germany, which purchased Hydronic-Steuersysteme and Hetronic Germany.   *Ibid.*   On the understanding that they owned the trademarks for products developed under the research-and-development agreement, the companies competed with International, almost entirely outside the United States.   Pet. App. 5a-6a, 32a.

**B.  District Court Proceedings**

1.   International sued petitioners—all German and Austrian nationals—in Oklahoma federal court, asserting (*inter alia*) claims under the Lanham Act.   Pet. App. 6a. International alleged that petitioners' sales of 10 types of radio remote controls infringed International's registered U.S. trademarks, in violation of 15 U.S.C. § 1114(1)(a); unregistered trademarks and trade dress, in violation of § 1125(a)(1); or both.   C.A. App. 718-725; Pet. App. 3a.

6

Nearly all accused sales were made in foreign countries, to foreign customers, for use in foreign countries. Pet. App. 32a, 43a; C.A. App. 3005-3007.  As just one example, they included sales Abitron Germany made in Germany to a Norwegian customer that used the equipment in Iceland.  C.A. App. 3007, 3018-3020.  Of petitioners' approximately $90 million in worldwide sales, only about 3% ever ended up in the United States—*e.g.*, when foreign purchasers incorporated remote controls into cranes they sold to end-users.  Pet. App. 32a, 43a, 134a-136a; C.A. App. 3006, 3089.  Few sales were to U.S. buyers: The court of appeals identified just €202,134.12 (roughly $240,000) in direct U.S. sales, Pet. App. 40a n.8—and all but €16,670.60 (roughly $20,000) of those were to *International* and affiliates, C.A. App. 3005-3007; see Pet. App. 13a n.1.

Petitioners sought summary judgment that the Lanham Act did "not apply extraterritorially to their foreign sales."  Pet. App. 91a.  It was "undisputed that none of [petitioners] are citizens of the United States."  Pet. App. 80a.  But the district court ruled that factual issues regarding the effect of petitioners' foreign conduct on U.S. commerce, foreign-law conflicts, and the United States' interest relative to foreign nations precluded summary judgment.  Pet. App. 77a-96a.

2.  The parties disputed ownership of the asserted U.S. trademarks and trade dress.  Petitioners claimed ownership under the 2000 research-and-development agreement, while International claimed ownership under later agreements.  See Pet. App. 53a.  Shortly before trial, the district court held petitioners were precluded from asserting ownership, citing a decision of the European Union Intellectual Property Office ("EUIPO") Board of Appeal.  Pet. App. 161a.

7

Before the EUIPO, Abitron Germany had sought cancellation of International's E.U. trademark registration for one of the products at issue here (the "NOVA"). C.A. App. 3111.  Abitron Germany argued International had registered the NOVA trademark in bad faith, as Hetronic Steuersysteme (Hetronic Deutschland) had used an unregistered version of the mark in Germany since the 1990s and Abitron Germany acquired the mark when it bought Hetronic Steuersysteme.  C.A. App. 3110-3112.

The Board found International had not registered the mark in bad faith.  C.A. App. 3114.  Noting the parties' "dispute" over various agreements' meaning, the Board stated "it cannot immediately constitute bad faith for a contract party to interpret a contract in its favor." *Ibid.* The Board also ruled that Abitron Germany had not shown, "under German law," that Hetronic Steuersysteme established rights to the NOVA mark through prior use.  C.A. App. 3112.  Those rulings were sufficient to deny Abitron Germany's cancellation request.  The Board nonetheless opined that, *if* Hetronic Steuersysteme had established rights to the NOVA mark through use, the mark would not have transferred to Abitron Germany under Germany's Trademark Act.  C.A. App. 3113.

Although the Board had before it a narrow question regarding registration of a single *E.U. trademark* under E.U. law, the district court ruled that the Board's decision precluded petitioners from arguing that they owned *U.S. trademarks and trade dress* under *U.S. law*. Pet. App. 153a-161a.  The district court ruled that the Board's commentary on whether Abitron Germany *would* have acquired rights from Hetronic Steuersysteme under German law was not dictum, even though

8

the Board had ruled no such rights were established. Pet. App. 157a.  The district court barred petitioners from contesting International's ownership of the asserted U.S. marks, or asserting any good-faith belief that they owned them.  Pet. App. 160a.

3.  Barred from arguing they owned the trademarks, petitioners focused on issues related to the Lanham Act's extraterritorial application and damages.  "But the district court precluded" petitioners from adducing evidence that their "'purely foreign sales'" had "'no "effect" on U.S. commerce'" and caused "'no confusion among U.S. citizens.'"  Pet. App. 33a.  For example, after an International witness "testif[ied] about the confusion [petitioners'] alleged trademark infringement created among [International's] customers," the district court barred petitioners from eliciting on cross-examination that "*only non-U.S. customers* were confused."  *Ibid.* (emphasis added); see Pet. App. 163a-165a.  The district court "apparently assumed" it had granted International summary judgment on extraterritoriality because International's counsel "t[old] the court that it had."  Pet. App. 33a.  As International later admitted, the district court had merely denied petitioners' request for summary judgment and "reserve[d] definitive resolution of the [extraterritoriality] issue for another day."  Pet. App. 32a.

The district court also foreclosed petitioners' effort to limit damages.  Under the Lanham Act, plaintiffs may recover the "profits" from infringing sales.  15 U.S.C. § 1117(a).  The plaintiff needs "to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  *Ibid.*  After International presented evidence about petitioners' total sales, petitioners called an expert to identify their costs.  Pet. App. 63a.  While petitioners' accounting system was not "set up" to track

9

costs on a "product level," the expert would have testified that, working with an Abitron employee, he determined product costs using corporate ledgers and conservative cost-accounting principles.   C.A. App. 3321-3322; see C.A. App. 3302-3317.  The district court excluded the testimony.  Pet. App. 168a.  It conceded that the information "about the costs of goods sold" the expert relied on was "sufficient * * * under Rule 703 for purposes of expert testimony under Rule 702." *Ibid.*  In the court's view, however, the *Lanham Act* imposed a higher bar.  The court ruled the expert's testimony did not "pas[s] muster under * * * the Lanham Act" absent "independently admissible evidence" about the "reliability of the numbers." *Ibid.*; contrast Fed. R. Evid. 703.

4.  The jury awarded International approximately $90 million in damages for Lanham Act violations. Pet. App. 134a-136a.  That figure encompassed petitioners' *total worldwide sales* of accused products—even though 97% of those products were sold outside the United States to foreign customers for use in foreign nations.  Pet. App. 32a, 43a; C.A. App. 3005-3007.  The award reflected *gross* sales, without any deduction for costs of goods.

The district court entered a "worldwide" permanent injunction under 15 U.S.C. § 1116, prohibiting petitioners from using the marks and trade dress for the 10 accused products anywhere in the world.  Pet. App. 132a; see Pet. App. 113a-121a.  The court rejected arguments that extraterritorial application of the Lanham Act was inappropriate, refusing to limit its injunction to U.S. sales or products "destined for the United States."   Pet. App. 124a-130a, 132a.

10

### C.   Tenth Circuit Proceedings

The Tenth Circuit affirmed in relevant part.  It upheld the $90 million damages award reflecting petitioners' total worldwide sales—including sales made abroad to foreign customers that never reached the United States. Pet. App. 2a-3a, 134a-136a.  It held petitioners' foreign activities could be enjoined, while limiting the injunction to countries where International markets or sells its products.  Pet. App. 50a.

1.   The Tenth Circuit held that the Lanham Act applied extraterritorially to all of petitioners' foreign sales.  In the court's view, *Steele* established that the "Lanham Act could apply abroad at least in some circumstances."  Pet. App. 21a.  But *Steele* "le[ft] much unanswered" about the statute's "extraterritorial reach—particularly, as in our case, as it relates to foreign defendants."  Pet. App. 21a-22a.

The Tenth Circuit surveyed five distinct tests different circuits had adopted for "deciding whether the Lanham Act governs a defendant's foreign conduct."  Pet. App. 24a-31a.  The court endorsed the First Circuit's approach—and then modified it to produce a *sixth* test. *Ibid.*

Under the Tenth Circuit's framework, courts first consider "whether the defendant is a U.S. citizen." Pet. App. 31a.  If so, the Lanham Act applies to foreign activities without further inquiry.  If "the defendant is *not* a U.S. citizen," courts ask "whether the defendant's conduct had a substantial effect on U.S. commerce." *Ibid.*  If so, courts consider "whether extraterritorial application of the Lanham Act would create a conflict with trademark rights established under foreign law."  *Ibid.*

11

The Tenth Circuit recognized petitioners are all foreign citizens. It nonetheless held the Lanham Act applied extraterritorially to their foreign conduct as a matter of law because their foreign sales allegedly had a "substantial effect on U.S. commerce." Pet. App. 39a-47a. The court adopted two different theories for different categories of foreign sales.

a.   The overwhelming majority of petitioners' sales—97%—were purely foreign. They were made in foreign countries, by foreign companies, to foreign customers, for use in foreign countries. Pet. App. 32a, 43a. For example, they included a German company's sale to a Norwegian customer of equipment used in Iceland. C.A. App. 3007, 3018-3020.

The Tenth Circuit did not deny that "'all of th[os]e challenged transactions occurred abroad'" and any putative confusion they produced was limited to foreign consumers. Pet. App. 44a. It nonetheless concluded that those purely foreign sales substantially affected U.S. commerce based on a "diversion-of-foreign-sales" theory. That theory rests on "the idea that [petitioners] stole sales from [International] *abroad*, which in turn affected [International's] *cash flows in the United States*." *Ibid.* (emphasis added). The court reasoned that "U.S. courts have an interest in protecting" *U.S. plaintiffs* from "the economic harm [they] suffe[r] in the form of lost sales" outside the United States, because revenues from those foreign sales "would have flowed into the U.S. economy." Pet. App. 45a.

The Tenth Circuit recognized that its holding conflicts with the Fourth Circuit's decision in *Tire Engineering & Distribution, LLC* v. *Shandong Linglong Rubber Co.*, 682 F.3d 292 (4th Cir. 2012). Pet. App. 46a. There, the Fourth Circuit held that a diversion-of-foreign-sales

12

theory can support the Lanham Act's extraterritorial application only if *the defendant* is a "*U.S. corporatio[n]* that conducted operations—including at least some of the infringing activity—*within the United States*." *Tire Engineering*, 682 F.3d at 311 (emphasis added). Because petitioners are all *foreign* nationals, that rule would have foreclosed liability for virtually all accused sales here.

b. For a small portion of petitioners' foreign sales—3%—the Tenth Circuit found a substantial effect on U.S. commerce because the products "ended up in the United States" and "caused confusion among U.S. consumers." Pet. App. 41a-43a. The court reasoned that, whenever "'American consumers have been exposed to [an] infringing mark,'" the United States has a "'reasonably strong interest in the litigation.'" Pet. App. 41a, 43a.

The court conceded that theory implicated only a tiny portion of petitioners' foreign sales. It identified only €1.7 million in sales that ever reached the United States. Pet. App. 43a. But the court refused to limit damages or the injunction to such sales. *Ibid.* It affirmed the entire $90 million damages award, encompassing all of petitioners' worldwide sales. Pet. App. 47a, 134a-136a.[1]

2. The Tenth Circuit declined to restrict the injunction to U.S. sales or products likely to reach the United States. But it concluded the district court's worldwide injunction should not have encompassed countries where

---

[1] The court held that the Lanham Act governs "direct sales into the United States" as a *domestic* application of the Act; petitioners' "direct U.S. sales" thus "d[id]n't factor into [the court's] analysis of whether the Lanham Act applies abroad." Pet. App. 40a-41a. Direct U.S. sales at most "totaled €202,134.12"—an infinitesimal portion of the worldwide sales underlying the $90 million award. Pet. App. 40a n.8, 134a-136a; see p. 6, *supra*.

13

International does not compete.  Pet. App. 48a-49a.  It remanded for entry of an injunction limited to "countries in which [International] currently markets or sells its products."  Pet. App. 50a.

3.  The Tenth Circuit rejected challenges to the district court's preclusion and evidentiary rulings.  Pet. App. 50a-66a.  It read the EUIPO Board of Appeal's decision as holding that, in purchasing International, Methode "obtained ownership of all the Hetronic-related intellectual property," including U.S. trademarks.  Pet. App. 58a.  The Tenth Circuit found the district court's rationale for excluding petitioners' damages expert "unclear."  Pet. App. 65a.  It nonetheless affirmed on the ground that the data the expert used was not sufficiently authenticated.  Pet. App. 66a.

## REASONS FOR GRANTING THE PETITION

The Tenth Circuit's decision to extend the Lanham Act extraterritorially to foreign defendants' foreign sales to foreign customers concededly conflicts with decisions of other circuits.  Trademarks are territorial.  A U.S. trademark gives its owner rights to the mark in this country, but not in foreign countries; conversely, a foreign trademark does not confer rights in the United States.  See *A. Bourjois & Co.* v. *Katzel*, 260 U.S. 689, 691-692 (1923); 5 *McCarthy on Trademarks and Unfair Competition* §29:1 (5th ed. 2021).  Under the presumption against extraterritoriality, moreover, a federal statute may not be construed to "reach conduct occurring in the territory of a foreign sovereign" absent specific congressional direction.  *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013).  "When a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010).

14

The Lanham Act nowhere states that it applies in foreign countries.  Federal courts have nonetheless applied the statute extraterritorially, citing *Steele* v. *Bulova Watch Co.*, 344 U.S. 280 (1952).  But *Steele*—decided long before this Court's refinement of its extraterritoriality doctrine—offers little relevant guidance.  It held a federal district court had "jurisdiction" over a suit alleging trademark infringement "consummated in a foreign country *by a citizen and resident of the United States*."  *Id.* at 281 (emphasis added).  As the Tenth Circuit observed, *Steele* "leaves much unanswered about the extent of the Lanham Act's extraterritorial reach—particularly, as in our case, as it relates to foreign defendants."  Pet. App. 21a-22a.  And while this Court "has in recent years considered (or reconsidered) the extraterritoriality of several federal statutes," it has not addressed the Lanham Act's extraterritorial reach in the seven decades since *Steele*.  Pet. App. 21a.

As a result, the courts of appeals have badly splintered.  They have adopted at least *six different tests* for determining when the Lanham Act applies extraterritorially—including the novel approach the Tenth Circuit devised here.  This case presents that conflict starkly.  Petitioners (defendants below) are all foreign nationals of Germany and Austria.  The Tenth Circuit held that the Lanham Act applies extraterritorially to their purely foreign sales—sales made by foreign defendants in foreign countries to foreign customers for use in foreign countries.  The court did not find that those purely foreign sales ever reached the United States or confused any U.S. customer.  Instead, it declared they had a "substantial effect on U.S. commerce" justifying extraterritorial application of the Lanham Act *solely* because they allegedly diverted "*foreign sales*" away from a *U.S.*

15

*plaintiff*, limiting foreign revenues that could have "flowed into the U.S. economy." Pet. App. 45a-47a (emphasis added). On that basis, the Tenth Circuit upheld $90 million in damages, encompassing petitioners' *total worldwide sales*, and approved an injunction barring petitioners' sales *anywhere in the world* plaintiff markets or sells competing products.

As the Tenth Circuit candidly acknowledged, Pet. App. 45a-46a, its holding conflicts with the Fourth Circuit's decision in *Tire Engineering & Distribution, LLC* v. *Shandong Linglong Rubber Co.*, 682 F.3d 292, 310-311 (4th Cir. 2012), which *rejected* the diversion-of-foreign-sales theory adopted below. Tens of millions of dollars in liability—for conduct occurring entirely abroad—should not turn on whether a plaintiff chooses to sue in Oklahoma or Virginia.

The Tenth Circuit's "diversion of foreign sales from a U.S. plaintiff" theory has no limiting principle. *Whenever* a U.S. plaintiff loses foreign sales to foreign competitors in foreign markets, it can claim it lost revenue that would have eventually flowed into the U.S. economy. If that were enough for extraterritorial application of U.S. law, it would entitle U.S. plaintiffs to damages and injunctions against foreign competitors in foreign markets all over the world—regardless of whether any accused sale reached U.S. consumers. Nothing supports giving the Lanham Act such blatantly protectionist effect, which defies basic territoriality principles, contradicts U.S. treaty commitments, threatens international friction, and invites other countries to respond in kind.

16

## I. THE COURTS OF APPEALS ARE DIVIDED OVER THE LANHAM ACT'S EXTRATERRITORIAL EFFECT

### A. Uncertainty Pervades After *Steele*

This Court addressed the Lanham Act's application to foreign conduct for the first and last time 70 years ago in *Steele*. Dating from long "before [this Court] honed [its] extraterritoriality jurisprudence," *RJR Nabisco, Inc.* v. *European Community*, 579 U.S. 325, 353 (2016), *Steele* provided scant guidance—causing courts of appeals to fracture in its wake.

In *Steele*, the Court held that the Lanham Act gave a federal district court "jurisdiction" over a suit against "a citizen and resident of the United States" who sold counterfeit Bulova watches in Mexico. 344 U.S. at 281. The defendant's U.S. citizenship was central to the Court's analysis, which invoked the United States' authority to "'gover[n] the conduct of *its own citizens* * * * in foreign countries.'" *Id.* at 285 (emphasis added); see *id.* at 282. The Court emphasized that it was protecting the plaintiff's *U.S.* trademark rights. Although the alleged infringement was "consummated" in Mexico, the U.S. defendant "bought component parts of his wares in the United States" and counterfeit products filtered "into this country," threatening the plaintiff's "trade reputation" "here." *Id.* at 281, 286. "[V]iewed as a whole," the Court ruled, those facts brought the case "within the jurisdictional scope of the Lanham Act." *Id.* at 285.

*Steele* "le[ft] much unanswered" about the Lanham Act's extraterritorial reach. Pet. App. 21a. And this Court has not revisited the subject in the seven decades since *Steele*—even as it "has in recent years considered (or reconsidered) the extraterritoriality of several federal

17

statutes, some of them multiple times." *Ibid.* (collecting cases).

### B. The Circuits Have Splintered Over Extraterritorial Application of the Lanham Act

Lacking guidance from this Court, the circuits have fractured over the Lanham Act's application to foreign conduct. The Tenth Circuit identified *five distinct tests* adopted by other circuits—then devised a *sixth* test of its own. Those tests diverge on fundamental questions, including what effect (if any) foreign conduct must have on U.S. commerce and the relevance of defendants' foreign citizenship. Here, the Tenth Circuit held the Lanham Act reaches petitioners' purely foreign sales because they allegedly diverted *foreign sales* and revenues from a *U.S. plaintiff.* But it conceded that the Fourth Circuit has *rejected* that theory for applying the Lanham Act to foreign defendants.

1. *The Circuits Have Fractured Over Lanham Act Extraterritoriality*

The Second and Eleventh Circuits apply the "*Vanity Fair*" test. See *Vanity Fair Mills, Inc.* v. *T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956); *International Café, S.A.L.* v. *Hard Rock Café Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001). Under *Vanity Fair*, courts look for three factors present in *Steele*: (1) "the defendant's conduct had a substantial effect on United States commerce"; (2) the defendant was "a United States citizen"; and (3) "there was no conflict with trade-mark rights established under * * * foreign law." 234 F.2d at 642. Because *Steele* "was so thoroughly based on the power of the United States to govern 'the conduct of its own citizens * * * when the rights of other nations or their nationals are not infringed,'" the absence of any "facto[r] might well be determinative." *Id.* at 642-643.

18

The Fourth and Fifth Circuits apply less stringent versions of *Vanity Fair*. Pet. App. 25a. Whereas *Vanity Fair* asks whether foreign conduct has a "substantial" effect on U.S. commerce, the Fourth Circuit asks only whether there is a "*significant* effect on United States commerce." *Nintendo of Am. Inc.* v. *Aeropower Co., Ltd.*, 34 F.3d 246, 250 (4th Cir. 1994) (emphasis added). The Fifth Circuit "lower[s] the bar further," Pet. App. 25a, requiring only "*some* effect" on U.S. commerce, *American Rice, Inc.* v. *Ark. Rice Growers Co-Op. Ass'n*, 701 F.2d 408, 414 & n.8 (5th Cir. 1983). It has suggested the Lanham Act may apply extraterritorially against U.S. citizens "regardless of the effect on United States commerce." *Paulsson Geophysical Servs., Inc.* v. *Sigmar*, 529 F.3d 303, 307 (5th Cir. 2008).

The Ninth Circuit applies a "distinct tripartite test" derived from antitrust law. Pet. App. 25a. It requires only "*some* effect on American foreign commerce." *Trader Joe's Co.* v. *Hallatt*, 835 F.3d 960, 969 (9th Cir. 2016) (emphasis added). It then considers whether "the effect [is] sufficiently great to present a cognizable injury to the plaintiffs under the Lanham Act" and whether "the interests of and links to American foreign commerce [are] sufficiently strong in relation to those of other nations." *Ibid.* That last factor "further breaks down into *seven* additional factors." Pet. App. 26a n.5.

The First Circuit "choose[s] not to adopt the formulations used by other circuits." *McBee* v. *Delica Co., Ltd.*, 417 F.3d 107, 110 (1st Cir. 2005). It considers citizenship a threshold consideration: If "the defendant is an American citizen," the Lanham Act automatically applies. *Id.* at 111. If the defendant is foreign, the Lanham Act applies if the defendant's foreign conduct has a "substantial effect" on U.S. commerce. *Ibid.* In cases involving

19

foreign defendants, the First Circuit "use[s] the substantial effects test as the sole touchstone to determine jurisdiction." *Id.* at 121. It "differs" from circuits that consider international comity "as part of the basic jurisdictional analysis," deeming comity only a "prudential" factor. *Ibid.*

The decision below further deepens the split. The Tenth Circuit declared it would "adopt" the First Circuit's approach—but promptly modified that approach to produce a *sixth* test. Pet. App. 28a-31a. Like the First Circuit, the Tenth Circuit treats citizenship as a threshold issue. If the defendant is a U.S. citizen, the Lanham Act applies to its foreign conduct even if "the effect on U.S. commerce isn't substantial." Pet. App. 28a. If a defendant is foreign, "the plaintiff must show that the defendant's conduct has a substantial effect on U.S. commerce" (not merely "some" effect). Pet. App. 29a. But while the First Circuit "eschew[s]" analysis of foreign law, the Tenth Circuit held that courts should "consider whether extraterritorial application of the Lanham Act would create a conflict with [foreign] trademark rights." Pet. App. 30a.

As courts and commentators recognize, those disparate approaches produce disparate outcomes across the country. See T. Dornis, *Behind the* Steele *Curtain: An Empirical Study of Trademark Conflicts Law, 1952-2016,* 20 Vand. J. Ent. & Tech. L. 567, 599 (2018); T. Holbrook, *Is There a New Extraterritoriality in Intellectual Property?,* 44 Colum. J.L. & Arts 457, 464-465, 487-491 (2021); M. Chon, *Kondo-ing* Steele v. Bulova: *The Lanham Act's Extraterritorial Reach Via the Effects Test,* 25 B.U. J. Sci. & Tech. L. 530, 536, 559-563 (2019); C. Bradley, *Territorial Intellectual Property Rights in an Age of Globalism,* 37 Va. J. Int'l L. 505, 529 (1997).

Nor do verbal formulations fully capture the conflict. For example, the Second and Tenth Circuits both nominally look for "substantial effects" on U.S. commerce, but apply that standard very differently. The Tenth Circuit found a "substantial effect" here even though petitioners have no U.S. operations and 97% of their sales never reached the United States. Pet. App. 32a, 43a. Courts in the Second Circuit, by contrast, reject extraterritorial application where foreign defendants' U.S. sales are comparably minor. See *Juicy Couture, Inc.* v. *Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 508 (S.D.N.Y. 2013); *Sterling Drug, Inc.* v. *Bayer AG*, 14 F.3d 733, 747 (2d Cir. 1994) ("[N]ot every activity of a foreign corporation with any tendency to create some confusion among American consumers can be prohibited."). Even in the Ninth Circuit—which requires only "some" effect on U.S. commerce—extraterritorial application has been rejected where (as here) effects in the United States were "relatively minimal" compared to effects in Germany. *Zenger-Miller, Inc.* v. *Training Team, GmbH*, 757 F. Supp. 1062, 1071 (C.D. Cal. 1991).

2. *The Circuits Are Divided Over the Tenth Circuit's Diversion-of-Foreign-Sales Theory*

This case presents the conflict starkly. The Tenth Circuit affirmed a $90 million Lanham Act damages judgment, reflecting petitioners' *total worldwide sales* of accused products. Pet. App. 2a-3a, 134a-136a. But the vast bulk of those sales—at least 97%—were purely foreign, made in foreign countries, by foreign companies, to foreign customers, for use in foreign lands. Pet. App. 32a, 43a. The Tenth Circuit never suggested those purely foreign sales somehow confused U.S. customers.

It nonetheless held that those foreign sales were subject to the Lanham Act because they had a "sub-

21

stantial effect on U.S. commerce," based *solely* on a "diversion-of-sales theory": that petitioners' purely foreign sales "stole sales from [International] *abroad*." Pet. App. 44a (emphasis added). Because International is a U.S. company, the court reasoned, diverting foreign sales "affected [International's] cash flows *in the United States*." *Ibid.* (emphasis added). In other words, the court held that the Lanham Act allows "'an American plaintiff'" to sue foreign defendants for foreign activities whenever they allegedly cost the plaintiff "foreign sales" that would have benefited its U.S. coffers. Pet. App. 44a-47a. The Tenth Circuit claimed support for its diversion-of-sales theory from the First and Ninth Circuits. Pet. App. 44a-45a.

As the Tenth Circuit recognized, however, the Fourth Circuit has expressly *rejected* that theory. Pet. App. 45a-46a. In *Tire Engineering*, the plaintiff, a U.S. company, could not show the foreign defendants' "exclusively foreign sales" had caused "confusion among U.S. consumers" or "harm to [its] 'trade reputation in United States markets.'" 682 F.3d at 310, 311. But the plaintiff argued there was a sufficient effect on U.S. commerce because the foreign defendants' "sales to foreign consumers would jeopardize the income of an American company." *Id.* at 310. The Fourth Circuit disagreed, holding that a "diversion-of-sales theory" could *not* support extraterritorial application of the Lanham Act against foreign defendants. *Id.* at 311. It explained that a diversion-of-sales theory would be viable only if "*the defendants [were] U.S. companies* that conducted substantial *domestic business activity*," because "[o]nly in such instances is there a sufficient nexus between U.S. commerce and the infringing activity." *Ibid.* (emphasis added). Where the defendants are "not U.S. corpora-

22

tions" and "lack a pervasive system of domestic operations," that nexus is absent. *Ibid.*

As the Tenth Circuit recognized, *Tire Engineering* would foreclose the liability imposed for petitioners' purely foreign sales here. Pet. App. 45a-46a. While the Tenth Circuit declared *Tire Engineering* "unpersuasive," Pet. App. 46a, it never denied a conflict—and rightly so. The Tenth Circuit holds that a foreign defendant's diversion of foreign sales from a U.S. plaintiff is sufficient to apply the Lanham Act extraterritorially. The Fourth Circuit holds the opposite.

The decision below also conflicts with the Eleventh Circuit's decision in *International Café*, which held that financial impacts felt in the United States do *not* support extraterritorial application of the Lanham Act *even where* the defendant is "a United States corporation." 252 F.3d at 1278. Although "financial gain" had flowed to the defendant in the United States from alleged infringement abroad, the court found that did not constitute a "substantial effect" on U.S. commerce. *Ibid.* That holding is irreconcilable with the decision below: If foreign revenue that *actually* flows into the United States does not have a substantial effect on U.S. commerce, foreign revenue that merely *could* have flowed into the United States cannot either.

## II. The Issue Is Important

This Court has repeatedly granted review to clarify when statutes may—and may not—reach beyond this Nation's borders. See *Nestlè USA Inc.* v. *Doe*, 141 S. Ct. 1931, 1936-1937 (2021) (Alien Tort Statute); *Jesner* v. *Arab Bank, PLC*, 138 S. Ct. 1386, 1407 (2018) (same); *WesternGeco LLC* v. *ION Geophysical Corp.*, 138 S. Ct. 2129, 2136-2138 (2018) (Patent Act); *RJR*, 579 U.S. at 344 (RICO); *Kiobel*, 569 U.S. at 115-117 (Alien Tort Statute);

23

*Morrison*, 561 U.S. at 255-265 (Exchange Act); *Microsoft Corp.* v. *AT&T Corp.*, 550 U.S. 437, 458 (2007) (Patent Act); *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 163-173 (2004) (Foreign Trade Antitrust Improvements Act).  The Court should take this opportunity to clarify the Lanham Act's extraterritorial reach—or lack thereof.

A.  Lanham Act liability can swing wildly depending on where a plaintiff chooses to sue.  Commentators have described how the lower courts' divergent tests produce disparate results.  See p. 19, *supra*.  This case starkly illustrates the stakes.  The Tenth Circuit upheld $90 million in Lanham Act damages reflecting *all* of petitioners' worldwide sales.  Yet it conceded that 97% of those sales could *not* have supported Lanham Act liability (or an injunction) under Fourth Circuit law.  Pet. App. 43a-46a.  Tens of millions of dollars in liability for foreign conduct should not turn on the happenstance of where a U.S. plaintiff elects to sue.[2]

Such "overly-generous" applications of the Lanham Act to foreign conduct threaten the business models of numerous global firms, including American companies like "Costco," "Amazon, eBay, Etsy, and the like."  Chon, *supra*, at 536.  Those companies sell, or allow third parties to sell, goods around the world.  Under broad readings of the Lanham Act, however, foreign sales that are "legitimate" in the countries where they occur may

---

[2] Forum shopping is especially problematic in suits premised on foreign defendants' foreign conduct.  Where foreign defendants lack sufficient contacts with any one State to establish personal jurisdiction there, plaintiffs may assert jurisdiction over them in *any* federal district court through service of a summons.  Fed. R. Civ. P. 4(k)(2); see Pet. App. 14a-19a.

24

be deemed to violate U.S. trademark law. *Ibid.* Since *Steele* was decided seven decades ago, moreover, courts have seen a "constant rise" in the number of disputes involving extraterritorial application of the Lanham Act. Dornis, *supra*, at 583-584. As the world becomes more interconnected, that number is bound to grow.

The absence of guidance has led to inconsistencies across intellectual-property law. See Bradley, *supra*, at 520-530; Holbrook, *supra*, at 460, 504-509. "It is the general rule" that U.S. *patent* and *copyright* law "does *not* apply extraterritorially." *Microsoft*, 550 U.S. at 442 (emphasis added) (patent); see *Update Art, Inc.* v. *Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988) (copyright). Yet, U.S. *trademark* law has been construed to reach "'purely foreign sales.'" Pet. App. 43a. That inconsistency is particularly odd given that the Constitution gives Congress *less* authority over trademarks than over patents and copyrights. See *Trade-Mark Cases*, 100 U.S. (10 Otto) 82, 97 (1879); Bradley, *supra*, at 535.

Similar disarray over the extraterritorial scope of U.S. securities law led this Court to grant review in *Morrison*. Without clear guidance regarding the Exchange Act's extraterritorial application (or lack thereof), lower courts had "produced a collection of tests for divining what Congress would have wanted, complex in formulation and unpredictable in application." 561 U.S. at 255-256. While courts purported to apply "formalized" tests such as "'whether the wrongful conduct had a substantial effect in the United States,'" the actual result was "a proliferation of vaguely related variations" under which "'the presence or absence of any single factor which was considered significant in other cases'" was "'not necessarily dispositive in future cases.'" *Id.* at 257-259. Commentators "criticized the unpredictable and inconsistent

25

application" of the statute and disregard for "traditional principle[s]" of extraterritoriality. *Id.* at 260-261. Precisely the same is true here. As it did in *Morrison*, the Court should prune the tangled doctrinal thicket.

B. The issue's "potential for international controversy" underscores the need for review. *RJR*, 579 U.S. at 348. Construing *any* statute to have extraterritorial effect can intrude on foreign sovereignty, upsetting other countries' "policy judgments" regarding conduct within their borders. *Microsoft*, 550 U.S. at 455-456. But the "danger of international friction" is particularly great where, as here, a U.S. statute is deemed to "provid[e] a private civil remedy for foreign conduct" that can include "treble damages." *RJR*, 579 U.S. at 346-348; see 15 U.S.C. § 1117(a).

The danger is greater still where, as here, a U.S. statute is applied to "'purely foreign'" conduct. Pet. App. 43a. Extending the Lanham Act to commerce occurring entirely within foreign nations and between foreign nationals is not merely "an affront to [foreign] sovereignty." Holbrook, *supra*, at 459. It defies U.S. treaty commitments. In the Paris Convention, which is "incorporated by the Lanham Act," the United States agreed that "each nation's [trademark] law should *only* have territorial application." *International Café*, 252 F.3d at 1279 (emphasis added); see Paris Convention for the Protection of Industrial Property, July 14, 1967, [1970] 21 U.S.T. 1583, art. 6(3); 15 U.S.C. §§ 1126-1127.[3]

---

[3] It is no answer that courts may consider foreign-law conflicts in individual cases. See Pet. App. 30a. This Court has "reject[ed]" "case-by-case inquir[ies]" into whether "concerns about international friction are inapplicable in [a given] case." *RJR*, 579 U.S. at 348-349. Besides, courts often pay only "lip service" to foreign sovereign

26

The Tenth Circuit's approach also jeopardizes *American* sovereign interests.  When U.S. courts project U.S. law to regulate or impose damages for sales in other countries, that "invite[s] other countries to use their own [intellectual-property] laws and courts to assert control over our economy."  *WesternGeco*, 138 S. Ct. at 2139 (Gorsuch, J., joined by Breyer, J., dissenting).  Those "serious foreign policy consequences" confirm the need for review.  *Kiobel*, 569 U.S. at 124.

### III.  THE DECISION BELOW IS WRONG

The decision below defies foundational principles regarding the territoriality of trademark law.  It goes far beyond this Court's decision in *Steele* and other extra-territoriality precedents.  And it stretches the Foreign Commerce Clause to the breaking point.

### A. The Lanham Act Does Not Apply to Purely Foreign Sales

1.   "[T]erritoriality is fundamental to trademark law." *Topps Co., Inc.* v. *Cadbury Stani S.A.I.C.*, 526 F.3d 63, 70 (2d Cir. 2008).  As this Court recognized a century ago in *Katzel*, 260 U.S. 689, trademarks have "a separate existence in each sovereign territory in which [they are] registered or legally recognized."  *McCarthy*, *supra*, § 29:1; see *Person's Co.* v. *Christman*, 900 F.2d 1565, 1569 (Fed. Cir. 1990); *Fuji Photo Film Co.* v. *Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985); *American Circuit Breaker Corp.* v. *Oregon Breakers Inc.*, 406 F.3d 577, 581 (9th Cir. 2005).  The United States has also ratified—and incorporated into the Lanham

---

interests, Chon, *supra*, at 565, and at least one court "eschew[s]" consideration of "potential conflicts with foreign law," Pet. App. 30a (citing *McBee*, 417 F.3d at 111).

27

Act—the Paris Convention on trademarks, which is "premised" on the principle that "each nation's law shall have only territorial application." *Vanity Fair*, 234 F.2d at 640.

A U.S. trademark's "'lawful function'" thus is "'to symbolize the *domestic goodwill* of the *domestic mark-holder*,'" allowing the domestic public to rely on the "'*domestic reputation* earned for the mark by its owner'" and protecting the markholder in "'*domestic commerce*.'" *McCarthy*, *supra*, §29:1 (emphasis added). It is not to regulate "'all commercial conduct occurring anywhere in the world.'" *IMAPizza, LLC* v. *At Pizza Ltd.*, 965 F.3d 871, 880-881 (D.C. Cir. 2020). Accordingly, the "archetypal injury contemplated by the [Lanham] Act is harm to the plaintiff's 'trade reputation in United States markets.'" *Tire Engineering*, 682 F.3d at 310; see *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985); *Atlantic Richfield Co.* v. *Arco Globus Int'l Co.*, 150 F.3d 189, 193 (2d Cir. 1998).

If the Lanham Act can ever extend to foreign conduct (but see pp. 32-34, *infra*), it may do so only to protect *domestic trademark rights*. Even the Tenth Circuit recognized that plaintiffs must show foreign conduct with "effects" or "'impacts *within* the United States.'" Pet.App. 39a (emphasis added). But it erred in divorcing qualifying domestic "effects" from statutory text. Under that text, a plaintiff must prove not merely the use of a protected U.S. trademark, but that the *effect* is "likely to cause confusion" or "mistake" or to "deceive." 15 U.S.C. §1114(1)(a); see §1125(a)(1). Because a U.S. trademark confers no rights to use the mark in other countries (and vice versa), that inquiry is necessarily U.S.-centric: The key question is what use of the mark conveys *to U.S. consumers*. See *Katzel*, 260 U.S. at 692. Here, the Tenth

28

Circuit nowhere denied that any supposed confusion, mistake, or deception attributable to petitioners' purely foreign sales was "'limited to * * * consumers abroad.'" Pet. App. 44a.  And it acknowledged there is "'no United States interest in protecting [*foreign*] *consumers*.'" Pet. App. 45a.  But it still imposed tens of millions of dollars in liability under U.S. law for foreign sales with no connection to U.S. consumers.

The Tenth Circuit's rationale was that petitioners diverted "foreign sales" from "a U.S. company," preventing it from earning foreign revenues that otherwise eventually "would have flowed into the U.S. economy." Pet. App. 44a-47a.  The breadth of that theory is reason enough to reject it: It would allow the Lanham Act—a statute concerned with preventing domestic consumer confusion—to be asserted extraterritorially whenever a U.S. plaintiff claims lost sales abroad, on the theory that monetary loss to a *U.S. plaintiff* anywhere in the world is a "loss to *U.S. commerce*" warranting extraterritorial application.  Pet. App. 46a (emphasis added).  Nothing in the Lanham Act's text, history, or structure warrants giving the statute such breathtaking scope, much less one so divorced from its textual concern with "confusion," "mistake," or "dece[ption]" of U.S. consumers, 15 U.S.C. §§ 1114(1)(a), 1125(a)(1).

The Fourth Circuit thus has held that the Lanham Act can be applied extraterritorially "based solely on harm to a U.S. company's income from foreign infringement" only if the *defendant* is a "*U.S. compan[y]*" that conducted substantial domestic business activity."  *Tire Engineering*, 682 F.3d at 311 (emphasis added).  That approach at least is grounded in Congress's broad authority to "prescrib[e] standards of conduct *for American citizens* * * * beyond the territorial boundaries of the United States."

29

*Steele*, 344 U.S. at 282 (emphasis added). But authority over *U.S.* citizens provides no basis for extending the Lanham Act to foreign activities of *foreign* defendants.

2. *Steele*, 344 U.S. 280, does not support the decision below—even setting aside whether *Steele* actually held that the Lanham Act applies abroad, and whether such a holding would comport with current extraterritoriality doctrine and U.S. treaty obligations, see pp. 32-34, *infra*.

*Steele* nowhere suggests that the Lanham Act reaches foreign conduct by foreign defendants that does not confuse U.S. consumers. The defendant there was "a citizen and resident of the United States." *Steele*, 344 U.S. at 281; see *id.* at 287. Here, petitioners are all foreign nationals. There, "essential steps" of the defendant's scheme occurred within the United States. *Id.* at 286-287. Here, petitioners' purely foreign sales occurred entirely abroad. There, infringing goods "filtered through the Mexican border into this country," jeopardizing the plaintiff's "reputation in markets cultivated by advertising [in the United States] as well as abroad." *Ibid.* Here, the Tenth Circuit imposed liability for "'purely foreign sales'" that never reached the United States or affected International's reputation with U.S. consumers. Pet. App. 43a. Even if the facts of *Steele*, "viewed as a whole," were enough to bring that case "within the jurisdictional scope of the Lanham Act," this case's contrary facts leave it well outside that "jurisdictional scope." 344 U.S. at 285.

That a tiny percentage of petitioners' worldwide sales—about 3%—found their way into the United States is no answer. Pet. App. 41a-43a. That discrete category of sales cannot be a "springboard for liability" encompassing *all* of petitioners' foreign sales. *Microsoft*, 550 U.S. at 456. For the overwhelming majority of petition-

30

ers' sales—reflecting the vast bulk of the $90 million damages award—the Tenth Circuit made *no* finding of U.S. consumer confusion and relied *entirely* on the untenable notion that diverting foreign sales from a U.S. plaintiff is enough.  Pet. App. 44a-46a.  Awarding damages for 100% of worldwide sales on the theory that 3% of them implicate the Lanham Act would allow a very small tail to wag a very large dog.[4]

The $90 million award here is especially far removed from petitioners' actual gains or International's putative losses in the United States.  The district court *excluded* petitioners' expert on costs of goods, even as it *conceded* his testimony satisfied Rules 702 and 703.  Pet. App. 168a. The Tenth Circuit nonetheless affirmed—despite confessing it found the district court's grounds for exclusion "unclear."  Pet. App. 65a.

3.  The Tenth Circuit's expansive construction of the Lanham Act raises serious constitutional concerns.  No plausible reading of the Foreign Commerce Clause grants Congress "virtually plenary power over global economic activity."  *Baston* v. *United States*, 137 S. Ct. 850, 851-852 (2017) (Thomas, J., dissenting from denial of certiorari).  The clause authorizes Congress "to regulate Commerce *with* foreign Nations"—not commerce

---

[4] The objection that defendants should not be allowed to "escape Lanham Act liability" by claiming that "products entering the United States represented only a fraction of their sales," Pet. App. 43a, is misplaced.  If foreign-sold products later enter the United States and confuse U.S. consumers, defendants might be liable for *those* sales.  But that cannot support liability for *other* foreign sales that do *not* reach the United States or confuse U.S. consumers. Relief must be tailored to the violation.  See 15 U.S.C. § 1117(a) (damages available only for "violations"); § 1116(a) (injunctions available only "to prevent * * * violation[s]").

31

"among" or "within" foreign Nations.  U.S. Const. art. I, §8, cl. 3 (emphasis added).

As this Court has explained in the trademark context, "commerce with foreign nations means commerce *between* citizens of the United States *and* citizens and subjects of foreign nations." *Trade-Mark Cases*, 100 U.S. (10 Otto) at 96-97 (emphasis added).  Here, however, the Tenth Circuit stretched the Lanham Act to reach sales entirely between foreign nationals and entirely within foreign nations.  It approved an injunction barring petitioners from selling anywhere International currently markets or sells its products, regardless of whether petitioners' foreign sales have any connection to U.S. citizens.  Pet. App. 50a.  That overly capacious view of the Lanham Act cannot be reconciled with the Foreign Commerce Clause's text.  At a minimum, it raises "a serious doubt of constitutionality" that militates against it. *Crowell* v. *Benson*, 285 U.S. 22, 62 (1932).[5]

4.   The Tenth Circuit's departure from territoriality principles begat more error.  The Tenth Circuit did not merely uphold liability under *U.S.* law for infringement of a *U.S.* trademark, based on *foreign* sales properly governed by *foreign* law.  It also held petitioners were precluded from arguing they owned the asserted *U.S.* trademarks under *U.S.* law, based on dictum concerning a *foreign* trademark's status under *foreign* law.  Pet. App. 52a-61a.  The EUIPO addressed E.U. and German law; it did not purport to address ownership of U.S. trademarks

---

[5] Although the Tenth Circuit declined to consider petitioners' constitutional Commerce Clause argument, Pet. App. 45a n.9, petitioners "can make any argument in support of th[eir] claim" that the Lanham Act, properly construed, has a more limited scope than the Tenth Circuit supposed, *Yee* v. *Escondido*, 503 U.S. 519, 534 (1992).

32

under U.S. law.  See C.A. App. 3112-3113; p. 7, *supra*. (Indeed, it lacked jurisdiction even to decide ownership under German law.  See Appellants' C.A. Br. 16-17.) Other courts hold that, "when trade-mark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trade-mark rights of the parties are irrelevant." *Vanity Fair*, 234 F.2d at 639.  The Tenth Circuit did the opposite, declaring a foreign trademark opinion dispositive.

### B.  Properly Construed, the Lanham Act Does Not Apply Extraterritorially

The view that the Lanham Act can ever apply extraterritorially traces to this Court's 70-year-old decision in *Steele*.  While *Steele* does not support the Tenth Circuit's overexpansive application of the Lanham Act regardless, this Court may wish to consider whether *Steele* warrants giving the Lanham Act *any* extraterritorial application.

While this Court has, in dicta, described *Steele* as giving the Lanham Act extraterritorial effect, see *EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 252 (1991), that reading is not inescapable.  Because it involved a U.S. citizen who took essential steps within the United States, *Steele* "might be read" as addressing "application of a *nonextraterritorial* statute" to "*conduct in the United States* [that] contributes to a violation abroad." *Morrison*, 561 U.S. at 271 n.11 (emphasis added).

Regardless, *Steele* was decided long "before [this Court] honed [its] extraterritoriality jurisprudence in *Morrison* and *Kiobel*." *RJR*, 579 U.S. at 353.  *Steele*'s thin reasoning did not address territoriality principles under U.S. treaty obligations, is out of step with current extraterritoriality doctrine, and defies reliable appli-

33

cation.  See Bradley, *supra*, at 531-535; Chon, *supra*, at 568-569, Holbrook, *supra*, at 462, 485.   It should be reconsidered—or at least confined to its facts.

*Steele* framed the extraterritoriality question as "'whether *Congress* intended to make the law applicable' *to the facts of this case*." 344 U.S. at 285 (emphasis added).   This Court has since eschewed that approach, which improperly invites courts to "divin[e] what Congress would have wanted if it had thought of the situation before the court." *Morrison*, 561 U.S. at 261.   The Court's current extraterritoriality framework asks "whether *the statute gives a clear, affirmative indication* that it applies extraterritorially." *RJR*, 579 U.S. at 337 (emphasis added).   The Lanham Act lacks any such indication.  See generally Bradley, *supra*, at 531-535.

*Steele*'s observation that Congress may "gover[n] the conduct of its own citizens * * * in foreign countries," 344 U.S. at 285, could apply to *any* federal statute.   The question is not simply whether Congress has *power*, but whether "*the statute* gives a clear, affirmative indication" of extraterritorial effect. *RJR*, 579 U.S. at 337 (emphasis added).   That "indication" must come from "the text." *Morrison*, 561 U.S. at 265.

The Lanham Act's definition of "commerce" as "all commerce which may lawfully be regulated by Congress," 15 U.S.C. § 1127; see *Steele*, 344 U.S. at 284, 286, does not rebut the presumption against extraterritoriality. See Bradley, *supra*, at 531-535.  Under the Constitution, "all commerce which may lawfully be regulated by Congress," § 1127, is synonymous with "Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3.   This Court has "'repeatedly held that even statutes that contain broad language in their definitions of "com-

34

merce" that *expressly* refer to "*foreign* commerce" do not apply abroad.'" *Morrison*, 561 U.S. at 262-263 (some emphasis added). *A fortiori*, a statute whose definition of "commerce" at most *implicitly* could include foreign commerce cannot apply abroad either.

The statutory history reinforces that conclusion. In the *Trade-Mark Cases*, this Court declared a predecessor trademark statute unconstitutional because it was not "confined" to "the kind of commerce which Congress is authorized to regulate" (*i.e.*, "foreign or inter-state commerce"). 100 U.S. (10 Otto) at 97-98. Congress responded by expressly incorporating that limitation into later statutes, including the Lanham Act. *McCarthy*, *supra*, §5 n.6. The statute's reference to "all commerce which may lawfully be regulated by Congress" thus serves to *narrow* the statute's reach, not *expand* it. It certainly does not "'manifes[t] an unmistakable congressional intent to apply extraterritorially.'" *RJR*, 579 U.S. at 337.

Because the Lanham Act "gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255. And because the Act could reach petitioners' foreign sales *only* by being applied extraterritorially, see Pet. App. 40a-47a, no relief based on them may stand.

## IV. THIS CASE IS AN EXCELLENT VEHICLE

This is an ideal vehicle for clarifying the Lanham Act's extraterritorial reach—or lack thereof. The Tenth Circuit extensively addressed the issue in a lengthy opinion. It conceded a circuit split, surveyed various tests, and consciously devised a new one. Pet. App. 23a-31a. The court also directly addressed the conflict between its decision and the Fourth Circuit's *Tire Engineering* decision. Pet. App. 45a-46a.

35

Extraterritoriality, moreover, is central to this case. If the Lanham Act lacks extraterritorial effect (here or generally), neither the damages award nor the injunction can stand. The damages award encompasses *all* of petitioners' worldwide sales, even though 97% were purely foreign. Pet. App 32a, 43a. The approved injunction likewise extends to purely foreign sales, reaching into any country where International currently sells or markets, Pet. App. 50a, with no requirement that enjoined sales be destined for the United States.[6]

Finally, this case allows the Court to address the Lanham Act's application to several typical kinds of foreign sales. As the Tenth Circuit recognized, petitioners' sales fall into three discrete categories: (1) purely foreign sales that never reached the United States; (2) foreign sales that eventually reached the United States; and (3) sales to U.S. buyers. Pet. App. 32a, 40a, 43a. That presents an ideal opportunity to provide maximum guidance to lower courts.

## CONCLUSION

The petition should be granted.

---

[6] The remand proceedings addressing *which* countries the injunction should encompass, Pet. App. 50a, will not affect the extraterritoriality issue. Quite the opposite: This Court's decision would control the scope of any possible injunction.

Respectfully submitted.

RYAN YEH                           JEFFREY A. LAMKEN
MOLOLAMKEN LLP                         *Counsel of Record*
430 Park Avenue                    LUCAS M. WALKER
New York, NY  10022                JAMES A. BARTA
(212) 607-8160                     MOLOLAMKEN LLP
                                   The Watergate, Suite 500
                                   600 New Hampshire Ave.,
                                   N.W.
                                   Washington, D.C.  20037
                                   (202) 556-2000
                                   jlamken@mololamken.com

*Counsel for Petitioners*

JANUARY 2022

**APPENDIX**

**APPENDIX A**

**UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

————

Nos. 20-6057 & 20-6100

————

Hetronic International, Inc.,
*Plaintiff-Appellee,*

v.

Hetronic Germany GmbH;
Hydronic-Steuersysteme GmbH;
ABI Holding GmbH;
Abitron Germany GmbH;
Abitron Austria GmbH;
Albert Fuchs,
*Defendants-Appellants.*

————

Appeal from the United States District Court
for the Western District of Oklahoma in Case No. 5:14-
CV-00650-F, Judge Stephen P. Friot

————

Opinion

————

**August 24, 2021**

————

Geren T. Steiner (Anton J. Rupert and Mack J. Morgan with him on the briefs), of Rupert, Steiner & Morgan PLLC, Oklahoma City, Oklahoma, for Defendants-Appellants.

(1a)

2a

Debbie L. Berman (Wade A. Thomson and Matthew S. Hellman with her on the brief), of Jenner & Block LLP, Chicago, Illinois, for Plaintiff-Appellee.

————

Before PHILLIPS, MURPHY, and McHUGH, *Circuit Judges*.

PHILLIPS, *Circuit Judge*.

Hetronic International, Inc., a U.S. company, manufactures radio remote controls—the kind used to remotely operate heavy-duty construction equipment (think cranes). Defendants, none of whom are U.S. citizens, distributed Hetronic's products, mostly in Europe. That relationship worked well for nearly a decade. But then one of Defendants' employees stumbled across an old research-and-development agreement between the parties. Embracing a creative legal interpretation of the agreement endorsed by Defendants' lawyers, Defendants concluded that they—not Hetronic—owned the rights to Hetronic's trademarks and other intellectual property.

That caused some tension in the relationship. Defendants began manufacturing their own products— identical to Hetronic's—and selling them under the Hetronic brand, mostly in Europe. They even kept the same product names. Hetronic terminated the parties' distribution agreements, but that didn't stop Defendants from making tens of millions of dollars selling their copycat products (which they continue to sell today). Defendants attempted a brief foray into the U.S. market but backed off after Hetronic sued them.

Hetronic asserted numerous claims against Defendants, but we're here concerned almost exclusively with its trademark claims under the Lanham Act. A jury sitting in the Western District of Oklahoma awarded

3a

Hetronic over $100 million in damages, most of which related to Defendants' trademark infringement. Then on Hetronic's motion, the district court entered a worldwide injunction barring Defendants from selling their infringing products. Defendants have ignored the injunction.

In the district court and now on appeal, Defendants have focused on one defense in particular: Though they accept that the Lanham Act can sometimes apply extraterritorially, they insist that the Act's reach doesn't extend to their conduct, which generally involved foreign defendants making sales to foreign consumers. Our circuit has yet to grapple with that question. After considering the Supreme Court's lone decision on the issue and persuasive authority from our sibling circuits, we conclude that the district court properly applied the Lanham Act to Defendants' conduct. But we narrow the district court's expansive injunction. And so, exercising jurisdiction under 28 U.S.C. §1291, we affirm in part, reverse in part, and remand for further consideration consistent with this opinion.

## BACKGROUND

### I. Factual Background

Hetronic sells and services its radio remote controls in over forty-five countries around the world. Though Hetronic offers a wide range of radio remote controls, the parties' dispute centers on ten of those products: ERGO, EURO, GL, GR, HH, MINI, NOVA, Pocket, TG, and RX. Hetronic's products feature a distinctive black-and-yellow color scheme to distinguish them from those of its competitors:

4a




Hetronic NOVA

Hetronic ERGO

Appellants' App. vol. 7 at 1615-16, 1644.

Hetronic markets and distributes its radio remote controls through a worldwide network of wholly-owned subsidiaries and distributors. In 2006, Hetronic entered distribution and licensing agreements with Hydronic Steuersysteme GmbH, an Austrian corporation managed by Albert Fuchs. In time, Hydronic came to distribute Hetronic's products in over twenty European countries. In 2007, Hetronic entered similar distribution and licensing agreements with a company that would eventually be purchased by Hetronic Germany GmbH, a German corporation owned by Fuchs. Hetronic Germany became Hetronic's principal distributor in Germany.

The distribution and licensing agreements authorized Hydronic and Hetronic Germany to assemble and sell Hetronic's remote controls under Hetronic's brand, but they were required to purchase parts from Hetronic unless otherwise authorized in writing. Further, the two distributors agreed to act in Hetronic's best interest and to protect Hetronic's confidential information. They also agreed not to compete with Hetronic. They abided by those conditions without issue through much of 2011.

5a

September 2011 marked the beginning of the end of Hetronic's business relationship with Hetronic Germany and Hydronic. That month, a Hetronic Germany employee happened upon an old research-and-development agreement entered between Hetronic and Hetronic Germany's predecessor. After consulting with legal counsel, Hetronic Germany took the position that it owned all the technology developed under that agreement (more on that later).

Based on that understanding, Hetronic Germany and Hydronic began reverse-engineering Hetronic's products. One of Hetronic Germany's former employees testified by deposition that he used Hetronic-manufactured parts to try to "recreate the model . . . so that no difference could be seen." *Id.* at 1631. Once they developed these new, copycat parts (what they referred to as "KH" parts, *id.*), Hetronic Germany and Hydronic sought out new suppliers to source them. Eventually, both Hetronic Germany and Hydronic began selling Hetronic-branded products that incorporated KH parts sourced from unauthorized third-parties.

In 2014, a whistleblower who had worked for Hetronic Germany told Hetronic what had been going on the past few years. That June, once Hetronic understood the scope of Hetronic Germany and Hydronic's activities, it terminated their licensing and distribution agreements. But both distributors continued to sell Hetronic-branded products for several months.

Around the same time, Fuchs used an Austrian company he owned, ABI Holding GmbH, to incorporate two new companies, Abitron Germany GmbH and Abitron Austria GmbH. Abitron Austria purchased Hydronic in August 2014; Abitron Germany purchased Hetronic Germany the following month. They soon

6a

began competing directly with Hetronic, selling the same NOVA and ERGO products with the exact same trade dress (compared below).



Hetronic NOVA          Abitron NOVA

Hetronic ERGO          Abitron ERGO

*Id.* at 1644.   Before this litigation ensued, they sold several hundred thousand dollars' worth of products in the United States.

## II. Procedural Background

In June 2014, Hetronic sued Hetronic Germany and Hydronic in the Western District of Oklahoma, alleging breach of contract.  In 2015, Hetronic filed an amended complaint that added as defendants Fuchs, ABI, Abitron Austria, and Abitron Germany.  The amended complaint also added new claims under the Lanham Act and state tort law.

Two motions to dismiss soon followed, one filed by the Abitron companies and the other by ABI and Fuchs.  Each motion argued that the district court lacked

7a

personal jurisdiction over the relevant Defendants.  The district court denied both motions.  First, the district court concluded that the forum-selection clause in Hetronic's agreements with Hetronic Germany and Hydronic extended to both Abitron Germany and Abitron Austria as Hetronic Germany's and Hydronic's successors-in-interest.  Second, the district court denied ABI and Fuchs's motion because it concluded that they had purposefully availed themselves of a U.S. forum under Federal Rule of Civil Procedure 4(k)(2).

Hetronic then filed a Second Amended Complaint, and both sides moved for summary judgment.  Though the district court granted Hetronic's motion on Defendants' counterclaims, it otherwise denied the motion.

Defendants' motion argued that the court lacked subject-matter jurisdiction to resolve Hetronic's Lanham Act claims because the conduct at issue occurred overseas.  Specifically, Defendants asserted that the Lanham Act applies extraterritorially only if a defendant's conduct has a substantial effect on U.S. commerce; because that was allegedly lacking here, Defendants maintained that Hetronic's claims had to be dismissed.  The district court rejected that argument and denied Defendants summary judgment based on their extraterritoriality defense.

While Defendants played defense in federal district court, they sought to go on offense in the European Union.  In July 2015, Abitron Germany sought a "declaration of invalidity" from the European Union Intellectual Property Office (EUIPO) that would nullify Hetronic's "NOVA" trademark in the EU.  *Id.* vol. 13 at 3106--07, 3171.  The Cancellation Division—the initial EUIPO tribunal to consider the request—rejected Abitron Germany's claim.  Abitron Germany appealed,

8a

but the Board of Appeal affirmed. The Board concluded that Hetronic owned all the disputed intellectual property.

Based on that ruling, Hetronic moved for summary judgment on Defendants' defense that they owned the disputed intellectual property, arguing that the doctrine of issue preclusion barred Defendants from relitigating that question. After briefing and two hearings, the district court granted Hetronic's motion, concluding that the EUIPO proceeding afforded Defendants a full and fair opportunity to adjudicate the merits of the ownership dispute.

About a week later, the eleven-day jury trial began. The jury returned a verdict for Hetronic on all counts, finding that Defendants had willfully infringed Hetronic's trademarks. The jury awarded Hetronic over $115 million in damages, $96 million of which related to Defendants' Lanham Act violations.

After the trial, Hetronic moved for a permanent injunction to prohibit Defendants from further infringing its trademarks. In opposing the injunction, Defendants reasserted their contention that the court lacked jurisdiction under the Lanham Act to enjoin Defendants' foreign activities. Applying the facts established at trial, the district court concluded that the Lanham Act reached Defendants' foreign conduct. The court granted Hetronic's motion and entered a permanent injunction order, enjoining Defendants' infringing activities worldwide.

This appeal followed.

9a

## DISCUSSION

Defendants raise numerous issues on appeal. First, Defendants argue that the district court erroneously exercised personal jurisdiction over four of the six defendants. Second, Defendants argue that the district court erred in concluding that the Lanham Act applied extraterritorially to reach their foreign activities. Third, Defendants argue that the district court erred when it ruled that issue preclusion barred them from asserting at trial that they owned the disputed intellectual property. Fourth, Defendants argue that the district court made several erroneous evidentiary rulings at trial. We address each argument in turn.

## I. Personal Jurisdiction

Defendants have never disputed the district court's exercise of personal jurisdiction over Hetronic Germany and Hydronic, which derived from a forum-selection clause in the parties' distribution and licensing agreements. That clause designates Oklahoma as the forum for all disputes. But Defendants challenge the district court's exercise of personal jurisdiction over the Abitron entities, ABI, and Fuchs. Following the parties' lead, we first address the court's personal jurisdiction over Abitron Germany and Abitron Austria and then consider its jurisdiction over Fuchs and ABI.

We review *de novo* a district court's exercise of personal jurisdiction, *ClearOne Commc'ns, Inc.* v. *Bowers*, 651 F.3d 1200, 1214 (10th Cir. 2011) (footnote and citation omitted), and we consider each defendant separately, *Newsome* v. *Gallacher*, 722 F.3d 1257, 1265-66 (10th Cir. 2013) (citation omitted). "The plaintiff has the burden of proving that the court has jurisdiction." *Compañía de Inversiones Mercantiles, S.A.* v. *Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269,

10a

1281 (10th Cir. 2020) (citation omitted), cert. denied, No. 20-1033, 2021 WL 2519105 (2021).

When the district court evaluates personal jurisdiction "based only on the complaint and affidavits, 'a *prima facie* showing of personal jurisdiction' is sufficient." *Niemi* v. *Lasshofer*, 770 F.3d 1331, 1347 (10th Cir. 2014) (quoting *Dudnikov* v. *Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008)). Because the district court here assessed personal jurisdiction based only on the complaint and affidavits—and because Defendants never challenge the jurisdictional facts upon which the district court based its rulings—we consider only whether Hetronic made a *prima facie* showing of personal jurisdiction. See *id.*

**A. Abitron Companies**

Though Abitron Germany and Abitron Austria weren't parties to Hetronic's distribution and licensing agreements with Hetronic Germany and Hydronic, the district court nevertheless concluded that the forum-selection clauses in those agreements bound both Abitron entities. According to the district court, Abitron Austria and Abitron Germany were Hydronic's and Hetronic Germany's successors-in-interest. We agree.

In assessing personal jurisdiction, we have acknowledged that "[a] corporation's contacts with a forum may be imputed to its successor . . . ." *Williams* v. *Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) (citation omitted). But our Circuit has yet to address the specific issue here: whether a successor corporation is bound by its predecessor's contractual waiver of personal jurisdiction through a forum-selection clause.

Courts that have considered this question "have uniformly found that it is consistent with due process to

11a

impute a corporation's waiver of personal jurisdiction to its successor . . . for the same reasons that imputation of jurisdictional contacts is appropriate." *Patin* v. *Thoroughbred Power Boats Inc.*, 294 F.3d 640, 654 & n.19 (5th Cir. 2002) (collecting cases); cf. *Purdue Rsch. Found.* v. *Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783-84 (7th Cir. 2003) (distinguishing between "a corporate successor," whose contacts may be attributed to a predecessor, and "an assignee of a contract," whose contacts generally shouldn't be attributed to the assignor). Under this theory of personal jurisdiction, we ask whether the successor is a "mere continuation" of the predecessor. *Patin*, 294 F.3d at 654 ("The premise underlying the 'mere continuation' exception to the rule against successor liability is that the successor corporation is, in fact, the *same corporate entity* as the predecessor corporation, simply wearing a 'new hat.'" (citations omitted)).

To start, we must first answer the threshold question whether Abitron Austria and Abitron Germany are in fact successors-in-interest of Hydronic and Hetronic Germany, respectively. To decide that question, we look to the law of the forum state—here, Oklahoma. See *Williams*, 927 F.2d at 1132. Under Oklahoma law, "[t]he general rule . . . is that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor." *Pulis* v. *U.S. Elec. Tool Co.*, 561 P.2d 68, 69 (Okla. 1977); see also *Flores* v. *U.S. Repeating Arms Co.*, 19 F. App'x 795, 797 (10th Cir. 2001) (unpublished) (applying Oklahoma law). But Oklahoma's courts have recognized four exceptions to that general rule:

(1) Where there is an agreement to assume such debts or liabilities[;]

12a

(2) Where the circumstances surrounding the trans-
    action warrant a finding that there was a
    consolidation or merger of the corporations[;] or

(3) that the transaction was fraudulent in fact[;] or

(4) that the purchasing corporation was a mere
    continuation of the selling company.

*Pulis*, 561 P.2d at 69 (citations omitted). Only the fourth
exception applies here.

Under the "mere continuation" exception, "the test is
not whether there is a continuation of business
operations, but whether there is a continuation of the
corporate entity." *Crutchfield* v. *Marine Power Engine
Co.*, 209 P.3d 295, 301 (Okla. 2009) (footnote omitted). To
assess whether the corporate entity has been continued,
Oklahoma courts consider (1) "whether there is a
common identity of directors, officers, and stockholders
before and after the sale," (2) "whether there was good
consideration for the sale," and (3) "whether the seller
corporation continues to exist in fact." *Id.* (footnote
omitted). Concerning the third factor, "[t]he bare *de jure*
existence of the seller corporation after the sale is
insufficient alone to establish that the successor corp-
oration is not a mere continuation of the seller company."
*Id.* at 301-02 (footnote omitted).

These factors weigh heavily in favor of concluding that
the Abitron entities are Hydronic's and Hetronic
Germany's successors-in-interest. The analysis is the
same for both companies under the first and third
factors. Starting with the first factor, Defendants don't
contest that Fuchs owns all four companies. Nor do they
contest the district court's finding that "the Abitron
entities are using the same facilities, management,
employees, customer lists, and product mark and dress

13a

as H[etronic] Germany and Hydronic."  Appellants' App. vol. 1 at 122-23.  Further, Hetronic Germany's former CEO became the CEO of both Abitron companies.

On the third factor, though the seller corporations continue to exist in fact, their "bare *de jure* existence" carries little weight.  *Crutchfield*, 209 P.3d at 301-02.  Almost all of Hydronic's and Hetronic Germany's assets were transferred to the Abitron entities, with only "a small amount being left for the purposes of satisfying debt with Hetronic International."  Appellants' App. vol. 1 at 122.

The analysis on the second prong—whether there was good consideration for the sale—is less straightforward.  Abitron Germany purportedly paid €3 million[1] to purchase Hetronic Germany.  But no funds were exchanged when the sale closed, and ABI loaned Abitron Germany the money to complete the sale.  As for the sale of Hydronic to Abitron Austria, the parties provide no information about the purchase's details.  So we can't assess the second prong as to Abitron Austria.

But even if we concluded that the second factor cuts against finding that the Abitron companies are successors-in-interest (and it isn't clear that it does), Oklahoma courts weigh all three factors in deciding this issue.  See *Pulis*, 561 P.2d at 71-72.  At least two of those three factors weigh against Defendants.  Considering the three factors collectively, particularly the common identity of directors, officers, and stockholders before and after the sale, we hold that the Abitron companies

---

[1] €3 million refers to 3 million euros.  Though the exchange rate varies, 3 million euros currently equates to about $3.54 million.  See *Foreign Exchange Rates – H.10*, Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/releases/h10/current/ (last visited July 29, 2021).

14a

constitute a "mere continuation" of Hydronic and Hetronic Germany and are therefore successors-in-interest under Oklahoma law. See *Crutchfield*, 209 P.3d at 301. And because the Abitron entities are mere continuations of Hetronic Germany and Hydronic, the district court rightly concluded that the forum-selection clause in the parties' licensing agreements bound both Abitron Germany and Abitron Austria.[2] See *Patin*, 294 F.3d at 654. Consequently, the district court properly exercised personal jurisdiction over both companies.

### B. Fuchs and ABI

The district court ruled that it could exercise personal jurisdiction over Fuchs and ABI under Federal Rule of Civil Procedure 4(k)(2). Rule 4(k)(2) states that

---

[2] Defendants appear to argue that the forum-selection clauses don't bind them because Hetronic sued them only *after* terminating the licensing agreements. Our circuit hasn't addressed that issue, but the Supreme Court "presume[s] as a matter of contract interpretation that . . . parties d[o] not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of [an] agreement." *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc.* v. *N.L.R.B.*, 501 U.S. 190, 208 (1991). Though *Litton* related to arbitration clauses in the collective-bargaining context, our sibling circuits that have considered this question agree that dispute-resolution clauses generally may be enforced even after an agreement is terminated. *Silverpop Sys., Inc.* v. *Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 857 (11th Cir. 2016) (unpublished) ("While contractual obligations may expire upon the termination of a contract, provisions that are structural (*e.g.*, relating to remedies *and the resolution of disputes*) may survive that termination." (emphasis added) (citations omitted)); *U.S. Smoke & Fire Curtain, LLC* v. *Bradley Lomas Electrolok, Ltd.*, 612 F. App'x 671, 672–73 (4th Cir. 2015) (unpublished) ("Generally, dispute-resolution provisions, such as forum-selection clauses, are enforceable beyond the expiration of the contract if they are otherwise applicable to the disputed issue and the parties have not agreed otherwise." (citations omitted)).

15a

For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2). Under this rule, which has been described as a kind of federal long-arm statute, a court may exercise personal jurisdiction over a foreign defendant if (1) the "plaintiff's claims arise under federal law"; (2) "the defendant is not subject to the jurisdiction of any state court of general jurisdiction"; and (3) "the plaintiff can show that the exercise of jurisdiction comports with due process." *CGC Holding Co.* v. *Hutchens*, 974 F.3d 1201, 1208 (10th Cir. 2020) (citing *Grupo Cementos*, 970 F.3d at 1281 n.1).

Defendants don't dispute that Hetronic's claims arise under federal law; their arguments focus on the second and third elements. On the second element, Defendants indirectly argue that the district court failed to properly consider whether they were subject to the jurisdiction of other states' courts besides Oklahoma. See Appellants' Opening Br. at 53 (faulting the district court because it "actually considered contacts with other forums (Nevada, Massachusetts) that might have been proper forums, but made no determination as to same" (citation omitted)). Defendants imply that the district court was required to conduct a *sua sponte* analysis of all fifty states—or at least Nevada and Massachusetts—to assess whether Rule 4(k)(2)'s requirements had been satisfied.

16a

It's true that subsection A of Rule 4(k)(2) could be read to require a plaintiff to conduct a state-by-state assessment showing that the defendant isn't subject to any state's courts of general jurisdiction.   But we recently joined the majority of circuits that have rejected that reading of the rule: "Every other circuit court [besides the First and Fourth Circuits] to consider the issue has placed the initial burden on the defendant to identify a state in which the lawsuit could proceed." *Grupo Cementos*, 970 F.3d at 1283 (citations omitted). We adopted the Seventh Circuit's reasoning on this point:

> Now one might read Rule 4(k)(2) . . . [as] requiring 51 constitutional decisions: The court must first determine that the United States has power and then ensure that none of the 50 states does so . . . . Constitutional analysis for each of the 50 states is eminently avoidable by allocating burdens sensibly. A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed.  Naming a more appropriate state would amount to a consent to personal jurisdiction there (personal jurisdiction, unlike federal subject-matter jurisdiction, is waivable).  If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).

*Id.* at 1283-84 (quoting *ISI Int'l, Inc.* v. *Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).

Defendants never argued in the district court that some other state's courts could exercise personal jurisdiction over them.  So they have forfeited any challenge along those lines. *Grupo Cementos*, 970 F.3d at

17a

1282.  Even on appeal, they never argue that Nevada or Massachusetts could exercise personal jurisdiction over them.  Rather, they merely allege that the district court erred by not considering those states in assessing Rule 4(k)(2)'s applicability.  But as our caselaw makes clear, the district court wasn't required to consider all 50 states (or even two states that a defendant merely alludes to).  By failing to point to some other state that could exercise personal jurisdiction over them, Defendants conceded that Hetronic satisfied the second element to establish personal jurisdiction under Rule 4(k)(2).

Finally, Hetronic has satisfied the third element by demonstrating that the exercise of jurisdiction comports with due process.  "To determine whether the exercise of federal jurisdiction over [Defendants] satisfies due process, we must determine whether [Defendants] had minimum contacts with the United States." *CGC Holding Co.*, 974 F.3d at 1209.  Under that standard, a federal court can exercise specific personal jurisdiction over a foreign defendant "only if the defendant purposely directed [its] activities at the forum and the plaintiff's injuries arose from the defendant's forum-related activities." *Id.* (citing *Dudnikov*, 514 F.3d at 1071).  The relevant forum here is not an individual state, but the United States as a whole.[3]

---

[3] Ordinarily, we would also consider whether the exercise of jurisdiction was reasonable. *CGC Holding Co.*, 974 F.3d at 1209 ("Even when a defendant has purposely established minimum contacts with a forum state, minimum requirements inherent in the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction." (internal quotation marks and citations omitted)).  That entails weighing five factors: (1) "the burden on the defendant," (2) "the forum state's interest in resolving the dispute," (3) "the plaintiff's interest in receiving convenient and effective relief," (4) "the interstate judicial system's interest in

18a

Both Fuchs and ABI have sufficient minimum contacts that demonstrate they purposefully directed their activities at the forum (the United States), and Hetronic's injuries arose in part from those forum-related activities. As for Fuchs, Hetronic alleged the following:

- Fuchs traveled to the United States to try to obtain certifications from the U.S. Federal Communications Commission, which he needed for the Abitron entities to sell radio products in the United States.

- Fuchs also engaged a Massachusetts company to obtain the FCC certifications.

- Fuchs traveled to Las Vegas, Nevada, to meet with Hetronic's former President, Torsten Rempe, to seek advice about competing with Hetronic, along with sending over twenty separate e-mail communications to Rempe.

These contacts suffice to show Fuchs directed his activities at the United States and directly relate to the injuries Hetronic complained of (*i.e.*, trademark violations). See *CGC Holding Co.*, 974 F.3d at 1209 (holding that a Canadian defendant had sufficient minimum contacts with the United States even though she operated her RICO conspiracy mostly from Toronto because she worked extensively with a U.S. partner and "prepar[ed] loan commitment letters directed at U.S. borrowers").

---

obtaining the most efficient resolution of controversies," and (5) "the shared interest of the several states in furthering fundamental substantive social policies." *Id.* at 1210 (citation omitted). But to defeat jurisdiction on this ground, "[a] defendant must present a 'compelling' case that these factors render jurisdiction unreasonable." *Id.* (quoting *Grupo Cementos*, 970 F.3d at 1289). Defendants ignore these reasonableness factors entirely, so we needn't consider them.

19a

The same goes for ABI.  The district court detailed the following contacts ABI had with the United States:

- ABI filed a trademark application for the Abitron entities in the United States to protect the competing remote-control products it intended to sell.

- ABI entered a project agreement with a U.S.-based company (AZCS) owned by Rempe.  Under the agreement, ABI received consulting services from AZCS, including market research, so that ABI could directly compete with Hetronic in the United States.

Based on these findings, ABI can't seriously contest that it purposefully directed its activities at the United States. Nor can it dispute that Hetronic's injuries arose in part from these activities.  On these facts, ABI should have expected that it could be haled into court in the United States. See *id.*

In sum, we conclude that the district court properly exercised personal jurisdiction over all Defendants.  The forum-selection clauses in Hydronic's and Hetronic Germany's licensing agreements bound both Abitron companies as successors in interest.  And Hetronic has shown that the court rightly exercised personal jurisdiction over both Fuchs and ABI under Rule 4(k)(2). We thus consider the merits of the parties' dispute.

## II. Permanent Injunction

Defendants attack the permanent injunction prohibiting their worldwide sales of lookalike remote controls on primarily three grounds.  They argue (1) that the district court erroneously concluded that the Lanham Act applied extraterritorially here; (2) that the injunction lacks the specificity required by Rule 65 of the Federal Rules of Civil Procedure; (3) and that the injunction sweeps too broad.  Though we agree that the district

20a

court's worldwide injunction reaches too far, we otherwise reject Defendants' challenges and uphold the injunction.

We review for abuse of discretion the district court's grant of a permanent injunction. *Husky Ventures, Inc.* v. *B55 Invs., Ltd.*, 911 F.3d 1000, 1011 (10th Cir. 2018) (citation omitted). "A district court 'necessarily abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Id.* (brackets omitted) (quoting *Zurich N. Am.* v. *Matrix Serv., Inc.*, 426 F.3d 1281, 1289 (10th Cir. 2005)). A district court's factual findings are clearly erroneous if they lack "factual support in the record, or if we, after reviewing all the evidence, are left with the definite and firm conviction that a mistake has been made." *Id.* (brackets and citation omitted).

We begin by considering whether the district court correctly concluded that the Lanham Act reaches all of Defendants' allegedly infringing conduct here, after which we assess the injunction's specificity and scope.

### A. Extraterritorial Reach of the Lanham Act

The Lanham Act governs federal trademark and unfair competition disputes. It subjects to liability "[a]ny person who shall . . . use in commerce any . . . colorable imitation of a registered mark," 15 U.S.C. § 1114(1) (Section 32), or "[a]ny person who . . . uses in commerce any" word, false description, or false designation of origin that "is likely to cause confusion . . . or to deceive as to the affiliation," origin, or sponsorship of any goods, *id.* § 1125(a)(1) (Section 43). Notably, the Act defines commerce broadly as "all commerce which may lawfully be regulated by Congress," *id.* § 1127, and affords federal courts jurisdiction over all claims arising under it, *id.* § 1121(a). Though most of the damages the jury awarded

21a

to Hetronic flowed from Defendants' Lanham Act violations, Defendants argue as a threshold matter that the Act doesn't apply extraterritorially to their foreign conduct. We disagree.

The Supreme Court has in recent years considered (or reconsidered) the extraterritoriality of several federal statutes, some of them multiple times: the Alien Tort Statute, *Nestlè USA, Inc.* v. *Doe*, 141 S. Ct. 1931, 1936-37 (2021), and *Kiobel* v. *Royal Dutch Petrol. Co.*, 569 U.S. 108, 115-17 (2013); the Patent Act, *WesternGeco LLC* v. *ION Geophysical Corp.*, 138 S. Ct. 2129, 2136-38 (2018); the Racketeer Influenced and Corrupt Organizations Act, *RJR Nabisco, Inc.* v. *Eur. Cmty.*, 136 S. Ct. 2090, 2099-2103 (2016); section 10(b) of the Securities Exchange Act of 1934, *Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255-65 (2010); and both the Foreign Trade Antitrust Improvements Act of 1982, *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 163-73 (2004), and its predecessor, the Sherman Act, *Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764, 794-99 (1993). But you have to go back almost three-quarters of a century since the Court last substantively considered the extraterritoriality of the Lanham Act. *Steele* v. *Bulova Watch Co.*, 344 U.S. 280, 282-85 (1952). Though the *Steele* Court acknowledged the general presumption against extraterritoriality, see *id.* at 285, it held that the Lanham Act could apply abroad at least in some circumstances, see *id.* at 286 ("In the light of the broad jurisdictional grant in the Lanham Act, we deem its scope to encompass petitioner's [foreign] activities here.").[4] Still, that lone decision leaves much unanswered

_____

[4] The Court has in passing reaffirmed the Lanham Act's extraterritorial reach in two more recent decisions. See *Morrison*, 561 U.S. at 271 n.11 (citing *Steele* and noting that the Court has

22a

about the extent of the Lanham Act's extraterritorial reach—particularly, as in our case, as it relates to foreign defendants. See *McBee* v. *Delica Co.*, 417 F.3d 107, 117 (1st Cir. 2005) (noting that although "[t]he Supreme Court has long since made it clear that the Lanham Act could sometimes be used to reach extraterritorial conduct," "it has never laid down a precise test for when such reach would be appropriate" (footnote and citations omitted)).

Though none of the Supreme Court's recent decisions concerning extraterritoriality resolve the issues we face here related to the Lanham Act, they offer some useful guidance. In *RJR*, the Court established "a two-step framework for analyzing extraterritoriality issues." 136 S. Ct. at 2101. At step one, "we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id. Steele* already answered that question in the affirmative. See 344 U.S. at 285-88; see also *Trader Joe's Co.* v. *Hallatt*, 835 F.3d 960, 966 (9th Cir. 2016) ("The Supreme Court settled this question with regard to the Lanham Act when it held [in *Steele*] that the Act's 'use in commerce' element and broad definition of 'commerce' clearly indicate Congress's intent that the Act should apply

---

interpreted the Lanham Act "to have extraterritorial effect"); *EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 252 (1991) ("While recognizing that 'the legislation of Congress will not extend beyond the boundaries of the United States unless a contrary legislative intent appears,' the Court concluded that in light of the fact that the allegedly unlawful conduct had some effects within the United States, coupled with the [Lanham] Act's 'broad jurisdictional grant' and its 'sweeping reach into "all commerce which may lawfully be regulated by Congress,"'" the statute was properly interpreted as applying abroad." (quoting *Steele*, 344 U.S. at 285, 287)).

23a

extraterritorially." (citing *Steele*, 344 U.S. at 286)).  When a court concludes at step one that the statute in question applies extraterritorially, it needn't reach step two (which asks "whether the case involves a domestic application of the statute").  *RJR*, 136 S. Ct. at 2101.  Instead, when the presumption against extraterritoriality has been rebutted, *RJR* tells us that "[t]he scope of an extraterritorial statute . . . turns on the limits Congress has (or has not) imposed on the statute's foreign application."  *Id.* (footnote omitted).  In other words, just because a statute *can* apply extraterritorially doesn't mean that it always will.

Since *Steele*, the courts of appeals have devised various tests to answer that question—namely, what are the limits of the Lanham Act's extraterritorial reach?  Because our circuit has never confronted this issue, we have yet to speak on the matter.  So we begin by a-dopting a framework for resolving this question.  After that, we address the procedural objections Defendants raised regarding how the district court went about addressing this issue.  Last, we apply our newly adopted framework to the dispute before us.

### 1.  Framework for Assessing the Scope of the Lanham Act's Extraterritoriality

Each of the tests developed by the courts of appeals to explore the Lanham Act's extraterritorial reach stems from the Supreme Court's *Steele* decision.  There, the defendant, an American citizen operating a watch business in Texas decided to move his business to Mexico City. 344 U.S. at 284-85.  He discovered that "Bulova" had not been registered in Mexico, so he secured the rights to the name.  *Id.*  Importing watch parts from Switzerland and the United States, he sold the watches in Mexico under the "Bulova" name.  *Id.* at 285.  Bulova

24a

Watch Co., one of the largest watch manufacturers in the world, soon began receiving complaints from customers who needed repairs of defective "Bulova" watches that often turned out to be the defendant's product. *Id.* Bulova challenged in Mexico's courts the defendant's right to use the Bulova name, and the Mexico Supreme Court upheld an administrative ruling that had nullified the defendant's trademark registration. *Id.* Bulova then sought relief in federal court under the Lanham Act. *Id.* at 281-82.

The Court concluded that the Lanham Act encompassed the defendant's conduct, reasoning that "the United States is not debarred . . . from governing the conduct of i[t]s own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed." *Id.* at 285-86 (citation omitted). The Court explained that "Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States." *Id.* at 286 (citation omitted). Key to the Court's decision was that the defendant's "operations *and their effects* were not confined within the territorial limits of a foreign nation"; the "spurious 'Bulovas' filtered through the Mexican border into" the United States. *Id.* (emphasis added). And the Court noted that the inferior watches could damage Bulova's reputation in both the United States and foreign markets. *Id.*

Since *Steele*, the courts of appeals that have confronted this issue have adopted one of three tests for deciding whether the Lanham Act governs a defendant's foreign conduct. The first, devised by the Second Circuit and known as the *Vanity Fair* test, considers three factors: (1) whether the defendant's conduct had a

25a

substantial effect on U.S. commerce; (2) whether the defendant was a United States citizen; and (3) whether there was a conflict with trademark rights established under the relevant foreign law. *Vanity Fair Mills, Inc.* v. *T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956). Though no factor is dispositive, the absence of one of the factors "might well be determinative and . . . the absence of both is certainly fatal." *Id.* at 643 (footnote omitted).

Of our sibling circuits that have considered this issue, most have adopted some version of the *Vanity Fair* test. The Eleventh and Federal Circuits have adopted it wholesale. See *Int'l Cafe, S.A.L.* v. *Hard Rock Cafe Int'l, (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001) (describing the three-factor analysis as the "*Bulova* test" but citing *Vanity Fair*); *Aerogroup Int'l, Inc.* v. *Malboro Footworks, Ltd.*, 152 F.3d 948, *2 (Fed. Cir. 1998) (*per curiam*) (unpublished). The Fourth and Fifth Circuits have also adopted the *Vanity Fair* test, but each has tweaked the first prong. Rather than asking whether the defendant's conduct had a "substantial effect" on U.S. commerce, the Fourth Circuit asks whether the conduct had a "significant effect." *Nintendo of Am., Inc.* v. *Aeropower Co.*, 34 F.3d 246, 250 (4th Cir. 1994). The Fifth Circuit, following the Ninth Circuit's lead (discussed below), lowered the bar further, requiring only "*some* effect" on U.S. commerce. *Am. Rice, Inc.* v. *Ark. Rice Growers Coop. Ass'n*, 701 F.2d 408, 414 n.8 (5th Cir. 1983).

The Ninth Circuit has adopted a similar but distinct tripartite test, based on its decisions governing the extraterritorial application of antitrust law under the Sherman Act. See *Wells Fargo & Co.* v. *Wells Fargo Express Co.*, 556 F.2d 406, 427-28 (9th Cir. 1977); *Star-Kist Foods, Inc.* v. *P.J. Rhodes & Co.*, 769 F.2d 1393,

26a

1395 (9th Cir. 1985) ("In *Wells Fargo* we concluded that the Lanham Act's coverage of foreign activities may be analyzed under the test for extraterritorial application of the federal antitrust laws set forth in *Timberlane Lumber Co.* v. *Bank of America National Trust & Savings Ass'n*, 549 F.2d 597 (9th Cir. 1976) . . . ."). Under what's known as the *Timberlane* test, the Lanham Act applies extraterritorially if:

> (1) the alleged violations . . . create some effect on American foreign commerce; (2) the effect [is] sufficiently great to present a cognizable injury to the plaintiffs under the Lanham Act; and (3) the interests of and links to American foreign commerce [are] sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority.[5]

*Trader Joe's Co.*, 835 F.3d at 969 (alterations in original) (citation and footnote omitted). Notably, the Ninth Circuit rejected other circuits' conclusions that the effect on U.S. commerce must be "substantial," reasoning that

---

[5] Timberlane's third prong "considers international comity," *Trader Joe's Co.*, 835 F.3d at 972 (citation omitted), and further breaks down into *seven* additional factors:

> [1] the degree of conflict with foreign law or policy, [2] the nationality or allegiance of the parties and the locations or principal places of business of corporations, [3] the extent to which enforcement by either state can be expected to achieve compliance, [4] the relative significance of effects on the United States as compared with those elsewhere, [5] the extent to which there is explicit purpose to harm or affect American commerce, [6] the foreseeability of such effect, and [7] the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

*Id.* at 972–73 (brackets in original) (quoting *Star-Kist Foods*, 769 F.2d at 1395).

27a

*Steele* "contains no such requirement." *Wells Fargo*, 556 F.2d at 428.

Finally, the First Circuit has rejected both the *Timberlane* and *Vanity Fair* tests. See *McBee*, 417 F.3d at 110 ("[W]e choose not to adopt the formulations used by various other circuits." (citations omitted)). Relying heavily on the Supreme Court's caselaw governing the extraterritoriality of U.S. antitrust laws (wisely, in our view),[6] *id*. at 111, the *McBee* court adopted the following framework. The court begins by determining whether the defendant is an American citizen. *Id*. That's because "a separate constitutional basis for jurisdiction exists for control of activities, even foreign activities, of an American citizen." *Id*. In that scenario, the court reasoned that "the domestic effect of the international activities may be of lesser importance and a lesser showing of domestic effects may be all that is needed." *Id*. at 118.

The court adopted a "separate test" to assess the Lanham Act's extraterritorial reach when a plaintiff seeks damages based on "foreign activities of foreign defendants." *Id*. at 111. In that situation, the court held that the Lanham Act applies "only if the complained-of activities have a substantial effect on [U.S.] commerce, viewed in light of the purposes of the Lanham Act." *Id*. The court noted that its substantial-effect requirement aligned with the framework the Supreme Court has established for assessing the extraterritorial scope of

---

[6] "The Court has written in [the antitrust context], on the issue of extraterritorial application, far more recently than it has written on the Lanham Act, and thus the decisions reflect more recent evolutions in terms of legal analysis of extraterritorial activity." *McBee*, 417 F.3d at 119.

28a

Sherman Act (antitrust) claims. See *id.* at 119-20 (analogizing to *Hartford Fire Ins. Co.*, 509 U.S. at 796).

Besides one caveat we explain below, we adopt the *McBee* framework for several reasons. First, we agree with *McBee* that the Lanham Act will usually extend extraterritorially when the defendant is an American citizen. *Id.* at 118. No one questions Congress's ability "to regulate the conduct of its own citizens, even extraterritorial conduct." *Id.* (quoting *Steele*, 344 U.S. at 285-86) (internal quotation marks omitted). Indeed, "Congressional power over American citizens is a matter of domestic law that raises no serious international concerns, even when the citizen is located abroad." *Id.* (collecting cases); see also Restatement (Third) of Foreign Rels. Law of the United States § 402 (1987) ("[A] state has jurisdiction to prescribe law with respect to . . . the activities . . . of its nationals *outside as well as within its territory* . . . ." (emphasis added)). Some federal statutes even govern U.S. citizens' conduct abroad regardless of whether that conduct produces domestic effects. See, *e.g.*, 18 U.S.C. § 2423(c) ("Engaging in illicit sexual conduct in foreign places. Any United States citizen . . . who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both."). So when the defendant is an American citizen, courts may conclude that the Lanham Act reaches that defendant's extraterritorial conduct even when the effect on U.S. commerce isn't substantial. See *McBee*, 417 F.3d at 118. Though that probably amounts to something akin to the Fifth Circuit's "some effect" test, *Am. Rice, Inc.*, 701 F.2d at

29a

414 n.8, we've no need to lay down a specific test given that our case involves only foreign defendants.

Second, when a plaintiff seeks to recover under the Lanham Act against a foreign national, we also agree with *McBee* that the plaintiff must show that the defendant's conduct has a substantial effect on U.S. commerce. True, the *Steele* Court never required that the effects on U.S. commerce must be *substantial* to trigger extraterritorial application of the Lanham Act (as the Fifth and Ninth Circuits have pointed out in adopting their less-stringent "some effect" test). See 344 U.S. at 286 (noting that the defendant's conduct "and their effects were not confined within the territorial limits of a foreign nation"); *Am. Rice*, 701 F.2d at 414 n.8; *Wells Fargo*, 566 F.2d at 428. But we nonetheless adopt the substantial-effects requirement for two reasons. First, the defendant in *Steele* was an American citizen—for the reasons just explained, it's no surprise that the *Steele* Court was unconcerned about the relatively modest effect of the defendant's conduct on U.S. commerce given Congress's uncontroversial and extensive powers to regulate the conduct of its own citizens. Second, requiring that the defendant's conduct has a substantial effect on U.S. commerce aligns the test for Lanham Act extraterritoriality with both the Supreme Court's antitrust jurisprudence and general principles of foreign relations law. See *Hartford Fire Ins.*, 509 U.S. at 796 ("[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." (collecting cases)); Restatement (Third) of Foreign Rels. Law of the United States § 402(1)(c) (1987) ("[A] state has jurisdiction to prescribe law with respect

30a

to . . . conduct outside its territory that has or is intended to have substantial effect within its territory . . . .").

Finally, if a plaintiff successfully shows that a foreign defendant's conduct has had a substantial effect on U.S. commerce, courts should also consider whether extraterritorial application of the Lanham Act would create a conflict with trademark rights established under the relevant foreign law. See *Steele*, 344 U.S. at 289 ("Mexico's courts have nullified the Mexican registration of 'Bulova'; there is thus no conflict which might afford petitioner a pretext that such relief would impugn foreign law."). Though the *McBee* court eschewed such an analysis, 417 F.3d at 111, every other circuit court considers potential conflicts with foreign law in assessing the Lanham Act's extraterritorial reach, see, *e.g.*, *Vanity Fair*, 243 F.3d at 642; *Trader Joe's Co.*, 835 F.3d at 972-73. Accordingly, in conducting this analysis, courts should weigh any foreign trademark rights established by the defendant.

Hetronic urges us to adopt the Ninth Circuit's *Timberlane* test, noting that our Circuit has looked to that test in assessing extraterritoriality in the antitrust context. See *Montreal Trading Ltd.* v. *Amax Inc.*, 661 F.2d 864, 869 (10th Cir. 1981). But we remain persuaded that *McBee* provides the better framework for assessing Lanham Act claims for several reasons. As an initial matter, Hetronic doesn't argue that we're bound by *Montreal Trading*—nor could it. Unlike our focus here on the Lanham Act, that case considered the extra-territorial reach of the Sherman Act. *Id.* Further, that case involved U.S. defendants; the defendants here are all foreign. *Id.* at 865-66. As we have explained, unlike the *Timberlane* test adopted in *Montreal Trading*, the *McBee* framework accounts for the differences in a

31a

defendant's citizenship.  Indeed, the *Montreal Trading* court didn't have the benefit of *McBee* or the Supreme Court's more recent decisions concerning how courts should approach extraterritoriality questions.  Considering those developments, we conclude that *McBee* establishes the best test for assessing extraterritoriality under the Lanham Act.

To recap, in deciding whether the Lanham Act applies extraterritorially, courts should consider three factors.  First, courts should determine whether the defendant is a U.S. citizen.  Second, when the defendant is *not* a U.S. citizen, courts should assess whether the defendant's conduct had a substantial effect on U.S. commerce.  Third, only if the plaintiff has satisfied the substantial-effects test, courts should consider whether extra-territorial application of the Lanham Act would create a conflict with trademark rights established under foreign law.

Having adopted a framework for assessing the scope of the Lanham Act's extraterritorial reach, we next consider Defendants' arguments that the district court erred procedurally in resolving this issue.

### 2. The District Court Should Have Decided As a Matter of Law Whether the Lanham Act Reached Defendants' Foreign Conduct

#### a. Background

The district court considered the Lanham Act's extraterritoriality three times: once before trial at summary judgment, once during trial on Hetronic's relevance objection, and once after trial in considering Hetronic's preliminary-injunction motion.  Most of Defendants' procedural objections flow from un-certainties about the district court's summary-judgment ruling.

32a

In moving for partial summary judgment, Defendants argued that Hetronic's Lanham Act claims failed because the Act didn't reach Defendants' foreign sales (which made up nearly 97% of their total sales). It's clear that the district court rejected that argument and denied Defendants summary judgment on their extra-territoriality defense: "Viewed in a light favorable to plaintiff, the record evidence raises genuine issues of material fact as to customer confusion and harm to reputation to plaintiff in the United States due to [D]efendants' alleged infringing conduct." Appellants' App. vol. 7 at 1712. What's less clear is whether the district court granted *Hetronic* summary judgment on the extraterritoriality issue. At times, the district court's order suggests that it did: "[T]he court concludes that extraterritorial application of the Lanham Act to defendants' foreign sales . . . is appropriate." *Id.* at 1716.

But on appeal, both sides agree that the court merely denied Defendants summary judgment on their extraterritoriality defense, reserving definitive resolution of the issue for another day. Appellee's Resp. Br. at 50 n.15 (conceding that the district court had not granted summary judgment on the extraterritoriality issue; "it . . . only denied defendants' summary judgment motion"); Reply Br. at 4-5. Despite some of the order's language suggesting otherwise, we agree that the district court didn't resolve the extraterritoriality issue at summary judgment. Indeed, the court repeatedly stated that it was viewing the evidence in a light favoring Hetronic. But summary judgment in Hetronic's favor on that issue would have been appropriate only if there were no genuine disputes of material fact when viewing the evidence in *Defendants'* favor. See, *e.g.*, *Obermeyer Hydro Accessories, Inc.* v. *CSI Calendering, Inc.*, 852

33a

F.3d 1008, 1014 (10th Cir. 2017) (reviewing summary-judgment evidence in a light most favorable to the *nonmoving* party (citation omitted)). Even more fundamentally, the district court concluded that genuine disputes of material fact existed relevant to the extraterritoriality issue. That alone precludes summary judgment. Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact . . . .").

Based on the district court's order, Defendants understandably believed that they could argue the issue to the jury. So they "prepared to present at trial their evidence that there was no 'effect' on U.S. commerce, and that there was no confusion among U.S. citizens, caused by the[ir] purely foreign sales." Reply Br. at 4. But the district court precluded them from doing so. At trial, Hetronic called Josef Scheuerer, one of Hetronic's sales representatives, to testify about the confusion Defendants' alleged trademark infringement created among Hetronic's customers. On cross-examination, Defendants sought to establish that only non-U.S. customers were confused and that, as a result, any infringement couldn't have substantially affected U.S. commerce. Defendants' line of questioning went to "whether or not there [was] a Lanham Act claim at all." Appellants' App. vol. 13 at 3273. That is, as Defendants argued on summary judgment, if their foreign sales didn't substantially affect U.S. commerce, the Lanham Act wouldn't apply.

Hetronic objected to the questioning, asserting that the subject matter was irrelevant and unfairly prejudicial. During a sidebar between the court and counsel, Hetronic's counsel misspoke, telling the court that it had already granted summary judgment in Hetronic's favor

34a

on the extraterritoriality issue. The court apparently assumed this was so and sustained the objection:

> HETRONIC'S COUNSEL: Your Honor, . . . it seems like defendants are trying to reargue extraterritoriality, *which Your Honor granted summary judgment on* . . . . [T]hey're trying to back-door it through this witness and I think it's inappropriate. It's 402 and 403. Where the confusion took place is irrelevant to whether there's confusion under the Lanham Act.

> THE COURT [to Defendants' counsel]: Where are you headed with this?

> DEFENDANTS' COUNSEL: The most recent case that we read . . . does suggest that where the confusion occurs matters . . . . But [Hetronic's counsel is] exactly right, that is where I'm going. *It was my understanding this issue was still open.* If Your Honor has already ruled on it, we can perhaps at a break put that on the record and I'll stop this. I thought this was still open.

> * * *

> THE COURT: It's [D]efendants' position that the location of the confusion is relevant for what purpose?

> DEFENDANTS' COUNSEL: For whether or not there is a Lanham Act claim at all.

> THE COURT: Well, I've—for better or worse, *I've already crossed that bridge.* And there may be a . . . case from last week, and if so, that's really not something that I can revisit in the middle of this trial, so the objection will be sustained.

*Id.* at 3272-73 (emphasis added).

35a

As noted, Hetronic now concedes that the district court never granted it summary judgment on the extraterritoriality issue. Yet Hetronic contends—without citing to the record—that "the trial court already had held (correctly) . . . that the [Lanham] Act could apply extraterritorially." Appellee's Resp. Br. at 50.

Hetronic is mistaken. The only time the district court addressed the extraterritoriality issue before trial was in denying Defendants' motion for summary judgment. But as Hetronic acknowledges, the court's ruling concluded that there was a genuine dispute of material fact about whether Defendants' foreign activities had caused confusion among U.S. consumers.

After the jury rendered its verdict in Hetronic's favor, Hetronic moved for a worldwide injunction barring Defendants from selling their infringing products. In granting that injunction, the district court considered the Lanham Act's extraterritoriality for the third time. This time, relying on the evidence established at trial, the district court undeniably concluded that the Lanham Act reached Defendants' foreign conduct.

### b. Determining the Scope of the Lanham Act's Extraterritoriality Presents a Question of Law

With that background in mind, Defendants argue that the district court erred in two ways. First, Defendants insist that the district court should have resolved the extraterritoriality issue as a matter of subject-matter jurisdiction before trial. Second, because the district court didn't do so, Defendants maintain that the court erred by precluding them from arguing the issue at trial.

We agree with Defendants that the district court should have resolved the extraterritoriality issue as a

36a

matter of law before trial, but we disagree that this issue presents a question of subject-matter jurisdiction. Defendants' confusion on this point is understandable. Before 2010, every court—including the U.S. Supreme Court—considered the Lanham Act's extraterritoriality as a matter of subject-matter jurisdiction. See, *e.g.*, *Steele*, 344 U.S. at 281; *McBee*, 417 F.3d at 117 (collecting cases). But in 2010, the Supreme Court clarified in *Morrison* that questions about the extraterritorial reach of a federal statute go to the merits, not jurisdiction. 561 U.S. at 254. In assessing the extraterritoriality of the Securities Exchange Act, the Court explained that "to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question." *Id.* That same rationale holds true for the Lanham Act. *Derma Pen, LLC* v. *4EverYoung Ltd.*, 736 F. App'x 741, 748 n.4 (10th Cir. 2018) (unpublished) (citing *Morrison* and rejecting appellant's suggestion that the Lanham Act's extraterritoriality was a question of subject-matter jurisdiction); *Trader Joe's Co.*, 835 F.3d at 968 ("We hold that the extraterritorial reach of the Lanham Act is a merits question that does not implicate federal courts' subject-matter jurisdiction . . . .").

But to hold that the extraterritorial reach of the Lanham Act presents a merits question isn't to say that the question can't be decided as a matter of law. To the contrary, the *Morrison* Court decided a similar extraterritoriality issue as a matter of law under Rule 12(b)(6), concluding that the petitioners "failed to state a claim on which relief [could] be granted." 561 U.S. at 273. And in considering the Lanham Act's extraterritoriality post-*Morrison*, the Ninth Circuit recently decided the issue as a matter of law in reversing the district court's 12(b)(6)

37a

dismissal of the plaintiff's trademark claims. See *Trader Joe's Co.*, 835 F.3d at 975, 977-78.

Consistent with how courts have previously handled this issue, we hold that district courts should ordinarily decide questions about the scope of the Lanham Act's extraterritorial reach as a matter of law, preferably in the litigation's early stages. We think this the best course for several reasons. First, as just discussed, courts have always decided this issue as a matter of law since the Supreme Court decided *Steele* and have continued to do so even after *Morrison* cleared up that it's not a question of subject-matter jurisdiction. See *id.*

Second, "the proper extraterritorial reach of a Lanham Act injunction is a matter of statutory interpretation." *Derma Pen*, 736 F. App'x at 748 n.4; see also *RJR*, 136 S. Ct. at 2101 ("The scope of an extraterritorial statute . . . turns on the limits Congress has (or has not) imposed on the statute's foreign application." (footnote omitted)). We have "always considered" questions of statutory interpretation as "quintessentially legal in nature." *United States* v. *McLinn*, 896 F.3d 1152, 1156 (10th Cir. 2018) (citation omitted); see also *Proctor & Gamble Co.* v. *Haugen*, 222 F.3d 1262, 1271 (10th Cir. 2000) ("The question here is one of statutory interpretation *and thus a pure matter of law* . . ." (emphasis added)). Judges, not juries, decide purely legal questions. See *McLinn*, 896 F.3d at 1156. The extraterritoriality of the Lanham Act usually presents just such a question.[7]

---

[7] *Montreal Trading* isn't to the contrary. 661 F.2d at 870. There, we noted that the trial court let the jury decide the subject-matter jurisdiction question about whether the Sherman Act applied extraterritorially to reach the defendants' conduct. See *id.* at 866,

38a

Even so, Defendants at times appear to frame the issue of whether their conduct created a substantial effect on U.S. commerce as a factual dispute. But on closer examination, we see only a legal dispute. For instance, Defendants insist that they should have been able to cross-examine Joseph Scheuerer to show that his testimony related primarily to foreign customers. From that testimony, Defendants sought to establish that no U.S. consumers were confused, so there couldn't have been a substantial effect on U.S. commerce. The problem for Defendants is that this cross-examination testimony of Scheuerer wouldn't have created a factual dispute. Hetronic presented other evidence, discussed below, detailing instances of confusion among *U.S. consumers*. Defendants never tried to argue that those examples never happened or otherwise refute that portion of Hetronic's evidence. Instead, Defendants sought to show that *most* of the confusion occurred among foreign customers, in effect arguing that even if there was some effect on U.S. commerce, it wasn't substantial. But weighing that argument—whether a defendant's conduct created a substantial effect on U.S. commerce—requires a legal determination that's left to the courts.

Actual factual disputes underlying the extra-territoriality question certainly can arise. For example, a defendant could dispute whether (or how much of) its allegedly infringing products entered the United States. Establishing that factual predicate could affect the court's determination of whether the defendant's conduct had a substantial effect on U.S. commerce. In those instances, the court may submit the factual dispute to the jury while reserving the ultimate legal determination for

---

870. But we didn't pass on the question whether the trial court should have decided that issue as a matter of law. *Id.* at 870.

39a

itself.   We have expressed our preference for this procedure in dealing with issues that, like the Lanham Act's extraterritorial scope, usually constitute a question of law but may involve factual disputes.  Cf. *Gonzales* v. *Duran*, 590 F.3d 855, 862-63 (10th Cir. 2009) (Ebel, J., concurring) ("[I]f a district court submits the question of qualified immunity to the jury because there are disputed historical facts material to resolving the immunity question, the district court should submit to the jury only the disputed factual contentions underlying the immunity question and should reserve for itself the legal question of objective reasonableness.").

Having reaffirmed that the scope of the Lanham Act's extraterritorial reach generally presents a legal question of statutory interpretation, we now review the issue *de novo*.  *McLinn*, 896 F.3d at 1156 (citation omitted).

### 3.  Applying the Framework

Our analysis proceeds in three steps.  We begin by assessing whether any of Defendants are American citizens.  None are.  Thus, to prevail, Hetronic must show that Defendants' foreign infringing conduct had a substantial effect on U.S. commerce.  The extraterritoriality issue turns solely on this question because Defendants nowhere argue the third element—that applying the Lanham Act extraterritorially would conflict with trademark rights under another country's laws (an issue we would normally consider only if a plaintiff first satisfied the substantial-effect requirement).  We conclude that Defendant's foreign conduct had a substantial effect on U.S. commerce.

"The substantial effects test requires that there be evidence of impacts within the United States, and these impacts must be of a sufficient character and magnitude to give the United States a reasonably strong interest in

40a

the litigation." *McBee*, 417 F.3d at 120 (citations omitted). In applying this test, courts should keep in mind the Lanham Act's "core purposes"—protecting U.S. consumers from confusion and "assur[ing] a trademark's owner that it will reap the financial and reputational rewards associated with having a desirable name or product." *Id.* at 121 (citing *Dastar Corp.* v. *Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-34 (2003) (second citation omitted)).

To meet its burden, Hetronic points to three "great wells of effects on U.S. commerce": (1) Defendants' direct sales into the United States; (2) Defendants' sales of products abroad that ended up in the United States; and (3) diverted foreign sales that Hetronic would have made but for Defendants' infringing conduct. See Appellee's Resp. Br. at 18-19, 23-28. We address each theory in turn and conclude that Hetronic has sufficiently shown that Defendants' conduct had a substantial effect on U.S. commerce.

On appeal, the parties dispute the amount of Defendants' direct sales into the United States.[8] But we needn't resolve that disagreement because, regardless, a

---

[8] Defendants assert that only Abitron Germany sold products directly into the United States and that those sales totaled $16,670. But as Hetronic flags, that assertion contradicts Defendants' admissions both in their statement of undisputed facts in their motion for summary judgment and in an offer of proof they submitted at trial. Defendants represented in their statement of undisputed facts that their remote-control sales into the U.S. totaled €202,134.12 and "were comprised of €185,463.52 of sales by Hetronic Germany, and €16,670.60 of sales by Abitron Germany." Appellants' App. vol. 4 at 939. They made an identical representation in an offer of proof at trial. Given Defendants' failure in their reply brief to explain the disparity, we accept its admissions in the district court as the true totals of their direct U.S. sales.

41a

foreign infringer's direct U.S. sales don't factor into our analysis of whether the Lanham Act applies abroad. See *McBee*, 417 F.3d at 122. Applying the Lanham Act to a foreign infringer's direct U.S. sales isn't an extraterritorial application of the Act: "Courts have repeatedly distinguished between domestic acts of a foreign infringer and foreign acts of that foreign infringer; the extraterritoriality analysis . . . attaches only to the latter." *Id.* (collecting cases). In other words, the Lanham Act would encompass Defendants' direct sales into the United States even if we concluded that the Act didn't apply extraterritorially to Defendants' infringing sales abroad. See *id.* So we turn to Hetronic's two other theories.

First, Hetronic argues that many of Defendants' foreign sales have ended up in the United States. Numerous courts have recognized that a foreign defendant can be liable for Lanham Act violations when its products find their way into the United States, even if initially sold abroad: "Quite commonly, plaintiffs in these sorts of cases can meet their burden by presenting evidence that while the initial sales of infringing goods may occur in foreign countries, the goods subsequently tend to enter the United States in some way and in substantial quantities." *McBee*, 417 F.3d at 125 (collecting cases). Defendants acknowledge that over €1.7 million of their foreign sales ended up in the United States (Abitron Germany: €1,026,482; Hetronic Germany: €592,591; Hydronic: €120,344; Abitron Austria: €10,792). And when a plaintiff presents evidence that "American consumers have been exposed to the infringing mark"— here, in the form of over €1.7 million worth of products that ended up in the hands of American consumers—

42a

"confusion and reputational harm . . . can often . . . be inferred." *Id.*

But we don't need to rest on an inference of confusion. Hetronic submitted evidence that U.S. consumers were confused about Hetronic's products relationship to the Abitron companies.  See Supp. App. vol. 2 at 529-33 (former Abitron Germany employee agreeing that "there were instances where [U.S.] customers were confused about the relationship between Abitron and Hetronic"). For instance, U.S. consumers would sometimes reach out to Abitron Germany to obtain Hetronic products under the mistaken belief that Abitron manufactured and sold Hetronic products.  See *id.* at 528-29.  One U.S. customer emailed Abitron Germany about buying a "Nova-XL Hetronic."  *Id.* at 530.  An Abitron Germany employee instructed its U.S. sales representative to "inform the customer that it can obtain an Abitron part from us, not Hetronic."  *Id.* at 531.  And one of Hetronic's sales representatives testified that "[a]lmost every week," customers sent Abitron products to Hetronic USA for repair.  *Id.* vol. 3 at 651.  Even Abitron Germany's own U.S. distributor was uncertain about the relationship between the Abitron companies and Hetronic.

Q: And when I mentioned the brand Hetronic, what's your understanding as to that brand?  Is that a competitor brand of Abitron's, or is that the same thing?

A: I don't really know, honestly.  I know that Hetronic was based in Germany, and then they changed their name to Abitron.  Now, I am aware that there was a company in Oklahoma called Hetronic International . . . .  Am I paying attention to whether it says "Germany" or "International" or

43a

whatever?  Generally, no, I really wasn't.  So to me it was Hetronic.

Appellants' App. vol. 13 at 3289.  Hetronic's counsel also showed Abitron Germany's U.S. distributor a photograph of an Abitron NOVA and a Hetronic NOVA side by side. When asked if he could "tell which one was Hetronic and which one was Abitron" if they hadn't been labelled, the distributor responded, "I would have no idea, no." *Id.* at 3294.

On this evidence alone—that millions of euros worth of infringing products found their way into the United States and that Defendants' efforts to sell those products caused confusion among U.S. consumers—we could conclude that the effects of Defendants' foreign conduct are sufficiently substantial to give the United States a reasonably strong interest in the litigation.

Defendants offer two rebuttals.  First, Defendants argue that the €1.7 million worth of products represented only 3% of Defendants' total sales and that such a small fraction can't serve as a "springboard to call the rest of the $90 million of purely foreign sales damages under the Lanham Act."  Reply Br. at 7 (internal quotation marks omitted).  But Defendants misunderstand the nature of our inquiry here.  We ask only whether the effects of Defendants' foreign conduct produce substantial impacts on U.S. commerce; it's irrelevant what proportion of Defendants' global sales entered the United States. Otherwise, billion-dollar-revenue companies could escape Lanham Act liability by claiming that millions of dollars of their infringing products entering the United States represented only a fraction of their sales.  But the United States would certainly have a strong interest in litigation brought by an American company seeking to stem the flow of such substantial amounts of infringing products.

44a

Besides, the Supreme Court has made clear that once a court determines that a statute applies extraterritorially to a defendant's conduct, as we do here, that statute captures all the defendant's illicit conduct: "If §10(b) did apply abroad, we would not need to determine which transnational frauds it applied to; it would apply to all of them (barring some other limitation)." *RJR*, 136 S. Ct. at 2101 (quoting *Morrison*, 561 U.S. at 267 n.9).

Second, Defendants argue that Hetronic failed to present evidence at trial of Defendants' infringing foreign sales that eventually entered the United States. But as we explained above, this was an issue that the district court should have resolved as a matter of law; it should have never reached a jury. And Defendants admitted long before trial that about €1.7 million worth of their products reached the United States. Considering that admission, we reject Defendants' contention that Hetronic needed to provide additional evidence on this point.

Next, Hetronic relies on a diversion-of-sales theory— the idea that Defendants stole sales from Hetronic abroad, which in turn affected Hetronic's cash flows in the United States. Several courts have recognized that evidence of diverted sales evinces a substantial effect on U.S. commerce: "The [effect-on-U.S.-commerce] criteria may be met even where all of the challenged transactions occurred abroad, and where 'injury would seem to be limited to the deception of consumers' abroad, as long as 'there is monetary injury in the United States' to an American plaintiff." *Love* v. *Associated Newspapers*, Ltd., 611 F.3d 601, 613 (9th Cir. 2010) (first quoting *Ocean Garden, Inc.* v. *Marktrade Co.*, 953 F.2d 500, 503 (9th Cir. 1991); and then citing *Reebok Int'l, Ltd.* v. *Marnatech Enters.*, Inc., 970 F.2d 552, 554-55 (9th Cir.

45a

1992)); see also *McBee*, 417 F.3d at 126 ("Courts have considered sales diverted from American companies in foreign countries in their analyses." (collecting cases)).

In *McBee*, the court explained that "[e]vidence of economic harm to McBee in Japan due to confusion of Japanese consumers is less tightly tied to the interests that the Lanham Act intends to protect, since there is no United States interest in protecting *Japanese consumers*." 417 F.3d at 126. But the court still approved of the diversion-of-sales theory because "American courts do . . . have an interest in protecting American commerce by protecting McBee from lost income" due to a foreign defendant's infringing conduct. *Id.* Under that rationale, U.S. courts have an interest in protecting Hetronic from the economic harm it suffered in the form of lost sales that it would have made if it weren't for Defendants' trademark infringement. Here, Hetronic presented evidence that Defendants' conduct cost it tens of millions of dollars in lost sales. Those lost revenues would have flowed into the U.S. economy but for Defendants' conduct infringing a U.S. trademark. Thus, this monetary injury to Hetronic also caused substantial effects on U.S. commerce. See *Love*, 611 F.3d at 613 (citations omitted).

In response, Defendants contend that the diversion-of-sales theory applies only when the defendant is a U.S. citizen.[9] For that proposition, they rely heavily on *Tire*

---

[9] In their reply brief, Defendants also challenge Hetronic's diversion-of-sales theory on two other grounds—that applying the theory "exceeds the authority of the Commerce Clause" and that Hetronic failed to prove its lost sales. Reply Br. at 13–21. But we generally deem arguments raised for the first time in a reply brief waived. *United States* v. *Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019). Defendants offer no reason why we should depart from our usual

46a

*Engineering & Distribution, LLC* v. *Shandong Linglong Rubber Co.*, 682 F.3d 292 (4th Cir. 2012). There, the Fourth Circuit rejected the plaintiff's argument, stating that "courts invoking the diversion-of-sales theory have required the defendants to be U.S. corporations that conducted operations—including at least some of the infringing activity—within the United States." *Id.* at 311 (citations omitted). We find *Tire Engineering* unpersuasive for three reasons.

First, though both of the cases *Tire Engineering* cites involved U.S.-citizen defendants, neither court suggested—let alone *held*—that the diversion-of-sales theory is inapplicable to foreign defendants. See *Ocean Garden*, 953 F.2d at 504; *Am. Rice*, 701 F.2d at 414-15. Second, the *Tire Engineering* court ignored courts that have conducted a diversion-of-sales analysis involving foreign defendants. *E.g.*, *McBee*, 417 F.3d at 126. Third, restricting the diversion-of-sales theory to U.S.-citizen defendants makes little sense; if anything, it applies with *greater* force to a foreign defendant. When diverted sales that would have otherwise flowed to a U.S. company instead inure to a foreign defendant, the loss to U.S. commerce is clear. By contrast, when the defendant is a U.S. citizen with a U.S. presence, the sales divert from one U.S. company to another—either way, U.S. commerce benefits from the sales revenue flowing into the U.S. economy. We thus reject Defendants' argument that plaintiffs may argue a diversion-of-sales theory only against U.S.-citizen defendants.

---

rule, so we decline to consider these additional arguments. *Id.* ("[T]o allow an appellant to raise an argument for the first time in a reply brief would be manifestly unfair to the appellee who, under our rules, has no opportunity for a written response." (internal quotation marks and citations omitted)).

47a

Viewing the evidence as a whole, Hetronic has presented more than enough evidence to show that Defendants' foreign infringing conduct had a substantial effect on U.S. commerce. Besides the millions of euros worth of infringing products that made their way into the United States after initially being sold abroad, Defendants also diverted tens of millions of dollars of foreign sales from Hetronic that otherwise would have ultimately flowed into the United States. Moreover, though much of Hetronic's evidence focused on consumer confusion abroad, it also documented numerous incidents of confusion among U.S. consumers. We thus conclude that Hetronic has presented evidence of impacts within the United States of a sufficient character and magnitude as would give the United States a reasonably strong interest in the litigation. Accordingly, the Lanham Act applies extraterritorially here to reach all of Defendants' foreign infringing conduct.

## B. Injunction's Specificity

Defendants next argue that the injunction "lacks the specificity required by [Federal Rules of Civil Procedure] 65." Appellants' Opening Br. at 32. We disagree.

Rule 65 of the Federal Rules of Civil Procedure requires that injunctions contain "*reasonable* detail." Fed. R. Civ. P. 65(d)(1)(C) (emphasis added). Injunctions violate Rule 65 "when the delineation of the proscribed activity lacks particularity, or when containing only an abstract conclusion of law, not an operative command capable of enforcement." *CF & I Steel Corp.* v. *United Mine Workers of Am.*, 507 F.2d 170, 173 (10th Cir. 1974) (internal quotation marks and footnotes omitted).

The district court's injunction goes far beyond an abstract conclusion of law and easily satisfies Rule 65. The trial court enjoined Defendants from "[d]irectly or

48a

indirectly using . . . Hetronic's . . . Trade Dress, or any reproduction, counterfeit, copy or colorable imitation thereof on or in connection with any products or services." Appellants' App. vol. 10 at 2518. The injunction specifically defines trade dress: "'trade dress' refers to the total image of a product, product packaging, product label, product design, or a combination of these things," including "features such as size, shape, color or color combinations, texture, graphics, or particular sales techniques." *Id.* at 2515 n.1. Crucially, the court further states that the trade dress is "the black and yellow color scheme and the design of the housings" of Hetronic's products. *Id.* at 2515. This provides ample detail to meet Rule 65's requirements.

### C. Injunction's Scope

Despite the above, we conclude that the district court's injunction is improperly broad. Recall that the court's injunction extends not only to countries in which Hetronic currently sells its products, but to every country in the world. The Lanham Act—the statute on which the district court relied—cannot support such a broad injunction here.

Hetronic dismisses Defendants' "lengthy disquisition on trademark history and geography" as "irrelevant to this case." Appellee's Resp. Br. at 30. But Defendants' argument that trademark rights "are fundamentally geographical" is sound. Appellants' Opening Br. at 27. "[E]ven the owner of a federally registered mark—who enjoys the presumption of nationwide priority—is not entitled to injunctive relief *except in the area actually penetrated through use of the mark.*" *Emergency One, Inc.* v. *Am. Fire Eagle Engine Co.*, 332 F.3d 264, 269 (4th Cir. 2003) (emphasis added) (internal quotation marks, citation, and footnote omitted); see also *Hanover Star*

49a

*Milling Co.* v. *Metcalf*, 240 U.S. 403, 416 (1916) ("[A] trademark … extends to every market where the trader's goods have become known and identified by his use of the mark. But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article."). Though *Emergency One* involved a trademark dispute confined within the United States, it's equally applicable here: Hetronic isn't entitled to injunctive relief in markets it hasn't actually penetrated.

In a footnote, Hetronic argues that "Defendants' geographic argument is doubly irrelevant because Hetronic obtained the marks in question by sale, not by first use; rights thus flowed *via contract* rather than particular jurisdictions' first-use laws." Appellee's Resp. Br. at 31 n.7 (emphasis altered). If anything, Hetronic's argument on this point undermines the district court's injunction. As Hetronic acknowledges, its rights against Defendants flow from contract—not necessarily from trademark violations under the Lanham Act.

Consider an example. If Defendants begin tomorrow selling their remote controls in a country in which Hetronic has no presence, Hetronic could hardly assert a trademark claim against Defendants. How could there be market confusion, the hallmark of a trademark claim, when there were no confusingly similar products being marketed? Hetronic seems to argue that it could assert a contract claim against Defendants because the parties' agreements limited Defendants' rights to use Hetronic's product marks (NOVA, ERGO, etc.). And Hetronic would probably be right. But that contract claim wouldn't necessarily support a trademark claim, much less injunctive relief under the Lanham Act.

50a

Accordingly, we narrow the injunction to the countries in which Hetronic currently markets or sells its products. To the extent those countries have changed since the district court entered the injunction, we remand for the court to modify the injunction in accordance with this opinion.

## II. Defendants' Ownership Defense

### A. Background

Leading up to trial, Defendants repeatedly argued that Hetronic's claims failed because Defendants owned all the disputed intellectual property, including the products' trademarks and trade dress. To explain Defendants' rationale, we first provide additional background about the products' origins and Hetronic's formation.

Hetronic was initially founded in Germany in the early 1980s as Hetronic Steuersysteme GmbH. In 2000, Hetronic Steuersysteme's founder, Max Heckl, moved to the United States and formed Hetronic International, Inc. (the company we have called "Hetronic"), which became the headquarters for Hetronic-related companies. By this time, there were several Hetronic-related subsidiary companies, including Hetronic Malta Limited and Hetronic USA.

In July 2000, Hetronic entered a research-and-development agreement with Hetronic Steuersysteme, Hetronic Malta, and Hetronic USA to "pool their resources" and to "share the costs equally between them" as they worked to further develop, market, and sell radio remote controls. Appellants' App. vol. 7 at 1617. The R&D Agreement refers to Hetronic as the "Contractor" and refers to the other three Hetronic companies collectively as "Developer." *Id.* The R&D Agreement contains this later-disputed provision:

51a

Contractor acknowledges that the Developer [*i.e.*, Hetronic Steuersysteme, Hetronic Malta Limited, and Hetronic USA] is, and shall remain, the sole owner of all that which is done, produced or developed by the Contractor, *including but not limited to the know-how, technical information, designs, product descriptions, trade marks, trade names* and of all and any data or information that the Developer has supplied to the Contractor or which may have been developed by the Contractor in connection with the Work and of any improvements . . . made by either the Developer or the Contractor during the term of this agreement or at any other time if these relate to the Work, *and acknowledges Developer's exclusive right, title, and interest in and to such property.*

*Id.* at 1617-18 (emphasis altered).

By 2006, Hetronic Steuersysteme—Heckl's original company—had a minor role in the company's wider operations. It sold to Hetronic its "Hetronic" trademarks registered in Germany, the United States, South Korea, Japan, China, Taiwan, and the European Union. And because Hetronic Steuersysteme's business "was focused on the marketing, sales and assembly of [radio remote controls] in Germany," it changed its name to Hetronic Deutschland (which would later be purchased by Fuchs's company, Hetronic Germany). *Id.* at 1618.

In January 2008, years after the R&D Agreement was signed, Methode Electronics, Inc., a Delaware corporation, sought to acquire all the Hetronic-related companies. But during negotiations, Methode learned that Hetronic's distributor in Germany, Hetronic Deutschland, was embroiled in a tax dispute with the

52a

German government, so Methode declined to purchase that company.

Before completing the sale to Methode, Heckl sought to consolidate all of his companies' intellectual property in Hetronic. So Hetronic Deutschland sold to Hetronic the trademarks for the "Hetronic" name that it had registered in South America and Malta. Heckl believed that when the sale to Methode was completed, Hetronic had owned the rights to all the intellectual property held by the Hetronic-related companies, including the NOVA and ERGO trademarks and their trade dress.

In September 2008, Methode completed its purchase of the Hetronic companies. The purchase agreement included "All Intellectual Property owned by, licensed by or used by any [Hetronic-related company not including Hetronic Deutschland]." *Id*. at 1620. The agreement defined "Intellectual Property" as "[a]ll trademarks, service marks, certification marks, trade dress, logos, trade names, Internet domain names, and corporate names, . . . including all goodwill associated therewith." *Id*. at 1621.

After the sale, Heckl continued to own and manage Hetronic Deutschland. But in 2009, he considered selling the company. In response to a due-diligence inquiry from Fuchs, Hetronic Deutschland represented that it had no "patents, utility models or design rights . . . copyrights, trademarks, and/or respective applications." *Id*. at 1623. Yet when Hetronic Germany bought Hetronic Deutschland in 2010, the purchase agreement provided that "Seller sells and hands over to the Buyer . . . any and all intangible assets . . . including, in particular, patents, trademarks, rights relating to designs and utility models . . . that the Seller holds and can dispose of . . . ." *Id*. at 1624.

53a

Based on that series of transactions, Hetronic Germany alleges it believed that it owned all the technology developed under the 2000 R&D Agreement as well as "legacy" technology developed before the Agreement was executed. *Id.* at 1629. Its rationale was as follows. Hetronic Germany is the successor of Hetronic Deutschland, which, when it was known as Hetronic Steuersysteme, became a party to the R&D Agreement. Under that agreement, Hetronic Steuersysteme—along with Hetronic Malta and Hetronic USA—retained ownership over "the know-how, technical information, designs, product descriptions, trade marks, [and] trade names." *Id.* at 1617-18. Though Hetronic Deutschland later sold to Hetronic the trademark rights to the "Hetronic" name, Hetronic Germany maintained that the sale didn't include any other intellectual property. And because Methode didn't purchase Hetronic Deutschland (or any of its assets, intangible or otherwise), Hetronic Germany claimed that it owns the intellectual property that its predecessor, Hetronic Deutschland, retained under the R&D Agreement. Defendants have continued to rely on that same theory in defending against Hetronic's trademark claims.

## B. The District Court Correctly Barred Defendants from Raising Their Ownership Defense

Based on their reading of the R&D Agreement, Defendants planned to assert their ownership defense at trial. But just two months before trial, the EUIPO Board of Appeal issued its decision in Hetronic's favor, and Hetronic moved for summary judgment on

54a

Defendants' ownership defense.[10]   Relying on the Board of Appeal's decision in the EUIPO proceedings, Hetronic argued that preclusion principles barred Defendants from claiming any ownership interest in the relevant intellectual property.   The district court granted the motion via oral ruling after a hearing, and, after *another* hearing addressing Defendants' "Motion to Clarify" (essentially a motion to reconsider), the court prohibited Defendants from arguing at trial that they owned any of the trademarks or trade dress.   Defendants assert that the district court erred in so ruling.

Because the district court construed Hetronic's motion as one for summary judgment, we review the district court's ruling *de novo*.   *Savant Homes, Inc.* v. *Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (citation omitted).

The issue-prelusion dispute before us is atypical in that we're considering the preclusive effect of a foreign judgment.   Federal courts recognize and enforce foreign judgments if they meet due-process standards.   See *Phillips USA, Inc.* v. *Allflex USA, Inc.*, 77 F.3d 354, 359 (10th Cir. 1996) (quoting *Hilton* v. *Guyot*, 159 U.S. 113, 202 (1895));[11] Restatement (Second) of Conflict of Laws

---

[10] For reasons unimportant here, Hetronic initially moved under Rule 50(a), but the district court rightly construed the motion as one for summary judgment.

[11] This due-process standard is met if "there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting, or fraud in procuring the judgment."   *Phillips USA*, 77 F.3d at 359 (quoting

55a

§ 98 cmt. b (1971) (explaining that valid "[j]udgments rendered in a foreign nation . . . will be accorded the same degree of recognition to which sister State judgments are entitled").  The parties agree that the judgments rendered in the EUIPO proceedings satisfy this standard, as do we.

But although we consider the preclusive effect of a foreign judgment, as a federal court examining a federal-law question, we rely on the federal law of issue preclusion.  See *Murdock* v. *Ute Indian Tribe of Uintah and Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992) (footnote and citations omitted); cf. *Blonder-Tongue Lab'ys, Inc.* v. *Univ. of Ill. Found.*, 402 U.S. 313, 324 n.12 (1971) (discussing *res judicata* and noting that "[i]n federal-question cases, the law applied is federal law").[12]  "[I]ssue preclusion bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim."  *Park Lake Res. Ltd. Liab.* v. *U.S. Dep't of Agric.*, 378 F.3d 1132, 1136 (10th Cir. 2004) (citation omitted).  In the civil context, four criteria must be met before a court may apply the doctrine of issue preclusion:

---

*Hilton*, 159 U.S. at 202); see also *Soc'y of Lloyd's*, 402 F.3d at 999 (quoting same *Hilton* language).

[12] At least one authority suggests that U.S. courts should apply foreign preclusion law if the foreign rules "are substantially the same as the rules of the [U.S.] court."  Restatement (Second) of Conflict of Laws § 98 cmt. f (1971).  Under that principle, it's arguable that EU preclusion law should govern this dispute.  But the parties agree that federal issue-preclusion law applies, and they didn't provide any discussion of EU preclusion law.  Given the lack of briefing on EU preclusion law, we follow the parties' lead and the authority we identify above in considering this issue under federal issue-preclusion law.

56a

(1)  the issue previously decided is identical with the one presented in the action in question,

(2)  the prior action has been finally adjudicated on the merits,

(3)  the party against whom the doctrine is invoked was a party, or inprivity with a party, to the prior adjudication, and

(4)  the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Id.* (citation omitted).  Though Hetronic argues why it has met each element, Defendants seriously contest only the first two elements.  Focusing our discussion on those elements, we conclude that the district court rightly precluded Defendants from presenting their ownership defense to the jury.

Under the first element, we assess whether the issue Defendants seek to litigate "is the same as the one addressed previously by" EUIPO. *Murdock*, 975 F.2d at 687.  That is, we aim "to prevent repetitious litigation of what is essentially the same dispute."  Restatement (Second) of Judgments § 27 cmt. c (1982).  Here, the issue—whether Defendants own the disputed intellectual property—is essentially the same one decided in the EUIPO proceedings.  That becomes clear, though, only after reading *both* the Cancellation Division's decision and the Board of Appeal's decision.

Defendants are correct that the Cancellation Division didn't decide the ownership issue.  Recall that Abitron Germany initiated the EUIPO proceedings, arguing that the EU should nullify Hetronic's "NOVA" trademark because Hetronic had filed for the mark in bad faith (i.e., Hetronic supposedly knew that Abitron Germany had a

57a

stronger claim to ownership of the mark).  Both parties to that proceeding based much of their arguments on their respective claims to ownership of the intellectual property.  But the Cancellation Division equivocated on the ownership issue: "The arguments ... give the impression that both [Defendants] and [Hetronic] were authorized to use" the NOVA trademark.  Appellants' App. vol. 13 at 3180.  So that initial tribunal decided the dispute on a narrow basis.  It concluded only that Hetronic didn't act in bad faith when it filed for (and obtained) the NOVA trademark because Hetronic had a valid basis to believe that it owned the mark, regardless of whether it actually had the superior claim to ownership.  If the EUIPO proceedings had ended with the Cancellation Division, issue preclusion would not apply.

But unlike the Cancellation Division, the Board of Appeal tackled the ownership issue head-on.  It framed the dispute this way: When a company transfers all of its "business operation"—as the original Hetronic International did when Methode acquired it—that necessarily includes "the right to a trademark acquired by use."  *Id.* at 3112.  In other words, though Abitron Germany tried to argue that Methode's purchase of Hetronic International didn't include the rights to use the *non-registered* "NOVA" trademark, the Board of Appeal concluded that it was impossible to separate the rights to a company's trademarks from the operation of the business as a whole.

In reaching its decision, the Board of Appeal reasoned that "[t]he decisive question is . . . whether the Hetronic business operation remained with [Abitron Germany's] legal predecessors.  That is not the case."  *Id.* at 3112.  Indeed, the Board of Appeal reached the opposite

58a

conclusion, holding that "[i]t is clear from all the[] agreements that Hetronic Deutschland, as one of the legal predecessors to [Abitron Germany], had no rights to the company name [or] the German 'Hetronic' trademarks." *Id.* at 3113.  It based its ruling on its conclusion that Methode's purchase of Hetronic International "comprise[d] *all* of the intellectual property." *Id.* at 3112 (emphasis added).  In short, the Board of Appeal resolved the exact issue that Defendants sought to dispute at trial: that when Methode bought Hetronic International, it obtained ownership of all the Hetronic-related intellectual property.[13]   Thus, the district court rightly concluded that the EUIPO proceedings resolved the same issue that Defendants sought to dispute at trial.

Defendants' contrary arguments fail to persuade us.  They argue that the Board of Appeal didn't decide the same issue because the parties' dispute before EUIPO was limited to the NOVA trademark and no others.  According to Defendants, because the Board of Appeal's decision didn't mention EURO, GL, GR or any of the other product marks, its decision governs only ownership of the NOVA trademark.

But we read the Board of Appeal's decision the same way as the district court: "ownership of the intellectual property at issue was very much an either/or proposition.  Either it all passed to [Hetronic] in 2008 or to

---

[13] Several months after oral argument, Hetronic filed a Rule 28(j) letter informing us that the General Court of the European Union had upheld the Board of Appeal's decision.  In response, Defendants renewed their assertion that the General Court, like EUIPO, lacked jurisdiction to decide the ownership issue.  But as we explain below, Defendants waived any argument about EUIPO lacking jurisdiction by not raising it in the district court.

59a

[D]efendants in 2010." Supp. App. vol. 2 at 361. It's evident that the Board of Appeal concluded that all the intellectual property passed to Hetronic, not just the NOVA trademark. See Appellants' App. vol. 13 at 3112 (explaining that the relevant agreements "show that the assets transferred . . . comprise *all of the intellectual property*, including all Intellectual Property incorporated into the radio remote control products developed, manufactured, marketed or sold by [Hetronic]." (emphasis added) (internal quotation marks omitted)). Moreover, Defendants fail to explain how the ownership dispute would differ as to the other trademarks. Indeed, Abitron Germany's claim to the other intellectual property would be based on the same theories, documents, and arguments it presented vis-à-vis the NOVA mark and that the Board of Appeal rejected. See Restatement (Second) of Judgments § 27 cmt. c (1982) (suggesting that in assessing whether the previous tribunal decided the same issue, courts should ask if "there [is] a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first").

Defendants fare no better on the second element. There, we consider whether "the prior action has been finally adjudicated on the merits." *United States* v. *Rogers*, 960 F.2d 1501, 1508 (10th Cir. 1992) (citation omitted). It has. After resolving the parties' dispute, EUIPO dismissed Abitron Germany's petition and ordered it to pay the costs of the proceeding.

Defendants nevertheless insist that the Board of Appeal's finding concerning ownership is mere dicta, and thus it didn't actually decide the issue. True, "[a]djudication on the merits requires that the adjudication be necessary to the judgment," so dicta wouldn't suffice.

60a

*Murdock*, 975 F.2d at 687 (citations omitted). But the Board of Appeal's ownership ruling wasn't dicta. Dictum refers to "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)." *Dictum*, Black's Law Dictionary (11th ed. 2019). Here, the Board of Appeal's decision turned on its conclusions regarding who owned the intellectual property: "[Abitron Germany] bases its allegation of bad faith on supposedly earlier rights in the mark 'NOVA'. As already pointed out . . . , however, it has no rights to a 'NOVA' trademark acquired by use." Appellants' App. vol. 13 at 3114. Stated differently, the Board of Appeal's ruling that Hetronic owned all the intellectual property was a necessary predicate to its conclusion that Defendants' bad-faith claim failed. So the ownership ruling wasn't dicta.[14]

---

[14] Defendants raise a number of other arguments in passing—usually devoting little more than a sentence to each—that we decline to address. First, they argue that EUIPO lacked jurisdiction to decide the ownership issue. Defendants have forfeited that argument by failing to raise it in the district court. And because Defendants failed to identify plain error as the standard of review governing this new argument (let alone contend that the argument survives that exacting standard), we decline to consider it. See *Grupo Cementos*, 970 F.3d at 1282–83 ("[I]n order to avoid a waiver on appeal, a party is required to identify plain error as the standard of review in their opening brief and to provide a defense of that standard's application." (citations omitted)). Second, addressing the third element, Defendants argue that issue preclusion could bind only Abitron Germany, as the other Defendants weren't parties to the EUIPO proceedings. But like their jurisdictional argument, they didn't argue the third element in the district court, nor do they make the case that their argument can survive plain-error review, so we consider that argument waived. *Id.*

61a

In brief, because Hetronic has met each of the required elements, we affirm the district court's summary-judgment ruling on Defendants' ownership defense.

## III.   District Court's Evidentiary Rulings at Trial

Defendants challenge three of the district court's trial rulings.  First, Defendants argue that the district court erroneously sustained Hetronic's relevance objection, precluding them from arguing that the Lanham Act didn't reach their foreign-sales activity.  We already dealt with that issue above: Any error by the district court was harmless because we conclude as a matter of law that the Lanham Act reaches Defendants' conduct.  See *Bridges* v. *Wilson*, 996 F.3d 1094, 1099 (10th Cir. 2021) ("[E]ven if the trial court is mistaken, it will not be reversed unless its ruling results in substantial prejudice, or had a substantial effect on the outcome of the case." (alteration in original) (quotation omitted)).

Second, Defendants argue that the district court wrongly precluded them from using their evidence that they owned the intellectual property for purposes unrelated to the court's issue-preclusion ruling.  And third, Defendants contest the district court's exclusion of their damages expert.  We reject both of these challenges in turn.

"Evidentiary rulings generally are committed to the very broad discretion of the trial judge, and they may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment." *Leprino Foods Co.* v. *Factory Mut. Ins. Co.*, 653 F.3d 1121, 1131 (10th Cir. 2011) (internal quotation marks and citation omitted).  And "[e]ven if the court finds an erroneous evidentiary ruling, a new trial will be ordered only if the

62a

error 'affected the substantial rights of the parties.'" *Id.* (quoting *Webb* v. *ABF Freight Sys., Inc.*, 155 F.3d 1230, 1246 (10th Cir. 1998)).

### A. Waiver-and-Acquiescence and Good-Faith-Belief-in-Ownership Defenses

Despite the district court's issue-preclusion ruling that Defendants couldn't assert at trial that they owned the intellectual property, Defendants argue that they should have been allowed to introduce ownership evidence for a different purpose. Specifically, Defendants sought to present a waiver-and-acquiescence defense to Hetronic's contract claims and a good-faith-belief-in-ownership defense to combat the willful-infringement element of the trademark claims. The district court didn't abuse its discretion in handling either of these issues.

First, the district court ruled—over Hetronic's objection—that Defendants *could* assert a waiver-and-acquiescence defense. But the district court clarified that that defense "raises no issue as to whether *defendants* believed they owned the trademarks or the technology"; "[t]he question is whether *Hetronic* had the factual knowledge and subjective intent necessary to establish the acquiescence defense." Supp. App. vol. 2 at 362 (emphasis added). In other words, to present this defense and show that Hetronic acquiesced to Defendants' contractual breaches, Defendants needed to prove that Hetronic believed that Defendants owned the intellectual property—it was irrelevant whether Defendants believed that they owned it. Based on that ruling, Defendants apparently chose not to pursue the defense. That was no fault of the district court's.

Second, Defendants challenge the district court's refusal to permit them to assert a good-faith-belief-in-ownership defense, but they ignore the district court's

63a

rationale.  The district court prohibited Defendants from raising that defense, not because of its preclusion ruling, but because Defendants had forfeited it: They had failed to raise it in their answers, at summary judgment, or in their pretrial briefing.  And Defendants don't challenge the district court's conclusion that allowing them to raise that defense on the eve of trial would have significantly prejudiced Hetronic.  We thus conclude that the district court rightly prevented Defendants from raising this defense.

## B.  Exclusion of Defendants' Damages Expert

During the trial, Defendants sought to introduce testimony from their damages expert, Alexander Demuth, that any damages the jury awarded under the Lanham Act must be reduced by Defendants' costs of goods (*i.e.*, their expenses in producing their remote controls).  The district court permitted Demuth to testify but prohibited him from opining about the costs-of-goods issue.  Defendants appeal that ruling.

During discovery, Defendants "consistently claimed . . . that they could not determine their costs of goods sold because their accounting system of 'total cost method' does not contain the requisite information."  Supp. App. vol. 1 at 77 (citations omitted).  Yet in his expert report, Demuth purported to calculate Defendants' costs of goods sold based on spreadsheets that Defendants had prepared "after-the-fact" "in which they . . . 'allocated' total costs for the companies into several categories—but not costs associated with particular sales."  *Id.*  Hetronic moved to exclude Demuth's costs-of-goods testimony, asserting that it was based on "unreliable data that defendants ginned up for Demuth after claiming for months that they had no way to estimate their costs of goods sold."  *Id.* at 76.

64a

At the *Daubert* hearing, the district court provisionally denied Hetronic's motion based on Defendants' representation that "[a]n independent person from the company will testify to the validity of the numbers." *Id.* vol. 2 at 288 ("He will not confirm these numbers are, in fact, accurate. That's up to the company to confirm, to support his expert opinion."). The district court conditioned its ruling on Defendants verifying the underlying numbers upon which Demuth would base his testimony: "I do conclude that . . . *if* the defendants do carry their burden of presenting evidence to support . . . the cost of goods sold, then Mr. Demuth will be permitted to testify that cost of goods sold should be deducted from any Lanham Act recovery of the defendants' profits." *Id.* at 291-92 (emphasis added).

But by the time of trial, Defendants had failed to introduce any testimony or evidence confirming the accuracy of the underlying numbers upon which Demuth based his expert report. So, in an oral ruling near the end of the trial, the district court prohibited Demuth from testifying about the costs-of-goods issue: "We don't have the witness that I was told [at the *Daubert* hearing] I would have . . . , but more importantly, we don't have . . . the independently admissible evidence that I was told that we would have, and which I conclude is required under Section 35 of the Lanham Act." Appellants' App. vol. 13 at 3334-35.

Complicating matters, the district court's brief oral ruling doesn't clearly establish the legal basis for its decision. The parties advance competing—and equally erroneous—theories. Defendants argue that the district court excluded Demuth's testimony under Rule 602 because he lacked "*personal knowledge* of the cost information about which he testified." Appellants' Op-

65a

ening Br. at 49.  But Defendants misconstrue the court's point about Rule 602.  The court merely pointed out that Demuth himself couldn't testify about the accuracy of the underlying numbers because he hadn't verified them. Appellants' App. vol. 13 at 3334 ("[Demuth] is not a Rule 602 percipient witness *as to the reliability of the numbers* supplied by [the Abitron entities' CEO]." (emphasis added)).

For its part, Hetronic contends that the district court excluded Demuth's testimony "under *Daubert*."  Appellee's Resp. Br. at 54.  But that's equally incorrect. The district court recognized that Demuth's testimony sufficed under Rules 702 and 703 but explained that more was required under the Lanham Act:

> It's very likely that the basis that Mr. Demuth has offered for testifying about cost of goods sold is sufficient for use by an expert under Rule 703 for purposes of expert testimony under Rule 702 . . . .

> But it's one thing for a source of information to be sufficient for use by an expert under Rule 703 for purposes of Rule 702 expert [testimony]; in my view, it is quite another thing for the jury to have testimony and evidence that passes muster *under the substantive demands of Section 35 of the Lanham Act.*

Appellants' App. vol. 13 at 3334 (emphasis added).  Thus, the district court appears to have concluded that Defendants failed to "prove all elements of cost or deduction claimed," as required by the Lanham Act. 15 U.S.C. § 1117(a).

Though the district court's precise rationale is unclear, "we may affirm the district court for any reason

66a

supported by the record." *Spring Creek Expl. & Prod. Co., LLC* v. *Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1032-33 (10th Cir. 2018) (citation omitted). We have previously recognized that a district court may exclude an economic expert if the expert's "opinions lacked foundation because they were based on the self-serving statements of an interested party." *Champagne Metals* v. *Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006) (brackets and internal quotation marks omitted). That's what happened here. It was the underlying data supplied to Demuth—not Demuth's testimony itself—that was problematic. After consistently asserting that they kept no costs-of-goods records, Defendants suddenly produced just the financial records they needed to offset any potential damages award. The district court was rightly skeptical of those fortuitous documents. And even though the district court concluded that Demuth had used reliable methods to form his opinion, his testimony wouldn't be worth much if it was based on unreliable, manufactured numbers. Defendants had ample time and opportunity to authenticate the disputed numbers (as they promised they would), but they never did. On these facts, the district court didn't abuse its discretion in excluding Demuth's costs-of-goods testimony.

## CONCLUSION

For the forgoing reasons, we affirm in part, reverse in part, and remand to the district court to modify its injunction in accordance with our opinion.[15]

---

[15] We also grant Defendants' unopposed motion to file five documents under seal. Each of the documents was marked as confidential under the district court's protective order, and we are

67a

_____

satisfied that the parties have demonstrated "a real and substantial interest that justifies depriving the public of access to the records." *JetAway Aviation, LLC* v. *Bd. of Cnty. Comm'rs*, 754 F.3d 824, 826 (10th Cir. 2014) (citation and internal quotation marks omitted).

68a

**APPENDIX B**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

————

No. CIV-14-650-F

————

HETRONIC INTERNATIONAL, INC.,
*Plaintiff,*

v.

HETRONIC GERMANY GMBH,
HYDRONIC-STEUERSYSTEME GMBH,
ABI HOLDING GMBH,
ABITRON GERMANY GMBH,
ABITRON AUSTRIA GMBH, AND
ALBERT FUCHS,
*Defendants.*

————

SUMMARY JUDGMENT ORDER

————

**MARCH 22, 2019**

————

Before the court is All Defendants' Motion for Partial Summary Judgment. Doc. no. 262. Upon due consideration of the parties' submissions, the court makes its determination.

I.

*Introduction*

In the Second Amended Complaint, plaintiff seeks relief against defendants under thirteen claims. Seven of the claims are based upon violations of the Lanham Act

69a

and its Oklahoma counterpart. Four claims are tort claims and two claims are for breach of contract. Defendants move for partial summary judgment with respect to all claims except the breach of contract claims.

Initially, defendants assert the court lacks subject matter jurisdiction over the Lanham Act claims to the extent they seek to recover any relief based upon defendants' foreign sales of radio remote control (RRC) products. The total amount of these sales, defendants represent, is 56,608,254.76 euros (€). As to any United States sales, defendants acknowledge the court has subject matter jurisdiction. Defendants, however, argue that Abitron Germany GmbH (ABIG) and Abitron Austria GmbH (ABIA) (collectively Abitron entities) have no liability for infringing on the "Hetronic" trademark because they sold RRCs under the "Abitron" trademark. All defendants assert that they have no liability for infringing on other trade names and trade dress which are the subject of the Lanham Act claims because they own the trade names and trade dress.

Next, defendants challenge plaintiff's tort claims, arguing that the specific remedy plaintiff seeks—$5.4 million in attorneys' fees spent pursuing a civil action against plaintiff's former President, Torsten Rempe (Rempe)—is not recoverable. Defendants contend the attorney's fees are not "collateral damages" for purposes of the conversion claim, and under the Oklahoma Legislature's 2011 enactment of 23 O.S. § 15, they are not responsible for costs incurred pursuing Rempe's share of plaintiff's harm.

Defendants additionally argue that plaintiff has no actionable conversion claim or civil conspiracy claim against the Abitron entities.

70a

Lastly, defendants argue that they are entitled to partial summary judgment on the "breach of indemnity" claim included in plaintiff's expert's report but not alleged by plaintiff in the Second Amended Complaint.

Plaintiff opposes defendants' partial summary judgment motion in all respects.

## II.

### Standard of Review

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought." Rule 56(a), Fed. R. Civ. P. Summary judgment is appropriate under Rule 56(a) if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* In deciding whether summary judgment is appropriate, the court does not weigh the evidence and determine the truth of the matter asserted, but only determines whether there is a genuine issue of material fact for trial. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if under the substantive law, it is essential to the proper disposition of the claim. *Id.* In adjudicating a motion for summary judgment, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. *McGehee* v. *Forest Oil Corporation*, 908 F.3d 619, 624 (10th Cir. 2018).

71a

III.

*Lanham Act Claims*

a. Extraterritorial Application

In Counts 3 through 8 of the Second Amended Complaint, plaintiff alleges claims against defendants under the Lanham Act, 15 U.S.C. § 1051, *et seq.* Specifically, plaintiff alleges claims of trademark infringement in violation of sections 32 and 43(a) of the Lanham Act,[1] unfair competition in violation of section 43(a), false designation of origin in violation of section 43(a), trademark counterfeiting and infringement in violation of section 32, and contributory trademark infringement in violation of sections 32 and 43(a). In their motion, defendants challenge the extraterritorial application of the Lanham Act to the alleged infringement, unfair competition and false designation of origin involving defendants' foreign sales of RRCs and spare parts.[2]   In support of this challenge, defendants

---

[1] 15 U.S.C. § 1114(l)(a) (section 32) and 15 U.S.C. § 1125(a)(l)(A) (section 43(a)).

[2] Defendants assert that 96.9% of their collective sales, totaling €54,858,043.41, were purely foreign sales because they took place in a foreign country, between a foreign buyer and foreign seller, and were designated for destination in a foreign country.  They assert that 3.1% of collective sales, totaling €1,750,211.35, took place in a foreign country, between a foreign buyer and foreign seller, but the foreign buyer designated United States as "the ultimate location where the [product was] intended to be used."  Doc. no. 262, p. 3. According to defendants, foreign customers purchase RRCs as components for larger pieces of machinery, such as cranes, and the machinery is what is destined for the United States.  Defendants argue that neither of these categories of foreign sales fall within the extraterritorial reach of the Lanham Act, but urge that, at the very least, the purely foreign sales are not subject to the Lanham Act.

72a

rely upon a three-factor test established by the Second Circuit in *Vanity Fair Mills, Inc.* v. *T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956),[3] for determining whether the Lanham Act can be applied beyond the boundaries of the United States.   According to defendants, plaintiff—having the burden of establishing subject matter jurisdiction—cannot prove any of the three factors (defendant's conduct had a substantial effect on United States commerce; defendant is a United States citizen; and there is no conflict with trademark rights established under the foreign law) with respect to their foreign sales. Therefore, defendants argue the court lacks subject matter jurisdiction over plaintiff's Lanham Act claims involving their foreign sales.[4]

Plaintiff responds that defendants' infringing conduct justifies extraterritorial application of the Lanham Act under the *Vanity Fair* test.  First, plaintiff asserts that defendants' infringing conduct has had a substantial effect on United States commerce by diverting sales from plaintiff, causing customer confusion and harming

---

[3] The *Vanity Fair* test was developed from the Supreme Court's decision in *Steele* v. *Bulova Watch Co.*, 344 U.S. 280 (1952), wherein the Court gave the provisions of the Lanham Act extraterritorial application against infringing conduct committed in Mexico by an American citizen.

[4] Defendants concede the court has subject matter jurisdiction over the Lanham Act claims involving direct sales into the United States. According to defendants, these sales were made by ABIG and Hetronic Germany GmbH.   These sales, defendants assert, total €219,237.07 (€202,134.12 of RRCs and €17,102.95 of spare parts). Plaintiff challenges defendants' sales figures not only for direct sales to the United States but also for the foreign sales previously noted. For purposes of adjudicating defendants' motion, the court need not address plaintiff's challenge.

73a

plaintiff's reputation.  Additionally, plaintiff points out that defendants have had substantial ties with the United States because they entered into distribution and license agreements governed by Oklahoma law, and while operating under those agreements, received training in Oklahoma, hired Rempe and his company to assist in competing with plaintiff and circulated contact information for a United States distributor.  Plaintiff also points out that after termination of the distribution and license agreements, defendants obtained the "Abitron" trademark in the United States, contracted with a United States distributor to sell RRCs, and after the distributorship relationship ended, held themselves out as offering RRCs for sale in the United States.  In addition, plaintiff asserts that the Abitron entities have attended trade shows in the United States and exhibited products at foreign trade shows directed at United States citizens.  Further, plaintiff maintains that defendants' direct and indirect sales in the United States are substantial in that they total over €2 million.

Second, plaintiff argues that even though defendants are not United States citizens, they have availed themselves of United States laws.  Plaintiff again points out that defendants entered into distribution and license agreements with it.  According to plaintiff, the distribution agreements contained Oklahoma choice-of-law and forum-selection clauses.  Plaintiff also emphasizes that defendants have had substantial ties with the United States as previously described.

Third, plaintiff contends that extraterritorial application of the Lanham Act is appropriate since there is no conflict with any valid foreign trademark.  Plaintiff asserts that defendants do not possess any valid, registered trademark in any foreign country to which

74a

they sell.  Plaintiff states that it owns the registered trademarks for HETRONIC® and NOVA® in the United States as well as in the European Union.  The OHIM[5] proceeding challenging the NOVA® trademark registration in the European Union, plaintiff contends, should not preclude this court from applying the Lanham Act to the foreign sales because that proceeding was filed only after this lawsuit was commenced and it argues subsequent events do not oust jurisdiction.  Further, plaintiff posits that defendants' bare assertion of a conflict between United States and German trademark laws does not warrant refusal to exercise jurisdiction with respect to the foreign sales.

Although satisfying the Second Circuit's *Vanity Fair* three-factor test, plaintiff points out that the Ninth Circuit has established a similar three-factor test, which incorporates the test it developed to determine the extraterritorial reach of antitrust laws in *Timberlane Lumber Co.* v. *Bank of America, N.T. and S.A.*, 549 F.2d 597, 613 (9th Cir. 1976).  See, *Star-Kist Foods, Inc.* v. *P.J. Rhodes & Co.*, 769 F.2d 1393, 1395 (9th Cir. 1985).  Under this test, in order for the Lanham Act to apply extraterritorially: (1) the alleged violations must create some effect on U.S. foreign commerce; (2) the effect must be sufficiently great to present a cognizable injury to the plaintiff under the Lanham Act; and (3) the interests of and links to U.S. foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority.[6]  According to

---

[5] Acronym for Office for Harmonization in the Internal Market.

[6] The third factor breaks down into a seven-part test exploring such things as the degree of conflict with foreign law and the nationality

75a

plaintiff, there is reason to believe the Tenth Circuit would follow the *Timberlane* factors because it previously adopted those factors to determine the extra-territorial application of antitrust law in *Montreal Trading Ltd.* v. *Amax Inc.*, 661 F.2d 864, 869 (10th Cir. 1981). Plaintiff contends that the first two factors largely mirror the *Vanity Fair* substantial-effect-on-United States-commerce factor and it has demonstrated that that factor cuts in plaintiff's favor. Plaintiff asserts that the third factor articulated in *Timberlane* weighs in favor of extraterritorial application of the Lanham Act because defendants' infringing conduct has sufficiently strong links to United States foreign commerce.

Defendants, in reply, urge the court to follow the *Vanity Fair* test, and in so doing, find that the Lanham Act does not apply to their foreign sales. They contend that there has been no substantial effect on the United States because they operate in Europe and nearly all of their sales involved foreign customers. Defendants assert that their direct sales of RRCs totaling €202,134.12 are a tiny fraction of the collective sales at issue and argue that most of the direct sales do not even involve the Lanham Act because they were made to plaintiff or its affiliates or were made by ABIG under the "Abitron" name. Although they do not contest jurisdiction over the direct sales to the United States, defendants argue that plaintiff wants to use those sales as a springboard to reach over €56 million in sales, which defendants argue should not be permitted. Defendants also assert that the rights to the "NOVA" name are in dispute in European Union and maintain that the dispute belongs there since

---

and allegiance of the parties. See, *Starkist Foods, Inc.*, 769 F.2d at 1395.

76a

the trademarks or trade names originated in Germany and were created by a predecessor, Hetronic Steuer-systeme GmbH.  Moreover, defendants state that ABIG holds the trademark registration in Germany on the NOVA, GL, GR and GA names.  They also point out that it is undisputed they are not United States citizens.  Further, defendants argue that plaintiff has cited no well-reasoned case to support extraterritorial application of the Lanham Act over their foreign sales.  Defendants therefore seek partial summary judgment limiting the amount of sales to which plaintiff can seek relief under the Lanham Act to €202,134.12 in direct sales of RRCs and €17,102.95 in spare parts.[7]

---

[7] Plaintiff has recently filed a request for judicial notice or, in the alternative, motion for leave to supplement opposition to defendants' motion for partial summary judgment.  Doc. no. 309.  Plaintiff states "the OHIM tribunal just issued its ruling, rejecting defendants' attempt to invalidate Hetronic's EU community NOVA trademark.  Moreover, as a result of the OHIM tribunal's ruling, defendants' German NOVA trademark (which was obtained after Hetronic's) is invalid."  It also states that "newly acquired evidence shows that defendants continue to actively sell products that they know are intended for use in the United States."  *Id.* at ECF p. 2.  Plaintiff requests the court to take judicial notice of these facts or permit plaintiff to supplement its opposition to defendants' motion for partial summary judgment "so the record contains complete and accurate facts that did not exist at the time of the summary judgment briefing."  *Id.* at ECF p. 6.  In light of the court's ruling on the extraterritorial application of the Lanham Act, as subsequently discussed, which favors plaintiff, the court finds it unnecessary to grant the requested relief.  The court is also cognizant of plaintiff's representation that "[t]hat the EU Trademark Regulations allow any party adversely affected by a decision to appeal . . . Defendants have filed a notice indicating their intention to appeal."  *Id.* at ECF p. 3. n. 1.  The court therefore **DENIES** plaintiff's request and motion.

77a

In determining the extraterritorial application of the Lanham Act, the court finds that it is a "merits question" and not a question of the court's subject matter jurisdiction. See, *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247, 253-254 (2010) (extraterritorial reach of §l0(b) of the Securities Exchange Act of 1934 is a "merits question" not a "question of subject-matter jurisdiction"); see also *Trader Joe's Co.* v. *Hallatt*, 835 F.3d 960, 968 (9th Cir. 2016) ("We hold that the extraterritorial reach of the Lanham Act is a merits question that does not implicate federal courts' subject-matter jurisdiction.") (citing *Morrison*, 561 U.S. at 253-54); and *A.O. Smith Corporation* v. *USA Smith Industry Dev. Inc.*, 2017 WL 2224539, *2 (D. Colo. May 22, 2017) (agreeing with the conclusion in *Trader Joe's* that "the extraterritorial reach of the Lanham Act goes to the merits of a trademark claim").

As defendants concede that the Lanham Act applies to direct sales into the United States, the court need not address the Act's application to those claims.   The question for the court is whether the Lanham Act applies to defendants' foreign sales.

The Supreme Court has made it clear that, in appropriate circumstances, the Lanham Act can be applied extraterritorially to conduct in a foreign country. See, *Steele* v. *Bulova Watch Co.*, 344 U.S. 280 (1952). The Court, however, has not set forth a specific framework for determining when the extraterritorial application of the Lanham Act is warranted. The Tenth Circuit also has not established a formulation for making that determination, but other circuit courts have.   *McBee* v. *Delica Co., Ltd.*, 417 F.3d 107 (1st Cir. 2005); *Vanity Fair*, 234 F.2d at 642; *Nintendo of America, Inc.* v. *Aeropower Co.*, Ltd., 34 F.3d 246, 250 (4th Cir. 1994); *American Rice,*

78a

*Inc.* v. *Arkansas Rice Growers Co-op. Ass'n,* 701 F.2d 408,414 (5th Cir. 1983); *Star-Kist Foods, Inc.*, 769 F.2d at 1395; and *International Cafe, S.A.L.* v. *Hard Rock Cafe Intern. (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001). As has been discussed, defendants urge the court to use the Second Circuit's *Vanity Fair* test and plaintiff applies the *Vanity Fair* test to counter defendants' arguments but also advocates the use of the Ninth Circuit's *Timberlane* test. Upon review and out of an abundance of caution, the court will apply both tests. Courts have found the *Vanity Fair* test to be the "most commonly employed test." *International Academy of Business and Financial Management, Ltd* v. *Mentz,* 2013 WL 212640, at *5 (D. Colo. Jan. 18, 2013). Nonetheless, as stated by plaintiff, the Tenth Circuit has endorsed the analysis set forth in *Timberlane* as containing the appropriate elements governing consideration of extraterritorial application of the Sherman Act. And that same analysis has been applied by the Ninth Circuit in determining the extraterritorial reach of the Lanham Act. See, *Star-Kist Foods, Inc.*, 769 F.2d at 1395.

Vanity Fair Test

The *Vanity Fair* test asks whether (1) the defendant's conduct had a substantial effect on United States commerce; (2) the defendant is a United States citizen; and (3) there exists a conflict with trademark rights established under foreign law. *Vanity Fair Mills, Inc.*, 234 F.2d at 642. The Second Circuit, stated, in *Vanity Fair*, that "the absence of one of the above factors might well be determinative," but the absence of two "is certainly fatal" as to the extraterritorial application of the Lanham Act. *Id.* at 643. However, the Second Circuit subsequently noted that it has not applied the

79a

Lanham Act extraterritorially, absent a substantial effect on United States commerce.  See, *Atlantic Richfield Co.* v. *Arco Globus Intern. Co., Inc.*, 150 F.3d 189, 192 n. 4 (2d Cir. 1998).

*Substantial Effect on United States Commerce*

The court finds that plaintiff has proffered evidence, viewed in a light most favorable to plaintiff, sufficient to establish that defendants' alleged infringing conduct has had a substantial effect on United States commerce.  As recognized by the First Circuit in *McBee* v. *Delica Co., Ltd.*, 417 F.3d at 126, "[c]ourts have considered sales diverted from American companies in foreign countries in their analyses."  *Id.* (citing *Totalplan Corp. of Am.* v. *Colborne*, 14 F.3d 824, 830-831 (2d Cir. 1994) and *American Rice, Inc.*, 701 F.2d at 414-415); see also, *Bulova*, 344 U.S. at 283-84 and *Warnaco Inc.* v. *VF Corp.*, 844 F. Supp. 940, 950-952 (S.D.N.Y. 1994), but see, *Tire Engineering and Distribution, LLC* v. *Shandong Linglong Rubber Company, Ltd.*, 682 F.3d 292, 311 (4th Cir. 2012) (diversion-of-sales theory applicable only in cases involving defendant United States companies). Plaintiff has demonstrated that the use by Hetronic Germany GmbH (HG) and Hydronic Steuersysteme GmbH (HCEE) of KH parts, while under contract with plaintiff, precluded sales of "Hetronic" parts to HG and HCEE, resulting in a significant drop in revenue.  Plaintiff was entitled to revenue from the sale of "Hetronic" parts because of the distribution agreements executed by HG and HCEE.  It has also demonstrated that defendants' sales of RRCs, after termination of the distribution agreements and after the formation of the Abitron entities, precluded sales of Hetronic's RRCs in the same markets.  The evidence shows that like defendants, Hetronic advertises, promotes and sells RRCs

80a

worldwide.  Hetronic and defendants have competed, and do compete, in many of the same markets.

Courts have also considered customer confusion and harm to reputation in analysis of the substantial effect factor.  *Atlantic Richfield Co.*, 150 F.3d at 192-193; *A.V. by Versace, Inc.* v. *Gianni Versace, S.p.A,* 126 F. Supp. 2d 328, 340-341 (S.D.N.Y. 2001); *Libbey Glass, Inc.* v. *Oneida Ltd.*, 61 F. Supp. 2d 720, 724 (N.D. Ohio 1999); *Warnaco Inc.*, 844 F. Supp. at 951-952.  Viewed in a light favorable to plaintiff, the record evidence raises genuine issues of material fact as to customer confusion and harm to reputation to plaintiff in the United States due to defendants' alleged infringing conduct.

In sum, the court finds, after viewing the record evidence in a light most favorably to it, that plaintiff has proffered evidence to satisfy the "substantial effect on United States commerce" factor.

*Citizenship of Defendants*

It is undisputed that none of the defendants are citizens of the United States.  Plaintiff, however, urges the court to find that this factor nonetheless weighs in favor of plaintiff because defendants have had substantial ties to the United States through the distribution and license agreements, attending training in Oklahoma, hiring Rempe and his company to consult with them, hiring a United States distributor, and obtaining a trademark for "Abitron" in the United States.  The court notes that courts have treated foreign citizens as United States citizens when these defendants resided in the United States and did business in the United States or controlled a United States company.   See, *A.V. by Versace, Inc.* v. *Gianni Versace, S.p.A.*, 126 F. Supp. 2d 328, 337 (S.D.N.Y. 2001) (finding that defendant, who "resided in and [had] done business in the United States

81a

for over forty years" was a "constructive" United States citizen); *Calvin Klein Indus., Inc.* v. *BFK Hong Kong, Ltd.*, 714 F. Supp. 78, 80 (S.D.N.Y 1989) (finding that a foreign defendant could be treated as a United States citizen because he "resid[ed] in New York and is the controlling force behind" a New York corporation). In the case at bar, none of the defendants have resided in the United States or conducted business for many years in the United States or controlled a United States corporation. The court recognizes that some courts have also considered agreements or joint ventures between foreign citizens and American citizens as well as foreign citizens' consent to jurisdiction in the United States in analyzing the United States citizen factor. *NewMarkets Partners LLC* v. *Oppenheim*, 638 F. Supp. 2d 394, 407 (S.D.N.Y. 2009); *Warnaco Inc.*, 844 F. Supp. at 952. However, the court is not convinced that the distribution and license agreements and other domestic activities described by plaintiff suffice to demonstrate (resolving all factual doubts in favor of plaintiff) that defendants are in effect "constructive" United States citizens for purposes of the *Vanity Fair* test. The court therefore concludes that plaintiff has not presented evidence adequate to satisfy the United States citizenship factor.

*Conflict of Law*

In *Vanity Fair*, the Second Circuit concluded that "the remedies provided by the Lanham Act . . . should not be given an extraterritorial application against foreign citizens acting under presumably valid trademarks in a foreign country." *Vanity Fair Mills*, 234 F.2d at 643. Plaintiff has proffered evidence that it owns the registered trademark for "Hetronic" in the United States and other countries, including Germany and the European Union. Defendants do not challenge this. The court

82a

finds no conflict of law with trademark rights established under foreign law with respect to the "Hetronic" name.

As to the trade names, other than "NOVA," there is no evidence of valid registrations by defendants for any of the trade names as of the time of filing of this action against defendants. In reply, defendants proffer evidence that ABIG obtained registrations for GL, GR and GA[8] names. Even if the court were to consider these registrations, which were proffered for the first time in reply, the registrations appear to have been obtained after suit was filed against ABIG in April of 2015. Consequently, defendants were not operating under any valid registrations under foreign law for the GL, GR and GA names at the times relevant to this action. Although plaintiff seeks injunctive relief on the Lanham Act claims, it also seeks damages. Those damages are calculated from August, 2012. And as to ABIG, damages are sought after it began operations in September of 2014. The court discerns no rights under foreign law with respect to the GL, GR and GA names with which a damage award might conflict. Moreover, there are other trade names at issue, such as ERGO, as to which there is no conflict with any trademark rights established under foreign law.

With respect to "NOVA" trade name, plaintiff has shown that it owns the registered trademark for "NOVA" in the United States and the European Union. Defendants argue that the pending OHIM proceeding, which was commenced in July 2015 after this lawsuit was filed, should preclude the court from applying the Lanham Act extraterritorially. Defendants also point out

---

[8] According to defendants, the GA product was a predecessor to the HH product, which is one of the products at issue.

83a

for the first time in reply that ABIG has obtained registration of the "NOVA" name in Germany.  Even if the court were to consider that evidence, the trademark registration appears to have been obtained in 2016 after this action was filed.  As discussed, while plaintiff seeks injunctive relief for its Lanham Act claims, it also seeks damages.  The court discerns no rights under foreign law with respect to the "NOVA" name with which a damage award might conflict.  Further, although defendants argue that there are differences between German law and United States law with respect to trademarks or trade names, the *Vanity Fair* test looks to whether there exists a "conflict with *trade-mark rights established* under foreign law."  *Vanity Fair Mills, Inc.*, 234 F.2d at 642 (emphasis added).  Lastly, the court finds that even if the OHIM proceeding were to result in a cancellation of plaintiff's registered trademark for "NOVA," defendants have not satisfied the court that application of the Lanham Act would conflict with German trademark law regarding the unregistered trade name of "NOVA."  The alleged differences proffered by defendants between German law and United States law do not provide significant guidance for this court so as to enable the court to conclude that an actual conflict exists.[9]  Although the court should avoid deciding a case where "the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country," see, *Vanity Fair Mills*, 234 F.2d at 647, the court is not convinced that there is a real prospect of

---

[9] The court notes defendants proffer no expert affidavit on the differences between German and United States trademark laws.

84a

discord and conflict with respect to plaintiff's Lanham Act claims.[10]

In reply, defendants cite *Star-Kist Foods, Inc.* and *Pinkberry, Inc.* v. *JEC Intern. Corp.*, 2011 WL 6101828 (C.D. Calif. Dec. 7, 2011), in opposition to extraterritorial application of the Lanham Act extraterritorially where petitions to cancel trademark proceedings are pending. However, the court notes that the cancellation proceedings in both cases occurred prior to the filing of the infringement cases and in *Star-Kist Foods, Inc.*, plaintiff was sought only injunctive relief. *Star-Kist Foods*, 769 F.2d at 1394-1395; *Pinkberry, Inc.*, 2011 WL 6101828, *1. Moreover, both cases applied the *Timberlane* test, not the *Vanity Fair* test, for determining extraterritorial application of the Lanham Act.

In sum, the court finds that the record evidence, viewed favorably in favor of plaintiff, does not indicate a conflict with trademark rights established under foreign law.

*Applying the Vanity Fair Test*

The record evidence establishes that two of the *Vanity Fair* factors have been satisfied and one of those factors includes substantial effect on United States commerce. Balancing those factors against the United States citizen factor, the court concludes that extraterritorial ap-

---

[10] The court further notes that in their motion, defendants represent that the law of Austria would also apply to some foreign sales. However, defendants have provided nothing but a bare assertion that Austrian trademark law is different from United States trademark law. The court finds that a bare assertion is not adequate to show a conflict of law.

85a

plication of the Lanham Act to defendants' foreign sales based upon the *Vanity Fair* test is appropriate.

Timberline Test

As a prerequisite to extraterritorial application of the Lanham Act under the *Timberline test*, "first, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; and third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial application." *Star-Kist Foods, Inc.*, 769 F.2d at 1395.

*Some Effect on American Foreign Commerce*

The court concludes that plaintiff has presented adequate evidence, viewed in its favor, to establish the first *Timberlane* factor—some effect on American foreign commerce.[11]  Plaintiff has proffered evidence that HG and HCEE's use of KH parts diverted sales of "Hetronic" parts and defendants' sales of RRCs diverted sales of plaintiff's RRCs in the same markets.  See, *Reebok Intern., Ltd.* v. *Marnatech Enterprises, Inc.*, 970 F.2d 552, 555 (9ᵗʰ Cir. 1992) and *American Rice, Inc.*, 701 F.2d at 414-415; see also, *Totalplan Corp. of Am.*, 14 F.3d at 830-831.

*Cognizable Injury to Plaintiff under the Lanham Act*

The court concludes that plaintiff has satisfied the second *Timberlane* requirement because HG and H-CEE's use of KH parts prevented plaintiff from selling

---

[11] The Ninth Circuit has said that "[a] defendant's foreign activities need not have a substantial effect or even significant effect on American commerce, rather, 'some effect' may be sufficient."  *Trader Joe's Company* v. *Hallatt*, 835 F.3d 960, 969 (9ᵗʰ Cir. 2016).

86a

its parts to defendants and defendants' sales of RRCs to customers prevented plaintiff from selling its RRCs to those same customers.  Defendants' activities caused economic injury to plaintiff, which injury is cognizable under the Lanham Act.  See, *Ocean Garden, Inc.* v. *Marktrade Co., Inc.*, 953 F.2d 500, 503 (9ᵗʰ Cir. 1991); see also, *Pinkberry, Inc.*, 2011 WL 6101828, at *4 ("A loss of current and prospective business opportunity is a cognizable injury under the Lanham Act.")

*Interests of and Links to American Foreign Commerce in Relation to Others*

The third factor—interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations—includes examination and balancing of seven relevant factors.  They are:

> [1] the degree of conflict with foreign law or policy, [2] the nationality or allegiance of the parties and the locations or principal places of business of corporations, [3] the extent to which enforcement by either state can be expected to achieve compliance, [4] the relative significance of effects on the United States as compared with those elsewhere, [5] the extent to which there is explicit purpose to harm or affect American commerce, [6] the foreseeability of such effect, and [7] the relative importance[,] to the violations charged[,] of conduct within the United States as compared with conduct abroad.

*Star Kist Foods, Inc.*, 769 F.2d at 1395 (bracketed material added).  "No one factor is dispositive; each factor is just one consideration to be balanced."  *Trader Joe's Company* v. *Hallatt*, 835 F.3d 960, 973 (9ᵗʰ Cir. 2016) (internal quotation omitted).

87a

*i. Degree of Conflict*

The first relevant factor involves the degree of conflict with foreign law or policy.  In the court's view, this factor weighs in favor of extraterritorial application.  As previously discussed, there is no conflict with foreign law or policy with respect to the registered trademark of "Hetronic."  With respect to the trade names, other than "NOVA," the court finds that there is no conflict with foreign law or policy.  Although ABIG registered the names, GL, GR and GA, in Germany, it did so after this lawsuit was commenced, and the court finds no conflict with respect to plaintiff's requested relief in the form of damages.  Defendants also have not shown as a matter of law that application of the Lanham Act to claims involving unregistered trade names would conflict with German law or any other foreign law.  And, there is no evidence of any pending or ongoing adversarial proceeding involving the unregistered trade names.  The Ninth Circuit has noted that if "there are no pending proceedings" abroad, then it would not "be an affront to the foreign country's sovereignty or law."  *Ocean Garden*, 953 F.2d. at 503.  While defendants have challenged plaintiff's registered trademark for "NOVA" in the OHIM proceeding, any cancellation of the mark would result in plaintiff claiming ownership of the unregistered trade name and defendants have not shown as a matter of law that application of the Lanham Act to claims involving the unregistered trade name would conflict with German law or any other foreign law.  (Defendants also claim ownership of the unregistered trade name of "NOVA" for the period relevant to this action.)

88a

*ii. Nationality and Allegiance of Parties/Locations or Principal Place of Business*

As to the second factor, nationality or allegiance of the parties and locations or principal places of business, plaintiff is a United States corporation, headquartered in Oklahoma City. Defendants HG and ABIG are German corporations. ABIG took over HG's operations in September of 2014 and is headquartered in Langquaid, Germany. Defendants HCEE and ABIA are Austrian corporations. ABIA took over HCEE's operations in August of 2014 and is headquartered in Altheim, Austria. Defendant, Albert Fuchs, is domiciled in Austria, and defendant, ABI Holding, Inc., is an Austrian corporation.

Plaintiff has proffered evidence that HG was a distributor for plaintiff pursuant to distribution agreements from April of 2010 until June of 2014 and HCEE was a distributor for plaintiff from September of 2008 until June of 2014. And during this same time, HG and HCEE were licensees of plaintiff pursuant to license agreements. The evidence, viewed in a light favorable to plaintiff, reveals that HG and HCEE used their status as distributors and licensees to assist in their alleged infringing conduct. The evidence also shows that HG and HCEE hired plaintiff's former President, a United States citizen, as a consultant to assist them. After the termination of the distribution and license agreements, the evidence, viewed in plaintiff's favor, demonstrates that HG and HCEE continued to hold themselves out as plaintiff's distributors and licensees. Thereafter, the Abitron companies were formed and took over HG and HCEE's operations, taking all employees but one. They applied for and registered the "Abitron" trademark in the United States and hired a United States distributor to sell products in competition with Hetronic. De-

89a

fendants also sold some products into the United States. The evidence also shows that Fuchs, either directly or through ABI, owned and controlled HG, HCEE and the Abitron companies. Thus, even though defendants are foreign nationals, the evidence, viewed in plaintiff's favor, shows that they also have had substantial ties to the United States and thus exhibited some "allegiance" to the United States. See, *e.g.*, *Best Western Intern. Inc.* v. *1496815 Ontario, Inc.*, 2007 WL 779699, *6 n. 13 (D. Ariz. March 13, 2007) (finding "significant importance in the existence of the Arizona forum selection clause when considering 'allegiance to the parties' to a location."). The court concludes that the substantial ties to the United States edges the second factor in favor of extraterritorial application.

### iii.  Achieving Compliance

The third factor addresses the extent to which an order by this court can be expected to achieve compliance with the Lanham Act. Plaintiff points out that defendants have complied with all orders of the court in this case and there is no evidence from defendants to suggest that the court cannot achieve defendants' compliance with any final U.S. judgment. There is no indication that a final judgment in favor of plaintiff would not be enforceable in Germany or Austria. As a result, the court concludes that the third factor weighs in favor of extraterritorial application.

### iv. Relative Significance of Effects on the United States

With respect to the fourth factor, relative significance of effects on the United States as compared with those elsewhere, the court finds that this factor weighs in favor of extraterritorial application. The alleged illegal use of the "Hetronic" trademark and other trade names and

90a

trade dress has significantly impacted a domestic United States corporation.  The presence of losses affecting a domestic corporation cuts in favor of extraterritorial application.  See, *Ocean Garden*, 953 F.2d at 504.

### v. *Explicit Purpose to Harm or Affect United States Commerce and Foreseeability*

Factors five and six evaluate the extent to which there is an explicit purpose to harm or affect American commerce and the foreseeability of such effect.  Generally, "[i]ntentional and unauthorized use of a U.S. corporation's trademark abroad amounts to an explicit purpose to harm U.S. commerce." *Pinkberry*, 2011 WL 6101828, *7 (citing *Ocean Garden*, 953 F.2d at 504).  Here, the court finds that this factor weighs in favor of extraterritorial application.  Plaintiff has proffered evidence, viewed in a light most favorable to it, establishing that defendants' alleged infringing acts were intentional and unauthorized.  And because defendants' conduct was intentional, "it automatically follows that a negative effect was foreseeable." *MGM Resorts Intern.* v. *Unknown Registrant of www.imgmcasino.com*, 2015 WL 5674374, *6 (D. Nev. July 8, 2015).  Thus, the court concludes that the fifth and six factors favor extraterritorial application of the Lanham Act.

### vi. *Relative Importance to Violations Charged*

The final relevant factor assesses the relative importance, to the violations charged, of conduct that occurred within the United States as compared with conduct abroad.  The evidence reveals the alleged infringing acts with respect to foreign sales occurred overseas.  And, arguably, the conduct most important to defendants' operations happened overseas.  Because the infringing activity with respect to foreign sales occurred abroad, the court concludes that this factor weighs

91a

against extraterritorial application. See, *Trader Joe's Company*, 835 F.3d at 975.

In sum, balancing the relevant factors, the court concludes that plaintiff has satisfied the third criterion of the *Timberlane test*—interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations.

*Resolving the Timberlane Test*

After consideration and balancing of all three *Timberlane* criteria, the court concludes that analysis under the *Timberlane* test supports the extraterritorial application of the Lanham Act to defendants' foreign sales.

Ruling

Applying the *Vanity Fair* and *Timberlane* tests, the court rules that the Lanham Act reaches extra-territorially to defendants' foreign sales. Therefore, the court finds defendants are not entitled to summary judgment on the Lanham Act claims to the extent that defendants challenge those claims on the ground the Act does not apply extraterritorially to their foreign sales.[12]

b.   Lanham Act Claims Against Abitron Entities

Defendants also challenge the Lanham Act claims against the Abitron entities to the extent that they are based upon infringement of the "Hetronic" registered

---

[12] Defendants also appear to challenge extraterritorial application of Oklahoma unfair competition law to their foreign sales. This claim is alleged in Count 9 of the Second Amended Complaint. As defendants rely upon the same authorities to challenge that claim, the court, for the reasons already expressed, finds that defendants are not entitled to partial summary judgment on the common-law unfair competition claim.

92a

trademark.  Defendants point out that plaintiff, to es-
tablish its claims, must show that the Abitron defendants
used the trademark in commerce.  However, defendants
assert that the evidence shows that neither ABIG nor
ABIA ever sold a product labeled "Hetronic."  Rather,
defendants claim the evidence shows that the Abitron
entities used the "Abitron" trademark in selling RRCs.

Plaintiff, in response, counters that the record
evidence shows that the Abitron entities used the
"Hetronic" name on their websites, in metatags, and
email domains to sell their products.  It points out that
the Tenth Circuit, in *Australian Gold, Inc.* v. *Hatfield*,
436 F.3d 1228, 1239 (10th Cir. 2006), found that that sort
of conduct constituted impermissible infringement.
Plaintiff also asserts that ABIG and ABIA sold
"Hetronic" parts under their own name, either by
covering the "Hetronic" logo with an "Abitron" sticker or
scratching the "Hetronic" logo off.  This, plaintiff argues,
constitutes reverse palming or passing off in violation of
the Lanham Act.[13]

Upon review, the court finds that ABIG and ABIA are
not entitled to summary judgment on the Lanham Act
claims.  Plaintiff has proffered evidence to raise a gen-
uine issue of material fact as to whether the Abitron
entities infringed on the "Hetronic" registered trade-
mark by using it on their websites, placing it in website
metatags and using it in email domains.  See, *Australian
Gold, Inc.*, 436 F.3d at 1239 (defendants' unauthorized

---

[13] In its response, plaintiff claims that ABIG and ABIA sold products
with the "Hetronic" trademark to Hydronic Handelsges m.b.H,
another Fuchs' owned corporation.  The evidence cited in support of
the claim (doc. no. 260, ¶ 103), indicates that HG and HCEE sold the
Hetronic-labeled parts to Hydronic Handelsges m.b.H.

93a

use of manufacturer's trademarks on websites and website metatags constituted infringement in violation of Lanham Act because it caused initial interest confusion for customers).

The court also finds that plaintiff has proffered evidence sufficient to raise a genuine issue of material fact as to whether ABIG and ABIA violated section 43(a) of the Lanham Act[14] by placing "Abitron" stickers on previously labeled "Hetronic" parts and products or carving the "Hetronic" label off and selling the parts and products as "Abitron" parts and products.  See, *Arrow United Industries, Inc.* v. *Hugh Richards, Inc.*, 678 F.2d 410, 415 (6th Cir. 1982) (manufacturer which showed competitor reduced the size of manufacturer's standard product and affixed the competitor's own identifying mark on the result raised sufficiently serious questions going to the merits of a Lanham Act claim to make them fair ground for litigation).[15]

Accordingly, viewing the record evidence in a light most favorable to plaintiff, the court concludes that the Abitron entities, ABIG and ABIA, are not entitled to summary judgment on the Lanham Act claims.

---

[14] Section 43(a) precludes any person from using "any false designation of origin" which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(l)(A).

[15] ln response to plaintiff's summary judgment motion on the section 43(a) claim, defendants raise additional arguments to challenge the merits of the claim.  Those grounds were not raised in support of defendants' motion, so the court declines to address those arguments here.

94a

c. <u>Ownership of Trade Names and Trade Dress</u>

Lastly, defendants challenge plaintiff's Lanham Act and Oklahoma counterpart claims, arguing that the plaintiff does not own the NOVA, ERGO, EURO, FE, GL, GR, HH, Mini, TG and Pocket products, their trade names and the trade dress. Defendants maintain that H-G's predecessor, Hetronic Steuersysteme GmbH (HS), created all products, except the Pocket, in the 1990s, prior to plaintiff's predecessor's existence, and the trade names and trade dress were later transferred from HS to Hetronic Deutschland (HD), HG's immediate predecessor. Defendants also maintain that one product, the Pocket, was developed in 2002, after plaintiff's predecessor, Hetronic International, Inc., came into existence, but they assert that that product was governed by the Research & Development Agreement signed by plaintiff's predecessor and HS. The Research & Development Agreement, defendants contend, provided that the trade names and know-how developed under that agreement belonged to HS. Defendants posit that HS also transferred the Pocket product, trade name and trade dress to HD. Although plaintiff purchased the assets of certain Hetronic companies in 2008, defendants contend that HD was not one of those companies. Defendants point out that the purchase agreement specifically excluded HD and its assets. In response to plaintiff's assertion that prior to its purchase of the Hetronic companies, the trade names and trade dress belonging to HD were transferred to plaintiff's predecessor, defendants argue that the transfer was purportedly accomplished by a written document but that the only existing written documents addressing trademarks show that the Hetronic name was transferred, but trade names and trade dress were not.

95a

Defendants further contend that the trade names and trade dress possessed by HD were transferred to HG in 2010. Thus, defendants argue that there can be no Lanham Act claim based upon defendants' use of the NOVA, ERGO, FE, GL, GR, HH, Mini, TG and Pocket products.

In response, plaintiff contends that defendants are not entitled to summary judgment on the Lanham Act and Oklahoma counterpart claims on the ground of ownership. Plaintiff argues that the evidence shows that it owns all the relevant product marks and trade dress. According to plaintiff, defendants' first-to-use argument is irrelevant because the product marks and trade dress were transferred to plaintiff's predecessor prior to plaintiff's purchase of all the predecessor's assets. Plaintiff contends that by the time HD sold its assets, including intellectual property to HG, it did not have any intellectual property to sell. Further, plaintiff contends that defendants have waived any ownership rights or are estopped from challenging ownership by operating as plaintiff's licensee.

Defendants, in reply, argue that plaintiff has not created any factual dispute as to ownership of the relevant trade names and accompanying trade dress. Defendants posit that the written assignment, on which plaintiff's relies to show the transfer of the trade names and trade dress to plaintiff's predecessor, transfers only the "Hetronic" name and nothing else. Defendants contend that under Tenth Circuit authority, the transfer of one trademark does not carry with it the transfer of another, unnamed trademark. Accordingly, defendants maintain that they are entitled to summary judgment on the Lanham Act and Oklahoma counterpart claims based upon plaintiff's lack of ownership.

96a

The court has addressed the issue of ownership of the trade names and trade dress in adjudicating plaintiff's summary judgment motion.  In so doing, the court has determined that genuine issues of material fact exist as to the ownership of the trade names and trade dress developed up until 2008.  The court remains convinced that genuine issues of material fact exist on the ownership issue.  Hence, the court concludes that defendants are not entitled to summary judgment on the Lanham Act and Oklahoma counterpart claims due to plaintiff's lack of ownership of the NOVA, ERGO, EURO, FE, GL, GR, HH, Mini, TG and Pocket trade names and trade dress.[16]

IV.

*Tort Claims*

a. Recovery of Attorneys' Fees

Plaintiff's claims against defendants include tort claims of conversion, aiding and abetting Rempe's breach of fiduciary duty, tortious interference with Rempe's employment agreement and civil conspiracy.  Defendants represent that during discovery, plaintiff stated that the dollar amount of damages for these claims would be provided by plaintiff's expert.  Defendants assert that the only damages calculated by plaintiff's expert is the attorneys' fees paid ($5.4 million) in pursuing the civil

---

[16] The court concludes that to the extent defendants are challenging the state-law unfair competition claim based upon the issue of ownership, defendants are likewise not entitled to partial summary judgment.

97a

action against Rempe, *Hetronic International, Inc.* v. *Torsten Rempe*, Case No. CIV-14-787-F.[17]

Defendants argue that plaintiff may not recover the attorneys' fees as damages for the conversion claim because the fees do not constitute collateral damages. Defendants maintain that to recover the fees, plaintiff must show that the Rempe action had to be filed to obtain relief from the conversion allegedly committed. According to defendants, plaintiff did not need to file the Rempe action for the alleged conversion of the documents obtained by virtue of their access to the documents under the distribution agreements. They also argue that plaintiff did not need to file the Rempe action to recover the three documents allegedly stole by Rempe and sent to defendants. Defendants maintain that plaintiff could have obtained complete relief for the alleged conversion of documents by suing these defendants. They also point out that some of the claims alleged against Rempe, as well as counterclaims he filed, were based on conduct for which defendants are not responsible. Defendants further point out that the remedy plaintiff sought in the Rempe action was return of all documents Rempe improperly obtained from plaintiff and only three of those documents are the subject of the conversion claim in this action.

---

[17] Defendants' partial summary judgment record does not contain the paragraphs of plaintiff's expert's report which discuss the $5.4 million attorneys' fees. See, Attachments 1 and 2 of doc. no. 263. Nonetheless, the referenced paragraphs of the report, ¶¶ 89-91, are in the court's record at Ex. 152, attachment 88 to doc. no. 261, p. 38, and there appears to be no dispute over the expert's statements.

98a

In addition, defendants assert that they are not responsible for the attorneys' fees under the tort theories alleged against Rempe because 23 0.S. § 15 requires plaintiff to recover *from Rempe* for the harm he caused. They assert that under § 15, there is no joint liability; there is only several liability. Consequently, defendants contend that plaintiff cannot recover the attorneys' fees as collateral damages.

Plaintiff, in response, argues that its damages for the tort claims are not limited to attorneys' fees incurred in the Rempe action. According to plaintiff, its discovery response to Hetronic Germany GmbH's Interrogatory No. 22, as twice supplemented, details all damages it incurred. See, Ex. 163, attachment 2 to doc. no. 269, pp. 44-50. Plaintiff also points out that it seeks substantial injunctive and other relief in addition to monetary relief.

As to the attorneys' fees, plaintiff asserts that the fees are a permissible component of damages because the fees were caused by defendants' tortious conduct. It asserts that the tortious actions of defendants forced plaintiff to sue Rempe to protect plaintiff's business interests and mitigate future losses due to defendants' conduct. Plaintiff contends that all claims alleged against Rempe related to defendants' scheme to compete with it. Additionally, plaintiff contends that it need not prove the that Rempe action was required in order to obtain complete relief from defendants' wrong. Fees are recoverable under the collateral litigation rule, plaintiff asserts, if they were one of the elements of damages flowing from the original wrongful act of defendants.

Plaintiff further contends that its claim for fees is not based on the three documents Rempe emailed to defendants. Plaintiff contends that these documents were not the sole basis of plaintiff's claims against

99a

Rempe or for the conversion claim against defendants. According to plaintiff, it filed suit against Rempe to protect its interests and mitigate its damages stemming from defendants' misconduct, including tortious interference with Rempe's contract, aiding and abetting Rempe's breach of fiduciary duty, and conspiracy. Further, plaintiff argues that it is not precluded from recovering the attorneys' fees because a few of its allegations against Rempe did not stem from defendants' misconduct. Plaintiff asserts that the bulk of the lawsuit concerned defendants' misconduct and defendants' argument goes, at most, to the amount of damages that should be awarded and not liability. Finally, plaintiff argues that § 15 does not bar recovery of the fees because cases adjudicated since its enactment have continued to acknowledge the collateral litigation exception and the statute only eliminates joint liability for torts "based on fault," not intentional torts.

In reply, defendants argue that despite plaintiff's statements, the only dollar amount of damages claimed by plaintiff for the four tort claims is the $5.4 million of attorneys' fees from the Rempe action. Defendants assert that, although requested, plaintiff's discovery responses to Hetronic Germany GmbH's Interrogatory No. 22 never stated a dollar amount of its damages. Defendants state that in response to Abitron Germany GmbH's Interrogatory No. 22, see, Ex. 3, attachment no. 3 to doc. no. 262, p. 15, plaintiff represented that additional details and calculations for the damages would be provided by its expert, and the expert, in his report, set forth the $5.4 million attorneys' fees as damages for the tort claims.

Defendants contend that § 15 destroys plaintiff's "collateral damages" theory. They also argue that, even

100a

if § 15 does not apply and joint liability still exists as argued by plaintiff, plaintiff can escape the American Rule's prohibition on recovery of attorney's fees only if it shows that it was compelled by defendants' misconduct to file the Rempe action.   Defendants assert that if defendants and Rempe are jointly liable as plaintiff avers, then plaintiff was permitted to sue Rempe and defendants separately.   Separating the tort claims against "jointly" liable parties, defendants posit, does not make attorneys' fees recoverable and since there are no other damages claimed, defendants contend they are entitled to summary judgment.

Upon review, the court finds that defendants are not entitled to summary judgment on the tort claims based upon the relief sought by plaintiff.

Initially, it is not clear from the record, as defendants argue, that plaintiff is only seeking the $5.4 million in attorneys' fees as relief.  The court declines to rule at this stage that plaintiff cannot recover any damages other than the $5.4 million in attorneys' fees if plaintiff's expert did not provide a dollar amount for all damages plaintiff referenced in response to Hetronic Germany GmbH's Interrogatory No. 22. (That may be a matter for another day.)  Further, plaintiff seeks equitable relief in addition to monetary relief for the tort claims of conversion, aiding and abetting Rempe breach of fiduciary duty and tortious interference with Rempe's employment agreement.  Defendants have not cited any authority to the effect that plaintiff cannot seek to recover the equitable relief it seeks under these tort theories.  See, "Wherefore" paragraphs of Count 10, Count 11 and Count 12 of the Second Amended Complaint, requesting "return of all Hetronic materials," "return all confidential Hetronic information and anything downloaded from H-

101a

Pro," "return all Hetronic information obtained from Rempe," and "permanently enjoining [defendants] from publicly disclosing or otherwise using Hetronic's confidential and proprietary information," and "enjoining [defendants or their successors] from assisting Rempe in his possessing, accessing, and using Hetronic's information."

To the extent that plaintiff intends to seek the $5.4 million in attorneys' fees for the claims of aiding and abetting breach of fiduciary duty, tortious interference with employment contract, and civil conspiracy, the court concludes that the fees are recoverable.

At the outset, the court rejects defendants' argument that §15 applies to the intentional tort claims. The court previously determined in *Husky Ventures, Inc.* v. *B55 Investments, Ltd. and Christopher McArthur*, Case No. CIV-15-93-F, that §15 does not apply to a claim for tortious interference with contract and business relationships. In so doing, the court stated in part:

> Section 15 only applies when there is a "civil action based on fault and not arising out of contract." The "based on fault" qualification is stated twice in §15, once in subsection (A) and once in subsection (C). "Fault" is not a concept generally understood as applying to intentional torts. See generally, *Graham* v. *Keuchel*, 847 P.2d 342, 361-362 (Okla. 1993) (discussing fault in the context of negligence claims). The phrase "based on fault" must mean something. Clearly, the phrase is intended is to qualify the types of civil actions not arising out of contract, to which §15 applies. The most logical interpretation of "based on fault," is that this phrase excludes from the coverage of §15, claims like fraud, or intentional tort claims, which do not

102a

encompass the concept of degree of fault in the same way that, for example, negligence claims do. The tort of intentional interference with contracts or business relationships is an intentional tort which includes no concept of fault or degree of care. Tortious interference with business or contractual relationships is not a "a civil claim based on fault and not arising out of contract." As a result, the interference is not covered by § 15.

Doc. no. 279, p. 11. Applying the above analysis, the court also concludes that § 15 does not apply to plaintiff's claims against defendants for aiding and abetting breach of fiduciary duty, tortious interference with employment contract and civil conspiracy. In the court's view, these torts are intentional torts which include no concept of fault or degree of care. Therefore, the court finds that § 15 does not preclude plaintiff from seeking to recover the $5.4 million in attorney's fees.

Under Oklahoma law, attorneys' fees are generally not a proper element of damages. However, as stated by the Tenth Circuit, "where the wrongful acts of the defendant have involved the plaintiff in litigation with others, or have placed him in such relation with others as to make it necessary for him to incur attorney fees to protect his interests, attorney fees [are] recoverable in such cases as one of the elements of damages flowing from the original wrongful act of the defendant." *Hetronic International, Inc.* v. *Rempe*, 697 Fed. Appx. 589, 590 (10th Cir. 2017) (quoting *Barnes* v. *Oklahoma Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 181 (Okla. 2000) (citing *Griffin* v. *Bredouw*, 420 P.2d 546, 547 (Okla. 1966)). The Tenth Circuit also stated "[w]here the natural and proximate consequence of a wrongful act has been to involve plaintiff in litigation with others, there may, as a general

103a

rule, be a recovery in damages against the author of such act of the reasonable expenses incurred in such litigation, together with compensation for attorney's fees." *Id.* (quoting *Sec. State Bank of Comanche* v. *W.R. Johnston & Co.*, 228 P.2d 169, 173 (1951)); see also, *Restatement (Second) of Torts*, § 914 ("One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.)

The court concludes that plaintiff has raised a genuine issue of material fact as to whether the Rempe action was a natural and proximate consequence of the wrongful acts of defendants which are the bases for the aiding and abetting breach of fiduciary duty, tortious interference with contract and civil conspiracy claims.  Plaintiff claims that defendants enlisted Rempe's assistance and co-operation and conspired with him to illegally compete with plaintiff.  It also claims that defendants sought and received confidential information from Rempe and paid him for consulting services.  These wrongful acts, plaintiff asserts, forced it to sue Rempe, among other things, for breach of contract, breach of fiduciary duty and conspiracy to protect its business interests and mitigate future losses due to defendants' misconduct.  The court concludes that, viewing the evidence in a light most favorable to plaintiff, as the non-moving party, a reasonable jury could conclude that the alleged tortious conduct of defendants required plaintiff to sue Rempe to protect their business rights and mitigate its losses.  Thus, the attorneys' fees expended in the Rempe action would be recoverable as damages for the aiding and

104a

abetting breach of fiduciary duty, tortious interference with contract and civil conspiracy claims.[18]

As to defendants' challenge that plaintiff's attorneys' fees also consist of time spent pursuing wrongs by Rempe unrelated to this action, *i.e.*, dealings with Tele-Radio or Genge & Thoma, the court agrees with plaintiff that this challenge goes to the amount of damages recoverable and not to the issue of whether attorneys' fees from the Rempe action themselves would be recoverable.

With respect to defendants' wrongful acts of conversion alleged in Count 10 of the Second Amended Complaint, the court is not convinced that plaintiff has raised a genuine issue of material fact on the question of whether the Rempe action was a natural and proximate consequence of those wrongful acts. In the court's view, defendants' "possession" of the materials inconsistent with the rights of plaintiff did not require plaintiff to sue Rempe.[19] Those wrongful acts did not cause plaintiff to

---

[18] This leaves plaintiff in the position of suing, in this case, to recover more than $5 million spent pursuing Rempe, to get what would appear to be an uncollectable judgment which included $3.1 million in attorneys' fees incurred *in this case*. That claim will be measured by at least a minimal standard of reasonableness (see, doc. no. 211 in CIV-14-0787), to say nothing of the jury's consideration of whether that whole exercise made any sense in the first place. Without deciding, at this point, whether Rule 3.7 of the Oklahoma Rules of Professional Conduct (as adopted by this court) would preclude counsel of record in this case from testifying on the first issue (reasonableness of the fees-see, Rule 3.7 (a)(2)), it seems unlikely that counsel in this case would be eligible to testify on the second issue (whether the whole exercise made any sense in the first place). The exceptions in Rule 3.7 would not appear to go that far.

[19] "Conversion is defined by Oklahoma law as any act of dominion wrongfully exerted over another's personal property in denial of or

105a

sue Rempe to protect its business rights or mitigate its losses.  The court therefore concludes that plaintiff is not entitled to recover the $5.4 million in attorneys' fees as damages on the conversion claim.  Even though plaintiff may not recover the attorneys' fees as collateral damages, the court cannot conclude (as previously discussed) that plaintiff has no remedy for the alleged conversion. The court notes that plaintiff states, in response to Hetronic Germany GmbH's Interrogatory No. 22, that it may recover "the fair market value of the documents converted by defendants . . . ."  Ex. 163, attachment 2 to doc. no. 269, p. 50.  Further, plaintiff seeks the return of all Hetronic materials.  Accordingly, the court concludes that defendants are entitled to partial summary judgment determining that plaintiff is not entitled to recover, as a remedy for conversion, the $5.4 million in attorneys' fees expended in the Rempe action.  But that is as far in defendants' favor as this ruling goes.  Defendants are not entitled to partial summary judgment on the ground that plaintiff has no remedy for conversion and therefore cannot establish all the essential elements of the conversion claim.

b.  <u>Claims Against Abitron Entities</u>

Defendants assert that it is unclear whether plaintiff is suing ABIG and ABIA, for conversion because the purported conversion occurred before the entities existed.  However, defendants point out that the Second Amended Complaint alleges the claim against "the Fuch Companies," suggesting that they are included.  Defendants initially contend that the claim is not actionable

---

inconsistent with his right therein." *American Biomedical Group, Inc.* v. *Techtrol, Inc.*, 374 P.3d 820, 825 (Okla. 2016) (quotation omitted).

106a

because the alleged conversion is of "confidential information," see, doc. no. 163, ¶254, which Rempe stole or wrongfully obtained, and conversion does not lie for intangible things like "information." Doc. no. 262, p. 62. Although plaintiff previously represented to the court in opposing defendants' dismissal motions that the conversion claim is based on tangible property, such as drawings, schematics and other documents, defendants maintain that the claim is not based upon defendants' possession of the physical items but rather their use of the information. Defendants point out that plaintiff, as part of its relief, seeks to enjoin their "use" of the confidential information. Regardless, defendants argue that plaintiff cannot recover against the Abitron entities because conversion requires a taking of personal property and the alleged conversion (three emails sent by Rempe in February of 2014) occurred prior to their existence.

Defendants similarly argue that if the civil conspiracy claim is asserted against the Abitron entities, the claim is not actionable because the conspiracy is alleged to have occurred before the Abitron entities existed. Defendants state that the civil conspiracy claim requires a meeting of the minds on the conspiratorial object or course of action. Defendants point out that the "meeting of the minds" is alleged to have occurred while Rempe was employed by plaintiff and HG and HCEE were plaintiff's distributors. This all occurred, defendants assert, prior to the formation of the Abitron entities. Moreover, defendants contend that the alleged conspiracy was a conspiracy to compete against plaintiff and that the Abitron entities, not being under contract with plaintiff, were entitled to compete against plaintiff.

107a

Plaintiff responds that its conversion claim encompasses much more than the documents sent with the emails from Rempe.  Plaintiff asserts that it has shown that defendants wrongfully took and retained possession of its documents, software, drawings, schematics and its RRC parts.  It contends that after it terminated HG and HCEE as distributors and licensees, defendants retained materials, belonging to plaintiff, to which the companies had been afforded access because of the contractual relationship.  Plaintiff asserts that the companies no longer had authority to sell materials with the "Hetronic" brand or to represent themselves as affiliated with "Hetronic."  Plaintiff states that the companies, rather than returning the materials to plaintiff, sold some materials to Hydronic Handelsges mbh, another Fuchs company, and transferred others to the Abitron entities. The materials, plaintiff asserts, included drawings of every "Hetronic" part, and the Abitron entities still have access to those materials.  Plaintiff argues that defendants have ignored the fact that as part of the relief requested, plaintiff seeks the return of all "Hetronic" materials, including, but not limited to, documents, software, drawings and equipment.

Plaintiff also contends that the Abitron entities are liable for conversion because they improperly obtained and have retained the materials without plaintiff's consent.  Moreover, it asserts that the Abitron entities are successors-in-interest making them liable for HG and HCEE's actions.

To the extent that the court concludes that the property defendants took from Hetronic and retained does not constitute tangible property, as required for a conversion claim, plaintiff urges the court to permit the claim to proceed as a claim for misappropriation of con-

108a

fidential business information.  Plaintiff maintains that Oklahoma recognizes the tort of misappropriation of business information, a species of intangible property.

With respect to the conspiracy claim, plaintiff points out that courts have ruled that a party who joins an ongoing conspiracy may be held accountable for the acts or statements made prior to his entry into the conspiracy, if such acts or statements were made in furtherance of the conspiracy.  Consequently, plaintiff asserts that the fact the conspiracy began before the Abitron entities existed is irrelevant to their liability.  Plaintiff contends that the Abitron entities joined the conspiracy in 2014 when they took over HG and HCEE's businesses and took steps to further the conspiracy to compete against plaintiff using Hetronic materials.

The court concludes that defendants have not demonstrated that they are entitled to partial summary judgment on the conversion claim against the Abitron entities.  "Conversion is defined by Oklahoma law as any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his right therein."  *American Biomedical Group, Inc.* v. *Techtrol, Inc.*, 374 P.3d 820, 825 (Okla. 2016) (quotation omitted).  "This definition does not include intangible property."  *Id.*  "It does require that some form of wrongful possession or act of control over the property must occur."  *Id.* (quotation omitted).  "It is not necessary that the property wrongfully came into a party's possession, but only that the property was taken or appropriated without the owner's consent."  *Id.* (emphasis in original).  Further, "[i]t is the law in Oklahoma that where one converts personal property and sells it to another who has knowledge of the conversion, the two may be joined in an action for conversion."  *State ex rel. Williams* v.

109a

*Neustadt*, 149 F.2d 143, 145 (10th Cir. 1945) (citing *Probst* v. *Bearman*, 183 P. 886, 888 (Okla. 1919)).

After the termination of HG and HCEE's distribution agreements, the companies retained plaintiff's materials, including drawings, schematics and other materials. Plaintiff has raised a genuine issue of material fact as to whether possession of those materials was wrongful.  In addition, plaintiff has raised a genuine issue of material fact as to whether the Abitron entities had knowledge of the alleged conversion by their predecessors when they transferred plaintiff's materials to them.[20]

Turning to the civil conspiracy claim, the court finds that summary judgment is not appropriate.  Plaintiff has cited law, which defendants have not challenged, for the proposition that if a party joins a conspiracy, however late, it becomes in law a party to the acts previously done by others in pursuance of the conspiracy.  See, *Chemetron Corp.* v. *Business Funds*, 682 F.2d 1149, 1181

---

[20] The court rejects defendants' argument that the conversion claim as pled is seeking relief based upon a conversion of intangible property.  Although Count 10 refers to "confidential information," it also refers to defendants taking "possession" of "confidential information."  This can include the drawings, schematics, documents and equipment which plaintiff refers.  And although plaintiff does seek to enjoin the "use" of the confidential information, it also seeks the return of the materials.

Because the court concludes that there is evidence, viewed in plaintiff's favor, to support the conversion claim as pled, the court need not decide whether plaintiff's claim should be construed as a claim for misappropriation of confidential business information.  The court notes, however, that the issue of whether plaintiff can maintain a conversion claim was originally raised by defendants in their challenge to the First Amended Complaint, and in seeking to file the Second Amended Complaint, plaintiff did not seek to include any misappropriation claim.

110a

(5th Cir. 1982); see also, *UnitedHealth Group, Inc.* v. *Columbia Cas. Co.*, 836 F. Supp. 2d 912, 920-21 (D. Minn. 2011). Viewing the evidence in a light most favorable to plaintiff, the court concludes that plaintiff has raised a genuine issue of material fact as to whether a conspiracy existed and as to whether the Abitron entities joined an ongoing conspiracy and then took steps to further it. Therefore, the court finds that defendants' motion as to the conspiracy claim against the Abitron entities should be denied.

## V.

### *Indemnity Claim*

"As a cautionary measure," see, doc. no. 262, ECF p. 65, defendants request partial summary judgment on the "breach of indemnity claim," which defendants represent is addressed in plaintiff's expert's report but not alleged as a claim in the Second Amended Complaint. Defendants state that plaintiff's expert's report includes a claim of $10,319,865 for indemnification under the license agreements. The Second Amended Complaint, defendants assert, does not mention "indemnity" and while it does mention the license agreements, it does not allege a breach of those agreements.

Plaintiff, in response, concedes that it has not brought a claim for breach of indemnity against defendants. It asserts that indemnity is a remedy, not a claim. According to plaintiff, the license agreements clearly entitle Hetronic to indemnification from HG and HCEE for the costs of this litigation, which centers on their misuse of the intellectual property licensed to them—such as improperly using the "Hetronic" mark both while the license agreements were in effect and after they were terminated. Plaintiff also contends that it is entitled to indemnification with respect to the OHIM suit chall-

111a

enging plaintiff's ownership of the "NOVA" trademark registration.  Plaintiff asserts that its expert "indicates [that] these damages are not from any purported breach of an indemnity obligation, but instead [are] due to Hetronic under the terms of the License Agreement."[21] Doc. no. 269, at 77-78.  To the extent the court agrees with defendants, plaintiff states that it will file another action against HG and HCEE to have them comply with the indemnity obligations under the license agreements.

Upon review, the court concludes that defendants are entitled to partial summary judgment to the extent that plaintiff seeks to recover indemnification under the license agreements as a measure of damages from HG and HCEE.    Although plaintiff asserts that the indemnification sought is a remedy and not a claim, plaintiff does not point to any of the alleged claims for which the indemnification remedy would be available.  The Second Amended Complaint makes no mention of seeking indemnification from the defendant companies for the OHIM proceedings or this proceeding.  The court therefore concludes that plaintiff is not entitled to seek indemnification under the license agreements in the amount of $10,319,865 as a measure of damages with respect to any of the claims in this action.  The court concludes that defendants' motion should be granted as to the indemnification remedy for any of plaintiff's alleged claims.

---

[21] Whether this expert, or any other, will be permitted to opine on legal issues is a matter for another day,

112a

VI.

*Conclusion*

Based upon the foregoing, All Defendants' Motion for Partial Summary Judgment (doc. no. 262) is **GRANTED in part** and **DENIED in part.**

The court determines, under the applicable Rule 56 standards, that plaintiff is not entitled to seek, as a remedy for conversion, the $5.4 million in attorneys' fees incurred in pursuing the civil action against its former President, Torsten Rempe, or to seek indemnification pursuant to the license agreements as a remedy with respect to any of its claims.

The motion is **DENIED** in all other respects.

IT IS SO ORDERED this 22nd day of March, 2019.

[signature]
STEPHEN P. FRIOT
DISTRICT JUDGE

113a

## APPENDIX C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

————

No. CIV-14-650-F

————

HETRONIC INTERNATIONAL, INC.,
*Plaintiff,*

v.

HETRONIC GERMANY GMBH,
HYDRONIC-STEUERSYSTEME GMBH,
ABI HOLDING GMBH,
ABITRON GERMANY GMBH,
ABITRON AUSTRIA GMBH, AND
ALBERT FUCHS,
*Defendants.*

————

PERMANENT INJUNCTION

————

**APRIL 22, 2020**

————

Before the court is Plaintiff Hetronic International, Inc.'s ("Hetronic") Motion for Entry of a Permanent Injunction and Brief in Support (doc. no. 423). The motion has been fully briefed by the parties. Arguments on the motion were heard by the court on April 7, 2020. Some matters relating to the scope of this injunctive order are addressed in a memorandum filed concurrently herewith. The essential facts upon which this injunction is based are recited below.

114a

On October 19, 2016, plaintiff Hetronic filed its Second Amended Complaint against defendants Hetronic Germany GmbH ("Hetronic Germany"), Hydronic Steuersysteme GmbH ("HCEE"), ABI Holding GmbH ("ABI"), Abitron Germany GmbH ("Abitron Germany"), Abitron Austria GmbH ("Abitron Austria") and Albert Fuchs ("Fuchs") (collectively "defendants"), asserting claims for trademark infringement and contributory trademark infringement under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A); reverse passing off Under Section 1125(a)(1)(A); unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); trademark counterfeiting and infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition, breach of fiduciary duty, tortious interference with contract, conversion, civil conspiracy, and breach of contract under Oklahoma law.  Do. No. 163.

On March 2, 2020, after an eleven-day trial, the jury returned a verdict in favor of plaintiff Hetronic on all counts.  Doc. no. 420.  The jury also found that defendants' trademark infringement was willful.  *Id.*

As to liability on plaintiff's claims, the contested factual issues which were submitted to the jury were resolved in favor of the plaintiff and against the defendants.  The jury's verdicts on liability and related issues—such as willfulness—were well-supported by the evidence.  Broadly speaking, the defendants have, for several years, intentionally exploited plaintiff's intellectual property and proprietary information in violation of the laws of the United States and the State of Oklahoma, and in violation of clearly-established contractual obligations.  As to matters directly related to this order, the court finds:

115a

1. Plaintiff Hetronic is the owner of all rights with respect to the HETRONIC mark, the product marks for NOVA, ERGO, EURO, GL, GR, HH, MINI, Pocket, TG, and RX ("Product Marks") and distinctive trade dress for their products including the black and yellow color scheme and the design of the housings ("Trade Dress").[1] The evidence at trial clearly established the distinctiveness and non-functionality of the trade dress of the products at issue.

2. Plaintiff's HETRONIC Mark, Product Marks and Trade Dress are valid and protectable marks.

3. Defendants Hetronic Germany, HCEE, ABI, and Fuchs have engaged in willful trademark and trade dress infringement, trademark counterfeiting, use of false designations of origin, and unfair competition in that defendants unlawfully distributed and/or marketed unauthorized copies of plaintiff Hetronic's products that infringe the HETRONIC Mark, Product Marks and Trade Dress. Defendants' use of plaintiff Hetronic's HETRONIC Mark, Product Marks and Trade Dress has caused and is likely to cause confusion. Hetronic did not consent to defendants' use of the HETRONIC Mark, the Product Marks and Trade Dress.

4. That defendants Abitron Germany, Abitron Austria, ABI and Fuchs have engaged in willful

---

[1] As was set forth in the jury instructions (doc. no. 418), "trade dress" is a type of trademark used by a company to identify its product, to distinguish its products from those manufactured or sold by others, and to indicate the source of its product. The term "trade dress" refers to the total image of a product, product packaging, product label, product design, or a combination of these things. It includes features such as size, shape, color or color combinations, texture, graphics, or particular sales techniques.

116a

trademark and trade dress infringement, reverse passing off, use of false designations of origin, and unfair competition. Those defendants unlawfully distributed and/or marketed unauthorized copies of plaintiff Hetronic's products using the HETRONIC Mark, Product Marks and Trade Dress. Their use of the HETRONIC Mark, Product Marks and Trade Dress has caused and is likely to cause confusion. They have also, without Hetronic's consent, used the ABITRON trade name and mark on or in connection with their infringing product line in order to sow confusion in the marketplace and lead consumers to believe that Abitron Germany and Abitron Austria are affiliated with plaintiff Hetronic.

5. Defendants Hetronic Germany, HCEE, ABI and Fuchs engaged in willful contributory trademark and trade dress infringement, in that these defendants intentionally caused or knowingly facilitated Abitron Germany's and Abitron Austria's direct infringement of plaintiff Hetronic's HETRONIC Mark, Product Marks and Trade Dress.

6. The defendants engaged in unfair competition under Oklahoma law by unlawfully using plaintiff Hetronic's confidential information to compete unfairly against it. Hetronic Germany and HCEE had access to plaintiff Hetronic's confidential information by virtue of being them licensees and distributors. They also unlawfully enticed Torsten Rempe, Hetronic's former president, to misappropriate confidential information, in violation of his duties to his employer. Hetronic Germany and HCEE improperly provided Hetronic's confidential information to defendants Abitron Germany and Abitron Austria in order to continue to compete unfairly against plaintiff Hetronic.

117a

7. That defendants have converted plaintiff Hetronic's specific, tangible property in violation of Oklahoma law, in that defendants Hetronic Germany and HCEE retained documents, digital storage devices, drawings, pricing and supplier information and schematics without plaintiff Hetronic's consent. Hetronic Germany and HCEE provided Hetronic's property to defendants Abitron Germany and Abitron Austria.

8. Defendants' acts have resulted, and still result, in confusion as to plaintiff Hetronic's marks and trade dress, which has caused plaintiff Hetronic to suffer irreparable injury to its reputation and goodwill. These acts will continue to cause plaintiff Hetronic to suffer such irreparable injury. Remedies available at law are inadequate to compensate it for these injuries. Considering the balance of the hardships between plaintiff Hetronic and defendants, equitable relief by way of the injunctive relief set forth in this order is clearly warranted. The threatened injuries to plaintiff Hetronic caused by defendants' infringing and unlawful acts outweigh any injury an injunction may cause defendants. Defendants' intentional appropriation of plaintiff Hetronic's marks outweighs any such harm defendants may suffer. Entry of a permanent injunction would be in the public interest of fair trade under the Lanham Act.

The court **HEREBY ORDERS** that pursuant to Federal Rule of Civil Procedure 65(d), 15 U.S.C. §§ 1116 and 28 USC 1651(a) and this court's inherent equitable powers, defendants, their officers, agents, servants, employees, and attorneys and other persons who are in active concert or participation with defendants or any such officers, agents, servants, employees, and attorneys are permanently enjoined and restrained from:

118a

1. Directly or indirectly using, infringing, contributing to the infringement, or inducing the infringement of plaintiff Hetronic's HETRONIC Mark, Product Marks or Trade Dress, or any reproduction, counterfeit, copy or colorable imitation thereof on or in connection with any products or services.

2. Committing any acts calculated to cause purchasers to believe that defendants' products or services are authorized by, sponsored by, approved by, connected with, guaranteed by or distributed under the control and supervision of Plaintiff.

3. Using plaintiff Hetronic's HETRONIC, Products Marks or Trade Dress or any variations or colorable imitations thereof on or in connection with any websites owned or operated directly or indirectly by defendants (or controlled by them), or in any email addresses, meta-tags, advertising keywords or through any other means intended to direct Internet traffic to any websites owned or operated directly or indirectly by defendants.

4. Registering or filing an application to register the HETRONIC mark, Products Marks or Trade Dress or any variations or colorable imitations thereof in the United States Trademark Office, the European Union Intellectual Property Office or any other jurisdiction.

5. Registering or filing an application to register the HETRONIC Mark or Product Marks or any variations or colorable imitations thereof as part of any domain names and/or using such domain names to redirect users to any websites owned or operated directly or indirectly by defendants.

6. Otherwise infringing plaintiff Hetronic's HE-TRONIC Mark, Product Marks or Trade Dress or any

119a

variations or colorable imitations thereof and/or damaging plaintiff Hetronic's goodwill therein.

7. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (1)-(6).

**IT IS FURTHER ORDERED** that, pursuant to Federal Rule of Civil Procedure 65(d), 15 U.S.C. §§ 1116, 28 U.S.C. § 1651(a), and this court's inherent equitable powers, and in order to give practical effect to the permanent injunction, defendants shall turn over to plaintiff or its designated representative the following within twenty-one days of entry of this injunction:

1. All advertising or promotional materials bearing in whole or in part the HETRONIC Mark, Product Marks or Trade Dress or any variations or colorable imitations thereof including all technical data sheets, sales brochures, catalogs, trade show displays and marketing kits;

2. All existing inventory of products bearing any copies or colorable imitations of the HETRONIC Mark, Product Marks or Trade Dress;

3. All plates, molds, drawings and designs enabling the production of any products that infringe the HETRONIC Mark, Product Marks or Trade Dress or any variations or colorable imitations thereof.

**IT IS FURTHER ORDERED** that, pursuant to Federal Rule of Civil Procedure 65(d), 28 U.S.C. § 1651(a), and this court's inherent equitable powers, and in order to give practical effect to the permanent injunction, Defendants shall return to Plaintiff within twenty-one days of entry of this permanent injunction any and all of plaintiff Hetronic's internal, confidential or proprietary information including, but not limited to, price lists, supplier information, product drawings, technical infor-

120a

mation and schematics received from plaintiff Hetronic, and any materials containing any such Hetronic information that Rempe provided to defendants after he left plaintiff Hetronic.

**IT IS FURTHER ORDERED** that, pursuant to Federal Rule of Civil Procedure 65(d), 15 U.S.C. § 1116, 28 U.S.C. § 1651(a), and this court's inherent equitable powers, and in order to give practical effect to the permanent injunction, defendants shall file a report to the court within thirty days of this Order documenting their turn over or return of all items required under this injunction to be turned over or returned to plaintiff Hetronic.

<u>Further relief</u>. The court has noted and carefully considered plaintiff's request for injunctive relief in addition to the relief granted in this order, specifically including (i) an order requiring defendants to notify their licensees, distributors, suppliers, partners, and customers, informing them that defendants are not related to Hetronic, that Hetronic is the owner of the HETRONIC mark and related intellectual property, that defendants do not and cannot sell genuine Hetronic products or parts, and that defendants have been enjoined from all further use of these marks and Trade Dress, (ii) an order prohibiting the use of the Abitron trademark or trade name, and (iii) an order appointing an independent monitor to oversee defendants' compliance with this injunction. The court declines, at this time, to grant that relief. In lieu of granting that relief, it is **ORDERED** that the defendants shall, not later than thirty days from the date of this order, file in this case a detailed statement of defendants' plans for (i) assuring that neither the general public nor any entities with which defendants transact business (or may desire to transact business) will associate the defendants or their products

121a

with plaintiff Hetronic or Hetronic products (or any Product Mark associated with those products), (ii) modification of the defendants' products to clearly differentiate the trade dress of those products from the trade dress of Hetronic products, and (iii) documenting defendants' compliance with this order. The detailed statement required by this paragraph may be filed over the signature of defendants' counsel of record in this case, but will be taken by the court to constitute a direct representation to the court by the defendants.

Geographic scope of injunctive relief. This order shall apply to the defendants and their activities both within and outside of the United States.

Enforcement and related matters. The court shall retain jurisdiction over the parties and the subject matter of this litigation for the purpose of interpretation, enforcement, and/or modification of this permanent injunction.

Dated this 22nd day of April, 2020.

[signature]
Stephen P. Friot
District Judge

122a

**APPENDIX D**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

————

No. CIV-14-650-F

————

HETRONIC INTERNATIONAL, INC.,
*Plaintiff,*

v.

HETRONIC GERMANY GMBH,
HYDRONIC-STEUERSYSTEME GMBH,
ABI HOLDING GMBH,
ABITRON GERMANY GMBH,
ABITRON AUSTRIA GMBH, AND
ALBERT FUCHS,
*Defendants.*

————

MEMORANDUM RE: PERMANENT INJUNCTION

————

**APRIL 22, 2020**

————

Concurrently with the filing of this memorandum, the court has filed an order granting permanent injunctive relief in favor of the plaintiff and against the defendants. The facts that compel a grant of injunctive relief are stated in the injunctive order and will not be repeated in this memorandum except as may be relevant to the issues addressed in this memorandum.

The court's grant of injunctive relief is based on well-established standards for granting (or withholding) that

123a

species of equitable relief.  The usual prerequisites to injunctive relief (such as irreparable harm, the absence of an adequate remedy at law, balance of hardship, and the public interest) have been established so clearly as to obviate the need for elaboration of those matters beyond the findings set forth on page 4 of the injunctive order. Suffice it to say that entry of a permanent injunction is well-warranted, substantially for the reasons set forth in plaintiff's opening brief.  Whether the defendants will comply with the injunctive order is a matter to be determined, but there is no room for doubt that, absent injunctive relief, defendants would persist undaunted in their violations of the intellectual property and other rights of the plaintiff.  That much was made clear at the jury trial and at the injunction hearing on April 7, 2020. But one issue—the geographic scope of injunctive relief— is very much in issue and deserves special attention. Plaintiff is a U.S. company; the defendants are European entities (or, in the case of defendant Albert Fuchs, a European individual).  Defendants argue strenuously that any injunctive relief granted in this case by a U.S. court must stop at the water's edge.  For the reasons set forth in this memorandum, the court disagrees.

<u>Geographic Scope of Injunctive Relief</u>

Plaintiff seeks a permanent injunction enjoining defendants' infringing activities worldwide.  Defendants object to the entry of any permanent injunction, but argue that if any permanent injunction is granted, it should be limited to direct sales of radio remote controls and spare parts into the United States.  Defendants assert that the Lanham Act does not reach foreign sales by foreign defendants.

Defendants previously raised the issue of extra-territorial application of the Lanham Act to their foreign

124a

sales at the summary judgment stage.  Relying on the three-factor test established in *Vanity Fair Mills, Inc.* v. *T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956), defendants argued, as a matter of subject matter jurisdiction, that the Lanham Act could not be applied to their foreign sales. Plaintiff countered that extraterritorial application of the Lanham Act was justified under the *Vanity Fair* test, but also advocated the use of a similar three-factor test followed by the Ninth Circuit in *Star-Kist Foods, Inc.* v. *P.J. Rhodes & Co.*, 769 F.2d 1393, 1395 (9th Cir. 1985),[1] which plaintiff believed the Tenth Circuit would adopt and which three factors, it contended, supported extraterritorial application.  Out of an abundance of caution, the court applied both three-factor tests, and after doing so, "rule[d] that the Lanham Act reaches extraterritorially to defendants' foreign sales."  Doc. no. 311, p. 21.

In their summary judgment papers and again in their permanent injunction response, defendants maintain that extraterritorial application of the Lanham Act is an issue of subject matter jurisdiction.  Because the court did not hold an evidentiary hearing to resolve disputed jurisdictional facts, defendant now argue that the court has no evidentiary basis for a grant of permanent injunctive relief with extraterritorial reach.

As the court determined in its summary judgment ruling, the extraterritorial reach of the Lanham Act is not an issue relating to the court's subject matter jurisdiction. It goes to the merits of plaintiff's trademark claims.  See, *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247, 253-254 (2010) (extraterritorial reach of § 10(b) of the Sec-

---

[1] This three-factor test incorporated the test developed by the Ninth Circuit to determine the extraterritorial reach of antitrust laws in *Timberlane Lumber Co.* v. *Bank of America, N.T. and S.A.*, 549 F.2d 597, 613 (9th Cir. 1976).

125a

urities Exchange Act of 1934 is a "merits question" not a "question of subject-matter jurisdiction"); see also *Trader Joe's Company* v. *Hallatt*, 835 F.3d 960, 968 (9th Cir. 2016) ("We hold that the extraterritorial reach of the Lanham Act is a merits question that does not implicate federal courts' subject matter jurisdiction.") (citing *Morrison*, 561 U.S. at 253-254); and *A.O. Smith Corporation* v. *USA Smith Industry Dev. Inc.*, 2017 WL 2224539, *2 (D. Colo. May 22, 2017) (agreeing with the conclusion in *Trader Joe's* that "the extraterritorial reach of the Lanham Act goes to the merits of a trademark claim").  Although not cited in the court's summary judgment order, the Tenth Circuit has likewise concluded that the extraterritorial reach of the Lanham Act is not a matter of jurisdiction. *Derma Pen, LLC* v. *4EverYoung Limited*, 736 Fed Appx. 741, 748 n.4 (10th Cir. 2018) (unpublished decision cited as persuasive under 10th Cir. R. 32.1(A)).  Defendants have not cited any authority which would suggest that the court should reconsider its ruling.  In any event, even if the extraterritorial application issue were jurisdictional, it was not raised by defendants by the filing of a dismissal motion under Rule 12(b)(1), but rather, by the filing of a partial summary judgment motion under Rule 56.  *Holt* v. *United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) ("A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).")  Because the matter was before the court under the standards of Rule 56 rather than Rule 12(b)(1), an evidentiary hearing was neither required nor appropriate.  Moreover, defendants have cited no authority for the proposition that, as a procedural matter, the issue of extraterritorial application should have been treated as a matter to be contested once again at trial.

126a

The court recognizes that, for reasons of relevance, it did not permit defendants to challenge the testimony of Josef Scheuerer, relating to confusion in the marketplace, for the purpose of showing that the confusion was in Europe and not the United States.  But even if it had received the evidence included in defendants' offer of proof, via the affidavit of Reimer Bulling, there would still be a sound evidentiary basis in the trial record supporting the entry of a permanent injunction.  The jury's verdict of willful infringement likewise supports that determination.  Nonetheless, as will be seen, plaintiff is not foreclosed from relying upon confusion in Europe to show a substantial effect on United States commerce.

The *Vanity Fair* test, upon which defendants rely in support of their challenge to extraterritorial application, asks whether (1) the defendant's conduct had a substantial effect on United States commerce; (2) the defendant is a United States citizen; and (3) there exists a conflict with trademark rights established under foreign law.  *Vanity Fair Mills, Inc.*, 234 F.2d at 642.  Here, there is no question that defendants are not citizens of the United States and defendants, in challenging the extraterritorial reach of a permanent injunction, do not argue that there is a conflict with the trademark rights established under foreign law.[2]  The question, as acknowledged in their response, is whether defendants' activities have had a substantial effect on United States commerce.

In its summary judgment ruling, the court relied, in part, upon diversion of sales from plaintiff by the defendants to conclude that defendants' conduct had a

---

[2] Nonetheless, as mentioned at the permanent injunction hearing, the court has not seen anything that would suggest in any cogent way that a permanent injunction would conflict with the applicable law of the European Union.

127a

substantial effect on United States commerce. Defendants argue that the diversion-of-sales theory does not apply to foreign sales by foreign defendants. They point out that the *Vanity Fair* court applied the Lanham Act only to the foreign defendant's sales in the United States and not in Canada. However, the *Vanity Fair* court found that the substantial effect on United States commerce factor was "present" under the facts of the case. *Vanity Fair Mills, Inc.*, 234 F.2d at 642. Those facts revealed that the defendant diverted sales from plaintiff in Canada. *Id.* at 638. The appellate court, however, concluded that the absence of the other two factors was fatal to extraterritorial application to the sales in Canada. *Id.* at 643. *Vanity Fair* does not support defendants' argument regarding the diversion-of-sales theory.[3]

Defendants also rely heavily upon the Fourth Circuit's decision in *Tire Engineering and Distribution, LLC* v. *Shandong Linglong Rubber Company*, 682 F.3d 292 (4th Cir. 2012). In that case, the appellate court stated that "courts invoking the diversion-of-sales theory have required the defendants to be U.S. corporations that conducted operations—including at least some of the

---

[3] Defendants also cite the Second Circuit's decision in *Atlantic Richfield Co.* v. *Arco Globus Intern. Co.*, Inc., 150 F.3d 189 (2d Cir. 1998), to support their argument. However, in that case, the appellate court did not address the issue of diverted sales. The defendant's "principal activity [was] identifying products to be traded by its *de facto* parent, Arco Globus Company Ltd., a Channel Islands corporation engaged in the financing, processing, and sale of crude oil, the trading of oil and gas derivatives, and the provision of refinery engineering services." *Id.* at 191. Defendants do not address another Second Circuit case, *Totalplan Corp. of America* v. *Colborne*, 14 F.3d 824, 830-831 (2d Cir. 1994), where the appellate court analyzed diversion of foreign sales but found that the evidence failed to show lost sales.

128a

infringing activity—within the United States." *Id.* at 311. This court, in its summary judgment order, acknowledged the Fourth Circuit's decision, but was not persuaded to follow it. The Fourth Circuit relied upon *Ocean Garden, Inc.* v. *Marktrade Co., Inc.*, 953 F.2d 500, 504 (9th Cir. 1991) and *American Rice, Inc.* v. *Arkansas Rice Growers Co-op Ass'n*, 701 F.2d 408, 414-415 (5th Cir. 1983), for the quoted statement. However, neither of those cases "required" defendants to be U.S. corporations as a prerequisite to the use of the diversion-of-sales theory.

Additionally, defendants rely upon *McBee* v. *Delica Co., Ltd.*, 417 F.3d 107 (1st Cir. 2005), which recognized that "[c]ourts have considered sales diverted from American companies in foreign countries in their analyses." *Id.* at 126. However, defendants argue that the First Circuit dismissed the plaintiff's damages claim because the defendant's sales in Japan did not cause any confusion in the United States. Defendants maintain that there must be confusion in the United States, rather than overseas, for the diversion-of-sales theory to apply to them. Viewing the matter in light of the purpose of the Lanham Act, that argument is bereft of intrinsic logic. But it should be noted, aside from that, that the First Circuit did not foreclose a claim based on confusion to foreign consumers. According to the appellate court:

> Evidence of economic harm to [plaintiff] in Japan due to confusion of Japanese consumers is less tightly tied to the interests that the Lanham Act intends to protect, since there is no United States interest in protecting *Japanese consumers*. American courts do, however, arguably have an interest in protecting American commerce by protecting [plaintiff] from lost income due to the tarnishing of his trademark in Japan.

129a

*Id.* at 126 (emphasis in original).

The appellate court found that plaintiff presented no evidence of such harm.  In the case at bar, the trial record contains ample evidence of such harm.  The court concludes that the *McBee* case does not preclude the application of the diversion of-sales theory.

Defendants further rely upon a case from the Northern District of Illinois, *Alcar Group Inc.* v. *Corporate Performance Systems, Ltd.*, 109 F. Supp. 2d 948 (N.D. Ill. 2000).  *Alcar* did not involve the diversion-of-sales theory.  Moreover, in the case at bar, plaintiff's evidence at trial showed more than that the trademark violations "hurt the plaintiff's ability to conduct its business and license its products worldwide." *Id.* at 949.

The court remains satisfied that evidence relied upon by plaintiff as to the diversion of sales in foreign countries is adequate, and then some, to demonstrate a substantial effect on United States commerce.  The court also disagrees with defendants' position that there is no evidence of lost sales.  The evidence presented supports plaintiff's contention that the sales made by defendants in Europe could have been made by plaintiff but for defendants' infringing activity.

Defendants maintain that they were prepared to show at trial, through Mr. Bulling, that confusion in the United States was not possible.  They maintain that there was evidence at trial of only two direct sales by Abitron Germany to the United States.  The problem with that is that the evidence also showed that defendants sold to foreign customers substantial quantities of infringing products which they knew were destined for the United States.  See, *McBee*, 417 F.3d at 125 ("Quite commonly, plaintiffs in these sorts of cases can meet their burden by presenting evidence that while the initial sales of

130a

infringing goods may occur in foreign countries, the goods subsequently tend to enter the United States in some way and in substantial quantities.")[4]  The evidence also showed that defendants exhibited infringing products at international trade shows attended by United States customers.  Moreover, the trial record included other evidence of confusion in the U.S. marketplace.  The court concludes that the trial record contains reliable evidence of confusion in the United States.

While addressing the *Vanity Fair* test in its papers, plaintiff also advocates the use of the Ninth's Circuit *Timberlane* three-factor test, which the appellate court followed in *Star-Kist Foods*.  In *Timberlane*, the appellate court stated:

> Third, there is the additional question whether the interests of, and links to, the United States including the magnitude of the effect on American foreign commerce are sufficiently strong, vis-à-vis those of other nations, to justify an assertion of extra-territorial authority.

549 F.2d at 613.

In *American Rice, Inc.*, the Fifth Circuit addressing *Vanity Fair*, stated:

> In *Vanity Fair*, the Second Circuit . . . stated that the degree of effect on United States commerce must be 'substantial' before the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction.

---

[4] During the permanent injunction hearing, counsel for defendants represented that defendants did not intend to continue selling directly to the United States but made no such representation as to indirect sales.

131a

701 F.2d at 414 n. 8.

These two cases look at the "interests of, and links to" and the "contacts and interests" of the United States in determining extraterritorial application. In the case at bar, defendants clearly have contacts with and links to the United States, which in the court's view, make a stronger case for extraterritorial application of a permanent injunction.

In fact, it is at this point that any remaining qualms about extraterritorial application really melt away. Specifically, Hetronic Germany and Hydronic-Steuersysteme GmbH had a very intricate and carefully crafted contractual relationship with plaintiff. That relationship provided the vehicle that facilitated the infringement. After the contractual relationship was terminated due to defendants' infringing activities, the companies continued to hold themselves out as connected with plaintiff. Torsten Rempe, plaintiff's former President and a United States citizen, was hired as a consultant to assist with defendants' activities. The Abitron companies were formed and took over Hetronic Germany and Hydronic-Steuersysteme's operations, taking all employees but one. They applied for and registered the "Abitron" trademark in the United States and hired a United States distributor to sell products in competition with plaintiff. They sent employees to train salespersons and to perform repairs in the United States. The companies knew their products were exhibited at United States trade shows. They also exhibited at international trade shows with United States customers. The companies sold infringing products directly and indirectly in the United States.

Although defendants are foreign citizens, their links to and contacts with the United States are plainly sufficient

132a

to provide substantial additional support for entry of an injunction having extraterritorial application.

In *Steele* v. *Bulova Watch Co.*, 344 U.S. 280 (1952), the Supreme Court stated:

> Nor do we doubt the District Court's jurisdiction to award appropriate relief if warranted by the facts after trial . . . Where, as here, there can be no inter-ference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction.

*Id.* at 289.

After careful consideration, the court concludes that the evidence in the trial record supports the entry of a permanent injunction that applies to defendants' foreign sales. Therefore, the scope of the permanent injunction shall be worldwide as requested by plaintiff.

Dated this 22nd day of April, 2020.

[signature]
Stephen P. Friot
District Judge

133a

## APPENDIX E

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

————

No. CIV-14-650-F

————

HETRONIC INTERNATIONAL, INC.,
*Plaintiff,*

v.

HETRONIC GERMANY GMBH,
HYDRONIC-STEUERSYSTEME GMBH,
ABI HOLDING GMBH,
ABITRON GERMANY GMBH,
ABITRON AUSTRIA GMBH, AND
ALBERT FUCHS,
*Defendants.*

————

FINAL JUDGMENT

————

**MAY 29, 2020**

————

This action came on for trial before the court and a jury, Stephen P. Friot, District Judge, presiding, on plaintiff's claims against defendants under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and Oklahoma law, the court having previously granted partial summary judgment in plaintiff's favor on certain state law counterclaims of defendants, Hetronic Germany GmbH and Hydronic-Steuersysteme GmbH, and the same defendants having dismissed with prejudice the remaining

134a

state law counterclaims against plaintiff, and the issues having been duly tried as to plaintiff's federal and state law claims and the jury having duly rendered its verdict on plaintiff's claims,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED by the court as follows:

1. A jury trial was held in the above-captioned matter on February 13-28, 2020. On March 2, 2020, the jury returned a verdict for plaintiff, Hetronic International, Inc. ("Hetronic") and against defendants, Hetronic Germany GmbH ("HG"), Hydronic-Steuersysteme GmbH ("HCEE"), ABI Holding GmbH ("ABI"), Abitron Germany GmbH ("ABIG"), Abitron Austria GmbH ("ABIA") and Albert Fuchs ("Fuchs") (and collectively, "defendants") on all claims, including an award of punitive damages. (Doc. nos. 420, 421.)

2. Consistent with the jury verdict, JUDGMENT is hereby entered in favor of Hetronic and against defendants as follows:

a. $4,845,958 (Four million, eight hundred forty five thousand, nine hundred and fifty eight dollars) in actual damages against HG for HG's breach of the Distribution Agreement;

b. $1,596,821 (One million, five hundred ninety six thousand, eight hundred and twenty one dollars) in actual damages against HCEE for HCEE's breach of the Distribution Agreement;

c. $8,366,305 (Eight million, three hundred sixty six thousand, three hundred and five dollars) in actual damages against HG, ABI and Fuchs, jointly and severally, for HG's willful infringement of Hetronic's U.S. trademarks and trade dress prior to June 6, 2014;

135a

d. $2,608,048 (Two million, six hundred eight thousand, and forty eight dollars) in actual damages against HCEE, ABI and Fuchs, jointly and severally, for HCEE's willful infringement of Hetronic's U.S. trademarks and trade dress prior to June 6, 2014;

e. $2,788,037 (Two million, seven hundred eighty eight thousand, and thirty seven dollars) in actual damages against HG, ABI and Fuchs, jointly and severally, for HG's willful infringement of Hetronic's U.S. trademarks and trade dress from June 6, 2014 to September 1, 2014.

f. $703,701 (Seven hundred three thousand, seven hundred and one dollars) in actual damages against HCEE, ABI and Fuchs, jointly and severally, for HCEE's willful infringement of Hetronic's U.S. trademarks and trade dress from June 6, 2014 to September 1, 2014.

g. $60,560,346 (Sixty million, five hundred sixty thousand, three hundred and forty six dollars) in actual damages against HG, HCEE, ABIG, ABI and Fuchs, jointly and severally, for ABIG's willful infringement of Hetronic's U.S. trademarks and trade dress.

h. $14,205,263 (Fourteen million, two hundred five thousand, two hundred and sixty three dollars) in actual damages against HG, HCEE, ABIA, ABI and Fuchs, jointly and severally, for ABIA's willful infringement of Hetronic's U.S. trademarks and trade dress.

i. $859,904 (Eight hundred fifty nine thousand, nine hundred and four dollars) in actual damages against HG, ABIG, ABI and Fuchs, jointly and

136a

severally, for HG and ABIG willful reverse palming off infringement of the U.S. HETRONIC® trademark.

j. $51,888 (Fifty one thousand, eight hundred and eighty eight dollars) in actual damages against HCEE, ABIA, ABI and Fuchs, jointly and severally, for HCEE and ABIA willful reverse palming off infringement of the U.S. HETRONIC® trademark.

k. $5,360,832 (Five million, three hundred sixty thousand, eight hundred and thirty two dollars) in actual damages against all defendants, jointly and severally, for (1) all defendants' unfair competition and conspiracy and (2) HG, HCEE, ABI and Fuchs tortious interference with contract and aiding and abetting breach of fiduciary duty, in each case having caused harmful events in the United States.

3. JUDGMENT is also entered for $10,721,664 (Ten million, seven hundred twenty one thousand, six hundred and sixty four dollars) in punitive damages for defendants' tortious actions in paragraph 2.k being intentional and with malice, specifically:

a. $8,221,664 (Eight million, two hundred twenty one thousand, six hundred and sixty four dollars) against Fuchs.

b. $1,000,000 (One million dollars) against ABI.

c. $1,000,000 (One million dollars) against ABIG.

d. $500,000 (Five hundred thousand dollars) against ABIA.

4. JUDGMENT is additionally entered for pre-judgment interest, per 23 O.S. §6 and 15 O.S. §266, on the $5,360,832 in damages specified in paragraph 2.k above for Hetronic's state law tort claims. Interest from October 1, 2017 through April 30, 2020 is awarded in the total amount of $830,928.96. Additional pre-judgment

137a

interest is awarded at a rate of 6% from May 1, 2020 to the date that this Final Judgment is entered, which equals $878.82 per day.

5. JUDGMENT is further entered in favor of Hetronic and against HG and HCEE on HG and HCEE's counterclaims against Hetronic for breach of contract for failure to give technical assistance, intentional interference with business relations, business slander, and rescission.

6. Post-judgment interest is ORDERED and awarded at a rate of 6.75% on each of the judgment amounts awarded at paragraphs 2.a, 2.b, 2.k, 3 and 4 above, from the day after this Final Judgment is entered until the judgment amount specified in the applicable subparagraph or paragraph is satisfied in full.

7. Post-judgment interest is ORDERED and awarded at the rate provided by 28 U.S.C. § 1961(a) on each of the judgment amounts awarded at paragraphs 2.c through 2.j above, from the day after this Final Judgment is signed until the judgment specified in the applicable subparagraph is satisfied in full.

8. It is further ORDERED that Hetronic shall recover its taxable costs, as provided by law.

9. It is further ORDERED that this court's April 22, 2020 Permanent Injunction Order, Doc. no. 434, granting permanent injunction and other relief applicable to defendants and their activities both within and outside of the United States, remains in full force and effect and is not modified by this Final Judgment.

10. The court shall retain jurisdiction over the parties and subject matter of this civil action for the purpose of interpreting and enforcing this Final Judgment.

Dated this 29th day of May, 2020.

138a

[signature]
Stephen P. Friot
District Judge

139a

**APPENDIX F**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

————

No. CIV-14-650-F

————

HETRONIC INTERNATIONAL, INC.,
*Plaintiff,*

v.

HETRONIC GERMANY GMBH,
HYDRONIC-STEUERSYSTEME GMBH,
ABI HOLDING GMBH,
ABITRON GERMANY GMBH,
ABITRON AUSTRIA GMBH, AND
ALBERT FUCHS,
*Defendants.*

————

RULING ON DEFENDANTS' MOTION FOR
JUDGMENT AS A MATTER OF LAW

————

**FEBRUARY 6, 2020**

————

\* \* \* \* \*

THE COURT: Thank you.  I am prepared to rule.  I have benefited from the arguments we've had today, because even though it may not sound like it has had much impact on my ruling to have these arguments, it's helpful to have these arguments just to make sure that from the perspective of each side, it still shakes out the way it does

140a

in the briefs.  And indeed, it does shake out the way that it does in the briefs.

And I applaud counsel on both sides for the very helpful briefing you've provided on a compressed schedule, an unavoidably compressed schedule on both sides of the issue.  I also applaud the efforts of the European lawyers whose affidavits and declarations I have before me.  And I certainly appreciate their advancement of my legal education, which they certainly have.

So what we have before us is the motion filed on December 27th at Docket Entry No. 379.  Despite the compressed schedule, the motion has been fully briefed, as everybody is aware, to the point of a surreply, and it is ready for determination.  With the benefit of these arguments, with the benefit of my own personal study of the matter in considerable detail, my findings are as follows:

The defendants initiated—and when I say "the defendants," I'll address the privity issue momentarily, but the defendants initiated trademark cancellation proceedings in the European Union system of tribunals having jurisdiction over those matters.  The defendants lost before the EU Trademark Board and they appealed.  The appeal was resolved by the Board of Appeal of the European Union Intellectual Property Office, commonly called EUIPO.  The defendants lost the appeal.  The defendants now represent that they intend to appeal to the General Court of the European Union.  For purpose of the present motion, I do assume that they will in fact do that.  The motion now before me requires me to decide the legal question of whether the law of the European Union affords a full trial *de novo* in the General Court in the sense contemplated by the Tenth Circuit authority standing for the proposition that the pendency of an appeal does not

141a

prevent application of the collateral estoppel doctrine unless the appeal involves a full trial *de novo*.

Plaintiff moves pursuant to Rule 50(a) for a judgment as a matter of law on the defendants' ownership defense, specifically, that the defendants' owned the rights at issue. Plaintiff argues that the defendants, having litigated and lost the issue before the Board of Appeal, are now precluded from raising their ownership defense in this court based upon the issue—the doctrine of issue preclusion.

At the outset, I conclude as a procedural matter that plaintiff's motion should be construed as a motion for partial summary judgment under Rule 56(a) rather than a motion for judgment as a matter of law under Rule 50(a). Although rule 1450(a)(2) provides that a motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury." Rule 50(a)(1) implies to me, at least, that a motion under Rule 50(a) is to be made "during a jury trial." Local Rule 56.1 only permits the filing of one motion under Rule 56 and plaintiff previously filed a motion under Rule 56. However, Local Rule 1.2 allows the Court to waive any requirement of the local rules "when the administration of justice requires." Here, the EUIPO Board of Appeal did not render its decision until last month and thus plaintiff could not have filed this motion at an earlier juncture. The interest of judicial economy is served by resolving the issues presented by this motion prior to trial. Local Rule 56.1 should therefore be waived to permit the plaintiff to proceed with this motion under Rule 56(a). Application of the doctrine of collateral estoppel or issue preclusion is properly determined under Rule 56, as was discussed by the Court of Appeals in the *Matosantos Commercial Corporation* v. *Applebee*'s case, 245 F.3d 1203, which is a

142a

Tenth Circuit case from 2001, affirming summary judgment granted on the issue of collateral estoppel.

Now, the plaintiff in reply to the defendants' response and affidavit of Suzanna Heurung submitted the declaration of Christian Rohnke.  When new evidence or material in support of summary judgment is submitted with a reply, and the reply is accepted, the court has two permissible courses of action.  It may either permit a sur-reply or refrain from relying on the new evidence or material contained in the reply, as was discussed by our Court of Appeals in *Beaird* v. *Seagate*, 145 F.3d 1159, with the relevant discussion at page 1164, which is a decision from the Tenth Circuit in 1998.

Here, because of the question relating to the nature of the EU proceedings, I have opted to consider the declaration of Christian Rohnke and therefore I called for a surreply, which was filed.  In their surreply, the defendants request me to strike the reply arguing that the reply did not address any new matter raised in the response.  Defendants contend that Ms. Heurung was merely responding to plaintiff's motion and the declaration of Andreas Wehlau rather than raising a new matter.  However, in my view, the affidavit of Ms. Heurung did raise new matters, including the European Court of Justice decision confirming that the General Court has "exclusive jurisdiction," the European regulations allowing the General Court to alter or annul a contested decision and the General Court's Rules of Procedure allowing the presentation of new evidence and the summoning of witnesses or appointing expert witnesses.  I therefore decline to strike plaintiff's reply.

In its motion, plaintiff initially requests that the Board of Appeal decision be judicially noticed pursuant to Rule 201 of the Federal Rules of Evidence.  Plaintiff has atta-

143a

ched a certified translated EUIPO Board of Appeal decision issued December 11, 2019.  Rule 201(b) permits the court to "judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  And there I've omitted some irrelevant language.  And that is Rule 201(b)(2).

If a party so requests, as plaintiff does here, and the Court is supplied with the necessary information, the Court must, under Rule 201(c), take judicial notice.

Defendants do not oppose the Court taking judicial notice of the foreign judgment because plaintiff has supplied a certified translated copy of the December 11th decision and the matter is of public record and relevant to the dispute.  I should take judicial notice of the decision and I do so.

Next, plaintiff requests that the court recognize the foreign judgment.  The Supreme Court in the case that counsel on both sides are very familiar with, *Hilton* v. *Guyot*, 159 U.S. 113, an 1895 decision, determined that a foreign judgment must be recognized by a federal court so long as, and now I quote: "there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting or fraud in procuring the judgment."  That's at page 202 of 159 U.S.

The defendants, on the present motion, do not specifically challenge the court's recognition of the foreign judgment under federal law.  Plaintiff has shown that the

144a

EUIPO dispute was conducted via "regular proceedings." Defendants voluntarily appeared certainly because they commenced the proceeding. The EUIPO is a sophisticated tribunal implementing a well-developed body of intellectual property law and the proceedings were held in a manner that appears was neither prejudicial nor fraudulent.

As discussed below, plaintiff has also demonstrated clearly to the satisfaction of this court that the defendants did have an opportunity for a full and fair trial before the EUIPO.

Once the court determines that a foreign judgment is entitled to recognition under the *Guyot* test, the court must determine if the judgment is entitled to preclusive effect. The court, exercising federal question jurisdiction, as in this case, applies federal law in determining collateral estoppel or issue preclusion. Under the Tenth Circuit's decision in *United States* v. *Rogers*, 960 F.2d 1501, which is a Tenth Circuit decision from 1992, there are four requirements for application of collateral estoppel or issue preclusion.

First, I look at whether the issue previously decided is identical with the one presented in this action on the merits.

Second, I determine whether the prior action has been finally adjudicated on the merits.

Third, I determine whether the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication.

And fourth, I determine whether the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

145a

And that is from page 1508 of the *U.S.* v. *Rogers* decision.

On the basis of the motion papers before me, it's plain that the defendants challenge only the second and fourth elements that I have just outlined.

Plaintiff has carried its burden on elements one and three because it has shown that the issue in the EUIPO matter was identical to the defendants' ownership defense in this case and that defendants are effectively parties to the EUIPO proceedings.  Abitron Germany GmbH was the plaintiff in the EU proceedings and the remaining defendants in this action, as is clearly demonstrated by plaintiff in its papers, were in privity with Abitron Germany.

As for the second element, the requirement that the action—that the prior action be finally adjudicated on the merits.  The court assumes that the decision of the Board of Appeal will be appealed to the General Court of the European Union.  However, the Tenth Circuit has held that "the pendency of an appeal does not prevent application of the collateral estoppel doctrine unless the appeal involves a full trial *de novo*."  That's from the *Ruyle* v. *Continental Oil* case, with which counsel on both sides are very familiar, 44 F.3d 837, with the relevant discussion at page 846, which is a Tenth Circuit decision from 1994.  The Tenth Circuit has explained that "Black's Law Dictionary defines such a trial as"—this is a quote within a quote—'a new trial on the entire case, that is on both questions of fact and issues of law—as if there had been no trial in the first instance.'"  That's from *Timmons* v. *White*, 314 F.3d 1229, with the relevant discussion at page 1233, which is a Tenth Circuit decision from 2003.

Now, there is a threshold decision—a threshold question as to how I should approach my determination of

146a

the law of the European Union; specifically, how I should evaluate the affidavits and declarations which have been submitted.  For the sake of brevity, I will just call them declarations.  I have declarations from three European Union lawyers whose competence and professionalism I do not question.  A fair reading of the declarations would suggest that there may be a degree of tension between the declarations of Suzanna Heurung on one hand and the declarations of Andreas Wehlau and Christian Rohnke on the other hand.  But on the question of whether EU law provides a full trial *de novo* in the sense discussed by the Tenth Circuit in *Ruyle* v. *Continental Oil Company*, a careful reading of the declarations shows mostly differences of emphasis rather than outright contradictions.

For example, when Ms. Heurung states that the General Court has "jurisdiction to assess facts," that statement viewed in context is not difficult to reconcile with the declarations of plaintiff's experts.

The short of the matter is that there is very little in the declarations that I would have to definitively reject in order to rule one way or the other on this motion.

Nevertheless, on the issue of whether EU law provides for a full trial *de novo* in the General Court, it should be borne in mind that I am making a ruling on a question of law, specifically a question of foreign law.  That determination is governed by Rule 44.1 and the cases construing that rule.  If we assume for the moment that there are clear conflicts in the declarations and, as I have said, I'm not so sure that there are, but assuming that to be the case and assuming further that those conflicts relate to material matters, that would ordinarily stop me in my tracks under Rule 56.  But my determination of a contested point of foreign law is governed by Rule 44.1, not

147a

Rule 56.  Consequently, it is necessary to understand how much latitude I have under Rule 44.1.

As relevant here, Rule 44.1 states, and I quote:

"In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."  That rule is discussed in 9A Wright & Miller Federal Practice and Procedure at Section 2444.

And I'm going to quote on that fairly extensively because I think we should all have a very clear understanding and certainly for the benefit of a reviewing court, I want a reviewing court to understand how I arrive at my conclusion as to the framework within which I evaluate these declarations.

In section 2444, the Wright & Miller treatise tells us, and I quote:

"This provision does not prohibit testimony about foreign law; it simply permits the court to consider any relevant material or source on foreign law, including testimony, without regard to whether the material considered would be admissible under the Federal Rules of Evidence, a proposition that has been recited and applied in numerous cases since the promulgation of Rule 44.1.  The purpose of this provision is obvious.  One of the objectives of Rule 44.1 was to abandon the fact characterization of foreign law and to make the process of determining alien law identical with the method of ascertaining domestic law to the extent that it is possible to do so.

A little bit later on in that discussion tells us and I quote again: "In the past, some courts had been reluctant to

148a

resolve issues of foreign law on a motion for summary judgment if there was a conflict in the papers presented on the motion or among foreign law experts or if any doubt existed about the tenor of the foreign law. This reluctance stemmed from the belief that questions of foreign law were questions of fact, and from the provision in Rule 56, barring summary judgment, if there is any genuine issue of material fact."

As a matter of fact, that's the way I was taught in law school, by none other than Robert Allen Lefler. But the law has changed.

The treatise then goes on to discuss the evolution of the law as to ascertainment of foreign law and concludes in the summary judgment context that: "Once foreign law is ascertained to the judge's satisfaction, the court should proceed to decide the summary judgment motion as it would in any other context."

Now, the approach I've just described from Section 2444 has been consistently followed in the cases. I'm just going to cover two of those cases, again, so that everyone will understand the basis for my approach in evaluating these declarations, both for the benefit of the present parties and for the benefit of a reviewing court.

First of all, there is the late Judge Howard Bratton of New Mexico's opinion in *Burnett* v. *Trans World Airlines*, 368 F. Supp. 1152, with the relevant discussion on pages 1155 and 1156, that's from the New Mexico district court in 1973. And here I'm going to omit his citations and just quote the substantive language of his opinion in that case. And I quote:

"Thus, the court is essentially confronted with the determination of a question of foreign law. However, this finding no longer affects the method of inquiry into its

149a

substance.  Historically, the determination of foreign law in the federal system had been considered a question of fact.  However, Rule 44.1, enacted in 1966, sounded the death knell to this approach by mandating that all such questions in the future should be treated as questions of law.  Such a determination therefore does not obstruct the court's disposition of a motion for summary judgment." And obviously because Judge Bratton was looking at Rule 44.1, and a determination of foreign law in the summary judgment context, that opinion is especially relevant to my determination of the appropriate approach in this situation.

This is also echoed much more recently by none other than Judge Jack Weinstein of the Eastern District of New York in *Les Telecommunications D'Haiti* v. *Cine*, C-I-N-E, 77 F. Supp. 2d (sic) 263 at page 272, an Eastern District of New York decision from 2014.  And this again illustrates my approach and, again, I'm omitting Judge Weinstein's record citations.  And I quote:

"The credibility and persuasive force of the opinion of plaintiff's expert, Bernard H. Gousse, is substantially greater than that of defendant's expert Jean Senat Fleury. Gousse has a more extensive understanding and experience in interpreting Haitian law.  The plaintiff's expert made legal, historical and logical sense.  The defendant's expert did not.

The credibility and persuasive force of the opinion of plaintiff's expert, Bernard H. Gousse, is substantially greater than that of defendant's expert Jean Senat Fleury. Gousse has a more extensive understanding and experience in interpreting Haitian law.  The plaintiff's expert made legal, historical and logical sense.  The defendant's expert did not."

150a

And I hasten to add that I cite that simply as illustrative of Judge Weinstein's approach. There's absolutely no reason for me to borrow his characterizations in commenting on the experts who have filed declarations in this case.

And my hat is off to Judge Weinstein for venturing into Haitian law in the first place.

Returning to the motion that's now before me, I'm well satisfied under these authorities that to the extent there may be a material conflict between the parties' experts respective declarations, I am not just permitted to resolve that conflict, I am required to do so. And I must do so on the basis of my own analysis of the materials before me to the best of my ability.

So now returning to the second element, that of finality, I am persuaded, based on the evidence before me, specifically the declarations of Mr. Wehlau and Mr. Rohnke, as well as my analysis of other relevant materials in the record that the law of the European Union does not provide for a full trial *de novo* in the General Court in deciding the defendants' appeal of the decision of the Board of Appeal itself, in the sense required by the *Ruyle* decision. In reaching this decision, I conclude, as I have already suggested, that there is actually not much directly contradictory material in the declarations proffered by the parties. To the extent that my decision might be viewed as necessarily rejecting Ms. Heurung's conclusion that a full trial *de novo* is available in the General Court of the European Union, which I note is a third-instance tribunal, I do reject that conclusion. However, I will also note that beyond her broad assertion about what she calls a "brand new" standard of review in the European General Court, there is very little in her declarations that cannot be reconciled with the other declarations.

151a

Now, on the subject of declarations, it is necessary to digress briefly.  I noticed that Mr. Rohnke's declaration is not accompanied by a jurat or by a statement compliant with the literal terms of 28 United States Code, Section 1746(1), which is applicable to declarations executed outside of the United States.  In my view, Mr. Rohnke's declaration—his declarations recital that it is made "under penalties provided by law" amounts to substantial compliance with Section 1746.  I will permit plaintiff to supplement its filing at Docket Entry No. 382-1 with an amended declaration either supported by a jurat or compliant with Section 1746(1).  It also appears that due to time limitations, Ms. Heurung was unable to have her second affidavit notarized.  By parity of reasoning, I will permit the defendants to supplement their filing at Document Entry No. 388-1 with an amended affidavit that includes a jurat or is compliant with Section 1746(1).

Now, returning to the merits of the motion.  In my view, the General Court's "exclusive jurisdiction" as a third-instance tribunal, relates to that court's power to hear a case just as 28 United States Code, Section 1291 confers on a United States Court of Appeals the power to hear cases decided in district courts in its circuit.  The existence of that "exclusive jurisdiction" implies nothing with respect to the standard of review or with respect to whether a true trial *de novo* is available in the General Court.  Thus, Ms. Heurung's statement in her first affidavit that the General Court has exclusive jurisdiction to "appraise the facts," does not naturally lead to an inference that the standard of review is, as she puts it in the very next sentence, "brand new."  Her attempt in her first affidavit at paragraph 12 to link those two concepts is not otherwise supported and amounts to *ipse dixit*, which, when proffered by an expert, may be disregarded.

152a

To the extent that the regulations quoted by the defendants in Docket Entry No. 381 are cited for matters that are not averred in Ms. Heurung's affidavit, those citations amount to legal argument, which this Court may accept or reject on the basis of the Court's understanding of the applicable law, and this remains true even if that understanding is aided by resources such as the Rohnke declaration.

A fair reading of the materials before the court, including the two declarations and the two affidavits, satisfies me that although the General Court may, in some situations, perform its statutory functions in a way that is unfamiliar to those of us who work in the federal judicial system including receiving, as a third-instance tribunal, additional evidence in some narrow circumstances, the General Court does not offer a true trial *de novo* as is required for finality in the sense that is relevant here.

On that point, I take note of the *Femibion* decision cited by defendants in their response at page 10 and by Ms. Heurung in her second affidavit. *Femibion* is apparently cited as an example of a case in which the General Court provided a full trial *de novo*. I disagree. The court in *Femibion* did take issue with the factual determination of the Board of Appeal. On the issue that was before the Court, the General Court found that "not a single item of evidence contains specific information" supporting the board's conclusion as to classification of the pharmaceutical product involved in that case. Later in its opinion in *Femibion*, the General Court declared that there was "no basis" for the board's finding as to classification of the product in question. That sort of analysis is precisely what we see from our own courts of appeals when they engage in deferential review of fact findings by lower courts. When the Tenth Circuit finds that a district court had "no

153a

basis" for a fact finding, it will reverse unless the error is
waived or harmless.  That is not trial *de novo*.  The analysis
undertaken by the General Court in *Femibion* does not in
any sense suggest that the General Court provided the
"full trial *de novo*" required by the Tenth Circuit's decision
in *Ruyle*.

In their surreply the defendants state, and I quote,
"there seems to be no dispute that the forthcoming
decision of the European General Court will be the final
word in that European litigation.  If the court wishes to
see that final word on the critical ownership, the Court
has, as noted in plaintiff's motion, the discretion to stay
the trial of this matter pending final resolution in the
European General Court."  That's ECF page 3 of Docket
Entry No. 388.  Since the General Court will not be
offering a true trial *de novo*, I conclude that it is not
necessary to stay this litigation.  Under the *Ruyle* de-
cision, the pendency of an appeal does not prevent the
application of collateral estoppel or issue preclusion.

Now, with respect to the fourth element, full and fair
opportunity to litigate the issue in the Board of Appeal, the
Tenth Circuit focuses on "whether there were significant
procedural limitations in the prior proceeding, whether
the party had the incentive to litigate fully the issue, or
whether effective litigation was limited by the nature or
relationship of the parties."  That is from the Tenth Cir-
cuit's decision in *Murdock* v. *Ute Indian Tribe*, 975 F.2d.
683, with the relevant discussion at page 689.  That's a
Tenth Circuit 1992 decision.

In my view, the defendants' contention that they did not
have full and fair opportunity to litigate the issues which
they chose to litigate before the EUIPO tribunal is
overwhelmingly refuted by the record.  The decision of the
Board of Appeal cites the massive amount of evidence it

154a

had before it, a fair amount of which I will note has also been laid before this Court at various junctures when it rendered its decision.  The decision of that tribunal reflects thorough consideration of the parties' contentions, followed by straightforward syllogistic analysis, leading to the board's stated conclusion.  The fact that nothing akin to a common law trial was held is of no moment.  Defendants have cited nothing that they were precluded from presenting to the European tribunals.  In those areas of the world, notably including the European union in which the rule of law prevails, there is a wide gamut of approaches to ascertainment and adjudication of facts. The fact that the European tribunals were able to make their determinations on the basis of a massive paper record, including transcripts of testimony, does not undermine this court's confidence in the "fullness" and "fairness" of defendants' opportunity to make their case before the tribunals in which they elected to proceed.

For these reasons, Hetronic International, Inc.'s motion and memorandum of law in support for judgment as a matter of law on defendants' ownership defense, construed as a motion for partial summary judgment under Rule 56(a), Docket Entry No. 379, is granted.

\* \* \* \* \*

155a

## APPENDIX G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

————

No. CIV-14-650-F

————

HETRONIC INTERNATIONAL, INC.,
*Plaintiff,*

v.

HETRONIC GERMANY GMBH,
HYDRONIC-STEUERSYSTEME GMBH,
ABI HOLDING GMBH,
ABITRON GERMANY GMBH,
ABITRON AUSTRIA GMBH, AND
ALBERT FUCHS,
*Defendants.*

————

RULING ON DEFENDANTS' MOTION TO CLARIFY

————

**FEBRUARY 10, 2020**

————

\* \* \* \* \*

THE COURT: We're resuming in Civil 14-650.

I will rule on the motion for clarification that was filed on February 7th.

The motion to clarify is denied, but the ruling I'm about to make will nevertheless provide some clarification if clarification is needed.

156a

As an overarching matter, I'm going to echo what I think other individuals involved with the case as counsel have said, and that is really what was involved was ownership of the technology in a broad sense or the intellectual property in a broad sense.

I think that's a fair description of what was at issue before the Board of Appeals.  I think that comes as a surprise to no one.

As a matter of fact, on page 11 of the transcript of the hearing on February 6th, defense counsel referred to the matter as being, quote, about ownership of the technology, close quote.

I'm not here to impale anybody on any particular four words, if you will, but that's entirely consistent with my understanding with what the Board of Appeals chose to address by way of disposition of the matter before it.

I'm going to—I'm now looking at the ordinal paragraphs; first, second, third, and so forth in the defendants' motion.  I'm going to rule according to the ordinal paragraphs in that motion.

First, my order on the issue preclusion motion that resolved last week applies to the issues which were tendered to and decided by the Board of Appeal.

The Board of Appeal stated in paragraph 24 of its decision that, quote, the plaintiff has not identified any legal bases for an independent transfer of a trademark acquired by use, which is separate from the business operation.

The decisive question is therefore whether the Hetronic business operation remained with the plaintiff's legal predecessors.  That is not the case, close quote.

157a

Of course, in that context before the Board of Appeal, that plaintiff was these defendants.  In my view, that was not a mere musing by the Board of Appeal.

In order to determine whether to grant the precise relief that was sought in the EU proceedings, the Board was required to, and plainly did, decide the ownership issue.

My analysis persuades me that the Board of Appeal opted to address that issue in much the same way that an appellate court here would choose to resolve an appeal on a basis not addressed by the trial court.

By resolving the ownership issue as it did, the Board of Appeal eliminated the possibility that the trademark could be canceled on the ground of bad faith.

That brought the ownership issue to the heart of the matter.   The appellate tribunal's decision is no less dispositive of the issue it chose to address, and the fact that the issue was not addressed by the lower tribunal does not make it dicta.

Moreover, the fact that the specific relief, namely cancellation of the NOVA trademark, that was unsuccessfully sought by these defendants in the EU proceedings was narrower than the substantive issue the Board was required to resolve in order to grant or deny that relief is of no moment.

My ruling on issue preclusion with respect to the ownership issue is not limited to the NOVA mark.  To the contrary, it encompasses—and here I am paraphrasing from paragraph 26 of the Board of Appeal order—all of the intellectual property, including all intellectual property incorporated into the radio remote control products developed, manufactured, marketed, or sold by

158a

the sellers in the corporate and trade name "Hetronic," including those rights described in Schedule 5.19.

There's also no room, in my view, for doubt in this case, as is shown by the massive record in this case, that ownership of the intellectual property at issue was very much an either/or proposition. Either it all passed to the plaintiff in 2008 or to the defendants in 2010.

My issue preclusion ruling is coextensive with the issue tendered to and decided by the Board of Appeal.

It encompasses NOVA and the other trademarks, as well as the associated intellectual property and technology. That is precisely because the Board of Appeal addressed the ownership issue as it did.

Second, my order precludes the presentation of evidence suggesting that the defendants own the ERGO and other trademarks.

Third, the acquiescence defense, which I have determined, over plaintiff's objection, is a submissible defense—and it certainly remains a submissible defense—turns on the state of mind of the responsible individuals associated with plaintiff, not on the state of mind of the individuals associated with the defendants.

Specifically, the acquiescence defense raises no issue as to whether defendants believed they owned the trademarks or the technology.

The question is whether Hetronic had the factual knowledge and subjective intent necessary to establish the acquiescence defense. This, as I have said, does not turn on what the defendants believed.

Fourth, the defendants have not asserted a good faith belief of ownership as a defense to willfulness and will not be permitted to do so.

159a

To permit the assertion of that defense to willfulness at this stage would deny plaintiff the opportunity to discover all of the facts, likely including otherwise privileged documents, having a bearing on that defense to willfulness.

Now, I want everyone to understand that I do not lightly preclude the assertion of a good faith belief in ownership as a defense to willfulness. I have carefully reviewed those portions of the record cited by plaintiff on page 7 of its response.

On that score, I'll note, first of all, that Hetronic's citation to the original answer, document number 23, is erroneous.

The relevant pleading is not document number 23. The relevant pleadings are documents 166 and 167 filed on November 9 of 2016, answering the second amended complaint.

In those documents, infringement is defended on the basis of ownership, waiver and acquiescence, and not on the basis of a good faith belief in ownership as a defense to willfulness or otherwise.

A good faith belief defense was not asserted at the summary judgment stage or in the defendants' trial brief or in the pretrial order. Defendants put it concisely in their listing of the principal questions for trial in their trial brief at page 1.

Quote, with regard to the trademark claims on the product names NOVA and ERGO and their trade dress, who is the owner of these product names and their trade dress, Hetronic International or Abitron Germany, close quote?

In the original pretrial report, docket entry number 377, the defendants asserted, at pages 25 and on the

160a

following pages, with respect to the trademark claim, that they are the owners of the marks, that plaintiff cannot show first use, that there was no confusion, and that the Lanham Act does not apply to foreign sales.

Then at page 39, the defendants assert waiver and acquiescence. There is no mention of a good faith belief in ownership.

In the amended pretrial report, beginning on page 19, defendants assert ownership. Although they acknowledge the ruling I made last week, of course, they assert that Hetronic cannot show first use in commerce.

They come back to the ownership issues in paragraph 7 on page 22, and they assert in paragraph 12 on page 24 that the Lanham Act cannot apply to foreign sales.

On the issue of relief under the Lanham Act, the defendants argue, in paragraph 13 on page 25, that plaintiff is not entitled to recover its own lost profits, but they do not otherwise assert defenses with respect to damages.

In the Contentions and Claims for Damages section of the pretrial report, defendants raise ownership again in paragraph 7 on page 36 and in paragraph 13 on page 38.

They assert that plaintiff cannot show confusion in paragraph 15 on page 39, and they raise the foreign sales issue in paragraph 18 on page 40. There is no mention of a good faith belief of ownership.

The question of a good faith belief of ownership is not an issue that will be introduced into this case at this point for the reasons I have stated.

Fifth, my ruling with respect to issue preclusion forecloses the presentation of evidence to rebut plaintiff's evidence that it is the owner of the trademarks, trade dress, and technology.

161a

Let me repeat that so there is no mistake about this.

My ruling with respect to issue preclusion forecloses the presentation of evidence to rebut plaintiff's evidence that it is the owner of the trademarks, trade dress, and technology.

Finally, as to delay of the trial, plaintiff didn't address that.  My tentative intent that I mentioned at the outset was to complete jury selection tomorrow and then begin with opening statements on Thursday morning.

It appears perhaps that at least one of plaintiff's counsel could use a day off, but nevertheless I'll inquire as to whether plaintiff sees any serious prejudice from that schedule.

\* \* \* \* \*

162a

## APPENDIX H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

————

No. CIV-14-650-F

————

HETRONIC INTERNATIONAL, INC.,
*Plaintiff,*

v.

HETRONIC GERMANY GMBH,
HYDRONIC-STEUERSYSTEME GMBH,
ABI HOLDING GMBH,
ABITRON GERMANY GMBH,
ABITRON AUSTRIA GMBH, AND
ALBERT FUCHS,
*Defendants.*

————

TRIAL RULING

————

**FEBRUARY 25, 2020**

————

\* \* \* \* \*

MS. BERMAN: Your Honor, I request a sidebar.

\* \* \* \* \*

THE COURT: Counsel will approach.

(THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND OUT OF THE HEARING OF THE JURY.)

163a

MS. BERMAN: Your Honor, there's something in the case law where location of the confusion, there's no distinction, it's confusion.  That's what the evidence is.  And it seems like defendants are trying to reargue extraterritoriality, which Your Honor granted summary judgment on and said you have—it's a subject matter jurisdiction issue, and that they're trying to back-door it through this witness and I think it's inappropriate.  It's 402 and 403.  Where the confusion took place is irrelevant to whether there's confusion under the Lanham Act.

THE COURT: Where are you headed with this?

MR. RUPERT: The most recent case that we read, it's a Northern District of Illinois case, does suggest that where the confusion occurs matters.  I can find out the name of it for Your Honor, but I don't have it on the tip of my tongue.  But she's exactly right, that is where I'm going.  It was my understanding this issue was still open.  If Your Honor has already ruled on it, we can perhaps at a break put that on the record and I'll stop this.  I thought this was still open.

THE COURT: How much more do you have along this line?

MR. RUFERT: I can count one—three, sir—no, four, five—pardon me, sir—six, seven. I'm sorry, sir.

THE COURT: It's the defendants' position that the location of the confusion is relevant for what purpose?

MR. RUPERT: For whether or not there is a Lanham Act claim at all.

THE COURT: Well, I've—for better or worse, I've already crossed that bridge.  And there may be a Northern District of Illinois case from last week, and if so, that's

164a

really not something that I can revisit in the middle of this trial, so the objection will be sustained.

MR. RUPERT: May I ask one more question, please?

THE COURT: Surely.

MR. RUPERT. I do understand the Court denied summary judgment on this. I didn't understand the Court ruled on this, but I'm going to take this as a ruling on it and perhaps at a break we can talk about it a little bit more? I'm not trying to waste time—

THE COURT: I'm not going to make major substantive rulings here at the bench, so please don't take it as anything other than what I have just said.

The objection is sustained.

\* \* \* \* \*

165a

## APPENDIX I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

————

No. CIV-14-650-F

————

HETRONIC INTERNATIONAL, INC.,
*Plaintiff,*

v.

HETRONIC GERMANY GMBH,
HYDRONIC-STEUERSYSTEME GMBH,
ABI HOLDING GMBH,
ABITRON GERMANY GMBH,
ABITRON AUSTRIA GMBH, AND
ALBERT FUCHS,
*Defendants.*

————

TRIAL RULING

————

**FEBRUARY 27, 2020**

————

\* \* \* \* \*

THE COURT: Okay.  In—I'm ruling on this issue now.

Now, when we started this hearing, of course, Mr. Demuth was not in the courtroom and Mr. Demuth is, to me, a very impressive expert and a very professional person.  I think he deserves the background that we covered before he came into the courtroom.

166a

And the background, of course, relates mostly to the proceedings on November 15th at the motion hearing that was held on that day.

At that motion hearing, on page 28, I said in this context—I said: "Well, if Demuth has not audit—in fact, done something resembling a test audit of the underlying numbers, then I'm not going to let him contend that he did by confirming those numbers.  But what I'm assuming is that there's going to be some support for those numbers before he even takes the stand, so perhaps it's time for me to hear from the defendants."

Then I was told by Mr. Rupert: "An independent person from the company will testify to the validity of the numbers."

And then referring to Mr. Demuth, Mr. Rupert told me: "He will not confirm these numbers are, in fact, accurate. That's up to the company to confirm to support his expert opinion."

And then over on page 31, I said: "I do conclude that if the defendants carry their burden of proof, and that's an evidentiary matter and a Rule 50 matter, even perhaps for another day, but if the defendants do carry their burden of presenting evidence to support a jury finding as to the cost of goods sold, then Mr. Demuth will be permitted to testify that cost of goods sold should be deducted from any Lanham Act recovery of the defendants' products."

Okay.  That brings us to February 27 of 2020.

Mr. Demuth—Mr. Demuth's testimony today establishes that he—one thing that he had to work with was a download from what is called the SAP system.  That found its way into Attachment 18 to his expert report, which is an impressive aggregation of data that was provided to him.  And as he confirmed, it is cost infor-

167a

mation derived from source data.  I think it's at least two steps removed from source data, but it is, as he said, quite credibly, cost information derived from source data.

And let there be no mistake, Attachment 18 was prepared by Mr. Demuth and it's an integral part of his report.  I'm looking at page 106 of 161 of Document 325 filed on June 6 of 2019.  I've looked at that page and the following page, which were also looked at here just a little while ago.

And in elaborating on Attachment 18, Mr. Demuth said that he quote—and this is as close as I can come to it— "under these circumstances."  That he got "a source file" from Abitron Germany to populate his chart of costs and that his aggregation of this information was "based on his work with Ms. Hammerer," which of course is not surprising.

He elaborated on his work with Ms. Hammerer again by saying: "I walked through one of those tables with Ms. Hammerer," and I think in context that was one of the underlying tables that resulted in the data shown in Attachment 18 or at least a similar document.

He elaborated on that by stating here that he "spoke to Ms. Hammerer about costs."

And then that was echoed from his deposition when he said that he relied on representations by Ms. Hammerer.  Not only that, he relied on cost allocation judgments made by other persons.  Now, whether that other person was entirely Ms. Hammerer or not, I'm not clear, but it's very apparent from what he heard today that he relied on cost allocation judgments made by other persons, and we can parse that testimony, but it's clear from the documents that I have seen that there certainly is a fair amount of underlying judgment, if you will, that must be brought to

168a

bear on cost allocation before you can even begin to establish cost of goods sold in the sense that is relevant here.

Mr. Demuth, to be sure, is a very impressive witness as to the cost accounting principles that he applied and I don't want there to be any mistake about that, but in my view, he is not a Rule 602 percipient witness as to the reliability of the numbers supplied by Ms. Hammerer.

And here is where we come into a bit of a divergence between what's permissible under Rule 703 and what is sufficient under Section 35 of the Lanham Act.

It's very likely that the basis that Mr. Demuth has offered for testifying about cost of goods sold is sufficient for use by an expert under Rule 703 for purposes of expert testimony under Rule 702.  And, of course, Rule 702 is dependent on—in a sense, on Rule 703 because Rule 703 for expert testimony purposes defines what the expert may permissibly rely upon.

But it's one thing for a source of information to be sufficient for use by an expert under Rule 703 for purposes of Rule 702 expert; in my view, it is quite another thing for the jury to have testimony and evidence that passes muster under the substantive demands of Section 35 of the Lanham Act.

We don't have the witness that I was told I would have on November 15th, but more importantly, we don't have, in my view, the independently admissible evidence that I was told that we would have, and which I conclude is required under Section 35 of the Lanham Act.

And for that reason, this relates only to this one aspect, cost of goods sold of Mr. Demuth's testimony.  For that reason, Mr. Demuth's testimony based on cost of goods sold for Lanham Act purposes will be excluded.

169a

And I believe that the basis for my ruling is adequately explained by the matters that I have just covered.

\* \* \* \* \*

170a

## APPENDIX J

## RELEVANT STATUTORY PROVISIONS

The Lanham Act, 15 U.S.C. § 1051 *et seq.*, provides in relevant part:

### § 1051. Application for registration; verification

### (a) Application for use of trademark

(1) The owner of a trademark used in commerce may request registration of its trademark on the principal register hereby established by paying the prescribed fee and filing in the Patent and Trademark Office an application and a verified statement, in such form as may be prescribed by the Director, and such number of specimens or facsimiles of the mark as used as may be required by the Director.

(2) The application shall include specification of the applicant's domicile and citizenship, the date of the applicant's first use of the mark, the date of the applicant's first use of the mark in commerce, the goods in connection with which the mark is used, and a drawing of the mark.

\* \* \* \* \*

### § 1114. Remedies; infringement; innocent infringement by printers and publishers

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

171a

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.  Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

As used in this paragraph, the term "any person" includes the United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, or other persons acting for the United States and with the authorization and consent of the United States, and any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity.  The United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, other persons acting for the United States and with the authorization and consent of the United States, and any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

*  *  *  *  *

172a

## § 1115. Registration on principal register as evidence of exclusive right to use mark; defenses

### (a) Evidentiary value; defenses

Any registration issued under the Act of March 3, 1881, or the Act of February 20, 1905, or of a mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b), which might have been asserted if such mark had not been registered.

\* \* \* \* \*

## § 1116. Injunctive relief

### (a) Jurisdiction; service

The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title. A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a

173a

preliminary injunction or temporary restraining order. Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction.  Any such injunction granted upon hearing, after notice to the defendant, by any district court of the United States, may be served on the parties against whom such injunction is granted anywhere in the United States where they may be found, and shall be operative and may be enforced by proceedings to punish for contempt, or otherwise, by the court by which such injunction was granted, or by any other United States district court in whose jurisdiction the defendant may be found.

\* \* \* \* \*

## § 1117. Recovery for violation of rights

### (a) Profits; damages and costs; attorney fees

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  The court shall assess such profits and damages or cause the same to be assessed under its direction.  In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.  In assessing damages the court may enter judgment, according to the circumstances of

174a

the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.  Such sum in either of the above circumstances shall constitute compensation and not a penalty.  The court in exceptional cases may award reasonable attorney fees to the prevailing party.

**(b) Treble damages for use of counterfeit mark**

In assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title or section 220506 of title 36, in a case involving use of a counterfeit mark or designation (as defined in section 1116(d) of this title), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of—

(1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services; or

(2) providing goods or services necessary to the commission of a violation specified in paragraph (1), with the intent that the recipient of the goods or services would put the goods or services to use in committing the violation.

In such a case, the court may award prejudgment interest on such amount at an annual interest rate established under section 6621(a)(2) of title 26, beginning on the date of the service of the claimant's pleadings setting forth the

175a

claim for such entry of judgment and ending on the date such entry is made, or for such shorter time as the court considers appropriate.

* * * * *

## § 1125. False designations of origin, false descriptions, and dilution forbidden

### (a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(2) As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity.  Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

176a

(3) In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

\* \* \* \* \*

### § 1126. International conventions

### (a) Register of marks communicated by international bureaus

The Director shall keep a register of all marks communicated to him by the international bureaus provided for by the conventions for the protection of industrial property, trademarks, trade and commercial names, and the repression of unfair competition to which the United States is or may become a party, and upon the payment of the fees required by such conventions and the fees required in this chapter may place the marks so communicated upon such register. This register shall show a facsimile of the mark or trade or commercial name; the name, citizenship, and address of the registrant; the number, date, and place of the first registration of the mark, including the dates on which application for such registration was filed and granted and the term of such registration; a list of goods or services to which the mark is applied as shown by the registration in the country of origin, and such other data as may be useful concerning the mark. This register shall be a continuation of the register provided in section 1(a) of the Act of March 19, 1920.

### (b) Benefits of section to persons whose country of origin is party to convention or treaty

Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to

177a

which the United States is also a party, or extends recip-
rocal rights to nationals of the United States by law, shall
be entitled to the benefits of this section under the condi-
tions expressed herein to the extent necessary to give ef-
fect to any provision of such convention, treaty or recipro-
cal law, in addition to the rights to which any owner of a
mark is otherwise entitled by this chapter.

**(c) Prior registration in country of origin; country of origin defined**

No registration of a mark in the United States by a per-
son described in subsection (b) of this section shall be
granted until such mark has been registered in the coun-
try of origin of the applicant, unless the applicant alleges
use in commerce.

For the purposes of this section, the country of origin
of the applicant is the country in which he has a bona fide
and effective industrial or commercial establishment, or if
he has not such an establishment the country in which he
is domiciled, or if he has not a domicile in any of the coun-
tries described in subsection (b) of this section, the country
of which he is a national.

**(d) Right of priority**

An application for registration of a mark under section
1051, 1053, 1054, or 1091 of this title or under subsection
(e) of this section, filed by a person described in subsection
(b) of this section who has previously duly filed an applica-
tion for registration of the same mark in one of the coun-
tries described in subsection (b) shall be accorded the
same force and effect as would be accorded to the same
application if filed in the United States on the same date
on which the application was first filed in such foreign
country: *Provided*, That—

178a

(1) the application in the United States is filed within six months from the date on which the application was first filed in the foreign country;

(2) the application conforms as nearly as practicable to the requirements of this chapter, including a statement that the applicant has a bona fide intention to use the mark in commerce;

(3) the rights acquired by third parties before the date of the filing of the first application in the foreign country shall in no way be affected by a registration obtained on an application filed under this subsection;

(4) nothing in this subsection shall entitle the owner of a registration granted under this section to sue for acts committed prior to the date on which his mark was registered in this country unless the registration is based on use in commerce.

In like manner and subject to the same conditions and requirements, the right provided in this section may be based upon a subsequent regularly filed application in the same foreign country, instead of the first filed foreign application: *Provided*, That any foreign application filed prior to such subsequent application has been withdrawn, abandoned, or otherwise disposed of, without having been laid open to public inspection and without leaving any rights outstanding, and has not served, nor thereafter shall serve, as a basis for claiming a right of priority.

**(e) Registration on principal or supplemental register; copy of foreign registration**

A mark duly registered in the country of origin of the foreign applicant may be registered on the principal register if eligible, otherwise on the supplemental register in this chapter provided. Such applicant shall submit, within such time period as may be prescribed by the Director, a

179a

true copy, a photocopy, a certification, or a certified copy of the registration in the country of origin of the applicant. The application must state the applicant's bona fide intention to use the mark in commerce, but use in commerce shall not be required prior to registration.

**(f) Domestic registration independent of foreign registration**

The registration of a mark under the provisions of subsections (c), (d), and (e) of this section by a person described in subsection (b) shall be independent of the registration in the country of origin and the duration, validity, or transfer in the United States of such registration shall be governed by the provisions of this chapter.

**(g) Trade or commercial names of foreign nationals protected without registration**

Trade names or commercial names of persons described in subsection (b) of this section shall be protected without the obligation of filing or registration whether or not they form parts of marks.

**(h) Protection of foreign nationals against unfair competition**

Any person designated in subsection (b) of this section as entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies provided in this chapter for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.

**(i) Citizens or residents of United States entitled to benefits of section**

Citizens or residents of the United States shall have the same benefits as are granted by this section to persons described in subsection (b) of this section.

180a

\* \* \* \* \*

### § 1127. Construction and definitions; intent of chapter

In the construction of this chapter, unless the contrary is plainly apparent from the context—

\* \* \* \* \*

The word "commerce" means all commerce which may lawfully be regulated by Congress.

\* \* \* \* \*

The term "person" and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this chapter includes a juristic person as well as a natural person. The term "juristic person" includes a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law.

The term "person" also includes the United States, any agency or instrumentality thereof, or any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States. The United States, any agency or instrumentality thereof, and any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The term "person" also includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

181a

The terms "applicant" and "registrant" embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant.

\* \* \* \* \*

The term "trademark" includes any word, name, symbol, or device, or any combination thereof—

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

\* \* \* \* \*

The term "mark" includes any trademark, service mark, collective mark, or certification mark.

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark.  For purposes of this chapter, a mark shall be deemed to be in use in commerce—

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

182a

\* \* \* \* \*

A mark shall be deemed to be "abandoned" if either of the following occurs:

(1) When its use has been discontinued with intent not to resume such use.  Intent not to resume may be inferred from circumstances.  Nonuse for 3 consecutive years shall be prima facie evidence of abandonment.  "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark.  Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The term "colorable imitation" includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive.

The term "registered mark" means a mark registered in the United States Patent and Trademark Office under this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, or the Act of March 19, 1920.  The phrase "marks registered in the Patent and Trademark Office" means registered marks.

\* \* \* \* \*

A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.

\* \* \* \* \*

183a

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

\* \* \* \* \*